Of Counsel:

LUNG ROSE VOSS & WAGNILD

CRYSTAL K. ROSE          3242-0
(*crose@legalhawaii.com*)
Attorney at Law
A Law Corporation
RYAN H. ENGLE            7590-0
(*rengle@legalhawaii.com*)
Attorney at Law
A Law Corporation
GRANT FASI ALLISON       10368-0
(*gallison@legalhawaii.com*)
Topa Financial Center
700 Bishop Street, Suite 900
Honolulu, Hawaii 96813
Telephone: (808) 523-9000
Facsimile: (808) 533-4184

Attorneys for Plaintiffs
MARTIN DEFENSE GROUP, LLC
AND NAVATEK HOLDINGS LLC

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARTIN DEFENSE GROUP, LLC, AND NAVATEK HOLDINGS LLC ) | CASE NO. _____ |
| ) | |
| ) | COMPLAINT; DEMAND FOR |
| Plaintiffs, ) | JURY TRIAL; SUMMONS |
| ) | |
| vs. ) | |
| ) | |
| MARTIN KAO; TIFFANY JENNIFER ) | |
| LAM a.k.a. JENNY LAM and/or ) | |
| TIFFANY KAO; LAWRENCE ) | |
| KAHELE LUM KEE; CLIFFORD ) | (*Caption continued on next page.*) |
| CHEN; GARY AMBROSE; DUKE ) | |

HARTMAN; SOCIETY OF YOUNG            )
WOMEN SCIENTISTS AND                 )
ENGINEERS LLC,                       )
                                     )
              Defendants.            )
_____      )

## COMPLAINT

Plaintiffs MARTIN DEFENSE GROUP, LLC, and NAVATEK

HOLDINGS LLC, by and through its attorneys, Lung Rose Voss & Wagnild,

asserts the following Complaint against Defendants MARTIN KAO, TIFFANY

JENNIFER LAM a.k.a. JENNY LAM and/or TIFFANY KAO, LAWRENCE

KAHELE LUM KEE, CLIFFORD CHEN, GARY AMBROSE, DUKE

HARTMAN, and SOCIETY OF YOUNG WOMEN SCIENTISTS AND

ENGINEERS LLC, and alleges and avers as follows:

## INTRODUCTION

1.      Plaintiffs Martin Defense Group, LLC, and Navatek Holdings

LLC, bring this case against Defendant Martin Kao, his wife, Tiffany Lam, and a

gang of conspirators engaged in a complex racketeering scheme aimed to loot the

resources of a venerable engineering firm.  Rewarding themselves with ill-gotten

Federal Payment Protection Program ("PPP") funds, the conspirators constructed a

web of money laundering, shell entities, and unauthorized transfers in a brazen

attempt to perpetuate their fraud and illegal activity. Plaintiffs now seek

reimbursement against the Defendants for these malevolent acts.

2

1090142.14

## THE PARTIES AND THE PROPERTIES

2.     Plaintiff MARTIN DEFENSE GROUP, LLC ("MDG" or the "Company") is, and at all times relevant was, a Hawaii limited liability company doing business in the State of Hawaii.

3.     MDG is an entity primarily involved in the business of providing engineering and related services to the United States government.

4.     Plaintiff NAVATEK HOLDINGS, LLC ("Navatek Holdings") is, and at all times relevant was, a Hawaii limited liability company doing business in the State of Hawaii.

5.     MDG and Navatek Holdings are sometimes hereinafter collectively referred to as "Plaintiffs."

6.     On information and belief, Defendant MARTIN KAO ("Defendant Kao") is and was at all times relevant herein a resident of the State of Hawaii.

7.     On information and belief, Defendant JENNIFER TIFFANY LAM,  a.k.a. JENNY LAM and/or TIFFANY KAO ("Defendant Tiffany Lam" or "Defendant Lam") is and was at all times relevant herein a resident of the State of Hawaii.

1090142.14

8.    On information and belief, Defendant CLIFFORD CHEN ("Defendant Chen") is and was at all times relevant herein a resident of the State of Hawaii.

9.    On information and belief, Defendant LAWRENCE KAHELE LUM KEE ("Defendant Lum Kee") is and was at all times relevant herein a resident of the State of Hawaii.

10.    On information and belief, Defendant DUKE HARTMAN ("Defendant Hartman") is and was at all times relevant herein a part-time resident of the State of Hawaii and a current resident of the State of South Carolina.

11.    On information and belief, Defendant GARY AMBROSE ("Defendant Ambrose") is and was at all times relevant herein a resident of the State of Oklahoma.

12.    On information and belief, Defendant SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC ("SYWSE") is and was at all times relevant a limited liability company organized under the laws of the State of Hawaii.

13.    The following persons are collectively referred to as the "Defendants" or "Co-conspirators" and may sometimes be individually referred to as a "Defendant": (i) Martin Kao, (ii) Tiffany Lam (iii) Clifford Chen, (iv) Lawrence Lum Kee, (v) Duke Harman, (vi) Gary Ambrose, and (vii) SYWSE.

4

JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and under 18 U.S.C. § 1964 for claims alleged against Defendants that violate and/or arise from conduct described in 18 U.S.C. § 1962.

15.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over state law claims alleged herein because such claims are so related to and form part of the same case and controversy as MDG's Racketeer Influenced and Corrupt Organizations ("RICO") claims asserted against Defendants.

16.     Venue in the District of Hawaii is proper under 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because the Court possess personal jurisdiction over one or more Defendants that reside in the State of Hawaii and/or maintain traditional minimum contacts with the State of Hawaii, there is no other district in which a court would have personal jurisdiction over all co-conspirator Defendants, and the facts show a nationwide RICO conspiracy exists.

FACTUAL BACKGROUND
RELEVANT TO ALL CLAIMS

A.     Relationships Between Co-conspirators and Parties

17.     Defendant Kao is the architect and driving force behind the illegal conduct and pattern of racketeering conduct committed by the Defendants and Co-conspirators.

1090142.14

18.     Defendant Tiffany Lam is, and was during all relevant periods, Defendant Kao's wife.

19.     Defendant Kao was a former employee and member of Plaintiff MDG.

20.     Defendant Kao first became employed by MDG in or around 2008 and eventually became MDG's Chief Executive Officer ("CEO") and managing-member.

21.     Defendant Kao was disassociated from MDG and all direct ties between MDG and Defendant Kao were severed on or around November 23, 2021 because a Final Arbitration Award, also dated November 23, 2021, ordered the severing of any such direct relationship or association.

22.     Defendants Chen, Lum Kee, Hartman, and Ambrose were also employees of MDG who were hired and/or appointed to their positions with MDG by or under Defendant Kao in his role as CEO and manager of MDG and served in their respective roles from approximately January 2019 until January 2021 (hereinafter, the "Relevant Period").

23.     Defendant Chen served as MDG's Chief Financial Officer ("CFO") from the approximate time period of January 2019 until January 2021, and in that role was appointed as an officer of MDG.

6

24.     Defendant Ambrose was MDG's Chief Operating Officer ("COO") starting in or around June 2020, and in that role was appointed as an officer of MDG.

25.     Defendant Hartman was MDG's Vice President of Business Development and Vice President of Strategic Partnerships.

26.     During the Relevant Period, Defendant Hartman reported directly to MDG's COO, Defendant Ambrose, and at various times worked directly with Defendant Kao and Defendant Chen with respect to the pattern of racketeering and conspiracy alleged herein.

27.     Defendant Lum Kee was hired by Defendant Kao and Defendant Chen in or around May 2019 and, within months, was appointed to be MDG's "Controller."

28.     Defendant SYWSE is and was, during the relevant period, a shell company created by Defendants Kao, Chen, Lum Kee, and Tiffany Lam to carry out and assist in their pattern of racketeering activity as alleged in this Complaint.

29.     Defendant SYWSE was an alter ego of Martin Kao and Tiffany Lam, who was the sole member and manager of SYWSE and failed to uphold proper corporate governance of SYWSE.  Defendants Kao and Lam operated SYWSE as a fiction, co-mingled MDG funds with those of SYWSE, and used

7

SYWSE to illegally obscure the true source of their own personal and unlawfully obtained payments and money.

30.    The close nature of the family relationships and the manner in which Defendant Kao hired the Co-conspirators to create loyalties and allegiances among the Co-conspirators and in favor of Defendants Kao and Tiffany Lam is what enabled the fraud, pattern of racketeering, and conspiracy to flourish.

B.    Defendant Chen's Fiduciary Duties

31.    As the Company's CFO during the Relevant Period, Defendant Chen was responsible for, among other things, directing the fiscal functions of the Company in accordance with generally accepted accounting principles issued by the Financial Accounting Standards Board, the Securities and Exchange Commission, and other regulatory and advisory organizations and in accordance with financial management techniques and practices appropriate within the industry.

32.    As the Company's CFO during the Relevant Period, Defendant Chen was also responsible for supervising the Company's controller and the indirect supervision of all employees in the accounting and finance department.

33.    Prior to joining the Company, Defendant Chen brought with him a deep and sophisticated background and understanding of the law, legal fiduciary duties, and general accounting principles, having worked for years in

1090142.14

investment banking, serving as the former treasurer for Hawaiian Electric

Industries from July 2015 to June 2018, receiving his undergraduate degree (AB)

from Harvard, his law degree (JD) from the University of Michigan, and his

business (MBA) degree from the University of Chicago Graduate School of

Business (Booth) with a concentration in finance and accounting.

34.     By reason of his position as CFO and officer of the Company

during the Relevant Period, and because of his ability to control the accounting and

financial affairs of the Company during Relevant Period, Defendant Chen owed

the Company fiduciary obligations of good faith, loyalty and care, and was

required to use his utmost ability to control and manage the accounting and

financial affairs of the Company in a fair, just, honest and equitable manner.

35.     Defendant Chen was required at all times during the Relevant

Period to act in furtherance of the best interests of Company and its members and

not in furtherance of his, or any other individual or entity's, personal interest or

benefit.

36.     To faithfully discharge these duties, Defendant Chen was also

required to exercise undivided, unselfish and unqualified loyalty**,** unceasing effort

never to profit personally at the Company's expense, and an unbending disavowal

of any opportunity which would permit his private interests to clash with those of

the Company, including but not limited to the following:

a.      Exercise good faith in preparing and/or supervising the

preparation, filing and/or dissemination of financial statements, audits, reports,

employment, accounting, or other information required by law, and in examining

and evaluating any reports, filings, submissions, or examinations, audits, or other

employment or financial information concerning the Company; and

b.      Refrain from unduly benefiting himself and other

Company insiders or third parties at the expense of the Company.

C.     <u>Defendant Ambrose and Hartman's Fiduciary Responsibilities</u>

37.     As the Company's COO during the Relevant Period, Defendant

Ambrose was responsible for, among other things, implementing and overseeing

the Company's general operating and business operations that were typical of a

chief operating officer.

38.     Defendant Hartman served as the Vice President of Business

Development and Vice President of Strategic Partnerships for the Company during

the Relevant Period and was responsible for, among other things, the overall

performance of the Company's portfolio of programs, business development, and

hiring Washington D.C. political consultants to lobby on the Company's behalf.

10

39.    At all times during the Relevant Period, Defendant Hartman reported directly to the Company's COO, Defendant Ambrose, and at various times worked directly with Defendants Kao, Chen and others on the matters alleged herein.

40.    By reason of his position as COO and officer of the Company during the Relevant Period, and because of his significant operational responsibilities for the Company, Defendant Ambrose owed the Company fiduciary obligations of good faith, loyalty and care, and was required to use his utmost ability to control and manage the operational and business affairs of the Company in a fair, just, honest and equitable manner. Defendant Ambrose was required at all times during the Relevant Period to act in furtherance of the best interests of Company and its members and not in furtherance of his, or any other individual or entity's, personal interest or benefit.

41.    By reason of his position as a Vice President and officer of the Company during the Relevant Period, and because of his significant business and financial responsibilities for the Company, Defendant Hartman owed the Company fiduciary obligations of good faith, loyalty and care, and was required to use his utmost ability to control and manage the operational and business affairs of the Company in a fair, just, honest and equitable manner. Defendant Hartman was required at all times during the Relevant Period to act in furtherance of the best

11

interests of Company and its members and not in furtherance of his, or any other individual or entity's, personal interest or benefit.

42.    To faithfully discharge these duties, Defendants Ambrose and Hartman were also required to exercise undivided, unselfish and unqualified loyalty, unceasing effort never to profit personally at the Company's expense, and an unbending disavowal of any opportunity which would permit their private interests to clash with those of the Company, including but not limited to the following:

a.    As to Defendant Ambrose, exercising good faith in preparing, reviewing, and/or supervising the preparation, filing and/or dissemination of all operational, financial, and business matters pertaining to or concerning the Company;

b.    As to Defendant Hartman, exercising good faith in managing and overseeing the overall performance of the Company's portfolio of programs, business development, and engaging Washington D.C. political consultants to lobby on the Company's behalf; and

c.    As to both Defendants Ambrose and Hartman, refraining from unduly benefiting themselves and other Company insiders or third parties at the expense of the Company.

1090142.14

### The Co-conspirators' Conduct in Defrauding,
### Conspiring, Aiding and Abetting, and Stealing MDG's Assets

43.    All of the actions of Defendants set forth herein were

fraudulent, intentional, malicious, part of a pattern of racketeering activity, and/or

in violation of federal and state laws.

44.    Defendant Chen's actions were also in direct violation of his

fiduciary duties owed to the Company.

45.    Defendant Chen and Defendant Kao, the Company's indicted

former manager and chief executive officer, hired Defendant Lum Kee in May of

2019 and, within months, appointed him as the Company's "Controller" with

authority to sign checks for the Company, and to manage and assess the financial

health and needs of the Company, among other financial and monetary

responsibilities.

46.    As MDG's controller, with access and control over the

Company's checkbook, accounts, and management responsibilities over the

Company's financial health, Defendant Lum Kee owed fiduciary duties to the

Company.  Defendant Lum Kee's fiduciary obligations owed to MDG included,

but was not limited to, good faith, loyalty and care, and he was required to use his

utmost ability to control and manage the financial and bookkeeping affairs of the

Company in a fair, just, honest and equitable manner. Defendant Lum Kee was

required at all times during the Relevant Period to act in furtherance of the best

13

interests of Company and its members and not in furtherance of his, or any other individual or entity's, personal interest or benefit.

47.    Defendant Chen was appointed in his role as the Company's CFO by Defendant Kao, and Defendant Lum Kee was appointed in his role as the Company's Controller by Defendant Chen and Kao, so as to allow the three of them (Defendant Kao, Defendant Chen, and Defendant Lum Kee) to take complete financial control over the Company, its accounts, accounting, and its financial dealings, and to engage in the various frauds alleged herein, all to ensure they could do so with no scrutiny or direct oversight by superiors.

48.    Upon information and belief, Defendant Ambrose was hired by Defendants Kao and Chen, and was appointed as the Company's COO by Defendant Kao, which helped Defendants Kao and Chen ensure further loyalties and avoid unwanted scrutiny concerning all matters of oversight by the Company's chief operational officer.

49.    Defendant Tiffany Lam, Defendant Kao's wife during the Relevant Period, while not hired as an employee of the Company, was given access to the Company's credit cards, accounts and assets for her personal use (and the personal use of others) by Defendant Kao, Defendant Chen, Defendant Ambrose, and/or Defendant Lum Kee.

1090142.14

## The PPP Fraud

50.    Beginning in March 2020, Defendant Chen knowingly and fraudulently conspired with Defendants Kao and Lum Kee in using the Company to commit federal bank fraud and money laundering in connection with the CARES Act Paycheck Protection Program ("PPP Program"), which conduct included, among other things, making knowing false misrepresentations in the Company's federal loan applications to various financial institutions under the PPP Program and unlawfully aiding and abetting Defendant Kao in using the ill-gotten loan proceeds from the PPP Program for Defendant Kao's personal use, all in violation of Title 18 United States Code ("U.S.C.") §§ 1344 and 1957.

51.    As a federal contractor working primarily on cost plus contracts, the Company's payroll was already funded by the Federal Government, disqualifying the Company from loan forgiveness under the PPP Program, which would otherwise constitute double-dipping.

52.    Defendant Chen knowingly misused the Company to defraud the United States Government out of millions of dollars through a scheme whereby Defendant Chen conspired with Defendants Kao and Lum Kee in purposefully misrepresenting the Company's staff and payroll figures in order to fraudulently obtain inflated PPP loans from the United States government under the PPP Program.

15

1090142.14

53.    Because Defendant Chen knew and understood that it was illegal for an entity to receive multiple PPP loans or total PPP Loans in excess of $10M, Defendant Chen advised Defendant Kao that "we would need another bank with idiots running it and weak verification capabilities" in order to be awarded multiple loans.

54.    Because the law only allowed one PPP loan per company, Defendant Chen conspired with Defendants Kao and Lum Kee to illegally obtain two PPP loans, one for $10M and a second for $2.8M, and sought to obtain a third illegal PPP loan for over a million.

55.    Thus, not only was the initial $10M PPP Loan illegally obtained through false and fraudulent statements, but the subsequent second and third PPP Loans were illegal on their face because they exceeded both the $10M and one-loan limits.

56.    In recognition of the illegality of their conduct and after the third bank declined to offer a PPP loan, Defendant Kao angrily lamented to Defendant Chen and Lum Kee that the bank had gotten "the better of us."

57.    Defendant Hartman also masterminded a fraudulent PPP scheme involving the immediate signing bonuses of over $100,000 for the Company's new hires in Oklahoma, which signing bonuses were later

1090142.14

mischaracterized as vacation payments in order to illegally charge those expenses against the PPP loan proceeds in violation of the PPP Program.

58.    In support of Defendant Hartman's PPP scheme, Defendants Chen and Lum Kee authorized and effectuated immediate vacation payments of over $100,000 for the Company's new hires in Oklahoma, mischaracterizing them as vacation payments instead of signing bonuses in order to illegally charge those expenses against the PPP loan proceeds in violation of the PPP Program.

59.    Upon information and belief, Defendant Ambrose knowingly and improperly received $50,000 of the mischaracterized "vacation payments" from the Company upon his hiring in 2020, through the PPP scheme orchestrated by Defendants Chen and Hartman, all in violation of the PPP Program.

60.    As a result of Defendant Chen's, Defendant Lum-Kee's, Defendant Hartman's, and Defendant Ambrose's foregoing fraud and misconduct, individually and/or conspiring together in violating the PPP Program, and by Defendants Chen and Lum-Kee in aiding and abetting Defendant Kao in defrauding the United States Government under the PPP Program, criminal charges were brought by the United States Department of Justice ("DOJ") against Defendant Kao on September 29, 2020 and a subsequent indictment was filed against Defendant Kao on May 6, 2021 (collectively, the "PPP Fraud").

1090142.14

61.    In addition, Defendant Kao received written notice from the Department of the Navy on October 23, 2020 that he was suspended (and subsequently disbarred) "from Federal Government contracting and from directly or indirectly receiving the benefits of Federal assistance programs."

62.    The October 23, 2020 written suspension from Federal Government contracting made clear that "it is effective this date [October 23, 2020] throughout the Executive Branch of the Federal Government . . . You are excluded from conducting business with the Government as an agent or representative of other contractors."

63.    Accordingly, and as a result of the PPP Fraud, Defendant Kao was no longer able to participate in Federal Government contracting and any continued association between Defendant Kao and Plaintiffs would risk Plaintiffs' business.

64.    As a further result of said Defendants' PPP Fraud, MDG was damaged by, potentially having to repay the federal government for PPP proceeds, having its assets seized, and causing MDG to liquidate its investment accounts and forego future profits and investment proceeds, all while decimating its investment portfolio.

1090142.14

## Campaign Finance Fraud

65.    Defendants, together with Defendant Kao, conspired, orchestrated and engaged in an elaborate pay-to-play campaign finance scheme whereby the Company paid thousands of dollars (either checks or Company American Express cards) to federal candidates through third parties, including the Society of Young Women Scientists and Engineers ("SYWSE"), Defendant Chen, Defendant Lum Kee, Defendant Tiffany Lam, and several of their respective relatives (collectively, the "Campaign Finance Fraud"). This was despite the advice and counsel of high-powered Washington D.C. political consultants, to whom the Company paid millions, who strongly advised the Company against improper and/or illegal activities. Defendant Kao methodically orchestrated pay for play contributions to "get a Big Mac 100% of the time."

66.    Defendants' Campaign Finance Fraud was initially investigated by the Federal Bureau of Investigation ("FBI") in a criminal probe that resulted in an FBI search warrant for Defendants Chen and Defendant Kao, which warrant sets forth many of the sworn facts related to Defendants' criminal scheme.

67.    Indeed, Defendants Kao, Chen, Lum Kee, and Tiffany Lam devised a plan to create a shell entity, SYWSE, that would be "super vague and difficult to get any background info on." Through SYWSE, they could receive and funnel monies improperly taken from MDG and cover-up the true source of the

19

monies by using SYWSE as a middleman in their improper and illegal money laundering scheme.

68.    Defendants' Campaign Finance Fraud contributions included, without limitation: (a) federal contributions in the name of Defendant Tiffany Lam for tens of thousands of dollars in 2019 and 2020; (b) federal contributions in the name of Defendant Chen for thousands of dollars in 2019; (c) federal contributions in the name of Defendant Lum Kee for thousands of dollars in 2019; (d) federal contributions in the name of relatives of Defendant Lum Kee and Defendant Chen for thousands of dollars in 2019; and (e) federal contributions in the name of relatives of Defendant Tiffany Lam for tens of thousands of dollars in 2019.

69.    In September 2019, checks were written from the Company's bank account to Defendant Chen and Defendant Lum Kee, the same day that Defendant Chen's mother and Defendant Lum Kee's wife donated to Senator Collins' campaign. Within a week, Defendant Chen wrote his mother a check for the same amount she contributed to Senator Collins. Defendant Chen's mother later told law enforcement that Defendant Chen gave her money and asked her to donate it to the Collins for Senator campaign committee, which she did.

70.    As a government contractor, MDG is prohibited from making political contributions to federal politicians and their campaigns pursuant to 52

20

U.S.C. § 30119.  Additionally, 52 U.S.C. § 30122 prohibits political contributions in the name of another person.

71.    Defendants' Campaign Finance Fraud scheme was in violation of 52 U.S.C. § 30119, prohibiting political contributions by a government contractor, as well as 52 U.S.C. § 30122, prohibiting political contributions in the name of another person.

72.    Additionally, Defendant Tiffany Lam, together with Defendants Kao, Lum Kee, and Chen, orchestrated an illegal $150,000 campaign contribution from MDG to a political action committee (1820 PAC) supporting United States Senator Susan Collins in violation of 52 U.S.C. §§ 30119 and 30122.  The illegal contribution(s) to 1820 PAC occurred through an elaborate scheme by Defendants Kao, Chen, Lum-Kee, and Defendant Tiffany Lam, whereby they formed SYWSE in 2019 to launder money from MDG, into and through SYWSE, and ultimately to 1820 PAC.

73.    On November 22, 2019, Kao, Chen, and Lum Kee, in their roles as MDG's financial managers and bookkeeper, caused MDG to open a P.O. Box in the name of SYWSE in Honolulu, Hawaii, and that P.O. Box served as SYWSE's mailing address.

74.    SYWSE was formed using MDG's funds through a Company American Express credit card issued to and used by Defendant Tiffany Lam.

1090142.14

75.    Defendant Tiffany Lam, a certified public accountant with a clear understanding of the consequences of her actions pertaining to SYWSE and the Company, was appointed as the sole member, manager and decision-maker for SYWSE.

76.    On December 26, 2019, Defendants Kao, Chen, and Lum Kee, in their roles as MDG's financial managers and bookkeeper, caused MDG to write a check signed by Defendant Lum Kee in the amount of $150,000, made payable to SYWSE, and recorded the payment as a "loan to Kao" in the accounting records of MDG.

77.    On December 27, 2019, SYWSE deposited the $150,000 check from MDG, which was SYWSE's first deposit into a Central Pacific Bank account initially created by Defendant Tiffany Lam two weeks earlier on December 10, 2019 (the "CPB Account"). Defendant Tiffany Lam was designated as the sole authorized signatory for the CPB Account.

78.    On December 27, 2019, SYWSE wrote a check to "1820 PAC" in the amount of $150,000, signed by Defendant Kao, who was not an authorized signatory on SYWSE's CPB Account.

79.    The December 27, 2019 check in the amount of $150,000 to 1820 PAC was rejected because Defendant Kao was not an authorized signatory for the SYWSE Account.

80.    Defendant Tiffany Lam subsequently signed a replacement $150,000 check from SYWSE to 1820 PAC after the initial $150,000 check signed by Defendant Kao was rejected.

81.    The contributions from MDG to SYWSE, and then from SYWSE to 1820 PAC were illegal because they illegally funneled MDG's monies to a federal politician (1820 PAC) by washing MDG's funds through SYWSE, in violation of 52 U.S.C. §§ 30119 and 30122.

82.    After making the illegal contributions from MDG through SYWSE to 1820 PAC, and after being named in a Federal Election Commission complaint on February 2, 2020 concerning the illegal political campaign contribution to 1820 PAC, Defendant Tiffany Lam in concert with Defendants Kao, Lam, Chen, Lum-Kee, and Hartman sought to whitewash SYWSE's illegal deeds and legitimize its purpose by issuing a series of scholarships to various universities around the country starting in 2020.

83.    Defendant Tiffany Lam, in concert with Defendants Kao, Chen, Lum Kee, and Hartman created the SYWSE scholarship program for the primary purpose of attempting to cover up SYWSE's criminal misconduct, and did so only after making the illegal $150,000 campaign contribution to 1820 PAC and coming under criminal and/or administrative scrutiny.

84.     As a result of Defendants Lam, Kao, Chen, Lum-Kee, and

Hartman's foregoing misconduct in conspiring together to commit campaign

finance fraud, and in aiding and abetting Defendant Kao in doing so, a federal

indictment was filed by the DOJ against Defendants Kao, Chen, and Lum-Kee on

February 9, 2022 for violations of federal campaign finance laws and for making

false statements in connection with federal political campaigns, among other

criminal charges (collectively, the "Campaign Finance Fraud").

## Foundation Fraud

85.     Defendants also conspired to cause the Company to pay for

multiple personal expenses through illegal donations to the Marty & Mickey Kao

Foundation and the Navatek Foundation, organizations controlled by Defendant

Tiffany Lam, Defendant Kao and/or their family members. The Marty & Mickey

Kao Foundation is a Kao-family-run nonprofit formed in January 2019 with the

purported mission of expanding educational opportunities for children.

86.     Defendants Chen and Lam illegally conspired with Defendant

Kao in causing MDG to make improper donations to the Marty and Mickey Kao

Foundation, which monies were later illegally funneled to pay for, among other

improper expenditures, Defendant Chen's personal expenses, including his

children's tuitions.

24

87.    Defendant Chen conspired with Defendant Kao for MDG to make "donations" to the Marty and Mickey Kao Foundation which were subsequently used to pay Honolulu Waldorf School and Iolani School for Defendant Chen's children's tuition in amounts totaling at least $125,058.

88.    Upon information and belief, Defendant Chen also conspired with Defendant Kao for MDG to make "donations" to the Marty and Micky Kao Foundation which were likewise used to pay tuitions for Company executives' children in amounts to be proven at trial (collectively, as set forth in the foregoing paragraphs (the "Foundation Fraud").

89.    Upon information and belief, Defendants Kao and Tiffany Lam also conspired and caused approximately $370,000 of MDG's funds to be transferred to the Marty & Mickey Kao Foundation.

### Defendant Chen, Lum Kee, and Ambrose's Wrongful Transfer of MDG's Assets

90.    In September 2020, Defendants Chen and Lum Kee conspired with Defendant Kao to illegally assign all, or substantially all, of the Company's property to an entity formed by the name MDG NEWCO, LLC ("NEWCO") (the "NEWCO Fraud").

91.    No consent from the other member of MDG, Navatek Capital, Inc. ("NCI"), was obtained for the NEWCO transfer agreements that were contemplated, and the planning for them and drafting of the agreements to effect

1090142.14

the NEWCO transfer were intentionally done through Defendant Kao and Defendants Chen and Lum Kee in secret and with the express purpose of leaving behind an "empty shell."

92.     The legal expenses for the attempted illegal transfer of the Company's assets to NEWCO were in the tens of thousands of dollars.

93.     Almost immediately following the NEWCO Fraud, in early October 2020, and while serving as the Company's COO, Defendant Ambrose conspired with Defendants Chen and Lum-Kee in seeking to improperly and illegally cause the Company to pay monies to assign valuable Company contracts to an entity by the name of Advanced Unmanned Aerospace LLC ("AUA"), a company which Defendant Ambrose partially owned (the "AUA Fraud" and, collectively with the NEWCO Fraud, the "Illegal Transfer Fraud").

94.     The proposed payment by MDG to assign valuable contracts to AUA was not only against MDG's best interests, but the proposed assignment constituted an attempted self-dealing transaction by Defendant Ambrose, who stood to personally profit from the assigned contracts as a part owner of AUA.

95.     No notice was provided, nor consent obtained from the other member of MDG, Navatek Capital Inc., for the AUA transfer agreements that were contemplated, and the planning for them and drafting of the agreements to effect

26

the AUA transfer were intentionally done through Defendants Ambrose, Chen, and Lum Kee in secret.

96.     The legal expenses for the attempted illegal transfer of the Company's assets to AUA were in the thousands of dollars.

### Defendant Kao and Defendant Tiffany Lam's
### Theft of MDG's Property to Purchase the Kahala Property

97.     On or about April 20, 2020, Defendant Kao caused MDG to deposit $2,000,000 from MDG's account into his personal account and subsequently caused MDG to document the transfer as a note receivable (the "Purported $2M Loan").

98.     The Purported $2M Loan constituted a transaction between MDG and Defendant Kao that was not at arm's length.  Accordingly, as manager, Defendant Kao lacked the authority to approve the Purported $2M Loan without the unanimous written consent of all members, including NCI.

99.     NCI, the other member of MDG, did not provide its written consent to Defendant Kao receiving the Purported $2M Loan.

100.    Upon information and belief, in April 2020, very shortly after improperly transferring the $2,000,000 from MDG into his personal account, Defendants Kao and Defendant Tiffany Lam fraudulently used $1,546,381 of those stolen MDG funds to purchase real property located at 4900 Kahala Avenue, Honolulu, Hawaii, Tax Map Key (TMK) No. (1) 3-5-008-001 (the "Kahala

27

Property") and Defendant Kao co-mingled the remaining balance of the $2,000,000 with his personal accounts and investments.

101.    Defendants Kao and Defendant Tiffany Lam fraudulently transferred the stolen $1,546,381 into the Kahala Property with the actual intent to hinder, delay, and/or defraud MDG.

102.    In March 2021, MDG issued a demand for Defendant Kao to repay the Purported $2M Loan, among other amounts stolen from MDG by Defendant Kao.

103.    To date, Defendant Kao has refused to repay the Purported $2M Loan, and Defendants Kao and Defendant Tiffany Lam continue to own the Kahala Property.

## Defendant Hartman's Breach of Contract and Bad Faith

104.    On or about February 19, 2021, MDG agreed to pay a limited advancement of $15,000 to Holland & Knight LLP for legal fees and expenses on behalf of Defendant Hartman ("Defendant Hartman's Retention Advance").

105.    MDG's payment of Defendant Hartman's Retention Advancement was agreed by both Defendant Hartman and MDG to be subject to the representations and warranties made by Defendant Hartman in his February 24, 2021 letter to MDG requesting for the retention advance (the "Defendant Hartman's Reps and Warranties Agreement").

1090142.14

106.    Among other representations and warranties, Defendant Hartman's Reps and Warranties Agreement stated that "I have at all times acted in good faith, without active or deliberate dishonesty, and in a manner I reasonably believed to be in or not opposed to the best interests of the Company...  I did not receive any improper personal benefit in money, property, or services as a result of the acts or omissions alleged."

107.    Defendant Hartman's Reps and Warranties Agreement further stated that "I make the following representations based upon my personal, good faith belief in their truth as part of a formal request for indemnification and advanced reimbursement of expenses pursuant to the laws of the State of Hawaii concerning Indemnification."

108.    Defendant Hartman's Reps and Warranties Agreement agreed that "[i]n consideration of the Company's agreement to reimburse my actual and reasonable expenses incurred in connection with the Investigation, and for other lawful consideration, the receipt of which are hereby acknowledged, I agree that, if it is ultimately determined I was not eligible, or no longer am eligible, to receive indemnification, then the Company will no longer be obligated to advance reimbursement and, in addition, I will repay any and all amounts reimbursed and advanced to me, or paid on my behalf, by the Company."

1090142.14

109.   Defendant Hartman's misconduct alleged herein was not in good faith, was dishonest, and was not in the best interests of the Company.

110.   Defendant Hartman's misconduct alleged herein included the receipt of improper personal benefits in money, property, or services from MDG.

## Other Thefts and Damages Caused by the Co-conspirators

111.   Defendant Chen, Defendant Lum Kee, and Defendant Tiffany Lam also caused the Company to improperly pay for their personal expenses, including legal expenses (collectively, as set forth herein, and such other similar acts to be proven at trial, the "Personal Expense Fraud").

112.   Defendant Chen caused MDG to pay tens of thousands of dollars for his personal legal fees and expenses to his personal attorney, Braswell Fujioka-Lilley.

113.   Defendant Chen and/or Defendant Lum Kee also caused MDG to pay thousands of dollars for Defendant Lum Kee's personal legal fees and expenses to his personal attorney, MK Law, LLC.

114.   Defendant Tiffany Lam, although not an employee of MDG during the Relevant Period, charged numerous personal expenses through a Company American Express credit card in addition to orchestrating other non-business related payments by the Company to other third parties.

30

115.    Defendant Chen's transgressions and illegal misconduct also caused MDG to expend millions of dollars in legal expenses to address MDG's executive officer transgressions.

## The Co-conspirators' Pattern of Racketeering Activity

116.    MDG is a "person" as that term is defined by 18 U.S.C. § 1967 *et seq.* (the "RICO Act").

117.    MDG is primarily engaged in the business of providing engineering and related services to the United States government and, during all times relevant herein, MDG had offices and employees in numerous states, including Hawaii, Maine, Michigan, Oklahoma, South Carolina, and Rhode Island.

118.    As such, the conduct of the Defendants and Co-conspirators affected interstate commerce by, among other ways, the following: defrauding MDG, using illegally obtained funds to operate MDG, paying MDG's employees across numerous states with the ill-gotten funds, stealing MDG's money and using it for illegal campaign contributions through SYWSE, and using MDG's accounts to launder the monies and hide the unlawful activities.

119.    The Defendants and Co-conspirators engaged in a pattern of racketeering activity as described herein and in violation of the RICO Act.

31

120.  The Defendants and Co-conspirators comprised an "enterprise" in fact and through their associations with each other and with MDG, as that term is defined by the RICO Act.

121.  To the extent MDG was part of the "enterprise," MDG was merely a passive participant and the victim of the Defendants' unlawful conduct.

122.  MDG was damaged by the Co-conspirators' pattern of racketeering activity.

123.  The PPP Fraud comprised numerous instances of racketeering committed by Defendants Kao, Chen, Lum Kee, Ambrose, and Hartman.

124.  The PPP Fraud's numerous instances included the fraudulent and unlawful application and receipt of a PPP loan for $10M, the unlawful application and receipt of a second PPP loan for $2.8M, and the submission of an application and attempt to obtain a third PPP loan for more than $1M.

125.  These unlawful and fraudulent PPP Loan applications were submitted in or around the time period from March 2020 through May 2020 and were submitted, approved, and made with the express knowledge of Defendants Kao, Chen, and Lum Kee.

126.  In or around the same period, from March 2020 through May 2020, Defendants Kao, Chen, Lum Kee, and Hartman exchanged emails with one

another for the purpose of committing the PPP Fraud and, eventually, for the

purpose of covering up the PPP Fraud.

127.   Upon information and belief, in or around the same period,

from March 2020 through May 2020, Defendants Kao, Chen, and Lum Kee

drafted, signed, approved, and sent documents to financial intuitions that contained

purposely false statements and information intended to trick those institution into

approving PPP loans.

128.   These attempts to illegally obtain PPP loans constitute

racketeering activity because they are violations of 18 U.S.C. § 1344.

129.   These attempts to illegally and fraudulently obtain PPP loans

involved mail fraud because the Co-conspirators sent and received mail to and

from the financial institutions involved that contained falsified and fraudulent

information as part of the scheme and in violation of 18 U.S.C. § 1341.

130.   These attempts to illegally and fraudulently obtain PPP loans

involved wire fraud because the Co-conspirators sent and received electronic mail

("email") to and from financial intuitions as well as other MDG employees (who

were not involved in the scheme), and the purpose of these emails was to

perpetuate the fraud, cover-up the fraud, and effectuate the racketeering activity, all

in violation of 18 U.S.C. § 1343.

1090142.14

131.    Defendants Chen and Hartman's conduct in using the ill-gotten PPP monies to pay signing bonuses for MDG's new hires and then mischaracterizing those amounts as vacation payments to illegally charge those expenses against the PPP loan proceeds was another instance of racketeering activity in that it constituted: (i) fraud on the financial institutions that issued the PPP loans in violation of 18 U.S.C. § 1344; (ii) mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343; (iii) money laundering activity in violation of 18 U.S.C. § 1956; and (iv) racketeering activity in violation of 18 U.S.C. 1952.

132.    In furtherance of the PPP Fraud scheme, Defendant Kao emailed and threatened the financial institution with which the Co-conspirators applied for the $10M PPP loan.

133.    In doing so, Defendant Kao told the financial institution that he had close relationships with numerous members of the United States Congress, specifically including high-ranking Senators, and that he would contact these influential law makers and expose the financial institution if the fraudulent PPP application was not immediately approved.

134.    In doing so, Defendant Kao committed an act of extortion in violation of the RICO Act.

135.    Further, Defendant Kao's threats and extortions arose from the Campaign Finance Fraud occurring in 2019 or earlier, as well as Defendant Kao's alleged close personal relationship with high-ranking Senators.

136.    The Campaign Finance Fraud involved unlawful political contribution from SYWSE to 1820 PAC that supported a high-ranking Senator.

137.    This unlawful political contribution was for $150,000 that was stolen from MDG in 2019 and transferred to SYWSE by Defendants Kao, Chen, and Lum Kee in their roles as MDG's managers and bookkeeper.

138.    SYWSE was a shell entity that served no legitimate purpose and was incorporated for the sole purpose of acting as a conduit for this (and other) illegal campaign contributions.

139.    Defendant Tiffany Lam was SYWSE's member, manager, and operated SYWSE as her alter ego.

140.    Importantly, Defendant Tiffany Lam was the sole person with authority to sign checks on behalf of SYWSE and, as such, is the person who signed and issued checks on behalf of SYWSE, including the unlawful contributions to 1820 PAC.

141.    By funneling the illegal political contributions through SYWSE, Defendants Kao, Lam, Chen, and Lum Kee obscured or hid the source of

1090142.14

unlawfully obtained monies in violation of 18 U.S.C. § 1956 and engaged in racketeering in violation of 18 U.S.C. § 1952.

142.    Defendants Kao, Lam, Chen, and Lum Kee conspired and caused MDG to make the Purported $2M Loan to Defendants Kao and Lam out of the ill-gotten PPP Loan proceeds.

143.    The Purported $2M Loan was then used by Defendants Kao and Lam to purchase the Kahala Property.

144.    Specifically, on or before April 18, 2020, MDG's account balance in an account held at Central Pacific Bank ("CPB") was $590,596.30.

145.    On or around April 18, 2020, the $10M PPP Loan proceeds were transferred into this account raising the balance to $10,559,952.90.

146.    Sometime shortly thereafter, Defendant Kao instructed Defendant Lum Kee to transfer $2,000,000 of this amount into his personal Merrill Lynch account and Defendant Lum Kee did this on or around April 21, 2020.

147.    In doing so, Defendants Kao, Lam, Chen, and Lum Kee's conduct constituted the following unlawful acts: (i) engaged in a monetary transaction in property derived from unlawful activity in violation of 18 U.S.C. § 1957; (ii) obscured or hid the source of unlawfully obtained monies in violation of 18 U.S.C. § 1956; and (iii) engaged in racketeering in violation of 18 U.S.C. § 1952.

1090142.14

148.   On or around April 24, 2020, Defendant Kao emailed the

Co-conspirators to confirm the pattern of racketeering activity:

> [s]peaking of moving funds around, maybe we should start moving
> slowly more funds out of CPB over the next few months... wash it
> from them, before moving it all back to CPB. That way it looks like
> "new funds". . Is it difficult to change the account that the
> Government pmt systems sends money too? [sic] Can have them send
> to Navatek Merrill account until we exhaust the CPB loan funds
> currently in there? That way it even looks like were using it for
> payroll.

149.   According to this plan set forth in Defendant Kao's April 24,

2020 email, the Co-conspirators "washed" the remaining $8,000,000 of the $10M

PPP Loan by moving the funds from the CPB account into MDG's Merrill Lynch

account before moving the same funds back to the CPB account.

150.   In total, between April 20, 2020 and July 29, 2020, eleven (11)

different monetary transfers were made in which a total of $8,000,000 was moved

from the CPB account to the Merrill Lynch account, and a total of $7,500,000 was

moved from the Merrill Lynch account back to the CPB account.

151.   Each of the eleven (11) transfers for the purpose of "washing"

the millions of ill-gotten monies was a violation of 18 U.S.C. §§ 1956, 1957, and

1952.

152.   On September 29, 2020, Defendant Kao received a demand

letter from Navatek Capital Inc. that related to and made demands to remedy

numerous issues that Defendant Kao had previously ignored or refused.

153.  Later that same day, September 29, 2020, Defendant Chen created a calendar invite for a meeting he titled "Project Palisades" to occur the following day and sent invites to himself, Defendants Kao and Lum Kee, and MDG's then-counsel, Mike O'Malley.

154.  According to marriam-webster.com/dictionary/palisade a "palisade" is "a fence of stakes especially for defense" or "a long strong stake pointed at the top and set close with others as a defense."

155.   This meeting was clearly intended to allow Defendants Kao, Chen, and Lum Kee to coordinate their false stories and lies.

156.  Upon information and belief, the following morning, Defendants Kao, Chen, and Lum Kee, as well as then-counsel Mike O'Malley, were not able to conduct the "Project Palisades" meeting because Defendant Kao was arrested by federal authorities.

157.  In an effort to confuse the public about their misdeeds as officers and executives of MDG, Defendants published a statement about Defendant Kao's arrest on behalf of Navatek LLC, relying on Navatek LLC's status as a "highly reputable company," and causing long-term damage to Navatek LLC's reputation with the public, vendors, and customers.

158.  On October 5, 2020, Defendant Chen sent an email signed with his name and that was copied to Defendant Ambrose that was addressed to

38

Navatek's vendors and covered up the Defendants' fraud and pattern of racketeering.

159.    In the October 5, 2020 email to MDG's vendors, Defendants Chen and Ambrose admitted that Defendant Kao had been arrested for "fraud related to federal coronavirus relief funds[,]" but Defendants Chen and Ambrose fraudulently and falsely claimed that Defendant Kao's arrest was the result of "allegations . . . made by a disgruntled former business associate and an employee who worked at the company less than four months."

160.    The October 5, 2020 email signed by Defendant Chen continues by falsely claiming that the "executive management team, led by Gary Ambrose, continues to move all of our projects forward, while working closely with our clients and employees."

161.    Thus, the October 5, 2020 email contained intentional falsehoods that were clearly intended to shield and obfuscate the roles and conduct of Defendants Kao, Chen, and Ambrose in executing their pattern of racketeering activity.

162.    Finally, to the extent Defendant Kao claims or defends himself on the grounds that certain allegations against him in this Complaint are precluded by the prior Arbitration Award, this Complaint and the RICO claims asserted herein against Defendant Kao are limited to claims expressly reserved by the

1090142.14

Arbitration Award, which expressly includes claims related to or arising from the

Purported $2M Loan and Defendant Kao's conduct and racketeering efforts related

thereto.

## Kao's Refusal to Honor the Restructuring Agreement
## Continues to Damage Navatek Holdings and MDG

163.    Defendant Kao acquired a 20% membership of Navatek

Holdings in or around 2014 and as part of a corporate plan that included various

entities and subsidiaries of, or related to, MDG.

164.    As part of the restructuring plan, Defendant Kao agreed in

August 2018 to relinquish his interest in Navatek Holdings and in exchange,

Defendant Kao received an interest in MDG (which at that time was known as

Navatek LLC).

165.    This agreement is hereinafter called the "Restructuring

Agreement."

166.    Numerous writings and emails between Defendant Kao and

Navatek Holding's other member and manager, and its agents confirmed the

Restructuring Agreement.

167.    As an additional part of this plan, Navatek Holdings (through a

subsidiary) also received an interest in MDG.

168.    Pursuant to the Restructuring Agreement, Defendant Kao

received the agreed upon interest in MDG in or around March 2019, but Defendant

40

Kao refused to relinquish his interest in Navatek Holdings and continues to refuse to do so.

169.   The following two (2) organizational charts show the corporate structure of the relevant entities (1) before the Restructuring Agreement was effective, and (2) the intended organization structure after the Restructuring Agreement was complete wherein Defendant Kao had relinquished his 20% in Navatek Holdings in return for a 99% interest in Navatek, LLC (which became known as MDG).

170.   Organization Before the Restructuring Agreement (the "Before" Chart):



171.   Intended Organization After Completion of the Restructuring

Agreement (the "After" chart):



172.   As illustrated by the "Before" and "After" organizational charts

in the preceding paragraphs, Defendant Kao received a 99% share of the future

profits and losses of MDG (which was at that time called Navatek LLC) and in

exchange, Defendant Kao agreed to relinquish his 20% interest in Navatek

Holdings.

1090142.14

173.   Defendant Kao received the 99% share of future profits and losses of MDG as reflected in the "After" chart and as required by the Restructuring Agreement, but Defendant Kao refused (and continues to refuse) to relinquish the 20% interest in Navatek Holdings – in breach of his agreement to do so.

174.   Defendant Kao justified his refusal to uphold his obligations under the Restructuring Agreement based on alleged tax concerns, consequences, or penalties that he claimed he would face if he relinquished his interests in Navatek Holdings.

175.   Navatek Holdings has since learned that Defendant Kao's excuses and concerns related to his taxes were false.

176.   Specifically, examination of Defendant Kao's personal 2017-2018 tax returns by a CPA shows he did not declare Navatek Holding distributions and only because of these fraudulent actions causes the relinquishing of his NH negative member equity it to become a taxable event.

177.   Therefore, Defendant Kao's rationale for avoiding the already agreed upon and paid-for relinquishment of his shares in Navatek Holdings was the result of his own tax evasion in 2017-2018, has no bearing on his deal to relinquish the 20% Navatek Holdings membership, and was not due or related to any alleged negative tax consequences.

178.    Defendant Kao also continues to hold himself out as an owner or member of MDG through his improperly retained interest in Navatek Holdings.

179.    As a result of Defendant Kao's refusal to relinquish his interest in Navatek Holdings, and as a result of Defendant Kao's continuing representations that he is an owner of MDG, MDG continues to be harmed through this false association.

180.    As stated above, MDG is an entity that provides engineering and related services to the United States government.

181.    In its role as a government contractor, MDG is required to disclose the identity of its members and its ownership structure to the government and the government is permitted to terminate its contracts with MDG under certain circumstances.

182.    Thus, MDG may be required to disclose to the government that Defendant Kao is the 20% member of Navatek Holdings, which owns an interest in MDG.

183.    Due to Defendant Kao's numerous federal indictments stemming from the PPP Fraud and the Campaign Finance Fraud, the government has warned MDG that it must completely sever its relationship with Defendant Kao or all of MDG's federal contracts will be terminated.

1090142.14

184.   Compounding the damage caused by Defendant Kao, he has since attempted to extort Navatek Holdings and/or MDG by demanding payments or money for relinquishment of his interest in Navatek Holdings.

185.   Defendant Kao understands and knows that Navatek Holdings owns and controls MDG.

186.   Defendant Kao understands and knows that Navatek Holdings, through its ownership and control of MDG, is at risk of losing some or substantially all of its business and contracts with the government if and when the government learns of Defendant Kao's ongoing association with MDG through his yet-to-be relinquished 20% membership in Navatek Holdings.

187.    Defendant Kao further understands and knows that he has already agreed to relinquish his interest in Navatek Holdings and his latest monetary demands to do so are unlawful acts of extortion.

188.   Accordingly, Navatek Holdings and MDG are damaged and continue to be damaged by Defendant Kao's conduct as alleged in this Complaint and in refusing to honor the Restructuring Agreement.

<u>COUNT I</u>
(RICO Act Violation – 18 U.S.C. § 1962(c)
Racketeering Activity - Enterprise)

189.   MDG hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Complaint.

1090142.14

190.   This Count is alleged against Defendants Kao, Lam, Chen, Lum Kee, Ambrose, Hartman, and SYWSE, (the "Count I Defendants").

191.   The Count I Defendants, along with MDG, comprised an enterprise whose activities affect interstate commerce.

192.   MDG was a passive member and victim of the enterprise and of the Count I Defendants' racketeering activities.

193.   The Count I Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs, and established and operate the enterprise, through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding MDG as outlined in this Complaint.

194.   Pursuant to and in furtherance of their fraudulent scheme, the Count I Defendants committed multiple related acts including, but not limited to, mail fraud, wire fraud, fraud on a financial institution, extortion, money laundering, and engaging in monetary transactions in property derived from unlawful activity.

195.   The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

196.   The Count I Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

1090142.14

197.   As a direct and proximate result of the Count I Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), MDG has been injured in its business and property in amounts to be proven at trial including but not limited to: (i) loss of dozens of employees costing MDG millions of dollars; (ii) loss of contract funding resulting in lost profits of millions of dollars; (iii) loss of $2,000,000 in the form of the Purported $2M Loan that Defendant Kao has refused to pay back to MDG; (iv) millions of dollars in consulting fees that were rendered worthless to the Company through the Count I Defendants' decision to pursue an alternative illegal pay for play scheme; and (v) millions of dollars in attorneys' fees and costs that have been incurred in numerous legal actions resulting from the Count I Defendants' racketeering activities.

COUNT II
(RICO Act Violation – 18 U.S.C. § 1962(a)
Racketeering Activity – Investments and Money Laundering)

198.   MDG hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Complaint.

199.   This Count is alleged against Defendants Kao, Lam, Chen, Lum Kee, Ambrose, Hartman, and SYWSE (the "Count II Defendants").

200.   The Count II Defendants, along with MDG, comprised an enterprise whose activities affect interstate commerce.

47

201.   MDG was a passive member and victim of the enterprise and of the Count II Defendants' racketeering activities.

202.   The Count II Defendants used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise.

203.   Specifically, the Count II Defendants pattern of racketeering included, but was not limited to, the following: laundering money fraudulently obtained through the PPP Loan program; transferring the ill-gotten monies between bank accounts; using the proceeds to purchase the Kahala Property; using the proceeds to pay amounts to themselves, their friends, and their relatives; using proceeds to pay for their own legal expenses; and using amounts for their own personal benefit.

204.   The Count II Defendants' acts set forth above and in this Complaint constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

205.   As a direct and proximate result of the Count II Defendants' racketeering activities and violations of 18 U.S.C. § 1962(a), MDG has been injured in its business and property in amounts to be proven at trial including but not limited to: (i) loss of dozens of employees costing MDG millions of dollars; (ii) loss of contract funding resulting in lost profits of millions of dollars; (iii) loss of $2,000,000 in the form of the Purported $2M Loan that Defendant Kao has

refused to pay back to MDG; (iv) millions of dollars in consulting fees that were

rendered worthless to the Company through the Count II Defendants' decision to

pursue an alternative illegal pay for play scheme; and (v) millions of dollars in

attorneys' fees and costs that have been incurred in numerous legal actions

resulting from the Count II Defendants' racketeering activities.

COUNT III
(RICO Act Violation – 18 U.S.C. § 1962(d)
Racketeering Activity -Conspiracy)

206.   MDG hereby repeats, realleges, and incorporates herein the

allegations contained in the preceding paragraphs of this Complaint.

207.   This Count is alleged against Defendants Kao, Lam, Chen, Lum

Kee, Ambrose, Hartman, and SYWSE (the "Count III Defendants").

208.   As set forth above, the Count III Defendants agreed and

conspired to violate 18 U.S.C. § 1962 (a).

209.   As set forth above, the Count III Defendants agreed and

conspired to violate 18 U.S.C. § 1962(c).

210.   The Count III Defendants intentionally conspired and agreed to

directly and indirectly use or invest income that is derived from a pattern of

racketeering activity in an interstate enterprise and conducted and participated in

the conduct of the affairs of the enterprise through a pattern of racketeering

activity.

49

211.    The Count III Defendants knew, or should have known, that their predicate acts were part of a pattern of racketeering activity, and agreed to the commission of those acts to further the schemes described above.

212.    This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a) and (c) and in violation of 18 U.S.C. § 1962(d).

213.    As a direct and proximate result of the Count III Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in amounts to be proven at trial including but not limited to: (i) loss of dozens of employees costing MDG millions of dollars ; (ii) loss of contract funding resulting in lost profits of millions of dollars; (iii) loss of $2,000,000 in the form of the Purported $2M Loan that Defendant Kao has refused to pay back to MDG; (iv) millions of dollars in consulting fees that were rendered worthless to the Company through the Count III Defendants' decision to pursue an alternative illegal pay for play scheme ; and (v) millions of dollars in attorneys' fees and costs that have been incurred in numerous legal actions resulting from the Count III Defendants' racketeering activities.

<u>COUNT IV</u>
(RICO Act Violation – 18 U.S.C. § 1962(b)
Kao's Extortion of Navatek Holdings)

214.   Navatek Holdings and MDG hereby repeat, reallege, and incorporate herein the allegations contained in the preceding paragraphs of this Complaint.

215.   This count is alleged against Defendant Kao (the "Count IV Defendant").

216.   Navatek Holdings, through its interest, ownership, and control of MDG, is an entity engaged in and whose activities affect interstate commerce.

217.   The Count IV Defendant, along with Navatek Holdings and MDG, comprised an enterprise whose activities affect interstate commerce.

218.   Navatek Holdings and MDG were passive members and victims of the enterprise and of the Count IV Defendant's racketeering activities.

219.   Specifically, the Count IV Defendant has, on multiple occasions, maintained and exerted control over Navatek Holdings and the enterprise through extortion when the Count IV Defendant: (i) made numerous demands for payment to relinquish his 20% interest in Navatek Holdings despite the fact that the Count IV Defendant knows and understands that he has already received agreed upon consideration to relinquish this interest; (ii) continually held himself out as an owner of Navatek Holdings and/or MDG (by and through the

51

20% interest in Navatek Holdings); and (iii) knows and understands that the effectiveness of his demands for additional consideration arises from the threat that Navatek Holdings, by and through MDG, is at risk of losing some or substantially all of its business due to the ongoing association with the Count IV Defendant.

220.    The Count IV Defendant's acts of extortion described in this count were heightened by the October 23, 2020 written suspension notice the Count IV Defendant received from the Department of the Navy.

221.    In that October 23, 2020 notice, the Federal Government explicitly informed the Count IV Defendant that he could no longer have any association with an entity conducting business with the Federal Government, and that any such contracts with entities associated with the Count IV Defendant "will not be renewed or otherwise extended . . . ."

222.    Accordingly, the Count IV Defendant's actions subsequent to receiving the October 23, 2020 notice wherein he simultaneously held himself out as an owner of MDG (through his 20% membership in Navatek Holdings) while also demanding consideration for relinquishing that 20% membership was an illegal act of extortion.

223.    As described above, the Count IV Defendant acquired and maintained interests and control of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b).

1090142.14

224.    As a direct and proximate result of the Count IV Defendant's illegal acts of extortion, Plaintiffs have been injured in their business and property in an amount to be proven at trial.

## COUNT V
### (Fraud)

225.    MDG hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Complaint.

226.    By their actions alleged herein in committing the PPP Fraud, Campaign Finance Fraud, Foundation Fraud, Illegal Transfer Fraud, and/or Personal Expense Fraud, Defendants Chen, Lum-Kee, Ambrose, Hartman, Defendant Tiffany Lam, and SYWSE willfully engaged in fraudulent conduct that has adversely and materially harmed MDG.

227.    The foregoing actions by said Defendants were willful, wanton, malicious, and/or done with gross and reckless indifference to the law, and, by Defendants Chen, Ambrose, and Hartman, also in gross and reckless indifference to their fiduciary duties owed to the Company.

228.    As a direct and proximate result, the Company has been damaged by said Defendants' frauds in amounts to be proven at trial, which also includes but is not limited to damages to MDG's brand and reputation.

1090142.14

## COUNT VI
(Civil Conspiracy)

229.    MDG hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Complaint.

230.    Through their combined and concerted action in committing one or more of the Campaign Finance Fraud, Personal Expense Fraud, Illegal Transfer Fraud, and the Foundation Fraud, Defendants Chen, Lum Kee, Ambrose, Kao, Hartman, Tiffany Lam, and SYWSE conspired with each other and with Defendant Kao to accomplish criminal and/or unlawful purposes, and/or other purposes by criminal and/or unlawful means, including, without limitation, the allegations set forth in the foregoing paragraphs.

231.    Through their combined and concerted action in committing the PPP Fraud, Defendants Chen, Hartman and Lum Kee, conspired with each other and Defendant Kao to accomplish criminal and/or unlawful purposes, and/or other purposes by criminal and/or unlawful means, including, without limitation, the allegations set forth in the foregoing paragraphs.

232.    As a direct and proximate result, the Company was damaged in an amount to be proven at trial.

## COUNT VII
### (Aiding and Abetting)

233.    MDG hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Complaint.

234.    As officers of the Company during the Relevant Period, Defendants Kao, Chen, Ambrose, and Hartman owed the Company fiduciary duties at the time of the foregoing actions, including, without limitation, the duties of care, loyalty, good faith, and fair dealing.

235.    Through their foregoing conduct, Defendants Lum Kee and Defendant Tiffany Lam aided and abetted Defendants Kao, Chen, Ambrose, and Hartman to engage in willful, wanton, reckless, and/or intentional breaches of their fiduciary duties.

236.    As a direct and proximate result of Defendants Lum Kee and Tiffany Lam's actions, the Company has been damaged in an amount to be proven at trial.

## COUNT VIII
### (Defendants Chen, Ambrose, Hartman, Lum Kee - Breach of Fiduciary Duties)

237.    MDG hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Complaint.

238.    As officers of the Company during the Relevant Period, Defendants Chen and Ambrose owed the Company fiduciary duties at the time of

1090142.14

the foregoing actions, including, without limitation, the duties of care, loyalty, good faith, and fair dealing.

239.   As the Controller of the Company during the Relevant Period, Defendant Lum Kee owed the Company fiduciary duties at the time of the foregoing actions, including, without limitation, the duties of care, loyalty, good faith, and fair dealing.

240.   As a Vice President of the Company during the Relevant Period, Defendant Hartman owed the Company fiduciary duties at the time of the foregoing actions, including, without limitation, the duties of care, loyalty, good faith, and fair dealing.

241.   The foregoing actions of Defendants Chen, Ambrose Hartman, and Lum Kee were willful, wanton, reckless, and/or intentional breaches of their fiduciary duties.

242.   As a direct and proximate result of Defendants Chen, Ambrose, Hartman, and Lum Kee's actions, the Company has been damaged in an amount to be proven at trial.

## COUNT IX
### (Conversion)

243.   MDG hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Complaint.

1090142.14

244.    Defendants Kao, Chen, Lum Kee, Ambrose, Hartman, Tiffany Lam, and SYWSE's foregoing misconduct, including but not limited to one or more of the PPP Fraud, Campaign Finance Fraud, Foundation Fraud, Illegal Transfer Fraud, and Personal Expense Fraud, were performed by said Defendants using the Company's funds

245.    Defendants Kao, Chen, Lum Kee, Ambrose, Hartman, Tiffany Lam, and SWYSE committed the foregoing frauds with the Company's funds without the unanimous written consent of the Company's members, including NCI.

246.    By these acts, said Defendants converted to their own personal use and assumed ownership of the Company's property, monies, and assets.

247.    Defendants Kao, Chen, Lum Kee, Ambrose, Hartman, Tiffany Lam, and SYWSE wrongfully used the converted property, monies, and assets for their own personal use and beneficial enjoyment.

248.    Defendants Kao, Chen, Lum Kee, Ambrose, Hartman, Tiffany Lam, and SYWSE have failed to repay the Company the converted amounts resulting from their foregoing frauds.

## COUNT X
### (Embezzlement)

249.    MDG hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Complaint.

250.    Defendant Kao, as a former chief executive officer and managing member of the Company, charged with the overall control of the Company's management and business, among other responsibilities, acted as an agent of the Company.

251.    Defendant Ambrose, as a former chief operating officer of the Company charged with control over the Company's operations and business, among other responsibilities, acted as an agent of the Company.

252.    Defendant Chen, as a former chief financial officer of the Company charged with control over the Company's funds, accounting, and finances, among other responsibilities, acted as an agent of the Company.

253.    Defendant Lum Kee, as the former Controller of the Company, was charged with control over the Company's bank accounts as well as assessing and determining its financial health and needs.

254.    Defendant Hartman, as a former Vice President of Business Development for the Company during the Relevant Period charged with the overall performance of the Company's portfolio of programs, business development, and federal relations initiatives, among other responsibilities, acted as an agent of the Company.

255.    Defendant Tiffany Lam, as the wife of Defendant Kao, the former Company manager and CEO, was given access to the Company's accounts

58

and funds for her personal use and for the use of other third parties through her access to those accounts and funds.

256.    In their respective roles and capacities, said Defendants had access to the Company's property, including its funds.

257.    Defendants Kao, Chen, Lum-Kee, Ambrose, Hartman, and Defendant Tiffany Lam intentionally and fraudulently converted the Company's funds as their own, and for other non-business uses.

258.    As a direct and proximate result of said Defendants' actions, the Company has been damaged in an amount to be proven at trial.

<u>COUNT XI</u>
(All Defendants – Unjust Enrichment)

259.    MDG hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Complaint.

260.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of the Company.

261.    The Company seeks restitution from Defendants, and seeks an order from the Court, disgorging all profits, benefits, monies, properties, assets, and other compensation obtained by Defendants through their wrongful conduct and fiduciary breaches.

1090142.14

## COUNT XII
(Gross Negligence)

262.   MDG hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Complaint.

263.   Defendants Chen, Ambrose, and Hartman owed fiduciary duties to the Company.

264.   Defendants Lum Kee and Defendant Tiffany Lam knew that Defendants Chen, Ambrose, and Hartman were officers of the Company and owed fiduciary duties to the Company.

265.   Defendants Chen, Ambrose and Hartman willfully, wantonly, recklessly, and/or intentionally breached their fiduciary duties owed to the Company, and were indifferent to the injuries they would cause them.

266.   Defendants Lum Kee and Defendant Tiffany Lam willfully, wantonly, recklessly, and/or intentionally aided and abetted Defendants Chen, Ambrose, and Hartman in breaching their respective fiduciary duties to the Company, and willfully, wantonly, recklessly, and/or intentionally conspired with Defendants Chen, Ambrose and Hartman in committing the foregoing frauds involving the Company.

267.   Defendants Chen, Lum Kee, Ambrose, Hartman and Defendant Tiffany Lam also willfully, wantonly, recklessly, and/or intentionally aided and abetted Defendant Kao, the Company's manager and CEO during the Relevant

60

Period, in breaching his fiduciary duties to the Company, and willfully, wantonly, recklessly, and/or intentionally conspired with Defendant Kao in committing the foregoing frauds involving the Company.

268. Defendants Chen, Lum Kee, Ambrose, Hartman and Defendant Tiffany Lam knew, or should have known, that the Company would incur damages as a result of their collective gross misconduct.

269. As a direct and proximate result of said Defendants' actions, the Company has been damaged in an amount to be proven at trial.

COUNT XIII
(Fraudulent Conveyance – $1,546,381 into Kahala Property)

270. MDG hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Complaint.

271. As the former managing-member of MDG, Defendant Kao knew that MDG was in possession of the $2,000,000 asset.

272. Defendant Kao transferred or directed the transfer of the $2,000,000 asset into his personal account from MDG and, shortly thereafter, transferred $1,546,381 of those funds into the Kahala Property in or around June 2020.

61

273.    At the time of Defendant Kao's transfer of the $1,546,381 asset into the Kahala Property, MDG had (and continues to have) a claim against Defendant Kao in the amount of the Purported $2M Loan

274.    Defendant Kao's transfer of the $1,546,381 into the Kahala Property was made with the actual intent to hinder, delay, and/or defraud MDG in the collection of the Purported $2M Loan from Defendant Kao.

275.    Defendant Kao's transfer of the $1,546,381 asset into the Kahala Property constituted a fraudulent transfer under applicable law.

276.    As a direct and proximate result of Defendant Kao's fraudulent transfer of the $1,546,381 asset into the Kahala Property, MDG is entitled to: (a) avoidance of the transfer of the $1,546,381 asset into the Kahala Property, (b) attachment against the Kahala Property, (c) injunctive relief against further disposition by Defendants Kao and Defendant Tiffany Lam (or any person or party acting by, through, or on behalf of them) of the Kahala Property, and/or (d) appointment of a receiver to take charge of the Kahala Property.

## COUNT XIV
### (Breach of Contract – Defendant Hartman)

277.    MDG hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Complaint.

1090142.14

278.   Defendant Hartman's Retention Advance is an enforceable agreement between Defendant Hartman and MDG that was made expressly subject to Defendant Hartman's Reps and Warranties Agreement.

279.   MDG's advancement of $15,000 to Holland & Knight LLP for Defendant Hartman's Retention Advance was made in reliance upon Defendant Hartman's Reps and Warranties Agreement.

280.   Defendant Hartman's Reps and Warranties Agreement misrepresented that Defendant Hartman had at all times acted in good faith, without active or deliberate dishonesty, and in the best interests of the Company, and that he had not received any improper personal benefit in money, property, or services from MDG.

281.   Defendant Hartman's Reps and Warranties Agreement required and agreed that Defendant Hartman must repay MDG the $15,000 advancement made to Holland & Knight LLP if he was later determined that he was not eligible for the advancement based on Defendant Hartman's representations and warranties upon which MDG had relied upon in making the advance.

282.   As a result of Defendant Hartman's breach of his Reps and Warranties Agreement, Defendant Hartman is contractually obligated to repay MDG any and all unreturned amounts from the $15,000 advancement made by MDG to Holland & Knight LLP.

<u>COUNT XV</u>
(Breach of Contract and/or Specific Performance –
MDG and Navatek Holdings against Defendant Kao)

283.   MDG and Navatek Holdings hereby repeat, reallege, and incorporate herein the allegations contained in the preceding paragraphs of this Complaint.

284.   The Restructuring Agreement between Navatek Holdings and Defendant Kao that resulted in, among other things, Defendant Kao receiving an ownership interest in MDG, was a valid and binding agreement.

285.   MDG was a third-party beneficiary of that agreement.

286.   Navatek Holdings performed all obligations, or was ready, willing, and able to perform its obligations, required by the Restructuring Agreement.

287.   Defendant Kao has breached the Restructuring Agreement by, among other things, refusing to relinquish his interest in Navatek Holdings.

288.   As a direct and proximate result of Defendant Kao's material breaches of the Restructuring Agreement, MDG and Navatek Holdings have been damaged, and continues to be damaged in an amount to be determined at trial.

289.   In addition or in the alternative, MDG and Navatek Holdings seek an order for specific performance of the Restructuring Agreement's obligations by Kao.

WHEREFORE, Plaintiffs pray for judgment in its favor and against Defendants as follows:

A.    For general, special, compensatory, incidental and consequential damages in amounts to be proven at trial;

B.    For treble damages;

C.    For punitive damages;

D.    For specific performance of the Restructuring Agreement;

E.    For restitution and other equitable relief;

F.    For declaratory and injunctive relief;

G.    For an order establishing that Defendant SYWSE was an alter ego of Defendant Tiffany Lam and establishing that Defendant Tiffany Lam is personally liable for any judgements against SYWSE;

H.    For appointment of a receiver to take control of the Defendants' assets;

I.    For a constructive trust to be placed on Defendants' assets and properties that were acquired with, from, or constitute amounts that were unlawfully taken from MDG by Defendants;

J.    For prejudgment and post-judgment interest;

K.    For its attorneys' fees, costs and expenses;

L.      For such other and further relief as this Court deems just and

proper.

DATED:  Honolulu, Hawaii, June 22, 2022.


/s/ Ryan H. Engle
CRYSTAL K. ROSE
RYAN H. ENGLE
GRANT FASI ALLISON

Attorneys for Plaintiffs
MARTIN DEFENSE GROUP, LLC and
NAVATEK HOLDINGS LLC

1090142.14