Of Counsel:

LUNG ROSE VOSS & WAGNILD

CRYSTAL K. ROSE 3242-0
(*crose@legalhawaii.com*)
Attorney at Law
A Law Corporation
RYAN H. ENGLE 7590-0
*(rengle@legalhawaii.com)*
Attorney at Law
A Law Corporation
GRANT FASI ALLISON 10368-0
*(gallison@legalhawaii.com)*
Topa Financial Center
700 Bishop Street, Suite 900
Honolulu, Hawaii 96813
Telephone: (808) 523-9000
Facsimile: (808) 533-4184

Attorneys for Plaintiffs
MARTIN DEFENSE GROUP, LLC
and NAVATEK HOLDINGS LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARTIN DEFENSE GROUP, LLC; and NAVATEK HOLDINGS LLC, | CASE NO. 1:22-cv-00283 (WRP) |
| Plaintiffs, | PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT DUKE HARTMAN'S MOTION TO DISMISS COMPLAINT, FILED (*Caption continued on next page*.) |
| vs. | |
| MARTIN KAO; TIFFANY JENNIFER LAM a.k.a. JENNY LAM and/or TIFFANY KAO; LAWRENCE KAHELE LUM KEE; CLIFFORD CHEN; GARY AMBROSE; DUKE | <u>Hearing:</u><br>DATE: November 18, 2022<br>TIME: 9:45 a.m.<br>JUDGE: Hon. Leslie E. Kobayashi |

| | |
|---|---|
| HARTMAN; SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC, | ) JUNE 22, 2022 [ECF 1], FILED ) SEPTEMBER 22, 2022 [DKT. 36]; ) CERTIFICATE OF WORD COUNT; ) CERTIFICATE OF SERVICE |
| Defendants. | ) |
| | ) |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... iii-v

I. INTRODUCTION .......... 1

II. RELEVANT FACTUAL BACKGROUND .......... 2

A. The Parties .......... 3

B. Hartman's Unlawful Conduct .......... 4

1. The PPP Fraud .......... 4

2. The Campaign Finance Fraud .......... 6

C. MDG Is Damaged by Hartman's Pattern of Racketeering Conduct .......... 8

III. LEGAL STANDARD .......... 8

IV. THE RICO CLAIMS ARE PROPERTY ASSERTED .......... 9

A. 18 U.S.C. §1962(c) .......... 10

1. Hartman's conduct violated subparts of 18 U.S.C. §1961 .......... 10

2. The pattern of racketeering .......... 13

3. Particularity .......... 15

4. Injury to MDG's property and business .......... 17

B. 18 U.S.C. §1962(a) .......... 18

C. 18 U.S.C. §1962(d) .......... 19

V. STATE LAW CLAIMS ARE SUFFICIENTLY ASSERTED .......... 21

A. Fraud .......... 21

B. Civil Conspiracy .......... 22

C. Aiding and Abetting .......... 24

D. Breach of Fiduciary Duty .......... 24

E. Conversion .......... 25

F. Embezzlement .......... 26

G. Unjust Enrichment .......... 27

H. Gross Negligence .......... 27

I. Breach of Contract .......... 28

VI. NAVATEK HOLDINGS ASSERTS NO CLAIMS AGAINST HARTMAN .......... 29

VII. LEAVE TO AMEND SHOULD BE GRANTED .......... 29

VIII. CONCLUSION .......... 30

TABLE OF AUTHORITIES

**_Cases_** **_Page_**

Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 460, 126 S. Ct. 1991 (2006) ........ 18

Armstrong v. Reynolds, 22 F.4th 1058 (9th Cir. 2022) ........ 23

Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009) ........ 9

Baumer v. Pachl, 8 F.3d 1341 (9th Cir. 1993) ........ 20

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007) ........ 8

Cohen v. Trump, 200 F. Supp. 3d 1063, 1070 (S.D. Cal. 2016) ........ 9, 12

Doran v. Wells Fargo Bank, , 2012 U.S. Dist. LEXIS 42805, at *15 (D. Haw. Mar. 28, 2012) ........ 16

Durette v. Aloha Plastic Recycling, Inc., 105 Hawai‘i 490, 503, 100 P.3d 60 (2004) ........ 27

Fed'n of African Am. Contractors v. City of Oakland, 96 F.3d 1204, 1207 (9th Cir. 1996) ........ 8

Greys Ave. Partners, LLC v. Theyers, 484 F. Supp. 3d 895, 911 (D. Haw. 2020) ........ 24

Grinpas v. Kapaa 382, Ltd. Liab. Co., 145 Hawai‘i 54, 445 P.3d 1088, 1089 (App. 2019) ........ 23

H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S. Ct. 2893 (1989) ........ 13

Harris v. Amgen, Inc., 573 F.3d 728, 736 (9th Cir. 2009) ........ 29

Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, 113 Hawai'i 77, 107, 148 P.3d 1179, 1209 (2006)) ........ 23

Hawaii's Thousand Friends v. Anderson, 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989) ........ 21

Heartland Payment Sys. v. Cent. Pac. Bank, 2012 U.S. Dist. LEXIS 17564, at *5 (D. Haw. Feb. 13, 2012) ........ *passim*

Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 269-70, 112 S. Ct. 1311 (1992) ... 18

Howard v. Am. Online, Inc., 208 F.3d 741, 751 (9th Cir. 2000) ........ 20

Ikuno v. Yip, 912 F.2d 306, 309 (9th Cir. 1990) (citation omitted) ........ 15

Leyvas v. Bank of Am. Corp., 601 F. Supp. 2d 1201, 1217 (S.D. Cal. 2009) ........ 16

Media Rights Techs., Inc. v. Microsoft Corp., 922 F.3d 1014, 1026 (9th Cir. 2019) ........ 27

Miyashiro v. Roehrig, 122 Hawai‘i 461, 484, 228 P.3d 341, 364 (App. 2010) ........ 26

Odom v. Microsoft Corp., 486 F.3d 541, 547 (9th Cir. 2007) (en banc)) ........ 10

Oki Semiconductor Co. v. Wells Fargo Bank, 298 F.3d 768, 775 (9th Cir. 2002) ........ 20

Pancakes of Haw. v. Pomare Props. Corp., 85 Hawai‘i 286, 293, 944 P.2d 83, 90 (App. 1997) ........ 28

RJR Nabisco, Inc. v. European Cmty., 579 U.S. 325, 329-30, 136 S. Ct. 2090 (2016) ........ 10, 18

Reves v. Ernst & Young, 507 U.S. 170, 185) ........ 11

Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co., 91 Hawai'i 224, 252 n.28, 982 P.2d 853 (1999) ........ 23, 24

Ryan v. Salisbury, 380 F. Supp. 3d 1031, 1054 (D. Haw. 2019) ........ 20

Sanford v. MemberWorks, Inc., 625 F.3d 550, 557 (9th Cir. 2010) ........ 10

Sea-Land Serv., Inc. v. Atl. Pac. Int'l, Inc., 57 F. Supp. 2d 1048, 1054 (D. Haw. 1999) (citation omitted .......... 19

Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497, 105 S. Ct. 3275 (1985).......... 15

Sever v. Alaska Pulp Corp., 978 F.2d 1529, 1535 (9th Cir. 1992).......... 13

Smallwood v. NCSOFT Corp., 730 F. Supp. 2d 1213 (D. Haw. 2010) .......... 27

Soriano v. Wells Fargo Bank, N.A., 2012 U.S. Dist. LEXIS 59826 at *13 (D. Haw. Apr. 30, 2012 .......... 9

Swift v. Swift, 138 Hawai‘i 52, 375 P.3d 1290 (App. 2016) .......... 25

Ticor Title Ins. Co. v. Florida, 937 F.2d 447 (9th Cir. 1991) .......... 14

Webster v. Omnitition Int’l, Inc., 79 F.3d 776 (9th Cir. 1996) .......... 12

Young v. Buren, 130 Hawai‘i 349, 310 P.3d 1050 (App. 2010) .......... 28

***Statutes***

18 U.S.C. §1341 .......... 7, 10
18 U.S.C. §1343 .......... 10
18 U.S.C. §1344 .......... 10
18 U.S.C. §1952 .......... 10
18 U.S.C. §1956 .......... 10
18 U.S.C. §1957 .......... 10
18 U.S.C. §1962(c) .......... 10
18 U.S.C. §§1956, 1957 .......... 7
18 U.S.C. §§1961 .......... 1
RICO Act §§1962(c), 1962(a), 1962(d) .......... 9

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT DUKE HARTMAN'S MOTION TO DISMISS COMPLAINT, FILED JUNE 22, 2022 [ECF 1], FILED SEPTEMBER 22, 2022 [DKT. 36]

## I. INTRODUCTION

Defendant Duke Hartman ("Hartman") seeks dismissal of every claim asserted by Plaintiff Martin Defense Group, LLC ("MDG" or the "Company"). MDG's claims arise from Hartman's participation in two highly publicized illegal schemes, each involving the commission of numerous predicate criminal acts prohibited under 18 U.S.C. §§1961 *et seq.* ( "RICO Act"). Nevertheless, Hartman argues he did nothing wrong and MDG has no viable claims against him. Hartman is wrong, and the Motion must be denied.

First, Hartman and co-conspirators, as high-ranking managers of MDG, committed acts of mail fraud, wire fraud, fraud against financial institutions, and racketeering when they unlawfully caused MDG to apply for three PPP loans. MDG was barred from obtaining a single PPP loan, let alone multiple. Hartman played a critical role in the scheme by concocting a method of intentionally mischaracterizing $100,000 "signing bonus" payments as "vacation payments." . The deceit was to dupe banks into reducing PPP repayments.. For each loan, and for the mischaracterized payments, the enterprise used email and U.S. Mail between March and May 2020 for the purposes of executing or attempting to execute the fraud.

Second, the same group of co-conspirators also caused MDG to make illegal campaign contributions, including $150,000 given through middleman Society of Young Women Scientists and Engineers, LLC ("SYWSE"). After federal investigators filed a complaint arising from this unlawful contribution, the co-conspirators concocted a plan whereby MDG's money would be converted and embezzled to SYWSE, and Hartman used those amounts to fund scholarships for universities around the country. The conspirators' stated purpose for SYWSE was to be "super vague" and hard to trace, and the scholarships were concocted to coverup the illegal contributions that had already occured. Thus, Hartman abused his position with MDG by converting its money, using the money for illegal purposes and to coverup crimes, and did so via email and U.S. mail.

As a result of Hartman's conduct, MDG has been damaged, and MDG has viable RICO and state law claims against Hartman. The Motion must be denied.

## II. RELEVANT FACTUAL BACKGROUND

The Complaint's allegations must be taken as true and construed in the light most favorable to Plaintiffs. Heartland Payment Sys. v. Cent. Pac. Bank, 2012 U.S. Dist. LEXIS 17564, at *5 (D. Haw. Feb. 13, 2012) (citation omitted).

A. The Parties

Because MDG has offices in numerous states, the wrongdoing affected interstate commerce. Id., ¶¶117-118. Hartman was employed by MDG from January 2019 through January 2021 as MDG's Vice President of Business Development and Vice President of Strategic Partnerships. Id., ¶¶22,25. Hartman was responsible for the overall performance of MDG's portfolio programs, business development, and hiring Washington D.C. political consultants to lobby for MDG. Id., ¶25,38. Thus, Hartman owed MDG duties of good faith, loyalty, and care because he had significant financial responsibilities and power over MDG. Id., ¶41.

In executing his duties, Hartman worked directly with Defendants Martin Kao ("Kao"), Clifford Chen ("Chen"), and Lawrence Kahele Lum Kee ("Lum Kee"). Id., ¶¶26,39. Kao is MDG's disgraced former CEO who has recently pled guilty to multiple crimes giving rise to the Complaint. Id., ¶¶20,60,84. Chen was MDG's CFO and is under indictment for his role in the same criminal conspiracies. Id., ¶¶23,84. Lum Kee, who is also under indictment, was handpicked by Kao and Chen to be MDG's "Controller" and exercised significant authority over MDG's accounts and finances. Id., ¶¶22,27,45-46,84. Hartman was also hired and appointed to his position by Kao and directly reported

to Kao and Chen. Id., ¶30. Because Hartman was specially placed by Kao, he acted with loyalty to Kao, instead of MDG. Id., ¶¶22,30.

B. Hartman's Unlawful Conduct

The pattern of racketeering by Hartman and other co-conspirators involved two schemes. First, Kao caused MDG to apply for multiple PPP loans in violation of federal law (the "PPP Fraud"). Id., ¶¶50-64. Second, the co-conspirators used MDG's funds to make unlawful campaign contributions, and then sought to coverup their crimes through additional racketeering activity (the "Campaign Finance Fraud"). Id., ¶¶65-84. Hartman played an integral role in both illegal schemes.

1. The PPP Fraud

The PPP Fraud involved a series of unlawful acts committed by Hartman, Kao, Chen, and Lum Kee. Beginning in March 2020, at Kao's direction, and with the direct assistance of Hartman, Chen, and Lum Kee, MDG applied for and obtained multiple PPP loans. Id., ¶50. MDG was not lawfully permitted to apply for or obtain a single PPP loan, let alone multiple PPP loans. Id., ¶¶51,53,55-56. Regardless, MDG unlawfully obtained $12.8 million through two PPP loans, and was denied a third. Id., ¶124.

The PPP loans were requested and/or obtained through the provision of intentionally false information. Once the enterprise developed falsified financial

information, that same information was used in connection with three PPP loans. Id., ¶¶124-127. Once the funds were received, Kao Chen, and Lum Kee caused MDG to "wash" the funds by transferring smaller amounts of the $12.8 million back and forth between various bank accounts to make it harder to track, and to make the money appear as if it was "new funds," because "[t]hat way it even looks like were [sic] using it for payroll." Id., ¶148-151.

With respect to the PPP Fraud, Hartman conceived an intentionally fraudulent method of reporting employee compensation. Id., ¶57. Hartman directed MDG to pay signing bonuses of over $100,000 to new employees, but also to mischaracterize the amounts as "vacation payments" with respect to replaying PPP loan amounts. Because individual compensation over $100,000 was not an allowable PPP cost, Hartman surmised that by burying the $100,000 bonus payments under the vacation pay category, the enterprise could deduct it from the repayments to the government for the PPP loans.. Id.

This scheme is notable in two respects. First, Hartman's plan to mischaracterize information provided to banks was itself an illegal action, thus, Hartman knew the loan applications were illegal. Id., ¶¶55,57-58. Second, Hartman worked with Chen and Lum Kee to put the plan into action. Id. These acts involved sending falsified information via email and U.S. mail to financial institutions. Thus, each fraudulent loan application involved separate violations of

18 U.S.C. §§1341, 1343, 1344, and 1952. Id., ¶131. This pattern of unlawful conduct occurred between March 2020 and September 29, 2020. See id., ¶¶50,60. Defendants Hartman, Kao, Chen, and Lum Kee exchanged emails between March 2020 and May 2020 for the commission of the PPP Fraud, and eventually, to coverup the PPP Fraud. Id., ¶126.

2. The Campaign Finance Fraud

The Campaign Finance Fraud began when MDG made an illegal contribution of $150,000 on December 27, 2019 to Senator Susan Collins' 1820 PAC. Id., ¶¶72,77,80. At about the same time, Kao, Chen, and Lum Lee caused MDG to make payments to Chen and Lum Kee for political contributions made through their family members. Id., ¶69. There is no dispute that the contemporaneous acts of donating $150,000 to Senator Collins 1820 PAC, along with the donations made through Chen and Lum Kee's family, were related and illegal acts. Id., ¶¶70-72,81,84.

The conduit or middleman for the illegal $150,000 contribution from MDG to 1820 PAC was a shell company, Defendant Society of Young Women Scientists and Engineers, LLC ("SYWSE"). SYWSE was intended to be "super vague and difficult to get any background on." Id., ¶¶67,74,76. The funds used to capitalize SYWSE belonged to MDG but were embezzled to SYWSE's bank account. Id., ¶¶74,76. Lum Kee recorded the $150,000 transfer to SYWSE in

MDG's books as a "loan to Kao." Id. ¶76. SYWSE is not a legitimate entity, and its sole purpose was to disguise Defendants' illegal conduct by laundering the funds it received and used. Id., ¶¶29,67,138.

Hartman's role in the Campaign Finance Fraud involved covering up the enterprise's illegal actions though a series of financial transactions using SYWSE as a conduit for MDG's money. Specifically, on February 2, 2020, the Federal Election Commission ("FEC") filed a complaint arising from the unlawful contribution of $150,000 by SYWSE. Id., ¶82. Shortly after the FEC filed its complaint, Kao, Chen, and Lum Kee recruited Hartman to help them coverup the crimes.

Hartman began contacting various universities in numerous states to provide scholarship funds from SYWSE using MDG's money. Id., ¶¶82-83. Hartman, Kao, Chen, and Lum Kee improperly stole and converted MDG's money by transferring those funds to SYWSE to fund the scholarships. Id., ¶¶67,74,83. Hartman's purpose was to create a façade of legitimacy for SYWSE to protect Kao, Chen, and Lum Kee for their pattern of unlawful campaign contributions. Hartman arranged numerous scholarships via email, and each time this was done, Hartman committed mail fraud in violation of 18 U.S.C. §1341 and money laundering and illegal monetary transactions in violation of 18 U.S.C. §§1956 and 1957.

C. MDG Is Damaged by Hartman's Pattern of Racketeering Conduct

Hartman and the co-conspirators formed "enterprises," as that term is defined in the RICO Act, to conduct the PPP and Campaign Finance Frauds. Id., ¶¶120,191,200. To the extent MDG was a member of the enterprise, it was passive and was the victim of the enterprise. Id., ¶¶121,192,201. The patterns of racketeering alleged against Hartman related to and affected interstate commerce. Id., ¶¶117-118,191,200,202,210. MDG suffered substantial losses to its business and property including: (i) the loss of employees; (ii) loss of contracts and business; (iii) $2,000,000 taken by Kao as a result of the PPP loan fraud; (iv) millions of dollars paid to consultants; and (v) attorney's fees and costs. Id., ¶¶64,197,205,213.

## III. LEGAL STANDARD

"To survive a Rule 12(b)(6) motion to dismiss, factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true even if doubtful in fact." Heartland, 2012 U.S. Dist. LEXIS 17564, at *6 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007)). Thus, the Court must accept all material allegations of fact as true and must construe those facts in the light most favorable to the nonmoving party. Fed'n of African Am. Contractors v. City of Oakland, 96 F.3d 1204, 1207 (9th Cir. 1996). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Soriano v. Wells Fargo Bank, N.A., 2012 U.S. Dist. LEXIS 59826, at *13 (D. Haw. Apr. 30, 2012) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009)).

## IV. THE RICO CLAIMS ARE PROPERLY ASSERTED

The Complaint alleges RICO claims against Hartman in Count I, Count II, and Count III, arising under RICO Act §§1962(c), 1962(a), and 1962(d), respectively. Hartman generally argues that nearly every element of the RICO claims is lacking. Other district courts have explained that "allegations of routine commercial relationships are insufficient to support a RICO claim . . . [and] in such cases, courts have characterized the activity at issue as a 'routine commercial relationship' *precisely* because the plaintiff has failed to meet a required element in their RICO claim." Cohen v. Trump, 200 F. Supp. 3d 1063, 1070 (S.D. Cal. 2016) (cleaned up, emphasis provided, numerous federal citations omitted). There is nothing "routine" or "commercial" about Hartman's purposeful financial mischaracterizations to induce PPP loans or Hartman's attempts to cover up illegal campaign contributions by disbursing MDG money through the sham entity SYWSE. There is equally nothing "routine" or "commercial" about the indictments and/or guilty pleas by MDG's CEO, CFO, and Controller arising from

this exact conduct. Because the RICO Claims are properly plead, and because Hartman misconstrues the RICO Act and related case law, the Motion must be denied.

A. 18 U.S.C. §1962(c)

"To state a claim under §1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sanford v. MemberWorks, Inc., 625 F.3d 550, 557 (9th Cir. 2010) (quoting Odom v. Microsoft Corp., 486 F.3d 541, 547 (9th Cir. 2007) (en banc)). Here, each element is satisfied.

1. Hartman's conduct violated subparts of 18 U.S.C. §1961

RICO claims are premised on "racketeering activity," which are "known in RICO parlance as predicates." RJR Nabisco, Inc. v. European Cmty., 579 U.S. 325, 329-30, 136 S. Ct. 2090 (2016). The predicate acts include "any act 'indictable' under specified federal statutes, §§1961(1)(B)-(C), (E)-(G)[.]" Id. The following predicates are alleged against Hartman: (i) mail fraud, 18 U.S.C. §1341; (ii) wire fraud, 18 U.S.C. §1343; (iii) financial institution fraud, 18 U.S.C. §1344; (iv) racketeering, 18 U.S.C. §1952; (v) laundering of monetary instruments, 18 U.S.C. §1956; and (vi) laundering of monetary instruments, 18 U.S.C. §1957.

Hartman's predicate acts arise from his role in perfecting the PPP and Campaign Finance Frauds. Hartman's Motion does not dispute that these

predicates occurred, but instead argues that Hartman did not "direct" the enterprise. Hartman says the Complaint did not "show [Hartman] directed the enterprise's affairs[]" and that dismissal must be granted because "one must have ***some*** part in directing [the enterprise's] affairs." Motion, p. 3 (emphasis added) (quoting Reves v. Ernst & Young, 507 U.S. 170, 185).

In arguing for the rigid application of Reves, Hartman misconstrues the Court's holding. The Court considered the "operation or management" test in determining whether a RICO defendant's acts triggered §1962(c). The Court held that although a RICO defendant must "participate, directly or indirectly, in the conduct of such enterprise's affairs," that requirement is tempered:

> the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise . . .
>
> . . .
>
> an enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management. An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it . . . .

Id., 507 U.S. at 179, 184. The Court also rejected the District of Columbia's requirement that a defendant exert "*significant control* over or within an enterprise." Id., at 179 n.4 (emphasis provided, citations omitted).

Here, Hartman was "upper management" and he exercised control. The Complaint alleges that Hartman used the power and knowledge that came with his corporate position to intentionally falsify employee compensation on PPP loan information to dupe lenders and the government into reducing the amount the enterprise had to repay for the fraudulently obtained PPP loans. The Complaint also alleges that Hartman directed the enterprise's efforts in unlawfully converting MDG's money to SYWSE to fund scholarships to coverup prior illegal campaign contributions. Hartman knew the money being used by SYWSE belonged to MDG and knew those funds were being laundered through SYWSE in order to coverup the enterprise's campaign contribution crimes.

Further, the case law and examples cited by Hartman are distinguishable. Hartman cites cases involving attorneys who provided third-party legal services to alleged RICO enterprises. See Motion, pp. 4-5 (citing Baumer v. Pachl, 8 F.3d 1341 (9th Cir. 1993), Webster v. Omnitition Int'l, Inc., 79 F.3d 776 (9th Cir. 1996)). In these cases, the attorney-defendants did not operate or manage the RICO enterprises because they were merely "providing legal services" and were "outside counsel."

Hartman is not a lawyer, he is not outside the enterprise, and instead, he played a direct role in formulating, approving, and conducting the crimes. In this way, Hartman's conduct is similar to that of the defendant in Cohen, where

factual issues existed as to whether the defendant "played some part in directing the affairs" because he "reviewed and approved" the fraudulent information at issue. Id., 200 F. Supp. 3d at 1072. At the very least, Hartman reviewed and approved the falsified "bonus payment" information as well as the fraudulent scholarships – because these were his ideas and it was his conduct that caused each to occur.

2. The pattern of racketeering

Hartman argues that because there is no "continuity" in the enterprise's illegal actions, there is no "pattern" of racketeering. Hartman concludes that the alleged illegal conduct consists of "isolated" events. This is wrong.

"A 'pattern' . . . requires at least two acts of racketeering activity." 18 U.S.C. §1961(5). "[T]o show a pattern of racketeering activity, a RICO plaintiff must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." Sever v. Alaska Pulp Corp., 978 F.2d 1529, 1535 (9th Cir. 1992) (citing H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S. Ct. 2893 (1989)). "Continuity is demonstrated if the illegal conduct poses a threat of continued criminal activity, such as when the illegal conduct is a regular way of conducting a defendant's ongoing legitimate business." Id., 978 F.2d at 1535.

Continuity is demonstrated where the enterprise illegally applied for three different PPP loans, and unlawfully obtained $12.8 million from two PPP loans. The Complaint also alleges RICO violations arising from the conversion of $150,000 of MDG's money for unlawful contributions through SYWSE as a conduit. Hartman subsequently disguised these actions by offering scholarships through SYWSE with MDG's laundered funds.

Case law demonstrates that these allegations are sufficient. In Ticor Title Ins. Co. v. Florida, 937 F.2d 447 (9th Cir. 1991), the Circuit Court found continuity based on "three episodes of forgery." Id., at 450. The Ticor forgeries "were related under the Supreme Court test, because they had both similar purposes and identical methods of commission[]" and they "posed a threat of continued criminal activity[]" because they were executed "within a 13-month period." Id. The Circuit Court found that "[t]he frequency of the forgeries suggests that the practice had become a regular way of conducting business [], satisfying the continuity prong of the pattern test." Id. Here, the fraudulent PPP loan applications containing Hartman's crooked compensation figures and the campaign frauds and related conduct were, according to the Motion, "concentrated in an eleventh-month period from September 2019 to July 2020[.]" Motion, p. 6

Hartman appears to argue there is no pattern because the criminal acts occurred close together in time. See Motion, pp. 6-7. The Circuit Court's case law

demonstrates the opposite. "We have adopted a test for pattern which inquires whether the predicate acts are sporadic or isolated. If they are isolated and sporadic, then they cannot form a 'pattern.'" Ikuno v. Yip, 912 F.2d 306, 309 (9th Cir. 1990) (citation omitted). Ikuno cautioned that "there is no talismanic number of predicate acts needed to establish a pattern" but that because the statute lists two as the minimum, that is sufficient. Id. (citation omitted). "Being mindful that RICO is to be read broadly," the Ikuno Court found that two predicate acts demonstrated "continuity." Id. (citing Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497, 105 S. Ct. 3275 (1985)). Because the Complaint alleges more than two instances of illegal and connected predicate acts by Hartman, the Motion must be denied.

3. Particularity[1]

Hartman argues that allegations against him are not particularly pled. See Motion, pp. 9-10. Hartman complains there is no "account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Motion, p. 10 (citation omitted). This is not correct.

---

[1] This section responds to Motion Section III(A)(1)(c) titled "Racketeering"; the header is mislabeled because this section argues particularity under Rule 9(b).

First, with respect to time, Hartman admits the alleged fraud occurred in a tight and definable time period, "concentrated in an eleventh-month period from September 2019 to July 2020." Motion, p. 6. Hartman also admits the "PPP Fraud lasted six months" and specifically cites the period from March 2020 through May 2020. Motion, p. 7. With respect to the campaign contribution crimes, Hartman admits the conduct occurred from September 2019 through December 2019. Motion, p. 6. Furthermore, because Hartman's employment with MDG terminated in January 2021, his efforts to cover up the campaign crimes necessarily occurred between December 2019 and that date. These are sufficiently narrow time ranges under Rule 9(b). See, e.g., Doran v. Wells Fargo Bank, , 2012 U.S. Dist. LEXIS 42805, at *15 (D. Haw. Mar. 28, 2012) (9-month time range is sufficient); but see Leyvas v. Bank of Am. Corp., 601 F. Supp. 2d 1201, 1217 (S.D. Cal. 2009) (21-month period is insufficient).

Second, each instance of fraud was directed at MDG, who was a "passive member" and therefore "a victim" of the conduct of the criminal enterprises. With respect to the PPP Fraud, the Complaint alleges that Hartman's fraud was also directed at the PPP lenders. With respect to the Campaign Finance Fraud, Hartman's efforts to use MDG's laundered funds through SYWSE were directed at various universities. Although the Complaint does not specifically

name these institutions, Plaintiffs are able to do so. Thus, if required, Plaintiffs should be permitted leave to amend to add these details.

Third, the "what," or the content, of Hartman's fraudulent and unlawful predicate acts is alleged. Hartman created the method of falsifying compensation payments to dupe PPP lenders and the government. With respect to the Campaign Finance Fraud, Hartman is alleged to have arranged money transfers with laundered funds through SYWSE. Furthermore, had Hartman informed the universities that the scholarship funds were comprised of laundered money intended to coverup other crimes, it is doubtful any university would have accepted.

4. Injury to MDG's property and business

Hartman concludes there is no proximate causation of MDG's injuries attributable to the alleged racketeering. In doing so, Hartman zooms in on his parts of the pattern of racketeering, ignores any other conduct by the enterprise, and concludes that his predicate acts caused no harm. This is not correct.

With respect to RICO causation, the U.S. Supreme Court has held:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is

> simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 269-70, 112 S. Ct. 1311 (1992) (applied to RICO by Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 460, 126 S. Ct. 1991 (2006)). Direct and proximate harms are alleged by the Complaint.

First, a significant amount of MDG's workforce immediately quit when the PPP and campaign schemes broke. This had a crippling impact on MDG's operations, profits, and commercial and business relationships. These losses were direct, quantifiable, easily calculated, and were only suffered by MDG. Second, contrary to Hartman's conclusions, MDG lost multiple contracts worth millions of dollars. Business partners and vendors told MDG's remaining management that, in the wake of the PPP and Campaign Finance Frauds, they no longer wished to be associated with MDG. As a result, numerous contracts were lost. MDG also sustained losses to its investment accounts and had its assets seized. Finally, the $2,000,000 in PPP amounts taken by Kao personally are still owed to MDG.

B. 18 U.S.C. §1962(a)

"Section 1962(a) makes it unlawful to invest income derived from a pattern of racketeering activity in an enterprise." RJR Nabisco, 579 U.S. 325, 330, 136 S. Ct. 2090. The Complaint's theory is simple: the RICO enterprise

unlawfully obtained funds through numerous fraudulent PPP loan applications. Hartman was critical in those efforts by creating the manner in which falsified compensation data was used to obtain PPP money. Indeed, he *entire purpose* of obtaining these funds was to invest them in a manner to control the enterprise and MDG.

"[A] §1962(a) claim must include allegations of injury from the use and investment of racketeering proceeds, not merely injury from the predicate acts of racketeering themselves." Sea-Land Serv., Inc. v. Atl. Pac. Int'l, Inc., 57 F. Supp. 2d 1048, 1054 (D. Haw. 1999) (citation omitted). Here, the Complaint alleges that the unlawfully obtained PPP money was used to control MDG and to pay benefits to the members of the enterprise. See Dkt. 1, ¶203. Hartman, as a member of the enterprise, received these benefits. For example, Hartman is alleged to have had his legal fees paid by MDG in connection with these vary same schemes. Id., ¶104.

C. 18 U.S.C. §1962(d)

"[18 U.S.C.] §1962(d) makes it unlawful to conspire to violate any of the other three prohibitions [of the RICO Act]." RJR Nabisco, 579 U.S. 325, 330, 136 S. Ct. 2090. The Complaint alleges that Hartman conspired with Kao, Chen, and Lum Kee to violate other RICO Act sections. Accordingly, the Complaint properly alleges §1962(d) against Hartman.

Under §1962(d), a plaintiff is not required to plead that a conspiracy defendant personally committed any predicate or overt act—it is sufficient that the defendant is merely "aware of the essential nature and scope of the enterprise and intended to participate in it." Ryan v. Salisbury, 380 F. Supp. 3d 1031, 1054 (D. Haw. 2019) (quoting Baumer v. Pachl, 8 F.3d 1341, 1346 (9th Cir. 1993)). Thus, "[t]o state a claim for conspiracy to violate RICO under §1962(d), a plaintiff must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." Id., at 1054 (quoting Howard v. Am. Online, Inc., 208 F.3d 741, 751 (9th Cir. 2000)). The "illegal agreement need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." Id. (citing Oki Semiconductor Co. v. Wells Fargo Bank, 298 F.3d 768, 775 (9th Cir. 2002)).

The Complaint satisfies these requirements with respect to Hartman. The Complaint alleges a pattern of racketeering concocted by Hartman, Kao, Chen, and Lum Kee to (i) illegally obtain at least three PPP loans via RICO predicate acts, and (ii) commit and coverup numerous campaign law violations via RICO predicate acts. Hartman and the co-conspirators had an agreement to commit these acts because, without any such agreement, the acts could not have been committed by the multiple different actors in concert with each other and for the common

purpose. Confirming these allegations is the fact that Defendants Hartman, Kao, Chen, and Lum Kee exchanged emails with each other between March 2020 and May 2020 that were for the purpose of committing the PPP Fraud, and eventually, to coverup the PPP Fraud. Id., ¶126.

Accordingly, the Complaint properly asserted §1962(d) against Hartman and the Motion must be denied as to this claim.

## V. STATE LAW CLAIMS ARE SUFFICIENTLY ASSERTED

Hartman seeks dismissal of Plaintiffs' state law claims for fraud, civil conspiracy, aiding and abetting, breach of fiduciary duty, conversion, embezzlement, unjust enrichment, gross negligence, and breach of contract. As explained below, each claim is properly alleged, and the Motion must be denied.

### A. Fraud

First, the Complaint alleges each element of fraud under Hawaii law. Hawaii's Thousand Friends v. Anderson, 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989). Hartman made intentionally false statements and/or omissions in the course of committing the PPP Fraud and Campaign Finance Fraud. Hartman intentionally mischaracterized bonus payments in the PPP Fraud and failed to disclose he was using MDG's laundered money to fund scholarships intended to disguise the Campaign Finance Fraud. The Complaint also alleges that MDG was a passive participant (and therefore a victim) of the enterprise's conduct that

perpetrated these schemes. Thus, MDG relied on Hartman's intentionally false statements and/or omissions. As a result, MDG was damaged by Hartman's fraudulent conduct by the loss of employees, loss of business contracts, among other things. Second, Hartman restates the same particularity arguments made in response to §1962(c) claim. See Motion, pp. 9-12, 21-22. As explained in Section IV(A)(3) above, the fraud occurred during a narrow time period from September 2019 to July 2020. The narrow time period, in addition to the content, purpose, and identities of the recipients of the fraudulent statements are sufficient details under Rule 9(b) and the allegations are pled with particularity.

B. Civil Conspiracy

Hartman's seeks dismissal based on the conclusion that his conduct was "taken in [his] role as an employee of MDG[]" and "employees of a corporation cannot conspire with their . . . employer where they act in their official capacities . . . ." Motion, p. 22. This is not an accurate summary of the Complaint's allegations against Hartman. Simply put, the entire point of the Complaint is that Hartman (and his co-conspirators) *failed* to act within the gambit of their typical employment duties. Thus, the Motion misconstrues the Complaint and relevant case law.

"The Hawai'i Supreme Court has defined civil conspiracy as the combination of two or more persons or entities by concerted action to accomplish a

criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means." Grinpas v. Kapaa 382, Ltd. Liab. Co., 145 Hawai'i 54, 445 P.3d 1088, 1089 (App. 2019) (quoting Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co., 91 Hawai'i 224, 252 n.28, 982 P.2d 853 (1999) (citations and brackets omitted), superseded by statute on other grounds as stated in Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, 113 Hawai'i 77, 107, 148 P.3d 1179, 1209 (2006)). A "civil conspiracy claim must include either that the alleged conspirators had a criminal or unlawful purpose for their concerted action or that the alleged conspirators used criminal or unlawful means to accomplish a lawful objective." Id. (citation omitted).

The Complaint alleges numerous torts by the civil co-conspirators, including fraud, breach of fiduciary duties, gross negligence, and fraudulent conveyance (with respect to the Kahala Property). The concerted efforts by Hartman and the co-conspirators included all the steps taken to illegally obtain PPP funds, and also extends to the taking of MDG's money to be used in the Campaign Finance Fraud. Accordingly, the elements are satisfied.

Moreover, Hartman's argument that he merely acted within his normal or typical corporate duties is unavailing. Hartman cites to Armstrong v. Reynolds, 22 F.4th 1058 (9th Cir. 2022) for application of the "intracorporate conspiracy doctrine." Motion, p. 22 (citing Armstrong, at 1085). However,

another case cited by Hartman "recognize[d] that, when officers of a corporation act for their own personal purposes, they become independent actors, who can conspire with the corporation." Greys Ave. Partners, LLC v. Theyers, 484 F. Supp. 3d 895, 911 (D. Haw. 2020) (quoting Roberts, 91 Hawai‘i at 253, 982 P.2d at 882). Given the scope and nature of the allegations, there is no colorable argument that the co-conspirators were conducting typical corporate business. This is confirmed by the guilty pleas entered by the CEO, and the multiple indictments facing the CFO and Controller.

C. Aiding and Abetting

Hartman did not carefully read the Complaint – a defect present in other arguments, but obvious with respect to the aiding and abetting arguments. This count is not alleged against Hartman and is only alleged against "Lum Kee and Tiffany Lam." Dkt. 1, ¶236.

D. Breach of Fiduciary Duty

Hartman concludes that no viable breach of fiduciary duty claim exists because the Complaint "lump[ed] together Defendants Chen, Ambrose, Hartman, and Lum Kee." Motion, p. 23. As with other arguments, Hartman focuses solely on the paragraphs alleging the Count, and ignores the factual allegations supporting the claim.

"To claim breach of fiduciary duty, a plaintiff must show that a fiduciary relationship existed between the parties, the defendant breached a fiduciary duty to the plaintiff, and the breach proximately caused injury to the plaintiff." Swift v. Swift, 138 Hawai'i 52, 375 P.3d 1290 (App. 2016). Here, Hartman owed MDG fiduciary duties. See Dkt. 1, ¶¶38,41-42. Hartman breached those duties by participating in the various fraudulent schemes, including the falsified bonus payments in the PPP applications and his efforts to coverup the Campaign Finance Fraud. See, e.g., id., ¶¶57-60,82-84,126,131. MDG was damaged as a result of this conduct. Id., ¶¶197, 242.

E. Conversion

The Motion concludes that "Plaintiffs made almost no effort to allege the elements of conversion against Hartman apart from broad, conclusory statements." The Motion only cites to the portion of the Complaint alleging the Count for conversion (¶¶244-48) but disregards the factual averments supporting the claim (¶¶1-188). Motion, p. 24. Instead, the Complaint alleges that Hartman, along with the co-conspirators, took MDG's money, transferred it to SYWSE, and therefore assumed ownership and control of the money. The Complaint further alleges the money was used for illegal purposes. Accordingly, conversion is properly pled, and in any event, Hartman fails his burden and cannot obtain dismissal with mere conclusions.

F. Embezzlement

Hartman's argues that embezzlement is a "fraud claim" and was not pled with "particularity." Motion, p. 24. Hartman provides no case citation or authority for the conclusion that this is a fraud claim. Regardless, as explained above, Hartman's conduct was alleged with particularity as it relates to the PPP Fraud and Campaign Finance Fraud.

Under Hawaii law, embezzlement has the following elements: (i) an employment or agency relationship between the owner of the money and defendant, (ii) the money allegedly embezzled came into the defendant's possession via the relationship, (iii) and an intentional or fraudulent appropriation or conversion of the money. Miyashiro v. Roehrig, 122 Hawai'i 461, 484, 228 P.3d 341, 364 (App. 2010).

The elements are satisfied. First, Hartman was MDG's Vice President and was MDG's agent and fiduciary. Second, MDG's money was transferred to SYWSE, a sham organization created for the purpose of covering up the Campaign Finance Fraud. Hartman abused his position with MDG by offering MDG's money to third parties through SYWSE as a conduit. Thus, MDG's money was taken, transferred to others, and appropriated through Hartman's abuse of his position with MDG. Accordingly, embezzlement is properly alleged and the Motion must be denied.

G. Unjust Enrichment

Hartman concludes that he never received a benefit, and therefore, there is no retention or resulting injustice. Motion, p. 25. Unjust enrichment requires a benefit conferred by plaintiff to defendant, and that defendant's retention of the benefit is unjust. Durette v. Aloha Plastic Recycling, Inc., 105 Hawai'i 490, 503, 100 P.3d 60 (2004). The elements are properly asserted. First, Hartman received $15,000 from MDG based on certain promises Hartman made. See Dkt. 1, ¶¶104,106-107. MDG has since learned that Hartman lied in making these promises. Id., ¶109. As a result, it is unjust for Hartman to retain the $15,000. Id., ¶¶110,561.

H. Gross Negligence

Hartman's argues that gross negligence must be dismissed because the Complaint failed to allege an "entire want of care" or the "presumption of conscious indifference to consequences." Hartman's argument relies on incorrect law and his conclusions are wrong.

Hartman incorrectly relies on Smallwood v. NCSOFT Corp., 730 F. Supp. 2d 1213 (D. Haw. 2010). Smallwood does not interpret *Hawaii* law, and instead cites to *Texas* law pursuant to the subject contract. Id., at 1226-27. Hartman should have cited *Hawaii* law. Media Rights Techs., Inc. v. Microsoft Corp., 922 F.3d 1014, 1026 (9th Cir. 2019). Under Hawaii law, a plaintiff must

allege that the defendant owed a duty of care to plaintiff and defendant breached that duty. Young v. Buren, 130 Hawai‘i 349, 310 P.3d 1050 (App. 2010). In addition, gross negligence is the "indifference to a present legal duty and utter forgetfulness of obligations so far as other persons may be affected." Pancakes of Haw. v. Pomare Props. Corp., 85 Hawai‘i 286, 293, 944 P.2d 83, 90 (App. 1997) (brackets and citations omitted).

Hartman's conduct in directing and participating in the PPP and Campaign Finance Frauds was intentional, wanton, reckless, and therefore grossly negligent. There is no question Hartman owed MDG duties of care, loyalty, and good faith as MDG's high-ranking manager. There is equally no question the Complaint alleges gross breaches of his duties and damages resulted. Accordingly, gross negligence is sufficiently pled.

I. Breach of Contract

Hartman wrongly concludes that the breach of contract claim is a disguised fraudulent inducement claim. Contrary to Hartman's conclusions, the Complaint alleges that Hartman made a written request for payment of his attorneys' fees and MDG agreed to pay $15,000. "[I]n consideration," Hartman forfeited indemnification rights and agreed to repay $15,000 if he failed to act in "good faith." Dkt. 1, ¶¶105-110. MDG sues for breach of contract because

Hartman's conduct was not in good faith and he owes MDG $15,000. Thus, breach of contract is adequately asserted, and the Motion must be denied.

## VI. NAVATEK HOLDINGS ASSERTS NO CLAIMS AGAINST HARTMAN

Hartman seeks dismissal of claims by Navatek Holdings LLC, but no such claims are asserted.

## VII. LEAVE TO AMEND SHOULD BE GRANTED

If the Court is inclined dismiss claims, the Court should do so without prejudice and grant leave to amend. "Dismissal without leave to amend is improper unless it is 'clear' that 'the complaint could not be saved by any amendment.'" Harris v. Amgen, Inc., 573 F.3d 728, 736 (9th Cir. 2009). Since the Complaint was drafted, MDG has uncovered substantial evidence and details supporting its claims against Hartman and MDG requests leave to amend.

## VIII. CONCLUSION

Plaintiff respectfully requests that the Court DENY Hartman's motion in its entirety.

DATED: Honolulu, Hawaii, October 28, 2022.

/s/ Ryan H. Engle
CRYSTAL K. ROSE
RYAN H. ENGLE
GRANT FASI ALLISON

Attorneys for Plaintiffs
MARTIN DEFENSE GROUP, LLC
and NAVATEK HOLDINGS LLC