Of Counsel:

LUNG ROSE VOSS & WAGNILD

CRYSTAL K. ROSE 3242-0
(*crose@legalhawaii.com*)
Attorney at Law
A Law Corporation
RYAN H. ENGLE 7590-0
*(rengle@legalhawaii.com)*
Attorney at Law
A Law Corporation
GRANT FASI ALLISON 10368-0
*(gallison@legalhawaii.com)*
Attorney at Law
A Law Corporation
Topa Financial Center
700 Bishop Street, Suite 900
Honolulu, Hawaii 96813
Telephone: (808) 523-9000
Facsimile: (808) 533-4184

Attorneys for Plaintiff
PACMAR TECHNOLOGIES LLC
(f/k/a MARTIN DEFENSE GROUP, LLC)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PACMAR TECHNOLOGIES LLC (f/k/a MARTIN DEFENSE GROUP, LLC), | CASE NO. 1:22-cv-00283-LEK-WRP |
| Plaintiff, | SECOND AMENDED COMPLAINT; DEMAND FOR JURY TRIAL; CERTIFICATE OF SERVICE |
| vs. | |
| | (*Caption continued on next page*.) |

MARTIN KAO; TIFFANY JENNIFER LAM a.k.a. JENNY LAM and/or TIFFANY KAO; LAWRENCE KAHELE LUM KEE; CLIFFORD CHEN; DUKE HARTMAN; SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC, )

Defendants. )

SECOND AMENDED COMPLAINT

Plaintiff PACMAR TECHNOLOGIES LLC (f/k/a MARTIN DEFENSE GROUP, LLC), by and through its attorneys, Lung Rose Voss & Wagnild, assert the following Second Amended Complaint against Defendants MARTIN KAO, TIFFANY JENNIFER LAM a.k.a. JENNY LAM and/or TIFFANY KAO, LAWRENCE KAHELE LUM KEE, CLIFFORD CHEN, DUKE HARTMAN, and SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC, and allege and aver as follows:

INTRODUCTION

1. Plaintiff PacMar Technologies LLC brings this case against Defendant Martin Kao, his wife, Tiffany Lam, and a gang of conspirators engaged in a complex racketeering scheme aimed to loot the resources of a venerable engineering firm. Rewarding themselves with ill-gotten Federal Payment Protection Program ("PPP") funds, the conspirators constructed a web of money laundering, shell entities, and unauthorized transfers in a brazen attempt to

perpetuate their fraud and illegal activity. Plaintiff now seeks reimbursement against the Defendants for these malevolent acts.

THE PARTIES AND THE PROPERTIES

2. Plaintiff PACMAR TECHNOLOGIES LLC (f/k/a MARTIN DEFENSE GROUP, LLC) ("PacMar" or the "Company") is, and at all times relevant was, a Hawaii limited liability company doing business in the State of Hawaii.

3. PacMar is an entity primarily involved in the business of providing engineering and related services to the United States government.

4. PacMar is sometimes hereinafter referred to as "Plaintiff."

5. On information and belief, Defendant MARTIN KAO ("Kao") is and was at all times relevant herein a resident of the State of Hawaii.

6. On information and belief, Defendant JENNIFER TIFFANY LAM, a.k.a. JENNY LAM and/or TIFFANY KAO ("Tiffany Lam" or "Lam") is and was at all times relevant herein a resident of the State of Hawaii.

7. On information and belief, Defendant CLIFFORD CHEN ("Chen") is and was at all times relevant herein a resident of the State of Hawaii.

8. On information and belief, Defendant LAWRENCE KAHELE LUM KEE ("Lum Kee") is and was at all times relevant herein a resident of the State of Hawaii.

9. On information and belief, Defendant DUKE HARTMAN ("Hartman") is and was at all times relevant herein a resident of the State of South Carolina.

10. On information and belief, Defendant SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC ("SYWSE") is and was at all times relevant a limited liability company organized under the laws of the State of Hawaii.

11. The following persons are collectively referred to as the "Defendants" or "Co-conspirators" and may sometimes be individually referred to as a "Defendant": (i) Martin Kao, (ii) Tiffany Lam (iii) Clifford Chen, (iv) Lawrence Lum Kee, (v) Duke Hartman, and (vi) SYWSE.

12. These same Co-conspirators formed an enterprise as that term is defined under 18 U.S.C. 1961, *et seq.* (the "RICO Act").

13. As explained in the Second Amended Complaint, the purpose of the enterprise was twofold: (i) to obtain government benefits, contracts, and money through illegal means, the PPP fraud, and illegal campaign contributions; and (ii) use the Company's money to coverup these crimes and obstruct investigations into these same crimes.

14. Ultimately, the enterprise's goals were intended to result in the personal financial gain of its members.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and under 18 U.S.C. § 1964 for claims alleged against Defendants that violate and/or arise from conduct described in 18 U.S.C. § 1962.

16. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over state law claims alleged herein because such claims are so related to and form part of the same case and controversy as PacMar's Racketeer Influenced and Corrupt Organizations ("RICO") claims asserted against Defendants.

17. Venue in the District of Hawaii is proper under 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because the Court possess personal jurisdiction over one or more Defendants that reside in the State of Hawaii and/or maintain traditional minimum contacts with the State of Hawaii, there is no other district in which a court would have personal jurisdiction over all co-conspirator Defendants, and the facts show a nationwide RICO conspiracy exists.

## FACTUAL BACKGROUND RELEVANT TO ALL CLAIMS

### A. Relationships Between Co-conspirators and Parties

18. Defendant Kao is the architect and driving force behind the illegal conduct and pattern of racketeering committed by the RICO enterprise comprised by the Defendants and Co-conspirators.

19. Kao could not have executed the pattern of racketeering by himself, and to achieve his illegal and fraudulent objectives, Kao conspired and worked with Defendants Tiffany Lam, Chen, Lum Kee, Hartman, and SYWSE to execute various parts of the enterprise's schemes and goals.

20. Defendant Tiffany Lam is, and was during all relevant periods, Defendant Kao's wife.

21. Defendant Kao first became employed by the Company in or around 2008 and eventually became the Company's Chief Executive Officer ("CEO") and managing-member.

22. Kao's deception and fraud against the Company started when he was first hired in 2008 when he falsely told the Company, both orally and in his resume, that he held law degrees from UCLA and NYU; instead, the Company recently found out via subpoenas to these schools that Kao never attended either school and never obtained either degree.

23. Kao was employed in various roles and positions by the Company from 2008 until March 2019 when Kao took over day-to-day operations of the Company when its prior manager, founding member, CEO, and President, Steven Loui, relinquished those positions to Kao but continued as an owner of the Company and as its Chairman.

24. Defendant Kao was disassociated from the Company and all direct ties between the Company and Defendant Kao were severed on or around November 23, 2021 because a Final Arbitration Award, also dated November 23, 2021, ordered the severing of any such direct relationship or association.

25. Defendants Chen, Lum Kee, and Hartman, were also employees of PacMar who were hired and/or appointed to their positions with PacMar by or under Defendant Kao in his role as CEO and manager of PacMar and served in their respective roles from approximately January 2019 until January 2021 (hereinafter, the "Relevant Period").

26. Defendant Chen served as PacMar's Chief Financial Officer ("CFO") from the approximate time period of January 2019 until January 2021, and in that role was appointed as an officer of PacMar.

27. Defendant Hartman was hired as PacMar's Director of Programs but eventually became the Company's Senior Vice President of Strategic Partnerships, and in this role, Defendant Hartman reported directly to Defendant Kao and worked closely with Defendant Chen.

28. Defendant Lum Kee was hired by Defendant Kao and Defendant Chen in or around May 2019 and, within months, was appointed to be PacMar's "Controller" and in this role, Lum Kee worked directly under Defendants Kao and Chen.

29. Defendant SYWSE is and was, during the relevant period, a shell company created by Defendants Kao, Chen, Lum Kee, Tiffany Lam, and Hartman to carry out and assist in their pattern of racketeering activity as alleged in this Second Amended Complaint.

30. Defendant SYWSE's registered agent, sole member, and principal is and was Tiffany Lam, and SYWSE was directed by Defendant Hartman with respect to the pattern of racketeering activity alleged in this Second Amended Complaint.

31. Defendant SYWSE was an alter ego of Martin Kao and Tiffany Lam, who failed to uphold proper corporate governance of SYWSE as its sole member and manager. Defendants Kao and Lam operated SYWSE as a fiction, and under their direction, Defendant Hartman co-mingled PacMar funds with those of SYWSE and used SYWSE to illegally obscure the true source SYWSE's funds.

32. The close nature of the family relationships and the manner in which Defendant Kao hired the Co-conspirators to create loyalties and allegiances among the Co-conspirators and in favor of Defendants Kao and Tiffany Lam is what enabled the fraud, pattern of racketeering, and conspiracy to flourish.

B. Defendant Chen's Fiduciary Duties

33. As the Company's CFO during the Relevant Period, Chen was responsible for, among other things, directing the fiscal functions of the Company

in accordance with generally accepted accounting principles issued by the Financial Accounting Standards Board, the Securities and Exchange Commission, and other regulatory and advisory organizations and in accordance with financial management techniques and practices appropriate within the industry.

34. As the Company's CFO during the Relevant Period, Defendant Chen was also responsible for supervising the Company's controller and the indirect supervision of all employees in the accounting and finance department.

35. Prior to joining the Company, Defendant Chen brought with him a deep and sophisticated background and understanding of the law, legal fiduciary duties, and general accounting principles, having worked for years in investment banking, serving as the former treasurer for Hawaiian Electric Industries from July 2015 to June 2018, receiving his undergraduate degree (AB) from Harvard, his law degree (JD) from the University of Michigan, and his business (MBA) degree from the University of Chicago Graduate School of Business (Booth) with a concentration in finance and accounting.

36. By reason of his position as CFO and officer of the Company during the Relevant Period, and because of his ability to control the accounting and financial affairs of the Company during the Relevant Period, Defendant Chen owed the Company fiduciary obligations of good faith, loyalty and care, and was

required to use his utmost ability to control and manage the accounting and financial affairs of the Company in a fair, just, honest and equitable manner.

37. Chen was required at all times during the Relevant Period to act in furtherance of the best interests of the Company and its members and not in furtherance of his, or any other individual or entity's, personal interest or benefit.

38. To faithfully discharge these duties, Defendant Chen was also required to exercise undivided, unselfish and unqualified loyalty, unceasing effort never to profit personally at the Company's expense, and an unbending disavowal of any opportunity which would permit his private interests to clash with those of the Company, including but not limited to the following:

a. Exercise good faith in preparing and/or supervising the preparation, filing and/or dissemination of financial statements, audits, reports, employment, accounting, or other information required by law, and in examining and evaluating any reports, filings, submissions, or examinations, audits, or other employment or financial information concerning the Company; and

b. Refrain from unduly benefiting himself and other Company insiders or third parties at the expense of the Company.

C. <u>Defendant Hartman's Fiduciary Responsibilities</u>

39. Defendant Hartman served as the Senior Vice President of Strategic Partnerships for the Company during the Relevant Period and was

responsible for, among other things, the overall performance of the Company's portfolio of programs, business development, and hiring Washington D.C. political consultants to lobby on the Company's behalf.

40. At all times during the Relevant Period and with respect to the allegations in this Second Amended Complaint, Defendant Hartman reported directly to Defendant Kao and worked closely with Defendant Chen and conspired with Kao and Chen to unlawfully take money from the Company, and launder it through SYWSE, in order to cover up various crimes committed by the enterprise.

41. By reason of his position as a Senior Vice President and officer of the Company during the Relevant Period, and because of his significant business and financial responsibilities for the Company, Defendant Hartman owed the Company fiduciary obligations of good faith, loyalty and care, and was required to use his utmost ability to control and manage the operational and business affairs of the Company in a fair, just, honest and equitable manner.

42. Hartman was required at all times during the Relevant Period to act in furtherance of the best interests of Company and its members and not in furtherance of his, or any other individual or entity's, personal interest or benefit.

43. To faithfully discharge these duties, Defendant Hartman was also required to exercise undivided, unselfish and unqualified loyalty, unceasing effort never to profit personally at the Company's expense, and an unbending

disavowal of any opportunity which would permit their private interests to clash with those of the Company, including but not limited to the following:

a. Exercising good faith in managing and overseeing the overall performance of the Company's portfolio of programs, business development, and engaging Washington D.C. political consultants to lobby on the Company's behalf; and

b. Refrain from unduly benefiting himself and other Company insiders or third parties at the expense of the Company.

D. Defendant Lum Kee's Fiduciary Responsibilities

44. Kao and Chen hired Lum Kee in May of 2019 and, within months, appointed him as the Company's "Controller" with authority to sign checks for the Company, and to manage and assess the financial health and needs of the Company, among other financial and monetary responsibilities, and Lum Kee reported directly to Kao and Chen in executing these duties.

45. As PacMar's Controller, with access and control over the Company's checkbook, accounts, and management responsibilities over the Company's financial health, Lum Kee owed fiduciary duties to the Company.

46. Defendant Lum Kee's fiduciary obligations owed to PacMar included, but were not limited to, good faith, loyalty and care, and he was required

to use his utmost ability to control and manage the financial and bookkeeping affairs of the Company in a fair, just, honest and equitable manner.

47. In addition, Lum Kee owed fiduciary obligations to the Company to execute his duties in a reasonable manner and to employ the skill and judgment of a typically prudent financial manager.

48. Defendant Lum Kee was required at all times during the Relevant Period to act in furtherance of the best interests of Company and its members and not in furtherance of his, or any other individual or entity's, personal interest or benefit.

**The Co-conspirators' Conduct in Defrauding,
Conspiring, Aiding and Abetting, and Stealing PacMar's Assets**

49. All of the actions of Defendants set forth herein were fraudulent, intentional, malicious, part of a pattern of racketeering activity, and/or in violation of federal and state laws.

50. Defendant Chen was appointed in his role as the Company's CFO by Defendant Kao, and Defendant Lum Kee was appointed in his role as the Company's Controller by Defendants Chen and Kao.

51. In making these appointments, Kao also fired the Company's prior CFO and Controller, as well as its IT Manager, who had been with the Company for decades, and would not have accepted Kao's overtly illegal acts.

52. Kao and the enterprise not only fired these employees, but the enterprise took additional steps to ensure the long-time employees could not interfere with their schemes by installing new software for critical Company operations, such as payroll and communications, which the fired employees were denied access, and threatening other employees with termination if they spoke with the terminated CFO, Controller, or IT Manager.

53. Once Kao, Chen, and Lum Kee had ascended to their respective positions, the three Co-Conspirators had financial control over the Company, its accounts, and its financial dealings.

54. This financial control over the Company allowed the enterprise to engage in the various frauds alleged herein without scrutiny or direct oversight by any superiors.

55. Defendant Tiffany Lam, Defendant Kao's wife during the Relevant Period, while not an employee of the Company, was given access to the Company's credit cards, accounts and assets for her personal use (and the personal use of others) by Defendant Kao, Defendant Chen, and/or Defendant Lum Kee.

56. Tiffany Lam was a Certified Public Accountant for nearly a decade during her career, and therefore, Tiffany Lam had specialized knowledge that the conduct alleged in this lawsuit was unlawful and fraudulent.

57. Martin Kao holds a masters in tax accounting from University of Southern California and was also a Certified Public Accountant for nearly a decade during his career, and therefore, Kao had specialized knowledge that the conduct alleged in this lawsuit was unlawful and fraudulent.

58. Lum Kee was also a Certified Public Accountant for nearly two decades during his career, and therefore, Lum Kee had specialized knowledge that the conduct alleged in this lawsuit was unlawful and fraudulent.

59. Tiffany Lam used these company credit cards for improper purposes, including to pay for the initial costs associated with incorporating and capitalizing SYWSE.

60. Defendant Tiffany Lam was also the registered agent and principal of Defendant SYWSE, which was integral to the enterprise's pattern of racketeering, and as such, Defendant Tiffany Lam was a direct contributor and participant in SYWSE's pattern of racketeering.

**The Enterprise's Pattern of Racketeering Started With Illegal Campaign Contributions to 1820 PAC And Members of Congress**

61. On September 17, 2019 Kao emailed Chen and Lum Kee an email with subject line "Let's Discuss in person" and the email included an internet address for a Political Action Committee called 1820 PAC.

62. 1820 PAC was a Political Action Committee supporting Senator Susan Collins from Maine.

63. 1820 PAC was chosen because Senator Collins had decision making authority over government contracts that Kao desired, and Kao intended to use illegal campaign donations to garner favor and influence these decisions in his favor.

64. The same day, on September 17, 2019, Chen and Lum Kee used their PacMar corporate credit cards to make $5,600 contributions to 1820 PAC.

65. On September 26, 2019, Chen and Lum Kee were cut checks from the Company's general account for additional amounts that were donated to 1820 PAC by Chen and Lum Kee as follows: Chen received $6,000 and Lum Kee received $5,218.88, and both checks were cashed the same day.

66. On or around the same day, Defendant Chen's mother and Defendant Lum Kee's wife donated to Senator Collins' campaign.

67. Within a week, Chen wrote his mother a check for the same amount she contributed to Senator Collins and Chen's mother later told law enforcement she made the donation to Senator Collins because Chen asked her to.

68. These contributions were made with Company money by Chen and Lum Kee as conduits.

69. These are just a few examples of the dozens of unlawful campaign contributions that Kao, Tiffany Lam, Chen, and Lum Kee made with the Company's money between in or around August 2019 through August 2020.

70. In total, Kao, Tiffany Lam, Chen, and Lum Kee made at least 39 illegal political donations, made these donations either in their own names or in the names of their family members, and these donations were made with at least $173,968 of improperly taken Company funds.

71. Because the Company was a government contractor, and because the Company's money was used to fund these donations, these were unlawful campaign donations.

72. On November 21, 2019, Lum Kee sent an email to Kao and Chen with the subject "New LLC" that stated "Looks like we can setup a new LLC Pretty vaguely. Let me know who you want to list as the registered agent, manager and the address to use and I can get started when you are read. Thanks." Kao responded in part, "Name of LLC: [SYWSE]."

73. Confirming this purpose, Kao emailed a representative of 1820 PAC on November 22, 2019 that he "[h]ad a chance to discuss 1820 with my CFO and attorney last night. They are suggesting setting up a separate new LLC to make the donations."

74. The "CFO and attorney" Kao referenced, who had the initial idea to set up a separate LLC to make the illegal donations, was Defendant Chen.

75. Kao continued by telling the 1820 PAC representative that the new LLC would be "super vague and very difficult to get any background info on" and likened it to a shell company in a real estate transaction that is set up to conceal "the identity of the buyer/seller."

76. On November 26, 2019 SYWSE filed articles of organization and Tiffany Lam was named its registered agent and manager and signed the organization documents under her alias "Jennifer Lam."

77. The initial filing fees and other amounts required to register SYWSE were amounts taken from the Company and paid for with the approval and knowledge of Lum Kee as the Company's controller.

78. Thus, SYWSE was the "new LLC" set up by Kao, Tiffany Lam, Chen, and Lum Kee for the sole purpose of making the illegal campaign donation to 1820 PAC.

79. Sometime between November 26, 2019 and December 31, 2019 Kao met with 1820 PAC's representatives to discuss additional and forthcoming campaign contributions from the Company.

80. On December 26, 2019, Lum Kee wrote a check for $150,000 from the Company to SYWSE.

81. On December 27, 2019, the check was deposited into SYWSE checking account and constituted SYWSE's only funds at that time.

82. The same day, Kao signed a check on behalf of SYWSE that caused SYWSE to make a $150,000 contribution to 1820 PAC but the check was rejected because Kao was not an authorized signatory on the SYWSE account.

83. Therefore, to ensure the $150,000 donation to 1820 PAC was made, on December 31, 2019, Tiffany Lam as the agent and principal of SYWSE signed another check from SYWSE to 1820 PAC for $150,000.

84. On February 3, 2020, and as a result of the numerous illegal campaign contributions made by and through Kao, Tiffany Lam, Chen, Lum Kee, and SYWSE, as described above, a complaint was filed with the Federal Election Commission ("FEC") alleging violations of campaign contribution laws ("FEC Complaint").

85. The FEC Complaint was made against the following persons: (i) SYWSE, (ii) Tiffany Lam (who was named as Jennifer Lam), and (iii) "other persons who created and operated [SYWSE], and made contributions to 1820 PAC in the name of [SYWSE][.]"

86. Because Kao, Tiffany Lam, Chen, Lum Kee, Hartman, and SYWSE were the persons and entity that did these things, the FEC Complaint commenced a federal investigation into illegal campaign contribution activity

alleged against and/or involving these same Defendants, even if they were not specifically named in the FEC Complaint at the time it was filed.

87. These actions were unlawful pursuant to 52 U.S.C. § 30122, which prohibits making campaign contributions in the name of another person, and pursuant to 52 U.S.C. §§ 30119, 30109, and 18 U.S.C. § 2, which prohibit government contractors, such as the Company, from making campaign contributions.

88. As alleged in this Second Amended Complaint, Hartman was enlisted by Kao, Chen, and Lum Kee to direct and operate the SYWSE in its efforts to coverup the SYWSE's illegal campaign donations, thus Hartman was a person "who created and operated" SYWSE and was an unnamed target of the FEC Complaint.

89. Importantly, Kao, Tiffany Lam, Chen, Lum Kee, Hartman, and SYWSE knew of the February 3, 2020 FEC Complaint, and therefore understood and had knowledge of the legal and criminal risks and liabilities created by the FEC Complaint and ensuing federal investigation.

90. This knowledge was imparted by the following: (i) the FEC Complaint was made against the Co-Conspirators; (ii) the FEC Complaint garnered immediate national and local media attention, including a Civil Beat article published the same day as the FEC Complaint titled "Watchdog Asks FEC to

Probe Hawaii Company's $150K Political Donation"; (iii) emails sent in the days following the FEC Complaint show that the Co-Conspirators were aware of the FEC Complaint and immediately began taking steps to engage legal counsel; and (iv) emails sent in the days following the FEC Complaint show the Co-Conspirators immediately hatched a plan to coverup the unlawful conduct and obstruct the federal investigation commenced by the FEC Complaint.

91. Indeed, the enterprise's conduct with respect to the campaign contributions resulted in charges being brought against Kao, Chen, and Lum Kee in the United States District Court for the District of Columbia in the case styled United States v. Kao, et al., 22-cr-00048-CJN ("Campaign Contribution Criminal Case").

92. Kao has since pled guilty to charges brought in the Campaign Contribution Criminal Case.

**The Enterprise's Scheme to Obstruct Justice**
**By Covering Up SYWSE's Illegal Campaign Contributions**

93. Starting on or around February 5, 2020, Kao, Chen, Lum Kee, and Hartman hatched a plan to coverup the SYWSE's illegal campaign donations by creating a scholarship program whereby the enterprise took the Company's money, laundered it through transfers to Kao, Tiffany Lam, and eventually to SYWSE, before donating the laundered funds to universities to create a façade of

legitimacy for SYWSE that could be used to deflect investigators' attention and scrutiny.

94. The scholarship program would then be highly publicized with the help of the universities who unwittingly accepted these funds without knowledge or notice that the scholarships were only being awarded for nefarious purposes.

95. The Co-Conspirators provided evidence of the scholarship program to the FEC and federal investigators as proof that the SYWSE was incorporated for benevolent reasons, rather than its actual sole intended purpose of making the illegal $150,000 donation to 1820 PAC with money stolen from the Company.

96. Sometime between February 5, 2020 and February 18, 2020, Kao was contacted by an attorney representing 1820 PAC and Kao reported the falsehood that SYWSE was a legitimate organization that existed for the purpose of giving scholarships to women pursing engineering and scientific studies.

97. In a February 18, 2020 email sent to Kao and Chen from the attorney representing 1820 PAC, Kao was advised that these scholarships need to be given by SYWSE "to protect the entity and YOU now while we have the time to do that."

98. These emails further recognized that "information related to the scholarships" would be "include[d] [] in the response to the FEC."

99. These emails were then forwarded to Hartman, who was added to the email chain on February 28, 2020, because Hartman was the specific person tasked with contacting universities to set up the scholarships.

100. Hartman responded to these emails on February 28, 2020 that he had contacted at least twelve (12) universities and stated that "we have committed in 2020" scholarship amounts totaling at least $155,000 to the twelve universities for this purpose.

101. Indeed, after Hartman made additional "commitments" for SYWSE to donate scholarships using Company funds, the total increased to $185,000.

102. Hartman orchestrated and directed the payment of Company money through various conduits designed to launder and hide the source of the money for these scholarships starting in or around March 2020, the month after the FEC Complaint was filed and made public.

103. Between March and June 2020, Hartman oversaw and directed the payment of at least $60,000 for these "scholarships" to the following schools: University of Alaska, University of Hawaii Foundation, University of Illinois, University of Michigan, Oklahoma State University, University of Rhode Island,

South Carolina State University, University of Wisconsin Milwaukee, and Wichita State University.

104. The fraudulent, obstructionist, and illegal nature of the scheme is also confirmed, planned, and discussed in numerous emails between the enterprise members, and specifically between Kao and Hartman.

105. For example, in an email sent on February 20, 2020 between Kao, Hartman, and third-party political consultants hired by Kao, Kao admitted that the 1820 PAC donation was a "screwup" and instructs Hartman to "do EVERYTHING we can to now fix this."

106. On March 25, 2020, Kao, Hartman, Chen, and Lum Kee sent each other emails showing that the Co-Conspirators expressly recognized the purpose of the coverup and their intention to obstruct justice through this plan.

107. In these emails, an attorney engaged to represent the SYWSE named Bill Canfield emailed Kao and Hartman a draft letter that would "explain[] the purpose of the Society . . . [in] response to the FEC . . . and that there is a factual basis for asserting that the LLC was not formed for the purpose of making that contribution."

108. The phrase "that contribution" – as used by Bill Canfield in the March 25, 2020 emails to Kao, Hartman, Chen, and Lum Kee – referred to the

$150,000 donation made by SYWSE to 1820 PAC using the Company's money that was the subject of the FEC Complaint and federal investigation.

109. The entire premise of this letter to the FEC and federal investigators was intentionally false as SYWSE was incorporated and created for the sole purpose of making the illegal $150,000 donation to 1820 PAC, and this purpose was aided through the common understanding of Kao, Chen, Lum Kee, and Hartman that SYWSE was supposed to be "super vague" and "difficult to get any background on."

110. After Kao, Chen, and Hartman all made edits to this letter, Kao emailed Chen, Lum Kee, and Hartman the following description of the scholarships and their intended recipients that formed the so-called legitimate purpose of SYWSE: "Whatever…just a pack of bitches getting free $."

111. A few days later, on March 30, 2020, Kao sent another email to Hartman and Chen in which he parodied Donald Trump's hyperbolic speech to underscore that the scholarship program was not to benefit women, but was instead a coverup of the prior illegal activity:

> I know I'm doing amazing and wonderful things for young women. Huge…hugely wonderful and amazing I tell you. Wonderful to the likes of which you've never seen. That young women and people have never seen. I don't need the fake news and nasty media to tell me what things I already know I'm doing. They are all nasty liars. Amazing stuff I'm doing. Huge I tell you…huger than huge. 😉

112. Driving home the sarcasm underlying Kao's message, and that Kao, Chen, Lum Kee, and Hartman were using the scholarships to coverup and obstruct ongoing investigations, Kao ended the above email with a winking-face emoji.

113. Thus, Kao, Chen, Lum Kee, and Hartman all understood and knew that the SYWSE scholarship program was intended to impede and obstruct the investigation into the illegal campaign contributions previously made by the enterprise.

114. Furthermore, because SYWSE was a sham entity, it lacked any funds of its own, and Kao, Chen, Lum Kee, and Hartman stole Company money to pay Canfield's legal bills in furtherance of the obstructionist scheme.

**Hartman Directed the Enterprise to Use Funds Stolen From the Company To Cover Up The Campaign Contribution Crimes**

115. On February 26, 2020, Hartman emailed instructions to Company employees that were under his management on how these donations were to be made.

116. Hartman specifically advised these employees that the "name of the entity sending the donations" must be "The Society of Women Scientists and Engineers" and "NOT Navatek, Navatek Foundation or anything associated directly with Martin or his family."

117. On March 30, 2020, Hartman, Kao, Chen, and other Company employees and third-party consultants were copied on various emails for the purpose of developing a public relations or "PR" plan for SYWSE.

118. Hartman was in charge of directing and overseeing the SYWSE's scholarship program and PR plan.

119. The PR plan primarily focused on publicizing the scholarships being given out by SYWSE.

120. After reviewing the initial PR plan, Hartman criticized the PR plan and directed changes to the plan to address his concerns.

121. Hartman wrote on March 30, 2020 that there were "concerns from Cliff [Chen] and others that we should try and keep Martin [Kao] . . . at arm's length from SYWSE . . ." and therefore the PR plan should not include any reference to Kao, Tiffany Lam, or the Company.

122. Hartman also recognized in the March 30, 2020 emails that the PR plan will appear like they are trying to "whitewash the foundation for self-serving purposes, especially since the donations are to universities that [the Company] works with . . ."

123. This was a critical detail because one of the primary goals of the enterprise was to target Members of Congress who had decision making authority over government contracts the Company sought and to ply them with

campaign donations, scholarships to their local universities that could be used to bolster their public profiles, and other benefits.

124. As a result, changes were made to the PR plan, including removal of references to Kao, Tiffany Lam, and the Company.

125. Further confirming the illegal nature of the enterprise's plan to use the SYWSE scholarships as a coverup scheme is the fact that SYWSE had no money of its own to fund the scholarships.

126. At least $60,000 paid out by SYWSE to fund these scholarships was money that the enterprise stole from the Company.

127. Before the $60,000 was given to the universities, it was first and transferred from the Company to Kao and/or Tiffany Lam as intermediaries, before being transferred to the SYWSE, and then from SYWSE to the universities.

128. These transfers were facilitated and directed by Kao, Hartman, Chen, and Lum Kee, and the actual physical act of transferring the funds was done by Chen and Lum Kee who controlled the Company's accounts and finances as the CFO and Controller, respectively.

129. The reason the funds were transferred to Kao and Tiffany Lam as intermediaries was for the same reason Hartman directed changes to the PR plan: to create a false appearance of separation between the Company's money, Kao and Tiffany Lam, and the SYWSE scholarship obstruction.

130. Because Tiffany Lam was the SYWSE principal, sole member, registered agent, and signatory on accounts, Tiffany Lam was directly responsible for receiving these funds from the Company after they had been laundered through Kao and herself.

131. Thus, the SYWSE was funded by the Company without consideration or legitimate reasons for doing so, as confirmed by numerous emails sent and received by Hartman and Lum Kee.

132. For example, on February 25, 2020, Hartman emailed the dean of the college of engineering at University of South Carolina ("USC") that he was "reaching out to let you know that [the Company] is interested in providing funding for scholarships for women students studying STEM fields . . . We intend to make these donations by way of a charitable foundation set up for this purpose."

133. The "foundation" Hartman represented would make donations using the Company's money to USC was SYWSE, which was expressly confirmed a few days later in a March 3, 2020 email sent by Kao's secretary to other USC personnel that described the "wonderful relationship with [USC] and [the Company] and the Society of Young Women Scientists and Engineers."

134. A document dated March 3, 2020 and prepared by USC titled "Proposal for the Society of Young Women Scientists and Engineers, LLC" provided instructions to the Company for making the scholarship payment and

states that the payment would come "from the Society of Young Women Scientists and Engineers, LLC."

135. On March 4, 2020, Kao's secretary emailed Lum Kee and Chen stated that $20,000 has been approved by Cliff [Chen] for you to cut a check for [USC]. Please see attached Revised Proposal, there you will see where to make the check out to." The "Revised Proposal" referenced was the March 3, 2020 document from USC.

136. Then, on April 14, 2020, Hartman emailed Lum Kee that they need to "go . . . to Martin [Kao] for funding" of the scholarships.

137. The SYWSE started paying out scholarships in or around March 2020, but the majority of Company money paid for these scholarships was made in May 2020 or later, which was after the Company had received and "washed" the PPP funds.

138. As the sole member, principal, and signatory of its accounts, Tiffany Lam signed each check from the SYWSE to each university.

139. A total of at least $60,000 was paid out by SYWSE using the Company's funds through this bogus scholarship program and with the "washed" PPP money.

140. The enterprise had plans in place to transfer, launder, and give out at least another $120,000 through the SYWSE's scholarship plan, but those

plans were interrupted by the indictments of Kao, Chen, and Lum Kee in the Campaign Contribution Criminal Case, and the indictment of Kao in the PPP Criminal Case.

141. Therefore, the scholarship coverup scheme involved money laundering on two different levels.

142. The scholarship funds involved the company's money, laundered through Kao, and then SYWSE, before being transferred to universities.

143. Additionally, the scholarship money was also co-mingled PPP funds that were illegally obtained, and therefore represented money laundering of the PPP funds as well.

144. Hartman knew his actions in directing the SYWSE were improper and illegal, which he recognized in an email on May 14, 2020 stating he would no longer directly oversee SYWSE in order to "maintain the separation" between the Company and SYWSE.

145. However, this was false and Hartman continued to direct the enterprises efforts with respect to the SYWSE scholarship scheme.

146. Further confirming these facts are emails between Hartman, Chen, and Kao sent on May 21, 2020 about a press release that was being made by Senator Jerry Moran's office about a SYWSE scholarship for Wichita State University students.

147. After removing all other independent recipients from the email chain, Kao asked Hartman and Chen if the press release should include "a plug for the Society [i.e. SYWSE]?" Hartman responded that his "instinct would be NOT to comingle [the Company] and the Society . . ." even though that is exactly what they were doing, and Kao replied to Hartman: "Lol. . .I was joking."

148. Hartman responded to Kao: "Lol SYWSE Pays to Play Again!"

**The PPP Fraud**

149. Soon after hatching the scholarship scheme to coverup their prior campaign contribution crimes, the enterprise seized upon a new opportunity to fraudulently obtain money from the federal government through the Paycheck Protection Program.

150. In March 2020, the federal government enacted the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which allowed business to obtain loans that are commonly referred to as Paycheck Protection Program or "PPP" loans.

151. Beginning in March 2020, Defendants Kao, Chen, and Lum Kee conspired to commit fraud against numerous financial institutions through the PPP loan program (hereinafter, "PPP Fraud").

152. Specifically, Kao, Chen, and Lum Kee assembled PPP loan applications with intentionally falsified information relating to the Company's

payroll, location of its offices, and the number of persons employed by the Company.

153. These figures were used by the PPP loan program to calculate the amount of funds that would be granted to applicant, thus, by intentionally and fraudulently misstating this information, Kao, Chen, and Lum Kee were able to obtain higher PPP loans than they otherwise would have had they included honest and correct information in the PPP application.

154. For example, on April 1, 2020, before assembling any information for a PPP application, Kao emailed Chen and Lum Kee to discuss the application because Kao had "some tricks up [his] Wuhan Sleeves."

155. The next day, Lum Kee emailed Chen: "I don't think we can get anywhere near the $10 million loan . . . I think we can up to max $3.5 million loan without looing [sic] like we are cooking anything."

156. Because PPP loan amounts were calculated based on certain employment statistics, such as the number of employees and amount of payroll, Lum Kee concluded that the Company could not qualify for a loan larger than $3.5 million based on his analysis of the Company's actual size.

157. Thus, in this email, Lum Kee recognized that the only way for the Company to qualify for the maximum allowable PPP loan of $10,000,000 was through fraud.

158. In response, Kao, Chen, and Lum Kee set out to obtain the full $10,000,000 by making changes to the Company's "Summary of Payroll and Related Costs for the Year Ended December 31, 2019" for submission to PPP lenders.

159. These changes included the inclusion of employees from the "Office Expansion Pool" that did not exist and falsely increasing the amount of payroll paid by the Company, thus, Kao, Chen, and Lum Kee purposefully misstated the Company's relevant information in the PPP application.

160. There is no dispute that the "Office Expansion Pool" employees did not exist at the time when Kao, Chen, and Lum Kee drafted and submitted the fraudulent PPP loan applications.

161. This is proven by an email Kao sent to Chen and Lum Kee on April 3, 2020 in which Kao suggested they can "add another for group health costs for the 'pools.' Just use the same ~% as the actual 941 guys."

162. Thus, Kao, Chen, and Lum Kee expressly recognized the number of "actual" employees was less than the number being submitted to CPB, and in order to calculate health care costs for the fictious employees, Kao, Chen, and Lum Kee would apply a percentage of costs for the real employees multiplied across the number of fictious employees.

163. Just prior to submitting the PPP application, Kao emailed Lum Kee and Chen that they would “Chance’m!” – meaning they would submit the fraudulent PPP application and wait and see if it would be approved by PPP lenders based on the falsified information.

164. Chen and Lum Kee understood that the information had been falsified and contributed to and approved the false and fraudulent employment data and PPP applications.

165. This false and fraudulent information was used by Kao, Chen, and Lum Kee in PPP applications to at least three (3) different banks.

166. On April 3, 2020, Kao submitted a PPP application to Central Pacific Bank (“CPB”) and on April 17, 2020, the loan was funded and CPB deposited $10,000,000 into the Company’s bank account

167. On April 19, 2020, Chen emailed Kao and Lum Kee that “[w]e could have made two applications at different banks . . . we would need another bank with idiots running it and weak verification capabilities.” Chen followed up by asking Kao and Lum Kee: “Can we try for a second PPP or is that a double dip if we use same data.”

168. Chen and Kao knew it was a “double dip” and it was illegal to apply for a second PPP loan, but the enterprise did it anyway.

169. On April 20, 2020, Kao submitted a PPP application to Radius Bank, and on May 4, 2020, the loan was funded and Radius Bank deposited $2,841,490 into the Company's bank account.

170. On April 21, 2020, Kao and Lum Kee each submitted different PPP applications to First Hawaiian Bank, but on April 28, 2020, First Hawaiian Bank notified Kao that the applications were denied because the Company had already received PPP loans.

171. In response, Kao emailed Chen and Lum Kee that FHB "got the better of us." Chen replied that if they want to keep obtaining PPP loans they "[n]eed banks smaller than CPB to get a more risk tolerant lender."

172. Compounding the enterprise's PPP fraud was the enterprise's refusal to provide information about the PPP application to the Company's other owners and shareholders.

173. When Kao assumed day-to-day operations of the Company in or around March 2019, the Company's other owners, who had founded, managed, and built the Company, had left approximately $2,500,000 of its own funds in the Company's accounts.

174. Kao, on the other hand, had deposited $0 in his capital membership accounts with the Company.

175. As a result, not only did Kao owe fiduciary and contractual obligations to these other owners through the Company's corporate governing documents, but these other owners had a significantly larger interest in the Company's funds by virtue of owning 100% of the $2,500,000 held by the Company. Thus, the Company's other owner was, essentially, its majority shareholder.

176. Specifically, in or around late-July 2020, after learning of the Company's PPP loans through public reporting, the Company's other owner who held this majority interest (through its principal Steven Loui), requested production of the Company's PPP loan applications and related documents and information.

177. The Company's other owner only learned of the PPP Loan applications and related criminal conduct through public reporting because the enterprise members purposefully withheld this information from the other owner.

178. In emails sent on July 23 and 24, 2020, Kao, Chen, and Lum Kee discuss the information request by the Company's other owner for the PPP loan application and information.

179. In these emails, Kao, Chen, and Lum Kee considered the Company's contractual obligations to its other owner and concluded that they were not obligated and would not give the requested information about the PPP applications to the other owner.

180. Shortly thereafter, Chen and Lum Kee deleted and destroyed Company records pertaining to the PPP loan applications so the Company's other owner could not obtain the information from the Company and instead would need to request it from the banks that made the PPP loans.

181. Chen and Lum Kee discussed and knew that the Company's other owner would not be able to obtain the information from any of the PPP lenders because the request would not be made on behalf of the Company itself, and it would therefore be denied.

182. Thus, these efforts by Chen and Lum Kee were done in order to eliminate any ability for the Company's other owner to obtain the requested information.

183. As part of this effort, Chen instructed Lum Kee to go through the Company's computer drives and electronic storage and delete the same information so it could not be retrieved.

184. To further the destruction of evidence and relevant documents, Lum Kee physically destroyed and shredded Company records relevant to the PPP fraud.

185. Chen admitted that he instructed Lum Kee to delete these files in an interview with the Company's legal counsel that occurred on October 24, 2020.

186. Lum Kee was seen by Company employees continuing to destroy and shred documents through December 2020.

187. The final result of this fraud was that the enterprise applied for three (3) PPP loans and successfully received two (2) PPP loans totaling $12,841,490.

188. The PPP fraud eventually resulted in criminal charges being brought against Kao in the United States District Court for the District of Hawaii in the case styled as United States v. Martin Kao, Mag. No. 20-01208-WRP ("PPP Criminal Case").

189. Kao has since pled guilty to the charges brought in the PPP Criminal Case.

190. In connection with the PPP Criminal Case, and to date, the Government has sought and obtained warrants to seize over $20,000,000 from the Company and has seized $8,693,986.72 from the Company's accounts that is held by the Department of Treasury.

191. The Government has also seized at least $2,000,000 from Kao that is held by the Department of Treasury.

192. Notably, the Company was informed in writing from the Small Business Administration ("SBA") that outstanding PPP balances, which may include interest, have been "referred to Treasury for collection."

193. Therefore, the Company has begun working on a plan to repay any PPP balances owed to the Department of Treasury once the Company has sufficient funds..

194. As a result of Kao's numerous crimes, Kao was fully disbarred from Federal Government contracting as of November 18, 2020.

**The Enterprise's Coverup Of The Co-Conspirator's Illegal Activity Furthers The Pattern Of Racketeering**

195. Because the PPP loans were illegally obtained, the enterprise needed to take steps to coverup its illegal activity.

196. The enterprise was already generally aware of its criminal liability because the enterprise had notice of the February 2020 FEC Complaint relating to the illegal campaign contributions made in late-2019.

197. Then, on May 1, 2020, Chen sent Kao and Lum Kee a Bloomberg News article about early signs of fraud related to improperly obtained PPP loans and Kao responded: "Fk."

198. In response, Kao attempted to portray the Radius Loan as having been removed from the PPP program.

199. To do this, Kao, Chen, and Lum Kee forged and falsified copies of certain Radius Bank PPP loan documents maintained in the Company's records by removing paragraphs containing references to the PPP program.

200. Chen and Lum Kee then persisted in telling Company employees that the Radius Bank loan was "removed" from the PPP program despite their knowledge that this was not true.

201. For example, on July 6, 2020, Lum Kee sent an email advising that "Radius removed us from the PPP program, even though they modeled the loan around it. The actual loan documents don't reference PPP. Good thing though that isn't us . . ." Lum Kee's statements were intentionally false and misleading.

202. The only reason the loan documents no longer referenced the PPP loan program was because Kao, Chen, and Lum Kee had doctored them to remove those references in order to support their lies.

**The Enterprise's Attempts to "Wash" or Launder the PPP Funds**

203. On or before April 18, 2020, PacMar's account balance in an account held at Central Pacific Bank ("CPB") was $590,596.30.

204. On or around April 18, 2020, CPB transferred $10,000,000 in PPP Loan proceeds into this account, raising the balance to $10,559,952.90.

205. Sometime shortly thereafter, Defendant Kao instructed Defendant Lum Kee to transfer $2,000,000 of this amount into his personal Merrill Lynch account and Defendant Lum Kee did this on or around April 21, 2020.

206. By making this transfer to a Merrill Lynch account, Lum Kee and Kao made a transfer of stolen property in violation of U.S.C. §§ 2314 and 2315.

207. Lum Kee entered this transaction in the Company's books as "Loan to Kao" even though it was not a loan and Lum Kee was transferring the money to Kao without consideration or legitimate reason to do so.

208. On or around April 24, 2020, Defendant Kao emailed Chen and Lum Kee to confirm and direct the pattern of racketeering activity:

> [s]peaking of moving funds around, maybe we should start moving slowly more funds out of CPB over the next few months... wash it from them, before moving it all back to CPB. That way it looks like "new funds". . Is it difficult to change the account that the Government pmt systems sends money too? [sic] Can have them send to Navatek Merrill account until we exhaust the CPB loan funds currently in there? That way it even looks like were using it for payroll.

209. On April 24, 2020, Chen responded to Kao's plan to "wash" the illegally obtained PPP funds: "That is a good idea."

210. According to this plan set forth in Defendant Kao's April 24, 2020 email, Lum Kee directed and executed the "washing" of the remaining $8,000,000 of the $10,000,000 CPB PPP Loan by moving the funds from the CPB account into PacMar's Merrill Lynch account before moving the same funds back to the CPB account.

211. In total, between April 20, 2020 and July 29, 2020, Lum Kee made eleven (11) different monetary transfers in which a total of $8,000,000 was moved from the CPB account to the Merrill Lynch account, and a total of $7,500,000 was moved from the Merrill Lynch account back to the CPB account.

212. Each of the transfers for the purpose of "washing" the millions of ill-gotten monies was a violation of 18 U.S.C. §§ 1956, 1957, and 1952.

213. Critically, by this time, the unlawful conduct had become the enterprise's regular way of doing business, and this was confirmed by emails between Kao, Chen, and Lum Kee.

214. On April 24, 2020, Kao emailed Chen and Lum Kee that he was "starting to fall in love with COVID-19" and that this would "for sure be the case if we get Radius and FHB."

215. That same day, Chen responded to Kao and copied Lum Kee that the fraudulent PPP loans had become the "key strategic competitive advantage for our new business model."

216. Then, in or around October 2020, after Kao was arrested, Chen and Lum Kee coordinated with legal counsel to apply for PPP loan forgiveness based on costs that Chen and Lum Kee said they could justify of approximately $6,200,000 in payroll and $1,700,000 in rent.

217. Chen and Lum Kee drafted and completed forms showing these amounts and their intent and plan to submit these amounts to CPB for loan forgiveness.

218. However, these costs were not accurate, not justifiable, and were intentionally fraudulent, and Chen and Lum Kee's plan to submit them to CPB was financial institution fraud in violation of 18 U.S.C. §§ 1344 and 1952 and was only interrupted by the arrests of the enterprise members.

**Hartman's Knowledge and Participation in the PPP Fraud**

219. Hartman was informed of and knew of the PPP loans as they were occurring because Kao, Chen, and Lum Kee enlisted Hartman's assistance to direct and execute the coverup of the fraud they committed against the PPP lenders.

220. Hartman's knowledge of the enterprise's PPP fraud, and thus his participation, is demonstrated by numerous emails in which the enterprise members discussed their plans to defraud the government of PPP money.

221. For example, on April 1, 2020, while the enterprise was assembling the fraudulent loan applications and just two (2) days before the first PPP application was sent to CPB, Hartman emailed Kao a portion of the Company's payroll and asked why a former employee named Fitch was still being paid. Kao responded that it did not matter because they will "recover most of it via

the stimulus relief." Thus, Hartman knew of the PPP applications and loans before they were submitted or approved.

222. On April 2, 2020, Hartman sent Kao, Chen, and Lum Kee information about how to prepare the PPP loan applications, specifically telling Lum Kee: "I know you are already preparing the SBA loan apps. Here's some additional info attached (interim final rules) and below."

223. Hartman sent numerous other emails between April and May 2020 to Kao, Chen, and Lum Kee tracking and explaining changes to the PPP loan program that could be used by the enterprise to reduce the amounts that the Company would have to pay back to the PPP lenders and/or the SBA.

224. Then, on April 8, 2020, less than a week after the first PPP loan application was submitted, a Company employee emailed Kao, Chen, Lum Kee, and Hartman to suggest that the Company apply for "SBA money" because as a "small business" the Company could receive "payroll cost offset/loan forgiveness, 1% loan rate, etc[.]"

225. Kao responded on April 8, 2020, with Chen, Lum Kee, and Hartman all copied, that "[o]ur payroll is already funded by the Fed Gov. This would be double dipping. I would need at least two cups."

226. Thus, Kao, Chen, Lum Kee, and Hartman, knew and understood that the Company was not permitted to apply for any PPP loans as a

government contractor with payroll funded by the government, and also knew and understood that they could not “double dip” by obtaining PPP loans.

227. Then, in an email Hartman sent to the Company’s Chief Operating Officer (“COO”) on March 26, 2020, Hartman warned the COO that he must “be consistent with Martin’s message that we are bracing for ‘severe impacts’ to our business[,]” even though Hartman recognized in the same email that there were no “severe impacts” to the Company’s business.

228. Hartman told the COO the reason he must be “consistent” was because “we are seeking relief funding” and the warning was necessitated by the COO’s email to a third-party stating that the Company’s business had “seen little to no impact” or loss due to the COVID pandemic.

229. Hartman knew the loans were unlawful but participated in schemes related to and in furtherance of the fraudulent PPP loans anyway.

230. Hartman was tasked with opening new offices in various cities to increase the number of Company employees to match the fraudulent figures stated in the PPP loan applications submitted by Kao, Chen, and Lum Kee.

231. Moreover, Kao, Chen, Lum Kee, and Hartman, as a result of their executive positions at the Company, knew that the Company lacked the cash on hand or resources as of mid-2020 to open offices in numerous cities, pay for leases on those spaces, or pay employees in those offices, and therefore knew that

the fraudulently obtained PPP money was required to fund their "office expansion" plans.

232. As a result, Hartman signed leases in various cities, including a 36-person office space in South Carolina, commencing in September 2020, which has never had more than seven (7) employees (and currently has only four (4)), thus, the Company has never needed or been able to utilize these spaces or justify the costs associated with those offices.

233. Hartman similarly set up an office in Maine that was not needed, could not be afforded by the Company, and was for the sole purpose of justifying the enterprise's lies on the PPP applications.

234. In doing so, Hartman bound the Company to agreements with contractors and developers, and once the PPP fraud was revealed, the Company paid over $602,000 to these contractors to cancel the agreements without any benefit to the Company.

235. Defendant Hartman also masterminded a fraudulent PPP scheme involving the immediate signing bonuses of $121,298 (plus taxes and other amounts) paid by the Company to four (4) perspective employees hired for the Company's Oklahoma office.

236. Critically, Hartman's plan was to fraudulently and intentionally mischaracterize these bonus payments as vacation payments in submissions to the

PPP lenders in order to illegally charge those expenses against the PPP loan proceeds.

237. In other words, Hartman devised a plan to defraud the PPP lenders into reducing amounts that the Company would need to repay on the illegally obtained PPP loans.

238. Hartman's scheme to intentionally mischaracterize the bonuses as vacation payments arose from his work in tracking PPP rules, which he regularly emailed to Kao, Chen, and Lum Kee, including in emails sent in April 2020, when the enterprise was preparing the fraudulent loan applications.

239. Indeed, on April 23, 2020, Hartman emailed Chen, among others, the specific names of employees that Hartman had determined would be given "signing bonuses" in order to "take advantage of PPP."

240. The Company paid the signing bonuses at Hartman's direction in or around June 2020.

241. Further, because these bonuses were intended to defraud the PPP lenders who had made the loans, both the scheme as well as the individual payments of these bonuses were also violations of 18 U.S.C. § 1344.

242. These payments damaged the Company because after the payments were made, the employees were told not to come to work until the "vacation" time period was over.

243. Thus, Hartman's plan resulted in the Company paying out hundreds of thousands of dollars in order to create a pretense for PPP loan forgiveness, and the Company received nothing in return.

**The Enterprise Members Rewarded Themselves With Lavish Pay Raises For Successfully Defrauding The PPP Loan Program**

244. Participation and control of the enterprise by Kao, Chen, Lum Kee, and Hartman is confirmed by the fact that Chen, Lum Kee, and Hartman all received significant pay raises approved by the other members of the enterprise immediately following the completion of the PPP fraud.

245. On April 1, 2020, the date the first PPP application was submitted, Chen received a raise in base compensation from $300,000 to $350,000 per year, and the Company's internal documents show Kao approved and signed on off on this pay increase.

246. About one month later, on May 11, 2020, and immediately after the CPB and Radius Bank PPP loans were funded, Kao again signed off on another raise for Chen, this time increasing his base pay from $350,000 to $400,000 per year.

247. Thus, in just three months from April 2020 through May 2020, Chen's annual salary increased $100,000, which was an increase of 33.33%.

248. Lum Kee was also rewarded when, on March 12, 2020, Chen signed off and approved an increase in Lum Kee's base compensation from $168,750.40 to $200,000 per year.

249. As with Chen, Lum Kee also received another increase on May 11, 2020, once the PPP loan fraud was perfected, with Lum Kee's base salary increasing from $200,000 to $250,000; Chen signed the Company documents confirming and approving this increase.

250. Thus, in just two months from March 2020 through May 2020, Lum Kee's annual salary increased by $81,249.60, which was an increase of 48.15% over that two-month period.

251. Hartman was also rewarded for his part in helping to perpetrate and cover up the enterprise's illegal conduct.

252. Like Chen and Lum Kee, Hartman also received an unusually large annual pay increase at or around the time when the PPP applications were submitted.

253. Company records show that on March 23, 2020, Kao recommended Hartman for a $20,000 annual pay increase, representing a one-time increase to his annual salary of 9.52%, and Chen signed the approval for Kao's recommended increase to Hartman's pay on that same day.

254. Then, about one week later, Kao and Chen rewarded Hartman with a promotion by changing his official title to "Vice President, Strategic Partnerships" and the internal Company documents show Chen signed the approval for this promotion and included text specifically stating that a "large part of [Hartman's] functional reporting" would now be "to Martin Kao on congressional business development and new relationships. (Job description attached)[.]"

255. The attached job description memorized the responsibilities Hartman was already executing on behalf of SYWSE and to coverup the enterprise's prior crimes, specifically including the development of new relationships with "universities."

256. Once the PPP funds were received, and in or around August 2020, Hartman received another promotion, when he was elevated to Senior Vice President.

257. No other similarly situated managers or executives at the Company received pay raises in or around March, April, or May of 2020, and the significant pay increases that the enterprise members gave to themselves in the days and weeks after completing the PPP fraud shows their common and illegal purpose and membership in the enterprise.

**Hartman Memorialized And Incorporated The**
**Enterprise's Scheme As The Company's Stated Business Strategy**

258. Notably, the cities in which Hartman setup new offices, hired employees, and paid "signing bonuses" to, and targeted universities for SYWSE donations, were all situated in districts that elected Senators and Representatives could influence and impact government appropriations and contracts that were sought after by the enterprise.

259. This shows a continuation of the enterprise's goal to use the Company and its money to defraud the federal government for the purpose of obtaining benefits and contracts by any means possible.

260. These purposes were officially memorialized by Hartman as the Company's business strategy in a power point presentation titled "Strategic Partnerships Overview" that authored and presented by Hartman, dated September 29, 2020, and marked as "Proprietary Information" of the Company.

261. In the Strategic Partnerships Overview, Hartman laid out a new business strategy for the Company.

262. In the business plan, Hartman advocated for the Company to "set up shop near the university" – meaning the Company would open new offices near universities.

263. The specific cities where this would be done were cities with universities and schools located in districts that elected Senators and

Representatives could affect appropriations and government contracts sought by the Company.

264. One slide in Hartman's power point even had a triangle-shaped graphic with the three points comprised by the Company's logo, a picture of Senator Jack Reed from Rhode Island, and the University of Rhode Island's logo, with arrows pointing back and for the between each point in the triangle.

265. The power point stressed the need to build "goodwill" with both the "congressional delegation" but also the "research partner" or the school receiving funds.

266. Because the enterprise's pattern of racketeering was premised, in part, on making bogus scholarship donations to these same schools in order to cover up prior crimes committed by the enterprise, Hartman's power point was enshrining the pattern of racketeering as the Company's strategic business plan.

267. This is further evidenced by an April 14, 2020 email from Hartman to Chen and Lum Kee with subject line "Scholarship Programs – The Society" in which Hartman says they "forgot one school . . . South Carolina State University is Congressman Clyburn's favorite school . . . I think $10k would be fine and much appreciated." In these same emails, Hartman recognized that these scholarships will "win[] us some 'points' . . . which could have a material effect on the result of the congressional request."

268. Chen also emailed Kao and Lum Kee on April 24, 2020 that the illegally obtained PPP funds are a "key strategic competitive advantage for our new business model."

**Foundation Fraud**

269. Defendants also conspired to cause the Company to pay for multiple personal expenses through illegal donations to the Marty & Mickey Kao Foundation and the Navatek Foundation, organizations controlled by Defendant Tiffany Lam, Defendant Kao and/or their family members. The Marty & Mickey Kao Foundation is a Kao-family-run nonprofit formed in January 2019 with the purported mission of expanding educational opportunities for children.

270. However, Kao and Tiffany Lam instead operated the Navatek Foundation and the Marty & Mickey Kao Foundation as alter egos and for the purpose of paying for their own personal expenses and for their own personal benefit.

271. Defendants Chen and Lam illegally conspired with Defendant Kao in causing PacMar to make improper donations to the Marty and Mickey Kao Foundation, which monies were later illegally funneled to pay for, among other improper expenditures, Defendant Chen's personal expenses, including his children's tuitions.

272. Defendant Chen conspired with Defendant Kao for PacMar to make "donations" to the Marty and Mickey Kao Foundation which were subsequently used to pay Honolulu Waldorf School and Iolani School for Defendant Chen's children's tuition in amounts totaling at least $125,058.

273. Upon information and belief, Defendant Chen also conspired with Defendant Kao for PacMar to make "donations" to the Marty and Micky Kao Foundation which were likewise used to pay tuitions for Company executives' children in amounts to be proven at trial (collectively, as set forth in the foregoing paragraphs (the "Foundation Fraud").

274. Upon information and belief, Defendants Kao and Tiffany Lam also conspired and caused approximately $370,000 of PacMar's funds to be transferred to the Marty & Mickey Kao Foundation.

**Defendant Chen and Lum Kee's**
**Wrongful Transfer of PacMar's Assets**

275. In September 2020, Defendants Chen and Lum Kee conspired with Defendant Kao to illegally assign all, or substantially all, of the Company's property to an entity formed by the name MDG NEWCO, LLC ("NEWCO") (the "NEWCO Fraud").

276. No consent from the other member of PacMar, Navatek Capital, Inc. ("NCI"), was obtained for the NEWCO transfer agreements that were contemplated, and the planning for them and drafting of the agreements to effect

the NEWCO transfer were intentionally done by Defendants Kao and Chen and Lum Kee in secret and with the express purpose of leaving behind an "empty shell."

277. As part of this scheme, Kao, Chen, and Lum Kee registered and incorporated the NEWCO entity, engaged counsel, and executed documents for the transfer of the Company's assets to NEWCO, while specifically leaving all liabilities as the Company's responsibility, including the more than $12.8 million owned on the PPP loans.

278. Kao, Chen, and Lum Kee executed this fraudulent scheme because the Company's other owners demanded the PPP loan applications and related information from the Company in July 2020 after learning of the loan through public records, news, and media.

279. The Company's other owners suspected the Company violated the law by obtaining PPP loans and Kao, Chen, and Lum Kee refused to produce any information related to the PPP applications to the other owners.

280. Throughout this same time period, Kao was attempting to negotiate a buyout of the Company's other owners, but when terms could not be reached, Kao executed the NEWCO scheme in retaliation.

281. As part of the NEWCO scheme, Kao executed a lease for a new office space for NEWCO, but did so under the Company's name, and the Company

was damaged when it paid at least $156,571 in amounts related to this lease, leasing commissions, and amounts to break this lease.

282. The legal expenses for the attempted illegal transfer of the Company's assets to NEWCO were in the tens of thousands of dollars.

283. Almost immediately following the NEWCO Fraud, in early October 2020, Defendants Chen and Lum Kee sought to improperly and illegally cause the Company to pay monies to assign valuable Company contracts to an entity by the name of Advanced Unmanned Aerospace LLC ("AUA"), (the "AUA Fraud" and, collectively with the NEWCO Fraud, the "Illegal Transfer Fraud").

284. Indeed, on October 5, 2020, Chen arranged and hosted a meeting attended by Lum Kee, Hartman, the Company's security officer, Pam Berry, and others.

285. The purpose of this meeting was for Chen to execute his plan to assign the Company's assets to AUA and to learn from Pam Berry how to transfer classified government information and documents to the new entity.

286. At this meeting, Hartman specifically raised the option of "novating" the Company's contracts to AUA without any consideration given to the Company in return.

287. The proposed payment by PacMar to assign valuable contracts to AUA was against PacMar's best interests.

288. No notice was provided, nor consent obtained from the other member of PacMar, Navatek Capital Inc., for the AUA transfer agreements that were contemplated, and the planning for them and drafting of the agreements to effect the AUA transfer were intentionally done through Defendants Chen and Lum Kee in secret.

289. The legal expenses for the attempted illegal transfer of the Company's assets to AUA were in the thousands of dollars.

**Defendant Kao and Defendant Tiffany Lam's**
**Theft of PacMar's Property to Purchase the Kahala Property**

290. On or about April 20, 2020, Defendant Kao caused PacMar to deposit $2,000,000 from PacMar's account into his personal account and subsequently caused PacMar to document the transfer as a note receivable (the "Purported $2M Loan").

291. The Purported $2M Loan constituted a transaction between PacMar and Defendant Kao that was not at arm's length. Accordingly, as manager, Defendant Kao lacked the authority to approve the Purported $2M Loan without the unanimous written consent of all members, including NCI.

292. NCI, the other member of PacMar, did not provide its written consent to Defendant Kao receiving the Purported $2M Loan.

293. Upon information and belief, in April 2020, very shortly after improperly transferring the $2,000,000 from PacMar into his personal account,

Defendants Kao and Defendant Tiffany Lam fraudulently used $1,546,381 of those stolen PacMar funds to purchase real property located at 4900 Kahala Avenue, Honolulu, Hawaii, Tax Map Key (TMK) No. (1) 3-5-008-001 (the "Kahala Property") and Defendant Kao co-mingled the remaining balance of the $2,000,000 with his personal accounts and investments.

294. Defendants Kao and Defendant Tiffany Lam fraudulently transferred the stolen $1,546,381 into the Kahala Property with the actual intent to hinder, delay, and/or defraud PacMar.

295. Further, the balance between the $2,000,000 loan and the $1,546,381 that Defendant Kao used to purchase the Kahala Property – or $453,619 – were comingled by Defendants Kao and Tiffany Lam into their own personal accounts and monies.

296. Defendant Kao and Tiffany Lam's conduct in co-mingling the $453,619 balance into their personal funds was a deception designed to make it more difficult for the Company to track those funds, and constituted further acts of conversion, theft, fraud, negligence, and unjust enrichment.

297. In March 2021, PacMar issued a demand for Defendant Kao to repay the Purported $2M Loan, among other amounts stolen from PacMar by Defendant Kao.

298. To date, Defendant Kao has refused to repay the Purported $2M Loan, and Defendants Kao and Defendant Tiffany Lam continue to own the Kahala Property.

**Defendant Hartman's Breach of Contract and Bad Faith**

299. On or about February 19, 2021, PacMar agreed to pay a limited advancement of $15,000 to Holland & Knight LLP for legal fees and expenses on behalf of Defendant Hartman ("Defendant Hartman's Retention Advance").

300. PacMar's payment of Defendant Hartman's Retention Advancement was agreed by both Defendant Hartman and PacMar to be subject to the representations and warranties made by Defendant Hartman in his February 24, 2021 letter to PacMar requesting for the retention advance (the "Defendant Hartman's Reps and Warranties Agreement").

301. Among other representations and warranties, Defendant Hartman's Reps and Warranties Agreement stated that "I have at all times acted in good faith, without active or deliberate dishonesty, and in a manner I reasonably believed to be in or not opposed to the best interests of the Company... I did not receive any improper personal benefit in money, property, or services as a result of the acts or omissions alleged."

302. Defendant Hartman's Reps and Warranties Agreement further stated that "I make the following representations based upon my personal, good

faith belief in their truth as part of a formal request for indemnification and advanced reimbursement of expenses pursuant to the laws of the State of Hawaii concerning Indemnification."

303. Defendant Hartman's Reps and Warranties Agreement agreed that "[i]n consideration of the Company's agreement to reimburse my actual and reasonable expenses incurred in connection with the Investigation, and for other lawful consideration, the receipt of which are hereby acknowledged, I agree that, if it is ultimately determined I was not eligible, or no longer am eligible, to receive indemnification, then the Company will no longer be obligated to advance reimbursement and, in addition, I will repay any and all amounts reimbursed and advanced to me, or paid on my behalf, by the Company."

304. Defendant Hartman's misconduct alleged herein was not in good faith, was dishonest, and was not in the best interests of the Company.

305. Defendant Hartman's misconduct alleged herein included the receipt of improper personal benefits in money, property, or services from PacMar.

**Other Thefts and Damages Caused by the Co-conspirators**

306. Defendant Chen, Defendant Lum Kee, and Defendant Tiffany Lam also caused the Company to improperly pay for their personal expenses, including legal expenses (collectively, as set forth herein, and such other similar acts to be proven at trial, the "Personal Expense Fraud").

307. Defendant Chen caused PacMar to pay tens of thousands of dollars for his personal legal fees and expenses to his personal attorney, Braswell Fujioka-Lilley.

308. Defendant Chen and/or Defendant Lum Kee also caused PacMar to pay thousands of dollars for Defendant Lum Kee's personal legal fees and expenses to his personal attorney, MK Law, LLC.

309. Defendant Tiffany Lam, although not an employee of PacMar during the Relevant Period, charged numerous personal expenses through a Company American Express credit card in addition to orchestrating other non-business related payments by the Company to other third parties.

310. Specifically, Tiffany Lam personally took money from the Company's Merrill Lynch account on two occasions in late-2020 to pay for criminal defense attorneys engaged to defend Kao and/or herself after Kao had been arrested for crimes arising from the PPP and campaign contribution frauds.

311. Tiffany Lam's conduct in taking this money was an overtly illegal act and was contrary to the Company's Operating Agreement, which did not provide for or allow Company funds to be used for Kao or Tiffany Lam's defense.

312. Specifically, on October 13, 2020 Tiffany Lam personally picked up and received a check from Merrill Lynch payable to Michael Jay Green

& Associates in the amount of $250,000.00 that was written from the Company's corporate investment account.

313. Tiffany Lam delivered the check for $250,000 to Michael Jay Green & Associates, who cashed the check.

314. Because Tiffany Lam was not an employee of the Company, was not authorized to take or receive Company funds, and was not authorized to pay or transfer these funds to attorneys representing herself or Kao in their personal capacities, Tiffany Lam's conduct in taking these funds and paying them to these attorneys was an act of theft, conversion, embezzlement, and were RICO predicate acts of racketeering and transferring stolen money.

315. In addition, Defendants Chen, Lum Kee, and Hartman actively discouraged the Company's Facility Security Officer from timely reporting Defendant Kao's arrest to required Federal Agencies and regulators so that they could cover-up their own misconduct and facilitate the Illegal Transfer Fraud.

316. Because the Company was a government contractor in a "cleared industry," Defendants Kao, Chen, Lum Kee, and Hartman, were all mandated by the Defense Counterintelligence and Security Agency to complete a comprehensive Insider Threat Awareness course through the Center for Development of Security Excellence (the "Course"), which they did in or around July 2020.

317. The Course instructed enrollees on how to recognize insider threats to the Company's Facility Security Officer, who was then tasked with making a report to the Defense Security Service, and in the case of the most serious threats, such as the conduct alleged herein, reporting was to be made directly to the Federal Bureau of Investigation.

318. Defendants Kao, Chen, Lum Kee, and Hartman each completed and passed the Course, and therefore knew, or should have known, that their conduct was illegal, and the conduct of the Co-Conspirators should have been reported to federal authorities.

319. Defendant Chen's transgressions and illegal misconduct also caused PacMar to expend millions of dollars in legal expenses to address PacMar's executive officer transgressions

320. To the extent Defendant Kao claims or defends himself on the grounds that certain allegations against him in this Complaint are precluded by the prior Arbitration Award, this Complaint and the RICO claims asserted herein against Defendant Kao are limited to claims expressly reserved by the Arbitration Award, which expressly includes claims related to or arising from the Purported $2M Loan and Defendant Kao's conduct and racketeering efforts related thereto.

321. Finally, the Second Amended Complaint does not assert damages against any Defendant for the amounts of the PPP loans.

COUNT I

(18 U.S.C. § 1962(c) – Campaign Contribution Racketeering)

322. PacMar hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Second Amended Complaint.

323. This Count is alleged against Defendants Kao, Tiffany Lam, Chen, Lum Kee, Hartman, and SYWSE, (the "Count I Defendants").

324. The Count I Defendants, along with PacMar, comprised an enterprise whose activities affect interstate commerce.

325. PacMar is a "person" as that term is defined by 18 U.S.C. § 1961 *et seq*. (the "RICO Act").

326. PacMar was a passive member and victim of the enterprise and of the Count I Defendants' racketeering activities.

327. The Count I Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs, and established and operated the enterprise, through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding PacMar and covering up the enterprise's crimes, as outlined in this Second Amended Complaint.

328. The purpose of the enterprise was twofold: (i) to obtain government benefits, contracts, and money through illegal campaign contributions;

and (ii) use the Company's money to coverup these crimes and obstruct investigations into these same crimes.

329. PacMar is primarily engaged in the business of providing engineering and related services to the United States government and, during all relevant times, PacMar had offices in numerous states, including Hawaii, Maine, Michigan, Oklahoma, South Carolina, and Rhode Island.

330. Accordingly, the enterprise's conduct affected interstate commerce by, among other ways, steering or attempting to steer government contracts to the Company and away from competitors of the Company through a scheme to use money stolen form the Company for illegal campaign contributions to members of congress with decision making authority over those contracts, and then using additional funds stolen from the Company to cover up and obstruct criminal investigations into these crimes.

331. The Pattern of racketeering and the specific predicate acts committed by each Count I Defendant are stated in this Second Amended Complaint and are summarized in the following paragraphs.

332. In or around September 2019, Kao, Chen, Lum Kee, and Tiffany Lam incorporated SYWSE for the sole purpose of using SYWSE as the conduit for an unlawful campaign contribution to 1820 PAC. In November or December 2019, Kao, Tiffany Lam, Chen, and Lum Kee stole $150,000 from the

Company and transferred that money to SYWSE, and then transferred those funds across state lines to 1820 PAC. This donation was illegal and is the subject of the FEC Complaint and ensuing criminal investigation and charges. Accordingly, these transfers were RICO predicate acts in violation of 18 U.S.C. §§ 1956, 1957, 2314, 2315, and 1952.

333. The $150,000 stolen from the Company for this illegal contribution damaged the Company.

334. Additional amounts were stolen from the Company and given to Kao, Chen, Lum Kee, and Tiffany Lam during this same time period, or to family their family members, as reimbursements for unlawful campaign contributions. These acts were also RICO predicate acts in violation of 18 U.S.C. §§ 1956, 1957, 2314, 2315, and 1952.

335. In total, Kao, Tiffany Lam, Chen, and Lum Kee directly made, or arranged to make through conduits, at least 39 illegal political campaign contributions between May 2019 and December 2019 using at least $173,968 of funds stolen from the Company, and the Company is damaged by this same amount.

336. After the FEC Complaint was filed on or around February 3, 2020, the enterprise concocted a scheme to coverup their misdeeds and obstruct the ongoing investigation.

337. The coverup scheme involved enterprise members Kao, Tiffany Lam, Hartman, Lum Kee, and Chen stealing money from the Company, transferring it to Kao and/or Tiffany Lam, who then transferred the funds to SYWSE, before the funds were finally "donated" to universities to be used as "scholarships" with the SYWSE's name attached to the donations.

338. The purpose of the scholarship program was to give the enterprise a basis to argue to the FEC that SYWSE was incorporated for the legitimate purpose of funding scholarships, and not for its actual intended purpose of making the illegal campaign contribution to 1820 PAC.

339. This scheme was first hatched by Kao, who proposed it to Chen, Lum Kee, and Hartman, as well as Tiffany Lam, who was the sole member and principal of SYWSE and signed checks and received money used to fund the Scholarship scheme.

340. Emails between February 5 and during March 25, 2020 show that Kao, Hartman, Lum Kee, and Chen expressly discussed and planned the cover up, knew of the illegal purpose of this scheme, intended to provide false information to the FEC and investigators, and intended to obstruct the investigation into the illegal campaign contributions.

341. The scholarship scheme was itself a RICO predicate act in violation of 18 U.S.C. §§ 1503 and 1952.

342. Chen, Lum Kee, and Hartman arranged the transfers of funds used for the scholarships. This is evidenced in an April 14, 2020 email in which Hartman tells Lum Kee that they should wait until they have more commitments from additional universities before going to Kao for funding. This is also shown in emails from Hartman to USC personnel sent in February 2020 in which Hartman promised that the Company would make donations through SYWSE, which the company subsequently did when Chen approved that transfer via a March 4, 2020 email. Further, Hartman contacted universities and arranged for the payments to be made to the universities between February and May 2020.

343. Thus, the scholarship coverup plan executed by Kao, Chen, Lum Kee, Hartman, Tiffany Lam, and SYWSE involves numerous RICO predicate acts that are violations of 18 U.S.C. §§ 1952, 1503, 2314, 2315, 1956, and 1957.

344. The scholarships were funded and paid out to universities starting in or around March 2020 through June 2020, and at least $60,000 was taken from the Company for this purpose.

345. Ultimately, $60,000 was stolen from the Company and used for the scholarships and the Company is damaged by this same amount.

346. Because SYWSE was a fictitious entity first conceived by Chen and later incorporated by Kao and Tiffany Lam to be used as a conduit for unlawful activities, SYWSE did not have any funds of its own. Therefore, all

funds used by SYWSE for these scholarships were first transferred from the Company to Kao and Tiffany Lam, who then transferred the funds to SYWSE. These transfers were arranged and carried out by Kao, Chen, Lum Kee, Hartman, and Tiffany Lam. These transfers were RICO predicate acts in violation of 18 U.S.C. §§ 1956, 1957, 1503, 1952, 2314, and 2315.

347. Subsequently, and once the funds were received by SYWSE, Kao, Chen, Lum Kee, Hartman, and Tiffany Lam arranged and executed payment of these funds to the universities. Tiffany Lam signed each check from the SYWSE to each university. These transfers also occurred between March and June 2020. Accordingly, these transfers were additional RICO predicate acts in violation of 18 U.S.C. §§ 1956, 1957, 1503, 1952, 2314, and 2315.

348. Because SYWSE was a sham entity and had no money of its own, the amounts that Kao, Tiffany Lam, Hartman, Chen, and Lum Kee stole from the Company to pay for SYWSE administrative, incorporation, PR consultants and PR plans, and legal costs, were predicate acts that damaged the Company.

349. Tiffany Lam, as the sole member, principal, registered agent, and signatory for SYWSE's accounts, was also responsible for the predicate acts committed by and through SYWSE.

350. Tiffany Lam also committed RICO predicate acts on or around October 13, 2020 when she personally picked up and received a check from

Merrill Lynch that was made from the Company's corporate investment accounts and was payable to attorneys who represented herself and/or Kao in their personal capacities. The check was for $250,000, and Tiffany's conduct in taking these funds from the Company and transferring it to others was theft, conversion, embezzlement, and constituted RICO predicate acts in violation of 18 U.S.C. §§ 2314, 2315, 1344, 1952.

351. Kao, Chen, Lum Kee, and Hartman rewarded themselves with increases to their annual base salary, and rewarded Hartman with a promotion to his title, for their participation in the enterprise and its illegal conduct. Chen received a $100,000 annual pay increase, Lum Kee received a $81,249.60 annual pay increase, and Hartman received a $20,000 annual pay increase. These raises occurred during the period between late-March 2020 and early-May 2020. These raises were additional RICO predicate acts in violation of 18 U.S.C. §§ 2314, 2315, 1952.

352. The acts set forth above constitute a pattern of racketeering committed by each Count I Defendant pursuant to 18 U.S.C. § 1961(5).

353. The Count I Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

354. As a direct and proximate result of the Count I Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), PacMar has been injured in its business and property in amounts to be proven at trial including but not limited to: (i) $150,000 of Company money stolen and used for the 1820 PAC contribution; (ii) $173,968 of Company money stolen and used for illegal campaign contributions by the enterprise members; (iii) $60,000 of Company stolen and used by the enterprise as scholarship donations to universities; (iv) $250,000 of Company money stolen and used by Kao and Tiffany Lam to pay their personal attorneys to defend them against criminal charges arising from the enterprise's conduct; (v) $201,249.60 in pay raises the enterprise caused the Company to give to Hartman, Chen, and Lum Kee as rewards for their loyalty to the enterprise; and (vi) amounts stolen from the Company and used to capitalize, fund, incorporate SYWSE and to pay SYWSE's attorneys' bills.

COUNT II
(18 U.S.C. § 1962(d) Conspiracy to Commit
Campaign Contribution Racketeering)

355. PacMar hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Second Amended Complaint.

356. This Count is alleged against Defendants Kao, Tiffany Lam, Chen, Lum Kee, Hartman, and SYWSE (the "Count II Defendants").

357. As set forth above, the Count II Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).

358. The Count II Defendants knew, or should have known, that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

359. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) and in violation of 18 U.S.C. § 1962(d).

360. As a direct and proximate result of the Count II Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), PacMar has been injured in its business and property in amounts to be proven at trial including but not limited to: (i) $150,000 of Company money stolen and used for the 1820 PAC contribution; (ii) $173,968 of Company money stolen and used for illegal campaign contributions by the enterprise members; (iii) $60,000 of Company stolen and used by the enterprise as scholarship donations to universities; (iv) $250,000 of Company money stolen and used by Kao and Tiffany Lam to pay their personal attorneys to defend them against criminal charges arising from the enterprise's conduct; (v) $201,249.60 in pay raises the enterprise caused the Company to give to Hartman, Chen, and Lum Kee as rewards for their loyalty to the enterprise; and (vi) amounts stolen from the

Company and used to capitalize, fund, incorporate SYWSE and to pay SYWSE's attorneys' bills.

COUNT III
(18 U.S.C. § 1962(c) Racketeering to Justify and Cover Up False Information From the PPP Loan Applications)

361. PacMar hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Second Amended Complaint.

362. This Count is alleged against Defendants Kao, Chen, Lum Kee, and Hartman (the "Count III Defendants").

363. PacMar was a passive member and victim of the enterprise and of the Count I Defendants' racketeering activities.

364. The Count III Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs, and established and operated the enterprise, through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding PacMar and covering up the enterprise's crimes, as outlined in this Second Amended Complaint.

365. PacMar is primarily engaged in the business of providing engineering and related services to the United States government and, during all relevant times, PacMar had offices in numerous states, including Hawaii, Maine, Michigan, Oklahoma, South Carolina, and Rhode Island.

366. Accordingly, the enterprise's conduct affected interstate commerce by, among other ways, improperly using the Company's funds to pay amounts to employees and other third-parties to justify, cover up, and obstruct investigations into fraudulent statements and false information provided by the enterprise to PPP lenders in loan applications.

367. The Pattern of racketeering and the specific predicate acts committed by each Count III Defendant are stated in this Second Amended Complaint and are summarized in the following paragraphs.

368. Between April 3, 2020 and April 21, 2020, Kao, Chen, and Lum Kee caused the Company to apply for PPP loans with three (3) different lenders, and these applications resulted in two (2) PPP loans being funded on .

369. During the course of submitted these PPP applications, Kao, Chen and Lum Kee compiled and submitted intentionally false and fraudulent information to the PPP lenders for the intended and stated purpose of obtaining larger PPP loans.

370. The intentionally false and fraudulent information submitted by Kao, Chen, and Lum Kee to the PPP lenders included employee figures from the "Office Expansion Pool."

371. The employees from the "Office Expansion Pool" did not exist and were included to dupe the PPP lenders into believing that the Company had

more employees than it actually had, which the enterprise hoped would induce the lenders into making larger PPP loans to the Company.

372. After the PPP loans were funded on April 17 and May 4, 2020, Kao ordered Hartman to use the Company's money to open offices in South Carolina and Maine to make it appear as if the fraudulent "Office Expansion Pool" and employment data included in the PPP applications was accurate.

373. Based on these orders, Hartman opened the Maine office. However, once the FEC Complaint was filed and made Public, the Company sought to cancel its lease and agreements with contractors, and these cancellations cost the Company at least $602,000. The enterprises conduct of submitting false information to financial institutions was financial institution fraud, and Hartman's conduct in opening offices to obscure or coverup these crimes was racketeering.

374. Similarly, Kao ordered Hartman to open an office in South Carolina to further justify and cover up the fraudulent inclusion of the "Office Expansion Pool" figures in the PPP loan applications. The Company spent at least $1,250,000 on rent, construction, and other amounts related to the South Carolina office alone, and that amount increases with each monthly rent payment the Company must make for the empty office space.

375. Hartman also contributed to the fraudulent loan applications by devising a scheme in which the Company paid signing bonuses to employees with

the express intention of falsely characterizing the bonuses as vacation payments in order to reduce amounts due under the PPP loan program by the same amounts.

376. These bonus payments totaled at least $121,298 (plus taxes and other amounts) paid out by the Company in or around June 2020 to at least four employees in Oklahoma. These payments were also intended to fraudulently induce financial intuitions into reducing the Company's repayments under the PPP loan program.

377. Kao, Chen, Lum Kee, and Hartman rewarded themselves with increases to their annual base salary, and rewarded Hartman with a promotion to his title, for their participation in the enterprise and its illegal conduct. Chen received a $100,000 annual pay increase, Lum Kee received a $81,249.60 annual pay increase, and Hartman received a $20,000 annual pay increase. These raises occurred during the period between late-March 2020 and early-May 2020.

378. The acts set forth above constitute a pattern of racketeering committed by each Count III Defendant pursuant to 18 U.S.C. § 1961(5).

379. The Count III Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

380. As a direct and proximate result of the Count III Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), PacMar has been injured in its business and property in amounts to be proven at trial including but not limited to: (i) $602,000 of Company money to cancel various contracts the enterprise caused the Company to enter related to the Maine office and to justify the fraudulent PPP applications; (ii) $1,250,000 of Company money spent on the South Carolina office and to justify the fraudulent PPP applications; (iii) $121,298 (plus taxes and other amounts) the Company paid for signing bonuses to four (4) employees in or around June 2020 as a result of Hartman's fraudulent scheme to further defraud the PPP lenders by intentionally mischaracterizing the amounts as vacation payments; and (iv) $201,249.60 in pay raises the enterprise caused the Company to give to Hartman, Chen, and Lum Kee as rewards for their loyalty to the enterprise.

## COUNT IV
(18 U.S.C. § 1962(d) Conspiracy to Commit Racketeering to Justify and Cover Up False Information From the PPP Loan Applications)

381. PacMar hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Second Amended Complaint.

382. This Count is alleged against Defendants Kao, Chen, Lum Kee, and Hartman (the "Count IV Defendants").

383. As set forth above, the Count IV Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).

384. The Count IV Defendants knew, or should have known, that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

385. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) and in violation of 18 U.S.C. § 1962(d).

386. As a direct and proximate result of the Count IV Defendants' conspiracy, the overt acts taken in furtherance of its conspiracy, and violations of 18 U.S.C. § 1962(d), PacMar has been injured in their business and property in amounts to be proven at trial including but not limited to: (i) $602,000 of Company money to cancel various contracts the enterprise caused the Company to enter related to the Maine office and to justify the fraudulent PPP applications; (ii) $1,250,000 of Company money spent on the South Carolina office and to justify the fraudulent PPP applications; (iii) $121,298 (plus taxes and other amounts) the Company paid for signing bonuses to four (4) employees in or around June 2020 as a result of Hartman's fraudulent scheme to further defraud the PPP lenders by intentionally mischaracterizing the amounts as vacation payments; and (iv) $201,249.60 in pay raises the enterprise caused the Company to give to Hartman, Chen, and Lum Kee as rewards for their loyalty to the enterprise.

COUNT V
(Fraud)

387. PacMar hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Second Amended Complaint.

388. As persons with authority and control over the Company, its money and accounts, and its employees, Kao, Chen, Lum Kee, and Hartman owed a duty to the Company not to abuse their positions of trust and power, to be honest to the Company, and not induce the Company to make discissions or disburse money in support of illegal or self-serving purposes.

389. By their actions alleged herein, Kao, Chen, Lum Kee, and Hartman breached their duties to the Company, acted in bad faith, and committed fraud against the Company.

390. Once Kao, Chen, Lum Kee, and Hartman breached their duties to the Company, they actively and purposefully withheld information from the Company concerning their fraudulent actions and conduct.

391. As a result of their conduct in withholding information from the Company, knowledge and information held by Kao, Chen, Lum Kee, and Hartman of their own wrongdoing cannot be imputed on the Company.

392. As a further result, the Company's independent owners, executives, accountants, and other fiduciaries could not act on behalf of the Company to stop or mitigate the fraud.

393. Thus, the Company acted in reliance on the fraudulent acts, statements, and omissions of Kao, Chen, Lum Kee, and Hartman.

394. The specific fraudulent conduct and acts committed by Kao, Chen, Lum Kee, and Hartman are described in this Second Amended Complaint and include the PPP Fraud, Campaign Finance Fraud, Foundation Fraud, Illegal Transfer Fraud, and Personal Expense Fraud, and these fraudulent acts are summarized in the following paragraphs.

395. Kao fraudulently breached his duties to the Company by causing the Company to transfer its funds to himself, Tiffany Lam, Chen, Lum Kee, and the SYWSE.

396. Kao, Chen, and Lum Kee fraudulently breached their duties to the Company by causing the Company to make the illegal donation to the 1820 PAC.

397. Kao, Chen, Lum Kee, and Hartman fraudulently breached their duties to the Company by causing the Company to enter into the illegal PPP loan applications and by omitting information that should have been provided to the Company to allow the Company to know these acts were unlawful.

398. Kao, Chen, Lum Kee, and Hartman fraudulently breached their duties to the Company by causing the Company to participate in the coverup and obstruction of the investigation into the illegal 1820 PAC donation.

399. Chen, Lum Kee, and Hartman fraudulently breached their duties to the Company by charging time they worked on these illegal schemes as "overhead," which were not reimbursable amounts and are therefore damages of the Company.

400. Kao, Chen, and Lum Kee fraudulently breached their duties to the Company by causing the Company to "wash" or launder the PPP funds, and by not omitting information that should have been provided to the Company that would have prevented these illegal acts from occurring.

401. Hartman fraudulently breached his duties to the Company by overseeing and directing the scheme to use the Company's money, laundered through the SYWSE, as donations to the universities in order to coverup the prior illegal conduct and campaign contributions.

402. Chen and Lum Kee breached their duties to the Company through their participation in the NEWCO Fraud.

403. Kao, Chen, Lum Kee, and Hartman further committed fraud against the Company by rewarding themselves with large compensation increases immediately following their receipt of the fraudulently obtained PPP funds.

404. Kao, Chen, Lum Kee, and Hartman knew their conduct as described above and in this Second Amended Complaint was unlawful, and intentionally withheld information from the Company, its auditors, employees, attorneys, and partners that would have revealed and stopped the harmful actions that Kao, Chen, Lum Kee, and Hartman had induced the Company to take.

405. For example, the Company's other owner, through its representative Steven Loui, requested the PPP loan applications and related information and documents from the Company in or around late-July 2020, but Kao, Chen, Lum Kee, and Hartman caused the Company to refuse this request.

406. The Company's other owner only found out about the illegal PPP loans and scheme through public reporting because the enterprise members, who were the Company insiders committing the fraudulent acts, never informed the Company's other owners of their conduct.

407. The Company's other independent fiduciaries who were not part to of the group of insiders that were defrauding the Company were also denied relevant information.

408. Company fiduciaries who were denied this information include the Company's auditors and CPAs at CW Associates who requested information relating to the PPP loans in or around May 2020 from Lum Kee who refused to provide the requested information.

409. The Company's former COO was also intentionally denied information and misled by Kao, Chen, Lum Kee, and Hartman about the Company's PPP loans in emails that occurred in or around March 2020.

410. Kao, Chen, and Lum Kee furthered these efforts through their coordinated plans and acts in forging the Radius PPP loan documents, destroying and shredding Company records, and deleting information off the Company's electronic drives.

411. Under Kao's direction, the Company fired its former Chief Financial Officer, Controller, and IT Manager in order to further deny information to the Company by removing these independent fiduciaries.

412. These same independent fiduciaries were denied information about the 1820 PAC donation, the transfer of Company funds to SYWSE, the PPP loans, the coverup scheme involving scholarships to universities through SYWSE, the "washing" or laundering of PPP money, and they Illegal Transfer Fraud, Personal Spending Fraud, and Foundation Fraud.

413. Then, on September 29, 2020, Defendant Kao received a demand letter from Navatek Capital Inc.'s legal counsel that demanded information and remedies to many issues that Defendant Kao had previously ignored or refused.

414. Later that same day, September 29, 2020, Defendant Chen created a calendar invite for a meeting he titled "Project Palisades" to occur the following day and sent invites to himself, Defendants Kao and Lum Kee, and MDG's then-counsel, Mike O'Malley.

415. According to merriam-webster.com/dictionary/palisade a "palisade" is "a fence of stakes especially for defense" or "a long strong stake pointed at the top and set close with others as a defense."

416. This meeting was clearly intended to allow Defendants Kao, Chen, and Lum Kee to coordinate their false stories and lies.

417. Upon information and belief, the following morning, Defendants Kao, Chen, and Lum Kee, as well as then-counsel Mike O'Malley, were not able to conduct the "Project Palisades" meeting because Defendant Kao was arrested by federal authorities.

418. As a result of Defendants' conduct in withholding information from the Company's independent fiduciaries and employees, information and knowledge held by Kao, Chen, Lum Kee, and Hartman of their own fraud cannot be imputed on the Company and the Company was induced by, and relied on, the fraudulent statements, acts, and omissions committed by Kao, Chen, Lum Kee, and Hartman.

419. The foregoing actions by said Defendants were willful, wanton, malicious, and/or done with gross and reckless indifference to the law, and, by Defendants Chen, and Hartman, also in gross and reckless indifference to their fiduciary duties owed to the Company.

420. As a direct and proximate result, the Company has been damaged by said Defendants' frauds in amounts to be proven at trial, which also includes but is not limited to damages to PacMar's brand and reputation.

COUNT VI
(Civil Conspiracy)

421. PacMar hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Second Amended Complaint.

422. Through their combined and concerted action in committing one or more of the schemes related to the 1820 PAC donation, misusing the Company's money to pay for their personal expenses, conspiring to transfer the Company's assets to other entities for no consideration, using the Company's money to pay for scholarships to coverup the 1820 PAC donation and obstruct justice, the fraud relating to the Foundations, and the schemes and fraud related to the "washing" of the illegally obtained PPP funds and transferring of those funds to Kao and Tiffany Lam's personal accounts, Chen, Lum Kee, Kao, Hartman, Tiffany Lam, and SYWSE conspired with each other and with Defendant Kao to

accomplish criminal and/or unlawful purposes, and/or other purposes by criminal and/or unlawful means, including, without limitation, the allegations set forth in the foregoing paragraphs.

423. Through their combined and concerted action in committing the PPP Fraud, Defendants Chen, Hartman and Lum Kee, conspired with each other and Defendant Kao to accomplish criminal and/or unlawful purposes, and/or other purposes by criminal and/or unlawful means, including, without limitation, the allegations set forth in the foregoing paragraphs.

424. As a direct and proximate result, the Company was damaged in an amount to be proven at trial.

## COUNT VII
(Aiding and Abetting)

425. PacMar hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Second Amended Complaint.

426. As officers of the Company during the Relevant Period, Defendants Kao, Chen, and Hartman owed the Company fiduciary duties at the time of the foregoing actions, including, without limitation, the duties of care, loyalty, good faith, and fair dealing.

427. Through their foregoing conduct, Defendants Lum Kee and Defendant Tiffany Lam aided and abetted Defendants Kao, Chen, and Hartman to

engage in willful, wanton, reckless, and/or intentional breaches of their fiduciary duties.

428. As a direct and proximate result of Defendants Lum Kee and Tiffany Lam's actions, the Company has been damaged in an amount to be proven at trial.

COUNT VIII
(Defendants Chen, Hartman, Lum Kee - Breach of Fiduciary Duties)

429. PacMar hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Second Amended Complaint.

430. As officers of the Company during the Relevant Period, Defendant Chen owed the Company fiduciary duties at the time of the foregoing actions, including, without limitation, the duties of care, loyalty, good faith, and fair dealing.

431. As the Controller of the Company during the Relevant Period, Defendant Lum Kee owed the Company fiduciary duties at the time of the foregoing actions, including, without limitation, the duties of care, loyalty, good faith, and fair dealing.

432. As a Senior Vice President of the Company during the Relevant Period, Defendant Hartman owed the Company fiduciary duties at the time of the

foregoing actions, including, without limitation, the duties of care, loyalty, good faith, and fair dealing.

433. The foregoing actions of Defendants Chen, Hartman, and Lum Kee were willful, wanton, reckless, and/or intentional breaches of their fiduciary duties.

434. As a direct and proximate result of Defendants Chen, Hartman, and Lum Kee's actions, the Company has been damaged in an amount to be proven at trial.

COUNT IX
(Conversion)

435. PacMar hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Second Amended Complaint.

436. Defendants Kao, Chen, Lum Kee, Hartman, Tiffany Lam, and SYWSE's foregoing misconduct, including but not limited to one or more of the PPP Fraud, Campaign Finance Fraud, Foundation Fraud, Illegal Transfer Fraud, and Personal Expense Fraud, and the raises approved for Chen, Lum Kee, and Hartman were performed by said Defendants using the Company's funds.

437. Defendants Kao, Chen, Lum Kee, Hartman, Tiffany Lam, and SYWSE committed the foregoing frauds with the Company's funds without the unanimous written consent of the Company's members, including NCI.

438. By these acts, said Defendants converted to their own personal use and assumed ownership of the Company's property, monies, and assets.

439. Defendants Kao, Chen, Lum Kee, Hartman, Tiffany Lam, and SYWSE wrongfully used the converted property, monies, and assets for their own personal use and beneficial enjoyment.

440. Defendants Kao, Chen, Lum Kee, Hartman, Tiffany Lam, and SYWSE have failed to repay the Company the converted amounts resulting from their foregoing frauds.

COUNT X
(Embezzlement)

441. PacMar hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Second Amended Complaint.

442. Defendant Kao, as a former chief executive officer and managing member of the Company, charged with the overall control of the Company's management and business, among other responsibilities, acted as an agent of the Company.

443. Defendant Chen, as a former chief financial officer of the Company charged with control over the Company's funds, accounting, and finances, among other responsibilities, acted as an agent of the Company.

444. Defendant Lum Kee, as the former Controller of the Company, was charged with control over the Company's bank accounts as well as assessing and determining its financial health and needs.

445. Defendant Hartman, as a former Senior Vice President of Business Development for the Company during the Relevant Period charged with the overall performance of the Company's portfolio of programs, business development, and federal relations initiatives, among other responsibilities, acted as an agent of the Company.

446. Defendant Tiffany Lam, as the wife of Defendant Kao, the former Company manager and CEO, was given access to the Company's accounts and funds for her personal use and for the use of other third parties through her access to those accounts and funds.

447. In their respective roles and capacities, said Defendants had access to the Company's property, including its funds.

448. Defendants Kao, Chen, Lum-Kee, Hartman, and Defendant Tiffany Lam intentionally and fraudulently converted the Company's funds as their own, and for other non-business uses.

449. As a direct and proximate result of said Defendants' actions, the Company has been damaged in an amount to be proven at trial.

COUNT XI
(All Defendants – Unjust Enrichment)

450. PacMar hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Second Amended Complaint.

451. By their wrongful acts and omissions, Defendants Kao, Chen, Lum Kee, Hartman, and Tiffany Lam were unjustly enriched at the expense of and to the detriment of the Company.

452. The Company seeks restitution from Defendants, and seeks an order from the Court, disgorging all profits, benefits, monies, properties, assets, and other compensation obtained by Defendants through their wrongful conduct and fiduciary breaches.

COUNT XII
(Gross Negligence)

453. PacMar hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Second Amended Complaint.

454. Defendants Chen and Hartman owed fiduciary duties to the Company.

455. Defendants Lum Kee and Defendant Tiffany Lam knew that Defendants Chen, and Hartman were officers of the Company and owed fiduciary duties to the Company.

456. Defendants Chen and Hartman willfully, wantonly, recklessly, and/or intentionally breached their fiduciary duties owed to the Company and were indifferent to the injuries they would cause them.

457. Defendants Lum Kee and Defendant Tiffany Lam willfully, wantonly, recklessly, and/or intentionally aided and abetted Defendants Chen and Hartman in breaching their respective fiduciary duties to the Company, and willfully, wantonly, recklessly, and/or intentionally conspired with Defendants Chen and Hartman in committing the foregoing frauds involving the Company.

458. Defendants Chen, Lum Kee, Hartman, and Tiffany Lam also willfully, wantonly, recklessly, and/or intentionally aided and abetted Defendant Kao, the Company's manager and CEO during the Relevant Period, in breaching his fiduciary duties to the Company, and willfully, wantonly, recklessly, and/or intentionally conspired with Defendant Kao in committing the foregoing frauds involving the Company.

459. Defendants Chen, Lum Kee, Hartman and Defendant Tiffany Lam knew,or should have known, that the Company would incur damages as a result of their collective gross misconduct.

460. As a direct and proximate result of said Defendants' actions, the Company has been damaged in an amount to be proven at trial.

COUNT XIII
(Fraudulent Conveyance – $1,546,381 into Kahala Property)

461. PacMar hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Second Amended Complaint.

462. As the former managing-member of PacMar, Defendant Kao knew that PacMar was in possession of the $2,000,000 asset.

463. Defendant Kao transferred or directed the transfer of the $2,000,000 asset into his personal account from PacMar and, shortly thereafter, transferred $1,546,381 of those funds into the Kahala Property in or around June 2020.

464. At the time of Defendant Kao's transfer of the $1,546,381 asset into the Kahala Property, PacMar had (and continues to have) a claim against Defendant Kao in the amount of the Purported $2M Loan

465. Defendant Kao's transfer of the $1,546,381 into the Kahala Property was made with the actual intent to hinder, delay, and/or defraud PacMar in the collection of the Purported $2M Loan from Defendant Kao.

466. Defendant Kao's transfer of the $1,546,381 asset into the Kahala Property constituted a fraudulent transfer under applicable law.

467. As a direct and proximate result of Defendant Kao's fraudulent transfer of the $1,546,381 asset into the Kahala Property, PacMar is entitled to: (a) avoidance of the transfer of the $1,546,381 asset into the Kahala Property, (b) attachment against the Kahala Property, (c) injunctive relief against further disposition by Defendants Kao and Defendant Tiffany Lam (or any person or party acting by, through, or on behalf of them) of the Kahala Property, and/or (d) appointment of a receiver to take charge of the Kahala Property.

COUNT XIV
(Breach of Contract – Defendant Hartman)

468. PacMar hereby repeats, realleges, and incorporates herein the allegations contained in the preceding paragraphs of this Second Amended Complaint.

469. Defendant Hartman's Retention Advance is an enforceable agreement between Defendant Hartman and PacMar that was made expressly subject to Defendant Hartman's Reps and Warranties Agreement

470. PacMar's advancement of $15,000 to Holland & Knight LLP for Defendant Hartman's Retention Advance was made in reliance upon Defendant Hartman's Reps and Warranties Agreement.

471. Defendant Hartman's Reps and Warranties Agreement misrepresented that Defendant Hartman had at all times acted in good faith, without active or deliberate dishonesty, and in the best interests of the Company,

and that he had not received any improper personal benefit in money, property, or services from PacMar.

472. Defendant Hartman's Reps and Warranties Agreement required and agreed that Defendant Hartman must repay PacMar the $15,000 advancement made to Holland & Knight LLP if he was later determined that he was not eligible for the advancement based on Defendant Hartman's representations and warranties upon which PacMar had relied upon in making the advance.

473. As a result of Defendant Hartman's breach of his Reps and Warranties Agreement, Defendant Hartman is contractually obligated to repay PacMar any and all unreturned amounts from the $15,000 advancement made by PacMar to Holland & Knight LLP.

WHEREFORE, the following bullet points summarize the Counts stated in this Second Amended Complaint the Defendants named in each Count:

(i) **Count I**, RICO Act Violation pursuant to 18 U.S.C. § 1962(c), against Kao, Tiffany Lam, Chen, Lum Kee, Hartman, and SYWSE.

(ii) **Count II**, RICO Act Violation pursuant to 18 U.S.C. § 1962(d), against Kao, Tiffany Lam, Chen, Lum Kee, Hartman, and SYWSE.

(iii) **Count III**, RICO Act Violation pursuant to 18 U.S.C. § 1962(c), against Kao, Chen, Lum Kee, and Hartman.

(iv) **Count IV**, RICO Act Violation pursuant to 18 U.S.C. § 1962(d), against Kao, Chen, Lum Kee, and Hartman.

(v) **Count V**, Fraud, against Kao, Chen, Lum Kee, and Hartman.

(vi) **Count VI**, Civil Conspiracy, against Kao, Tiffany Lam, Chen, Lum Kee, Hartman, and SYWSE.

(vii) **Count VII**, Aiding and Abetting, against Lum Kee and Tiffany Lam.

(viii) **Count VIII**, Breach of Fiduciary Duties, against Chen, Hartman, and Lum Kee.

(ix) **Count IX**, Conversion, against Kao, Chen, Lum Kee, Hartman, Tiffany Lam, and SYWSE.

(x) **Count X**, Embezzlement, against Kao, Chen, Lum Kee, Hartman, and Tiffany Lam.

(xi) **Count XI**, Unjust Enrichment, against Kao, Chen, Lum Kee, Hartman, and Tiffany Lam

(xii) **Count XII**, Gross Negligence, against Chen, Lum Kee, Hartman, and Tiffany Lam.

(xiii) **Count XIII**, Fraudulent Conveyance, against Kao.

(xiv) **Count XIV**, Breach of Contract, against Hartman.

WHEREFORE, Plaintiffs pray for judgment in its favor and against Defendants as follows:

A. For general, special, compensatory, incidental and consequential damages in amounts to be proven at trial;

B. For treble damages;

C. For punitive damages;

D. For restitution and other equitable relief;

E. For declaratory and injunctive relief;

F. For an order establishing that Defendant SYWSE was an alter ego of Defendant Tiffany Lam and establishing that Defendant Tiffany Lam is personally liable for any judgements against SYWSE;

G. For appointment of a receiver to take control of the Defendants' assets;

H. For a constructive trust to be placed on Defendants' assets and properties that were acquired with, from, or constitute amounts that were unlawfully taken from PacMar by Defendants;

I. For prejudgment and post-judgment interest;

J. For its attorneys' fees, costs and expenses;

K. For such other and further relief as this Court deems just and proper.

DATED: Honolulu, Hawaii, April 21, 2023.

/s/ Ryan H. Engle
CRYSTAL K. ROSE
RYAN H. ENGLE
GRANT FASI ALLISON

Attorneys for Plaintiff
PACMAR TECHNOLOGIES LLC
(f/k/a MARTIN DEFENSE GROUP, LLC)