UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| PACMAR TECHNOLOGIES LLC, FORMERLY KNOWN AS MARTIN DEFENSE GROUP LLC,  Plaintiff,  vs.  MARTIN KAO, et al.  Defendants. | CIV. NO. 22-00283 LEK-WRP |

**ORDER GRANTING IN PART AND DENYING IN PART:
DEFENDANT DUKE HARTMAN'S MOTION TO DISMISS SECOND AMENDED
COMPLAINT, FILED APRIL 21, 2023 [ECF 97]; DEFENDANT/CROSS-
CLAIMANT CLIFFORD CHEN'S AND DEFENDANT/CROSS-CLAIMANT LAWRENCE
KAHELE LUM KEE'S RESPECTIVE JOINDERS IN HARTMAN'S MOTION**

Before the Court is Defendant Duke Hartman's

("Hartman") Motion to Dismiss Second Amended Complaint, Filed

April 21, 2023 [ECF 97] ("Motion"), filed on May 19, 2023. [Dkt.

no. 101.] Plaintiff Pacmar Technologies LLC, formerly known as

Martin Defense Group, LLC ("PacMar"), filed its memorandum in

opposition on August 17, 2023, and Hartman filed his reply on

August 25, 2023. [Dkt. nos. 106, 110.] On August 18, 2023,

Defendant/Cross-Claimant Clifford Chen ("Chen") and

Defendant/Cross-Claimant Lawrence Kahele Lum Kee ("Lum Kee")

filed joinders in Hartman's Motion ("Chen Joinder" and "Lum Kee

Joinder"). [Dkt. nos. 107, 108.] Also on August 18, 2023,

Defendant/Cross-Defendant Martin Kao ("Kao"), Defendant Tiffany

Jennifer Lam ("Lam"), and Defendant Society of Young Women Scientists and Engineers, LLC ("SYWSE") filed their Statement of No Position Re: Defendant Duke Hartman's Motion to Dismiss Second Amended Complaint. [Dkt. no. 109.] These matters came on for hearing on September 8, 2023 ("9/8 Hearing"). Hartman's Motion, Chen's Joinder, and Lum Kee's Joinder are hereby granted in part and denied in part:

Counts III and IV are dismissed without prejudice in their entirety against all defendants for lack of RICO standing. Count X against Hartman is dismissed with prejudice.

As to Count I against Hartman, certain portions of this claim are not alleged with requisite particularity and therefore must be dismissed with prejudice. Specifically, the allegations as to Hartman's facilitation of fund transfers from PacMar to SYWSE; the transfer of the $60,000 to fund scholarships; Hartman's alleged stealing of PacMar's money to fund SYWSE's initial start-up costs; and Hartman's receipt of a pay raise are dismissed with prejudice. The remainder of Count I against Hartman is not dismissed.

As to Count V against Hartman, certain portions of this claim are not alleged with requisite particularity and therefore must be dismissed with prejudice. Specifically, the allegations as to the claims of PPP fraud stemming from Hartman's withholding of information; campaign finance fraud as

2

it relates to Hartman's facilitation of laundering money and receipt of a pay raise; Hartman's alleged breach of duty by charging time worked on illegal schemes; and illegal transfer fraud are dismissed with prejudice. The remainder of Count V against Hartman is not dismissed.

Counts II, VI, VII, IX, XI, XII, and XIV against Hartman are not dismissed.

### BACKGROUND

On March 24, 2023, the Court issued an entering order granting Hartman's Motion to Dismiss First Amended Complaint, Filed January 9, 2023 [ECF 68], [filed 2/9/23 (dkt. no. 73),] and dismissing without prejudice PacMar's First Amended Complaint. [Minute Order, filed 3/24/23 (dkt. no. 96) ("3/24 EO").] PacMar filed its Second Amended Complaint on April 21, 2023. [Dkt. no. 97.]

In the Second Amended Complaint, PacMar alleges Hartman participated in an enterprise – as defined under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO") – with Kao, Lam, Chen, Lum Kee, and SYWSE. See Second Amended Complaint at ¶¶ 11-12. "[T]he purpose of the enterprise was twofold: (i) to obtain government benefits, contracts, and money through illegal means, the [Paycheck Protection Program ('PPP')] fraud, and illegal campaign contributions; and (ii) use [PacMar]'s money to coverup

3

these crimes and obstruct investigations into these same crimes." [Id. at ¶ 13.]

Hartman was originally hired by Kao as PacMar's Director of Programs, but was promoted to PacMar's Senior Vice President of Strategic Partnerships. Hartman reported directly to Kao – who was PacMar's Chief Executive Officer ("CEO") – and worked closely with Chen – who was PacMar's Chief Financial Officer ("CFO") from January 2019 to January 2021. See id. at ¶¶ 25-27. Hartman "was responsible for, among other things, the overall performance of [PacMar]'s portfolio of programs, business development, and hiring Washington D.C. political consultants to lobby on [PacMar]'s behalf." [Id. at ¶ 39.]

I.   **Campaign Contributions**

On September 17, 2019, Kao emailed Chen and Lum Kee regarding a political action committee named 1820 PAC. 1820 PAC supported United States Senator Susan Collins. See id. at ¶¶ 61-62. Between August 2019 and August 2020, Kao, Lam, Chen, and Lum Kee made at least thirty-nine illegal political contributions to 1820 PAC worth approximately $173,968 of funds taken from PacMar. See id. at ¶¶ 69-70. $150,000 of those contributions was through a check sent from SYWSE to 1820 PAC. The contribution from SYWSE was money originally transferred to SYWSE from PacMar. See id. ¶¶ 80-83. On February 3, 2020, a complaint was filed with the Federal Election Commission ("FEC"), see id. at

4

¶ 84, against SYWSE, Lam, and "'other persons who created and operated SYWSE, and made contributions to 1820 PAC in the name of SYWSE,'" [id. at ¶ 85 (brackets omitted)].

SYWSE was created on November 26, 2019 with Lam named as its registered agent and manager.[1] See id. at ¶ 76. SYWSE was created "by Kao, Tiffany Lam, Chen, and Lum Kee for the sole purpose of making the illegal campaign donation to 1820 PAC." [Id. at ¶ 78.] Hartman was allegedly "enlisted by Kao, Chen, and Lum Kee to direct and operate the SYWSE in its efforts to coverup the SYWSE's illegal campaign donations[.]" [Id. at ¶ 88.] Federal criminal charges were brought against Kao, Chen, and Lum Kee, and Kao pled guilty to the charges against him. See id. at ¶¶ 91-92.

## II.  **The Coverup of SYWSE's Campaign Contributions**

PacMar alleges that around February 5, 2020, Kao, Chen, Lum Kee, and Hartman planned to coverup SYWSE's campaign contributions "by creating a scholarship program whereby the enterprise took [PacMar]'s money, laundered it through transfers to Kao, Tiffany Lam, and eventually to SYWSE, before donating the laundered funds to universities to create a façade of legitimacy for SYWSE that could be used to deflect

---

[1] SYWSE's articles of organization named "Jennifer Lam" as its registered agent and manager, which PacMar alleges was an alias Lam used. See Second Amended Complaint at ¶ 76.

investigators' attention and scrutiny." [Id. at ¶ 93.] Hartman was responsible for contacting universities to offer scholarships. [Id. at ¶ 99.] Hartman stated in a February 28, 2020 email that he committed at least $155,000 to twelve universities. [Id. at ¶ 100.] Subsequently, Hartman made additional commitments, making the total commitment around $185,000. [Id. at ¶ 101.] "Between March and June 2020, Hartman oversaw and directed the payment of at least $60,000 for these 'scholarships' . . . ." [Id. at ¶ 103.]

PacMar alleges that, "in an email sent on February 20, 2020 between Kao, Hartman, and third-party political consultants hired by Kao, Kao admitted that the 1820 PAC donation was a 'screwup' and instruct[ed] Hartman to 'do EVERYTHING we can to now fix this.'" [Id. at ¶ 105 (emphasis in original).] "On March 25, 2020, Kao, Hartman, Chen, and Lum Kee sent each other emails showing that [they] expressly recognized the purpose of the coverup and their intention to obstruct justice through this plan." [Id. at ¶ 106.] The March 25, 2020 emails included an email from an attorney representing SYWSE – Bill Canfield, Esq. ("Canfield") – to Kao and Hartman, which contained "a draft letter that would 'explain the purpose of [SYWSE] in response to the FEC and that there is a factual basis for asserting that [SYWSE] was not formed for the purpose of making that contribution.'" [Id. at ¶ 107 (some alterations and brackets

omitted).] PacMar states that "[t]he phrase 'that contribution' – as used by Bill Canfield in the March 25, 2020 emails to Kao, Hartman, Chen, and Lum Kee – referred to the $150,000 donation made by SYWSE to 1820 PAC using [PacMar]'s money that was the subject of the FEC Complaint and federal investigation." [Id. at ¶ 108.]

"After Kao, Chen, and Hartman all made edits to this letter, Kao emailed Chen, Lum Kee, and Hartman the following description of the scholarships and their intended recipients that formed the so-called legitimate purpose of SYWSE: 'Whatever . . . just a pack of bitches getting free $.'" [Id. at ¶ 110.] PacMar further alleges "Kao, Chen, Lum Kee, and Hartman all understood and knew that the SYWSE scholarship program was intended to impede and obstruct the investigation into the illegal campaign contributions previously made by the enterprise." [Id. at ¶ 113.] Because SYWSE did not possess its own funds, "Kao, Chen, Lum Kee, and Hartman stole [PacMar's] money to pay Canfield's legal bills in furtherance of the obstructionist scheme." [Id. at ¶ 114.]

On February 26, 2020, Hartman emailed PacMar employees with instructions regarding how the scholarship donations were to be made, including instructions that the donations must be sent by SYWSE. See id. at ¶¶ 115–16. Hartman directed and oversaw SYWSE's scholarship program and the public relations

plan for the scholarship program. See id. at ¶ 118. Hartman
wrote in a March 30, 2020 email that the public relations plan
should not reference Kao, Lam, or PacMar. See id. at ¶ 121.
PacMar alleges that "[a]t least $60,000 paid out by SYWSE to
fund these scholarships was money that the enterprise stole from
[PacMar]." [Id. at ¶ 126.] The $60,000 was first transferred
from PacMar to Kao and/or Lam, then transferred to SYSWE, then
finally transferred to the universities as scholarship
donations. Hartman, along with others, allegedly helped
facilitate the money transfers, although the physical act of
transferring the money was performed by Chen and Lum Kee. See
id. at ¶¶ 127–28. For instance, on April 14, 2020, Hartman
emailed Lum Kee stating "that they need to 'go . . . to Martin
Kao for funding' of the scholarships." [Id. at ¶ 136 (brackets
omitted) (ellipsis in original).]

III. **The PPP Scheme**

        PacMar alleges that, beginning in March 2020, Kao, Lum
Kee, and Chen "conspired to commit fraud against numerous
financial institutions through the PPP loan program," [id. at
¶ 151,] which was created through the Coronavirus Aid, Relief,
and Economic Security Act ("CARES Act"), see id. at ¶ 150. Kao,
Chen, and Lum Kee allegedly completed and submitted PPP loan
applications containing false information to obtain PPP loans
for more money than they would have otherwise been able to

obtain had correct information been used. See id. at ¶¶ 152–53. The enterprise applied for three PPP loans and was approved for two of the PPP loans for a total amount of $12,841,490. See id. at ¶ 187.

Hartman allegedly knew about the PPP loans because he assisted Kao, Chen, and Lum Kee in the scheme. See id. at ¶ 219. On April 1, 2020, which was two days before the first PPP loan application was sent, Hartman emailed Kao asking why a former employee was still being paid through PacMar's payroll, and "Kao responded that it did not matter because they will 'recover most of it via the stimulus relief.'" [Id. at ¶ 221.] In April and May 2020, Hartman sent emails to Kao, Chen, and Lum Kee regarding PPP loan information and explaining changes to the PPP loan program. See id. at ¶¶ 222–23. In a March 26, 2020 email, Hartman told the Chief Operating Officer ("COO") to "'be consistent with [Kao]'s message that we are bracing for "severe impacts" to our businesses,' even though Hartman recognized in the same email that there were no 'severe impacts' to [PacMar]'s business." [Id. at ¶ 227 (brackets omitted).] Hartman's email was a response to "the COO's email to a third-party stating that [PacMar]'s business had 'seen little to no impact' or loss due to the COVID pandemic." [Id. at ¶ 228.]

PacMar also alleges "Hartman was tasked with opening new offices in various cities to increase the number of [PacMar]

employees to match the fraudulent figures stated in the PPP loan applications submitted by Kao, Chen, and Lum Kee." [Id. at ¶ 230.] Hartman allegedly signed leases for new offices in South Carolina and Maine to justify the information submitted for the PPP loan applications. See id. at ¶¶ 232–33. PacMar further states that Hartman "masterminded a fraudulent PPP scheme involving the immediate signing bonuses of $121,298 . . . paid by [PacMar] to four (4) prospective employees." [Id. at ¶ 235.] According to PacMar, Hartman "fraudulently and intentionally mischaracterize[d] these bonus payments as vacation payments in submissions to the PPP lenders in order to illegally charge those expenses against the PPP loan proceeds." [Id. at ¶ 236.] The signing bonuses were paid in June 2020, at Hartman's direction. See id. at ¶ 240. PacMar states it was damaged because, once the signing bonus payments were made, "the employees were told not to come to work until the 'vacation' time period was over." [Id. at ¶ 242.]

PacMar alleges its records show that, on March 23, 2020, Hartman was approved for a $20,000 annual pay increase. See id. at ¶ 253. Approximately one week later, Hartman also received a title promotion. In August 2020, after PacMar received the PPP loans, Hartman received another title promotion. See id. at ¶¶ 254, 256.

10

## IV.  **Legal Fees and Expenses**

PacMar states that, on February 19, 2021, it agreed to pay a limited advance of $15,000 for legal fees and expenses to a law firm on behalf of Hartman. [Id. at ¶ 299.] The payment was subject to Hartman's representations and warranties in a February 24, 2021 letter to PacMar requesting the advance. See id. at ¶ 300. In the letter, Hartman stated:

> I have at all times acted in good faith, without active or deliberate dishonesty, and in a manner I reasonably believed to be in or not opposed to the best interests of [PacMar] . . . I did not receive any improper personal benefit in money, property, or services as a result of the acts or omissions alleged.

[Id. at ¶ 301 (ellipsis in Second Amended Complaint).] PacMar states Hartman agreed to repay the advance if it was determined that Hartman was not eligible to receive indemnification. See id. at ¶ 303.

## V.  **Claims Alleged Against Hartman**

PacMar alleges the following claims against Hartman: (1) a campaign contribution RICO claim pursuant to 18 U.S.C. § 1962(c) ("Count I"); (2) an 18 U.S.C. § 1962(d) claim alleging a conspiracy to commit the campaign contribution RICO violation ("Count II"); (3) a PPP loan fraud RICO claim pursuant to § 1962(c) ("Count III"); (4) a § 1962(d) claim alleging a conspiracy to commit the PPP loan fraud RICO ("Count IV"); (5) a fraud claim ("Count V"); (6) a civil conspiracy claim

11

("Count VI"); (7) a breach of fiduciary duty claim ("Count VIII"); (8) a conversion claim ("Count IX"); (9) an embezzlement claim ("Count X"); (10) an unjust enrichment claim ("Count XI"); (11) a gross negligence claim ("Count XII"); and (12) a breach of contract claim ("Count XIV").

       In Hartman's Motion, he argues the RICO claims against him should be dismissed pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) and, since those claims should be dismissed, the Court should decline to exercise supplemental jurisdiction over PacMar's state law claims against him. See Motion at 2.

## DISCUSSION

## I.  RICO Standing

       Hartman argues PacMar has not sufficiently alleged RICO standing regarding its RICO claims as to the campaign contributions and the PPP scheme. See Motion, Mem. in Supp. at 6-7. The Court concludes that PacMar has sufficiently alleged RICO standing as to the campaign contribution claims against Hartman (Counts I and II), but not as to the PPP scheme claims against any defendant (Counts III and IV).

       "The Racketeer Influenced and Corrupt Organizations Act (RICO or Act), 18 U.S.C. §§ 1961-1968, provides a private right of action for treble damages to '[a]ny person injured in his business or property by reason of a violation' of the Act's criminal prohibitions." Bridge v. Phoenix Bond & Indem. Co., 553

U.S. 639, 641 (2008) (alteration in <u>Bridge</u>) (quoting 18 U.S.C.
§ 1964(c)).

> Under 18 U.S.C. § 1962(c),
>
> [i]t shall be unlawful for any person employed by
> or associated with any enterprise engaged in, or
> the activities of which affect, interstate or
> foreign commerce, to conduct or participate,
> directly or indirectly, in the conduct of such
> enterprise's affairs through a pattern of
> racketeering activity or collection of unlawful
> debt.

"Broadly speaking, there are two parts to a civil RICO claim."
<u>Painters & Allied Trades Dist. Council 82 Health Care Fund v.
Takeda Pharms. Co.</u>, 943 F.3d 1243, 1248 (9th Cir. 2019)
("<u>Painters</u>"). There is "[t]he civil RICO violation . . . defined
under 18 U.S.C. § 1962," and then there is "'RICO standing'
. . . defined under 18 U.S.C. § 1964(c)." <u>Id.</u> The first part
"sets out four elements: a defendant must participate in (1) the
conduct of (2) an enterprise that affects interstate commerce
(3) through a pattern (4) of racketeering activity or collection
of unlawful debt." <u>Eclectic Props. E., LLC v. Marcus & Millichap
Co.</u>, 751 F.3d 990, 997 (9th Cir. 2014) (citing 18 U.S.C.
§ 1962(c)). The second part – RICO standing – requires that "a
plaintiff must show:(1) that his alleged harm qualifies as
injury to his business or property; and (2) that his harm was
'by reason of' the RICO violation." <u>Painters</u>, 943 F.3d at 1248
(citation and some internal quotation marks omitted).

A plaintiff alleging injury to property must sufficiently plead a "concrete financial loss." Canyon Cnty. v. Syngenta Seeds, Inc., 519 F.3d 969, 975 (9th Cir. 2008) (quotation marks and citation omitted). "Financial loss alone, however, is insufficient. 'Without a harm to a specific business or property interest — a categorical inquiry typically determined by reference to state law — there is no injury to business or property within the meaning of RICO.'" Id. (quoting Diaz v. Gates, 420 F.3d 897, 900 (9th Cir. 2005) (en banc), cert. denied, 546 U.S. 1131, 126 S. Ct. 1069, 163 L. Ed. 2d 928 (2006)). "[S]peculative injuries do not serve to confer standing under RICO, unless they become concrete and actual." Steele v. Hosp. Corp. of Am., 36 F.3d 69, 71 (9th Cir. 1994) (citations omitted).

Additionally, RICO standing has a causation requirement. Specifically,

> "[a] plaintiff must show that the defendant's RICO violation was not only a 'but for' cause of his injury, but that it was a proximate cause as well." Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n, 298 F.3d 768, 773 (9th Cir. 2002) (citing Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 268–69, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992)). "Some 'direct relationship' between the injury asserted and the injurious conduct is necessary." Oki Semiconductor Co., 298 F.3d at 773 (quoting Holmes, 503 U.S. at 269, 112 S. Ct. 1311). "To establish proximate cause, plaintiffs must show that their injury flows directly from the defendants' commission of the predicate

acts." <u>Pedrina v. Chun</u>, 906 F. Supp. 1377, 1415
(D. Haw. 1995) (citation omitted).

<u>Ryan v. Salisbury</u>, 382 F. Supp. 3d 1031, 1056 (D. Hawai`i 2019)
(alteration in <u>Ryan</u>).

### A.   **PPP Scheme: Counts III and IV**

In Count III, PacMar alleges a RICO claim against
Defendants Kao, Chen, Lum Kee and Hartman for the role they
purportedly played in covering up false information to
legitimatize the PPP loans. <u>See, e.g.</u>, Second Amended Complaint
at ¶¶ 368–76. PacMar further alleges:

> As a direct and proximate result of the
> Count III Defendants'[2] racketeering activities
> and violations of 18 U.S.C. § 1962(c), PacMar has
> been injured in its business and property in
> amounts to be proven at trial including but not
> limited to: (i) $602,000 of [PacMar's] money to
> cancel various contracts the enterprise caused
> [PacMar] to enter related to the Maine office and
> to justify the fraudulent PPP applications;
> (ii) $1,250,000 of [PacMar's] money spent on the
> South Carolina office and to justify the
> fraudulent PPP applications; (iii) $121,298 (plus
> taxes and other amounts) [PacMar] paid for
> signing bonuses to four (4) employees in or
> around June 2020 as a result of Hartman's
> fraudulent scheme to further defraud the PPP
> lenders by intentionally mischaracterizing the
> amounts as vacation payments; and
> (iv) $201,249.60 in pay raises the enterprise
> caused [PacMar] to give to Hartman, Chen, and Lum
> Kee as rewards for their loyalty to the
> enterprise.

---

[2] Kao, Chen, Lum Kee, and Hartman are the "Count III
Defendants." [Second Amended Complaint at ¶ 362.]

[Id. at ¶ 380.] Hartman argues these amounts are not concrete financial losses to PacMar's business or property interest because they stem from the PPP money. See Motion, Mem. in Supp. at 9-10. The Court agrees in part and disagrees in part.

PacMar received $12,841,490 in PPP loans. [Second Amended Complaint at ¶ 187.] When the Second Amended Complaint was filed, the United States government had seized $8,693,986.72 from PacMar's accounts. [Id. at ¶ 190.] The Small Business Administration ("SBA") informed PacMar "that outstanding PPP balances, which may include interest, have been 'referred to Treasury for collection.'" [Id. at ¶ 192.] PacMar alleges it has been injured for a total of approximately $2,174,548 in relation to the PPP scheme. See id. at ¶ 380. For purposes of the instant Motion, this Court accepts as true PacMar's allegations regarding the amount of its PPP loans and the amount seized. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." (citation and internal quotation marks omitted)).

Based on the allegations in the Second Amended Complaint, $8,693,986.72 has been seized of the $12,841,490 received in PPP loans, leaving approximately $4,147,504 in PPP loan funds that have not been seized. In other words, at the

time that the Second Amended Complaint was filed, PacMar had
more money in its account, at least on paper, than it would have
otherwise had without the PPP loans. Although PacMar alleges the
SBA referred the outstanding balance to the Department of
Treasury for collection, PacMar does not allege that the
outstanding balance has been collected. The injuries that PacMar
is alleged to have sustained after the PPP loans were received
are speculative, and, thus, they "do not serve to confer
standing under RICO, unless they become concrete and actual."
See Steele, 36 F.3d at 71 (citations omitted). These injuries
consist of all damages alleged in Count II aside from the pay
raises: the $602,000 spent to cancel contracts related to the
Maine office; $1,250,000 spent on the South Carolina office; and
$121,298 (plus taxes and other amounts) paid for signing bonuses
to four employees around June 2020. [Amended Complaint at
¶ 380.] These injuries occurred after the PPP loans were
received, are speculative, and fail to confer standing. See
Steele, 36 F.3d at 71.

However, PacMar alleged it was injured by employee pay
raises before the PPP loans were issued. Of the $2,174,548 of
alleged damages based on the PPP scheme, $101,249.60 in damages
from the first round of pay raises are alleged to have occurred
before receipt of PPP funds. See Second Amended Complaint at
¶¶ 245-46, 248-49, 253, 372, 380. The Court therefore rejects

17

Hartman's argument that Count III should be dismissed for lack of concrete injury stemming from the PPP scheme as to the $101,249.60 in damages from the first round of pay raises.

To confer standing, the defendants' unlawful conduct must be the "but for" and proximate cause of the injury. See Harmoni Int'l Spice, Inc. v. Hume, 914 F.3d 648, 651 (9th Cir. 2019). Proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged." Holmes, 503 U.S. at 268. The injurious conduct alleged in relation to the PPP scheme is the fraudulent submission of applications for PPP loans. See Second Amended Complaint at ¶¶ 368-71. The March and early April 2020 pay raise damages, however, are not directly linked to the submission of fraudulent PPP loan applications. First, the pay raises were alleged not just in connection to the PPP scheme, but also as rewards for the campaign contribution scheme, thus making them appear less directly tied to the PPP scheme. See id. at ¶¶ 351, 354. Second, Chen and Lum Kee each received a second raise **after** PacMar received the PPP funds, making this second round of raises (rather than the first round of raises) appear more likely to be a reward for the PPP scheme. [Id. at ¶¶ 246, 249.] The relationship between the unlawful conduct alleged in relation to the PPP scheme and the first round of pay raises is "too attenuated to support a finding of proximate cause." Harmoni,

18

914 F.3d at 651. PacMar has not alleged factual content that would allow this court to draw the reasonable inference that the pay raises occurring before April 17, 2020 were the direct result of fraudulent PPP applications. See Iqbal, 556 U.S. at 678 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (citations and internal quotation marks omitted)). Rather, more than one possible cause for the pay raises exists. Count III must therefore be dismissed for lack of standing as to all of the Count III defendants (Kao, Chen, Lum Kee and Hartman).

Because PacMar fails to demonstrate standing to pursue a RICO claim under § 1962(c) in Count III, PacMar's conspiracy claim under § 1962(d) in Count IV also fails. See Howard v. Am. Online Inc., 208 F.3d 741, 751 (9th Cir. 2000) ("Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO."). Counts III and IV are therefore dismissed without prejudice against all defendants.

B.   **Campaign Contributions: Counts I and II**

Hartman contends that PacMar did not suffer a concrete financial loss, and none of the injuries alleged in Count I are traceable to Hartman, because the predicate acts alleged in relation to the coverup scheme occurred after the campaign contributions were made. [Motion, Mem. in Supp. at 7.] Hartman's arguments fail.

As to injury for purposes of standing, Hartman is mistaken. PacMar need not allege it was injured by all of the predicate acts alleged, but rather by a pattern of racketeering activity.

> In *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479 (1985), the Supreme Court stated that the plaintiff is required to plead "compensable injury [consisting of] harm caused by predicate acts sufficiently related to constitute a pattern." *Id.* at 497. The Seventh Circuit has explained that, after establishing that predicate acts are sufficiently related to constitute a pattern of racketeering activity, "a plaintiff need not demonstrate injury to himself from each and every predicate act making up the RICO claim." *Corley v. Rosewood Care Ctr.,* 388 F.3d 990, 1004 (7th Cir. 2004) (discussing *Marshall & Ilsley Trust Co. v. Pate,* 819 F.2d 806, 809–10 (7th Cir. 1987)). Instead, the plaintiff must prove only "an injury directly resulting from some or all of the activities comprising the violation." *Marshall,* 819 F.2d at 809. *See also Deppe v. Trippe,* 863 F.2d 1356, 1366 (7th Cir. 1988) ("no requirement exists that the plaintiff must suffer an injury from two or more predicate acts, or from all of the predicate acts . . . Thus, a RICO verdict can be sustained when a pattern of racketeering acts existed, but when only one act caused injury."); *Kearny v. Hudson*

> Meadows Urban Renewal Corp._, 829 F.2d 1263, 1268
> (3d Cir. 1987) (finding that the statute required
> only injury from "any predicate act," not all,
> and stating that a contrary holding would mean
> that, "[f]or example, if an organized crime group
> were to operate a protection racket, extorting
> money from each merchant in a community, then
> each merchant's injury would be separate, and
> therefore, . . . none could recover"); Edgenet,
> Inc. v. GS1, AISBL, 742 F. Supp. 2d 997, 1015 n.6
> (E.D. Wis. 2010) (noting that the Supreme Court
> did not hold otherwise in Hemi Group); Gregory P.
> Joseph, _Civil RICO: A Definitive Guide_ 58–59 (3d
> ed. 2010) ("As long as the pattern of
> racketeering activity has caused harm to the
> plaintiff's business or property, the plaintiff
> has RICO standing. The plaintiff is not obliged
> to plead or prove that it has been injured by
> multiple predicate acts, as long []as it has been
> injured by at least one predicate act.").

Just Film, Inc. v. Merch. Servs., Inc., No. C 10-1993 CW, 2012

WL 6087210, at *12 (N.D. Cal. Dec. 6, 2012) (alterations in Just

Film); see also In re JUUL Labs, Inc., Mktg., Sales Pracs., &

Prods. Liab. Litig., 533 F. Supp. 3d 858, 871–72 (N.D. Cal.

2021) ("Plaintiffs are not required to show that each RICO

defendant including Bowen **personally** committed at least two acts

of mail or wire fraud to establish a pattern of

racketeering. . . . [I]t is only necessary that plaintiffs

allege that each defendant knowingly participated in the scheme

to defraud, with the requisite intent, and that some member or

members of the Enterprise commit at least two acts of mail or

wire fraud." (emphasis in original) (citation omitted)).

Here, PacMar alleges a pattern of racketeering activity based on the campaign contributions, and the scholarship scheme intended to cover up prior illegal campaign contributions and to make further illegal campaign contributions. [Second Amended Complaint at ¶¶ 61-114, 140.]

PacMar sufficiently alleges it has been injured by the campaign contribution scheme. PacMar alleges that, in September 2019, SYWSE was incorporated and, in November or December 2019, Kao, Lam, Chen, and Lum Kee stole $150,000 from PacMar and transferred the money to SYWSE, which used the money to make contributions to 1820 PAC. See id. at ¶ 332. Kao, Lam, Chen, and Lum Kee allegedly made or arranged at least thirty-nine political contributions using at least $173,968 of PacMar's funds, all between May 2019 and December 2019. See id. at ¶ 335. Although it is unclear if the $150,000 and $173,968 campaign donations are separate donation amounts, or if the $150,000 donation is part of the $173,968, PacMar alleges those amounts were taken from its own funds to make illegal campaign contributions. See, e.g., id. at ¶¶ 333, 335. PacMar has therefore sufficiently alleged that these amounts are concrete financial losses.

Further, PacMar states the scholarship scheme was a continuation of the campaign contribution scheme because the former was meant to cover up the latter. Specifically, PacMar

alleges that, to give legitimacy to SYWSE's existence – *i.e.*, that SYWSE was not created solely to make campaign contributions to 1820 PAC – Kao, Chen, Lum Kee, Hartman, and Lam planned to cover up the purported illegal scheme behind SYSWE by making scholarship donations to numerous universities. See id. at ¶¶ 336–43. Between March 2020 and June 2020, $60,000 was transferred from PacMar to SYWSE, and SYWSE used the $60,000 to fund scholarships at universities. See id. at ¶¶ 344–45.

PacMar adequately alleges concrete financial injury sufficient for standing stemming from the campaign contribution coverup scheme. PacMar alleges that some portion of the $60,000 used to fund scholarships was derived directly from PacMar's funds - not PPP funds. The Second Amended Complaint alleges: "At least $60,000 paid out by SYWSE to fund these scholarships was money that the enterprise stole from [PacMar]." Id. at ¶ 126, see also id. at ¶ 125. The Second Amended Complaint alleges some portion of the $60,000 of scholarship money was used in March to fund scholarships, before the PPP funds arrived in PacMar's account in April 2020. See Second Amended Complaint at ¶ 137 ("The SYWSE started paying out scholarships in or around March 2020[.]"); ¶ 166 ("on April 17, 2020, the loan was funded and [Central Pacific Bank] deposited $10,000,000 into [PacMar]'s bank account[.]"). While it is unclear what portion of the $60,000 was derived directly from PacMar's funds, rather than

23

being derived from PPP loan money,[3] the allegations are sufficient to plead a plausible basis that would support RICO standing. A portion of the $60,000 was used in March 2020 to fund scholarships, and was derived from PacMar's funds, thereby resulting in concrete financial injury to PacMar. See Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 396 (1906) ("A person whose property is diminished by a payment of money wrongfully induced is injured in his property.").

As to Hartman's proximate cause argument, PacMar need not prove Hartman directly caused PacMar injury through a predicate act; rather, "the inquiry must include the harm caused by all of the predicate acts, regardless of which Defendants actually committed, or agreed to commit, the alleged acts." Pedrina v. Chun, 906 F. Supp. 1377, 1414 (D. Hawai`i 1995).[4] The Ninth Circuit has formulated a non-exhaustive test to evaluate proximate cause:

---

[3] The Second Amended Complaint alleges that "the majority of" PacMar's money used to pay for the scholarships "was made in May 2020 or later, which was after [PacMar] had received and 'washed' the PPP funds." [Second Amended Complaint at ¶ 137.] PacMar also alleges that "[a] total of at least $60,000 was paid out by SYWSE using [PacMar]'s funds through this bogus scholarship program **and with the 'washed' PPP money.**" [Id. at ¶ 139 (emphasis added).] It therefore is unclear what portion of the $60,000 is not derived from PPP funds.

[4] Pedrina, 906 F. Supp. 1337, was affirmed on appeal. 97 F.3d 1296 (9th Cir. 1996).

> (1) whether there are more direct victims of the
> alleged wrongful conduct who can be counted on to
> vindicate the law as private attorneys general;
> (2) whether it will be difficult to ascertain the
> amount of the plaintiff's damages attributable to
> defendant's wrongful conduct; and (3) whether the
> courts will have to adopt complicated rules
> apportioning damages to obviate the risk of
> multiple recoveries.

Mendoza v. Zirkle Fruit Co., 301 F.3d 1163, 1169 (9th Cir. 2002)

(citation omitted). As to the coverup scheme, all three factors

are met: PacMar is the direct victim of the predicate acts

alleged, including the $60,000 allegedly stolen to fund

scholarships. The amount stolen from PacMar is not difficult to

ascertain – it is funds stolen directly from PacMar. There is no

risk of multiple recoveries. PacMar has therefore pled a

plausible basis that would support a conclusion that proximate

cause exists for the coverup scheme.

     To the extent that Hartman seeks dismissal of PacMar's

claims against him in Counts I and II based on lack of standing,

the Motion is denied.

## III. Counts I and II

### A.   Alleging Fraudulent Predicate Conduct

     Hartman contends PacMar fails to allege with

particularity Hartman's fraudulent predicate conduct as to

Count I. [Motion, Mem. in Supp. at 14.] Predicate acts based on

a theory of fraudulent conduct must be pled with particularity

to comply with Rule 9(b). Fed. R. Civ. P. 9(b); see Schreiber

Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1400-01
(9th Cir. 1986). PacMar alleges the coverup scheme itself is a
predicate act, and alleges numerous other predicate acts that
constitute the coverup scheme. Second Amended Complaint at
¶ 341; see also id. at ¶¶ 326-48, 351. Of the predicate acts
alleged to comprise the coverup scheme, some sound in fraud and
some do not. Nonfraudulent conduct need not be pled with
particularity. See Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097,
1104-05 (9th Cir. 2003). However, the fraudulent conduct alleged
must be stated with particularity.

Generally, to sufficiently plead fraud, "the pleader
must state the time, place, and specific content of the false
representations as well as the identities of the parties to the
misrepresentation." Schreiber, 806 F.2d at 1400-01 (citations
omitted). When the fraud involves multiple defendants, the
pleader may not lump defendants together, but must
"differentiate their allegations" and "inform each defendant
separately of the allegations surrounding his alleged
participation in the fraud." Swartz v. KPMG LLP, 476 F.3d 756,
764-65 (9th Cir. 2007) (per curiam) (quotation marks and
citation omitted). At minimum, the pleader must identify the
role each defendant had in the alleged fraudulent scheme. Id. at
765. Rule 9(b)'s requirements may be relaxed regarding matters
that are exclusively within the opposing party's knowledge.

26

Rubenstein v. Neiman Marcus Grp. LLC, 687 F. App'x 564, 567 (9th Cir. 2017) (quoting Moore v. Kayport Package Express, Inc., 885 F.2d 531, 540 (9th Cir. 1989)). In this instance, a pleading is sufficient under Rule 9(b) "if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." Id. at 568 (quoting Moore, 885 F.2d at 540).

Among the initial predicate acts alleged to make up the coverup scheme are the fund transfers from PacMar to SYWSE that Hartman, along with other defendants, is alleged to have "arranged and carried out" and "facilitated and directed." [Second Amended Complaint at ¶¶ 128, 346.] These allegedly fraudulent predicate acts are not pled with particularity as to Hartman. PacMar makes broad allegations against Hartman, such as that Hartman "co-mingled PacMar funds with those of SYWSE," [id. at ¶ 31], and "orchestrated and directed the payment of [PacMar] money through various conduits designed to launder and hide the source of the money for these scholarships," [id. at ¶ 102]. These broad allegations are deficient. It is unclear how Hartman directed the fund transfer from PacMar to SYWSE. The only particular action alleged in this regard against Hartman is that Hartman emailed Lum Kee on April 14, 2020 that "they need to go to Martin Kao for funding of the scholarships." [Id. at ¶ 136 (brackets, ellipsis, and internal quotation marks omitted).]

27

PacMar does not allege Hartman took any other action to make
these transfers – rather, PacMar alleges Chen and Lum Kee
carried out the physical transfer of funds, [id. at ¶ 128], and
"Tiffany Lam was directly responsible for receiving these funds
from [PacMar] after they had been laundered through Kao and
herself." [Id. at ¶ 130.]

Further, PacMar does not provide sufficient
specificity regarding the transfer of the $60,000 –
specifically, when the transfer was made. See Schreiber, 806
F.2d at 1400-01. Rule 9(b)'s pleading standard cannot be relaxed
due to PacMar's lack of access to the information because, here,
PacMar alleges the $60,000 was stolen from PacMar itself, and
PacMar presumably has access to its own records. As such,
PacMar's allegation of the $60,000 funds stolen from it for
scholarship donations is not alleged with specificity to comply
with Rule 9(b).

PacMar also alleges Hartman and other defendants stole
money from it to fund SYWSE's initial start-up costs, but this
allegation, too, is not pled with particularity as to Hartman.
PacMar alleges: "Because SYWSE was a sham entity and had no
money of its own, the amounts that Kao, Tiffany Lam, Hartman,
Chen, and Lum Kee stole from [PacMar] to pay for SYWSE
administrative, incorporation, PR consultants and PR plans, and
legal costs, were predicate acts that damaged [PacMar]." [Second

Amended Complaint at ¶ 348.] The only further detail alleged
regarding Hartman is that Hartman and others "stole [PacMar's]
money to pay Canfield's legal bills[.]" [Id. at ¶ 114.] This
does not satisfy Rule 9(b) because these are broad allegations
against Hartman with "no particularized supporting detail." See
Bly-Magee v. California, 236 F.3d 1014, 1018 (9th Cir. 2001).
Rule 9(b) "require[s] 'plaintiffs to differentiate their
allegations when suing more than one defendant . . . and inform
each defendant separately of the allegations surrounding his
alleged participation in the fraud.'" Swartz, 476 F.3d at 764-65
(quoting Haskin v. R.J. Reynolds Tobacco Co., 995 F. Supp. 1437,
1439 (M.D. Fla. 1998)).

         PacMar also alleges Hartman received a pay raise to
reward him for his participation in the enterprise. See Second
Amended Complaint at ¶ 351. However, Hartman is not alleged to
be responsible for the pay raise. Rather, Martin Kao recommended
Hartman for the raise, and Chen approved the raise. [Id. at
¶ 253.] Hartman is not alleged to have taken any action
regarding the pay raise. As such, Hartman's fraudulent predicate
conduct is not pled with particularity as to the pay raise.

         The only remaining predicate act alleged - aside from
the coverup scheme as a whole - is PacMar's allegations
regarding Hartman's direction of funds from SYWSE to the
universities. See Second Amended Complaint at ¶ 347. Here,

PacMar does allege sufficient detail with the required particularity as to Hartman's direction of money from SYWSE to scholarships. See id. at ¶¶ 103, 115-16, 136, 139, 347. These allegations sufficiently identify Hartman's role in the allegedly fraudulent scheme, and inform Hartman of the allegations surrounding his alleged participation in the fraud. See Swartz, 476 F.3d at 764-65.

Although some of the predicate acts are not pled with particularity under Rule 9(b), PacMar has sufficiently alleged Hartman's participation in the predicate acts of the coverup scheme and directing money to scholarships. Therefore, Count I cannot be dismissed against Hartman for failure to allege Hartman's participation in predicate acts under Rule 9(b). The Motion is denied as to Count I's allegations regarding the alleged scholarship fraud scheme.

**B.    Specific Intent to Defraud**

In the Motion, Hartman argues "specific intent to engage in mail fraud, the underlying predicate act claimed by PacMar, is lacking and the [Second Amended Complaint] must be dismissed as implausible." [Motion, Mem. in Supp. at 11.] Mail fraud was not a predicate act alleged for Count I in relation to Hartman. Rather, the predicate acts alleged for Count I that involve Hartman are violations of 18 U.S.C. §§ 1503, 1952, 1956, 1957, 2314, 2315. [Second Amended Complaint at ¶¶ 341-51.]

Hartman also argues the Second Amended Complaint does not exclude a plausible and innocuous explanation for Hartman's conduct. This is not the correct standard. See Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is **im**plausible." (emphasis in original)). The Court rejects Hartman's arguments related to mail fraud.

C.   **Conduct**

Hartman also argues the Second Amended Complaint fails to plead specific factual allegations demonstrating Hartman directed the enterprise's affairs because, rather than directing the affairs, he reported to and was instructed by Martin Kao. [Motion, Mem. in Supp. at 16.] Hartman notes the Amended Complaint specifies Hartman co-mingled PacMar and SYWSE funds "under [Kao and Lam's] direction." [Id. at 17 (emphasis omitted).]

Because Counts III and IV are dismissed, Hartman's alleged conduct is evaluated as to the campaign finance fraud and coverup scheme alleged in Counts I and II.

> In order to "participate, directly or indirectly,
> in the conduct of such enterprise's affairs," one
> must have some part in directing those affairs.
> Of course, the word "participate" makes clear
> that RICO liability is not limited to those with
> primary responsibility for the enterprise's
> affairs, just as the phrase "directly or
> indirectly" makes clear that RICO liability is
> not limited to those with a formal position in
> the enterprise, but **some** part in directing the
> enterprise's affairs is required.

Reves v. Ernst & Young, 507 U.S. 170, 179 (1993) (footnote

omitted). Further, the United States Supreme Court has stated

that "[a]n enterprise is 'operated' not just by upper management

but also by lower rung participants in the enterprise who are

under the direction of upper management." Id. at 184.

PacMar sufficiently alleges that Hartman had some part

in directing the enterprise's affairs regarding the campaign

contribution scheme. PacMar alleges that Hartman: was an

enterprise member who directed SYWSE and its scholarship program

to coverup the campaign finance contribution; [Second Amended

Complaint at ¶¶ 30, 88, 324;] facilitated the transfer of funds

from PacMar to SYWSE; [id. at 128;] oversaw and directed the

payment of the $60,000 for scholarships; [id. at ¶¶ 103, 118;]

and instructed employees on how to make the scholarship

donations, [id. at ¶¶ 115-16,] among other allegations. PacMar

alleged Hartman's conduct in Counts I and II with requisite

specificity.

D.   **Pattern**

Hartman argues PacMar "fails to state plausible allegations of either a closed-ended or open-ended criminal activity." [Motion, Mem. in Supp. at 18.] Hartman argues there is no "closed-end" continuity because the fraudulent incidents occurred in an eleven-month period, and there is no open-ended continuity because Kao, Chen, Lum Kee were dismissed from the company in 2021. [Id. at 18-20.]

> "'[R]acketeering activity' is any act indictable under several provisions of Title 18 of the United States Code . . . ." Turner v. Cook, 362 F.3d 1219, 1229 (9th Cir. 2004) (some citations omitted) (citing 18 U.S.C. § 1961(1)). A "'pattern of racketeering activity' requires at least two acts of racketeering activity . . . ." 18 U.S.C. § 1961(5). A "pattern" also "requires that the predicate criminal acts be 'related' and 'continuous.'" Allwaste, Inc. v. Hecht, 65 F.3d 1523, 1527 (9th Cir. 1995) (quoting H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239, 109 S. Ct. 2893, 2900-01, 106 L. Ed. 2d 195 (1989)). "The element of relatedness is the easier to define . . . ." H.J. Inc., 492 U.S. at 239, 109 S. Ct. 2893. Predicate criminal acts may be related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id. at 240, 109 S. Ct. 2893 (quotation marks and citation omitted). The element of continuity, however, is more challenging to define.
>
> In H.J. Inc., the Supreme Court observed that the term "continuity" escapes strict definition: "'[c]ontinuity' is both a closed-and open-ended concept, referring either to a closed period of repeated conduct or to past conduct that by its

nature projects into the future with a
threat of repetition." [492 U.S.] at 241,
109 S. Ct. at 2902. "Closed-ended"
continuity is established by showing that
related predicate acts occurred over a
"substantial period of time." Id. at 242,
109 S. Ct. at 2902. The Court thus noted
that "[p]redicate acts extending over a few
weeks or months and threatening no future
criminal conduct do not satisfy this
requirement," and concluded that "Congress
was concerned in RICO with long-term
criminal conduct." Id.

Where long-term criminal conduct cannot
be established, "open-ended" continuity may
be proved. Id. Open-ended continuity is the
threat that criminal conduct will continue
into the future. It is established by
showing either that the predicate acts
"include a specific threat of repetition
extending indefinitely into the future" or
that the predicate acts were "part of an
ongoing entity's regular way of doing
business." Id.

The Court warned that "the precise
methods by which relatedness and continuity
or its threat may be proved, cannot be fixed
in advance with such clarity that it will
always be apparent whether in a particular
case a 'pattern of racketeering activity'
exists." Id. at 243, 109 S. Ct. at 2903.

Allwaste, 65 F.3d at 1527 (some alterations in
Allwaste).

Puana v. Kealoha, 587 F. Supp. 3d 1035, 1051–52 (D. Hawai`i

2022) (alterations in Puana).

The predicate acts alleged in Count I that involve

Hartman are:

- "The scholarship scheme was itself a RICO predicate act in violation of 18 U.S.C. §§ 1503 and 1952." [Second Amended Complaint at ¶ 341.]

- "[A]ll funds used by SYWSE for these scholarships were first transferred from [PacMar] to Kao and Tiffany Lam, who then transferred the funds to SYWSE. These transfers were arranged and carried out by Kao, Chen, Lum Kee, Hartman, and Tiffany Lam. These transfers were RICO predicate acts in violation of 18 U.S.C. §§ 1956, 1957, 1503, 1952, 2314, and 2315." [Id. at ¶ 346.]

- "Subsequently, and once the funds were received by SYWSE, Kao, Chen, Lum Kee, Hartman, and Tiffany Lam arranged and executed payment of these funds to the universities. Tiffany Lam signed each check from the SYWSE to each university. These transfers also occurred between March and June 2020. Accordingly, these transfers were additional RICO predicate acts in violation of 18 U.S.C. §§ 1956, 1957, 1503, 1952, 2314, and 2315." [Id. at ¶ 347.]

- "Because SYWSE was a sham entity and had no money of its own, the amounts that Kao, Tiffany Lam, Hartman, Chen, and Lum Kee stole from [PacMar] to pay for SYWSE administrative, incorporation, PR consultants and PR

plans, and legal costs, were predicate acts that

damaged [PacMar].” [Id. at ¶ 348.]

- -“Kao, Chen, Lum Kee, and Hartman rewarded themselves with

    increases to their annual base salary, and rewarded

    Hartman with a promotion to his title, for their

    participation in the enterprise and its illegal

    conduct. Chen received a $100,000 annual pay increase,

    Lum Kee received a $81,249.60 annual pay increase, and

    Hartman received a $20,000 annual pay increase. These

    raises occurred during the period between late - March

    2020 and early - May 2020. These raises were

    additional RICO predicate acts in violation of 18

    U.S.C. §§ 2314, 2315, 1952.” [Id. at ¶ 351.]

These predicate acts sufficiently allege open-ended

continuity. See Turner, 362 F.3d at 1229 (some citations

omitted) (quoting Religious Tech. Ctr. v. Wollersheim, 971 F.2d

364, 366 (9th Cir. 1992)).

Here, Sun Savings & Loan Association v. Dierdorff, 825

F.2d 187 (9th Cir. 1987) is instructive. In that case, Daniel

Dierdorff (“Dierdorff”), the then-president of Sun Savings &

Loan Association (“Sun”), allegedly received kickbacks from

customers, which he deposited in an account under a fictitious

name. Sun brought a RICO claim against Dierdorff, based on four

predicate acts of mail fraud. The predicate acts were based on

four letters Dierdorff sent to agencies and an auditor to
conceal his wrongdoing. The letters were mailed in April, June,
and September of 1984. Sun Savings, 825 F.2d at 189-90. The
Ninth Circuit found those four letters posed "a threat of
continuing activity because they covered up a whole series of
alleged kickbacks and receipts of favors, occurred over several
months, and in no way completed the criminal scheme." Id. at
194. Likewise, the allegations about the scholarship scheme
involve activities that took place over a defined time ~~and~~
involved a series of alleged wrongful actions that did not
complete the criminal scheme.

The Second Amended Complaint alleges "[t]he enterprise
had plans in place to transfer, launder, and give out at least
another $120,000 through the SYWSE's scholarship plan, but those
plans were interrupted by the indictments of Kao, Chen, and Lum
Kee in the Campaign Contribution Criminal Case, and the
indictment of Kao in the PPP Criminal Case." [Second Amended
Complaint at ¶ 140.] Hartman allegedly memorialized the scheme
in PacMar's business strategy in September 2020. [Id. at ¶ 266.]
As in Sun Savings, the coverup appeared to be ongoing – at least
until the indictment of the defendants. Therefore, the Court
rejects Hartman's argument regarding continuity in Count I.

37

## IV.  <u>PacMar's State Law Claims</u>

Hartman's Motion is denied with respect to all of the state law claims, with the exception of Count X. PacMar's claim against Hartman in Count X is dismissed, and all of PacMar's other state law claims against Hartman remain.

### A.  <u>Count V (Fraud)</u>

Hartman argues the fraud allegations are insufficient because the reliance element of fraud is not adequately alleged where PacMar was controlled by Defendants Kao, Chen, and Lum Kee because PacMar cannot mislead itself. [Motion, Mem. in Supp. at 23; Reply at 11-12.] The Court rejects this argument. Hartman fails to cite caselaw to support this proposition. Courts in other jurisdictions have persuasively held that "where officers and directors have disabling conflicts that give them an interest in hiding information from a corporation's independent directors and stockholders, the conflicted fiduciaries' knowledge is not imputed to the corporation for purposes of holding those fiduciaries liable for the harm they caused to the corporation." <u>Am. Int'l Grp., Inc. v. Greenberg</u>, 965 A.2d 763, 806 (Del. Ch. 2009) (citation omitted).

#### 1.  <u>Pleading Fraud with Particularity</u>

Hartman also argues that PacMar fails to plead the state law fraud claim against him with particularity. <u>See</u> Motion, Mem. in Supp. at 23. PacMar alleges the specific

38

fraudulent conduct alleged includes the PPP fraud, campaign finance fraud, foundation fraud, illegal transfer fraud, and personal expense fraud. <u>See</u> Second Amended Complaint at ¶ 394. Hartman is not alleged to have participated in the foundation fraud, or committed the personal expense fraud. [<u>Id.</u> at ¶¶ 269-74, 306.]

As to the PPP fraud, PacMar alleges Hartman fraudulently breached his duty to PacMar by causing PacMar to enter into illegal PPP loan applications and by omitting information that should have been provided to PacMar to allow PacMar to know these acts were unlawful. [<u>Id.</u> at ¶ 397.] PacMar has pled with particularly Hartman's conduct in causing PacMar to enter into the PPP loan applications. PacMar alleges Hartman knew of the PPP fraud as the applications were being filed and provides specific emails that demonstrate this knowledge. [<u>Id.</u> at ¶¶ 219-22, 224-26.] PacMar also alleges Hartman provided information to Kao, Chen, and Lum Kee about preparing the loan applications [<u>id.</u> at ¶¶ 222-23], and directing PacMar's then-Chief Operating Officer to keep messaging consistent with what was stated on the fraudulent PPP loan applications. [<u>Id.</u> at ¶¶ 227-28.] While the thrust of PacMar's allegations against Hartman as to the PPP fraud relate to Hartman's actions after the loans were received, [<u>id.</u> at ¶¶ 230-243], Hartman's conduct prior to the PPP loan submissions is alleged with particularity.

As to the allegation of withholding information of the PPP fraud from PacMar, PacMar appears to be alleging a claim of fraudulent concealment. "A claim for 'fraudulent concealment' is simply a type of fraud based on fraud by omission and concealment, and not just affirmative conduct." Ryan v. Salisbury, CIV. NO. 18-00406 ACK-RT, 2019 WL 2121518, at *9 (D. Hawai`i May 14, 2019) (citation and internal quotation marks omitted). "A defendant may be liable for a 'fraudulent concealment' where it (1) fails to disclose a fact that it knows may cause the plaintiff to act; and (2) the defendant had a duty to the plaintiff to exercise reasonable care to disclose that fact." Id. (brackets, quotation marks, and citation omitted). PacMar has sufficiently alleged that Hartman owed a duty to PacMar. See Second Amended Complaint at ¶¶ 39, 41-43, 388-90. PacMar also alleged Hartman failed to disclose facts to PacMar that Hartman knew may cause PacMar to act. [Id. at ¶¶ 390, 392, 397, 404-09, 418.] However, these allegations are not pled with particularity. PacMar alleges Hartman and other defendants knew their conduct was unlawful and "intentionally withheld information from [PacMar], its auditors, employees, attorneys, and partners that would have revealed and stopped the harmful actions that Kao, Chen, Lum Kee and Hartman induced [PacMar] to take." [Id. at ¶ 404.] PacMar then alleges PacMar's owner, through its representative, Steven Loui, requested the PPP loan

applications and related information around July 2020, but "Kao,
Chen, Lum Kee and Hartman caused [PacMar] to refuse this
request," [id. at ¶ 405,] and that PacMar's "former COO was also
intentionally denied information and misled by Kao, Chen, Lum
Kee and Hartman about [PacMar]'s PPP loans in emails that
occurred in and around March 2020," [id. at ¶ 409]. PacMar fails
to specify what information Hartman denied, and how Hartman
mislead the COO. PacMar also fails to specify how Hartman
refused Steven Loui's request. PacMar's allegations lump Hartman
in with other defendants and do not specify the actions Hartman
specifically took, in contravention of Rule 9(b). See Bly-Magee,
236 F.3d at 1018-19. PacMar's claim of PPP fraud stemming from
Hartman's withholding of information fails to comply with Rule
9(b).

       As to the campaign finance fraud, PacMar alleges
Hartman fraudulently breached his duty to PacMar by causing
PacMar to participate in the scholarship coverup scheme and to
obstruct the investigation of the 1820 PAC donation. [Id. at
¶ 398.] PacMar alleges Hartman further breached his duty to
PacMar by "overseeing and directing the scheme to use [PacMar]'s
money, laundered through the SYWSE, as donations to the
universities in order to coverup the prior illegal conduct and
campaign contributions." [Id. at ¶ 401.] Insufficiently alleged
coverup scheme allegations – in particular Hartman's alleged

facilitation of laundering money and receipt of a pay raise -
are discussed *supra* Discussion § III.A. However, as noted *supra*,
some of the fraud allegations as to the coverup scheme are
sufficiently pled.

PacMar further alleges that Hartman breached his duty
"by charging time [he] worked on these illegal schemes as
'overhead,' which were not reimbursable amounts" and that this
practice damaged PacMar. [Id. at ¶ 399.] However, PacMar fails
to provide any supporting detail beyond this broad allegation,
which is insufficient to comply with Rule 9(b).

As to the illegal transfer fraud, PacMar alleges
Hartman attended a meeting with PacMar's security officer Pam
Berry and others, to learn how to transfer classified government
information to a new entity. [Id. at ¶¶ 284-85.] At this
meeting, Hartman allegedly "raised the option of 'novating'
[PacMar]'s contacts to [Advanced Unmanned Aerospace LLC] without
any consideration given to [PacMar] in return," which was not in
PacMar's best interests. [Id. at ¶¶ 286-87.] These allegations
are insufficient to allege fraud against Hartman. See Fisher v.
Grove Farm Co., 123 Hawai`i 82, 103, 230 P.3d 382, 403 (Ct. App.
2009) ("[T]he elements of fraud are: 1) false representations
made by the defendant, 2) with knowledge of their falsity (or
without knowledge of their truth or falsity), 3) in
contemplation of plaintiff's reliance upon them, and

42

4) plaintiff's detrimental reliance." (citing <u>Hawaii's Thousand
Friends v. Anderson</u>, 70 Haw. 276, 286, 768 P.2d 1293, 1301
(1989))).

Because some of the fraud allegations comply with
Rule 9(b), Hartman's Motion is denied as to Count V on the
claims involving Hartman's conduct prior to the PPP loan
submission, and the campaign finance fraud as it relates to the
scholarship scheme. Hartman's motion is granted as to the claims
of PPP fraud stemming from Hartman's withholding of information,
campaign finance fraud as it related to Hartman's facilitation
of laundering money and receipt of a pay raise, Hartman's
alleged breach of duty by charging time worked on illegal
schemes as overhead, and illegal transfer fraud.

    **B.**   **<u>Count VI (Civil Conspiracy)</u>**

Hartman also argues he as an agent cannot be
personally liable for acts taken in his official capacity under
the intra-corporate conspiracy doctrine, and that he cannot
conspire with his corporation. <u>See</u> Motion, Mem. in Supp. at 24
(citing <u>Armstrong v. Reynolds</u>, 22 F.4th 1058, 1085 (9th Cir.
2022); <u>Greys Ave. Partners, LLC v. Theyers</u>, 484 F. Supp. 3d 895,
911 (D. Hawai`i 2020)). Hartman fails to cite to any Hawai`i
caselaw supporting these propositions. <u>Armstrong</u> discusses
Nevada's intercorporate conspiracy doctrine, and therefore is
unavailing. <u>See Armstrong</u>, 22 F.4th at 1085 (citing <u>Collins v.</u>

Union Fed. Sav. & Loan Ass'n, 99 Nev. 284, 303, 662 P.2d 610
(1983)). Greys Avenue rejected the proposition that an officer
of a corporation cannot conspire with that corporation. The
district court in Greys Avenue clarified that, under Hawai`i
law, "'when officers of a corporation act for their own personal
purposes, they become independent actors, who can conspire with
the corporation.'" Greys Ave., 484 F. Supp. 3d at 911 (quoting
Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co., 91
Hawai`i 224, 253, 982 P.2d 853, 882 (1999)).[5] PacMar sufficiently
alleges Hartman acted for personal purposes. See, e.g., Second
Amended Complaint at ¶¶ 244, 251-53. Hartman's Motion is denied
as to Count VI.

C.   **Count VIII (Breach of Fiduciary Duties)**

Hartman argues PacMar lumps him together with the
other defendants, and Hartman argues he cannot be liable for
actions of other defendants. See Motion, Mem. in Supp. at 25. To
state a breach of fiduciary duty claim, Plaintiff must plausibly
allege: "1) the existence of a fiduciary duty; 2) a breach of
the fiduciary duty; and 3) resulting damage." See Aquilina v.
Certain Underwriters at Lloyd's Syndicate #2003, 407 F. Supp. 3d

---

[5] Robert's Hawaii has been superseded by statute on other
grounds. See, e.g., Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n,
113 Hawai`i 77, 106-07, 148 P.3d 1179, 1208-09 (2006).

1016, 1048 (D. Hawai`i 2019) (quotation marks and citations omitted).

PacMar's allegations do not impermissibly lump Hartman in with other defendants as to the breach element. Rather, PacMar alleges Hartman: was aware of the nature and scope of the coverup scheme, and that the purpose of the scholarship scheme was to coverup illegal conduct by Kao and others [Amended Complaint at ¶¶ 93, 97-100, 104-13, 144]; directed, along with other defendants, the transfer of funds from PacMar to SYWSE [id. at ¶¶ 102-03, 136]; and directed the subsequent donations to universities [id. at ¶¶ 102-03, 115, 116]. These allegations are sufficient to state a plausible claim that Hartman breached his fiduciary duty. Hartman's Motion is denied as to Count VIII.

**D.   Count IX (Conversion)**

Hartman contends the fact that he received a pay raise is insufficient to support a claim for conversion. [Motion, Mem. in Supp. at 25.]

> The State courts of Hawai`i have stated the
> following with respect to conversion: "Conversion
> encompasses the following acts: '(1) [a] taking
> from the owner without his consent; (2) an
> unwarranted assumption of ownership; (3) an
> illegal use or abuse of the chattel; and (4) a
> wrongful detention after demand.'" Freddy Nobriga
> Enters., Inc. v. Dep't of Haw. Home Lands, 295
> P.3d 993, 999 (Haw. Ct. App. 2013) (quoting Tsuru
> v. Bayer, 25 Haw. 693, 696 (1920)).

45

Privratsky v. Liberty Mut. Fire Ins. Co., 637 F. Supp. 3d 1077, 1080 (D. Hawai`i 2022) (alteration in Privratsky).

Hartman's argument fails. To establish a claim for conversion, a defendant need not gain personally from plaintiff's property or control over plaintiff's property – the defendant needs merely to exercise control over property. See Tsuru, 25 Haw. at 697 ("The act must be essentially tortious, but it is not essential to conversion sufficient to support the action of trover that the defendant should have the complete mancupation of the property, or that he apply the property to his own use, if he has exercised dominion over it in exclusion of, in defiance of, or inconsistent with the owner's right."); see also Freddy Nobriga Enters., 129 Hawai`i at 130, 295 P.3d at 1000 ("So long as he [or she] intends to deal with the property in a way which is in fact inconsistent with the plaintiff's right, he [or she] is a converter." (alterations in original) (citation and quotation marks omitted)). Further, "[i]t is fundamental that directors and officers must use corporate funds for corporate purposes only or they will be liable for misappropriation, diversion, or conversion of corporate assets." Lussier v. Mau-Van Dev., Inc., 4 Haw. App. 359, 371, 667 P.2d 804, 814 (1983) (citation omitted). Hartman's Motion is denied as to Count IX.

**E.   Count X (Embezzlement)**

Hartman argues the fact Hartman received a pay raise was insufficient to show Hartman fraudulently converted PacMar's funds. [Motion, Mem. in Supp. at 26.] However, there is no common law tort of embezzlement under Hawai`i law. Hartman cites to Miyashiro v. Roehrig, Roehrig, Wilson & Hara, 122 Hawai`i 461, 484, 228 P.3d 341, 364 (Ct. App. 2010), as stating the elements of an embezzlement claim. See Motion, Mem. in Supp. at 26. However, under Hawai`i law embezzlement is a criminal charge. See Territory v. Yim, 39 Haw. 214, 217 (1952) (noting embezzlement is a crime "against the Territory and not against the owner of the property embezzled"); see also Kealoha v. Machado, 131 Hawai`i 62, 81-82, 131 P.3d 213, 232-33 (2013) (holding that Haw. Rev. Stat. § 708-874, which establishes the criminal offense of "misapplication of entrusted property," does not create a private right of action). Therefore, the Motion is granted insofar as Count X is dismissed for failure to state a claim.

**F.   Count XI (Unjust Enrichment)**

Hartman argues PacMar impermissibly lumps together all defendants, and fails to plausibly allege that PacMar conferred a benefit upon Hartman and that the retention of that benefit would be unjust. See Motion, Mem. in Supp. at 26-27. A claim for unjust enrichment requires the plaintiff to demonstrate that

47

(1) the plaintiff conferred a benefit upon the defendants, and
(2) the retention of that benefit would be unjust. <u>Durette v.</u>
<u>Aloha Plastic Recycling, Inc.</u>, 105 Hawai`i 490, 504, 100 P.3d
60, 74 (2004). PacMar argues that PacMar's advancement to
Hartman of the $15,000 is the benefit conferred and unjustly
retained by Hartman, given that "Hartman's inducing promises
were lies." [Mem. in Opp. at 28 (citing First Amended Complaint
at ¶¶ 470-73).[6]] The allegations in the Second Amended Complaint
state a plausible claim for unjust enrichment. Hartman's Motion
is denied as to Count XI.

G.   **Count XII (Gross Negligence)**

Hartman contends PacMar fails to sufficiently allege
how he "displayed a 'conscious indifference to consequences' of
the alleged **breaches by other Defendants**." <u>See</u> Motion, Mem. in
Supp. at 27 (citing Second Amended Complaint at ¶ 450) (emphasis
added). Hartman's argument ignores PacMar's allegations of
actions Hartman himself took, which are alleged to have resulted
in a breach of his fiduciary duty. <u>See, e.g.,</u> Second Amended
Complaint at ¶¶ 40-41, 126-128, 342, 346. Hartman's Motion is
denied as to Count XII.

---

[6] The Court assumes these were mistaken citations that were
intended to refer to the Second Amended Complaint. <u>See</u> Mem. in
Opp. at 28.

### H.   Count XIV (Breach of Contract)

Hartman contends PacMar has not shown Hartman "failed to act in good faith when he performed his job duties or acted with active or deliberate dishonesty." See Motion, Mem. in Supp. at 27. The Second Amended Complaint sufficiently alleges Hartman did not act in good faith. See, e.g., Second Amended Complaint at ¶¶ 93-113. Hartman's Motion as to Count XIV is denied.

## V.   No Leave to Amend

Counts III and IV are dismissed without prejudice because PacMar has not sufficiently alleged concrete financial injury for purposes of RICO standing. See Fleck & Assocs., Inc. v. City of Phoenix, 471 F.3d 1100, 1106-07 (9th Cir. 2006). Although PacMar's counsel represented at the 9/8 Hearing that approximately $10 million had been seized to date, leaving a balance of between $1.5-$2 million to be collected, it is speculative as to whether and when, if ever, PacMar will be demanded to pay these amounts. If that occurs, PacMar may then have a cause of action, and could file a claim then. PacMar does not have leave to amend Counts III and IV in the instant case.

The allegations in Counts I against Hartman that assert Hartman's facilitation of fund transfers from PacMar to SYWSE, the transfer of the $60,000 to fund scholarships, Hartman's alleged stealing of PacMar's money to fund SYWSE's initial start-up costs, and Hartman's receipt of a pay raise are

49

not pled with sufficient particularity and thus do not comply
with Rule 9(b). Similarly, the allegations in Count V against
Hartman that assert the PPP fraud stemming from Hartman's
withholding of information; campaign finance fraud as it related
to Hartman's facilitation of laundering money and receipt of a
pay raise; Hartman's alleged breach of duty by charging time
worked on illegal schemes as overhead; and illegal transfer
fraud are not pled with sufficient particularity and thus do not
comply with Rule 9(b). Therefore, these allegations in Counts I
and V are dismissed with prejudice because PacMar has been
afforded ample opportunity to amend its complaint and it is
clear that the allegations sufficient to support the fraud
claims cannot be saved by amendment. The motion to dismiss is
denied as to the remaining allegations and claims in Counts I
and V.

Count X is dismissed, and the dismissal is with
prejudice because it is clear the claim cannot be saved by
amendment. See Hoang, 910 F.3d at 1102.

## VI.  **Chen Joinder and Lum Kee Joinder**

Chen and Lum Kee do not state whether their respective
joinders are substantive joinders or joiners of simple
agreement. Regardless, because the Chen Joinder and the Lum Kee
Joinder were filed more than three days after Hartman's Motion,
and neither joinder is "supported by a memorandum that complies

50

with LR7.4(a) and (b) supplementing" Hartman's Motion, the Court

considers them as joinders of simple agreement. See Local

Rule LR7.7. Accordingly, the Chen Joinder and Lum Kee Joinder

are granted in part and denied in part to the same extent as

Hartman's Motion. In other words, the instant Order does not

rule upon any of PacMar's claims against Chen and Lum Kee,

except for Counts III and IV.

**CONCLUSION**

For the foregoing reasons, Hartman's Motion to Dismiss

Second Amended Complaint, Filed April 21, 2023 [ECF 97], filed

May 19, 2023, is HEREBY GRANTED IN PART AND DENIED IN PART.

-Hartman's Motion is GRANTED insofar as Counts III and IV are
    DISMISSED WITHOUT PREJUDICE as to all defendants, and Count
    X against Hartman is DISMISSED WITH PREJUDICE.

-As to Counts I and II, Hartman's Motion is DENIED to the extent
    that it seeks the dismissal of PacMar's claims against
    Hartman, but the Motion is GRANTED insofar as the Court
    finds that portions of Count I are not pled with sufficient
    particularity, namely: Hartman's facilitation of fund
    transfers from PacMar to SYWSE, the transfer of the $60,000
    to fund scholarships, Hartman's alleged stealing of
    PacMar's money to fund SYWSE's initial start-up costs, and
    Hartman's receipt of a pay raise. These portions of Count I
    are therefore DISMISSED WITH PREJUDICE.

-As to Count V, Hartman's Motion is DENIED to the extent that it
    seeks the dismissal of PacMar's claim against Hartman, but
    the Motion is GRANTED insofar as the Court finds that
    portions of Count V are not pled with sufficient
    particularity, namely: the claims of PPP fraud stemming
    from Hartman's withholding of information, campaign finance
    fraud as it related to Hartman's facilitation of laundering
    money and receipt of a pay raise, Hartman's alleged breach
    of duty by charging time worked on illegal schemes, and

illegal transfer fraud. These portions of Count V are
therefore DISMISSED WITH PREJUDICE.

-As to Counts VI, VII, IX, XI, XII, and XIV, Hartman's Motion is
    DENIED.

        Other than as stated as to Counts III and IV, this

Order does not make any ruling as to any of PacMar's other

claims against any other defendant. The Chen Joinder and Lum Kee

Joinder are GRANTED IN PART AND DENIED IN PART to the same

extent as Hartman's Motion.

        IT IS SO ORDERED.

        DATED AT HONOLULU, HAWAII, DECEMBER 29, 2023



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

PACMAR TECHNOLOGIES LLC, FORMERLY KNOWN AS MARTIN DEFENSE GROUP
LLC v. KAO, ET AL., CIV. NO. 22-00283, LEK-WRP; ORDER GRANTING
IN PART AND DENYING IN PART: DEFENDANT DUKE HARTMAN'S MOTION TO
DISMISS SECOND AMENDED COMPLAINT, FILED APRIL 21, 2023 [ECF 97];
DEFENDANT/CROSS-CLAIMANT CLIFFORD CHEN'S AND DEFENDANT/CROSS-
CLAIMANT LAWRENCE KAHELE LUM KEE'S RESPECTIVE JOINDERS IN
HARTMAN'S MOTION