IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| PACMAR TECHNOLOGIES LLC (f/k/a MARTIN DEFENSE GROUP, LLC),<br><br>Plaintiff,<br><br>vs.<br><br>MARTIN KAO; TIFFANY JENNIFER LAM a.k.a JENNY LAM and/or TIFFANY KAO; LAWRENCE KAHELE LUM KEE; CLIFFORD CHEN; DUKE HARTMAN; SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC,<br><br>Defendants. | Case 1:22-cv-00283-LEK-WRP<br><br>MEMORANDUM IN SUPPORT OF MOTION |

# TABLE OF CONTENTS

I. INTRODUCTION....................1

II. BACKGROUND....................3

III. STANDARD OF REVIEW....................10

IV. ARGUMENT....................10

A. Plaintiff Cannot Prove its RICO Claims (Counts I & II)....................10

B. Plaintiff Cannot Prove Campaign Contribution Racketeering Under 18 U.S.C. §1962(c) (Count I)....................11

1. Plaintiff Cannot Prove Racketeering....................12

a. Obstruction of Justice (18 U.S.C. § 1503)....................13

b. Money Laundering (18 U.S.C. §§ 1953 & 1957)....................14

c. Stolen Property (18 U.S.C. §§ 2314 & 2315)....................18

d. Travel Act (18 U.S.C. §§ 1952)....................19

2. Plaintiff Cannot Prove Conduct....................19

3. Plaintiff Cannot Show a Pattern of Racketeering Activity....................20

4. Plaintiff Cannot Prove Causation or Injury....................23

C. Plaintiff Cannot Prove Conspiracy under 18 U.S.C. §1962(d) (Count II)....................25

D. Plaintiff's State Law Claims Must be Dismissed....................26

V. CONCLUSION....................26

# TABLE OF AUTHORITIES

**Cases** **Page**

*Albright v. Attorney's Title Ins. Fund*,
504 F.Supp.2d 1187, 1204 (D. Utah 2007) ....24

*Ayres v. Gen. Motors Corp.*,
234 F.3d 514, 522 (11th Cir. 2000) ....15

*Barsam v. Pure Tech. Int'l, Inc.*,
864 F.Supp. 1440, 1450 (S.D.N.Y. 1994) ....23

*Baumer v. Pachl*,
8 F.3d 1341, 1344 (9th Cir. 1993) ....19, 25

*Beck v. Purpis*,
529 U.S. 494 (2000) ....26

*Celotex Corp. v. Catrett*,
477 U.S. 317, 323 (1986) ....10

*Chaset v. Fleer/Skybox Int'l, LP*,
300 F.3d 1083, 1086 (9th Cir. 2002) ....11

*Davis v. Grusemeyer*,
996 F.2d 617, 626–27 (3d Cir. 1993) ....23

*H.J. Inc. v. Northwestern Bell Tel. Co.*,
492 U.S. 229, 237–38 (1989) ....20

*Holmes v. Sec. Inv'r Prot. Corp.*,
503 U.S. 258, 268–69 (1992) ....23, 24

*Howard v. Am. Online, Inc.*,
208 F.3d 741, 751 (9th Cir. 2000) ....25

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,
533 F. Supp. 3d 858, 871-72 (N.D. Cal. 2021) ....12

*Lopez v. Council on Am.-Islamic Rel. Action Network, Inc.*,
657 F.Supp.2d 104, (D.D.C. 2009)....................24

*Metaxas v. Lee*,
503 F.Supp.3d 923, 941 (N.D. Cal. 2020)....................21

*Ochner v. Ochner*,
2020 WL 13615943, *3 (C.D. Cal. Sept. 16, 2020)....................13

*O'Malley v. New York City Transit Authority*,
896 F.2d 704, 708 (2nd Cir. 1990)....................14

*Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*,
298 F.3d 768, 773 (9th Cir. 2002)....................23, 24

*Pedrina v. Chun*,
906 F.Supp. 1377, 1415 (D. Haw. 1995)....................24

*Puana v. Kealoha*,
587 F.Supp.3d 1035, 1052 (D. Haw. 2022)....................21

*Religious Tech. Ctr. v. Wollersheim*,
971 F.2d 364, 366–67 (9th Cir. 1992)....................21

*Reves v. Ernst & Young*,
507 U.S. 170, 185 (1993)....................19

*Robinson v. Hawkins*,
942 F.Supp. 1234, 1238 (E.D. Mo. 1996)....................23

*Rolo v. City Investing Co. Liquidating Trust*,
155 F.3d 644 (3d Cir. 1998)....................23

*Schiffels v. Kemper Financial Services, Inc.*,
978 F.2d 344, 352 (7th Cir. 1992)....................26

*Sever v. Alaska Pulp Corp.*,
978 F.2d 1529, 1535–36 (9th Cir. 1992)....................21

*Smith v. Aldridge*,
2018 WL 1434813, *5 (D. Ore. Mar. 22, 2018)....................13

*Soremekun v. Thrifty Payless, Inc.*,
509 F.3d 978, 984 (9th Cir. 2007) ........................................................10

*State of Fla. v. Tenet Healthcare Corp*.,
420 F. Supp. 2d 1288, 1303 (S.D. Fla. 2005)..........................................18

*Steinberg Moorad & Dunn Inc. v. Dunn*,
136 Fed.Appx. 6, 11-12 (9th Cir. 2005) ...................................................22

*Trump v. Clinton*,
626 F. Supp. 3d 1264, 1304 (S.D. Fla. 2022)..........................................15

*Turner v. Cook*,
362 F.3d 1219, 1229 (9th Cir. 2004) ....................................12, 20, 25

*United States v. French*,
748 F.3d 922, 937 (9th Cir. 2014) .........................................................16

*United States v. Marbella*,
73 F.3d 1508, 1514 (9th Cir. 1996) ...............................................14, 15

*United States v. Rogers*,
321 F.3d 1226, 1229 (9th Cir. 2003) ......................................................15

*United States v. Singh*,
995 F.3d 1069, 1075 (9th Cir. 2021) ......................................................14

*United States v. Tavelman*,
650 F.2d 1133, 1138 (9th Cir. 1981) ......................................................19

*United States v. Wilkes*,
662 F.3d 524, 530 (9th Cir. 2011) ..........................................................17

*United States v. Williams*,
874 F.2d 968 (5th Cir. 1989) ..................................................................13

*Walter v. Drayson*,
538 F.3d 1244, 1249 (9th Cir. 2008) ......................................................20

*Wash. Mut. Inc. v. United States*,
636 F.3d 1207, 1216 (9th Cir. 2011) ........................................................10

*Webster v. Omnitrition Int'l, Inc.*,
79 F.3d 776, 780, 789 (9th Cir. 1996). ......................................................19

**RULES**

FRCP 56(c) ........................................................................................10

**STATUTES/OTHER**

18 U.S.C. §1503 ....................................................................................12, 13

18 U.S.C. §§1952 ..................................................................................12, 19

18 U.S.C. §1956 and 1957 ..................................................12, 14, 16, 17

18 U.S.C. §1961(5) ....................................................................12, 20, 25

18 U.S.C. §1962(d) ..........................................................................19, 25

18 U.S.C. §1964(c) ..................................................................................11

18 U.S.C. §2314 and 2315 ..................................................................13, 18

28 U.S.C. §1367(c)(3) .............................................................................26

## MEMORANDUM IN SUPPORT OF MOTION

## I. INTRODUCTION

Plaintiff PacMar Technologies LLC (f/k/a Martin Defense Group, LLC) ("PacMar", the "Company", or "Plaintiff") asserts ten claims against Defendant Duke Hartman ("Hartman") in the Second Amended Complaint ("SAC") [ECF 97]. At the heart of Plaintiff's case is its Racketeer Influenced and Corrupt Organizations Act ("RICO") claims against the Defendants.

However, Plaintiff cannot prove its RICO claims against Hartman. In the Court's Order Granting In Part and Denying In Part: Defendant Duke Hartman's Motion To Dismiss Second Amended Complaint, filed December 29, 2023 [ECF 116] ("Dismissal Order"), the Court dismissed two of Plaintiff's RICO claims (Counts III and IV) and partially dismissed the two remaining RICO claims (Counts I and II) against Hartman. Dismissal Order at 51. Because Plaintiff cannot prevail as a matter of law on the remaining portion of Plaintiff's RICO claims, summary judgment on Counts I and II in Hartman's favor must be granted.

In Counts I and II, Plaintiffs allege that Defendant Martin Kao, along with Defendants Tiffany Lam, Clifford Chen, and Lawrence Kahele Lum Kee, made unlawful campaign contributions with the Company's money. SAC ¶¶ 71-72. Plaintiffs aver that because PacMar was a government contractor, and that the Company's funds were used to fund campaign donations, the donations were illegal. *Id.* ¶ 73.

Notably, Plaintiff did not allege that Hartman made or was involved in any illegal campaign contributions, and the Court dismissed any RICO claims against Hartman in connection with the contributions and any monetary transfers from the Company to Defendant Society of Young Women Scientists & Engineers LLC ("SYWSE"). Dismissal Order at 51. Indeed, Plaintiffs admit that federal criminal charges related to illegal campaign contributions were brought only against Kao, Chen and Lum Kee—and not against Hartman—to which Kao (and subsequently Chen and Lum Kee) pled guilty. SAC ¶¶ 93-94.

But Plaintiff nonetheless claims that Hartman directed the entity used for the contributions, SYWSE, to carry out a "cover-up" of the campaign contribution scheme by using "laundered" PacMar moneys to fund university student scholarships. *Id*. ¶¶30-32, 41, 71-73, 90. According to Plaintiff, the scholarship program was intended "to create a façade of legitimacy for SYWSE that could be used to deflect investigators' attention and scrutiny." *Id.* ¶ 95. Nonsense. Plaintiff cannot show a pattern of racketeering, actionable conduct by Hartman, or resulting injury caused by the alleged predicate acts.

Given that jurisdiction in this Court is premised on federal question and supplemental jurisdiction, SAC ¶¶ 15-16, once the RICO claims are disposed of, the Court should decline to assert supplemental jurisdiction of Plaintiff's state law claims and should dismiss them on that basis.

For these reasons, the Court should grant Hartman's motion.

## II. BACKGROUND

PacMar is a Hawaii-based company primarily involved in the business of providing engineering solutions and related services in the defense and martime industries. SAC ¶ 3; Hartman Decl. ¶4. Hartman was hired on around September 2018 as the Company's Director of Programs. *Id*. ¶12. The CEO of the Company at the time, Kao, hired Hartman. *Id.* ¶6. Plaintiff acknowledges that "Kao is the architect and driving force behind the illegal conduct and pattern of racketeering committed by the RICO enterprise[.]" SAC ¶ 19.

At the time Hartman joined in 2018, the Company was governed by a Board, which included Steven Loui as the Chairman of the Board, who was also a fiduciary officer and part owner of the Company. Hartman Decl. ¶7; Exhibit 1.

From April 2020 to August 2020, Hartman was the Company's Vice President of Strategic Partnerships. Hartman Decl. ¶13. His duties included developing business opportunities for the Company through partnering with research institutions and pursuing joint-funding opportunities. *Id*. He was instructed to work with lobbyists and political consultants to assist the Company in these efforts. *Id*. ¶15. However, the responsibility for retention and oversight of lobbyists and political consultants, including the execution of contracts, payments, and legal compliance, lay with Kao. *Id.* In this position, Hartman reported directly to Troy Keipper, the Company's Chief Operating Officer ("COO"). *Id*. ¶14.

In August 2020, Hartman was promoted to Senior Vice President for

Strategic Partnerships. *Id.* ¶16. Hartman remained in that role until January 2021. *Id*. In this position, Hartman reported directly to Gary Ambrose, who was then the Company's COO. *Id.* ¶17.

As CEO, Kao's directive was that the Company should undertake sophisticated and complex lobbying efforts to increase the Company's likelihood of being awarded Federal contracts. *Id.* ¶19. In particular, Kao's objective was for the Company to enter into "strategic partnerships" with universities, and through paid lobbyists, to request "Programmatic Budget Increases" (or "plus-ups") from members of Congress and their staff who had the ability to request increases or decreases to programmatic budgets of the executive branch, including the Department of Defense. *Id.* ¶20.

However, this strategy was not new to the Company, but had been pursued by Steven Loui, Mike Schmicker, Eric Schiff, and other technical leaders in the Company who first proved the viability of the model of partnering with universities like the University of Maine. *Id.* ¶¶21, 22. This process of requesting and competing for Programmatic Budget Increases is a well-established and legal process in which many academic and private entities participate, including multiple entities in Hawaii. *Id.* ¶28.

As part of his duties, Hartman was directed to prepare a PowerPoint presentation entitled "Strategic Partnerships Overview." *See* Exhibit 2. The purpose of the presentation was to summarize the Company's strategy of

increasing the likelihood of funding for its university partnerships. Hartman Decl. ¶25. The Company would partner with a research institution or university located in the state of a congressional member who had the ability to request increases or decreases in Programmatic Budgets of the executive branch, including Department of Defense programs. *Id.* ¶26.

The Company's partnerships with the university and the recruitment of university students as Company hires had two objectives: 1) to provide engineering staff to execute the Company's existing projects, and 2) to generate good will and a positive working relationship with members of Congress to increase the likelihood that he or she would support a Programmatic Budget Increase if requested. *Id.* ¶29.

To develop relationships with members of Congress and to identify opportunities for business development, the Company used the services of multiple lobbyists. *Id.* ¶30. Among other things, some of these firms advised the Company as to the lawful and appropriate means by which the Company or its employees could make political contributions to candidates and/or Political Action Committees ("PACS"). *Id.* ¶31.

As alleged by Plaintiff, in November 2021, Lum Kee advised to Kao and Chen that they "can setup a new LLC Pretty vaguely." SAC ¶ 72. Kao suggested the name "SYWSE." *Id.* On November 26, 2019, Lam filed articles of organization for SYWSE. SAC ¶ 76. Lam was named SYWSE's registered agent and manager. *Id.* Plaintiff alleged that "SYWSE was the 'new LLC' set up by Kao, Tiffany Lam,

Chen, and Lum Kee for the sole purpose of making the illegal campaign donation to 1820 PAC." SAC ¶ 78.

Hartman did not have any involvement in creating the Society of Young Women Scientist and Engineers, LLC ("SYWSE"), managing its operations or affairs, ensuring compliance with campaign finance regulations, transferring any funds from the Company to SYWSE, or authorizing campaign contributions by SYWSE. Hartman Decl. ¶32. While Hartman was aware that campaign contributions were being made by Kao and others with the Company, he was told by Kao, and believed, that the Company and Kao were being advised by the Company's board, its Chairman (Loui) and professional lobbyists and attorneys who were ensuring compliance with all applicable campaign finance laws and regulations. *Id.* ¶33.

On February 3, 2020, news report in Civil Beat revealed that a public interest watchdog complaint was filed with the Federal Elections Commission ("FEC") against SYWSE. *See* Exhibits 3, 4. The watchdog group requested that the FEC investigate the source of the funding for SYWSE. *Id.*

Because of the bad press generated by the complaint to the FEC, Kao formulated a plan and directed me and a number of others at the Company to execute the plan, which included putting in place a website and a scholarship program for SYWSE. Hartman Decl. ¶34. Kao's plan to use SYWSE as a philanthropic vehicle to fund scholarships was part of his strategy for defending

SYWSE against the allegations with the FEC and the bad press it generated. *Id.* Besides Hartman, the other Company employees involved included Chen, Lum Kee, Lori Bofman, Michael Schmicker, Troy Keipper, Karen Ernst, and eventually Jen Oliver. *Id.* ¶35.

Schmicker was the original author of a plan he entitled "PR Plan for SYWSE $165k scholarship donations" to improve the public image of the Company after the FEC complaint. *Id*. ¶36. This "plan", which Schmicker developed with Kao and Bofman, was a comprehensive public relations and communications plan which included establishing a website, informing the entire company of the plan on behalf of Kao, and introducing Bofman (who was directed to lead the operation of SYWSE) with universities across the country. *Id*. ¶37.

Hartman's involvement with this PR plan for SYWSE was directed by Kao and was limited to two activities: 1) providing my general thoughts about the plan to Schmicker and Bofman, who were the primary architects and executors of the plan on behalf of Kao and 2) introducing Bofman to universities at Kao's direction. Hartman Decl. ¶38; Exhibit 5 (Schmicker email re. PR plan).

Kao directed Hartman to generate a list of the universities with which the Company was doing business or wished to do business, which Hartman provided to Bofman. Hartman Decl. ¶¶40, 46; Exhibit 6. At the time, Hartman did not know whether SYWSE was compliant with the laws and regulations governing campaign finance. Hartman Decl. ¶41. His understanding was that the Company and Kao

were being advised by the Company's Board, which included Loui, and by professional lobbyists and lawyers who were ensuring compliance with all applicable campaign finance laws and regulations. *Id*. ¶42. Hartman did believe the proposed scholarships had genuine value for the recipients in increasing the participation of women in science, technology, engineering and mathematics (STEM) fields. *Id.* ¶43.

As Hartman and others were being directed by Kao to execute the plan to award scholarships to universities, and because he believed the entire Company (including Loui) would be aware of and involved in supporting the effort, Hartman decided to give Kao the "benefit of the doubt" and complied with his directives. *Id*. ¶44. But Hartman would not have done so if he believed (or was advised) that the scholarships were being done illegally or for illegitimate purposes. *Id.*

Hartman had no knowledge or intent to participate in a "cover up" of any illegal campaign contributions by SYWSE or Kao, Chen or Lum Kee. *Id*. ¶45. At no point did anyone at or above his level in the Company's organization at the time (including Loui, Schmicker, Keipper (who was his immediate supervisor at the time and involved in the plan), Chen, Lum Kee, Schiff, Kring, and Kao), or any of the Company's advisors (including Andy Winer, Jeff Bjornstad, Glen Mandigo, and William Canfield) tell Hartman that this "plan" was a coverup of illegal activities. *Id.*

On February 25, 2020, Kao met with attorney William Canfield for the purposes of engaging Canfield to advise Kao with respect to the 1820 PAC issue and the complaint to the FEC. *Id.* ¶48. In an email sent on February 28, 2020, Hartman provided Canfield with a list of scholarships that Kao had directed to be funded by the SYWSE. Hartman Decl. ¶49; Exhibit 8. Hartman was included in the emails from Canfield because he maintained the list of universities which Kao directed should receive scholarships. *Id.*

Hartman understood that Bofman, in coordination with Lum Kee and Chen, would then send donation checks for scholarships via SYWSE to universities that were to be given to women studying STEM at various universities. *Id.* ¶50. While Plaintiff in the SAC alleged that "on April 14, 2020, Hartman emailed Lum Kee that they need to 'go . . . to Martin [Kao] for funding' of the scholarships," SAC ¶ 136, it was actually *Lum Kee* who said that to Bofman and Hartman. Exhibit 6 at 1.

Hartman had no access to SYWSE's checking account and was not a signatory to the checking account, had no knowledge of the source of the funds of the scholarship donations that would be made by SYWSE or whether those funds would originate from the Company or Kao's personal sources. Hartman Decl. ¶51. Hartman did not sign any of the checks making the scholarship payments to any universities. *Id*. All the SYWSE checks were signed by Lam to the universities. *See* Exhibit 9 (checks). According to a chart produced by Plaintiff in discovery,

SYWSE issued checks to universities from March 23, 2020 to June 18, 2020. *See* Exhibit 10 (PAC-002407-08) (chart of SYWSE Scholarship payments).

On September 29, 2020, Kao was arrested and charged by the U.S. Justice Department for defrauding the federal government out of $10.2 million in CARES Act relief. *See* Exhibit 14 (Civil Beat article); Exhibit 15 (criminal complaint) .

## III. STANDARD OF REVIEW

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FRCP 56(c); *Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). A party seeking summary judgment bears the initial burden of "identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## IV. ARGUMENT

### A. Plaintiff Cannot Prove its RICO Claims (Counts I & II)

The only surviving RICO claims are Counts I and Count II, relating to "Campaign Contribution Racketeering." SAC ¶¶ 322-360. However, Plaintiff's proof of Hartman's actionable conduct is thoroughly lacking. Because the Court has dismissed with prejudice any allegations against Hartman in connection with the illegal campaign contribution payments, the <u>*only*</u> basis for liability under RICO is Hartman's alleged participation in a "cover-up" by "directing" SYWSE's

issuance of scholarship payments to various universities. In other words, the making of the campaign contributions using the Company's funds cannot be considered predicate acts of racketeering. Plaintiff can only prove Hartman's liability by establishing Hartman committed predicate acts in the cover-up.

But all Plaintiff has to show in support of its RICO claims are random, piecemeal emails that are taken out of context. Instead of "masterminding" the SYWSE scholarship program, Hartman followed the directions of Kao and PacMar upper management to contain the fallout of the indictment against Kao and to protect the Company's reputation and viability. Far from "knowingly" intending to commit any fraud, Hartman's actions were entirely consistent with carrying out the ordinary business of the Company, and consistent with the actions of multiple other employees within the Company who, like Hartman, followed Kao's orders but committed no criminal acts.

### B. Plaintiff Cannot Prove Campaign Contribution Racketeering Under 18 U.S.C. §1962(c) (Count I)

"To prevail on a civil RICO claim, a plaintiff must prove that [each] defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity and, additionally, must establish that (5) the defendant caused injury to plaintiff's business or property." *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1086 (9th Cir. 2002) (citing 18 U.S.C. §§1962(c), 1964(c)).

### 1. Plaintiff Cannot Prove Racketeering

Plaintiff cannot prove racketeering activity by Hartman. "'[R]acketeering activity' is any act indictable under several provisions of Title 18 of the United States Code ...." *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004) (some citations omitted) (citing 18 U.S.C. § 1961(1)). In the Dismissal Order, the Court dismissed with prejudice any liability for Hartman under Count I arising from allegations "that assert Hartman's facilitation of fund transfers from PacMar to SYWSE, the transfer of the $60,000 to fund scholarships, Hartman's alleged stealing of PacMar's money to fund SYWSE's initial start-up costs, and Hartman's receipt of a pay raise" in connection with Campaign Contribution Racketeering. Dismissal Order at 43.

Separately, the Court found that "PacMar has sufficiently alleged Hartman's participation in the predicate acts of the coverup scheme and directing money to scholarships." Dismissal Order at 30. Thus, Plaintiff can only sustain its Count I RICO claim if, and only if, Plaintiff can prove that Hartman "knowingly participated in the scheme to defraud, with the requisite intent[.]" *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 533 F. Supp. 3d 858, 871-72 (N.D. Cal. 2021). This Plaintiff cannot do.

As alleged, Plaintiff relies on the following sections of Title 18 to establish the predicate acts necessary to prove racketeering activity: § 1503 (obstruction of justice), § 1952 (Travel Act), § 1956 (money laundering), § 1957 (money

laundering), § 2314 (stolen goods), and § 2315 (stolen goods). SAC ¶¶ 341-347. Plaintiff cannot prove any predicate acts under these provisions. All of Hartman's actions were done in the normal course of carrying out the Company's expanding operations. Plaintiff cannot prove that Hartman was aware that he was participating in the Campaign Contribution Racketeering by assisting with giving out student scholarships—activities which is not fraudulent in itself.

**a. Obstruction of Justice (18 U.S.C. § 1503)**

Plaintiff cannot prove obstruction of justice under 18 U.S.C. § 1503 by Hartman. The essential elements which must be alleged in an indictment for violation of the omnibus clause of 18 U.S.C. § 1503 are that there was a pending federal judicial proceeding, the defendant had knowledge or notice of the pending proceeding, and the defendant acted corruptly with the specific intent to obstruct or impede the proceeding or the due administration of justice. *United States v. Williams*, 874 F.2d 968 (5th Cir. 1989).

However, Plaintiff cannot show that Hartman acted to impede any pending federal court proceeding with his alleged involvement with the scholarship program. "RICO claims for obstruction of justice may only be alleged pursuant to false statements or representations in federal court." *Ochner v. Ochner*, 2020 WL 13615943, *3 (C.D. Cal. Sept. 16, 2020) (citing 18 U.S.C. § 1503(a)). "18 U.S.C. § 1503—the appropriate federal statute—only applies to obstruction of justice in *federal* court proceedings." *Smith v. Aldridge*, 2018 WL 1434813, *5 (D. Ore.

Mar. 22, 2018) (emphasis in original) (citation omitted); *O'Malley v. New York City Transit Authority*, 896 F.2d 704, 708 (2nd Cir. 1990) (racketeering activity "is expressly limited to federal court proceedings").

It is undisputed that the U.S. Justice Department did not file its Indictment bringing the campaign finance charges until February 10, 2022, well after the scholarship moneys were paid. *See Indictment, United States v. Kao*, Case #1:22-cr-00048-CJN-1, filed Feb. 10, 2022 (Exhibit 16). Therefore, none of the acts asserted against Hartman in connection with the SYWSE scholarship payments can serve as grounds for obstruction under the statute.

**b. Money Laundering (18 U.S.C. §§ 1953 & 1957)**

Plaintiff cannot prove money laundering by Hartman under either 18 U.S.C. § 1956 or § 1957. To plead a violation of § 1956, a plaintiff must allege that the defendant "(1) engaged in a financial transaction which involved proceeds from specified illegal activity, (2) knew the proceeds were from illegal activity, and (3) intended the transaction either to promote the illegal activity or to conceal the nature, source, or ownership of the illegal proceeds." *United States v. Marbella*, 73 F.3d 1508, 1514 (9th Cir. 1996). "In other words, that a transaction is structured to hide its source is not enough. The government must prove that the transaction had the purpose of concealing the source." *United States v. Singh*, 995 F.3d 1069, 1075 (9th Cir. 2021) (citation omitted).

Section 1957, in contrast, requires a plaintiff to show that "(1) the defendant knowingly engaged in a monetary transaction; (2) he knew the transaction involved criminal property; (3) the property's value exceeded $10,000; and (4) the property was derived from a specified unlawful activity." *United States v. Rogers*, 321 F.3d 1226, 1229 (9th Cir. 2003). Thus, under both provisions, a plaintiff must prove the defendant knowingly engaged in a financial transaction of funds from specified illegal or unlawful activity.

Here, Plaintiff cannot prove that any of the moneys used to make the scholarship payments to the universities were "proceeds from specified illegal activity," that Hartman "knew the proceeds were from illegal activity" and that he intended "to promote the illegal activity or to conceal the nature, source, or ownership of the illegal proceeds." *Marbella*, 73 F.3d at 1514.

First of all, the illegal campaign contributions themselves that Defendants Kao, Chen and Lum Kee have pled guilty to cannot serve as predicate acts under RICO. "Violations of federal campaign finance laws are not RICO predicate offenses." *Trump v. Clinton*, 626 F. Supp. 3d 1264, 1304 (S.D. Fla. 2022) (citing *Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 522 (11th Cir. 2000)). In any event, Plaintiff did not allege that Hartman himself engaged in any illegal contributions, and the Court dismissed with prejudice any liability for Hartman arising from any "facilitation of fund transfers from PacMar to SYWSE[.]" Dismissal Order at 43.

Therefore, the "specific illegal activity" under the money laundering statutes must arise from Hartman's alleged control of the funds from SYWSE to the universities for the scholarships. But there is no proof that Hartman asserted any control over the payments made to the universities. Based on a chart produced by Plaintiff in discovery, the scholarship payments were made by SYWSE checks dated from March 23, 2020 through June 18, 2020. *See* Exhibit 10 (PAC-002392). Copies of the checks to the universities from SYWSE's Central Pacific Bank checking account shows that Hartman did not sign those checks. *See* Exhibit 9 (JSH-005698-5711).

Hartman did not have control over the SYWSE checking account and did not have signature authority over the account. Hartman Decl. __. He had no knowledge of the source of the funds of the scholarship donations that would be made by SYWSE, and whether those funds would originate from the Company or Kao's personal sources. Id. He did not sign any of the checks making the scholarship payments to any universities. *Id.*; Exhibit 9.

Under those circumstances, Hartman cannot be liable for money laundering. In *United States v. French*, 748 F.3d 922, 937 (9th Cir. 2014), the Ninth Circuit found that the defendant could not be found guilty of money laundering under Section 1956 where "there is no evidence in the record indicating that Jennifer had access to this account, let alone that she personally transferred money into it, knowing the funds to be the proceeds of unlawful activity."

The subject financial transactions—straight payments from SYWSE to the universities—are not the type of transactions which courts have found to constitute money laundering. In *United States v. Wilkes*, 662 F.3d 524, 530 (9th Cir. 2011), the defendant was convicted of concealment money laundering under § 1956(a)(1)(B)(i) for payments and gifts to a California congressman in exchange for government contracts. Wilkes transferred a $525,000 mortgage payment to the congressman in exchange for a contract; instead of transmitting the funds directly, Wilkes conducted a series of transfers, moving the money between different bank accounts. The Ninth Circuit concluded that the transactions, "which provided additional buffers between the corrupt contract and the payoff of [the congressman's] mortgage" were intended to conceal the source of the funds because, as here, they were "convoluted" and not "simple transactions," which were intended to mask the link between the funds and their source. *Id*. at 547.

Overall, Hartman did not have <u>any involvement</u> in creating SYWSE, managing its operations or affairs, ensuring compliance with campaign finance regulations, transferring any funds from the Company to SYWSE, or authorizing campaign contributions by SYWSE. Hartman Decl. ¶32. In fact, Plaintiff has produced no evidence that Hartman had any role whatsoever with respect to SYWSE, beyond merely introducing its spokesperson, Lori Bofman, to the Company's university contacts. While the use of Company funds to make campaign donations was illegal, the use of Company funds to make scholarship

payments to universities is not. The use of the Company's moneys was not "stolen" funds.

**c. Stolen Property (18 U.S.C. §§ 2314 & 2315)**

To state a claim under 18 U.S.C. § 2314, Plaintiffs must prove (1) that Hartman transported, transmitted or transferred or caused to be transported, transmitted or transferred in interstate commerce, monies that were stolen or converted; (2) that such monies had a value of $5,000 or more; and (3) that Hartman transported the monies willfully and with knowledge that the monies had been stolen or converted. *State of Fla. v. Tenet Healthcare Corp*., 420 F. Supp. 2d 1288, 1303 (S.D. Fla. 2005) (citing 18 U.S.C. § 2314).

To allege a 18 U.S.C. § 2315 violation, Plaintiff must show that: (1) Hartman received, possessed, concealed, stored or disposed of stolen money; (2) that such monies had a value in excess of $5,000; (3) that such monies had crossed a State or United States boundary after having been stolen or unlawfully converted; and (4) that Hartman knew that the property had been stolen or unlawfully converted. *State of Fla. v. Tenet Healthcare Corp*., 420 F. Supp. 2d 1288, 1303 (S.D. Fla. 2005) (citing 18 U.S.C. § 2315).

Thus, for both provisions Plaintiff must prove that Hartman knew that the funds used for the SYWSE scholarships were stolen or converted. As discussed in connection with the money laundering provisions, Plaintiff cannot prove that Hartman knew that converted funds were being used for the SYWSE scholarships.

**d. Travel Act (18 U.S.C. §§ 1952)**

A conviction under the Travel Act requires proof of: "(1) interstate commerce or use of an interstate facility (2) with intent to promote an unlawful activity and (3) a subsequent overt act in furtherance of that unlawful activity."; *United States v. Tavelman*, 650 F.2d 1133, 1138 (9th Cir. 1981). Again, as shown above, Plaintiff cannot prove that Hartman intended to promote unlawful activity with his limited role in the SYWSE scholarship program.

**2. Plaintiff Cannot Prove Conduct**

For the purposes of §1962(c), to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs, "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). Therefore, "one must have some part in directing [the enterprise's] affairs." *Id*. at 179; *Baumer v. Pachl*, 8 F.3d 1341, 1344 (9th Cir. 1993).

Here, Plaintiff cannot show that Hartman's "conduct" was part of the Company's or SYWSE's operation or management. In his roles at the Company, Hartman reported directly to the Company's COO, and was instructed by Kao and others during his employment with PacMar. Hartman Decl. ¶¶14, 17, 18. None of these duties *for PacMar* in the course of his employment show that he directed "the conduct of [the] *enterprise's* affairs." *Reves*, 507 U.S. at 179 (emphasis added). *See Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 780, 789 (9th Cir. 1996) (attorney's conduct did not rise to the level of "operation or management" of

the enterprise despite "assistant secretary" position and appearance in video in which he made "statements allegedly promoting the scheme").

In addition to not having any management or direction of the Company, Hartman likewise had no control over SYWSE. Hartman neither had the final involvement related to the registration of SYWSE, did not have any management role in SYWSE, did not control the checking account of SYWSE, nor had signed any checks. Hartman Decl. ¶¶23, 51. "Simply performing services for the enterprise does not rise to the level of direction[.]" *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008). Plaintiff cannot show that Hartman had control of Defendant SYWSE, which, in any event, is NOT alleged to be the RICO enterprise. *See* SAC ¶ 324.

**3. Plaintiff Cannot Show a Pattern of Racketeering Activity**

Plaintiff cannot establish closed-ended or open- ended criminal activity by Hartman. A "pattern ... requires at least two acts of racketeering activity," 18 U.S.C. §1961(5), and "also requires proof that the racketeering predicates are related and 'that they amount to or pose a threat of continued criminal activity.' " *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004) (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237–38 (1989)).

"'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241 (citation omitted).

"Closed-ended" continuity is established by showing that related predicate acts occurred over a "substantial period of time." *Id.* at 242. Thus "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement," because "Congress was concerned in RICO with long-term criminal conduct." *Id.* "A pattern of activity lasting only a few months does not reflect the 'long term criminal conduct' to which RICO was intended to apply." *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366–67 (9th Cir. 1992) (quoting *H.J. Inc.*, 492 U.S. at 242). The Ninth Circuit has observed that "[w]e have found no case in which a court has held the requirement to be satisfied by a pattern of activity lasting less than a year." *Id.* at 366 (footnote omitted).

Here, neither closed-ended or open-ended continuity can be proven where, in the context of the remaining RICO claims of the Campaign Contribution Racketeering, Plaintiff "essentially alleges only a single scheme with a single victim"—Plaintiff itself. *Puana v. Kealoha*, 587 F.Supp.3d 1035, 1052 (D. Haw. 2022). "[W]hen a plaintiff alleges only a single scheme with a single victim it cuts against a finding of both closed-ended as well as open-ended continuity." *Metaxas v. Lee*, 503 F.Supp.3d 923, 941 (N.D. Cal. 2020) (citing *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 365-67 (9th Cir. 1992)). This is particularly true "in the context of open-ended continuity," because "a criminal scheme with a singular goal poses no threat of continuing criminal activity once that goal is achieved." *Id.* (citation omitted); *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535–36 (9th Cir.

1992) (concluding that plaintiff failed to allege threatened continuity where the evidence suggested that a single episode was comprised of multiple predicate acts, but did not suggest that harm was meant to anyone but the plaintiff); *Steinberg Moorad & Dunn Inc. v. Dunn*, 136 Fed.Appx. 6, 11-12 (9th Cir. 2005) (rejecting argument that "a small number of threats (perhaps even a single threat), with no indication of repetition aside from the sole fact of their having been made once, could, contrary to *H.J. Inc.*, support a claim under RICO").

The alleged fraudulent incidents in connection with the scholarship program "cover up" were concentrated in a six-month period from February 2020 to June 2020, barely five months. After the bad press about complaint submitted to the FEC came out, the purported "plan to coverup" the campaign contributions through SYWSE scholarships allegedly started in February 2020 and continued to June 2020. SAC ¶¶ 91-113, 381, 390-94. According to copies of the SYWSE checks and Plaintiff's own records, the last series of scholarship checks were issued on June 18, 2020. *See* Exhibit 10 (PAC-002392) (scholarship payments chart); Exhibit 9 (checks). No further scholarship payments or efforts to distribute further scholarships have been revealed in discovery. The purpose and intent of the alleged "cover-up"—to make SYWSE appear to be more than a vehicle for Kao's illegal campaign contribution—collapsed when Kao was charged and arrested for Cares Act fraud on September 29, 2020. *See* Exhibit 14 (Civil Beat article).

Moreover, courts have delineated a line between alleged predicate acts which involve the original illicit activity, and subsequent acts which are alleged to "cover-up" the original activity once it has ceased. The original acts of wrongdoing do not support liability for the cover-up under RICO. "[A] RICO conspiracy ends when the substantive misconduct ends and does not continue merely because the conspirators take steps to cover up the traces of their main criminal purpose. *Robinson v. Hawkins*, 942 F.Supp. 1234, 1238 (E.D. Mo. 1996). *See also, Davis v. Grusemeyer*, 996 F.2d 617, 626–27 (3d Cir. 1993) ("An attempt to cover up a completed scheme of criminal activity ... does not constitute a predicate act in furtherance of a RICO conspiracy ..."), *abrogated on other grounds by Rolo v. City Inv. Co. Liquidating Tr.*, 155 F.3d 644 (3d Cir. 1998); *Barsam v. Pure Tech. Int'l, Inc.,* 864 F.Supp. 1440, 1450 (S.D.N.Y. 1994) (dismissing RICO claim because efforts at covering up whole fraudulent act are inadequate to satisfy continuity requirements). Here, predicate acts based on a "cover-up" cannot be tied to the illegal campaign contribution.

**4. Plaintiff Cannot Prove Causation or Injury**

Lastly, Plaintiff cannot prove that the scholarship program caused its claimed injury. To establish RICO standing, "[a] plaintiff must show that the defendant's RICO violation was not only a 'but for' cause of his injury, but that it was a proximate cause as well." *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 773 (9th Cir. 2002) (citing H*olmes v. Sec. Inv'r Prot. Corp.*,

503 U.S. 258, 268–69 (1992)). "Some 'direct relationship' between the injury asserted and the injurious conduct is necessary." *Oki Semiconductor Co*., 298 F.3d at 773 (quoting *Holmes*, 503 U.S. at 269). "To establish proximate cause, plaintiffs must show that their injury flows directly from the defendants' commission of the predicate acts." *Pedrina v. Chun*, 906 F.Supp. 1377, 1415 (D. Haw. 1995).

Just as courts treat the "cover-up" of a completed crime as separate from the underlying crime, Plaintiff cannot prove that its alleged injury—use of Company funds for illegal campaign contributions—was proximately caused by the giving of scholarships. *See Albright v. Attorney's Title Ins. Fund,* 504 F.Supp.2d 1187, 1204 (D. Utah 2007) ("Plaintiffs did not lose their money because of the clean-up actions of defendants."); *Lopez v. Council on Am.-Islamic Rel. Action Network, Inc*., 657 F.Supp.2d 104, (D.D.C. 2009) (observing "plaintiffs have alleged two separate acts of wrongdoing, the initial fraud by Days and the subsequent cover-up by the RICO Defendants. The plaintiffs' injuries were caused by Days, not by the subsequent cover up.") (citation omitted). Plaintiff's injuries, if any, were caused by the funding of the illegal campaign contributions, which the Court has dismissed with prejudice as a basis for finding Hartman liable under RICO. *See* Dismissal Order at 51. No injuries were caused by this "cover-up."

### C. Plaintiff Cannot Prove Conspiracy under 18 U.S.C.§ 1962(d) (Count II)

To state a claim for conspiracy to violate RICO under §1962(d), there must be "either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard v. Am. Online, Inc.*, 208 F.3d 741, 751 (9th Cir. 2000). Under §1962(d), while a conspiracy defendant need not have personally committed a predicate act, or even an overt act in furtherance of the RICO conspiracy, the defendant must be "aware of the essential nature and scope of the enterprise and intended to participate in it." *Baumer*, 8 F.3d at 1346.

Because Plaintiff failed to prove a predicate violation of §1961(c), Plaintiff's §1961(d) claim in turn fails. *Turner*, 362 F.3d at 1231 n.17 ("Because appellants failed to allege the requisite substantive elements of a RICO claim under 18 U.S.C. § 1962(c), appellants' claim under 18 U.S.C. § 1962(d) . . . also fails."); *Howard,* 208 F.3d at 751 ("[T]he failure to adequately plead a substantive violation of RICO precludes a claim for conspiracy.").

Moreover, Plaintiff cannot establish that Hartman knew that he was acting in furtherance of the alleged conspiracy. None of the emails touted in the SAC is enough to show that Hartman was "aware of the essential nature and scope of the enterprise[.]" *Baumer*, 8 F.3d at 1346. "A conspiracy to cover up a past RICO violation is not necessarily a conspiracy to violate RICO, because the conspiracy to

cover up does not necessarily include an agreement to the commission of a pattern of predicate acts." *Schiffels v. Kemper Financial Services, Inc*., 978 F.2d 344, 352 (7th Cir. 1992), *abrogated on other grounds by Beck v. Purpis*, 529 U.S. 494 (2000).

**D. Plaintiff's State Law Claims Must be Dismissed**

Because Plaintiff cannot prove its RICO claims against Hartman, the Court must dismiss the state law claims for lack of jurisdiction. Without the RICO claims, the Court lacks federal question jurisdiction and diversity jurisdiction does not exist. A court should not assert supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. §1367(c)(3). The Court should decline to exercise supplemental jurisdiction of Plaintiff's state law claims against Hartman and dismiss them.

## V. CONCLUSION

There are no genuine issues of material fact and Hartman is entitled to judgment as a matter of law on all counts against him.

DATED: Honolulu, Hawai'i, November 15, 2024.

*/s/ Rex Y. Fujichaku*
MARGERY S. BRONSTER
REX Y. FUJICHAKU
NOELLE E. CHAN

Attorneys for Defendant
DUKE HARTMAN