IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| PACMAR TECHNOLOGIES LLC (f/k/a MARTIN DEFENSE GROUP, LLC),<br><br>            Plaintiff,<br><br>    vs.<br><br>MARTIN KAO; TIFFANY JENNIFER LAM a.k.a JENNY LAM and/or TIFFANY KAO; LAWRENCE KAHELE LUM KEE; CLIFFORD CHEN; DUKE HARTMAN; SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC,<br><br>            Defendants. | Case 1:22-cv-00283-LEK-WRP<br><br>DECLARATION OF DUKE HARTMAN |

## DECLARATION OF DUKE HARTMAN

I, DUKE HARTMAN, being duly sworn on oath, deposes and says that:

1. I am competent to testify to the matters set forth herein and I make this declaration based upon my personal knowledge.

2. I make this declaration in support of my Motion for Summary Judgment.

3. From September 2018 through January 2021, I worked for Navatek LLC, which changed its name to Martin Defense Group, LLC ("the Company"), in Honolulu, Hawaii and in Columbia, South Carolina.

4.     The Company is a Hawaii-based company primarily involved in the business of providing engineering solutions and research services in the defense and martime industries.

5.     From the time of my hire in September 2018 until November 2020, the Chief Executive Officer and President of the Company was Defendant Martin Kao.

6.     I was interviewed and hired by Eric Schiff, Todd Peltzer, and Martin Kao.

7.     To the best of my knowledge, at the time I joined in 2018, the Company was governed by a Board, which included Steven Loui as the Chairman of the Board, who was also a fiduciary officer and part owner of the Company. Attached as Exhibit 1 is a true and correct copy of an organization chart for the Company dated August 8, 2018 that I received upon joining the Company.

8.     From about January 2019 until January 2021, the Company's Chief Financial Officer was Defendant Clifford Chen.

9.     From sometime in early 2019 until January 2021, the Company's Controller was Defendant Kahele Lum Kee.

10.    From August 2019 until approximately May 2020, the Company's Chief Operating Officer was Troy Keipper.

11.    From approximately May 2020 until November 2020, the Company's

Chief Operating Officer was Gary Ambrose.

12. For the period of September 2018 to April 2020, I was the Company's Director of Programs. In that capacity, I supported program management of research and development programs and contributed to business development efforts.

13. From April 2020 to August 2020, I was the Company's Vice President of Strategic Partnerships. My duties included developing business opportunities for the Company through partnering with research institutions and pursuing joint-funding opportunities.

14. In my position as Vice President of Strategic Partnerships, I reported directly to the Company's Chief Operating Officer at the time, Troy Keipper, until Gary Ambrose was hired as his replacement, at which point I reported to Gary Ambrose.

15. I was instructed by Company management to work with lobbyists and political consultants to assist the Company in these efforts. To the best of my knowledge, responsibility for retention and oversight of lobbyists and political consultants, including the execution of contracts, payments, and legal compliance, lay with then Chief Executive Officer, Martin Kao.

16. In August of 2020, I was promoted to Senior Vice President for Strategic Partnerships. I remained in that role until January 2021.

17. In my position as Senior Vice President for Strategic Partnerships, I reported directly to the Chief Operating Officer at the time, Gary Ambrose.

18. At various times I also worked directly with Steven Loui (and others who worked in his "Pacific Marine & Supply Co." family of companies[1]), Vice President of Marketing, Michael Schmicker, and Defendants Kao, Lum Kee, and Chen.

19. As Chief Executive Officer, Kao's directive was that the Company should undertake a lobbying effort to increase the Company's likelihood of being awarded Federal contracts.

20. In particular, Kao's objective was for the Company to enter into "strategic partnerships" with universities, and through paid lobbyists such as Jeff Bjornstad, to request "Programmatic Budget Increases" (or "plus-ups") from members of Congress and their staff who had the ability to request increases or decreases to programmatic budgets of the executive branch, including the research and development budgets of the Department of Defense.

21. During the time of my employment from September 2018 until January 2021, Kao successfully expanded the application of this business strategy to multiple university partners. However, this strategy was not new to the Company, nor was it primarily developed by him.

---

[1] https://pacmarhawaii.com/companies/

22.     After I was hired, I learned from employees like Mike Schmicker and Eric Schiff that this model was piloted by Mike Schmicker, Steven Loui, Eric Schiff, and other technical leaders in the Company such as Dave Kring, who first proved the viability of the model of partnering with universities like the University of Maine, prior to my joining the Company.

23.     This university-specific model was an adaptation of deep and long prior experience of the Company under Steven Loui's ownership and leadership, having successfully contracted for millions in contracts based on congressionally appropriated "plus-up" funding that was made possible by supporters like Hawaii's U.S. Senator Brian Schatz and, prior to his death, Hawaii's U.S. Senator Daniel Inouye, over many fiscal years, dating back decades.

24.     While I did not invent the model, and I was not involved in establishing the first successful partnerships, as the Company grew, I was directed to summarize and communicate this model to the entire Company, including new employees and consultants.

25.     To that end, I was directed by Kao to prepare a PowerPoint presentation entitled "Strategic Partnerships Overview," a true and correct copy of which is attached hereto as Exhibit 2. The purpose of this presentation was to summarize the Company's strategy of increasing the likelihood of funding for its

university partnerships.

26. As illustrated on Page 8 of the Strategic Partnership Overview, the Company would partner with a research institution or university located in the state of a congressional member who had the ability to request increases or decreases in Programmatic Budgets of the executive branch, including Department of Defense programs.

27. Again, longtime Company personnel (including Michael Schmicker, Steven Loui, and Eric Schiff) and Company consultants (including Glen Mandigo and others) had intimate knowledge of the method and process of securing research contracts based on the congressional appropriation process in the form of Department of Defense Programmatic Budget Increases or "plus-ups" long before my arrival at the Company in September 2018. However, I was directed to summarize and communicate this institutional knowledge to all hands for the benefit of the Company.

28. Even if a Programmatic Budget Increase was secured, the Company would still have to submit proposals to Department of Defense agencies via a competitive process and the Federal Program Managers who retained discretion over which proposals to fund. In other words, while requesting Programmatic Budget Increases increased the likelihood of success, the Company still had to participate in a competitive proposal, selection, and contracting process to win a

new contract award. This process of requesting and competing for Programmatic Budget Increases is a well-established and legal process in which many academic and private entities participate, including multiple entities in Hawaii.

29. The Company's partnerships with universities led to joint research contracts that would fund the opening of a Company office, and the recruitment of university students as Company hires. These actions had two objectives: 1) to provide engineering staff to execute the Company's research and engineering projects, and 2) to generate good will and a positive working relationship with members of Congress to increase the likelihood that the member would support a Programmatic Budget Increase if requested.

30. To develop relationships with members of Congress and to identify opportunities for business development, the Company used the services of multiple lobbyists.

31. Among other things, some of these firms advised the Company as to the lawful and appropriate means by which the Company or its employees could make political contributions to candidates and/or Political Action Committees ("PACS").

32. I did not have <u>any involvement</u> in creating the Society of Young Women Scientist and Engineers, LLC ("SYWSE"), managing its operations or affairs, ensuring compliance with campaign finance regulations, transferring any

funds from the Company to SYWSE, or authorizing campaign contributions by SYWSE.

33. While I was aware that campaign contributions were being made by Kao and others with the Company, I was told by Kao, and believed, that the Company and Kao were being advised by the Company's board, its Chairman (Loui) and professional lobbyists and attorneys who were ensuring compliance with all applicable campaign finance laws and regulations.

34. After the news in early February 2020 that a public interest watchdog complaint was filed with the Federal Elections Commission ("FEC") against SYWSE related to a campaign finance contribution to a Maine super PAC supporting U.S. Sen. Susan Collins, Kao formulated a plan and directed me and a number of others at the Company to execute the plan, which included putting in place a website and a scholarship program for SYWSE.  Kao's plan to use SYWSE as a philanthropic vehicle to fund scholarships was part of his strategy for defending SYWSE against the allegations filed with the FEC and the bad press it generated.

35. Besides me, the other Company employees involved in Kao's efforts included Chen, Lum Kee, Lori Bofman, Michael "Mike" Schmicker, Troy Keipper, Eric Schiff, Karen Ernst, and eventually Jen Oliver.

36. Schmicker was the original author of the plan he entitled "PR Plan for SYWSE $165k scholarship donations" to improve the public image of the Company after the FEC complaint. Schmicker was, at the time, the Vice President of Marketing for the Company, and had worked for Steven Loui and Navatek since 1986.[2] I understood that he was Loui's brother-in-law, having married Loui's sister, and was well trusted by the Company, its Board, and fiduciaries.

37. This "plan", which Schmicker developed with Kao and Bofman, was a comprehensive public relations and communications plan which included establishing a website, informing the entire company of the plan on behalf of Martin, and introducing Bofman (who was directed to lead the operation of SYWSE) with universities across the country.

38. My involvement with this PR plan for SYWSE was directed by Kao and was limited to two activities: 1) providing my general thoughts about the plan to Schmicker and Bofman, who were the primary architects and executors of the plan on behalf of Kao, and 2) introducing Bofman to universities at the direction of Kao.

39. Schmicker sent the details of this plan in an email on March 27, 2020, addressed to Kao, but included others (me, Bofman, Keipper, Chen) and asked, "Anyone else have any comments? If not, Lori and I will get this going…. Mike".

---

[2] http://www.thai27.org/thai27/volunteer_Smicker.htm

9

A true and correct copy of this email is attached as Exhibit 5. I replied via email and added some comments relating to legal ways that I thought Mike and the Company could improve the public image of the Company.

40. In addition, Kao directed me to provide to Bofman a list of the universities with which the Company was doing business or wished to do business.

41. At the time, I did not know for certain whether SYWSE was compliant with the laws and regulations governing campaign finance. I was not qualified to advise on, nor experienced with, campaign finance laws and regulations. I had no prior experience with corporate donations to political campaigns, nor had I made donations to political campaigns (then or since) on behalf of myself or anyone else, other than personal donations of trivial amounts.

42. Again, my understanding was that the Company and Kao were being advised by the Company's Board, which included Loui, as well as professional lobbyists and lawyers who were ensuring compliance with all applicable campaign finance laws and regulations.

43. However, I did believe the proposed scholarships had genuine value for the recipients in increasing the participation of women in science, technology, engineering and mathematics (STEM) fields. I am an engineer, I am the father of two young daughters myself, and in spite of hesitations I had about Kao's

motivations, I personally liked the idea of this scholarship initiative increasing the representation of women in male-dominated STEM disciplines.

44. As we were being directed by Kao to execute the plan drafted by Schmicker to award scholarships to universities, and because I believed the entire Company (including, I believed, Loui) would be aware of and involved in supporting the effort, I decided to give Kao the "benefit of the doubt" and complied with his directives. But I would not have done so if I believed (or was advised by the Company's board or advisors) that the scholarships were being done illegally or for illegitimate purposes.

45. I had no knowledge or intent to participate in a "cover up" of any illegal campaign contributions by Kao, Chen, Lum Kee, or anyone else. At no point did anyone at or above my level in the Company's organization at the time (including Loui, Schmicker, Keipper (who was my immediate supervisor at the time and involved in the plan), Chen, Lum Kee, Schiff, Kring, and Kao), or any of the Company's advisors (including Andy Winer, Jeff Bjornstad, Glen Mandigo, and William "Bill" Canfield) tell me that this "plan" was a coverup of illegal activities.

46. At Kao's direction, I put Company employee Bofman (who was directed to be the "spokesperson" for SYWSE) in email contact with the Company's contacts at the universities with which the Company was already

11

partnered or was planning on partnering. A true and correct copy of my email string with Bofman is attached hereto as Exhibit 6.

47. In a February 25, 2020 email, I wrote to Hossein Haj-Hariri of the University of South Carolina that "Navatek is interested in providing funding for scholarships for women students studying in STEM fields . . . at UofSC." A true and correct copy of that email is attached hereto as Exhibit 7. I wrote: "We intend to make these donations by way of a charitable foundation set up for this Purpose." By "we" I meant the SYWSE would provide these donations.

48. On February 25, 2020, Kao met with attorney William Canfield for the purposes of engaging Canfield to advise Kao with respect to the 1820 PAC issue and the complaint to the FEC.

49. In an email sent on February 28, 2020, I provided Canfield with a list of scholarships that Kao had directed to be funded by the SYWSE. A true and correct copy of that email string is attached as Exhibit 8. I was included in the emails to and from Canfield because I managed the university partnerships and maintained the list of universities which Kao directed should receive scholarships.

50. I understood that Bofman, in coordination with Lum Kee and Chen, would then send donation checks for scholarships via SYWSE to universities that were to be given to women studying STEM at various universities.

51.  I had no access to SYWSE's checking account and was not a signatory to the SYWSE checking account. I had no knowledge of the source of the funds of the scholarship donations that would be made by SYWSE, and whether those funds would originate from the Company or Kao's personal sources. I did not sign any of the checks making the scholarship payments to any universities.

52.  By the end of March 2020, multiple employees of the Company were still working on a comprehensive public relations response to increasing scrutiny of SYWSE's activities. Those involved in formulating the PR plan were Kao, Chen, Lori Bofman, Michael Schmicker, Troy Keipper, and me.

53.  In an email dated March 30, 2020, related to a revised PR plan that had been developed for the Company, I relayed "hav[ing] been hearing concerns from Cliff [Chen] and others that we should try to keep Martin [Kao], his family, and Navatek at arm's length from SYWSE, even if it's good press like scholarships." This effort was made in good faith to continue to support the PR plan developed by Schmicker under Kao's direction, with the intent of continuing to improve the public image of the Company. A true and correct copy of the email string is attached hereto as Exhibit 11.

54.  Because press articles were drawing connections between SYWSE, Kao and his family, and the Company, which in turn was damaging the Company's

13

reputation, Chen had emphasized to me that that it was important to maintain a clear separation between the Company and SYWSE.

55. In mid-May, the Company's employees were still attempting to protect the Company from the fallout of the bad press. In emails dated May 13 and 14, 2020, with Michael Schmicker and Lori Bofman, I suggested to "maintain the separation" between SYWSE and the Company moving forward and advised that I should no longer be contacting universities about donations that would be made by SYWSE. A true and correct copy of the email string is attached hereto as Exhibit 12.

56. In a May 21, 2020 email string relating to a draft press release for an office opening for the Company in Kansas, Kao facetiously asked, "Maybe we should put in a plug for the Society?" When Chen responded, "We could but my instinct would be NOT to comingle Navatek and the Society and get people confused about the difference," Kao replied, "Lol…I was joking."

57. Because it was widely known that the Company was being accused of "pay to play" activities in the press, and in this same spirit of ironic humor, I chimed in with my own joke, "Lol. 'SYWSE Pays to Play Again!'" While I am not necessarily proud of this joke about a serious situation that was threatening the Company, I must reiterate that at this time I still did NOT believe that the

Company had done, or was doing, anything illegal. A true and correct copy of the email string is attached hereto as Exhibit 13.

    58.    On September 29, 2020, Kao was arrested and charged by the U.S. Justice Department for defrauding the federal government out of more than $10.2 million in CARES Act relief.

I declare under penalty of law that the foregoing statements are true and correct to the best of my knowledge.

DATED: November 15, 2024, Waco, Texas.

_____
DUKE HARTMAN