Of Counsel:

LUNG ROSE VOSS & WAGNILD

CRYSTAL K. ROSE          3242-0
(*crose@legalhawaii.com*)
Attorney at Law
A Law Corporation
RYAN H. ENGLE            7590-0
(*rengle@legalhawaii.com*)
Attorney at Law
A Law Corporation
GRANT FASI ALLISON       10368-0
(*gallison@legalhawaii.com*)
Attorney at Law
A Law Corporation
Topa Financial Center
700 Bishop Street, Suite 900
Honolulu, Hawaii 96813
Telephone:  (808) 523-9000
Facsimile:  (808) 533-4184

Attorneys for Plaintiff
PACMAR TECHNOLOGIES LLC
(f/k/a MARTIN DEFENSE GROUP, LLC)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PACMAR TECHNOLOGIES LLC (f/k/a MARTIN DEFENSE GROUP, LLC), | ) CASE NO. 1:22-cv-00283-LEK-WRP )<br>) PLAINTIFF'S COUNTER<br>) STATEMENT OF FACTS IN |
| Plaintiff, | ) OPPOSITION TO DEFENDANT<br>) DUKE HARTMAN'S MOTION FOR |
| vs. | ) SUMMARY JUDGMENT;<br>) CERTIFICATE OF COMPLIANCE |
| MARTIN KAO; TIFFANY JENNIFER LAM a.k.a. JENNY LAM and/or | )<br>) *(Caption continued on next page)* |

1373763.1

TIFFANY KAO; LAWRENCE
KAHELE LUM KEE; CLIFFORD
CHEN; DUKE HARTMAN; SOCIETY
OF YOUNG WOMEN SCIENTISTS
AND ENGINEERS LLC,

              Defendants.

)  FOR COUNTER STTAEMENT OF
)  FACTS; ADDITIONAL
)  STATEMENT OF FACTS;
)  CERTIFICATE OF COMPLIANCE
)  FOR ADDITIONAL STATEMENT
)  OF FACTS; DECLARATION OF
)  GRANT FASI ALLISON;
)  DECLARATION OF DANIEL J.
)  BRUNK; DECLARATION OF
)  STEVEN LOUI; EXHIBITS 1-53;
)  CERTIFICATE OF SERVICE
)
)
)  Trial Date:  April 14, 2025
)  Trial Judge: Hon. Leslie E. Kobayashi
)

PLAINTIFF'S COUNTER STATEMENT OF FACTS
IN OPPOSITION TO DEFENDANT DUKE HARTMAN'S
<u>MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Local Rule 56.1, Plaintiff PACMAR TECHNOLOGIES

LLC (f/k/a MARTIN DEFENSE GROUP, LLC ("Plaintiff") submits its (I)

Counter Concise Statement; (II) Rule Certification of  Facts and Statement of

Additional Facts below.

I.         RESPONSES

      Plaintiff submits the following response to Duke Hartman's

("Hartman") Concise Statement of Facts:

| No. | Fact (Copied from Hartman's SoF) | Counter SoF and Citations. |
|-----|----------------------------------|-----------------------------|
| 1 | From September 2018 through January 2021, Hartman worked for Navatek LLC, which changed its name to Martin | Admitted. |

|   | Defense Group, LLC ("the Company"). |   |
|---|---|---|
| 2 | The Company is a Hawaii-based company primarily involved in the business of providing engineering solutions and research services in the defense and maritime industries. | Admitted. |
| 3 | From at least September 2018 until November 2020, the Chief Executive Officer and President of the Company was Defendant Martin Kao. | Admitted. |
| 4 | In 2018, the Company was governed by a Board, which included Steven Loui as the Chairman of the Board, who was also a fiduciary officer and part owner of the Company. | Denied for March 2019 and later. Loui Decl., ¶¶3-5; Brunk Decl., ¶24. |
| 5 | The responsibility for retention and oversight of lobbyists and political consultants for the Company lay with then Chief Executive Officer, Martin Kao. | Denied. Brunk Decl., ¶9. |
| 6 | Kao's objective was for the Company to enter into "strategic partnerships" with universities, and through paid lobbyists to request "Programmatic Budget Increases" (or "plus-ups") from members of Congress and their staff who had the ability to request increases or decreases to programmatic budgets of the executive branch. | Admitted. |
| 7 | The Company would partner with a research institution or university located in the state of a congressional member who had the ability to request increases or decreases in Programmatic Budgets of the executive branch, including Department of Defense programs. | Admitted. |
| 8 | Even if a Programmatic Budget Increase was secured, the Company would still have to submit proposals to Department of Defense agencies via a competitive | Denied regarding the "competitive proposal selection" process. |

1373763.1

| | | |
|---|---|---|
| | process and the Federal Program Managers who retained discretion over which proposals to fund. In other words, while requesting Programmatic Budget Increases increased the likelihood of success, the Company still had to participate in a competitive proposal, selection, and contracting process to win a new contract award. | Brunk Decl., ¶9 |
| 9 | This process of requesting and competing for Programmatic Budget Increases is a well-established and legal process in which many academic and private entities participate, including multiple entities in Hawaii. | Admitted. |
| 10 | The Company's partnerships with universities led to joint research contracts that would fund the opening of a Company office, and the recruitment of university students as Company hires. These actions had two objectives: 1) to provide engineering staff to execute the Company's research and engineering projects, and 2) to generate good will and a positive working relationship with members of Congress to increase the likelihood that the member would support a Programmatic Budget Increase if requested. | Admitted. |
| 11 | To develop relationships with members of Congress and to identify opportunities for business development, the Company used the services of multiple lobbyists. | Admitted. |
| 12 | Some of these firms advised the Company as to the lawful and appropriate means by which the Company or its employees could make political contributions to candidates and/or Political Action Committees ("PACS"). | Admitted. |

| 13 | Hartman did not have any involvement in creating the Society of Young Women Scientist and Engineers, LLC ("SYWSE"), managing its operations or affairs, ensuring compliance with campaign finance regulations, transferring any funds from the Company to SYWSE, or authorizing campaign contributions by SYWSE. | Denied regarding Hartman "not having any involvement" in "managing its operations or affairs" or "transferring funds from the Company to SYWSE." <br><br> Brunk Decl., ¶17; <br><br> Dkts. 187-7; 187-8, pp.2-4,6-10; 187-9; 187-10, pp.2,4-5; 187-11; 187-12; 187-13; 187-14; 187-15; <br><br> Exs. 4, p.2; 5; 6; 10; 11; 12; 13; 14; 15; 16; 17, p.3; 18, pp.2-3. |
| 14 | Hartman was told by Kao, and believed, that the Company and Kao were being advised by the Company's board, its Chairman (Loui) and professional lobbyists and attorneys who were ensuring compliance with all applicable campaign finance laws and regulations. | Denied. <br><br> Loui Decl., ¶¶6-7; <br><br> Brunk Decl., ¶¶23-24. |
| 15 | After the news in early February 2020 that a public interest watchdog complaint was filed with the Federal Elections Commission ("FEC") against SYWSE related to a campaign finance contribution to a Maine super PAC supporting U.S. Sen. Susan Collins, Kao formulated a plan and directed me and a number of others at the Company to execute the plan, which included putting in place a website and a scholarship program for SYWSE. | Denied regarding Kao was the only person who formulated the plan or Hartman merely followed Kao's orders. <br><br> Brunk Decl., ¶9; <br><br> Dkts. 187-8, pp.3,6,8-9; 187-9; 187-10; 187-13, pp.2-3; 187-15, p.2; <br><br> Exs. 5; 6; 9; 10; 11; 12; 14; 15; 16; 20. |

1373763.1

| 16 | Kao's plan to use SYWSE as a philanthropic vehicle to fund scholarships was part of his strategy for defending SYWSE against the allegations filed with the FEC and the bad press it generated. | Denied regarding the efforts were "philanthropic" or for "defending SYWSE." Brunk Decl., ¶¶13-17; |
| | | Dkts. 187-9; 187-10, pp.2-3,5-6,9-10,13; 187-13, pp.2-3; 187-14, p.3; 187-15, pp.2,5-6; |
| | | Exs. 1, 2, 3, 4; 6, p.2-3; 9; 10, p.1; 11, pp.1-2; 14; 15; 16; 17; 18; 19; 21. |
| 17 | Besides Hartman, the other Company employees involved in Kao's efforts included Chen, Lum Kee, Lori Bofman, Michael "Mike" Schmicker, Troy Keipper, Eric Schiff, Karen Ernst, and eventually Jen Oliver. | Admitted. |
| 18 | Schmicker was the original author of the plan he entitled "PR Plan for SYWSE $165k scholarship donations" to improve the public image of the Company after the FEC complaint. | Denied regarding Hartman's implied non-involvement managing Schmicker or the PR plan. |
| | | Brunk Decl., ¶17; |
| | | Dkts. 187-7; 187-13; 187-14; |
| | | Exs. 11, p.3; 12; 14, p.3; 17, p.3. |
| 19 | This "plan", which Schmicker developed with Kao and Bofman, was a comprehensive public relations and communications plan which included establishing a website, informing the entire company of the plan on behalf of Kao, and introducing Bofman (who was | Denied regarding Hartman's implied non-involvement managing Schmicker or the PR plan. |
| | | Brunk Decl., ¶17; |
| | | Dkts. 187-7; 187-13; 187- |

| | | |
|---|---|---|
| | directed to lead the operation of SYWSE) with universities across the country | 14; Exs. 11, p.3; 12; 14, p.3; 17, p.3. |
| 20 | Hartman's involvement with this PR plan for SYWSE was directed by Kao and was limited to two activities: 1) providing my general thoughts about the plan to Schmicker and Bofman, who were the primary architects and executors of the plan on behalf of Kao, and 2) introducing Bofman to universities at the direction of Kao. | Denied regarding Hartman's actions directing SYWSE, managing SYWSE's funding from the Company, selecting universities, communicating with SYWSE counsel, joking about SYWSE's false purpose, and scrubbing references to Kao in SYWSE statements. Brunk Decl., ¶17; Dkts. 187-7; 187-8; 187-10; 187-13, pp.2-3; 187-14, pp.3-4; 187-15, pp.2-6; Exs. 4, 5, 6, 9, 10, 11, 12, 13, 14, 15, 16, 21. |
| 21 | Kao directed Hartman to provide to Bofman a list of the universities with which the Company was doing business or wished to do business. | Admitted. |
| 22 | The Company and Kao were being advised by the Company's Board, which included Loui, as well as professional lobbyists and lawyers who were ensuring compliance with all applicable campaign finance laws and regulations. | Denied. Brunk Decl., ¶¶23-24, Loui Decl., ¶¶3-7. |
| 23 | Hartman had no knowledge or intent to participate in a "cover up" of any illegal campaign contributions by Kao, Chen, | Denied. Brunk Decl., ¶¶10-17; |

1373763.1

| | | |
|---|---|---|
| | Lum Kee, or anyone else. At no point did anyone at or above his level in the Company's organization at the time (including Loui, Schmicker, Keipper (who was my immediate supervisor at the time and involved in the plan), Chen, Lum Kee, Schiff, Kring, and Kao), or any of the Company's advisors (including Andy Winer, Jeff Bjornstad, Glen Mandigo, and William "Bill" Canfield) tell Hartman that this "plan" was a coverup of illegal activities. | Dkts. 187-10, 187-13, pp.2-3; 187-14; 187-15, p.2;<br><br>Exs. 4; 5; 6; 9; 10; 11; 13; 15; 16; 17, pp.2-3. |
| 24 | At Kao's direction, Hartman put Company employee Bofman (who was directed to be the "spokesperson" for SYWSE) in email contact with the Company's contacts at the universities with which the Company was already partnered or was planning on partnering. | Denied regarding implication that Bofman managed SYWSE.<br><br>Brunk Decl., ¶¶17-22. |
| 25 | Bofman, in coordination with Lum Kee and Chen, would then send donation checks for scholarships via SYWSE to universities that were to be given to women studying STEM at various universities. | Denied regarding implication that Hartman was not involved in funding decisions relating to the SYWSE scholarships.<br><br>Brunk Decl., ¶¶17-22;<br><br>Dkt. 187-8,p.4; 187-9;<br><br>Exs. 10, 12, 16. |
| 26 | Hartman had no access to SYWSE's checking account and was not a signatory to the SYWSE checking account. He had no knowledge of the source of the funds of the scholarship donations that would be made by SYWSE, and whether those funds would originate from the Company | Denied regarding Hartman's claim he had no knowledge of the source of funds and/or did not participate in efforts to fund SYWSE's scholarships. |

| | | |
|---|---|---|
| | or Kao's personal sources. He did not sign any of the checks making the scholarship payments to any universities. | Brunk Decl., ¶17;<br><br>Dkt. 187-8,p.4; 187-9;<br><br>Exs. 10, 12, 16. |
| 27 | By the end of March 2020, multiple employees of the Company were still working on a comprehensive public relations response to increasing scrutiny of SYWSE's activities. Those involved in formulating the PR plan were Kao, Chen, Lori Bofman, Michael Schmicker, Troy Keipper, and me. | Admitted. |
| 28 | On September 29, 2020, Kao was arrested and charged by the U.S. Justice Department for defrauding the federal government out of more than $10.2 million in CARES Act relief. Hartman was not charged by the Federal government. | Admitted. |
| 29 | On February 10, 2022, Kao, Chen, and Lum Kee were charged by the U.S. Justice Department for making and conspiring to make illegal campaign contributions. Hartman was not charged by the Federal government. | Admitted. |

II.    <u>LR 7.4 Certification</u>

Pursuant to Rule LR7.4(e) of the Local Rules of Practice for the United

States District Court for the District of Hawaii, I hereby certify that the Counter

Statement of Facts contains 393 words, exclusive of the restatement of Hartman's

facts in the middle column which was provided for the Court's convenience, and

exclusive of any captions and signature block.  The Counter Statement of Facts uses a

14-point Times New Roman font.

III.    ADDITIONAL STATEMEN OF FACTS

Plaintiff submits the following Concise Statement of Additional Facts

for the Court's Consideration when reviewing the Motion:

| No. | Fact | Support |
|---|---|---|
| 1 | SYWSE was created for the sole purpose of donating $150,000 of PacMar money to 1820 PAC and in a manner to obscure and hide the involvement of PacMar or any of its executives or employees in making the donation and the money used for the donation was taken from PacMar because SYWSE had no money of its own. | Brunk Decl., ¶¶11-12, Exs. 1, 2, 17, 18, 19. |
| 2 | On February 3, 2020, a Complaint was filed with the FEC arising from the $150,000 illegal contribution by SYWSE to 1820 PAC | Ex. 3. |
| 3 | On February 20, 2020, Kao emailed Hartman that he must "do EVERYTHING we can to now fix this" in reference to FEC complaint and $150,000 contribution. | Ex. 4. |
| 4 | Hartman oversaw and managed SYWSE's efforts, with Chen and Lum Kee, by communicating with SYWSE's retained counsel, managing SYWSE's personnel who were PacMar employees under Hartman, and directing SYWSE's efforts to remove reference to Kao, Tiffany, PacMar, and eventually Hartman from communications or statements involving SYWSE. | Brunk Decl., ¶¶ <br><br> Dkts. 187-8; p.8; 187-10; 187-13; 187-14; <br><br> Exs. 5; 6; 10; 12; 13; 14; 15; 16. |
| 5 | On February 28, 2020, Hartman was forwarded a long email chain that initially started between Kao and Cleta Mitchell, counsel for 1820 PAC, in which the emails | Dkt. 187-10; Exs. 9, 20. |

| | | |
|---|---|---|
| | describe (i) the scholarship plan was created after and in response to the FEC complaint, (ii) the purpose of the scholarship plan was to create a false reason for SYWSE's existence (i.e. the scholarships) that could be given to investigators to protect Kao by obscuring or hiding SYWSE's initial purpose of illegally donating $150,000 to 1820 PAC, and (iii) Chen and SYWSE's counsel (with Hartman copied) exchanged emails perpetuating the falsehood that SYWSE and the Company were separate. | |
| 6 | On February 25, 2020, Hartman sends an email to a university stating that "we intend to make these donations by way of a charitable foundation set up for this purpose" and falsely adds the scholarships "have been in the works for sometime." | Ex. 16. |
| 7 | Hartman memorialized the SYWSE scholarship plan as part of the Company's business strategy and plan in a power point called "Strategic Partnerships Overview" but also in emails in which Hartman expressly states that SYWSE is donating Company money to universities with ties to (or are located in districts that elected) members of Congress with oversight approval on contracts that the Company sought under Hartman's Strategic Partnership plan. | Brunk Decl., ¶17.<br><br>Dkt. 187-4, pp.9,23-25; 187-8, pp.7,15;<br><br>Exs. 12. |
| 8 | On March 25, 2020, SYWSE counsel emailed Kao and Hartman a memo stating that a written response to FEC was for the purpose of asserting that SYWSE was "not formed for the purpose of making that contribution" – clearly describing the cover-up scheme, and Hartman added Chen and Lum Kee to the email and removed the SYWSE counsel so the enterprise members could continue to discuss their plans, | Ex. 6, p.3. |

| | | |
|---|---|---|
| | including Lum Kee dismissing the pretextual effort as: "Whatever…just a pack of bitches getting free $." | |
| 9 | On July 16, 2020, SYWSE counsel sent the FEC a letter perfecting the SYWSE cover-up scheme. | Ex. 9. |
| 10 | Hartman was copied on, received, and/or sent emails with other enterprise members making crass jokes about SYWSE's false purpose and the cover-up scheme showing their intent and knowledge of the criminality and/or improper basis of their efforts. | Dkts. 187-15; Exs. 6, 11, 15. |
| 11 | Lori Bofman sent various emails confirming that PacMar money used by SYWSE was laundered through Kao and Tiffany before being transferred to SYWSE. | Exs. 17-18. |
| 12 | Other enterprise members also sent separate emails noting the false and illegal nature of the SYWSE scholarship scheme and/or indicating the sham nature of their efforts. | Exs. 7, 8, 21. |
| 13 | Hartman also had knowledge of the Pay Check Protection ("PPP") Scheme, including in emails from Kao noting the illegal nature of a government contractor "double dipping" by taking PPP money . | Exs. 22-23. |
| 14 | Hartman improperly used the Companies money in creating false singing bonuses using paid time off for new hires that had no benefits yet because the plan was designed to "take advantage of PPP." | Exs. 25-30. |
| 15 | Hartman spearheaded the effort to bind the Company to office spaces, lease, and other contracts that cost the Company over $3,000,000 because it was part of the SYWSE scholarship cover-up plan that became part of PacMar's "business strategy." | Brunk Decl., ¶25. |

| 16 | Between March and August 2020, Hartman was promoted three times, including a 9.52% pay raise and two title promotions, ending as Senior Vice President, which made Hartman one of the highest-ranking executives and memorialized job duties for Hartman such that he worked directly with Kao and on initiatives that were the same as the roles he has been executing in furtherance of the SYWSE cover-up scheme. | Brunk Decl., ¶¶9-10; Dkts. 187-3; 187-4, p.6; Exs. 31-33. |
| 17 | In mid-2020, Chen and Lum Kee (along with Hartman) were the only Company executives who were promoted and received pay raises. | Brunk Decl., ¶¶26. |
| 18 | While still employed by the Company, Hartman covertly communicated with PacMar's business partners through his private email (to hide the communications from the Company) in an effort to undermine PacMar and steal business for a new company that Hartman was working to register and create, and the new company was intended to steal business from PacMar, and that new company was eventually named "Integer Technologies LLC" ("Integer") and was founded by Hartman (who is CEO) and another former employee of PacMar. | Brunk Decl., ¶¶63-70; Exs. 36-48 |
| 19 | PacMar's damages resulting from Hartman's conduct includes loss of two contracts that Integer did in fact steal from PacMar, as well as the loss of numerous other contracts and business opportunities that the Company expected to receive and which Hartman himself said totaled $40,000,000 during a meeting that occurred sometime after Kao's arrest. | Exs. 49 (video starting at 3:30), 50. |
| 20 | Similarly, Hartman's presentation documents show his expectation in late- | Brunk Decl., ¶¶63; |

| | | |
|---|---|---|
| | 2020 that the Company would receive significant contracts in FY21 (including two contracts that Integer stole from the Company), but the Company lost these contracts and the associated revenue once news of the criminal conduct of Kao, Lum Kee, Chen became public, and for which Hartman sought to cover-up through control over the SYWSE scholarship scheme. | Dkt. 187-4, pp.16,17,20-23, 33, 36-40 (and particularly the green checkmarks on exhibit page 22, which is slide 21). |
| 21 | On January 8, 2021, Hartman emailed himself (to his private email) 58 company documents totally 677-pages, including proprietary information relating to the two contracts Integer stole from the Company. | Brunk Decl., ¶67; Ex. 43. |
| 22 | Employees of PacMar, specifically including Hartman, are required to complete "Insider Threat Awareness" training because PacMar works on sensitive matters for the Government, Hartman last completed the training on July 28, 2020, and the program requires (among other things) that Hartman report any criminal conduct within the Company or by its employees to the Company's security officer and the FBI, and Hartman failed to do this and breached his duties and requirements by the actions stated in the Opposition. | Brunk Decl., ¶¶72-73; Exs. 51-52. |
| 23 | On February 24, 2021, Hartman requested an advance of $15,000 from the Company for legal fees and based on his claim that he acted in "good faith"; however, the Company was not aware of Hartman's conduct that damaged the Company when it agreed to pay the $15,000, and had the Company known of Hartman's conduct, it would have paid this amount and this amount is due back to the Company as a result. | Brunk Decl., ¶75. |

14

IV.    LR 7.4 Certification

Pursuant to Rule LR7.4(e) of the Local Rules of Practice for the United

States District Court for the District of Hawaii, I hereby certify that the Additional

Statement of Facts contains 1,275 words, exclusive of any captions and signature

block.  The Additional Statement of Facts uses a 14-point Times New Roman font.

DATED:  Honolulu, Hawaii, January 3, 2025.

*/s/ Grant Fasi Allison*
CRYSTAL K. ROSE
RYAN H. ENGLE
GRANT FASI ALLISON

Attorneys for Plaintiff
PACMAR TECHNOLOGIES LLC
(f/k/a MARTIN DEFENSE GROUP, LLC)

15