## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PACMAR TECHNOLOGIES LLC (f/k/a MARTIN DEFENSE GROUP, LLC), | ) CASE NO. 1:22-cv-00283-LEK-WRP ) ) DECLARATION OF DANIEL J. ) BRUNK |
| Plaintiff, | ) ) |
| vs. | ) ) |
| MARTIN KAO; TIFFANY JENNIFER LAM a.k.a. JENNY LAM and/or TIFFANY KAO; LAWRENCE KAHELE LUM KEE; CLIFFORD CHEN; DUKE HARTMAN; SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## DECLARATION OF DANIEL J. BRUNK

I, DANIEL J. BRUNK, hereby declare as follows:

1.     I am the Chief Executive Officer ("CEO") of Plaintiff PacMar

Technologies LLC (f/k/a Martin Defense Group, LLC, and f/k/a Navatek, LLC)

("PacMar" or the "Company").

2.     I am competent to testify in the matters set forth herein and I

make this declaration based upon my own personal knowledge and in support of

the motion filed herein.

3.      I was hired by the Company in or around June 2020 to a director level position in business development.

4.      When I was hired, Defendant Martin Kao ("Kao") was still the CEO of the Company (and Tiffany Lam ("Tiffany") is and was Kao's wife), Defendant Duke Hartman ("Hartman") was still Vice President, Strategic Partnerships of the Company, Defendant Clifford Chen ("Chen") was still the Chief Financial Officer of the Company, and Defendant Lawrence Lum Kee ("Lum Kee") was still the Controller of the Company.

5.      In or around late-September 2020, Kao was arrested and was removed as CEO shortly thereafter, and after separate litigation between the Company and Kao, all ties between Kao and the Company were finally severed on or around November 23, 2021.

6.      In or around November 2020, I became CEO of the Company, a position I continue to hold through the current date.  As CEO, I am one (of many) custodian of records for the Company, the Company maintains business records in the normal course of its business, and those records include emails, contracts, plans and outlines or other strategic documents, spreadsheets, power point presentations, and other records that are typically maintained by a business.  The documents that are authenticated by this declaration are such business records of the Company that are maintained by the Company in its regular course of business.

2

7.      The Company is primarily involved in the business of providing engineering and related services to the U.S. Government.  Under Kao, the Company's strategy involved entering "strategic partnerships" with universities and those relationships were created by and through paid lobbyists.  The specific universities selected were in districts from which members of Congress had been elected who had the ability to grant increases to Programmatic Budgets of the executive branch of Government, including Department of Defense programs. Because the Company had spent such significant amounts on its lobbyists in furtherance of this strategy, the Company was typically informed ahead of time with a high degree of certainty if Programmatic Increases would be granted or awarded to the Company, even if competitive bidding processes were still ongoing. Although the Company's proposals were technically submitted against one of the Office of Naval Research's ("ONR") "open Broad Agency Announcements," which was a competitive process, in reality, the ONR would not typically go against the will of congress and ONR would use language such as "we support congressional directives" as a means of informing the Company that it would be awarded Programmatic Increases despite the "competitive contract" process.

8.      The manner in which ONR would inform the Company of its expectations regarding the funding or granting of Programmatic Increases, despite the ongoing competitive process, and through language such as "we support

congressional directives" was understood and recognized by Hartman and he frequently presented this understanding to the Company in meetings and presentations. For example, this is confirmed by a power point presentation created and presented by Hartman that is attached to Hartman's Motion as Exhibit 2 (Dkt. 187-4), and specifically in slides 15, 19-22, 32, 35-39. In particular, the green checkmarks on slide 2 next to amounts for Programmatic Increases demonstrate Hartman's knowledge and conclusions that those amounts had been granted to the Company despite the competitive process that was still ongoing.

9.    Hartman was promoted by the Company numerous times during mid-2020, including a title promotion on April 1, 2020 from Director of Programs to Vice President, Strategic Partnership and then in August 2020 to Senior Vice President, Strategic Partnerships. In these positions, Hartman owed the Company fiduciary obligations, and duties of honesty and care. Although Kao was the LLC manager who signed retention agreements with lobbyists, in these positions, Hartman was the Company executive tasked with day-to-day oversight of the Company's lobbyists. Once Hartman was elevated to VP, Hartman's reporting was almost entirely directly to Kao and related to his work on behalf of SYWSE, relating to the scholarship program involving SYWSE, and relating to the Company's paid lobbyists and relationships with the Company's university research partners.

4

10.     Hartman's promotion to SVP elevated Hartman to the third highest level or ranking of executives in the Company behind only Kao (CEO), Chen (CFO), and Gary Ambrose ("Ambrose") who was the Chief Operating Officer ("COO").  However, Ambrose was hired by the Company in or around July 2020, and due to the recency of his hire, combined with Hartman's close business and personal relationship with Kao, it is my opinion and it was well-known throughout the Company that Hartman functionally out-ranked Ambrose regardless of their titles.

11.     On December 26, 2019, the Company wrote a check to Defendant Society of Young Women Scientists and Engineers LLC ("SYWSE") for $150,000 that SWYSE deposited into its own bank account on December 27, 2019.

12.     That same amount, $150,000, was then given by SYWSE to "1820 PAC," a political action committee supporting Senator Susan Collins, on or around December 31, 2019.

13.     On February 3, 2020, a complaint was filed with the Federal Elections Commission ("FEC") that generally alleged that the $150,000 contribution to 1820 PAC was an illegal campaign contribution.

14.     Prior to accepting employment with the Company in or around June 2020, my final interview was with Defendant Hartman, who brought up the

FEC Complaint in the interview and represented to me that the FEC Complaint

was "a big misunderstanding."

15.    Between the months from February through September 2020,

the Company commenced a series of donations to various universities and those

donations were made by transferring money from the Company to SYWSE, and

then SYWSE donated the money to the universities.

16.    $60,000 was taken from the Company between March 2020 and

June 2020 for SYWSE's donations to universities, and another $135,000 of

Company money was committed by SYWSE to be given to universities, but those

additional amounts were refused by the universities once news of Kao's arrest

became public.

17.    Numerous Company employees worked for or on behalf of

SYWSE's efforts to donate Company money to universities, including Defendants

Hartman, Kao, Chen, Lum Kee, Lori Bofman ("Bofman").  A third-party

consultant, Michael Schmicker, was also hired to work on a public relations ("PR")

plan for SYWSE, but Schmicker was paid by the Company for his work on behalf

of SYWSE.  However, it was well-known within the Company at the time I first

became employed in June 2020 that Hartman oversaw the SYWSE scholarship

efforts, and Hartman even gave Company presentations outlining his role in

overseeing these efforts and how these efforts were being incorporated into the

Company's strategy for building goodwill with members of Congress with oversight powers over Programmatic Increases the Company sought and that were from the districts in which the Universities were located.

18.    During the time Bofman was employed by the Company, Bofman was Martin Kao's executive assistant, and her duties were limited to secretarial, administrative, and personal assistant job tasks.

19.    Bofman was initially hired to work for the Company by Kao because Bofman was a personal friend and had a personal relationship with Tiffany, who was and is Kao's wife.

20.    Bofman was not qualified to manage or direct any efforts made on behalf of the Company with respect to its relationships with its university research partners, including (but not limited to) the granting and section of university scholarships to partners, particularly where those efforts were alleged by the Defendants to be a core component of the Company's strategy to obtain joint research contracts and/or to generate goodwill with members of Congress.

21.    With respect to SYWSE, Bofman's duties were limited to securing a P.O. Box, arranging meetings and other communications between Company employees, and mailing checks once the specific universities and amounts were determined by Hartman and the other Defendants.

22.    It was well-known within the Company that Bofman spent much of her time as a personal assistant for Kao and Tiffany, and was even known to have babysat Kao's and Tiffany's children.

23.    From at least August through November 2020, but likely prior to that date, Hartman and Kao made it clear that they did not respect Steven Loui and sought to exclude him from any management, control, influence, or having any impact on the Company's operations or business.  Hartman and Kao made this clear through statements they made in the Company's office, during meetings or videochats in which Company business was discussed, and in various emails that were sent between themselves and with other Company personnel.  They also denigrated Steven Loui by saying he had an outsized control as a 1% owner, implying that they thought that the provisions of the operating agreement where both LLC members were required to consent to specified actions should not be in place.

24.    From at least November 2019 through the time when Hartman was employed by the Company, the Company did <u>not</u> have a Board of Directors and Steven Loui was not the Chairman of the Company.  This was common knowledge in the Company, and Kao, Chen, and Lum Kee made no secret of their dislike of Steven Loui.

8

25.     Hartman also directed the Company in securing various office spaces throughout the United States in regions where he had directed Company money to be donated to universities through SYWSE including South Carolina, Maine, Michigan, and Honolulu, and the Company has since paid out over $3 million dollars related to these offices which were never fully utilized and were not justified expenses for the Company.

26.     Between March and August 2020, Hartman, Chen, and Lum Kee were given multiple compensation and/or title promotions, and no other similarly situated Company employees or executives received similar promotions or raises during that period.

27.     Company records show that starting in or around October 2020 and while still employed as the SVP of the Company, Hartman began covertly communicating with the Company's contacts within its university strategic research partners and with Company's paid lobbyists through private and personal channels, including his personal "google mail" or "gmail" email account.

28.     Attached hereto as Exhibit 1 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.

29.    Attached hereto as Exhibit 2 is a true and correct copy of a check that is maintained by the Company as a business record in the regular course of the Company's business.

30.    Attached hereto as Exhibit 3 is a true and correct copy of the FEC Complaint.  This document is public record and is also maintained by the Company as a business record in the regular course of the Company's business.

31.    Attached hereto as Exhibit 4 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.

32.    Attached hereto as Exhibit 5 is a true and correct copy of an email that is maintained by the Company as a business record in the regular course of the Company's business.

33.    Attached hereto as Exhibit 6 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.

34.    Attached hereto as Exhibit 7 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.

35.    Attached hereto as Exhibit 8 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.

36.    Attached hereto as Exhibit 9 is a true and correct copy of a letter was maintained by the Company as a business record in the regular course of the Company's business when Kao was CEO and has remained in the Company's records since that time as a historic business record.

37.    Attached hereto as Exhibit 10 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.

38.    Attached hereto as Exhibit 11 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.

39.    Attached hereto as Exhibit 12 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.

40.    Attached hereto as Exhibit 13 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.

11

41.    Attached hereto as Exhibit 14 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.

42.    Attached hereto as Exhibit 15 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.

43.    Attached hereto as Exhibit 16 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.  This document was also produced by University of South Carolina in response to a subpoena duces tecum in this case.

44.    Attached hereto as Exhibit 17 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.

45.    Attached hereto as Exhibit 18 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.  However, the yellow highlights were added to the document.

46.    Attached hereto as Exhibit 19 is a true and correct copy of a check and deposit slip that are maintained by the Company as a business record in

12

the regular course of the Company's business.  However, bank account numbers were redacted.

47.    Attached hereto as Exhibit 20 is a true and correct copy of an engagement letter that was maintained by the Company as a business record in the regular course of the Company's business when Kao was CEO of the Company and has remained in the Company's records as a historic business record.

48.    Attached hereto as Exhibit 21 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.

49.    Attached hereto as Exhibit 22 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.

50.    Attached hereto as Exhibit 23 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.

51.    Attached hereto as Exhibit 24 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.

52.    Attached hereto as Exhibit 25 are true and correct copies of emails that are maintained by the Company as a business record in the regular

13

course of the Company's business.  However, the yellow highlights were added to the document.

53.     Attached hereto as Exhibit 26 are true and correct copies of emails that are maintained by the Company as a business record in the regular course of the Company's business.

54.     Attached hereto as Exhibit 27 is a true and correct copy of payroll records that are maintained by the Company as a business record in the regular course of the Company's business.

55.     Attached hereto as Exhibit 28 is a true and correct copy of payroll records that are maintained by the Company as a business record in the regular course of the Company's business.

56.     Attached hereto as Exhibit 29 is a true and correct copy of payroll records that are maintained by the Company as a business record in the regular course of the Company's business.

57.     Attached hereto as Exhibit 30 is a true and correct copy of payroll records that are maintained by the Company as a business record in the regular course of the Company's business.

58.     Attached hereto as Exhibit 31 are employment records that are maintained by the Company as a business record in the regular course of the Company's business.

59.     Attached hereto as Exhibit 32 are employment records that are maintained by the Company as a business record in the regular course of the Company's business.

60.     Attached hereto as Exhibit 33 are employment records that are maintained by the Company as a business record in the regular course of the Company's business.

61.     Attached hereto as Exhibit 34 are employment records that are maintained by the Company as a business record in the regular course of the Company's business.

62.     Attached hereto as Exhibit 35 are employment records that are maintained by the Company as a business record in the regular course of the Company's business.

63.     Attached hereto as Exhibits 36, 37, 38, 41, 42 are a true and correct copies of emails that were produced by University of South Carolina in response to a subpoena duces tecum in this case.  In these emails, Hartman and Josh Knight ("Knight"), another former employee of the Company, are communicating with Hossein Haj-Hariri ("Hossein"), who was the Dean of the College of Engineering and Computing for the University of South Carolina during 2020 and 2021.  In or around January 2021, Hartman and Knight resigned from their employment with the Company and registered a new company called Integer

Technologies LLC ("Integer") that provides the same or similar services as the
Company but focused in South Carolina, and is therefore a competitor of the
Company.  In these emails, both Hartman and Knight use their personal (non-
company) email accounts to communicate with Hossein which prevented the
Company from knowing of these communications at the time.  Further, Hossein
had direct influence over the Company's ability to secure two (2) contracts in
partnership with University of South Carolina called (i) "Talent and Technology
for Navy Power and Energy Systems" and (ii) "Unmanned Logistics Solutions for
Marine Corp".  These two (2) contracts were eventually awarded to Integer rather
than the Company, despite reports from ONR during 2020 that these contracts
were expected to be awarded to the Company.  The Company's understanding that
it would receive these contracts is confirmed by Hartman's own "Strategic
Partnership" power point presentation on slide 21 and noted by green checkmarks
next to the amounts for these contracts (see Dkt. 187-4).

   64. Attached hereto as Exhibit 39 are true and correct copies of
emails that are maintained by the Company as a business record in the regular
course of the Company's business.  This document was also produced by
University of South Carolina in response to a subpoena duces tecum in this case.
In these emails, Hartman and Knight communicate with Hossein and University of
South Carolina using their Company email address, demonstrating the covert,

secret, and improper nature of the emails sent and received by Hartman and Knight

in Exhibits 36, 37, 38, 40, 41, 42 wherein Hartman and Knight communicate with

Hossein using their private email accounts at or around the same time.  I was

copied on the emails in Exhibit 39, and the meeting discussed and proposed by

Hartman in these emails occurred shortly thereafter in which I was presented with

an agreement or contract that had been created by Hartman, Knight, and

representatives of University of South Carolina, including Hossein.  This

agreement sought to absolve Hartman, Knight, Integer, and University of South

Carolina from any liability or wrongdoing arising from or related to the covert

efforts by Hartman, Knight, and Integer to usurp the Company's two (2) pending

Strategic Partnership contracts with University of South Carolina called "Talent

and Technology for Navy Power and Energy Systems" and "Unmanned Logistics

Solutions for Marine Corps".  Neither I nor the Company agreed to Hartman's

proposal, and in response, Hartman threatened me and the Company at this

meeting with Integer's competition, both with respect to the contracts with

University of South Carolina, but also with respect to recruitment of the

Company's South Carolina based employees.

      65.    Attached hereto as Exhibit 40 is a true and correct copy of

handwritten notes produced by Hartman.  These notes are dated December 28,

2020, which was during the time where I had various discussions with Hartman

about his future with the Company.  These notes say, among other things, that

"NewCo formation – Dan unaware of USC willingness to have NewCo."  It is

correct that I was unaware at that time that University of South Carolina had

already agreed with Hartman to cut the Company out of any future contracts or

business relationships.

66.    Attached hereto as Exhibit 43 is a true and correct copy of an

email and some of its attachments that are maintained by the Company as a

business record in the regular course of the Company's business.

67.    Exhibit 43 is an email that was sent by Hartman from his

company email account to his own personal google email account on January 8,

2021, shortly before Hartman resigned from the Company and while Hartman was

setting up his new company, Integer, to compete with the Company.  The original

copy of the email had 58 attachments totaling 677-pages of the Company's

proprietary information and records.  Although taking all 58 attachments from the

Company was a breach of the Company's security policies and Hartman's

fiduciary obligations to the Company as its SVP, Exhibit 43 omits attachments

other than the following attachments that directly relate to the Company's business

relationship with University of South Carolina and the two (2) contracts with

University of South Carolina that Hartman and Integer stole from the Company: (i)

"Navatek FY20-22 Initiatives.xlsx"; (ii) "OAM_ Sen. Lindsey Graham FY21

18

Appropriations Request Form_UofSC-Navatek Program 1_Navy Power and Energy Systems.docx"; (iii) "OAM_ Sen. Linsey Graham FY21 Appropriations Request form_UofSC-Navatek Program 2_USMC Unmanned Logistics.docx"; (iv) "South Carolina FY21 Congressional Request – Unmanned Logistics USMC (2a) – 26JAN2020.docx"; (v) "U. South Carolina Congressional Request – Navy Power and Energy Systems (1b) – 03FEB2020.docx"

68.    Attached hereto as Exhibit 44 is a true and correct copy of an email I received and was produced by Hartman.

69.    Attached hereto as Exhibit 45 is a true and correct copy of text messages between Hartman and myself that Hartman produced.  In these messages, I express my concern that Hartman in his new position of CEO of Integer has presented information to Government and Navy personnel that was lifted directly from the Company's proprietary information that Hartman had stolen, misused, and misappropriated.

70.    Attached hereto as Exhibit 46 is a true and correct copy of text messages between Hartman and myself that Hartman produced.  In these messages, I express my concern that Hartman had covertly been working against the Company since at least November 2020 to steal information and business opportunities from the Company while still employed as the Company's Senior Vice President.

19

71.    Attached hereto as Exhibit 50 is a true and correct copy of an email that is maintained by the Company as a business record in the regular course of the Company's business.

72.    Attached hereto as Exhibit 51 is a true and correct copy of an Insider Threat Awareness certificate that is maintained by the Company as a business record in the regular course of the Company's business.

73.    Attached hereto as Exhibit 52 is a document explaining the Insider Threat Awareness requirement for the Company and its employees that is maintained by the Company as a business record in the regular course of the Company's business.  The Insider Treat Awareness training is required to be completed by certain Company personnel and employees because the Company words on secret, top secret, sensitive, and "cleared industry" work and matters.  Hartman was one such Company employee who was required to maintain Insider Threat Awareness training and satisfy reporting obligations.  The Insider Treat Awareness reporting obligations required any such employee to report to the Company's security officer and to the Federal Bureau of Investigation any illegal conduct occurring within the Company or by any Company employees.

74.    Attached as Exhibit 53 is a true and correct copy of a letter the Company received from Hartman that is maintained by the Company as a business record in the regular course of the Company's business.  Pursuant to this letter and

the request stated therein, the Company advanced $15,000 for legal fees to

Hartman and based on the Company's then-understanding that Hartman had "acted

in good faith" as promised in the letter.

      75.    Hartman's actions described in this declaration, including (but

not limited to) his role in directing the SYWSE's scholarship cover-up in response

to the FEC Complaint, emailing himself Company proprietary information, setting

up Integer to compete with the Company while still employed as a high ranking

executive of the Company, were actions that breached Hartman's fiduciary duties

to the Company, were contrary to the Insider Threat Awareness reporting

obligations, and were not carried out "in good faith." As a result, had the

Company known of these actions, the Company never would have advanced legal

fees to Hartman, and Hartman is in breach of the letter attached as Exhibit 53.

      I, <u>DANIEL J. BRUNK</u>, do declare under penalty of law that the

foregoing is true and correct.

      DATED: Arlington, Virginia, January 3 , 2025.


                      DJBrunk
                      DANIEL J. BRUNK