UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| PACMAR TECHNOLOGIES LLC, fka MARTIN DEFENSE GROUP, LLC,<br><br>               Plaintiff,<br><br>     vs.<br><br>MARTIN KAO, TIFFANY JENNIFER LAM, LAWRENCE KAHELE LUM KEE, CLIFFORD CHEN, DUKE HARTMAN, SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC,<br><br>               Defendants. | CIV. NO. 22-00283 LEK-WRP |

**ORDER GRANTING IN PART AND DENYING IN PART: DEFENDANT DUKE HARTMAN'S MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS AGAINST HARTMAN; DEFENDANT/CROSS-CLAIMANT CLIFFORD CHEN'S, DEFENDANT CROSS-CLAIMANT LAWRENCE KAHELE LUM KEE, DEFENDANT TIFFANY JENNIFER LAM, AND DEFENDANTS MARTIN KAO AND SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS, LLC'S RESPECTIVE JOINDERS IN HARTMAN'S MOTION**

Before the Court is Defendant/Cross-

Claimant/Counterclaimant Duke Hartman's ("Hartman") Motion for

Summary Judgment on All Claims Against Hartman ("Motion"), filed

on November 15, 2024. [Dkt. no. 186.] On January 3, 2025,

Plaintiff/Counterclaim Defendant PacMar Technologies LLC,

formerly known as Martin Defense Group, LLC ("PacMar") filed its

memorandum in opposition. [Dkt. no. 218.] Hartman filed a reply

on January 10, 2025. [Dkt. no. 221.] On December 31, 2024,

Defendant/Cross-Claimant Clifford Chen ("Chen") filed a joinder

in Hartman's Motion ("Chen Joinder"). [Dkt. no. 214.] On

January 3, 2025, Defendant/Cross-Claimant Lawrence Kahele Lum Kee ("Lum Kee"), Defendant Tiffany Jennifer Lam ("Lam"), Defendant Martin Kao ("Kao"), and Defendant Society of Young Women Scientists and Engineers, LLC. ("SYWSE") filed joinders in Hartman's Motion ("Lum Kee Joinder," "Lam Joinder," and "Kao and SYWSE Joinder"). [Dkt. nos. 215-17.] These matters came on for hearing on January 24, 2025. For the reasons set forth below, Hartman's Motion is granted in part and denied in part. Summary judgment is granted in favor of Hartman as to Count I, and denied with respect to Count II and the state law claims (Counts V through XIV). The Chen Joinder, the Lum Kee Joinder, the Lam Joinder, and the Kao and SYWSE Joinder are construed as joinders of simple agreement, and are granted in part and denied in part to the same extent as Hartman's Motion.

<u>**BACKGROUND**</u>

On December 29, 2023, the Court issued its Order Granting in Part and Denying in Part: Defendant Duke Hartman's Motion to Dismiss Second Amended Complaint, Filed April 21, 2023 [ECF 97]; Defendant/Cross-Claimant Clifford Chen's and Defendant/Cross-Claimant Lawrence Kahele Lum Kee's Respective Joinders in Hartman's Motion ("12/29/23 Order"). [Dkt. no. 116.[1]] In the 12/29/23 Order, the Court dismissed Counts III and IV as

---

[1] The 12/29/23 Order is also available at 2023 WL 9047370.

2

to all defendants. 12/29/23 Order, 2023 WL 9047370 at *18. The
12/29/23 Order also dismissed the following claims against
Hartman: Count X, the portions of Count I alleging "Hartman's
facilitation of fund transfers from PacMar to SYWSE; the
transfer of the $60,000 to fund scholarships; Hartman's alleged
stealing of PacMar's money to fund SYWSE's initial start-up
costs; and Hartman's receipt of a pay raise," id., and the
portion of Count V alleging "claims of [Paycheck Protection
Program ('PPP')] fraud stemming from Hartman's withholding of
information, campaign finance fraud as it related to Hartman's
facilitation of laundering money and receipt of a pay raise,
Hartman's alleged breach of duty by charging time worked on
illegal schemes, and illegal transfer fraud," id.

        Primarily at issue in the Motion are Counts I and II.
See Motion, Mem. in Supp. at 1-2. Count I is a claim under the
Racketeer Influenced and Corrupt Organizations Act ("RICO"),
Title 18 United States Code Section 1962(c). See Second Amended
Complaint, filed 4/21/23 (dkt. no. 97), at ¶¶ 322-54. The
remaining portion of Count I against Hartman is based upon
Hartman's alleged participation in a coverup scheme, discussed
below, and his role in directing money to scholarships. See
12/29/23 Order, 2023 WL 9047370 at *10. Count II is a Title 18
United States Code Section 1962(d) claim alleging a conspiracy
to commit the RICO violation at issue in Count I. See Second

3

Amended Complaint at ¶¶ 355–60. Counts V through XIV are state
law claims. See id. at ¶¶ 387–473. In the Motion, Hartman argues
that summary judgment must be granted in Hartman's favor on
Counts I and II, and that the Court should decline to exercise
supplemental jurisdiction over the remaining state law claims
once the RICO claims are dismissed. See Motion, Mem. in Supp. at
1–2.

The coverup scheme is extensively discussed in the
12/29/23 Order, and will not be repeated at length. Briefly, the
Second Amended Complaint alleges that Hartman was enlisted to
"direct and operate the SYWSE in its efforts to coverup the
SYWSE's illegal campaign donations," Second Amended Complaint at
¶ 88, via establishing a scholarship program at various
universities in order to "deflect investigators' attention," id.
at ¶ 93. As summarized in the 12/29/23 Order, the relevant
allegations to the coverup scheme are:

### I. Campaign Contributions

On September 17, 2019, Kao emailed Chen and
Lum Kee regarding a political action committee
named 1820 PAC. 1820 PAC supported United States
Senator Susan Collins. See [Second Amended
Complaint] at ¶¶ 61–62. Between August 2019 and
August 2020, Kao, Lam, Chen, and Lum Kee made at
least thirty-nine illegal political contributions
to 1820 PAC worth approximately $173,968 of funds
taken from PacMar. See id. at ¶¶ 69–70. $150,000
of those contributions was through a check sent
from SYWSE to 1820 PAC. The contribution from
SYWSE was money originally transferred to SYWSE
from PacMar. See id. ¶¶ 80–83. On February 3,

2020, a complaint was filed with the Federal
Election Commission ("FEC"), see id. at ¶ 84,
against SYWSE, Lam, and "'other persons who
created and operated SYWSE, and made
contributions to 1820 PAC in the name of SYWSE,'"
[id. at ¶ 85 (brackets omitted)].

SYWSE was created on November 26, 2019 with
Lam named as its registered agent and manager.
See id. at ¶ 76. SYWSE was created "by Kao,
Tiffany Lam, Chen, and Lum Kee for the sole
purpose of making the illegal campaign donation
to 1820 PAC." [Id. at ¶ 78.] Hartman was
allegedly "enlisted by Kao, Chen, and Lum Kee to
direct and operate the SYWSE in its efforts to
coverup the SYWSE's illegal campaign
donations[.]" [Id. at ¶ 88.] Federal criminal
charges were brought against Kao, Chen, and Lum
Kee, and Kao pled guilty to the charges against
him. See id. at ¶¶ 91-92.

**II.  The Coverup of SYWSE's Campaign Contributions**

PacMar alleges that around February 5, 2020,
Kao, Chen, Lum Kee, and Hartman planned to
coverup SYWSE's campaign contributions "by
creating a scholarship program whereby the
enterprise took [PacMar]'s money, laundered it
through transfers to Kao, Tiffany Lam, and
eventually to SYWSE, before donating the
laundered funds to universities to create a
façade of legitimacy for SYWSE that could be used
to deflect investigators' attention and
scrutiny." [Id. at ¶ 93.] Hartman was responsible
for contacting universities to offer
scholarships. [Id. at ¶ 99.] . . . "Between March
and June 2020, Hartman oversaw and directed the
payment of at least $60,000 for these
'scholarships' . . . ." [Id. at ¶ 103.]

12/29/23 Order, 2023 WL 9047370, at *2 (some alterations in

12/29/23 Order) (footnote omitted).

Hartman worked for Navtek LLC, which changed its name

to Martin Defense Group, LLC, and later changed its name to

PacMar Technologies LLC, between September 2018 to January 2021. [Hartman's Statement of Facts in Support of Motion for Summary Judgment, filed 11/15/24 (dkt. no. 187) ("Hartman CSOF"), at ¶ 1; Plaintiff's Counter Statement of Facts in Opposition to Defendant Duke Hartman's Motion for Summary Judgment, filed 1/3/25 (dkt. no. 219) ("PacMar CSOF"), at ¶ I.1 (stating Hartman's ¶ 1 is admitted).] Between September 2018 and April 2020, Hartman was PacMar's Director of Programs. [Hartman CSOF, Declaration of Duke Hartman ("Hartman Decl.") at ¶ 12.] Between April 2020 and August 2020, Hartman was PacMar's Vice President of Strategic Partnerships. [Id. at ¶ 13.] In this capacity, Hartman developed business opportunities for PacMar through partnering with research institutions, and he reported to Troy Keipper ("Keipper"), the then-Chief Executive Officer ("CEO"), and later Gary Ambrose, who replaced Keipper. [Id. at ¶¶ 13-14.] In August 2020, Hartman was promoted to Senior Vice President for Strategic Partnerships, and worked in that role until January 2021. [Id. at ¶ 16.] In this position, he reported to Gary Ambrose. [Id. at ¶ 17.]

Kao was PacMar's CEO and President from September 2018 to November 2020. [Hartman CSOF at ¶ 3; PacMar CSOF at ¶ I.3.] Kao sought for PacMar to enter into "strategic partnerships" with universities, and to request "Programmatic Budget Increases" through paid lobbyists, "from members of Congress and

6

their staff who had the ability to request increases . . . to
programmatic budgets of the executive branch." [Hartman CSOF at
¶ 6; PacMar CSOF at ¶ I.6.] PacMar "would partner with a
research institution or university located in the state of a
congressional member who had the ability to request increases
. . . in Programmatic Budgets of the executive branch." [Hartman
CSOF at ¶ 7; PacMar CSOF at ¶ I.7.]

On February 3, 2020, a complaint was filed with the
Federal Election Commission ("FEC") against SYWSE related to the
$150,000 campaign finance contribution to 1820 PAC, a Super PAC
supporting United States Senator Susan Collins. [PacMar's CSOF
at ¶ III.2; Hartman's response to Plaintiff's CSOF, filed
1/10/25 (dkt. no. 220) ("Hartman Reply CSOF"), at ¶ 2 (stating
PacMar's ¶ III.2 is admitted); PacMar CSOF, Declaration of
Daniel J. Brunk ("Brunk Decl."), Exh. 3 (FEC Complaint filed by
Campaign Legal Center against SYWSE and Lam) ("FEC Complaint").]
The FEC Complaint alleges SYWSE gave $150,000 to 1820 PAC.
[Brunk Decl., Exh. 3 (FEC Complaint) at ¶ 6.]

On September 29, 2020, Kao was arrested and charged
with defrauding the federal government out of over $10.2 million
in Coronavirus Aid, Relief, and Economic Security ("CARES") Act
relief. On February 10, 2022, Kao, Chen, and Lum Kee were
charged with making and conspiring to make illegal campaign
contributions. Hartman CSOF at ¶¶ 28-29; PacMar CSOF at ¶¶ I.28-

7

29; see also Hartman CSOF, Declaration of Rex Y. Fujichaku
("Fujichaku Decl."), Exh. 15 (Criminal Complaint, filed 9/29/20
in the United States District Court of the District of Hawaii
against Kao, Mag. No. 20-01208-WRP); Fujichaku Decl., Exh. 16
(Grand Jury Indictment of Kao, Lum Kee, and Chen in the United
States District Court for the District of Columbia, dated
2/9/22).

## I.  Hartman's Role in SYWSE and the Campaign Contribution Cover-Up

        The parties contest Hartman's involvement in managing
SYWSE's operations and affairs, and transferring funds from
PacMar to SYWSE. After the FEC Complaint was filed, Hartman was
directed, along with other PacMar employees, to execute a plan
titled "PR Plan for SYWSE $165k scholarship donations" ("PR
Plan"), which included putting in place a website and a
scholarship program for SYWSE. [Hartman CSOF at ¶¶ 15, 18-19;
PacMar CSOF at ¶¶ I.15, I.18-19 (admitting in part).] Hartman
states Kao directed him to execute the PR Plan, and other
employees were involved. [Hartman Decl. at ¶¶ 34-35.]

        Hartman attests Michael Schmicker ("Schmicker"),
PacMar's then-Vice President of Marketing, was the original
author of the PR Plan, which he developed with Kao and Lori
Bofman ("Bofman"). [Id. at ¶¶ 36-37.] Schmicker was hired to
work on a public relations plan for SYWSE. [Brunk Decl. at

8

¶ 17.] Hartman states his involvement with the PR Plan was directed by Kao and limited to: (1) providing his general thoughts to Schmicker and Bofman, and (2) introducing Bofman to universities. [Hartman Decl. at ¶ 38.]

Daniel J. Brunk ("Brunk") is PacMar's CEO, and was hired in June 2020 to a director level position in business development. [Brunk Decl. at ¶¶ 1, 3.] Brunk states Bofman was Kao's executive assistant, [id. at ¶ 18,] and her duties regarding SYWSE "were limited to securing a P.O. Box, arranging meetings and other communications between [PacMar] employees, and mailing checks once the specific universities and amounts were determined by Hartman and the other Defendants," [id. at ¶ 21]. Brunk attests that "Bofman was not qualified to manage or direct any efforts made on behalf of [PacMar] with respect to its relationships with its university research partners, including (but not limited to) the granting and section of university scholarships to partners[.]" [Id. at ¶ 20.]

Brunk states that in June 2020, it was well-known that Hartman "oversaw the SYWSE scholarship efforts" and that Hartman gave presentations outlining his role in overseeing those efforts. [Id. at ¶ 17.]

Hartman attests that he had no role in managing SYWSE's operations or affairs. [Hartman Decl. at ¶ 32.] He asserts that he had no knowledge or intent to cover up any

9

illegal campaign contributions, [id. at ¶ 45,] and that, while
he "did not know for certain whether SYWSE was compliant with
the laws and regulations governing campaign finance," [id. at
¶ 41,] he believed that PacMar and Kao were being advised by
PacMar's board and "professional lobbyists and lawyers who were
ensuring compliance with all applicable campaign finance laws
and regulations," [id. at ¶ 42].

　　　　Hartman states he "had no access to SYWSE's checking
account and was not a signatory to the SYWSE checking account,"
"had no knowledge of the source of the funds of the scholarship
donations that would be made by SYWSE, and whether those funds
would originate from [PacMar] or Kao's personal sources," and
that he "did not sign any of the checks making the scholarship
payments to any universities." [Id. at ¶ 51.]

### A.   Emails Involving Hartman and the SYWSE Scholarship Program

#### 1.   Emails Related to Hartman's Role in Managing the SYWSE Scholarship Program

　　　　Emails confirm Hartman provided comments on the PR
Plan. On March 30, 2020, Hartman sent an email to Schmicker,
Kao, Chen, Bofman and Keipper commenting on Schmicker's PR Plan
and giving suggestions. Hartman Decl., Exh. 11 (email thread
dated 3/27/20 to 3/30/20 titled "SYWSE PR PLAN" between Chen,
Hartman, Schmicker, Kao, Bofman and Keipper); see also id., Exh.
5 (emails dated 3/30/20 between Hartman and Schmicker confirming

10

Hartman's suggested were implemented in the PR Plan). In a March
30, 2020 email, Hartman commented on the part of the PR Plan
that stated "SYWSE was created by Navatek CEO Martin Kao and his
family to support young women engineers." Hartman commented:

> Are we ready to come out and admit the connection
> there? Obviously this has been alleged by the
> press, but I have been hearing concerns from
> [Chen] and others that we should try to keep
> [Kao], his family, and Navatek at arm's length
> from SYWSE, even if it's good press like
> scholarships. Is that not still true?

[Id., Exh. 11 at PageID.2808.]

An email dated February 18, 2020 shows Kao directing
Hartman to provide the initial points of contact for
universities, and directing Bofman to reach out to them. See
id., Exh. 6 (email thread dated 2/18/20 to 4/14/20 titled
"Scholarship Programs – The Society" between Hartman, Lum Kee,
Bofman, Chen, and others) at PageID.2767 (email dated 2/18/20
from Kao to Chen and Lum Kee, with copy to Hartman and others).
In this email, Kao stated "the Society my wife established would
like to accelerate efforts to establish the scholarship program
for women students." [Id.] Hartman subsequently emailed a list
of universities and the monetary amounts of the scholarships to
be provided, and gave Bofman direction on the naming of SYWSE
and the implementation of the scholarship program. Hartman
appears to be supervising Bofman, and communicating Kao's
direction. Hartman stated he reached out to universities and

11

introduced Bofman to them. [Id. at PageID.2763-65 (emails dated 2/25/20, 2/26/20, and 3/18/20 from Hartman to Bofman and others).] An email that Hartman received from Lum Kee states "I need to receive funding from [Kao] before checks are cut. I didn't want to piece meal him funding needs." [Id. at PageID.2761 (3/18/20 email from Lum Kee to Bofman and Hartman).]

Other emails confirm that Hartman reached out to contacts at universities regarding the scholarships. For example, Hartman emailed Hossein Haj-Hariri ("Haj-Hariri") regarding funding scholarships at the University of South Carolina, and wrote: "Navatek is interested in providing funding for scholarships," and "[w]e intend to make these donations by way of a charitable foundation set up for this purpose[.]" [Brunk Decl., Exh. 16 (emails dated 2/25/20 between Hartman and Haj-Hariri, with copies to others) at PageID.3178.] When Haj-Hariri asked if Hartman's email was in response to a proposal Haj-Hariri sent that morning to Kao, Hartman responded "[t]his effort has been in the works for some time[.]" [Id. at PageID.3177.]

### 2. Emails Pertinent to Hartman's Knowledge of the Coverup

On February 20, 2020, Hartman received an email from Kao in which Kao stated in relation to "the screwup with 1820," "let's do EVERYTHING we can now to fix this." [Brunk Decl., Exh.

4 (emails between Kao, Hartman, and others dated 2/20/20 to
2/21/20).]

In a separate email thread, on February 28, 2020,
Hartman sent an email to an attorney, William Canfield
("Canfield"), updating him on the status of reaching out to
universities and committing money for scholarships in 2020.
[Hartman Decl., Exh. 8 (email thread dated 2/5/20 to 2/28/20
between Kao, Chen, Hartman, Canfield, and others) at
PageID.2773-74; id. at ¶¶ 48-49.] Earlier in the email thread
that Hartman received is an email from Cleta Mitchell
("Mitchell"), where Mitchell stated:

> I want to be sure that the LLC proceeds with the
> ideas we discussed – giving scholarships and
> recognition to women in engineering, etc. – as
> that is going to be an issue at some point, so we
> should make sure to take necessary steps to
> protect the entity and YOU now while we have the
> time to do that. We should develop a plan and
> timetable, so there are some scholarships given
> over the next several months, and particularly,
> perhaps in Maine, where the bad press was.

[Hartman Decl., Exh. 8 at PageID.2780 (email dated 2/18/20 to
Kao from Mitchell).] After Kao confirmed SYWSE was working to
give out more than 140 scholarships, Mitchell stated "Keep me
posted on the progress and send me information related to the
scholarships. I will include that in the response to the FEC."
[Id. at PageID.2778-79 (emails between Kao and Mitchell dated
2/18/20).] Later, Mitchell sent the following email:

> I'm going to be preparing the response to the FEC
> complaint in the next week – and I wonder if it
> is possible for any scholarships to be awarded or
> other activities taken by the LLC that gave the
> contribution to 1820 PAC? I would like to be able
> to point to something that is either public – or
> perhaps a letter that you could send to me, and
> which I could attach to the response. Think about
> that and let's work on how we can make sure to
> include other activities of the LLC as part of my
> response to the Commission. That would help both
> of us, I think.

[Id. at PageID.2776 (email dated 2/28/20 from Mitchell to Kao).]

Hartman was copied on the thread in order to provide a list of

universities where SYWSE is setting up scholarships. See id. at

PageID.2775 (emails dated 2/28/20). Canfield then responded to

Mitchell's idea:

> I think that [Mitchell's] desire to inform the
> FEC, in the superpac's response to the complaint,
> about the LLC's scholarship program is both ill
> advised and counter-intuitive. The superpac' [sic]
> response should, in essence be, we got an LLC
> check, we deposited it and duly reported it on
> our year end 2019 FEC report, end of story. Her
> position should be that the superpac accepted a
> legitimate contribution. She shouldn't provide
> her opinion on the eliomosinary [sic] activities
> of the LLC, of which she has no first hand
> knowledge. When the time comes, the LLC can
> explain its scholarship program . . . we don't
> need [Mitchell] doing that for us.

[Id. at PageID.2773 (email dated 2/28/20 to Hartman from

Canfield) (ellipsis in original).]

On May 13, 2020, Hartman emailed Schmicker and Bofman

stating he should not be sending emails on behalf of SYWSE

regarding scholarships to "maintain the separation" between

SYWSE and PacMar, and gave suggestions on how to proceed with specific communications with universities regarding the scholarships. [Hartman Decl., Exh. 12 (emails thread dated 5/11/20 to 5/14/20 titled "follow up on SYWSE" between Bofman, Schmicker, and Hartman) at PageID.2814.]

On May 21, 2020, Hartman emailed Kao and Chen "Lol. 'SYWSE Pays to Play Again!'" [Hartman Decl., Exh. 13 (email thread between Hartman, Kao, Chen, and others, dated 5/21/20) at PageID.2817.] Hartman stated that when he wrote this email he did not believe PacMar had done or was doing anything illegal. [Hartman Decl. at ¶ 57.] Rather, his statement was intended to be "ironic humor" because "it was widely known that [PacMar] was being accused of 'pay to play' activities in the press." [Id.]

**DISCUSSION**

I.  **Count I**

Count I is brought pursuant to Title 18 United States Code Section 1962(c), which states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

A claim under Section 1962(c) has four elements:

> a defendant must participate in (1) the conduct of (2) an enterprise that affects interstate

15

> commerce (3) through a pattern (4) of
> racketeering activity or collection of unlawful
> debt. 18 U.S.C. § 1962(c). In addition, the
> conduct must be (5) the proximate cause of harm
> to the victim. Sedima, S.P.R.L. v. Imrex Co.,
> Inc., 473 U.S. 479, 496–97, 105 S. Ct. 3275, 87
> L. Ed. 2d 346 (1985). . . . Racketeering
> activity, the fourth element, requires predicate
> acts . . . .

Eclectic Props. E., LLC v. Marcus & Millichap Co., 751 F.3d

990, 997 (9th Cir. 2014).

Hartman argues that PacMar cannot: (1) prove

racketeering activity by Hartman; (2) prove that Hartman's

conduct was part of PacMar's or SYWSE's operation or management;

(3) establish a pattern of racketeering activity; or (4) prove

causation or injury. [Motion, Mem. in Supp. at 12-24.] The Court

first analyzes whether PacMar establishes a genuine issue of

material fact as to the issue of whether Hartman engaged in

racketeering activity, meaning that he committed predicate acts.

Predicate acts

> include any act "indictable" under specified
> federal statutes, §§ 1961(1)(B)–(C), (E)–(G), as
> well as certain crimes "chargeable" under state
> law, § 1961(1)(A), and any offense involving
> bankruptcy or securities fraud or drug-related
> activity that is "punishable" under federal law,
> § 1961(1)(D). A predicate offense implicates RICO
> when it is part of a "pattern of racketeering
> activity" — a series of related predicates that
> together demonstrate the existence or threat of
> continued criminal activity. H.J. Inc. v.
> Northwestern Bell Telephone Co., 492 U.S. 229,
> 239 (1989); see § 1961(5) (specifying that a
> "pattern of racketeering activity" requires at

16

least two predicates committed within 10 years of each other).

RJR Nabisco, Inc. v. Eur. Cmty., 579 U.S. 325, 330 (2016).

To be liable under Section 1962(c), PacMar must establish that Hartman individually committed at least two predicate acts. See In re WellPoint, Inc. Out-of-Network UCR Rates Litig., 865 F. Supp. 2d 1002, 1035 (C.D. Cal. 2011) ("Where RICO is asserted against multiple defendants, a plaintiff must allege at least two predicate acts by **each** defendant." (citations omitted)); Marshall v. Goguen, 604 F. Supp. 3d 980, 1020 (D. Mont. 2022) ("Plaintiffs cannot maintain a § 1962(c) claim against [a certain defendant] because they do not allege two predicate acts by [said defendant].");  Pedrina v. Chun, 906 F. Supp. 1377, 1424 (D. Hawai`i 1995) ("With respect to the individual Defendants, it is only necessary that they commit, or conspire to commit, two predicate acts." (citation omitted)).[2]

The remaining predicate acts that allegedly involve Hartman are: the scholarship coverup scheme in violation of Title 18 United States Code Sections 1503 and 1952; and Hartman's arranging for the funds to be paid to universities for scholarships in violation of Title 18 United States Code

---

[2] The Ninth Circuit affirmed. Pedrina v. Chun, 97 F.3d 1296 (9th Cir. 1996).

Sections 1956, 1957, 1503, 1952, 2314 and 2315. <u>See</u> Second
Amended Complaint at ¶¶ 341, 347; 12/29/23 Order, 2023 WL
9047370 at *12-13 (listing the predicate acts alleged against
Hartman).

　　　　Hartman argues that PacMar cannot prove he committed
any of the remaining predicate acts alleged against him:
obstruction of justice pursuant to Section 1503; money
laundering pursuant to Sections 1956 and 1957; stolen goods
pursuant to Sections 2314 and 2315; or a violation of the Travel
Act, Section 1952. [Motion, Mem. in Supp. at 12-13.] Hartman is
correct. PacMar has not established that Hartman committed two
predicate acts. Each remaining predicate act alleged against
Hartman is discussed in turn.

### 1.　**Obstruction of Justice (Section 1503)**

　　　　Hartman argues none of the acts Hartman allegedly took
in connection to the SYWSE scholarship program can serve as
grounds for obstruction of justice, because the indictment for
campaign finance charges was filed on February 10, 2022, after
the scholarship money was paid, meaning that PacMar cannot show
that Hartman acted to impede any pending federal court
proceedings. [Motion, Mem. in Supp. at 13-14.] PacMar contends
Hartman obstructed the FEC investigation, which qualified as a
predicate act under Title 18 United States Code Sections 1505
and 1512(c). [Mem. in Opp. at 19.] However, PacMar does not

18

plead a violation of Sections 1505 and 1512(c) as predicate

acts. Therefore, these will not be considered.

Section 1503(a) imposes criminal liability on anyone

who:

> corruptly, or by threats or force, or by any
> threatening letter or communication, endeavors to
> influence, intimidate, or impede any grand or
> petit juror, or officer in or of any court of the
> United States, or officer who may be serving at
> any examination or other proceeding before any
> United States magistrate judge or other
> committing magistrate, in the discharge of his
> duty, or injures any such grand or petit juror in
> his person or property on account of any verdict
> or indictment assented to by him, or on account
> of his being or having been such juror, or
> injures any such officer, magistrate judge, or
> other committing magistrate in his person or
> property on account of the performance of his
> official duties, or corruptly or by threats or
> force, or by any threatening letter or
> communication, influences, obstructs, or impedes,
> or endeavors to influence, obstruct, or impede,
> the due administration of justice[.]

"To constitute an offense under [Section 1503], the act must

relate to a proceeding in a federal court of the United States."

O'Malley v. New York City Transit Auth., 896 F.2d 704, 707, 708

(2d Cir. 1990) (citations omitted); see also Smith v. Aldridge,

No. 3:17-cv-01485-HZ, 2018 WL 1434813, at *5 (D. Or. Mar. 22,

2018) (noting that Section 1503 only applies to federal court

proceedings).

PacMar does not offer any evidence supporting a

violation of Section 1503. Accordingly, there is no genuine

issue of material fact as to whether Hartman committed a
predicate act in violation of Section 1503.

### 2.    __Money Laundering (Sections 1956 and 1957)__

Hartman argues PacMar cannot prove money laundering
pursuant to Sections 1956 or 1957 because PacMar cannot prove
that any of the money used to make scholarship payments to
universities were "'proceeds from specified illegal activity,'
that Hartman 'knew the proceeds were from illegal activity' and
that he intended 'to promote the illegal activity or to conceal
the nature, source, or ownership of the illegal proceeds.'"
[Motion, Mem. in Supp. at 15 (quoting United States v. Marbella,
73 F.3d 1508, 1514 (9th Cir. 1996)).] Specifically, the use of
PacMar's money to fund scholarship was not stolen funds, and
there is no proof that Hartman asserted control over the
payments to the universities: Hartman did not sign the checks,
control the checking account, or know the source of funds of the
scholarship donations. [Id. 16-18.] PacMar argues Hartman told
recipients of SYWSE's money that it was from PacMar, while also
erasing links between PacMar, Kao and SYWSE. [Mem. in Opp. at
19-20.]

To establish a violation of Section 1956, a plaintiff
must show that the defendant "(1) engaged in a financial
transaction which involved proceeds from specified illegal
activity, (2) knew the proceeds were from illegal activity, and

(3) intended the transaction either to promote the illegal activity or to conceal the nature, source, or ownership of the illegal proceeds." United States v. Marbella, 73 F.3d 1508, 1514 (9th Cir. 1996) (citations omitted). To establish a violation of Section 1957, a plaintiff must show that "(1) the defendant knowingly engaged in a monetary transaction; (2) he knew the transaction involved criminal property; (3) the property's value exceeded $10,000; and (4) the property was derived from a specified unlawful activity." United States v. Rogers, 321 F.3d 1226, 1229 (9th Cir. 2003) (citation omitted).

PacMar does not offer any evidence demonstrating that Hartman engaged in a monetary transaction on behalf of SYWSE. Instead, Hartman provided unrebutted evidence that he had no access to SYWSE's checking account and was not a signatory on this account. See Hartman Decl. at ¶ 51. Accordingly, there is no genuine issue of material fact as to whether Hartman committed a predicate act of money laundering in violation of Sections 1956 or 1957. See, e.g., United States v. French, 748 F.3d 922, 937 (9th Cir. 2014) (reversing a defendant's convictions for money laundering pursuant to Sections 1956 and 1957 for money laundering where "there is no evidence in the record indicating that [the defendant] had access to this account, let alone that she personally transferred money into it, knowing the funds to be the proceeds of unlawful activity").

21

### 3.   Interstate Transfer of Stolen Property (Sections 2314 and 2315)

Section 2314 imposes criminal liability upon, among others: "Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, **knowing the same to have been stolen, converted or taken by fraud**[.]" 18 U.S.C. § 2314 (emphasis added). "To sustain a conviction for interstate transportation of stolen property, the government must prove that the money transported was stolen, converted, taken by fraud, or derived from such property." United States v. Lazarenko, 564 F.3d 1026, 1035 (9th Cir. 2009) (citation omitted). Section 2315 imposes liability upon, among others:

> Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as security for a loan any goods, wares, or merchandise, or securities, of the value of $500 or more, which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, **knowing the same to have been stolen, unlawfully converted, or taken**[.]

(Emphasis added.)

To be liable for the predicate act of a violation of either Section 2314 or Section 2315, Hartman must have known that the funds used for the scholarships were stolen or converted. Hartman argues that PacMar cannot prove that Hartman knew that the funds used for the SYWSE scholarships were stolen

22

or converted. [Motion, Mem. in Supp. at 18.] PacMar argues
Hartman's emails show he knew the money was being taken from
PacMar, and Hartman's control over SYWSE and attempts to hide
his ties to SYWSE show that he received, stored, possessed,
concealed, and disposed of stolen property. [Mem. in Opp. at
20.]

Hartman states that he "had no knowledge of the source
of the funds of the scholarship donations that would be made by
SYWSE, and whether those funds would originate from [PacMar] or
Kao's personal sources." [Hartman Decl. at ¶ 51.] The only other
evidence pertinent to Hartman's possible knowledge of the source
of funds is emails. An email that Hartman received from Lum Kee
states "I need to receive funding from [Kao] before checks are
cut. I didn't want to piece meal him funding needs." [Hartman
Decl., Exh. 6 (email thread dated 2/18/20 to 4/14/20 titled
"Scholarship Programs – The Society" between Hartman, Lum Kee,
Bofman, Chen, and others) at PageID.2761 (email dated 3/18/20
from Lum Kee to Bofman and Hartman).] In another email, Hartman
states that "Navatek is interested in providing funding for
scholarships for women," and that "[w]e intend to make these
donations by way of a charitable foundation set up for this
purpose." [Brunk Decl., Exh. 16 (emails dated 2/25/20) at
PageID.3178.] In a February 18, 2020 email that Hartman was
copied on, Kao stated "the Society my wife established would

23

like to accelerate efforts to establish the scholarship program
for women students." [Hartman Decl., Exh. 6 at PageID.2767
(email dated 2/18/20 from Kao to Chen and Lum Kee, with copy to
Hartman and others).] Hartman wrote an email commenting on an
early proposal for the PR Plan which stated: "SYWSE was created
by Navatek CEO Martin Kao and his family to support young women
engineers." Hartman commented:

> Are we ready to come out and admit the connection
> there? Obviously this has been alleged by the
> press, but I have been hearing concerns from
> [Chen] and others that we should try to keep
> [Kao], his family, and Navatek at arm's length
> from SYWSE, even if it's good press like
> scholarships. Is that not still true?

[Id., Exh. 11 (email thread dated 3/27/20 to 3/30/20 titled
"SYWSE PR PLAN" between Chen, Hartman, Schmicker, Kao, Bofman
and Keipper) at PageID.2808 (email dated 3/30/20 from Hartman to
the others).]

        While there is circumstantial evidence that Hartman
may have known that the funds for the scholarships came from
PacMar, there is no evidence to support that Hartman knew that
these funds were stolen or unlawfully converted. Emails
demonstrating Hartman distanced himself from SYWSE do not
support the inference that Hartman knew the funds for the
scholarship were stolen. See Hartman CSOF, Exh. 12 (email thread
dated 5/11/20 to 5/14/20 titled "follow up on SYWSE" between
Bofman, Schmicker, and Hartman) at PageID.2814 (5/13/20 email

from Hartman suggesting to maintain the separation between SYWSE
and Navatek); Hartman Decl. at ¶ 53 (stating "[t]his effort was
made in good faith to continue to support the PR plan developed
by Schmicker under Kao's direction, with the intent of
continuing to improve the public image of [PacMar]"); Hartman
Decl. at ¶ 54 (stating that, "[b]ecause press articles were
drawing connections between SYWSE, Kao and his family, and
[PacMar], which in turn was damaging [PacMar's] reputation, Chen
had emphasized to me that that it was important to maintain a
clear separation between [PacMar] and SYWSE").

PacMar does not offer any evidence demonstrating that
Hartman knew that the funds for the scholarships were derived
unlawfully. Accordingly, there is no genuine issue of material
fact as to whether Hartman committed the predicate act of
transporting stolen property in violation of Sections 2314 and
2315.

### 4.    Travel Act (Section 1952)

Liability under the Travel Act requires proof of:
"(1) interstate commerce or use of an interstate facility
(2) with intent to promote an unlawful activity and (3) a
subsequent overt act in furtherance of that unlawful activity."
United States v. Tavelman, 650 F.2d 1133, 1138 (9th Cir. 1981)
(citations omitted).

> The definition of "unlawful activity" includes
> different types of crimes: The Travel Act targets
> activities taken in connection with organizations
> involving illegal gambling, illegal liquor
> distribution, controlled substances, and
> prostitution. 18 U.S.C. § 1952(b). It also
> targets activities related to extortion, bribery,
> arson, money laundering, monetary transactions
> related to unlawful activities, and certain
> violations of financial reporting requirements.
> Id.

United States v. Rogers, 389 F. Supp. 3d 774, 786 (C.D. Cal.

2019). The unlawful activity is defined as:

> (1) any business enterprise involving gambling,
> liquor on which the Federal excise tax has not
> been paid, narcotics or controlled substances (as
> defined in section 102(6) of the Controlled
> Substances Act), or prostitution offenses in
> violation of the laws of the State in which they
> are committed or of the United States,
> (2) extortion, bribery, or arson in violation of
> the laws of the State in which committed or of
> the United States, or (3) any act which is
> indictable under subchapter II of chapter 53 of
> title 31, United States Code, or under section
> 1956 or 1957 of this title . . . .

18 U.S.C. § 1952(b)(i). "To obtain a conviction under the Travel

Act, the Government must show defendants had 'specific intent to

promote, manage, establish, carry on or facilitate one of the

prohibited activities.'" United States v. Lacey, 423 F. Supp. 3d

748, 761 (D. Ariz. 2019) (some citations omitted) (quoting

United States v. Gibson Specialty Co., 507 F.2d 446, 449 (9th

Cir. 1974)).

Hartman contends PacMar cannot prove Hartman intended

to promote unlawful activity, given his limited role in the

SYWSE scholarship program. [Motion, Mem. in Supp. at 19.] PacMar argues the SYWSE scholarship funds were taken without authority for an unlawful purpose, and sent through interstate commerce, for the purpose of obstructing justice and covering up other crimes. [Mem. in Opp. at 20.]

PacMar argues the unlawful activity that Hartman intended to engage in is obstruction of justice. However, obstruction of justice is not one of the unlawful activities statutorily defined in Section 1952(b)(i). Accordingly, even if Hartman did possess the intent to obstruct justice, this would not violate the Travel Act.[3] For the same reasons discussed in the preceding subsections, there is no genuine issue of material fact as to whether Hartman violated Section 1952.

### 5.   Conclusion Regarding Predicate Acts

Because there is no genuine issue of material fact as to whether Hartman committed a predicate act undergirding Count I, the Court grants summary judgment on Count I in favor of Hartman. See Fed. R. Civ. P. 56(a) ("The court shall grant

---

[3] Though PacMar does not argue this, to the extent that Hartman could be held liable under the Travel Act if he intended to commit the unlawful act of money laundering through his alleged direction of the scholarship fund transfers, this theory of liability fails. For the same reasons that PacMar did not establish a triable issue of fact that Hartman engaged in money laundering, PacMar does not present a genuine issue of material fact that Hartman intended to engage in money laundering in violation of the Travel Act.

summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). Given the Court's ruling regarding predicate acts, the Court does not address Hartman's other arguments regarding Count I.

## II.  <u>Count II</u>

Hartman argues Count II fails because (1) PacMar failed to prove a substantive violation of Section 1961(c), and (2) PacMar cannot establish that Hartman knew he was acting in furtherance of a conspiracy. [Motion, Mem. in Supp. at 25.] In contrast, PacMar argues that Hartman sent and received emails that established the enterprise's illegal objectives, and thus an issue of fact exists regarding Hartman's understanding of the conspiracy. [Mem. in Opp. at 26-27.]

"[18 U.S.C.] § 1962(d) makes it unlawful to conspire to violate any of the other three prohibitions [of § 1962]." <u>RJR Nabisco</u>, 579 U.S. at 330.

> "A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." <u>Salinas v. United States</u>, 522 U.S. 52, 65, 118 S. Ct. 469, 139 L. Ed.2d 352 (1997). A defendant must also have been "aware of the essential nature and scope of the enterprise and intended to participate in it." <u>Baumer v. Pachl</u>, 8 F.3d 1341, 1346 (9th Cir. 1993) (internal quotation marks omitted). To establish a violation of section 1962(d), Plaintiffs must

> allege either an agreement that is a substantive
> violation of RICO or that the defendants agreed
> to commit, or participated in, a violation of two
> predicate offenses. See id.

Howard v. Am. Online Inc., 208 F.3d 741, 751 (9th Cir. 2000).

###    A.    Relationship to Section 1962(c)

As to Hartman's brief argument that PacMar failed to
prove a substantive violation of 1962(c) against Hartman, and
therefore the Section 1962(d) claim against Hartman necessarily
fails, this is incorrect. A defendant may be held liable for a
violation of Section 1962(d) even if they are not liable under
Section 1962(c). See Salinas, 522 U.S. at 66 (holding there was
sufficient evidence to support the defendant's conviction under
Section 1962(d) where he "knew about and agreed to facilitate
the scheme"). In Salinas, the United States Supreme Court
affirmed that well-known conspiracy principles apply to Section
1962(d) claims:

> A conspiracy may exist even if a conspirator
> does not agree to commit or facilitate each and
> every part of the substantive offense. See United
> States v. Socony-Vacuum Oil Co., 310 U.S. 150,
> 253–254 (1940). The partners in the criminal plan
> must agree to pursue the same criminal objective
> and may divide up the work, yet each is
> responsible for the acts of each other. See
> Pinkerton v. United States, 328 U.S. 640, 646,
> (1946) ("And so long as the partnership in crime
> continues, the partners act for each other in
> carrying it forward"). If conspirators have a
> plan which calls for some conspirators to
> perpetrate the crime and others to provide
> support, the supporters are as guilty as the
> perpetrators. As Justice Holmes observed:

> "[P]lainly a person may conspire for the
> commission of a crime by a third person." <u>United
> States v. Holte</u>, 236 U.S. 140, 144 (1915). A
> person, moreover, may be liable for conspiracy
> even though he was incapable of committing the
> substantive offense. <u>United States v. Rabinowich</u>,
> 238 U.S. 78, 86 (1915).

<u>Id.</u> at 63–64 (alteration in <u>Salinas</u>).

Therefore, this portion of PacMar's argument is
rejected. <u>See</u> <u>Hamilton v. Willms</u>, No. CV F 02 6583 AWI SMS, 2005
WL 3797562, at *10 (E.D. Cal. Oct. 28, 2005) ("[T]he court
cannot simply grant [a certain defendant] summary judgment on
[the p]laintiffs' Section 1962(d) RICO conspiracy claim merely
because [said defendant] is entitled to summary judgment on [the
p]laintiffs' Section 1962(c) RICO claim."); <u>Ketayi v. Health
Enrollment Grp.</u>, 516 F. Supp. 3d 1092, 1138 (S.D. Cal. 2021)
("Because the Court finds that Plaintiffs have stated a claim
for a substantive violation of RICO as to at least one
Defendant, the remaining question is whether Plaintiffs have
properly pleaded that each Defendant knowingly agreed to
facilitate the scheme and intended to participate in it.").

**B.    Hartman's Knowledge**

Hartman also argues that PacMar cannot establish that
Hartman knew he was acting in furtherance of the alleged
conspiracy, because none of the emails that Hartman received or
sent demonstrate that Hartman was "'aware of the essential
nature and scope of the enterprise . . .'" [Motion, Mem. in

Supp. at 25 (quoting Baumer, 8 F.3d at 1346).] PacMar contends

that Hartman sent and received the following emails from which

the enterprise's illegal objectives could be inferred:

(1) emails Hartman received that discussed that the scholarship

plan originated after and in response to the FEC Complaint;

(2) Hartman falsely stated to third parties that the scholarship

plan was older than it was; (3) Hartman discouraged any public

connection between SYWSE and Kao, PacMar, and himself; and

(4) Hartman participated in jokes with the other defendants that

recognized the pretextual nature of the SYWSE scholarships.

[Mem. in Opp. at 26-27.]

> Unlike common law conspiracy, which requires that
> a participant specifically intend the object of
> the conspiracy be accomplished, RICO conspiracy
> requires only "that two or more people agreed to
> commit a[t least two] crime[s] covered by the
> [RICO] . . . statute (that a conspiracy existed)
> and that the defendant knowingly and willfully
> participated in the agreement (that he was a
> member of the conspiracy)."

United States v. Wallis, 630 F. App'x 664, 668 (9th Cir. 2015)

(alterations in Wallis) (some citations omitted) (quoting Smith

v. United States, 568 U.S. 106, 110, 133 S. Ct. 714, 719, 184 L.

Ed. 2d 570 (2003)).

> The Ninth Circuit has explained:

> "[T]he point of making the government show that
> the defendants ha[d] some knowledge of the nature
> of the enterprise[ ] is to avoid an unjust
> association of the defendant with the crimes of
> others." United States v. Brandao, 539 F.3d 44,

> 52 (1st Cir. 2008). Nonetheless, the definition
> of a RICO enterprise has "wide reach" and is to
> be "liberally construed to effectuate its
> remedial purposes." Boyle [v. United States], 556
> U.S. [938,] 944–45, 129 S. Ct. 2237 [(2009)]
> (internal quotation marks omitted) (holding that
> a RICO enterprise does not need to have a formal,
> business-like structure or hierarchy).
>
> As the First Circuit has explained, "[t]he
> RICO net is woven tightly to trap even the
> smallest fish, those peripherally involved with
> the enterprise." United States v. Marino, 277
> F.3d 11, 33 (1st Cir. 2002) (citation and
> internal quotation marks omitted). . . .

United States v. Christensen, 828 F.3d 763, 780–81 (9th Cir.

2015) (some alterations in Christensen). "Every member of the

conspiracy need not know every other member nor be aware of all

acts committed in furtherance of the conspiracy." United States

v. Taren-Palma, 997 F.2d 525, 530 (9th Cir. 1993) (per curiam)

(citation omitted).[4]

PacMar establishes a triable issue of fact as to

Hartman's awareness of "the essential nature and scope of the

enterprise." Baumer, 8 F.3d at 1346 (citation and quotation

marks omitted). Emails that Hartman sent and received provide

circumstantial evidence of Hartman's knowledge of the

conspiracy. See, e.g., Brunk Decl., Exh. 4 (emails between Kao,

Hartman, and others dated 2/20/20 to 2/21/20); Hartman Decl.,

---

[4] Taren-Palma was overruled on other grounds by United
States v. Shabani, 513 U.S. 10 (1994), as stated in United
States v. Fuentes, 203 F. App'x 804, 806 (9th Cir. 2006).

Exh. 8 at PageID.2773-80 (emails between Kao, Mitchell and
others regarding the FEC Complaint and SYWSE's scholarship
plan); Brunk Decl., Exh. 16 (emails dated 2/25/20); Hartman
Decl., Exh. 12 (emails thread dated 5/11/20 to 5/14/20 titled
"follow up on SYWSE" between Bofman, Schmicker, and Hartman) at
PageID.2814; Hartman Decl., Exh. 13 (email thread dated 5/21/20
titled "WSU office opening press release draft" between Hartman,
Kao, Chen, and others); see also Planned Parenthood Fed'n of
Am., Inc. v. Ctr. for Med. Progress, 402 F. Supp. 3d 615, 653-55
(N.D. Cal. 2019) (determining an issue of fact existed regarding
three defendants' intent in furthering a RICO conspiracy, though
these defendants had not committed a predicate act themselves,
where circumstantial evidence of each defendant's individual
knowledge of the enterprise existed);[5] Hamilton, 2005 WL 3797562,
at *10 ("Evidence that [a particular defendant] knew what the
other conspirators 'were up to' and knew or suspected that she
was part of a larger enterprise is sufficient." (citation
omitted)). Courts have found summary judgment as to a
defendant's intent to participate in an enterprise to be a high
bar. See Tatung Co. v. Shu Tze Hsu, 217 F. Supp. 3d 1138, 1171
(C.D. Cal. 2016) (finding there was a triable issue of fact as

---

[5] The Ninth Circuit affirmed. Planned Parenthood Fed'n of
Am., Inc. v. Newman, No. 20-16068, 2022 WL 13613963 (9th Cir.
Oct. 21, 2022).

to a Section 1962(d) claim regarding a defendant's knowledge of the enterprise and his intent to participate in it, and noting that "intent 'is a question of the state of mind . . . a factual matter rarely free from dispute and thus rarely enabled in summary proceedings'" (alteration in <u>Tatung Co.</u>) (quoting <u>Ferring B.V. v. Barr Labs., Inc.</u>, 437 F.3d 1181, 1204 (Fed. Cir. 2006) (Newman, J., dissenting))). Because circumstantial evidence exists regarding Hartman's awareness of "the essential nature and scope of the enterprise," Hartman's Motion is denied as to Count II.

### III. **<u>State Law Claims</u>**

Hartman argues the state law claims must be dismissed for lack of supplemental jurisdiction if summary judgment is granted in his favor as to the RICO claims. [Motion, Mem. in Supp. at 26.] Because the Section 1962(d) conspiracy claim is not dismissed against Hartman, there are no grounds to dismiss the state law claims against Hartman for lack of supplemental jurisdiction. Accordingly, this portion of Hartman's Motion is denied.

### IV. **<u>Joinders</u>**

Chen and Lum Kee do not state whether their respective joinders are substantive joinders or joiners of simple agreement. <u>See generally</u> Chen Joinder; Lum Kee Joinder. Because the Chen Joinder and the Lum Kee Joinder were filed more than

three days after Hartman's Motion, and neither joinder is
"supported by a memorandum that complies with LR7.4(a) and (b)
supplementing" the Motion, the Court considers them as joinders
of simple agreement. See Local Rule LR7.7. While the Kao and
SYWSE Joinder is titled as a substantive joinder, see Kao and
SYWSE Joinder at 2, and Lam requests summary judgment be granted
in her favor in the Lam Joinder, see Lam Joinder at 2, because
these joinders were filed more than three days after Hartman's
Motion and are not supported by a memorandum as required, the
Court considers them as joinders of simple agreement. See Local
Rule LR7.7. Accordingly, the Chen Joinder, Lum Kee Joinder, Lam
Joinder, and Kao and SYWSE Joinder are granted in part and
denied in part to the same extent as Hartman's Motion. In other
words, the instant Order does not rule upon any of PacMar's
claims against Chen, Lum Kee, Lam, Kao, or SYWSE.

**CONCLUSION**

On the basis of the foregoing, the Motion for Summary
Judgment on All Claims Against Hartman, filed November 15, 2024,
is GRANTED IN PART AND DENIED IN PART. Hartman is GRANTED
summary judgment on Count I, and DENIED summary judgment on
Count II. Hartman's Motion is DENIED as to Counts V through XIV.
The Chen Joinder, the Lum Kee Joinder, the Lam Joinder, and the
Kao and SYWSE Joinder are GRANTED IN PART AND DENIED IN PART to
the same extent as Hartman's Motion.

35

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, March 3, 2025.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
Senior U.S. District Judge

PACMAR TECHNOLOGIES LLC, FKA MARTIN DEFENSE GROUP, LLC VS.
MARTIN KAO, ET AL; CV 22-00283 LEK-WRP; ORDER GRANTING IN PART
AND DENYING IN PART:  DEFENDANT DUKE HARTMAN'S MOTION FOR
SUMMARY JUDGMENT ON ALL CLAIMS AGAINST HARTMAN; DEFENDANT/CROSS-
CLAIMANT CLIFFORD CHEN'S, DEFENDANT CROSS-CLAIMANT KAHELE LUM
KEE, DEFENDANT TIFFANY JENNIFER LAM, AND DEFENDANTS MARTIN KAO
AND SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS, LLC'S
RESPECTIVE JOINDERS IN HARTMAN'S MOTION