# EXHIBIT "1"

#1798468



DP&R, INC.

KOBAYASHI SUGITA & GODA, LLP

DAVID M. LOUIE            2162
JESSE W. SCHIEL           7995
NICHOLAS R. MONLUX        9309
First Hawaiian Center
999 Bishop Street, Suite 2600
Honolulu, Hawai'i 96813
Telephone: (808) 535-5700
Facsimile:  (808) 535-5799
Email: dml@ksglaw.com; jws@ksglaw.com; nrm@ksglaw.com

Attorneys for Claimant
NAVATEK CAPITAL INC., individually and derivatively
on behalf of Nominal Respondent MARTIN DEFENSE
GROUP, LLC, fka NAVATEK LLC

DISPUTE PREVENTION & RESOLUTION, INC.

STATE OF HAWAII

| | |
|---|---|
| NAVATEK CAPITAL INC, individually and derivatively on behalf of Nominal Respondent MARTIN DEFENSE GROUP, LLC, fka MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC<br><br>, <br><br>         Claimant,<br><br>  vs.<br><br>MARTIN KAO; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-5; DOE CORPORATIONS 1-10; DOE ENTITIES 1-10; and DOE GOVERNMENTAL UNITS 1-10,<br><br>         Respondents,<br><br>  and<br><br>MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC<br><br>         Nominal Respondent. | DPR NO.<br><br><br>DEMAND FOR ARBITRATION; CERTIFICATE OF SERVICE |

## DEMAND FOR ARBITRATION

Claimant NAVATEK CAPITAL INC., individually and derivatively on behalf of Nominal Respondent MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC, by and through its attorneys Kobayashi Sugita & Goda, LLP, submits this demand for arbitration against Respondent MARTIN KAO and Nominal Respondent MARTIN DEFENSE GROUP, fka NAVATEK LLC alleges and avers as follows:

**A.    PARTIES**

1.    Claimant NAVATEK CAPITAL INC. ("**NCI**"), individually and derivatively on behalf of Nominal Respondent MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC, is, and was at all times relevant herein, a Hawaii corporation doing business in the State of Hawaii.

2.    Nominal Respondent MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC ("**Company**") is, and was at all times relevant herein, a Hawaii limited liability company doing business in the State of Hawaii.

3.    Respondent MARTIN KAO ("**Respondent Kao**"), is, and was at all times relevant herein, a resident of the State of Hawaii.

4.    Respondent Kao at all relevant times held a majority voting membership interest in Company, but only owned an approximate thirty-nine percent (39%) of all the ownership interest in Company as of December 31, 2019, was also the sole manager of Company, and at all relevant times herein was acting as the sole member-manager of Company.

5.    NCI was at all times relevant a minority one percent (1%) owner of the profits and losses of the Company, but held a sixty-one percent majority interest in the capital of the Company, and at all relevant times herein was not participating in the management or control of the Company.

6.      NCI has contributed substantial sums of money to the Company and has a substantial capital account in the Company, in excess of $2,500,000.

**B.      RESPONDENT KAO'S OWNERSHIP, MANAGEMENT AND FIDUCIARY DUTIES OWED TO COMPANY**

7.      Respondent Kao began working at Company in 2008 (then "Navatek, Ltd.").

8.      On or about August 31, 2018, Navatek Ltd. converted to "Navatek, LLC" as a limited liability company under Hawaii law pursuant to articles of conversion filed with the Department of Commerce and Consumer Affairs ("**DCCA**").

9.      At all relevant times until March 1, 2019, NCI owned 100% of the Company (being Navatek Ltd. until August 31, 2018).

10.      On March 1, 2019, NCI transferred 99% of the future profits and losses of the Company to Respondent Kao, maintaining a 1% interest in future profits and losses in the Company.  At the time of the transfer, NCI's capital account in the Company was $2,577,320 and Respondent Kao's capital account was zero.

11.      NCI continues to hold its capital account to this day, which capital account has increased to $2,596,808 as of December 31, 2019 by allocations of income to the capital account, and holds nearly all of the Company's capital and future capital risk in the Company.

12.      In contrast to NCI, Respondent Kao held only $1,604,098 of the Company's capital account as of December 31, 2019, and has a relatively inconsequential stake in the Company's future capital risk as Respondent Kao has made significant withdrawals from the Company in 2020.

13.      On March 1, 2019, NCI and Respondent Kao, being the sole members of Company, executed an operating agreement (the "**Operating Agreement**") concerning the ownership and management of Navatek, among other operating matters.

14.     On July 27, 2020, Respondent Kao filed Articles of Amendment to Change Limited Liability Company Name with the DCCA, changing the name of the Company from Navatek LLC to The Martin Group, LLC (the "**Company Name Change**").

15.     From March 1, 2019 until November 19, 2021 (the "**Relevant Period**"), Respondent Kao held a ninety-nine percent (99%) voting interest in the Company, and was the sole manager of Company pursuant to the terms of Operating Agreement.

16.     By reason of his position as a member, manager, and fiduciary of Company during the Relevant Period, and because of his ability to control the business and affairs of the Company, Respondent Kao owed Company and its members fiduciary obligations of good faith, loyalty and care, and was required to use his utmost ability to control and manage the Company in a fair, just, honest and equitable manner.  Respondent Kao was required to act in furtherance of the best interests of Company and its members and not in furtherance of his, or any other individual or entity's, personal interest or benefit.

17.     As the manager of Company during the Relevant Period, Respondent Kao owed to the Company and its members the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

18.     To faithfully discharge his duties, Respondent Kao was required during the Relevant Period to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, Respondent Kao was required to, among other things:

a.    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of the Company's business;

b.    Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal, state and foreign laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of his legal authority;

c.    Exercise good faith in preparing and/or supervising the preparation, filing and/or dissemination of financial statements, audits, reports, employment, accounting, or other information required by law, and in examining and evaluating any reports, filings, submissions, or examinations, audits, or other employment or financial information concerning the Company; and

d.    Refrain from unduly benefiting himself and other Company insiders or third parties at the expense of the Company.

19.    Section 5.5 of Company's Operating Agreement states that "Each Manager shall perform his duties as a Manager in good faith, in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances."

20.    Section 6.5 of the Company's Operating Agreement expressly acknowledges that NCI at all times relevant has been a passive member in the Company and has not participated in the management of the Company, stating that "[the] Members acknowledge that Navatek Capital Inc. holds its interest as a passive investment and will not participate in the management and control of the Company except as specifically permitted by this Agreement."

21.    Section 8.1 of the Company's Operating Agreement provides that each member in the Company shall carry out their duties and obligations and will not "(c) Transfer all or any portion of its Units in the Company in violation of [the Operating Agreement]... [or] (e) commit a breach of any material covenant contained in [the Operating Agreement]...."

22.    Pursuant to HRS Section 428-409(h)(3), Respondent Kao, as the member-manager of the Company during the Relevant Period who exercised the rights of a manager in the management of the Company's business pursuant to the Operating Agreement, was held to the same standards of conduct required of a member in subsections (b) to (f) of HRS Section 428-409.

23.    Respondent Kao's duties to the Company and NCI during the Relevant Period under HRS Section 428-409(h)(3) included, but were not limited, the nonwaivable duty of loyalty contained in HRS Section 428-409(b) to (1) account to the Company and to hold as trustee for it any property, profit, or benefit derived by Respondent Kao in the conduct of the Company's business or derived from a use by Respondent Kao of the Company's property, including the appropriation of a Company's opportunity, (2) refrain from dealing with the Company in the conduct of the Company's business as or on behalf of a party having an interest adverse to the Company, and (3) refrain from competing with the Company in the conduct of the Company's business.

24.    Respondent Kao's duties to the Company and NCI during the Relevant Period under HRS Section 428-409(h)(3) also included, but were not limited to, the duty of care contained in HRS Section 428-409(c) to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

25.    Respondent Kao's duties to the Company and NCI during the Relevant period under HRS Section 428-409(h)(3) further included, but were not limited, the duty of good faith and fair dealing contained in HRS Section 428-409(d).

26.    Sections 8.1 and 8.2 of the Operating Agreement provide for the removal of any member who breaches a material covenant contained in the Operating Agreement.

27.    Section 4.1 of the Operating Agreement provides:

> **4.1 Distributions.** Except in the event of dissolution and winding up, the Company shall make distributions of its Distributable Cash, if any, at such times as determined by the Management Committee, in its reasonable discretion, ninety-nine percent (99%) to Martin Kao and one percent (1%) to Navatek Capital Inc.

28.    Section 5.4 of the Operating Agreement, in relevant part, provides:

> **5.4. Limitation    on Authority of the Management Committee.** Notwithstanding any other provision of this Agreement, the Management Committee shall not take any action in connection with any of the following matters without the unanimous written consent signed by the Members:
>
> **c)**    Any act in contravention of this [Operating] Agreement; [and]
> . . . .
>
> **(f)**    Any transaction between the Company and any Member, Manager or affiliate which may not be an arm's length transaction[.]

## C.    RESPONDENT KAO'S PPP LOAN FRAUD

29.    During the Relevant Period, Respondent Kao knowingly and fraudulently used the Company as his personal vehicle to commit federal bank fraud and money laundering in connection with the CARES Act Paycheck Protection Program ("**PPP Program**"), which conduct included, among other things, Respondent Kao making knowing false misrepresentations in Company's federal loan applications to various financial institutions under the PPP Program and improperly using ill-gotten loan proceeds from the PPP Program for his personal use, all in violation of Title 18 United States Code Sections ("**U.S.C.**") 1344 and 1957.

30.     On July 23, 2020, NCI's principal, upon learning indirectly through a news article about the Company being one of the largest loan recipients of the PPP loan program in Hawaii, raised concerns to Respondent Kao about whether Respondent Kao had misrepresented the Company's payroll and related information in its loan applications under the PPP Program and requested that Respondent Kao provide NCI with copies of the Company's loan applications under the PPP Program in order to verify the accuracy of the information and representations made by Respondent Kao therein.

31.     Respondent Kao, who is a certified public accountant and has asserted that he holds a law degree, dismissed NCI's concerns regarding the Company's loans under the PPP Program, claiming that he had done everything in conformance with his advisors, and refused to provide NCI with any of the Company's loan applications under the PPP Program.

32.     On September 29, 2020, the United States Department of Justice (the "**DOJ**") filed a criminal complaint against Respondent Kao, MAG.NO. 20-01208-WRP (the "**Criminal Complaint**"), charging Mr. Kao with "Bank Fraud, in violation of 18 U.S.C. § 1344, and Money Laundering, in violation of 18 U.S.C. § 1957."

33.     Respondent Kao knowingly misused the Company to defraud the United States Government out of millions of dollars through a scheme whereby Respondent Kao purposefully misrepresented the Company's staff and payroll figures in order to fraudulently obtain inflated (and partially forgivable) PPP loans from the United States government under the PPP Program.

34.     Respondent Kao first fraudulently obtained a $10,000,000 PPP loan, being the maximum loan amount allowable under the PPP Program, from Central Pacific Bank ("**CPB**") through false pretenses, misrepresentations, and false documentation in violation of federal bank fraud and money laundering statutes.

35.     Despite being statutorily prohibited from doing so, Respondent Kao next sought and unlawfully obtained a second $2,841,490 PPP loan from Radius Bank through the same false pretenses, misrepresentations, and false documentation used to fraudulently obtain the $10,000,000 PPP loan from CPB, while also lying in the application about whether the Company had previously applied for or obtained a PPP loan.

36.     Unsatisfied with defrauding the government out of $12,841,490 in loans under the PPP Program, Respondent Kao fraudulently sought a third $2,852,839 PPP loan, this time from First Hawaiian Bank, through the same lies and deception, which fortunately failed when FHB discovered the Company's prior PPP loan with CPB.

37.     According to the DOJ's Criminal Complaint, "[d]uring the spring of 2020, KAO fraudulently obtained more than $12.8 million in Paycheck Protection Program ("PPP") funds on behalf of his company, NAVATEK, LLC (now known as MARTIN DEFENSE GROUP, LLC)....After committing the fraud, KAO transferred approximately $2 million to himself."

38.     In Count 1 of the Criminal Complaint, the DOJ alleges that Kao "knowingly executed and attempted to execute a scheme and artifice to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, by means of false and fraudulent pretenses, representations, and promises, namely the preparation and submission of materially false documents and statements to Central Pacific Bank in the application process for a CARES Act Paycheck Protection Program loan of approximately $10,000,000."

39.     In Count 2 of the Criminal Complaint, the DOJ further alleges that Kao "knowingly executed and attempted to execute a scheme and artifice to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial

institution, by means of false and fraudulent pretenses, representations, and promises, namely the preparation and submission of materially false documents and statements to Radius Bank in the application process for a CARES Act Paycheck Protection Program loan of approximately $2,841,490."

40.     In Counts 3-7 of the Criminal Complaint, the DOJ alleges that Kao "knowingly engaged and attempted to engage in [a series of] monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000...such property having been derived from a specified unlawful activity, namely Bank Fraud, in violation of Title 18, United States Code, Sections 1344(2)."

41.     The DOJ's Criminal Complaint seeks, among other things, the forfeiture of federal loan proceeds fraudulently obtained by Respondent Kao and/or the Company under the PPP Program, and criminal sanctions against Respondent Kao as a consequence of his asserted bank fraud under 18 U.S.C. Section 1344 and money laundering under 18 U.S.C. Section 1957.

42.     All of the foregoing actions of Respondent Kao pertaining to the PPP loans and Criminal Complaint were conducted without NCI's knowledge or consent, were fraudulent, intentional, malicious, and were in violation of federal and state laws, the Operating Agreement, and Respondent Kao's nonwaivable fiduciary duties owed to the Company and NCI.

D.     **RESPONDENT KAO'S OVER $7 MILLION IN THEFTS FROM THE COMPANY AND NCI, AND NUMEROUS BREACHES OF FIDUCIARY DUTIES OWED TO COMPANY AND NCI**

43.     All of the actions of Respondent Kao set forth below were fraudulent, intentional, malicious, and in violation of federal and state laws, the Operating Agreement, and Respondent Kao's nonwaivable fiduciary duties owed to the Company and NCI.

**AT LEAST $2,974,838.02 IN NON-ARMS LENGTH TRANSACTIONS**

44.    Respondent Kao paid retainers to several law firms on his behalf from Company funds in connection with his personal criminal and civil cases and investigations, of which **$974,838.02** remains unrecovered by the Company (the **"Retainers"**).  The Retainers include, without limitation:

      a.    A retainer of $350,000.00 paid on or about October 13 and October 27, 2020 to Michael Jay Green & Associates, the entirety of which is still unrecovered by the Company;

      b.    A retainer of $450,000.00 paid on or about October 22, 2020 to Troutman Pepper Hamilton Sanders LLP, of which $124,838.02 is still unrecovered by the Company; and

      c.    A retainer of $500,000.00 paid in or around November 2020 to Crowell & Moring LLP, the entirety of which is still unrecovered by the Company.

45.    The Retainers constituted transactions between the Company and Respondent Kao that were not at arm's length. Accordingly, as manager, Respondent Kao lacked the authority to approve the Retainers without the unanimous written consent of all members.

46.    NCI, as the other voting member, did not provide its written consent for Respondent Kao to pay the Retainers using the Company's funds.

47.    On or about April 20, 2020, Respondent Kao caused the Company to lend him $2,000,000.00 as a "account receivable" (the **"$2M Account Receivable"**), which is due on demand to the Company.

48.    In an email, Respondent Kao instructed Lum Kee:

Those idiots are stupid beyond belief. I decided to move forward on buying a place. BofA now needs to see a balance in my personal account for at least the entire purchase price in order to give me the funds letter to make the offer (just the Martin Kao account). Why the entire amount and not net of the loan is beyond me. I told that fool it's just semantics and he could move from any of my other accounts, even the Navatek account...issue the letter and then move the funds back. I'm still waiting for him to get back to me on that. But just in case, can you deposit $2M from CPB into my personal Merrill account tomorrow. Once BofA issues the letter I'll move it to the Navatek account. Maybe just book to some kind of suspense account for a few days. Once all BofA funds the NY home, we fk'n bail from Merrill and BofA. That's it. . . .

49.      The $2M Note Receivable was an unauthorized, non-arms length transaction, and

NCI did not provide its written consent for Respondent Kao to receive the $2M Note Receivable.

### AT LEAST $445,000.00 IN UNLAWFUL "DISTRIBUTIONS"

50.      Respondent Kao also withdrew **$445,000.00** in monies from the Company, couched

as "distributions" to himself, without making a corresponding distribution to NCI (the "**Unlawful**

**Distributions**"), all in contravention of the Operating Agreement. The Unlawful Distributions

include, without limitation:

a.      At least $325,000.00 distributed to Respondent Kao in or around

December 2019;

b.      At least $120,000.00 distributed to Respondent Kao in or around

February 2020; and

c.      Other Unmatched Distributions to be proven at trial.

### AT LEAST $184,150.00 IN UNLAWFUL "POLITICAL CONTRIBUTIONS"

51.      The Company is a federal contractor subject to federal campaign finance laws and

regulations. Under 52 U.S.C. §§ 30119 and 30122, the Company is prohibited from making

contributions to federal campaigns and from making contributions in the name of another person.

52.    Respondent Kao made and caused to be made multiple contributions to federal campaigns using the Company's funds through a scheme using American Express credit cards in the total amount of **$184,150.00** (the **"Unlawful Political Contributions"**). The Unlawful Political Contributions include, without limitation:

    a.    Contributions in the name of Respondent Kao for $34,500.00 in 2019 and $42,650.00 in 2020 for a total of $77,150.00;

    b.    Contributions in the name of Respondent Kao's wife, Tiffany Lam for $26,200.00 in 2019 and $36,600.00 in 2020 for a total of $62,800.00;

    c.    Contributions in the name of former Company Chief Financial Officer, Clifford Chen for $5,600.00 in 2019 and $11,600.00 in 2020 for a total of $17,200.00; and

    d.    Contributions in the name of former MDG Controller, Lawrence Kahele Lum Kee (**"Lum Kee"**) for $12,600.00 in 2019 and $14,400.00 in 2020 for a total of $27,000.00.

## AT LEAST $255,822.42 IN KAO'S UNLAWFUL PERSONAL EXPENSES AND ALTER-EGOS

53.    Respondent Kao used Company funds for alter-ego foundations which funded his, his family's, and his co-conspirator's personal expenses.

54.    Upon information and belief, in or around 2019, Respondent Kao caused the Company to pay approximately **$110,625.00** into his alter-ego foundation, the Marty and Mickey Foundation, which monies were later used for his, his family's, and his co-conspirator's personal expenses.

55.    Upon information and belief, Respondent Kao also caused the Company to pay approximately **$58,625** to another of his alter-ego foundations, Navatek Foundation, which monies were also later used for various personal expenses.

56.    Respondent Kao spent approximately **$78,640.80** on other personal expenses, including airfare for his family, startup costs and legal fees for his charitable foundations, expenses relating to personal assets, and social outings, all from the Company's accounts.

57.    Upon information and belief, Respondent Kao also spent approximately **$7,931.62** of the Company's monies to pay a law firm in Taiwan, Tsar and Tsui Law Firm, for legal services related to Respondent Kao's property in Taiwan valued at $24,000,000.00.

58.    None of these expenses were authorized under the terms of the Operating Agreement, and NCI did not authorize or consent to these personal expenditures from the Company's funds.

### AT LEAST $3,145,000.00 IN INDEMNITY OBLIGATIONS

59.    In the event of a member's breach, Section 8.2(c) of the Operating Agreement provides that the "breaching member" is liable to the Company for all "damages, without requirement of a prior accounting, to the Company for all costs and liabilities that the Company or any Member may incur as a result of the Breach."

60.    As a result of Respondent Kao's foregoing breaches of the Operating agreement, the Company and NCI have incurred, and continue to incur, damages in addition to the foregoing amounts totaling at least $3,145,000.00, including, without limitation:

    a.    $109,000.00 and counting in legal fees and expenses for an interim Chief Financial Officer;

    b.    $2,000,000.00 and counting in legal fees and expenses incurred by the Company in responding to the various civil, criminal, and debarment proceedings all arising from Respondent Kao's foregoing misconduct;

    c.    $1,000,000.00 and counting in legal fees and expenses incurred by NCI;

    d.  $36,000.00 in crisis communication services incurred by a public relations firm; and

    e.  Other fees and expenses to be proven at trial.

**E.    RESPONDENT KAO'S REMOVAL AS MANAGER & CEO, FEDERAL DEBARMENT, AND DISSOCIATION FROM THE COMPANY**

61.    The Company is a federal contractor subject to various Federal Acquisition Regulations ("**FAR**") requirements. The Company currently employs approximately 150 people located in Honolulu, Hawai'i and in offices in the mainland U.S. Its primary source of revenue comes from contracts with the United States Navy ("**Navy**") and the Defense Advanced Research Projects Agency ("**DARPA**"). With respect to the Company's solvency and general operations, its current contracts with the Navy and DARPA and ability to compete for future contracts with the federal government are critical to maintaining the Company's viability.

62.    Due to the federal Criminal Complaint filed against Respondent Kao, the Navy Suspending & Debarring Official ("**SDO**"), who has authority to handle suspension and debarment matters concerning the Company on behalf of the federal government, suspended Respondent Kao in his individual capacity from all federal contracts. Moreover, under federal debarment regulations, *i.e.*, 48 CFR § 9.406-1(b) and 48 CFR § 9.403, the SDO has discretion to extend its suspension and debarment decisions to include affiliates of Respondent Kao, including the Company.

63.    By letter dated November 19, 2020, Respondent Kao voluntarily withdrew as the manager and chief executive officer ("**CEO**") of the Company and appointed Daniel Brunk as the replacement manager and CEO of the Company.

64.    By letter dated November 20, 2020, Mr. Brunk accepted his appointments as manager and CEO of the Company and presently serves the Company in both capacities.

65.    Section 6.2(e) of the Operating Agreement provides that NCI automatically becomes the sole voting member of the Company in the event Respondent Kao is no longer the manager of the Company.  Accordingly, as of November 19, 2021, NCI became the sole voting member of the Company.

66.    Section 8.2(a) of the Operating Agreement mandates that a breaching member "shall immediately be disassociated and thereby cease to be a Member, [and] shall have no further power to act as a Member of the Company...."

67.    On or about May 1, 2021, NCI executed an Action by Consent to Confirm the Dissociation Of Martin Kao due to his numerous and indisputable breaches of the Operating Agreement and applicable laws.   Therefore, Respondent Kao has ceased being a member of the Company whose rights became automatically limited to those of an Assignee as if he were the recipient of a prohibited Transfer of his Units under the Operating Agreement.

## F.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

68.    NCI brings this action derivatively, in part, in the right and for the benefit of Company to redress injuries suffered, and to be suffered, by Company and NCI as a direct result of Respondent Kao's numerous breaches of his fiduciary duties to the Company and NCI.

69.    NCI is a member of Company, was a member of Company at the time of the wrongdoing alleged herein, and has been a member of Company continuously since that time.

70.    NCI will adequately and fairly represent the interests of Company in enforcing and prosecuting its rights.

71.    Except as to NCI's indemnity claim against the Company, Company is named as a nominal respondent in this case solely in a derivative capacity.  Prosecution of this action is in the best interests of the Company.

72.    Respondent Kao's wrongful acts complained of herein subject, and will continue to subject, the Company to continuing harm because the adverse consequences of his actions are unresolved and millions of stolen monies uncollected.

73.    Throughout the relevant period, the wrongful acts complained of herein show multiple breaches by Respondent Kao of his fiduciary duties of loyalty, due care and oversight of Company.

74.    NCI has not made any demand on the Company to institute this action since making a demand on the Company to enforce an indemnity against the Company would be a futile and useless act.

## COUNT I
### (Derivative and Direct – Breach of Fiduciary Duties)

75.    NCI incorporates the foregoing paragraphs as if fully set forth herein.

76.    Respondent Kao owed fiduciary duties to both Company and NCI, including the duties of good faith, loyalty, due care, and to refrain from self-dealing.

77.    Respondent Kao breached said fiduciary duties through the actions described herein.  By reason of his fiduciary relationships, Respondent Kao owed and owes Company and NCI the highest obligation of good faith, fair dealing, loyalty, and due care.

78.    As a direct and proximate result of Respondent Kao's breaches of his fiduciary obligations, Company and NCI have sustained significant damages, which includes but is not limited to damages described herein as well as damages to NCI's brand, reputation, and the possible depletion of NCI's capital account in Company.   As a result of the misconduct alleged herein, Respondent Kao is liable to the Company and NCI in amounts to be proven at trial.

79.    The breach of fiduciary duties by Respondent Kao further entitles Company and NCI to disgorge from Respondent Kao all improperly procured funds.

## COUNT II
### (Breach of Operating Agreement – Derivative and Direct)

80.    NCI incorporates by reference all foregoing paragraphs as if fully set forth herein.

81.    Under § 4.1 of the Operating Agreement, Respondent Kao was obligated at all relevant times to make a proportional distribution to NCI for each and every distribution made to himself.

82.    Respondent Kao repeatedly failed to make and failed to cause to be made such distributions to NCI.

83.    As a member-manager, Respondent Kao was required to refrain from engaging in transactions with the Company that were not at arm's length without the unanimous written consent of the Company's members.

84.    Respondent Kao repeatedly engaged in transactions with the Company that were not at arm's length and without the unanimous written consent of the members.

85.    As a direct and proximate result, the Company and NCI have been damaged by Respondent Kao's breach of the Operating Agreement in amounts to be proven at trial.

## COUNT II
### (Derivative – Gross Mismanagement)

86.    NCI incorporates the foregoing paragraphs as if fully set forth herein.

87.    By his actions alleged herein, Respondent Kao abandoned and abdicated his responsibilities and fiduciary duties with regard to prudently managing the assets and business of Company in a manner consistent with the requirements under the Operating Agreement and applicable federal and state laws.

88.    As a direct and proximate result of Respondent Kao's gross mismanagement and breaches of duty alleged herein, Company has sustained significant damages.

89.    As a result of his misconduct and breaches of his duties alleged herein, Respondent Kao is liable to the Company.  Any profits or ill-gotten gains realized from Respondent Kao's mismanagement of Company should be held in constructive trust pending further order of the arbitrator.

## COUNT III
### (Derivative and Direct – Fraud)

90.    NCI incorporates the foregoing paragraphs as if fully set forth herein.

91.    By his actions alleged herein, Respondent Kao, as a member-manager of Company, willfully engaged in fraudulent conduct that has adversely and materially affected Company and NCI by, among other conduct: (a) using the Company as a vehicle to submit and obtain fraudulent loan applications under the PPP Program in violation of federal laws, resulting in his criminal indictment pertaining to over $12,000,000 in loans obtained under the name of the Company; (b) withdrawing millions of dollars from the Company's operating bank account for his personal use; (c) engaging in the aforementioned self-dealing transactions; and (d) attempting to transfer the assets of the Company to a third-party without consideration, and without notice to and consent by NCI as a voting member of the Company.

92.    The foregoing actions by Respondent Kao were willful, wanton, malicious, and/or done with gross and reckless indifference to the law and his fiduciary duties owed to the Company and NCI.

93.    As a direct and proximate result, NCI and the Company have been damaged by Respondent Kao's fraud in amounts to be proven at trial, which includes but is not limited to damages to NCI's brand, reputation, and the possible depletion of NCI's capital account in Company.

## COUNT IV
### (Direct and Derivative - Embezzlement)

94.    NCI incorporates by reference all foregoing paragraphs as if fully set forth herein.

95.    Respondent Kao, as a former member and manager, acted as an agent of the Company.

96.    As the Company's agent during all relevant times, Respondent Kao had access to the Company's property, including its funds.

97.    Respondent Kao intentionally and fraudulently converted the Company's funds as his own.

98.    As a direct and proximate result of Respondent Kao's actions, the Company and NCI have been damaged in an amount to be proven at trial.

## COUNT V
### (Direct and Derivative - Conversion)

99.    NCI incorporates by reference all foregoing paragraphs as if fully set forth herein.

100.    Respondent Kao paid the Retainers to several law firms from Company funds in connection with his various criminal and civil cases.

101.    Respondent Kao paid the Retainer's from the Company's funds despite the fact that the Operating Agreement does not indemnify Respondent Kao for any of the conduct asserted in the various criminal and civil cases.

102.    Respondent Kao caused the Political Contributions to be made using Company funds.

103.    Respondent Kao caused the Company to loan him the $2M Note Receivable in connection with Respondent Kao's personal purchase of real property.

104.    Respondent Kao made other personal loans to himself from the Company's accounts.

105.    Respondent Kao also spent in excess of $200,000.00 on personal expenses, including airfare for his family, startup costs and legal fees for his charitable foundations, personal properties, and social outings, all from the Company's accounts.

106.    Respondent Kao did so without the unanimous written consent of the Company's members, including NCI.

107.    By these acts, Respondent Kao assumed ownership of the Company's property.

108.    Respondent Kao used the converted property for his own personal use and beneficial enjoyment.

109.    The Company has demanded repayment of certain converted funds from Respondent Kao.

110.    Respondent Kao has failed to repay the demanded converted amounts.

**COUNT VI**
**(Derivative and Direct – Unjust Enrichment)**

111.    NCI incorporates the foregoing paragraphs as if fully set forth herein.

112.    By his wrongful acts and omissions, Respondent Kao was unjustly enriched at the expense of and to the detriment of Company and NCI.

113.    NCI, as a member of Company, seeks restitution from Respondent Kao, and seeks an order of the arbitrator disgorging all profits, benefits, and other compensation obtained by Respondent Kao through his wrongful conduct and fiduciary breaches.

## COUNT VI
### (Civil Conspiracy)

114.    NCI incorporates by reference all foregoing paragraphs as if fully set forth herein.

115.    Through combined and concerted action, Defendant Kao and one or more of the doe defendants, as discovery will reveal, conspired to accomplish criminal and/or unlawful purposes, and/or other purposes by criminal and/or unlawful means, including, without limitation, the allegations set forth in the foregoing paragraphs. NCI will seek leave to amend this Complaint to allege the true names of the doe respondents and describe their activities, responsibilities and/or capacities when the same is ascertained.

116.    As a direct and proximate result, the Company and NCI were damaged in an amount to be proven at trial.

## COUNT VII
### (Derivative and Direct – Indemnities)

117.    NCI incorporates the foregoing paragraphs as if fully set forth herein.

118.    Under the Operating Agreement, the Company and NCI are indemnified and held harmless from any liability or loss incurred by reason of any act performed by a breaching member.

119.    As an entity that can only act through its manager, Company is without fault and is merely vicariously, constructively, derivatively or technically liable for the wrongful acts of Respondent Kao.

120.    Respondent Kao is at fault as a result of engaging in a wrongful course of conduct which resulted in damage to Company and NCI.

121.    NCI and Company are entitled to be indemnified by Respondent Kao for all damages arising out of or in connection with his improper conduct and breaches of fiduciary duties.

122.   NCI is also entitled to be indemnified by the Company for all damages arising out of the acts or omissions of the Company, which includes but is not limited to NCI's attorneys' fees and costs incurred in this action as a result of Company's actions undertaken by and through Respondent Kao.

## COUNT VIII
### (Derivative and Direct – Declaratory Judgment)

123.   NCI realleges and incorporates the foregoing paragraphs as if fully set forth herein.

124.   A dispute exists between NCI and Respondent Kao with regard to NCI's and Company's right to have Respondent Kao disassociated from serving as a member of Company based on the terms of Company's Operating Agreement and Hawaii's limited liability statute.

125.   Respondent Kao was the holder of the Majority-in-Interest membership in Company but, by virtue of his voluntary resignation as manager of the Company, NCI became the sole voting member of the Company as of November 19, 2020.

126.   NCI exercised its vote to confirm the dissociation of Respondent Kao due to his numerous breaches of fiduciary duties described herein that have harmed the Company and continue to harm the Company.

127.   NCI therefore desires and is entitled to a determination by the arbitrator that (a) Respondent Kao's foregoing conduct breached his fiduciary obligations to the Company and/or was in breach of the Operating Agreement, (b) by virtue of Respondent Kao's voluntary resignation as manager of the Company on November 19, 2020, NCI became the sole voting member of NCI as of November 19, 2021, (c) due to Respondent Kao's breaches of his fiduciary duties and of the Operating Agreement, NCI's vote to confirm Respondent Kao's mandatory dissociation was proper, and (d) if the Company so elects, the redemption amount, if any, of Respondent Kao's units in the Company under the terms of the Operating Agreement.

## COUNT IX
## (Direct – Accounting)

128.    NCI realleges and incorporates the foregoing paragraphs as if fully set forth herein.

129.    As a member of Company, NCI has the right to inspect Company's books and records to obtain information concerning Company's operations.

130.    Among other information, the Company is required to maintain separate books of account for the Company reflecting a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received , and all income derived in connection with the conduct of the Company and the operation of its business.

131.    It is not clear that the remedy at law would be as full, adequate, and expeditious as it is in equity.

132.    As a result of Respondent Kao's aforesaid wrongful acts and omissions, NCI has been injured and damaged and demands the equitable remedy of accounting.

WHEREFORE, NCI prays that judgment be entered in its favor against Respondent Kao as follows:

A.    An award of damages in favor of NCI and the Company and against Respondent Kao in amounts to be proven at trial;

B.    That NCI be awarded its attorneys' fees and costs incurred herein;

C.    Declaratory relief as requested herein;

//

D.      An award of such other relief as the arbitrator deems just and proper.

DATED:  Honolulu, Hawaii, May 4, 2021.

DAVID M. LOUIE
JESSE W. SCHIEL
NICHOLAS R. MONLUX
KOBAYASHI SUGITA & GODA, LLP

Attorneys for Claimant
NAVATEK CAPITAL INC., individually and
derivatively on behalf of Nominal Respondent
MARTIN DEFENSE GROUP, LLC, fka
NAVATEK LLC

#1809111

DISPUTE PREVENTION & RESOLUTION, INC.

STATE OF HAWAII

| | |
|---|---|
| NAVATEK CAPITAL INC, individually and derivatively on behalf of Nominal Respondent MARTIN DEFENSE GROUP, LLC, fka MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC , | DPR NO. |
| Claimant, | CERTIFICATE OF SERVICE |
| vs. | |
| MARTIN KAO; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-5; DOE CORPORATIONS 1-10; DOE ENTITIES 1-10; and DOE GOVERNMENTAL UNITS 1-10, | |
| Respondents, | |
| and | |
| MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC | |
| Nominal Respondent. | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the date noted below, a true and correct copy of

the foregoing document was duly served upon the following parties at their last known address via

hand-delivery:

MICHAEL JAY GREEN, ESQ.
GLENN H. UESUGI, ESQ.
841 Bishop Street, Suite 2201
Honolulu, Hawaii 96813
Email: michael@michaeljaygreen.com
Email: glenn.uesugi@gmail.com
    Attorneys for Defendant
    MARTIN KAO

RECEIVED THIS _____ DAY OF
_____ 20___
By _____

1

PETER STARN, ESQ.
DOUGLAS S.G. CHIN, ESQ.
STARN O'TOOLE MARCUS & FISHER
733 Bishop Street, Suite 1900
Honolulu, Hawaii 96813
Email: pstarn@starnlaw.com
Email: dchin@starnlaw.com
    Attorneys for Nominal Defendant
    MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC

RECEIVED THIS 4 DAY OF May 2021
By
Print Name Kim Jadao

RECEIVED
MAY 04 2021

STARN O'TOOLE
MARCUS & FISHER

DATED:  Honolulu, Hawaii, May 4, 2021.

/s/ David M. Louie
DAVID M. LOUIE
JESSE W. SCHIEL
NICHOLAS R. MONLUX

Attorneys for Plaintiff
NAVATEK CAPITAL INC., individually and derivatively on behalf of Nominal Defendant MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC