# EXHIBIT "2"

STARN ● O'TOOLE ● MARCUS & FISHER
A Law Corporation

PETER STARN                                    1246-0
DOUGLAS S. CHIN                                6465-0
ROBERT J. BROWN                              10174-0
ERIC S. ROBINSON                             11306-0
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 1900
Honolulu, Hawai'i 96813
Telephone:  (808) 537-6100
Email:  pstarn@starnlaw.com
          dchin@starnlaw.com
          rbrown@starnlaw.com
          erobinson@starnlaw.com

VERNON Y.T. WOO                                 910-0
City Financial Tower
201 Merchant Street, Suite 2302
Honolulu, Hawai'i 96813
Telephone:  (808) 537-6100
Email:  hawaiilawyerwoo@gmail.com

Attorneys for Nominal Respondent/
Counterclaimant/Crossclaimant
MARTIN DEFENSE GROUP, LLC, fka
NAVATEK LLC

DISPUTE PREVENTION & RESOLUTION, INC.

STATE OF HAWAI'I

| | |
|---|---|
| NAVATEK CAPITAL INC., individually and derivatively on behalf of Nominal Respondent MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC,<br><br>          Claimant,<br>     vs.<br><br>MARTIN KAO; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-5; DOE CORPORATIONS 1-10; DOE ENTITIES 1-10; and DOE GOVERNMENTAL UNITS 1-10,<br><br>          Respondents, | DPR NO. 21-0234-A<br><br>MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC'S **ANSWERING STATEMENT**;<br><br>MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC'S **COUNTERCLAIM** AGAINST NAVATEK CAPITAL INC.;<br><br>MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC'S **CROSSCLAIM** AGAINST MARTIN KAO, JOHN DOES 11-20; JANE DOES 11-20; DOE PARTNERSHIPS 6-10; DOE |

2424082_4

**Exhibit J (N/M)-387**

and

MARTIN DEFENSE GROUP, LLC, fka
NAVATEK LLC,

               Nominal Respondent.

MARTIN DEFENSE GROUP, LLC, fka
NAVATEK LLC,

               Counterclaimant,
    vs.

NAVATEK CAPITAL INC.,

               Counterclaim Respondent.

MARTIN DEFENSE GROUP, LLC, fka
NAVATEK LLC,

               Crossclaimant,
    vs.

MARTIN KAO; JOHN DOES 11-20; JANE
DOES 11-20; DOE PARTNERSHIPS 6-10;
DOE CORPORATIONS 11-20; and DOE
ENTITIES 11-20,

               Crossclaim Respondents.

CORPORATIONS 11-20; and DOE ENTITIES
11-20;

**CERTIFICATE OF SERVICE**

<u>**Arbitration**</u>:
Dates:  July 21-23, 2021;
         July 26-27, 2021

Arbitrator:  Jerry M. Hiatt

2

DISPUTE PREVENTION & RESOLUTION, INC.

STATE OF HAWAIʻI

| | |
|---|---|
| MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC,<br><br>Crossclaimant,<br><br>vs.<br><br>MARTIN KAO; JOHN DOES 11-20; JANE DOES 11-20; DOE PARTNERSHIPS 6-10; DOE CORPORATIONS 11-20; and DOE ENTITIES 11-20,<br><br>Crossclaim Respondents. | DPR NO. 21-0234-A<br><br>CROSSCLAIMANT MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC'S **CROSSCLAIM** AGAINST CROSSCLAIM RESPONDENTS MARTIN KAO, JOHN DOES 11-20; JANE DOES 11-20; DOE PARTNERSHIPS 6-10; DOE CORPORATIONS 11-20; AND DOE ENTITIES 11-20 |

**CROSSCLAIMANT MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC'S CROSSCLAIM AGAINST CROSSCLAIM RESPONDENT MARTIN KAO, JOHN DOES 11-20; JANE DOES 11-20; DOE PARTNERSHIPS 6-10; DOE CORPORATIONS 11-20; AND DOE ENTITIES 11-20**

Crossclaimant MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC (*Company*), through its attorneys, in its crossclaim against Crossclaim Respondents MARTIN KAO (*Kao*), JOHN DOES 11-20; JANE DOES 11-20; DOE PARTNERSHIPS 6-10; DOE CORPORATIONS 11-20; and DOE ENTITIES 11-20 (collectively, *Doe Respondents*), alleges and avers as follows:

1. This crossclaim arises out of the same transactions and occurrences set forth in the Demand for Arbitration filed herein by Claimant NAVATEK CAPITAL, INC. (*NCI*) on May 4, 2021, as modified by Claimant's Errata to Demand for Arbitration served by Claimant on May 5, 2021 (*Demand*).

## **PARTIES**

2. The Company is, and was at all times relevant herein, a Hawaiʻi limited liability company doing business in the State of Hawaiʻi.

2424082_4

3.      Kao is, and was at all times relevant herein, a resident of the State of Hawai'i.

4.      Doe Respondents are persons, partnerships, corporations, associations, trusts, and entities whose names, identities, capacities, activities, and/or responsibilities are presently unknown to the Company and its attorneys, despite diligent and good-faith efforts to ascertain their true names, identities, and capacities, who may be, or are, responsible and/or liable to the Company for the acts set forth herein and the damages sustained by the Company. Accordingly, the Company has used the unidentified Doe Respondents herein with fictitious names pursuant to Rule 17(d) of the Hawai'i Rules of Civil Procedure. The Company will seek leave from the Arbitrator to amend this crossclaim to allege the true names of the Doe Respondents and describe their activities, responsibilities, and/or capacities when the same is ascertained.

## FACTUAL ALLEGATIONS

5.      Upon information and belief, Kao started working for the Company (then known as Navatek, Ltd.) in 2008.

6.      On or about August 31, 2018, Navatek, Ltd. converted to Navatek, LLC as a limited liability company under Hawai'i law, pursuant to articles of conversion filed with the State of Hawai'i Department of Commerce and Consumer Affairs.

7.      Up until March 1, 2019, at all relevant times, NCI owned 100% of the Company (being Navatek, Ltd. until August 31, 2018).

8.      NCI and Kao executed an operating agreement effective March 1, 2019 (***Operating Agreement***) concerning, *inter alia*, the ownership and management of the Company.

9.      Concurrent with the execution of the Operating Agreement, NCI transferred 9,900,000 Membership Units in the Company to Kao and retained 100,000 Membership Units for itself. Under the Operating Agreement, Kao's Membership Units represented a 99.00%

2

ownership interest in the Company and NCI's Membership Units represented a 1.00% ownership interest in the Company.

10. On or about July 27, 2020, the Company's name was changed to Martin Defense Group, LLC.

11. From March 1, 2019 to on or about November 20, 2020 (**Relevant Period**), Kao served as the sole manager of the Company pursuant to the terms of the Operating Agreement.

## Kao's Fiduciary Duties to the Company

12. By reason of Kao's position as a member, manager, and fiduciary of the Company during the Relevant Period, and because of his ability to control the business and affairs of the Company, Kao owed the Company and its members the fiduciary duties of good faith, loyalty, and due care, and was required to use his utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

13. Kao was also required to act in furtherance of the best interests of the Company and its members, and not in furtherance of his or any other individual's or entity's personal interest or benefit.

14. As the manager of the Company, Kao owed to the Company and its members the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs, and, in the use and preservation of its property, the highest obligations of fair dealing.

15. Kao was required to exercise reasonable and prudent supervision over the management, policies, practices, and control of the Company. By virtue of such duties, Kao was required to, *inter alia*:

3

a.    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of the Company's business;

b.    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and that it complied with all applicable federal, state, and foreign laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of his legal authority;

c.    Exercise good faith in preparing and/or supervising the preparation, filing, and/or dissemination of financial statements, audits, reports, employment, accounting, or other information required by law, and in examinations, audits, or other employment or financial information concerning the Company; and

d.    Refrain from unduly benefiting himself and other Company insiders or third parties at the expense of the Company or its members.

### Relevant Provisions of HRS Chapter 428

16.    Pursuant to Section 428-409(h) of the Hawai'i Revised Statutes (HRS), as a member-manager of the Company, Kao owed certain statutory duties to the Company, including:

a.    The duty of loyalty:

i.    To account to the Company and hold as trustee for the Company any property, profit, or benefit derived by Kao in the conduct of the Company's business, or derived from a use by Kao of the Company's property, including the appropriation of a Company opportunity;

ii.    To refrain from dealing with the Company in the conduct of its business as or on behalf of a party having an interest adverse to the Company; and

4

        iii.    To refrain from competing with the Company in the conduct of the Company's business;

        b.    The duty of care to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law; and

        c.    The duty of good faith and fair dealing in the discharge of his duties to the Company and its members.

17.    HRS Section 428-601 provides that:

> A member is dissociated from a limited liability company upon the occurrence of any of the following events:
> . . . .
>
> (2) An event agreed to in the operating agreement as causing the member's dissociation;
>
> . . . .
>
> (5) On application by the company or another member, the member's expulsion by judicial determination because the member:
>
>    (A) Engaged in wrongful conduct that adversely and materially affected the company's business;
>    (B) Wil[l]fully or persistently committed a material breach of the operating agreement or of a duty owed to the company or the other members under section 428-409; or
>    (C) Engaged in conduct relating to the company's business which makes it not reasonably practicable to carry on the business with the member[.]

18.    Under HRS Section 428-404(c)(12), the consent of all members of a limited liability company is required to sell, lease, exchange, or otherwise dispose of all, or substantially all of the company's property.

19.    HRS Section 428-301 provides:

> (b) [I]n a manager-managed limited liability company:
>
> . . . .

(2) Each manager is an agent of the company for the purpose of its business;

(3) An act of a manager, including the signing of an instrument in the company name, for apparently carrying on in the ordinary course the company's business or business of the kind carried on by the company binds the company, unless the manager had no authority to act for the company in the particular matter and the person with whom the manager was dealing knew or had notice that the manager lacked authority; and

(4) An act of a manager which is not apparently for carrying on in the ordinary course the company's business or business of the kind carried on by the company binds the company only if the act was authorized under section 428-404(b)(2).

. . . .

### Relevant Provisions of the Operating Agreement

20.    Section 4.1 of the Operating Agreement provides:

**4.1 Distributions.** Except in the event of dissolution and winding up, the Company shall make distributions of its Distributable Cash, if any, at such times as determined by the Management Committee,[2] in its reasonable discretion, ninety-nine percent (99%) to Martin Kao and one percent (1%) to Navatek Capital Inc.

21.    Section 5.4 of the Operating Agreement, in relevant part, provides:

**5.4. Limitation on Authority of the Management Committee.** Notwithstanding any other provision of this Agreement, the Management Committee shall not take any action in connection with any of the following matters without the unanimous written consent signed by the Members:

. . . .

**(c)**    Any act in contravention of this [Operating] Agreement; [and]

. . . .

**(f)**    Any transaction between the Company and any Member, Manager or affiliate which may not be an arm's length transaction[.]

22.    Section 5.5 of the Operating Agreement provides that "Each Manager shall

perform his duties as a Manager in good faith, in a manner he reasonably believes to be in the

---

[2] Kao was the sole manager comprising the Management Committee.

6

best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances."

23.    Section 8.1 of the Operating Agreement, in relevant part, provides:

**8.1 Covenant Not to Breach.** Each Member hereby covenants and agrees that the Members have entered into this Agreement based on their mutual expectation that all Members will continue as Members and carry out the duties and obligations undertaken by them hereunder and that, except with the consent of the Members, each Member hereby covenants and agrees as follows:

. . . .

**(c)**    Not to Transfer all or any portion of its Units in the Company in violation of this Agreement; [and]

. . . .

**(e)**    Not to commit a breach of any material covenant contained in this [Operating] Agreement or default on any material obligation provided for in this Agreement if such breach or default continues for thirty (30) days after the date such Member has been given notice of such breach or default by the Management Committee or any other Member.

24.    Section 8.2 of the Operating Agreement, in relevant part, provides:

**8.2 Consequences of Violation of Covenants.** If a Member (a "Breaching Member") attempts to take any or has taken any action in breach of Section 8.1 (a "Breach"), the Company shall continue and such Member shall be subject to this Section 8.2. In such event, the following shall occur:

. . . .

**(c)**    The Breaching Member shall be liable for damages, without requirement of a prior accounting, to the Company for all costs and liabilities that the Company or any Member may incur as a result of the Breach[.]

## Kao's Breaches of his Fiduciary Duties and the Operating Agreement

25.    In or around October and November of 2020, Kao paid retainers to several law firms on his behalf from Company funds in connection with criminal and civil cases and investigations (*Retainers*). The Retainers included, without limitation:

a.    A retainer of $350,000.00 paid on or about October 13 and October 27, 2020 to Michael Jay Green & Associates;

b.    A retainer of $450,000.00 paid on or about October 22, 2020 to Troutman Pepper Hamilton Sanders LLP[3]; and

c.    A retainer of $500,000.00 paid in or around November 2020 to Crowell & Moring LLP.

26.    The Retainers constitute transactions between the Company and Kao that were not at arm's length. Accordingly, as manager, Kao lacked the authority to approve the Retainers without the unanimous written consent of all members.

27.    NCI did not provide its written consent for Kao to pay the Retainers using the Company's funds.

28.    On several occasions, Kao made, or caused to be made, distributions to himself, without making, or causing to be made, a distribution to NCI (***Unmatched Distributions***), in contravention of the Operating Agreement. The Unmatched Distributions include, without limitation:

a.    At least $325,000.00 distributed to Kao in or around December 2019;

b.    At least $120,000.00 distributed to Kao in or around February 2020; and

c.    Other Unmatched Distributions to be proven at arbitration.

29.    The Company is a federal contractor subject to federal campaign finance laws and regulations. Under 52 U.S.C. §§ 30119 and 30122, the Company is prohibited from making contributions to federal campaigns and from making contributions in the name of another person.

---

[3] The Company recovered the unused portion of the retainer, totaling $325,161.98 on or about December 20, 2020.  The remaining balance has not yet been recovered.

30.    Kao made and caused to be made multiple contributions to federal campaigns using the Company's funds (***Political Contributions***). These Political Contributions include, without limitation:

a.    Contributions in the name of Kao for $34,500.00 in 2019 and $42,650.00 in 2020, totaling $77,150;

b.    Contributions in the name of Kao's spouse, Tiffany Lam, for $26,200.00 in 2019 and $36,600.00 in 2020, totaling $62,800;

c.    Contributions in the name of former Company Chief Financial Officer, Clifford Chen (***Chen***), for $5,600.00 in 2019 and $11,600.00 in 2020, totaling $17,200; and

d.    Contributions in the name of former Company Controller, Lawrence Kahele Lum Kee (***Lum Kee***), for $12,600 in 2019 and $14,400.00 in 2020, totaling $27,000.

31.    On or about April 20, 2020, Kao caused the Company to lend him $2,000,000 as a note receivable (***$2M Note Receivable***). In an email, Kao instructed Lum Kee:

> Those idiots are stupid beyond belief. I decided to move forward on buying a place. BofA now needs to see a balance in my personal account for at least the entire purchase price in order to give me the funds letter to make the offer (just the Martin Kao account). Why the entire amount and not net of the loan is beyond me. I told that fool it's just semantics and he could move from any of my other accounts, even the Navatek account…issue the letter and then move the funds back. I'm still waiting for him to get back to me on that. But just in case, can you deposit $2M from CPB into my personal Merrill account tomorrow. Once BofA issues the letter I'll move it to the Navatek account. Maybe just book to some kind of suspense account for a few days. Once all BofA funds the NY home, we fk'n bail from Merrill and BofA. That's it. . . .

9

32.     The $2M Note Receivable constituted a transaction between the Company and Kao that was not at arm's length. Accordingly, as manager, Kao lacked the authority to approve the Retainers without the unanimous written consent of all members.

33.     NCI did not provide its written consent to Kao receiving the $2M Note Receivable.

34.     On or about December 31, 2019, Kao made, or caused to be made, distributions to himself in the amounts of $150,000.00 and $175,000.00 in order to write off two loans made to Kao by the Company that were previously characterized as notes receivable (*2019 Notes Receivable*).

35.     NCI did not provide its written consent to Kao receiving the 2019 Notes Receivable.

36.     In addition to the 2019 Notes Receivable being made without NCI's consent, Kao failed to make and failed to cause to be made a 1% matching distribution to NCI.

37.     Kao also used Company funds to pay for his family to travel to California and Japan on multiple occasions and to fund the fees and expenses of his own charitable foundations.

38.     On March 12, 2021, the Company issued to Kao, through his counsel, a letter demanding repayment (*Repayment Demand*)[4] of the $2M Note Receivable, the Retainers, and the Campaign Contributions (collectively, *Amounts Owed*). The Repayment Demand required repayment of the Amounts Owed, totaling $3,158,988.02, by March 22, 2021.

39.     Kao did not repay the Amounts Owed by the March 22, 2021 deadline.

40.     To date, the Amounts Owed continue to be outstanding.

---

[4] The Repayment Demand was issued to Kao through his counsel due to ongoing litigation and the then existing restrictions on direct communications between the Company and Kao.

**Kao's Misconduct Regarding the Paycheck Protection Program**

41.    On or about April 8, 2020, a Company employee asked Kao in an email whether the Company had applied for a loan under the Paycheck Protection Program (***PPP Loan***). Despite having already submitted a PPP Loan application to Central Pacific Bank, Kao replied, "Sounds sketchy. Best to stick to our standard practices of raping and pillaging. . . . Our payroll is already funded by the Fed Gov. This would be double dipping."

42.    Then, in a side bar email with Chen and Lum Kee, Kao remarked, "Can't have our people thinking there's 'free' money out there. Fk they are stupid. Believe anything you tell them."

43.    Following the initial application for a PPP Loan with CPB, and in spite of his statement to a Company employee on April 8, 2020 indicating otherwise, Kao knowingly, intentionally, and willfully applied for multiple additional PPP Loans.

44.    Kao knowingly, intentionally, and willfully applied for multiple PPP Loans in order to, in Kao's own words, "milk PPP for all it's worth."

45.    After obtaining the proceeds of PPP Loans, Kao, Chen, and Lum Kee knowingly, intentionally, and willfully proceeded to "wash" the PPP Loan proceeds from one bank to another in order to disguise the transactions as payroll costs and create a "paper trail" for forgiveness of the PPP Loans.

46.    In an April 24, 2020 email to Chen and Lum Kee, Kao stated:

> Speaking of moving funds around, maybe we should start moving slowly more funds out of CPB over the next few months…wash it from them, before moving it all back to CPB.  That way it looks like "new" funds.  Is it difficult to change the account that the Government pmt systems sends money too?  Can have them send to Navatek Merrill account until we exhaust the CPB loan funds currently in there? That way it even looks like we're using it for payroll.
>
> . . . .

11

> And looks like we are indeed getting stiffed by COVID-19 with CPB.  No cash pmts coming in for Gov when the [sic] look.
>
> I'm starting to fall in love with COVID-19. Will for sure be the case if we get Radius and FHB.  So much so, I wish I could take credit for starting it.

47.    Kao, Chen, and Lum Kee purposefully and systematically limited Company access to and control of financial records, financial systems, and finances to only themselves in order to cover their tracks.

48.    Kao knowingly, intentionally, and willfully lied to Company employees and the Company's banks in connection with PPP Loans to ensure that he had, in Kao's own words, a "plausible story" or had "construct[ed] a plausible defensible narrative" for his actions.

49.    When confronted with discrepancies or irregularities with his myriad PPP Loan applications, Kao invariably played dumb with banks before checking with Chen and Lum Kee to see if his performances were, in Kao's own words, "believable" or "Oscar worthy."

### Kao's Attempted Assignment of All, or Substantially All, of the Company's Property

50.    On or about September 29, 2020—the evening before Kao's arrest—Kao executed an operating agreement for MDG NEWCO, LLC (**NEWCO**) (**NEWCO Operating Agreement**), on behalf of NEWCO's purported members—Kao, individually, and the Company.

51.    On or about September 29, 2020, Kao executed an Incentive Unit Award Agreement (**Incentive Agreement**) which granted Kao sole control of NEWCO and sole interest in NEWCO's profits.

52.    On or about September 29, 2020, Kao executed an Assignment and Assumption Agreement (**Assignment**) between the Company and NEWCO. The Assignment purported to "assign, sell, transfer, and set over to [NEWCO] all of [the Company]'s right, title, benefit, privileges and interest in and to" the Company's wholly-owned subsidiaries in exchange for a passive, non-voting interest in NEWCO.

53.     On or about September 29, 2020, Kao executed an Agreement Re Inter-Company Obligations (***Intercompany Agreement***). The Intercompany Agreement purports to bind the Company to consummate the Assignment in the event of Kao's death or disability. In the event the Company does not consummate the Assignment, the Intercompany Agreement further purports to bind the Company to pay to NEWCO, as liquidated damages, (1) the "gross contract revenues remaining to be collected or earned" on all of the Company's contracts, and (2) the "gross amount of balance sheet assets" remaining on the Company's books.

54.     The NEWCO Operating Agreement, Incentive Agreement, Assignment, and Intercompany Agreement (collectively, the ***NEWCO Agreements***) each purport to be effective as of September 23, 2020.

55.     Upon information and belief, NCI did not consent to the Company's execution of the NEWCO Agreements.

### Kao's Suspension and Debarment from Federal Contracting and Suspension of Kao's Security Clearance

56.     The Company's primary source of revenue comes from federal contracts with the United States Navy (***Navy***) and the Defense Advanced Research Projects Agency (***DARPA***).

57.     Following a criminal complaint being filed against Kao in September 2020 for his involvement with the PPP Loans, the Navy's Suspension and Debarment Officer (***SDO***) suspended Kao, in his individual capacity, from all federal contracts.

58.     As a federal contractor, the Company is subject to various requirements under the Federal Acquisition Regulations (***FAR***), including 48 C.F.R. §§ 9.406-1(b) and 9.403, which permit the SDO to extend its suspension and debarment decisions to include affiliates of Kao, such as the Company.

59.    The Company's current contracts with the Navy and DARPA, and the Company's ability to compete for future federal contracts are essential to maintaining the Company's viability.

60.    Under its federal contracts, the Company is also required to maintain a facility security clearance (**FCL**) with the Defense Counterintelligence and Security Agency (**DCSA**).

61.    The Company's FCL is tied to the personnel security clearance (**PCL**) of its senior management official.

62.    Kao was previously designated as the Company's senior management official, and his PCL suspended by DCSA on or about December 9, 2020.

63.    Due to Kao's PCL being suspended, DCSA temporarily invalidated the Company's FCL on or about January 21, 2021.

64.    The Company became ineligible to compete for classified federal contracts, pending the revalidation of the Company's FCL.

65.    As a result of Kao's actions, the Company has incurred and continues to incur damages, including without limitation:

     a.    Fees and expenses for an interim Chief Financial Officer;

     b.    Legal fees and expenses;

     c.    Fees and expenses for crisis communication services; and

     d.    Other damages to the Company to be proven at arbitration.

## COUNT I
### (Breach of Fiduciary Duty)

66.    The Company repeats, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

14

67.    As a member-manager, Kao owed the Company and its members fiduciary duties at the time of the foregoing actions, including, without limitation, the duties of care, loyalty, good faith, and fair dealing.

68.    The foregoing actions of Kao were willful, wanton, reckless, and/or intentional breaches of his fiduciary duties.

69.    As a direct and proximate result of Kao's actions, the Company has been damaged in an amount to be proved at arbitration.

## COUNT II
### (Gross Negligence)

70.    The Company repeats, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

71.    Kao owed fiduciary duties to the Company and its members.

72.    Kao knew, or should have known, that the Company and its members would be injured by or incur damages as a result of his conduct.

73.    Kao willfully, wantonly, recklessly, and/or intentionally breached the fiduciary duties he owed the Company and its members, indifferent to the injuries he would cause them.

74.    As a direct and proximate result of Kao's actions, the Company has been damaged in an amount to be proved at arbitration.

## COUNT III
### (Declaratory Relief – Dissociation)

75.    The Company repeats, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

15

76.     A dispute exists between the Company, NCI, and Kao with regard to the Company's and NCI's rights to have Kao dissociated from serving as a member of the Company pursuant to the terms of the Operating Agreement and HRS chapter 428.

77.     Kao's foregoing wrongful acts constitute breaches of the Operating Agreement causing immediate dissociation.

78.     Kao willfully and persistently committed material breaches of the Operating Agreement and the fiduciary duties he owed the Company and its members.

79.     Kao's foregoing wrongful acts, suspension from federal contracting, and suspension of his PCL adversely and materially affected the Company's business.

80.     Kao's foregoing wrongful acts, suspension from federal contracting, and suspension of his PCL make it not reasonably practicable to carry on business with Kao as a member of the Company.

81.     The Company therefore desires and is entitled to a determination by the Arbitrator that Kao's foregoing conduct:

     a.     Was in material breach of the Operating Agreement;

     b.     Breached the fiduciary duties Kao owed the Company and its members;

     c.     Adversely and materially affected the Company's business;

     d.     Made it not reasonably practicable to carry on business with Kao as a member of the Company.

## COUNT IV
### (Declaratory Relief – NEWCO Agreements)

82.     The Company repeats, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

83.     Kao attempted to dispose of all, or substantially all, of the Company's property by executing the NEWCO Agreements.

84.     Kao required the consent of NCI to dispose of all, or substantially all, of the Company's property.

85.     Without NCI's consent to dispose of all, or substantially all, of the Company's property, Kao lacked the authority to bind the Company in the NEWCO Agreements.

86.     The NEWCO Agreements did not bind the Company because Kao lacked the authority to dispose of all, or substantially all, of the Company's property and the NEWCO Agreements were outside the ordinary course of the Company's business.

87.     In the alternative, if the Arbitrator finds that the NEWCO Agreements were in the ordinary course of the Company's business, the NEWCO Agreements did not bind the Company because Kao lacked the authority to dispose of all, or substantially all, of the Company's property and NEWCO knew or had notice that Kao lacked authority.

88.     The Company therefore desires and is entitled to a determination by the Arbitrator that the NEWCO Agreements are void and do not bind the Company.

## COUNT V
### (Indemnification)

89.     The Company repeats, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

90.     If NCI has suffered any loss or injury, as alleged in the Demand, such loss or injury was caused by the actions, omissions, misrepresentations, and/or other fault of Kao, and the Company is in no way at fault, or at minimum, its fault was lesser than that of Kao.

91.     Any tortious act alleged to have been committed by the Company, which the Company denies, was due to the actions, omissions, and/or misrepresentations of Kao.

17

92.     Kao owes a contractual obligation to indemnify the Company against liabilities caused by his breach of the Operating Agreement.

93.     To the extent that the Company is found to be liable to NCI for any damages whatsoever, Kao would be inequitably and unjustly enriched if he were not required to indemnify the Company against the claims asserted by NCI.

94.     The Company is entitled to an award for indemnity from Kao for all damages, costs, fess, expenses, settlements, judgments, and awards paid by and/or incurred by the Company in connection with this arbitration.

## COUNT VI
### (Contribution)

95.     The Company repeats, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

96.     To the extent that the Company committed any tortious act, as alleged in the Demand, which the Company denies, it was due in whole or in part to the contribution, encouragement, and participation by Kao.

97.     To the extent that the Company is found liable to NCI for any damages whatsoever, Kao should also be found liable to the extent of Kao's relative fault.

98.     The Company is entitled to a determination of its relative fault, if any, a determination of its *pro rata* share of responsibility for any damages to be awarded to NCI should it recover upon its claims in this arbitration, and to have an award made against Kao for any amounts over and above the Company's *pro rata* share.

//

//

//

18

## COUNT VII
### (*Uyemura v. Wick* Claim)

99.    The Company repeats, realleges, and incorporates by reference all foregoing paragraphs as if fully set forth herein.

100.    The wrongful acts, omissions, and/or breaches of Kao and the Doe Respondents have caused the Company to be drawn into this dispute with NCI.

101.    The Company has incurred, and will continue to incur, significant attorneys' fees and other expenses to protect its interests in the dispute.

102.    The Company's attorneys' fees and other expenses were, and continue to be, incurred as the natural and necessary consequence of Kao's wrongful acts.

103.    The Company's attorneys' fees and other expenses constitute damages recoverable from Kao under *Uyemura v. Wick*, 57 Haw. 102, 551 P.2d 171 (1976) and its progeny, in an amount to be proven at arbitration.

WHEREFORE, the Company prays that an award be entered in its favor and against Kao and Doe Respondents, as follows:

A.    That the Company be awarded compensatory, special, and punitive damages in an amount to be proven at the Arbitration hearing;

B.    For declaratory relief as requested herein;

C.    For all attorneys' fees and costs;

D.    For pre-award and post-award interest; and

E.    For all other relief as the Arbitrator may deem just and proper.

//

//

//

19

DATED:  Honolulu, Hawai'i, May 19, 2021.


_____

PETER STARN
DOUGLAS S. CHIN
ROBERT J. BROWN
ERIC S. ROBINSON
VERNON Y.T. WOO

Attorneys for Crossclaimant
MARTIN DEFENSE GROUP, LLC, fka
NAVATEK LLC

20

DISPUTE PREVENTION & RESOLUTION, INC.

STATE OF HAWAI'I

| | |
|---|---|
| NAVATEK CAPITAL INC., individually and derivatively on behalf of Nominal Respondent MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC,<br><br>        Claimant,<br>    vs.<br><br>MARTIN KAO; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-5; DOE CORPORATIONS 1-10; DOE ENTITIES 1-10; and DOE GOVERNMENTAL UNITS 1-10,<br><br>        Respondents,<br>    and<br><br>MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC,<br><br>        Nominal Respondent. | DPR NO. 21-0234-A<br><br>**CERTIFICATE OF SERVICE** |
| MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC,<br><br>        Counterclaimant,<br>    vs.<br><br>NAVATEK CAPITAL INC.,<br><br>        Counterclaim Respondent. | |
| MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC,<br><br>        Crossclaimant,<br>    vs.<br><br>MARTIN KAO; JOHN DOES 11-20; JANE DOES 11-20; DOE PARTNERSHIPS 6-10; DOE CORPORATIONS 11-20; and DOE ENTITIES 11-20,<br><br>        Crossclaim Respondents. | |

2424082_4

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the date noted below, a true and correct copy of the foregoing document was duly served upon the following parties noticed herein via electronic mail at their last known e-mail address:

DAVID M. LOUIE, ESQ.              (dml@ksglaw.com)
JESSE W. SCHIEL, ESQ.             (jws@ksglaw.com)
NICHOLAS R. MONLUX, ESQ.          (nrm@ksglaw.com)
Kobayashi Sugita & Goda, LLP
999 Bishop Street, Suite 2600
Honolulu, Hawai'i 96813

Attorneys for Claimant/Counterclaim Respondent
NAVATEK CAPITAL INC., individually and
derivatively on behalf of Nominal Respondent
MARTIN DEFENSE GROUP, LLC, fka
NAVATEK LLC

MICHAEL JAY GREEN, ESQ.           (michael@michaeljaygreen.com)
GLENN H. UESUGI, ESQ.             (glenn.uesugi@gmail.com)
841 Bishop Street, Suite 2201
Honolulu, Hawai'i 96813

        – and –

PHILIP T. INGLIMA, ESQ.           (pinglima@crowell.com)
NATHANIEL J. WOOD, ESA.           (nwood@crowell.com)
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004

Attorneys for Respondent/Crossclaim Respondent
MARTIN KAO

DATED:  Honolulu, Hawai'i, May 19, 2021.

_____
PETER STARN
DOUGLAS S. CHIN
ROBERT J. BROWN
ERIC S. ROBINSON
VERNON Y.T. WOO

Attorneys for Nominal Respondent/
Counterclaimant/Crossclaimant
MARTIN DEFENSE GROUP, LLC, fka
NAVATEK LLC

2