# EXHIBIT "3"

DISPUTE PREVENTION & RESOLUTION, INC.

STATE OF HAWAI'I

| | |
|---|---|
| NAVATEK CAPITAL INC., individually and derivatively on behalf of Nominal Respondent MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC,<br><br>           Claimant,<br>   vs.<br><br>MARTIN KAO; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-5; DOE CORPORATIONS 1-10; DOE ENTITIES 1-10; and DOE GOVERNMENTAL UNITS 1-10,<br><br>           Respondents,<br>   and<br><br>MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC,<br><br>           Nominal Respondent. | DPR NO. 21-0234-A<br><br>**FINAL AWARD**<br><br>**Arbitration Dates:**<br>September 27-October 1, 5, 7, 2021<br><br>**Arbitrator:** Jerry M. Hiatt |

## **FINAL AWARD**

CONFIDENTIAL INFORMATION                    PMT092111

JSH-008882

## TABLE OF CONTENTS

| Heading | Page |
|---|---|
| I. INTRODUCTION | 1 |
| II. THE PARTIES' CLAIMS AND THEIR COUNSEL | 1 |
| III. PROCEDURAL BACKGROUND, STIPULATIONS AND AGREEMENTS | 3 |
|     A. Order #1 | 3 |
|     B. Order #2 | 4 |
|     C. Order #3 | 4 |
|     D. Order #4 | |
|     E. Order #5 | 10 |
|     F. Order #6 | 11 |
|     G. Order #7 | 11 |
|     H. Order #8 | 11 |
|     I. Order dated July 26, 2021 (Unnumbered) | 11 |
|     J. Order #9 | 11 |
|     K. Order #10 | 11 |
|     L. Order #11 | 14 |
|     M. Order #12 | 14 |
|     N. Order #13 | 17 |
|     O. Order #14 | 17 |
|     P. Order #15 | 17 |
|     Q. Further Agreements and Orders | 18 |
| IV. CREDIBILITY | 19 |
| V. BURDEN OF PROOF | 19 |
| VI. AWARD FINDING #1 REGARDING JURISDICTION AND RELATED MATTERS | 19 |
| VII. THE DISPUTES | 20 |
| VIII. PRELIMINARY FACTUAL BACKGROUND | 21 |
|     A. The History of the Company and the Relationship Between Mr. Kao and Mr. Loui | 21 |
|     B. The Execution and Terms of the OA | 22 |

i

CONFIDENTIAL INFORMATION          PMT092112

JSH-008883

| Heading | Page |
|---|---|
| IX. SUMMARY OF THE EVIDENCE AND RELATED AWARD FINDINGS AS TO LIABILITY AND RELEVANT DEFENSES | 24 |
| A. AWARD FINDING #2 REGARDING DERIVATIVE CLAIMS | 24 |
| B. AWARD FINDING #3 REGARDING THE CENTRAL PACIFIC BANK ("CPB") PPP LOAN | 25 |
| C. AWARD FINDING #4 REGARDING THE RADIUS PPP LOAN | 30 |
| D. AWARD FINDING #5 REGARDING THE FIRST HAWAIIAN BANK ("FHB") PPP LOAN | 32 |
| E. AWARD FINDING #6 REGARDING MONEY LAUNDERING PPP FUNDS | 34 |
| F. AWARD FINDING #7 REGARDING MR. KAO'S TACTICS | 37 |
| G. AWARD FINDING #8 REGARDING FEDERAL CAMPAIGN CONTRIBUTIONS | 38 |
| 1. Contributions By Way Of MDG's American Express Cards | 39 |
| 2. Contributions Through the Society of Young Women Scientists and Engineers to the 1820 PAC | 40 |
| 3. Contributions Through MDG's Employees and their Family Members | 41 |
| H. AWARD FINDING #9 REGARDING ALLEGATIONS OF BREACH OF FIDUCIARY DUTY BY SELF DEALING | 42 |
| 1. Applicable Law | 42 |
| 2. Improper Use of Company Funds for Personal Expenses | 44 |
| 3. Improper Use of Company Funds for Kao-Related Entities | 44 |
| 4. Improper Distributions | 45 |
| 5. Improper Loans | 46 |
| 6. Improper $2,000,000 Note Receivable | 47 |
| 7. Improper Efforts By Mr. Kao to Create the MDG NEWCO Agreements | 48 |
| 8. Use of Company Funds for Personal Legal Fees | 49 |
| 9. Additional Bank and/or Wire Fraud | 50 |
| X. DISCUSSION OF DAMAGES | 51 |
| A. AWARD FINDING #10 REGARDING WHETHER DAMAGES CAN BE SETOFF AGAINST MR. KAO'S CAPITAL ACCOUNT | 51 |
| 1. Positions of the Parties | 51 |

CONFIDENTIAL INFORMATION                    PMT092113

JSH-008884

| Heading | Page |
|---|---|
|     2.   Subsequent Filings | 54 |
|     3.   Applicable Law Regarding the Arbitrator's Discretion as to Setoff | 56 |
|     4.   Setoff Is Appropriate Here | 59 |
| B.   AWARD FINDING #11 REGARDING WHETHER THE 2019 OR 2020 K-1 APPLIES TO ANY SETOFF | 63 |
|     1.   The Parties' Positions | 63 |
|       a.   NCI And MDG's Position | 63 |
|       b.   Mr. Kao's Position | 65 |
|     2.   Findings that the 2020 K-1 Applies to Setoff | 70 |
| C.   AWARD FINDING #12 REGARDING WHAT SPECIAL DAMAGES ARE DUE FROM MR. KAO TO MDG AND NCI IN TOTAL AND WHAT IS THE NET AMOUNT STILL DUE AFTER THE TOTAL DAMAGES ARE SETOFF AGAINST HIS 2020 CAPITAL ACCOUNT | 73 |
|     1.   Gross Special Damages Claimed | 73 |
|     2.   Gross Special Damages Awarded Against Mr. Kao | 74 |
|     3.   Special Damages Already Deducted From Mr. Kao's Capital Account | 75 |
|     4.   The Present Value Of the Payoff of Mr. Kao's Capital Account | 78 |
| D.   AWARD FINDING #13 REGARDING CLAIMS FOR ACCOUNTING | 80 |
| E.   AWARD FINDING #14 REGARDING CLAIMS FOR PUNITIVE DAMAGES | 80 |
| F.   AWARD FINDING #15 ON TIMING AND RELATED MATTERS AS TO DISSOCIATION AND DAMAGES | 83 |
| G.   AWARD FINDING #16 ON ATTORNEYS' FEES AND COSTS AS TO EACH PARTY | 84 |
| H.   AWARD FINDING #17 REGARDING PRE-JUDGMENT INTEREST | 99 |
| I.   AWARD FINDING #18 REGARDING DPR AUTHORITY | 99 |
| XI.   CONCLUSION | 99 |

CONFIDENTIAL INFORMATION      PMT092114

JSH-008885

## FINAL AWARD

### I.    INTRODUCTION

By agreement of Claimant NAVATECK CAPITAL INC. ("NCI"), Respondent MARTIN KAO ("Mr. Kao") and Nominal Respondent MARTIN DEFENSE GROUP, LLC ("MDG" or the "Company")[1], Jerry M. Hiatt (the "Arbitrator") was duly appointed to serve as the Arbitrator for this matter. Also by agreement of the Parties, this arbitration was administered by Dispute Prevention and Resolution Inc. ("DPR") pursuant to DPR's rules.

The arbitration hearings were held in this matter on an expedited schedule pursuant to the requirements of Section 12.22 of the applicable operating agreement ("OA"). *See* NCI-202. The required time frame to complete the arbitration was amended by agreement of the Parties at various times during the proceedings. The arbitration hearings were held over seven days via Zoom video conferences from September 27 through October 1, 2021,and on October 5, 2021 and October 7, 2021 (all hearing days collectively referred to herein as the "Hearing").

During the Hearing, the Parties were afforded a full and fair opportunity for examination and cross-examination of all witnesses, introduction of relevant exhibits and submission of arguments and legal authorities in support of their respective claims, counterclaims, cross claims, defenses and all related positions.

The Parties collectively called fifteen witnesses to testify. All witnesses sought to be called at the Hearing by each Party were allowed to be called.

NCI offered Exhibits NCI-1 – NCI-598. Mr. Kao offered Exhibits KAO-1 - KAO-123. MDG offered Exhibits MDG-1 – MDG-241.[2] All of these exhibits which were offered in evidence by each Party were stipulated to be authentic and were further stipulated to be received in evidence subject to being given the weight the Arbitrator deemed appropriate. *See* Volume 7 of the transcript at page 1359, line 19 to page 1360, line 17.[3]

### II.    THE PARTIES' CLAIMS AND THEIR COUNSEL

The disputes heard involved claims by NCI against Mr. Kao and MDG. NCI brought its claims individually and derivatively on behalf of MDG. MDG also brought its own claims against

---

[1] NCI, MDG and Mr. Kao referred to herein singularly as a "Party" or collectively as the "Parties".
[2] All references to exhibits herein shall cite to the Party's name, the number of the exhibit and the page number(s) of the exhibit, as applicable., i.e. NCI-1, pp.___.
[3] All references to the Hearing transcripts herein shall cite to the volume, page "p." and line(s).

1

CONFIDENTIAL INFORMATION                    PMT092115

JSH-008886

Mr. Kao. Mr. Kao also asserted counterclaims against NCI and MDG. There were also various cross claims between and among the Parties. The claims, counterclaims, cross claims and all defenses thereto (together hereafter the "Disputes") are fully set forth in the Parties' pleadings which were filed herein, but, in general, the Disputes related to allegations by MDG and NCI that Mr. Kao had improperly obtained, and attempted to obtain, various Paycheck Protection Plan ("PPP") loans under the Cares Act ("PPP Loans") and that Mr. Kao had engaged in other misconduct that damaged MDG and NCI. Mr. Kao's counterclaims and cross claims related to various matters, including MDG's failure to indemnify Mr. Kao from the above claims and MDG's alleged failure to properly account for Mr. Kao's interest in MDG and to return an alleged $300,000 overpayment which Mr. Kao made to MDG.

In these arbitration proceedings, the Parties were professionally and competently represented by their respective counsel. David Louie ("Mr. Louie") and Jesse W. Schiel ("Mr. Schiel") and the firm of Kobayashi Sugita and Goda ("KSG Firm") represented NCI during the hearing. Messrs. Louie and Schiel conducted the examinations during the Hearing. MDG was represented by Peter Starn ("Mr. Starn"), Douglas S. Chin ("Mr. Chin"), Robert J. Brown ("Mr. Brown") and Eric S. Robinson ("Mr. Robinson") and the firm of Starn O'Toole, Marcus & Fisher ("SOM&F Firm"), as well as Vernon Woo (Mr. Woo"). Messrs. Chin, Brown and Robinson conducted the examinations during the Hearing. Mr. Kao was represented initially by Michael Green ("Mr. Green") and Glenn Uesugi ("Mr. Uesugi") of the firm of Michael J. Green & Associates, Inc. LLP ("Green Firm"), together with Philip Inglima ("Mr. Inglima") and Nathaniel Wood ("Mr. Wood") of the firm of Crowel & Moring LLP ("C&M Firm"). By the (unnumbered) stipulation and order dated July 6, 2021, these firms withdrew in favor of Keith Kiuchi ("Mr. Kiuchi") and Michael Okazaki ("Mr. Okazaki"), Chuck Choi ("Mr. Choi") and Allison Ito ("Ms. Ito") of the firm of Choi & Ito ("Choi Ito Firm"). Mr. Kiuchi conducted the examinations during the Hearing.

Except for brief periods, Mr. Kao was personally present during the Hearing. The current CEO of MDG, Daniel Brunk, ("Mr. Brunk") was also personally present. The principal of NCI, Steven Loui ("Mr. Loui") was also personally present. Both Mr. Brunk and Mr. Loui were called to testify in the proceedings. Mr. Kao asserted his state and federal constitutional rights not to testify throughout the discovery and the proceedings, and he re-confirmed his decision in that regard at the beginning of the last day of the Hearing on October 7, 2021. *V.7, 1359:19-1360:17.*

2

CONFIDENTIAL INFORMATION                    PMT092116

JSH-008887

Mr. Kao was not called as a witness by any Party to the Arbitration.

## III.    PROCEDURAL BACKGROUND, STIPULATIONS AND AGREEMENTS

Over the course of the proceedings, the Parties entered into various written stipulations and orders related to the conduct of the proceedings.  Other agreements and stipulations were placed on the record during the proceedings.  Each such stipulation and agreement was relied upon by the Arbitrator in the conduct of these proceedings and is incorporated by reference as a part of this arbitration award ("Award").  In addition, various orders were also issued as to which the Parties did not stipulate.  There were fifteen numbered written orders and one un-numbered written order (noted above, regarding the withdrawal and substitution of counsel for Mr. Kao) entered in this matter prior to the Hearing, which are summarized below for ease of reference.

### A.    Order #1

Order #1, dated May 24, 2021 ("Order #1), set the original hearing dates and all pre-hearing disclosures, briefing and discovery deadlines.  Many of these dates were later modified by agreement of the Parties.  Order #1 also noted, at Section X. A. that:

> A.    Arbitrator's Disclosures. The Parties and their respective counsel have reviewed the Arbitrator's disclosures made to date and are unaware of any matter that should be disclosed which has not been disclosed and all parties waive any objections to the service of the Arbitrator in this case based on the disclosures made to date.

*See* Order #1 at Section X A.

This agreement regarding disclosures and the service of the Arbitrator was updated and reiterated on the record at the conclusion of the evidentiary portion of the hearings.  *V.7, 1409:1-12.*  In addition, at that time Mr. Kao, Mr. Loui and Mr. Brunk each agreed that Mr. Kao, NCI and MDG had each been fully and fairly represented throughout the Hearing by their respective counsel and that each of them had had an opportunity to present all witnesses and all evidence which they respectively desired to present.  *V.7, 1406:4-1407:23.*

Order #1 also provided at Section X. B. that:

> B.    Applicable Rules. The Arbitration shall proceed pursuant to Hawaii's Uniform Arbitration Act, Chapter 658A of the Hawaii Revised Statutes (the "**Arbitration Act**"); provided, however, that when Arbitration Act is silent, the published DPR Arbitration Rules shall apply.

*See* Order #1 at Section X.B.

3

CONFIDENTIAL INFORMATION                    PMT092117

JSH-008888

**B.    Order #2**

Order #2, dated May 24, 2021 ("Order #2"), provided for the *pro hac vice* admission of Mr. Inglima.

**C.    Order #3**

Order #3, dated May 24, 2021 ("Order #3"), provided for the *pro hac vice* admission of Mr. Wood.

**D.    Order #4**

Order #4, dated June 6, 2021 ("Order #4") denied Mr. Kao's "Motion to Stay Arbitration Pending Resolution of Criminal Proceedings, filed on May 24, 2021" ("Motion to Stay") by which Mr. Kao moved to stay the arbitration proceedings because of the parallel criminal proceedings which are pending against him. During the proceedings, Mr. Kao's counsel argued at various times that conducting the proceedings while the criminal matters were pending risked violating Mr. Kao's state and federal constitutional privileges against self-incrimination and was otherwise inherently prejudicial. These issues were addressed extensively in the briefing on the Motion to Stay and again at the hearing of the Motion to Stay, which was held on May 27, 2021. Counsel for all of the Parties agreed at that hearing that the tests articulated in the *Keating* case (cited below), applied to this question. As this issue is an important one which relates to the merits, and as it was heavily briefed and argued, the most relevant portions of Order #4 are set out below, as follows:

> 2.    In determining whether a stay is warranted due to parallel criminal proceedings, the Ninth Circuit Court of Appeals opinion in *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 324 (9th Cir. 1995) ("*Keating*") articulated a five-factor balancing test ("*Keating* Factors") based on the following considerations:
>
> a.    the interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay;
> b.    the burden which any particular aspect of the proceedings may impose on defendants;
> c.    the convenience of the court (or in this context, the arbitrator) in the management of its cases, and the efficient use of judicial (here arbitral) resources;
> d .    the interests of persons not parties to the civil litigation; and
> e.    the interest of the public in the pending civil and criminal litigation.

4

CONFIDENTIAL INFORMATION                    PMT092118

JSH-008889

3.      *Keating* and other cases addressing the same, or similar, topics indicate that the final decision about a stay in circumstances such as these, where there is a civil case and a pending criminal matter, is within the discretion of the court or arbitrator. Kao cited to various Hawaiʻi cases for the proposition that, "This court has chosen to interpret the self-incrimination provisions of the Hawaiʻi Constitution in a manner independent of and broader than found in the federal court's Fifth Amendment jurisprudence." Citing to *State v. Strong*, 2010 Haw. LEXIS 124, \*57; *State v. Valera*, 74 Haw. 424, 434, 848 P.2d 376, 380 (1993) and *State v. Santiago*, 53 Haw. 254, 492 P.2d 657 (1971) (See Motion at p. 12). The Arbitrator has reviewed these and the other cases cited by the Parties. Here, the Parties' respective counsel all agreed during the hearing, that the *Keating* analysis remained applicable and that, based on the *Keating* analysis, "the final decision about a stay... was within the discretion of the Court or Arbitrator". (See Hearing Transcript ("Tr.") p. 55:20 56:13.

*See* Order #4 at pp. 2-3.

The Arbitrator then weighed all five of the *Keating* factors and ultimately denied the Motion to Stay. In denying the Motion to Stay, the Arbitrator noted that the procedural history of this matter and the conduct of the Parties required that it proceed within the rather expedited time frame imposed by the Parties' contract for arbitration. The reasoning in that portion of Order #4 is set out below, as follows:

4.      Upon consideration and analysis of the *Keating* Factors, on balance, the Arbitrator has determined, in his discretion, that the *Keating* Factors weigh against granting the Motion.

5.      The first of the *Keating* Factors is the interest of the Claimant in proceeding expeditiously with this litigation and the potential prejudice to the Claimant of a delay.

6.      The Arbitrator finds that the Claimant has made an adequate case that substantial prejudice would more likely than not result from a stay, including the following specific forms of prejudice:

a.      The Company has demonstrated, and Kao has not rebutted, that there has already been a large loss of key employees from the Company, with the threat that other employees may also leave. The Arbitrator notes that, as a practical matter, it is not odd or unusual that lay people confronted with the circumstances of this case might find that a position in another company is better suited to them and/or their families' interests. The loss of such key employees poses an obvious threat to the survival of the Company and there has

5

CONFIDENTIAL INFORMATION                    PMT092119

JSH-008890

been no remedy identified in the event the Motion was granted which would serve to effectively remediate that threat. Thus an earlier resolution of this matter appears to be in the interest of the Company's ability to survive, as well as in the best interests of those employees who have not already left the Company.

    b.    The Company has demonstrated that Kao's association with the Company has created doubt concerning the Company's ability to maintain current contracts and obtain new contracts from government sources. It has been noted that, to mitigate this doubt, Kao has been removed as MDG's manager and that Kao's membership shares are now subject to a voting trust agreement, which was intended to help alleviate that issue. However, the Company has stated that even this step has not resolved the issue for its customers. The economic viability and perhaps the survival, of the Company are uncertain if it cannot continue existing business with the government and/or cannot obtain new business from the government. A more prompt resolution of this matter will serve to end that uncertainty. A less prompt resolution will extend that uncertainty.

7.    Therefore, the Arbitrator finds that the first of the *Keating* Factors weighs in favor of NCI and the Company and against granting the Motion.

8.    The second of the *Keating* Factors is the burden which any particular aspect of the proceedings may impose on Kao.

9.    The Arbitrator recognizes that there is a burden on Kao who may have to choose between speaking in his own defense, or pleading the Fifth Amendment and/or its Hawai'i counterpart. Kao has pointed out that this same issue may affect the testimony of other key witnesses, in particular Mr. Chen and Mr. Lum Kee.

10.    However, that burden must be balanced against the interests of the Company, and of NCI, and the Arbitrator finds that this burden can be effectively balanced by Kao asserting any legally appropriate Fifth Amendment right against self-incrimination which he wishes to assert during the arbitration process. The Arbitrator further finds that Kao may not, under the relevant case law, assert this right on behalf of other witnesses who may be called.

12. The third of the *Keating* Factors is the convenience of the court (or in this context, the arbitration proceeding) and the management of its cases and efficient use of judicial or in this case, arbitral, resources.

6

CONFIDENTIAL INFORMATION    PMT092120

JSH-008891

13.    The Arbitrator takes note that the Parties were previously involved in the Circuit Court Proceedings before the Hon. Judge Gary Chang ("Judge Chang") related to substantially the same issues which were later submitted to this arbitration **and, that it was Kao who, on March 10, 2021, moved for a stay ("First Stay Motion") suspending the Circuit Court Proceedings in order to assert his right to arbitration under the Company's governing Operating Agreement ("Agreement") in this proceeding.**

14.    In making the First Stay Motion in order to litigate those issues in this arbitration, **Kao cited to Section 12.22 of the Agreement in support of his position that the issues were required to be submitted to arbitration.**

15.    Thereafter, on March 30, 2021 the parties entered into a "STIPULATION AND ORDER TO (1) REFER MATTER TO VOLUNTARY SETTLEMENT CONFERENCE; AND (2) STAY PROCEEDINGS PENDING ALTERNATIVE DISPUTE RESOLUTION." ("First Stipulation") which provided inter alia that:

\*\*\*

> 3. If the Parties are unable to fully resolve all of their claims at such settlement conference, **the Parties shall submit any and all claims asserted in the Complaint and/or Crossclaim and any affirmative defenses and/or counterclaims to binding arbitration pursuant to section 12.22 of the Operating Agreement**
>
> 4. The Parties jointly request and the Court hereby orders that this proceeding shall be stayed for all purposes except those noted specifically below:

\*\*\*

See First Stipulation (emphasis supplied).

16.    The First Stipulation was signed and entered as an order by Judge Chang on April 1, 2021.

17.    Section 12.22 of the Agreement provides, in relevant part, that an award must be entered within 120 days of the commencement of the arbitration, as follows:

The parties hereby agree that the single arbitrator shall be selected by the parties from a list submitted to them by DPR. If the parties cannot agree upon a single arbitrator, each party shall alternate striking the name of one arbitrator from a list of no more than nine (9) potential arbitrators until a

7

CONFIDENTIAL INFORMATION                    PMT092121

JSH-008892

single arbitrator remains. **The arbitration shall be conducted in such a manner that the decision will be rendered no more than one hundred twenty (120) days after the submission of the dispute to DPR.**

See Agreement at Section 12.22 (emphasis supplied).

18.     Thereafter, on April 26, 2021, in accordance with the Agreement, the Parties engaged in mediation by way of a settlement conference with the Court in an attempt to settle their dispute.

19.     Thereafter, on May 6, 2021, Kao was indicted by a Federal Grand Jury in the criminal matter that is at issue in this Motion.

20.     On May 14, 2021, the Arbitrator was advised that he was confirmed by agreement of the Parties and on May 17, 2021, the Parties participated before the Arbitrator in a lengthy pre- arbitration hearing conference in this matter during which all dates for this arbitration were firm set, including discovery, motions and witness disclosure deadlines. Those dates are included in the "Order 1" previously filed herein. The Parties thus not only contemplated, but committed, to an aggressive schedule in order to prepare for the hearing on the merits in this Arbitration which is currently set to commence on July 21, 2021, with post hearing briefing scheduled to be completed no later than August 1, 2021, all so that an award may be provided to the Parties within the requirements of Section 12.22 of the Agreement by no later than September 1, 2021.

21.     At the pre-arbitration hearing conference on May 17, 2021, there was no request by Kao for a stay of the kind that is reflected in the Motion. After inquiry by the Arbitrator as to whether the Parties would be amenable to stipulating to a more relaxed schedule, Kao's counsel did specifically request that the proceedings be extended by a month or so for the convenience of all the parties. The Fifth amendment issue was not raised as a reason for that request. However, after inquiry by the Arbitrator to the respective counsel for the other Parties the other Parties declined to agree to any such extension. The Arbitrator noted first, that the time in which the Arbitrator was required to issue a ruling was mandated by Section 12.22 of the Agreement and that time limitation could not be extended by the Arbitrator absent a written agreement to do so by all of the Parties, and second, that the Arbitrator had been advised by Dispute Prevention and Resolution of Hawai'i ("DPR") in connection with his retention that the Parties required this deadline to be met.

22.     Thereafter, the Motion was filed by Kao on May 24, 2021.

8

CONFIDENTIAL INFORMATION                    PMT092122

JSH-008893

23.     Thereafter, on or about May 25, 2021, Kao signed the agreement for arbitration of this matter that is on record with DPR. This agreement has also been signed by all other parties and by the Arbitrator.

24.     The timing of the Motion in relation to the events noted above is relevant in weighing the third *Keating* Factor.

25.     The Arbitrator finds that there has already been a substantial investment of time, effort, and money by the Parties in litigating the Circuit Court Proceedings and that the Circuit Court Proceedings were stipulated to be stayed by the Parties and ordered to be stayed by Judge Chang in reliance upon the Parties' stipulation and on the assumption that this arbitration would proceed to resolve the relevant issues under the terms of Section 12.22 of the Agreement. Following the stay of the Circuit Court Proceedings, the work product of that case was largely stipulated to be used in this arbitration, so that the dispute could more seamlessly move forward to a resolution. Significant additional discovery and other preparation has already occurred in this arbitration in order to prepare for the expedited hearings scheduled for July.

26.     The Arbitrator finds that granting the requested stay would necessarily exceed the time period required for a decision under Section 12.22 of the Agreement and that this in turn would materially prejudice NCI and the Company because, (since arbitration is a creature of contract, as agreed by the Parties' counsel during the hearing, See Tr. p. 61; 4-62:23), the Arbitrator would likely then be deprived of jurisdiction to proceed in this matter upon the expiration of the stay sought by the Motion. This problem was discussed at some length during the hearing on the Motion (See Tr. 63:2-73:19). After inquiry of the Parties prior to the hearing on the Motion no case could be found similar to the current scenario involving a pending civil arbitration which is being conducted under a contractually imposed time limit to complete and where there was also a pending criminal case involving the same core facts.

27.     Kao's counsel advised the Arbitrator and the Parties by letter dated May 25, 2021 that the criminal trial in Hawai'i based on the current indictments here will not occur until at least April 18, 2022, i.e. about 7.5 months after the award in this matter is now due pursuant to the Parties' existing Agreement. The Arbitrator was advised that Kao also apparently faces a further potential indictments in another jurisdiction. If so, any trial date related thereto is also uncertain. If a stay were granted in this matter, it is very unclear to the Arbitrator how long the stay would have to be effective in order for it to end after these trials were completed. It is similarly unclear whether any such stay would need to cover any period of any appeal related to any of these criminal proceedings. The Arbitrator finds that these factors create a high level of uncertainty about when these proceedings could

9

CONFIDENTIAL INFORMATION                    PMT092123

JSH-008894

resume if the Motion were to be granted and even if the Arbitrator's concerns about continued jurisdiction were somehow resolved.

28.     The Arbitrator finds that, if the Motion was granted , the efforts of the Parties spent to date would not be entirely wasted, but that such a stay would likely have an enormous negative impact on the current momentum and progress of preparing the case for the hearing on the merits.

29.     Therefore, the Arbitrator finds that the third *Keating* Factor weighs in favor of NCI and the Company and against granting the Motion.

30.     The fourth *Keating* Factor is the interests of persons who are not parties to the civil litigation.

31.     With respect to this Factor, the Arbitrator has considered the interests of Company's employees, and it appears that the continuation of this matter is having a detrimental impact on those employees.

32.     Therefore, the Arbitrator finds that the fourth *Keating* Factor weighs in favor of NCI and the Company and against granting the Motion.

33.     The fifth *Keating* Factor is the interest of the public in pending civil and criminal litigation.

34.     The Arbitrator assigns the least weight to this factor as the public is not directly involved in the civil litigation, but to the extent the public does have an interest, the Arbitrator finds that the fifth *Keating* Factor of public interest weighs in favor of proceeding with the arbitration and against granting the Motion.

35.     In addition, and as a separate and independent basis for denying the Motion, the Arbitrator notes that Hawai'i has adopted and applied the principal of judicial estoppel, also known as equitable estoppel, (*see, e.g., Rosa v. CWJ Contractors, Ltd.*, 664 P.2d 745 (1983) and that granting the stay sought here would be inconsistent with that body of established Hawai'i case law.

36.     In summary, the Arbitrator finds, after consideration and weighing all five of the *Keating* Factors, and all of the Hawai'i case law cited by Kao, and other applicable law, that the balance of whether a stay should be granted weighs against Kao and in favor of proceeding with the arbitration.

*See* Order #4 at pp. 3-11 (emphasis supplied).

**E.     Order #5**

Order #5, dated June 6, 2021 ("Order #5"), granted in part and denied in part Mr. Kao's motion to quash certain subpoenas.

10

CONFIDENTIAL INFORMATION                    PMT092124

JSH-008895

**F.     Order #6**

Stipulation and Order #6, dated June 7, 2021 ("Order #6"), extended various pre-hearing deadlines by agreement of the Parties.

**G.     Order #7**

Stipulation and Order #7 also dated June 7, 2021 ("Order #7"), extended the pre-hearing deadline for all Parties to produce documents.

**H.     Order #8**

Stipulation and Order #8, dated June 14, 2021 ("Order #8"), amended Order #1 and extended various pre-hearing and post-hearing deadlines by agreement of the Parties. As of that time, the agreed hearing date had been extended to the period of September 27 through October 1, 2021, and the Award was then due by November 1, 2021.

**I.     Order dated July 26, 2021 (Unnumbered)**

The unnumbered Order, dated July 6, 2021 ("July 6, 2021 Order"), provided for the withdrawal of Messrs. Green and Uesugi and the Green Firm, as well as Messrs. Inglima and Wood and the C&M Firm, as to the representation of Mr. Kao and for the appearance of Mr. Kiuchi and the Choi & Ito Firm, Ms. Ito and Mr. Okazaki, to represent Mr. Kao. This Order was consented to by Mr. Kao. Before issuing the July 6, 2021 Order, the Arbitrator noted upon it that "All existing dates for this matter remain in effect unless altered by agreement and all existing stipulations remain binding unless altered by agreement."

**J.     Order #9**

Order #9, dated August 26, 2021 ("Order #9"), provided for the sharing of documents and information with Mr. Kao's criminal defense counsel, for various scheduling issues related to pending discovery motions and to a motion by Mr. Kao to disqualify certain opposing counsel.

**K.     Order #10**

Order #10, dated September 6, 2021 ("Order #10"), denied Mr. Kao's motion to disqualify Mr. Woo and the SO Firm, as well as Steven Rinesmith ("Mr. Rinesmith"). That motion was heard on August 16, 2021, after very extensive briefing, and it also presented arguments as to whether the Arbitrator had jurisdiction to decide disqualification issues. The reasoning in Order #10 relates to the merits and is set out below, as follows:

> 5.     The Arbitrator finds and/or concludes that the Arbitrator has jurisdiction to decide the matters raised in the Motion brought by Kao as a matter of law and by agreement of the Parties, for these reasons:

11

CONFIDENTIAL INFORMATION          PMT092125

JSH-008896

a.    The adjudication of disputes, and the discovery issues necessarily related to them, often involve resolution of questions about the use of privileged information and issues of attorney responsibility. For that reason, it is not surprising arbitrators have ruled on disqualification and privilege motions and that courts have refused to intervene on an interlocutory basis to either first-or second-guess those rulings. Rather the interests of justice are served by charging the arbitrators with deciding the overall matter, including allegations of discovery abuse and disqualification motions. SOC-SMG, Inc. v. Day & Zimmerman, Inc., C.A. No. 5375-VCS, 2010 WL 3634204 (Del. Ch. Sept. 15, 2010).

b.    In Section 12.22 of the Company's Operating Agreement, the Parties agreed to grant jurisdiction to the Arbitrator over any and all disputes arising out of or relating to the terms or conditions of the subject matter of the Operating Agreement.

c.    In a stipulation entered in by the Parties in the Circuit Court Proceeding, the Parties agreed to stay the Circuit Court Proceeding and submit the case to arbitration with no reservation of jurisdiction, and specifically, no statement that there would be no jurisdiction on such things as disqualification.

d.    The Agreement to Participate in Binding Arbitration before Dispute Prevention and Resolution, executed by the Parties on May 25, 2021 (**DPR Agreement**), provides that the Arbitrator shall determine all issues submitted to arbitration by the Parties and may grant any and all remedies that the Arbitrator determines to be just and appropriate under the law.

e.    The DPR Agreement further evidences the commitment of the Parties to submit the entire dispute to DPR and to abide by the rules of DPR, which provide a separate and independent basis for jurisdiction and are meant to be inclusive of any matter that would have been capable of being heard in court.

6.    The Arbitrator is concerned about the timing of the Motion and finds that the Motion is untimely and/or that Kao waived his right to bring the Motion at this late stage in the Arbitration, for these reasons:

a.    In determining a motion to disqualify counsel, timeliness may be considered. Polish Roman Catholic St. Stanislaus Parish v. Hettenbach, 303 S.W.3d 591, 599 (Mo. Ct. App. 2010).

b.    The objections raised within and evidentiary bases for the Motion, in their entirety, would have been known to Kao and his

12

CONFIDENTIAL INFORMATION                    PMT092126

JSH-008897

counsel before Kao and the other Parties stipulated in the Circuit Court Proceeding to submit the dispute to arbitration.

c.      The Parties agreed to arbitrate the matter, at Kao's own initiative, at a time when Woo and the Starn Firm were already on record representing the Company, yet Kao did not move to disqualify counsel at that time.

d.      Significant motions, including but not limited to a motion by Kao to stay arbitration until his related criminal proceedings concluded, have already been brought before and argued in front of the Arbitrator, yet Kao did not move to disqualify counsel at that time. The Arbitration Hearing is only a few weeks away.

f.      The law generally disfavors delay in motions to disqualify, particularly on grounds already known to the moving party.

g.      Even though Kao has brought in new counsel, Kao's new counsel, under these circumstances, should be held to the decisions of Kao's prior counsel.

7.      The Motion fails on its merits because Kao has not shown by a preponderance of the evidence (i) that an attorney-client relationship ever existed between Kao in his individual capacity and Woo, and/or Kao in his individual capacity and the Starn Firm and/or (ii) that Kao in his individual capacity made a confidential communication to Woo or the Starn Firm.

8.      There is no attorney-client relationship, evidenced by a written agreement, in which either Woo or the Starn Firm was representing Kao.

9.      Woo's engagement letter is with the Company.

10.     The Starn Firm's engagement letter is with the Company.

11.     There was no joint defense agreement made between Kao and Woo or Kao and the Starn Firm that would have memorialized such an alignment between Kao in his individual capacity and the Company.

12.     One of the factors that can be considered is the sophistication of the client who is asserting the claim of representation.

13.     Kao is purportedly an educated professional and a certified public accountant.

13

CONFIDENTIAL INFORMATION                    PMT092127

JSH-008898

14. The Arbitrator finds Kao is a highly sophisticated client who understands the difference and distinction between interacting with attorneys in his individual capacity and in his corporate capacity as then-Manager of the Company.

15. The evidence does not show that Kao believed Woo and/or the Starn Firm represented Kao in his individual capacity; furthermore, such a belief would not be objectively reasonable.

16. Upon review of the evidence, the Arbitrator does not see a showing by Kao that any of the specific matters allegedly disclosed to Woo by Kao, when Kao was seeking counsel, was disclosed in Kao's individual capacity.

17. Accordingly, no fiduciary obligations or implied attorney-client relationships were created by the divulgence of confidential information by Kao in his individual capacity.

18. For these reasons, Kao has failed to meet his burden of proving by a preponderance of the evidence the existence of a prior attorney-client relationship between Kao in his individual capacity and Woo and/or the Starn Firm; ACCORDINGLY, THE MOTION IS DENIED as to Woo and the Starn Firm.

19. As to Rinesmith, the issue is moot because Rinesmith is not counsel of record for NCI or any party in this arbitration matter; ACCORDINGLY, THE MOTION IS DENIED as to Rinesmith.

*See* Order #10 at pp. 3-7.

**L.    Order #11**

Order #11, dated September 5, 2021 ("Order #11"), denied MDG's motion to compel legally sufficient responses to MDG's discovery requested of Mr. Kao.

**M.    Order #12**

Order #12, dated September 6, 2021 ("Order #12"), granted in part and denied without prejudice in part MDG's Motion to Determine the Admissibility of Martin Kao's Purported Privileged Documents in the Custody, Possession and Control of Martin Defense Group, LLC fka Navatek LLC. As Order #12 dealt with claims of privilege as to key evidentiary documents, relevant portions are set out below, as follows:

1. The 113 documents at issue (***Documents***) are identified in Exhibit 1 that is attached to the Motion.

14

CONFIDENTIAL INFORMATION                    PMT092128

JSH-008899

2.      The Documents came into the possession, custody, and control of the Company because the Documents were on the Company's computer and e-mail systems.

3.      The Arbitrator finds that the Documents are authentic.

4.      At all relevant times, the Company maintained policies governing the use of the Company's computer systems and e-mail.

5.      These policies governing the use of the Company's computer systems and e-mail were set forth in the Company's Employee Handbook (*Handbook*), in the section titled, "Electronic Mail and Internet Usage." These include but are not limited to the following:

> a. "Computers, computer files, electronic communications systems, internet access, and software furnished to employees are Company property intended to be used solely for business purposes ... To ensure compliance with this policy, computer, e-mail, and internet usage may be monitored."
>
> b. "The system should be treated like other shared filing systems and the Company reserves the right to access the contents of e-mail communications at all times, with or without notice, for any purpose."
>
> c. "All e-mail messages are Company records. The contents of e-mail, properly obtained for legitimate business purposes, may be disclosed within the Company without your permission. Therefore, you should not assume that messages are confidential."
>
> d. "The Company reserves the right to access and disclose as necessary all messages sent over it e-mail system, without regard to content. Since your personal messages can be access by Company management without prior notice, you should not use e-mail to transmit any messages you would not want read by a third party."

6.      To invoke attorney-client privilege, it is the burden of the party asserting it to establish that the communication occurred (1) where legal advice of any kind is sought, (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except that the protection may be waived." Sapp v. Wong, 62 Haw. 34, 38, 609 P.2d 137, 140 (1980) (citing Wigmore, EVIDENCE, § 2292 (Mc Naughton rev. 1961).

CONFIDENTIAL INFORMATION              PMT092129

JSH-008900

7.    Attorney-client privilege may be waived by the voluntary disclosure of privileged information to third parties. Haw. R. Evid. 511.

8.    Where a third party is present during attorney-client communications, or where no attorney-client relationship exists, there may not be any privileged communication. Metzler Contracting LLC v. Stephens, 642 F.Supp. 2d, 1192, 1203 (D.Haw. 2009).

9.    In determining whether privilege has been waived, the focal point should be the holder's disclosure of privileged communications to someone outside the relationship, not the holder's intent to waive the privilege. State v. Moses, 107 Hawai'i 282, 292, 112 P.3d 768, 778 (App. 2005).

10.    For communications to be protected by attorney-client privilege, a client must have a subjective expectation of confidentiality and that expectation must be reasonable. State v. Soto, 84 Hawai'i 229, 241, 933 P.2d 66, 78 (1997).

11.    In the context of e-mails and files stored on company computers, whether an expectation of confidentiality is reasonable turns on whether a client's expectation of privacy is reasonable. In re Asia Global Crossing, Ltd., 322 B.R. 247 (Bankr. S.D.N.Y. 2005). Here:

    a.    The Handbook prohibits the use of Company e-mail for personal or objectionable uses.

    b.    The Handbook explicitly and repeatedly warns that Company e-mail may be monitored.

    c.    The Handbook explicitly and repeatedly warns that third parties may access e- mails.

    d.    Kao, the Company's then-Manager and a highly sophisticated party, had actual and constructive notice of the policies contained in the Handbook.

12.    The Arbitrator finds, under the circumstances set forth here and the written briefing and exhibits, that the Documents are not privileged, or in the alternative, that the protection afforded by the attorney-client privilege has been waived.

13.    The steps taken by the Company are sufficient to make them Company documents.

16

CONFIDENTIAL INFORMATION                    PMT092130

JSH-008901

14.    The Arbitrator finds that Kao was then-Manager of the Company and a highly sophisticated party. Kao was particularly susceptible to the Handbook being enforced against him.

15.    Kao did not have a reasonable expectation of privacy while using the Company's e-mail.

16.    Even if attorney-client privilege did exist regarding certain Documents, the privilege was further waived by Kao's disclosure to third parties, including but not limited to, Clifford Chen, Lawrence "Kahele" Lum Kee, Duke Hartman, Lori Bofman, Andy Winer, employees of Pacific Shipyards, Bank of America/Merrill Lynch, and/or Central Pacific Bank.

17.    The Arbitrator at this time is not ruling on whether any of the Documents are admissible during the arbitration based upon the crime-fraud exception. Any and all other objections beyond authenticity and privilege are reserved.

*See* Order #12 at pp. 2-5.

### N.    Order #13

Order #13, dated September 8, 2021 ("Order #13"), denied MDG's motion to compel Mr. Kao to provide legally sufficient answers to MDG's deposition questions and, in the alternative, to dismiss Mr. Kao's cross-claims. Order #13 provided in relevant part that, "As with Order No. 11, the Arbitrator will not test the limits of the privilege against self-incrimination as asserted in response to the deposition questions."

### O.    Order #14

Stipulation and Order #14, dated October 5, 2021 ("Order #14"), covered various discovery agreements and also included stipulations that all experts' reports would be admitted into evidence in lieu of the direct examination of the Parties' respective experts and that all documents offered in evidence by all Parties in the matter were to be deemed authentic with other objections reserved.

### P.    Order #15

Stipulation and Order #15, dated October 5, 2021 ("Order #15"), further modified Orders #1 and #8 to revise various briefing dates and also the date on which the Award was due. Modifications of these due dates were again revised by further stipulation during the Hearing itself. Pursuant to Order #1 at pages 8 and 9, the Award was originally to be due on or before September 1, 2021. In various agreements over the course of the proceedings, this time was extended. Order #15 contemplated that the Award would be due 30 days after the final brief was submitted, possibly around November 22, 2021. Thereafter, a further agreement between the Parties, which was then

17

CONFIDENTIAL INFORMATION                    PMT092131

JSH-008902

confirmed on the record, extended the due date for the Award herein to November 29, 2021. *V.7, 1483:15-1484:23.*

Q.    **Further Agreements and Orders**

In the course of the proceedings before the Arbitrator, the Parties entered into other stipulated agreements covering various items and are subject to various court orders, all as shown by the record. These included, but were not limited to, each of the following:

1.    The Arbitrator notes that on March 30, 2021 the STIPULATION AND ORDER TO (1) REFER MATTER TO VOLUNTARY SETTLEMENT CONFERENCE; AND (2) STAY PROCEEDINGS PENDING ALTERNATIVE DISPUTE RESOLUTION was signed by all Parties and by Judge Chang and that this effectively served to enforce the agreement of the Parties to arbitrate. It provided *inter alia* that:

\* \* \*

> 3. If the Parties are unable to fully resolve all of their claims at such settlement conference, **the Parties shall submit any and all claims asserted in the Complaint and/or Crossclaim and any affirmative defenses and/or counterclaims to binding arbitration pursuant to section 12.22 of the Operating Agreement**
>
> 4. The Parties jointly request and the Court hereby orders that this proceeding shall be stayed for all purposes except those noted specifically below:

Thus, first, the Arbitrator finds that this is the law of this case and that the Award rendered herein is provided pursuant to this law of the case. Second, the Award is provided independently pursuant to the authority provided under the OA. Third, the Award is provided independently pursuant to the separate agreement of the Parties to proceed pursuant to arbitration under DPR's rules.

2.    The Parties were given options as to the form of the Award and the Parties stipulated that the Arbitrator should issue a detailed and reasoned Award.

3.    The Parties agreed that all sides had made some claims and raised some defenses under contract theories and that all sides were seeking their respective attorneys' fees based on those claims and defenses. All Parties thereafter submitted claims for their respective attorneys' fees.

4.    The Parties agreed that the damages sought by both NCI and MDG were identical, except for their respective claims for attorneys 'fees and costs. *V.3, 644:22-645:25.*

18

CONFIDENTIAL INFORMATION                    PMT092132

JSH-008903

5.      The Parties agreed to the submission of post-hearing briefs on the merits and on their requests for attorneys' fees and costs. The Parties' briefs were all timely submitted per the agreed schedule, whereupon the substantive issues in this matter were submitted for decision.

## IV.    CREDIBILITY

The Award is based upon both the extensive testimony heard and the many exhibits introduced during the Hearing and argument in this matter. At times, the testimony revealed disagreements between the Parties' respective experts and certain other witnesses about disputed issues. The Arbitrator was thus required to weigh the witnesses' respective credibility on those issues. The Arbitrator did so and this was one basis for the findings made herein.

## V.    BURDEN OF PROOF

All findings made herein were reached after weighing the relevant evidence and reaching determinations that the relevant Party either met, or failed to meet, its burden of proof as to that issue. The burden of proof applied was the normal civil standard of a "preponderance of the evidence" for all matters, except as follows: As to the claims for punitive damages, the burden of proof applied to those claims was "clear and convincing evidence". As to the background issues which relate to the criminal law, the burden of proof is "beyond a reasonable doubt". This arbitration proceeding obviously is not intended to determine, or attempt to determine, any ultimate criminal issue, however, since various criminal laws have been cited which the Parties claim relate to the civil issues which are being decided, to the extent any findings made herein rely on that argument, they are made to the "beyond a reasonable doubt" standard of proof.

## VI.    AWARD FINDING #1 REGARDING JURISDICTION AND RELATED MATTERS

Based on the totality of the prior court and arbitration orders, the stipulations and agreements of the Parties and applicable law, the Arbitrator finds that this matter is properly before the Arbitrator for a final and binding determination as between all of the Parties hereto as to all of the Disputes.

There was a lengthy and helpful discussion during the hearing (*V.4, 720:18 – 746:4*) about potential limitations on the Arbitrator's authority. The Arbitrator has considered these issues and finds that the Arbitrator has jurisdiction and authority to decide all of the Disputes which have been brought before him in this matter, including each of the Disputes previously resolved by the various arbitration orders discussed above.

19

CONFIDENTIAL INFORMATION            PMT092133

JSH-008904

This matter having proceeded in arbitration through pre-hearing proceedings, discovery and evidentiary hearings, the Arbitrator will address the claims on the merits and related issues raised in this matter below:

## VII.   THE DISPUTES[4]

The claims made herein were contained in (1) NCI's May 4, 2021 Demand for Arbitration ("NCI's Arbitration Demand"); (2) MDG's May 19, 2021 Counterclaim against NCI and its Cross Claim against Mr. Kao ("MDG's Counterclaim and Cross Claim"); (3) Mr. Kao's May 19, 2021 Counterclaim against NCI ("Mr. Kao's Counterclaim"); and (4) Mr. Kao's May 19, 2021 Cross Claim against MDG ("Mr. Kao's Cross Claim"), and those documents control.

In summary, NCI's Arbitration Demand (*see* NCI-383) asserted claims against Mr. Kao as follows: (1) Count I, Breach of Fiduciary Duties; (2) Count II, Breach of Operating Agreement; (3) Count II [sic], Gross Mismanagement; (4) Count III, Fraud; (5) Count IV, Embezzlement; (6) Count V, Conversion; (7) Count VI, Unjust Enrichment; (8) Count VI [sic], Civil Conspiracy; (9) Count VII, Indemnities; (10) Count VIII, Declaratory Judgment (Dissociation); and (11) Count IX, Accounting.

In summary, MDG's Cross Claim (*see* NCI-387) asserted claims against Mr. Kao as follows: (1) Count I, Breach of Fiduciary Duty; (2) Count II, Gross Negligence; (3) Count III, Declaratory Relief – Dissociation; (4) Count IV, Declaratory Relief – NEWCO Agreements; (5) Count V, Indemnification; (6) Count VI, Contribution; and (7) Count VII, Uyemura v. Wick Claim.

NCI's Count IX claim against MDG for an accounting and MDG's counterclaims against NCI, were both dismissed by stipulation without prejudice on September 20, 2021, prior to the Hearing.

In summary, Mr. Kao's Counterclaim against NCI (*see* NCI-400) sought a declaratory ruling that: (1) NCI does not have authority under the OA, or otherwise, to unilaterally expel and disassociate Mr. Kao from the Company; (2) any purported action to that effect is null and void; (3) Sections 6.2(e), 8.2 and 8.3 of the OA are unenforceable against Mr. Kao; and (4) MDG may

---

[4] Portions of this Award are taken from various Party's post-hearing briefs where the Arbitrator accepts the points that were provided in the relevant brief. In many instances, these excerpts from the various Parties' briefs have also been further edited by the Arbitrator so that the Arbitrator's findings are accurately reflected.

CONFIDENTIAL INFORMATION                    PMT092134

JSH-008905

not take any adverse action against Mr. Kao resulting from NCI's allegedly wrongful attempts to disassociate him from the Company.

In summary, Mr. Kao's Cross Claim against MDG asserted the following claims: (1) Indemnity (statutory); (2) Recovery pursuant to Hawaiʻi Revised Statutes ("HRS") 428-403(b) for Mr. Kao of $300,000 he allegedly overpaid to MDG to repay loans; (3) Unjust Enrichment pertaining to the same $300,000; (4) Money Had And Received pertaining to the same $300,000; (5) Conversion pertaining to the same $300,000; (6) An accounting of Mr. Kao's capital account; and (7) A Declaratory Ruling that mirrors Mr. Kao's one count claim against NCI.

## VIII.  PRELIMINARY FACTUAL BACKGROUND

### A.    The History of the Company and the Relationship Between Mr. Kao and Mr. Loui

Mr. Loui testified that the business which is referred to herein as MDG was originally created in the 1970s under the name "Navatek Ltd." as a research and development company (sometimes referred to by the Parties as an "IRAD"). *V. 1, 27:25-29:5.* Mr. Loui operated Navatek Ltd. for approximately 40 years. Mr. Loui testified that the Company's research and development business model was one from which future contracts and profits could be realized. Mr. Kao began working at the Company in 2008 while it was still known as Navatek, Ltd. *See* NCI-400 at ¶ 18. Mr. Kao served as the CFO till 2012 when he became its CEO. Mr. Loui considered him to be a valued employee of the Company up until March 2019. In the period from 2008 to 2018, Mr. Kao was compensated with total payments of between $6 to 7 million. *See* NCI-582.

For the past 10 years, the Company was largely sustained by the earnings of an investment account, which had grown to over $10,000,000 by 2019. This account was liquidated shortly after Mr. Kao's arrest, in or around October 2020. *See* NCI-583.

On or about August 31, 2018, Navatek Ltd. converted to a limited liability company under Hawaiʻi law. At that time, it also changed its name to "Navatek, LLC". This was accomplished pursuant to articles of conversion filed with the Department of Commerce and Consumer Affairs ("DCCA"). *See* NCI-418.

Around the same time, Navatek LLC also filed Articles of Organization with the DCCA. It elected to have a duration for a specified term, rather than a duration "at-will". This term expires on December 31, 2117. *See* NCI-365 at p. 55.

21

CONFIDENTIAL INFORMATION                    PMT092135

JSH-008906

The Claimant in this case, NCI, was formed by Mr. Loui on June 14, 2018 and NCI was the sole owner of Navatek LLC. The Articles of Incorporation for NCI were attached as Appendix C to NCI's first post-closing brief ("NCIPCB1").

NCI continued to own 100% of Navatek LLC until August 31, 2018. *See* NCI-199. Around that time, Mr. Loui decided that he wanted to step away from the Company. He believed that he had found a worthy successor in Mr. Kao, whom he hoped would keep the Company prospering and would take care of its employees. *V.4, 851:20-853:16.* Thus, Mr. Loui started negotiations with Mr. Kao for him to become that successor.

**B.    The Execution and Terms of the OA**

Mr. Loui eventually made the decision to turn the Company over to Mr. Kao, giving him a 99% interest in future profits and also control of 99% of the membership interest in the Company. Mr. Kao was not required to, and did not, pay any cash for his 99% interest, because he was entitled to a 99% share only as to all future profits and he would have to work to make such profits a reality. After various agreed transfers of assets, Mr. Loui (through NCI) retained a capital account in the Company valued at $2,500,000 on the Company's books, along with NCI's own 1% interest in future profits. *See* NCI-197 and NCI-199.

Although Mr. Kao put no money into the Company to obtain his interest, Michael Schmicker ("Mr. Schmicker"), who was then an employee of the Company, and who is also the brother-in-law of Mr. Loui, testified that Mr. Kao represented to Mr. Schmicker, as well as to other employees at the Company, that Mr. Kao had put $1,000,000 of his own money into the company. *V.4, 896:22-25.* At some point after Mr. Kao obtained his interest in Navatek LLC, the Company changed its name to Martin Defense Group—referred to herein as MDG.

Mr. Rinesmith was the attorney who assisted Mr. Loui in this transaction. Mr. Rinesmith testified that over the course of approximately six months, the OA for the Company was negotiated at arms-length between NCI and Mr. Kao. *V.6, 1297:12-22.* Mr. Kao was advised by Mr. Rinesmith and Mr. Loui that he could hire his own attorney. *V.7, 1368:3-16,* and *V.1, 53:22-24.*

During the time that Mr. Kao was employed by the Company, Mr. Kao had falsely represented orally, and in a written resume, that he held law degrees from both UCLA and NYU. *See* NCI-210 at NCI000089 (indicating that Mr. Kao had an LLM from NYU School of Law and a JD from UCLA School of Law), NCI-402 at 000020 ("Kao was never a student at the NYU

22

CONFIDENTIAL INFORMATION                    PMT092136

JSH-008907

School of Law."), and NCI-001 at 000008 (after a "thorough search" for records of Mr. Kao's attendance at UCLA School of Law, "no such records were found.").

In the negotiations related to the OA, Mr. Kao told Mr. Loui that he was acting as his own attorney. *V.1, 54:1-55:3.* Mr. Kao also conveyed that point to Mr. Rinesmith. *V.6, 1341:16-1342:17.* Mr. Schmicker was also advised by Mr. Kao that Mr. Kao had a law degree. *V.4, 896:12-21.* Mr. Ota, the internal accountant for the Company, also testified that he was advised by Mr. Kao that Mr. Kao had a law degree. *V.4. 815:9-17.*

Mr. Kao did engage his friend and colleague, Clifford Chen ("Mr. Chen"), who did hold a law degree, to represent Mr. Kao during the negotiation of the OA. *V.6, 1296:1-10.* During this period of negotiation, two redline drafts containing edits to the OA were made. *See* NCI-597 and NCI-598.

On March 1, 2019, NCI and Mr. Kao, as the sole members of the Company, executed the OA which dealt with the ownership and management of the Company. *See* NCI-202. At that time, NCI maintained all of the equity (over $2.5M) through its capital account in the Company while Mr. Kao had none. Mr. Loui testified that the reason for this ownership structure was because NCI was leaving over $2.5M in assets in the Company, while Mr. Kao was not putting any money into the Company. *V.4, 853:17-20.* Pursuant to the terms of the OA, Mr. Kao thereafter held a 99% voting interest in the Company, and Mr. Kao served as the sole manager of Company from March 1, 2019 (*see* NCI-202 at p. 65) until November 19, 2020.

At the time of the Hearing in this matter, Mr. Loui gave various testimony as to the value of the entire Company. At one point, Mr. Loui said it was "…worth about a million" and at another that it was "…worth zero". *V.1, 221:11-25.* At another point, Mr. Loui indicated that, if the Company were to be sold, he would "like to get" at least $ 8.6 million for the Company in order to recoup his capital and expenses. *V.4, 876:6-878:*18. Throughout the Hearing, NCI's and MDG's counsel took the position that the value of the Company was not relevant and was not an issue to be decided by the Arbitrator. *See e.g., V.4, 720:18 – 746:4.*

Mr. Loui was clearly very disappointed in the path the Company had taken under Mr. Kao's leadership. Mr. Loui testified that he was committed to continuing the Company to make up for Mr. Kao's poor leadership in the interests of its long-term employees. *V.4, 872:4-873:24.* Mr. Loui noted that he had no plans to bankrupt the Company, that he planned to continue it, that there was a pipeline of possible future work in the amount of $150,000.000 in proposals which were

23

CONFIDENTIAL INFORMATION          PMT092137

JSH-008908

being negotiated at the time of the Hearing, and that the Company had recently been awarded a new $55,000,000 contract. *V.1, 226:17- 227:7* and *V.4, 874:18-23*. Mr. Loui also confirmed that the Company's gross sales were approximately $32,000,000 for the current year. *V.1, 228:4-10*. Mr. Brunk confirmed that Mr. Loui was being paid his severance at $450,000 per year at the time of the Hearing (payments which were scheduled to end this year), that Mr. Brunk was receiving $300,000 in annual salary, and that while serving as Manager, Mr. Kao has been paid his annual compensation by way of distributions in the total amount of $480,000 annually. *V.3, 641:17-642:19*.

The Arbitrator noted on the first day of the Hearing that the economic effect of a dissociation of Mr. Kao would be that Mr. Kao's entire interest in the Company would pass to Mr. Loui's company, NCI, and the Parties were asked to explain the economic effect of the dissociation remedy which had been requested in their respective briefs. *V.1, 228:18-229:12*.

## IX. SUMMARY OF THE EVIDENCE AND RELATED AWARD FINDINGS AS TO LIABILITY AND RELEVANT DEFENSES

Both MDG and NCI alleged that Mr. Kao wrongfully sought and obtained PPP Loans and engaged in other misconduct which justifies the relief they have respectively requested. To the extent liability is found to exist in this matter, MDG and NCI have agreed that the damages each seeks are identical (except for their respective claims for attorneys' fees and costs), that these damages may thus not be duplicated in any Award, and that any damages recovered properly flow only to the Company, rather than NCI. *V.3, 644:22-646:25*.

### A. AWARD FINDING #2 REGARDING DERIVATIVE CLAIMS AND CLAIMS THAT ARE MOOT

The Arbitrator agrees with, and accepts, the agreement between MDG and NCI referenced in the preceding paragraph and finds that any damages recovered (as opposed to any attorneys' fees and costs) must flow only to MDG under the applicable law regarding derivative claims. The claims of MDG and NCI will thus be discussed together as is appropriate when a derivative claim is made on behalf of a Company.

For the same reason all claims by NCI against MDG and all claims by MDG against NCI are found to be moot at this point. Similarly, the Cross Claim by MDG against Mr. Kao for indemnification (Count V) and for contribution (Count VI) as to any damages MDG must pay to NCI are both also found to be moot at this point .

CONFIDENTIAL INFORMATION                    PMT092138

JSH-008909

### B.    AWARD FINDING #3 REGARDING THE CENTRAL PACIFIC BANK ("CPB") PPP LOAN

The discussions of the acts underlying the alleged wrongful conduct by Mr. Kao are found at pp. 3-25 of MDG's first post-closing  brief ("MDGPCB1"), at pp. 16-23 of NCI's first post-closing brief ("NCIPCB1") and at pp. 2-15 of Mr. Kao's first post-closing brief ("KPCB1"). These briefs are replete with citations to the extensive record of testimony and exhibits in this matter. That material will not be reproduced here, as it is already in the record.

The Arbitrator has relied on the entire record in making the Award.   However, the discussion which follows is intended to summarize and illustrate various points as to each area of alleged misconduct raised by the Parties.

On April 1, 2020, CPB began accepting PPP applications.   *See* NCI-173 at MDG-HIGJ00052372-73.    When informed by Lawrence Kahele Lum Kee ("Mr. Lum Kee") (an accountant with the Company who reported to Mr. Kao) that employee data needed to be submitted along with the application, Mr. Kao told Mr. Lum Kee to discuss the application with him first because Mr. Kao had *"some tricks up [his] Wuhan sleeves."* *Id.* at MDG-HIGJ00052371-72 (emphasis supplied) (Wuhan, China is purportedly where the COVID-19 virus which caused the global pandemic of 2020 was first identified).   The next day, Mr. Lum Kee told Mr. Kao, *"I don't think we can get anywhere near the $10 million loan. . . . . without loo[k]ing like we are cooking anything."* *See* NCI-129 (emphasis supplied).   In response, Mr. Kao provided his edits to the "Summary of Payroll and Related Costs for the Year Ended December 31, 2019" ("CPB Summary") for submission to CPB so they could *"Chance'm!"* and see if CPB would approve the full $10,000,000. *See* NCI-130 and NCI-132 (emphasis supplied).

The CPB PPP Application and the CPB Summary were submitted to CPB on April 3, 2020. *See* NCI-002 at pp. 8-9.  To calculate the maximum PPP loan amount for the CPB PPP Application, Mr. Kao was supposed to use "payroll costs incurred during the 1-year period" before the CPB PPP loan was made. *See* 15 U.S.C. § 636(a)(36)(E).  Instead, Mr. Kao included numerous payroll amounts and employees associated with an "Office Expansion Pool" in the CPB Summary. *See* KAO-6 at CPB-000147.

However, the employees in the "Office Expansion Pool" did not exist.  Payroll amounts reported were never incurred for the Office Expansion Pool for the "Year Ended December 31, 2019." *V.2, 352:7-21.*  Thus, Mr. Kao knowingly and purposefully misstated the number of employees in the Company on the CPB PPP Application. *V.2, 344 :14-16* ("the loan application

25

CONFIDENTIAL INFORMATION              PMT092139

JSH-008910

itself was false on its face because [Mr. Kao is] claiming employees that didn't exist"); *V.5, 1088:4-18* (CPB's understanding of the CPB Summary was that it was for "2019 employees because of the way this document was titled.").

The Arbitrator finds that it was uncontroverted at the end of the Hearing that the Office Expansion Pool employees and payroll amounts were simply not in existence in 2019. *Cf.* KAO-6 at CPB-000001-111 (2019 ADP 941s).

The Arbitrator finds that Mr. Kao's misstatements were knowing and intentional because he personally edited the CPB Summary, and he directed Mr. Lum Kee on how to "fudge" the numbers. *See* NCI-130 and NCI-172. Mr. Kao confirmed his knowledge, before submitting the CPB PPP Application, that the Office Expansion Pool employees were not actual employees on April 3, 2020, when he stated: "maybe we should add another row for group health costs for the 'pools.' *Just use the same ~% as the __actual__ 941 guys*." *See* NCI-172 (emphasis supplied). Mr. Lum Kee acknowledged as much to CPB in July, 2020, stating: "*our 'office expansion pool' labor/fringe costs is based on the employees (salaried and hourly wage) to a single cost proposal for our new South Carolina office*." *See* KAO-6 at CPB-000144 (emphasis supplied). Thus, Mr. Kao clearly and knowingly devised a scheme to defraud CPB by means of misrepresentations in a writing (i.e., the CPB PPP Application) and then transmitted that to CPB to execute his fraudulent scheme, in apparent violation of 18 U.S.C. §1343. This violation occurred on the date the CPB PPP Application was submitted--April 3, 2020.

In the KPCB1, Mr. Kao essentially argued that CPB should have caught the false claims that Mr. Kao made to achieve this fraud. However, the Arbitrator finds that fraud, which is not caught by bank personnel who are acting in good faith in a time of national crisis, is simply not a legal defense to Mr. Kao's own intentional misconduct in creating that fraud in the first place. This is especially true in this context, where the PPP Loan program was rolled out quickly and without training and was designed to be quickly funded, all to aid businesses so that their payrolls were met.

Mr. Kao also argued that payroll amounts similar to the loan amount were in fact expended by the Company over the next year, however, this period is well outside the PPP Loan forgiveness period and so the Arbitrator finds that this is also no defense to Mr. Kao's fraudulent conduct.

Mr. Kao also argued that he did not "hide" that there was an "office expansion pool". However, the Arbitrator first finds the terms "Office Expansion Pool" to be deliberately ambiguous

CONFIDENTIAL INFORMATION    PMT092140

JSH-008911

and that use of this language helped effectuate the fraud. Second, the Arbitrator also finds that Mr. Kao clearly knew that any use of the PPP proceeds to fund expansion was improper, since the PPP Loans were designed to preserve the jobs of then existing employees at a time of national crisis.

Based on the record here, the Arbitrator also finds that Mr. Kao knew that the Company was completely ineligible for any PPP Loans from the outset because, as a federal contractor, the Company's payroll was not threatened by COVID because its payroll was guaranteed to continue to be funded under the Company's existing federal contracts. Thus, Mr. Kao's effort to obtain PPP Loans for this purpose was fraudulent from its inception and thus particularly egregious.

The Arbitrator also finds that Mr. Kao's signature was on all relevant loan applications and other documents in evidence for each of the loans in question, that the authenticity of his signature was not disputed at any point in these proceedings and was specifically confirmed by Mr. Brunk, (V.3, 646: 4-21), and that these documents were all received in evidence, subject to the Arbitrator's discretion to determine their weight, and pursuant to the Parties' stipulation as to their authenticity, as noted previously.

In summary, the Arbitrator finds that Mr. Kao's certifications concerning the truthfulness and accuracy of the information provided in the CPB PPP Application, and in all supporting documents and forms, were clearly known by him to be false when they were made and were thus fraudulent.

The KPCB1 correctly notes that Mr. Kao's conduct did the most direct economic damage to his own interest in the Company--because he was the 99% owner of the Company. However, the Arbitrator finds first, that this is not a valid legal defense to Mr. Kao's conduct, and second, that it omits any recognition by Mr. Kao that the Company is a separate legal entity and that his reckless conduct in perpetuating this fraud imperiled the income and welfare of the many employees of the Company, as well as the smaller interest of NCI. Of course, the employees were the people whose work Mr. Kao had relied upon to build his own wealth within the Company. Except for Mr. Lum Kee and Mr. Chen (who both aided Mr. Kao), the vast majority of these employees would have had no knowledge of Mr. Kao's actions and were in no position to moderate or control those actions.

The Arbitrator finds that Mr. Kao's conduct led to the departure of many key employees and it also imperiled the ability of the Company to obtain further contracts and to survive. Mr. Kao's conduct also subjected both Mr. Kao and the Company to a federal criminal investigation.

27

CONFIDENTIAL INFORMATION                    PMT092141

JSH-008912

For all the above reasons, the Arbitrator finds and awards (based solely on the CPB Loan issues discussed in this section of the Award) as follows :

1.    Mr. Kao is liable to MDG under the following Counts of MDG's Cross Claim against Mr. Kao: (1) Count I, Breach of Fiduciary Duty; (2) Count II, Gross Negligence; (3) Count III, Declaratory Relief – Dissociation; and (4) Count VII, Uyemura v. Wick Claim.

2.    MDG's Counts V, for Indemnification and Count VI for Contribution are both moot for the reasons previously stated.

3.    MDG's Cross Claim for Count IV, Declaratory Relief – NEWCO Agreements will be discussed in a later section of the Award.

4.    Mr. Kao is liable to NCI under the following Counts of NCI's Claim: (1) Count I, Breach of Fiduciary Duties; (2) Count II, Breach of Operating Agreement; (3) Count II [sic], Gross Mismanagement; (4) Count III, Fraud; (5) Count VI, Civil Conspiracy; (7) Count VII, Indemnities; (8) Count VIII, Declaratory Judgment (Dissociation).

5.    NCI's claims at Count IV, Embezzlement, Count V, Conversion and Count VI, Unjust Enrichment will be discussed in a later section of the Award.

6.    NCI's claim at Count IX for an Accounting is moot for the reasons previously stated.

7.    Mr. Kao's Cross Claim against MDG asserted statutory indemnity as to these claims and that claim is hereby denied. The Arbitrator finds specifically that Mr. Kao's conduct fell well outside the business judgment rule and also well outside the standard of his duty as a prudent manager of the Company and also well outside any other express, or implied, term in the OA, or any applicable statute, or other law, which might otherwise provide for indemnity of Mr. Kao.

8.    As to the claim by Mr. Kao that he should have been provided Directors and Officers insurance, or other similar insurance coverage, by the Company for the claims made against Mr. Kao in this matter, and/or that the Company should have filed a claim against Pacific Marine (a non-party affiliate) for having failed to provide that coverage to Mr. Kao (*V.7, 1402*), the Arbitrator finds that it was Mr. Kao's own responsibility, as the Manager of the Company, to determine what insurance was necessary, what risks that insurance would cover and to then obtain that insurance if Mr. Kao felt it was needed. Based on the record at the Hearing, the Arbitrator was made aware that Mr. Kao tendered the claims against him here to the carrier who did provide

28

CONFIDENTIAL INFORMATION                    PMT092142

JSH-008913

coverage to the Company and that this carrier declined coverage. *V.7, 1387:8-1388:2* and KAO-23 (the denial letter from the carrier). This denial is not surprising to the Arbitrator given Mr. Kao's conduct. The Arbitrator further finds that Mr. Kao has not met his burden to show that any carrier could have been found, at the relevant time and for a reasonable cost, who would have provided coverage for the egregious conduct of Mr. Kao, which is the subject of the claims involved here.

9.     As to Mr. Kao's Cross Claims 2 through 5 related to the alleged $300,000 overpayment of loans, those will be discussed in a later section of the Award.

10.     As to Mr. Kao's Cross Claim 6, for an accounting of Mr. Kao's capital account; and Claim 7, for a declaratory ruling that mirrors Mr. Kao's one count claim against NCI, the Arbitrator makes the same findings for MDG which are made below in the discussion of the same counterclaims against NCI.

11.     Mr. Kao's Counterclaim against NCI sought the following declaratory rulings. Each is determined based solely as to the CPB Loan issues discussed in this section of the Award.

a.     The Arbitrator finds that as to Counterclaim (1) NCI does not have authority under the OA, or otherwise, to unilaterally expel and disassociate Mr. Kao from the Company. Instead, that requires judicial action, or in this case, action by the Arbitrator because of the Parties' agreements to submit the matter to arbitration.

b.     The Arbitrator finds as to Counterclaim (2) that any purported previous unilateral action to dissociate Mr. Kao is therefore null and void.

c.     The Arbitrator denies Mr. Kao's Counterclaim (3) that Sections 6.2(e), 8.2 and 8.3 of the OA are generally unenforceable against Mr. Kao, however, in a later section of this Award, the Arbitrator will discuss and rule upon how the OA is to be construed in light of the Parties' conduct and the terms of the Voting Trust Agreement ("VTA").

d.     The Arbitrator grants Mr. Kao's Counterclaim (4) that MDG may not take any adverse action against Mr. Kao resulting from NCI's allegedly wrongful attempts to disassociate him from the Company. However, the Arbitrator notes that this issue appears to be moot because it is found below that dissociation shall be effective on the date of issuance of this Award.

12.     As to the requests by MDG and by NCI for the relief of dissociation of Mr. Kao from the Company, the Arbitrator finds that Mr. Kao is dissociated from the Company effective

29

CONFIDENTIAL INFORMATION                    PMT092143

JSH-008914

as of the date of this Award, subject to the further findings on that issue set forth in the balance of this Award.

13.    All monetary damages and any setoffs between the Parties related thereto will be addressed in subsequent sections of this Award.

For ease of reference, the entire set of findings made above shall be referred to hereafter as the "CPB Findings".

### C.    AWARD FINDING #4 REGARDING THE RADIUS PPP LOAN

On April 19, 2020, Mr. Chen broached the idea to Mr. Kao that: "We could have made two applications at different banks…*We would need another bank with idiots running it and weak verification capabilities.*" *See* NCI-013 (emphasis supplied). Mr. Chen followed up, "Can we try for a second PPP *or is that a double dip if we use same data?*" *See* NCI-154 (emphasis supplied). It is a "double dip" and thus unlawful to use the same data. *See* 15 U.S.C. § 636(a)(36)(G)(i)(III)-(IV) and *V. 2, 370:1-17*. Mr. Kao then "insinuated" to Radius that they "got screwed on the CPB PPP Application" in setting up his next fraudulent application to Radius. *See* NCI-119.

Mr. Kao submitted the Radius PPP Application on April 20, 2020 (*see* NCI-403 at LC_000116-17) after Mr. Kao had already received and used funds from the CPB PPP Loan. The Radius PPP Application also included a Summary of Payroll and Related Costs for the Year Ended December 31, 2019 ("Radius Summary"), which did not include an Office Expansion Pool. *See* NCI-403 at LC_000202. Mr. Kao falsely claimed to Radius, "*we did submit an application with a local Hawaii bank for a completely separate company, and that is the one that got fumbled.*" *See* NCI-403 at LC_000196 (emphasis supplied). But, except for the Office Expansion Pool, Mr. Kao submitted the same employee and payroll figures (i.e., the same employees and data) in the CPB PPP Application and the Radius PPP Application, along with their respective supporting documents. *Cf.* NCI-403 at LC_000116-17 (Radius PPP Application), *id.* at LC_000202 (Radius Summary), with NCI-002 at 8-9 (CPB PPP Application), KAO-6 at CPB-000147 (CPB Summary). As Gabe Beukinga from Radius ("Mr. Beukinga") testified, this was problematic because it was "double counting." *V.6, 1225:19-1226:16*. Submitting the same data in the Radius PPP Application under the name Navatek CFD – a wholly owned subsidiary of the Company – did not change the fact that Mr. Kao had already applied for and received a PPP Loan for the same data from CPB. *V.2, 413:20-415:4*.

30

CONFIDENTIAL INFORMATION                    PMT092144

JSH-008915

Mr. Kao took advantage of Radius' perceived "weak verification capabilities" by submitting the Radius PPP Application under the name of one of the Company's wholly-owned subsidiaries--Navatek CFD. *See* NCI-013; NCI-403 at LC_000116-17. Mr. Kao misrepresented this relationship on the Radius PPP Application by answering "No" to the question:

> Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business? If yes, list all such businesses and describe the relationship on a separate sheet identified as addendum A.

*See* NCI-403 at LC_000116.

When Mr. Beukinga asked Mr. Kao about the relationships between and among the Company, Navatek CFD, and other subsidiaries, he was told:

> Each of these companies have their own employees. So yes, 'technically' they should be submitting separate applications for each. We can do that, but during PPP 1, was told to combine them. Otherwise, it would appear that the same company was submitting multiple applications.

*See* NCI-190 at MDG-HIGJ00106420-21; *see also* NCI-164 at MDG-HIGJ00051034 (Mr. Kao telling Mr. Chen and Mr. Lum Kee that he responded to Mr. Beukinga *"in a manner to further confuse and bewilder him."* (emphasis supplied).

Accordingly, Mr. Kao knowingly falsely certified that the Company "has not and will not receive another loan under the Paycheck Protection Program." *See* NCI-403 at LC_000117. Mr. Kao did this again on May 4, 2020 when he signed the Radius Promissory Note. *See* NCI-419 at LC_000205-210. In making these knowing false certifications to obtain a second PPP loan, Mr. Kao violated 18 U.S.C. § 1343.

Apparently to deceive his own employees, Mr. Kao then created the false narrative that the Radius Loan he had applied for as a PPP Loan was somehow not a PPP Loan. Pam Berry ("Ms. Berry") provided direct evidence that she had heard that false narrative in her deposition:

> [T]here was one loan that was going to be a PPP loan, but they had reached out to the bank, [Chen] and Martin and [Lum Kee] had reached out to the bank and converted that into what was called, he called it a normal loan, a regular loan. . . . [A]gain, there was supposed to be another loan that was going to be a PPP. But they called the bank. They worked with the bank and got that paperwork straightened out so that it would be whatever normal loan means.

*See* Berry transcript at KAO-1 at Ex 4, pp. 41:17-21, 42:13:17.

31

CONFIDENTIAL INFORMATION                    PMT092145

JSH-008916

On May 1, 2020, Mr. Chen sent Mr. Kao a Bloomberg News article about early signs of fraud related to PPP Loans. *See* NCI-017. Mr. Kao replied, "***Fk.***" *See* NCI-018 (emphasis supplied). The timing in the record indicates that Mr. Kao then tried to create a paper trail to suggest that the Radius Loan was not a PPP Loan. What purports to be a promissory note with Radius (located on the desktop of Mr. Kao's computer) contains no PPP terms. *See* NCI-216; *V.6, 1241:15-17*. Mr. Lum Kee and Mr. Kao persisted in the false narrative that Radius agreed to remove the loan from the PPP program--even when confronted with data from the SBA showing that the Radius Loan was a PPP Loan--with Mr. Lum Kee stating on July 6, 2020, "***Radius removed us from the PPP program, even though they modeled the loan around it. The actual loan documents don't reference PPP. Good thing though that isn't us…***" *See* NCI-150 at MDG-HIGJ00014400 (emphasis supplied) (ellipsis in original).

However, this was untrue, as the actual loan documents, as produced by Radius, repeatedly reference the PPP. *See* NCI-419 at LC_000205-10. Mr. Kao himself had signed the Radius Promissory Note, which contained numerous references to PPP and the CARES Act, on May 4, 2020, confirming the Radius PPP loan was in fact a PPP Loan. Mr. Beukinga testified there was no doubt that the loan applied for with Radius was a PPP Loan, as memorialized by the terms of the Radius Promissory Note, as funded by Radius, and deferred pursuant to PPP terms. Mr. Beukinga confirmed during his testimony that NCI-419 was the correct version of the Radius Promissory Note. *V.6, 1242:7-17*. NCI's expert, Tom Simon ("Mr. Simon"), testified, "someone clearly didn't want someone else to know that this was a PPP loan. ***Whoever removed those paragraphs is trying to create the illusion this is a loan in, some other kind of loan, a normal bank loan as opposed to a forgivable PPP loan.***" *V.2, 450:11-16* (emphasis supplied).

For each of the above reasons, the Arbitrator makes the same Findings and Award independently as to the events discussed in this section, which were made in the CPB Findings discussed previously.

**E.   AWARD FINDING #5 REGARDING THE FIRST HAWAIIAN BANK ("FHB") PPP LOAN**

Mr. Kao also improperly applied on the Company's behalf for a third PPP Loan with FHB. *See* NCI-185 at MDG-HIGJ00081560-61 (in which Mr. Chen replies, "***Navatek putting the 'Triple' in the PPP.***" (emphasis supplied). Mr. Kao reiterated his instructions the next day and Mr. Chen confirmed they "***[j]ust need to construct a plausible defensible narrative to explain these series of actions if ever called on it.***" *See* NCI-142 at MDG-HIGJ00011556 (emphasis

CONFIDENTIAL INFORMATION                    PMT092146

JSH-008917

supplied). Mr. Kao first submitted a PPP application for Navatek SHC to FHB on April 21, 2020, falsely telling Darlene Blakeney ("Ms. Blakeney"):

> *As we discussed, we dropped the ball with timing and process the first time. . . . we really got confused on how to apply. . . . we discussed with SBA and figured it out...too late. We'll [sic] here is hopefully our second chance.*

*See* NCI-170 at MDG-HIGJ00051156 (emphasis, ellipsis in original).

In fact, at this time the CPB PPP Loan was already funded (and portions had been improperly used for Mr. Kao's mortgage application on his Kahala home) and the Radius PPP Application had also been submitted the day before. Later in the day on April 21, 2020, applications for Navatek LLC and Navatek CFD were submitted to FHB.

On April 28, 2020, FHB discovered that both Navatek LLC and Navatek CFD had already been approved for PPP loans with other banks. *See* NCI-006 at 12. Ms. Blakeney informed Mr. Kao of that discovery and indicated that it caused the FHB applications to be rejected. *See* NCI-158 at MDG-HIGJ00050835. The next day, Mr. Kao then texted this message to Mr. Chen and Mr. Lum Kee:

> FK. I'M IRRITATED THE BITCH GOT THE BETTER OF US.

*See* MDG-234 (emphasis supplied).

At the same time, Mr. Kao replied to Ms. Blakeney:

> *Thank you again . . . . We're over it already. We've spent way too much time . . . for too little money involved in the scheme of our overall operations and revenue."*

*See* NCI-158 at MDG-HIGJ00050835 (emphasis supplied).

Mr. Kao then asked Mr. Chen and Mr. Lum Kee if his email to Ms. Blakeney was "*Oscar worthy?*" *See* NCI-158 at MDG-HIGJ00050834 (emphasis supplied). Mr. Chen replied, "the broader lesson here is to not work with these larger banks." *Id.* at MDG-HIGJ00081620; *cf.* NCI-137 at MDG-HIGJ00011415 ("Need banks smaller than CPB to get a more risk tolerant lender.").

Mr. Kao thus intentionally submitted employee and payroll figures for Navatek LLC and Navatek CFD a third time, in an attempt to obtain a PPP Loan from FHB, which only failed because he ran into a commendably professional and alert banker in Ms. Blakeney, who was able to prevent Mr. Kao from defrauding her bank as he had two other banks. Mr. Kao again used fraudulent representations in the applications he submitted, again in apparent violation of 18 U.S.C. § 1343.

CONFIDENTIAL INFORMATION          PMT092147

JSH-008918

Furthermore, Mr. Kao's acknowledgment that Ms. Blakeney "got the better of" him and his withdrawal of the PPP application demonstrate to the Arbitrator that Mr. Kao knew that what he was attempting to do was fraudulent. Mr. Kao's distasteful and sexist reference to Ms. Blakeney, who was just doing a very good job for her employer, has no legal consequence except as evidence of Mr. Kao's pattern of bullying and arrogance over not being able to consummate a third fraud.

For each of the above reasons, the Arbitrator makes the same Findings and Award independently as to the events discussed in this section which were made in the CPB Findings discussed previously. However, the Arbitrator also finds that no loan was consummated with FHB and thus no direct special damages flow from this failed attempt at fraud. Rather these findings concern evidence showing Mr. Kao's intent, pattern of behavior and tactics, and are relevant to the consideration of punitive damages.

### E.    AWARD FINDING #6 REGARDING MONEY LAUNDERING PPP FUNDS

The amount of $10,000,000 of the CPB PPP Loan proceeds were deposited in the Company's CPB account on April 17, 2020. *See* NCI-341 at NCI002039. Mr. Kao thereafter texted Mr. Chen and Mr. Lum Kee on April 18, 2020 confirming the deposit, stating, "it's in. Grandpa [referring to Roland Chang of CPB] just called me." *See* NCI-011.

The Company's CPB account balance prior to this deposit was $590,596.30. It increased to $10,559,952.90 with the CPB PPP Loan proceeds. *See* NCI-341 at NCI002042. Mr. Kao then instructed Mr. Lum Kee to transfer $2,000,000 from the Company's CPB account to Mr. Kao's personal Merrill Lynch account. *See* NCI-224 at NCI000176. Mr. Kao then issued check #30986 for $2,000,000 from the Company to Mr. Kao's personal account on April 21, 2020. *See* NCI-224 at NCI000179.

Without the $10,000,000 CPB PPP Loan proceeds, the Company's CPB account balance, including deposits made through April 21, 2020, would have been insufficient to clear the $2,000,000 check. *See* NCI-341 at NCI002038-39, NCI002042; *V.2, 366:7-21*. Check #30986 was deposited into Mr. Kao's personal Merrill Lynch account on April 21, 2020. *See* NCI-224 at NCI000180; NCI-004 at 158. Thus, Mr. Kao completed a monetary transaction involving property obtained from unlawful activity (i.e., wire fraud) in violation of 18 U.S.C. § 1957.

On April 24, 2020, Mr. Kao stated that:

> Speaking of moving funds around, *maybe we should start moving slowly more funds out of CPB over the next few months... wash it from them,*

34

CONFIDENTIAL INFORMATION          PMT092148

JSH-008919

*before moving it all back to CPB. That way it looks like "new funds". .* Is
it difficult to change the account that the Government pmt systems sends
money too? (sic)  Can have them send to Navatek Merrill account until we
exhaust the CPB loan funds currently in there? *That way it even looks like
were using it for payroll"*

*See* NCI-144 at MDG-HIGJ00011736-37 (emphasis supplied).

This email from Mr. Kao expresses his unambiguous intent to "wash" or launder the PPP
Loan money which the Company had just fraudulently obtained and was a further violation of 18
U.S.C. § 1957.  Mr. Kao reiterated this intent on April 27, 2020, by instructing Mr. Chen and Mr.
Lum Kee, *"you should move as much as the funds out of CPB as possible this week."* *See* NCI-
145 at MDG-HIGJ00011772 (emphasis supplied).  Each of these transfers, constituted an improper
use of PPP funds in contravention of the certification made by Mr. Kao on the CPB PPP
Application.  For example,

*[t]he funds will be used to retain workers and maintain payroll or make
mortgage interest payments, lease payments, and utility payments . . . . I
understand that if the funds are knowingly used for unauthorized
purposes, the federal government may hold me legally liable, such as for
charges of fraud.*

*See* NCI-002 at 9 (emphasis supplied).

At this point, transfers from the Company's CPB account to the Company's Merrill
Lynch account had already begun:

| DATE | FROM CPB ACCOUNT | TO MERRILL LYNCH ACCOUNT |
|------|------------------|--------------------------|
| 4-20-2020 | Check #31029 for $2,000,000 (NCI-341 at NCI002055) | MDG-153 at MDG00196552 |
| 4-27-2020 | Check #31124 for $3,000,000 (NCI-341 at NCI0002058) | MDG-153 at MDG00196488 |
| 5-07-2020 | Check #31127 for $3,000,000 (NCI-570 at MDG00164798) | MDG-153 at MDG00196499 |

These transfers then reversed direction, flowing from the Company's Merrill Lynch
account back to the Company's CPB account:

35

CONFIDENTIAL INFORMATION          PMT092149

JSH-008920

| DATE | FROM MERRILL LYNCH ACCOUNT | TO CPB ACCOUNT |
|---|---|---|
| 6-05-2020 | $500,000 transferred as transaction "NAV 6-4" (MDG-153 at MDG00196488) | MDG-153 at MDG00196475 |
| 6-18-2020 | $1,000,000 transferred as transaction "NAV 6-13" (MDG-153 at MDG00196488) | MDG-153 at MDG00196476 |
| 6-26-2020 | $500,000 transferred as transaction "NAV 6-16" (MDG-153 at MDG00196488 | MDG-153 at MDG00196476 |
| 6-29-2020 | $2,000,000 transferred as transaction "NAV 6-23" (MDG-153 at MDG00196488) | MDG-153 at MDG00196476 |
| 7-08-2020 | $500,000 transferred as transaction "NAV 7-1" (MDG-153 at MDG00196489) | MDG-153 at MDG00196476 |
| 7-16-2020 | $1,500,000 transferred as transaction "NAV 7-11" (MDG-153 at MDG00196489) | MDG-153 at MDG00196476 |
| 7-20-2020 | $1,000,000 transferred as transaction "NAV 7-14" (MDG-153 at MDG00196489) | MDG-153 at MDG00196477 |
| 7-29-2020 | $500,000 transferred as transaction "NAV 7-19" (MDG-153 at MDG00196489) | MDG-153 at MDG00196478 |

See also NCI-195 at MDG-HIGJ00151955-56 (discussing timing the transfers from Merrill Lynch to CPB to correspond with payments received from the government, noting that *"[t]iming is good and we can point to these payments as the sourcing of the funds used to pay the [Company's CPB line of credit]*," (emphasis supplied)). The Arbitrator finds this to be an acknowledgment that the use of PPP proceeds to make the payment was improper. As a result of Mr. Kao's deliberate "washing," $8,000,000 in total flowed from the Company's CPB account to the Company's Merrill Lynch account and $7,500,000 in total flowed back from the Company's Merrill Lynch account to the Company's CPB account. Each of these transfers, in addition to being used for an improper purpose under PPP, constituted a monetary transaction involving property from unlawful activity in violation of 18 U.S.C. § 1957.

For each of the above reasons, the Arbitrator makes the same Findings and Award independently as to the events discussed in this section which were made in the CPB Findings discussed previously.

36

CONFIDENTIAL INFORMATION                PMT092150

JSH-008921

In addition, the Arbitrator finds liability against Mr. Kao and in favor of NCI on NCI's Count IV, for Embezzlement, of the $2 million in funds discussed above and Count V for Conversion and Count VI, Unjust Enrichment ,as to these same converted funds.

**F.    AWARD FINDING #7 REGARDING MR. KAO'S TACTICS**

Mr. Kao pressured each of the banks involved to process the Company's applications quickly. *See, e.g.*, NCI-134 at MDG-HIGJ00011192 (stating that approval and funding "*should be automatic*") (emphasis supplied)); and NCI-133 at MDG-HIGJ00011189 (commenting, just twelve hours after the CPB PPP Application was submitted, "*[o]urs should have been processed by now.*") (emphasis supplied)).

Also, on April 2, 2020, Mr. Kao flexed his connections with U.S. Senators Susan Collins (R-ME), James Inhofe (R-OK), and Lindsay Graham (R-SC), "*urg[ing] CPB to process as quickly as possible Navatek's application, so I can give great praise to how CPB was able to administer quickly the intent of Congress and President [Trump].*" *See* NCI-133 at MDG-HIGJ00011190, (emphasis supplied).

On April 7, 2020, Mr. Kao switched from a carrot to a stick with CPB, stating that Senator Inhofe and U.S. Representative Horn "*asked about the status of our PPP application and were very adamant about stepping in, if our application was getting stalled.*" *See* NCI-136 at MDG-HIGJ00011345(emphasis supplied).

On April 10, 2020, Mr. Kao told CPB its review of applications "*are simple checks of information and mathematical accuracy*" that "*should take minutes. . . NOT days*" (*see* KAO-6 at CPB-000129 (ellipsis in original) (emphasis partially supplied)) and that "*[a]ny additional review that the bank does should be perfunctory...at best*" (*see* KAO-6 at CPB-000130 )(ellipsis in original, emphasis supplied)).

Each of these communications indicates that Mr. Kao was bullying and creating a false sense of urgency to try to steamroll approval of the applications and thus avoid a thorough, detailed review of the applications, which might have exposed his fraud.

The contention by Mr. Kao's counsel that Mr. Kao thought that CPB might claw back its loan because the loan was funded outside of the ten-day window was not supported by any evidence during the Hearing that CPB ever even contemplated doing so. *V.2, 375:15-20.* Mr. Kao raised no such concern at the time. Instead, on April 27, 2020, Mr. Kao said the following to Mr. Chen and Mr. Lum Kee:

37

CONFIDENTIAL INFORMATION                    PMT092151

JSH-008922

> Not sure why [CPB] is now trying to understand our PPP calcs (after the fact). *If [CPB] calls me I can present to [CPB] a very plausible story. I don't think they can do much at this point as they have already given us the loan. That said, you should move as much as the funds out of CPB as possible this week.*

*See* NCI-145 at MDG-HIGJ00011772 (emphasis supplied).

The Arbitrator thus finds that Mr. Kao's intent at the time was to get the loan proceeds, then "wash" them as quickly as possible. The evidence reviewed in the previous section indicates that this intent was accomplished.

The findings in this section of the Award do not involve conduct which the Arbitrator finds has independently caused special damages under any count, or claim made by NCI or MDG. Rather these findings concern evidence related to Mr. Kao's intent, pattern of behavior and tactics, and are relevant to the consideration of punitive damages.

The Arbitrator does find, based on the entire record, including the evidence reviewed in this section, that Mr. Kao willfully and intentionally engaged in a misleading, dishonest, bullying and reckless pattern of behavior in order to support and accomplish his goal of fraudulently obtaining PPP funds.

G.    AWARD FINDING #8 REGARDING FEDERAL CAMPAIGN CONTRIBUTIONS

Under 52 U.S.C. § 30119, it is unlawful for a federal government contractor to directly or indirectly "make any contribution of money . . . to any political party, committee, or candidate for public office or to any person for any political purpose or use[.]" *See also* 11 C.F.R. § 115.2. 11 C.F.R. § 115.4(a)-(b): which provides that:

> (a) The assets of a partnership which is a Federal contractor *may not be used to make contributions or expenditures in connection with Federal elections.* (b) Individual partners may make contributions or expenditures in their own names from their personal assets." (emphasis added).

Additionally, under 52 U.S.C. § 30122, it is unlawful to make a political contribution in the name of another person, i.e., a "conduit" or "straw donor" contribution. *U.S. v. Whittemore*, 776 F.3d 1074, 1078-79 (9th Cir. 2015) ("[2 U.S.C.] Section 441f [now known as 52 U.S.C. § 30122] directly addresses so-called 'conduit' or 'straw donor' contributions."). In straw-donor cases, the "key issue . . . is the source of the funds. Id. at 1080 (emphasis in original). 52 U.S.C. § 30122 "prohibits straw donor contributions, in which a defendant solicits others to donate to a candidate for federal office in their own names and furnishes the money for the gift either through

38

CONFIDENTIAL INFORMATION                    PMT092152

JSH-008923

an advance or a prearranged reimbursement." *United States v. O'Donnell*, 608 F.3d 546, 556 (9th Cir. 2010) (rejecting the argument that no violation occurred where contributions were actually transmitted by straw donors in their own names). It also prohibits gifts to third parties who subsequently decide to voluntarily contribute to a campaign. *See, supra, United States v. Whittemore*, 776 F.3d at 1079 (9th Cir. 2015).

### 1.    Contributions By Way Of MDG's American Express Cards

During Mr. Kao's tenure as manager and CEO of the Company, he and his wife made frequent contributions to federal political campaigns using Company-issued American Express cards. *See, e.g.*, NCI-393 at 14-16; *see also* Pre-Arbitration Brief of NCI at Appendix 1. Mr. Kao could have made those contributions individually from his personal bank account. By law, Mr. Kao could not do so from the Company's assets. *See* 52 U.S.C. § 30119; see 11 C.F.R. § 115.4(b).

Mr. Simon, testified very credibly about the impropriety of such transactions:

> [SIMON]: Navatek by even creating the appearance of impropriety and Mr. Kao would put the Company at tremendous risk by doing that. There are so many better ways for individuals to make political contributions than to do it in that manner. . . .
>
> Q: Let me ask you this. Was the concern about it that [Kao] paid for it from company dollars? Or was the concern that it looked like he was making donations in return for political favors.
>
> A: I would say both. Both are awful things to do.
>
> Q: Well, let's talk about making political contributions for favors. Would you say that's improper?
>
> A. Absolutely. Quid pro quo is a crime.

*V.2, 377:18-378:10.*

Mr. Kao's defense to his conduct was that there were "long-standing contribution[s] made by Navatek[,] Pacific Marine and its affiliated companies." However, this ignores the source of the funds used to make those contributions. *V.2, 380:7-11* (referring to KAO-98).

Moreover, it is "important to look at where money is going or to whom it's going" when someone is "trying to exert influence." *V.2, 451:20-23.* The contributions made and orchestrated by Mr. Kao almost invariably went to members of the Senate Appropriations Committee (including the Subcommittee for Defense), the Senate Armed Services Committee, the House Appropriations Committee (including the Subcommittee for Defense), and the House Armed Services Committee. Indeed, it "make[s] perfect sense . . . why a defense contractor would want

39

CONFIDENTIAL INFORMATION                    PMT092153

JSH-008924

to funnel money to those particular politicians." *V.3, 452:13-15.* Mr. Kao purposefully, methodically, and repeatedly orchestrated and made contributions to federal campaigns using Company funds in an effort "get a Big Mac 100% of the time," i.e., to "pay to play." *See* NCI-116 at MDG-DCGJ00203154; *see also* NCI-393 at 14-16.

    2.    **Contributions Through the Society of Young Women Scientists and Engineers to the 1820 PAC**

Mr. Kao engaged in an unlawful campaign contribution to the 1820 PAC, a political action committee ("1820 PAC") in violation of 52 U.S.C. §§ 30119 and 30122. Mr. Kao stated his contribution to the 1820 PAC was made because he was "willing to help move heaven and earth to help [Senator Collins] win" and would "obviously help the 1820 PAC" after discussing the "'best approach for doing so." *See* NCI-109 at MDG-DCGJ00162074.

Mr. Kao started the Society of Young Women Scientists and Engineers ("SYWSE")--an "LLC that can be set up to 'facilitate' transactions" and that is *"super vague and very difficult to get any background info on."* *See* NCI-109 at MDG-DCGJ00162073 (emphasis supplied). After "setting up the new LLC and associated bank accounts" (*see* NCI-109 at MDG-DCGJ00162072), check #30326 for $150,000 was written *from the Company* to the SYWSE on December 26, 2019 (*see* NCI-325 at NCI001356). The next day, the check was deposited into the SYWSE's bank account. *See* NCI-325 at NCI001355-57. A check for $150,000.00, signed by Mr. Kao, was then written from the SYWSE to the 1820 PAC. *See* NCI-325 at NCI001359. It was rejected at first because Mr. Kao was not a signatory on the SYWSE's bank account. *See* NCI-393 at 13-14. The check subsequently cleared once Tiffany Lam, Mr. Kao's wife, and the manager of the SYWSE, signed the check. *See* NCI-393 at 13-14; *see also* NCI-325 at NCI001360-62 (the SYWSE's sole financial statement entries were the transactions facilitating the 1820 PAC Contribution).

On February 3, 2020, the Campaign Legal Center filed a complaint with the Federal Elections Commission ("FEC") against the SYWSE for its contribution to the 1820 PAC. *See, e.g.,* Lachlan Markay, Susan Collins' Campaign is Being Helped by a Mysterious Hawaii Company, THE DAILY BEAST (Feb. 3, 2020, 11:27 AM), https://www.thedailybeast.com/susan-collins-campaign-is-being-helped-by-a-mysterious-hawaii-company (last updated Feb. 4, 2021, 4:28 AM). Although "[f]rom a forensic accounting perspective you rarely can see things this clean and neat[,]" (*V.2, 431:22-24*) after news broke about the contribution, *Mr. Kao maintained that the "contribution to the 1820 PAC ha[d] nothing to do with [the Company]".* *See* NCI-100 at MDG-DCGJ00012168, (emphasis supplied).

CONFIDENTIAL INFORMATION        PMT092154

JSH-008925

Prior to the FEC complaint, SYWSE had no funding. SYWSE made no scholarship contributions aside from the 1820 PAC contribution. *See, e.g.,* MDG-184 (showing the earliest scholarship being paid on March 23, 2020). A scholarship program was set up later to do "damage control" following "the screwup with 1820." *See* NCI-098 at MDG-DCGJ00000104.

The above evidence demonstrates that Mr. Kao's facilitation of the contribution to the 1820 PAC, via the SYWSE, was a violation of 52 U.S.C. §§ 30119 and 30122.

### 3.    Contributions Through MDG's Employees and their Family Member

Between June 2019 and September 2019, Mr. Kao's family members, as well as his employees, Mr. Chen, and Mr. Lum Kee, contributed to Senator Collins' campaign. *See* NCI-229 at NCI000238-39. A Special Agent for the Federal Bureau of Investigation reviewed Mr. Kao's personal FHB bank records, which show that Mr. Kao "wrote a series of $5,600 checks to Christopher Maxim Tory Lam (his brother-in-law), Christopher Mark Toby Lam (his brother-in-law), Christopher Michael Todd Lam (his brother-in-law), JoAnn Lam (his mother-in-law), and Rachel Kao (his mother), and a $5,200 check to George Kao (his father). *Id.* at NCI000239. The same amounts given by Mr. Kao to his family members were subsequently donated to Senator Collins' campaign by the same individuals. *Id.*; *see also* NCI-328.

Similarly, on September 26, 2019, checks were written from the Company's CPB account to Mr. Chen and Mr. Lum Kee, the same day that Hsiu Chan Chen (Mr. Chen's mother) and Joy Lum Kee (Mr. Lum Kee's wife) donated to Senator Collins' campaign. *See* NCI-229 at NCI000239-40, NCI-329 and NCI-330. Within a week, Mr. Chen wrote his mother a check for $5,600--the same amount she contributed. *See* NCI-229 at NCI000240. Mr. Chen's mother later "told law enforcement that . . . Chen gave her money and asked her to donate it to the Collins for Senator campaign committee, which she did." *Id.* Mr. Kao was not only aware of this straw donor contribution by being copied on emails with Mr. Chen and Mr. Lum Kee, but Mr. Kao also specifically informed the Collins Campaign that the donation would be coming. *See* NCI-229 at NCI000241-42.

Mr. Kao similarly orchestrated contributions through Mr. Chen and Mr. Lum Kee. For example, on May 4, 2020, Mr. Kao instructed Mr. Chen and Mr. Lum Kee, "Please do $5,600 each on Amex. Send me receipt after. Thx." and included a link to donate to Senator Lindsey Graham. *See* NCI-192 at MDG-HIGJ00151895; *see also* NCI-010 (Mr. Kao asking Mr. Chen and Mr. Lum Kee, "*you guys ok having your names associated with donations I'm making next week?*")

41

CONFIDENTIAL INFORMATION                    PMT092155

JSH-008926

(emphasis supplied). Mr. Chen and Mr. Lum Kee both complied, each donating $5,600 to the Graham Campaign using their Company American Express cards. *See, e.g.,* MDG-049 at MDG02503975; MDG-050 at MDG00281443, MDG00281447; MDG-088 at MDG00160307, MDG00160319.

Mr. Kao's conduct in orchestrating and condoning straw donor contributions through his family members, the Company's employees, and their family members was in violation of 52 U.S.C. § 30122 and was done to circumvent the prohibition on contributions by federal contractors under 52 U.S.C. § 30119, which Mr. Kao also violated.

For each of the above reasons, the Arbitrator makes the same Findings and Award independently as to the events discussed in this section which were made in the CPB Findings discussed previously.

In addition, the Arbitrator finds liability against Mr. Kao and in favor of NCI on NCI's Count IV, for Embezzlement, of the Company funds discussed above, Count V for Conversion and Count VI, Unjust Enrichment as to these same converted funds.

### H.    AWARD FINDING #9 REGARDING ALLEGATIONS OF BREACH OF FIDUCIARY DUTY BY SELF DEALING

#### 1.    Applicable Law

MDG and NCI have both claimed breaches of fiduciary duty by Mr. Kao based on claims of self-dealing. By statute, the fiduciary duty of loyalty for a manager of a limited liability company prohibits self-dealing. *See, e.g.,* HRS § 428-409(b)(2) (prohibiting a manager from "dealing with the company . . . as or on behalf of a party having an interest adverse to the company"). The OA has a similar prohibition. *See* NCI-202 at NCI000043 (§ 5.4(f) prohibiting "transaction[s] between the Company and any Member, Manager, or Affiliate which may not be an arm's length transaction" without the unanimous written consent of the members). Indeed:

> A partner, and by analogy, a member of a limited liability company, has a fiduciary obligation to others in the . . . limited liability company which bars not only blatant self-dealing, but also requires avoidance of situations in which the fiduciary's personal interest might possibly conflict with the interests of those to whom the fiduciary owes a duty of loyalty.

*Willoughby Rehab. & Health Care Ctr., LLC v. Webster,* 12431-04, 2006 WL 3068961, at *4 (N.Y. Sup. Ct. Oct. 26, 2006).

An arm's length transaction is defined as a "transaction between two unrelated and unaffiliated parties" or a "transaction between two parties, however closely related they may be,

42

CONFIDENTIAL INFORMATION                    PMT092156

JSH-008927

conducted as if the parties were strangers, so that no conflict of interest arises. Arm's-Length Transaction, BLACK'S LAW DICTIONARY (11th ed. 2019).

During the Hearing, the Arbitrator specifically inquired of the Parties as to whether Mr. Kao's use of the Company's funds to pay for certain personal expenses and/or for improper distributions were no longer items of damage because they had already been reclassified by the Company to reduce his capital account balance. *V.4, 778:8-780:8* and *V.4, 756:9-15* (observing that net income increases capital account balances, while distributions decrease capital account balances). The Parties were each asked to, and then chose to, submit supplemental briefs to the Arbitrator in an effort to clarify that issue. The specific damages claimed and allowed will be addressed further below.

The Arbitrator notes that MDG did appear to concede in MDGPCB1 that some expenses and/or distributions originally claimed as damages may have already been accounted for by reducing Mr. Kao's capital account balance, as reflected on the most recent K-1 issued to him. MDG also appears to concede that the Arbitrator must determine the amount of damages and also which capital account calculation applies in this case in order to resolve these issues:

> *Though some expenses and/or distributions may already have the effect of reducing Kao's capital account balance, as reflected on a particular K-1,...*" MDG highlights what occurred because: (1) they are illustrative of Kao's repeated acts of self-dealing and therefore support the Company's claims for breaches of fiduciary duties, dissociation, and punitive damages; (2) a matching 1% distribution was not made to NCI, which is a breach of §§ 4.1 and 8.1(e) of the Operating Agreement; and (3) *the effect these items have on Kao's capital account, if such a valuation is required, would depend on the date of Kao's capital account valuation (e.g., if Kao's capital account was valued using the 2019 K-1, expenses and distributions that occurred in 2020 and 2021 had not had the effect of reducing Kao's capital account because they occurred after the date of the 2019 K-1). Once a determination is made* concerning the amount of damages owed by Kao *and when he was dissociated* (which may be relevant to capital account valuation), *damages that already reduced Kao's capital account can be identified and excluded from a damages award."*

*See* MDGPCB1 at p. 18 (emphasis supplied).

This portion of the Award therefore tracks those transactions, but without addressing whether or not they are still outstanding as recoverable damages because they have already been offset against Mr. Kao's capital account.

43

CONFIDENTIAL INFORMATION          PMT092157

JSH-008928

The alleged self-dealing transactions are shown in MDG-225 and MDG-225A, which contain more than 1,250 pin citations to the record. These citations detail the supporting records and substantiation for the transactions contained therein, including receipts, invoices, checks, account statements, and general ledger entries. To the extent particular transactions contained in MDG-225 have been incurred, but not yet paid (*e.g.*, NCI-535; NCI-537; NCI-538) the Company's position is that these are still a liability that the Company believes it must pay. These transactions will be reviewed by category below.

### 2. Improper Use of Company Funds for Personal Expenses

While acting as the Company's Manager and Member, Mr. Kao clearly used the Company's funds inappropriately to pay for numerous personal expenses, including airfare, lodging, and transportation expenses for himself and his family. *See, e.g.*, MDG-225; NCI-242 at MDG016691-95; MDG-037 at MDG00281064; and NCI-065 at MDG015995. Under basic accounting principles, Mr. Kao's personal transactions and the Company's business transactions should not have been commingled in the same accounting records. Furthermore, Mr. Kao's personal expenses should have been treated as imputed income and taxed accordingly, i.e., as fringe benefits. Instead, Mr. Kao caused his personal expense transactions to be recorded alongside the Company's business transactions and expenses. In addition, Mr. Kao failed to reimburse the Company for his personal expenses at the time they were incurred and otherwise failed to treat the expenses as imputed income. Instead, in some instances, Mr. Kao treated the Company's funds and his personal funds as essentially the same. *See* NCI-102 at MDG-DCGJ00100058; *see also* NCI-479 at MDG-DCGJ00105290 *("[T]here is no difference between Navatek's assets and myself from a lender's perspective."*) (emphasis supplied)).

### 3. Improper Use of Company Funds for Kao-Related Entities

Mr. Kao also caused the Company to pay for multiple expenses on behalf of the Marty & Mickey Kao Foundation ("MMK Foundation") and the Navatek Foundation ("Navatek Foundation") (the MMK Foundation and Navatek Foundation referred to together as the "Foundations"). The Foundations were tax-exempt organizations which were controlled by Mr. Kao and/or his family members. *See, e.g.*, MDG-225. Neither of the Foundations were a part of MDG or were necessary for MDG's business. For example, Mr. Kao caused the Company to pay for certain of the Foundations' legal fees, as well as expenses related to the MMK Foundation's luxury condominium. *See* NCI-392 at 4; *see, e.g.*, NCI-301 at NCI00986-1006. Just as personal

CONFIDENTIAL INFORMATION                    PMT092158

JSH-008929

expenses should have been segregated from the Company's business expenses, expenses related to the Foundations should have also been segregated. This segregation did not occur. None of the expenses made on behalf of the Foundations were repaid by the Kao-related organizations, or by Mr. Kao himself at the time. *See* NCI-392 at 4. The effect of these transactions also reduced the Company's income, which in turn reduced Mr. Kao's taxable income creating potential tax liability for both the Company and Mr. Kao.

### 4.    Improper Distributions

Under § 4.1 of the OA, proportional distributions are supposed to be made to Mr. Kao (99%) and NCI (1%). *See* NCI-202 at NCI000041. Sections 4.1 and 4.2 of the OA further require that distributions be made using "Distributable Cash," which requires a determination of cash "in excess of the reasonable cash requirements and repair, replacement, and other reserves of the Company." *See* NCI-202 at NCI000041. There was no evidence of Mr. Kao having made such a determination or calculation of "Distributable Cash" before making these distributions. *See, e.g., V.1, 77:24-78:8.*

Mr. Kao also made, or caused to be made, distributions to himself, without making, or causing to be made, proportional 1% distributions to NCI. These unmatched distributions included at least $325,000 distributed to Mr. Kao in or around December of 2019, $120,000 distributed to Mr. Kao in February of 2020, and $50,000 in August of 2020. *See, e.g.,* MDG-225. NCI received no proportional distribution and was never made aware of, nor did it approve, any of these distributions to Mr. Kao. The unmatched distributions breached OA § 4.1, which in turn triggers OA § 8.1(e). *See* NCI-202 at NCI000046; *V.6, 1311:6-15.*

Mr. Kao's December 2019 distributions were made to erase two notes receivable off the Company's accounting books--one for the unlawful $150,000 funneled through the SYWSE to the 1820 PAC and another for $175,000. *See, e.g.,* MDG-154 at MDG00196031. Mr. Kao was extremely facile to his own advantage as to distributions. At one point, Mr. Kao discussed whether he could use PPP funds to pay himself a tax-free severance and increase his capital account balance for future tax-free distributions. *See* NCI-163 at MDG-HIGJ00051005 ("*[D]oes it makes sense to do the severance sooner vs. waiting the 8 weeks? It's net zero for taxes between the severance income to me and the deduction for the LLC. Then when I repatriate the funds back to LLC, it's a capital contribution. So no income to LLC and my cap account goes up. So when I get a*

CONFIDENTIAL INFORMATION                    PMT092159

JSH-008930

*distribution, I could just book as a return of capital depending on how the tax situation looks.*")(emphasis supplied)).

These distributions were in material breach of Mr. Kao's fiduciary duty of loyalty and his obligation of good faith and fair dealing.

### 5.    Improper Loans

On April 3, 2019, Mr. Kao caused two $250,000 checks to be written from the Company's CPB account to Merrill Lynch accounts held by the Foundations. *See* NCI-392 at 2; *see also, e.g.*, NCI-251 and NCI-255. Mr. Kao instructed then-employee Susan Matsuura ("Ms. Matsuura") to book the checks as a loan from the Company to each Foundation ("Foundation Loans"). *See* NCI-392 at 2; *see also, e.g.*, NCI-297.

Ms. Matsuura did as she was told. *See* NCI-392 at 2. The terms of the Foundation Loans were not memorialized and it appears that each Foundation Loan was interest-free. *See* NCI-392 at 4; MDG-102 at MDG02544663, NCI-252 and NCI-256. Each Foundation Loan was amortized by monthly book contributions--i.e., the balance was reduced with no actual money paid by the Foundations. Mr. Kao repaid both Foundation Loans in full, on behalf of each Foundation on November 17, 2020. *See* KAO-122. The Foundation Loans were not arm's length transactions. NCI did not provide its consent in writing. *V.1, 78:3-6.* Accordingly, each Foundation Loan constituted self-dealing, in violation of Mr. Kao's fiduciary duty of loyalty.

Mr. Kao has argued that the repayment of the Foundation Loans was an advance or contribution as a member of the Company. *See, e.g.*, NCI-400 at p. 30 (Mr. Kao Cross Claim at ¶ 78). Mr. Kao further alleges that the Foundation Loans received partial payment of $300,000 and his repayment of $500,000 is thus an overpayment. *See, e.g.*, NCI-400 at p. 30 (Mr. Kao Cross Claim at ¶¶ 78-82). However, prior to Mr. Kao's repayment in full, no actual repayment was ever made on either Foundation Loan. *See* NCI-252 and NCI-256. Instead, fictitious "contributions" were made by the Company to each Foundation to allegedly amortize the Foundation Loan balances. *See* NCI-252; NCI-256. Mr. Kao's allegation and argument that the repayment of the Foundation Loans is an advance or contribution as a member of the Company is a non-sequitur-- Mr. Kao was repaying an obligation of two separate entities, neither of which is a member of the Company. Mr. Kao's repayment of the Foundation Loans was indisputably on behalf of the MMK Foundation and the Navatek Foundation. *See, e.g.*, KAO-122 ("full and final repayment for loans made by the Martin Defense Group, LLC to the Marty and Mickey Kao Foundation ($250,000.00)

46

CONFIDENTIAL INFORMATION                    PMT092160

JSH-008931

and the Navatek Foundation ($250,000.00).""). Mr. Kao did not provide any evidence that the repayment was intended to be a contribution, or that the repayment was recorded as a contribution (it was not). Based on the record at the Hearing, Mr. Kao's allegation that repayment of the Foundation Loans on behalf of the Foundations was an advance or contribution is incorrect. Therefore, the Arbitrator finds that this Cross Claim by Mr. Kao against the Company for $300,000 in alleged over payments is denied under each theory asserted by Mr. Kao.

### 6.   Improper $2,000,000 Note Receivable

On April 20, 2020, Mr. Kao instructed Mr. Lum Kee to deposit $2,000,000 from the Company's CPB account into Mr. Kao's personal Merrill Lynch account, and to book it to the Company's suspense account. *See* NCI-392 at 3; *see also, e.g.*, NCI-225. Mr. Lum Kee complied, and the transaction was listed in the Company's General Ledger as "N/R [Note Receivable] – Martin Kao." *See* MDG-153 at MDG00196488.

The Company found no "source documentation" memorializing the terms of the loan. The loan was never repaid by Mr. Kao. NCI did not consent to the $2,000,000 note receivable. *V.1, 78:3-6.*

The Arbitrator finds that the $2,000,000 loan constituted self-dealing and was improper and in violation of Mr. Kao's fiduciary duty of loyalty for the reasons noted above.

However, the Arbitrator also finds that there has been no showing by the Company of current damages caused by the $2,000,000 loan and note receivable and that such damages are too speculative to award at this time because:

1.   The government has already seized amounts equal to the $12,000,000 in PPP Loans received by the Company.

2.   It was admitted in the Hearing that no claim or litigation was pending against the Company to recover those sums as of the conclusion of the Hearing.

3.   If the Company were to receive $2,000,000 in damages from Mr. Kao now it would effectively be receiving a portion of the PPP money that was fraudulently obtained first by the Company and then by Mr. Kao at the outset, a result which the Arbitrator finds would be highly inequitable and inappropriate.

However, this finding is made expressly without prejudice. If such a claim for the $2,000,000 is ever actually made against the Company at any point in the future and if the

CONFIDENTIAL INFORMATION                    PMT092161

JSH-008932

Company must either pay the $2,000,000, or defend against a claim for it, then the Company is free to make a claim for all resulting damages against Mr. Kao in an appropriate future proceeding.

7.    **Improper Efforts By Mr. Kao to Create the MDG NEWCO Agreements**

On or about September 29, 2020, Mr. Kao executed a series of agreements related to MDG NEWCO, LLC ("MDG NEWCO") on behalf of himself and the Company. *See* NCI-530, NCI-531, NCI-532 and NCI-533. Section 5.4 of the OA limits the authority of the Management Committee--i.e., Mr. Kao--from taking an action without the unanimous written consent of all Members: (i) in contravention of the OA; (ii) to authorize or ratify any acts or transactions which would violate the duty of loyalty owed to the Company; (iii) to engage in any transaction between Mr. Kao and an affiliate which may not be at arm's length; and/or (iv) to compromise an obligation of a Member to make a contribution or return money or other property paid or distributed in violation of the OA. *See* NCI-202 at NCI000043 (§ 5.4(c)-(d), (f)-(g))

HRS § 428-404 likewise requires the consent of all members to authorize any act or transaction that would violate the duty of loyalty and/or to "sell[], leas[e], exchang[e], or otherwise dispos[e] of all, or substantially all, of the company's property with or without goodwill." *See* HRS § 428-404(c)(2), (12).

No consent from Mr. Loui was obtained for the MDG NEWCO agreements that were contemplated and the planning for them and drafting of the agreements were intentionally done by Mr. Kao in secret from him.

On the final day of the Hearing, Mr. Kao's counsel represented that "NEWCO was formed but the transaction never went through. So the assets are still with MDG. They are not with NEWCO. . . . it was never a deal that was consummated." *V.7, 1458:5-14.* In response, the Arbitrator stated, "I'm going to regard that as a stipulation that that count, that Mr. Kao is not claiming the benefit of the NEWCO transactions[,]" to which Mr. Kao's counsel confirmed "No[,]" that Mr. Kao was not claiming the benefit. *V.7, 1458:15-18.*

The Arbitrator finds that Mr. Kao's attempt to assign all, or substantially all, of the Company's property to MDG NEWCO, was an additional breach of his fiduciary duty of loyalty. *See, e.g., Patin v. Ferguson,* 115 So. 3d 1204, 1210 (La. Ct. App. 2013) (finding a breach of fiduciary duty where member transferred all or substantially all of the company's property). The Arbitrator also finds that these efforts to secretly transfer the company to Mr. Kao constitute

48

CONFIDENTIAL INFORMATION                    PMT092162

JSH-008933

furthers evidence of a self-serving and deceitful pattern of conduct by Mr. Kao. However, in this instance, the Arbitrator finds that the conduct caused no compensable damage and the Arbitrator further finds that a stipulation was reached during the Hearing that these agreements never went into effect. The Arbitrator finds and declares that that these purported agreements are therefore void in their entirety. These findings should be considered to be findings as to Count IV of MDG's cross claim against Mr. Kao.

### 8.    Use of Company Funds for Personal Legal Fees

In or around October and November of 2020, Mr. Kao caused the Company to make payments to several law firms in connection with the criminal and civil cases filed against him. These retainer payments included: (1) a retainer of $250,000 paid on or about October 13, 2020 and $100,000 paid on or about October 27, 2020, to Mr. Green; (2) a retainer of $450,000 paid on or about October 22, 2020, to Troutman Pepper Hamilton Sanders LLP; and (3) a retainer of $500,000 paid in or around November 2020 to the C&M Firm. *See, e.g.,* MDG-225 and NCI-222. NCI did not provide its written consent for Mr. Kao to cause the Company to pay these retainers using the Company's funds. *V.1, 78:3-6.*

The OA does not provide for indemnification of the Manager in the circumstances of these claims. *See* NCI-202. Mr. Kao was also not entitled to indemnification under HRS § 428-403(a), which provides that a "limited liability company shall . . . indemnify a member or manager *for liabilities incurred by the member or manager in the ordinary course of the business of the company or for the preservation of its business or property*." (emphasis supplied). This is because Mr. Kao's conduct, as detailed above, was neither in the ordinary course of the Company's business, nor was it for the preservation of the Company's business or property. As a result, Mr. Kao was not entitled to indemnification by the Company.

Mr. Kao's payment of retainers for his defense when the Company had no obligation to indemnify him constituted self-dealing, which breached Mr. Kao's fiduciary duty of loyalty. The payments were also made without the consent of Mr. Loui.

The Arbitrator also finds that Mr. Kao is also not entitled to indemnification by the Company for the failure to obtain a D&O Insurance policy that covered the Company and its manager as to the claims against Mr. Kao. *See, e.g.,* NCI-400 at 28 (Mr. Kao's Cross Claim at ¶¶ 57-58); *V.7, 1481:2-4.* The failure to obtain D&O insurance occurred while Mr. Kao was the manager of the Company and the Arbitrator has previously found that he was a sophisticated

49

CONFIDENTIAL INFORMATION                    PMT092163

JSH-008934

business person and a CPA who claimed to have two law degrees. On this record, Mr. Kao cannot be heard to say that he is not responsible to seek and obtain coverage for his own conduct-- especially given his choice to, and his pattern of, engaging in aggressive, risky and illegal conduct. Mr. Kao certainly cannot now claim that the Company that he controlled and manipulated to his personal advantage--and which acted through him as its sole manager--failed to protect him. *See, e.g.,* NCI-400 at 28 (Mr. Kao's cross claim at ¶¶ 57-58); *V.7, 1481:2-4.*

Mr. Kao argued, through his counsel, that he was also entitled to offset any damages he may owe "because of [the Company]'s failure to go after Pacific Marine for the [D&O] insurance policy." *V.7, 1481:2-4*; and *1479:1:3* (taking issue with the "decision not to proceed with a third-party claim against Pacific Marine").

The Arbitrator notes that Mr. Kao may still bring any meritorious claims of his own against Pacific Marine (as it is not a party to this Arbitration) and that Mr. Kao was likewise free to make derivative demands in this Arbitration on the Company to do so. However, Mr. Kao had not done either of these things as of the time of the Hearing.

The Arbitrator incorporates here the CPB findings discussed *supra* at Award Finding #3 and also notes that Mr. Kao's tendered claim under Pacific Marine's D&O Policy was denied because he was not "in an insured capacity relative to the Company [(i.e., Pacific Marine & Supply Company, Ltd & Subsidiary Companies)]." *See* KAO-123 at 1, 3 ("[T]here are no allegations against you in the capacity as an Insured Person of the Company. In contrast, the Affidavit asserts that you 'fraudulently obtained more than $12.8 million in [PPP] funds on behalf of . . . Navatek, LLC[.]'"); *but cf.* V. 7 p.1481:4-7 ("It's very clear if you look at [KAO-123], the letter doesn't say anything about denying Mr. Kao's claim because of a subsidiary issue.").

For all the above reasons, the Arbitrator finds that payment of the retainers noted above constituted a breach of Mr. Kao's fiduciary duty of loyalty and his obligation of good faith and fair dealing to the Company and the Arbitrator denies Mr. Kao's claim for indemnification by MDG.

### 9.    Additional Bank and/or Wire Fraud

The record has established that Mr. Kao caused fabricated statements for his E*Trade account ("Fabricated Statements") to be submitted to Merrill Lynch in connection with his application for a residential mortgage (the same mortgage that the $2,000,000 of PPP proceeds was used for). *See* MDG-097, MDG-098, NCI-393 at 21-24, and *V. 2, 435:11-21.* The Fabricated

CONFIDENTIAL INFORMATION              PMT092164

JSH-008935

Statements purport to show that Mr. Kao had a balance of $10,383,788.01 in his E*Trade account as of May 31, 2020. *See* NCI-407 at MDG00613123, NCI-408. Mr. Kao's actual balance was $71,132.59, as shown on the May, 2020 account statement produced by E*Trade in response to a subpoena from NCI ("Actual Statements"). *See* NCI-005 at 195. This constitutes a violation of 18 U.S.C. § 1343. *See* NCI-393 at 24.

The Fabricated Statements reflect numerous falsifications and alterations with respect to Mr. Kao's personal E*Trade account's account balance, deposits, holdings, and dividend payments. In addition to containing false information, the Fabricated Statements evince Mr. Kao's thoughtful, careful, detailed plan to commit bank fraud against Merrill Lynch.

The Arbitrator finds that this evidence is consistent with a pattern of fraudulent and illegal actions by Mr. Kao. However, the Arbitrator also finds that this conduct did not legally cause damage to MDG or NCI.

In summary, for each of the actual breaches noted above within Award Finding #9 which caused damage to the Company, the Arbitrator makes the same Findings and Award independently as to the events discussed in this section which were made in the CPB Findings discussed previously.

In addition, for each action by Mr. Kao discussed in Award Findings #8 and #9 above, which transferred Company funds either for his personal or family benefit, or for purposes the Arbitrator has found improper as detailed above, this constitutes a Finding and Award of liability in favor of NCI and against Mr. Kao on NCI's separate claims under Count IV, Embezzlement; and Count V for Conversion and NCI's Count VI, Unjust Enrichment.

The Arbitrator again notes that all damages (as opposed to attorneys' fees and costs) from these and all other NCI counts flow to MDG and that damages are to be calculated as set forth below.

## X.    DISCUSSION OF DAMAGES

### A.    AWARD FINDING #10 REGARDING WHETHER DAMAGES CAN BE SETOFF AGAINST MR. KAO'S CAPITAL ACCOUNT

#### 1.    Positions of the Parties

In each of the Parties' respective post-closing briefs, filed on October 18 and November 5, 2021, the issue of whether any damages awarded could be "setoff" or "offset" against Mr. Kao's capital account arose. These two terms have similar application will be used interchangeably hereafter in discussing this concept.

51

CONFIDENTIAL INFORMATION                    PMT092165

JSH-008936

Mr. Kao argued that any such damages must be set-off against his capital account, (*see e.g.* KPCB1 at p. 35), "Table 3 also shows the offset to Mr. Kao's capital account balance by the remaining claimed damages by MDG." *See also id.* at p. 42, "All damages arising from the alleged breaches of the Operating Agreement must be set-off against Mr. Kao's capital account which was $4,019,368 as of 12/31/20."

Mr. Kao also argued that NCI's expert and the drafter of the OA, Mr. Rinesmith, had admitted as much in his testimony:

> Setoff was emphasized by the drafter of the Operating Agreement, Steven Rinesmith. Although he used the 2019 tax return in this example (which is disputed), **his description of the setoff procedure is undisputed:**
>
> **Q. So then if there is an award of damages by somebody, such as this arbitrator, then that would be offset as against this capital, the capital account from the 2019 tax return?**
>
> A. **Correct.**
>
> Q. Now, if that is a positive number, then Mr. Kao would be paid something?
>
> A. Correct.
>
> Q. So there was a capital account of 1.6 million. Let's say there's a million dollars in damages. So then he would get $600,000?
>
> A. Correct.
>
> **Q. Now, what happens if the damages are $5,000,000?**
>
> **A. He would get zero and have an income offset to bring him up to zero.**

KPCB1 at pp 42-3, *citing V.6: 1319;4-18* (emphasis supplied).

NCI argued that any setoff would be completely improper for several reasons, including that the defense of setoff had never even been pled by Mr. Kao and that applying any setoff was beyond the power or authority of the Arbitrator. *See* NCIPCB1 at pp. 5 and 38. NCI's argument is set out here as a general summary of its position:

52

CONFIDENTIAL INFORMATION          PMT092166

JSH-008937

Defendant Kao's pre-arbitration brief requests, **for the first time,** that any damages awarded against him be simply offset against his capital account. **This belated request, which was never made anywhere within his Crossclaim or Counterclaim,** must be rejected.

First, as explained thoroughly above, the purchase of Defendant Kao's distributional interest has not occurred and, pursuant to HRS §428-603(a)(2)(B) and 701(a)(2), and Section 8.2(d) of the Operating Agreement, will not occur until December 31, 2117 unless the Company elects at some point to redeem his distributional interest before then. This right is not only contractual, it's statutory.

**Therefore, since the purchase of Defendant Kao's distributional interest has not yet been triggered and <u>may not be triggered for another 96 years, there is no basis whatsoever for the Arbitrator to honor his request to simply "offset" any damages awarded against him against his capital account.</u>** Doing so would run afoul of both Hawaii's LLC Statute and the Operating Agreement, **as it would require that the Arbitrator first order the Company's premature purchase of his distributional interest upon his dissociation in clear violation of HRS §428-603(a)(2)(B) and Section 8.2(d) of the Operating Agreement.**

Second, the Company is entitled to damages, costs, and liabilities incurred as a result of Defendant Kao's breach under Section 8.2(c) of the Operating Agreement. **Nowhere in Section 8.2, or anywhere else in the Operating Agreement or Hawaii's LLC Statute for a specified term LLC, as here, does it allow a breaching/dissociated member to simply offset the damages award against his capital account.**

The only valid way the Arbitrator could order the purchase of Defendant Kao's distributional interest in his ruling is if the Arbitrator somehow finds that the Company already elected to invoke Section 8.3. However, both the Company and Defendant Kao have maintained that this has not occurred (Defendant Kao arguing that Section 8.3 is unenforceable altogether, and the Company stating that the election has not been made). **If the election is somehow inferred based on NCI's May 1, 2021 action letter, then, as stated above, the last filed partnership return as of that date was indisputably Defendant Kao's 2019 K-1, in which case any damages must be offset against his $1,604,097.00 capital account stated in his 2019 return.** 11*See* Exhibit 201.

*See* NCIPCB1 at p 38-39 (emphasis supplied).

53

CONFIDENTIAL INFORMATION            PMT092167

JSH-008938

MDG's original position on the issue was more nuanced and seemed to concede that certain items of claimed damages have already been setoff against Mr. Kao's capital account. MDG stated:

> **Though some expenses and/or distributions may already have the effect of reducing Kao's capital account balance, as reflected on a particular K-1**, the Company nevertheless highlights what occurred because: (1) they are illustrative of Kao's repeated acts of self-dealing and therefore support the Company's claims for breaches of fiduciary duties, dissociation, and punitive damages; (2) a matching 1% distribution was not made to NCI, which is a breach of §§ 4.1 and 8.1(e) of the Operating Agreement; and (3) **the effect these items have on Kao's capital account, if such a valuation is required, would depend on the *date* of Kao's capital account valuation (*e.g.*, if Kao's capital account was valued using the 2019 K-1, expenses and distributions that occurred in 2020 and 2021 had not had the effect of reducing Kao's capital account because they occurred *after* the date of the 2019 K-1). Once a determination is made concerning the amount of damages owed by Kao *and* when he was dissociated (which may be relevant to capital account valuation), damages that already reduced Kao's capital account can be identified and excluded from a damages award.**
>
> The below self-dealing transactions are extensively detailed in ***MDG-225*** and ***MDG- 225A*** and contain more than 1,250 pin citations to the record. ***MDG-225***'s pin citations thoroughly detail the supporting records and substantiation for the transactions contained therein, including receipts, invoices, checks, account statements, and general ledger entries. **Additionally, to the extent particular transactions contained in *MDG-225* have been incurred but not yet paid (*e.g.*, *NCI-535*; *NCI-537*; *NCI-538*)** the transaction is still a liability that the Company must pay.

*See* MDGPCB1 at pp.18-19 (emphasis supplied).

### 2.   Subsequent Filings

Because of the importance of the setoff issue, the Parties were advised during the Hearing to brief it fully. This request followed the testimony of Mr. Ota, during the fourth day of the Hearing. Mr. Ota is a CPA and also holds a UH law degree. He is the current in-house CPA for MDG. He had discussed MDG-225, which provides a very detailed and cross-referenced list of the amounts in question. The Arbitrator's request was as follows:

> BY THE ARBITRATOR: Q. Okay. So a few follow-up. Mr. Ota, I'm looking at MDG-225 which is this long thing. Do you have that in front of you
>
> A. Now I do, yes.

54

CONFIDENTIAL INFORMATION                    PMT092168

JSH-008939

THE ARBITRATOR: There are categories of I'll call them amounts here. And the amount for the $2,000,000 and these other amounts I'm just going to kind of note this for all counsel. **I'm confused at this point about in the broad categories which amounts are still being claimed as damages. Just as an exemplar there was recent testimony in your examination, Mr. Ota, of some amounts that came back from the law firms where the retainers had been charged. Now, kind of coming into today I was under the impression that perhaps those amounts were claimed as damages. There's some testimony now that they've been returned.** I think that 225 is a useful grid for me. I've got a lot of notes on it already, about the claims. I'm totally open still about what's out there. **But I would like counsel to use this exhibit in their briefs to tell me a couple of simple things. What's claimed <u>and what's been returned if anything. And what's deducted from the capital account already that may be reflected in this exhibit. And what has not been.</u>**

*V.4, 812:23-814:25* (emphasis supplied).

Mr. Kao set out his view of the setoff issue in considerable detail in KPCB1 and claimed that all, or most, of the damage amounts had already been setoff against his capital account. Despite the Arbitrator's request made above, MDG and NCI's first post-closing briefs failed to provide clarity on what exact amounts, if any, had already been setoff against Mr. Kao's capital account.

So, by way of the Arbitrator's email to the Parties dated October 30, 2021, the Arbitrator invited the Parties to provide more clarity on this issue, if they wished, as follows:

All,

I [sic] reviewing the briefs on the merits I have noted the very wide disagreement between the parties as to whether the claimed amounts owed are still owed. In the Kau [sic] brief at p 29- 41 Mr. Kau [sic] argues that the amounts noted have already been deducted from his most recent capital account. In MDG and NCI's briefs these amounts are obviously still being claimed.

In order to allow the parties to clarify why their positions on this point are the subject of this significant disagreement I will accept further short briefs solely on this issue. *These briefs should address the reasons for the parties' differing views on only this point—i.e. whether the damages being claimed have already been satisfied by adjustments to Mr. Kao's capital account or some other form of repayment to MDG.* I remind the parties that the evidentiary portion of this matter is now closed, thus your briefs are strictly limited to arguments about and citations to the material that is already in the existing record.

55

CONFIDENTIAL INFORMATION                    PMT092169

JSH-008940

The parties are free to provide this further material, or not, as they wish. If one or more parties elect to file nothing further then I will resolve any questions based on the materials already on file in this matter. If all or some of you wish to submit such briefs then they are due to me by email no later than 4 pm on Friday November 5th and are limited to 10 pages per party plus any exhibits that are already in the record.

Submission of such briefs will not enlarge the current deadline of 11/29 for issuance of the award in this matter.

Thanks to all of you for your kind assistance.

Aloha,

Jerry

*See* the Arbitrator's October 30, 2021 email to Counsel (emphasis supplied).

In response, the Parties all then submitted additional briefs on November 5, 2021. (These will be referred to as "MDGPCB2", "NCIPCB2" and "KPCB2" respectively). The MDG and NCI briefs asserted that all claimed damages were still due and both disputed the notion that any amounts due had already been deducted from Mr. Kao's capital account. However neither provided details of the transactions raised by Mr. Kao which purported to show the setoffs. Mr. Kao's brief argued that various entries he attached showed transactions where setoffs had already been taken against his capital account.

On the same day these supplemental briefs were received, MDG's counsel submitted a letter dated November 3, 2021 from its accounting firm, Acuity LLP ("Accuity Letter"). Mr. Kiuchi objected to the Acuity Letter being considered in an email on November 9, 2021. On November 9, 2021, the Arbitrator responded to all parties that neither the Acuity letter nor Mr. Kiuchi's response to it, were evidence and neither would be considered by the Arbitrator because briefing and evidence in the matter had been closed.

The Arbitrator does find that the 2020 K-1 filed with the IRS and provided to Mr. Kao was created based on the best available information at the time it was filed based on the testimony to that effect from Mr. Ota during the Hearing.

### 3.    Applicable Law Regarding the Arbitrator's Discretion as to Setoff

In light of the Parties' diverse positions, the Arbitrator will first address whether setoff is an issue upon which the Arbitrator has authority to rule.

The arbitration agreement in this case contained in the OA provides, in relevant part, that:

CONFIDENTIAL INFORMATION                    PMT092170

JSH-008941

**12.22 Mediation and Arbitration.** The parties, at the option of any party, to try in good faith to settle *any difference arising out of or relating to the terms or conditions or subject matter of this agreement* by mediation *and that, if agreement cannot be reached by mediation, to submit the difference to binding arbitration.* Any arbitration shall be conducted in accordance with the rules for Arbitration of Disputes of the Dispute Prevention and Resolution, Inc. ("DPR") or its successor. *The award of the arbitrator shall be final and binding, judgment upon the award may be entered in any court having jurisdiction thereof. This procedure shall be the exclusive means of settling any disputes that may arise under this agreement.* All fees and expenses of the arbitrator and all other expenses of the arbitration, except for the fees and expenses of each party's attorneys and witnesses, shall be shared equally by the parties thereto.
....
The arbitration shall be conducted in such a manner that the decision will be rendered no more than 120 days after the submission of the dispute to DPR.

**12.23 Waiver.** Any term or provision of this agreement may be waived by the time for performance may be extended by the party or parties entitled to the benefit thereof.

*See* NCI-202 at paragraphs 12.22 and 12.23, emphasis supplied in part.

Here the grant of authority to the Arbitrator under the OA is clearly unlimited, covering *"any difference arising out of or relating to the terms or conditions or subject matter of this agreement"*.

Further, the OA provides no express restriction against setoff, or any other equitable or legal remedy, though it clearly does include express limitations on the time allowed for the proceeding. Had such limitation on setoff been agreeable to the parties it could have been included as well.

DPR's Rules also provide broad authority to the Arbitrator as follows:

Unless the parties' agreement provides otherwise, the Arbitrator(s) must determine all issues submitted to arbitration by the parties **and may grant any and all remedies that the Arbitrator(s) determine to be just and appropriate under the law.**

Rule 30 of the Arbitration Rules, Procedures & Protocols of Dispute Prevention & Resolution, Inc. ("DPR Rule 30") (emphasis supplied).

This grant of broad authority under DPR Rule 30 is completely consistent with Hawai'i's version of the Uniform Arbitration Act, which provides, in relevant part, that:

57

CONFIDENTIAL INFORMATION                PMT092171

JSH-008942

> *[A]n arbitrator may order such remedies as the arbitrator considers just and appropriate under the circumstances of the arbitration proceeding.* The fact that such a remedy could not or would not be granted by the court is not a ground for refusing to confirm an award under section 658A-22 or for vacating an award under section 658A-23.

HRS § 658A-21(c) (emphasis supplied).

Moreover, beyond the language of the applicable agreement, the applicable rule, and the applicable arbitration statute, the Supreme Court of Hawai'i has recently re-stated that:

> ....because of the legislative policy to encourage arbitration and thereby discourage litigation, *arbitrators have broad discretion in resolving the dispute.* Upon submission of an issue, *the arbitrator has authority to determine the entire question, including the legal construction of terms of a contract or lease, as well as the disputed facts.*

*Matter of Hawai'i State Tchrs. Ass'n*, 140 Haw. 381, 391, 400 P.3d 582, 592 (2017) (*quoting Schmidt v. Pac. Benefit Servs., Inc.*, 113 Hawai'i 161, 165-66, 150 P.3d 810, 814-15 (2006)). (emphasis supplied).

Finally, other courts have come to similar results--including in cases closely analogous to this one involving LLC agreements. Arbitrators acting under an agreement conferring broad discretion to craft an appropriate remedy have repeatedly been found not to exceed their powers when they construe the terms of a contract, or other agreements, to achieve an equitable result. *See, e.g., The Spaulding LLC v. Miller*, 250 Ariz. 383, 480 P.3d 651, 655 (Ariz. Ct. App. 2020) (Arbitrator did not exceed his powers under arbitration clause in limited liability company's operating agreement when he awarded member 8.6% interest in real property previously owned by LLC, rather than 8.6% interest in LLC itself, after ruling in favor of member on claims relating to managing member's transfer of property to his own companies without member's knowledge; member's pre-arbitration statement asserted that damages in case were the value of member's share in the property, LLC had no value at the time of arbitration because its only asset had been the property that managing member had transferred to his own companies, and arbitrator was authorized under arbitration group's rules to grant any relief deemed just and equitable within scope of parties' agreement).[5]

---

[5]  *See also, Cohen v. TNP 2008 Participating Notes Program, LLC*, 243 Cal. Rptr. 3d 340, 368 (Cal.App.5th 2019) (Arbitrator acted within his powers under arbitration agreement, which stated that rules and procedures of arbitration association would apply in any arbitration, by determining that unclean hands doctrine precluded law firm retirement plan from recovering damages against real estate investment company and its parent company for breach of promissory notes; terms of arbitration agreement did not limit arbitrator's power to fashion equitable remedy, arbitration association rule provided that arbitrator could grant any remedy he deemed just and equitable); *Gueyffier*

CONFIDENTIAL INFORMATION    PMT092172

JSH-008943

### 4.    Setoff Is Appropriate Here

After considering the Parties' respective positions in light of the rules, statute and case law cited above, and based on the entire record in this matter, the Arbitrator makes the following findings on the above issues related to setoff:

1.    Pursuant to the express agreement of the Parties and the rules and law cited above, the Arbitrator clearly has the authority to apply the doctrine of setoff in this matter.

2.    Contrary to the position stated in NCIPCB1, setoff was specifically plead by Mr. Kao as an affirmative defense in his Answer to the claim of NCI filed herein at page 4, ¶17, and in the same paragraph in his cross claim against MDG. The issue was also raised and very thoroughly litigated during the Hearing and was fully briefed by the Parties (twice) following the Hearing.

3.    The OA here makes no mention of setoff and certainly contains no term barring its application. The same is true of the LLC statute. The Arbitrator thus finds that setoff is not barred in these circumstances either under the OA, or by the LLC statute. The Arbitrator also notes the testimony by Mr. Rinesmith that the long term buyout terms for the Units on dissociation were not discussed during the negotiations for the OA. *V.6, 1337.*

4.    The Arbitrator finds that the cases cited by NCI and MDG do not involve facts similar enough to those at issue here to change the reasoning for this finding--i.e. the cases cited do not involve a claim for dissociation of a member of an LLC against whom the company has current substantial monetary claims which may be wholly, or partially, setoff against that

---

*v. Ann Summers, Ltd.,* 184 P.3d 739, 744 (Cal. 2008) (Arbitrator did not exceed his powers by interpreting retail franchise contract to allow for equitable excusal of the notice-and-cure condition, even though contract included explicit no-modification clause limiting arbitral powers to "modify or change" the parties' agreement, where contract did not unambiguously prohibit arbitrator from excusing performance of a contractual condition where arbitrator concluded performance would have been an idle act); *Barclays Cap. Inc. v. Urquidi,* 786 F. App'x 970, 972 (11th Cir. 2019) (Arbitration award did not exceed authority of arbitration panel, in granting former employees' request for declaration that any amount due to employer under promissory notes was subject to equitable setoff so they owed nothing under notes, which provided that employees' continued employment was material condition of loans and that, if their employment ended for any reason, unpaid principal and interest would become immediately due and payable; although panel provided no written reasons for award, panel acknowledged notes and concluded that employees were not liable to pay, given circumstances, from which reasonable inference could be made that panel agreed with employees' position that employer's unilateral change to material conditions of their employment rendered notes unenforceable); *Neighbors Const. Co. v. Woodland Park at Soldier Creek, LLC,* 48 Kan. App. 2d 33, 46, 284 P.3d 1057, 1068 (2012) (rejecting appellant's argument that arbitrator exceeded his powers by deleting terms in the contract, rewriting the contract to delete a liquidated damages provision, rewriting lien release provisions under the contract, and rewriting the contract to "change its very essence").

59

CONFIDENTIAL INFORMATION                    PMT092173

JSH-008944

dissociated member's positive capital account at the same time that dissociation is sought, nor do they involve claims by the company that its damages against the dissociated member can be awarded now but payment of the member's capital account can be held in limbo for up to 96 years.

5.       The Arbitrator has noted previously that NCI and MDG have stipulated that all of the damages which flow from Mr. Kao's misconduct go to MDG and not to NCI. The question of whether damages can be offset against Mr. Kao's capital account is a critical component of that larger issue. Because it is MDG's money and accounts which are at stake, the Arbitrator finds that MDG's original position, as quoted above, to be most relevant to this issue. The Arbitrator treats the statements in MDG's brief above as an admission that at least some offsets for some damage items claimed in this Arbitration have already been made to Mr. Kao's capital account. The Arbitrator finds that since that has been done previously, there is no compelling reason why it could not be done again and that doing so would not offend the Company's view of how its accounts should be kept.

6.       The Arbitrator also finds that the following testimony (previously quoted above) from Mr. Rinesmith, who was called by NCI as its witness, is particularly relevant to this issue, as Mr. Rinesmith drafted the OA and appears to concede in this passage that setoff is available:

> **[By Mr. Kiuchi] Q. So then if there is an award of damages by somebody, such as this arbitrator, then that would be <u>offset</u> as against this capital, the capital account from the 2019 tax return?**
>
> [By Mr. Rinesmith] A. **<u>Correct</u>**.
>
> Q. Now, if that is a positive number, then Mr. Kao would be paid something?
>
> A. Correct.
>
> Q. So there was a capital account of 1.6 million. Let's say there's a million dollars in damages. So then he would get $600,000?
>
> A. Correct.
>
> **Q. Now, what happens if the damages are $5,000,000?**
>
> **A. <u>He would get zero</u> and have an income offset to bring him up to zero.**

*V.6, 1319:4-19* (emphasis supplied).

60

CONFIDENTIAL INFORMATION                    PMT092174

JSH-008945

7.    The Arbitrator also finds that, in the portion of MDGPCB1 at pp.18-19, which was quoted above, MDG contemplates possibly making further adjustments to Mr. Kao's capital account following issuance of the Award in this matter.  It is clear from the testimony of Mr. Ota, and the Arbitrator hereby finds, that the 2020 K-1 provided to Mr. Kao was based on the best available information at the time.  The Arbitrator also hereby finds that this degree of certainty meets the preponderance of the evidence standard applicable to this issue in this matter and that it is sufficient for purposes of this Arbitration for at least the following three reasons:

a.    First, the Arbitrator is required to make a final and binding decision based on the evidence now before him--not some unspecified possible future adjustment of the relevant accounts--especially where the Parties note that the Arbitrator's decision is needed in order to properly adjust those accounts as to the matters at issue in this case.

b.    Second, an expedited decision based on the current record is required in order to comply with the shortened time frame mandated and agreed to by the Parties under section 12.22 of the OA.

c.    Third, a stay of these proceedings was denied at the request of NCI and MDG so that they could obtain timely relief regarding dissociation.  This balancing of needs precludes deciding some issues now while delaying decisions on others that are inextricably intertwined with the issues that NCI and MDG wish to have decided now.

8.    The Arbitrator next finds that, in all the time since the date of the VTA, MDG's new management, headed by Mr. Brunk, has been responsible for, and has controlled, the accounting treatment and tax preparations for the Company.  Thus, the Arbitrator expects that MDG has treated its accounts properly since that time.  Accordingly, the Arbitrator gives much greater weight to the accuracy of the current accounts than those maintained under Mr. Kao's leadership.

9.    The Arbitrator next notes that in the portion of their brief quoted above, even NCI discusses the concept of offset--provided that the offset is against Mr. Kao's earlier and much lower 2019 capital account balance.  Obviously, if the concept is acceptable then, it should be applied to whatever K-1 is found to apply under the evidence.  NCI also discusses the concept of offset being employed by the Treasury in the following passage.  Certainly, if offset would be appropriate in this instance to favor MDG, then it ought to be  appropriate here as well.

At this time it is uncertain whether the DOJ will transfer the $2 million to

61

CONFIDENTIAL INFORMATION                    PMT092175

JSH-008946

> the Treasury for purposes of applying against the amounts owed by the Company to the Treasury (who has taken over collection for the CPB/Radius PPP loans). Arbitration Transcript, Volume 3 (Testimony of D. Brunk) at 570:6-22. The DOJ could elect to keep the money to satisfy penalties awarded against Defendant Kao in the criminal case, **or it could instead elect to transfer the $2 million to the Treasury, <u>which may offset amounts owed to the Treasury on the PPP loans.</u>** *See id.* at 507:7-17, 570:6-22.

*See* NCIPCB1 at p. 36 (emphasis supplied).

10.    The Arbitrator also cannot divorce this question from the overall landscape of the case. If any amount awarded as damages herein were not offset against Mr. Kao's capital account to the extent appropriate, then the Award and a later judgment would issue against him for the full amount of the Award--yet Mr. Kao would not have access, for an indeterminate time, to funds due him from the Company which might substantially reduce that obligation.

Indeed, if one accepts the suggestion by NCI in the portion of their brief quoted above then Mr. Kao could be denied access to those funds at NCI's sole discretion for the next 96 years-- during which time he (or his estate) would have the status of an unauthorized assignee of his 99% interest, i.e., he or his estate would still technically own the interest, because it would not yet have been paid for, though they could not vote that interest.

Simultaneously with taking the above position, both NCI and MDG have expressed their fervent wish that Mr. Kao be completely dissociated from the Company as soon as possible, explaining that this relief is necessary for the good of the Company in terms of its ability to contract with the government free of the taint of any relationship with Mr. Kao and in order to retain valued employees. This passage from the NCIPCB1 brief is illustrative of that sentiment:

> As explained in detail in NCI's Pre-Arbitration Brief (Appendix A) and in Steven Shaw's expert report (Exhibit 390), **MDG's ability to remain eligible to compete for new federal contracts is in serious jeopardy <u>due to Defendant Kao's ongoing disputed ownership of MDG</u> while being the subject of civil and criminal fraud claims, the Indictment filed against him, and the FBI's criminal probe for illegal campaign contributions, among other wrongdoing.** *See also* Arbitration Transcript, Volume 2 (Testimony of Steven Shaw) at 288-22-291:1.

*See* NCIPCB1 at p. 21 (emphasis supplied).

The Arbitrator finds that this position constitutes an irreconcilable contrast with the request by NCI and MDG that Mr. Kao be dissociated, but remain unpaid, for his LLC interests, which he would still technically own, though in a highly circumscribed manner, for the foreseeable future.

CONFIDENTIAL INFORMATION                    PMT092176

JSH-008947

For all of the reasons evident in the record, including those noted above, the Arbitrator finds that a setoff of the damages awarded herein against the present value of Mr. Kao's capital account is appropriate and will be allowed here. The Arbitrator further finds that failing to do so would lead to a cumbersome, impractical, inequitable and unjust result.

To the extent that opposing arguments have been made that have not been specifically addressed above, those are hereby denied.

## B.    AWARD FINDING #11 REGARDING WHETHER THE 2019 OR 2020 K-1 APPLIES TO ANY SETOFF

### 1.    The Parties' Positions

#### a.    NCI's And MDG's Positions

The OA references the value at which Mr. Kao's interest would be purchased as the amount shown for his capital account on the most recent K-1 prior to his dissociation. *See* NCI-202 at ¶ 8.3. NCI and MDG argue that Mr. Kao's dissociation occurred automatically at the time he committed the wrongful events discussed previously and that this in turn dictates that the 2019 K-1 is the operative document.

To support this timing, NCI and MDG argue that Mr. Kao received notice of the dissociation by being served with the civil complaint filed against him herein. Counsel for NCI acknowledged during the Hearing that no other form of notice, for example by a demand letter, had been provided. *V.6, 1327-1328.*

These arguments are summarized in the NCIPCB1 as follows:

> Sections 8.1 and 8.2 of the Operating Agreement provide for the removal of any member who breaches a material covenant contained in the Operating Agreement:
>
> **Covenant Not to Breach.** Each Member hereby covenants and agrees that the Members have entered into this Agreement based on their mutual expectation that all Members will continue as Members and carry out the duties and obligations undertaken by them hereunder and that, except with the consent of the Members, each Member hereby covenants and agrees as follows:
>
> . . .
>
> (e) Not to commit a breach of any material covenant contained in this Agreement or default on any material obligation provided for in this Agreement **if such breach or default continues for thirty (30) days after the date such Member has been given notice of such breach or default by** the Management Committee or **any other Member.**

63

CONFIDENTIAL INFORMATION                    PMT092177

JSH-008948

Exhibit 202 at ¶ 8.1 (emphasis added).

**Consequences of Violation of Covenants.** If a Member (a "Breaching Member") attempts to take any or has taken any action in breach of Section 8.1 (a "Breach"), the Company shall continue and such Member shall be subject to this Section 8.2. In such event, the following shall occur:
(a) **The Breaching Member** <u>shall immediately be disassociated</u> **and thereby** <u>cease to be a Member,</u> shall have no further power to act as a Member of the Company **and shall become an Assignee as if he were the recipient of a prohibited Transfer of his Units under Section 7.3;**

*Id.* at ¶ 8.2.

NCIPCB1 p 12,13. (some emphasis in original and some supplied)…

…Third, regarding dissociation generally, Hawaii's LLC Statute and the ULLC Model Act are clear that **a member is dissociated upon the occurrence of "an event agreed to in the operating agreement as causing the member's dissociation."** *See* HRS §428-601(2). **Additionally, a member may be dissociated through judicial determination because the member (A) engaged in wrongful conduct that adversely and materially affected the company's business, (B) willfully or persistently committed a material breach of the operating agreement or of a duty owed to the company or the other members, or (C) engaged in conduct relating to the company's business which makes it not reasonably practical to carry on the business with the member.** *See* **HRS §428-601(5). Thus, Section 8.2, which sets out the terms for dissociation due to a breach of the operating agreement and duties owed to the Company, is clearly enforceable**

Id. p. 24 ( emphasis supplied)

**NCI further requests that the Arbitrator fix the date of Defendant Kao's dissociation as December 9, 2020 Section 8.1(e) of the Operating Agreement only requires that "notice of such breach" be given and does not require anything further within the breach notice. Section 8.1(e) further provides that if the asserted breach continues for 30 days after notice is given, the member is dissociated.** Section 8.2(a) provides that the dissociation is "automatic" and does not require any further act or notice by the Company to effect the dissociation. *See e.g. Master Garage, Inc. v. Bugdanowitz*, 690 P.2d 879 (Colo. App. 1984) (date of filing of complaint); *Headfirst Baseball LLC v. Elwood*, 239 F.Supp.3d 7 (D.C. 2017) (date of filing of complaint); *see also Holladay v. Storey*, 2013 UT App 158, 307 P.3d 584 (Utah Ct. App. 2013) (the trial court properly "backdated" judicial expulsion of LLP member to coincide with the date of his misconduct leading to the expulsion).

64

CONFIDENTIAL INFORMATION                    PMT092178

JSH-008949

> **Therefore, the December 9, 2020 effective dissociation date is appropriate given that Defendant Kao was given notice of his breaches of the Operating Agreement through the filing of the Civil Complaint on November 9, 2020. Exhibit 394.** The Civil Complaint contains numerous allegations putting Defendant Kao on notice of his breaches and requesting his dissociation. Exhibit 394, at 8-13, 20-21. And Defendant Kao failed to cure his breach within thirty days pursuant to Section 8.1(e), resulting in his automatic dissociation on December 9, 2020 under Section 8.2(a).

*See* NCIPCB1 at p. 28 (emphasis supplied).

### b.    Mr. Kao's Position

By contrast, Mr. Kao argues in his brief that dissociation can only occur as of the date of this Award and that this dictates that the 2020 K-1 would apply to value Mr. Kao's capital account. (In some places cited below from KPCB1, the Arbitrator has edited these portions for brevity where indicated by asterisks).

### 1.    The date of dissociation can be no earlier than the date of the award.

> MDG and NCI claim that violation of Section 5.5 of the Operating Agreement is a member breach under Section 8.1 of the Operating Agreement. NCI has claimed that its Complaint filed on November 9, 2020, was the "written notice" required under Section 8.1(e) of the Operating Agreement. They claim that December 9, 2020—the 30th day after the "written notice"—is the date of the breach became effective.

> NCI claims that dissociation occurred on that same date.

* * *

### 2.    NCI is incorrect about the dissociation date

> However, this "immediate dissociation" was waived by NCI. Section 12.23 of the Operating Agreement provides: "Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the party or parties entitled to the benefit thereof."

> NCI's Complaint sought judicial dissociation, not a determination that Mr. Kao had been automatically dissociated pursuant to "written notice":

> 102. A dispute exists between Plaintiff and Defendant Kao with regard to NCI's and Company's right to have Defendant Kao immediately enjoined from serving as manager, and ultimately replaced as a manager and member of Company based on the terms of Company's Operating Agreement and Hawaii's LLC Statute.

65

CONFIDENTIAL INFORMATION                PMT092179

JSH-008950

*See* Exhibit NCI-394 at ¶ 102. NCI filed its TRO motion the same day as the Complaint. (Exhibit NCI-417). It sought the following relief, consistent with an action for judicial dissociation:

> Defendant Kao be disassociated as the controlling voting-member of the Company pursuant to HRS Section 428-601(5), due to his conduct in using the Company to commit criminal bank fraud and money laundering, and breaching his fiduciary obligations to the Company and NCI, all in violation of the Operating Agreement and Hawaii statute . . . .

Exhibit NCI-417. Section HRS 428-601(5), which is the statutory authority referenced by NCI, provides the procedure for judicial dissociation:

> "A member is dissociated from a limited liability company **upon the occurrence** of any of the following events:
>
> (5) On application by the company or another member, the member's expulsion by judicial determination because the member:
>
> (A) Engaged in wrongful conduct that adversely and materially affected the company's business; . . .

(*See* Haw. Rev. Stat. Ann. § 428-601(5) (emphasis added). NCI was clearly seeking judicial dissociation. **Judicial dissociation is effective "upon the occurrence" of the judicial determination of dissociation.**

NCI is also estopped from arguing that dissociation occurred "automatically." NCI agreed not to seek an immediate decision on dissociation. On November 20, 2020, before any determination was made, the parties entered into a First Stipulation and Order regarding the TRO. *See* Exhibit NCI-371. The First Stipulation and Order was essentially a standstill agreement for 100 days, ending on February 28, 2021. *See* Exhibit NCI-371 at pdf 2. The stipulation provided in part as follows:

> During the pendency of this Agreement, and except in the event of a mutually agreed upon 100% vote of their membership interests in the Company, NCI and Kao agree not to: a. Vote or exercise their ownership interests in the Company, including but not limited to the provisions in Section 6.2(e) of the Navatek LLC Operating Agreement.

Exhibit NCI-371, at § 2. The parties agreed that Mr. Kao would voluntarily resign as manager of the Company, and that Dan Brunk would be appointed CEO and Manager, effective immediately. *Id.* at §§1.a, 1.b. The parties also agreed to suspend active litigation for 100 days while they explored possible settlement. *Id.* at 2. A letter appointing Mr. Brunk as Manager and

66

CONFIDENTIAL INFORMATION                    PMT092180

JSH-008951

CEO and confirming Mr. Kao's resignation from those positions was also prepared. *See* Exhibit NCI-539.

Before the standstill agreement ended, Mr. Kao in coordination with (and with the support of) the Company, entered into a Voting Trust Agreement (the "VTA") that transferred his 99% of the units and the voting rights into a voting trust, and appointed Dan Brunk, the Company's CEO, the voting trustee. The VTA was signed by Mr. Kao on or about January 5, 2021. *See* Exhibit NCI-368. On December 30, 2020, the Company filed in Circuit Court a motion to compel NCI to approve the VTA. *See* Exhibit NCI-376.

The VTA was approved with amendments a month later. The stipulation and order, signed by all parties, was approved by the Circuit Court on February 19, 2021, **nine days before the First Stipulation and Order expired**. *See* NCI-381.

Attached to the stipulation is the VTA, as amended. On page 1 of the Clean version (23/37), the VTA states: "**Member is currently a member of the Company** and owns the Securities set forth on Exhibit C hereto[.]" The VTA says: "Member is transferring all of the Securities into the voting trust formed by this Agreement . . . ." (emphasis added).

Once the VTA was approved by the Court, the Company extensively relied on it in seeking revalidation of its FCL. And by stipulation and order dated April 1, 2021, entered in the Circuit Court (Exhibit NCI 540), the parties agreed to make a final effort to settle their claims (which includes claims for dissociation), and, if such efforts were unsuccessful, to resolve the claims through arbitration. The stipulation and order stated in part:

If the Parties are unable to fully resolve all of their claims at such settlement conference, *the Parties shall submit any and all claims asserted in the Complaint and/or Crossclaim and any affirmative defenses and/or counterclaims* to binding arbitration pursuant to section 12.22 of the Operating Agreement[.]

Exhibit NCI-540. (emphasis above added by Arbitrator)

The parties were unable to reach a settlement. The Operating Agreement requires disputes be mediated and then arbitrated: "The parties, at the option of any party, to try in good faith to settle any difference arising out of or relating to the terms or conditions or subject matter of this Agreement by mediation and that, if agreement cannot be reached by mediation, to submit the difference to binding arbitration." NCI 202 at 12.22. There was dispute over NCI's claim for dissociation, and the dispute was required to be arbitrated before there could be any dissociation.

CONFIDENTIAL INFORMATION          PMT092181

JSH-008952

NCI filed its arbitration demand on May 4, 2021. *See* Exhibit NCI-383. In its demand, NCI concocted an argument asserting that once Mr. Kao resigned as the manager in favor of Mr. Brunk, Steven Loui became the sole voting member. Completely ignoring how such an argument is incompatible with the court-approved VTA, NCI asserted: "On or about May 1, 2021, NCI executed an Action by Consent to Confirm the Dissociation Of Martin Kao due to his numerous and indisputable breaches of the Operating Agreement and applicable laws." Mr. Brunk, who holds the majority voting rights, did not vote to dissociate Martin Kao.

Section 5.1 of the VTA describes its duration. *See* Exhibit NCI-381, at 11/37). It ends on dissolution of the Company or upon the occurrence of one of two other events that involve the US Navy Acquisition Integrity Office. None of these events has occurred.

Furthermore, dissociation of Mr. Kao cannot be an arbitrary event. The Internal Revenue Code provided specific rules and guidance concerning the dissociation of a Member whereby a partnership becomes a "Single Member LLC" after dissociation.

A domestic LLC with at least two members is classified as a partnership for federal income tax purposes unless it files Form 8832 and elects to be treated as a corporation. For income tax purposes, an LLC with only one member is treated as an entity disregarded as separate from its owner, unless it files Form 8832 and affirmatively elects to be treated as a corporation.https://www.irs.gov/businesses/small-businesses-self-employed/single-member-limited-liability-companies. The Company filed a partnership return for the entirety of 2020. Mr. Kao has not and cannot be dissociated under the date and manner argued by NCI and MDG. Dissociation, if it occurs, will occur no sooner than the date of the Award.

The alleged action to dissociate can be found at Exhibit NCI-554. It is a self-serving, disingenuous, and patently absurd document. Mr. Loui asserts Martin Kao is dissociated "no later than this April 30, 2021," but Dan Brunk never signed the document.

Mr. Loui displays near contempt for the VTA approved by the Court, even though his lawyers approved it and the Company benefited from it as the VTA paved the way for the revalidation of the Company's FCL and tens of millions of dollars in new work.

There is zero evidence that the parties treated the VTA as no longer in effect because NCI had stripped away Mr. Kao's voting rights through a secret dissociation.

* * *

CONFIDENTIAL INFORMATION          PMT092182

JSH-008953

The alleged unilateral action to dissociate the 99% owner further states "Kao's capital account be determined as of April 30, 2020," which is also a completely arbitrary date, not supported by the Operating Agreement.

The record establishes that dissociation has not occurred. NCI's claims that the dissociation occurred in 2020, or maybe on or before April 30, 2021, underscores Steven Loui's bad faith rush to profit from Martin Kao's misfortune. The dissociation date in this case is the date the arbitrator issues his award.

**3.    Redemption**

\*.\*.\*

Section 8.3 of the Operating Agreement provides as follows:

If the Company so elects, the Breaching Member shall be deemed to have sold his Units to the Company in exchange for a promissory note with an amount equal to the value of such Units as reflected in such Member's Capital Account on the most recently filed federal return of partnership income. The note shall be payable in ten (10) equal annual installments of principal, without interest, commencing on the first anniversary of the Breach by the Breaching Member.

Steven Rinesmith, the NCI lawyer who drafted the Operating Agreement, explained the purpose of Section 8.3:

Q. Okay. So, why is that provision in here?
A. For finality. To line things up so that we know what the number is, where it comes from and to prevent arguments over how to get the number.

TR Hearing, V.6., at 1303. The most recently filed tax return is for the year ending 2020. Martin Kao's Member Capital Account as shown in the Form K-1 issued for this year is $4,019,368. *See* Exhibit KAO-99, at 58/63. In response to a question from the Arbitrator, Counsel for NCI confirmed that Mr. Kao's capital account in the 2020 return was $4,019,368. *See* TR Hearing, V.6., at 1308. There is no dispute that the 2020 K-1 lists Mr. Kao's capital account as $4,019,368. *See* Exhibit KAO-99, at pdf 58.

**4.    Redemption must be a condition to dissociation.**

NCI and MDG are estopped from seeking dissociation without redemption (and the arbitrator may condition dissociation upon redemption). Even in the May 1, 2021 "Action by Consent" (NCI 554), NCI represents that "in the event Kao's capital account is determined to be a positive amount, that such amounts be paid pursuant to the terms of the

69

CONFIDENTIAL INFORMATION                PMT092183

JSH-008954

Operating Agreement." Now they want to hedge and claim the decision to redeem can be made later, if at all.

NCI and the Company should not be allowed to play "fast and loose" with their legal positions. The rush to arbitration was premised entirely on the imminent danger posed to the Company by having to disclose that Mr. Kao has an ownership interest in the Company.

Under the Operating Agreement, Mr. Kao is considered an owner unless his units are redeemed.

Units or Unit' **means an ownership interest in the Company** representing a Capital Contribution of $1.00 or other such denomination as may be set by the Management Committee, including any and all benefits to which the holder of such Units may be entitled as provided in this Agreement, together with all obligations of such Person to comply with the terms and provisions of this Agreement.

'Unit Holder' means any Person who owns a Unit either as a Member, **an Assignee** or by operation of law.

*See* Exhibit NCI-202 at 20 (emphasis added). The Operating Agreement states that the dissociated member "shall become an Assignee…." *Id.* at 7. An "Assignee is a term of art under the Operating Agreement. ""**Assignee" shall mean an owner** of Units which is not a Member." *Id.* at 15 (emphasis added)."

*See* KPCBI at pp. 23-29 (emphasis in original except as noted above).

### 2.    Findings that the 2020 K-1 Applies to Setoff

The Arbitrator makes the following findings:

1.    The Arbitrator finds, based on the entire record of this matter, including the points noted above, that the 2020 K-1 shall be applied for purposes of this case to establish Mr. Kao's capital account and any offsets thereto for the damages he has caused to NCI and/or MDG. The Arbitrator finds that the agreed amount of Mr. Kao's capital account shown on this K-1 is $4,019,368.

Although this finding is based on the entire record, the Arbitrator particularly highlights the following considerations which underly his decision.

2.    While the final accounting by the Company may still be in flux, the 2020 K-1 is clearly the latest official statement of the capital account for Mr. Kao. Moreover, it ties into the requirements for dissociation valuation under the OA and it presumably reflects whatever value

CONFIDENTIAL INFORMATION                    PMT092184

JSH-008955

was added during Mr. Kao's term with the Company. In a sea of competing claims and counterclaims, the Arbitrator finds that this value is most appropriate given the damages which will be assessed against Mr. Kao.

3.      The VTA was executed after the OA and contains a combined integration and interpretation clause which specifically references the OA and which states as follows:

> In the event of any conflict *or inconsistency* between this Agreement and the LLC Agreement, ***this Agreement shall control*.*"

*See* NCI-381, ¶ 6.1 (emphasis supplied).

4.      The VTA retained very substantial rights by Mr. Kao in his LLC units. He essentially gave up nothing except the right to vote those units, as well as any right to visit the Company premises or contact its employees while the VTA was in effect. For examples of his retained rights, *see, e.g,* ¶¶ 2.3 f)  and g), which respectively specifically include preventing at f) "...*reclassifying or altering the rights powers or preferences of any existing securities...*" and at g) "...*redeeming or approving the transfer of any Units or other ownership interests...*"

5.      The Arbitrator finds that if the OA were interpreted so as to have allowed dissociation and loss of Mr. Kao's units after the VTA was executed, then the OA and the VTA would be completely and irreconcilably inconsistent in this area. The Arbitrator further finds that, when construed together, the most reasonable and logical interpretation of the two agreements is that, as of the time the VTA was executed, Mr. Kao had not been dissociated and could not be dissociated till the matter was ruled upon by the court or by the Arbitrator.

6.      Based on the evidence from the Hearing, obtaining the VTA was critical to the Company's survival at the time it was entered into because it could demonstrate to the relevant authorities that Mr. Kao no longer controlled the management of the Company. The Arbitrator notes that the VTA thus conferred very substantial and immediate benefits to the Company, which it then adroitly utilized to survive in the interim--albeit at the price of leaving Mr. Kao's ownership of his units in place until these proceedings could be completed.

7.      The VTA was dated prior to the unilateral attempt to dissociate Mr. Kao by Mr. Loui which was executed on May 1, 2021 to be effective as of April 30, 2021. *See* NCI-554. The Arbitrator again notes that NCI has conceded that this attempt was not effective, and the Arbitrator has agreed that this attempt at dissociation was ineffective. In that context, if the complete dissociation of Mr. Kao was desired at the time of the execution of the VTA it could have been, and should have been, included as a part of that agreement.

71

CONFIDENTIAL INFORMATION                    PMT092185

JSH-008956

However, this plainly did not occur at that point, and the Arbitrator finds it to be quite understandable that the Parties did not reach agreement on that issue at that time as this matter was then being hotly contested and the most important task from the Company's perspective was likely to distance Mr. Kao as much as possible and thereby try to save the Company. Conversely, Mr. Kao was likely trying to retain as much control of his equity interest as he could in the circumstances.

8.    During the recent Hearing of this matter, the Company did provide Mr. Kao with a K-1 for 2020 which contained an updated valuation of his capital account. In the circumstances of this case, the Arbitrator finds that NCI and MDG cannot have it both ways, i.e., they cannot provide assurances to Mr. Kao in order to obtain critical cooperation from him under the VTA, which expressly preserved Mr. Kao's status as a unit owner, but then insist that dissociation had actually occurred at an earlier point in time which effectively contradicts those same assurances. In support of this finding, the Arbitrator adopts the basic chronology and reasoning noted above from Mr. Kao's brief (absent the hyperbole and argument).

9.    In addition, the Arbitrator finds that, on this record, NCI and MDG are equitably and judicially estopped from taking this position under applicable Hawai'i case law, *see, e.g., Rosa v. CWJ Contractors, Ltd.*, 664 P.2d 745 (1983), even though it has been creatively and zealously advocated by their counsel on behalf of their respective clients. This finding is made in light of the points noted above and because the Arbitrator finds that, on this record, a rather clear choice was made to pursue a judicial path (now an arbitral path) to the dissociation remedy and that process is only now being completed after a full hearing.

10.    In order to weigh the effect of the relief sought on the Parties, the Arbitrator inquired during the Hearing about the effects of the dissociation. It was confirmed by Mr. Rinesmith in his testimony that, after the dissociation was completed, the Company would then be effectively 100% owned by Mr. Loui through Navatek Capital rather than the 1% interest he currently holds after having effectively sold the company to Mr. Kao.

> Q.    So only Mr. Steven Loui, Mr. Steven Loui then becomes effective 100 percent owner of this LLC?
>
> A.    Through Navatek Capital, yes.

*V.6, 1345:7-9; See generally* Mr. Rinesmith's testimony at *V.6 p. 1342:22-1345:19.*

CONFIDENTIAL INFORMATION                    PMT092186

JSH-008957

Fortunately, the Company now appears to be on the road to recovery, as evidenced by it having obtained the $55 million federal contract previously noted. Given the value of the Company's prospects and its role as a federal defense contractor, it is particularly appropriate that the path to any disassociation of Mr. Kao be a clear, equitable, fair and transparent process for all Parties concerned.

11. In light of the choice to pursue first a judicial and then an arbitral path to dissociation, and given the complex facts and claims here, including that a retroactive dissociation based on Mr. Kao's misconduct was being sought, the Arbitrator further finds that service of the complaint did not alone serve as adequate notice of the dissociation sought under the OA.

However, the Arbitrator further finds that any issue of insufficient notice has now been completely and thoroughly cured by the hearings and procedures of this arbitration, such that all issues as to the Parties may now be determined.

C. **AWARD FINDING #12 REGARDING WHAT SPECIAL DAMAGES ARE DUE FROM MR. KAO TO MDG AND NCI IN TOTAL AND WHAT IS THE NET AMOUNT STILL DUE AFTER THE TOTAL DAMAGES ARE SETOFF AGAINST HIS 2020 CAPITAL ACCOUNT**

1. **Gross Special Damages Claimed**

During the Hearing, MDG provided Exhibits 225 and 225A as a detailed summary with pin cites to the relevant accounting records showing the source of various categories of damages which it claimed and the documentation in support of each item of damages claimed.

The claims were explained in detail during the Hearing and summarized in the MDGPCB1 at pages 34-36. The summary included the damage chart included below, which has now been numbered by the Arbitrator for ease of reference to specific lines.

In this section of the Award, the Arbitrator will address only lines 1-9 of the damage chart, because the punitive damage claims and attorneys' fees claims for both MDG and NCI will be addressed in later sections of the Award. It is also noted that this chart only includes the attorneys' fees requested by MDG. NCI has requested attorneys' fees in an additional amount and they will be addressed in a separate section below.

As noted previously, MDG and NCI have agreed that they both claim the same special damages in the categories covered by the first 10 lines below.

The Company's damage amounts are summarized in the below table.

CONFIDENTIAL INFORMATION          PMT092187

JSH-008958

| | |
|---|---|
| 1. $2M Note Receivable | $2,000,000.00 |
| 2. Improper Distributions | $495,000.00 |
| 3. Crisis Communications | $35,575.90 |
| 4. Interim CFO | $168,419.22 |
| 5. Post-Arrest Retainers | $974,838.02 |
| 6. Personal Expenses | $295,661.12 |
| 7. Foundation Expenses | $107,209.55 |
| 8. SYWSE Expenses | $1,513.83 |
| 9. Political Contributions | $190,587.76 |
| 10. Punitive Damages (*e.g.*, unseized balance of CPB and Radius PPP loans) | $2,148,490.00 |
| 11. Attorneys' Fees and Costs – Investigation; Grand Jury Subpoena Responses | $1,078,243.57 |
| 12. Attorneys' Fees and Costs – Suspension and Debarment | $267,726.15 |
| 13. Attorneys' Fees and Costs – Civil Complaint and Arbitration | $1,360,841.63 |
| **TOTAL** | **$9,124,106.75** |

**2.    Gross Special Damages Awarded Against Mr. Kao**

The Arbitrator finds that the $2 million claimed in Line 1 is speculative at this point for the reasons previously noted, thus that particular claim is denied at this time entirely without prejudice for the reasons set forth herein.

The Arbitrator finds that each of the categories of damages in lines 2 through 9 have been proven to the required preponderance standard and that each are the direct responsibility of Mr. Kao. The total of these special damages is $2,268,805.40 and that amount is hereby found to be the special damages legally caused by Mr. Kao and which MDG (assisted by NCI) is legally entitled to recover, if it has not done so already.

The special damages of $2,268,805.40 is further hereby found to have been independently caused by each of the following: Mr. Kao's fraud, Mr. Kao's multiple breaches of the OA previously noted above and Mr. Kao's multiple gross and reckless breaches of his fiduciary and other duties to MDG and NCI, and by Mr. Kao acts constituting embezzlement, conversion, and unjust enrichment, all as previously noted above.

As to the collection of the special damages of $2,268,805.40, the Arbitrator finds that the amount is due from and collectible from Mr. Kao personally to the extent the Company has not

74

CONFIDENTIAL INFORMATION                    PMT092188

JSH-008959

already deducted all or a portion of that amount from Mr. Kao's capital account as reported on his 2020 K-1.

**3.     Special Damages Already Deducted From Mr. Kao's Capital Account**

MDG's position in the MDGPCB2 included this statement:

> <u>**An award of damages for amounts which previously reduced Kao's capital account is an appropriate and fair return of the Company's property back to itself and is vital to its liquidity and profitability going forward.**</u> The same is true for the $2 million note receivable which, in the words of Kao's counsel: "Kao has never suggested that he would fail to repay this amount and remains intent on doing so." *KAO-89* at KAO_000001.

The Arbitrator regards the above as a further, albeit tacit, admission that some amounts claimed by MDG/NCI as damages were already deducted from Mr. Kao's capital account. However, in their supplemental post-closing briefs neither MDG nor NCI provided a clear schedule showing what those amounts were--despite the Arbitrator's two requests to do so as previously noted above. As a result, the Arbitrator was left to work through Mr. Kao's claims that virtually all of the claimed damages had already been "baked into" his capital and try to decipher which of those claims should be sustained.

The Arbitrator has thus decided to credit those claims where Mr. Kao produced exhibits or testimony showing a reduction of his capital account for the item of damage in question and the Arbitrator rejects those claims where Mr. Kao alleges that the item is an expense which the Company took, or must have taken, or will likely take, in the future. Mr. Kao has argued that the expenses of the LLC will ultimately mostly affect his capital account, but the Arbitrator was seeking a list of those items which have clearly already affected his capital account and finds the other claims by Mr. Kao to be speculative.

Using that approach and based on the evidence summarized below from portions of pages 3-8 of the KPCB2, the Arbitrator finds that the damages which have already been deducted are as follows (The comments of the Arbitrator are found below each referenced section of the KPCB2):

> A. <u>IMPROPER DISTRIBUTIONS OF $495,000.</u>
>
> The $495,000 claimed by MDG for "improper distributions" were all reflected as distributions to Mr. Kao. *See* Exhibit NCI-569. Mr. Kao was therefore already charged for these items, whether from his 2019 capital account or his 2020 capital account. As shown in Exhibit MDG-154:

CONFIDENTIAL INFORMATION                    PMT092189

JSH-008960

```
2-0-00-202.00  Distribution
  12-31-2019         NAV 12-6      To distribute loan to Martin        175,000.00
  12-31-2019         NAV 12-8      To distribute loan to Martin        150,000.00
```

*See* Exhibit MDG-154 at MDG00196079.

These 2019 distributions are confirmed to have been subtracted from Mr. Kao's capital account in Exhibit NCI-569:

| Date | Purpose | Martin | Capital | Total |
|------|---------|--------|---------|-------|
| 7/19/2019 | Various Political contributions | 175,000.00 | - | 175,000.00 |
| 12/23/2019 | Fund SUWSE | 150,000.00 | - | 150,000.00 |
| | **31-Dec-19** | **325,000.00** | **-** | **325,000.00** |

The remaining $120,000 distribution occurred in 2020, and therefore reduced Mr. Kao's 2020 capital account:

```
2-0-00-202.00  Distribution

  2-28-2020          NAV 2-8       To recod funds from Margin Loa      120,000.00
```

*See* Exhibit MDG-153 at Bates MDG00196557.

The $120,000 distribution in 2020 is also confirmed in Exhibit NCI 569:

....

| Date | Purpose | Martin | Capital | Total |
|------|---------|--------|---------|-------|
| 2/28/2020 | Distribution | 120,000.00 | - | 120,000.00 |

*See* Exhibit NCI-569 at pdf 2.

Accordingly, MDG's claim for $495,000 in "improper distributions" have already been satisfied by adjustment to Mr. Kao's capital account. MDG is therefore not entitled to these distributions as damages."

*See* KPCB2 at pp. 3-8.

As to these positions of Mr. Kao, the Arbitrator finds that they are documented sufficiently to meet the preponderance standard, except that the sum of the entries above is not equal to $495,000 but rather to $445,000. Thus, the amount of $445,000 shall be allowed as a setoff to the total special damages is $2,268,805.40 having been already deducted from Mr. Kao's capital account, leaving a sub-total still due after this deduction of $1,823,805.40.

76

CONFIDENTIAL INFORMATION                    PMT092190

JSH-008961

The next section of the KPCB2 covers the post arrest retainers—the Company funds that Mr. Kao improperly appropriated to fund his own defense. The total claimed by MDG and NCI for this category is $974,838.02. Mr. Kao's response at pages 4 and 5 of KPCB2 as to his claim that this was already deducted from his capital account was as follows:

"**B. POST ARREST RETAINERS**.

As described in detail on page 38 of Kao's Closing Brief, the post arrest retainers sought as damages by MDG were also already deducted from Mr. Kao's capital accounts. This conclusion was confirmed by Controller James Ota during his deposition. *See id.*, at 38-39 ("I believe these expenses were booked as distributions to Martin Kao.").

| Date | Purpose | Martin | Capital | Total | |
|------|---------|--------|---------|-------|---|
| 10/13/2020 | Transfer out of ML Account | 250,000.00 | | 250,000.00 | Michael Green |
| 10/31/2020 | Transfer out of ML Account | 450,000.00 | | 450,000.00 | Troutman & Pepper |
| 11/9/2020 | Transfer out of ML Account | 500,000.00 | | 500,000.00 | Crowell & Moring |
| 12/22/2020 | Distribution to Capital | | 7,898.76 | 7,898.76 | |
| 12/22/2020 | Return of Monies to Starn | (325,161.98) | | (325,161.98) | Troutman & Pepper |

*See id.*

The only retainer on Exhibit MDG-225A that is not addressed by Exhibit NCI-569 is a $100,000 payment described as "Landon Yun." The General Ledger (Exhibit MDG-151) describes this payment as a distribution to "MK" (i.e., Martin Kao).

| 31000 | 0 | Liability | Members Distributions | | | | |
|-------|---|-----------|----------------------|---|---|---|---|
| 10-2020 | 10/29/2020 GL | 002171 | | To record Members Distribution to MK | 100,000.00 | 0.00 | 923,277.00 |

*See* Exhibit MDG-151 at 808.

As shown by the records, the amounts claimed by MDG for the attorney retainers have been assessed against Mr. Kao.

Finally, Exhibit MDG-225A highlights in yellow all of the retainer entries. All of the foregoing establishes that these amounts were treated as distributions. (Although not stated specifically by MDG, it appears that the

77

CONFIDENTIAL INFORMATION                    PMT092191

JSH-008962

highlighting was intended to underscore expense items that were treated as distributions. Expenses reduce a capital account indirectly while distributions reduce a capital account directly.)

Accordingly, MDG's claim for post-arrest retainers have already been satisfied by adjustment to Mr. Kao's capital account."

*See* KPCB2 at pp. 4 and 5.

As to these positions of Mr. Kao regarding the post arrest retainers, the Arbitrator also noted Mr. Ota's clear hearing testimony (*V.4, 789:3-16*) that these amounts were booked as distributions to Mr. Kao and showed up on a schedule to his 2020 K-1. Thus, the Arbitrator finds that these amounts have also been documented sufficiently and supported by Mr. Ota's testimony sufficiently to meet the preponderance standard. Adding the numbers above does not exactly equal the amount claimed, but it is approximately the same. Thus, the amount of $974,838.02 shall be allowed as a further setoff to the sub-total of $1,823,805.40 previously noted above, leaving a new sub-total of special damages not yet offset in the amount of $848,967.38.

Mr. Kao next addresses six different categories in the KPCB2 which were the payments made for the Interim CEO in the amount of $168,419.22 to Bowen Hunsaker (*see* KPCB2 at pp 5-9); payments made to Crisis Communications of $35,575.90; payments made for his San Francisco condominium; payments made for his family members' personal travel; payments made for his personal legal fees, and payments made for other miscellaneous personal expenses.

After reviewing these arguments and the referenced exhibits, the Arbitrator finds that Mr. Kao did not meet his burden to show that these sums had already been deducted from his capital account, i.e., even if they were expenses that were paid, or to be paid, in whole or in part by the Company, the showing required for an offset is that they have already been recovered by the Company from Mr. Kao's capital account. The Arbitrator finds that this showing has not been clearly made by Mr. Kao on this record.

In summary, the Arbitrator finds that of the special damages found to have been caused by Mr. Kao, he has not met his burden to show that the remaining $848,967.38 has already been offset against his capital account, thus these special damages remain due.

### 4. The Present Value Of the Payoff of Mr. Kao's Capital Account

Footnote 17 on page 35 of KPCB1 states that: "***The discount rate*** for a guaranteed stream of 10 equal annual payments of the balance of Martin Kao's capital account ***should be low given***

78

CONFIDENTIAL INFORMATION                    PMT092192

JSH-008963

*the near zero risk of nonpayment*. Mr. Kao submits that the discount rate should be 3.31% (the average historical risk-free rate for 10-year treasuries) which would result in a discounted present value amount for his capital account of $3,002,929" (emphasis supplied). In effect, this is an admission that, upon disassociation, if there is a setoff, that setoff is taken against a sum which is less than the full value of Mr. Kao's capital account as shown on his 2020 K-1, which the Arbitrator finds to be $4,019,368 as stated on that K-1, which was provided by MDG during the hearing. The discount amount proposed by Mr. Kao is equal to $1,016,439.

The Arbitrator has taken arbitral notice of common discount rates and has some experience in this area gained over the past 44 years of practice in which discount rates for future income streams have frequently arisen. The Arbitrator finds that the discount rate suggested by Mr. Kao is simply not appropriate here--because it is highly aggressive in Mr. Kao's favor for the following reasons, at a minimum:

1.    The debt which would be owed to Mr. Kao to pay off his capital account on dissociation is not owed by the highly reliable U. S. Treasury and it is certainly not risk free.

2.    Instead, the debt is owed by MDG, a small, non-publicly traded, LLC--one whose future has been placed in serious question by reason of Mr. Kao's extraordinary misconduct and one which now has a history of very expensive and very complex litigation with Mr. Kao. MDG itself still faces a number of serious risks to its continued existence and prosperity as noted in this record. These factors all impact the risk of such an entity paying the debt owed--unlike the US Treasury.

3.    MDG has lost its banking relationship both with Merrill Lynch and with its main banker, CPB, due to its fraudulent loan applications. Based on the testimony from Mr. Chang of CPB at the hearing (*V.5, pp. 1137-38*) this cannot be restored soon, or easily. MDG has apparently sought, but not yet obtained, a similar alternate banking relationship.

Due to these risks affecting payment, the Arbitrator finds that an appropriate discount amount should be twice what Mr. Kao has suggested. Applying that doubled discount amount reduces the present value of Mr. Kao's capital account by the further sum of $1,016,439, leaving the present value of the capital account for purposes of setoff against the current damages due at $1,986,490. ($4,019,368 - $2,032,878 = $1,986,490).

The Arbitrator finds that this amount of $1,986,490 is a fair and reasonable present value for the ten year payoff which would have been required for Mr. Kao's capital account had he been

79

CONFIDENTIAL INFORMATION          PMT092193

JSH-008964

paid out over the ten year term referenced in the OA. Thus, the amount of $1,986,490 is the amount against which all other damages due from Mr. Kao shall be setoff. When the remaining special damages are offset against this sum, then the remaining unpaid value of Mr. Kao's 2020 capital account is $1,137,522.62 ($1,986,490 - $848,967.38 = $1,137,522.62).

### D.    AWARD FINDING #13 REGARDING CLAIMS FOR ACCOUNTING

Mr. Kao's request for an accounting is hereby denied. This is based on the entire record herein, including but not limited to the following considerations:

1.    Mr. Kao is a CPA and had the ability to access, through the discovery process, all relevant financial records of the Company. In addition, while he was in control of the Company, he had access to all relevant financial records. He thus should have been in a position to obtain any financial information in the course of these proceedings and to present any irregularities in the Arbitration for an appropriate and timely determination. To the extent he did so, those claims have all been ruled upon above.

2.    Now that Mr. Kao is dissociated and has had his capital account credited against the damages due, the Arbitrator sees no need for a further accounting--because all the claims Mr. Kao presented have now been ruled upon.

3.    By this ruling, the Arbitrator is not attempting to foreclose any lawful request for an accounting that may arise in the future based on new facts which affect Mr. Kao--such as any amendments to the financials, K-1's, or other tax filings that have a future effect on him and which were not before the Arbitrator in these proceedings. To that extent, this ruling is without prejudice as to any such matters for all of the Parties. However, to be very clear, **anything that could have been brought up in these proceedings by any Party, including Mr. Kao,** is intended to be fully and finally resolved by this Award and, as to such matters, this denial of an accounting is with prejudice.

### E.    AWARD FINDING #14 REGARDING CLAIMS FOR PUNITIVE DAMAGES

The Arbitrator has considered the purpose of punitive damages, the facts of this case, the harm done to the Company and NCI by Mr. Kao's conduct, the harm done to the employees of MDG and the truly shocking misuse of this country's tax dollars shown on this record to fund Mr. Kao's reckless fraud.

In particular, the Arbitrator has noted the pervasive, intentional and manipulative conduct of Mr. Kao as he perpetuated his pattern of fraud and the greed which infused his plans. His greed

80

CONFIDENTIAL INFORMATION                    PMT092194

JSH-008965

is all the more clear because he is a person who had benefitted from a good education, one who had demonstrated professional knowledge in his area of accounting and thus one who should have had an acute awareness of his own financial misconduct. Mr. Kao had experienced considerable success and earned a high income from his history of legitimate work for his prior accounting firm and then for MDG. It is thus hard to fathom why Mr. Kao would gamble all of these advantages in order to perpetuate this obvious series of frauds.

After review of the applicable case law, including *Exxon Shipping Co. v. Baker,* 554 US 471, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (Supreme Court, 2008), the Arbitrator finds that this matter has all of the "earmarks of exceptional blameworthiness", *id.* which justify a substantial award of punitive damages. These have already been detailed in the record of this case and summarized above. The Arbitrator thus finds that an award of punitive damages against Mr. Kao is both justified and appropriate in this matter.

In fixing the amount which is appropriate here, the Arbitrator is aware that the record indicates Mr. Kao personally valued his net worth at $40,500,000 as of March 4, 2019 and $77,936,764 as of September 14, 2020, via signed personal financial statements. *See* MDG-241 and MDG-240. The Arbitrator notes that, given Mr. Kao's history of pervasive fraud, those statements may well have been grossly exaggerated--but they are Mr. Kao's own documents and they are useful for these reasons: (1) they reflect Mr. Kao's own valuation of his net worth (which he then submitted to CPB with the understanding that they would rely upon it; and (2) they are somewhat probative of how Mr. Kao personally valued the gains he received from MDG during his tenure as Manager and CEO.

The Arbitrator thus finds that punitive damages in an amount equal to two times the gross special damages of $2,268,805.40, which were caused by Mr. Kao's conduct here are conservative and appropriate on these facts. This results in a total punitive award against Mr. Kao, and in favor of MDG, in the amount of $4,537,610.80.

In coming to this amount, the Arbitrator notes first that Mr. Kao did not act to expose his own wrong-doing, nor did he take any steps to correct it until he was discovered.

The Arbitrator also notes that the set-offs made above to his capital account for the damages he has caused were not voluntarily offered by him before the harm he caused was discovered and were only possible before this Award was entered because new and neutral management was in charge of MDG to make these adjustments.

81

CONFIDENTIAL INFORMATION                    PMT092195

JSH-008966

Finally, the Arbitrator notes that, through counsel, Mr. Kao argued throughout these proceedings that he was only acting for the good of the Company, that most of the money was available to be spent on legitimate payroll and that he thus bore the majority of the damages he caused because he was the 99% owner of the Company.

All of these positions are not defenses based on the rulings made previously above. Most importantly however, these defenses reflect a complete lack of appreciation by Mr. Kao of the harm that was caused to the Company *as a legal entity distinct from Mr. Kao*, as well as the harm caused to all of its  employees--who could reasonably expect that the Company for which they worked would comply with the law and with normal and prudent standards in the conduct of its business. Put another way, had the money, which was misused here *not* been misused, it would have been available to the Company for investment in research, development, sales, and all  other legitimate Company purposes--it would not necessarily have been distributed 99% to Mr. Kao

The Arbitrator also notes the clever efforts Mr. Kao apparently made to conceal his frauds as he was committing them, as indicated by fabricated documents found on his computer and in the files of MDG, and by threatening bankers with pressure from highly placed politicians.

The overall pattern of Mr. Kao's conduct here was clearly egregious, intentional, and motivated by greed, as well as a misplaced and unearned sense of entitlement--all of which were harnessed to a selfish, corrupt and ego-driven personality.  In a very short time after Mr. Kao obtained his 99% interest in the future profits of the Company, this toxic mixture of his qualities enveloped and virtually destroyed a productive local company, one which previously had a good reputation, one which had been carefully built by many years of hard and productive work.

Mr. Kao's misconduct thus deserves a suitable response, both to punish him and as an example to others who may consider engaging in similar misconduct.

The punitive damage award made above uses up the remaining positive balance of Mr. Kao's capital account and leaves an amount of $3,400,088.18, which is still owing as damages by him to MDG before the calculation of attorneys' fees and costs (i.e., the positive balance of $1,137,522.62 - $4,537,610.80 in punitive damages equals a negative balance of $3,400,088.18). The Arbitrator notes again that all damages flow to MDG, as opposed to NCI, based on the stipulation noted previously.

82

CONFIDENTIAL INFORMATION                    PMT092196

JSH-008967

## F.    AWARD FINDING #15 ON TIMING AND RELATED MATTERS AS TO DISSOCIATION AND DAMAGES

The Arbitrator finds as follows as to the timing and intended effect of the relief provided in this Award.

1.    Effective as of the date of this Award, the damages awarded herein against Mr. Kao are intended to be deemed to have been deducted from Mr. Kao's capital account and paid to MDG. The Arbitrator's understanding is that Mr. Kao's capital account at that point will be zero but the net remaining damages will still be due from him to MDG. The Arbitrator finds this to be consistent with Mr. Rinesmith's testimony and with the OA par. 8.2 (e) which provides that:

> The Company may apply any distributions otherwise payable with respect to such Units to satisfy any claims it may have against the Breaching Member;

2.    Immediately after the deduction of these damages, Mr. Kao is intended to be fully and finally dissociated from MDG, also effective as of the date of this Award.

3.    The intended effect of these rulings is that there will then be no distributable funds remaining due to Mr. Kao from his capital account, which will have been completely liquidated as provided above. As a result, the Arbitrator's lay understanding is that there should be no further distributions due from MDG to Mr. Kao to pay his income tax on distributions which have been made--first, because he is in fact, obtaining no net distributions and, second, because he has then become a net debtor to the MDG for the remaining damages due.

4.    The Arbitrator is stating the intended effects of these rulings for clarity and because the Parties requested a detailed award, but, of course, the Arbitrator is not an accountant, and the Arbitrator leaves it to the sound discretion of the respective Parties and their respective counsel and accountants to determine the effects of, and to lawfully treat, all the rulings made hereunder, including those contained in this section of the Award.

5.    The Arbitrator is aware that the normal effect of a judgment for money damages having been entered based on a finding of fraud is that such judgments are not dischargeable in a subsequent bankruptcy proceeding. The Arbitrator obviously has no role in any such future proceedings and simply notes that this aspect of the Award was not an oversight and was thoroughly considered in the course of arriving at the remedies provided in the Award.

83

CONFIDENTIAL INFORMATION                    PMT092197

JSH-008968

### G. AWARD FINDING #16 ON ATTORNEYS' FEES AND COSTS AS TO EACH PARTY

1.      The Arbitrator finds that MDG and NCI are determined to be the prevailing parties on the disputed main issues in this matter and are therefore respectively entitled to an award of their reasonable attorneys' fees and costs as determined by the Arbitrator. This finding is based on the entire record herein, including, but not limited to ¶¶ 8.2 (c) and 12.18 of the OA, HRS Sections 607-14 and 658A-21 and the following case law: *Food Pantry, Ltd. v. Waikiki Business Plaza, Inc.*, 58 Haw. 606, 5S75 P.2d 869 (1978) and *Chun v .Bd. of Trs.of Emps.Ret. Sys. of Haw.*, 92 Haw. 432, 992 P.2d 127, 137 (2000).

2.      Generally, where a party prevails on assumpsit claims in court, HRS § 607-14 limits the award of attorneys' fees to 25% of the amount in controversy. However, because this matter is in arbitration, and because the OA provides for recovery of attorneys' fees and costs, the Arbitrator finds that, pursuant to the holding in *Kona Village Realty, Inc. v. Sunstone Realty Partners*, XIV, LLC, 123 Haw. 476, 236P.3d 456 (2010), the 25% cap does not apply. The Arbitrator has previously noted ¶12.18 of the OA. The Arbitrator also notes both ¶ 8.2 (c) and ¶12. 22 of the OA as follows:

Paragraph 8.2 (c) states that:

> The breaching Member shall be liable for damages, without requirement of a prior accounting, to the Company, for *all costs and liabilities* that the Company or any Member may incur as a result of the Breach.

The relevant sentence of Paragraph 12.22 states that:

> All fees and expenses of the Arbitrator and all other expenses of the arbitration *except for the fees and expenses of each party's attorneys and witness* shall be shared equally by the parties hereto.

3.      To the extent the 25% limit on attorneys' fees may be in issue in any later proceedings involving this matter, the Arbitrator also finds that the amount in controversy is substantial for the following reasons:

a.      The sum of the special damages and punitive damages found above is $2,268,805.40 + $4,537,610.80 for a total of $6,806,416.80.

b.      However, in addition to this monetary amount, the declaratory relief of dissociation sought by MDG and NCI and opposed by Mr. Kao effectively involves the involuntary disposition and sale of a 99% interest in MDG by Mr. Kao to NCI. Because of that fact, the actual relief at issue in this matter was the worth of a company with approximately 200 employees and

84

CONFIDENTIAL INFORMATION                    PMT092198

JSH-008969

multiple existing and pending multi-million dollar federal contracts. Based on the record noted previously, the Company was capable of paying executive compensation to Mr. Loui, Mr. Brunk and Mr. Kao of approximately $1.2 million over the past year. Although Mr. Loui testified at one point that the Company was worthless, or worth only $1 million, a prudent business person does not normally expend over $4 million in attorneys' fees and costs in order to preserve a $1 million asset--much less one that is worth nothing. For these reasons and based upon the other evidence in this record, the Arbitrator finds that the value of the transfer of Mr. Kao's 99% interest in the Company to NCI pursuant to the dissociation relief provided herein is worth in excess of $10 million and that the combined amount in controversy in this matter, before any award of attorneys' fees and costs is therefore in excess of $16.8 million.

   c.  Based on that finding, should the 25% limitation under HRS § 607-14 later be found to be relevant to this matter, the limit on reasonable attorneys' fees is found to be, at a minimum, $4.2 million.

   4.  Based upon the holding in *Uyemura v. Wick.* 57 Haw. 102, 551 P.2d 171(1976) and the terms of the OA cited previously, the Arbitrator finds that MDG and NCI are also entitled to recover reasonable attorneys' fees and costs expended for the efforts to repair the harm done by Mr. Kao.

   5.  The Arbitrator also finds that, per the terms of the OA at section 12.22 quoted previously, all Parties have agreed to equally share the costs of the arbitration and the Arbitrator. Those costs are to be paid equally, as assessed by DPR. However other reasonable costs, which were not incurred for the Arbitration or DPR, will be awarded to the extent as set forth below.

   6.  The Arbitrator further finds that, although Mr. Kao prevailed on some issues, he is not the prevailing party on the main claims in this matter and is thus not entitled to recover his attorneys' fees or costs.

   7.  In MDG's Memorandum in Support of their Motion for Attorneys' Fees and Costs filed herein on October 18, 2021 ("MDG Fee Motion"), MDG sought attorneys' fees and costs for work by the following four law firms: the SOM&F Firm, Buckley LLP ("Buckley Firm"), Covington & Burling LLP ("Covington Firm"), and attorney Vernon Woo ("Woo").

   8.  Mr. Kao filed his Memorandum in Opposition to the MDG Fee Motion on October 25, 2021 ("KAOMIO1"). All of the arguments made in the KAOMIO1 have been carefully considered in making the findings on these issues in this Award.

CONFIDENTIAL INFORMATION    PMT092199

JSH-008970

9.     The MDG Fee Motion states that the SOM&F and Woo Firms have been primarily responsible for prosecuting and defending the claims at issue in the initial First Circuit Court civil litigation before Judge Chang and then in this arbitration; that the Buckley Firm has handled the Company's internal review and responses to government subpoenas and criminal investigations, as well as assisting with certain tasks related to the Arbitration, and that the Covington Firm has handled efforts contesting suspension and debarment proceedings initiated by federal agencies against the Company. *See* MDG Fee Motion at p. 2.

10.     The MDG Fee Motion states that MDG has incurred $2,361,321.49 in attorneys' fees of which $1,102,847.86 is attributable to work by the SOM&F Firm, $96,473.13 is attributable to work by Woo; $894,274.00 of which is attributable to work by the Buckley Firm, and $267,726.50 of which is attributable to the Covington Firm. The MDG Fee Motion states that MDG has also incurred costs, through the SOM&F Firm and the Buckley Firm, in the amount of $346,192.41. *Id.* The total of all attorneys' fees and costs claimed by MDG is $2,707,513.90. *Id.*

11.     NCI has filed a similar motion, also on November 18, 2021 ("NCI Fee Motion") seeking total fees of $1,104,778.93 and total costs of $214,093.97 on behalf of four law firms: the KSG Firm, Williams Mullen, ("WM Firm"), the Lyons Brandt Firm ("LB Firm") and Rinesmith and Sekiguchi ("RS Firm"). The total amount of attorneys' fees and costs claimed by NCI is $1,318,872.90.

12.     Mr. Kao filed his Memorandum in Opposition to the NCI Fee Motion on October 25, 2021 ("KAOMIO2"). All of the arguments made in the KAOMIO2 have also been carefully considered in making the findings on these issues in this Award.

13.     The total combined fees and costs sought for all eight firms in the MGD Fee Motion and the NCI Fee Motion is thus $4,026,386.80 ($2,707,513.90 + $1,318,872.90 = $4,026,386.80). Based on the invoices provided these fees and costs were incurred starting around July 2020. NCI filed its Civil Complaint on November 9, 2020. From July 2020 to the present is a period of about 17 months. As to both the MDG Fee Motion and the NCI Fee Motion, the Arbitrator notes the following general considerations:

a.     This was a large and complex case involving strong underlying sentiments, some of which were expressed on the record during the Hearing by Mr. Loui. It is thus perfectly understandable that all Parties would seek the best counsel and experts they could obtain and that

86

CONFIDENTIAL INFORMATION                    PMT092200

JSH-008971

the Parties would agree to pay their respective counsel at the rates those counsel respectively charged in order to assist in obtaining the best chance to obtain their respective desired results.

b.      However, Mr. Kao was obviously not consulted as to the representation agreements entered into by MDG, or NCI and the task of the Arbitrator when these attorneys' fees and costs are sought to be recovered from the losing party, i.e. Mr. Kao, is to determine whether the attorney's fees and costs incurred were reasonable and necessary for the case and also whether they were reasonable in this jurisdiction.   These points were made forcefully in both the KAOMIO1 and KAOMIO2.   These factors usually mean that the party seeking to recover attorneys' fees and costs recovers less than they may have chosen to expend, so it should come as no surprise that this is the result here.

c.      The Arbitrator also notes that it is the burden of the movant in each case to meet the preponderance standard in showing that the attorneys' fees and costs were reasonable and necessary.   To meet that burden, the Arbitrator must be able to review the work done, the time incurred for the same  and all other charges incurred.   Within this general framework, the MDG Fee Motion and the NCI Fee Motion will be addressed below.   The MDG Fee Motion will be discussed first.

### 14.    Attorneys' Fees and Costs Claimed by and Awarded to MDG

As to the MDG Fee Motion, the Arbitrator has reviewed the total request for attorneys' fees and costs and finds that the amounts requested therein should be reduced by the following factors:

a.      The Arbitrator finds that the hourly rates billed by the SOM&F Firm and by Woo, both for attorneys and paralegal work, are reasonable for this jurisdiction given the experience and reputation of the counsel involved.

b.      The Arbitrator finds that the hourly rates of the billing entities for the Buckley Firm and Covington Firm are quite far above those of highly skilled and experienced Hawai'i counsel.   For example, the Covington Firm partners billed at rates from $841.50 to $1,233.00 per hour and the associates were billed from $504 to $765 per hour. The Buckley Firm's rates were comparable.   The Arbitrator does not doubt the professional abilities of the Buckley Firm and Covington Firm billing entities concerned, but finds that rates comparable to those in Hawai'i are most appropriate when taxing attorneys' fees in a case between Hawai'i parties that was litigated in Hawai'i and which arose based primarily on conduct that primarily occurred in

87

CONFIDENTIAL INFORMATION                    PMT092201

JSH-008972

Hawai'i. Accordingly, the Buckley Firm's and Covington Firm's hourly rates have been uniformly adjusted downwards by 40%, after having made various further adjustments, which are each noted below. This results in the highest hourly rate at the Buckley Firm being $684 for Mr. Christopher Witeck and the highest hourly rate at the Covington being $739 for Mr. Repke. For comparison purposes, the hourly rates for Mr. Starn, Mr. Chin and Mr. Woo are $600, $550 and $450 respectively. Thus, mainland counsel are still being provided a significant premium for their time over the most experienced Hawai'i counsel involved for MDG in this matter.

      c.     The next adjustment for the Buckley and Covington Firms relates to various entities who were billed at different rates for different periods in the submissions (*see e.g.*, Mr. Hays at the Buckley Firm at both $310 and $325 hourly rates, and Mr. Wagner at the Covington Firm at both $841.50 and $877.50 hourly rates). For all those entities, the lower rate will be the starting point for the 40% reduction. All of these billing entities were identified in the MDG Fee Motion at pp. 17, 18 and 21.

      d.     The next adjustment for the Buckley Firm relates to the portion of Exhibit 1 attached to the MDG Fee Motion and referenced at ¶ 4 of the Declaration of Preston Burton ("Burton Declaration") filed with the MDG Fee Motion. This is a 329 page summary of the time incurred by each billing entity for each firm assisting MDG. Pages 1-56 of that summary cover the time of the Buckley Firm. Upon reviewing Exhibit 1, the Arbitrator noted that each of the three other firms' time entries, though redacted for material claimed to be privileged, left un-redacted sufficient information for the Arbitrator to make reasonably fair determination as to what general tasks were worked on for each day that time was billed. Regrettably, there was no similar time description for virtually all of the Buckley Firm entities time throughout pages 1 through 55. Instead, virtually all of this information was completely redacted, *i.e.*, blacked out. On page 56, a small amount of very general information was provided by each of the seven Buckley Firm entries made for the few days between September 28, 2021 and September 30, 2021.

      The Arbitrator specifically advised the Parties' counsel in the course of the proceedings that any time must be described in order to be considered for an award of attorney's fees, as follows:

> ...But I want to know very clearly on what basis any attorneys fees are claimed. I'll want to see a record that they are not duplicative. That they are reasonable. That the hourly rates are community rates. That kind of thing. *I want to see detailed time descriptions of whatever attorneys fees are*

CONFIDENTIAL INFORMATION      PMT092202

JSH-008973

*claimed.* When I say "not duplicative" there are two layers to that. One is not duplicative within a firm. And not duplicative between say NCI and MDG on the same quarrel.

*V.6., 1258:15-25* (emphasis supplied).

In the KAOMIO1, Mr. Kao pointed out the following case law that decries such redactions because of the inability to evaluate the time spent:

> ***But when the description of work performed itself is redacted, and it is impossible to determine whether a billing entry is reasonable or necessary, the court must disallow the fees.*** *Las Vegas Monorail*, 458 B.R. at 558 (citing *In re Tri-State Plant Food, Inc.*, 273 B.R. 250, 267 (Bankr. M.D. Ala. 2002)). Ultimately, '[p]rofessionals may not properly avoid scrutiny of their fees by redacting the description of the billing entry.' *Id.*
>
> *In re Earl Gaudio & Son, Inc.*, No. 13-90942, 2018 Bankr. LEXIS 2065, at *18 (Bankr. C.D. Ill. July 10, 2018) (footnote omitted).

*See* KAOMIO1 at p. 5 (emphasis supplied).

The Arbitrator and the opposing Party are severely disadvantaged when this occurs. For that reason, the Arbitrator was initially inclined to deny all of the requested compensation for the Buckley Firm time except for the last seven days noted above. However, upon reflection, it is clear enough from the record, including the following excerpts from the Burton Declaration filed with the MDG Fee Motion that the Buckley Firm did perform the following general tasks:

> For example, and without limitation, attorneys and staff for Buckley conducted an internal review of Company affairs; collected and processed over 4.5 million documents and produced more than 150,000 documents and data responsive to government subpoenas; produced tens of thousands of documents in the Arbitration; and conducted work necessary to provide and manage discovery in the Arbitration.

*See* Burton Declaration at ¶ 2.

> As reflected in "Exhibit 1" to the Fees Motion, between November 11, 2020, through to present, the Company, through Buckley, incurred $36,659.00 in attorneys' fees for Buckley's services in prosecuting and defending the claims at issue in the Arbitration, and $857,615.00 in attorneys' fees for Buckley's services in conducting an internal review of certain Company's affairs and addressing the Company's obligations with respect to government subpoenas issued in connection with the investigations of conduct involving Respondent Martin Kao (Kao). In total, the Company, through Buckley, incurred $894,274.00 in attorneys' fees for Buckley's services.

89

CONFIDENTIAL INFORMATION                    PMT092203

JSH-008974

*Id.* at ¶ 4.

While these general tasks were performed, the failure to share the daily time descriptions remains quite troubling. In an effort to adjust these competing concerns equitably, the Arbitrator will reduce the amount awarded for the Buckley Firm time by an additional 30%, after making the other adjustments noted herein.

e.    The Arbitrator has inputted the amounts claimed for time in the charts provided within the MDG Fee Motion into an Excel spreadsheet and discovered a few minor mathematical errors going both directions, as follows: For Denise Arestad-Asuncion (*see* chart at page 16 of the MDG Fee Motion) her rate of $150 times her 417.9 hours equals $62,685 rather than the $66,440.5 which is stated. For Mr. Hays, his rate (*id.* at p 21) of $325 times 54 hours equals $17,550 rather than the $16,819 which is stated. For Ms. Katz her rate (*id.* at p 21) of $945 times 15 hours equals $14,175 rather than the $14,277 stated. After the revised hourly rates determined by the Arbitrator were inserted, all mathematical corrections were automatically made by the Excel program.

f.    The Arbitrator has also noted the very large number of billing entities assigned to this matter by each firm involved (except Woo). For the SOM&F Firm, there were twelve billing entities consisting of three Directors, one of Counsel, four associates, one summer associate, one paralegal as well as entries for "Staff". For the Buckley Firm, there were eighteen billing entities consisting of three Partners, one "Counsel", one "Licensing Attorney," five associates, five "Litigation Attorneys," two "FORTE-E Discovery Advisors" and one paralegal. For the Covington Firm, there were six billing entities, consisting of three partners, one of counsel and two associates.

g.    The Arbitrator has had experience in administering complex commercial and construction litigation, including directing teams to obtain and organize electronic discovery in preparation for the trial, or arbitration of such cases. The Arbitrator is aware that in a large case with a tight timeline, such as this one, it is understandable that a larger number of people would be involved. However, here there is a very large number of people and the Arbitrator notes that very large teams are more difficult to manage efficiently and can create additional costs for the client because of the need to share relevant documents and keep everyone up to speed on the case. The team assembled here for MDG involved four law firms and a total of thirty-seven billing entities. That inevitably leads to reasonable questions about whether the needed work was done

90

CONFIDENTIAL INFORMATION                    PMT092204

JSH-008975

as efficiently as reasonably possible and without being duplicative between and among the thirty-seven billing entities and the four firms involved. Again, a client who wants and can afford the best representation can certainly agree to bear such costs. However, whether such costs can be passed on to the losing side as "reasonable and necessary" is a different question and the one that must be answered here. The Arbitrator does find that the combined number of billing entities for the SOM&F firm, the Buckley Firm and the Covington Firm is unreasonable to pass on in the context of the fees sought here.

h.    The Arbitrator is also aware that the damages sought by MDG and NCI were stipulated to be identical and that, even though NCI and MDG started the case as apparent adversaries based on the initial pleading, these two entities ended up pursuing the same essential goals at the time of the Hearing. The Arbitrator finds that it is not reasonable to place the entire cost of these two Parties' attorneys' fees on Mr. Kao when the two prevailing Parties sought and obtained essentially identical relief. However, the Arbitrator notes that since MDG and NCI started as adversaries, their work was not duplicated in that phase and that in the later phase when they were cooperating, the Arbitrator observed that many tasks and witnesses were reasonably divided between the MDG team and the NCI teams and were then effectively handled by one and not the other. These facts have been factored into the Arbitrator's decision.

In order to address each of the factors noted above reasonably (*i.e.*, the number of billing entities and the duplicative work towards the same goal by NCI and MDG) the Arbitrator finds that reducing the fees requested by the MDG team by a flat 20% as to all firms involved for MDG is reasonable and appropriate (For the Buckley Firm, the 20% here is in addition to the 30% reduction discussed above). As to MDG, the net award will be shown in the chart below after the discussion of allowed costs.

i.    As to the Costs claimed by MDG, the detail for those costs is found in Exhibit 3 to the MDG Fee Motion which starts on page 382 of that filing and the Arbitrator finds as follows:

1.    GET is found not to be a permissible recovery on top of the attorneys' fees awarded, as it is not referred to as specifically recoverable either in the statute, or pursuant to OA ¶¶ 8.2 (c) or 12.18 or 12.22, which are the main contract terms allowing for fee recovery. The Arbitrator also notes that GET was sought by the SOM&F Firm and Woo for MDG,

CONFIDENTIAL INFORMATION          PMT092205

JSH-008976

and also by the KSG Firm for NCI--but not by the Buckley Firm or by the Covington Firm, thus this treatment makes that claim for GET equal as to each firm involved.

2.      The Arbitrator does not find it reasonable to claim for the categories of "conference calls", "messenger services", "Westlaw research charges" or "Staff Support." In the Arbitrator's experience, these are frequently not billable in Hawai'i and legal research is often obtained at flat subscription rates by the law firm. The Arbitrator does note that there were extensive submissions of transcripts as exhibits by all sides and occasionally to impeach a witnesses during the arbitration and that these transcripts were necessary for the Arbitrator to prepare the Award. Thus, the costs for transcripts are allowed for both MDG and NCI.

3.      As to the copying costs claimed of $22,088.67, the maximum charge normally allowed in Hawaii is 10 cents per page, however there was no page number detail in the information supplied to see if that rate was used. Obviously, however, many copies were made and used in this matter, so the Arbitrator will allow 50% of the sum claimed or $11,044.34, an amount which would cover 111,000 printed copies.

4.      The Arbitrator is concerned about the lack of detail for the large charges for "e-discovery" which are shown on Exhibit 3 by the Buckley Firm, often over $30,000 per month. These charges lack any detail about what exactly was done for each such charge. However, it is clear that massive e-discovery was required and was done consisting of the approximately 4.5 million documents, so the Arbitrator will allow this cost to be recovered.

5.      As to other costs for DPR's administration and the Arbitrator's fees, the Arbitrator finds that these costs are to be shared between the Parties and are thus not allowable, based on ¶ 12.22 of the OA. However, these do not appear to be called out in the MDG Fee Motion and so will not be discussed further here.

After each of the above hourly rate reductions and other adjustments are made for the MDG attorneys' fees and costs discussed above, the Arbitrator finds that the following attorneys' fees and costs are reasonable and were necessary for this matter and they are awarded as noted in the chart below. The total attorneys' fees awarded to MDG are $1,327,504.18 and the total costs awarded to MDG are: $280,542.72 for a total award of attorneys' fees and costs of $1,608,046.90.

CONFIDENTIAL INFORMATION        PMT092206

JSH-008977

**MDG ATTORNEYS' FEES:**

| ATTORNEY | HOURLY RATE | HOURS | TOTAL AMOUNT |
|---|---|---|---|
| **1. SOM&F FIRM** | | | |
| Peter Starn | $600.00 | 657.80 | $394,680.00 |
| Douglas Chin | $550.00 | 512.50 | $281,875.00 |
| Christina Ohira | $350.00 | 1.10 | $385.00 |
| Norman Cheng | $395.00 | 0.80 | $316.00 |
| Paul Sato | $400.00 | 5.00 | $2,000.00 |
| Robert Brown | $295.00 | 350.70 | $103,456.50 |
| Eric Robinson | $175.00 | 1,177.40 | $206,045.00 |
| Matthew Kollinger | $175.00 | 18.90 | $3,307.50 |
| Lauren Kagawa | $190.00 | 1.80 | $342.00 |
| Nicole Kim | $150.00 | 29.90 | $4,485.00 |
| Elizabeth Spradlin | $60.00 | 4.70 | $282.00 |
| Denise Arestad-Asuncion | $150.00 | 417.90 | $62,685.00 |
| **Subtotal:** | | **3,178.50** | **$1,059,859.00** |
| Less 20% Reduction of Subtotal | | | ($211,971.80) |
| **TOTAL SOM&F FIRM** | | | **$847,887.20** |
| | | | |
| **2. WOO FIRM** | | | |
| **Vernon Woo Subtotal** | **$450.00** | **205.75** | **$92,587.50** |
| Less 20% Reduction of Subtotal | | | ($18,517.50) |
| **TOTAL WOO FIRM:** | | | **$74,070.00** |
| | | | |
| **3. BUCKLEY FIRM (#1)** | | | |
| Preston Burton | $585.00 | 8.70 | $5,089.50 |
| Ben Hayes | $186.00 | 11.00 | $2,046.00 |
| Bree Murphy | $567.00 | 1.00 | $567.00 |
| Jackson Hagen | $285.00 | 5.70 | $1,624.50 |
| Kaina Sainvil | $162.00 | 78.20 | $12,668.40 |
| **Subtotal** | | **104.60** | **$21,995.40** |
| Less 50% Reduction of Subtotal: | | | ($10,997.70) |
| **TOTAL BUCKLEY FIRM (#1)** | | | **$10,997.70** |

CONFIDENTIAL INFORMATION                    PMT092207

JSH-008978

### 4. BUCKLEY FIRM (#2)

| | | | |
|---|---|---|---|
| Patricia Beaubrun-Reese | $129.00 | 34.90 | $4,502.10 |
| Preston Burton | $585.00 | 276.30 | $161,635.50 |
| John Georgievski | $129.00 | 2.40 | $309.60 |
| Jackson Hagen | $285.00 | 553.80 | $157,833.00 |
| Ben Hayes | $186.00 | 54.00 | $10,044.00 |
| Alyssa Helfer | $285.00 | 37.80 | $10,773.00 |
| Gage Javier | $129.00 | 40.90 | $5,276.10 |
| Erica Johnson | $210.00 | 32.90 | $6,909.00 |
| Richard Jolly | $285.00 | 27.90 | $7,951.50 |
| Katherine Katz | $567.00 | 15.00 | $8,505.00 |
| Lane Kauder | $285.00 | 19.00 | $5,415.00 |
| Hank Lindsley | $129.00 | 92.30 | $11,906.70 |
| Bree Murphy | $567.00 | 127.50 | $72,292.50 |
| Okey Oji | $129.00 | 109.80 | $14,164.20 |
| Angela Parr | $129.00 | 20.60 | $2,657.40 |
| Kaina Sainvil | $162.00 | 202.40 | $55,138.50 |
| K. Viet | $162.00 | 3.20 | $518.40 |
| Christopher Witeck | $684.00 | 1.00 | $684.00 |
| **Buckley Firm (#2) Subtotal:** | | **1651.70** | **$536,515.50** |
| Less 50% Reduction of Subtotal: | | | ($268,257.75) |
| **TOTAL BUCKLEY FIRM (#2)** | | | **$268,257.75** |

### 5. COVINGTON FIRM

| | | | |
|---|---|---|---|
| Michael Wagner | $504.90 | 172.80 | $87,246.72 |
| Heather L. Finstuen | $483.30 | 1.80 | $869.94 |
| Tyler D. Evans | $526.50 | 3.00 | $1,579.50 |
| Thomas E. Repke | $715.50 | 7.10 | $5,080.05 |
| Terra W. Fulham | $459.00 | 74.20 | $34,057.80 |
| Victoria A. Barnard | $302.40 | 96.00 | $29,030.40 |
| **Subtotal:** | | **354.90** | **$157,864.41** |
| Less 20% Reduction of Subtotal | | | ($31,572.88) |
| **TOTAL COVINGTON FIRM** | | | **$126,291.53** |

CONFIDENTIAL INFORMATION                    PMT092208

JSH-008979

**ALL MDG FIRMS:**

| | |
|---|---:|
| 1. SOM&F FIRM | $847,887.20 |
| 2. WOO FIRM | $74,070.00 |
| 3. BUCKLEY FIRM (#1) | $10,997.70 |
| 4. BUCKLEY FIRM (#2) | $268,257.75 |
| 5. COVINGTON FIRM | <u>$126,291.53</u> |
| **TOTAL MDG ATTY. FEES** | **$1,327,504.18** |

**MDG COSTS:**

| ITEM | AMOUNT AWARDED | AMOUNT REQUESTED |
|---|---:|---:|
| 1. Conference calls | **$0** | $160.57 |
| 2. Copying | **$11,044.34** | $22,088.67 |
| 3. Discovery | **$238,874.03** | $238,874.03 |
| 4. Messenger | **$0** | $138.22 |
| 5. Postage | **$139.10** | $139.10 |
| 6. Research (Westlaw) | **$0** | $ 14,310.71 |
| 7. Staff Support | **$0** | $39,564.00 |
| 8. Transcripts | **$30,485.25** | $30,485.25 |
| 9. Miscellaneous | **$0** | $431.86 |
| **TOTAL MDG COSTS** | **$280,542.72** | $346,192.41 |

15.     **Attorneys' Fees and Costs Claimed by and Awarded to NCI**

a.     As noted above, the NCI Fee Motion seeks total attorneys' fees of $1,104,778.93 and total costs of $214,093.97 on behalf of the KSG, WM, LB and RS Firms.

b.     The KSG, WM, LB and RS Firms ("NCI Firms") had a total of nineteen billing entities on this matter. The KSG Firm's team consisted of thirteen people composed of five partners, one "of counsel", three associates, one law clerk and three paralegals. The partner rates ranged from Mr. Louie at $500 per hour to Mr. Monlux at $300 per hour. Associates were charged at $175 to $180 per hour with a 50% discount provided for Ryan Loui. Paralegal rates were $90 to $130 per hour.

c.     The LB Firm utilized Mr. Brandt at $355 per hour and Mr. Cook at $300 per hour and their paralegal was billed at $100 per hour.

CONFIDENTIAL INFORMATION          PMT092209

JSH-008980

d.     The RS Firm utilized Mr. Rinesmith whose rate for this matter was $450 per hour.

e.     The WM Firm is based in Virginia and specializes in Government contract issues. They utilized Mr. Korroch, initially at $540 per hour and then at 560 per hour after February 1, 2021 and Mr. Anikeef at $650 per hour.

f.     All of these firms, except for the WM Firm, billed and collected GET at 4.712%. For the same reasons noted with respect to MDG, the amounts claimed by these three firms will be reduced by approximately 4.712% so that the GET is deducted.

g.     The Arbitrator finds that the hourly rates billed by the KSG Firm, the LB Firm and the RS Firm, both for attorneys and paralegal work, are very reasonable for this jurisdiction, given the experience and reputation of all of these counsel and the Arbitrator accepts those rates. The Arbitrator finds that the rates of the WM Firm were much closer to those in this jurisdiction and, thus, the Arbitrator will apply a reduction of only 10% to the WM Firm's billings to account for this factor.

h.     The Arbitrator has reviewed the total request for attorneys' fees and costs in the NCI Fee Motion and finds that the amounts requested therein should be reduced to some degree in light of the same factors discussed in Section 14, f, g, and h above with regard to the MDG Fee Motion. However, because the number of people on the NCI Firms were considerably less, and because the hourly rates for the NCI Firms are generally significantly lower than the MDG team, the Arbitrator finds that a reduction of 10% for these combined factors is reasonable as to the fees sought by the NCI Firms. Those calculations are as set forth below.

i.     The KSG Firm claimed total fees of $733,748.50 before GET (*see* NCI Fee Motion at p. 12). Ninety percent 90% of $733,748.50 (to reflect the 10% reduction) is $660,373.65, which is the net award for the KSG Firm's attorneys' fees.

The KSG Firm claimed costs of $29,140.79 in Exhibit B filed with the NCI Fee Motion which contains a summary by category of all costs claimed. Westlaw services of $4,022.85 were included, which is to be deducted from the allowable KSG Firm costs for the same reasons as it was deducted from the MDG Firms' costs. The KSG Firm billed copies at 10 cents a page and so those are allowed in full. The balance of the costs sought by KSG are all allowed, thus, the cost award as to the KSG Firm is $29,140.79 less $4,022.85 for a total cost award of $25.117.94.

CONFIDENTIAL INFORMATION                    PMT092210

JSH-008981

j.      The LB Firm claimed total fees with GET of $76,135.09. *See* NCI Fee Motion at p. 13. This amount reduced by 4.712%, or $3,587.49 (the math is not perfect as GET would have been paid on a lesser total), leaves $72,547.60. Ninety percent of $72,547.60 is $65,292.84, which is the net award for the LB Firm's attorneys' fees. The LB Firm's cost expenditures were minimal and are included in the above figures, so that $65,292.84 is the net award for these items.

k.      The RS Firm claimed total fees including GET of $240,785.25. *See* NCI Fee Motion at p. 14. The total fees requested shall be reduced by 4.712%, or $11,345.80 (the math is again not perfect as GET would have been paid on a lesser total), which leaves the amount of $229,439.45. Ninety percent of $229,493.45 is $206,495.51, which is the net award to the RS Firm for attorneys' fees. The RS Firm also had minimal advanced costs on their invoices. Attachment # F- 6 to the NCI Fee Motion included $158 for copies of various real estate documents and that cost is allowed.

l.      The WM Firm claimed total fees not including GET of $35,800. *See* NCI Fee Motion at p. 13. The total fees reduced by 10%, to adjust for the billing rates as noted previously, results in a new total $32,220. Ninety Percent of $32,220 is $28,998. which is the net award to the WM Firm for their attorneys' fees.

m.      The costs paid directly by NCI total $187,510.79. These covered court reporter fees, electronic records processing by Xact Data Discovery, the experts called in the case of Steve Shaw, Tom Simon and Mark Gergen and DPR fees of $56,300. Each of these costs is allowed, except the DPR fees which are not recoverable due to the previously noted contractual terms of the OA which require that they be shared equally by the parties. Thus, the net award for this item is $131,210.79.

In the KAOMIO2, vigorous argument was made by Mr. Kao's counsel that expert fees were not a recoverable cost. The Arbitrator respectfully disagrees on this record and finds that this cost is within the recoverable costs and expenses allowed under the terms of the OA cited previously. The Arbitrator also notes that the expert opinions offered and received from all sides were quite helpful in deciding this complex matter.

The total award for attorneys' fees and costs for NCI is thus $1,117,488.73.

CONFIDENTIAL INFORMATION                    PMT092211

JSH-008982

| NCI FIRMS | AMOUNTS | TOTALS |
|---|---|---|
| **KSG FIRM** | | |
| Attorneys' Fees Requested | $733,748.50 | |
| Less 10% Reduction | $(73,374.85) | |
| **Total KSG Firm's Attorneys' Fees** | **$660,373.65** | **$660,373.65** |
| Costs Requested | $29,140.79 | |
| Costs Disallowed (Westlaw) | $(4,022.85) | |
| **Total KSG Firm Costs** | **$25,117.94** | **$25,117.94** |
| | | |
| **LB FIRM** | | |
| Attorneys' Fees/Costs Requested | $76,135.09 | |
| Less included GET of 4.712% | $(3,587.49) | |
| Subtotal | $72,547.60 | |
| Less 10% Reduction of Subtotal | $(7,254.76) | |
| **Total LB Firm's Attorneys' Fees/Costs** | **$65,292.84** | **$65,292.84** |
| | | |
| **RS FIRM** | | |
| Attorneys' Fees Requested | $240,785.25 | |
| Less included GET of 4.712% | $(11,345.80) | |
| Subtotal | $229,439.45 | |
| Less 10% Reduction of Subtotal | $(22,943.94) | |
| **Total RS Firm Attorneys' Fees** | **$206,495.50** | **$206,495.50** |
| **Total RS Firm Costs** | **$158.00** | **$158.00** |
| | | |
| **WM FIRM** | | |
| Attorneys' Fees Requested | $35,800.00 | |
| Less 10% Reduction | $(3,580.00) | |
| Subtotal | $32,220.00 | |
| Less 10% further reduction | $(3,222.00) | |
| **Total WM Firm Attorneys' Fees** | **$28,998.00** | **$28,998.00** |
| | | |
| **NCI** | | |
| Cost Requested | $187,510.79 | |
| Less Costs Disallowed | $(56,300.00) | |
| **Total NCI Costs** | **$131,210.79** | **$131,210.79** |
| | | |
| **TOTAL NCI ATTORNEYS' FEES AND COSTS** | | **$1,117,646.72** |

98

CONFIDENTIAL INFORMATION        PMT092212

JSH-008983

### 16.    The Total Award

The total amount of damages, plus all attorneys' fees and costs, is thus as follows:

| CATEGORY | AMOUNT |
|---|---|
| Special Damages | $2,268,805.40 |
| Punitive Damages | $4,537,610.80 |
| MDG Attorneys' Fees and Costs | $1,608,046.77 |
| NCI Attorneys' Fees and Costs | $1,117,646.72 |
| **TOTAL FINAL AWARD** | **$9,532,109.82** |
| Less Present Value of Capital Account | $(1,986,490.00) |
| Less Setoff Against Capital Account | $(1,419,838.02) |
| Total Credits Against Final Award | $(3,406,328.02) |
| **TOTAL FINAL AWARD STILL DUE** | **$6,125,781.80** |

### H.    AWARD FINDING #17 REGARDING PREJUDGMENT INTEREST

Prejudgment interest at the statutory rate of 10% may be awarded in a civil case in the discretion of the Arbitrator under applicable law in light of the applicable equities. The Arbitrator finds that prejudgment interest is appropriate here based on the facts already found above concerning Mr. Kao pattern of conduct and fraud. Prejudgment interest is therefore awarded in favor of MDG commencing as of the date of entry of this Award on all damages, costs and attorneys' fee still due from Mr. Kao, which have not been offset against his capital account, in the amount of **$6,125,781.80.**

Prejudgment interest at the statutory rate shall continue to accrue on all unpaid and outstanding amounts awarded hereunder from that date until the date of payment and satisfaction of the amounts awarded hereunder, whichever event occurs first.

### I.    AWARD FINDING #18 REGARDING DPR AUTHORITY

The Arbitrator finds that all remaining Arbitration fees and costs are to be billed to the Parties on an equal basis and collected by DPR pursuant to the Parties' agreement.

### XI.    CONCLUSION

This Final Award is intended to, and shall, resolve any and all claims, counterclaims, cross claims and all defenses thereto by all of the Parties hereto which were submitted to the Arbitrator

CONFIDENTIAL INFORMATION                    PMT092213

JSH-008984

by the Parties in this matter. Any claim, counterclaim, cross claim or defense not specifically addressed and preserved above is hereby denied with prejudice.

This Final Award may be executed by way of a typed or electronic signature, or by facsimiles, and any copy with a typed or electronic signature, or any facsimile copy of the same shall be sufficient proof of the execution of this Final Award.

The Arbitrator thanks the Parties and their respective counsel for their hard work in very ably and professionally preparing and presenting this matter.

This will conclude the Arbitrator's service in this matter unless further proceedings are properly and timely pursued pursuant to applicable law.

DATED:     Honoka'a, Hawai'i, November 23, 2021.

_____
JERRY M. HIATT, Arbitrator

100

CONFIDENTIAL INFORMATION          PMT092214

JSH-008985