# EXHIBIT "6"

STARN ● O'TOOLE ● MARCUS & FISHER
A Law Corporation

PETER STARN                    1246-0
DOUGLAS S. CHIN                6465-0
ROBERT J. BROWN              10174-0
ERIC S. ROBINSON             11306-0
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 1900
Honolulu, Hawai'i 96813
Telephone:  (808) 537-6100
Email:  pstarn@starnlaw.com
        dchin@starnlaw.com
        rbrown@starnlaw.com
        erobinson@starnlaw.com

Attorneys for MARTIN DEFENSE GROUP, LLC,
fka NAVATEK LLC

VERNON Y.T. WOO                910-0
City Financial Tower
201 Merchant Street, Suite 2302
Honolulu, Hawai'i 96813
Telephone:  (808) 537-6100
Email:  hawaiilawyerwoo@gmail.com

## DISPUTE PREVENTION & RESOLUTION, INC.

## STATE OF HAWAI'I

| | |
|---|---|
| NAVATEK CAPITAL INC., individually and derivatively on behalf of Nominal Respondent MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC, <br><br> Claimant, <br><br> vs. <br><br> MARTIN KAO; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-5; DOE CORPORATIONS 1-10; DOE ENTITIES 1-10; and DOE GOVERNMENTAL UNITS 1-10, <br><br> Respondents, <br> and <br><br> MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC, <br><br> Nominal Respondent. | DPR NO. 21-0234-A <br><br> MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC'S **POST-ARBITRATION BRIEF**; APPENDICES 1-2; CERTIFICATE OF SERVICE <br><br> **Arbitration:** <br> Dates:  September 27 - October 7, 2021 <br> Arbitrator: Jerry M. Hiatt |

2526798_3

JSH-000653

**MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC'S**
**POST-ARBITRATION BRIEF**

## I.      INTRODUCTION

MARTIN KAO (**Kao**) must be dissociated as a member of MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC (**Company**). Kao's own actions demand this. He breached his duties as a member and manager under Hawai'i limited liability company (**LLC**) law. He violated the Company's Operating Agreement – a contract with "high reward/high risk" terms which he negotiated and signed – to which express consequences for such violations are to be dispassionately applied. Kao must also pay damages to the Company for his breaches, violations and instances of self-dealing. Simply put, Kao, who did not put a dime into the LLC when he became its manager, must pay back what he stole and make good on the damages he caused. The 135 Company employees, many of whom live and work in Hawai'i, deserve nothing less.

The Brief reviews both how and why Kao breached his fiduciary duties to the Company, breached the Company's Operating Agreement, committed gross negligence, and is subject to both automatic and immediate dissociation and monetary damages.[1] The Company's cross-claims against Kao[2] should be granted, and Kao's cross-claim against the Company should be dismissed.

## II.      KAO BREACHED HIS FIDUCIARY DUTIES TO THE COMPANY

To sustain a fiduciary duty claim, the Arbitrator must find by a preponderance of the evidence: (1) the existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damages caused by the breach. *Aqualina v. Certain Underwriters at Lloyd's Syndicate #2003*, 407 F. Supp. 3d 1016, 1048 (D. Haw. 2019); *Knodle v. Waikiki Gateway Hotel, Inc.*, 69 Haw. 376, 384-85, 742 P.2d 377, 383 (1987); *Graham-Sult v. Clainos*, 756 F,3d 724, 736 (9th Cir. 2014).

---

[1] Exhibits cited herein are cited as are cited as "**NCI-[#],**" "**KAO- [#],**" and "**MDG-[#].**" Bates stamps, page numbers, sections, and paragraphs are cited where applicable.

[2] The Company's claims include its cross-claims against Kao, specifically **Counts I-III** and **Count VII**, and claims made derivatively by NAVATEK CAPITAL INC. (**NCI**) in the Arbitration Demand. As to **Count IV** of the Company's cross-claims, on the last day of the hearing, counsel for Kao verbally indicated Kao did not oppose this count seeking declaratory relief for certain "NEWCO" agreements. Also, by virtue of the Company and NCI's stipulation submitted on September 20, 2021, in which the Company and NCI dismissed their claims against each other, **Count V** and **Count VI** of the Company's cross-claims against Kao are moot.

JSH-000659

The existence of fiduciary duties owed by Kao to the Company and to NCI is undisputed. In a manager-managed limited liability company, a manager owes the company and its members fiduciary duties of loyalty and care. Haw. Rev. Stat. (**HRS**) § 428-409(b)-(c) .[3] The manager must discharge these fiduciary duties "consistent with the obligation of good faith and fair dealing." HRS § 428-409(d). Furthermore, the Company's Operating Agreement explicitly provides a manager's standard of care in carrying out his fiduciary duties:

> **5.5 Manager's Standard of Care**. Each Manager shall perform his duties as a manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.

*NCI-202* at NCI000043. The Operating Agreement also places express limitations on the authority of a manager, requiring the *unanimous written consent of members* to take action in connection with:

> (c) Any act in contravention of this [Operating] Agreement;

> (d) Authorization or ratification of acts or transactions which would otherwise violate the duty of loyalty owed to the Company by the Managers;

---

[3] HRS § 428-409 provides, in relevant part:

> (b) A member's duty of loyalty to a member-managed limited liability company and its other members is limited to the following:

> (1) To account to the company and to hold as trustee for it any property, profit, or benefit derived by the member in the conduct or winding up of the company's business or derived from a use by the member of the company's property, including the appropriation of a company's opportunity;

> (2) To refrain from dealing with the company in the conduct or winding up of the company's business as or on behalf of a party having an interest adverse to the company; and

> (3) To refrain from competing with the company in the conduct of the company's business before the dissolution of the company.

> (c) A member's duty of care to a member-managed limited liability company and its other members in the conduct of and winding up of the company's business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

> . . . .

> (h) In a manager-managed limited liability company:

> . . . .

> (2) A manager is held to the same standards of conduct prescribed for members in subsections (b) to (f).

2

JSH-000660

. . . .

(f) Any transaction between the Company and any Member, Manager, or Affiliate which may not be an arm's length transaction; and

(g) Compromise an obligation of a Member to make a Contribution or return money or other property paid or distributed in violation of the Act [(HRS ch. 428)].

*NCI-202* at NCI000043.

Courts have found breaches of fiduciary duties in circumstances where company funds are misappropriated. *See*, *e.g.*, *CCD, L.C. v. Millsap*, 116 P.3d 366, 374 (Utah 2005) (expulsion warranted for "misappropriation of company funds"); *Nelson v. Craner*, No. SOM-L-1098-01, 2002 WL 32067029, at *8 (N.J. Super. Ct. Law Div. Apr. 5, 2002) ("Plaintiff's theft of corporate funds and active cover-up amount to fraud that clearly violates his fiduciary duty."). Breaches have also been found where all or substantially all of a company's assets are transferred without the requisite consent of members. *See, e.g.*, *Patin v. Ferguson*, 115 So. 3d 1204, 1210 (La. Ct. App. 2013). Breaches have been found where improper distributions are made. *See*, *e.g.*, *Kumar v. Kumar*, 2009 WL 902035, No. 1:07CV263-DAS, at *9 (N.D. Miss. Mar. 31, 2009) (finding manager that took a salary and made distributions to himself and relatives without the consent of the other member violated the duty of loyalty). Similarly, where company funds are used to pay for personal expenses, breaches have been found. *See*, *e.g.*, *Out of the Box Promotions LLC v. Koschitzki*, 2007 WL 1374501, at *7 (N.Y. Sup. May 10, 2007), aff'd, 55 A.D.3d 575 (N.Y. 2d Dep't 2008) (finding a manager that used a company account to pay his personal debit card seventy-six times, used company accounts to receive and ship items, instructed employees to work at his house, wired money to himself and his wife, and diverted business to his own competing business violated the duty of loyalty).

On day 1 of the arbitration hearing, the Company, NCI and Kao agreed **all documents** produced by any party both in the civil case and during discovery in the arbitration were considered authentic unless a party objected in writing to its admissibility prior to commencement of the hearing. *See* Transcript of Arbitration Hearing (*hereinafter* "Hearing Transcript") at 14:3-16:8. Lest there be any doubt that the substantial record in this matter indicates by a preponderance of the evidence that Kao breached his fiduciary duties to the Company, this Brief reviews in detail the evidentiary record in support of this claim.

3

### A. Kao's Fraudulent Applications for and Receipt of Paycheck Protection Program Loans Breached His Fiduciary Duties.

Federal law prohibits wire fraud and money laundering. Under 18 U.S.C. § 1343 (wire fraud), it is unlawful to: (1) knowingly devise or intend to devise a scheme or artifice to defraud or obtain money or property by means of false or fraudulent pretenses, representations, or promises; and (2) transmit or cause to be transmitted writings for the purpose of executing such a scheme or artifice. Further, under 18 U.S.C. § 1957 (money laundering), it is unlawful to knowingly engage or attempt to engage in a monetary transaction involving property obtained from unlawful activity. While a member of the Company and on its behalf, Kao engaged in both wire fraud and money laundering when he fraudulently applied for Paycheck Protection Program (**PPP**) loans and received its proceeds.

PPP applicants, including Kao on the Company's behalf, had to certify, *inter alia*, that:

> All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule.

> The Applicant is not engaged in any activity that is illegal under federal, state or local law.

*See, e.g.*, **NCI-002** at 9. PPP applicants like Kao also had to initial additional certifications, including:

> The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; *I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud*.

> . . . .

> During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program.

> I further certify that *the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects*. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law . . . .

> I acknowledge that the lender will confirm the eligible loan amount *using the required documents submitted*. . . .

*See, e.g.*, *id.* (emphasis added); *see also* 15 U.S.C. § 636(a)(36)(G)(i).

JSH-000662

The preponderance of the evidence in this hearing indicates Kao committed wire fraud, in violation of 18 U.S.C. § 1343, and money laundering, in violation of 18 U.S.C. § 1957.[4] Kao committed wire fraud by knowingly and intentionally: (1) misrepresenting employee and payroll figures in the PPP Loan application to Central Pacific Bank (**CPB**) and making false certifications relating to the veracity and accuracy of the same; (2) applying for and receiving another PPP Loan from Radius Bank (**Radius**), again making false certifications; and (3) attempting to apply for a third PPP Loan from First Hawaiian Bank (**FHB**), making even more false certifications. 18 U.S.C. § 1343. He committed money laundering by transferring or causing to be transferred $2,000,000 of fraudulently obtained PPP Loan proceeds to his personal bank account. 18 U.S.C. § 1957. His actions were grossly negligent or reckless conduct, intentional misconduct, and knowing violations of the law. Such acts breached Kao's fiduciary duty of care. *See* HRS § 428-409(c).

1.    <u>The Central Pacific Bank PPP Loan</u>

On April 1, 2020, CPB began accepting PPP applications. *See **NCI-173*** at MDG-HIGJ00052372-73. When informed by Lum Kee that employee data needed to be submitted along with the application, Kao told Lum Kee to discuss the application with him first because Kao had "some tricks up [his] Wuhan[5] sleeves." *Id.* at MDG-HIGJ00052371-72. The next day, Lum Kee told Kao, "I don't think we can get anywhere near the $10 million loan. . . . without loo[k]ing like we are cooking anything." *See **NCI-129***. In response, Kao provides his edits to the "Summary of Payroll and Related Costs for the Year Ended December 31, 2019" (**CPB Summary**) for submission to CPB so they could "Chance'm!" and see if CPB would approve the full $10,000,000. *See **NCI-130***; ***NCI-132***. The CPB PPP Application and the CPB Summary were submitted to CPB on April 3, 2020. ***NCI-002*** at 8-9.[6]

To calculate the maximum PPP loan amount for the CPB PPP Application, Kao was supposed to use "payroll costs incurred during the 1-year period" before the CPB PPP loan was made. 15 U.S.C. § 636(a)(36)(E). Instead, Kao included numerous payroll amounts and employees associated with an Office Expansion Pool in the CPB Summary. ***KAO-6*** at CPB-

---

[4] A more detailed timeline of Kao's conduct related to the PPP loans is provided at Appendix 1.

[5] Wuhan, China is purportedly where the COVID-19 virus which started the global pandemic of 2020 and led to the death of millions of people, was first identified.

[6] A previous application was submitted on April 2, 2020 (***NCI-133*** at MDG-00011190) before an updated application was requested (***NCI-172*** at MDG-HIGJ00051363).

5

JSH-000663

CONFIDENTIAL

000147. These employees did not exist. Payroll amounts reported were never incurred for the Office Expansion Pool for the "Year Ended December 31, 2019." *See, e.g.*, Hearing Transcript, at 352:7-21. Thus, Kao knowingly and purposefully misstated the number of employees in the Company on the PPP application. *See* Hearing Transcript at 344:14-16 ("the loan application itself was false on its face because [Kao is] claiming employees that didn't exist"); *see also* Hearing Transcript at 1088:4-18 (CPB's understanding of the CPB Summary was that it was for "2019 employees because of the way this document was titled.").[7] Indeed, it is uncontroverted that the Office Expansion Pool employees and payroll amounts were not in existence in 2019. *Cf.* ***KAO-6*** at CPB-000001-111 (2019 ADP 941s).

Kao's misstatements were purposeful. He personally edited the CPB Summary and directed Lum Kee on how to "fudge" the numbers. *See* ***NCI-130***; ***NCI-172***. He confirmed his knowledge, before submitting the CPB PPP Application, that the Office Expansion Pool employees were not actual employees on April 3, 2020, when he stated: "maybe we should add another row for group health costs for the 'pools.' Just use the same ~% as the ***actual*** 941 guys." ***NCI-172*** (emphasis added).[8] Lum Kee acknowledged as much to CPB in July 2020, stating: "our 'office expansion pool' labor/fringe costs is based on the employees (salaried and hourly wage) to a single cost ***proposal*** for our new South Carolina office." *See* ***KAO-6*** at CPB-000144 (emphasis added).

Thus, Kao knowingly devised a scheme to defraud CPB by means of misrepresentations in a writing (*i.e.*, the CPB PPP Application) transmitted to CPB to execute his scheme, in

---

[7] Suspiciously, the Office Expansion Pool inflated monthly payroll costs to an amount that was just enough to get over the $10,000,000 maximum threshold, much like the 490 purported employees was just under the 500-employee cap. *See* ***KAO-6*** at CPB-000147 (showing average monthly payroll of $4,072,285 x 2.5 months = $10,180,714 (the CPB Summary contains rounding errors)). Further, in the CPB Summary, Kao represented that the Company's 2019 total payroll was $48,867,425, despite only having $34,043,075 of gross revenue from September 1, 2018 to December 31, 2019. *See* ***NCI-581*** at MDG00131521 (revenue of $19,220,265 for the period September 1, 2018 to June 30, 2019); ***NCI-580*** at MDG00160277 (revenue of $14,822,810 for the six months ending December 31, 2019); *see also* Hearing Transcript at 832:19-834:4, 836:13-837:5.

[8] *See also* ***NCI-183*** at MDG-HIGJ00067429 (Chen commenting to Kao and Lum Kee that they should break away from Pacific Marine because "[h]aving us tied into their HR gives them information they have no need to know, like our headcount and payroll. The next thing he might try to do is take our HR data as of Feb and try to recreate a [PPP] loan application[.]"); ***NCI-106*** at MDG-DCGJ00146911 )"Congress . . . could care less. In fact they would probably be thrilled about our growth and hiring by leveraging PPP.").

6

violation of 18 U.S.C. § 1343.[9] The violation occurred on the date the CPB PPP Application was submitted—April 3, 2020. That CPB did not initially catch Kao's fraud,[10] that payroll amounts were subsequently spent over the next year, or well outside the forgiveness period, in an amount similar to the loan amount,[11] that Kao "did not hide that there was an office expansion pool,"[12] and that Kao may have intended to use the PPP proceeds to fund expansion[13] are all flimsy, specious arguments asserted by Kao during this arbitration hearing. They are feints and follies. Kao's certifications concerning the truthfulness and accuracy of the information provided in the CPB PPP Application and in all supporting documents and forms were patently false.[14] Kao knew this and placed himself **and the Company** in the crosshairs of a federal criminal investigation when he did so.

2. <u>The Radius PPP Application</u>

On April 19, 2020, Chen pitched the idea to Kao that: "We could have made two applications at different banks. LLC at CPB. CFD we would need another bank **with idiots running it and weak verification capabilities**." **NCI-013** (emphasis added). Chen followed up, inquiring: "Can we try for a second PPP or is that a double dip if we use same data?" **NCI-154**.[15] Without missing a beat, Kao "insinuated" to Radius that they "got screwed" on the CPB PPP Application in setting up his next fraudulent application to Radius. **NCI-119**.

Despite having already receiving, acknowledging, and using funds from the CPB PPP loan, Kao unabashedly submitted the Radius PPP Application on April 20, 2020. **NCI-403** at LC_000116-17. The Radius PPP Application also included a Summary of Payroll and Related Costs for the Year Ended December 31, 2019 (**Radius Summary**) which did not include an Office Expansion Pool. **NCI-403** at LC_000202. Kao claimed to Radius, "we did submit an

---

[9] *See also* Hearing Transcript at 1166:22-1167:3 ("Q. If CPB had known that these representations and certifications in the loan application . . . were misrepresentations at the time, would CPB have made the loans, the PPP loans? A. Probably not.").

[10] *See* Hearing Transcript at 352:3-10.

[11] *See* Hearing Transcript at 1471:23-1472:2.

[12] Hearing Transcript at 475:8-17.

[13] Hearing Transcript at 1471:18-23.

[14] Specifically, the number of employees was false, the average monthly payroll was false, and the eligible loan amount was false.

[15] Indeed, it is a "double dip" to use the same data. *See* 15 U.S.C. § 636(a)(36)(G)(i)(III)-(IV); Hearing Transcript at 370:1-17.

7

application with a local Hawaii bank for a ***completely separate company***, and that is the one that got fumbled." **NCI-403** at LC_000196. But, except for the Office Expansion Pool, Kao submitted ***the same employee and payroll figures*** (*i.e.*, the same employees and data) in the CPB PPP Application and the Radius PPP Application, along with their respective supporting documents. *Compare* **NCI-403** at LC_000116-17 (Radius PPP Application), *id.* at LC_000202 (Radius Summary), *with* **NCI-002** at 8-9 (CPB PPP Application), **KAO-6** at CPB-000147 (CPB Summary). As Gabe Beukinga from Radius (**Beukinga**) testified, this was problematic because it was "double counting." *See* Hearing Transcript at 1225:19-1226:16. Submitting the same data in the Radius PPP Application under the name Navatek CFD – a wholly owned subsidiary of the Company – did not change the fact that Kao already applied for and received a PPP loan for the same data from CPB. *See, e.g.*, Hearing Transcript at 413:20-415:4.

Kao took advantage of Radius' perceived "weak verification capabilities" by submitting the Radius PPP Application under the name of one of the Company's wholly-owned subsidiaries—Navatek CFD. *See* **NCI-013**; **NCI-403** at LC_000116-17. Kao misrepresented this relationship[16] on the Radius PPP Application by answering "No" to the question:

> Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business? If yes, list all such businesses and describe the relationship on a separate sheet identified as addendum A.

**NCI-403** at LC_000116. When Beukinga asked Kao about the relationships between and among the Company, Navatek CFD, and other subsidiaries, Kao told Beukinga:

> Each of these companies have their own employees. So yes, 'technically' they should be submitting separate applications for each. We can do that, but during PPP 1, was told to combine them. Otherwise, it would appear that the same company was submitting multiple applications.

**NCI-190** at MDG-HIGJ00106420-21; *see also* **NCI-164** at MDG-HIGJ00051034 (Kao telling Chen and Lum Kee that he responded to Beukinga "in a manner to further confuse and bewilder him."). Kao knowingly submitted an application containing payroll and employment figures for the Company and its subsidiaries, despite having already done so with CPB. *See id.*

Accordingly, Kao knowingly falsely certified that the Company "has not and will not receive another loan under the Paycheck Protection Program." **NCI-403** at LC_000117. He did

---

[16] Kao similarly misrepresented the Company's subsidiary structure in the CPB PPP Application. *See* **NCI-002** at 8.

JSH-000666

this again on May 4, 2020 when he signed the Radius Promissory Note. *NCI-419* at LC_000205-210. In making these knowing false certifications to obtain a second PPP loan Kao violated 18 U.S.C. § 1343.

To deceive trusting Company employees, Kao created the false narrative that the Radius Loan was not a PPP loan. Indeed, Pam Berry recounted the false narrative in her deposition:

> [T]here was one loan that was going to be a PPP loan, but they had reached out to the bank, [Chen] and Martin and [Lum Kee] had reached out to the bank and converted that into what was called, he called it a normal loan, a regular loan. . . . [A]gain, there was supposed to be another loan that was going to be a PPP. But they called the bank. They worked with the bank and got that paperwork straightened out so that it would be whatever normal loan means.

*KAO-1* at 220 (41:17-21, 42:13:17).

On May 1, 2020, Chen sent Kao a Bloomberg News article about early signs of fraud related to PPP loans. *See NCI-017*. Kao replied, "Fk." *See NCI-018*. The record indicates Kao then tried to create a paper trail to suggest the Radius loan was not a PPP loan. Mysteriously, what purports to be a promissory note with Radius (located on the desktop of Kao's computer) contains no PPP terms. *See NCI-216*; *see also* Hearing Transcript at 1241:15-17. Lum Kee and Kao persisted in the false narrative that Radius agreed to remove the loan from the PPP program—even when confronted with data from the SBA showing that the Radius loan was a PPP loan—with Lum Kee stating on July 6, 2020, "Radius removed us from the PPP program, even though they modeled the loan around it. The ***actual loan documents*** don't reference PPP. Good thing though that isn't us…" *NCI-150* at MDG-HIGJ00014400 (emphasis added) (ellipsis in original).

It was all a lie. The actual loan documents, as produced by Radius, repeatedly reference the PPP. *See NCI-419* at LC_000205-10. Kao himself had signed the Radius Promissory Note, which contained numerous references to PPP and the CARES Act, on May 4, 2020, confirming the Radius PPP loan was in fact a PPP loan. Beukinga testified there was no doubt that the loan applied for with Radius was a PPP loan, as memorialized by the terms of the Radius Promissory Note, as funded by Radius, and deferred pursuant to PPP terms. Beukinga confirmed during his testimony that *NCI-419* was the correct version of the Radius Promissory Note. *See* Hearing Transcript at 1242:7-17. As NCI's expert, Tom Simon, testified, "someone clearly didn't want someone else to know that this was a PPP loan. Whoever removed those paragraphs is trying to

9

create the illusion this is a loan in, some other kind of loan, a normal bank loan as opposed to a forgivable PPP loan." Hearing Transcript at 450:11-16.

        3.     The FHB PPP Application

Insatiable, Kao applied on the Company's behalf for a third PPP loan with FHB. *See* ***NCI-185*** at MDG-HIGJ00081560-61 (in which Chen cheerfully replies, "Navatek putting the 'Triple' in the PPP."). Kao reiterated his instructions the next day and Chen confirmed they "[j]ust need to construct a plausible defensible narrative to explain these series of actions if ever called on it." ***NCI-142*** at MDG-HIGJ00011556. Kao first submitted a PPP application for Navatek SHC to FHB on April 21, 2020, telling Darlene Blakeney (***Blakeney***):

> As we discussed, we dropped the ball with timing and process the first time. . . . we really got confused on how to apply. . . . we discussed with SBA and figured it out…too late. We'll [*sic*] here is hopefully our second chance.

***NCI-170*** at MDG-HIGJ00051156 (third ellipsis in original). The truth was that the CPB PPP loan was already funded (and being used for Kao's mortgage application on his Kahala home) and the Radius PPP Application had been submitted the day before. Later in the day on April 21, 2020, applications for Navatek LLC[17] and Navatek CFD[18] were submitted to FHB.

On April 28, 2020, FHB discovered both Navatek LLC and Navatek CFD had already been approved for PPP loans with other banks. ***NCI-006*** at 12. Blakeney informed Kao of that discovery and indicated that it caused the FHB applications to be rejected. ***NCI-158*** at MDG-HIGJ00050835. The next day, Kao texted this to Chen and Lum Kee:

> FK. I'M IRRITATED THE BITCH GOT THE BETTER OF US.

***MDG-234*** (emphasis added). At the same time, Kao replied to Blakeney:

> Thank you again . . . . We're over it already. We've spent way too much time . . . for too little money involved in the scheme of our overall operations and revenue."

*See* ***NCI-158*** at MDG-HIGJ00050835. Kao then asked Chen and Lum Kee if his email to Blakeney was "Oscar worthy?" ***NCI-158*** at MDG-HIGJ00050834. Chen replied, "the broader lesson here is to not work with these larger banks." *Id.* at MDG-HIGJ00081620; *cf.* ***NCI-137*** at MDG-HIGJ00011415 ("Need banks smaller than CPB to get a more risk tolerant lender.").

---

[17] ***NCI-006*** at 34-36, 41, 44; *see also* ***NCI-177***; ***NCI-178***.

[18] ***NCI-006*** at 4-6, 10, 13; see also ***NCI-176***.

10

JSH-000668

Kao knowingly and purposefully submitted employee and payroll figures for Navatek LLC and Navatek CFD a third time, to obtain a PPP loan from FHB, using fraudulent representations in the applications submitted, in violation of 18 U.S.C. § 1343. Furthermore, Kao's acknowledgment that Blakeney "got the better of" him and withdrawal of the PPP application evince his consciousness of guilt and wrongdoing.

4.     The Money Laundering Scheme to "Wash" PPP Proceeds

Kao's transfer of $2,000,000 of CPB PPP loan proceeds from the Company to himself constituted money laundering in violation of 18 U.S.C. § 1957. The proceeds had been deposited in the Company's CPB account on April 17, 2020. *NCI-341* at NCI002039. Kao texted Chen and Lum Kee on April 18, 2020 confirming the deposit, stating, "it's in. Grandpa [referring to Roland Chang of CPB] just called me." *NCI-011*. The Company's account balance prior to the deposit was $590,596.30. It increased to $10,559,952.90 with the CPB PPP loan proceeds. *NCI-341* at NCI002042. Kao then instructed Lum Kee to transfer $2,000,000 from the Company's CPB account to Kao's personal Merrill Lynch account. *NCI-224* at NCI000176. Kao then issued check #30986 for $2,000,000 from the Company to his personal account on April 21, 2020. *NCI-224* at NCI000179. Without the $10,000,000 CPB PPP loan proceeds, the Company's CPB account balance, including deposits made through April 21, 2020, would have been insufficient to clear the $2,000,000 check. *See NCI-341* at NCI002038-39, NCI002042; *see also* Hearing Transcript at 366:7-21. Check #30986 was deposited into Kao's personal Merrill Lynch account on April 21, 2020. *NCI-224* at NCI000180; *NCI-004* at 158. Thus, Kao completed a monetary transaction involving property obtained from unlawful activity (*i.e.*, wire fraud) in violation of 18 U.S.C. § 1957.

On April 24, 2020, Kao stated his intent to "wash" the CPB PPP loan proceeds through the Company's Merrill Lynch account, which was in further violation of 18 U.S.C. § 1957. *See NCI-144* at MDG-HIGJ00011736-37. Kao reiterated this on April 27, 2020, instructing Chen and Lum Kee, "you should move as much as the funds out of CPB as possible this week." *NCI-145* at MDG-HIGJ00011772. At this point, transfers from the Company's CPB account to the Company's Merrill Lynch account had already begun:[19]

---

[19] Each of these transfers, constitute an improper use of PPP funds and are in contravention of the certification made by Kao on the CPB PPP Application. *See, e.g.*, *NCI-002* at 9 ("[t]he funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility

11

| DATE | FROM CPB ACCOUNT | TO MERRILL LYNCH ACCOUNT |
|---|---|---|
| 4-20-2020 | Check #31029 for $2,000,000 (***NCI-341*** at NCI002055) | ***MDG-153*** at MDG00196552 |
| 4-27-2020 | Check #31124 for $3,000,000 (***NCI-341*** at NCI0002058) | ***MDG-153*** at MDG00196488 |
| 5-07-2020 | Check #31127 for $3,000,000 (***NCI-570*** at MDG00164798) | ***MDG-153*** at MDG00196499 |

These transfers then reversed direction, flowing from the Company's Merrill Lynch account back to the Company's CPB account:

| DATE | FROM MERRILL LYNCH ACCOUNT | TO CPB ACCOUNT |
|---|---|---|
| 6-05-2020 | $500,000 transferred as transaction "NAV 6-4" (***MDG-153*** at MDG00196488) | ***MDG-153*** at MDG00196475 |
| 6-18-2020 | $1,000,000 transferred as transaction "NAV 6-13" (***MDG-153*** at MDG00196488) | ***MDG-153*** at MDG00196476 |
| 6-26-2020 | $500,000 transferred as transaction "NAV 6-16" (***MDG-153*** at MDG00196488 | ***MDG-153*** at MDG00196476 |
| 6-29-2020 | $2,000,000 transferred as transaction "NAV 6-23" (***MDG-153*** at MDG00196488) | ***MDG-153*** at MDG00196476[20] |
| 7-08-2020 | $500,000 transferred as transaction "NAV 7-1" (***MDG-153*** at MDG00196489) | ***MDG-153*** at MDG00196476 |
| 7-16-2020 | $1,500,000 transferred as transaction "NAV 7-11" (***MDG-153*** at MDG00196489) | ***MDG-153*** at MDG00196476 |

---

payments . . . . I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.").

[20] *See also* ***NCI-195*** at MDG-HIGJ00151955-56 (discussing timing the transfers from Merrill Lynch to CPB to correspond with payments received from the government, noting that "[t]iming is good and we can point to these payments as the sourcing of the funds used to pay the [Company's CPB line of credit]," in apparent acknowledgment that the use of PPP proceeds to make the payment was improper.).

12

JSH-000670

| 7-20-2020 | $1,000,000 transferred as transaction "NAV 7-14" (***MDG-153*** at MDG00196489) | ***MDG-153*** at MDG00196477 |
|---|---|---|
| 7-29-2020 | $500,000 transferred as transaction "NAV 7-19" (***MDG-153*** at MDG00196489) | ***MDG-153*** at MDG00196478 |

As a result of Kao's deliberate "washing," $8,000,000 in total flowed from the Company's CPB account to the Company's Merrill Lynch account and $7,500,000 in total flowed back from the Company's Merrill Lynch account to the Company's CPB account. Each of these transfers, in addition to being used for an improper purpose under PPP, constituted a monetary transaction involving property from unlawful activity in violation of 18 U.S.C. § 1957.

5.     Kao's Pressure Tactics to Evade Review

To deflect scrutiny into his fraudulent PPP applications, Kao cajoled and nagged the banks to process the Company's applications quickly. *See, e.g.*, ***NCI-134*** at MDG-HIGJ00011192 (lamenting that approval and funding "should be automatic"); ***NCI-133*** at MDG-HIGJ00011189 (commenting twelve hours after the CPB PPP Application was submitted, "[o]urs should have been processed by now."). On April 2, 2020, Kao flexed his connections with U.S. Senators Susan Collins (R-ME), James Inhofe (R-OK), and Lindsay Graham (R-SC), "urg[ing] CPB to process as quickly as possible Navatek's application, so I can give great praise to how CPB was able to administer quickly the intent of Congress and President [Trump]." ***NCI-133*** at MDG-HIGJ00011190. On April 7, 2020, Kao switched from a carrot to a stick with CPB, stating that Senator Inhofe and U.S. Representative Horn "asked about the status of our PPP application and were very adamant about stepping in, if our application was getting stalled." ***NCI-136*** at MDG-HIGJ00011345. On April 10, 2020, Kao told CPB its review of applications "are simple checks of information and mathematical accuracy" that "should take minutes. . . NOT days" (***KAO-6*** at CPB-000129 (ellipsis in original) (emphasis in original)) and that "[a]ny additional review that the bank does should be perfunctory…at best" (***KAO-6*** at CPB-000130 (ellipsis in original). Thus, it is readily apparent Kao was in a rush to get funding from the day the CPB began accepting PPP loan applications. Kao purposefully exploited the crisis and urgency to steamroll approval of the applications and avoid a thorough, detailed review.

The contention by Kao's counsel that Kao thought CPB might claw back the loan because it was funded outside of the ten-day window lacks evidentiary support and as such, is

13

pure conjecture and not evidence. *See* Hearing Transcript at 375:15-20. Kao raised no such concern at the time. Instead, he said this on April 27, 2020 to Chen and Lum Kee:

> Not sure why [CPB] is now trying to understand our PPP calcs (after the fact). If [CPB] calls me I can present to [CPB] a very plausible story. I don't think they can do much at this point as they have already given us the loan. ***That said, you should move as much as the funds out of CPB as possible this week***.

**NCI-145** at MDG-HIGJ00011772. Only one concern existed in Kao's mind at the time: get the loan proceeds, then "wash" them as quickly as possible.

> **B.  Kao's Orchestration of and Participation in Illegal Federal Campaign Contributions Breached His Fiduciary Duties.**

Under 52 U.S.C. § 30119, it is unlawful for a federal government contractor to directly or indirectly "make any contribution of money . . . to any political party, committee, or candidate for public office or to any person for any political purpose or use[.]"[21] Additionally, under 52 U.S.C. § 30122, it is unlawful to make a political contribution in the name of another person, *i.e.*, a "conduit" or "straw donor" contribution. *U.S. v. Whittemore*, 776 F.3d 1074, 1078-79 (9th Cir. 2015) ("[2 U.S.C.] Section 441f [now known as 52 U.S.C. § 30122] directly addresses so-called 'conduit' or 'straw donor' contributions."). In straw-donor cases, the "key issue . . . is the *source* of the funds. *Id.* at 1080 (emphasis in original). 52 U.S.C. § 30122 "prohibits straw donor contributions, in which a defendant solicits others to donate to a candidate for federal office in their own names and furnishes the money for the gift either through an advance or a prearranged reimbursement." *United States v. O'Donnell*, 608 F.3d 546, 556 (9th Cir. 2010) (rejecting the argument that no violation occurred where contributions were actually transmitted straw donors in their own names). It also prohibits gifts to third parties who subsequently decide to voluntarily contribute to a campaign. *See Whittemore*, 776 F.3d at 1079. After Kao became a member of the Company, in short order, he broke every one of these laws.

> 1.  Contributions From the Company's American Express Cards.

Throughout Kao's tenure as manager and CEO, he and his wife made frequent contributions to federal political campaigns using Company-issued American Express cards. *See, e.g.*, **NCI-393** at 14-16; *see also* Pre-Arbitration Brief of Navatek Capital Inc. at Appendix 1.

---

[21] *See also* 11 C.F.R. § 115.2. 11 C.F.R. § 115.4(a)-(b) also provides: "(a) The assets of a partnership which is a Federal contractor may not be used to make contributions or expenditures in connection with Federal elections. (b) Individual partners may make contributions or expenditures in their own names *from their personal assets*." (emphasis added).

JSH-000672

Kao could have made those contributions individually from his personal bank account. By law, he could not do so from the Company's assets. 52 U.S.C. § 30119; *see* 11 C.F.R. § 115.4(b).

> NCI's expert, Tom Simon, testified about the impropriety of such transactions:
>
> [SIMON]: Navatek by even creating the appearance of impropriety and Mr. Kao would put the Company at tremendous risk by doing that. There are so many better ways for individuals to make political contributions than to do it in that manner. . . .
>
> Q: Let me ask you this. Was the concern about it that [Kao] paid for it from company dollars? Or was the concern that it looked like he was making donations in return for political favors.
>
> A: I would say both. Both are awful things to do.
>
> Q: Well, let's talk about making political contributions for favors. Would you say that's improper?
>
> A. Absolutely. *Quid pro quo* is a crime.

Hearing Transcript at 377:18-378:10. The argument advanced by Kao that there were "long-standing contribution[s] made by Navatek[,] Pacific Marine and its affiliated companies" glosses over the key issue of the source of funds used to make contributions. *See* Hearing Transcript at 380:7-11 (referring to ***KAO-98***).

Moreover, it is "important to look at where money is going or to whom it's going" when someone is "trying to exert influence." *See* Hearing Transcript at 451:20-23. The contributions made and orchestrated by Kao almost invariably went to members of the Senate Appropriations Committee (including the Subcommittee for Defense), the Senate Armed Services Committee, the House Appropriations Committee (including the Subcommittee for Defense), and the House Armed Services Committee.[22] Indeed, it "make[s] perfect sense . . . why a defense contractor would want to funnel money to those particular politicians." *See* Hearing Transcript at 452:13-15. Kao purposefully, methodically, and repeatedly orchestrated and made contributions to federal campaigns using Company funds in an effort "get a Big Mac 100% of the time," *i.e.*, to "pay to play." *See* ***NCI-116*** at MDG-DCGJ00203154; *see also* ***NCI-393*** at 14-16.[23]

---

[22] Compare **MDG-229** and **MDG-230** with **NCI-393** at 14-15.

[23] "And let's not forget the primary Senate supporters of the CARES Flexibility Act . . . Susan Collins, Jim Inhofe, and Lindsey Graham. Any guesses on why they supported it so emphatically? LOL[.]" ***NCI-106*** and MDG-DCGJ00146911.

15

JSH-000673

2.      Contributions Through the Society of Young Women Scientists and Engineers to the 1820 PAC

Kao engaged in an unlawful campaign contribution to the 1820 PAC in violation of 52 U.S.C. §§ 30119 and 30122. Kao stated his contribution to the 1820 PAC, a political action committee (**PAC**) was made because he was "willing to help move heaven and earth to help [Senator Collins] win" and would "obviously help the 1820 PAC" after discussing the "'best' approach for doing so." *See* ***NCI-109*** at MDG-DCGJ00162074. His "best" approach was to break federal laws. Kao started the Society of Young Women Scientists and Engineers (***SYWSE***)—an "LLC that can be set up to 'facilitate' transactions" and that is "super vague and very difficult to get any background info on." *See* ***NCI-109*** at MDG-DCGJ00162073. After "setting up the new LLC and associated bank accounts" (***NCI-109*** at MDG-DCGJ00162072), check #30326 for $150,000 was written from the Company to the SYWSE on December 26, 2019 (***NCI-325*** at NCI001356). The next day, the check was deposited into the SYWSE's bank account. ***NCI-325*** at NCI001355-57. A check for $150,000.00, signed by Kao, was then written from the SYWSE to the 1820 PAC. ***NCI-325*** at NCI001359. It was rejected at first because Kao was not a signatory on the SYWSE's bank account. *See* ***NCI-393*** at 13-14. It subsequently cleared once Tiffany Lam, Kao's wife and the manager of the SYWSE, signed the check. *See* ***NCI-393*** at 13-14; *see also* ***NCI-325*** at NCI001360-62 (the SYWSE's sole financial statement entries were the transactions facilitating the 1820 PAC Contribution).

Campaign finance watchdogs noticed. On February 3, 2020, the Campaign Legal Center filed a complaint with the Federal Elections Commission (***FEC***) against the SYWSE for its contribution to the 1820 PAC. *See, e.g.*, Lachlan Markay, *Susan Collins' Campaign is Being Helped by a Mysterious Hawaii Company*, THE DAILY BEAST (Feb. 3, 2020, 11:27 AM), https://www.thedailybeast.com/susan-collins-campaign-is-being-helped-by-a-mysterious-hawaii-company (last updated Feb. 4, 2021, 4:28 AM). Although "[f]rom a forensic accounting perspective you rarely can see things this clean and neat[,]" (Hearing Transcript at 431:22-24) after news broke about the contribution, Kao maintained that the "contribution to the 1820 PAC ha[d] nothing to do with [the Company]" (*see* ***NCI-100*** at MDG-DCGJ00012168).

Prior to the FEC complaint, SYWSE had no funding. It made zero scholarship contributions aside from the 1820 PAC contribution. *See, e.g.*, ***MDG-184*** (showing the earliest scholarship being paid on March 23, 2020). A scholarship program was set up later to do "damage control" following "the screwup with 1820." ***NCI-098*** at MDG-DCGJ00000104. The

16

JSH-000674

preponderance of evidence sufficiently demonstrates Kao's facilitation of the contribution to the 1820 PAC, via the SYWSE, was in knowing and willful violation of 52 U.S.C. §§ 30119 and 30122.

3.  Contributions Through Company Employees and Company Employee's Family Members

Between June 2019 and September 2019, Kao's family members, Chen, and Lum Kee contributed to Senator Collins' campaign. *NCI-229* at NCI000238-39. A Special Agent for the Federal Bureau of Investigation reviewed Kao's personal FHB bank records, which show that Kao "wrote a series of $5,600 checks to Christopher Maxim Tory Lam [(Kao's brother-in-law)], Christopher Mark Toby Lam [(Kao's brother-in-law)], Christopher Michael Todd Lam [(Kao's brother-in-law)], JoAnn Lam [(Kao's mother-in-law)], [and] Rachel Kao [(Kao's mother)] and a $5,200 check to George Kao [(Kao's father)]. *Id.* at NCI000239. The same amounts given by Kao to his family members were subsequently donated to Senator Collins' campaign by the same individuals. *Id.*; NCI-328.

Similarly, on September 26, 2019, checks were written from the Company's CPB account to Chen and Lum Kee, the same day that Hsiu Chan Chen (Chen's mother) and Joy Lum Kee (Lum Kee's wife) donated to Senator Collins' campaign. *NCI-229* at NCI000239-40; *NCI-329*; *NCI-330*. Within a week, Chen wrote his mother a check for $5,600—the same amount she contributed. *NCI-229* at NCI000240. Chen's mother later "told law enforcement that . . . Chen gave her money and asked her to donate it to the Collins for Senator campaign committee, which she did." *Id.* Kao was not only aware of this straw donor contribution by being copied on emails with Chen and Lum Kee, but he also specifically informed the Collins Campaign that the donation would be coming. *NCI-229* at NCI000241-42.

Kao similarly orchestrated contributions through Chen and Lum Kee. For example, on May 4, 2020, Kao instructed Chen and Lum Kee, "Please do $5,600 each on Amex. Send me receipt after. Thx." and included a link to donate to Senator Lindsey Graham. *NCI-192* at MDG-HIGJ00151895; *see also NCI-010* (Kao asking Chen and Lum Kee, "you guys ok having your names associated with donations I'm making next week?"). Chen and Lum Kee both complied, each donating $5,600 to the Graham Campaign using their Company American Express cards. *See, e.g., MDG-049* at MDG02503975; *MDG-050* at MDG00281443, MDG00281447; *MDG-088* at MDG00160307, MDG00160319.

17

JSH-000675

Kao's conduct in orchestrating and condoning straw donor contributions through his family members, the Company's employees, and their family members was in violation of 52 U.S.C. § 30122 and was done to circumvent the prohibition on contributions by federal contractors under 52 U.S.C. § 30119, which Kao also violated.

**C.      Kao's Flagrant, Pernicious Self-Dealing Breached His Fiduciary Duties.**

By statute, the fiduciary duty of loyalty for a manager of a limited liability company prohibits self-dealing. *See, e.g.*, HRS § 428-409(b)(2) (prohibiting a manager from "dealing with the company . . . as or on behalf of a party having an interest adverse to the company"). So does the Operating Agreement. ***NCI-202*** at NCI000043 (§ 5.4(f) prohibiting "transaction[s] between the Company and any Member, Manager, or Affiliate which may not be an arm's length transaction" without the unanimous written consent of the members). Indeed:

> A partner, and by analogy, a member of a limited liability company, has a fiduciary obligation to others in the . . . limited liability company which bars not only blatant self-dealing, but also requires avoidance of situations in which the fiduciary's personal interest might possibly conflict with the interests of those to whom the fiduciary owes a duty of loyalty.

*Willoughby Rehab. & Health Care Ctr., LLC v. Webster*, 12431-04, 2006 WL 3068961, at *4 (N.Y. Sup. Ct. Oct. 26, 2006). An arm's length transaction is defined as a "transaction between two unrelated and unaffiliated parties" or a "transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises. *Arm's-Length Transaction*, BLACK'S LAW DICTIONARY (11th ed. 2019).

During the arbitration hearing, statements were made that Kao's use of Company's funds to pay for certain personal expenses and/or for improper distributions were either not relevant or caused no harm because they had reduced his capital account balance. *See, e.g.,* Hearing Transcript at 778:24-779:3 (inquiring whether  "the company got [damages] because [Kao's] capital account was reduced"); *see also* Hearing Transcript at 756:9-15 (observing that net income increases capital account balances, while distributions decrease capital account balances). Though some expenses and/or distributions may already have the effect of reducing Kao's capital account balance, as reflected on a particular K-1, the Company nevertheless highlights what occurred because: (1) they are illustrative of Kao's repeated acts of self-dealing and therefore support the Company's claims for breaches of fiduciary duties, dissociation, and punitive damages; (2) a matching 1% distribution was not made to NCI, which is a breach of §§ 4.1 and 8.1(e) of the Operating Agreement; and (3) the effect these items have on Kao's capital

18

JSH-000676

account, if such a valuation is required, would depend on the *date* of Kao's capital account valuation (*e.g.*, if Kao's capital account was valued using the 2019 K-1, expenses and distributions that occurred in 2020 and 2021 had not had the effect of reducing Kao's capital account because they occurred *after* the date of the 2019 K-1). Once a determination is made concerning the amount of damages owed by Kao *and* when he was dissociated (which may be relevant to capital account valuation), damages that already reduced Kao's capital account can be identified and excluded from a damages award.

The below self-dealing transactions are extensively detailed in *MDG-225* and *MDG-225A* and contain more than 1,250 pin citations to the record. *MDG-225*'s pin citations thoroughly detail the supporting records and substantiation for the transactions contained therein, including receipts, invoices, checks, account statements, and general ledger entries. Additionally, to the extent particular transactions contained in *MDG-225* have been incurred but not yet paid (*e.g.*, *NCI-535*; *NCI-537*; *NCI-538*) the transaction is still a liability that the Company must pay.

1.    Use of Company Funds for Personal Expenses

While acting as the Company's Manager and Member, Kao used Company funds to pay for numerous personal expenses, including airfare, lodging, and transportation expenses for himself and his family. *See, e.g.*, *MDG-225*; *NCI-242* at MDG016691-95; *MDG-037* at MDG00281064; *NCI-065* at MDG015995. Under basic accounting principles, Kao's personal transactions and the Company's business transactions should not have been commingled in the same accounting records.[24] Furthermore, Kao's personal expenses should have been treated as imputed income and taxed accordingly, *i.e.*, as fringe benefits.[25] All this was disregarded when Kao caused his personal expense transactions to be recorded alongside the Company's business transactions and expenses. Worse, Kao never reimbursed the Company for his personal expenses and otherwise failed to treat the expenses as imputed income.[26] Instead, he treated Company funds and his personal funds as "all one in the same."[27] These transactions were not at arm's length. They constitute self-dealing and breached Kao's fiduciary duty of loyalty. Further, to the

---

[24] *See*, *e.g.*, *NCI-392* at 4.

[25] *NCI-392* at 4.

[26] *Id.*

[27] *NCI-102* at MDG-DCGJ00100058; *see also* *NCI-479* at MDG-DCGJ00105290 ("[T]here is no difference between Navatek's assets and myself from a lender's perspective.").

19

JSH-000677

extent Kao's actions relate to tax evasion, these transactions are a breach of Kao's fiduciary duty of care.

### 2. Use of Company Funds for Kao-Related Entities

Kao also caused the Company to pay for multiple expenses on behalf of the Marty & Mickey Kao Foundation[28] and the Navatek Foundation,[29] tax-exempt organizations[30] controlled by Kao and/or his family members. *See, e.g.*, **MDG-225**. For example, Kao caused the Company to pay for certain of the organizations' legal fees, as well as expenses related to the Marty & Mickey Foundation's luxury condominium. **NCI-392** at 4; *see, e.g.*, **NCI-301** at NCI00986-1006. Just as personal expenses should have been segregated from the Company's business expenses, expenses related to the "foundations" should have been segregated. This did not occur. None of the expenses made on behalf of the organizations was repaid by the Kao-related organizations or Kao himself. **NCI-392** at 4. The effect of these transactions also reduced the Company's income, which in turn reduced Kao's taxable income. They were not at arm's length. This also constituted self-dealing, breached Kao's fiduciary duty of loyalty, and, to the extent Kao's actions relate to tax evasion, these transactions are a breach of Kao's fiduciary duty of care.

### 3. Improper Distributions

Under § 4.1 of the Operating Agreement, proportional distributions are supposed to be made to Kao (99%) and NCI (1%). **NCI-202** at NCI000041.[31] Kao made, or caused to be made, distributions to himself, without making, or causing to be made, proportional distributions to NCI. These unmatched distributions included at least $325,000 distributed to Kao in or around December of 2019,[32] $120,000 distributed to Kao in February of 2020,[33] and $50,000 in August

---

[28] The Marty & Mickey Kao Foundation is a Kao family-run nonprofit formed in January 2019 with the purported mission of expanding educational opportunities for children. *See*, *e.g.*, https://www.civilbeat.org/2020/02/tangled-web-of-campaign-cash-connects-hawaii-to-maine/ (last visited Sept. 18, 2021).

[29] The Navatek Foundation is also a private foundation that is run by Kao and his family.

[30] *Cf., e.g.*, **MDG-116**; **MDG-117**; **MDG-103**.

[31] Sections 4.1 and 4.2 of the Operating Agreement further require that distributions be made using "Distributable Cash," which require a determination of cash "in excess of the reasonable cash requirements and repair, replacement, and other reserves of the Company." **NCI-202** at NCI000041. There is no evidence of Kao having made such a determination or calculation of "Distributable Cash." *See, e.g.*, Hearing Transcript at 77:24-78:8.

[32] *See, e.g.*, **NCI-228**; **MDG-154** at MDG00196031, 79.

[33] *Id.*; *see* **MDG-153** at MDG00196557.

20

JSH-000678

of 2020.[34] *See, e.g.,* **MDG-225**. NCI received no proportional distribution and thus was never made aware of, nor did it approve, any of these distributions to Kao. The unmatched distributions breach § 4.1, which in turn triggers § 8.1(e). *See* **NCI-202** at NCI000046; Hearing Transcript at 1311:6-15. Once again, it gets worse. Kao's December 2019 distributions were to erase two notes receivable off the Company's accounting books—one for the $150,000 funneled through the SYWSE to the 1820 PAC and another for $175,000. *See, e.g.,* **MDG-154** at MDG00196031. Kao was well aware of how to abuse distributions, having contemplated at one point whether he could use PPP funds to pay himself a tax-free severance and increase his capital account balance for future tax-free distributions. *See* **NCI-163** at MDG-HIGJ00051005 ("[D]oes it makes sense to do the severance sooner vs. waiting the 8 weeks? It's net zero for taxes between the severance income to me and the deduction for the LLC. Then when I repatriate the funds back to LLC, it's a capital contribution. So no income to LLC and my cap account goes up. So when I get a distribution, I could just book as a return of capital depending on how the tax situation looks."). These distributions were in breach of Kao's fiduciary duty of loyalty and his obligation of good faith and fair dealing.

### 4. Improper Loans

On April 3, 2019, Kao caused two $250,000 checks to be written from the Company's CPB account to Merrill Lynch accounts held by the Marty & Mickey Kao Foundation and the Navatek Foundation.[35] Kao instructed then-employee Susan Matsuura (**Matsuura**) to book the checks as a loan from the Company to each foundation.[36] Matsuura did as she was told.[37] The terms of the loans were not memorialized; it appears each loan was interest-free. *See* **NCI-392** at 4; **MDG-102** at MDG02544663; **NCI-252**; **NCI-256**. Each loan was amortized by monthly book contributions – *i.e.*, the balance was reduced with no actual money paid by the foundations. Kao repaid both loans in full, on behalf of each foundation on November 17, 2020. *See* **KAO-122**. The loans to each foundation were not arm's length transactions. NCI did not provide its consent in writing. Hearing Transcript at 78:3-6. Accordingly, each loan constituted self-dealing, in violation of Kao's fiduciary duty of loyalty.

---

[34] **MDG-111** at MDG-DCGJ00208459.

[35] **NCI-392** at 2; *see also, e.g.,* **NCI-251**; **NCI-255**.

[36] **NCI-392** at 2; *see also, e.g.,* **NCI-297**.

[37] **NCI-392** at 2.

JSH-000679

Kao has argued that the repayment of the foundation loans was an advance or contribution as a member of the Company. *See, e.g.*, **NCI-400** at p. 30 (Kao Crossclaim at ¶ 78). Kao further alleges that the foundation loans received partial payment of $300,000 and his repayment of $500,000 is thus an overpayment. *See, e.g.*, **NCI-400** at p. 30 (Kao Crossclaim at ¶¶ 78-82). However, prior to Kao's repayment in full, no actual repayment was ever made on either loan. *See* **NCI-252**; **NCI-256**. Instead, fictitious "contributions" were made to each foundation to amortize the loan balances. *See* **NCI-252**; **NCI-256**. Kao's allegation and argument that the repayment of the foundation loans is an advance or contribution as a member of the Company is a *non-sequitur*—Kao was repaying an obligation of two separate entities, neither of which is a member of the Company. Kao's repayment of the loans was indisputably on behalf of the Marty & Mickey Kao Foundation and the Navatek Foundation. *See, e.g.*, **KAO-122** ("full and final repayment for loans made by the Martin Defense Group, LLC to the Marty and Mickey Kao Foundation ($250,000.00) and the Navatek Foundation ($250,000.00)."). Kao has put forth no evidence that the repayment was intended to be a contribution, nor that the repayment was recorded as a contribution (it was not). Accordingly, Kao's allegation that repayment of the loans on behalf of the foundations was an advance or contribution has no merit. As such, his cross-claim against the Company should be denied.

### 5. Improper $2,000,000 Note Receivable

On April 20, 2020, Kao instructed Lum Kee to deposit $2,000,000 from the Company's CPB account into Kao's personal Merrill Lynch account, and to book it to a Company's suspense account.[38] Lum Kee complied, and the transaction was listed in the Company's General Ledger as "N/R [Note Receivable] – Martin Kao."[39] Despite a thorough review of the Company's accounting records, the Company has found no "source documentation" memorializing the terms of the loan.[40] The loan was never repaid by Kao. NCI did not consent to the $2,000,000 note receivable. Hearing Transcript at 78:3-6. The $2,000,000 constitutes self-dealing, in violation of Kao's fiduciary duty of loyalty. Further, because the $2,000,000 used funds that were fraudulently obtained, the issuance of the $2,000,000 constituted money laundering, in violation

---

[38] **NCI-392** at 3; *see also, e.g.*, **NCI-225**.

[39] *See* **MDG-153** at MDG00196488.

[40] **NCI-392** at 3. *But cf.* **NCI-224** at NCI000176 ("Once BofA issues the letter I'll move it[, the $2,000,000,] to the Navatek account. Maybe just book to some kind of suspense account for a few days.")

22

JSH-000680

of 18 U.S.C. § 1957, breaching Kao's fiduciary duty of care. *See, e.g.*, *The Money Laundering Scheme to "Wash" PPP Proceeds*, *supra* at § II.A.4.

In the event the Arbitrator decides that damages related to the $2,000,000 note receivable are too speculative to award at this time, the Company prays that the Arbitrator makes such decision without prejudice and with a finding in the Arbitrator's award that the $2,000,000 note receivable is still due and owing.

6.      Improper MDG NEWCO Agreements[41]

On or about September 29, 2020, Kao executed a series of agreements related to MDG NEWCO, LLC (**MDG NEWCO**) on behalf of himself and the Company. *See* **NCI-530**; **NCI-531**; **NCI-532**; **NCI-533**. Section 5.4 of the Operating Agreement limits the authority of the Management Committee – *i.e.*,  Kao[42] – from taking an action without the unanimous written consent of all Members: (i) in contravention of the Operating Agreement; (ii) to authorize or ratify any acts or transactions which would violate the duty of loyalty owed to the Company; (iii) to engage in any transaction between Kao and an affiliate which may not be at arm's length; and/or (iv) to compromise an obligation of a Member to make a contribution or return money or other property paid or distributed in violation of the Operating Agreement.[43] HRS § 428-404 likewise requires the consent of all members to authorize any act or transaction that would violate the duty of loyalty and/or to "sell[], leas[e], exchang[e], or otherwise dispos[e] of all, or substantially all, of the company's property with or without goodwill." HRS §428-404(c)(2), (12). Kao's attempt to assign all, or substantially all, of the Company's property to MDG NEWCO, was a breach of his fiduciary duty of loyalty. *See, e.g.*, *Patin v. Ferguson*, 115 So. 3d 1204, 1210 (La. Ct. App. 2013) (finding a breach of fiduciary duty where member transferred all or substantially all of the company's property).

---

[41] On the final day of the arbitration hearing, Kao's counsel represented that "NEWCO was formed but the transaction never went through. So the assets are still with MDG. They are not with NEWCO. . . . it was never a deal that was consummated." Hearing Transcript at 1458:5-14. In response, the Arbitrator stated, "I'm going to regard that as a stipulation that that count, that Mr. Kao is not claiming the benefit of the NEWCO transactions[,]" to which Kao's counsel confirmed "No[,]" that Kao was not claiming the benefit. *See* Hearing Transcript at 1458:15-18. The Company still highlights Kao's actions with respect to the NEWCO agreements as evidence of additional breaches of his fiduciary duties and prays that the Arbitrator make a finding regarding Kao's stipulation and/or declare the NEWCO agreements void.

[42] *See* **NCI-202** at NCI000041 (§ 5.1).

[43] **NCI-202** at NCI000043 (§ 5.4(c)-(d), (f)-(g)).

23

JSH-000681

(a)　　A limited liability company shall purchase a distributional interest of a member of: . . . .

　　(2)　　A company having a specified term for its fair value *determined as of the date of the expiration of the specified term that existed on the member's dissociation* if the expiration of the specified term does not result in a dissolution and winding up of the company's business under section 428-801.

Thus, Kao's units would be purchased for fair value at the end of the Company's term, *i.e.*, 99 years after organization, unless the Company elects to redeem Kao's units before then. *See, e.g.*, HRS § 428-701(a)(2); Hearing Transcript at 1325:9-1326:4. If and when the Company elects to redeem Kao's units, it may redeem them based upon the most recently filed K-1 as of the election, less any damages and liabilities owed by Kao to the Company. *See NCI-202* at NCI000047 (§ 8.3); *see, e.g.*, *MDG-225*; *MDG-225A*.

## VI.　KAO MUST PAY MONETARY DAMAGES TO THE COMPANY

### A.　Kao Must Pay Damages Based upon the Company's Cross-Claims.

The Company's damages are summarized in the below table.[58]

| | |
|---|---|
| $2M Note Receivable | $2,000,000.00 |
| Improper Distributions | $495,000.00 |
| Crisis Communications | $35,575.90 |
| Interim CFO | $168,419.22 |
| Post-Arrest Retainers | $974,838.02 |
| Personal Expenses | $295,661.12 |
| Foundation Expenses | $107,209.55 |
| SYWSE Expenses | $1,513.83 |
| Political Contributions | $190,587.76 |
| Punitive Damages (*e.g.*, unseized balance of CPB and Radius PPP loans) | $2,148,490.00 |
| Attorneys' Fees and Costs – Investigation; Grand Jury Subpoena Responses | $1,078,243.57 |

---

[58] As discussed above, the present value of Kao's distributional interest in the Company (*i.e.*, his capital account) does not come into play unless purchased. The Company has not elected to redeem Kao's units and statutory purchase of Kao's units is not required until the end of the Company's term. Thus, the effect any of the above expenses may have on reducing Kao's capital account balance is not relevant. The Company is entitled to make use of its property and capital, including amounts wrongfully taken by Kao, entitling the Company to a full award of damages, including amounts that have had the effect of reducing Kao's capital account.

34

JSH-000692

| | |
|---|---|
| Attorneys' Fees and Costs – Suspension and Debarment | $267,726.15 |
| Attorneys' Fees and Costs – Civil Complaint and Arbitration | $1,360,841.63 |
| **TOTAL** | **$9,124,106.75** |

**B.      Kao Must Pay for Expenses Incurred by the Company to Protect its Interests Due to Kao's Wrongful Acts.[59]**

Under Hawaiʻi law, the scope of damages which may be awarded has been expanded to include when a defendant's wrongful act has involved a plaintiff in litigation with others or has placed a plaintiff in such a relation with others as makes it necessary to incur expenses to protect its interests. Such expenses, including attorneys' fees, may be treated as legal consequences of the original wrongful act and recovered as damages. *Uyemura v. Wick*, 57 Haw. 102, 551 P.2d 171, 176 (1976). *Uyemura v. Wick* is a departure from the rule that attorneys' fees ordinarily cannot be awarded as damages or costs unless so provided by statute, stipulation, or agreement. *See* 57 Haw. at 108-09, 551 P.2d at 176. In this jurisdiction, such expenses are recognized. In further support, the Operating Agreement provides that in the event a Member breaches a material covenant contained in the Operating Agreement, that the breaching Member "shall be liable for damages, without requirement of a prior accounting, to the Company for all costs and liabilities that the Company… may incur as a result" of the breach. *NCI-202* at NCI000047 (§ 8.2(c)); *see also id.* at NCI000046 (§ 7.3); *and* §§ 7.3, 8.2(c), and 12.18 of the Operating Agreement.

Thus, Kao is liable for all costs and liabilities of the Company incurred which resulted from Kao's breaches of material covenants of the Operating Agreement, *i.e.*, his breaches of fiduciary duties. *NCI-202* at NCI000046-47 (§§ 8.1(e), 8.2(c)). As a direct and proximate cause of Kao's wrongful acts, the Company incurred expenses for a crisis communications consultant and for a court-ordered interim Chief Financial Officer, to protect its interests. *See MDG-225* at 1-2; *see also MDG-147*; *MDG-169*; *MDG-142*; *MDG-145*; *NCI-283*. The Company also incurred significant legal expenses as a direct and proximate result of Kao's wrongful acts. The Company is entitled to an award of its crisis communications, interim CFO, and attorneys' fees and costs as damages. Regarding the latter, these should not be confined to costs incurred in the civil proceeding and arbitration. As a result of Kao's acts and omissions, separate and apart from the underlying civil litigation, the Company incurred more than a million dollars staving off

---

[59] Count VII of the Company's Crossclaim.

35

JSH-000693

suspension and debarment by federal contracting agencies and responding to numerous, massive subpoenas from the government because Kao and the Company were placed under criminal investigation. These fees and costs were necessary to protect the Company's interests, and, under *Uyemura v. Wick*, should be awarded as damages.

## VII.  CONCLUSION

The Company's crossclaims against Kao should be granted, and Kao's crossclaims against the Company should be dismissed.

DATED:  Honolulu, Hawaiʻi, October 18, 2021.

PETER STARN
DOUGLAS S. CHIN
ROBERT J. BROWN
ERIC S. ROBINSON
VERNON Y.T. WOO

Attorneys for MARTIN DEFENSE GROUP, LLC, fka NAVATEK LLC

36

JSH-000694