# EXHIBIT 7

IN THE UNITED STATES DISTRICT CIRCUIT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PACMAR TECHNOLOGIES LLC (f/k/a MARTIN DEFENSE GROUP, LLC),<br><br>Plaintiff,<br><br>vs.<br><br>MARTIN KAO; TIFFANY JENNIFER LAM a.k.a. JENNY LAM and/or TIFFANY KAO; LAWRENCE KAHELE LUM KEE; CLIFFORD CHEN; DUKE HARTMAN; SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC,<br><br>Defendants. | CASE NO. 1:22-CV-00283-LEK-WRP<br><br>Certified Transcript<br><br>(Pages 1 to 226) |

DEPOSITION OF CLIFFORD CHEN

TUESDAY, APRIL 22, 2025

REPORTED BY: CARLENE K. SASAKI, RPR
State of Hawaii CSR No. 544

IN THE CIRCUIT COURT OF THE DISTRICT CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| PACMAR TECHNOLOGIES LLC (f/k/a MARTIN DEFENSE GROUP, LLC), Plaintiffs, vs. MARTIN KAO; TIFFANY JENNIFER LAM a.k.a. JENNY LAM and/or TIFFANY KAO; LAWRENCE KAHELE LUM KEE; CLIFFORD CHEN; DUKE HARTMAN; SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC, Defendants. | CASE NO. 1:22-CV-00283-LEK-WRP |

DEPOSITION OF CLIFFORD CHEN,

taken on behalf of the Plaintiffs pursuant to Notice, on Tuesday, April 22, 2025, commencing at 8:58 a.m., at the office of Lung Rose Voss & Wagnild, 700 Bishop Street, Suite 900, Honolulu, Hawaii 96813, before CARLENE K. SASAKI, RPR, State of Hawaii CSR No. 544.

APPEARANCES:

For Plaintiff:

LUNG ROSE VOSS & WAGNILD
BY: GRANT FASI ALLISON, ESQ.
Topa Financial Center
700 Bishop Street,
Suite 900
Honolulu, Hawaii 96813
Phone: (808) 523-9000
E-mail: gallison@legalhawaii.com

For Defendant CLIFFORD CHEN:

SCHLACK ITO, LLLC
BY: DEREK R. KOBAYASHI, ESQ.
BRITTNEY M. WU, ESQ.
745 Fort Street,
Suite 1500
Honolulu, Hawaii 96813
Phone: (808) 523-6040
E-mail: dkobayashi@schlackito.com
E-mail: bwu@schlackito.com

For Defendant DUKE HARTMAN and SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC:

BRONSTER FUCHICHAKU ROBBINS
BY: REX Y. FUJICHAKU
1001 Bishop Street, Suite 2300
Honolulu, Hawaii 96813
Phone: (808) 524-5644
E-mail: rfujichaku@bfrhawaii.com

For Defendant LAWRENCE KAHELE LUM KEE:

SCOTT E. KUBOTA, AAL, LLC
BY: SCOTT KUBOTA, ESQ.
500 Ala Moana Blvd
Honolulu, HI 96813
Phone: (808) 532-9595
E-mail: scott.kubota@gmail.com

APPEARANCES (continued):

For Defendant TIFFANY JENNIFER LAM a.k.a. JENNY LAM and/or TIFFANY KAO:

MIYOSHI & HIRONAKA LLLC
BY: PHILIP W. MIYOSHI, ESQ.
500 Ala Moana Blvd
Honolulu, HI 96813
Phone: (808) 529-7300
E-mail: philip@808-law.com

Also Present:

Andrew Sangasay, iDepo Moderator

# I N D E X


| DEPONENT: | EXAMINATION: | PAGE: |
|---|---|---|
| CLIFFORD CHEN | BY MR. ALLISON | 9 |


UNANSWERED QUESTIONS

(NONE)

MARKED PORTIONS BY COUNSEL

(NONE)

INFORMATION REQUESTED

(NONE)

I N D E X (continued):

E X H I B I T S


| Plaintiff's | | PAGE: |
|---|---|---|
| Exhibit 1 | Navatek Offer to Hire letter dated January 4, 2019 (4 Pages) | 46 |
| Exhibit 2 | Employee Status Report (1 Page) | 49 |
| Exhibit 3 | Employee Status Report dated March 29, 2020 (1 Page) | 50 |
| Exhibit 4 | Employee Status Report dated May 24, 2020 (1 Page) | 53 |
| Exhibit 5 | Company phone text message log (1 Page) | 60 |
| Exhibit 6 | Photocopy of checks and log of Whaldorf tuition payments (15 Pages) | 71 |
| Exhibit 7 | Photocopy of checks and log of Iolani School tuition payments (10 Pages) | 71 |
| Exhibit 8 | E-mail from Michael O'Malley dated May 7, 2019 (1 Page) | 91 |
| Exhibit 9 | Navatek e-mail Scott Reed dated November 22, 2019 (1 Page) | 96 |

EXHIBIT INDEX (continued)

E X H I B I T S


| Plaintiff's | | PAGE: |
|---|---|---|
| Exhibit 10 | Copy of check issued to Society of Young Women Scientists and Engineers LLC (2 Pages) | 103 |
| Exhibit 11 | Federal Election Commission complaint dated (14 Pages) | 104 |
| Exhibit 12 | E-mail chain (17 Pages) | 108 |
| Exhibit 13 | E-mail Lori Bofman dated February 26, 2020 (3 Pages) | 155 |
| Exhibit 14 | E-mail Lori Bofman dated January 21, 2021 (3 Pages) | 163 |
| Exhibit 15 | Navatek e-mail dated February 29, 2020 (2 Pages) | 172 |
| Exhibit 16 | Navatek e-mail dated February 28, 2020 (1 Page) | 177 |
| Exhibit 17 | E-mail William Canfield dated February 26, 2020 (1 Page) | 189 |
| Exhibit 18 | Navatek e-mail chain dated May 21, 2020 (7 Pages) | 194 |
| Exhibit 19 | Navatek e-mail chain dated May 21, 2020 (2 Pages) | 198 |

EXHIBIT INDEX (continued)

E X H I B I T S


| Plaintiff's | | PAGE: |
|---|---|---|
| Exhibit 20 | Navatek e-mail dated May 25, 2020 (3 Pages) | 203 |
| Exhibit 21 | Company phone text message log (1 Page) | 209 |
| Exhibit 22 | Navatek e-mail chain dated March 31, 2020 (5 Pages) | 213 |
| Exhibit 23 | Company phone text message log (3 Page) | 218 |

HONOLULU, HAWAI'I
TUESDAY, APRIL 22, 2025
8:58 A.M.
-o0o-

(Pursuant to Rule 14 of the Rules Governing Court Reporting in Hawaii, the reporter's disclosure is available.)

THE DEPOSITION OFFICER: Do you solemnly swear or affirm that the testimony you're about to give shall be the truth, the whole truth, and nothing but the truth?
THE WITNESS: Yes, I will.

CLIFFORD CHEN,
having been called as a witness and being first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION
BY MR. ALLISON:
**Q Okay. Good morning. My name is Grant Allison. I represent the plaintiff in this case, PacMar Technologies LLC. Just to get some**

definitions out of the way and make sure we're on the same page.

You agree and understand that PacMar Technologies LLC, which is also sometimes called PacMar Technologies, was previously called Martin Defense Group LLC? It was also previously called Navatek LLC.

You agree with that?

A I believe so. Yeah.

Q And I'll use those terms interchangeably at times. And you understand that it's all referencing the same plaintiff company?

A Okay.

Q And that's the same company you used to be employed by?

A Correct.

Q Okay. Sir, would you please state your name for the record.

A Clifford Han Wei Chen.

Q What's your address where you currently live, Mr. Chen?

A 48-46 Sierra Drive Honolulu.

Q And do you maintain a residence or home in any other states?

A No, I do not.

**Q And is that your only home or address in Hawaii?**
A It is.
**Q Okay. Well, what's your current employment, sir?**
A I'm unemployed.
**Q Have you been unemployed since you were unemployed by the company?**
A No.
**Q What's your employment history in the time since you were employed by the company?**
A I believe -- I can't remember the exact dates, but roughly -- for roughly two years, ending August of 2023. I was employed by an equipment leasing company based out of the Nebraska called Moore Equipment Finance.
**Q And was that employment position in the State of Hawaii?**
A Well, I worked remotely. So for a large part of it, yes.
**Q What was your -- what was your general job duties or responsibilities with the equipment-leasing company?**
A My title was, I believe, director of finance and strategy. So essentially, it would be an

ad hoc set of responsibilities -- reporting to what was functionally equivalent of the CFO to do various financial analyses, try to model out what various proposed projects might look like, new products, and then assist various teams and executions.

**Q Why did your employment end in around August 2023 with the equipment leasing company?**

A Essentially, I was laid off. They are owned by a private equity arm of PIMCO, who was then, at the time, looking to exit their investment. And as anyone familiar with that industry knows, the ideal thing for them to do is to polish their financials with respect to P&L, so that they can maximize valuations coming out of it.

So with respect to that time period, market uncertainty, and, you know, cutting out expenses that are ultimately necessary for the operations of the organization, I would categorize it as: I was nice to have. I wasn't a need to have.

**Q I see. Off the record.**

(Whereupon, a recess was taken from 9:02 a.m. to 9:03 a.m.)

**Q (BY MR. ALLISON) So we're back on the record, Mr. Chen. Okay. So I want to go over just briefly the ground rules here. But before I do that,**

my first question is: Have you ever had your deposition taken before?

A With this case?

Q At all, ever, in your life?

A I do not believe so.

Q Okay. And the reason why I ask this is because there's a couple of basic ground rules in depositions. And had you done it before, I would have gone a little bit quicker.

The first is that because there is a court reporter, and she's typing everything we say, I ask two things. The first is, you give verbal answers. For example, "yes" or "no" rather than "uh-huh" or "huh-huh" just because it's easier for the court reporter to write a "yes" or "no." Same goes for nodding your head -- "yes" or "no."

A Okay.

Q It's difficult for her to write that down.

A Understood.

Q Relatedly, if you could do your best to let me finish talking before you start talking, and I'll do the same for you because she can only write one speaker at a time.

A Okay.

**Q You are under oath today. You understand that?**

A I understand.

**Q Okay. Similar to my last question about being in a deposition, have you ever testified in court or any quasi-judicial proceeding in which you were under oath before?**

A No, I have not.

**Q Okay. From time to time, your counsel may object to questions.**

A Actually, hold on. I should -- hold on one second.

With respect to that question -- so as a defendant in federal court, would that be considered being a witness.

**Q It could if you were placed under oath and testified.**

A Okay. So I did not testify, but I was in the proceeding.

**Q Understood. As I was saying, from time to time your counsel, Mr. Kobayashi, here may object to questions asked. Unless he specifically asks you not to answer a question, his objections are to preserve the record, and your job is to answer the question, notwithstanding his objection.**

**Do you understand?**

A I understand.

**Q Okay. At the end of today, a transcript is going to be created by the court reporter. You're going to have an opportunity to review that and make any changes to it.**

**If you do make any changes, I'll have the opportunity to call you back and ask you about those changes.**

A What changes would I be considered making?

**Q That's something you can talk with your counsel at a later date.**

**Okay. Is there any reason why we can't go ahead today?**

A No.

**Q One last ground-rule item. I just ask that you don't guess as to answers. If you do not know something, it's okay to say you don't know. I just ask you don't speculate. And if you do give an answer, it's based on something you know, or heard, or experienced.**

A Okay.

**Q Did you do anything to prepare for today's deposition?**

A I got a quick briefing from my counsel.
**Q Okay. And did you look at any documents to prepare for today?**
A No.
**Q Did you have any meetings with anybody to prepare for today?**
A Other than counsel?
**Q And I'm not asking what you spoke about with your counsel, but I want to know when you met with your counsel to prepare.**
A I had a voice call yesterday, approximately 10:00 in the morning. And then I had a call -- a video call -- last week.
**Q What day was that exactly?**
A Like, Wednesday or Thursday.
**Q With your counsel?**
A With my counsel, yes.
**Q And that was with both Mr. Kobayashi and Ms. Wu, who are both here?**
A Correct.
**Q Was there anybody else on the call?**
A Not that I believe.
**Q Or the video conference?**
A (No audible response; shakes head.)
**Q And how long did the phone call last that**

**was yesterday?**
A Well, I'm going to have to guess on that one.
**Q If you can just estimate for me.**
A Approximately half an hour, maybe.
**Q Okay.**
A Give or take.
**Q And how about -- the video conference call from last week -- about how long?**
A Probably about an hour-ish.
**Q Okay. And you had no other phone conversations, meetings, discussions with anybody else, including any other of the defendants in this case, in preparing for today's deposition?**
A No, I have not.
**Q Okay. Could you please tell me what higher degrees -- higher educational degrees -- meaning college level or higher.**
A I have an undergraduate from Harvard, I've got a JD from the University of Michigan, and I've got an MBA from the University of Chicago.
**Q Approximately what time frames did you receive those degrees?**
A The undergrad degree in '95. The law degree in 2000. The MBA in 2005.

**Q And what about professional licenses? Which professional licenses do you currently hold?**
A I don't currently hold any active licenses.
**Q Do you hold any inactive or suspended license?**
A I have a California bar.
**Q And is that inactive, suspended, or both?**
A That is suspended for a period, I believe, ending time sometime on or before -- I want to say November.
**Q What about a Hawaii bar license? Do you hold that?**
A I do not hold a Hawaii bar license.
**Q Have you ever held a Hawaii bar license?**
A I never held a Hawaii bar license.
**Q Do you hold a CPA?**
A No, I do not.
**Q Have you ever held a CPA?**
A No, I do not. I never.
**Q What's the reason for the suspension of your California bar?**
A I self-reported by plea with the Court in D.C. about the misdemeanor conviction, and it's just as a result of that.

**Q To the best of your recollection, what did you plead guilty to in that case?**

A To the best of my recollection, I plead -- sorry. I'll turn this off -- I believe I plead guilty to a charge of -- I'm not sure what it was called exactly, but being a conduit where I had -- had my mother make a campaign donation and allowed her to be reimbursed through me by Martin Kau.

**Q You just mentioned Martin Kao.**

**When did you first come to meet Martin Kao?**

A Sometime on or about December of 2019, I believe.

**Q And how did that first meeting come about?**

A Through an introduction by a friend of mine who is a headhunter, who was acquainted with Martin and knew that Martin was looking for assistance at his company.

**Q And were you signed up with this headhunter to try to find employment? Or was this purely sort of, like, a social introduction with business underpingings to it?**

A Can you be more specific?

**Q Sure. Did you engage the headhunter to find you a job? Or did you just know the headhunter socially --**

A I --

**Q -- and that person made the connection --**

A I knew the headhunter socially. We had been talking, and he knew I was interested in maybe finding another position.

**Q And that first introduction, did that happen face-to-face, through e-mail, or how?**

A I don't recall exactly. Though, I do know that there were at least two face-to-face meetings involving Martin and his associate Jeff Fitch.

**Q Who is Jeff Fitch?**

A Jeff Fitch is a friend of Martin's. I'm not sure how far back their relationship goes, but he was also, at the time, an employee of the company. Sort of -- I don't know -- I can't remember what his position was actually called.

**Q If you can recall, what was Jeff Fitch's professional area of responsibility or qualification?**

A I don't know what his qualifications necessarily were, other than that Martin trusted him. And his responsibilities were not set in anything in

particular, but sort of being Martin's eyes and ears around the company.

**Q So he wasn't -- you know, for a lack of a better phrase -- he wasn't an engineer?**

A He was not an engineer, no.

**Q And he was not an accountant for the company?**

A No, he was not an accountant.

**Q So it's -- as you sit here today, it's difficult for you to define exactly what Mr. Fitch did?**

A Right.

**Q You mentioned that Martin trusted Mr. Fitch; correct?**

A Yes.

**Q Do you have an understanding why Martin had a trust in Mr. Fitch?**

A They had a prior relationship. I think this was Jeff's second stint at the company at the time. Martin actually brought him back to the company. And, as I said, I believe they were friends.

From what I understand, he was the only person to -- at least in the time period that I was there -- to visit Martin at his home.

**Q You never visited Martin at his home?**
A Never.
**Q You mentioned that Mr. Fitch was there at those initial face-to-face meetings you had with Martin; correct?**
A Correct.
**Q What was Mr. Fitch's roles in those initial meetings?**
A Kind of a get-to-know-you role, I suppose. Once again, I can't speak for what Martin had in my mind or what Jeff had in my mind, but he was there. He made conversation. I guess they were just trying to test the waters and see what it was like.
**Q And those meetings would have happened in or around December of 2019.**
**Is that your testimony?**
A Yes, I believe that is correct.
**Q Okay. After those two meetings occurred, did you then --**
THE WITNESS: Can I get --
MR. ALLISON: Please.
**Q (BY MR. ALLISON) After those initial first two meetings occurred, did you then submit a resume or an official application to the company for**

**employment?**

A No official application. I believe they already had my resume through my headhunter connection.

**Q So were those first two meetings that Jeff Fitch attended, were those your job interviews? Or did you have another job interview later?**

A Essentially, that was the job interview.

**Q Where did those two meetings occur?**

A One was over dinner. I can't recall the restaurant. Another was in the office -- conference room. I think that's -- those are the two face-to-face meetings I can recall.

**Q And Fitch, he was at both?**

A Yes. Like I said, he worked for the company; so he was there.

**Q So who else attended first -- the dinner meeting?**

A No. Just Jeff and Martin.

**Q Who else attended the second meeting at the company office?**

A Just Jeff and Martin.

**Q Okay. And so prior to being hired by the company, your only job interviews were these two meetings with Jeff Fitch and Martin Kao; correct?**

A Yes.
**Q Okay. And those -- that line of question started when I asked you about the company, "How did you first come to know the company?"**
**Would the answers be the same?**
A The headhunter, who said, "This is the company to work for," I hadn't heard of them, but okay.
**Q When you first were hired by the company, what position were you hired to be?**
A The title that Martin gave me was CFO, Chief Financial Officer.
**Q Did your title change throughout your employment with the company?**
A I do not believe it changed. No.
**Q And your approximate -- to the best of your recollection, employment dates with the company was from what starting date to what end date?**
A Sometime beginning of January 2020 to the end of 2021.
**Q So that's approximately two years?**
A Approximately two years.
**Q And just to confirm, I think you said it a moment ago, but your title was Chief Financial Officer of the company and no other title?**

A That's correct.

**Q When you were first hired in or around early 2020 as CFO, what were your core job duties and obligations as CFO?**

A So as part of our discussions of a potential job, I was made aware that Martin was looking to make a number of changes at the company. He was telling me at the time -- which was slightly incorrect, I believe -- that he recently acquired the company from its former owner, was looking to expand the size and scope of the organization, open new markets, and head towards a restructuring that would allow for employee ownership of the organization. And he needed help doing it.

I told him very clearly -- him and Jeff -- that if they were looking for a CPA to manage the books, they should go hire a CPA; that is not my role. My role would be to think through potential paths, strategies, and optimizations that would help to achieve what Martin said he wanted to achieve.

So as such, it turns out that Martin basically just wanted to push off the things that he wasn't interested in doing, like: interfacing with the H.R. part of the organization, managing the expansion, you know, looking at the financial and

figure out how we can improve the organization financially from an operational standpoint.

**Q So did that become part of your core duties and obligations for the company -- to do those things that Martin didn't want to do?**

**So including managing the company, looking at the books and the finances, and putting Martin's vision into reality?**

A For the most part, that is correct. Martin focused on the relationship side of the business, so to speak. As far I knew, he was in D.C. a lot, or so I was told.

**Q And while Martin was focusing on relationships in D.C., you were back in Honolulu at the office, managing the business.**

**Is that accurate?**

A That is somewhat accurate, although Martin would always feel free to interject whenever he wanted.

**Q Is it fair to say that Martin's goals for the company were to basically use money and lobbyists to try to increase the amount of congressional appropriations that the company received?**

A I believe that's a fair characterization.

**Q Was that one of the new markets or new**

**expansions that Martin wanted to execute for the company that you mentioned a moment ago?**

A During my time there, we opened, I believe, two or three new offices in different locations -- South Carolina, Michigan, Nebraska -- no. Oklahoma. Sorry -- Oklahoma, I believe. And maybe I might be missing one or two others, but you get the idea.

So that would be literally opening a physical footprint, making sure we had engineering hires that were brought aboard and interfacing with the engineering teams and the -- and Martin to get the right kind of hires to fill out whatever project needs were there with the various universities that Martin wanted to partner with.

**Q So then administratively, when these things happen, say it's the opening of these new offices, you mentioned Martin was more focused on the relationships in D.C.**

**Martin would not administratively have been the one to find a new office space, open a new office space, interview hires, hire people, things of that nature?**

A Well, he would say that and go off and do something else.

**Q So in reality, who were the company's managers that were overseeing the expansion of the new offices?**

A It would be myself and potentially a small group of people. Say, I would use Jeff Fitch, for instance, to go handle these things; right?

If he wanted a new office, say in Honolulu; right? He would send Jeff over to the old First Hawaiian building and look at spaces and, you know, figure out whether or not it would make sense for us to move into a space like that.

**Q And day to day, somebody needed to make a decision, or bind the company, or make a decision on behalf of the company.**

**Is that something that would fall onto you as CFO?**

A If depends on what you were talking about. I ultimately always deferred to Martin with respect to the final signature. He always wanted to know what would end up happening.

And in the end, a lot of times for a lot of financial transactions, Martin's personal guarantee was needed. So irrespective of whether I signed it or not wouldn't matter. So I had Martin look over -- ultimately -- over all the agreements.

**Q From the period of your first being hired until the time you were no longer employed by the company, describe to me the upper echelon of the hierarchy of management at the company.**

**Martin's at the top; correct?**

A Correct.

**Q Who was the number 2 person at the company below Martin during that time period?**

**Was it you?**

A Number 2? I'm not sure what you mean by "number 2."

**Q Well, if you were going to rank the company executives in order of their authority and power at the company, who would be second under Martin?**

MR. KOBAYASHI: Objection. Vague and ambiguous.

MR. FUJICHAKU: Joined.

THE WITNESS: I'm just a little bit confused because people had different roles. So there were various engineering heads with respect to the project management of the large contracts we were conducting on behalf of the federal government. I made zero decisions on those; right?

So there would be people away from me in

the organization who I would say held a lot of power from an operational perspective.

**Q (BY MR. ALLISON) Okay. With respect to the company's finances, who would have been the second in command? Was that you?**

MR. KOBAYASHI: Same objection. Vague and ambiguous.

THE WITNESS: I would pause at your use of the word "command." Because I knew in the end, even if Martin didn't want to handle dotting the I's and crossing the T's, he wanted to make all the decisions. I would make recommendations, and what I found was that I failed to convince him to actually pursue any of my recommendations if he actually was interested in listening at all.

**Q (BY MR. ALLISON) So generally, Martin's management style was to -- he'd come up with an idea, and he'd tell you what the idea is, and you might go back to him and make a different recommendation or suggestion at times; correct?**

A Correct.

**Q But if Martin had already made up his mind, then he would disregard your suggestion or recommendation?**

A Yes.

**Q And then what Martin wanted to have done is what would be done?**

A Because ultimately, he had final signature authority as the sole manager of the organization; right, 99-plus percent owner and CEO with signature authority on all the accounts anyway. He didn't need me to sign anything. I have no authority to override him.

**Q And in the instances where you told Martin that you thought his ideas were wrong, and you made a different recommendation or suggestion, and Martin disregarded your recommendation or suggestion, was there ever a time where you refused to carry out Martin's instruction?**

A If I had a strong enough objection to something that Martin wanted to do, in the end, Martin would just go around me. I never did it, but Martin would find a way to get it done.

**Q Can you give me a specific example of something where Martin wanted to do one thing, you recommended or suggested something else, Martin said, "No, we're going to do it my way," and you refused to act, and Martin went around and did it anyway?**

A The very first example would be right when I got to the company. When I realized that

Martin, in fact, hadn't yet formalized the transfer of ownership to himself for the organization.

He presented me with an operating agreement, which I reviewed, and told him you should sign this thing. It's ridiculous. There's no way you should need to agree to this. That, in effect, puts you in a lot of risk from an ownership perspective with potential loss of control; that didn't make any sense to me. But in his impatience, I want to say, to "get it done" because he had been waiting multiple years for ownership to transfer, he just signed it and sent it back.

**Q Okay. Can you think of any other examples when this occurred?**

A Can you repeat the question?

**Q Yeah. I'm looking for situations where Martin instructed you to do something or instructed the company to do something, you objected to the instruction, Martin disregarded your objection, and then Martin went around and made it happen anyway.**

A I would was say the most telling one about Martin would be his misinformation to me and to the controller, Kahele Lum Kee, about the PPP process.

**Q Okay. And what specific misinformation**

**about the PPP process did Martin say or communicate to you?**

A On my initial review of the evolving legislative language and regulatory language that was coming out at the time, I, along with Kahele, had estimated our maximum PPP cap to be somewhere in the neighborhood of, I want to say, 2.3, 2.6 -- somewhere in that ballpark -- million dollars, based upon our recent historical head count.

Martin, however, then proceeded to tell us that he had meetings with various senior senators -- I can't recall which names -- as well as a senior official from the small business, SBA -- I forget what the acronym is for -- that he was being urged to push for his future-looking estimates for head counts as part of an application process and that that would be okay.

**Q Did you believe Martin when he told you that?**

A I was highly skeptical because that's not what I was reading, but that being said, at that point in time, Martin had demonstrated a significant amount of influence and strong relationships with the senior legislators on D.C. in Capitol Hill and other officials that I was not a part of or conversation

had.

So I was very, very hesitant to act on anything he was saying. And so I told him, "You know, that's not what I see here on the website that I'm reading. I don't know what you're reading, but I would be cautious if I were you."

**Q And to be clear, the specific issue that we're talking about is that the company's PPP application at Central Pacific Bank, to the SBA, and ultimately to Central Pacific Bank, stated that the company had roughly 400 employees --**

A I don't recall the number. So you can tell me the number. I can't confirm or deny that.

**Q Okay. Well then, let's put it this way: Do you agree that the issue that you're referencing is that the company's PPP application to SBA and eventually Central Pacific Bank included a vastly inflated number of company employees than the company actually had?**

A I don't know about the term "vastly" since I don't know what the difference is, but higher?

**Q Yes.**

A Higher.

**Q What was the size of the loan from**

**Central Pacific Bank on the PPP application?**

A I believe it was for the maximum $10 million.

**Q And you said a moment ago that your own personal calculations were that the company should have had a maximum loan disbursement of roughly $2.4 million?**

A Something in that range -- 2. something.

**Q So the difference is that you were able to -- the company was able to obtain a loan of three times over the size of what you initially calculated, should have been the maximum; correct?**

A Correct.

**Q And so then that three times figure -- that increase -- was a result of false inflation of the number of employees listed on the PPP application; correct?**

MR. KOBAYASHI: Objection. Argumentative. Calls for speculation.

THE WITNESS: If I recall correctly, what happened was that Martin ended up working directly with Kahele to put together the application package. I don't recall reviewing that package. I don't believe I did, but, you know, there was discussion about how Martin was going to put forward his

estimate, his near term estimate, for the head count that was going to occur because of the expansion we were doing.

**Q (BY MR. ALLISON) And it's your testimony that your own personal research into the matter at the time revealed to you that that was not proper or appropriate; correct?**

A Which is why I stepped back and said, "I can't help you do this."

**Q And how did you tell Martin these things, and how did you tell Martin you were stepping back and you weren't going to assist with this process?**

A Face to face.

**Q You never sent him an e-mail or put this in writing?**

A Not in so many words that along the way, I did send him e-mails indicating that the federal government would be prosecuting PPP fraud. And, in fact, it was happening. And so that he should be certain about what he is doing.

**Q But you sent those e-mails after the company had already received at least one PPP loan; correct?**

A Correct, because that's when I started seeing them.

**Q You also sent e-mails encouraging Martin and Kahele Lum Kee to apply for multiple PPP loans; correct?**

A I believe there were e-mails that went out discussing multiple applications, but it was my understanding at the time -- because once again, the regulations were -- understanding it was still quite vague to me -- that you can apply to as many as you want, but it's just you can only take one of them.

**Q So based on that testimony, if you, the company, apply to Central Pacific Bank, and you get $10 million -- you get the money -- can you go then go and apply to others?**

**The answers "no" based on what you just said?**

A I can't recall the timing of it all, because I'm not certain of that as I sit here today.

So, for instance, if we went back and think through the -- what's the bank in Chicago? It's a Chicago bank, and Martin ended up applying for another loan. And when he told us he applied and got approved, then we were very worried what Martin proceeded to do; that we told him by all means, not accept that loan. He should not follow through and execute that document.

**Q And did you put those warnings in writing to Martin?**
A No. We went into his office to tell him.
**Q So the only warnings that you claim that you gave to Martin on this subject were verbally in his office?**
A I was hesitant at that point in time to put in writing to a boss that increasingly I found unstable in a period of COVID to risk getting fired on the spot by saying, "Hey, I think you are potentially committing a criminal act. Please cease and desist."
**Q But at that time, you suspected he was committing a criminal act?**
A That he was in danger, serious danger, if he had not already -- was crossing the line.
**Q Okay. I want to step back a second here to something you said here a moment ago. It's your testimony --**
MR. ALLISON: I'm sorry. Can we go off the record for a second?
(Whereupon, a recess was taken from 9:41 a.m. to 9:45 a.m.)
**Q (BY MR. ALLISON) Mr. Chen, we're back on the record. You're still under oath.**

As CFO, you agree you were the executive of the company?
A I suppose you can say that. Yes.
Q And as CFO and as an executive of the company, you agree that you owed the company fiduciary duties?
A To the extent that I had the authority and power to execute all those duties, yes. If not, no.
Q You agree that you owed the company duties of care?
A For things that I could care for, yes.
Q Duties of loyalty?
A Certainly.
Q Duties of honesty?
A Yes. Being honest to the company. Correct.
Q And duties of competency -- carrying out your roles competently?
A Sure. Yes.
Q Okay. A moment ago you testified that it was your understanding at the time, the company was applying to PPP applications, which would have been around March and April of 2020; correct?
A Sometime thereabouts.

**Q And it was your understanding at that time that it was unlawful to receive one PPP loan and then apply for and get a second PPP loan; correct?**

A I don't know that all of those statements are correct; that you can apply for a loan, accept a loan -- I don't know that applying for another loan was lawful, but I did strongly suspect that accepting a second loan would certainly be unlawful.

**Q And that's exactly what the company did during that time frame, was accept two PPP loans; correct?**

A That's actually what happened, but that was not our understanding of what happened at the time.

So after Kahele and I went in to speak to Martin about this second loan, we said that, "We strongly suspect that accepting a second loan would be illegal. Please do not do that."

And the discussion continued -- and I'm not sure who said what at this point -- where we came to some sort of agreement that if Martin could get the bank, which has now extended credit to us, to alter the loans so that it wasn't a PPP loan -- meaning, whatever it took, whether it be to increase interest rate, extend the terms, change the terms --

but now that we had a relationship, if they wanted to lend you money, they could loan you money outside the PPP check.

Martin said he would go back, talk to the banker, and that's what we believed he did. And he came back -- and I'm not sure how many days later -- a day later or whatever -- and said, "The banker agreed. They'll lend us money. There won't be PPP. Make sure the documents were not PPP documents."

Well, fine, Martin. If that's what he wants to do, go ahead; right.

**Q When you first learned that the company had obtained a second PPP loan and before Martin told you these things about changing the PPP loan to a different type of loan, did you report this illegal act to anybody else other than Martin in this one meeting with Kahele?**

A Again, what illegal act are you talking about?

**Q Obtaining a second PPP loan.**

A I didn't learn about the second PPP loan until Martin was already in custody, not until October when I was then told, "Hey, by the way, that loan is a PPP loan." That was a surprise to me.

**Q So it's your testimony then that you**

**didn't take any overt acts to encourage the company or Martin to apply for second or third PPP loan applications?**

A I did not urge Martin to go apply for multiple loans. Martin wanted to apply for the loans. And if you wanted to apply, as I said, it wasn't my understanding that the application itself -- since I hadn't read the application -- would be an illegal act. Again, like I said, I was just dead set on stopping him from accepting other loans, other PPP loans.

**Q AS a CFO, it's accurate to say that you oversaw the company's financial condition and accounts; "yes" or "no"?**

A I would say that statement is too abroad.

**Q In what way?**

A That I oversaw the analysis of the financials. As I would tell Martin at the beginning, I'm not a producer of financial statements, I'm a consumer of financial statements. I'm going to rely on your inside accountants, outside accountants, CPAs, who are doing the audits, to tell me that the financials are appropriate, they're accurate. And if I have questions, because I don't understand something that they did, then I will ask.

**Q As CFO, isn't it correct that it's your ultimate obligation and responsibility to manage and be in control of that information and the company's financial condition and accounts?**

MR. KOBAYASHI: Objection. Vague and ambiguous.

THE WITNESS: It appears to me that the underlying presumption of your question is that the definition and responsibilities of CFO are uniform across a universe of jobs that are out there, which is incorrect.

**Q (BY MR. ALLISON) Okay. Let's do it this way: Describe to me what your responsibilities and duties were with respect to the company's financial position and accountants as CFO during your employment with the company.**

A As I was looking over and helping to manage the expansion, my major concern from a financial standpoint was that we had sufficient liquidity positions to meet our obligations; right? Whether it be payroll, whether it be lease payments, whether it be other operational payments that we made to subcontractors; right, that we had sufficient wherewithal to keep the company moving forward, marching towards whatever expansion that we were

trying to achieve.
So if I had a question, "Hey, how are you doing today Kahele? What's your cash position?" Right? "What does payroll look like? What's happening there?" Okay, okay, okay. "It seems like we're doing okay." You know, the timing of cash payments coming in from the federal government. All right. That's on time. Got it. Good."
All right. Green light business usual, let's move forward.
**Q You mentioned earlier that the company opened a number of offices -- you mentioned two or three. You said there might have been more during this period -- from early to mid-2020; correct?**
A Yeah. That's probably the right time frame.
**Q That's also during the COVID time frame; correct?**
A Yes. We were moving forward with this expansion at a time when other people were contracting.
**Q Did the company have sufficient liquidity to meet those obligations at that time?**
A It was my understanding that we did.
**Q And was the reason why the company had**

**sufficient liquidity is because it received $10 million in PPP loans from Central Pacific Bank?**

A No. Well, that was additional liquidity. That was a nice safety net, but had we not had that in the account, then I believe that money was essentially -- was essentially still there.

We were looking at other options as well from a loan perspective -- other lenders. And the cash flows of the operations of the company as we began to shift from a lot of subcontracting work, which didn't provide all of the overhead coverage from our own employees, and try to find savings -- sort of inefficiencies -- that were existing in the organization. It was my understanding at the time, that we were okay.

**Q So it's your testimony, then, that the company didn't even need the $10 million PPP loan?**

MR. KOBAYASHI: Objection.

THE WITNESS: No, that is not what I'm saying. That is an assumption that is certainly incorrect.

**Q (BY MR. ALLION) Okay. So then --**

A In terms of did we end up using it? I don't believe we did, but it's always, always, always nicer to have a cushion that you can rely on in case

of emergency.

**Q Okay. I'm going to introduce the first exhibit. I'll give you a copy, Mr. Chen. Please don't leave with these copies. The court reporter has to leave with them.**

A Okay.

(Whereupon, Plaintiff's Exhibit No. 1 was marked for identification by the deposition officer and is attached hereto.)

**Q (BY MR. ALLISON) Do you recognize this document that I put in front of you, Mr. Chen?**

**And that's your signature on page 3; correct?**

A It looks like -- yeah.

**Q Okay. This is a copy of what I believe to be your initial offer to be hired by the company dated January 4, 2019; correct?**

A That's what is says. Yes.

**Q Earlier you testified that you thought you started in January 2020, but it looks like --**

A No, no. 2019.

**Q Okay.**

A Sorry.

**Q So you started 2019 --**

A It was a two-year period. So maybe I was incorrect, or if I misstated, I apologize; but I was there for two years.

What year was COVID? Was COVID 2020?

**Q That's correct.**

A Okay. Then COVID was the second year. So then it would be '19, '20. I correct that.

**Q Okay. And on the first page there, it says that your minimum amount of incentive compensation will be capped at your base wage of $200,000.**

**You see where it says that?**

A Yes.

**Q And was that, in fact, your starting salary, $200,000?**

A I assume it was. I don't have a reason to say otherwise right now.

**Q And below that figure, there are -- paragraph 4, "Benefits." And it starts on the first page and goes to the second page.**

**If you could briefly look over those benefits, I'm going to ask you about them.**

A Okay.

**Q Are there any benefits that you received caused by or as a result of being employed by the**

**company that are not listed here in paragraph 4, "Benefits"?**

A What would an example of that be?

**Q I don't know. The question is for you, Mr. Chen.**

A But what would you call a benefit?

**Q Anything of value that you received.**

A Like, pencils from -- I mean --

**Q Sure. If that's your answer.**

A Anything of value? The only thing I can possibly think of now, I recall, would be business meals.

**Q Okay. And in list of benefits here -- so you got some meals, business meals, which I think is pretty standard for most executives at companies.**

**Adding the business meals to this list of benefits in photograph 4, that makes the list of benefits comprehensive and complete; correct?**

A Once again, I can't recall anything of significance. I might be mistaken, but I don't remember.

**Q Okay. And did your benefits -- not counting any base compensation -- but did the benefits stay the same throughout your employment?**

A I believe there was talk about membership

at the Pacific Club or something.

**Q But that never happened?**

A It never proceeded. That never happened. Yeah, I don't know.

**Q Okay. You can put that off to the side.**

**Here is the second document that I want you to look at. This looks to be an internal document from the company noting a salary increase you received on April 1, 2019; correct?**

A Correct.

(Whereupon, Plaintiff's Exhibit No. 2 was marked for identification by the deposition officer and is attached hereto.)

**Q (BY MR. ALLISON) And did you, in fact, receive that salary increase?**

A I believe I did, yes.

**Q Okay. And did your -- other than your salary increase, did your benefits change when you received this promotion or this increase in pay?**

A I don't believe so. However, just as a side here, during the period of our negotiation, this was the salary I had initially proposed.

**Q And the salary is $250,000 annually?**

A $250,000. That his response was he

didn't want to rock the boat just yet with respect to the other members of the management team; that he wanted to wait a couple of months before pushing this one to 250 that I had requested, with the understanding that, as we got farther along down the road, according to the my performance, we would go even higher.

**Q Okay. And here's a third document that shows that you went even higher as you phrased it.**

THE DEPOSITION OFFICER: Are these being marked as exhibits?

MR. ALLISON: Yes, they are.

THE DEPOSITION OFFICER: Okay. I need to mark them. If you hand them to me, I can mark it and pass it to the witness.

(Whereupon, Plaintiff's Exhibit No. 3 was marked for identification by the deposition officer and is attached hereto.)

**Q (BY MR. ALLISON) So, Mr. Chen, looking at document marked Exhibit 3, this is, as you phrased it, another internal document showing that your salary went higher, up to $350,000 a year as of March 29, 2020; correct?**

A That's what it says, yeah.

**Q And you did, in fact, receive that salary pay raise on that date?**

A I believe so. Correct.

**Q Did your job responsibilities or duties change with this increase in pay?**

A I was taking on additional work internally, yes.

**Q What kind of additional work internally?**

A As I referenced earlier, Martin had a vision of expanding the company, but also getting it to a place where we were operating more efficiently, and we also could start sharing ownership amongst the employee base.

So with the help of Kahele, with the help of external counsel, with maybe a few other consultants, whatever, we looked into this. So as we were, you know, holding these offices and making these new hires, we were conveying this message out there to the employee base and the management team.

**Q But that never actually happened; correct?**

A We never got there.

**Q So here's number 4.**

A Sometime before or during this period, I became more aware of friction that existed between

Martin and Steven Loui, the former owner. And Steven Loui has a family of companies, I believe owns somewhere in the neighborhood of, or has right to, 0.8 percent of Navatech, Martin Defense Group, PacMar -- not PacMar -- but, yes.

And in looking through all the intercompany agreements, we had come across some historical relationship among the companies that -- let's just say, didn't make sense moving forward as an independent organization.

So one of the things that, you know, we knew, at least from the operating agreement, was that Steven had made reference -- and when I say "Steven," Steven and his attorneys, and his companies, whatever; right -- made reference to fulfillment of various agreements that were -- that had been made between Navatek and the rest of the organization as part of the condition of Martin maintaining his "managancy."

So, you know, things like the continued payments to Steven personally for his contributions to the work the company was doing, as well as the continued participation Navatek in the sharing of the pier facilities, of insurance purchase, as well as an intercompany agreement whereby Steven's companies

would provide back office services.
(Whereupon, Plaintiff's Exhibit No. 4 was marked for identification by the deposition officer and is attached hereto.)
**Q (BY MR. ALLISON) I'm sorry, Mr. Chen. How does this relate to the question I asked, which was: Did your job obligations change with the most reasonable pay raise?**
A Well, on or around the time, I was taking on all of this investigation and analysis, figuring out how to deal with all of this.
**Q I see. So Martin asked you to investigate Steven's role in the company?**
A So we can disentangle ourselves.
**Q I see. And so Martin was in an adversarial position to Steven Loui, and he asked you --**
A Increasingly adversarial. Once again, a lot of these conversations are happening out of my presence; right?
**Q And in the dispute that was brewing between Steven Loui on one side and Martin Kao on the other side, it's fair to say that you were on Martin's side? You supported Martin, and you were**

**loyal to Martin?**
MR. KOBAYASHI: Objection. Argumentative.
THE WITNESS: I'm loyal to the company. And as far as I understood, Martin was manager, sole manager, and 99-plus percent of the owner of the place; that was my understanding.
And as between Steven, Martin, and the company, well, first it's the company, and the company does what Martin wants it to do.
**Q Did you consider yourself to be loyal to Martin at the time, let's say, in mid-2020?**
A In what capacity would you make that statement?
**Q Generally, were you loyal to Martin in supporting him and his business endeavors with respect to the company?**
A I was loyal to preserve and promote the business interest of the company. I could care less about what happens to Martin other than, "Hey, I hate to see something bad happen to Martin that turns around and damages the company."
**Q Okay. Let's take a look at what's been marked as Exhibit 4. This is another internal company document noting another pay increase for**

**yourself; correct?**

A Yes, sir, that's what it says.

**Q And it says that your salary increases as of May 24, 2020, from $350,000 a year to $400,000 a year; correct?**

A Correct.

**Q And that's not too much time after you received the prior pay increase on March 29, 2020; correct?**

A Yeah, that's correct.

**Q Do you have an understanding why or what the justifications were that you receive a $50,000 pay increase on March 29, 2020, and then another $50,000 pay increase on May 24, 2020?**

A Martin did not give me the full rundown of why he was doing this. Though, I do know I was not the only one receiving pay raises as such, you know, on or around this time frame. Whether this would be some of the senior engineers or whether it would be other officers of the company.

**Q And who are those people specifically that received the pay raises at this time in the same manner that you did?**

A I don't recall the names quite frankly.

**Q But wasn't it just Kahele Lum Kee and**

**Duke Hartman?**

A I don't know. But on or around, you know, maybe on the same day, Martin would go, "Why don't we give that guy over there and that guy over there some raises? They're doing a good job and we're going to need them moving forward."

**Q Okay. Separate of those people, just speaking about yourself, is it your testimony that Martin never explained to you these two pay raises -- the one on March 29th and the one on May 24th?**

**He just gave them to you and you accepted them?**

A I wasn't going to turn him down, but on or around this time, I was also trying to help him organizationally how to get more freedom for the company to operate and introduce employee ownership, and, you know, I thought, "Hey, I'm doing a lot here for him. All right. I'm doing a good job. I guess that's what it was for."

**Q So your base pay doubled from your start date in January 2019 through about 16, 17 months later through 2020; correct?**

**It went from $200,000 to $400,000 over that time period?**

A Mm-hm.

**Q Was that typical at the company for employees? Or were you the only employee who received a pay raise of that magnitude during that period?**

MR. KOBAYASHI: Objection. Vague and ambiguous. Calls for speculation.

THE WITNESS: I don't recall what the other magnitudes were, but I would venture to guess, if I'm allowed to guess, that, yeah, it was probably on the higher end.

**Q And Martin never fully explained to you or justified why your pay was being doubled over that period of time? He just gave you those raises and you accepted it?**

A "Hey, you're doing good work." Okay.

**Q It was for good work?**

A Good work. He said he was impressed with with some of the recommendations I was making, whether or not he followed through on them.

**Q And when you received that final pay raise on May 24th, raising your base pay of $400,000, did your non-base pay benefits increase or change in any way?**

A I don't think so.

**Q Mr. Chen, how many children do you have?**

A I have three.
**Q And isn't it true that --**
A Oh.
**Q Isn't it true that through Martin's foundation, you received roughly $90,000 in tuition payments for your three children?**
A That is correct. That is correct, yes.
**Q And is it also correct that you understood that to be company money?**
A No, that is not correct.
**Q Who paid for your children's tuition?**
A Some foundation that he had.
**Q Some foundation that he had.**
**What was the name of the foundation?**
A Mickey and Marty -- Marty and Mickey -- something like that.
**Q Okay. So you accepted $90,000 in tuition from Martin's foundation -- you don't really know the name of the foundation?**
A No, I don't.
**Q Okay.**
A I mean, whether one kid came first, the second, I don't recall.
**Q Okay. And what did you do to receive those tuition payments for your children?**

MR. KOBAYASHI: Objection. Vague and ambiguous.

**Q (BY MR. ALLISON) Well, did you apply for them? Did your children give interviews? Was there a program listed on a website?**

**How did this work? How did you receive the money?**

A Martin explained it as such that he had been working with his attorneys to come up with an employee scholarship program, and that he wanted to extend this benefits to me, as well as one or two other employees that were at the company. I can't remember his name now.

**Q So it's Martin's idea? Martin is the one that came up with this tuition idea?**

A Yeah.

**Q So, in addition to doubling your pay from 2019 through May 2024 from $200,000 to $400,000, he also came to you and said, "We're going to pay for your kids's tuition"?**

A Yeah.

**Q And you understood that to be paid from the foundation separate from the company and unrelated to your work for the company?**

A Well, as an employee of the company,

that's how I qualify for whatever this was.
Q I see. And it's your testimony that the idea for this scholarship program for your children and certain select other employee's children originated with Martin?
A He was the originator. Yes.
MR. ALLISON: Okay. Here we'll have this document marked as number 5.
Q (BY MR. ALLISON) Okay. So what we're looking at here, Mr. Chen, I'll represent to you is -- this is a printoff of text messages taken from your phone -- your company phone -- at the time you worked for the company.
Do you recall having a company phone?
A I do.
(Whereupon, Plaintiff's Exhibit No. 5 was marked for identification by the deposition officer and is attached hereto.)
Q (BY MR. ALLISON) Okay. Do you recall what the phone number was?
A I don't recall the phone number.
Q Okay. If you look at the top column, second row. At the top, the header is two; it says, "myself, owner." And there's a number there. It's

Area code 808-840-9585.
A Correct. That was my number.
Q That was your number from -- at the company?
A No. This is my personal number.
Q Oh, this is your personal number.
Okay. And what I would like you to do is look at the column that is titled "Body" and those are the chats. And once you've had a chance to look those over, please let me know.
A Okay. Yup.
Q Okay. And these are text messages between yourself and Jeff Fitch, who we discussed earlier; correct?
A Yes.
Q And do you recall sending them -- receiving these text messages?
A They look familiar.
Q Okay. The first one from Jeff Fitch, the time stamp is June 23, 2019. Do you see that on the right side?
A Mm-hm.
Q And he's proposing to you that you could use -- he says:
"Can we use" -- he uses

**"we" -- "Mickey and Marty Foundation to fund school for** our employee's (current and future.) Do you think we could get them to agree to sticking with us for a term after graduation."

Correct?

A Mm-hm.

**Q Was this where the idea for the scholarships to be paid through the Mickey and Marty Foundation first came from?**

A No. My understanding from talking to Jeff was that this was discussed with Martin before bringing it to me in this fashion. So Martin was behind this conversation.

**Q So Jeff told you he talked about it with Martin, and then he sent you this message?**

A Yeah. I was like, "That sounds great. I would love to do this for our employees. Hey, by the way, let's make sure it's legal."

**Q And that's why you said, "Let's look into this. I think we would have to structure this carefully"?**

A And then I sent the IRS site. I'm not an

expert in this, but somebody should be looking into this.

**Q Okay. And did you ever follow up to better understand if it was structured legally or correctly?**

A No. That wasn't -- that wasn't my main -- my job at that time.

**Q So --**

A This is the Mickey and Marty Foundation; right? I'm not -- they can do whatever they want to do.

**Q So you had a concern that this could end up being illegal, but --**

A Or being poorly structured, or have, you know, unintended consequences -- whatever; right? I'm not sure it's illegal necessarily, just probably done wrong. But whatever it is, just as an aside to him, "Hey, none of my business what you do with the Mickey and Marty Foundation, but just as a recommendation, I think you should look into it."

**Q Okay. And the amount of tuition that was paid for your three children, it was -- I have the number here. It was $90,897.63 during 2020.**

**Does that number sound accurate to you, or do you dispute that figure?**

A I don't have an accounting of it but I presume that you've got whatever you need to take a look at.

**Q Okay. Did you know at the time, what the Mickey and Marty Foundation's purpose or mission was?**

A I was told by Martin that it was a promotion of education for children in Hawaii, and at this point, he wanted to make it extended to the company employees.

**Q Okay. So, you know, rather than introducing these documents, Mr. Chen -- and I'll introduce them and show them to you if you want to see them -- but I'll represent to you that there was a check made out to Honolulu Waldorf School on May 29, 2020 for $17,700, and the note on the check is "Devon Chen."**

**Is that your son?**

A That's my daughter.

**Q Your daughter. Okay.**

**And did she attend the Honolulu Waldorf School in 2020?**

A I belive she did.

**Q And is it your understanding that the $17,700 was for her tuition at that school?**

A I don't know what else it would be for,

but, yes, that's my understanding.
Q Okay. And then next we have a check dated July 7, 2020, from the Mickey -- Marty and Mickey Kao Foundation in the amount of $26,199 made out to Iolani School with a note on the check that states "Xander N. Chen."
Is Xander N. Chen your son?
A He is.
Q And was that $26,199, to the best of your knowledge, paid for his Iolani School tuition?
A Correct.
Q Okay. And then lastly, we have a check for $25,000 to Iolani School, dated August 16, 2019. I think this one was for Elle.
Is your daughter named Elle?
A Ellis.
Q Ellis. Is that your child?
A I said "2019"; right?
Q I'm sorry, Mr. Chen. Strike that. I had the wrong -- I was looking at the wrong information here.
Ellis was in grade 6 in 2019, and I have a check for $30,000 to the Honolulu Waldorf School from the Mickey and Marty Foundation?
Did she attend Honolulu Waldorf School?

A Yes, at the time.

**Q Okay. And the $30,000, would that have been for her tuition at Honolulu Waldorf School?**

A Not just her tuition because that sounds like more than tuition was at the time. It sounds like her and Devon, perhaps.

**Q Okay. And it was your testimony earlier that the Mickey and Marty Foundation was not using company money; correct?**

A Well, it was my understanding that it was funded by distributions that came out of the company -- whether it be distributions directly to Martin, and then redirected, or just directly with the understanding that it's a distribution to Martin -- something of that arrangement.

**Q So is it your understanding that the money that went to the Mickey and Marty Kao Foundation was eventually rerouted for these school tuitions?**

**Is that your understanding that the money came directly from the company accounts to the Mickey and Marty --**

A I don't know.

**Q As a CFO, wouldn't it have been your responsibility to know these things about the**

**company's money accounts, as the CFO that was hired at Navatek?**

A No, it wouldn't. As I told Martin, I'm not interested in taking a job where I am, you know, literally taking my pen for the books. I'm going to rely on the accounting teams to do that. If I have questions later, then I will ask.

**Q Okay. So if there were some kind of financial misdeeds occurring within the company's books, whose responsibility was it to review that and stop that?**

A It would be the accounting teams and as a backstop, if there were something significant that were occurring or something obvious that was occurring that seemed a little off, that, "Hey, this is now impacting our operations. Maybe we should figure out why we're" --

**Q Right. Who's that person?**

A That would be me.

**Q Okay. And earlier you testified that receiving two PPP loans didn't rise to that level because you didn't raise any alarms; correct?**

A Well, because I didn't know there were two PPP loans until October.

**Q Okay. And then when the company**

**transfers $90,000 plus to Mickey and Marty Kao Foundation, and then your children receive that same amount of tuition payments from Mickey and Marty Kao Foundation, that also doesn't rise to the level of raising any alarm bells for you in terms of the company's accounts or financial statements?**

MR. KOBAYASHI: Objection. Argumentative. Assumes facts not in evidence. Lacks foundation.

THE WITNESS: It doesn't because of my understanding of who Martin was and what was happening in the organization. That my understanding was that the payments that were being made by the company -- wherever the payments went. Whether it be to Sam's Club because they want to stock the snack room, or whether it be payments -- what the hell is that little lunch place on top -- anyway, Martin was -- Martin and the company were often making transactions like this.

As I said, if it wasn't impacting to the point of, "Hey, I think we're going to crash the ship on the rocks," or Martin then say, "Hey, this is really bothering me. Please look into it," I had other things to do.

**Q I see. So the only financial issues that would have aroused your suspicion is something that**

**would have ruined the company?**

A That's ultimately when I would be forced to step in, because I would be seeing these thing occur. I never wrote a check. I didn't reconcile a check. I didn't do any of that; that's not my function.

**Q Did you ever have any concerns that it was an improper -- could be a potential improper use of the company's money to be transferring its funds to Mickey and Marty Kao Foundation are paying tuition for your children to the tune of $90- -- almost $91,000 in 2020?**

A After having recommended that they look into the legalities of whatever arrangement they were making, and maybe it was too much of a presumption that they actually did it. Even if they said they did, my understanding is that they had been making transfers of some sort either through Martin, or not -- I'm not sure -- to the foundation since long before I got there.

And -- okay. If that's what you're doing, if that's what you assume is correct, I'm not going to challenge that, because I don't know that to be incorrect.

MR. ALLISON: Okay. I'll introduce

these. We'll do these as the next ones in order here.

THE WITNESS: Can I get some water?

MR. ALLISON: Sure. Why don't we take a real quick five-minute break? We've been going about an hour, maybe a little longer. We'll go off the record.

Mr. Chen, it will be about five minutes.

(Whereupon, a recess was taken from 10:29 a.m. to 10:32 a.m.)

MR. MIYOSHI: Philip Miyoshi on behalf of Defendant Tiffany Lam.

MR. ALLISON: And, Scott, are you there? Scott Kubota?

Well, I can just let you know.

THE MODERATOR: Mr. Scott, can you hear us?

MR. ALLISON: Maybe Scott got up for a second. But I'll represent on the record -- Scott can confirm later -- that he represents Kahele Lum Kee -- defendant Lum Kee.

**Q (BY MR. ALLISON) Okay. Mr. Chen, are you ready to continue, still under oath?**

A Yes.

**Q Okay. You have Exhibit 6 and 7 there in**

**front of you. These are the checks I was referencing earlier. You can take a look at the first few pages to see those checks, but really, what I'd like you to do is pass the checks to the Merrill Lynch statements, and I would just like you to confirm, if you can, that these are statements showing that the money is coming from the Mickey and Marty Kao Foundation.**

A Okay.

(Whereupon, Plaintiff's Exhibit Nos. 6 and 7 were marked for identification by the deposition officer and are attached hereto.)

**Q (BY MR. ALLISON) Okay. And it looks like it's listed as "loan advance" on the second page of that statement.**

A Okay.

**Q Do you see that? $17,700 loan advance?**

A What page are we on?

**Q It's the fourth page.**

A Okay.

**Q And did you have an understanding that it was a loan to you, and you would repay those tuition amounts?**

A Nope. I don't know -- they never said it

was a loan. It was an outright scholarship. You're free and clear.

**Q Okay. You can put that one down.**

A And so who is this loan to?

**Q Let's look at document 7 now, Mr. Chen. It's the next one.**

MR. KOBAYASHI: Where is that? I'm sorry.

MR. ALLISON: I had handed it out earlier. It has the check that's dated 8-16-19 on the first page.

**Q (BY MR. ALLISON) So what I would like you to do is flip to the third page, Mr. Chen.**

A Okay.

**Q And it looks like here is a check from Navatek, LLC, general account made out to Marty and Mickey Foundation in the amount of $20,000.**

**Is that correct?**

A That's what it seems like. Yup.

**Q Okay. And then if we flip the page, there's an e-mail from Kahele Lum Kee, and you're copied on it, but it's to Susan Matsuura.**

**Do you see that?**

A Okay. Yeah.

**Q And Kahele, he was the controller that**

**you referenced earlier?**

A Correct.

**Q Okay. And Kahele's saying:**

**"Can we grab another 20k from the Schwabb account and transfer it to the main account, then in the main account, write a check to the Mickey and Marty Foundation for 20k?"**

**Correct?**

A Correct.

**Q And based on these e-mails that you were copied on, you agree that it's pretty clear that the money going -- at least in this instance -- the Mickey and Marty Kao Foundation is directly from the company; correct?**

A The Schwab account. I'm sorry.

What's the Schwab account?

**Q I'm just reading what the e-mail says that you were copied on.**

A Right. So I'm not sure what the Schwab account is off the top of my head. So if I said, "Hey, the Schwab account is owned by you, the split in the company account and pull it out, then technically came from the Schwab account; right?

I don't know that that's what it is. It is company money for sure.

Secondly --

**Q Mr. Chen, do you think that Kahele Lum Kee would e-mail Susan Matsuura and copy you as the CFO of Navatek and do it on Navatek e-mail, asking for money to be transferred from --**

A I don't --

**Q -- from the Schwab account to the main account?**

MR. KOBAYASHI: Objection. Argumentative.

**Q (BY MR. ALLISON) That was your testimony. You were just saying --**

A No --

MR. KOBAYASHI: Argumentative.

THE WITNESS: I don't -- I can't testify to say that, "Yes, you are correct," when I don't know what that is.

**Q (BY MR. ALLISON) Okay. Let's flip the page here.**

A And, furthermore, whether or not it came from an account, in my mind, is not necessarily definitive of whether it was company money. Because just like me saying if I got a dividend from Apple

that I didn't just put into for some other purpose -- well, that's Apple money? No, that's my money.

**Q It's your money because it gets paid to you, and you get possession of that money before you redirect it somewhere else; correct? But that's what you just said; correct?**

A No. But whether I say, "Hey, Apple. Instead of giving me that dividend, can you just donate it over there?" Well, it's still my donation. It's my donation. I made the decision to do that.

**Q And you know that's something Apple does with its dividends?**

A No. I'm just saying for whatever reason. So let's say I got -- I loaned somebody in this room money. Instead of paying me back, just put that money over there.

**Q So that's your --**

A So I don't know for a fact that it's company money. There's a big difference between saying, "Yes, I definitively know it's company money," to, "Hey, what actually happened in the accounting ultimately"; right?

"Did that -- did that set of funds get considered a distribution to Martin that just directly went somewhere else?" Versus, "No, we

didn't say that was a distribution. The company really made a donation somewhere." Right?

**Q Okay.**

A I can't speak to that.

**Q So it's your testimony that upon receiving this e-mail from Kahele Lum Kee, describing these transfers from one account to another, and then eventually to the Mickey and Marty Kao Foundation, it's your testimony that there was a substantial question in your mind where this money was coming from and whether or not it was coming --**

A No, I'll answer the question right now. When the e-mail came out, I probably barely even read it.

**Q Okay.**

A This is not my concern, I'm moving on; right? As soon as I read "the foundation," I'm out of it.

**Q And then if you could just flip the page one more time. Confirm there's a $20,000 check here from the company's general account to Mickey --**

A I'm sorry. Where am I --

**Q The next page.**

A This is 4 -- page 4? It's this one?

**Q Yeah.**

A What am I looking at?

**Q Just confirm that this is, in fact, the check, if you understood, that the check was referenced in the prior e-mail from the company to Marty and Mickey Foundation.**

A Well, I never laid eyes physically on the check, and this is the first time I'm seeing it, but according to what I see here -- okay. Yeah. It seems to make sense.

**Q Okay. And if you could flip to the second-to-last page. Here's another check. This one for $40,000 from Navatek general account to Marty and Mickey Foundation; correct?**

A That's what it says.

**Q And up above, there's a note there -- a handwritten note -- that says "donation." It doesn't say that it's a distribution to Martin that's rerouted to the Marty and Mickey Foundation.**

A Yeah, that's what it says. I can't testify one way or the other.

**Q It's also your testimony that, as CFO, it wasn't your responsibility, you weren't generally aware of the company's use of money in this regard?**

A That if the company -- if Martin, who is the sole manager the company, wants to make a

contribution somewhere -- okay.

And as far as I know, that organization has been legally formed and operates legally -- okay. I'm not going to sit there and dig in too far into that because ultimately, not an important issue for the operation of the company.

**Q Did you pay taxes on the nearly $91,000 you received in tuition payments from Mickey and Marty Kao Foundation?**

A I don't believe so because my understanding from what they were telling me, it was a scholarship. So --

**Q Did you discuss it with your personal CPA?**

A I don't have a personal CPA.

**Q Did you do anything to look into whether or not that was taxable income for yourself?**

A No. I took it on their word. I used TurboTax. I'm not a complicated guy.

**Q Earlier you testified that Martin was becoming -- and these are your words -- "more and more unstable." Correct?**

A Yes.

**Q During what period did you first notice Martin becoming unstable?**

A I'm not sure when the first e-mail came out when he was ranting and raving about remote work or something. Where even our H.R. manager, she was concerned. And also I think it was February sometime.

**Q Of 2020?**

A Of 2020, yeah. The second year. Beginning of the second year, where there was a weekend call with Martin and the senior members of the team.

**Q Who were "they?"**

A I can't recall the names. I'm sorry.

**Q Any names? Can you recall any names?**

A Honestly, I don't remember any other names. I mean, I hadn't seen them in five years; right?

**Q Sure.**

A Where there was a discussion about Jeff.

**Q Jeff Fitch?**

A Jeff Fitch. Jeff Fitch -- Martin's best friend at the company, his, you know, his guy; right?

And on that discussion, what I took away from that is there was a directive by Martin that Jeff should be fired. Not because Martin necessarily wanted Jeff to be fired -- and I'm not even sure what

the real rationale was, and I had to kind of rationalize it for myself -- but at that point in time, you know, ostensibly, Jeff reported to me.

So I'm not sure why Martin necessarily wanted Jeff fired. But in the end, all right, I'm not here to say that Jeff can't be fired, because certainly he can. It's within Martin's prerogative to do so, but ultimately I took that as an understanding that I needed to fire Jeff.

**Q And did you?**

A I did. Right.

**Q Under Martin's direction?**

A Under Martin's direction.

**Q Despite not knowing why you were firing him?**

A That -- there was a lot of internal friction between Jeff and some of the other senior managers. And my understanding was, you know, Jeff was in their business too much.

**Q And which senior managers, if you recall?**

A Once again, I don't have names.

**Q Okay. Was Kahele Lum Kee one of them?**

A No. Kahele liked Jeff. Kahele was there at the lunch where we fired Jeff. You know, I liked Jeff. But it just -- it boggled my mind.

This is a guy who basically runs the place like an autocracy, somehow agreeing with other senior managers, who he disparaged often, to firing his best friend; right? I just didn't get in, but once again, not my company; right, not my decision.

**Q Does that impart onto you a suspicion, or fear, or risk that Martin could turn onto you and fire you?**

A Oh, absolutely. He, like -- he promoted -- what's that guy? Troy. I can't remember his last name. But he promoted that guy to be chief operating officer, and I believe also offering him a scholarship, by the way. And within the span of -- I don't know -- two or three months, he wanted him fired and replaced; right? Martin was very mercurial.

**Q And was part of your fear or the risk that you felt in this respect born out of a fear that if you didn't fall in line and do what Martin wanted, that could be the thing that could get him to turn on you?**

A Let's just say I was very cautious about how I communicated with him.

**Q And you had strong incentives to be cautious in how you communicated with him because**

**very soon after, your pay would increase to $400,000; correct?**

MR. KOBAYASHI: Objection. Argumentative. Vague and ambiguous.

THE WITNESS: I was never that concerned with the $400,000 or the $300,000. The only pay raise that I ever pushed for was the one we had discussed at the very beginning. That, "Hey, I wanted 250, let's do 250."

Okay. Three months later, we go 250, or four months later -- whatever that was. Every other one was Martin just coming to me, "Hey, I'm going to give a raise to X, Y, Z, and you too." Okay. Sure. Why not?

**Q And that resulted in -- eventually, in a pay raise to an annual base pay of $400,000; correct?**

A Apparently.

**Q Plus $91,000 in children's tuition during 2020; correct?**

A Apparently.

**Q So there was a moment in time where, if you take the $91,000 and the $400,000, it's nearly a half a million dollars?**

A But that's an annualized number that never came to be.

**Q You never received a base pay of $400,000? You never received either monthly or bimonthly paychecks?**

A That's what I'm saying; right? If he raises your pay to 400, or 250 percent, or 300, whatever number; right? That's only as good until the next paycheck. And my concern is less for the amount of money than just remaining employed during that period; right?

I didn't quit after Martin got arrested, and we all imposed pay cuts on ourselves back to 100 -- whatever it was; right? I stayed on. It's not the money -- the lack of money that kept me on or off; it's trying to help the company move forward.

**Q Okay. I want to ask you about the criminal case in Washington, D.C., that you mentioned earlier. You testified earlier that you pled guilty to a single count, and I think which you mentioned was that it was acting as a conduit in making --**

A I believe that's what it was.

**Q Let me finish the question. Acting as a conduit for making illegal political campaign contributions; correct?**

A I believe that's what it was. I don't know the legality, or the term, or whatever.

**Q Okay. And this specific campaign contributions that were at issue were made with a company -- were made with a credit card that was paid by the company's bank account; correct?**
A At Martin's direction, yes.
**Q So it was company money that was being used?**
A As far as I know, yes.
**Q Okay. And were you aware at the time of what the laws or rules were with respect to a company such as Martin Defense Group or Navatek making political contributions?**
A I mean, I never worked for a government contractor before.
**Q So you just didn't have any knowledge of what the law was?**
A That was actually my first campaign contribution in my life.
**Q Okay. And similarly, I'm curious if at this same period of time -- let's call it roughly April 2020 -- did you have awareness of whether it was legal or illegal for a company working in government contracting to obtain PPP loans?**
A I did not know it was illegal because I don't think -- I still don't think it's illegal. You

can obtain a PPP loan. I think at this point in time, with the evolution of the regulations over time -- and I could be wrong now because I haven't kept up with it -- but I believe the question is whether they can get forgiveness on those loans.

**Q Okay. Part of the indictment in that Washington, D.C., case in which you were a defendant involved The Society of Young Women Scientists and Engineers LLC; is that correct?**

A I believe so.

**Q Okay. And what is your understanding as to what -- I'm just going to call it "The Society" -- what's your understanding, as you sit here today, as to what is The Society?**

A I was told by Martin that The Society was an organization that would be supporting the education for women in the engineering arts, that would provide good optics for the company, even though it's outside of the company, among the various constituents that the company worked with.

**Q And that's your understanding today, or that's your understanding at some point in the past?**

A At some point in the past.

**Q When in the past was that your understanding?**

A When it first came up in -- I don't know -- was there like a -- some kind of watchdog group that shed light on this?

Once again, this was not something -- this was outside the company that I really didn't bother to look into that much because one place again that's an not really that important to what I was doing -- that that was the stated purpose according to Martin. I don't know, ultimately, the evolution from that to whatever it is in terms -- as described in the indictment. I don't know.

**Q Okay. And what's your understanding today, as you sit here today, of what is The Society?**

A The claim is that it was -- I don't know. For a lack of a better term on my part, I don't know -- a window dressing maybe on whatever Martin wanted to do with respect to influence politicians he was working with.

**Q The complaint that you referenced earlier, was that the complaint filed with the Federal Elections Committee in early February 2020?**

A I think so.

**Q Okay. So as of that time, who did you understand were The Society's employees?**

A Tiffany.

**Q Only Tiffany?**

A As far as I knew, she was the manager. I don't know if they had employees, but I believe they were getting assistance from their -- their personal assistant, Lori?

**Q Lori Bofman?**

A Lori Bofman.

**Q Okay. You mentioned she's a personal assistant --**

A Who was also on the payroll of Navatek.

**Q Okay. So Lori Bofman was an employee of Navatek at or around that time -- February '22?**

A But also handled the family's business, whether it be shopping errand or whether she would handle it.

**Q Did Lori Bofman have any qualifications sufficient to allowed her to manage or run a business, as far as you know?**

A Did she run a business? I don't know.

**Q Well, I'm asking you the question.**

A I have no idea what her qualifications were other than she had "been with the family a long time," and they trusted her.

**Q What were Ms. Bofman's job responsibilities or duties at the company?**

**What did she do?**

A Errands for Martin.

**Q Did she manage any employees? Or was she the direct report for any employees?**

A I think just to Martin. Like, the only thing I recall her actually doing that I knew of certainly for the company was, you know, go to Sam's Club and fill the stockroom -- the snack room. But, you know, I don't know for certain what her other jobs were.

**Q Did she oversee any business projects or accounts or clients for the company?**

A Well, the clients being the federal government? No.

**Q Did she manage any divisions or employees, or contribute to the company's business, or work in any other ways you haven't mentioned so far?**

A I don't have knowledge of that. I don't know.

**Q But she -- was it your understandings in or around the February 2020 time frame that Ms. Bofman was an employee of The Society?**

A I didn't know that she was being paid by The Society. Whether she had an official position or

whether she was just helping Tiffany, or Martin, or whomever made the decisions.

**Q So it could have been she was an employee of the company, making a salary from the company, but Martin was redirecting her to do tasks for The Society?**

A I can't sit here and make the claim that she was doing it on company time because she was essentially Martin's personal assistant --

**Q Okay.**

A -- right? From a person standpoint, I don't know.

**Q So same question for you: Were you executing tasks on behalf of The Society during that time frame?**

A I was actively trying not to.

**Q But that was not the answer to my question. My question is did you?**

A I don't think I did.

**Q Okay.**

A Because I was actively trying not to.

**Q Did you send e-mails to further The Society's objectives and goals?**

A I don't recall, but I do know that one my objectives, because of various calls I was fortunate

to sit in on with counsel, that the company could not be directly related to The Society.

**Q And what does it mean to be directly related to The Society?**

A Being operated, being run by; that's kind of roughly what I understand.

**Q Okay. Did you send any e-mails that would have constituted operating or helping to run The Society?**

A I don't recall sending any e-mails, but I do know I did send an e-mail saying people should be very cautious about how they interact with The Society. That representations should not be made that The Society and the company are one and the same.

This cannot -- if you do any work for The Society, it's not company time. You're not operating as a company employee. This is not something that the company wants to actively validate.

I know it's difficult because essentially from what I understood, The Society is a personal, I guess, activity of Tiffany and her husband.

**Q Okay. I want to -- sorry to do this to you, Mr. Chen. I just want to go back to the tuition issue for just a second. And we'll come back to**

**The Society here in one moment. Sorry to switch streams on you. This one is very important.**

MR. ALLISON: Next exhibit in order, please.

**Q (BY MR. ALLISON) Okay. So earlier we were talking about where the money for the Mickey and Marty Kao Foundation came from. And it was your testimony that that money was disbursements to Martin that were being rerouted to the Marty and Mickey Kao Foundation; correct?**

A I said I don't know how that necessarily was treated.

But it says here --

(Whereupon, Plaintiff's Exhibit No. 8 was marked for identification by the deposition officer and is attached hereto.)

**Q (BY MR. ALLISON) Okay. So what I want to ask you about here is this e-mail that you sent to Mike O'Malley on May 7, 2019. And in it, you say:**

**"Mike, Martin wants to proceed with the loans from Navatek LLC to each of his** foundations (Navatek Foundation and the Marty and Mickey

Foundation.) I presume you have simple forms that we can use to document the loans."

So this is what it says on its face. You're directing the company's attorney, Michael O'Malley; correct? He's the company's attorney?

A Yes.

**Q And you're directing the company attorney to create paperwork to document transactions that will be loans from the company -- that's Navatek LLC to, among others, the Marty and Mickey Kao Foundation; accurate?**

A That's what it says.

**Q Okay. And did those loans occur?**

A I don't know. I don't recall.

**Q You don't recall what happened after these communications?**

A It's out of my hands at this point.

**Q As the CFO, it would have been under your job duties and responsibilities to direct the company to make these loans; correct?**

A If it were not for Martin deciding that this was to happen, then he's the only one that matters.

**Q So, Mr. Chen, it sounds like your**

**testimony so far has been a lot of -- it's consisted a lot of -- Martin told you to do things, and you just did them. Is that correct?**

MR. KOBAYASHI: Objection. Argumentative to the extent questions were asked, and they were answered.

**Q (BY MR. ALLISON) So in this instance -- let's take this instance: It's your testimony that Martin directed you to cause these loans to occur, to send this communication to begin the process of causing these loans to occur; correct?**

A To get the ball rolling, yes.

**Q And then you went and sent the e-mail, and did that in response?**

A Sure.

**Q As CFO of the company, did you ever do any independent thought or analysis about whether this was a proper use of the company's money?**

A I don't understand your question, or how that would have happened, or why.

**Q Earlier you testified that as the CFO, you were an executive of the company, and you owed the company fiduciary duties. Do you recall that?**

A Yes.

**Q Okay. One of those fiduciary duties is**

**the duty of care. Do you remember saying that?**

A Sure. For things that I was responsible for.

**Q And as the CFO, isn't one of things you're responsibile for is the company's money with respect to these loans that you're causing the company to potentially originate?**

A Only insofar as it impacted the ability of the company to continue operations without being handicapped.

**Q I see. So it's your testimony that if Martin directs you to do something with the company money, you're totally absolved of fiduciary obligations?**

MR. KOBAYASHI: Objection. Argumentative.

THE WITNESS: No, that's extreme. Because if you said, "Hey, Cliff. Go to the bank, empty the accounts, put it in a pile on the floor and burn it," then, yeah, I'd probably question that. But with respect to what ostensibly is a legally existing foundation with an actual purpose to promote education, he can legally direct the company to make a donation or make a loan. There's no issue there.

Unless you go in with foreknowledge that,

"Oh, yeah. There's some nefarious stuff going on," then there's no question here. Because at this point, it's May of 2019. I've been at the company barely over four months. I had no reason at that point to question anything of what he did just on its face. It's perfectly innocent.

**Q When that same foundation wrote checks nearly $91,000 to pay for your children's tuition in 2020, did that trigger in your mind any thought that perhaps these loans to the Mickey and Marty Kao Foundation of company money was not proper?**

A No, it did not.

**Q So even still at that point, when you received $91,000 in tuition payments for your three children, it was your thought and your belief that all of this was being done lawfully, and proper, and not in any breach to the company?**

A That it's being done with counsel in the background.

**Q Okay.**

A That why would there be a reason otherwise? If there is the appearance, on its face, of actions that are not illegal, that are within the power of the sole manager of the company to decide, and with a program, ultimately, in my mind,

understanding was vetted by counsel, I'm not going to stand in the way and reinvent the wheel here.

**Q Okay. If that's your testimony.**

**We're going to look at the next document in order. We're marking this as Exhibit 12 (sic).**

**These are e-mails, Mr. Chen, that you're not copied on, but I want to ask you about the e-mail at the very bottom. It's an e-mail from Mkao@navatek llc.com. I understand that to be Martin's e-mail address and an e-mail from Martin Kao.**

**Is that your understanding?**

A I'm sorry. Say that again.

(Whereupon, Plaintiff's Exhibit No. 9 was marked for identification by the deposition officer and is attached hereto.)

**Q (BY MR. ALLISON) The e-mail at the bottom from MKao@navatekllc.com, do you understand that to be an e-mail from Martin Kao?**

A Oh, I'm sorry, here. Martin Kao wrote -- okay. So I understand this to be an e-mail from Martin.

**Q Do you know who Scott Reed is -- the person who's receiving this e-mail?**

A Sounds familiar. I don't know right now who that is.

**Q Okay. I'll represent to you -- or I'll tell you my understanding -- that he was someone who was affiliated or represented 1820 PAC?**

A So he's an attorney?

**Q I don't know that. But 1820 PAC was the entity that received $150,000 from The Society. A campaign contribution that I'm sure you're aware of.**

**Are you aware of that one?**

A That Martin caused or directed some contributions to be made to the 1820 PAC? Yes, I'm aware now of that.

**Q So Martin in his e-mail says here -- at the top of his e-mail:**

**"Had a chance to discuss 1820 with my CFO and attorney last night."**

**Is it your understanding that he's referring to you as the CFO?**

A I think he is, but we never had that conversation.

**Q Do you also think he's referring to you as the attorney as well?**

A No.

**Q Did Martin regularly refer to you in the business context as "his CFO" or "the company's CFO"?**

A Yes.

**Q So this would have been a standard way for him to reference you in an e-mail?**

A Yes.

**Q And you're saying that he discussed 1820 with you, with the CFO -- with you -- sometime before November 22, 2019?**

**That's what Martin is saying; correct?**

A That's what he's saying.

**Q And you're saying that Martin is basically lying in this e-mail. That's not true?**

A We didn't have that conversation that -- one of the reasons why he gave me the title of CFO is he thought the outward appearances would be better -- would be more influential. There's no gravitas to it. So he would throw around, "Yeah, I got a CFO" all the time.

**Q Are you implying that you either didn't want or shouldn't have had the title of CFO?**

A No. There's different functions and different types of CFO; right? That not every CFO is the bean-counting CPA. Some CFOs are more strategic that think bigger picture, and they don't work with

the other side as much because they don't have that expertise.

Now, in this particular case, Martin liked to work in the gray areas.

**Q Hang on, Mr. Chen.**

**So is it your testimony that you didn't have the expertise to be a chief financial officer?**

A No. I don't have expertise to be a CPA.

**Q Okay. And did that, in your mind, prevent you from being qualified to fulfill the obligations of a CFO?**

A No.

**Q To fulfill the obligations of a CFO?**

A It's not -- it is not a universal requisite to be a CPA to be CFO. There are numerous examples out there of individuals who are not.

**Q Can you name one right now?**

A Yeah. One would be the former CFO of M&I Bank in Michigan that got bought out in -- let's see -- 2007, I think. He was an investment banker.

**Q So at the bottom of Martin's e-mail, he has a paragraph there that starts, "In my personal" -- and I'll read it:**

**"In my personal real estate investments, we often use**

**LLCs that can be set up to 'facilitate' transactions."**

**And the word "facilitate" is in quotation marks:**

**"They are super vague and very difficult to get any background info on. Totally legal and typically used in real estate transactions to conceal the identity of the buyer and seller."**

A Okay.

**Q Did Martin ever discuss with you that the purpose of setting up The Society was to obscure the identity of who was behind The Society?**

A He did mention that one of the things he was concerned about was having his personal name or the name of his company directly on it. And that if he did that, he tended to find people coming out with their hands out of the woodwork.

And so to the extent that he was "concealing" anything by putting his wife as manager, referencing an engineering in the name, and being based in Hawaii, there's not a whole lot of people you're going to come up with, or places are going to

come up with to say that he's really trying to hide too much of anything.

**Q As you sit here today, not at the time this e-mail was sent, but as you sit here today, do you agree that the donation of $150,000 to 1820 PAC by The Society using company money was an illegal campaign donation?**

MR. KOBAYASHI: Objection. Argumentative. Calls for a legal conclusion. Lacks foundation.

THE WITNESS: Once again, I don't know that I can say that because I don't know that it really was considered company money.

If it was considered, say, for instance, a distribution to the members of the LLC, and that member decided to put it into, or direct it to The Society, then okay. That's something his family can choose to do. I don't know that it did or didn't happen. So I can't say one way or the other if your statement is correct.

**Q And anytime company money is being taken from the company accounts -- be it by check, or transfer, or any other method -- anytime money is transferred from the company accounts to some other person or third party, you can always say that;**

**right?**

**You could always say that, "Oh, that was a transfer to Martin that he just didn't take personally, and he forwarded it or redirected it to another source -- foundation."**

MR. KOBAYASHI: Objection. Argumentative. Lacks foundation. Calls for speculation.

**Q (BY MR. ALLISON) Isn't that correct?**

A You could, potentially.

**Q And anytime I ask you a question about the use of the company's money, you're going to say that same --**

MR. KOBAYASHI: Objection. Argumentative.

THE WITNESS: I don't know that --

MR. KOBAYASHI: Badgering the witness.

**Q (BY MR. ALLISON) Okay. But that's your testimony --**

A Like I said, I don't know. I can't make that definitive statement you're asking me to make.

**Q Right. And as CFO, it wasn't your responsibility or job duty to know those things?**

A Not as the way my job was set up, no.

**Q Okay.**

MR. FUJICHAKU: Just for the record, what number exhibit was that e-mail?

MR. KOBAYASHI: I have 9.

MR. ALLISON: 12. We're on 12.

MR. KOBAYASHI: 12?

THE WITNESS: It's 12. They scratched out 9.

THE DEPOSITION OFFICER: Were you trying to go in order?

MR. ALLISON: Yeah, I was going in order.

THE DEPOSITION OFFICER: Okay. Then it should be 9.

MR. ALLISON: Sorry. I might have said 12 because that's my own internal number. I apologize. Sorry about that, Rex.

We'll go next document in order.

(Whereupon, Plaintiff's Exhibit No. 10 was marked for identification by the deposition officer and is attached hereto.)

**Q (BY MR. ALLISON) Okay. So, Mr. Chen, if you could take a look at this document. It's two pages. It -- the second page is a check from Navatek LLC general account for $150,000, dated December 26, 2019, Society of Young Women Scientists and**

**Engineers.**

**And I want to ask you to confirm this is company money being transferred to The Society of Young Women Scientists and Engineers?**

A It is a company check to The Society of Young Women Scientists and Engineers.

**Q But as with other prior topics, is it correct that it's your testimony that simply can't say if this is company's money or somebody else's money that is being redirected for this purpose?**

A Right. I'm not sure what the accounting looks like.

**Q Okay. I'm going to ask you about -- we'll go next document in order.**

**Mr. Chen, do you recognize this document?**

A It says complaint to the FEC.

(Whereupon, Plaintiff's Exhibit No. 11 was marked for identification by the deposition officer and is attached hereto.)

**Q And is this the complaint that you previously mentioned?**

A That I referenced from an article that referenced it, yeah.

**Q Okay. When did you first become aware of**

this complaint?
A When there was an article about it.
Q If you flip to -- it's about the third or fourth to final page -- there are some dates. I think there's going to be a couple of dated pages. The dates are all generally February 3rd.
A I'm sorry. What number?
Q So if you look at --
A Okay. That?
Q Yeah. And the page right before it is the signature page.
A Okay. Yup.
Q They're both dated February 3, 2020, the signature page and the verification notary page.
So given that this complaint is dated February 3, 2020, the article that you read, in which you first learned about the complaint, would it have been relatively close to the February 3, 2020, date?
A It's likely. Yeah.
Q Is it fair to say that you became aware of this complaint, if not immediately, upon it being filed pretty soon thereafter?
A Soon, yeah. Sure.
Q Okay. And what about Martin Kao?
Do you know if he was also similarly

**aware of this complaint in the same time frame?**
**Did you discuss it with him?**
A I didn't discuss the complaint. We had the article passed around. And I forget who was that guy -- the other guy -- I can't remember his name -- but his -- he was a former journalist. I believe he was Steven Loui's brother-in-law, who sort of did PR for the company or something like that.
He got called in, I got called in, and we were -- Martin wanted to discuss the fallout of that article with us.
**Q What specifically about the fallout was Martin concerned with?**
A Well, you know, it's claiming that he committed a crime essentially; right?
**Q So upon reading that article and having a discussion with Martin and this other employee -- you can't remember his name -- was his name Michael Schmicker?**
A Yes, that's it.
**Q Okay. So upon reading the article that you referenced and having a discussion with Michael Schmicker and Martin Kao, you knew at that time, as did Martin, that Martin was being accused of committing a crime; correct?**

A Correct.
**Q Okay. Did -- to you knowledge, did Kahele Lum Kee participate in those conversations?**
A I don't recall.
**Q Were there e-mails on this subject?**
A Yeah, there were probably e-mails. Yeah.
**Q Were you copied -- or did you participate in those e-mails?**
A I think I participated in some of them.
**Q Along with Martin Kao?**
A Yes, and Michael.
**Q How about Kahele?**
A Maybe Kahele was on it. I don't recall.
**Q What about Duke Hartman?**
A Maybe. I don't recall.
**Q Okay. Have you ever read this FEC complaint?**
A No. That's for the article.
**Q Do you have an understanding that the eventual crimes that you were indicted on in Washington, D.C., Federal Court arose or related to this FEC complaint in any way?**
A I guess that's logic to conclude.
**Q I already asked you about what Martin's initial reaction to learning about the complaint was.**

**If you recall or know, what was Kahele Lum Kee's initial reaction?**

A I don't recall. I mean, he's generally too busy with accounting for the company to be concerned with this.

MR. ALLISON: Okay. I'm going to introduce the next exhibit in order.

**Q (BY MR. ALLISON) And this is a long e-mail chain, Mr. Chen. I'm going to start at the beginning, which is the back of the packet.**

A What page?

(Whereupon, Plaintiff's Exhibit No. 12 was marked for identification by the deposition officer and is attached hereto.)

**Q (BY MR. ALLISON) We're looking at the page marked 13 at the bottom.**

A 13. Okay. Martin's e-mail?

**Q Yeah. And this is an e-mail from Martin to somebody named Cleta Mitchell?**

A Yes.

**Q Dated February 5, 2020?**

A Lawyer -- yup.

**Q And February 5, 2020, that's just three days -- or two days -- excuse me -- after that**

February 3, 2020, date on the FEC complaint; correct?
A Yup.
Q So this is immediately following the complaint; correct?
A Very soon after, yes.
Q And you said the word "lawyer" a second ago. Was that in reference to Cleta Mitchell?
A Cleta Mitchell is an attorney. That's correct.
Q Who did you understand, upon receiving this e-mail, that Cleta Mitchell represented?
A I didn't. I just knew she was an attorney in D.C.
Q Okay. And Andy Winer is also copied; correct?
A He's a consultant, I believe.
Q And what was Andy Winer's relationship to you and Cleta Mitchell in this e-mail chain?
A I believe he's a lobbyist. I'm not sure -- or something. I'm not sure.
Q Was he engaged by the company to work on the company's behalf?
A I think so. That name is familiar.
Q Okay. So of the four participants here -- Andy Winer, Martin Kao, yourself -- you're

**all under the company's umbrella and Cleta Mitchell is not; correct?**

A Meaning that Cleta Mitchell is an employee of Foley & Lardner, I guess -- Foley -- whatever the --

**Q Well, she doesn't -- well, let me ask you the question this way: Was Cleta Mitchell the company's employee?**

A She was not a company employee. No.

**Q Was Cleta Mitchell the company's attorney?**

A I don't know for certain. I assumed as much, but I don't know for certain.

**Q Okay. And Martin here in this e-mail says that he spoke with Scott Reed today.**

**You testified earlier, you don't really know who Scott Reed is; correct?**

A I don't recall who he is.

**Q Okay. I'll represent to you that he's a representative or an employee of the 1820 PAC -- the entity that received the $150,000 of company money through The Society.**

A All right.

**Q Did Martin tell you what he spoke to Scott Reed about that day?**

A If he did, I don't remember what it was.

**Q Did he tell you why he was trying to schedule a call with Cleta Mitchell?**

A I assume it was because of the complaint.

**Q And was that your understanding at the time?**

A That Cleta Mitchell, to my knowledge, was an experienced attorney in Washington, D.C., who should be able to help us with something like this.

**Q And you understood that at the time -- February 5, 2020?**

A That was my understanding at the time.

**Q Okay. And if we flip over one page, we'll look at the next e-mail --**

A To 12?

**Q -- marked 12 at the bottom. Cleta Mitchell responds -- and you're still copied -- and she's scheduling the call with Martin; correct?**

A Yes, it looks like it.

**Q If you know, did that phone call between Cleta and Martin happen?**

A I do recall that at some point in time, I did hear Cleta's voice on the speakerphone.

**Q Okay. So you participated in the call with Martin and Cleta?**

A I don't know that I participated in every call, but I do recall hearing her voice.
**Q And it would have been at or around this time frame -- February 5, 2020?**
A Should have been or, you know, this one's from February 14th --
**Q Somewhere in the early mid-February time frame?**
A That's fair.
**Q Okay. And what did Cleta and Martin discuss while you were in the room on the speakerphone?**
A To discuss this -- this issue that he had that this claim, what Martin was doing was illegal.
**Q Is it fair to say, if you know, that it was widely known at the company at this time that there were concerns with what Martin had done with respect to The Society and the $150,000 donation that that was illegal?**
A I think there was a concern -- yeah, the complaint. So that's certainly logical to assume.
**Q If you know, based on your conversations and experiences, did Kahele Lum Kee share that concern?**
A I don't know because we never -- I don't

believe we spoke about it a lot.
**Q Okay. If you know, based on your communications and experiences, did Duke Hartman share that concern at this time in February 2020?**
A I don't recall speaking to Duke a lot about it. That's why I think Martin, Mike Schnicker, Cleta, and whatever team of attorneys she had on with her.
**Q Okay. We'll move ahead to the next page.**
A Which one?
**Q Let's skip these. Let's go to page 10.**
A Okay.
**Q And I'm looking at the e-mail there from Martin in the middle of the page, but it actually starts on page 9 that's where the header is. And it was sent February 18, 2020, from Martin to Cleta. And once again, you and Andy Winer are copied.**
**Do you see that?**
A Yup, I see that.
**Q And on February 18th, Martin says in the e-mail to Cleta:**
**"At this point, it would seem like this is no longer of relevance, and the best course of action to is to do nothing.**

Please let me know if you think
we should still have a call to
discuss."
If you know, why did Martin -- why did Martin believe or say on this date, February 18, 2020, that this issue was no longer relevant, and that the best course of action was to do nothing?
A I don't recall. I don't know.
Q At that time, did you agree that between February 5th and February 18th that the problem had revolved itself and --
A No, of course.
Q So even though Martin sends this e-mail to Cleta on February 18th, as of February 18th, you still felt there was risk --
A Well, even if --
Q Please let me finish the question, Mr. Chen.
At this time, you still felt there was risk of some kind of investigation or criminal investigation based on the $150,000 donation from The Society using company money?
A It was not my knowledge that the complaint disappeared or went away. It still existed at this time. Did it not?

And so even if it didn't exist, there would still be whatever lingering public relations issues that we would have had to deal with. So I'm not sure exactly what his thought process was when he used this language in this e-mail.

**Q Okay. Let's take a look at the next e-mail on page 9. So this is from Cleta Mitchell to Martin later in that same day, February 18th. And, again, yourself and Mr. Winer are copied; correct?**

A Correct.

**Q Okay. And Cleta says:**

**"I want to be sure that the LLC proceeds with the ideas we discussed -- giving scholarships and recognition to women in engineering, etc. -- as that is going to be an issue at some point. So we should make sure to take necessary steps to protect the entity and YOU" --**

**And the word "you" is all in capitalized letters; correct?**

A It is, yes.

**Q Was that a summary of one of those phone conversations you had in which you were present and**

**on speakerphone?**
A I believe that was part of that discussion, yes.
**Q Okay. And during that phone conversation, who brought up this idea that The Society would give scholarships and recognition to women in engineering?**
A Well, that was the stated purpose that Martin gave.
**Q For The Society?**
A Yes.
**Q And up to that point, to the best of your knowledge, had The Society ever given a single scholarship?**
A I had no idea because I wasn't paying attention to The Society.
**Q Based on phone call that you happened that you listened to and is memorialized in this e-mail, did you understand that The Society had ever given a single scholarship in its history?**
A Well, the history would be very short. There wasn't a lot of time between this phone call and its origin; right?
**Q Okay. Sure. When did you understand The Society was first created or registered?**

A I did not know for certain.
**Q Okay. But you said it was very short.**
A Because we talked about it a while now.
**Q Okay. And did you have that understanding at this time -- February 18, 2020?**
A I understood it to be somewhat recent.
**Q And you knew that in that recent time, The Society -- at least you knew that The Society was alleged to have donated $150,000 to a political action committee; correct?**
A Correct.
**Q So you had that knowledge --**
A At this point.
**Q -- at this point?**
A Yes.
**Q Did you have knowledge that The Society had given a single scholarship to anybody?**
A I don't know, but I don't think so.
**Q So up to that point, as of February 18, 2020, it was your understandings that The Society had given a $150,000 campaign contribution, but you didn't know whether or not if they had given a scholarship?**
A Correct.
**Q But it was your understanding, based on**

**what Martin told you, that the sole purpose of The Society was to give scholarships?**

A Well, I wouldn't say "sole," but that's certainly one of the major purposes, yeah.

**Q Okay. Well, was it your belief at that time that is was the primary function of The Society to give these scholarships to women in engineering?**

A No. Probably without him saying as much, it was currying favor --

**Q And that's --**

A -- within the optics of giving scholarships.

**Q And that's what you understood as of February 18, 2020?**

A At that point in time, yeah.

**Q It's fair to say that giving the $150,000 to 1820 PAC, which, by the way, is a PAC that supports Senator Susan Collins. That is an another way to use your words of "currying favor"; correct?**

A That's certainly another way of currying favor.

**Q And Susan Collins was a significant member of US Congress with respect to the company's business; isn't that correct?**

A That's correct.

**Q And why was she a significant member of US Congress in that context?**

A I believe it was her committee possessions as well as the fact that we had two offices in the State of Maine.

**Q And she also had power over certain appropriations that were relevant and important to the company's business; accurate?**

A The committee positions, yes.

**Q As you sit here today, can you give me an idea of the magnitude of funds that she had influence over that the company was interested in obtaining?**

A I don't know. Once again, all that D.C. stuff --

**Q Okay. And then getting back to this e-mail where Cleta Mitchell says that:**

**"We should make sure to take necessary steps to protect the entity and YOU" -- with "you" in all capitalized letters -- "now while we have the time to do that."**

**Who did you understand the entity to be?**

A The Society.

**Q Could the entity have been Navatek?**

MR. KOBAYASHI: Objection. Asked and answered. Calls for speculation.

THE WITNESS: I don't know, but I suppose that could be a reading.

**Q (BY MR. ALLISON) And the "you" in all capitalized letters, who did you understand that to be?**

A I understood that to be Martin.

**Q And the protection that she references that's needed. She says:**

**"Takes the necessary steps to protect the entity and YOU..."**

**What is it that you understood necessitated protection? What was being protected?**

A I would presume it was to protect Martin from having been -- for having committed a crime.

**Q Okay. And so then, she's saying that the way we're going to do that protection, she says:**

**"We should develop a plan and a timetable, so there are some scholarships given over the next several months, and particularly, in Maine, where the bad press was."**

**Correct?**

A To address the PR issues.

**Q So is it your understanding that Cleta Mitchell is proposing that The Society gives scholarships in order to protect Martin from these potential criminal charges?**

A To proceed with that -- his stated goal.

**Q Which to that time, you understood nothing had been done in futherance of --**

A But that was his goal.

**Q But it's correct that nothing had been done?**

A As far as I knew, they hadn't been done yet.

**Q And eventually scholarships were given; correct?**

A Correct.

**Q And so, to the best of your knowledge, those scholarships were only given in the effort to protect the entity and you, using the language in this e-mail to protect the entity and Martin; correct?**

A I don't think that's the only thing because that's the stated goal; that's what needed to be done.

**Q Okay. And I think we discussed this**

**already, but if you can confirm to me, Maine was critical because isn't that the state that Susan Collins is from?**

A Yes.

**Q And is that why the bad press was occurring in Maine?**

A Because it looked bad for Susan.

**Q Okay. And so part of this was to protect the relationship with Senator Collins as well?**

A I believe it was. Yeah.

**Q Okay. Was anything else discussed in that phone call that's memorialized in this e-mail, which you were listening into on the speakerphone?**

A Not that I can recall, but what I didn't hear on that call was that Martin did, in fact, commit a crime.

**Q So Martin didn't admit that he committed a crime during that call; is that what you're saying?**

A And the attorney on the call didn't say that he did. They were laying out a course of action that they believed was lawful; that's what I presumed they were to be doing. They were the experts here.

**Q Okay. If we flip the page here to page 8.**

A Okay.

Q And we have Martin's response to Cleta Mitchell's last e-mail that we were just looking at -- same date, February 8, 2020.
And, again, you and Mr. Winer are both copied; correct?
A Mm-hm.
Q And Martin responds and says:
"Yes. The Society is now actively working with 14 universities (including University of Maine) to give out over 140 scholarships (minimum $1,000 each) to female students in 2020."
Correct?
A That's what it says.
Q Okay. So this confirms that only after receiving Cleta's e-mail, and/or having the phone call with her that is memorialized by the prior e-mail, did The Society work, as Martin says, actively working with the universities to distribute these scholarships; correct?
A That's a little bit too precise.
Q In what way?
A Because it does not confirm that it

started after that statement. I cannot make that confirmation. He's just saying that at that point in time, The Society is active. I don't know when it exactly started to be active, but it is somewhere near and about, given the short history of The Society.

**Q Administratively and procedurally, how did The Society make these scholarships?**

A I do recall Lori being involved, making calls to various university offices.

**Q Were you involved?**

A I never made any calls. No.

**Q Were you involved in the administration of those scholarships?**

A I don't care who gets it. I don't care how it happens. It's not my business.

**Q Were you involved in the administration of The Society's effort to make these scholarships in any way?**

A Other than telling Lori, "Do not say that you're with Navatek because this is not a Navatek thing."

**Q And why was it so important to draw those distinctions between Navatek and The Society?**

A Because of the relationship between

Navatek through Martin and The Society. Ultimately, it could be interpreted as the company making political contributions.

**Q And you understood that at the time in February 2020; correct?**

A After these phone calls, yeah. We can't do that. The company cannot be responsible for this stuff.

**Q And earlier you testified that there was concern, after you read the article, that Martin had committed a crime or would be alleged to have committed a crime; correct?**

**And doesn't that risk of criminal liability or risk of criminal prosecution provide another reason to, as you said, separate The Society from the company because of Martin's connection to both?**

A Sorry. Repeat that question. I'm not sure I follow.

MR. ALLISON: Could you repeat the question, please?

(Whereupon, the requested portion was read back as follows:)

**Q And earlier you testified that there was**

**concern, after you read the article, that Martin had committed a crime or would be alleged to have committed a crime; correct?**

**And doesn't that risk of criminal liability or risk of criminal prosecution provide another reason to, as you said, separate The Society from the company because of Martin's connection to both?"**

THE WITNESS: I think you are saying very similar things. Because that would be a crime to be making the political contribution. I believe that that's the case.

**Q (BY MR. ALLISON) So -- but your testimony is that you believe the $150,000 donation was unlawful?**

A It could be unlawful depending on how it was considered and structured; that's my understanding.

Because my assumption was, if it had been definitively unlawful, I should have heard it from the attorneys on the call -- that this shouldn't have

happened, and this needs to be unwound -- but that is not what I heard, because it's not my expectation to be hearing these high-powered attorneys recommend that we continue and cover up a crime.

**Q Earlier you testified that you had concerns upon learning of the complaint that Martin could be at risk for criminal prosecution; correct?**

A It could be a risk. Yeah.

**Q And he could be at risk for criminal prosecution as a result of the $150,000 donation; correct?**

A Whatever the complaint ultimately said happened, yes. But once again, I'm not the expert.

**Q And is it also correct that separating or obscuring the connection between The Society and Navatek would further assist in protecting Martin?**

A It would assist in protecting the company. Whether it protected Martin was ultimately a secondary benefit. My only concern was for the company.

**Q Okay. But in the e-mail we looked at a moment ago -- Cleta's February 18th e-mail -- which you're copied on and memorializes a phone call you listened in on on speakerphone; correct?**

**Is that correct?**

A Sure. Yes.

**Q Cleta says the goal of this plan is to protect the entity and you. And you testified earlier that "the entity" could be either The Society or the company Navatek; correct?**

A Could be. I can't say for certain.

**Q Is it your understanding that her reference to "the entity" could be anything else other than either The Society or the company?**

A Nothing comes to mind at this point.

**Q And the "YOU" that's in all capitalized letters that needs to be protected, is there anybody other than Martin Kao that you believe or understand that that could reference?**

A No, he's the person to whom the e-mail is addressed.

**Q Okay. So then is accurate to say that this plan that Cleta Mitchell is describing in this e-mail to make the scholarships the women in engineering is a plan designed to protect the company -- excuse me -- the entity, which could be the company or The Society and Martin Kao; correct?**

A Correct. Those things don't have to be mutually exclusive.

**Q And, therefore, it follows that a reason**

**to keep The Society and the company separate or disconnected is to further protect Martin from these risks; correct?**

A That's a reason, but it's not the only reason. I think different parties have different interests. And those interests can be aligned in the same direction. My concern is for the ongoing relationship and visibility of the company moving forward.

**Q Okay. Let's go to the next e-mail. It's on page 7. And this is Cleta Mitchell's response on that same day, February 18, 2020. She sends it to Martin Kao and, once again, you and Mr. Winer are copied. Do you see that?**

A Mm-hm.

**Q And in the e-mail she says:**

**"Keep me posted on the progress and send me information on the scholarships. I will include that in the response to the FEC."**

**So upon receiving that e-mail, did you understand that Cleta Mitchell intended to tell the FEC about The Society's 14 scholarships that Martin had just mentioned in the prior e-mail?**

A That's my assumption at this point, yes.

**Q Was there a phone call in this subject that you participated in?**

A I can't recall. It could have. Maybe, maybe not. But ultimately, I think, on its face, this is pretty clear.

**Q Okay. I want to flip to page 5. Now, we're at February 28, 2020. It's an e-mail from Cleta Mitchell to Martin Kao with yourself and Mr. Winer copied. Do you see that?**

A This one at the bottom here?

**Q That's correct. Okay. So Cleta Mitchell says:**

**"I'm going to be preparing the response to the FEC complaint in the next week -- and I wonder if it is possible for any scholarships to be awarded or other activities taken by the LLC that that gave the contribution to 1820 PAC."**

**Do you see that?**

A Yup.

**Q At the time that you received this e-mail, did you understand that, in that first**

**sentence, Cleta Mitchell was asking for information about The Society's scholarships that it was giving out specifically so that she could provide that to the FEC?**

A Reading this now, that's my understanding.

**Q Was that your understanding at the time?**

A I don't recall that I necessarily even read this e-mail that carefully, but probably.

**Q Reading those words, is there any other understanding that you think you could have arrived at as of February 28, 2020?**

A Give me a second. I'm sorry. Repeat the question again.

**Q My question was simply: Reading these words, is there any other possible understanding you could have of this as of February 28, 2020?**

A I don't understand. Other than what?

**Q Cleta Mitchell's purpose here is to get information about the scholarships being given by The Society specifically to provide it to the FEC.**

A I think that's a fair reading.

**Q And the contribution that she mentions to the 1820 PAC, once again, that's the $150,000 donation made using company money that is the subject**

**of the FEC's complaint?**

A I presume that's the case, yes.

**Q And that was your understanding as of February 2020 when these e-mails were sent and received?**

A Likely.

**Q Okay. She continues:**

**"I would like to be able to point to something that is either public -- or perhaps a letter you could send to me, and which I could attached to the" --**

THE WITNESS: Could we take a short break? I need to use the restroom. If that's all right?

MR. ALLISON: Let's go off the record for just a second.

(Whereupon, a recess was taken from 11:48 a.m. to 11:50 a.m.)

MR. ALLISON: Okay. Okay. Back on the record. You're still under oath, Mr. Chen. You understand that.

THE WITNESS: Okay.

**Q (BY MR. ALLISON) So we were looking at this Cleta Mitchell February 28th e-mail. We had**

just gone through the first sentence. I wanted to ask you about the next sentence. I'll read it out loud. It says, and I'll quote:

"I would like to be able to point to something that is either public -- or perhaps a letter you could send to me, and which I can attach to the response."

So did you understand at the time that she's asking for specific written information about these scholarships that she can then pass to the FEC in response to the $150,000 1820 PAC contribution claims?

A That is a logical conclusion.

Q Okay. Then she says:

"Think about that and let's work on how we can make sure to include other activities of the LLC as part of my response to the Commission."

In the phone calls that you mentioned that you sat in on that involved Cleta Mitchell, and you listened in on speakerphone, were other activities of the LLC ever discussed?

A Probably, but I don't recall what they are.

**Q Okay. So we know that the activities of the LLC so far include: the $150,000 donation to 1820 PAC using company money, and then sometime after February 5, 2020, starting to give -- as Martin said in his e-mail -- perhaps 14 scholarships of a minimum $1,000; correct?**

A I still want to be very careful about saying it was company money because, again, I don't know the accounting for what was behind it. It could have been, but again, it could have been something else. But otherwise, yes, I would agree with that.

**Q Okay. Well, we can agree that we looked at a check earlier showing that the company wrote a check for $150,000 to The Society?**

A That I can agree on. Yes.

**Q Okay. You just don't know whose money was held in the company's account that --**

A Or whether we accounted for it by making it a contribution to Martin, and then Martin doing whatever he wanted with the check.

**Q Are you speculating about that?**

A Like I said, I don't know what it was, that's why I cannot say for certain that was company

money.

**Q I see. So you have no basis to believe or argue that it was anything other than company money --**

A I can't --

**Q -- you just don't know?**

A I just don't know. And I can't tell you what it was.

**Q Okay. And so drawing that out to its logic end, what you don't know is whether the company was holding somebody else's money in its account and drawing that somebody else's money to pay these --**

A Yes, Martin's money.

**Q Okay. Was it typical for Martin to comingle his personal funds in the company account?**

A Unfortunately, very.

**Q And you knew about this at the time as CFO?**

A It was like that when I got there. And so what we were trying to do over time was trying to professionalize the organization.

So one of the things, for instance, we would be doing at the time was to install a new enterprise resource management system, for instance.

**Q Okay. Did you report Martin's**

**commingling of his personal money and company money to anybody?**

A To Kahele. And, like, "What are we doing here? We're keeping track of the accounting. Okay. If you guys are comfortable doing that."

**Q Did you notify Steven Loui or -- and/or Steven Loui's personal attorneys?**

A Why would I do that?

**Q Well, you testified earlier, he was part owner of the company; correct?**

A Yes, but he was also an extreme minority ownership, which I stated in the operating agreement that he had no operating interest, and -- and -- it wasn't clear to me that we actually did have to disclose anything to him.

**Q So --**

A And, furthermore, that's the way the company had been operating prior to Steven's sale of the company to Martin. Steven knew about the stuff or he should have known about it. All those checks that is checked by Susan -- what's her name? Right? That's Steven's employee. We had to go to her to get checks written.

**Q What do you mean that's Steven's employee? She was an employee of the company at the**

**time; correct?**

A Yes, but she was loyal to Steven. Outside his office, she's the one that he had to go through.

**Q Well, what do you mean by "loyal," because I asked you that question earlier with respect to Martin. And your answer was, "I don't know what 'loyal' means." So what is "loyal"?**

A That she protected his interest. So if I were to go to ask a question about certain arrangements that were made, for instance -- we talked about it earlier. I referenced it -- intercompany agreements where extraordinarily large payments were being made to one of Steven's companies for services that should cost a quarter of what they cost. Her response to me was, "Oh, you know what it's for."

**Q Isn't it true that you were similarly loyal to Martin Kao throughout this same time period?**

MR. KOBAYASHI: Objection. Argumentative. Asked and answered.

THE WITNESS: The company is different. But many times, Martin is the company.

**Q (BY MR. ALLISON) So if Martin is the company, and your loyalty is to the company, then**

**your loyalty is also to Martin?**

A But I told him, if he's doing something stupid, then he's doing something stupid. I'll tell him that.

**Q But you don't report any of those stupid things beyond just telling Martin that it's stupid?**

A That he should stop. If I think he's actually doing something wrong. If he's lying to me about it, that's another thing.

**Q And isn't one of the reasons why that was the extent of your reporting was because you were being extremely well compensated?**

**You had a base salary of $400,000, you were receiving $91,000 in tuition payments for your children through Martin's Foundation that he controlled, and you testified earlier that you were afraid of losing your job during COVID because Martin had become unstable.**

**So weren't those the reasons for your loyalty to Mr. Kao?**

A My loyalty can't be bought like that.

**Q Well, it kind of looks like that, Mr. Chen.**

MR. KOBAYASHI: Objection. Argumentative. That's not a question.

You don't need to answer.

THE WITNESS: Did he lie to me about it? Convince me that you're telling the truth, that's one thing, but if I knew for certain.

**Q (BY MR. ALLISON) Back to these e-mails. I was asking you about the other activities referencing Cleta's e-mail here at the bottom of page 5. And we discussed that we know The Society made the $150,000 donation. We know that The Society, at some point after the donation, began making scholarship efforts; correct?**

A Sure, yes. That's what it says.

**Q So other than those two activities, were there any other activities of the LLC that Cleta could have included in her response to the commission?**

A I don't know for certain, but, you know, I think maybe sponsorships of events on campus or, you know, things of that nature.

**Q Did those things happen? And do you have personal knowledge of them, or are you speculating?**

A I'm speculating at this point.

**Q Okay. I'd ask that you don't speculate.**

A Okay.

**Q If you don't know, you can just say, "I**

**don't know."**
A I don't.
**Q Okay. Final line, she says:**
**"That would help both of us,**
**I think."**
**What did you understand her to mean when she said, "that would help both of us"?**
A It would make her job easier.
**Q How would that help Martin Kao, the person she's sending the e-mail to?**
A Well, it's in his interest to follow her directions.
**Q And at that time, February 28, 2020, how did you understand it was in his interest to follow her directions with respect to what she's laying out here in the e-mail?**
A Because she -- to my understanding -- is the presumed expert of what should properly happen, and the implication being: not following her instructions could put Martin, the company, The Society, all in jeopardy.
**Q You testified earlier you have a law degree; correct?**
A I do.
**Q Did you ever practice law?**

A For a very short period of time.
**Q Okay. Based on having a law degree and your short amount of time practicing, do you have an understanding of what the attorney-client relationship is?**
A Somewhat, I suppose. Yeah.
**Q Okay. Did you understand at the time these communications were happening that Cleta Mitchell had an attorney-client relationship with Martin Kao?**
A It wasn't clear to me who her relationship was with.
**Q Okay. Did you understand that she had an attorney-client relationship with the company -- with Navatek/Martin Defense Group?**
A I don't know.
**Q Did you understand that she had an attorney-client relationship with 1820 PAC?**
A I don't know.
**Q Did you understand that she had an attorney-client relationship with you?**
A I don't believe so. That never happened. So --
**Q Okay. If she did have an attorney-client relationship with Martin Kao, do you have**

**understanding that inclusion of Andy Winer and yourself on these e-mails would have broken the confidentiality of the communications?**

A If we -- if she -- you're saying if she had a personal representation of Martin Kao?

Is that what you're saying?

**Q Well, your testimony is that she was an attorney and expert on these matters; correct?**

A Yes.

**Q And your testimony is also that she was giving advice to protect Martin and the company; correct?**

A That's what she's saying, yes.

**Q So your understanding of these communications is that Martin should do what she's suggesting in order to protect himself?**

A And the company and The Society.

**Q So then at the bottom when she says, "That would help both of us, I think," that is what she's getting at: protecting Martin, and the company, and The Society? That's your understanding?**

A That's my reading of it.

**Q Okay. The next e-mail up from Andy Winer on the same day, February 28, 2020, to Martin Kao with yourself copied. Do you see that?**

A Andy Winer's e-mail, yes.

**Q He says he's removing Cleta, and he's suggesting that these e-mails get forwarded to Bill Canfield, and ask him to respond.**

A I don't recall who Bill Canfield is.

**Q Okay. I'll represent to you that Bill Canfield was an attorney, I believe, out of Washington, D.C., who was engaged to represent The Society.**

A Okay.

**Q Does that refresh your recollection?**

A Not really, but I'll take your word for it.

**Q Okay. So flipping the page to page 4. I'm looking at Martin's response from February 28, 2020, to Andy Winer with yourself now carbon copied.**

**Do you see that?**

A Mm-hm.

**Q Okay. So Martin says he's on a plane, and he says:**

**"Yes, please foward to Bill."**

**He says:**

**"Yes, we have already started the process of issuing**

**scholarships and have been in**
**touch with all the universities**
**we are working with."**
**Based on how Martin wrote that sentence, isn't he saying that the efforts to give scholarships to universities have just started?**
**Is that your understanding of that sentence?**
A I wouldn't use the word "just" because I don't see it here. But at some point in time between the beginning and now, yes.
**Q The way he phrased that, did you understand it to mean that The Society had always been giving out scholarships since it started and that was its purpose?**
A No, I don't read that either. So it's just some point in time, but I don't know the proximity in time.
**Q And he says:**
**"Duke can send you the**
**specific list. Working with**
**universities and setting up**
**scholarships is a time-consuming**
**process."**
**He says:**

"The universities move at a
glacial pace. We are doing and
moving as fast as we can."
Do you see that?
A Mm-hm.
Q So what was your understanding at the time of why Duke Hartman was suddenly added to these e-mails?
A Duke was --
MR. FUJICHAKU: Objection. Calls for speculation.
Q (BY MR. ALLISON) If you know?
A My understanding was that Duke was more closely working with the universities and the arrangements that the company had with them.
Q And the specific universities that Duke worked with, those were the ones in districts of members of Congress who sat on the appropriations committees and had oversight ability on contracts and dollar amounts that company sought.
Is that correct?
A That's my understanding.
MR. FUJICHAKU: Objection. Calls for speculation. Assumes facts not in evidence.
Q (BY MR. ALLISON) Was the company's

strategy to target those markets in the districts of those specific members of US Congress that had seats on the appropriations committee?

A I don't think there was ever any stated strategy as such, but sure seems like it was.

Q Did the company open offices in any cities, or states, or areas that were not in the districts of those specific members of US Congress?

A I don't know who those members were then.

Q Okay. I want to flip the page to page 3. At the top of page 3, and I guess it starts on page 2 is where the header is. It's February 28, 2020 -- the same day. And Duke sends Bill an e-mail. He says, "See list below." And there's a list of universities with dollar amounts.

Do you see that?

A Mm-hm.

Q And so was Duke -- was the reason if you understand and know, is the reason Duke was included in this e-mail was because he was the specific person who was going to arrange these relationships between The Society and the universities to make those donations or these scholarships?

MR. FUJICHAKU: Objection. Calls for speculation. Assumes facts not in evidence.

THE WITNESS: I don't want to say the word "arranged." I don't know what his actual roles and his methodology in those -- these relationships was. But I will just have assumed that he was one of the company employees that was closest to the relevant parties at the universities.

**Q (BY MR. ALLISON) Did you work closely with Duke during this time period?**

A Meaning, what?

**Q Did you work with him on any of these initiatives of the company, like giving scholarships?**

MR. FUJICHAKU: Objection. Vague.

MR. KOBAYASHI: Join.

THE WITNESS: I don't think we were actively working together on any of these things. Keeping me generally informed of, you know, where these relationships were like this, would help me determine, okay, maybe we can move a little faster opening this office versus that office, or maybe -- "Oh, because these universities actually are ready to do some engineering work, we might have to expedite the hiring in this region a little more than another region."

**Q (BY MR. ALLISON) Okay. And if you know, this list that was generated here, who created this**

list?
A I don't know. I don't care.
Q So you don't know if it came from Martin or if it came from Duke?
A I don't know, right. It has no bearing on what I need to do after.
Q Okay. We'll flip the page. We're looking at the bottom. It says page 2.
A Bottom of page 2 the -- e-mail?
Q Yes. Please take a look at that e-mail and let me know if that refreshes your recollection on who Bill Canfield is.
A It doesn't, but --
Q Obviously, you agree with Bill Canfield's e-mail, or you did at the time; correct?
A Yeah.
Q Because in the next e-mail, you respond:
"For what it's worth, I completely agree."
Is that your response?
A Yeah.
Q Is there anything in Bill Canfield's e-mail there that you don't agree with?
A I'm okay with most of it, not all of it.
Q So you say, if not all of it, is there

**something specific you don't agree with?**

A That I don't know that it's necessarily ill-advised in the timing. I think it's just a messenger. We should be in control of that.

**Q So it would have been your preference that The Society explain its own scholarship program to the FEC, and not Cleta Mitchell?**

A Right. In terms of the author, we don't know what Cleta is doing completely or what all of her communications are, but, like, if you have the power to have control over a message, generally speaking, that's probably a good idea. But once again, not my call, not my society.

**Q Okay. And then we'll flip to the first page. At the bottom is an e-mail you sent same day, February 28, 2020, in response to an Andy Winer e-mail. And you say:**

**"Unless there have been some other disclosures that I wasn't aware of, at this point "Navatek" --**

**in quotations --**

**"Is not definitively involved in this matter nor is anyone's client. Navatek's**

**association in this matter is completely speculative. The parties of primary relevance right now are 1820 and SYWSE with respect to interaction with any third parties. No one should be assuming at this stage that Navatek is a client. Or am I misunderstanding something here?"**

**Did I read your e-mail correctly?**

A You have.

**Q Although you are saying to Bill Canfield that Navatek's association is completely speculative, as you sit here today, you would agree that Navatek's association is not completely speculative; correct?**

MR. KOBAYASHI: Objection. Argumentative. Misstates the e-mail.

THE WITNESS: Well, it's always speculative at the time; right? I can't say it was or was not -- I don't know --

**Q (BY MR. ALLISON) Well, at the time, it's correct that Navatek had written the check to The Society for a $150,000?**

A Which I hadn't seen; so I don't know that for certain.

**Q Okay. But at this time, it is correct that it was not completely speculative because Navatek had written the check; correct?**

A That there is a plausible relationship, yes.

**Q Okay.**

A Right. My concern here is keeping the company out of it because the company is my primary concern.

**Q And then the final e-mail at the top of the page, which is from you to Bill Canfield, Andy Winer, Duke Hartman, and Martin Kao; correct?**

A Yup.

**Q And you say:**

**"Agreed. My real point is that we should be trying to be very aware of the distinctions. If we cannot do so internally, it will be difficult to distinguish them externally even though they are real."**

**Correct?**

A Yes. That there are boundaries. There are different entities. And it's difficult at times to not confuse yourself with them.

Q And at this time, which you're pointing out, is that because Martin is a link between The Society and the company that you say internally, you as well as Bill Canfield, Duke Hartman, and Andy Winer, need to keep in mind that Martin's connection to both doesn't mean that they're the same entity --
A Right.
Q -- am I understanding correctly?
A Yes.
MR. ALLISON: Okay. Let's go off the record.
(Whereupon, a recess was taken from 12:12 p.m. to 12:47 p.m.)
MR. ALLISON: All right. Mr. Chen, we're going back on the record. You're still under oath.
Do you understand?
THE WITNESS: Yes.
Q (BY MR. ALLISON) Okay. Before our break started, we were discussing the lengthy e-mail that began with Cleta Mitchell; correct?
A Mm-hm.
Q Okay. And I want to ask you now about The Society a little more.
Let's start with this question: To your knowledge and understanding, who were all of the

**company's employees who executed tasks or other work in furtherance of The Society's goals or objectives?**

A So Lori. I presume, Martin.

And so from an ancillary perspective, does that count, too, from the company's side in terms of Duke having had university relations, which, of course, dovetailed into what The Society was doing?

Does that count?

**Q Mr. Chen, the question was: Who are the company employees who, to your knowledge, executed tasks or did other work in furtherance of The Society's goals and objectives?**

MR. FUJICHAKU: Objection.

**Q (BY MR. ALLISON) And so you may answer that question based on your personal knowledge and understanding.**

MR. FUJICHAKU: Objection.

THE WITNESS: Well, my understanding of that is --

MR. ALLISON: I'm sorry, Rex?

MR. FUJICHAKU: Vague and ambiguous.

THE WITNESS: But when you say "to my understanding" and to the "furtherance of" -- I mean, well, "the furtherance of" could mean a lot of

people; right? If you delivered the check to someone because it was in your hand, you were in furtherance of --

**Q (BY MR. ALLISON) Sure. Who were those people?**

A Well, I just want to understand. I don't know who those people were.

**Q So let's focus on the people who you have knowledge of. And please listen for me.**

A In furtherance of, as a wide definition, would be Martin, Lori, and probably Duke, given his university relationships.

**Q Okay. Just those three?**

A I'm going to say most of the accounting team if they handled any transaction that occurred. And I'm not sure who exactly on the team would have done that directly. I mean, maybe Kahele; maybe it was somebody else. I don't know.

**Q So Lum Kee?**

A Perhaps, just from an accounting perspective.

**Q What about yourself?**

A I answered an e-mail. I mean, does that count?

**Q Do you believe, Mr. Chen, that you took**

any actions in management or in furtherance of The Society's goals and objectives?
A I do not believe I did.
Q Okay. So you're excluding yourself from that list?
A Right. I was here trying to represent the company to the best of my ability and knowledge. If that also furthered The Society's goals, then that would fit your definition, but that's not my intention.
Q Okay. We'll look at this next document as the next exhibit in order.
This is an e-mail chain between yourself and Lori Bofman with all of the e-mails sent between -- they're all send on a single day, February 26, 2020; correct?
A Correct. Yup.
(Whereupon, Plaintiff's Exhibit No. 13 was marked for identification by the deposition officer and is attached hereto.)
Q (BY MR. ALLISON) So earlier you testified that no company employee should have been conducting any society business --
A That's not what I said.

**Q -- during company time?**

A That's not -- I said they should not be using company time. I'm not sure -- "company time" -- how you're using that term.

**Q Mr. Chen, tell me, what do you mean by using company time?**

A So if we need to do company work at the moment that you're doing something else, that should be our time. So you should not be doing whatever else you were doing. Say you are Lori Bofman, and you were off at Sam's Club, and you answer a call from Martin about The Society, I can't stop you from doing that.

**Q So Wednesday, February 26, 2020, from 11:15 a.m. to 12:00 noon, did you consider that to be company time?**

**Do you consider that to be company time?**

A For me, yeah.

**Q What about for Lori Bofman?**

A Probably, but I don't know. I don't know what Martin has her doing.

**Q And these e-mails between yourself and Lori Bofman, they're all sent from an e-mail address for both you and Ms. Bofman that ends @navatekllc.com?**

A Yes, that's correct.
**Q That is your company e-mail address and also her company e-mail address; correct?**
A Correct.
**Q Okay. So is it correct to say that you and Ms. Bofman in these e-mails are communicating during a work day, during company time, using company e-mail?**
A That's probably fair to say; however, for me, it's also representing the company on company time. Because as you can see through these e-mails, I'm trying to maintain the distinction.
**Q And it was important -- sorry. Let's step back a second.**
**The distinction you're talking about is what these e-mails are all about and that is keeping separate The Society and the company?**
A Yes.
**Q And once again, the reason why you've testified that was so important was to protect the company and to protect Martin?**
A That was to protect the company. Protecting Martin was an ancillary effect of protecting the company.
**Q Okay. But by protecting the company in**

**this respect, it also protects Martin.**
**Do you agree?**
A Sure.
**Q So through these e-mails, the end result is protection -- the goal is protection of Martin and the company --**
A Once again --
**Q -- while keeping The Society separate from --**
A The goal was to protect the company. Whether it protects Martin is a secondary issue. It just so happens that it does.
So you can't say that the goal is to protect Martin. The goal was to protect the company.
**Q Okay. Earlier you testified that the money, the company money, that was used for The Society wasn't necessarily company money; correct?**
A I don't -- I said that I cannot confirm or deny whether it was.
**Q And one reason why you speculated why it may not be, or that you cannot confirm or deny, is because it could have been distributions to Martin?**
A That is redirected somewhere else.
**Q Okay. And if it were distributions to Martin, can you tell me why wouldn't those amounts**

**just have been made out to Martin?**

A Because most likely what could have happened is that, in the accounting for the company, it could be represented as a distribution to Martin. But not having the accounting in front of me, I can't say it did or didn't happen. But if it did, then I would not claim that the check is dispositive of who the money came from.

**Q If the amount -- let's say hypothetically, if the amount were paid from the company to a third party, as CFO, do you agree that later on reclassifying that amount as a distribution would be improper?**

A Improper if that was the intent, but if it was a mistake, and you're correcting the mistake, then, no, it's not improper.

**Q So --**

A If it was always supposed to be a distribution and for some odd reason somebody dropped the ball there, then I wouldn't call that improper. I would call that a correction.

So as here, as we can see, from what I think I can refer to the e-mail here; right?

I'm encouraging them for the funding to come from the Kao family accounts because I do not

want this stuff to be even confused. Whether they followed through is another matter.

**Q As CFO, wouldn't it be your responsibility to ensure that they did follow through, and this was your advice, and this was the thing that prevented it from being improper or illegal?**

A Well, it would be worse for Martin if that wasn't done.

**Q So the advice there was to protect Martin?**

A No, it's still bad for the company, but I wouldn't necessarily call it illegal if it was a mistake of the company because I don't know what the intent was; right?

My intent was to make sure we do not as an organization confuse these two things. And I can only give instructions as to whether it's true. I can only be told; right, because I do not directly access all of this stuff because once again, it was never my intention to fill that role.

**Q Looking at these e-mails, it appears to me that Lori Bofman doesn't understand --**

A She doesn't, which is why I keep having to go back to her.

**Q And it appears to me that you're telling her these things repeatedly?**

A I have.

**Q And in telling her these things repeatedly, do you agree that you are helping to direct The Society?**

A No. I'm helping the company to try to protect itself.

**Q Through managing and operating The Society's business?**

A Once again, if I could have controlled it, because I was in charge of it, then I would have. Then it would have gotten done. But as such, it is not my function, it's not my role, it's not my responsibility.

**Q Okay. I want to ask you about your e-mail in the middle of the first page. It's the one sent at 11:53 a.m. to Lori Bofman.**

A Yup.

**Q And I want to ask you about the last line. You write:**

**"While we can potentially start with Navatek funds and pass them on as a distribution, we're better off having that**

fire break in between."

A Yes, for optics.

Q And so is what you're recommending there that the money from the company's accounts should go to Martin first?

A I'm recommending --

Q Let me finish, please -- that the money should go to Martin's family accounts first before it is then paid to The Society to eventually be used as scholarships?

A Correct.

Q But what you're also saying is that at the start -- you used the word "potentially" -- potentially at the start, you could use Navatek funds directly and pass them on as a distribution?

A Without saying it to Martin.

Q To Martin. So what you're suggesting is is initially, Navatek or the company, will take its money and give it directly to the society, and then put it in the books as a distribution to Martin?

A So basically skipping a step.

Q I see.

A No, but knowing in the beginning that it's supposed to be a distribution. So rather than waiting for them to write two checks and waiting for

it to clear and come through, we can just say this is a distribution, this is what happened.

**Q And eventually your recommendation or plan would be to have the money not skip that step, as you said, to go into Martin's family accounts before it goes into The Society's accounts?**

A I would recommend that.

**Q And, again, the reason for those recommendations, is to make it more difficult to see the connection between the company and The Society?**

A No.

**Q Well, you said earlier it was to protect the company.**

A To not confuse someone who is unfamiliar with the transaction in making the claim that it is the company's money; right? Belt and suspenders here.

**Q Okay. We'll do this one next in order.**

**So this looks like the same e-mail chain, except Lori has now forwarded it onto a new recipient on**

**January 21, 2021. Do you see that?**

A Yeah, and she completely --

(Whereupon, Plaintiff's Exhibit No. 14 was marked for identification by the

deposition officer and is attached hereto.)

**Q (BY MR. ALLISON) And she writes:**

**"Confirms that the funding was coming from Tiffany's accounts; however, according to Cliff, we could use Navatek's funds."**

**Do you disagree with Lori Bofman's statement there?**

A She butchered my statement and made it more confusing. So I don't know that I can say I totally agree with what she said.

I said it's potentially that we could do that as long as we're accounting for distribution. But that was not my recommendation, no.

**Q Okay. And do you know who randy@808-law.com is?**

A I have no idea. Is that some local law firm?

**Q I couldn't tell you. I was asking you the question.**

A I don't know. I was wondering if you did.

**Q I'll represent to you, Mr. Chen, in**

**recent motions, Mr. Hartman took the position that Lori Bofman was the manager and mastermind behind The Society. Do you agree with that characterization?**

MR. FUJICHAKU: Objection --

THE WITNESS: I think it's possible. It's a possibility.

MR. FUJICHAKU: -- assumes fact not evidence.

THE WITNESS: I don't know what claims, and I don't know whether it's true or not. It could be true.

**Q (BY MR. ALLISON) I'm not asking you to verify Mr. Hartman's characterizations. I'm asking you whether or not you agree that Lori Bofman was running and managing The Society.**

A I would say Lori Bofman was taking a lot of tasks that The Society needed done, whether she was fully in charge of making decisions on those tasks, is another question.

**Q It strikes, me reading these e-mails, particularly the ones we just looked at and based on your prior testimony, that Lori Bofman -- or her responsibilities were limited to just doing what other people told her to do. Is that accurate?**

A That would be -- I guess the day that I

would characterize it is that she generally did what Martin and Tiffany told her to do.

**Q And --**

A And she did not necessarily show not a lot of -- at least in my perspective -- show a lot of personal initiative in making her own decisions.

So I have a hard time believing that she was the mastermind behind it all.

**Q To put it simply: Lori Bofman was not capable of managing a business or an enterprise?**

A Well, she had difficulty understanding my e-mails, or what I was telling her over and over and over again.

**Q Right. Lori Bofman is not on the level of someone who could be controller or CFO of a big company, for example?**

A Unless she was disguising herself -- well, I would agree with that.

**Q Do you have any knowledge of what Lori Bofman's education level is?**

A No.

**Q Okay. Going back to the document in front of you that's marked as number 14.**

A Yes.

**Q I want to go back to that. It's the same**

e-mail we looked at -- we looked at it on the prior version or prior exhibit, but that e-mail at the bottom page, you said -- I want to ask you about the sentence:

"As I discussed with Martin before he left on his trip, the funding of the check should come from Kao family accounts. Best if Tiffany writes to The Society, but Martin can."

Why was it better if Tiffany wrote the checks than Martin?

A Because Tiffany is the sole manager, to my understanding.

Q I've seen a lot of e-mails dealing with The Society and this scholarship program on which you and others are copied, or you're receiving or sending. I don't believe I've ever seen a single e-mail that involved Tiffany.

Do you recollect ever e-mailing with Tiffany about The Society?

A No, because -- other than meeting her once near the very beginning of my employment, I never saw her again until the very end.

Q Do you have any knowledge of what

**Tiffany's duties, job responsibilities, or roles were with The Society?**

A No. The only thing I knew about Tiffany was that she was a former CPA.

**Q Okay. And I think you mentioned she was the member of The Society?**

A The LLC, yes.

**Q Okay. But in terms of actually conducting The Society's business or helping them achieve its goals, be them as it may, do you have any personal knowledge or experience of actions, communications, or conduct that Tiffany did in furtherance of The Society?**

A Like I said, I was not in contact with Tiffany. I was not ever in contact with Tiffany until the very end. And my belief was that Tiffany deferred to Martin.

**Q Okay. Do you agree that The Society was operating as an alter ego or one and the same with the company?**

MR. KOBAYASHI: Objection. Argumentative.

MR. FUJICHAKU: Calls for a legal conclusion. Join.

MR. KOBAYASHI: Join the legal

conclusion. Object.
THE WITNESS: I don't. I mean, that was the whole point of my efforts to keep them separate.
**Q (BY MR. ALLISON) I understand that you are sending e-mails saying that they need to be portrayed as separate?**
A They need to be separate.
**Q Okay. But, Mr. Chen, we're looking at an e-mail here that is sent during company time, on a workday, from company e-mails, that are for the purpose of conducting The Society's business; am I correct?**
A But on my part of it, society business is company business because they're interrelated. What we do as the company or don't do as the company could get us in hot water because of The Society.
So I need to get us out of hot water to the extent it's possible. If I need to tell Lori a dozen times, then I will tell her a dozen times. And that's all spent, I believe, on company time.
**Q Okay. Thank you. Based on the e-mails we just looked at, in this most recent document introduced as number 14 --**
A Mm-hm.
**Q -- including the e-mail from Tiffany at**

the top to randy@808 --
A Lori.
Q I'm sorry, Lori. Thank you -- the email from Lori at the top stating:
"That the funding was coming from Tiffany's account; however, according to Cliff, we should use Navatek funds."
There's that e-mail.
A We could use.
Q Were Navatek funds ever used?
A I don't know.
Q We know that they were used for the initial $150,000. We looked at that check earlier; correct?
A We did see the check, yes.
Q Okay. I could show you the documents, but I think it would take up time that can be better used in other ways. So I'll represent to you the scholarships that were actually made were all made with money that was conveyed to the LLC -- sorry -- to The Society from Navatek's account.
Are you aware of that?
A No.
Q Do you have any reason to doubt that?

A I have no current reason to doubt that. No.

**Q And it's sort of in keeping with these e-mails here's because Tiffany, the person -- I'm sorry, not Tiffany -- Lori, the person who's making these arrangements, is not understanding your point about having the checks come from the Kao family accounts; accurate?**

A Are we talking about the checks from The Society to the universities for the scholarships?

**Q I'm talking about the money that The Society had in its accounts to give out as scholarships.**

**Where did that money come from?**

A Well, that apparently -- the check we saw -- came from a Navatek account.

**Q Do you have any specific knowledge that any money for The Society came from the Kao family accounts?**

A I do not have any specific knowledge.

**Q And you obviously had concerns, based on these e-mails, that the money was not coming from the Kao family accounts, and it was instead, coming from Navatek or company accounts?**

A That they were being very cavalier about

how they were representing themselves and how they were exposing the company unnecessarily.

**Q And that's why earlier -- a moment ago when you testified, that society business is company business; that's what you meant?**

A Right. In order to disentangle ourselves or keep ourselves away from The Society, that becomes company business.

MR. ALLISON: Okay. Okay. We'll do this one as the next one in order.

**Q (BY MR. ALLISON) Okay. Here you go, Mr. Chen. Okay. So this looks like an e-mail chain -- I can't tell if you were included from the start -- but it was forwarded to you by Martin Kao on February 29, 2020, at the top; correct?**

A Yes. He forwarded an e-mail to me, yes.

(Whereupon, Plaintiff's Exhibit No. 15 was marked for identification by the deposition officer and is attached hereto.)

**Q (BY MR. ALLISON) So let's start with the -- let's start with the very first e-mail in the chain on the second page.**

A The start of the first page?

**Q Sorry. That's correct. Yeah, at the**

bottom of the first page, Martin writes:
"Bill: CONFIDENTIAL!!!"
And this looks like it's to William or Bill Canfield; correct?
A Mm-hm.
Q And we discussed earlier that he was the attorney who was engaged to represent The Society.
Does that refresh your recollection in who he was?
A Not exactly, but I'll take your word for it again.
Q Okay. So earlier we were looking at the big, long e-mail chain that was started by Cleta Mitchell and involved all of the ideas about how The Society would be giving scholarship.
Do you recall?
A Yeah.
Q And do you recall that a lot of those e-mails were sent between February 18th and February 28, 2020?
A Yes.
Q So the e-mail at the bottom here, February 28, 2020, is at the same time, roughly, as those other e-mails we looked at; correct?
A Yes, okay.

**Q Okay. And what Martin is telling Bill at the bottom here is he's describing to him certain campaign contributions he's going to make; is that correct?**
A It looks like, yeah.
**Q Okay. And, if you know, these specific members of US Congress that are noted in Martin's e-mail, are those members of Congress that are on the appropriations committee?**
A I don't know. But I'm assuming some of them are, if not, all of them, or were, I guess.
**Q Okay. And then Bill Canfield responds on February 28, 2020.**
A That's the e-mail above?
**Q The e-mail above. Correct. I'm sorry. Before we go there. Bill Canfield responds same day:**
**"Martin, are all of these folks either appropriators or Armed Services members?"**
A I'm sorry. Where are you?
**Q On the front page in the middle.**
A Oh, okay. Okay. So Martin says not all, but most.
**Q Okay. And so do you have any reason to doubt Martin's response there?**

A No.
Q Okay. So what's going on in these first three e-mails, you agree, that Martin is discussing with Bill Canfield that he's going to make -- what he refers to in this e-mail as "max out donations to mostly folks that are on the Appropriations or Armed Services Members Committee." Correct?
A That's what it says here, yes.
Q Okay. And the second to the top e-mail Bill Canfield's response, he says:
"Going forward, contributions would best be spread (at least a little) to members who do not have a direct influence of Navatek's business. You need to be able to push-back (if necessary) to the assertion that all the folks will benefit from the company from the approps process."
And "approps" is probably appropriation?
A Appropriation.
Q (Reading:)
"Plausible deniability

as to the pay-for-play criticism."
Do you see that?
A Mm-hm.
Q So this e-mail was then forwarded to you by Martin short after at the top; correct? And Martin says:
"Spread the love? stupid."
Correct?
A That's what it says, yeah.
Q So what is it that you understood that Martin was saying here in his message and by forwarding this to you?
A In all likelihood, I probably didn't make it past the stupid. But reading this e-mail, I would say this is Martin being Martin again, basically jabbing someone whose back is turned around, just because that's the way he is.
And so another -- his sense of humor is a little cruel. And that's why I probably was stopped. I said, "I don't care. Whatever. Next."
Q Did you have an understanding at the time as to why Bill Canfield was recommending plausible deniability as to the pay-for-play criticism?

A I would guess -- I'm guessing because that's all I can do here -- by reading this language now, is he trying to head off any PR criticism.

**Q And were there concerns within the company about being characterized as a pay-for-play business model?**

A Not that I had heard directly. I mean, other than, you know, whatever articles that are out there in the general public and about lobbyist and how business is done in Washington.

**Q Okay. And did you agree with Martin's message that spreading the love, meaning giving donations to folks, other than those who directly influence the company's business, was stupid?**

A I didn't give it a second thought, because I don't deal with D.C.; that's his bailiwick.

MR. ALLISON: Okay. Okay. We'll do this one next in order.

**Q (BY MR. ALLISON) Do you recognize these e-mails, Mr. Chen?**

A I don't recognize them, but I'm seeing them now, yeah.

(Whereupon, Plaintiff's Exhibit No. 16 was marked for identification by the deposition officer and is attached

hereto.)
Q (BY MR. ALLISON) These are e-mails that you sent and received from Martin Kao -- at least on the top; correct?
A I'm sorry. Which one did I send?
Q It looks like you sent the one at the very top.
A Oh, okay let's see. Yup. Okay. Yup.
Q Okay. So at the bottom, the very first e-mail is from William Canfield to Martin Kao, Andy Winer, and Duke Hartman; correct?
A Yes, I see that.
Q And the subject is engagement letter -- FEC complaint; correct?
A Compliance.
Q I'm sorry. Compliance. Thank you.
And it looks that the content of this e-mail is about executing and returning Mr. Canfield's engagement letter and paying him a retainer fee; correct?
A Yup.
Q And then Martin takes that e-mail and he forwards it to you and only with a note that says:
"I met with him. Good guy and definitely an advocate for

'us.'"
Do you see that?
A Mm-hm.
Q And the "us" is in quotes -- quotations.
What's your understanding of who the "us" is that Martin is referring to?
A Is Martin and his varied interest all bundled in one.
Q Is it possible that he's referring to you and himself?
A No.
Q He's sending you the e-mail, and he's saying "us"; so that's not a possible meaning here?
A It's possible, but it's not.
Q Okay. And then Martin continues:
"His fees are reasonable.
Moreover, I'll be cutting Andy's
(S360s) fees shortly. I just
need to write it up and present
it to Andy."
And Andy he's referencing, would that be Andy Winer?
A Yeah, I guess.
Q And his S360, is that Andy Winer's company?

A It's the consulting company that stands for strategy, maybe.

**Q Okay. So is the purpose of him forwarding this to you is to forward Canfield's engagement letter and get your take on it?**

A Probably because I am reading this now, I'm thinking I'm still in the protect-the-company mode and let's make sure whatever documenation is out there, doesn't mix us up.

**Q Going back to Martin Kao's use of the word "us" in quotation marks, I think you said a moment ago that the "us" were the varying business interests?**

A Yeah, all of his interest, him, and the company and everything he does.

**Q Do you include The Society in that?**

A That's a fact. The Society is -- what I was told -- is a family effort. So it's bound to be him as well.

**Q And in the specific engagement letter that Martin forwarded you, that was engagement for Canfield to represent The Society; correct?**

A According to this, probably.

**Q And based on your response, do you think it's accurate that you did, in fact, review that**

**engagement letter?**

A I think I read it so we weren't being confused for The Society.

**Q So that's a "yes" you did --**

A Probably, yeah. Or quickly glanced over.

**Q And your answer is yes, reasonable, meaning that Mr. Canfield's enagagement letter to The Society is reasonable?**

A No. The fees are reasonable. I'm referencing to his e-mail in the middle.

**Q Okay. Where in this e-mail does it state what the fees are?**

A It doesn't. It just says his fees are reasonable. But I don't know. It's probably in the letter.

**Q So you would have reviewed the engagement letter, it would have stated the fees, and you're saying you think they're reasonable based on your review?**

A Based upon his comment, it's reasonable. Like, yeah, I guess they're reasonable. Sure.

**Q So you're just repeating back to him what he said to you?**

A Yeah. In reference to what he said.

**Q Okay. And then you say:**

**"Given the nature of the**
**representation and the specific**
**definitions of who the" --**
**and in quotes -- "client."**
**"Who the "client" is here.**
You and Tiffany, (as the sole
members of the LLC) should
sign this engagement letter."
That was your advice to Martin Kao?
A No, this is not. I'm signing on behalf of the company.
**Q And based on your statement about the specific definitions of who the client is, with the "client" in quotes, does that confirm for you in your mind that you did, in fact, review that engagement letter?**
A Like I said, I probably read it to some degree. I don't know how heavily I reviewed every term.
**Q Well, you're referencing specific -- you say, "specific definitions of who the 'client' is."**
A Right. Because that's what I'm focused on.
**Q And where would you have gotten that specific definition of who the client is?**

A Probably who's signing it and who they're saying they're representing.

**Q From the engagement letter; right?**

A Probably.

**Q Okay. And so in this e-mail, and in your conduct in reviewing The Society engagement letter, you're advising Martin, with respect to The Society's engagement of an attorney to represent The Society?**

A It's The Society's business; right? It's with Tiffany. It's not us -- us in the company.

**Q Okay. But you are helping Martin -- you're assisting Martin with Society business --**

A By virtue of sitting on the other side of the company's side of the fence. If not for me looking out for the company, who is exactly?

**Q So then is it your testimony that you were the only person looking out for the company in this respect?**

A He's the only one handing out the letter, and I don't know who else he handed the letter too.

**Q And what are all the actions you did to look out for the company's interest with respect to The Society?**

A Would be this and all the e-mails that I send to Lori, talking to Martin about keeping the

lines clear, the e-mail I sent to the rest of the company about keeping the lines clear. I believe it was a mass e-mail actually. That we are not -- we -- Navatek -- are not The Society. So anybody out there saying otherwise, stop saying it because you're wrong.

**Q And you never did anything to try to discover or learn the true source of The Society's money that it was being given; correct?**

A I was recommending that it come from their accounts and be accounted for as a distribution.

**Q I understand that your testimony is that you were making that recommendation.**

**My question, sir, was you never actually looked into the issue, you never looked at the accounts, you never looked at the books, you never verified -- please let me finish -- you never verified where the money was actually coming from?**

A No, I did not actually verify that.

**Q Looking back, do you think you should have if your interest was to protect the company?**

MR. KOBAYASHI: Objection. Argumentative.

THE WITNESS: With 100 percent benefit of hindsight, there should have been a lot of things I looked into. I should have looked into who Martin was before I even signed into the company, but that's easy to say now; right? If I could do it all over again, I would not have joined the company. I wouldn't want to work with him or Steven.

**Q (BY MR. ALLISON) I want to ask you about the company's business strategy in the time that you worked for the company.**

**Is it accurate to say that the company's strategy was to use money and influence to try to direct appropriations in government monies to the company as part of that influence campaign?**

A I guess, yeah, sure. I would say that.

**Q And is that what the prior e-mail we looked that was warning against the pay-for-play allegations, is that what that was getting at in your mind?**

A Getting at the perception that the company and Martin used money and influence to direct business to the company; is that what you're asking?

**Q Yes.**

A I think that's a fair thing to say.

**Q And to the best of your recollection and**

**knowledge, the company was, in fact, doing that wasn't it?**

A Probably.

**Q And do you agree that the scholarship campaign furthered those efforts because the scholarships were being given to schools in the districts of those same US congressmen and women who were elected from the districts with the schools that received the scholarships?**

A Probably.

**Q Who -- who at the company was the primary manager for the company's relationship with the universities?**

MR. FUJICHAKU: Objection. Vague.

THE WITNESS: I don't know for certain because there was never a list or declaration as such, but I thought it was Duke and Martin. But Duke was probably more the on-the-ground face?

**Q (BY MR. ALLISON) Right. And based on your earlier testimony about how Martin wanted to manage relationships in D.C., and he wasn't interested in the nitty-gritty or nuts and bolts of actually being in the office and making paperwork happen and running the business --**

A Yeah.

**Q -- does that contribute to your idea that it was probably Duke who was doing the day-to-day relationship with the universities?**

A If not him, I'm not sure who else it would have been.

**Q And you've been copied on e-mails where Duke is participating in those types of relationship management; correct?**

A Yes.

**Q And have you been copied on e-mails where anybody else is assuming that role?**

A Just tangentially in that there were senior engineers in the various offices who were literally on the ground, who would have relationships as well.

**Q Those senior engineers, they would just have relationships with the one university they were working with; correct?**

A Probably. Unless they had a more senior role, which I don't believe most of them did.

**Q Can you think of anybody specific?**

A Who was the guy in Maine in Providence? I can't recall his name either. Sorry.

**Q But Duke was the person who had the relationships with all of the universities?**

A With multiple, I would say.

**Q Okay. And was that why, to your understanding, Duke was brought into these communications about The Society to provide the names and contacts of universities that had received scholarships?**

A As a good interface. I'm going to guess that's probably why, I guess.

**Q And because Duke was the one that had those relationships, is it correct that those scholarship connections probably could not have happened without Duke's help?**

MR. FUJICHAKU: Objection. Form.

THE WITNESS: That was hard to say because I have a hard time believing a lot of -- or any of these universities would say no to free scholarships. But it would make it easier and faster, certainly.

**Q (BY MR. ALLISON) But in reality, Duke was the one who did that; correct?**

MR. FUJICHAKU: Objection. Assumes facts not evidence.

THE WITNESS: I don't know, but if pushed, I would have to say probably.

**Q (BY MR. ALLISON) Okay. We'll do this**

next one in order. I'll note that these are e-mails that you're not copied on.

So my first question is going to be: Have you ever seen these before?

A No.

(Whereupon, Plaintiff's Exhibit No. 17 was marked for identification by the deposition officer and is attached hereto.)

Q (BY MR. ALLISON) Okay. Well, we won't linger on them too long, but I want to ask you a few quick questions about them. In the first e-mail at the bottom, Bill Canfield e-mails Martin Kao and Andy Winer on February 25, 2020. He says:

"I think it would be smart to grant several STEM scholarships from the LLC to girls who want to go to schools in states other than those represented by a member on the Approps or Armed Services Committees."

A Okay.

Q That's essentially the same e-mail we saw a moment ago that got forwarded to you; correct?

A Yes, similar.

**Q Okay. And did you agree with that message from Mr. Canfield that the company should be granting STEM scholarships to other schools, not in states and districts represented by members on the Appropriations or Armed Services Committees?**

MR. KOBAYASHI: Objection. Lacks foundation.

THE WITNESS: Did I agree?

**Q (BY MR. ALLISON) Yeah. Do you agree with that message?**

A Did I currently agree with this message?

**Q At the time, would you have agreed with that?**

MR. KOBAYASHI: Objection. Speculation. Lacks foundation.

THE WITNESS: I would have thought it would be smart to get to as many schools given the nature of our expansion strategy. So irrelevant of why they would do it, I would say, yeah, let's get as many as possible out there. We want to spread a wide net. We want to develop relationships with a lot of research universities. Yeah, sure. Go ahead.

And let's not forget, we were also recruiting.

**Q (BY MR. ALLISON) Okay. But to the best**

**of your knowledge, were STEM scholarships ever given to these schools recommended by Mr. Canfield?**

A No idea.

**Q And did Martin ever -- other than the e-mail we just looked at where he forwarded you the message "spread the love" -- did Martin ever discuss this idea with you?**

A Nope.

**Q Are you aware that Martin was sentenced in the federal district court court case that occurred here in Hawaii about the PPP loan?**

A I think I heard about it. I don't know what the actual result was.

**Q When was the last time you spoke to Martin Kao?**

A I want to say the night of Halloween 2022 maybe or '23. I saw him on the street.

**Q So it's just a chance occurrence?**

A My kids were trick-or-treating in Manoa, and I saw him -- well, he saw me and came over.

**Q What did you discuss with him that evening?**

A What was happening to him. He was just complaining. Told me about his job working at a sushi restaurant. I don't know. Some random stuff.

**Q Okay. What about prior to that meeting? When was the last time you spoke to him before that?**

A Probably a phone call. Not sure the exact date, but certainly, you know, well before his conviction.

**Q Do you recall what was discussed during that phone call?**

A Probably more of the same, more of his complaining about how, you know, he's getting screwed over and blah, blah.

**Q And what was the last time you spoke to Kahele Lum Kee?**

A A month, month and a half ago.

**Q And what did you speak about at that time?**

A He called and asked about -- what did he ask about it -- hold on give me a second. Well, he asked about whether I've been keeping track with what happened to Martin, and whether I had a chance to review discovery documents, and that's kind of mostly it.

**Q So the purpose of the discussion was about this case?**

A I guess tangentially, yeah.

**Q And I'm sorry. When did you say that**

**phone call occurred?**

A Month, month and a half ago, perhaps.

**Q And prior to that, when was the last time you spoke to Mr. Lum Kee?**

A Oh, I have no idea. A year part of that. It's like every now and then, he would call about whether I saw this happen to Martin or whatever, just kind of checking in.

**Q What about Duke Hartman? When was the last time you spoke to him?**

A Probably not since -- not after I left the company.

**Q Okay. And for Martin, Kahele, and Mr. Hartman, if I expanded it beyond just verbal communications that included e-mail, text message, any kind of written communication, would your answer be different?**

A Not significantly different.

**Q How would it be different in a nonsignificant way?**

A You know, probably for Kahele, maybe he -- since, you know, he's a bit -- I would say he's closer to friend -- on the friend spectrum than the other two. So he might say, "How are things going?" Or something.

Q I see. Okay. I'm going to ask you about two similar e-mail chains here. Let's start with this one. We'll introduce this as the next document in order.

Do you recognize any of these e-mails, Mr. Chen?

A Some of them, yeah.

(Whereupon, Plaintiff's Exhibit No. 18 was marked for identification by the deposition officer and is attached hereto.)

Q (BY MR. ALLISON) Okay. And generally, what are the original e-mails that we're looking at?

A I'm not sure.

Q It looks to me that it's about an office that's being opened in Wichita?

A Yeah, okay. I see. Yup.

Q And I see that on page 4 down at the bottom, an e-mail from Duke to yourself discussing Senator Jerry Moran and the voters of Wichita. And the subject line is "WSU office opening press release draft."

And WSU, I believe, is reference to Wichita State University; is that correct?

A I believe so, yes.

Q Okay. And was that also one of the universities set to receive scholarships from The Society?

A I think? Once again, I don't know who got what scholarship, but I presume if we're opening an office there, that it's very likely that would have been the case.

Q So earlier, you testified about the way the company was using money and lobbyist and influence to try to encourage greater appropriations from senators who had that power; correct?

A I believe that was the intent of Martin, yes.

Q And if Senator Jerry Moran is one of those senators, then opening an office through Wichita State University and giving scholarships to students at Wichita State University, would all help make the relationship with Senator Jerry Moran more beneficial. Do you agree?

A Sure.

Q Okay. And if we get to the more recent e-mails, I want to ask you about Martin's e-mail sent Thursday, May 21, 2020, on the second page where he says:

"Maybe we should put in

a plug for The Society."
A Okay. I see that.
Q And you respond:
"We could but my instinct would be not to comingle Navatek and The Society and get people confused about the difference."
Again, that's been something that you've been e-mailing quite a bit in the e-mails we've looked at; correct?
A Correct.
Q And so you felt very strongly about maintaining and portraying the distinction between the company and The Society?
A Yes.
Q And Martin responds:
"LOL...I was joking."
A So he responds essentially and soft backed out.
Q Okay. And Duke says:
"Lol. SYWSE Pays to Play Again!"
So are all these jokes about putting in a plug for The Society and paying to play again, was

**this a topic to joke about because that's, in fact, what the company was doing?**

MR. FUJICHAKU: Objection. Assumes facts not evidence.

THE WITNESS: I'm sorry. I don't understand the question.

MR. KOBAYASHI: Join. Argumentative.

**Q (BY MR. ALLISON) Right. There's a number of jokes here about paying to play and putting in a plug for The Society, and you're part of the e-mail chain, you're participating in it, and I want to know from you, Mr. Chen, what is your understanding of why this was a topic to be joked about?**

MR. FUJICHAKU: Same objections.

MR. KOBAYASHI: Calls for speculation. Lacks foundation. Argumentative.

MR. FUJICHAKU: Join.

THE WITNESS: In terms of this company and set of employees, there is a reason to joke just about anything, especially if it is -- if we're being accused of something. As you can see; right? All the pay to play ha-ha; right? That ultimately, to me, has no bearing on what's actually happening. It is them being them.

Q (BY MR. ALLISON) And you didn't think when you sent your response at 3:26 p.m., May 21st, at the bottom of page 1, you didn't think that Martin was joking, did you?

A I was being serious because I've seen all these other examples of people being careless. So I'm, once again, putting it out there.

Q Okay. Okay. We'll do this one as the next one in order.

What we're looking at here, Mr. Chen, appears to me to be the same e-mail chain, but after Martin says his LOL-I-was-joking e-mail, there's a different response from you?

What I assumed happened here was e-mails crossed, that multiple people responded to Martin at the same time.

Do you agree?

A Yeah. Looks like that's what happened. Yeah.

(Whereupon, Plaintiff's Exhibit No. 19 was marked for identification by the deposition officer and is attached hereto.)

Q (BY MR. ALLISON) And this is your response at the top. You say:

**"Got me nervous there for a second."**

**Correct?**

A Yes.

**Q So that confirms that you thought Martin was being serious when --**

A Well, that he might have been serious. I didn't know for sure. And so that's my response. All right. I don't have to worry about it; right? We're good.

**Q But then the next line in your e-mail says -- you asked:**

**"However, didn't WSU make an announcement about SYWSE contributions?"**

A Yes. I was curious because that contribution, while being made from The Society, still had an ancillary benefit for us, and wondering whether they'd mentioned to them.

So how -- where are our relationships with WSU? Where are they now?

**Q And so by making this statement, it's correct that you knew at that time that WSU had received Society --**

A Probably at that time, yeah.

**Q Okay.**

A Whether they were going, or the plan was that, or something to that effect.

MR. ALLISON: Okay. Let's go off the record for a second.

(Whereupon, a recess was taken from 1:53 p.m. to 1:56 p.m.)

MR. ALLISON: Okay. Let's go back on the record.

Mr. Chen, we're back on the record.

THE WITNESS: Yes.

**Q (BY MR. ALLISON) Okay. We're going to start getting into -- well, first, we're going to go for about another half an hour or so because I understand you have to leave?**

A Okay.

**Q We're not going to be able to finish the deposition today before you have to leave; so I'd like to reschedule the remainder of your deposition. Are you available next week?**

A I should be available next week Wednesday or Thursday, I believe.

**Q Okay. So next week Wednesday is the 30th?**

A Yes.

**Q And Thursday is the 1st?**

A But I'll defer to my counsel's availability.

MR. ALLISON: Derek, how are those days for you?

MR. KOBAYASHI: I'm good on Wednesday.

MR. FUJICHAKU: Unfortunately, Wednesday and Thursday are not good for us, yeah.

MR. ALLISON: Let's go off the record for this.

(Whereupon, a recess was taken from 1:59 p.m. to 2:01 p.m.)

**Q (BY MR. ALLISON) Okay. Mr. Chen, we're back on the record. And we have had a discussion off the record, and we're going to continue your deposition or Friday, May 2nd at 9:00 a.m., and it will be right here again.**

A And we'll expect a couple of hours.

**Q Yeah.**

MR. FUJICHAKU: Okay. Great.

**Q (BY MR. ALLISON) Okay. We're going to start looking at more communications here about The Society. But before we get into them, one thing that I've noticed in these e-mails is that there was a lot of derogatory and misogynistic ways of describing**

**women, particularly the recipients of The Society's scholarships.**

**Do you recall that in the e-mails?**

A I do recall that.

**Q A lot of it came from Martin Kao.**

**Is that what you recall?**

A He was the originator of this.

**Q There's quite a bit from Kahele Lum Kee as well. Do you recall that?**

A I recall that, but I would characterize that as him just following the boss, as was mine.

**Q Okay. And was that the typical way that communications happened? Was it typical to disparage these women that were receiving these scholarships?**

A It was typical of Martin to disparage everybody.

**Q Okay.**

A People -- his employees, people in the office, people outside the office, people in the community he would do it to everybody.

**Q Did you disagree with the way Martin spoke about these women?**

A It's a bit distasteful, yes.

**Q Did you disagree with the way Lum Kee spoke about these women?**

A It's also a bit distasteful, but I understood why he did it.
**Q Do you recall if you ever contributed --**
A Oh, I'm sure I did.
**Q And do you regret doing that?**
A Certainly, I think that's not an optimal way for anybody to speak. One thing I'm glad about is that at least Martin tended not to do it out in the open in public to actually insult someone to their face. But on occasion he would do that well.
**Q Did you ever object to Martin's misogynistic characterizations of these women?**
A No, I did not object to him. No.
**Q Did you ever tell him to stop that?**
A I did not. No.
**Q To your knowledge, did anybody ever tell him to stop?**
A Nope.
**Q Okay. We'll do this one as the next one in order. Do you remember these e-mails?**
A Not specifically, but I'm familiarizing myself with them right now.
(Whereupon, Plaintiff's Exhibit No. 20 was marked for identification by the deposition officer and is attached

hereto.)

Q (BY MR. ALLISON) So if you look at the very first e-mail on the last page.

A Duke?

Q Flip back one more page. So this is an e-mail from Bill Canfield sent March 25, 2020, to Martin and Duke; correct?

A Yes.

Q And it is conveying what is described as and attached as a draft letter to her -- her being Cleta Mitchell, who's referenced earlier in the e-mail --

A Mm-hm.

Q -- and Mr. Canfield asked Martin and Duke:

"Please review and make any suggested modifications ASAP."

Correct?

A Mm-hm.

Q And if we turn the page, there's an e-mail from you in the middle of the page sent that same day. Apparently you were forwarded these e-mails from Duke, and you responded on March 25, 2020 that you:

"Made a few edits. More

personal taste than anything
else. The bulk of the substance
seems fine."
Do you recall this e-mail? Sending this e-mail?
A I don't recall, but apparently I did.
Q Do you recall the letter?
A I don't recall what was in the letter. No idea.
Q Okay. And then if we look at the top of the page, there's an e-mail from Martin -- the header start on the first page -- and it's Martin to yourself, Duke Hartman, and Kahele Lum Kee is cc'd.
And at the end, Martin describes the women who are getting the scholarships from The Society as -- he says:
"Whatever...just a pack of
bitches getting free" --
And then there's a dollar sign; correct?
Was that the sentiment in the group as to how the group viewed The Society's effort in making scholarships?
A Nope. Just Martin. I mean, for what it's worth, the actual plan -- providing scholarships for women engineers, that (inaudible.)

Q Okay. And on the first page, you respond on March 25, 2020:

"We could, but if this letter is going out very soon, the website is not active yet. We could direct them to a general e-mail for inquiries, but for communications with Cleta, I think she should go through Bill. Also The Society is not taking an active role in selecting recipients, but rather, depending on the universities to take that role."

So I first want to ask you about the website -- the first sentence.

Are you referencing The Society's website?

A I think so.

Q Okay. So as of March 25th, The Society didn't have any kind of website -- presence online?

A As far as I know, no. It was in the process, I believe.

Q Okay. And when you say:

"Also The Society is not

**taking an active role in**
**selecting recipients, but rather,**
**depending on the universities to**
**take that role,"**
**how did you know that information?**

A Because there's nobody at The Society to do it. Who's going to review all the resumes? Nobody's going to do it.

**Q So is it true, then, or is it you're saying that The Society was simply giving the money to schools, and the schools would decided --**

A Figure out who, you know, should get the money.

**Q And also implicitly in your statement is that The Society didn't have any employees to be able to --**

A Nobody was tasked to do that. No one asked us to review the resumes or at least, to my knowledge, she wasn't being asked to do that.

**Q But Lori wasn't an employee of The Society; correct?**

A I don't know who was an employee of The Society. I don't think she was getting a paycheck from The Society if that's what you mean. I do know she was an employee of the company, but also served

as the personal assistant to the family.

**Q If you know, was Lori Bofman a full-time of the company during this period?**

A I don't know what her hours were. She was salaried, I believe; right?

**Q So she wasn't being paid an hourly wage?**

A I don't think so.

**Q Okay. And did Lori -- sorry. Strike that.**

**Okay. And then at the top, Duke responds and part of what he says he:**

**"Saved all changes,**
**including Cliff's suggestion of**
**dropping the word "advance"**
**from educational opportunities."**

**Do you remember making that change?**

A I'm going to take Dukes's word here that I did. Okay.

**Q Okay. Next, we'll look at some more text messages -- the next document in order.**

**Okay. So looking at the very top text. This is a text on the left-hand side is the phone column. It says it's from Martin. And the recipients are yourself, Kahele, and Jeffrey Scott Fitch; correct?**

A Mm-hm.

(Whereupon, Plaintiff's Exhibit No. 21 was marked for identification by the deposition officer and is attached hereto.)

**Q (BY MR. ALLISON) And the first text messages says "by the PMS babes." Correct?**

A Mm-hm.

**Q Do you have an understanding of what Martin was referring to as "the PMS babes"?**

A Not right now, no, but Pacific Marine, apparently.

**Q In two text messages down, Martin provides the text -- three words: "Pacific Marine Sluts." Correct?**

A Mm-hm.

**Q And so is that what you understood what he meant by "PMS babes"?**

A That's what I understand now. I mean, I don't recall what I thought then.

**Q Who do you understand Martin is referring to as the "PMS babes" or the "Pacific Marine Sluts"?**

A I have no recollection of who that is or at least the company in general. I don't --

**Q Okay. And then you respond to "Pacific**

Marine Sluts" by saying:

"We should propose that restructuring and replace the staff appropriately."

Is that you saying that you should get some specific "marine sluts"? You're agreeing with him?

A That's a joke, yeah.

Q And then Martin responds to your joke with the word "Society of Young Women Maritime Sluts, LLC." Correct?

A Yup.

Q And then he asked:

"Wait...is women and sluts duplicative?"

And you respond:

"I'd like to see that website when completed."

And your answer:

"I'd like to see that website when completed."

Is referring to "The Society of Young Women Maritime Sluts, LLC"; correct?

A Probably yeah.

Q Okay. So given these types of pejorative

**and misogynistic communications, is it fair to say that someone reading this message would assume or would understand that this scholarship initiative is not serious by the people putting it on?**

A Repeat that again.

**Q Yes. Reading these communications, do you agree that it's fair to say that a reading of these is that the people putting on The Society's scholarship program, including yourself and Martin involved in these communications, are simply not serious about the initiative; you don't care about it?**

A What do you mean "care about it"?

**Q Well, I'm looking at the way you're discussing the potential scholarships.**

A I know, but what do you mean by "care about the program"?

**Q That there's no true beneficial purpose or intent behind the actions.**

A That is a reading, but there's a lot of different readings you can take, but I don't think that's the only reason.

And second of all, I don't believe what you're saying is exactly what you're trying to get at because in this particular case, why couldn't it be

both?

Because remember what Martin is trying to do with this organization is ultimately to please his benefactors. So irrespective of how he addresses them or denigrates them, the program itself has value to him.

**Q And part of that value is protecting him -- protecting himself?**

A Well, assuming that he knows what he's doing is a crime, which he probably does, but I don't know at the time.

**Q Well, you testified that you understood that one of the benefits to The Society program was protecting Martin Kao?**

A Yes, because if negative inference is true that he really does have no purpose for this organization, then that -- yeah. That can very definitively be seen as a crime; however, no one around Martin, other than Martin knows, for sure what his intent actually is, only what he's telling us.

So if he wants to be a jerk behind the scenes, he can be a jerk, but he can still care about the program.

**Q And when you testified a moment ago that it could be both things; right? When you said both**

**things, did you mean both that there was some clear language here denigrating the purpose of the scholarship effort?**

A Sure.

**Q But what was the other thing? What are both things?**

**What's the other thing is?**

A But also realizing the value of the program and willingness to actually sincerely promote the program in order to benefit his interests. He doesn't have to have a noble purpose at the end of day, just a legal one.

**Q Okay. Thank you very much.**

**Okay. We'll do the next document in order.**

**Do you recall these e-mails, Mr. Chen?**

A No, but they seem somewhat familiar.

(Whereupon, Plaintiff's Exhibit No. 22 was marked for identification by the deposition officer and is attached hereto.)

**Q (BY MR. ALLISON) Okay. So at the back of the packet is what has been referred to as the "PR plan" that I believe that Michael Schmicker might have originally drafted.**

**And he sends it starting on page 3. He sends it to Martin Kao, yourself, Karen Ernst, Troy Keipper, Duke Hartman, and Lori Bofman; correct?**

A Okay. Yeah.

**Q And who is Karen Ernst?**

A She was our H.R. head.

**Q And Troy Keiper, I think you mentioned him earlier?**

A He was the short-term COO.

**Q Okay. And then at this time, do you know what Duke's job title was at this point in time?**

A No, I didn't know anybody's job title even was. They were directly in front of me.

**Q Okay. But at this time, is it fair to say that part of Duke's responsibilities was being the relationship manager with the university contacts?**

A Sure.

**Q Okay. And the subject here is "SYWSE PR plan -- final recommendation." Based on that subject and the content of that e-mail, do you understand that the PR plan is being sent to the recipients to give it one last look over, and then it's finalized?**

A Okay. What are we -- sorry.

**Q Is that your understanding of the purpose**

**of this e-mail when you received it?**
A Yeah, it looks like it.
**Q Okay. And do you recall if you made any changes to this PR plan or gave any input?**
A I don't recall.
**Q Okay. And all of these persons that received the e-mail, they are all receiving it at a @navatekllc.com email address; correct?**
A Correct?
**Q And for each of these persons, is it your understanding that is a company work e-mail address?**
A Yes.
**Q Okay. And this e-mail is being sent --**
A Well, other than Mike.
**Q Mike wasn't a company employee, was he?**
A I don't know if he was or not. I can't recall.
**Q And this e-mail by Mike is sent Tuesday March 31, 2020. And it's -- you don't dispute that it's The Society's PR plan; correct?**
A I don't dispute that, no.
**Q Okay. And I'll also note that Tiffany is not a recipient here; correct?**
A No.
**Q And you said earlier, you never**

**participated in any e-mails about The Society with Tiffany?**

A Unless she's bcc'd, and I can't see it, no.

**Q So I want to turn now to page 2 to Martin's response. And particularly that second paragraph that starts with, "I know I'm doing wonderful and amazing things for young women."**

A Okay.

**Q What is it that you understand is the purpose of that paragraph that Martin e-mailed to the group?**

A Martin trying to bring some humor in and timely at that. Because this is the COVID period with Trump leading.

**Q And he's parodying the way that Donald Trump speaks. And in parodying the way that Trump speaks, is it your understanding or your reading of this e-mail that it's sarcastic, and he's not really doing amazing things for the women?**

A Well, he may or may not be. It's just the rest of it that makes it funny.

**Q And we just looked at a company text messages where he used extremely misogynistic language about the recipients --**

A Yes.
**Q -- of these scholarships?**
A Correct.
**Q So given the way he spoke in those other text messages and communications, and given the apparent sarcasm of this e-mail, you agree that Martin didn't really -- you understand there's -- is it your understanding that Martin didn't really believe he was doing all these wonderful things for women that he says here?**
A I believe he can be doing wonderful things and just not care about it.
**Q Is that what you understood was happening here?**
A That he's providing opportunities or more opportunities for people that might not have them otherwise. Is that a good thing? Yes. Is it necessarily his primary goal? No.
**Q Okay. This will be the last one we'll look at. And we'll call it after this, Mr. Chen.**
A Okay.
MR. ALLISON: Next one in order, please.
**Q (BY MR. ALLISON) Okay. So this is another printoff of text messages, same format as the prior ones we looked at. On the left hand column is**

who sends the message, the next one with the "to" above in the header is who received it. All the participants are in the third column, the body of this message is in the third column, and there's a time stamp associated with these message on the right-hand column.

The specific one I wanted to ask you about was a message you sent on the second page. It's the fourth from the top. And it says --

A Fourth from the top.

(Whereupon, Plaintiff's Exhibit No. 23 was marked for identification by the deposition officer and is attached hereto.)

Q (BY MR. ALLISON) It says:

"Eight week leases, then we can donate to SYWSE."

A Hold on.

Q And the reason why I provided almost three pages of the text messages, was to contextalize it.

A Okay.

Q So if you could read through the messages, I will then ask you what's going on here.

My first question, Mr. Chen, is that on

**the first page, six messages down, from Martin to you and Kahele Lum Kee, says:**

**"Signed! Just talked to Arnold again. It's done!!! Guess we can discuss tomorrow or Friday the spending plan. Paying down our capital line will not be looked upon well by him. He specifically asked me not to do that. We can wait a a couple of weeks and then do it, so the funds look like 'their' (sic) coming from another source."**

**My first question is: Is that word "signed," is that in reference to the fact that the PPP money CPB had just been received?**

A It doesn't sound like it's necessarily been received. It just says "signed" -- the promissory note, probably.

**Q Okay. "And just talked to Arnold again," who is it that you understood Arnold to be?**

A An official officer at CPB.

**Q Is that Arnold Martinez?**

A Probably.

Q Okay. And so then if we continue down, the rest of the e-mail seems to be talking about CPB and the disbursement of the PPP funds; correct?

A (No audible response; nods.)

Q And then at the top of the second page, it looks like you send a message to Kahele and Martin that's an Apple News link. And then you immediately respond:

"Stimulating the economy obviously."

And then Martin says:

"Strippers definitely quality as payroll cost."

Probably he meant "qualify."

And you respond:

"Better make sure we have the correct job descriptions on the website."

Martin then says:

"Make sure to rent the dildos versus purchasing."

And then you say:

"Eight week leases, then we can donate to SYWSE,"

which is The Society. So I want to ask

**you what you mean by "Eight-weeks leases, then we can donate to SYSWE."**

A I believe it was a joke in reference to to the regulations for the PPP of how you could qualify for forgiveness, and kind of what expenditures qualify, and what didn't, and what time frame. So it's technically a joke.

**Q And when you say, "We can donate to SYWSE," is the "we" the company?**

A Yeah.

**Q So your joke is about using company money to fund The Society; correct?**

A It is that we would no longer have the ability to get forgiveness after eight weeks, we have to get rid of them, ha-ha, that's The Society.

**Q Okay. And then on the last page, the second-to-the-last e-mail, Martin says:**

**"Need to thank Steven for this."**

**Do you know what he was referring to there?**

A I don't know. Maybe whatever article he sent. I'm not sure what that article is.

**Q And Kahele responds:**

**"Already have. I ordered**

**him a pole."**

**I think that's a reference to the stripper poles being discussed earlier in the text?**

A Probably.

**Q And I don't understand the joke.**

**Why would Kahele say he ordered Steven a stripper pole?**

A Probably because of the increasing antagonism between Martin and Steven.

**Q And again, these are just the typical ways that this group communicated to each other about these business matters?**

A Yeah.

MR. ALLISON: Okay. Mr. Chen, it's a few minutes before 2:30. We're going to end this deposition. We'll be back on May 2nd at 9:00 a.m.

I'll send your counsel an amended depo notice. Since we're not done, I think we can withhold the instruction about signing, unless you want to give it to him now?

MR. KOBAYASHI: No, we'll wait.

THE DEPOSITION OFFICER: Will the parties be ordering a transcript?

MR. KOBAYASHI: We will.

MR. ALLISON: I will as well.

MR. FUJICHAKU: I will as well.

MR. ALLISON: Okay. Mr. Chen, thank you very much.

(Whereupon, the proceedings adjourned at 2:27 p.m.)

-o0o-

STATE OF HAWAII )
)
CITY AND COUNTY OF HONOLULU)

Deponent's Declaration

I certify under penalty of perjury that the foregoing is true and correct.

Executed at ________________________ on ______________.

_________________________________________
(Signature of Deponent)

I, CARLENE K. SASAKI, CSR No. 544, do hereby declare:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to text under my direction.

__X__ That the witness was requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

_____ Signature is Waived

_____ The changes made by the witness are appended to the transcript.

_____ No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event or the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Witness my hand this 2nd day of May, 2025.

CARLENE K. SASAKI, HAWAII CSR 544

ERRATA LIST

| PAGE | LINE | ERROR | CORRECTION | REASON |
|---|---|---|---|---|
| ______ | ______ | ______________ | ________________ | _______________ |
| ______ | ______ | ______________ | ________________ | _______________ |
| ______ | ______ | ______________ | ________________ | _______________ |
| ______ | ______ | ______________ | ________________ | _______________ |
| ______ | ______ | ______________ | ________________ | _______________ |
| ______ | ______ | ______________ | ________________ | _______________ |
| ______ | ______ | ______________ | ________________ | _______________ |
| ______ | ______ | ______________ | ________________ | _______________ |
| ______ | ______ | ______________ | ________________ | _______________ |
| ______ | ______ | ______________ | ________________ | _______________ |
| ______ | ______ | ______________ | ________________ | _______________ |
| ______ | ______ | ______________ | ________________ | _______________ |
| ______ | ______ | ______________ | ________________ | _______________ |
| ______ | ______ | ______________ | ________________ | _______________ |
| ______ | ______ | ______________ | ________________ | _______________ |
| ______ | ______ | ______________ | ________________ | _______________ |
| ______ | ______ | ______________ | ________________ | _______________ |

I, undersigned, do hereby certify that I have read the foregoing deposition, and find it to be a true and accurate transcription of my testimony, with the above-noted corrections,

If any:

______________________________ ________________
Signature of Deponent Date

**Exhibits**

**EXHIBIT 1** 6:5 46:7
**EXHIBIT 2** 6:7 49:11
**EXHIBIT 3** 6:8 50:16,21
**EXHIBIT 4** 6:10 53:2 54:24
**EXHIBIT 5** 6:12 60:16
**EXHIBIT 6** 6:14 70:25 71:10
**EXHIBIT 7** 6:16 71:11
**EXHIBIT 8** 6:19 91:14
**EXHIBIT 9** 6:21 96:14
**EXHIBIT 10** 7:4 103:17
**EXHIBIT 11** 7:7 104:17
**EXHIBIT 12** 7:9 96:5 108:12
**EXHIBIT 13** 7:11 155:18
**EXHIBIT 14** 7:13 163:24
**EXHIBIT 15** 7:15 172:17
**EXHIBIT 16** 7:17 177:23
**EXHIBIT 17** 7:19 189:6
**EXHIBIT 18** 7:21 194:8
**EXHIBIT 19** 7:23 198:20
**EXHIBIT 20** 8:4 203:23
**EXHIBIT 21** 8:6 209:2
**EXHIBIT 22** 8:8 213:18
**EXHIBIT 23** 8:10 218:11

**$**

**$1,000** 123:13 134:8
**$10** 35:3 37:12 45:2,17
**$150,000** 97:8 101:5 103:24 110:21 112:18 114:21 117:9, 21 118:16 126:18 127:10 131:24 133:13 134:4,16 139:9 150:23 170:14
**$17,700** 64:15,24 71:18
**$2.4** 35:7
**$20,000** 72:17 76:20
**$200,000** 47:11,15 56:23 59:18
**$25,000** 65:13
**$250,000** 49:24,25
**$26,199** 65:4,9
**$30,000** 65:23 66:2
**$300,000** 82:6
**$350,000** 50:23 55:4
**$40,000** 77:12
**$400,000** 55:4 56:23 57:21 59:18 82:1,6,16,22 83:2 138:13
**$50,000** 55:12,14
**$90,000** 58:5,17 68:1
**$90,897.63** 63:23
**$90-** 69:11
**$91,000** 69:12 78:7 82:18,22 95:8,14 138:14

**-**

**-o0o-** 9:4 223:6

**0**

**0.8** 52:4

**1**

**1** 46:7 49:9 198:3
**10** 103:17 113:11
**100** 83:12 185:1
**10:00** 16:12
**10:29** 70:10
**10:32** 70:10
**11** 104:17
**11:15** 156:15
**11:48** 132:19
**11:50** 132:19
**11:53** 161:18
**12** 96:5 103:4,5,6,14 108:12 111:15,16
**12:00** 156:15
**12:12** 152:13
**12:47** 152:13
**13** 108:17,18 155:18
**14** 9:6 123:9 129:24 134:7 163:24 166:23 169:23
**140** 123:12
**14th** 112:6
**15** 172:17
**16** 56:21 65:13 177:23
**17** 56:21 189:6
**18** 113:16 114:5 117:5,19 118:14 129:12 194:8
**1820** 97:5,7,12,17 98:7 101:5 110:20 118:17 130:21 131:24 133:13 134:5 141:18 150:4
**18th** 113:20 114:10,14 115:8 127:22 173:19
**19** 47:7 198:20
**1:53** 200:7
**1:56** 200:7
**1:59** 201:12
**1st** 201:1

**2**

**2** 29:7,10,11 35:8 49:11 146:11 148:8,9 216:5
**2.3** 33:7
**2.6** 33:7
**20** 47:7 203:23
**2000** 17:25
**2005** 17:25
**2007** 99:20
**2019** 19:13 22:16 46:18,22,25 49:9 56:21 59:18 61:20 65:13, 18,22 91:20 95:3 98:9 103:25
**2020** 24:19 25:3 39:24 46:21 47:4 50:24 55:4,8,13,14 56:22 63:23 64:15,21 65:3 69:12 79:6,7 82:19 84:21 86:21 88:22 95:9 105:13,16,18

108:22,24 109:1 111:11 112:4 113:4,16 114:6 117:5,20 118:14 123:3,14 125:5 129:12 130:8 131:12,17 132:4 134:6 140:13 142:24 143:16 146:12 149:16 155:16 156:14 172:15 173:20,23 174:13 189:14 195:23 204:6,24 206:2 215:19

**2021** 24:20 163:22

**2022** 191:16

**2023** 11:14 12:7

**2024** 59:18

**2025** 9:2

**20k** 73:4,9

**21** 163:22 195:23 209:2

**21st** 198:2

**22** 9:2 87:12 98:9 213:18

**23** 61:20 191:17 218:11

**24** 55:4,14

**24th** 56:10 57:21

**25** 189:14 204:6,23 206:2

**250** 50:4 82:9,10 83:5

**25th** 206:20

**26** 103:24 155:16 156:14

**28** 130:8 131:12,17 140:13 142:24 143:15 146:12 149:16 173:20,23 174:13

**28th** 132:25

**29** 50:24 55:8,13 64:15 172:15

**29th** 56:10

**2:01** 201:12

**2:27** 223:5

**2:30** 222:15

**2nd** 201:16 222:16

**3**

**3** 46:13 50:16,21 105:13,16,18 109:1 146:10,11 214:1

**300** 83:5

**30th** 200:24

**31** 215:19

**3:26** 198:2

**3rd** 105:6

**4**

**4** 46:18 47:19 48:1,17 51:23 53:2 54:24 76:24 143:14 194:18

**400** 34:11 83:5

**48-46** 10:22

**5**

**5** 60:8,16 108:22,24 111:11 112:4 130:7 134:6 139:8

**5th** 114:10

**6**

**6** 65:22 70:25 71:10

**7**

**7** 65:3 70:25 71:11 72:5 91:20 129:11

**8**

**8** 91:14 122:24 123:3

**8-16-19** 72:10

**808-840-9585** 61:1

**8:58** 9:3

**9**

**9** 96:14 103:3,7,12 113:15 115:7

**95** 17:24

**99-plus** 31:5 54:6

**9:00** 201:16 222:16

**9:02** 12:22

**9:03** 12:22

**9:41** 38:23

**9:45** 38:23

**@**

**@navatekllc.com** 156:25 215:8

**A**

**a.m.** 9:3 12:22 38:23 70:10 132:19 156:15 161:18 201:16 222:16

**ability** 94:8 145:19 155:7 221:14

**aboard** 27:11

**abroad** 42:15

**absolutely** 81:9

**absolved** 94:13

**accept** 37:24 40:5,10

**accepted** 56:11 57:14 58:17

**accepting** 40:7,17 42:10

**access** 160:20

**account** 45:5 72:16 73:5,6,7,17,18,22,23,24,25 74:9,10,23 76:7,21 77:12 84:4 103:24 134:19 135:11,15 170:6,22 171:16

**accountant** 21:6,8

**accountants** 42:21 43:15

**accounted** 134:20 184:11

**accounting** 64:1 67:6,12 75:22 104:11 108:4 134:11 136:4 154:14,20 159:3,5 164:15

**accounts** 31:6 42:14 43:4 66:21 67:1 68:6 88:12 94:19 101:22,24 159:25 162:4,8 163:5,6 164:6 167:8 171:8,12,19,23,24 184:11,17

**accurate** 26:16,17 42:12,23 63:24 92:12 119:8 128:17 165:24 171:8 180:25 185:11

**accused** 106:24 197:22

**achieve** 25:20 44:1 168:10

**acquainted** 19:18
**acquired** 25:9
**acronym** 33:14
**act** 31:23 34:2 38:11,14 41:16,18 42:9
**acting** 83:19,21
**action** 113:25 114:7 117:10 122:20
**actions** 95:23 155:1 168:11 183:21 211:19
**active** 18:3 124:3,4 206:5,11 207:1
**actively** 89:16,21 90:19 123:9,21 147:15
**activities** 130:19 133:19,25 134:3 139:6,13,14
**activity** 90:22
**acts** 42:1
**actual** 94:22 147:2 191:13 205:24
**ad** 12:1
**added** 145:7
**Adding** 48:16
**addition** 59:17
**additional** 45:3 51:6,8
**address** 10:20 11:1 96:10 121:1 156:23 157:2,3 215:8, 11
**addressed** 128:16
**addresses** 212:4
**adjourned** 223:4
**administration** 124:13,17
**administratively** 27:16,20 124:7
**admit** 122:17
**advance** 71:15,18 208:14
**adversarial** 53:17,19
**advice** 142:11 160:5,10 182:9
**advising** 183:7
**advocate** 178:25
**affiliated** 97:5
**affirm** 9:11
**afraid** 138:17
**agree** 10:3,8 32:6 34:15 39:1, 5,10 62:5 73:13 101:5 114:9 134:13,14,17 148:14,19,23 149:1 150:14 158:2 159:11 161:5 164:13 165:3,14 166:18 168:18 175:3 177:11 186:4 190:1,8,9,11 195:19 198:17 211:7 217:6
**agreed** 41:8 151:15 190:12
**agreeing** 81:2 210:6
**agreement** 32:4 40:21 52:12, 25 136:12
**agreements** 28:25 52:7,16 137:13
**ahead** 15:15 41:11 113:9 190:22
**alarm** 68:5
**alarms** 67:22
**aligned** 129:6
**allegations** 185:18
**alleged** 117:9 125:11 126:4
**ALLION** 45:22
**Allison** 9:22,24 12:23 22:22, 23 30:3,16 36:4 38:20,24 43:12 46:11 49:15 50:12,20 53:6 59:3 60:7,9,20 69:25 70:4,13,18,22 71:14 72:9,12 74:13,20 91:3,5,18 93:7 96:18 102:9,18 103:4,10,13,21 108:6,8,16 120:5 125:20 126:17 132:16,20,24 137:24 139:5 145:12,25 147:7,24 150:21 152:10,14,18 153:15, 21 154:4 155:22 164:3 165:12 169:4 172:9,11,21 177:17,19 178:2 185:8 186:19 188:19,25 189:10 190:9,25 194:12 197:8 198:1,24 200:4,8,12 201:4,9, 13,21 204:2 209:6 213:22 217:22,23 218:15 222:14,25 223:2
**allowed** 19:8 57:9 87:17
**alter** 40:23 168:19
**amazing** 216:8,20
**ambiguous** 29:17 30:7 43:6 57:6 59:2 82:4 153:22
**amended** 222:17
**amount** 26:22 33:23 47:9 63:21 65:4 68:3 72:17 83:8 141:3 159:9,10,12
**amounts** 71:24 145:20 146:15 158:25
**analyses** 12:3
**analysis** 42:17 53:11 93:17
**ancillary** 153:4 157:23 199:18
**and/or** 123:18 136:6
**Andy** 109:14,17,25 113:17 142:1,23 143:1,16 149:16 151:11 152:4 178:10 179:20, 21,22,24 189:13
**Andy's** 179:17
**announcement** 199:14
**annual** 82:16
**annualized** 82:24
**annually** 49:24
**answers** 13:13 15:18 24:5 37:14
**antagonism** 222:9
**anybody's** 214:12
**anyone's** 149:25
**anytime** 101:21,23 102:11
**apologize** 47:2 103:15
**apparent** 217:6
**apparently** 82:17,20 171:15 204:22 205:6 209:12
**appearance** 95:22
**appearances** 98:16
**appears** 43:7 160:22 161:1 198:11
**Apple** 74:25 75:2,7,11 220:7
**application** 22:25 23:2 33:16 34:9,16 35:1,17,22 42:7,8
**applications** 37:5 39:23 42:3

**applied** 37:21

**apply** 37:2,8,11,13 40:3,5 42:2,4,5,6 59:3

**applying** 37:20 39:23 40:6

**appropriately** 210:4

**appropriation** 175:22,23

**appropriations** 26:23 119:7 145:18 146:3 174:9 175:6 185:13 190:5 195:10

**appropriators** 174:18

**approps** 175:20,22 189:20

**approved** 37:22

**approximate** 24:16

**approximately** 16:12 17:5, 22 24:21,22

**April** 9:2 39:24 49:9 84:21

**area** 20:22 61:1

**areas** 99:4 146:7

**argue** 135:3

**Argumentative** 35:19 54:3 68:7 74:12,16 82:4 93:4 94:16 101:9 102:7,15 137:21 138:25 150:17 168:22 184:25 197:7, 17

**arm** 12:9

**Armed** 174:19 175:6 189:20 190:5

**Arnold** 219:4,21,22,24

**arose** 107:21

**aroused** 68:25

**arrange** 146:21

**arranged** 147:2

**arrangement** 66:15 69:14

**arrangements** 137:11 145:15 171:6

**arrested** 83:10

**arrived** 131:11

**article** 104:23 105:2,16 106:4,11,16,21 107:18 125:10 126:2 221:22,23

**articles** 177:8

**arts** 85:17

**ASAP** 204:17

**asks** 14:22

**assertion** 175:18

**assist** 12:5 36:12 127:16,17

**assistance** 19:20 87:4

**assistant** 87:5,9 89:9 208:1

**assisting** 183:12

**associate** 20:13

**association** 150:1,13,15

**assume** 47:16 69:22 111:4 112:21 211:2

**assumed** 110:12 147:4 198:14

**assumes** 68:8 145:24 146:25 165:7 188:21 197:3

**assuming** 150:7 174:10 187:11 212:9

**assumption** 45:20 126:23 130:1

**attach** 133:8

**attached** 46:9 49:13 50:18 53:4 60:18 71:12 91:16 96:16 103:19 104:19 108:14 132:12 155:20 164:1 172:19 177:25 189:8 194:10 198:22 203:25 204:10 209:4 213:20 218:13

**attend** 64:20 65:25

**attended** 23:6,17,20

**attention** 116:16

**attorney** 92:5,6,8 97:6,17,24 109:8,13 110:11 111:8 122:19 142:8 143:7 173:7 183:8

**attorney-client** 141:4,9,14, 18,21,24

**attorneys** 52:14 59:9 113:7 126:25 127:3 136:7

**audible** 16:24 220:4

**audits** 42:22

**August** 11:14 12:7 65:13

**author** 149:8

**authority** 29:13 31:4,6,8 39:7

**autocracy** 81:2

**availability** 201:3

**awarded** 130:19

**aware** 25:6 51:25 77:23 84:9 97:9,10,13 104:25 105:20 106:1 149:20 151:17 170:23 191:9

**awareness** 84:21

## B

**babes** 209:7,10,18,22

**back** 12:23 15:8 20:17 21:20 26:14 30:19 32:12 36:8,11 37:18 38:17,24 41:4,6 53:1 75:15 83:11 90:24,25 108:10 119:15 125:23 132:20 139:5 152:15 157:14 160:25 166:22, 25 176:18 180:10 181:22 184:22 200:8,10 201:14 204:5 213:22 222:16

**backed** 196:20

**background** 95:19 100:7

**backstop** 67:13

**bad** 54:21 120:24 122:5,7 160:12

**Badgering** 102:17

**bailiwick** 177:16

**ball** 93:12 159:20

**ballpark** 33:8

**bank** 34:9,10,17 35:1 37:11, 19,20 40:22 45:2 84:4 94:18 99:19

**banker** 41:5,7 99:20

**bar** 18:7,12,14,15,16,22

**barely** 76:13 95:4

**base** 47:10 48:23 51:13,19 56:20 57:21 82:16 83:1 138:13

**based** 11:15 15:21 33:8 37:10,14 73:12 100:24 112:22 113:2 114:21 116:17 117:25 141:2 144:4 153:16 165:21 169:21 171:21 180:24 181:18,

20 182:12 186:19 214:20

**basic** 13:7

**basically** 25:22 26:21 81:1 98:13 162:21 176:17

**basis** 135:2

**bcc'd** 216:3

**bean-counting** 98:24

**bearing** 148:5 197:24

**began** 45:10 139:10 152:20

**begin** 93:10

**beginning** 24:19 42:18 79:8 82:8 108:10 144:11 162:23 167:23

**behalf** 28:14 29:23 70:11 89:14 109:22 182:10

**belief** 95:15 118:5 168:16

**believed** 41:5 122:21

**believing** 166:7 188:15

**belive** 64:22

**bells** 68:5

**Belt** 163:16

**benefactors** 212:4

**beneficial** 195:19 211:18

**benefit** 48:6 127:19 175:19 185:1 199:18 213:10

**benefits** 47:19,22,24 48:2,13, 17,18,22,24 49:19 57:22 59:11 212:13

**big** 75:19 166:15 173:13

**bigger** 98:25

**Bill** 143:3,5,6,22 146:13 148:12,14,22 150:12 151:11 152:4 173:2,4 174:1,12,16 175:4,10 176:24 189:13 204:6 206:10

**bimonthly** 83:3

**bind** 28:13

**bit** 13:9 29:19 123:23 193:22 196:10 202:8,23 203:1

**bitches** 205:18

**blah** 192:10

**boat** 50:1

**body** 61:8 218:3

**Bofman** 87:6,7,11,16 88:23 155:14 156:10,19,23,24 157:6 160:23 161:18 165:2,14,16,22 166:9,14 208:2 214:3

**Bofman's** 87:24 164:9 166:20

**boggled** 80:25

**bolts** 186:22

**books** 25:17 26:7 67:5,10 162:20 184:17

**born** 81:18

**boss** 38:8 202:11

**bother** 86:6

**bothering** 68:22

**bottom** 96:8,19 99:21 108:17 111:16 130:11 139:7 142:18 148:8,9 149:15 167:3 173:1, 22 174:2 178:9 189:13 194:19 198:3

**bought** 99:19 138:21

**bound** 180:18

**boundaries** 151:23

**breach** 95:17

**break** 70:5 132:14 152:18 162:1

**brewing** 53:22

**briefing** 16:1

**briefly** 12:25 47:21

**bring** 216:13

**bringing** 62:15

**broken** 142:2

**brother-in-law** 106:7

**brought** 21:20 27:11 116:5 188:3

**building** 28:9

**bulk** 205:2

**bundled** 179:8

**burn** 94:20

**business** 19:24 26:11,15 33:13 44:9 48:11,14,16 54:16, 19 63:18 80:19 87:13,18,19 88:11,16 98:2 118:24 119:8 124:16 155:24 161:10 166:10 168:9 169:11,13,14 172:4,5,8 175:16 177:6,10,14 180:12 183:9,12 185:9,22 186:24 222:12

**busy** 108:4

**butchered** 164:11

**buyer** 100:10

C

**calculated** 35:11

**calculations** 35:5

**California** 18:7,22

**call** 15:8 16:11,13,21,25 17:9 48:6 79:9 84:20 85:12 111:3, 18,20,24 112:2 114:2 116:17, 22 122:12,15,18,19 123:19 126:25 127:23 130:2 149:13 156:11 159:20,21 160:13 192:3,7 193:1,6 217:20

**called** 9:17 10:4,5,6 11:15 19:6 20:20 106:9 192:16

**calls** 35:19 57:6 89:25 101:9 102:7 120:2 124:10,12 125:6 133:22 145:10,23 146:24 168:23 197:16

**campaign** 19:7 83:22 84:1,17 97:9 101:7 117:21 174:3 185:14 186:5

**campus** 139:18

**Canfield** 143:4,5,7 148:12 150:12 151:11 152:4 173:4 174:12,16 175:4 176:24 178:10 180:22 189:13 190:2 191:2 204:6,14

**Canfield's** 148:14,22 175:10 178:19 180:4 181:7

**cap** 33:6

**capable** 166:10

**capacity** 54:13

**capital** 219:7

**capitalized** 115:21 119:20 120:6 128:11

**Capitol** 33:24

**capped** 47:10

**carbon** 143:16

**card** 84:3

**care** 39:11,12 54:19 94:1 124:15 148:2 176:22 211:11, 13,16 212:22 217:12

**careful** 134:9

**carefully** 62:24 131:9

**careless** 198:6

**Carolina** 27:5

**carry** 31:13

**carrying** 39:18

**case** 9:24 13:3 17:14 19:2 45:25 83:16 85:7 99:3 126:16 132:2 191:10 192:23 195:7 211:25

**cash** 44:3,6 45:9

**categorize** 12:18

**caused** 47:25 97:11

**causing** 93:11 94:6

**cautious** 34:6 81:22,25 90:12

**cavalier** 171:25

**cc'd** 205:13

**cease** 38:11

**Central** 34:9,10,17 35:1 37:11 45:2

**CEO** 31:5

**CFO** 12:2 24:11 25:3,4 28:16 39:1,4 42:12 43:1,9,15 66:24 67:1 74:6 77:21 92:19 93:16, 21 94:4 97:17,20 98:2,8,15, 18,21,23 99:11,13,15,18 102:22 135:18 159:11 160:3 166:15

**CFOS** 98:24

**chain** 108:9 109:18 155:13 163:19 172:13,23 173:13 197:11 198:11

**chains** 194:2

**challenge** 69:23

**chance** 61:9 97:16 191:18 192:19

**change** 24:13 40:25 49:19 51:5 53:8 57:22 208:16

**changed** 24:15

**changing** 41:14

**characterization** 26:24 165:3

**characterizations** 165:13 203:12

**characterize** 166:1 202:10

**characterized** 177:5

**charge** 19:5 161:12 165:18

**charges** 121:5

**chats** 61:9

**check** 41:3 64:14,15 65:2,5, 12,23 69:4,5 72:10,15 73:8 76:20 77:3,7,11 101:22 103:23 104:5 134:15,16,22 150:22 151:3 154:1 159:7 167:7 170:14,16 171:15

**checked** 136:21

**checking** 193:8

**checks** 71:1,3,4 95:7 136:20, 23 162:25 167:12 171:7,9

**Chen** 9:16 10:19,21 12:24 38:24 46:3,12 48:5 50:20 53:6 57:25 60:10 64:11,16 65:6,7, 19 70:8,22 72:5,13 74:4 90:24 92:25 96:6 99:5 103:21 104:15 108:9 114:18 132:21 138:23 152:14 153:10 154:25 156:5 164:25 169:8 172:12 177:20 194:6 197:12 198:10 200:10 201:13 213:16 217:20 218:25 222:14 223:2

**Chicago** 17:21 37:19,20

**chief** 24:12,24 81:11 99:7

**child** 65:17

**children** 57:25 58:6,25 59:4 60:3,4 63:22 64:7 68:2 69:11 95:15 138:15

**children's** 58:11 82:18 95:8

**choose** 101:18

**cities** 146:7

**claim** 38:4 86:14 89:7 112:14 159:7 163:15

**claiming** 106:14

**claims** 133:14 165:9

**clear** 34:7 72:2 73:13 130:6 136:14 141:11 163:1 184:1,2 213:1

**Cleta** 108:20 109:7,8,11,18 110:1,3,7,10 111:3,7,16,21,25 112:10 113:7,16,21 114:14 115:7,11 119:16 121:2 123:1 128:2,18 129:11,23 130:9,12 131:1,19 132:25 133:23 139:14 141:8 143:2 149:7,9 152:20 173:13 204:11 206:9

**Cleta's** 111:23 123:18 127:22 139:7

**client** 149:25 150:8 182:4,5, 13,14,21,25

**clients** 88:12,13

**Cliff** 94:18 164:7 170:7

**Cliff's** 208:13

**Clifford** 9:16 10:19

**close** 105:18

**closely** 145:14 147:7

**closer** 193:23

**closest** 147:5

**Club** 49:1 68:14 88:8 156:11

**code** 61:1

**college** 17:18

**Collins** 118:18,22 122:3,9

**column** 60:23 61:8 208:23 217:25 218:3,4,6

**comfortable** 136:5

**comingle** 135:15 196:5

**command** 30:5,9

**comment** 181:20

**commingling** 136:1

**commission** 133:21 139:16

**commit** 122:16

**committed** 106:15 120:16 122:17 125:11,12 126:3,4

**committee** 86:21 117:10 119:3,9 146:3 174:9 175:7

**committees** 145:19 189:21 190:5

**committing** 38:11,14 106:25

**communicate** 33:1

**communicated** 81:23,25 222:11

**communicating** 157:6

**communication** 93:10 193:16

**communications** 92:17 113:3 141:8 142:3,15 149:10 168:12 188:4 193:15 201:22 202:13 206:8 211:1,6,10 217:5

**community** 202:20

**companies** 48:15 52:2,8,14, 25 137:14

**company** 10:12,14 11:8,11, 15,23 12:7 19:20 20:18 21:2, 7,19,21 22:25 23:16,21,24 24:3,4,7,9,14,17,25 25:7,10 26:4,6,21,23 27:2 28:13,14 29:3,4,8,13,14 31:25 32:18 34:11,18 35:5,10 36:22 37:11 39:2,5,10,16,22 40:9 41:12 42:1 43:16,24 44:11,22,25 45:9,17 46:17 48:1 49:8 51:10 52:22 53:14 54:4,9,10,17,19, 22,25 55:20 56:16 57:1 58:9 59:12,23,24,25 60:12,13,14 61:4 64:9 66:9,12,21 67:25 68:13,17 69:1 73:16,24 74:2, 24 75:19,20 76:1 77:4,24,25 78:6 79:21 81:5 83:14 84:3,6, 10,22 85:18,19,20 86:5 87:25 88:7,12 89:4,8 90:1,14,17,18, 19 92:8,10,20 93:16,22,23 94:7,9,12,23 95:3,11,17,24 100:18 101:6,13,21,22,24 104:3,5 106:8 108:4 109:21 110:9,21 112:16 114:22 119:12 125:2,7,16 126:11 127:18,20 128:5,9,21,22 129:1,8 131:25 134:5,10,15, 25 135:3,10,15 136:1,10,18, 19,25 137:22,23,25 140:20 141:14 142:11,17,21 145:15, 20 146:6 147:5,11 151:8 152:3 153:11 155:7,23 156:1, 3,6,7,16,17 157:2,3,7,10,17, 21,22,24,25 158:6,10,14,16, 17 159:3,11 160:12,14 161:7 162:18 163:10,13 166:16 168:20 169:9,10,14,15,20 171:24 172:2,4,8 175:20 177:5 179:25 180:1,15 182:11 183:10,15,17 184:2,23 185:4, 6,10,14,21,22 186:1,11 190:2 193:12 195:9 196:15 197:2,19 207:25 208:3 209:24 215:11, 15 216:23 221:9,11

**company's** 28:1 30:4 34:8, 16 42:13 43:3,14 67:1,9 68:6 69:9 76:21 77:23 84:4 88:16 92:5,6 93:18 94:5 98:2 102:12 104:9 109:22 110:1,8,10 118:23 119:8 134:19 145:25 153:1,5 162:4 163:16 177:14 183:14,22 185:9,11 186:12

**compensated** 138:12

**compensation** 47:10 48:23

**competency** 39:18

**competently** 39:19

**complaining** 191:24 192:9

**complaint** 86:19,20 104:16, 21 105:1,15,17,21 106:1,3 107:17,22,25 109:1,4 111:4 112:21 114:24 127:6,12 130:16 132:1 178:14

**complete** 48:18

**completed** 210:18,21

**completely** 148:19 149:9 150:2,13,15 151:2 163:23

**Compliance** 178:15,16

**complicated** 78:19

**comprehensive** 48:18

**conceal** 100:9

**concealing** 100:22

**concern** 43:18 63:12 76:16 83:7 112:20,24 113:4 125:10 126:1 127:19 129:7 151:7,9

**concerned** 79:4 82:5 100:17 106:13 108:5

**concerns** 69:7 112:17 127:6 171:21 177:4

**conclude** 107:23

**conclusion** 101:9 133:15 168:24 169:1

**condition** 42:13 43:4 52:18

**conduct** 168:12 183:6

**conducting** 29:23 155:24 168:9 169:11

**conduit** 19:6 83:19,22

**conference** 16:23 17:8 23:11

**CONFIDENTIAL** 173:2

**confidentiality** 142:3

**confirm** 24:23 34:13 70:20 71:5 76:20 77:2 104:2 122:1 123:25 158:18,21 182:14

**confirmation** 124:2

**confirms** 123:17 164:4 199:5

**confuse** 151:25 160:17 163:14

**confused** 29:20 160:1 181:3 196:7

**confusing** 164:12

**Congress** 118:23 119:2 145:18 146:2,8 174:7,8

**congressional** 26:22

**congressmen** 186:7

**connection** 20:5 23:4 125:16 126:12 127:15 152:5 163:10

**connections** 188:11

**consequences** 63:15

**considered** 14:14 15:10 75:24 101:13,14 126:21

**consisted** 93:1

**constituents** 85:20

**constituted** 90:8

**consultant** 109:16

**consultants** 51:16

**consulting** 180:1

**consumer** 42:20

**contact** 168:14,15

**contacts** 188:5 214:17

**content** 178:17 214:21

**context** 98:2 119:2

**contextalize** 218:20

**continue** 70:23 94:9 127:4 201:15 220:1

**continued** 40:19 52:20,23

**continues** 132:7 179:15

**contracting** 44:21 84:23

**contractor** 84:14

**contracts** 29:22 145:19

**contribute** 88:16 187:1

**contributed** 203:3

**contribution** 78:1 84:18 97:9 117:21 126:15 130:21 131:23 133:13 134:21 199:17

**contributions** 52:21 83:23 84:2,12 97:12 125:3 174:3 175:12 199:15

**control** 32:8 43:3 149:4,11

**controlled** 138:16 161:11

**controller** 32:23 72:25 166:15

**conversation** 22:12 33:25 62:16 97:22 98:14 116:5

**conversations** 17:12 53:20 107:3 112:22 115:25

**conveyed** 170:21

**conveying** 51:18 204:9

**conviction** 18:24 192:5

**convince** 30:13 139:3

**COO** 214:9

**copied** 72:22 73:13,20 96:7 107:7 109:14 111:17 113:17 115:9 123:5 127:23 129:14 130:10 142:25 143:16 167:17 187:6,10 189:2

**copies** 46:4

**copy** 46:3,16 74:5

**core** 25:3 26:3

**correct** 10:16 16:20 21:14 22:5,6,18 23:25 25:1 26:9 29:5,6 30:20,21 35:12,13,17 36:7,23,24 37:3 39:17,24 40:3,5,11 43:1 44:14,18 46:14,18 47:5,7 48:18 49:9,10 50:24 51:3,21 55:1,5,6,9,10 56:22 58:7,8,10 61:2,14 62:8 65:11 66:9 67:22 69:22 72:18 73:2,10,11,16 74:18 75:5,6 77:13 78:22 82:2,16,19 83:23 84:4 85:9 91:10 92:6,21 93:3, 11 98:10 101:20 102:9 104:8 106:25 107:1 109:1,4,9,15 110:2,17 111:18 115:9,10,22 117:10,11,24 118:19,24,25 120:25 121:10,15,16,21 123:5,15,22 125:5,12 126:5 127:7,11,14,24,25 128:5,22, 23 129:3 130:12 134:8 136:10 137:1 139:11 140:23 142:8,12 145:21 148:15 150:15,22 151:1,3,12,22 152:20 155:16, 17 157:1,3,4,5 158:17 162:11 169:12 170:15 172:15,25 173:4,24 174:4,15 175:7 176:6,10 178:4,11,14,20 180:22 184:9 187:8,18 188:10,20 189:24 194:24 195:11 196:11,12 199:3,23 204:7,18 205:19 207:21 208:25 209:7,15 210:11,23 214:3 215:8,9,20,23 217:3 220:3,17 221:12

**correcting** 159:15

**correction** 159:21

**correctly** 35:20 63:5 150:10 152:8

**cost** 137:15,16 220:13

**counsel** 14:9,21 15:13 16:1, 7,9,10,16,17 51:15 90:1 95:18 96:1 222:17

**counsel's** 201:2

**count** 33:9 36:1 83:18 153:5, 9 154:24

**counting** 48:23

**counts** 33:16

**couple** 13:7 50:3 105:5 201:18 219:11

**court** 9:6 13:11,15 14:6,14 15:4 18:23 46:4 107:21 191:10

**cover** 127:4

**coverage** 45:11

**COVID** 38:9 44:17 47:4,6 138:17 216:14

**CPA** 18:17,19 25:16,17 78:14, 15 98:24 99:8,15 168:4

**CPAS** 42:22

**CPB** 219:17,23 220:2

**crash** 68:20

**create** 92:9

**created** 15:4 116:25 147:25

**credit** 40:22 84:3

**crime** 106:15,25 120:16 122:16,18 125:11,12 126:3,5, 14 127:4 212:10,18

**crimes** 107:20

**criminal** 38:11,14 83:16 114:20 121:5 125:13,14 126:7,8 127:7,9

**critical** 122:2

**criticism** 176:2,25 177:3

**crossed** 198:15

**crossing** 30:11 38:16

**cruel** 176:21

**curious** 84:19 199:16

**current** 11:4 62:3 171:1

**currying** 118:9,19,20

**cushion** 45:25

**custody** 41:22

**cuts** 83:11

**cutting** 12:16 179:17

D

**D.C.** 18:24 26:11,14 27:19 33:24 83:16 85:7 107:21 109:13 111:8 119:13 143:8 177:16 186:21

**damages** 54:22

**danger** 38:15

**date** 15:13 24:18 51:2 56:21 105:18 109:1 114:5 123:3 192:4

**dated** 46:18 65:3,13 72:10 103:24 105:5,13,15 108:22

**dates** 11:13 24:17 105:4,6

**daughter** 64:18,19 65:15

**day** 16:14 28:12 41:7 56:3 110:25 115:8 129:12 142:24 146:13 149:15 155:15 157:7 165:25 174:16 204:22 213:12

**day-to-day** 187:3

**days** 41:6 108:25 201:4

**dead** 42:10

**deal** 53:12 115:3 177:16

**dealing** 167:15

**December** 19:13 22:16 103:24

**decide** 95:24

**decided** 101:16 207:11

**deciding** 92:22

**decision** 28:13 75:10 81:5

**decisions** 29:24 30:12 89:2 165:18 166:6

**declaration** 186:16

**defendant** 14:14 70:12,21 85:7

**defendants** 17:13

**Defense** 10:6 52:4 84:11 141:15

**defer** 201:2

**deferred** 28:18 168:17

**define** 21:10

**definition** 43:9 154:10 155:9 182:25

**definitions** 10:1 182:3,13,21

**definitive** 74:24 102:21

**definitively** 75:20 126:24 149:23 212:18

**degree** 17:24,25 140:23 141:2 182:18

**degrees** 17:17,23

**delivered** 154:1

**demonstrated** 33:22

**deniability** 175:25 176:25

**denigrates** 212:5

**denigrating** 213:2

**deny** 34:13 158:19,21

**depending** 126:20 206:13 207:3

**depends** 28:17

**depo** 222:17

**deposition** 9:10 13:2 14:5 15:25 17:14 46:9 49:13 50:10, 13,18 53:4 60:18 71:12 91:16 96:16 103:8,11,19 104:19 108:14 155:20 164:1 172:19 177:25 189:8 194:10 198:22 200:18,19 201:16 203:25 209:4 213:20 218:13 222:16, 22

**depositions** 13:8

**Derek** 201:4

**derogatory** 201:25

**describe** 29:3 43:13

**describes** 205:14

**describing** 76:6 128:18 174:2 201:25

**descriptions** 220:17

**designed** 128:20

**desist** 38:12

**determine** 147:18

**develop** 120:19 190:21

**Devon** 64:16 66:6

**difference** 34:21 35:9 75:19 196:8

**difficult** 13:18 21:10 90:20 100:6 151:19,24 163:9

**difficulty** 166:11

**dig** 78:4

**dildos** 220:21

**dinner** 23:10,17

**direct** 88:4 92:20 94:23 101:16 161:6 175:15 185:13, 21 206:6

**directed** 93:9 97:11

**directing** 92:5,8

**direction** 80:12,13 84:5 129:7

**directions** 140:12,15

**directive** 79:23

**directly** 35:21 66:12,13,21 73:15 75:25 90:2,3 100:18 154:17 160:19 162:15,19 177:7,13 214:13

**director** 11:24

**directs** 94:12

**disagree** 164:9 202:21,24

**disappeared** 114:24

**disbursement** 35:6 220:3

**disbursements** 91:8

**disclose** 136:15

**disclosure** 9:7

**disclosures** 149:19

**disconnected** 129:2

**discover** 184:8

**discovery** 192:20

**discuss** 78:13 97:16 100:13 106:2,3,10 112:11,13 114:3 191:6,21 219:5

**discussed** 61:13 62:14 82:8 98:7 115:14 121:25 122:11 133:25 139:8 167:5 173:6 192:6 222:3

**discussing** 37:5 152:19 175:3 194:19 211:15

**discussion** 35:24 40:19 79:18,22 106:17,22 116:3 192:22 201:14

**discussions** 17:12 25:5

**disentangle** 53:15 172:6

**disguising** 166:17

**disparage** 202:13,15

**disparaged** 81:3

**dispositive** 159:7

**dispute** 53:22 63:25 215:19, 21

**disregard** 30:23

**disregarded** 31:12 32:19

**distasteful** 202:23 203:1

**distinction** 157:12,15 196:14

**distinctions** 124:24 151:17

**distinguish** 151:20

**distribute** 123:21

**distribution** 66:14 75:24 76:1 77:17 101:15 159:4,12, 19 161:24 162:15,20,24 163:2 164:15 184:12

**distributions** 66:11,12 158:22,24

**district** 191:10

**districts** 145:17 146:1,8 186:7,8 190:4

**dividend** 74:25 75:8

**dividends** 75:12

**divisions** 88:15

**documenation** 180:8

**document** 37:25 46:12 49:6, 8 50:8,21,22 54:25 60:8 72:5 92:3,9 96:4 103:16,22 104:14, 15 155:11 166:22 169:22 194:3 208:20 213:14

**documents** 16:2 41:9 64:11 170:17 192:20

**dollar** 145:20 146:15 205:19

**dollars** 33:8 82:23

**Donald** 216:16

**donate** 75:9 218:17 220:24 221:2,8

**donated** 117:9

**donation** 19:7 75:9,10 76:2 77:16 94:24 101:5,7 112:18 114:21 126:18 127:10 131:25 134:4 139:9,10

**donations** 146:23 175:5 177:13

**dotting** 30:10

**doubled** 56:20 57:12

**doubling** 59:17

**doubt** 170:25 171:1 174:25

**dovetailed** 153:7

**dozen** 169:19

**draft** 194:22 204:10

**drafted** 213:25

**draw** 124:23

**drawing** 135:9,12

**dressing** 86:16

**Drive** 10:22

**dropped** 159:19

**dropping** 208:14

**Duke** 56:1 107:14 113:3,5 144:20 145:7,9,13,16 146:13, 18,19 147:8 148:4 151:12 152:4 153:6 154:11 178:11 186:17 187:2,7,24 188:3,9,19 193:9 194:19 196:21 204:4,7, 15,23 205:13 208:10 214:3

**Duke's** 188:12 214:11,15

**Dukes's** 208:17

**duly** 9:17

**duplicative** 210:15

**duties** 11:22 25:3 26:4 39:6, 8,11,13,15,18 43:14 51:4 87:25 92:20 93:23,25 168:1

**duty** 94:1 102:23

## E

**e-mail** 20:10 36:14 72:21 73:19 74:5,6 76:6,13 77:4 79:1 90:11 91:19 93:13 96:7, 8,10,18,20,22,25 97:14,15 98:5,13 99:21 101:4 103:2 108:9,18,19 109:11,18 110:14 111:14 113:13,21 114:13 115:5,7 116:19 119:16 121:20 122:12 123:2,18,20 127:21,22 128:15,19 129:10,16,22,25 130:8,25 131:9 132:25 134:7 139:7 140:10,16 142:23 143:1 146:13,20 148:9,10,15,17,23 149:15,17 150:10,17 151:10 152:19 154:23 155:13 156:23 157:2,3,8 159:23 161:17 163:19 167:1,2,19 169:9,25 170:9 172:12,16,22 173:13,22 174:8,14,15 175:5,9 176:5,16 178:10,18,22 179:12 181:10, 11 183:5 184:1,3 185:16 189:12,23 191:5 193:15 194:2,19 195:22 197:11 198:11,12 199:11 204:3,6,12, 21 205:4,5,11 206:7 214:21 215:1,7,11,13,18 216:19 217:6 220:2 221:17

**e-mailed** 216:11

**e-mailing** 167:20 196:10

**e-mails** 36:17,21 37:1,4 73:12 89:22 90:7,10 96:6 107:5,6,8 132:4 139:5 142:2 143:3 145:8 155:14 156:22 157:6,11,16 158:4 160:22 165:20 166:12 167:15 169:5, 10,21 171:4,22 173:19,24 175:3 177:20 178:2 183:24 187:6,10 189:1,13 194:5,13 195:22 196:10 198:14 201:24 202:3 203:20 204:23 213:16 216:1

**earlier** 44:11 46:20 51:9 61:14 66:7 67:20 71:2 72:10 73:1 78:20 83:17 86:20 91:5 93:21 110:16 125:9,24 127:5 128:4 134:15 136:9 137:6,12 138:16 140:22 155:22 158:15 163:12 170:14 172:3 173:6,12 186:20 195:8 204:11 214:8 215:25 222:3

**early** 25:3 44:14 86:21 112:7

**ears** 21:1

**easier** 13:14 140:8 188:17

**easy** 185:5

**echelon** 29:3

**economy** 220:9

**edits** 204:25

**education** 64:7 85:17 94:23 166:20

**educational** 17:17 208:15
**effect** 32:6 157:23 200:3
**efficiently** 51:11
**effort** 121:18 124:18 180:18 205:21 213:3
**efforts** 139:11 144:5 169:3 186:5
**ego** 168:19
**Eight-weeks** 221:1
**elected** 186:8
**Elections** 86:21
**Elle** 65:14,15
**Ellis** 65:16,17,22
**else's** 104:9 135:11,12
**email** 170:3 215:8
**emergency** 46:1
**employed** 10:15 11:11,14 29:2 47:25 83:8
**employee** 20:18 25:13 51:13, 19 56:16 57:2 59:10,25 87:11 88:23 89:3 90:18 106:17 110:4,8,9,20 136:22,25 155:23 207:20,22,25 215:15
**employee's** 60:4 62:3
**employees** 34:11,18 35:16 45:12 57:2 59:12 62:20 64:9 86:24 87:3 88:3,4,16 147:5 153:1,11 197:20 202:18 207:15
**employment** 11:5,10,17 12:6 19:22 23:1 24:14,17 43:16 48:24 167:23
**empty** 94:19
**enagagement** 181:7
**encourage** 42:1 195:10
**encouraging** 37:1 159:24
**end** 12:6 15:3 24:18,20 28:20, 21 30:9 31:16 45:23 57:10 63:12 80:5 135:10 158:4 167:24 168:16 205:14 213:11 222:15
**endeavors** 54:16
**ended** 35:21 37:20
**ending** 11:13 18:10
**ends** 156:24
**engage** 20:1
**engaged** 109:21 143:8 173:7
**engagement** 178:13,19 180:5,20,21 181:1,16 182:8, 15 183:3,6,8
**engineer** 21:4,5
**engineering** 27:10,12 29:21 85:17 100:23 115:16 116:7 118:7 128:20 147:21
**engineers** 55:19 85:9 104:1, 4,6 187:13,16 205:25
**ensure** 160:4
**enterprise** 135:24 166:10
**entities** 151:24
**entity** 97:8 110:21 115:20 119:19,23,25 120:12 121:19, 20 128:3,4,8,21 152:6
**equipment** 11:14,16 12:7
**equipment-leasing** 11:23
**equity** 12:9
**equivalent** 12:2
**Ernst** 214:2,5
**errand** 87:14
**Errands** 88:2
**essentially** 11:25 12:8 23:8 45:6 89:9 90:20 106:15 189:23 196:19
**estate** 99:25 100:9
**estimate** 17:4 36:1
**estimated** 33:6
**estimates** 33:15
**evening** 191:22
**events** 139:18
**eventual** 107:20
**eventually** 34:17 66:18 76:8 82:15 121:14 162:9 163:3
**evidence** 68:8 145:24 146:25 165:8 188:22 197:4
**evolution** 85:2 86:9
**evolving** 33:3
**exact** 11:12 192:4
**EXAMINATION** 9:21
**examined** 9:19
**examples** 32:14 99:16 198:6
**excluding** 155:4
**exclusive** 128:24
**excuse** 108:25 128:21
**execute** 27:1 37:25 39:8
**executed** 153:1,11
**executing** 89:14 178:18
**executions** 12:5
**executive** 39:1,4 93:22
**executives** 29:13 48:15
**exhibit** 46:3,7 49:11 50:16,21 53:2 54:24 60:16 70:25 71:10 91:3,14 96:5,14 103:2,17 104:17 108:7,12 155:12,18 163:24 167:2 172:17 177:23 189:6 194:8 198:20 203:23 209:2 213:18 218:11
**exhibits** 50:11
**exist** 115:1
**existed** 51:25 114:24
**existing** 45:13 94:22
**exit** 12:10
**expand** 25:10
**expanded** 193:14
**expanding** 51:10
**expansion** 25:25 28:2 36:2 43:18,25 44:20 190:18
**expansions** 27:1
**expect** 201:18
**expectation** 127:2
**expedite** 147:21
**expenditures** 221:6
**expenses** 12:17
**experience** 168:11

**experienced** 15:22 111:8
**experiences** 112:23 113:3
**expert** 63:1 127:13 140:18 142:8
**expertise** 99:2,7,8
**experts** 122:22
**explain** 149:6
**explained** 56:9 57:11 59:8
**exposing** 172:2
**extend** 40:25 59:11
**extended** 40:22 64:8
**extent** 39:7 93:5 100:21 138:11 169:18
**external** 51:15
**externally** 151:20
**extraordinarily** 137:13
**extreme** 94:17 136:11
**extremely** 138:12 216:24
**eyes** 21:1 77:6

**F**

**face** 36:13 92:4 95:6,22 130:5 186:18 203:10
**face-to-face** 20:10,12 22:4 23:13
**facilitate** 100:2,3
**facilities** 52:24
**fact** 32:1 36:19 47:14 49:15 51:1 75:18 77:2 119:4 122:15 165:7 180:17,25 182:15 186:1 197:1 219:16
**facts** 68:8 145:24 146:25 188:21 197:3
**failed** 30:13
**fair** 26:20,24 53:24 105:20 112:9,15 118:16 131:22 157:9 185:24 211:1,7 214:14
**fall** 28:15 81:19
**fallout** 106:10,12
**false** 35:15
**familiar** 12:11 61:18 97:1 109:23 213:17
**familiarizing** 203:21
**family** 52:2 87:22 101:17 159:25 162:8 163:5 167:8 171:7,18,23 180:18 208:1
**family's** 87:13
**farther** 50:5
**fashion** 62:15
**fast** 145:3
**faster** 147:18 188:18
**favor** 118:9,19,21
**fear** 81:7,17,18
**February** 79:4 86:21 87:12 88:22 105:6,13,16,18 108:22, 24 109:1 111:11 112:4,6 113:4,16,20 114:5,10,14 115:8 117:5,19 118:14 123:3 125:5 127:22 129:12 130:8 131:12,17 132:4,25 134:6 140:13 142:24 143:15 146:12 149:16 155:16 156:14 172:15 173:19,20,23 174:13 189:14
**FEC** 104:16 107:16,22 109:1 129:21,24 130:15 131:4,21 133:12 149:7 178:14
**FEC's** 132:1
**federal** 14:14 29:23 36:17 44:7 86:21 88:13 107:21 191:10
**fee** 178:20
**feel** 26:18
**fees** 179:16,18 181:9,12,13, 17
**felt** 81:18 114:15,19 196:13
**female** 123:13
**fence** 183:14
**fiduciary** 39:6 93:23,25 94:13
**figure** 26:1 28:10 35:14 47:18 63:25 67:17 207:12
**figuring** 53:11
**filed** 86:20 105:22
**fill** 27:13 88:8 160:21
**final** 28:19 31:3 57:20 105:4 140:3 151:10 214:20
**finalized** 214:23
**finance** 11:16,25
**finances** 26:7 30:4
**financial** 12:3 24:12,24 25:25 28:22 42:13,19,20 43:4,14,19 67:9 68:6,24 99:7
**financially** 26:2
**financials** 12:13 42:18,23
**find** 19:22 20:2 27:21 31:18 45:12 100:19
**finding** 20:8
**fine** 41:10 205:3
**finish** 13:22 83:21 114:17 162:7 184:19 200:17
**fire** 80:9 81:8 162:1
**fired** 38:9 79:24,25 80:5,6,24 81:15
**firing** 80:14 81:3
**firm** 164:20
**fit** 155:9
**Fitch** 20:14,15,16 21:10,14,17 22:3 23:6,14,25 28:5 61:13,19 79:19,20 208:25
**Fitch's** 20:21 22:7
**five-minute** 70:5
**flip** 72:13,20 74:20 76:19 77:10 105:3 111:13 122:23 130:7 146:10 148:7 149:14 204:5
**flipping** 143:14
**floor** 94:19
**flows** 45:9
**focus** 154:8
**focused** 26:10 27:18 182:22
**focusing** 26:13
**Foley** 110:4
**folks** 174:18 175:6,19 177:13
**follow** 37:24 63:3 125:19 140:11,14 160:4

**footprint** 27:10
**forced** 69:2
**foreknowledge** 94:25
**forget** 33:14 106:4 190:23
**forgiveness** 85:5 221:5,14
**Form** 188:13
**formalized** 32:1
**format** 217:24
**formed** 78:3
**forms** 92:2
**fortunate** 89:25
**forward** 35:25 43:24 44:10,19 52:9 56:6 83:14 129:9 175:11 180:4
**forwarded** 102:4 143:3 163:20 172:14,16 176:5 180:21 189:24 191:5 204:22
**forwarding** 176:14 180:4
**forwards** 178:23
**found** 30:13 38:8
**foundation** 58:5,12,13,14,18, 19 59:23 62:2,12 63:9,19 65:4,24 66:8,18 68:2,4,8 69:10,19 71:8 72:17 73:9,15 76:8,17 77:5,13,18 78:9 91:7, 10,24 92:1,12 94:22 95:7,11 101:10 102:5,7 138:15 190:7, 15 197:17
**Foundation's** 64:5
**foundations** 91:24
**fourth** 71:20 105:4 218:9,10
**foward** 143:21
**frame** 40:10 44:16,17 55:18 88:22 89:15 106:1 112:4,8 221:7
**frames** 17:22
**frankly** 55:24
**fraud** 36:18
**free** 26:18 72:2 188:16 205:18
**freedom** 56:15
**friction** 51:25 80:17
**Friday** 201:16 219:6
**friend** 19:17 20:16 79:21 81:4 193:23
**friends** 21:22
**front** 46:12 71:1 159:5 166:23 174:21 214:13
**FUJICHAKU** 29:18 103:1 145:10,23 146:24 147:12 153:14,18,22 165:4,7 168:23 186:14 188:13,21 197:3,15,18 201:7,20 223:1
**fulfill** 99:10,13
**fulfillment** 52:15
**full** 55:15
**full-time** 208:2
**fully** 57:11 165:18
**function** 69:6 118:6 161:14
**functionally** 12:2
**functions** 98:22
**fund** 62:2 221:12
**funded** 66:11
**funding** 159:24 164:4 167:7 170:5
**funds** 69:9 75:23 119:11 135:15 161:23 162:14 164:8 170:8,11 219:12 220:3
**funny** 216:22
**furtherance** 153:2,12,24,25 154:2,10 155:1 168:13
**furthered** 155:8 186:5
**futherance** 121:8
**future** 62:4
**future-looking** 33:15

## G

**gave** 24:11 38:5 56:11 57:13 98:15 116:9 130:20 215:4
**general** 11:21 72:16 76:21 77:12 103:24 177:9 206:7 209:24
**generally** 30:16 54:15 77:22 105:6 108:3 147:16 149:11 166:1 194:12
**generated** 147:25
**get-to-know-you** 22:9
**girls** 189:17
**give** 9:12 13:12 15:20 17:7 31:19 46:3 55:15 56:4 59:4 82:13 116:6 118:2,7 119:10 123:11 131:13 134:6 144:5 160:18 162:19 171:12 177:15 192:17 214:23 222:20
**giving** 75:8 115:14 118:11,16 131:2 142:11 144:14 147:11 173:15 177:12 195:16 207:10
**glacial** 145:2
**glad** 203:7
**glanced** 181:5
**goal** 121:6,9,23 128:2 158:5, 10,13,14 217:18
**goals** 26:20 89:23 153:2,13 155:2,8 168:10
**good** 9:23 44:8 56:5,18 57:15,16,17 83:6 85:18 149:12 178:24 188:7 199:10 201:6,8 217:17
**Governing** 9:6
**government** 29:23 36:18 44:7 84:13,23 88:14 185:13
**grab** 73:4
**grade** 65:22
**graduation** 62:7
**grant** 9:23 189:16
**granting** 190:3
**gravitas** 98:17
**gray** 99:4
**great** 62:19 201:20
**greater** 195:10
**Green** 44:9
**ground** 12:25 13:7 187:14
**ground-rule** 15:17
**group** 10:6 28:5 52:4 84:11 86:3 141:15 205:20,21 216:12 222:11

**guarantee** 28:23

**guess** 15:18 17:2 22:12 56:18 57:8,9 90:22 107:23 110:4 146:11 165:25 174:11 177:1 179:23 181:21 185:15 188:7,8 192:24 219:5

**guessing** 177:1

**guilty** 19:2,5 83:17

**guy** 56:4 78:19 79:21 81:1,10, 11 106:5 178:24 187:22

**guys** 136:5

### H

**H.R.** 25:24 79:3 214:6

**ha-ha** 197:23 221:15

**half** 17:5 82:23 192:13 193:2 200:14

**Halloween** 191:16

**Han** 10:19

**hand** 50:14 154:2 217:25

**handed** 72:9 183:20

**handicapped** 94:10

**handing** 183:19

**handle** 28:6 30:10 87:15

**handled** 87:13 154:15

**hands** 92:18 100:20

**handwritten** 77:16

**Hang** 99:5

**happen** 20:10 27:17 32:20 54:21 92:23 101:19 111:21 139:20 140:18 159:6 186:24 193:7

**happened** 22:15 35:21 40:12,13 49:2,3 51:20 75:21 92:16 93:20 116:17 127:1,13 141:22 159:3 163:2 188:12 192:19 198:14,18 202:13

**happening** 28:20 36:19 44:5 53:20 68:11 141:8 191:23 197:24 217:13

**hard** 166:7 188:14,15

**Hartman** 56:1 107:14 113:3 145:7 151:12 152:4 165:1 178:11 193:9,14 205:13 214:3

**Hartman's** 165:13

**Harvard** 17:19

**hate** 54:20

**HAWAI'I** 9:1

**Hawaii** 9:7 11:2,18 18:12,14, 15,16 64:7 100:24 191:11

**Hawaiian** 28:9

**head** 13:16 16:24 25:12 33:9, 16 36:1 73:22 177:3 214:6

**header** 60:24 113:15 146:12 205:11 218:2

**headhunter** 19:18,22 20:1,2, 6 23:3 24:6

**heads** 29:21

**hear** 70:16 111:23 122:15

**heard** 15:21 24:7 126:24 127:2 177:7 191:12

**hearing** 112:2 127:3

**heavily** 182:18

**held** 18:15,16,19 30:1 134:19

**hell** 68:15

**helping** 43:17 89:1 90:8 161:5,7 168:9 183:11

**hereto** 46:10 49:14 50:19 53:5 60:19 71:13 91:17 96:17 103:20 104:20 108:15 155:21 164:2 172:20 178:1 189:9 194:11 198:23 204:1 209:5 213:21 218:14

**hesitant** 34:2 38:7

**Hey** 38:10 41:23 44:2 54:20 56:17 57:15 62:20 63:18 67:15 68:20,21 73:23 75:7,21 82:8,12 94:18

**hide** 101:1

**hierarchy** 29:4

**high-powered** 127:3

**higher** 17:17,18 34:22,24 50:7,9,23 57:10

**highly** 33:20

**Hill** 33:24

**hindsight** 185:2

**hire** 25:17 27:22

**hired** 23:23 24:9,10 25:2 29:1 46:17 67:1

**hires** 27:11,13,22 51:18

**hiring** 147:22

**historical** 33:9 52:8

**history** 11:10 116:20,21 124:5

**hoc** 12:1

**hold** 14:11 18:2,3,5,13,14,17 192:17 218:18

**holding** 51:17 135:11

**home** 10:23 11:1 21:25 22:1

**honest** 39:16

**Honestly** 79:14

**honesty** 39:15

**Honolulu** 9:1 10:22 26:14 28:8 64:14,20 65:23,25 66:3

**hot** 169:16,17

**hour** 17:5 70:6 200:14

**hour-ish** 17:10

**hourly** 208:6

**hours** 201:18 208:4

**huh-huh** 13:14

**humor** 176:20 216:13

**husband** 90:22

**hypothetically** 159:10

### I

**I's** 30:10

**idea** 27:8 30:17,18 59:14,15 60:3 62:10 87:21 116:5,15 119:11 149:12 164:19 187:1 191:3,7 193:5 205:9

**ideal** 12:12

**ideas** 31:10 115:13 173:14

**identification** 46:8 49:12 50:17 53:3 60:17 71:11 91:15

96:15 103:18 104:18 108:13 155:19 163:25 172:18 177:24 189:7 194:9 198:21 203:24 209:3 213:19 218:12

**identity** 100:10,15

**ill-advised** 149:3

**illegal** 40:18 41:15,18 42:9 63:13,16 83:22 84:22,24,25 95:23 101:6 112:14,19 160:7, 13

**immediately** 105:21 109:3 220:7

**impacted** 94:8

**impacting** 67:16 68:19

**impart** 81:6

**impatience** 32:9

**implication** 140:19

**implicitly** 207:14

**implying** 98:20

**important** 78:5 86:7 91:2 119:7 124:23 157:13,20

**imposed** 83:11

**impressed** 57:17

**improper** 69:8 159:13,14,16, 20 160:6

**improve** 26:1

**inactive** 18:5,8

**inaudible** 205:25

**incentive** 47:9

**incentives** 81:24

**include** 129:20 133:19 134:4 180:16

**included** 34:17 139:15 146:19 172:13 193:15

**including** 17:13 26:6 123:10 169:25 208:13 211:9

**inclusion** 142:1

**income** 78:17

**incorrect** 25:9 43:11 45:21 47:2 69:24

**increase** 26:22 35:15 40:24 49:8,16,19,20 51:5 54:25 55:8,13,14 57:22 82:1

**increases** 55:3

**increasing** 222:8

**increasingly** 38:8 53:19

**independent** 52:10 93:17

**indicating** 36:17

**indicted** 107:20

**indictment** 85:6 86:11

**individuals** 99:16

**industry** 12:11

**inefficiencies** 45:13

**inference** 212:15

**inflated** 34:18

**inflation** 35:15

**influence** 33:23 86:17 119:11 175:15 177:14 185:12,14,21 195:10

**influential** 98:17

**info** 100:7

**information** 43:3 65:20 129:18 131:1,20 133:11 207:5

**informed** 147:16

**initial** 22:4,8,23 33:3 46:17 107:25 108:2 170:14

**initially** 35:11 49:23 162:18

**initiative** 166:6 211:3,11

**initiatives** 147:11

**innocent** 95:6

**input** 215:4

**inquiries** 206:7

**inside** 42:21

**install** 135:23

**instance** 28:6 37:18 73:14 93:7,8 101:14 135:22,24 137:11

**instances** 31:9

**instinct** 196:4

**instructed** 32:17

**instruction** 31:14 32:19 222:19

**instructions** 140:20 160:18

**insult** 203:9

**insurance** 52:24

**intended** 129:23

**intent** 159:14 160:15,16 195:12 211:19 212:20

**intention** 155:10 160:21

**interact** 90:12

**interaction** 150:5

**interchangeably** 10:10

**intercompany** 52:7,25 137:13

**interest** 40:25 54:19 136:13 137:9 140:11,14 179:7 180:14 183:22 184:23

**interested** 20:7 25:23 30:15 67:4 119:12 186:22

**interests** 129:6 180:13 213:10

**interface** 188:7

**interfacing** 25:23 27:11

**interject** 26:18

**internal** 49:7 50:22 54:24 80:16 103:14

**internally** 51:7,8 151:18 152:3

**interpreted** 125:2

**interrelated** 169:14

**interview** 23:7,8 27:22

**interviews** 23:6,24 59:4

**introduce** 46:2 56:16 64:12 69:25 108:7 194:3

**introduced** 169:23

**introducing** 64:11

**introduction** 19:17,23 20:9

**investigate** 53:14

**investigation** 53:11 114:20, 21

**investment** 12:10 99:20

**investments** 99:25

**involved** 85:8 124:9,11,13,17 133:23 149:24 167:19 173:14 211:10

**involving** 20:13

**Iolani** 65:5,10,13

**irrelevant** 190:18

**irrespective** 28:23 212:4

**IRS** 62:25

**issue** 34:7,15 78:5 84:2 90:25 94:24 112:13 114:6 115:17 158:11 184:16

**issues** 68:24 115:3 121:1

**issuing** 143:25

**item** 15:17

**J**

**jabbing** 176:18

**January** 24:19 46:18,21 56:21 163:22

**JD** 17:20

**Jeff** 20:13,15,16,21 22:11 23:6,19,22,25 25:15 28:5,8 61:13,19 62:14,17 79:18,19, 20,24,25 80:3,5,6,9,17,18,23, 24,25

**Jeff's** 21:19

**Jeffrey** 208:24

**jeopardy** 140:21

**jerk** 212:21,22

**Jerry** 194:20 195:14,18

**job** 11:22 14:24 20:2 23:6,7,8, 24 25:3,6 51:4 53:8 56:5,18 63:7 67:4 87:24 92:20 102:23, 24 138:17 140:8 168:1 191:24 214:11,12 220:17

**jobs** 43:10 88:10

**Join** 147:13 168:24,25 197:7, 18

**joined** 29:18 185:6

**joke** 197:1,20 210:8,9 221:3, 7,11 222:5

**joked** 197:13

**jokes** 196:24 197:9

**joking** 196:18 198:4

**journalist** 106:6

**July** 65:3

**June** 61:20

**justifications** 55:12

**justified** 57:12

**K**

**Kahele** 32:23 33:5 35:22 37:2 40:15 41:17 44:3 51:14 55:25 70:20 72:21,25 74:4 76:6 80:22,23 107:3,12,13 108:1 112:23 136:3 154:17 192:12 193:13,21 202:8 205:13 208:24 219:2 220:6 221:24 222:6

**Kahele's** 73:3

**Kao** 19:10,12 23:25 53:23 65:4 66:17 68:1,3 69:10 71:7 73:15 76:8 78:9 91:7,9 92:11 95:10 96:11,20,21 105:24 106:23 107:10 109:25 128:13, 22 129:13 130:9 137:19 138:20 140:9 141:10,25 142:5,24 151:12 159:25 167:8 171:7,18,23 172:14 178:3,10 182:9 189:13 191:15 202:5 212:14 214:2

**Kao's** 180:10

**Karen** 214:2,5

**Kau** 19:9

**Kee** 32:23 37:2 55:25 70:21 72:21 74:5 76:6 80:22 107:3 112:23 154:19 192:12 193:4 202:8,24 205:13 219:2

**Kee's** 108:2

**keeping** 136:4 147:16 151:7 157:16 158:8 171:3 183:25 184:2 192:18

**Keiper** 214:7

**Keipper** 214:3

**kid** 58:22

**kids** 191:19

**kids's** 59:20

**kind** 22:9 27:13 51:8 67:8 80:1 86:2 90:5 114:20 138:22 192:20 193:8,16 206:21 221:5

**knew** 19:19 20:6,7 26:11 30:9 52:12 87:2 88:6 106:23 109:12 117:7,8 121:12 135:17 136:19 139:4 168:3 199:23

**knowing** 80:14 162:23

**knowledge** 65:10 84:15 88:19 107:2 111:7 114:23 116:13 117:12,16 121:17 139:21 152:25 153:11,16 154:9 155:7 166:19 167:25 168:11 171:17,20 186:1 191:1 203:16 207:19

**Kobayashi** 14:21 16:18 29:16 30:6 35:18 43:5 45:18 54:2 57:5 59:1 68:7 72:7 74:11,16 82:3 93:4 94:15 101:8 102:6,14,17 103:3,5 120:1 137:20 138:24 147:13 150:16 168:21,25 184:24 190:6,14 197:7,16 201:6 222:21,24

**Kubota** 70:14

**L**

**lack** 21:3 83:13 86:15

**Lacks** 68:8 101:9 102:7 190:6,15 197:17

**laid** 12:8 77:6

**Lam** 70:12

**language** 33:4 115:5 121:19 177:2 213:2 216:25

**Lardner** 110:4

**large** 11:19 29:22 137:13

**lastly** 65:12

**law** 17:24 84:16 140:22,25 141:2 164:19

**lawful** 40:7 122:21

**lawfully** 95:16

**laws** 84:10

**lawyer** 108:23 109:6
**laying** 122:20 140:15
**leading** 216:15
**learn** 41:21 184:8
**learned** 41:12 105:17
**learning** 107:25 127:6
**lease** 43:21
**leases** 218:16 220:23 221:1
**leasing** 11:15 12:7
**leave** 46:4,5 200:15,18
**left** 167:6 193:11 217:25
**left-hand** 208:22
**legal** 62:21 84:22 100:8 101:9 168:23,25 213:12
**legalities** 69:14
**legality** 83:25
**legally** 63:4 78:3 94:21,23
**legislative** 33:4
**legislators** 33:24
**lend** 41:2,8
**lenders** 45:8
**lengthy** 152:19
**letter** 132:11 133:7 178:13,19 180:5,20 181:1,7,15,17 182:8, 16 183:3,6,19,20 204:10 205:7,8 206:4
**letters** 115:22 119:20 120:6 128:12
**level** 17:18 67:21 68:4 166:14,20
**liability** 125:14 126:7
**license** 18:6,12,14,15,16
**licenses** 18:1,2,4
**lie** 139:2
**life** 13:4 84:18
**light** 44:9 86:3
**likelihood** 176:15
**limited** 165:23
**lines** 184:1,2
**linger** 189:11
**lingering** 115:2
**link** 152:2 220:7
**liquidity** 43:20 44:22 45:1,3
**list** 48:13,16,17 144:21 146:14 147:25 148:1 155:5 186:16
**listed** 35:16 48:1 59:5 71:15
**listen** 154:9
**listened** 116:18 127:24 133:24
**listening** 30:15 122:13
**literally** 27:9 67:5 187:14
**live** 10:21
**LLC** 9:25 10:4,6,7 72:16 85:9 91:23 92:11 101:15 103:24 115:13 130:20 133:20,25 134:4 139:14 168:7 170:21 182:7 189:17 210:11,23
**llc.com.** 96:9
**LLCS** 100:1
**loan** 34:25 35:6,10 36:22 37:21,24 40:2,3,5,6,8,16,17, 23 41:2,13,14,15,20,21,24 42:2 45:8,17 71:15,18,23 72:1,4 85:1 94:24 191:11
**loaned** 75:14
**loans** 37:2 40:10,23 42:5,6,11 45:2 67:21,24 84:23 85:5 91:22 92:3,10,14,21 93:9,11 94:6 95:10
**lobbyist** 109:19 177:9 195:9
**lobbyists** 26:21
**local** 164:19
**locations** 27:5
**logic** 107:23 135:10
**logical** 112:21 133:15
**Lol** 196:22
**LOL-I-WAS-JOKING** 198:12
**LOL...I** 196:18
**long** 16:25 17:9 69:19 87:22 108:8 164:15 173:13 189:11
**longer** 29:2 70:6 113:23 114:6 221:13
**looked** 51:16 122:7 127:21 134:14 165:21 167:1 169:22 170:14 173:24 184:16,17 185:3,17 191:5 196:11 216:23 217:25 219:8
**Lori** 87:5,6,7,11,16 124:9,20 153:3 154:11 155:14 156:10, 19,23 160:23 161:18 163:20 164:9 165:2,14,16,22 166:9, 14,19 169:18 170:2,3,4 171:5 183:25 207:20 208:2,8 214:3
**losing** 138:17
**loss** 32:8
**lot** 26:12 28:21 30:1 32:7 45:10 53:20 56:17 80:16 93:1, 2 100:24 113:1,5 116:22 153:25 165:16 166:5 167:15 173:18 185:2 188:15 190:21 201:24 202:5 211:20
**loud** 133:3
**Loui** 52:1,2 53:17,23 136:6
**Loui's** 106:7 136:7
**love** 62:20 176:8 177:12 191:6
**loyal** 54:1,4,11,15,18 137:2,5, 8,19
**loyalty** 39:13 137:25 138:1, 20,21
**Lum** 32:23 37:2 55:25 70:20, 21 72:21 74:4 76:6 80:22 107:3 108:2 112:23 154:19 192:12 193:4 202:8,24 205:13 219:2
**lunch** 68:16 80:24
**lying** 98:13 138:8
**Lynch** 71:4

M

**M&i** 99:18
**made** 20:5 22:12 25:6 29:24 30:22 31:11 32:20 43:22 52:13,15,16 64:14 65:4 68:12

72:16 75:10 76:2 84:2,3 89:2 90:13 97:12 124:12 131:25 137:11,14 139:9 159:1 164:11 170:20 199:17 204:25 215:3

**magnitude** 57:3 119:11

**magnitudes** 57:8

**main** 63:7 73:6,7 74:9

**Maine** 119:5 120:23 122:1,6 123:11 187:22

**maintain** 10:23 157:12

**maintaining** 52:18 196:14

**major** 43:18 118:4

**make** 10:1 15:5,7 19:7 25:7 28:10,12,13 30:11,12,19 32:9 41:9 52:9 54:13 62:21 64:8 77:9,25 89:7 92:21 94:23,24 102:20,21 115:18 119:17 124:1,8,18 128:19 133:18 140:8 146:22 160:16 163:9 174:3 175:4 176:15 180:8 188:17 195:18 199:13 204:16 220:16,20

**makes** 48:17 216:22

**making** 15:11 27:10 51:17 57:18 68:17 69:15,17 83:19, 22 84:11 89:4 124:9 125:2 126:15 134:20 139:11 163:15 165:18 166:6 171:5 184:14 186:23 199:22 205:21 208:16

**managancy** 52:19

**manage** 25:16 43:2,18 87:17 88:3,15 186:21

**management** 29:4,22 30:17 50:2 51:19 135:24 155:1 187:8

**manager** 31:4 54:5,6 77:25 79:3 87:2 95:24 100:22 165:2 167:13 186:12 214:16

**managers** 28:2 80:18,20 81:3

**managing** 25:24 26:6,15 161:9 165:15 166:10

**manner** 55:23

**Manoa** 191:19

**March** 39:24 50:24 55:8,13 56:10 204:6,23 206:2,20 215:19

**marching** 43:25

**marine** 209:11,14,22 210:1,6

**Maritime** 210:10,23

**mark** 50:14

**marked** 46:8 49:12 50:11,17, 21 53:3 54:24 60:8,17 71:11 91:15 96:15 103:18 104:18 108:13,17 111:16 155:19 163:25 166:23 172:18 177:24 189:7 194:9 198:21 203:24 209:3 213:19 218:12

**market** 12:16

**markets** 25:12 26:25 146:1

**marking** 96:5

**marks** 100:4 180:11

**Martin** 10:5 19:8,10,11,19 20:13,24 21:13,16,20,25 22:1, 5,10 23:19,22,25 24:11 25:6, 20,21 26:5,10,13,18 27:1,12, 15,18,20 28:18,24 29:8,15 30:10,22 31:1,10,12,16,17,18, 20,21,23 32:1,17,19,20,22 33:1,10,18,22 35:21,25 36:10, 11 37:1,20,22 38:2,5 40:16,21 41:4,10,13,16,22 42:2,4,5,18 51:9 52:1,4,18 53:13,16,23,25 54:1,5,8,10,12,15,20,21 55:15 56:3,9 57:11 59:8,14 60:5 62:14,15,18 64:6 66:13,15 67:3 68:10,16,17,21 69:18 75:24 77:17,24 78:20,25 79:9, 23,24 80:4 81:7,15,19 82:12 83:10 84:11 85:15 86:9,16 88:2,5 89:1,5 91:8,21 92:22 93:2,9 94:12 96:10,20,21,23 97:11,14 98:1,10,12 99:3 100:13 102:3 105:24 106:10, 13,17,23,24 107:10 108:19 109:25 110:14,24 111:18,21, 25 112:10,14,17 113:6,14,16, 20 114:4,5,13 115:8 116:9 118:1 120:8,15 121:4,20 122:15,17 123:7,20 125:1,10 126:2 127:6,16,18 128:13,22 129:2,13,24 130:9 134:6,21 135:14 136:19 137:7,19,23,24 138:1,6,17 140:9,20 141:10, 25 142:5,11,15,20,24 143:19 144:4 148:3 151:12 152:2 153:3 154:11 156:12,21 157:21,23 158:1,5,11,14,22, 25 159:1,4 160:8,11 162:5,16, 17,20 166:2 167:5,10,12 168:17 172:14 173:1 174:1, 17,22 175:3 176:6,7,13,17 178:3,10,22 179:6,7,15 180:10,21 182:9 183:7,11,12, 25 185:3,21 186:17,20 189:13 191:4,6,9,15 192:19 193:7,13 195:12 196:17 198:3,12,15 199:5 202:5,15,21 203:8 204:7,14 205:11,12,14,23 208:23 209:10,13,21 210:9 211:9 212:2,14,19 214:2 216:11,13 217:7,8 219:1 220:6,11,19 221:17 222:9

**Martin's** 20:16 21:1 26:8,20 28:22 29:5 30:16 31:14 53:25 58:4,18 59:14 79:20 80:7,12, 13 84:5 89:9 96:10 99:21 107:24 108:18 123:1 125:16 126:11 135:13,25 138:15 143:15 152:5 162:8 163:5 174:7,25 177:11 195:22 203:11 216:6

**Martinez** 219:24

**Marty** 58:15 62:1,11 63:9,19 64:5 65:3,24 66:8,17,22 68:1, 3 69:10 71:7 72:16 73:8,15 76:8 77:5,12,18 78:9 91:7,9, 25 92:11 95:10

**mass** 184:3

**mastermind** 165:2 166:8

**Matsuura** 72:22 74:5

**matter** 28:24 36:5 149:24 150:1 160:2

**matters** 92:24 142:8 222:12

**max** 175:5

**maximize** 12:14

**maximum** 33:6 35:2,6,12

**MBA** 17:21,25

**meals** 48:12,14,16

**meaning** 17:18 40:24 110:3 147:9 177:12 179:13 181:7

**means** 37:23 137:8

**meant** 172:5 209:18 220:14

**meet** 19:11 43:20 44:23

**meeting** 19:15 23:18,20 41:17 167:22 192:1

**meetings** 16:5 17:12 20:13 22:4,8,15,19,24 23:5,9,13,25 33:11

**member** 101:16 118:23 119:1 168:6 189:19

**members** 50:2 79:9 101:15 145:18 146:2,8,9 174:7,8,19 175:7,14 182:7 190:4

**membership** 48:25

**memorialized** 116:18 122:12 123:19

**memorializes** 127:23

**mention** 100:16

**mentioned** 19:10 21:13 22:3 27:2,18 44:11,12 83:16,18 87:8 88:17 104:22 129:25 133:22 168:5 199:19 214:7

**mentions** 131:23

**mercurial** 81:16

**Merrill** 71:4

**message** 51:18 62:18 149:11 176:13 177:12 190:2,10,11 191:6 193:15 211:2 218:1,4,5, 8 220:6

**messages** 60:11 61:12,17 208:20 209:7,13 216:24 217:5,24 218:20,24 219:1

**messenger** 149:4

**met** 16:9 178:24

**method** 101:23

**methodology** 147:3

**Michael** 92:5 106:18,22 107:11 213:24

**Michigan** 17:20 27:5 99:19

**Mickey** 58:15 62:1,11 63:9,19 64:5 65:3,4,24 66:8,17,21 68:1,3 69:10 71:7 72:17 73:8, 15 76:8,21 77:5,13,18 78:8 91:6,9,25 92:11 95:10

**mid-2020** 44:14 54:12

**mid-february** 112:7

**middle** 113:14 161:17 174:21 181:10 204:21

**Mike** 91:20,21 113:6 215:14, 15,18

**million** 33:8 35:3,7 37:12 45:2,17 82:23

**mind** 22:11 30:23 74:23 76:10 80:25 95:9,25 99:9 128:10 152:5 182:15 185:19

**mine** 19:18 202:11

**minimum** 47:9 123:13 134:7

**minority** 136:11

**minutes** 70:8 222:15

**misdeeds** 67:9

**misdemeanor** 18:24

**misinformation** 32:22,25

**misogynistic** 201:25 203:12 211:1 216:24

**missing** 27:7

**mission** 64:5

**misstated** 47:2

**Misstates** 150:17

**mistake** 159:15 160:14

**mistaken** 48:20

**misunderstanding** 150:9

**Mitchell** 108:20 109:7,8,11, 18 110:1,3,7,10 111:3,7,17 115:7 119:16 121:3 128:18 129:23 130:9,12 131:1 132:25 133:23 141:9 149:7 152:20 173:14 204:11

**Mitchell's** 123:2 129:11 131:19

**mix** 180:9

**Miyoshi** 70:11

**Mkao@navatek** 96:9

**MKAO@NAVATEKLLC. COM** 96:19

**Mm-hm** 56:25 61:22 62:9 123:6 129:15 143:18 145:5 146:17 152:21 169:24 173:5 176:4 179:3 204:13,19 209:1, 8,16

**mode** 180:8

**model** 12:3 177:6

**MODERATOR** 70:16

**modifications** 204:17

**moment** 24:24 27:2 35:4 38:18 39:21 82:21 91:1 127:22 156:8 172:3 180:12 189:24 212:24

**money** 26:21 37:12 41:2,8 45:5 58:9 59:7 66:9,17,20 67:1 69:9 71:7 73:14 74:2,7, 24 75:2,3,4,15,16,19,21 76:10 77:23 83:8,13 84:6 91:6,8 93:18 94:5,13 95:11 101:6,13, 21,23 102:12 104:3,9,10 110:21 114:22 131:25 134:5, 10,18 135:1,4,11,12,13 136:1 158:16,17 159:8 162:4,7,19 163:4,16 170:21 171:11,14, 18,22 184:9,19 185:12,21 195:9 207:10,13 219:17 221:11

**monies** 185:13

**month** 192:13 193:2

**monthly** 83:2

**months** 50:3 56:21 81:14 82:10,11 95:4 120:22

**Moore** 11:16

**Moran** 194:20 195:14,18

**morning** 9:23 16:12

**mother** 19:7

**motions** 165:1

**move** 28:11 44:10 83:14 113:9 145:1 147:18

**moving** 43:24 44:19 52:9 56:6 76:16 129:8 145:3

**multiple** 32:11 37:2,5 42:5 188:1 198:15

**mutually** 128:24

### N

**named** 65:15 108:20

**names** 33:12 55:24 79:12,13, 15 80:21 188:4

**nature** 27:23 139:19 182:1 190:18

**Navatech** 52:4

**navatek** 10:7 52:17,23 67:2 72:16 74:6 77:12 84:11 87:10, 12 91:23,24 92:10 103:23 119:25 124:21,24 125:1 127:16 128:5 149:21 150:8,22 151:3 161:23 162:14,18 170:8,11 171:16,24 184:4 196:6

**Navatek's** 149:25 150:13,14 164:7 170:22 175:15

**Navatek/martin** 141:15

**Nebraska** 11:15 27:5

**necessarily** 20:24 63:16 74:23 79:24 80:4 91:11 131:8 149:2 158:17 160:13 166:4 217:18 219:18

**necessitated** 120:14

**needed** 25:14 28:12,23 80:9 120:10 121:23 165:17

**nefarious** 95:1

**negative** 212:15

**negotiation** 49:22

**neighborhood** 33:7 52:3

**nervous** 199:1

**net** 45:4 190:21

**News** 220:7

**nice** 12:19 45:4

**nicer** 45:25

**night** 97:18 191:16

**nitty-gritty** 186:22

**noble** 213:11

**Nobody's** 207:8

**nodding** 13:16

**nods** 220:4

**non-base** 57:22

**nonsignificant** 193:20

**noon** 156:15

**Nos** 71:10

**notary** 105:14

**note** 64:15 65:5 77:15,16 178:23 189:1 215:22 219:20

**noted** 174:7

**notice** 78:24 222:18

**noticed** 201:24

**notify** 136:6

**noting** 49:8 54:25

**notwithstanding** 14:25

**November** 18:11 98:9

**number** 25:7 29:7,10,11 34:12,13,18 35:16 44:12 51:23 60:8,21,22,25 61:2,3,5, 6 63:23,24 82:24 83:6 103:2, 14 105:7 166:23 169:23 197:9

**numerous** 99:15

**nuts** 186:22

## O

**O'MALLEY** 91:20 92:6

**oath** 14:1,7,16 38:25 70:23 132:21 152:15

**object** 14:10,21 169:1 203:11,13

**objected** 32:18

**objection** 14:25 29:16 30:6 31:15 32:19 35:18 43:5 45:18 54:2 57:5 59:1 68:7 74:11 82:3 93:4 94:15 101:8 102:6, 14 120:1 137:20 138:24 145:10,23 146:24 147:12 150:16 153:14,18 165:4 168:21 184:24 186:14 188:13, 21 190:6,14 197:3

**objections** 14:23 197:15

**objectives** 89:23,25 153:2,13 155:2

**obligation** 43:2

**obligations** 25:4 26:4 43:20 44:23 53:8 94:14 99:11,13

**obscure** 100:14

**obscuring** 127:15

**obtain** 35:10 84:23 85:1

**obtained** 41:13

**obtaining** 41:20 119:12

**obvious** 67:14

**occasion** 203:10

**occur** 23:9 36:2 69:4 92:14 93:9,11

**occurred** 22:19,24 32:14 154:15 191:11 193:1

**occurrence** 191:18

**occurring** 67:9,14,15 122:6

**October** 41:23 67:24

**odd** 159:19

**offer** 46:17

**offering** 81:12

**office** 23:11,21 26:15 27:21, 22 28:7 38:3,6 53:1 137:3 147:19 186:23 194:15,21 195:6,15 202:19

**officer** 9:10 24:12,25 46:9 49:13 50:10,13,18 53:4 60:18 71:12 81:12 91:16 96:16 99:7 103:8,11,19 104:19 108:14 155:20 164:1 172:19 177:25 189:8 194:10 198:22 203:25 209:4 213:20 218:13 219:23 222:22

**officers** 55:20

**offices** 27:4,18 28:3 44:12 51:17 119:5 124:10 146:6 187:13

**official** 22:25 23:2 33:13 88:25 219:23

**officials** 33:25

**Oklahoma** 27:6

**on-the-ground** 186:18

**one's** 112:5

**ongoing** 129:7

**online** 206:21

**open** 25:11 27:21 146:6 203:9

**opened** 27:3 44:12 194:16

**opening** 27:9,17 147:19

194:21 195:5,15

**operate** 56:16

**operated** 90:5

**operates** 78:3

**operating** 32:3 51:11 52:12 81:12 90:8,17 136:12,13,18 161:9 168:19

**operation** 78:6

**operational** 26:2 30:2 43:22

**operations** 12:18 45:9 67:16 94:9

**opportunities** 208:15 217:15,16

**opportunity** 15:5,8

**optics** 85:18 118:11 162:2

**optimal** 203:6

**optimizations** 25:19

**options** 45:7

**order** 29:13 70:1 91:3 96:5 103:9,10,16 104:14 108:7 121:4 142:16 155:12 163:18 172:6,10 177:18 189:1 194:4 198:9 203:20 208:20 213:10, 15 217:22

**ordered** 221:25 222:6

**ordering** 222:23

**organization** 12:18 25:11, 13,24 26:1 30:1 31:5 32:2 45:14 52:10,17 68:11 78:2 85:16 135:21 160:17 212:3,17

**organizationally** 56:15

**origin** 116:23

**original** 194:13

**originally** 213:25

**originate** 94:7

**originated** 60:5

**originator** 60:6 202:7

**ostensibly** 80:3 94:21

**outright** 72:1

**outward** 98:16

**overhead** 45:11

**override** 31:8

**oversaw** 42:13,17

**oversee** 88:11

**overseeing** 28:2

**oversight** 145:19

**overt** 42:1

**owed** 39:5,10 93:22

**owned** 12:9 73:23

**owner** 25:10 31:5 52:1 54:6 60:25 136:10

**ownership** 25:13 32:2,7,11 51:12 56:16 136:12

**owns** 52:2

### P

**P&I** 12:13

**p.m.** 152:13 198:2 200:7 201:12 223:5

**PAC** 97:5,7,12 101:5 110:20 118:17 130:21 131:24 133:13 134:5 141:18

**pace** 145:2

**Pacific** 34:9,10,17 35:1 37:11 45:2 49:1 209:11,14,22,25

**pack** 205:17

**package** 35:22,23

**packet** 108:10 213:23

**Pacmar** 9:25 10:3,5 52:5

**pages** 71:2 103:23 105:5 218:20

**paid** 58:11 59:22 62:11 63:22 65:10 75:3 84:3 88:24 159:10 162:9 208:6

**paperwork** 92:9 186:23

**paragraph** 47:19 48:1 99:22 216:7,11

**parodying** 216:16,17

**part** 11:20 25:5,24 26:3,9 33:16,25 52:18 81:17 85:6 86:15 116:2 122:8 133:20 136:9 169:13 185:14 193:5 197:10 208:11 212:7 214:15

**participants** 109:24 218:3

**participate** 107:3,7

**participated** 107:9 111:24 112:1 130:3 216:1

**participating** 187:7 197:11

**participation** 52:23

**parties** 129:5 147:6 150:3,6 222:22

**partner** 27:15

**party** 101:25 159:11

**pass** 50:15 71:4 133:12 161:24 162:15

**passed** 106:4

**past** 85:22,23,24 176:16

**paths** 25:19

**pause** 30:8

**pay** 49:20 51:2,5 53:9 54:25 55:8,13,14,17,22 56:9,20 57:3,12,20,21,22 59:17,19 78:7 82:1,6,16 83:1,5,11 95:8 135:12 197:23

**pay-for-play** 176:1,25 177:5 185:17

**paycheck** 83:7 207:23

**paychecks** 83:3

**paying** 69:10 75:15 116:15 178:19 196:25 197:9 219:7

**payments** 43:21,22 44:7 52:21 58:6,25 68:3,12,13,15 78:8 95:14 137:14 138:14

**payroll** 43:21 44:4 87:10 220:13

**Pays** 196:22

**pejorative** 210:25

**pen** 67:5

**pencils** 48:8

**people** 27:22 28:5 29:20,25 44:20 55:21 56:7 90:11 100:19,24 154:1,5,7,8 165:24 196:7 198:6,15 202:18,19 211:4,8 217:16

**percent** 31:5 52:4 54:6 83:5 185:1

**perception** 185:20
**perfectly** 95:6
**performance** 50:6
**period** 12:15 18:9 21:24 29:1, 8 38:9 44:14 47:1 49:22 51:24 56:24 57:4,13 78:24 83:9 84:20 137:19 141:1 147:8 208:3 216:14
**person** 20:5 21:24 29:7 67:18 89:11 96:25 101:25 128:15 140:10 146:20 171:4,5 183:17 187:24
**personal** 28:22 35:5 36:5 61:5,6 78:13,15 87:4,8 89:9 90:21 99:23,24 100:17 135:15 136:1,7 139:21 142:5 153:16 166:6 168:11 205:1 208:1
**personally** 52:21 102:4
**persons** 215:6,10
**perspective** 30:2 32:8 45:8 153:4 154:21 166:5
**Philip** 70:11
**phone** 16:25 17:11 60:12,14, 21,22 111:20 115:24 116:4, 17,22 122:12 123:18 125:6 127:23 130:2 133:22 192:3,7 193:1 208:22
**photograph** 48:17
**phrase** 21:4
**phrased** 50:9,21 144:12
**physical** 27:10
**physically** 77:6
**picture** 98:25
**pier** 52:24
**pile** 94:19
**PIMCO** 12:9
**place** 51:11 54:7 68:16 81:2 86:6
**places** 100:25
**plaintiff** 9:24 10:12
**Plaintiff's** 46:7 49:11 50:16 53:2 60:16 71:10 91:14 96:14 103:17 104:17 108:12 155:18 163:24 172:17 177:23 189:6 194:8 198:20 203:23 209:2 213:18 218:11
**plan** 120:19 128:2,18,20 163:4 200:2 205:24 213:24 214:20,22 215:4,20 219:6
**plane** 143:19
**plausible** 151:4 175:25 176:24
**play** 196:23,25 197:9,23
**plea** 18:23
**plead** 19:2,4,5
**pled** 83:17
**plug** 196:1,25 197:10
**PMS** 209:7,10,18,22
**point** 33:22 38:7 40:20 64:8 68:20 80:2 85:1,22,23 92:18 95:3,5,13 111:22 113:22 115:18 116:12 117:13,14,19 118:15 124:2 128:10 130:1 132:9 133:5 139:10,22 144:10,17 149:20 151:15 169:3 171:6 214:11
**pointing** 152:1
**pole** 222:1,7
**poles** 222:3
**polish** 12:12
**political** 83:22 84:12 117:9 125:3 126:15
**politicians** 86:17
**poorly** 63:14
**portion** 125:22
**portrayed** 169:6
**portraying** 196:14
**position** 11:17 20:8,20 24:10 43:15 44:3 53:17 88:25 165:1
**positions** 43:20 119:9
**possession** 75:4
**possessions** 119:4
**possibility** 165:6
**possibly** 48:11
**posted** 129:17
**potential** 25:6,18 32:8 69:8 121:5 211:15
**potentially** 28:4 38:11 94:7 102:10 161:22 162:13,14 164:14
**power** 29:14 30:1 39:8 95:24 119:6 149:11 195:11
**PPP** 32:23 33:1,6 34:8,16 35:1,16 36:18,22 37:2 39:23 40:2,3,10,23 41:3,8,9,13,14, 20,21,24 42:2,11 45:2,17 67:21,24 84:23 85:1 191:11 219:17 220:3 221:4
**PR** 106:7 121:1 177:3 213:23 214:19,22 215:4,20
**practice** 140:25
**practicing** 141:3
**precise** 123:23
**preference** 149:5
**prepare** 15:24 16:3,6,10
**preparing** 17:14 130:14
**prerogative** 80:7
**presence** 53:21 206:21
**present** 115:25 179:19
**presented** 32:3
**preserve** 14:24 54:18
**press** 120:24 122:5 194:21
**presume** 64:2 92:1 120:15 132:2 153:3 195:5
**presumed** 122:21 140:18
**presumption** 43:8 69:15
**pretty** 48:15 73:13 105:22 130:6
**prevent** 99:10
**prevented** 160:6
**previously** 10:5,6 104:22
**primary** 118:6 150:3 151:8 186:11 217:18
**printoff** 60:11 217:24
**prior** 21:18 23:23 55:8 77:4 104:7 123:19 129:25 136:18 165:22 167:1,2 185:16 192:1

193:3 217:25
**private** 12:9
**problem** 114:10
**procedurally** 124:7
**proceed** 91:22 121:6
**proceeded** 33:10 37:23 49:3
**proceeding** 14:6,19
**proceedings** 223:4
**proceeds** 115:13
**process** 32:24 33:1,16 36:12 93:10 115:4 143:25 144:24 175:21 206:23
**producer** 42:19
**products** 12:4
**professional** 18:1,2 20:22
**professionalize** 135:21
**program** 59:5,10 60:3 95:25 149:6 167:16 211:9,17 212:5,13,23 213:9,10
**progress** 129:18
**project** 27:13 29:22
**projects** 12:4 88:11
**promissory** 219:20
**promote** 54:18 94:22 213:9
**promoted** 81:10,11
**promotion** 49:20 64:7
**proper** 36:6 93:18 95:11,16
**properly** 140:18
**propose** 210:2
**proposed** 12:4 49:23
**proposing** 61:23 121:3
**prosecuting** 36:18
**prosecution** 125:14 126:8 127:7,10
**protect** 115:20 119:18 120:12,15 121:4,19,20 122:8 128:3,20 129:2 142:11,16 157:20,21,22 158:10,14 160:10 161:8 163:12 184:23
**protect-the-company** 180:7
**protected** 120:14 127:18 128:12 137:9
**protecting** 127:16,17 142:20 157:23,24,25 212:7,8,14
**protection** 120:9,14,18 158:5
**protects** 158:1,11
**provide** 45:11 53:1 85:18 125:14 126:8 131:3,21 188:4
**provided** 218:19
**Providence** 187:22
**providing** 205:24 217:15
**proximity** 144:18
**public** 115:2 132:10 133:6 177:9 203:9
**pull** 73:24
**purchase** 52:24
**purchasing** 220:21
**purely** 19:23
**purpose** 64:5 75:1 86:8 94:22 100:14 104:10 116:8 118:1 131:19 144:15 169:11 180:3 192:22 211:18 212:16 213:2,11 214:25 216:11
**purposes** 118:4
**pursuant** 9:6
**pursue** 30:14
**push** 25:22 33:15
**push-back** 175:17
**pushed** 82:7 188:24
**pushing** 50:3
**put** 34:14 35:22,25 36:14 38:1,8 46:12 49:5 72:3 75:1,15 94:19 101:16 140:20 162:20 166:9 195:25
**puts** 32:7
**putting** 26:7 100:22 196:24 197:9 198:7 211:4,8

## Q

**qualification** 20:22
**qualifications** 20:23 87:16,21
**qualified** 99:10
**qualify** 60:1 220:14 221:5,6
**quality** 220:13
**quarter** 137:15
**quasi-judicial** 14:6
**question** 13:1 14:4,13,23,25 24:2 32:15 43:8 44:2 48:4 53:7 76:10,12 83:21 85:4 87:20 89:13,18 93:19 94:20 95:2,5 102:11 110:7 114:17 125:18,21 131:14,15 137:6,10 138:25 152:24 153:10,16 164:22 165:19 184:15 189:3 197:6 218:25 219:15
**questions** 14:10,22 42:24 67:7 93:5 189:12
**quick** 16:1 70:5 189:12
**quicker** 13:9
**quickly** 181:5
**quit** 83:10
**quotation** 100:3 180:11
**quotations** 149:22 179:4
**quote** 133:3
**quotes** 179:4 182:4,14

## R

**raise** 51:2 53:9 57:3,21 67:22 82:7,13,16
**raises** 55:17,22 56:5,9 57:13 83:5
**raising** 57:21 68:5
**random** 191:25
**randy@808** 170:1
**randy@808-law.com** 164:18
**range** 35:8
**rank** 29:12
**ranting** 79:2
**rate** 40:25

**rationale** 80:1

**rationalize** 80:2

**raving** 79:2

**reaction** 107:25 108:2

**read** 42:8 76:13,17 99:23 105:16 107:16 125:10,23 126:1 131:9 133:2 144:16 150:10 181:2 182:17 218:23

**reading** 33:21 34:5 73:19 106:16,21 120:4 131:5,10,15, 22 142:22 165:20 175:24 176:16 177:2 180:6 211:2,6,7, 20 216:18

**readings** 211:21

**ready** 70:23 147:20

**real** 70:5 80:1 99:24 100:8 151:15,21

**reality** 26:8 28:1 188:19

**realized** 31:25

**realizing** 213:8

**reason** 13:6 15:14 18:21 44:25 47:16 75:13 95:4,21 125:15 126:9 128:25 129:4,5 146:18,19 157:19 158:20 159:19 163:8 170:25 171:1 174:24 197:20 211:22 218:19

**reasonable** 53:9 179:16 181:6,8,9,14,18,20,21

**reasons** 98:15 138:10,19

**recall** 20:11,21 23:10,13 33:12 34:12 35:20,23 37:16 48:11,19 55:24 57:7 58:23 60:14,20,22 61:16 79:12,13 80:20 88:6 89:24 90:10 92:15, 16 93:23 107:4,13,15 108:1,3 110:18 111:22 112:2 113:5 114:8 122:14 124:9 130:4 131:8 134:1 143:5 173:16,18 187:23 192:6 202:3,4,6,9,10 203:3 205:4,6,7,8 209:20 213:16 215:3,5,17

**receive** 17:23 40:2 49:16 51:1 55:12 58:24 59:6 68:2 195:2

**received** 26:23 36:22 45:1 47:24 48:7 49:9,20 55:8,22 57:3,20 58:5 78:8 83:1,2 95:14 97:8 110:21 130:24 132:5 178:3 186:9 188:5 199:24 215:1,7 218:2 219:17, 19

**receiving** 55:17 61:17 67:21 76:6 96:25 109:10 123:18 129:22 138:14 167:17 202:14 215:7

**recent** 33:9 117:6,7 165:1 169:22 195:21

**recently** 25:9

**recess** 12:21 38:22 70:9 132:18 152:12 200:6 201:11

**recipient** 163:20 215:23

**recipients** 202:1 206:12 207:2 208:24 214:22 216:25

**reclassifying** 159:12

**recognition** 115:15 116:6

**recognize** 46:11 104:15 177:19,21 194:5

**recollect** 167:20

**recollection** 19:1,3 24:17 143:11 148:11 173:8 185:25 209:23

**recommend** 127:3 163:7

**recommendation** 30:19,24 31:11,12 63:20 163:3 164:16 184:14 214:20

**recommendations** 30:12,14 57:18 163:9

**recommended** 31:21 69:13 191:2

**recommending** 162:3,6 176:24 184:10

**reconcile** 69:4

**record** 10:18 12:20,24 14:24 38:21,25 70:7,19 103:1 132:16,21 152:11,15 200:5,9, 10 201:9,14,15

**recruiting** 190:24

**redirect** 75:5

**redirected** 66:13 102:4 104:10 158:23

**redirecting** 89:5

**Reed** 96:24 110:15,17,25

**refer** 98:1 159:23

**reference** 52:13,15 98:5 109:7 128:8,14 181:24 194:23 219:16 221:3 222:2

**referenced** 51:9 73:1 77:4 86:19 104:23,24 106:22 137:12 204:11

**references** 120:9

**referencing** 10:12 34:15 71:1 100:23 139:7 179:21 181:10 182:20 206:17

**referred** 213:23

**referring** 97:20,23 179:6,9 209:10,21 210:22 221:20

**refers** 175:5

**refresh** 143:11 173:8

**refreshes** 148:11

**refused** 31:13,22

**regard** 77:23

**region** 147:22,23

**registered** 116:25

**regret** 203:5

**regularly** 98:1

**regulations** 37:7 85:2 221:4

**regulatory** 33:4

**reimbursed** 19:8

**reinvent** 96:2

**relate** 53:7

**related** 90:2,4 107:21

**Relatedly** 13:21

**relations** 115:2 153:6

**relationship** 20:17 21:18 26:10 41:1 52:8 109:17 122:9 124:25 129:8 141:5,9,12,14, 18,21,25 151:4 186:12 187:3, 7 195:18 214:16

**relationships** 26:14 27:19 33:23 146:21 147:3,17 154:12 186:21 187:14,17,25 188:10 190:21 199:20

**release** 194:21

**relevance** 113:24 150:3

**relevant** 114:6 119:7 147:6

**rely** 42:20 45:25 67:6

**remainder** 200:19

**remaining** 83:8

**remember** 11:12 20:19 48:21 59:13 79:14 81:10 94:1 106:5, 18 111:1 203:20 208:16 212:2

**remote** 79:2

**remotely** 11:19

**removing** 143:2

**rent** 220:20

**repay** 71:23

**repeat** 32:15 125:18,20 131:13 211:5

**repeatedly** 161:2,5

**repeating** 181:22

**replace** 210:3

**replaced** 81:15

**report** 41:15 88:4 135:25 138:5

**reported** 80:3

**reporter** 13:11,15 15:4 46:4

**reporter's** 9:7

**reporting** 9:7 12:1 138:11

**represent** 9:24 60:10 64:13 70:19 97:3 110:19 143:6,8 155:6 164:25 170:19 173:7 180:22 183:8

**representation** 142:5 182:2

**representations** 90:13

**representative** 110:20

**represented** 97:5 109:11 159:4 189:19 190:4

**representing** 157:10 172:1 183:2

**represents** 70:20

**requested** 50:4 125:22

**requisite** 99:15

**rerouted** 66:18 77:18 91:9

**reschedule** 200:19

**research** 36:5 190:22

**residence** 10:23

**resource** 135:24

**respect** 12:13,15 14:13 28:19 29:21 30:3 43:14 50:1 54:17 81:18 84:10 86:17 94:6,21 112:18 118:23 137:7 140:15 150:5 158:1 183:7,18,22

**respond** 143:4 148:17 196:3 206:1 209:25 210:16 220:8,15

**responded** 198:15 204:23

**responds** 111:17 123:7 174:12,16 196:17,19 208:10 210:9 221:24

**response** 16:24 49:25 93:14 123:1 129:11,20 130:15 133:9,13,20 137:16 139:15 143:15 148:20 149:16 174:25 175:10 180:24 198:2,13,25 199:8 216:6 220:4

**responsibile** 94:5

**responsibilities** 11:22 12:1 20:25 43:9,13 51:4 87:25 92:20 165:23 168:1 214:15

**responsibility** 20:22 43:2 66:25 67:10 77:22 102:23 160:4 161:15

**responsible** 94:2 125:7

**rest** 52:17 184:1 216:22 220:2

**restaurant** 23:11 191:25

**restroom** 132:14

**restructuring** 25:12 210:3

**result** 18:25 35:15 47:25 127:10 158:4 191:13

**resulted** 82:15

**resume** 22:25 23:3

**resumes** 207:7,18

**retainer** 178:20

**returning** 178:18

**revealed** 36:6

**review** 15:5 33:3 67:10 180:25 181:19 182:15 192:20 204:16 207:7,18

**reviewed** 32:4 181:16 182:18

**reviewing** 35:23 183:6

**revolved** 114:11

**Rex** 103:15 153:21

**rid** 221:15

**ridiculous** 32:5

**right-hand** 218:6

**rise** 67:21 68:4

**risk** 32:7 38:9 81:7,17 114:15, 20 125:13,14 126:6,7 127:7,8, 9

**risks** 129:3

**road** 50:6

**rock** 50:1

**rocks** 68:21

**role** 22:9 25:18 53:14 160:21 161:14 187:11,20 206:11,14 207:1,4

**roles** 22:7 29:20 39:19 147:2 168:1

**rolling** 93:12

**room** 23:12 68:15 75:14 88:8 112:11

**roughly** 11:13 34:11 35:6 58:5 84:20 90:6 173:23

**row** 60:24

**ruined** 69:1

**Rule** 9:6

**rules** 9:6 12:25 13:7 84:10

**run** 87:17,19 90:5,8

**rundown** 55:15

**running** 165:15 186:24

**runs** 81:1

**S**

**S360** 179:24

**S360s** 179:18

**safety** 45:4
**salaried** 208:5
**salary** 47:15 49:8,16,19,23,24 50:23 51:1 55:3 89:4 138:13
**sale** 136:18
**Sam's** 68:14 88:7 156:11
**sarcasm** 217:6
**sarcastic** 216:19
**sat** 133:23 145:18
**Saved** 208:12
**savings** 45:12
**SBA** 33:13 34:9,16
**scenes** 212:22
**schedule** 111:3
**scheduling** 111:18
**Schmicker** 106:19,23 213:24
**Schnicker** 113:6
**scholarship** 59:10 60:3 72:1 78:12 81:13 116:14,20 117:17,23 139:11 149:6 167:16 173:15 186:4 188:11 195:5 211:3,9 213:3
**scholarships** 62:11 115:15 116:6 118:2,7,12 120:21 121:4,14,18 123:12,22 124:8,14,18 128:19 129:19,24 130:18 131:2,20 133:12 134:7 144:1,5,14,23 146:23 147:11 162:10 170:20 171:10,13 186:6,9 188:6,17 189:16 190:3 191:1 195:2,16 202:2,14 205:15,22,24 211:15 217:2
**school** 62:2 64:14,21,24 65:5,10,13,23,25 66:3,18
**schools** 186:6,8 189:18 190:3,17 191:2 207:11
**Schwab** 73:17,18,21,23,25 74:9
**Schwabb** 73:5
**Scientists** 85:8 103:25 104:4,6
**scope** 25:11
**Scott** 70:13,14,16,18,19 96:24 110:15,17,25 208:24
**scratched** 103:6
**screwed** 192:9
**seats** 146:2
**second-to-last** 77:11
**second-to-the-last** 221:17
**secondary** 127:19 158:11
**select** 60:4
**selecting** 206:12 207:2
**self-reported** 18:23
**seller** 100:11
**Senator** 118:18 122:9 194:20 195:14,18
**senators** 33:12 195:11,15
**send** 28:8 36:17 89:22 90:7,11 93:10 129:18 132:11 133:7 144:20 155:15 178:5 183:25 220:6 222:17
**sending** 61:16 90:10 140:10 167:18 169:5 179:12 205:4
**sends** 114:13 129:12 146:13 214:1,2 218:1
**senior** 33:11,13,24 55:19 79:9 80:17,20 81:3 187:13,16,19
**sense** 28:10 32:9 52:9 77:9 176:20
**sentence** 131:1 133:1,2 144:4,8 167:4 206:16
**sentenced** 191:9
**sentiment** 205:20
**separate** 56:7 59:23 125:15 126:10 129:1 157:17 158:8 169:3,6,7
**separating** 127:14
**served** 207:25
**services** 53:1 137:15 174:19 175:7 189:20 190:5
**set** 12:1 20:25 42:10 75:23 100:1 102:24 195:2 197:20
**setting** 100:14 144:22
**shakes** 16:24
**share** 112:23 113:4
**sharing** 51:12 52:23
**shed** 86:3
**shift** 45:10
**ship** 68:20
**shopping** 87:14
**short** 116:21 117:2 124:5 132:13 141:1,3 176:6
**short-term** 214:9
**shortly** 179:18
**show** 64:12 166:4,5 170:17
**showing** 50:22 71:6 134:15
**shows** 50:9
**sic** 96:5 219:13
**side** 26:10 49:5,22 53:23,24,25 61:21 99:1 153:5 183:13,14 208:22
**Sierra** 10:22
**sign** 31:7 32:5 182:8 205:19
**signature** 28:19 31:4,6 46:13 105:11,14
**signed** 19:21 28:24 32:12 185:4 219:3,16,19
**significance** 48:20
**significant** 33:22 67:13 118:22 119:1
**significantly** 193:18
**signing** 182:10 183:1 222:19
**similar** 14:4 126:14 189:25 194:2
**similarly** 84:19 105:25 137:18
**simple** 92:2
**simply** 104:8 131:15 166:9 207:10 211:10
**sincerely** 213:9
**single** 83:18 116:13,20 117:17 155:15 167:18
**sir** 10:17 11:5 55:2 184:15

**sit** 21:9 37:17 78:4 85:13 86:13 89:7 90:1 101:3,4 119:10 150:14

**site** 62:25

**sitting** 183:13

**situations** 32:16

**size** 25:11 34:25 35:11

**skeptical** 33:20

**skip** 113:11 163:4

**skipping** 162:21

**slightly** 25:8

**sluts** 209:15,22 210:1,6,10, 14,23

**small** 28:5 33:13

**smart** 189:15 190:17

**snack** 68:14 88:8

**social** 19:23

**socially** 20:3,6

**society** 85:8,12,14,15 86:13 88:23,25 89:6,14 90:2,4,9,13, 14,17,21 91:1 97:8 100:14,15 101:6,17 103:25 104:3,5 110:22 112:18 114:22 116:6, 10,13,16,19,25 117:8,16,20 118:2,6 119:24 121:3 123:8, 20 124:3,6,8,24 125:1,15 126:10 127:15 128:4,9,22 129:1 131:21 134:16 139:8,10 140:21 142:17,21 143:9 144:13 146:22 149:6,13 150:23 152:3,23 153:7 155:24 156:12 157:17 158:8,17 161:6 162:9,19 163:10 165:3,15,17 167:9,16,21 168:2,6,13,18 169:13,16 170:22 171:10,12, 18 172:4,7 173:7,15 180:16, 17,22 181:3,8 183:6,8,12,23 184:4 188:4 195:3 196:1,6,15, 25 197:10 199:17,24 201:23 205:15 206:10,20,25 207:6, 10,15,21,23,24 210:10,22 212:13 216:1 220:25 221:12, 15

**Society's** 86:24 89:23 124:18 129:24 131:2 153:2,13 155:2, 8 161:10 163:6 168:9 169:11 183:7,9 184:8 202:1 205:21 206:17 211:8 215:20

**soft** 196:19

**sole** 31:4 54:5 77:25 95:24 118:1,3 167:13 182:6

**solemnly** 9:10

**son** 64:17 65:7

**sort** 19:23 20:19 21:1 40:21 45:13 69:18 106:7 171:3

**sought** 145:20

**sound** 63:24 219:18

**sounds** 62:19 66:4,5 92:25 97:1

**source** 102:5 184:8 219:14

**South** 27:5

**space** 27:21,22 28:11

**spaces** 28:9

**span** 81:13

**speak** 22:10 26:11 40:15 76:4 192:14 203:7

**speaker** 13:24

**speakerphone** 111:23 112:12 116:1 122:13 127:24 133:24

**speaking** 56:8 113:5 149:12

**speaks** 216:17,18

**specific** 19:25 31:19 32:25 34:7 84:1 133:11 144:21 145:16 146:2,8,20 149:1 171:17,20 174:6 180:20 182:2,13,20,21,25 187:21 210:6 218:7

**specifically** 14:22 55:21 106:12 131:3,21 203:21 219:9

**spectrum** 193:23

**speculate** 15:20 139:23

**speculated** 158:20

**speculating** 134:23 139:21, 22

**speculation** 35:19 57:6 102:8 120:2 145:11,24 146:25 190:14 197:16

**speculative** 150:2,13,15,19 151:2

**spending** 219:6

**spent** 169:20

**split** 73:23

**spoke** 16:8 110:15,24 113:1 191:14 192:2,11 193:4,10 202:22,25 217:4

**sponsorships** 139:18

**spot** 38:10

**spread** 175:13 176:8 190:20 191:6

**spreading** 177:12

**staff** 210:3

**stage** 150:7

**stamp** 61:20 218:5

**stand** 96:2

**standard** 48:15 98:4

**standpoint** 26:2 43:19 89:11

**stands** 180:1

**start** 13:22 51:12 56:20 108:9 152:24 161:23 162:13,14 172:14,21,22,24 194:2 200:13 201:22 205:12

**started** 24:3 36:24 46:21,25 124:1,4 143:25 144:6,14 152:19 173:13

**starting** 24:18 47:14 134:6 214:1

**starts** 47:19 99:22 113:15 146:11 216:7

**state** 10:17 11:18 119:5 122:2 181:11 194:24 195:16,17

**stated** 34:10 86:8 116:8 121:6,23 136:12 146:4 181:17

**statement** 42:15 54:14 71:16 101:20 102:21 124:1 164:10, 11 182:12 199:22 207:14

**statements** 40:4 42:19,20 68:6 71:5,6

**states** 10:24 65:6 146:7 189:18 190:4

**stating** 170:4

**stay** 48:24

**stayed** 83:12
**STEM** 189:16 190:3 191:1
**step** 38:17 69:3 157:14 162:21 163:4
**stepped** 36:8
**stepping** 36:11
**steps** 115:19 119:18 120:11
**Steven** 52:1,2,13,14,21 53:17,23 54:8 106:7 136:6,7, 19 137:2 185:7 221:18 222:6, 9
**Steven's** 52:25 53:14 136:18, 22,24 137:14
**sticking** 62:5
**Stimulating** 220:9
**stint** 21:19
**stock** 68:14
**stockroom** 88:8
**stop** 67:11 138:7 156:12 184:5 203:14,17
**stopped** 176:21
**stopping** 42:10
**strategic** 98:24
**strategies** 25:19
**strategy** 11:25 146:1,5 180:2 185:9,12 190:18
**streams** 91:2
**street** 191:17
**Strike** 65:19 208:8
**strikes** 165:20
**stripper** 222:3,7
**Strippers** 220:12
**strong** 31:15 33:23 81:24
**strongly** 40:7,17 196:13
**structure** 62:23
**structured** 63:4,14 126:21
**students** 123:14 195:17
**stuff** 95:1 119:14 125:8 136:19 160:1,20 191:25
**stupid** 138:3,5,6 176:9,16 177:14
**style** 30:17
**subcontracting** 45:10
**subcontractors** 43:23
**subject** 38:5 107:5 130:2 131:25 178:13 194:21 214:19, 20
**submit** 22:24
**substance** 205:2
**substantial** 76:9
**suddenly** 145:7
**sufficient** 43:19,23 44:22 45:1 87:17
**suggested** 31:21 204:17
**suggesting** 142:16 143:3 162:17
**suggestion** 30:20,23 31:11, 12 208:13
**summary** 115:24
**super** 100:5
**supported** 53:25
**supporting** 54:16 85:16
**supports** 118:18
**suppose** 22:10 39:3 120:3 141:6
**supposed** 159:18 162:24
**surprise** 41:24
**Susan** 72:22 74:5 118:18,22 122:2,7 136:21
**sushi** 191:25
**suspect** 40:7,17
**suspected** 38:13
**suspended** 18:5,8,9
**suspenders** 163:16
**suspension** 18:21
**suspicion** 68:25 81:6
**swear** 9:11
**switch** 91:1
**sworn** 9:18
**system** 135:24
**SYSWE** 221:2
**SYWSE** 150:4 196:22 199:14 214:19 218:17 220:24 221:9

**T**

**takes** 120:11 178:22
**taking** 51:6 53:10 67:4,5 165:16 206:11 207:1
**talk** 15:12 41:4 48:25
**talked** 62:17 117:3 137:12 219:3,21
**talking** 13:22 20:7 28:17 34:8 41:18 62:13 91:6 157:15 171:9,11 183:25 220:2
**tangentially** 187:12 192:24
**target** 146:1
**tasked** 207:17
**tasks** 89:5,14 153:1,12 165:17,19
**taste** 205:1
**taxable** 78:17
**taxes** 78:7
**team** 50:2 51:19 79:10 113:7 154:15,16
**teams** 12:5 27:12 67:6,12
**technically** 73:25 221:7
**Technologies** 9:25 10:4,5
**telling** 25:8 32:21 78:11 124:20 138:6 139:3 161:1,4 166:12 174:1 212:20
**tended** 100:19 203:8
**term** 34:20 36:1 62:6 83:25 86:15 156:4 182:19
**terms** 10:10 40:25 45:23 68:5 86:10 149:8 153:6 168:8 197:19
**test** 22:13
**testified** 9:19 14:5,17 39:21 46:20 67:20 78:20 83:17 93:21 110:16 125:9,25 127:5

128:3 136:9 138:16 140:22 155:23 157:20 158:15 172:4 195:8 212:12,24

**testify** 14:18 74:17 77:20

**testimony** 9:11 22:17 36:4 37:10 38:19 41:25 45:16 56:8 60:2 66:7 74:14 76:5,9 77:21 91:8 93:1,8 94:11 96:3 99:6 102:19 104:8 126:18 142:7,10 165:22 183:16 184:13 186:20

**text** 60:11 61:12,17 193:15 208:19,21,22 209:6,13,14 216:23 217:5,24 218:20 222:3

**thereabouts** 39:25

**thing** 12:12 31:20 32:5 48:10 69:3 81:20 88:6 121:22 124:22 138:9 139:4 160:6 168:3 185:24 201:23 203:7 213:5,7 217:17

**things** 13:12 25:22 26:5 27:17,22 28:6 36:10 39:12 41:14 52:11,20 66:25 68:23 93:2 94:2,4 100:16 102:23 126:14 128:23 135:22 138:6 139:19,20 147:15 160:17 161:2,4 185:2 193:24 212:25 213:1,6 216:8,20 217:9,12

**thinking** 180:7

**thought** 31:10 46:20 56:17 93:17 95:9,15 98:16 115:4 177:15 186:17 190:16 199:5 209:20

**throw** 98:18

**Thursday** 16:15 195:23 200:22 201:1,8

**Tiffany** 70:12 86:25 87:1 89:1 90:22 166:2 167:9,11,13,19, 21 168:3,12,15,16 169:25 171:4,5 182:6 183:10 215:22 216:2

**Tiffany's** 164:5 168:1 170:6

**time** 11:11 12:10,15 13:24 14:9,20,21 17:22 18:10 20:18 21:20,24 25:8 27:3 29:2,8 31:13 33:5,22 36:6 37:6 38:7, 13 39:22 40:2,10,14 44:8,15, 17,20,23 45:14 53:10 54:12 55:7,18,22 56:14,24 57:13 60:12 61:20 63:7 64:4 66:1,5 76:20 77:7 80:3 82:21 84:9,20 85:2,3 86:23 87:12,23 88:22 89:8,15 90:17 98:19 101:3 106:1,23 111:6,10,12,22 112:4,7,16 113:4 114:9,19,25 116:22 117:5,7 118:6,15 119:21 121:7 124:3 125:4 130:24 131:7 133:10 135:17, 20,23 137:1,19 140:13 141:1, 3,7 144:10,17,18 145:7 147:8 148:15 150:19,21 151:1 152:1 156:1,3,4,6,9,16,17 157:7,11 166:7 169:9,20 170:18 173:23 176:23 185:9 188:15 190:12 191:14 192:2,11,15 193:3,10 198:16 199:23,25 212:11 214:10,11,14 218:5 221:6

**time-consuming** 144:23

**timely** 216:14

**times** 10:11 28:21 30:20 35:11,14 137:23 151:24 169:19

**timetable** 120:20

**timing** 37:16 44:6 149:3

**title** 11:24 24:11,13,24,25 98:15,21 214:11,12

**titled** 61:8

**today** 14:1 15:3,15 16:3,6 21:9 37:17 44:3 85:13,21 86:13 101:3,4 110:15 119:10 150:14 200:18

**today's** 15:25 17:14

**told** 25:15 26:12 31:9 32:4 33:18 34:3 37:21,23 41:13,23 62:17 64:6 67:3 85:15 93:2 118:1 138:2 160:19 165:24 166:2 180:18 191:24

**tomorrow** 219:5

**top** 29:5 60:23,24 68:16 73:22 97:15 146:11 151:10 170:1,4 172:15 175:9 176:6 178:4,7 198:25 205:10 208:10,21 218:9,10 220:5

**topic** 197:1,13

**topics** 104:7

**totally** 94:13 100:7 164:13

**touch** 144:2

**track** 136:4 192:18

**transaction** 154:15 163:15

**transactions** 28:22 68:18 92:9 100:2,9

**transcript** 15:3 222:23

**transfer** 32:1,11 73:6 101:23 102:3

**transferred** 74:7 101:24 104:3

**transferring** 69:9

**transfers** 68:1 69:18 76:7

**treated** 91:12

**trick-or-treating** 191:19

**trigger** 95:9

**trip** 167:6

**Troy** 81:10 214:2,7

**true** 58:2,4 98:13 137:18 160:18 165:10,11 184:8 207:9 211:18 212:16

**Trump** 216:15,17

**trust** 21:17

**trusted** 20:24 21:13 87:23

**truth** 9:12,13,18,19 139:3

**Tuesday** 9:2 215:18

**tuition** 58:5,11,17,25 59:15, 20 63:21 64:24 65:10 66:3,4,5 68:3 69:10 71:23 78:8 82:18 90:24 95:8,14 138:14

**tuitions** 66:19

**tune** 69:11

**Turbotax** 78:19

**turn** 19:4 56:13 81:7,20 204:20 216:5

**turned** 176:18

**turns** 25:21 54:21

**two-year** 47:1

**type** 41:15

**types** 98:23 187:7 210:25

**typical** 57:1 135:14 202:12, 13,15 222:10

**typically** 100:8

**typing** 13:11

U

**uh-huh** 13:14

**ultimate** 43:2

**ultimately** 12:17 28:18,25 31:3 34:10 69:2 75:22 78:5 80:8 86:9 95:25 125:1 127:12, 18 130:5 197:23 212:3

**umbrella** 110:1

**uncertainty** 12:16

**undergrad** 17:24

**undergraduate** 17:19

**underlying** 43:8

**underpingings** 19:24

**understand** 10:3,11 14:1,3 15:1,2 21:23 42:24 63:4 86:24 90:6 93:19 96:9,19,22 109:10 116:19,24 119:23 120:6 128:13 129:23 130:25 131:18 132:22 133:10 140:6,14 141:7,13,17,20 144:13 146:19 152:16 154:6 160:23 169:4 184:13 197:6 200:15 209:19, 21 211:3 214:21 216:10 217:7 222:5

**understanding** 21:16 37:6,7 39:22 40:1,13 42:7 44:24 45:14 50:5 54:7 55:11 62:13 64:23 65:1 66:10,14,16,20 68:10,11 69:17 71:22 78:11 80:9,18 85:11,13,21,22,25 86:12 96:1,12 97:4,19 107:19 111:5,12 117:5,25 121:2 126:22 128:7 131:6,7,11,16 132:3 140:17 141:4 142:1,14, 21 144:7 145:6,13,22 152:8, 25 153:17,19,24 166:11 167:14 171:6 176:23 179:5 188:3 197:13 209:9 214:25 215:11 216:18 217:8

**understandings** 88:21 117:20

**understood** 13:20 14:20 54:5 58:9 59:22 77:3 90:21 111:10 117:6 118:13 120:8,13 121:7 125:4 176:12 203:2 209:17 212:12 217:13 219:22

**unemployed** 11:6,7,8

**unfamiliar** 163:14

**uniform** 43:9

**unintended** 63:15

**universal** 99:14

**universe** 43:10

**universities** 27:14 123:10,21 144:2,6,22 145:1,14,16 146:15,22 147:6,20 171:10 186:13 187:3,25 188:5,16 190:22 195:2 206:13 207:3

**university** 17:20,21 123:11 124:10 153:6 154:12 187:17 194:24 195:16,17 214:16

**unlawful** 40:2,8 126:19,20,24

**unnecessarily** 172:2

**unrelated** 59:24

**unstable** 38:9 78:22,25 138:18

**unwound** 127:1

**upper** 29:3

**urge** 42:4

**urged** 33:15

**us.'** 179:1

**usual** 44:9

V

**vague** 29:16 30:6 37:8 43:5 57:5 59:1 82:4 100:5 147:12 153:22 186:14

**validate** 90:19

**valuations** 12:14

**varied** 179:7

**varying** 180:12

**vastly** 34:17,20

**venture** 57:8

**verbal** 13:12 193:14

**verbally** 38:5

**verification** 105:14

**verified** 184:18,19

**verify** 165:13 184:21

**version** 167:2

**versus** 75:25 147:19 220:21

**vetted** 96:1

**video** 16:13,23 17:8

**viewed** 205:21

**virtue** 183:13

**visibility** 129:8

**vision** 26:8 51:10

**visit** 21:25

**visited** 22:1

**voice** 16:11 111:23 112:2

**voters** 194:20

W

**wage** 47:10 208:6

**wait** 50:3 219:10 222:21

**Wait...is** 210:14

**waiting** 32:11 162:25

**Waldorf** 64:14,20 65:23,25 66:3

**wanted** 25:20,22 26:19 27:1, 15 28:7,19 30:11 31:1,16,20 41:1 42:5,6 50:3 59:10 64:8 79:25 80:5 81:14,19 82:9 86:17 106:10 133:1 134:22 186:20 218:7

**warning** 185:17

**warnings** 38:1,4

**Washington** 83:16 85:7 107:21 111:8 143:8 177:10

**watchdog** 86:2

**water** 70:3 169:16,17

**waters** 22:13

**ways** 88:17 170:19 201:25 222:11

**website** 34:4 59:5 206:5,16, 18,21 210:18,21 220:18

**Wednesday** 16:15 156:14 200:21,23 201:6,7

**week** 16:13 17:9 130:16 200:20,21,23 218:16 220:23

**weekend** 79:9

**weeks** 219:11 221:14

**Wei** 10:19

**Whatever...just** 205:17

**wheel** 96:2

**wherewithal** 43:24

**whomever** 89:2

**Wichita** 194:16,20,24 195:16, 17

**wide** 154:10 190:20

**widely** 112:16

**wife** 100:22

**William** 173:3 178:10

**willingness** 213:9

**window** 86:16

**Winer** 109:14,25 113:17 115:9 123:4 129:13 130:10 142:1,23 143:16 149:16 151:12 152:5 178:11 179:22 189:14

**Winer's** 109:17 143:1 179:24

**withhold** 222:19

**women** 85:8,17 103:25 104:4,6 115:16 116:7 118:7 128:19 186:7 202:1,14,22,25 203:12 205:14,25 210:10,14, 23 216:8,20 217:10

**wonderful** 216:8 217:9,11

**wondering** 164:23 199:18

**woodwork** 100:20

**word** 30:9 78:18 100:3 109:6 115:21 143:12 144:9 147:2 162:13 173:10 180:11 208:14, 17 210:10 219:15

**words** 36:16 78:21 118:19 131:10,16 209:14

**work** 24:7 45:10 51:6,8 52:22 57:15,16,17 59:6,24 79:2 88:17 90:16 98:25 99:4 109:21 123:20 133:18 147:7, 10,21 153:1,12 156:7 157:7 185:7 215:11

**workday** 169:10

**worked** 11:19 23:15 60:13 84:13 85:20 145:17 185:10

**working** 35:21 59:9 84:22 86:18 123:9,21 144:3,21 145:14 147:15 187:18 191:24

**worried** 37:22

**worry** 199:9

**worse** 160:8

**worth** 148:18 205:24

**write** 13:15,18,23 73:7 161:21 162:25 179:19

**writes** 164:3 167:9 173:1

**writing** 36:15 38:1,8

**written** 133:11 136:23 150:22 151:3 193:16

**wrong** 31:10 63:17 65:20 85:3 138:8 184:6

**wrote** 69:4 95:7 96:21 134:15 144:4 167:11

**WSU** 194:21,23 199:13,21,23

**Wu** 16:19

**X**

**Xander** 65:6,7

**Y**

**year** 47:4,6 50:23 55:4,5 79:7, 8 193:5

**years** 11:13 24:21,22 32:11 47:3 79:15

**yesterday** 16:11 17:1

**young** 85:8 103:25 104:4,6 210:10,22 216:8

**yup** 61:11 72:19 105:12 108:23 109:2 113:19 130:23 151:13 155:17 161:19 178:8, 21 194:17 210:12