# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

PACMAR TECHNOLOGIES LLC (f/k/a MARTIN DEFENSE GROUP, LLC),

Plaintiff,

vs.

MARTIN KAO; TIFFANY JENNIFER LAM a.k.a. JENNY LAM and/or TIFFANY KAO; LAWRENCE KAHELE LUM KEE; CLIFFORD CHEN; DUKE HARTMAN; SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC,

Defendants.

CASE NO. 1:22-cv-00283-LEK-WRP

Certified Transcript

(Pages 1 - 308)

REMOTE DEPOSITION OF DUKE HARTMAN

THURSDAY, APRIL 24, 2025

REPORTED BY: CHANTELLE HEE, RPR
State of Hawai'i CSR No. 536

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

PACMAR TECHNOLOGIES LLC (f/k/a MARTIN DEFENSE GROUP, LLC),
Plaintiff,
vs.
MARTIN KAO; TIFFANY JENNIFER LAM a.k.a. JENNY LAM and/or TIFFANY KAO; LAWRENCE KAHELE LUM KEE; CLIFFORD CHEN; DUKE HARTMAN; SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC,
Defendants.

CASE NO. 1:22-cv-00283-LEK-WRP

Remote deposition of DUKE HARTMAN, taken on behalf of the Plaintiff, PACMAR TECHNOLOGIES LLC, pursuant to Notice, on THURSDAY, APRIL 24, 2025, commencing at 2:59 p.m. via Zoom videoconferencing before Chantelle Hee, RPR, State of Hawai'i CSR No. 536.

REMOTE APPEARANCES:

For Plaintiff PACMAR TECHNOLOGIES LLC:

LUNG ROSE VOSS & WAGNILD
BY: GRANT F. ALLISON, ESQ.
700 Bishop Street
Suite 900
Honolulu, Hawai'i 96813
(808) 523-9000
gallison@legalhawaii.com

For Defendant DUKE HARTMAN:

BRONSTER FUJICHAKU ROBBINS
BY: MARGERY S. BRONSTER, ESQ.
BY: NOELLE E. CHAN, ESQ.
1003 Bishop Street
Suite 2300
Honolulu, Hawai'i 96813
(808) 524-5644
mbronster@bfrhawaii.com
nchan@bfrhawaii.com

For Defendant CLIFFORD CHEN:

SCHLACK ITO, LLLC
BY: DEREK R. KOBAYASHI, ESQ.
745 Fort Street
Suite 1500
Honolulu, Hawai'i 96813
(808) 523-6060
dkobayashi@schlackito.com

REMOTE APPEARANCES (continued):

For Defendant LAWRENCE KAHELE LUM KEE:

SCOTT E. KUBOTA, AAL, LLLC
BY: SCOTT E. KUBOTA, ESQ.
500 Ala Moana Boulevard
3 Waterfront Plaza
Suite 500
Honolulu, Hawai'i 96813
(808) 532-9599
scott.kubota@gmail.com

For Defendant TIFFANY JENNIFER LAM:

MIYOSHI & HIRONAKA, LLLC
BY: PHILIP W. MIYOSHI, ESQ.
201 Merchant Street
Suite 2240
Honolulu, Hawai'i 96813
(808) 888-5042
philip@808-law.com

Also Present:

Andrew Sagansay, iDepo Moderator

Dan Brunk, PacMar Technologies, CEO

I N D E X

| DEPONENT: | EXAMINATION: | PAGE: |
|---|---|---|
| DUKE HARTMAN | BY MR. ALLISON | 10 |

INFORMATION TO BE SUPPLIED

(None.)

QUESTIONS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 25 | 5 |
| 25 | 16 |
| 26 | 1 |
| 26 | 10 |
| 101 | 4 |

I N D E X (continued)


| EXHIBITS: | DESCRIPTION: | PAGE: |
|---|---|---|
| EXHIBIT 1 | Declaration of Duke Hartman 16 pages | 75 |
| EXHIBIT 3 | Outlook E-mail Meeting invite Dated 10/25/2019 2 pages | 96 |
| EXHIBIT 4 | E-mail Chain Between Clifford Chen and William Canfield Dated 2/28/2020 17 pages | 121 |
| EXHIBIT 6 | E-mail Chain Between Martin Kao and Andy Winer and Duke Hartman Dated 2/21/2020 2 pages | 178 |
| EXHIBIT 7 | E-mail Between William Canfield and Martin Kao Dated 2/25/2020 1 page | 181 |
| EXHIBIT 8 | E-mail Chain Between Martin Kao and Clifford Chen Dated 2/2/2020 1 page | 186 |
| EXHIBIT 9 | E-mail Chain Between Martin Kao and William Canfield and Duke Hartman Dated 3/4/2020 2 pages | 190 |
| EXHIBIT 10 | Terms of Engagement Letter from William Canfield 2 pages | 194 |
| EXHIBIT 11 | E-mail Chain Between Duke Hartman and Hossein Haj-Hariri Dated 2/25/2020 2 pages | 197 |
| EXHIBIT 12 | E-mail Chain Between Duke Hartman, Kahele Lum Kee, and Lori Bofman Dated 3/18/2020 8 pages | 209 |

I N D E X (continued)


| EXHIBITS: | DESCRIPTION: | PAGE: |
|---|---|---|
| EXHIBIT 14 | E-mail Chain Between Duke Hartman, Clifford Chen, and Martin Kao 3 pages | 152 |
| EXHIBIT 15 | Letter from William Canfield to Cleta Mitchell Dated 3/25/2020 2 pages | 227 |
| EXHIBIT 16 | E-mail Chain Between Troy Keipper, Clifford Chen, Duke Hartman, Michael Schmicker, Martin Kao, and Lori Bofman Dated 3/30/2020 4 pages | 233 |
| EXHIBIT 18 | Confidential Employee Status Report Dated 3/23/2020 1 page | 243 |
| EXHIBIT 19 | Confidential Employee Status Report dated 4/1//2020 1 page | 244 |
| EXHIBIT 20 | E-mail Chain Between Duke Hartman, Kahele Lum Kee, and Lori Bofman Dated 4/14/2020 11 pages | 248 |
| EXHIBIT 22 | Strategic Partnerships Overview PowerPoint Slide Presentation 39 pages | 264 |
| EXHIBIT 26 | E-mail Chain Between Duke Hartman, Martin Kao, and Clifford Chen Dated 5/21/2020 7 pages | 270 |
| EXHIBIT 27 | Response of the Society of Young Women Scientists and Engineers, LLC 2 pages | 275 |
| EXHIBIT 28 | E-mail from Gary Ambrose to All Navatek Users Dated 10/21/2020 3 pages | 276 |

I N D E X (continued)


| EXHIBITS: | DESCRIPTION: | PAGE: |
|---|---|---|
| EXHIBIT 30 | E-mail Chain Between Hossein Haj-Hariri and Duke Hartman Dated 12/3/2020 4 pages | 281 |
| EXHIBIT 32 | Center for Development of Security Excellence Certificate of Training 1 page | 298 |
| EXHIBIT 33 | E-mail from Duke Hartman to Duke Hartman Dated 1/8/2921 120 pages | 291 |

HONOLULU, HAWAI'I

THURSDAY, APRIL 24, 2025

2:59 P.M.

-o0o-

(Pursuant to Rule 14 of the Rules Governing Court Reporting in Hawaii, the reporter's disclosure is available.)

-o0o-

THE COURT REPORTER: Mr. Hartman, please raise your right hand.

Do you solemnly swear that the testimony you are about to give in the matter now pending will be the truth, the whole truth, and nothing but the truth?

THE DEPONENT: I do.

THE COURT REPORTER: Thank you.

-o0o-

DUKE HARTMAN,

called as a deponent and sworn in by

the court reporter, was examined

and testified as follows:

-o0o-

EXAMINATION

BY MR. ALLISON:

Q. Good morning, Mr. Hartman. My name is Grant Allison. I'm counsel for the plaintiff in this case; that's PacMar Technologies LLC. I may, at times, refer to that entity, the plaintiff, as either the company or PacMar.

Do you understand that?

A. Yes.

Q. Previously, the company, or PacMar, also had the name Martin Defense Group, LLC.

Are you generally aware of that?

A. Yes.

Q. Okay. So at times, the documents or myself or even you may refer to the company as Martin Defense Group or MDG.

Do you understand that?

A. Yes.

Q. And then one last name for the company. It was also previously called Navatek LLC.

Is that accurate?

A. Yes.

Q. And so, once again, the documents or either of us may also refer to the company or the plaintiff as Navatek.

**Do you understand that?**

A. Yes.

**Q. Okay. Would you please state your name for the record.**

A. Duke Hartman.

**Q. What's the current address where you live, Mr. Hartman?**

A. 6336 Briarwood Road, Columbia, South Carolina 29206.

**Q. And -- I'm sorry. One more time?**

A. That was the ZIP Code, 29206.

MS. BRONSTER: Mr. Allison, please do not interrupt the witness. I know that it's a little bit more awkward when we're doing it via Zoom, but I --

MR. ALLISON: Yeah. That's no problem. Thanks.

MS. BRONSTER: Thank you.

BY MR. ALLISON:

**Q. So, Mr. Hartman --**

MS. BRONSTER: And please don't interrupt me. Mr. Allison --

(Speaking simultaneously.)

MR. ALLISON: This is unnecessary, Margery. Let's stop.

MS. BRONSTER: Do not interrupt me.

MR. ALLISON: Sure. You got it.
MS. BRONSTER: Thanks.
BY MR. ALLISON:
**Q. Mr. Hartman, your counsel brings up a good point that we should not speak over one another because there's a court reporter. The court reporter's writing everything down.**
**I did not intend to speak over you. I thought you were finished speaking. In any conversation, it's natural that at times we will speak over each other, but we should both do our best not to. I'll do that if you can do that. Okay?**
A. I understand.
**Q. Do you have any residences in Hawaii currently?**
A. A rental property.
**Q. Okay. And do you ever come there or stay there or live there?**
A. I visit about once a year. I still have family there. I was --
**Q. What's the -- I'm sorry?**
A. I was born and raised there; so I still have family and friends there.
**Q. What's the address of your rental property that you own?**

A. Is that germane? I mean, do I need to tell you that?

**Q. Are you refusing to answer the question?**

A. No. I was just -- I'm wondering why it's germane to what we're talking about here.

**Q. It's public information, isn't it?**

A. Probably.

**Q. So what's the address, Mr. Hartman?**

A. 2710 Kalihi Street, Honolulu, Hawaii 96816.

**Q. Okay. And who is your current employer?**

A. My current employer, Integer Technologies LLC.

**Q. Okay. And Integer Technologies, just as with the plaintiff entity, documents or either you or I may refer to that entity as just simply Integer.**

**Do you understand that?**

A. Yes.

**Q. Okay. When was Integer first formed or incorporated?**

A. January 2021.

**Q. And what's your position with Integer?**

A. I am the chief executive officer.

**Q. And how long have you held that position?**

A. Since the formation of the company.

**Q. Have you ever had your deposition taken**

before?

A. No, I have not.

Q. Have you ever testified under oath in any legal proceeding?

A. I don't believe so. And if I have, I do not recall.

Q. Do you understand that you're under oath today? That means that you are sworn to tell the truth?

A. Yes.

Q. Just a couple of basic ground rules here for a deposition. You may already know these things, Mr. Hartman, but just humor me.

The first is that we ask that you don't guess at anything. If you don't know the answer to something, it's okay to say you don't know. Please don't speculate, but if you have a basis to give an answer, please do so.

A. Okay.

Q. I ask that you give verbal responses because the court reporter is writing everything down. So please do not nod your head "yes" or "no" or say "uh-huh" or "uh-uh" because those are hard for the court reporter to write down.

A. Okay.

**Q. We already went over the one speaker at a time; I think we're on the same page there.**

**From time to time, your counsel, Margery Bronster, may object to questions. Unless she specifically directs you not to answer, you are to answer all questions.**

**Do you understand that?**

A. I do.

**Q. Okay. Is there any reason why we can't or shouldn't go forward today?**

A. I'm sorry. I didn't catch the last part of your sentence.

**Q. Is there any reason on your end or something going on with you as to why we cannot go forward today with this deposition?**

A. No.

**Q. And you're located where right now?**

A. In Columbia, South Carolina.

**Q. Okay. And what time of the day is it for you right now?**

A. It's 3:04 p.m.

**Q. And do you have a particular time this evening when you'll need to stop?**

A. No. I'd like to do it in one shot here.

**Q. Okay. Is there anybody in the room with**

you right now?
A. No.
Q. And where physically are you located at the moment?
A. In my personal residence.
Q. Okay. And that's the address you gave earlier?
A. Correct.
Q. Do you have any communication devices with you besides the computer you're on?
A. I have my phone.
Q. Okay. I ask that you put your phone away and that you don't look at it while we're doing the deposition
A. I'll do that now.
Q. And do you have any documents in the room with you?
A. I have a couple tips basically on -- deposition notes on what to do, what not to do.
Q. Okay. I'll ask that you put those away, Mr. Hartman. Or if you're going to have them out, I would ask that you give me a copy of them.
A. Okay. I'll put them away.
Q. One last ground rule here, Mr. Hartman, is that while the questions are going on, I ask that you

don't use your computer, your e-mail, or your cell phone or any other means of communication while I'm asking you questions, while questions are pending.

Do you understand that?

A. Yes.

Q. Okay. And we're going to take breaks probably about once every hour give or take. While there's a question pending, we're not going to take a break but we'll find times to -- reasonable times to stop and take five-, ten-minute breaks throughout the day.

If there comes a time where you need a break for any reason, let me know and we'll find a good time soon thereafter to take a break. Okay?

A. Okay.

Q. Okay. What did you do to prepare for today's deposition?

A. I spoke with my attorneys on Monday and as well yesterday.

Q. On Monday when you spoke with your attorneys -- and to be clear, I'm not going to ask you what they told you. I just want to know the details of how long you met, who you met with, things like that.

So, on Monday, who are the specific

**attorneys that you spoke to?**
MS. BRONSTER: Objection as to the preface.
You may answer.
THE DEPONENT: Okay. Rex Fujichaku, Margery Bronster, Lanson Kupau, and Noelle Chan.
BY MR. ALLISON:
**Q. And was that a meeting that occurred over a conference telephone call or was it a videoconference or something else?**
A. Videoconference.
MS. BRONSTER: Objection. Objection Compound.
Duke, you need to wait until I interpose my objection before you answer, please.
THE DEPONENT: Okay.
MS. BRONSTER: Thank you.
BY MR. ALLISON:
**Q. How long did this videoconference last?**
A. Roughly 90 minutes.
**Q. Did you look at any documents during that 90-minute videoconference?**
A. Yes, I did.
**Q. How many documents did you look at?**
A. I don't know the specific number.
**Q. If you had to estimate it to the best of**

**your ability?**

A. I can do that, half a dozen. So maybe six to eight documents, something like that.

**Q. And which documents did you look at?**

A. I don't know the specific names. I can give you the rough time frame and that they were e-mails, if that helps.

**Q. Sure. That does help.**

**What were the time frames?**

A. In, you know, the first quarter to the second quarter of 2020. And they were e-mails between myself, Cliff Chen, Martin Kao.

**Q. What were the topics of these e-mails generally?**

A. The subject of this case, so the Society of Young Women Scientists and Engineers and scholarships, things like that.

**Q. Okay. And then I'm going to ask you a series of questions that are similar but deal with yesterday's meeting that you mentioned.**

**Who did you meet with yesterday?**

A. The same group of attorneys I mentioned. I believe we were all on the line as well.

**Q. And in either Monday or yesterday's meeting, it was just you and those four attorneys and**

**nobody else; is that correct?**
A. That's correct. I don't recall, yeah, anyone else from their team or otherwise.
**Q. Yesterday's meeting was also over videoconference?**
A. That's correct.
**Q. And how long did that last?**
A. Roughly 30 minutes.
**Q. Did you look at any documents during that meeting?**
A. I believe so. A smaller number, I'd say two or three.
**Q. And which two or three documents did you look at yesterday?**
A. Again, I -- unless I pull them up, I couldn't -- I couldn't tell you exactly which, but they were e-mails in the same general time frame in the first quarter or second quarter of 2020 between, you know, the codefendants.
**Q. Were they also mostly about the Society and scholarships?**
MS. BRONSTER: Objection. Objection. Misstates the testimony.
You may answer.
THE DEPONENT: I'm sorry. Can you repeat

the question, Grant?
BY MR. ALLISON:
**Q. The question was were those two or three e-mails you looked at yesterday with your counsel during the 30-minute videoconference also generally about the Society and/or scholarships?**
MS. BRONSTER: Objection. Misstates the earlier testimony.
You may answer.
THE DEPONENT: The e-mails generally referenced scholarships and the Society.
BY MR. ALLISON:
**Q. Okay. And I think now's a good time to do a couple more definitions just to make sure we are on the same page and the record is clear.**
**When we're talking about the Society, we're talking about the -- an entity called the Society of Young Women Scientists Engineers LLC; is that correct?**
A. As far as I know, yes.
**Q. Okay. And the Society, that entity is sometimes commonly referred to as either the Society or even SYWSE; is that accurate?**
MS. BRONSTER: Objection. Vague.
You may answer.

THE DEPONENT: Yes. Yes.
BY MR. ALLISON:
**Q. So if we see reference to either "the Society" or "SYWSE" in documents or if those phrases are used in my questions or your testimony, we both understand that we're referring to the entity called the Society of Young Women Scientists Engineers LLC; correct?**
MS. BRONSTER: Objection as to form.
You may answer.
THE DEPONENT: I think it would depend on the context because there's a possibility that "the Society" refers to something else. But generally speaking, given contextual clues, then yes, I would agree with that statement.
BY MR. ALLISON:
**Q. Okay. If there's ever a time when we're looking at a document or I'm asking a question and you're providing an answer and the term "Society" is used in a context other than referring to the entity the Society of Young Women Scientists Engineers LLC, will you please let me know that?**
A. I will do my best.
**Q. Okay. Can you tell me -- can you list your higher educational degrees, college level or higher,**

**that you hold?**

A. Bachelor of Science in mechanical engineering from the University of Hawaii.

**Q. When did you get that degree?**

A. 2009? 2009.

**Q. So you said science and engineering. Was there a particular field of engineering that your degree was in?**

A. It was a -- the degree was a Bachelor of Science and the field was mechanical engineering.

**Q. I see. Thank you.**

**Do you hold any professional licenses such as a PE or any other license?**

A. I do.

**Q. So you do? You hold a PE; is that correct?**

A. That's correct.

**Q. Any other licenses?**

A. Related to my engineering profession?

**Q. Any at all, just any professional licenses.**

A. The question's a little broad. I may have other licenses that I'm not thinking about right now. That's the only one that comes to mind, let's say it that way.

**Q. And is that PE license currently active?**

A. Yes.

**Q. Have you ever been suspended or had any other discipline levied against you for any professional license in your career?**

A. No.

**Q. Okay. And today you're testifying as a fact or lay witness. Is that accurate?**

MS. BRONSTER: Objection to the extent it calls for a legal conclusion.

You may answer if you know.

THE DEPONENT: I don't understand the question.

BY MR. ALLISON:

**Q. Do you intend to testify in this case as an expert witness?**

MS. BRONSTER: Objection to the extent it calls for attorney-client privileged information.

But if you can avoid disclosing anything you've discussed with your attorneys, you may answer.

THE DEPONENT: So if I -- I'll repeat the question so I make sure I'm answering what I have in my mind.

Am I planning to appear as an expert witness in the trial? Is that the question?

BY MR. ALLISON:

**Q. That's correct.**

MS. BRONSTER: Same objections.
THE DEPONENT: Possibly. I'm not sure. I haven't decided, let's put it that way.
BY MR. ALLISON:
**Q. I see. And if you were to testify as an expert witness, what field would you testify potentially as an expert in?**
MS. BRONSTER: Objection to the extent it calls for discussions with counsel.
If it calls for -- if you have to refer to discussions with counsel, I would instruct you not to answer.
THE DEPONENT: I would need to discuss this with counsel.
BY MR. ALLISON:
**Q. Okay. And so then if I asked you what are your expert conclusions in this case, would you also not be able to answer that question?**
MS. BRONSTER: Using the same objection.
THE DEPONENT: I think that's true.
BY MR. ALLISON:
**Q. And if I asked you what is the support for your expert conclusions, would you have the same answer?**
A. I think that's true.

**Q. Okay. And if I asked you to explain to me the methodology underlying your expert reasoning or underpinning your expert conclusions, what would your answer be?**

MS. BRONSTER: Same objection. Same instruction.

THE DEPONENT: I would have to discuss with counsel.

BY MR. ALLISON:

**Q. Okay. So you're not able to testify as to any of those subject matter relating to your potential expert testimony based on the questions I just asked you today?**

MS. BRONSTER: Given the same objections and instructions.

THE DEPONENT: That's correct.

BY MR. ALLISON:

**Q. Okay. When did you first come to know Martin Kao?**

A. I first heard of Martin -- Kao is how generally I've pronounced his name, so I'll keep pronouncing it that way -- through my -- the first company I worked for called Makai Ocean Engineering. The CEO of that company, José Andres, knew of Martin and that's how I first came to know Martin.

**Q. And did the CEO of Makai Ocean Engineering that you just mentioned, did he introduce you to Martin?**

A. I do believe we had a meeting very, you know, early on, but I can't recall. I just generally knew him as a -- somebody who helped with R&D tax-related issues and Makai was one of the companies that had R&D tax-related issues. Doesn't exactly answer your question, I don't think.

I do believe José introduced me to Martin, but I won't say that I knew him well. I think, if anything, it was one meeting.

**Q. To the best of your recollection, what was the time frame when José first introduced to you Martin?**

A. Would have been some time in the 2012, 2013 time frame, I would -- I would estimate. But, again, a single -- a single meeting, you know, in passing.

**Q. When did you first come to know the company?**

A. I was aware -- I was aware of Navatek since I was in maybe grade school, even. So I always had an interest and a fascination with the ocean and engineering.

Navatek, at that time, I believed was a

reputable engineering firm, and I had fascination with, again, technology and the ocean, and Navatek was one of the companies in Hawaii doing that. So I can't say exactly when I became aware of them, but definitely in my undergraduate studies I was well aware that they were an engineering employer in Hawaii.

**Q. You mentioned that back when you were in grade school, you considered Navatek or the company to be a reputable company.**

**Do you still today consider it to be a reputable company?**

A. No.

**Q. Why not?**

A. I -- I had respect for some of the engineering projects that the company worked on or at least what was in the press and what I knew of before I became really familiar with the company. But I will say as I got to know the leadership, including Martin and Steven, I pretty quickly lost respect.

**Q. You were hired by the company when?**

A. I was given an offer, I believe, in March -- on or around March or April of 2018. And they allowed me a delayed start date; I didn't start until September 2018.

**Q. And how soon after you started in 2018 did you formulate the opinion that the company was not reputable?**

A. What I feel know and feel now is that the company is not reputable.

**Q. When did you form that opinion?**

A. Certainly after the indictments of Martin Kao.

**Q. And when you say "the indictments," you're referencing the indictment in US District Court in the District of Hawaii relating to the PPP loans. Is that one?**

A. That was one.

**Q. And then the indictment of Martin Kao, Cliff Chen, and Kahele Lum Kee in US District Court in the District of Columbia for indictments relating to campaign contributions; is that correct?**

A. That's correct.

**Q. Okay. Are there any other indictments that you were referencing in your prior answer?**

A. No.

**Q. You testified earlier that you were first introduced to Martin in 2012, but it sounds to me based on your testimony that he wasn't part of the company at that time.**

**Is that accurate?**

MS. BRONSTER: Objection. Misstates the testimony.

You may answer.

THE DEPONENT: I'm not aware of -- of Martin's employment status in 2012.

BY MR. ALLISON:

**Q. Well, you testified that he worked on doing tax credits for companies that were involved in R&D; is that right?**

A. That was his reputation with José. I don't know if he was still doing that line of business at the time when I, again, met him in passing.

**Q. I understand. So between the 2012 time frame when you met him in passing through José and when you were given an offer in or around March or April of 2018, how many times did you meet or interact with Martin between those two time periods?**

A. I don't remember a single interaction.

**Q. And then how did your job offer from the company come about in first or second quarter 2018?**

A. I had met Eric Schiff a number of times. Eric Schiff was, at that time, a vice president at the company. And I'd also met Ann Chung who was a business developer and, I think, lobbyist for the

company.

The two of them were aware that the company was growing at that time. They knew that I was, at the time, the vice president of business development at Makai; and so they invited me out to Navatek offices to have a discussion about -- about opportunities.

**Q. When did that happen?**

A. I don't know the specific dates, but it was a few months prior to receiving the offer. So if I had to -- well, I won't guess or speculate -- on or around the last quarter of 2017 or the first quarter of 2018.

**Q. Did Martin Kao attend that meeting?**

A. I -- I -- there were two meetings prior to receiving an offer, and I do believe he attended both meetings.

**Q. Anybody else attend these meetings besides Martin, Eric Schiff, and/or Ann Chung?**

A. Eric Schiff and Martin attended the first meeting, if my memory serves. And the second meeting included Eric Schiff, Martin Kao, and Todd Peltzer who, at the time, was also a vice president of the company.

**Q. Okay. You mentioned that your start date**

**was sometime -- with the company sometime in September 2018; correct?**

A. Correct.

**Q. What was can your last date working for the company?**

A. I'm sorry. Can you say that again, Grant?

**Q. Yeah. What was the last day that you were employed by the company?**

A. The last date, I want to say -- well, it was the first half of January 2021. I don't know the specific date.

**Q. Okay. So it was sometime in the first half is what you're saying? So, like, sometime between January 1st and, let's say, January 15th, somewhere in there?**

A. Correct.

**Q. Okay. When you were hired in 2018 September, what was the position you were hired to?**

A. There were a few different names and I believe what was put in the offer letter was different than what ended up on the business card.

Do you want all of the variations or --

**Q. To the best of your recollection, please give me the different variations.**

A. Okay. I believe the original offer was

something like business capture and manager of programs, something like that. I asked for a slightly simpler title.

And so I think I asked for business development manager and that's -- that's what I think was in the final offer. And then really what my title -- once I got into the company, I was reporting to Todd Peltzer and my title became director of programs.

**Q. As a director of programs, generally, what were your job duties and responsibilities?**

A. Here's where I have to say it was not very well defined. There were -- there were at least three areas of -- of responsibility.

Number one, I was reporting to Todd Peltzer who was the vice president of business operations, I think, at the time. So my job was to help Todd with the many Navy programs he was managing; help to complete and quality control technical reports being approved and submitted, transmittals that we were sending to Office of Naval Research; overall work flows because I -- at the time, I understood there was a challenge getting monthly reports out on time.

So that was one general area of responsibility, kind of managing the work product

that was coming out of some of these R&D programs that the company was working on.

Another area was general business development. So this involved things like looking out for Small Business Innovation Research, or SBIR, opportunities; looking for opportunities within the state; basically looking for new -- new business opportunities for revenue for the company.

And a third area that, frankly, was not even talked about and in the -- I would say in the first quarter or so, I really didn't have any -- any role in but eventually became a responsibility while I still had the same title -- would have to do with university partnerships and government relations.

So those are -- I would have been those -- at least those three areas of responsibility. But, again, I don't think any of this was really written down or clearly communicated to me.

**Q. The third area, university relationships and government relations, what specifically did you do with respect to university relationships as the director of programs?**

MS. BRONSTER: Objection. Vague as to time.

THE DEPONENT: I would have the same

problem with that question, Grant.

When do you mean?

BY MR. ALLISON:

**Q. During the time period when you held the title as director of programs.**

A. Well, I'll -- I will break it up into the first three to six months and I had little to no interaction with universities.

There was another gentleman by the name of Chris Abbott at the company. He had experience on Capitol Hill and he, at the time, was managing the lobbyists that I understood worked for the company and interactions with -- there -- to my knowledge, there were only two university partners at the time that I joined, University of Maine and University of Rhode Island. And I'm not even sure they would qualify the University of Rhode Island one as a formal partnership.

But Chris Abbott really managed that portfolio. And so I did not -- I did not have a heavy hand in that, I would say, for at least the first three months after joining the company.

**Q. And after those first three months, so let's say starting in the fourth or fifth month, did you take a larger hand in the university**

**relationships job duties?**

A. Yes.

**Q. And why did you take a larger hand at that point?**

A. Chris Abbott, who was managing those relationships at the time, it was clear to me that Martin was not happy with his performance through things he said.

And, you know, it did appear that the university partnerships was core to the strategy of the company when I arrived, and I was asked to help out with -- with business development activities related to university partnerships.

**Q. If you have an understanding, why is it that you understood Martin was displeased with Chris Abbott's performance in those first three months with respect to university relationships?**

A. One very specific and shocking example which I will say revealed Martin's character, at an all-hands meeting which I believe was in November or December of 2018, was it? Now I'm actually not sure of the date.

It was an all-hands meeting in which all the employees in the company if not 95 percent of the employees at the company were all present, and Martin

got up there and made a joke about "being successful requires hard work and I know that that's going to make Chris Abbott's head explode."

**Q. How many people were at this meeting?**

A. Probably 80 people. I'm not sure exactly of the head count at the time. But in that -- in that range, say 60 to 80 people.

**Q. Okay. And then what happened with Chris Abbott's employment with the company after that?**

A. Eventually, he was let go. I don't know -- I don't know anything about the arrangement between the company and Chris, how it happened, but eventually he was no longer working with the company.

**Q. You said a moment ago that the university partnerships were important to the company and the company's business.**

**Why is that?**

A. That was the sense I got from multiple people. So Eric Schiff, Mike Schmicker, Steven Loui, Martin talked about this new partnership that they had with the University of Maine.

**Q. What was that partnership with Maine at that time? How would you describe it?**

A. I would have to look at specific documents for the specific time frame, but I will give you my

perception of the partnership at my time of joining. What I understood is that the University of Maine was -- was great at composites and building composite structures to include shiphold forms. And I -- I was aware of -- the company had a long history in designing innovative hold forms; so these are the bottom of a boat, right, where it interacts with the -- the water surface.

And I knew that Steven Loui was the principal investigator on a large program called advanced planing hulls -- advanced planing hull research it might have been titled -- and that this was both core to what Navatek had developed for many years in terms of intellectual property and they had found a model or partnership that allowed them to unlock additional funding via the Office of Naval Research and -- yeah. I'll stop there.

**Q. Okay. And so if I'm understanding correctly, there was -- for lack of a better phrase, there was somewhat of a union between University of Maine funding coming from the Navy and work that the company could do.**

**Is that accurate?**

MS. BRONSTER: Objection as to form.

You may answer.

THE DEPONENT: The way I would characterize it is that the company saw the University of Maine as a partner with which they shared interests and found a way to get joint funding. And I think, in this case, I believe the University of Maine was a subcontractor to some degree. And they found a way to get funding via contracts with the Office of Naval Research which benefited both parties.

BY MR. ALLISON:

**Q. Is that why the third area of job responsibilities you mentioned that were assigned to you when you were the director of programs was university partnerships and government relations because they were mostly related in this business objective?**

A. I don't know why they assigned me those duties.

**Q. And that what you just described, the common objectives that existed between the University of Maine and the company, that became -- that was a strategy that was replicated with multiple different universities during the time you were employed with the company; is that correct?**

A. I would say there were similar aspects of partnerships after I joined the company that -- that

were replicated in other states. I will say every partnership seemed to be a little bit different. But, generally speaking, that's -- that's accurate.

**Q. Currently, that's also part of Integer's model with respect to University of South Carolina; correct?**

MS. BRONSTER: Objection. Overbroad.

You may answer.

THE DEPONENT: We have a different partnership model with the University of South Carolina.

BY MR. ALLISON:

**Q. It's accurate to say you have a partnership model with University of South Carolina that relates to Office of Naval Research contracts and grants; correct?**

A. That's correct.

**Q. And that's the same business strategy of the company that you just described; correct?**

MS. BRONSTER: Objection. Misstates the testimony.

THE DEPONENT: That's incorrect.

BY MR. ALLISON:

**Q. Okay. How is it incorrect?**

A. The company that you're referring to,

Navatek, for -- what I found out after joining the company was -- donated enormous amounts of money to politicians, including Steven Loui. There's a site called opensecrets.org in which you can look up individual donors and lobbying activity and see who has made donations to politicians personally.

Martin Kao obviously participated in this, Steven Loui participated in this, even other executives at the company participated in this. Integer does not do that.

**Q. So you don't make any political donations yourself personally?**

A. That is correct.

**Q. And nobody else at your company makes any, quote, unquote, "donations" in their personal capacity?**

MS. BRONSTER: Objection. Lacks foundation.

You may answer if you know.

THE DEPONENT: I have no -- I have never asked any employee to make any political donation. And their civic right, if they so choose to donate to any politician, is their own prerogative as a citizen of this country.

///

BY MR. ALLISON:
**Q. Is it your testimony that Steven Loui was making illegal campaign contributions or donations?**
MS. BRONSTER: Objection to the extent it calls for a legal conclusion.
THE DEPONENT: I have no basis to know whether Steven made legal or illegal campaign donations.
BY MR. ALLISON:
**Q. Okay. When you were the director of programs for the company starting in September 2018, how long did you hold that title for if you can recall?**
A. I don't recall the exact date. Would you like an estimate?
**Q. Well, how about this? I'll represent to you that I've seen in documents that that title was yours until about April 2020.**
**Does that sound accurate?**
MS. BRONSTER: Objection as to form.
THE DEPONENT: I believe I had the title of director of programs or something similar until roughly on or around April 2020. Yes.
BY MR. ALLISON:
**Q. And when your title changed on or around or**

**after April of 2020, what did it change to?**

A. I believe my title was vice president of strategic partnerships.

**Q. I -- I don't want you to repeat the same job areas or responsibilities that we just discussed when you were director of programs, but I would like to you confirm if they remained the same and explain to me if any new ones were added when you became vice president of strategic partnerships.**

MS. BRONSTER: Objection as to form.

THE DEPONENT: Maybe can you rephrase that, Grant? I don't quite understand the question.

BY MR. ALLISON:

**Q. Yeah. So you got a promotion in April 2020 to vice president of strategic partnerships; correct?**

A. Correct.

**Q. What changed -- what was different about your job duties and obligations and responsibilities when the title changed in April 2020 and for the period when you held the new title?**

MS. BRONSTER: Objection as to form.

You may answer.

THE DEPONENT: I don't recall at that time any major duties changing. I can say that I do believe my duties changed prior to that.

So Michael Schmicker -- Mike Schmicker is, I understand, the brother-in-law of Steven Loui. And was -- when I was introduced to him as the vice president of marketing for the company, I know -- I know at some point I believe he -- I shouldn't say "I know."

My understanding at the time was that Mike Schmicker became a part-time employee or part-time consultant at some time in 2019 or early 2020. Mike was very heavily involved in government relations alongside Chris Abbott when Chris was at the company. And when Chris left, he, I would say, took up even more responsibilities on -- related to university partnerships and government relations.

But Mike was -- he was at retirement age and sort of handing off responsibilities. And so I worked with him to pick up, I would say, some of the duties that he was performing at the time.

BY MR. ALLISON:

**Q. And during that period of time, is it also correct that your work on the university partnership and government relations also increased?**

MS. BRONSTER: Objection. Vague as to time.

THE DEPONENT: Can you give me a time

window when you're asking about, Grant?

BY MR. ALLISON:

**Q. Sure. You mentioned a moment ago that your job duties with respect to the university partnerships had already changed by the time you got the new title vice president of strategic partnerships; correct?**

A. That's correct.

**Q. And then you mentioned the work that you were taking on from Michael Schmicker because he was retirement age and he was part time at that time; correct?**

A. That's correct.

**Q. Okay. So my question then is that during that general time period, in addition to the work you were taking on for Mr. Schmicker, did you also -- did your work or job responsibilities or scope of responsibilities with respect to university partnerships also increase?**

A. Yes. I would say -- the way I would characterize it would be a gradual increase as over the course of 2019 -- say, spring of 2019 up until -- up until I -- I would say up until Mike sort of -- I wouldn't say faded away because he was still supporting the company through summer of 2020, but

duties gradually increased until about the first quarter of 2020 related to government relations and university partnerships.

**Q. And specifically with respect to university partnerships over that period, spring 2019 to first quarter 2020, did the scope of those university relationship job duties increase because the number and scope of tasks you were asked to increase or was it because the number of university relationships increased or both?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: I would say both my responsibilities and the number of universities that the company was pursuing partnerships with increased, so both.

BY MR. ALLISON:

**Q. Okay. I'm going to first ask you about the number of universities. You mentioned that when you started, there were really only two partnerships.**

**You mentioned Maine and Rhode Island; correct?**

A. I -- I will characterize that with that's what I was aware of when I was not responsible for university partnerships. So I can't claim at the time when I started in the -- in September, October

time frame 2018 that I knew about all of the university partnerships happening.

**Q. Okay. When it became your -- one of your core job responsibilities as of around spring 2019, how many university partnerships did the company have?**

A. It does -- how do you define a partnership? It does matter.

**Q. Well, how would you define a partnership with the university for the company?**

A. It really --

MS. BRONSTER: Objection. Vague as to time. Objection. Vague as to time.

THE DEPONENT: It -- it does depend on the context and who's asking; right?

So the way I would -- I wouldn't advertise that I had a partnership with the university unless we had a signed agreement, whether it's a teaming agreement, an MOU, a contract.

So can you repeat the question and the time frame you're asking about, please?

BY MR. ALLISON:

**Q. Yeah. Sure. So before I do that, though, let me clarify something you just said. You said that you wouldn't consider a university partnership**

**to be a partnership unless there was a signed agreement or MOU; correct?**

A. Generally, that's the way I would characterize a university partnership.

**Q. An MOU being a memorandum of understanding?**

A. That's correct.

**Q. Okay. And so there are those relationships which you say you would define as partnerships, but then would there also be relationships that had not crystallized into a signed contract or an MOU but which were, let's say, a work in progress or there were discussions going on between the company and the university with the end objective to enter into a contract or an MOU?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: I would say there were a number of leads or pursuits of other universities around the time of spring 2019. Yes.

BY MR. ALLISON:

**Q. Okay. So when you took over this job responsibility area in spring of 2019, how many -- to the best of your recollection, how many universities had actual partnerships, meaning a signed agreement or MOU?**

A. I do not recall. I don't know the specific

number.
**Q. If you can do your best to estimate, was it a large number or small number?**
A. I'll do my best to estimate with the caveat that I truly do not know. If we use my definition of a signed agreement, in spring 2019 I think it may have still been just the University of Maine.
There were a lot of pursuits. There were a lot of joint proposals being written and that sort of thing, but I don't recall any formalization of a partnership other than what I -- what I believed was a signed contract between the company and the University of Maine.
**Q. Okay. And then --**
A. With the caveat I'm not 100 percent certain about that.
**Q. I understand. The second category, relationships that hadn't crystallized yet into a signed agreement or MOU, how many of those do you recall were in pursuit or in progress in or around spring 2019?**
A. In spring 2019, if I had to estimate, I would say on the order of ten or -- say nine to 11, something in that range.
**Q. Okay. So then based on those figures, it**

**sounds to me like that was a growth area for the company.**

**It was trying to create more of these partnerships. Do you agree?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: That was an objective of Martin.

BY MR. ALLISON:

**Q. And we're talking about starting in spring 2019 because you mentioned the time period spring 2019 through first quarter 2020; is that correct?**

A. I'm sorry. I don't understand the question.

**Q. Sure. You mentioned that you had this job responsibility spring 2019 through the first quarter of 2020; correct?**

MS. BRONSTER: Objection. Vague.

THE DEPONENT: Okay.

BY MR. ALLISON:

**Q. Okay. So I want to ask you the same questions, but I'm going to change the time to first quarter 2020. So the end of the time -- time frame or time range that you gave.**

**So as of first quarter 2020, how many signed or -- or partnerships confirmed through an MOU**

**did the company have in around first quarter 2020?**

MS. BRONSTER: Objection as to preface.

You may answer.

THE DEPONENT: Around -- on or around the first quarter of 2020, again, in terms of pursuits with no -- no signed contract or MOU or, as I recall, new partners, so this is excluding active contract partners like the University of Maine, I would estimate anywhere from 16 to 18, something like that.

BY MR. ALLISON:

**Q. I'm sorry. I didn't catch that first part.**

**The 16 to 18 that you just provided in your testimony, was that the confirmed, signed agreement partnerships or was that the other category, the ones that were in pursuit?**

A. That was -- the ones that were in pursuit were on the order of roughly 16 to 18 universities being pursued. And that's not -- that's not additive to the prior number that I gave you; right? It's 16 to 18 total pursuits including ones we were pursuing the prior year.

**Q. I understand. And the other category, the partnerships that were confirmed through a signed agreement or MOU, how many were there in or around the first quarter of 2020?**

A. First quarter of 2020, to be honest, I don't know the specific number. If asked to guess, I know the University of Maine was still -- that partnership was going along.

I do not know the timing of the University of Rhode Island partnership and when that kicked off. I believe that was later in -- in the year. Same thing with the University of Michigan and the University of South Carolina. I think those partnerships were -- the contracts and agreements were signed later that year.

So I don't believe -- again, if I had to guess, it would still be just University of Maine. That's -- that's my guess.

**Q. Okay. You also mentioned that between spring 2019 and first quarter 2020, your responsibilities with respect to university partnerships also grew; correct?**

A. You said responsibilities with respect to university partnerships?

**Q. Yes.**

A. Yes.

**Q. Okay. How did they grow?**

A. As a -- the business development lead on pursuing brand-new universities that we had no prior

relationship with, I was responsible for finding a way to get introductions to the leadership at these universities to introduce our capabilities, how we might be able to partner with the university and that sort of thing, and traveling to the states and to the universities for the company.

**Q. Okay. So besides traveling to the university and meeting with leaders or decision-makers at the university, how else or what other strategies did you employ to build these relationships for the company?**

A. So what was well established when I joined the company in 2018 was a systematic logging effort that when I joined the company had hired a lobbying firm called SMI, Strategic Marketing Innovations, I think is the full name of the company.

A gentleman named Ted Lynch and another named Glen Mandigo were the two lobbyists that I believe Steven and Mike Schmicker had hired. The strategy that I understood -- and, again, this is coming from other employees such as Eric Schiff and Ann Chung -- but the strategy that had been developed and pioneered with the University of Maine was to hire a lobbying firm that was aware of the in-state politics and who within the state might be able to

help both the university and the company successfully lobby for appropriations.

And so, when I arrived, that was -- that was happening. Martin saw that as a growth area for the company and basically increased what it was already doing successfully with the University of Maine. And so, to answer your question more directly, eventually interfacing and interacting with the lobbyists that Martin had hired became part of my responsibilities.

**Q. When did that become part of your responsibilities?**

A. To be honest, I don't know the specific date. I believe I was -- I was brought in even when Chris Abbott was around, say, what I believed to be early 2019, and Mike Schmicker would include me on e-mails so that I was aware of what was happening with university partnerships.

And so, again, I just became invited to more and more meetings over time and -- and then, you know, eventually started interacting directly with -- with the lobbyists that were employed by the company. And time frame, I can't give you an exact date as to when that happened.

**Q. Okay. I understand you can't give me an**

**exact date on the time frames, but this same general time period -- is it fair to say that this was the first half of 2020 generally?**

A. I would -- I think it happened in -- when I say "it happened," I should clarify. I think I had more direct interactions with lobbyists in the summer of 2019 and -- and on. Yeah, I'll stop there.

**Q. With respect to the university partnerships and developing those relationships, were you the primary person at the company who was executing those duties during this same time period we're discussing?**

MS. BRONSTER: Objection as to form. Vague as to those same duties.

THE DEPONENT: Yeah. What do you mean by "primary person," Grant? How do you define that?

BY MR. ALLISON:

**Q. Well, was there anybody else who was tasked with building these relationships with the universities and doing the same work that you were doing on that front?**

A. Yes. Martin was -- was really the lead. I would not even be included on all of the interactions and communications even -- even toward -- to the very end of my tenure at the company and the end of his tenure at the company.

Michael Schmicker was also a leader in that department and, again, I would say gradually stepped down in terms of hours at the company but was still supporting the company even through, like I said, the summer of 2020 is what I recall.

**Q. And to be fair, we're talking about communications with universities and decision-makers within universities?**

A. That's correct.

**Q. And so it's your testimony that Michael Schmicker was having those conversations with university decision-makers and in contacts or e-mails that you were included in or copied on?**

A. Yes. And one specific university I can remember is the University of Alaska. In addition to the University of Maine, that was -- the way I understood it, Michael was the original business developer for the relationship that the company had with the University of Maine with Habib Dagher who was the head of the composite center there.

**Q. Okay. At some point in time, did you become the company's primary contact or manager for these university relationships?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: I would say in, de facto,

certain university partnerships where I initiated the outreach, yes, that's -- that's true.
BY MR. ALLISON:
**Q. Which ones were those?**
A. Oh, so Martin had established relationships with a number of universities prior to my coming on board, and I would say maintained primary relationship manager status even during my -- my tenure as VP of strategic partnerships. And so I'll list -- I'll list the universities that Martin maintained a primary relationship with so that I can exclude them in my mind.
The University of Maine, that was between Mike Schmicker and Martin. Steven was also involved in that.
The University of Rhode Island, a combination of a gentleman named Dave Kring, who was on-site in Rhode Island for a time before he moved up to Maine, and Martin were the relationship managers there.
The University of South Carolina, that was a combination of Martin and -- I mean, it was primarily Martin with the dean of engineering there. I, over time, got to interact with the dean as well. But I was not the primary POC.

The University of Michigan, that was -- that one's hard to say who was the primary there. We had hired a lot of Michigan graduates so I would say that one I had some interaction, but it was -- I would say Martin was still the lead there.

University of Alaska, Mike Schmicker was definitely the lead as far as I could tell.

University of Hawaii, we never really ended up doing anything with UH, but that was Eric Schiff and -- and Mike Schmicker.

So those are -- those are sort of partnerships that were already in progress at some degree when I joined. New partnerships with which I helped to lead and, again, Martin -- being that Martin saw this as a growth area in the company, he was almost always involved in the early meetings with leadership at the university.

So if pressed, I would call him the primary relationship manager, but I was involved in new relationships with universities at Oklahoma State University; at Wichita State University; at the University of Wisconsin, both Madison and Milwaukee. I'm not recalling any other universities immediately other than those right now.

**Q. How about South Carolina State University?**

A. Yes. So I -- I introduced the company and -- to South Carolina State University, and I would -- I would call myself the primary relationship manager there.

**Q. Okay. And at its height, when you were employed by the company, how many of these types of relationships, total number, did the company have with universities?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: When you say "relationship," do you mean both signed agreements and partnerships and pursuits?

BY MR. ALLISON:

**Q. I mean that list that you just provided, one for Martin being the primary and one for you being the primary contact, I mean those types of relationships.**

**What you would estimate, total number?**

MS. BRONSTER: Objection as to form. Misstates the testimony.

THE DEPONENT: So the total number of partnerships and at every level of maturity so including both signed agreements and pursuits, again, somewhere on the order of, I'd say, 18 to 20, something like that.

BY MR. ALLISON:

**Q. Thank you. And when the company achieved that number, 18 to 20, what was the approximate time when it achieved that number?**

A. The pursuits -- so it has to do with -- it's very hard to give a direct answer to that just simply because the business development cycle happens over this course of months.

So say in May of 2020, maybe it was 16 and then we picked up another the next month, does that -- am I making sense there?

**Q. Yes, it does. Would it be correct to say summer or midyear 2020 would have been the time frame when the company had the largest number of these types of relationships?**

A. Yes. All the way prior to Martin's indictment in September of 2020, the number of what we would call pursuits continued to grow. So up unto I would say that 18 to 20 number is -- you know, that's in August of 2020.

**Q. Did the scholarships that the Society gave help?**

MS. BRONSTER: Grant, if you're moving on to another topic, can we take a break? We've been going a little over an hour.

MR. ALLISON: Sure. We'll take a five-minute break. We'll go off the record. We'll be back here in five minutes, everybody, please.

THE DEPONENT: Thank you.

MS. BRONSTER: Thank you.

(Whereupon, a recess was held from 4:08 p.m. to 4:14 p.m.)

BY MR. ALLISON:

**Q. Mr. Hartman, we're back on the record. Let me continue where I left off.**

**I was just about to ask you the question, before we took our short break, did the scholarships that were issued by the Society, did those assist or aid in forming any of those university relationships we just discussed?**

A. Can you elaborate on what you mean by "the Society"?

**Q. The Society, we discussed what that meant earlier; correct?**

A. We -- we did discuss it. So you're referring to the Society of Young Women Scientists Engineers?

**Q. Correct.**

A. So the question is did the scholarships given by the Society help to form any of those

relationships?

**Q. Between the university partners and the company, correct, that's the question.**

**Yes or no?**

A. No.

**Q. So it's your testimony that the scholarships given by the Society had no impact on the formation of relationships between the company and the university partners?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: You asked a different -- you stated a different statement than the question you asked earlier.

The question you asked earlier was were any of the partnerships -- did the scholarship help with the formation of any of the university partnerships?

And the answer to that is no.

BY MR. ALLISON:

**Q. Okay. Did the scholarships given by the Society help crystallize any of those relationships from the work-in-progress phase to a signed MOU or signed contract partnership?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: No.

///

BY MR. ALLISON:

**Q. Did the scholarships given by the Society have any impact that you know of on the relationships with the universities between the company and the university?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: My understanding at the time is that some of the universities who were notified of the -- of the Society's intent to issue these scholarships had a positive reaction to these -- the notice that these scholarships would be issued.

BY MR. ALLISON:

**Q. And the positive reaction was, in part, a credit or a positive reaction to the company?**

MS. BRONSTER: Objection. Objection. Lacks foundation.

THE DEPONENT: I think -- I -- I won't speculate as to why they were positive and to whom they were grateful or positive. The universities are generally very grateful and excited when somebody notifies them they're going to receive scholarship money.

BY MR. ALLISON:

**Q. Earlier, you testified that part of your job responsibilities involved government relations;**

**correct?**

A. That's correct.

**Q. And you also testified that part of that effort was the hiring or interactions with lobbyists; correct?**

A. I interacted with lobbyists. The hiring of lobbyists was -- I -- I never hired a lobbyist. I didn't sign contracts for the company with lobbyists. That was definitely -- Martin, I know, did some of that. Steven may have prior to Martin taking over.

**Q. What role did you have with respect to Andy Winer's work for the company?**

MS. BRONSTER: Objection. Vague.

THE DEPONENT: Can you be more specific, Grant?

BY MR. ALLISON:

**Q. Sure. Do you know who Andy Winer is?**

A. Yes.

**Q. Who is he?**

A. Andy Winer is the former chief of staff for Senator Brian Schatz and, at the time, he was also hired as a lobbyist for the company at the firm Strategies 360.

**Q. Okay. And did you -- at any time you worked for the company, did you have communications**

**or business dealings on behalf of the company with Mr. Winer?**

MS. BRONSTER: Objection as to form. Compound.

THE DEPONENT: Yes, I did.

BY MR. ALLISON:

**Q. When did those interactions or business dealings that you had with Mr. Winer first start?**

A. I don't know.

**Q. Is there a general time frame that you can estimate based on your recollection?**

A. Andy Winer left the senate, and my recollection is that he went straight to a lobbying firm. And soon after that, the company hired him, but I -- I do not know the specific time frame. If I had to estimate, it would be some time in 2019.

**Q. So some time in 2019 you started communicating with Andy Winer in a business or professional role on behalf of the company; correct?**

A. Correct.

**Q. What was the scope or the subject matter with which you were communicating or dealing with Mr. Winer at that time?**

A. Andy Winer was hired as a lobbyist for the company. My job was to form new university

partnerships on behalf of the company and work with Andy to understand what political and, you know, government relations benefits that each state brought.

So, in other words, understanding the politics of -- of the state in which university partnerships existed.

**Q. In late 2019, Maine was the only such partnership that existed with the company.**

**Accurate?**

A. Again, back to definitions, it was my understanding that in 2019, the University of Maine was the only university that the company had a signed, significant contract with. University of Rhode Island may have been signed around that time frame but, again, I'm not exactly sure when that contract kicked off.

**Q. Did Mr. Winer have anything to do with the company's relationship with the University of Maine?**

A. Yes.

**Q. And what did he have to do with that relationship or in what way was he relevant to that relationship?**

A. I don't know all of the aspects because, again, my understanding at the time was that Martin

and Andy had private discussions that I wasn't privy to. But Andy, from Martin's perspective, was sort of hired as a generalist across all of the company's political portfolio of government-relations activities, if you will.

So that was my understanding of how Martin viewed Andy's role. And the University of Maine was the best example of a successful university partnership and lobbying campaign that had, I believe, kicked off in around 2017 or so.

**Q. Okay. We're going to switch gears here a little bit, Mr. Hartman.**

**Do you recall filing -- or your counsel filed on your behalf a motion for summary judgment in late 2024.**

**Do you recall that?**

A. Yes.

**Q. And you submitted a signed, sworn affidavit or declaration in support of that.**

**Do you recall that?**

A. Yes.

**Q. In that declaration and in your motion for summary judgment, you essentially argued that you didn't have anything to do with setting up the Society.**

**Is that accurate?**

MS. BRONSTER: Objection with respect to the document.

THE DEPONENT: Yeah. Can I see the document?

BY MR. ALLISON:

**Q. Not yet, Mr. Hartman. Just answer the question, please.**

MS. BRONSTER: Objection. Objection. Argumentative.

THE DEPONENT: I'm sorry, Grant. Can you repeat the question, please?

BY MR. ALLISON:

**Q. Sure. It was your position generally in the motion and the declaration essentially that you didn't have any role in registering or incorporating or setting up the Society?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: I can -- I can tell you that I did not have any role registering the entity, setting up the Society, you know, funding it in any way. Yes, I can tell you that. That's true.

BY MR. ALLISON:

**Q. Okay. And, similarly, you said that you didn't have any role in the management of its**

**operations.**
**Is that accurate?**
MS. BRONSTER: Objection to the extent you're asking him about what he said in a document that you're not showing him.
You may answer if you recall what was in the document.
You're asking about the document now, Grant, or -- or just a general question as to whether he was involved?
BY MR. ALLISON:
**Q. Did you understand the question, Mr. Hartman?**
A. Can you repeat it, please?
**Q. Sure. In your declaration, you stated that you didn't have anything to do with the management of the Society's operations.**
**Is that accurate?**
MS. BRONSTER: Same objection. Vague.
THE DEPONENT: In the way I understand the management and operations of a company, yes, that is correct.
BY MR. ALLISON:
**Q. And is that testimony still today that you believe you had nothing to do with the management or**

**the operations of the Society?**

A. The way I view the management and operations of the company, yes, that is -- that is accurate.

**Q. Okay. And you also stated in your MSJ and your declaration that you had nothing to do with ensuring compliance with any laws by the Society.**

**Accurate?**

MS. BRONSTER: Same objection.

THE DEPONENT: That is accurate.

BY MR. ALLISON:

**Q. Same question as to transferring funds to the Society.**

**You had nothing to do with that?**

A. (No audible response.)

**Q. I'm sorry. Your sound cut out, Mr. Hartman.**

**Could you repeat that?**

A. That is correct.

**Q. And then you also said that you had nothing to do with authorizing campaign contributions; is that correct?**

A. That is correct.

**Q. Okay. Notwithstanding the testimony you just gave, you do agree that you did complete at**

**least some actions on behalf of the Society, don't you?**

MS. BRONSTER: Objection. Vague as to "some actions."

THE DEPONENT: I disagree with the premise that it was on behalf of the Society, that -- that any actions that I took were on behalf of the Society.

BY MR. ALLISON:

**Q. Okay. So any actions you took that related to the Society in any way, for whom were they on behalf of?**

MS. BRONSTER: Objection. Vague.

You may answer.

THE DEPONENT: So the company, by which I mean Martin Kao, gave me explicit directions to support tasks related to a scholarship program and those were, in my view, on behalf of the company because the chief executive officer for the company asked me to do them.

BY MR. ALLISON:

**Q. And you understood that he was asking you to do those things as his role as CEO and not in his personal capacity as Martin Kao?**

A. I didn't believe it was in my -- it was my

place to question which hat Martin was wearing, if you will. He had asked me using his company e-mail and/or on company time to do these tasks, and I understood them to be in the best interest of the company.

**Q. So it's your testimony that you never thought about, analyzed, or considered whether the instruction was coming from Martin Kao, the CEO, or Martin Kao, the individual person?**

MS. BRONSTER: Objection. Misstates the testimony. Objection as to form.

THE DEPONENT: I was given direction by the chief executive officer of the company. He told me what to do.

If it were -- if it were very obviously a personal request like, for example, to go get groceries for him or something like that, I think I would begin to question it. But, at the time, I understood him acting in the capacity of the CEO of the company.

BY MR. ALLISON:

**Q. I see. And so anything that you did or any actions you took relating to the Society, you were doing as an employee of the company and at the direction of the company; is that correct?**

A. I understood the actions that I was taking at the time to be on behalf of the company. That's correct.

**Q. Okay. And what exact actions or roles did you execute at the direction of the company but for or relating to the Society?**

MS. BRONSTER: Objection as to form. Vague and ambiguous.

THE DEPONENT: Can you be more specific?

BY MR. ALLISON:

**Q. Yes. I'm asking you to describe to me what did the company tell you to do for the Society.**

A. So I'll -- I'll disagree with the premise that it was for the Society. I do believe what I -- at the time, I understood my actions to be on behalf of the company.

With that understanding, actions that I was asked to do were to help with a scholarship program that Martin had conceptualized and connect folks that -- that were working on behalf of -- were working on the scholarship program, connect them with university partners that the company was pursuing.

**Q. And that would assist the company how?**

A. So -- improve the public image of the company.

**Q. Improve the public image of the company with who?**

A. With the broader public and with the universities with whom we're partnered and in the states in which -- which the company was partnering, general good will in -- in those areas.

**Q. Would that also help improve the company's standing with members of the United States Congress elected from states and districts in which those universities were situated?**

A. I won't speculate now what -- what they would or would not find valuable but, in general, a member of Congress loves to see investment flowing into their state and their districts.

**Q. At the time that those scholarships were issued and you were taking those actions at the direction of the company with respect to the Society scholarships, did you understand that there would be a benefit to the company's relationships with those members of US Congress?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: Did I understand that there would be a benefit to the relationships with members of Congress because of the scholarships by the Society? Is that the question?

BY MR. ALLISON:
**Q. Yes.**
A. I did that understand there would be a benefit to the perception of the company, generally speaking, with the public and because of that, with members of Congress.
**Q. Okay.**
MR. ALLISON: Moderator, I'd like to introduce Exhibit Number 1, please, or Document Number 1.
(Whereupon, Plaintiff's Exhibit 1 was marked for identification by the court reporter and is attached hereto.)
MS. BRONSTER: Are you going to provide me with a copy of that, Mr. Allison?
MR. ALLISON: It's right there.
MS. BRONSTER: Well, I -- I think I'm entitled to a copy of the entire document whenever you introduce it to the -- to the witness, just as we would if we were doing it in person.
MR. ALLISON: Mr. Moderator, do you have a way to share this document with the people on the Zoom?
THE MODERATOR: I can send it via chat.

One second.

MR. ALLISON: Thank you. And, Moderator, I'll ask that every time I introduce a document that you send it by chat.

MS. BRONSTER: I don't think that I can look at both --

THE MODERATOR: I will, Counsel.

MS. BRONSTER: Wait. Just a second. Just practically speaking, I don't think I can look at both the chat and what is on the -- on the screen.

Can you e-mail it to me when you -- instead of putting it into the chat?

MR. ALLISON: No. I can't, because I'm taking a deposition.

MS. BRONSTER: No, no, no. I was asking the moderator.

MR. ALLISON: Okay. Let's go off the record for this, please. I don't want to use my depo time for this conversation.

(Whereupon, a discussion was held off the record.)

BY MR. ALLISON:

**Q. Mr. Hartman, we're back on the record. I'd like you to first take a look at this document. I'm not going to ask you to read the entire document, but**

**if you could just confirm that this is your declaration that you submitted in support of your motion for summary judgment.**

A. If you could scroll through, Grant, so that I can just --

**Q. Mr. Hartman, same as your counsel, you can open the chat and you can click either of the options that the moderator put in. If you click the link, a separate web browser will pop up and you'll to be able to see the entire document and control it yourself.**

A. Okay. I can do it that way.

I can confirm that that is my signature and this appears to be my declaration. Yes.

**Q. Okay. I want to turn to Paragraph 32, please. It's on Page 7 at the bottom.**

**I want to confirm that this is still your testimony as of today. Do you say "I did not have any involvement in creating the Society of Young Women Scientists and Engineers"?**

**That's your testimony as of today still; correct?**

A. In creating the Society, yes, that's correct.

**Q. And you underlined the words "any**

**involvement" to underscore that, essentially, you had no involvement. You're being very clear there; correct?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: That's correct. I had no involvement in creating the Society.

BY MR. ALLISON:

**Q. Okay. You also are saying you had no involvement in managing its operations or affairs; correct?**

A. The way I understand managing the operations or affairs of a company, yes, that's correct.

**Q. Okay. Same question as to ensuring compliance with campaign finance regulations.**

**You say you have no involvement there as well?**

A. That's correct.

**Q. No involvement in transferring any funds from the company to the Society; correct?**

A. That's correct.

**Q. And no involvement with authorizing campaign contributions by the Society; correct?**

A. That is correct.

**Q. Okay. Next, I would like to look at**

**Paragraph 38. So Paragraph 38 discusses your involvement with a PR plan for the Society. PR plan -- you're referring a public relations plan; is that correct?**

A. That's correct.

**Q. Okay. And you describe what your involvement was with the PR plan and you say it was limited to two activities; correct?**

A. That's what it says here. That's correct.

**Q. And you -- the two activities --**

MS. BRONSTER: I'm sorry to interrupt.

Duke, can you please speak up? I'm not hearing you clearly.

THE DEPONENT: Sure.

MS. BRONSTER: Thank you.

BY MR. ALLISON:

**Q. The two activities that you state that you did with this PR plan was that you provided your general thoughts about the plan to Michael Schmicker and Bofman, who were the primary architects and executors of the plan on behalf of Kao; correct?**

MS. BRONSTER: Objection. Misstates Paragraph 38.

You may answer.

THE DEPONENT: The paragraph we're looking

at is -- is my testimony. Yes.
BY MR. ALLISON:
**Q. Okay. And we already discussed who Schmicker was, Michael Schmicker.**
**Who is Bofman?**
A. Lori Bofman was an employee of the company and one who was very close to Martin.
**Q. Okay. And her name is Lori Bofman; correct?**
A. That's correct.
**Q. Okay. And then the second activity that you were involved with with respect to this PR plan was introducing Lori Bofman to universities at the direction of Kao; is that correct?**
A. That's correct.
**Q. Okay. Did you do anything else for or relating to the Society other than these two items that are disclosed in Paragraph 38 of your declaration?**
MS. BRONSTER: Objection as to form. Misstate the testimony.
You may answer.
THE DEPONENT: The first activity that we're looking at in Paragraph 38 here, "providing my general thoughts about the plan to Schmicker and

Bofman, who were the primary architects and executors of the plan on behalf of Kao," providing my general thoughts on the plan related to the PR plan which more generally is -- includes the scholarship plan that Kao had envisioned providing those thoughts on -- on that plan.

There were -- there were a range of -- of requests that came in requesting my thoughts on the plan but, generally speaking, yes, they were providing thoughts on the plan and introducing especially Bofman to universities to eventually work towards making scholarship donations.

BY MR. ALLISON:

**Q. Okay. But my question, Mr. Hartman, was did you do anything else with respect to the Society other than the two items stated here in Paragraph 38?**

A. I -- I worked with -- so I worked with Kao, Lum Kee, and Chen to provide my general thoughts to them about the plan. So if -- if you're parsing words here and saying that number one does not include them, yeah, that's -- that's -- I did provide my thoughts to Kao, Lum Kee, and Chen about the plan as well.

**Q. The answer to my question, then, would be "No, your testimony is you did nothing else relating**

**to or on behalf of the Society other than the two items stated in Paragraph 34 -- 38."**
**Is that accurate?**
MS. BRONSTER: Objection as to form. Misstates the testimony.
THE DEPONENT: That's accurate.
BY MR. ALLISON:
**Q. Okay. And the PR plan, that was a written document describing certain plans, activities, and objectives of the Society; is that correct?**
A. The reference is -- to "PR plan" is relatively broad. So in -- sorry.
Can you repeat the question?
**Q. Sure. The phrase "PR plan," I'm trying to determine what that means in the context of your declaration Paragraph 38.**
**I've always understood the PR plan to be a written document, and I'm asking you to confirm if that's your understanding and how you're using the phrase in this declaration.**
MS. BRONSTER: Objection as to form.
THE DEPONENT: The PR plan was a general plan mastermind by Martin Kao to improve the public relations of the company, specifically after February 2020 article that -- that didn't look good for him or

the company.

BY MR. ALLISON:

**Q. Okay. As you sit here today, I want to run through your facts and get your understanding on some basic facts about the Society.**

**So as you sit here today, do you understand or know that the Society was formed on or around November 26, 2019?**

A. I don't -- I don't know when -- exactly when the Society was formed.

**Q. Are you generally aware that it was formed in late 2019?**

A. Based on information I've read about and, you know, in public domain, that's the general awareness I have. I don't know if it's true or not.

**Q. Did you gain that general awareness at or around the time that you read that news article you just mentioned a moment ago?**

A. Martin included me on e-mails for, again, the Society in -- I want to say in late -- late 2020, probably December of 2020 referencing the Society. So that's when I became aware that this Society was -- was a thing.

**Q. I'm sorry. Did you mean late 2019?**

A. Oh, yes. I apologize. I meant late 2019,

December or so of 2019.

**Q. Okay. As you sit here today, are you aware that on December 27th, 2019, the Society made a $150,000 donation to 1820 PAC?**

A. That's what I've seen alleged and I have no reason to doubt the sources.

**Q. And would you have learned that information at or around the time you read the news article that you just mentioned a moment ago?**

MS. BRONSTER: Objection. Calls for speculation. Objection as to form.

BY MR. ALLISON:

**Q. Let me rephrase, Mr. Hartman.**

**Was that information in the news article that you read that you mentioned a moment ago?**

A. It's an allegation in the -- in the article in February 2020 about a large donation made by the Society.

**Q. So it's fair to say you were aware of that allegation in February 2020?**

A. That's correct.

**Q. When about did you read that article? Would it have been early February 2020, late in the month February 2020, to the best that you can recollect?**

A. I believe it was early February 2020.
**Q. Okay. So in early February 2020, you were generally aware of an allegation that the Society had donated $150,000 to 1820 PAC; correct?**
A. That's correct.
**Q. What is 1820 PAC?**
A. My understanding at the time was that it's a political action committee. Actually, it's a -- it's a PAC, in other words, an entity set up to receive donations for political campaigns. My understanding at the time was that it was set up to support the election campaign for Senator Susan Collins.
**Q. And Susan Collins is a US senator elected from the state of Maine; is that correct?**
A. That's correct.
**Q. And you knew that in late 2019 and early 2020; correct?**
A. When you say "knew that," can you define what you mean?
**Q. Well, you knew that Senator Susan Collins was the senator elected from the state of Maine in late 2019 and early 2020?**
A. That's correct.
**Q. Did you also know at that time the 1820 PAC**

**supported Senator Susan Collins?**

A. My understanding was that the 1820 PAC was set up to support the campaign of Senator Collins. Yes.

**Q. And at that time, Senator Susan Collins was a member of the Appropriations Committee of the US Senate; is that correct?**

A. That was my understanding at the time.

**Q. Okay. And, as such, being on that committee, she had at least some amount of influence or power over money or contracts or funding that the company sought through its partnership with the University of Maine; is that correct?**

MS. BRONSTER: Objection. Lacks foundation.

THE DEPONENT: There's a lot baked in there, Grant. I don't think I can answer the question.

BY MR. ALLISON:

**Q. Okay. Let's -- let's break it up.**

**At that time, so we're talking in the late 2019, early 2020 time period, Senator Susan Collins was on the Appropriations Committee; correct?**

A. Correct.

**Q. And did the Appropriations Committee have**

**oversight or decision-making authority over amounts of money that the company desired to obtain in its business operations?**

A. The company pursued Department of Defense contracts. I think a vast majority of its revenue came from the Department of Defense. Every dollar that the Department of Defense spends is appropriated by the US Congress. So, yes, all money that goes to the DOD needs to be appropriated by the Appropriations Committees in the Senate and the House.

**Q. Do you recall what Senator Collins' position on the Appropriations Committee was at that time?**

A. I do not.

**Q. But she was a member of the committee?**

A. That was my understanding, yes.

**Q. And it would be beneficial to the company to have a good relationship with Senator Collins for that reason; correct?**

A. There are multiple reasons to have good relationships with the political appointees in any state, including introductions all sorts of -- all sorts of reasons. But to answer your question, having relationships with members of the

Appropriations Committee, yes, that -- that does -- that is beneficial for -- for the company strategy that it had been executing on since before I joined the company.

**Q. And, specifically, it's beneficial because the Appropriations Committee has oversight and decision-making authority with respect to the money that the company sought for and with respect to its business; correct?**

A. The company pursued Office of Naval Research contracts in a number of different ways, via the university partnerships and -- and other methods.

So having relationships with members on the Appropriations Committee, is that valuable to the company's business? I would answer yes.

**Q. Okay. So the answer to my question is, yes, the Appropriations Committee can make decisions that result in money flowing to the company?**

MS. BRONSTER: Objection. Asked and answered. Objection as to form.

THE DEPONENT: I disagree with that statement. It vastly oversimplifies and takes out decision-maker steps that do exist at the Department of Defense.

///

BY MR. ALLISON:
**Q. Well, can the Appropriations Committee stop money from going to the company at that time?**
MS. BRONSTER: Objection. Vague.
You may answer if you understand it.
THE DEPONENT: The question, I think, has a false assumption about the way appropriations works. The Appropriations Committee appropriates money and then the executive branch executes on that money. So --
BY MR. ALLISON:
**Q. So -- so if the Appropriations Committee decides to appropriate --**
MS. BRONSTER: Don't interrupt the witness.
BY MR. ALLISON:
**Q. -- zero dollars to the company, then the company's going to get zero dollars; is that correct?**
MS. BRONSTER: Objection. Argumentative.
THE DEPONENT: I -- I don't agree with that statement. Put it that way.
BY MR. ALLISON:
**Q. Okay. So you don't agree with the statement. So then is it correct to say that if the Appropriations Committee appropriates zero dollars to the company, it can still get money that the**

**Appropriations Committee has oversight over?**
MS. BRONSTER: Objection. Incomplete hypothetical. Vague and ambiguous.
You may answer if you understand it.
THE DEPONENT: Saying that the Appropriations Committee can appropriate money for the company is not a sensical -- it's a nonsensical statement. It doesn't -- it doesn't make sense, so I can't answer that.
BY MR. ALLISON:
**Q. In order to get these amounts of money from the federal government, you need approval from the Appropriations Committee.**
**Yes or no?**
MS. BRONSTER: Objection as to form.
THE DEPONENT: We don't get approval from the appropriations company. The company did not get approval from the Appropriations Committee. Again, vastly oversimplifying the appropriations process and misstating it. So I can't answer that.
BY MR. ALLISON:
**Q. Okay. So what role does the Appropriations Committee have with respect to monies that the company sought from the federal government?**
A. The Appropriations Committee has the power

to write the Department of Defense spending bill and they pass it. Eventually, it's signed by the president of the United States. That goes into law and then the Department of Defense gets their funding in various number of programs and gets to decide how to execute that funding.

And so, to your question -- maybe if I could ask you to repeat the question? I'm sorry.

**Q. That's fine, Mr. Hartman. I think you've answered my question.**

**I want to get back to asking you about the Society. I'm asking you a number of basic facts about the Society and when you came to -- if you knew this information and then when you came to know it. So I want to get back to that.**

**And I want to ask you, Mr. Hartman, one day prior to -- well, first -- I'm sorry. Strike that.**

**So, earlier, I asked you if you were generally aware in or around late 2019 or early 2020 that the Society made a $150,000 donation to 1820 PAC. And you said you were aware of that allegation at or around that time; correct?**

MS. BRONSTER: Objection. Misstates the testimony.

THE DEPONENT: There was a -- I was aware

that there were allegations that the 1820 PAC had made a donation to -- I'm sorry -- the Society had made a donation to the 1820 PAC on or around late 2019 or early 2020. That's correct.

BY MR. ALLISON:

**Q. Okay. Were you also aware at or around that same time frame that one day prior to the donation being made by Society to 1820 PAC, so one day being December 26, 2019, the company wrote a check for $150,000, same amount, to the Society which the Society cashed and received the funds?**

A. At the time, I had no knowledge of that transaction.

**Q. Okay. Was that detail included in the article you read in early February 2020?**

A. I don't recall.

**Q. Okay. Did the article you read in early 2020 link Martin Kao to the Society?**

A. Yes.

**Q. And did it, therefore, also link the company to the Society?**

A. The article linked the company to the Society. At the time, after reading the article, the way -- the connection that I understood the article to be making was the Society was registered under --

under Martin Kao's wife's name. And that, at the time, was the way I understood the article making the connection between the donation, the Society, the company, and Martin.

**Q. Have you ever met Martin Kao's wife?**

A. Yes.

**Q. How many times have you met her or seen her in person?**

A. Probably on the order -- I don't know the specific number, but roughly speaking about five times, give or take.

**Q. Okay. And when was the last time you met or saw her?**

A. I don't know the specific date.

**Q. In any of the actions you took relating to the Society, including e-mails you sent or phone calls you made, did Martin Kao's wife ever participate or be present in any of them?**

A. No.

**Q. Okay. To the best of your recollection and knowledge, did Martin Kao's wife do anything with respect to the management or the conduct of the Society?**

A. Not to my knowledge at the time.

**Q. Okay. This donation to the 1820 PAC by the**

**Society, is it your testimony that you first learned of it when you read the news article?**

A. I was cc'd on e-mails between Martin and -- and Scott Reed, who I understood to be representing the 1820 PAC, discussing a check. He was discussing getting a check to Scott by the end of the year.

**Q. That check, did you understand that to be company money that would be delivered to 1820 PAC?**

A. I had no knowledge as to the source of the funds.

**Q. The fact that -- strike that.**

**So these e-mails that you were being copied on, were they sent from Martin's company e-mail with his company signature on them?**

A. It would be good to see the actual document, but what I recall is that, yes, he was using his Navatek e-mail at the time.

**Q. Okay. And were you receiving those e-mails on your company Navatek e-mail?**

A. Yes.

**Q. So then did you consider the content and the receipt of those e-mails to be company business?**

A. Generally speaking, when the CEO of the company e-mails me and it's not obviously personal, I -- I assume that it's company business. And that

was my understanding at the time.

**Q. So at the time in 2019, you understood that the company was going to deliver a check to 1820 PAC?**

MS. BRONSTER: Objection. Misstates the testimony.

THE DEPONENT: That's not what I'm saying. I understood that the company engaged in political donations, again, for decades and that making political donations -- my -- my understanding was that political donations would be made legally, but there were -- there was an aspect of -- of political campaigns that was part of the company business.

Again, how that's accounted for, whether -- whether he counted that time and that e-mail to be company time and he charged it to the company, I don't know. But my assumption was that it was related to company business.

BY MR. ALLISON:

**Q. Okay. So it's your testimony, though, that the first time you knew of or learned of a potential donation to 1820 PAC was when you received e-mails involving Martin Kao and Scott Reed in -- I'm sorry.**

**Did you say December of 2019?**

A. My first knowledge of -- of Martin's motivation to make a donation to the campaign

supporting Senator Collins was prior to that.
**Q. And when was that?**
A. It was on or around late October of that same year, 2019.
**Q. Okay.**
MR. ALLISON: Moderator, please introduce Document Number 3. And we'll just keep the same numbers even though I may skip some numbers.
So we'll introduce this as Exhibit 3. And if you could, please, put it in the chat for everybody else on the Zoom.
(Whereupon, Plaintiff's Exhibit 3 was marked for identification by the court reporter and is attached hereto.)
BY MR. ALLISON:
**Q. Okay. It's pretty small there, Mr. Hartman, but you can pull up your own copy using the chat. Let me know when you've done that.**
A. It's loading. Okay. I'm looking at the same. All right. You zoomed in now so it's easier to see. Yes, I can see the document.
**Q. This is an e-mail that you sent to yourself on January 8th, 2021; correct?**
A. That's what it appears.

Q. Is duke.hartman@gmail.com your private e-mail address that you used on January 8th, 2021?
A. Yes.
Q. Okay. And that's the address this was sent to and it was sent -- based on the e-mail signature, it was sent from your company e-mail address; is that correct?
A. That's what it appears. Yes.
Q. Do you recall sending yourself this e-mail?
A. This e-mail specifically, vaguely. I have a vague recollection of sending myself something like this. Yes.
Q. I want you to look at the name of the attachment. It is 2019-10-25 -- and I'll leave out the dashes and the underscores, but it says "Martin Kao, Duke Hartman, Andy Winer Outlook meeting invite to discuss Collins PAC dot PDF"; correct?
A. Correct.
Q. Okay. So does that tell you that the subject or at least the attachment relates to a meeting between yourself, Mr. Winer, Mr. Kao, relating to Senator Collins' PAC?
A. It would be good to see the attachment, if possible, Grant, if we're going to talk about it.
Q. We'll look at it in just one second, but I

**want to ask you about the cover page first.**

MS. BRONSTER: I object to you preventing the witness from seeing the entirety of the document.

MR. ALLISON: I'm not preventing anything. We'll look at it in just a second. I'm asking him questions about the e-mail.

MS. BRONSTER: If he -- he said that he wanted to see the document before he answered the question and I think he's entitled to do so.

BY MR. ALLISON:

**Q. Mr. Hartman, does the name of that attachment tell you that the document relates to a meeting between yourself, Winer, Kao relating to Senator Collins' PAC?**

A. Grant, all I can tell you is what's -- what's in the title of that attachment. That includes Martin's name, my name, Andy Winer's name, and Collins' PAC.

**Q. Okay. January 8th, 2021, would that have been your final day working for the company?**

A. I don't know.

**Q. It would have been pretty close to your final day at least?**

A. Yes. Yes, because, again, I think I ended my employment with the company in the first half of

January 2021.

MR. ALLISON: Moderator, can you please go back to Document 3. Wrong document, Moderator. Yeah.

BY MR. ALLISON:

**Q. The subject line here -- Mr. Hartman, do you have the document in front of you on your screen?**

A. Number 3?

**Q. Yeah.**

A. Yes.

**Q. The subject matter is "Privileged and confidential information dash attorney-client communication"; correct?**

A. That's what it says. Yes.

**Q. Okay. So why did you put that as the subject line in this e-mail that you sent yourself?**

A. My understanding was -- I mean, what was happening at the time was there was a federal government investigation, a criminal investigation that I understood to be ongoing related to -- related to an indictment of Martin Kao in -- that -- that was released in September 2020.

I was asked to be a fact witness in that -- in that investigation. I added the subject "privileged and confidential information

attorney-client communication" because it was my -- my understanding that as -- as a -- someone who's being interviewed by the federal government in a criminal case, I had a right to an attorney and that this document would be valid evidence or a document that I could reference and review with my -- my attorney.

**Q. Okay. So did you feel that you had risk or were you afraid that the investigation could potentially target you?**

A. Not really, to be totally blunt. I didn't believe that I had done anything illegal at any point. So it was having an attorney at all that I felt was a precaution, that speaking to people who know the legal profession much better than I, highly encouraged.

**Q. So sending yourself this e-mail titled "privileged and confidential information dash attorney-client communication" in the context of an ongoing criminal investigation was not an indication that you felt any risk for yourself?**

A. Again, abundance of caution. I -- generally if -- I don't plan to die today, but I have life insurance; right? So if there's a way to make sure I'm -- I'm doing the most prudent thing at any

given time, I will take that path. So sending this document to myself, again, was encouraged by people who know the legal profession very well.

**Q. Were those people your attorney?**

MS. BRONSTER: I'm going to object to the extent that you are asking for attorney-client privileged information.

And if you had gotten this advice from your attorney, I instruct you not to answer. You can answer to the extent that it was from others.

THE DEPONENT: I did get advice from others who were attorneys but not representing me in -- in Hawaii.

BY MR. ALLISON:

**Q. And were those other people who were attorneys but not your attorney, were they employees or related to the company in any way?**

A. No.

**Q. Okay. Who were those people?**

A. I got the original advice to get a criminal defense attorney to represent me in front of the federal government from a family friend named Ian Sandison.

**Q. And let's look at the second page of this Exhibit Number 3, please.**

**We're looking at an Outlook invite for a meeting that says it was organized by you; correct?**
A. That's what it says here. Yes.
**Q. It says "Required attendees, Martin Kao." And the subject is "Meet Andy W."**
**That would be Andy Winer; correct?**
A. That's correct.
**Q. "Location, main conference room."**
**Is that the conference room at the company's office in Honolulu?**
A. That's correct.
**Q. Okay. And the date is Friday, October 25th, 2019, and the meeting was set to last from 5 to 7 p.m., but it also says "tentative"?**
A. That's what I'm seeing here in the document. Yes.
**Q. Okay. So did this meeting occur?**
A. Yes.
**Q. Did you attend?**
A. Yes.
**Q. Did it happen on the 25th of October 2019?**
A. To the best of my recollection, yes.
**Q. Did it last approximately from 5 p.m. to 7 p.m.?**
A. I don't believe the meeting lasted that

long, to my recollection. I think it was much shorter, probably less than an hour.

**Q. Did Andy Winer and Martin Kao both attend?**

A. Yes.

**Q. Did anybody else attend?**

A. That part, I do not recall. I -- I don't believe so.

**Q. Did you, Martin Kao, and Andy Winer discuss a donation to Senator Colin's PAC during this meeting?**

A. Martin expressed a -- a desire to make a donation to Senator Collins. A -- I don't remember the words he used, but the -- the general theme was a large donation, larger than an individual can legally donate as a single, you know, person to a political campaign. And Martin was seeking Andy Winer's advice on how to do that. That was -- that was the purpose of the meeting.

**Q. And did Martin, Mr. Winer, or yourself discuss that one way to do that would be to make a donation through another entity or company?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: I do not remember any details about the mechanism of making the donation related to setting up a separate entity.

BY MR. ALLISON:
**Q. Okay. You agree that the donation being discussed in this meeting on October 25th, 2019, between yourself, Martin Kao, and Mr. Winer was the same donation that was made on December 27th, 2019, by the Society to 1820 PAC; correct?**
A. I cannot be sure. I have no knowledge of the actual check being written. The traceability of Martin's desire to donate to Senator Collins here and in executing on that, I don't know if it's the same or not or if he had multiple donations. Again, I had no visibility into Martin's other activities.
**Q. Sure. But you agree that here you are in late October discussing, in your words, a very large donation to Senator Collins' PAC and then two months later, a large donation is made to Senator Collins' PAC; correct?**
MS. BRONSTER: Objection. Argumentative. Objection as to form.
THE DEPONENT: We did discuss large donations to Senator Collins' PAC at this meeting and, allegedly, a large donation was made to the 1820 PAC in late 2020 -- or sorry, excuse me -- 2019.
BY MR. ALLISON:
**Q. You keep saying "allegedly" the donation**

**was made.**
**Do you doubt that that donation was made?**
A. At the time, I -- what I had to go on about a donation being made was an article and a link to an FEC complaint.
**Q. As you sit here today, do you doubt that the donation --**
MS. BRONSTER: Please -- please do not interrupt the witness.
MR. ALLISON: He was done speaking. I didn't interrupt anybody.
BY MR. ALLISON:
**Q. As you sit here today, Mr. Hartman, do you doubt that the donation was actually made?**
A. I don't have any to reason doubt it.
**Q. Okay. So when did that change in your mind from it being merely an allegation to not having doubt that it was made?**
A. After the revelations -- so your question about when, after I found out -- after Martin Kao was indicted in September of 2020, I began to question everything Martin had ever told me.
**Q. But, Mr. Hartman, didn't you receive numerous e-mails throughout February, March, April, May of 2020 relating to this donation and**

**specifically including attorneys that you helped engage for the Society?**

A. I don't --

MS. BRONSTER: Objection.

THE DEPONENT: -- agree with that statement.

BY MR. ALLISON:

**Q. Okay. Well, we're going to look at those e-mails soon. Okay?**

**Put that document away; we're done looking at this.**

**I'm going to ask you some more questions about your understanding of the Society. And to be clear, I'm asking these questions -- as you sit here today, I want to know your understanding.**

**What were the approximate dates during which the Society operated as an LLC or business entity?**

A. Approximately late -- late 2019. Again, this is my understanding today, approximately late 2019 until -- I would say my understanding was that the operation of the Society ceased after Martin's indictment in September of 2020.

**Q. Okay. What is your understanding of the Society's corporate or business purpose?**

A. As of right now, my understanding is that Martin set up the Society with the goal of making a donation to a political campaign.

**Q. And when did you come to that understanding?**

A. So that's -- that's hard to answer. My understanding, even in late 2019, was that Martin was standing up an entity and was in the process of writing a check which I understood to be from the entity to a political action committee -- you know, a political campaign. I was not aware of any other activity that the Society was undertaking at that time, late 2019.

**Q. So in late 2019, you understood that the Society's business or corporate purpose was to make a political donation?**

A. I didn't have any other information from Martin that would tell me otherwise. And that's the only activity I was aware of that Martin was, I guess, telling me about or including me on e-mails.

**Q. Given that that was your understanding of the Society's corporate purpose as of 2019, is it correct to say that you also understood that the Society didn't have any business operations or it didn't do anything that would generate income or**

**revenue?**

A. I would not say -- to your statement, I would not say I fully understood the corporate purpose of the Society because I felt in the dark, if you will, as to the formation of the company. I never saw anything related to that, the operating agreement, if there was one. The motivation and where it came from, all of that was not -- was not shared with me.

**Q. What was your understanding at that time, if you had one, as to the source of the Society's money or funding?**

A. I'm sorry, Grant. Can you repeat the question?

MS. BRONSTER: Objection as to vague as to "at that time."

BY MR. ALLISON:

**Q. We're talking about late 2019, right, Mr. Hartman?**

A. Okay.

**Q. So at that time, late 2019, if you had an understanding as to the source of the Society's money or funding, what was your understanding?**

A. I did not have an understanding of the Society's source of -- of funding.

**Q. Did you have any suspicions as to the source of the Society's money?**

A. Frankly, no. My understanding was that Martin Kao was a high-net-worth individual. This is -- he -- he bragged about fancy cars and having a lot of money. My perception was -- I have no idea where the money came from and I didn't -- I didn't ask.

**Q. Did you understand or believe at that time that this donation to Senator Collins' PAC would benefit the company?**

A. I understood that Martin making political campaign donations was really consistent, frankly, with what I had seen Navatek doing over many years which is donating to politicians in states in which it operates to find some way to benefit the company.

**Q. It was a "yes" or "no" question, Mr. Hartman. Was your answer "yes"?**

MS. BRONSTER: Objection. Argumentative. Objection as to form.

THE DEPONENT: Can you repeat the question, Grant? I apologize.

BY MR. ALLISON:

**Q. Sure. At the time, 2019, late 2019, did you have an understanding or belief that the donation**

**to 1820 PAC by the Society would benefit the company?**
MS. BRONSTER: Objection. Asked and answered.
THE DEPONENT: I did not know.
BY MR. ALLISON:
**Q. So you had no opinion on the subject?**
MS. BRONSTER: Objection. Asked and answered.
THE DEPONENT: My experience with political donation activity was minimal to none. So whether or not this would be a positive or a negative for the company, I -- I did not know.
My -- Martin runs the company, has been doing this for years. He's hired high-powered lobbyists. At the time, my understanding was those guys know best whether this is going to benefit the company or not. I had no personal knowledge of whether that donation would help or hurt the company.
BY MR. ALLISON:
**Q. Okay. Just for where we're at in this, I'm going to ask a couple more questions on a fairly short topic and then we can discuss if we want to take a break. So I'm just letting the court reporter and everybody on the Zoom and yourself know that, Mr. Hartman.**

**Okay. So I want to confirm now your basic understanding of the Federal Election Commission complaint that was filed with respect to this donation.**

**First basic question, are you aware of that complaint?**

A. If you're referring to the Federal Election Commission complaint filed in early February of 2020 or thereabouts, yes.

**Q. That's correct. And I can show you a copy of it if you would like to confirm your understanding.**

A. If we're going to talk further about it, that would be helpful but not necessary.

**Q. We'll talk about it eventually, but right now I just want to know some basic facts about it. If you say you know what it is and you understand what I'm referencing, then I think that's sufficient for now.**

A. Yes, I understand what you're referencing.

**Q. Okay. And I don't think there's any other Federal Election Commission complaint that's relevant to what -- you know, the Society and the company.**

**So I think it's the only one; is that correct?**

MS. BRONSTER: Objection as to form. Objection.

THE DEPONENT: Yeah. It's the only one I'm aware of. Put it that way.

BY MR. ALLISON:

**Q. Thank you. Thank you.**

**When did you first learn of the Federal Election Commission complaint?**

A. On or around early February of 2020.

**Q. I think I already know the answer to this question because you discussed an article you read in early February 2020, but how did you first learn of that complaint by the Federal Election Commission?**

A. By reading an article.

**Q. And to be clear, the article that you have mentioned a few times now in your testimony, is it just the single article or is it multiple articles?**

A. I recall several articles being published around that time frame. I believe one was published by Civil Beat and one was published by -- somewhere in Maine, I want to say. But there were -- there were two or more articles published around the same time.

**Q. Okay. At that time, can you just briefly or generally describe to me what your understanding**

**was for the basis of the complaint upon first learning about it?**

A. The -- again, I read the article, especially the Civil Beat article, about the FEC complaint. And what I gathered was that the complaint had to do with establishing an entity that obscures the original source of the funds of the -- of the campaign donation.

**Q. At that time in early February 2020 upon first learning of the FEC complaint, did you believe or have an understanding that either Martin Kao or the company could be at risk of criminal prosecution or penalties based on the allegations in the FEC complaint?**

MS. BRONSTER: Objection to the extent it calls for a legal conclusion.

You may answer if you know.

THE DEPONENT: My understanding of the article was that it didn't look good in terms of the public image of the company. Certainly, people who read it who knew I worked for the company, you know, might have asked about it. Internally, there was concern about -- about the article.

That being said, Martin assured me and others in the company that everything that he did was

legal. It -- you know, it looked bad, maybe there was something done improperly in terms of, like, the steps of how it was done but this kind of donation is made every day of the week and it's completely legal. And -- and that was Martin's stance on -- on the FEC complaint and risk to the company.

BY MR. ALLISON:

**Q. Okay. So despite your feeling of unease and despite Martin's statements that maybe something improper had been done with the steps taken to give the donation, you still believed Martin when he said that there was essentially no problem here?**

MS. BRONSTER: Objection. Vague as to time.

THE DEPONENT: I guess it's a -- well, after the article in early February 2020, my understanding was that Martin was concerned about it and this -- you know, in that it caused, again, bad publicity for the company. And I do know -- later in February, I came to know that he -- he wanted to take actions and steps to fix it, for lack of a better word, or improve the public image of the company.

But my understanding was this is -- this is a guy who advertised that he had a legal background, that he was -- you know, he had high-powered

lobbyists advising him and also that he had legal counsel and that he -- what he did was legal.

So to answer your question did I believe Martin when he said that it was legal? Yes.

BY MR. ALLISON:

**Q. But you did have your doubts?**

MS. BRONSTER: Objection. Asked and answered. Misstates the testimony.

You may answer again.

THE DEPONENT: I trusted him that he was telling the truth.

BY MR. ALLISON:

**Q. So you had no doubts about the situation, whether it was legal, whether things were done correctly?**

A. I understood it to be -- did I have any doubts whether it was legal? Did I have doubts about Martin? Again, I didn't think that he was an upstanding person, but did I have doubts about the legality of it?

I mean, complaints are levied against companies all the time. I'm mature enough to know that a complaint being filed and allegations being made does not equal criminal conviction. And trusting that my employer, that he did things

legally, I -- I trusted him that what he did was legal and trusted him at his word.

**Q. And you had no doubts about that?**

MS. BRONSTER: Objection. Asked and answered. Objection. Vague.

THE DEPONENT: Yeah. I guess, what do you mean, Grant?

BY MR. ALLISON:

**Q. Well, in your mind, did you have any doubt as to the truth of what you just testified?**

**Did you have any doubt that what was done was lawful and legal?**

MS. BRONSTER: Objection as to form. Compound.

THE DEPONENT: I do not have a law degree. I am not an expert in campaign finance. I did not feel qualified to question Martin's opinion or any of his advisors or consultants.

BY MR. ALLISON:

**Q. So it's fair to say you did not doubt it at all?**

A. Not to the degree --

MS. BRONSTER: Objection. Asked and answered. Objection. Vague as to what "it" refers to.

BY MR. ALLISON:

**Q. Sure. The legality of the donation made by the Society to 1820 PAC of which you were aware of in 2019, you had no doubt in your mind that everything done was legal at that time in late 2019 when you learned of it?**

MS. BRONSTER: Objection. Objection as to the preface. Misstates the testimony.

BY MR. ALLISON:

**Q. Yes or no, Mr. Hartman, you had any doubts as to the legality of those actions?**

A. Again, all I can say is that any doubts that I had did not rise to the level of me questioning the statements that Martin had made about -- about the donation, that he had done things properly and legally, and that, you know, if there was anything to the complaint, it would be on the level of a fine or some sort of infraction versus wholesale, you know, campaign finance fraud.

**Q. So -- but you did then have some doubts because you just testified any doubts that you did have didn't rise to the level of questioning Martin.**

**So you did have some doubt then; correct?**

MS. BRONSTER: Objection. Argumentative. Objection as to form. Objection. Asked and

answered.

THE DEPONENT: So, Grant, if a complaint is filed that names the company you work for, does -- do you ever question whether or not the complaint has any substance?

If that's the question, I mean, it's a complaint filed in -- you know, I think it was the District of Columbia, I believe, related to campaign finance. Obviously, it doesn't look good and, obviously, it makes me think, hey, is there something to this?

But, again, I'm an employee. I've got family to feed. I'm trusting that the CEO and owner of the company is going to exercise care and be truthful with us about the risks of -- of what's happening. And, you know, obviously, it turns out my trust was misplaced.

But did I have personal and private doubts because I've read an FEC complaint that eventually referenced Martin and the company I worked for? I mean, it caused me concern.

BY MR. ALLISON:

**Q. When did you read the FEC complaint for the first time, to the best of your recollection?**

A. I don't -- I don't know. I would doubt

that I read the FEC complaint in the first few weeks that the -- after the article in Civil Beat was published because I had moved on February 9th, 2020, from Hawaii to South Carolina with my family of four and -- and COVID just happened to kick off that month, too. So there was a lot going on.

So I don't know is when -- to answer your question about the FEC complaint, I don't know.

**Q. Is it accurate to say that during this general time frame, February, March, April 2020, the complaint comes out and you read the article -- is it accurate to say that in this general time frame, you did not know for certain whether the Society was compliant with the laws and regulations governing campaign finance?**

MS. BRONSTER: Objection as to form.

You may answer.

THE DEPONENT: I didn't have any basis to judge that. I was not an employee of the Society. I was not qualified in the rules and regulations of campaign finance.

BY MR. ALLISON:

**Q. So I'm sorry. I'm a little confused by your answer.**

**Is it accurate to say you just simply --**

**that you didn't know, you didn't have a conclusion as to whether or not what was done was legal or illegal?**

MS. BRONSTER: Objection to the extent it calls for a legal conclusion. And asked and answered.

THE DEPONENT: I did not feel qualified to make a legal conclusion. Right.

BY MR. ALLISON:

**Q. So you didn't know if it was legal or illegal?**

A. I did not know.

**Q. Okay.**

MR. ALLISON: Let's go off the record then, please.

(Whereupon, a lunch recess was held from 5:44 a.m. to 6:16 p.m.)

BY MR. ALLISON:

**Q. Okay, Mr. Hartman. We're back on the record. Same rules apply. You're still under oath.**

**Do you understand?**

A. Yes.

**Q. Okay. I'm going to introduce the next exhibit. It's what I've marked as Document Number 4, and we'll introduce it as Exhibit 4.**

**///**

(Whereupon, Plaintiff's Exhibit 4 was marked for identification by the court reporter and is attached hereto.)

MR. ALLISON: I'll give the moderator just a moment to put it up in the chat for everybody else.

BY MR. ALLISON:

**Q. Mr. Hartman, are you generally familiar with this document?**

A. Reading it over, it's a long one, 17 pages. Generally familiar, yes.

**Q. Okay. And on the first page, the last e-mail in the chain is an e-mail from Clifford Chen to William Canfield with yourself, Andy Winer, and Martin Kao copied; correct?**

A. That's what it appears, yes.

**Q. Okay. Who is it that you understand William Canfield to be?**

A. At the time, I understood William or Bill Canfield to be an attorney in D.C. and kind of an expert in campaign finance-related matters.

**Q. Okay. And when did you first come to know Bill Canfield?**

A. I can't say the specific day, but I believe it was some time in February 2020.

**Q. And it was through the dealings between and/or involving the company and the Society and the 1820 PAC; is that correct?**

A. I met Bill Canfield in the context of Andy Winer had introduced him to Martin. And to my knowledge at the time, it was to discuss the FEC complaint.

**Q. I would like you to turn to the fourth page of this exhibit. It has a four on the bottom. I'll reference the page numbers that are on the bottom.**

**And at the bottom of the fourth page, there's an e-mail dated February 28th, 2020, from Martin Kao to Andy Winer copying Clifford Chen and yourself; correct?**

A. That's what it looks like. Yes.

**Q. If you're looking at the screen, it would be down further on the page. There we go; it's that one. Okay.**

**And if you flip over to the fifth page, the next e-mail which would be one earlier in the chain, you're not copied on that one; correct?**

A. That's what it appears. Yes.

**Q. So going back to the bottom of Page 4, this is the first e-mail that you're receiving in this thread?**

A. Based on this document, that's what it appears. Yes.

**Q. Okay. And upon receiving this e-mail that you were added to by Martin Kao on February 28th, 2020, you received all the prior e-mails in the thread; correct?**

A. I can't say for certain. I imagine so. I think that's how our e-mails worked at the company, but I can't say definitively I got that entire chain.

**Q. Well, that's pretty standard for how e-mails work; right? If you have an e-mail thread between two people and at some point after a few replies back and forth, a third person is added as a copy, they receive everything prior in the e-mail chain; correct? That's pretty standard?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: I mean, I've seen e-mails -- the applications do both ways where they truncate it unless you opt to add them. But my recollection of how our e-mail system worked is, yes, it contained the entire previous thread of e-mails sent prior.

BY MR. ALLISON:

**Q. And upon receiving this e-mail from Martin Kao on February 28th, 2020, that you were copied on, did you -- do you recall reading the e-mail?**

A. I -- I'm -- I think I probably did. Yes. Generally, you know, receiving an e-mail from Martin, the CEO of the company, I would read them. I was pretty good about reading e-mails.

**Q. And do you also recall reading the prior e-mails in the chain?**

A. I don't know when I read the prior e-mails in the chain, but at some point I do remember reading a back-and-forth between Cleta and Martin.

**Q. Okay. And when -- even though you can't remember the specific date, would it have been more or less in the general time frame when you received these e-mails that you went back and reviewed the prior e-mails?**

MS. BRONSTER: Objection. Calls for speculation.

THE DEPONENT: I don't know.

BY MR. ALLISON:

**Q. Okay. So the -- the best that you can testify based on your recollection is that you read the prior e-mails at some point but you're not exactly sure when?**

A. That's correct.

**Q. Would it have been just generally occurring during the year 2020 that you went back and read the**

**prior e-mails?**

MS. BRONSTER: Objection. Calls for speculation.

THE DEPONENT: If I were to guess, which I am doing, yes, some time in 2020 I read these e-mails.

BY MR. ALLISON:

**Q. Well, how about let's do it this way. The first time you went back and read the prior e-mails in this chain, that wasn't, like, this year in 2025, was it? That wasn't the first time you saw it?**

A. No, 2025 was not the first time I've seen these e-mails.

**Q. And it wasn't in 2024 either, was it?**

A. This case has been going on since 2022. I definitely read them when they appeared in this case. I don't -- I don't recall. I don't recall exactly when I read them.

**Q. Okay. Is it your standard practice in the business context to -- when you receive an e-mail and you're added to a chain, to go back and read the prior e-mails to understand what's going on in the chain?**

MS. BRONSTER: Objection. Overbroad.

THE DEPONENT: I mean, generally, yes. I'd

like to get context of what's happening.
BY MR. ALLISON:
**Q. And you do eventually send some replies in this e-mail chain later on; correct?**
**And we can flip to, for example, Page 3. If -- the header starts on Page 2, at the very bottom of Page 2, and then the body of your e-mail there is on the next page, Page 3.**
A. Mm-hmm. Are you waiting for me to answer, Grant?
**Q. My question is you sent replies, you participated in this e-mail chain; correct?**
A. Yes, it appears so.
**Q. And do you -- so getting back to my prior question, I believe you confirmed it's a standard practice of yours when you're added to an e-mail chain to go back and read the prior e-mails to understand what's happening in the chain; correct?**
MS. BRONSTER: Objection. Misstates the testimony. Asked and answered.
THE DEPONENT: Again, generally speaking, that's something I would do.
BY MR. ALLISON:
**Q. And if you're going to send replies in the e-mail chain, does that give an extra basis or reason**

**for you to go back and review the prior e-mails in the chain?**

A. Yes. Sure.

**Q. Okay. If we can flip to Page 13, it's not all the way at the end but near the end.**

**And, Mr. Hartman, you can briefly just flip through the final pages of the exhibit and confirm that there's no earlier e-mails.**

MS. BRONSTER: Objection. Vague.

THE DEPONENT: I don't know if there's no earlier e-mails that weren't deleted, but in this document I don't see any substance of an e-mail. It's just the standard warning notices and the footer of e-mails.

So I don't see anything of substance other than signatures and disclosures they all have.

BY MR. ALLISON:

**Q. So the first e-mail in the document is on Page 13, and it's the e-mail sent by Martin Kao to Cleta Mitchell on February 5th, 2020; correct?**

A. Yes. I see that.

**Q. Okay. Who is Cleta Mitchell?**

A. At the time, I did not know what her role was or, really, her function.

**Q. Do you know who she is, what her role is,**

**or what her function is today?**

A. Today, I understood -- understand her today to be an attorney, that she was at this time an attorney in D.C., and I believe represented the 1820 PAC or some element of the fundraising chain.

**Q. To the best of your recollection, when did you come to that understanding of who Cleta Mitchell was?**

A. I don't know. I don't know specifically.

**Q. Would it have been through communications with Bill Canfield?**

A. I would say it was still foggy to me exactly who Cleta was even throughout the entire month of February. Again, I was picking up trying to make my best -- do my best to put together the pieces in the e-mail and reading, you know, what was said and -- but again, I had moved to -- not at the date of this e-mail, but this week, February 5th, I was moving that weekend. So packing up my house into a shipping container. It might not have been in the same time.

To directly answer your question, I don't know exactly when I learned and from whom I learned Cleta Mitchell's role.

**Q. Did you ever ask anybody who Cleta Mitchell**

**was?**

A. I don't recall.

**Q. Okay. Did you -- was it important to you upon reading these e-mails to know who Cleta Mitchell was or instead was it something that you just didn't think was a critical piece of information?**

A. I don't remember. I don't remember explicitly asking Martin or Cliff who Cleta was. I think, again, generally, and gradually over the month of February, I think it became clear that she was representing some -- some element of a stakeholder in the fundraising chain that was aware of the FEC complaint; right?

So, obviously, I knew that -- you know, in other e-mails here, it references the FEC complaint. So I knew that much. But, again, specifically who she represented, still today, I'm not even -- I'm not exactly sure her role and who hired her and what her duties were.

**Q. Okay. And in the e-mail we're looking at, Martin says:**

**"Hi, Cleta. Spoke with Scott Reed today."**

**And then he generally asks her to provide her availability for a phone call; correct?**

A. Yes. That's what it says in this document.

**Q. I'd like to turn to Page 10 now in this document. And if you want to briefly look at the e-mails between that Page 13 and Page 10, that's fine, but I'm going to ask you about an e-mail on Page 10 now.**

A. Okay.

**Q. Okay. And the header for this e-mail is actually on the prior page, Page 9. And it shows that this is an e-mail from Martin to Cleta dated February 18th, 2020, so it's 13 days later.**

**And Martin says:**

**"Hi, Cleta. I'm back in the office this week. At this point, it would seem like this is no longer of relevance and the best course of action is to do nothing. Please let me know if you think we should still have a call to discuss."**

**And my question, Mr. Hartman, is, if you know, why did Martin say that "this is no longer of relevance and the best course of action is to do nothing"?**

MS. BRONSTER: Objection. Lacks

foundation. You may answer if you know.

THE DEPONENT: To be honest, I don't know what Martin meant by this -- by this sentence. I don't -- I don't know what he meant.

BY MR. ALLISON:

**Q. Okay. I'm going to flip to Page 9 now. And I want to look at the e-mail in the middle of the page from Cleta Mitchell to Martin with Andy Winer and Cliff Chen copied.**

**Let me know when you have that in front of you.**

A. Sure. And just to make sure it's the same one, is the court reporter -- moderator looking at the one you're referencing?

**Q. That's the one I'm looking at with the time stamp 11:46 a.m. on February 18th, 2020. Okay.**

**So when you were forwarded this e-mail chain and you read it -- you went back and read the prior e-mails for the first time, that's the time frame or the context for my questions.**

**I want to know -- I'm going to ask you questions about these e-mails and the time frame I'm asking you about is when you went back and read these e-mails for the first time. Okay.**

**Do you understand that?**

MS. BRONSTER: Objection. Misstates the testimony. Objection as to form. Vague.
THE DEPONENT: So -- yeah. What date do you mean, Grant?
BY MR. ALLISON:
**Q. Well, it's -- so we know that these e-mails were forwarded to you on February 28th, 2020. We looked at that; correct?**
A. Yeah.
**Q. And you also testified that at some point you went back and read the e-mails prior to the e-mail that forwarded you the thread; correct?**
A. Correct.
**Q. So what I am telling you, Mr. Hartman, is that I'm going to ask you questions now and the time frame that I am asking you those questions under is the time when you went back and read these e-mails for the first time.**
A. Okay.
**Q. Okay. So when you went back and read this e-mail for the first time after being forwarded the chain, in that first sentence, what is your understanding -- what was your understanding of what the LLC is that's referenced in that first sentence?**
MS. BRONSTER: Objection. Calls for

speculation. Lacks foundation.

THE DEPONENT: Just to be sure, we're still referencing this February 18, 11:46 a.m.?

BY MR. ALLISON:

**Q. Correct.**

A. Okay. So it says:

"I want to be sure that the LLC proceeds with the ideas discussed."

That's the LLC you're talking about?

**Q. Correct.**

A. I guess based on, you know, my -- my reading of this e-mail chain, I -- I would infer that she was referencing the Society.

**Q. Okay. And when you first read this e-mail after having been forwarded it by Martin Kao, did you have an understanding of what she meant in that first sentence by "the ideas we discussed"?**

MS. BRONSTER: Objection. Lacks foundation. Calls for speculation.

THE DEPONENT: I don't know because I wasn't on calls. I wasn't on -- whenever they discussed it, if they did discuss ideas, I wasn't there.

///

BY MR. ALLISON:

**Q. Right. I'm not asking you for the content of a phone call. I'm asking you about this specific e-mail. And so the next part of it, it says:**

**"Giving scholarships and recognition to women in engineering, et cetera."**

**So my question, Mr. Hartman, is this: Did you understand that the, quote, "ideas we discussed" was giving scholarships and recognition to women in engineering?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation. He wasn't a -- he's already testified he didn't participate in that -- in that discussion.

THE DEPONENT: I can testify that those two things, one follows the other in the same sentence. So I can infer that that's what she means when she says "the ideas we discussed."

BY MR. ALLISON:

**Q. Okay. And what did you understand at the time you first read this e-mail, this -- the part of this sentence that says:**

**"That is going to be an issue at some point. We should**

**make sure to take necessary steps to protect the entity and you now while we have the time to do that."**

MS. BRONSTER: Same objections. Calls for speculation. Lacks foundation.

THE DEPONENT: I don't really know what she was thinking when she wrote this. Again, couple things I was aware of at the time that you're referencing.

I was aware of the Society, you know, existing, an FEC complaint being filed. And I don't know exactly when -- when Martin came up with the list of universities and the scholarships he intended to give out, but I was aware, you know, by the time I sent my reply to this e-mail thread, that Martin was intending on issuing scholarships.

So your question of "as that is going to be an issue at some point," I don't know exactly what she means by that.

BY MR. ALLISON:

**Q. Okay. So did you form an understanding when you read this e-mail of what that could have meant?**

MS. BRONSTER: Objection. Lacks

foundation. Calls for speculation.

THE DEPONENT: My understanding of the scholarship program or plan was that Martin wanted to use that to help to repair the image of the bad -- to negate the bad press that came about when the FEC complaint and the article were published.

So, again, my understanding was the scholarships referenced in this e-mail had to do -- had to do with that -- that effort that Martin had -- had conceived of.

BY MR. ALLISON:

**Q. And when she says "protect the entity," who was it you understood the entity to be?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.

THE DEPONENT: I don't know for certain but, again, given that the FEC complaint was referenced here, when she says "the LLC," my assumption was at some point after reading these e-mails -- again, I can't say specifically when -- I would have inferred that she was talking about the Society.

BY MR. ALLISON:

**Q. The two words later -- the next two words, it says "and you," with "you" capitalized,**

**capitalized Y-O-U.**

**At the time you received this e-mail, who did you understand the "you" to be in reference to?**

MS. BRONSTER: Objection. He didn't state that he saw it as soon as he received it and calls for speculation. Lacks foundation.

THE DEPONENT: I mean, if I would have read this e-mail carefully, I would have seen that Martin was in the To line of the e-mail and it was from Cleta Mitchell. So the pronoun probably refers to Martin, and that's what I would have inferred at the time.

BY MR. ALLISON:

**Q. So at the time, you would have inferred that Cleta is suggesting that steps be taken to protect the Society and to protect Martin?**

**Accurate?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.

THE DEPONENT: The -- I'd be speculating, but that seems like a reasonable inference.

BY MR. ALLISON:

**Q. Okay. The final sentence here starts:**

**"We should develop a plan**

**and timetable so there are**

**scholarships given out over the next several months."**

**Do you see that part of the sentence?**

A. Yes.

**Q. Do you understand based upon the wording -- or strike that.**

**At the time you first reviewed this e-mail, did you understand or have an understanding that -- based on that wording, that scholarships had not previously been given out?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.

THE DEPONENT: I don't know.

BY MR. ALLISON:

**Q. You don't believe it was a reasonable reading of this e-mail at the time you first received it that where she says "so there are some scholarships given out over the next several months" that the implication here is that no scholarships have previously been given out?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation. Asked and answered.

THE DEPONENT: Again, Grant, this is the first time I'm ever hearing of Cleta Mitchell so how am I to know that she is fully aware of what Martin's

done or not done?

At the time, I would have not been able to make that conclusion, the one you're asking me, that there have not been scholarships given out because, again, this is a person I know nothing about. So how am I to make that interference and trust that she knows what she's talking about?

BY MR. ALLISON:

**Q. As of the time when you first received these e-mails which was February 28th, 2020, did you know or do you have knowledge of the company giving any STEM scholarships to women during the time that you had worked with the company up through that date?**

A. I had heard from Martin that he had a foundation called the Marty and Mickey Foundation -- I think that was the name of it -- that had given out -- and I -- it was -- it was some sort of funds for public school education in Hawaii. I don't know anything more than just generally he had a foundation in Hawaii that was doing something like that.

And that's -- so, again, like having that knowledge of, like, okay, this guy has other -- has philanthropic activity in his history, I couldn't rule out that he had or had not given scholarships prior to me joining the company and getting, you

know, involved with -- with Martin.

**Q. Okay. But that's the Mickey and Marty Foundation, that's not the company; correct?**

A. Correct. I understood Mickey and Marty Foundation to be a different entity than Navatek.

**Q. Okay. And as of the date when you first received these e-mails, February 28th, 2020, did you have any knowledge or were you aware as to whether the Society had previously given out scholarships to women in STEM fields or engineering fields?**

A. I didn't -- I didn't have knowledge whether they had or had not.

**Q. Okay. The final part of that last sentence is that Cleta Mitchell suggests that over the next several months, scholarships should be given out, particularly in Maine where the bad press was; correct?**

MS. BRONSTER: Objection. The document speaks for itself.

THE DEPONENT: Yeah. I'm reading the document and it speaks for itself.

BY MR. ALLISON:

**Q. Did you understand at the time you first read this that the reason why Cleta Mitchell was specifically pointing out Maine was because of the**

**association between Maine, Senator Collins, and the 1820 PAC?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.

THE DEPONENT: I don't know.

BY MR. ALLISON:

**Q. Given the context and the words in this e-mail, is that a reasonable conclusion?**

MS. BRONSTER: Objection as to form. Calls for speculation. Lacks foundation.

THE DEPONENT: At the time, the -- when she says "bad press," I -- I recall when reading -- reading this e-mail assuming that when she says "bad press," she's talking about articles related to the FEC complaint.

BY MR. ALLISON:

**Q. Okay. Flip to Page 8, the same document now. It's the prior page.**

**So here's an e-mail dated February 18th, 2020, time stamped 4:52 p.m. from Martin Kao to Cleta Mitchell, again with Andy Winer and Clifford Chen copied; correct?**

A. Yes.

**Q. And who is or was Clifford Chen at this -- on this date or at this point in time?**

A. Cliff Chen was the CFO of the company at this time.

**Q. And in this e-mail, Martin says:**

**"Hi, Cleta. Yes, the Society is now actively working with 14 universities including U Maine to give out over 140 scholarships, minimum 1,000 each, to female students in 2020."**

**Correct?**

A. That's what it says. Yes.

**Q. So prior to this date, February 18th, 2020, had you been directed by Martin Kao to start working on that initiative?**

A. I don't recall. I don't recall the specific date that Martin asked me to -- to start supporting the scholarship -- university scholarship initiative.

**Q. Is it reasonable to conclude, based on Martin's e-mail, that he would have asked you to start on it prior to February 18th, 2020?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: Even -- even at the time when I still trusted Martin somewhat, he had a way of

exaggerating, so I would not put it past him to have said that he was doing something that he was not doing yet.

BY MR. ALLISON:

**Q. And at the time that he sent this e-mail, had you already begun to doubt the truth or the veracity of Martin's credibility or statements?**

A. Yes.

**Q. So, earlier, when I asked you if I had any duties about the legality of actions taken with respect to the Society and the legality of the $150,000 donation, you testified that one reason why your doubts were somewhat limited was because Martin told you it was all lawfully done; correct?**

MS. BRONSTER: Objection. Misstates the testimony.

THE DEPONENT: I'll restate what I said, Grant, which was I had concerns about the article that was published because it appeared to be a serious one. It was an FEC complaint that was published in a -- in a reputable media outlet.

BY MR. ALLISON:

**Q. Okay. But looking at this e-mail that we're looking at, you just told me that, you know, what Martin's saying in this e-mail may not be true**

**because Martin had a penchant for saying things that were not honest; correct?**

MS. BRONSTER: Objection. Misstates the testimony.

THE DEPONENT: I had observed Martin to, on occasion, exaggerate both in terms of how quickly something is being done or how much is being done. Yeah.

BY MR. ALLISON:

**Q. So you thought Martin would dishonestly portray how quickly something was done or how well it was done as of this general time frame, February 18th, 2020?**

MS. BRONSTER: Objection. Misstates the testimony.

THE DEPONENT: You used the word "dishonest." Again, my understanding of Martin was that, like some people who are in any kind of sales can be prone to do, his -- he's trying to put on an appearance of doing more or doing something better or faster. When you say "dishonestly," I still trusted that, at the highest level, he was running an ethical and legal company.

BY MR. ALLISON:

**Q. So Martin's penchant for exaggerating**

**things or saying they were done better than they were actually done did not extend to whether or not the actions of the Society were legal or illegal in your mind?**

A. I did not believe the actions of the Society to be legal because that's what Martin told me.

**Q. Okay. Let's flip to Page 7.**

A. I want to make sure I said that right on the record. I did not believe the actions of the Society to be illegal because Martin told me that they were not illegal. I just want to make sure that's correct on the record.

**Q. Okay. Next, we're looking at the e-mail on the bottom of Page 7 from Cleta to Martin, again with Andy Winer and Cliff Chen copied, dated February 18th, 2020, time stamped 11:53 a.m. It's the e-mail that starts with the word "Fabulous."**

**So, Mr. Hartman, at the time that you first reviewed this e-mail chain, what did you understand Cleta was asking when she wrote:**

**"Keep me posted on the progress and send me information related to the scholarships."**

MS. BRONSTER: Objection. Calls for

speculation. Lacks foundation.

THE DEPONENT: When I replied, whenever that was, I think the 28th, I must have inferred that she was referring to the scholarship program that Martin had asked me to support.

BY MR. ALLISON:

**Q. And that's that same scholarship program that Cleta had mentioned in her very first e-mail in this chain that we looked at; correct?**

A. Again, I don't know exactly what she was referring to because I'm not privy to it.

**Q. Well, you testified that upon reading the e-mail, you inferred that the entity discussed was the Society and that the ideas discussed were the scholarships for women in engineering; correct?**

MS. BRONSTER: Objection. Misstates the testimony. Asked and answered.

THE DEPONENT: Yeah. You'll have to read the record as to what I said there.

BY MR. ALLISON:

**Q. Sure. Your testimony is your testimony, Mr. Hartman. Okay.**

**So the next sentence here, Cleta says:**

**"I will include that in the response to the FEC."**

**My first question, Mr. Hartman, is the word "that," I will include "that."**

**What is it upon first reading this e-mail that you understood the word "that" to be in reference to?**

**And I'll restate it this way: What is it that she is saying she will include in the response to the FEC?**

MS. BRONSTER: Objection. Lacks foundation. Calls for speculation.

THE DEPONENT: I mean, the -- the pronoun, if my grammar is correct there, of "that," is referring to information related to the scholarships just based on the prior sentence.

BY MR. ALLISON:

**Q. And those were the same scholarships that Mr. Kao asked you to work on in conjunction with the Society; correct?**

A. Again, I think that's what I inferred based on -- yeah, my read of these e-mails and what Martin had asked me to do.

**Q. So upon reading this e-mail for the first time, you would have understood that, at least to Cleta Mitchell, there was an intention to provide information about the scholarships you were arranging**

**in a response to the FEC. Accurate?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.

THE DEPONENT: That's what I infer right now as -- you know, at this time.

BY MR. ALLISON:

**Q. Would your understanding or inference have been different upon first reading this e-mail chain?**

A. Probably not.

MR. ALLISON: Okay. I want to flip to Page 5 now, please. Right there is good.

BY MR. ALLISON:

**Q. I want to look at this e-mail from Cleta sent February 28th, the same day, 2020, 4:45 p.m. to Martin Kao, Andy Winer, and Clifford Chen.**

**So, again, I'm asking you questions about your understanding upon first reading these e-mails, Mr. Hartman. Cleta in the first sentence says:**

**"I'm going to be preparing the response to the FEC complaint in the next week."**

**So upon reading that the first time, did you understand that Cleta was going to be providing some kind of response to that FEC complaint that we previously discussed?**

A. Because I hadn't heard reference to any other FEC complaint, yes.

**Q. And the rest of that sentence after the dash specifically references 1820 PAC; correct?**

A. Yes, that's in the same sentence.

**Q. Okay. And the FEC complaint is about the $150,000 donation from the Society to 1820 PAC; correct?**

MS. BRONSTER: Objection. Are you asking what he knows now? Or what he knew?

THE DEPONENT: Are you asking me what I know now or what I knew then?

BY MR. ALLISON:

**Q. Let's go with what you knew then.**

A. Okay. And I apologize, Grant. Can you repeat that, please?

**Q. Sure. At the time, February 28th, 2020, you understood and knew that the FEC complaint involved and related to the Society and 1820 PAC and the 150,000 donation by the Society to 1820 PAC; correct?**

A. My understanding -- again, my only knowledge of any FEC complaint was the article that was published which did reference a donation by the Society, and I believe it was in that article that I

saw a reference to 1820 PAC as well. So, yes.

**Q. Okay. And Cleta Mitchell then says:**

**"I would like to be able to point to something that is either public or perhaps a letter that you could send to me and which I could attach to the response."**

**Do you see where she writes that in the e-mail?**

A. Yes.

**Q. Okay. Do you know if such a letter was ever provided to Cleta Mitchell for this purpose?**

A. I do not know.

**Q. Okay. At the time you first read this e-mail, did you understand that sentence to, again, mean that Cleta's asking for information about the scholarships that she can provide to the FEC in response to the FEC complaint?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.

THE DEPONENT: So the question is she's asking for a letter to send in response to the FEC complaint? Is that your question?

BY MR. ALLISON:

**Q. My question, Mr. Hartman, is this: That**

**sentence that we're looking at, was it your understanding upon first reading this e-mail that Cleta Mitchell is asking for information relating to the scholarships that she can provide to the FEC in response to the FEC complaint?**

MS. BRONSTER: Objection. Lacks foundation. Calls for speculation. Asked and answered.

THE DEPONENT: I believe -- you know, based on my inference at the time, that's -- that's what I inferred.

BY MR. ALLISON:

**Q. Okay. And you don't recall whether or not a letter was ever provided to Cleta for this purpose or pursuant to this request, do you?**

MS. BRONSTER: Objection. Asked and answered.

THE DEPONENT. I don't.

MR. ALLISON: Okay. One second, Mr. Hartman.

I'm going to ask the moderator to introduce Exhibit 14 now, please, and to also drop it in the chat for everybody and mark it as Exhibit 14.

///

///

(Whereupon, Plaintiff's Exhibit 14 was marked for identification by the court reporter and is attached hereto.)

BY MR. ALLISON:

**Q. I'll ask you to scroll to the bottom all the way to the first e-mail in the thread.**

MS. BRONSTER: While this is downloading, can you just give me a date on the -- either a production number or a date on the first e-mail, or the top e-mail, please?

MR. ALLISON: On the top e-mail is no date printed. The second e-mail is March 25th, 2020. It appears all e-mails in this thread are March 25th, 2020.

MS. BRONSTER: Thank you.

BY MR. ALLISON:

**Q. So, Mr. Hartman, here's an e-mail from William Canfield on March 25th, 2020, sent to Martin Kao and yourself; correct?**

A. That's what it appears. Yes.

**Q. And this says:**

**"Society letter to Cleta Mitchell."**

**Correct?**

A. The subject?
**Q. The subject, yes.**
A. Yes, that's the subject.
**Q. Okay. And the second-to-last line in his -- in Mr. Canfield's e-mail sent to you and Martin Kao says:**
**"Attached is a draft letter to her."**
**Correct?**
A. Yes. Towards the bottom, it does say:
"Attached is a draft letter."
**Q. And it says:**
**"Please review and make any suggested modifications ASAP. Thanks, Bill."**
**Do you see that?**
A. Yes.
**Q. And the very first sentence says:**
**"Cleta has asked for a brief letter explaining the purpose of the Society for inclusion with her pending response to the FEC in the complaint involving the Collins super PAC."**

**Do you see that?**
A. Yes.
**Q. Do you recall receiving this e-mail from Bill Canfield?**
A. Vaguely, yes.
**Q. Do you recall the draft letter that was attached?**
A. I -- I recall that there was a letter attached but I do not recall the content or form of the letter.
**Q. Okay. Do you recall making any edits to the letter?**
A. I do recall that there was back and forth related to -- to this letter. Yes.
MR. ALLISON: Okay. If we could go back to Exhibit 4 now, please, on Page 5.
BY MR. ALLISON:
**Q. Let me know when you're there, Mr. Hartman.**
THE MODERATOR: Just a second, Counsel.
BY MR. ALLISON:
**Q. The moderator's bringing it up for you if you prefer to look at the screen.**
A. Okay. Just to make sure I'm looking at the right one.
**Q. Okay. So the e-mails we just looked at**

**conveyed the letter from Bill Canfield to yourself and Martin Kao on March 25th.**

**My question now, Mr. Hartman, is that -- was that letter that was conveyed to you by Bill Canfield on March 25th, the letter -- did you understand that that was the letter that Cleta was requesting here in the e-mail on February 28th in Exhibit 4 that we're looking at?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation. And the letter does not appear to be attached to Exhibit 14.

THE DEPONENT: Yeah. I guess it's hard for me to know for sure. There are referencing -- Cleta is referencing a letter here and the other e-mail from Bill, Exhibit 14, was talking about a letter to Cleta. So I know those two things to be true.

Do I know that it's the same letter? That would be -- I'd be speculating.

BY MR. ALLISON:

**Q. And are you aware of whether or not there were multiple letters from Bill Canfield or the Society to Cleta Mitchell?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.

///

BY MR. ALLISON:
**Q. I'm sorry, Mr. Hartman. Did you answer the question?**
A. Yeah. I said I'm not aware.
**Q. So that letter that was referenced in the March 25th e-mail from Bill Canfield that was attached to it, that's the only letter to Cleta Mitchell on this subject matter, 1820 PAC FEC complaint, that's the only such letter you're aware of.**
**Accurate?**
A. That's -- again, this is five years ago now. I don't remember if there were other letters.
**Q. Okay. Could you flip to Page 4, please. This is the e-mail where you get included in the chain. We looked at this a moment ago; isn't that correct, Mr. Hartman?**
A. (No audible response.)
**Q. Did you say "yes"?**
A. Yes.
**Q. Okay. In this e-mail, Martin Kao says to Andy Winer with yourself and Cliff Chen copied:**
**"We have already started to process of issuing scholarships and have been in touch with all**

of the universities we are
working with. Duke can send you
the specific list."
Do you see that reference?
A. Mm-hmm. Yes.
Q. As of this date, February 28th, 2020, had you begun -- you personally, had you begun arranging the relationships between the Society and the universities to receive scholarships?
A. I don't know the specific date of outreach that I -- that I did between -- to the universities. I do believe -- yeah. So I'll stop there. I don't know the specific date that I reached out to the universities.
Q. Okay. And then the next e-mail up is one from Andy Winer, also on February 28th, 2020. And the second sentence, he says:
"I am also copying Duke
Hartman who has the list of
universities where the LLC is
working to set up scholarships."
You see that?
A. Yes.
Q. Upon receiving Mr. Winer's e-mail, did you understand the LLC to be a reference to the Society?

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.

THE DEPONENT: Yes.

BY MR. ALLISON:

**Q. And did you have the list of universities that the LLC was working to set up the scholarships with?**

A. Again, I don't know the specific time and date of when Martin made a list of the universities he wanted to contribute to. So I -- I don't know.

MR. ALLISON: Okay. Let's flip to Page 3, please. Can you go up a little further. Okay. Up just a little further so we can see the header. Okay. Stop.

BY MR. ALLISON:

**Q. So at the very bottom of Page 2 is the beginning of an e-mail on February 28th, 2020, sent at 8:01 p.m. from you, Duke Hartman; correct?**

A. Yes.

**Q. And the e-mail goes on to the next page and it starts:**

**"Bill, see list below."**

**Is this the list that both and Andy and Martin referenced in their prior e-mails?**

MS. BRONSTER: Objection. Calls for

speculation. Lacks foundation.

THE DEPONENT: Given that -- other than e-mails that didn't make reference to anything of substance, the e-mail -- the prior e-mail from Andy that references a list of universities, then yes, I'd infer that this is my response to that implied request for Andy to send the list of universities.

BY MR. ALLISON:

**Q. And it's been your testimony that the list was created by Martin; correct?**

A. That's correct.

**Q. Okay. So do you know or can you explain why Martin didn't send the list?**

A. I can't explain that. I don't know why he didn't decide to send it. My -- my best guess is that usually he would -- so regarding this list, he made -- he made a list on a whiteboard at some point and marked out all of the universities and the levels for amounts that he wanted to make -- make sure that scholarships were donated to each respective university.

As is typical with, you know, an executive, the employee takes notes, right, captures what the executive wants. And so I made notes and made -- digitized that list, I'm guessing originally either

in a spreadsheet or a document, and later on, you know, obviously, I'd been asked to provide that list and so I produced that list.

**Q. When did Martin write those items down on the whiteboard and then you took notes and digitized it?**

A. I don't know specifically. I don't know what date.

**Q. Was it pretty close in time proximity to you sending this e-mail to the group in this e-mail chain?**

A. I don't know. What I do know is that it was -- it was some time in the month of February. I know that.

**Q. Was it after the FEC complaint was filed on February 3rd, 2020?**

A. That's my -- that's my understanding. That's my recollection. Yes.

**Q. Turning back to your e-mail here in Exhibit 4 on Page 3, before the list of universities and corresponding dollar amounts, you say:**

**"Here's the updated list with status of reaching out and total dollars we have committed in 2020."**

**What did you mean by "status of reaching out"?**

A. Trying to understand it now, I -- my guess is that I meant the status of making some sort of contact to -- to these universities. That's the status I'm referring to.

**Q. In the next sentence, you say:**

**"Only one who hasn't been** notified yet is U Delaware (I will this weekend)."

Do you see that?

A. Yes.

**Q. Okay. So that sentence that I just read, that's you saying that you've contacted each of these universities except University of Delaware, but you'll do it this next weekend; is that correct?**

A. That's the way I would read this sentence. Yes.

**Q. So some time between -- or strike that.**

**Some time after the filing of the FEC complaint on February 3rd, 2020, and you sending this e-mail on February 28th, 2020, you contacted each of these universities for the purpose of offering a scholarship except University of Delaware who you would do the weekend following the sending of this**

**e-mail?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: That's --

MS. BRONSTER: (Indiscernible) or statement?

THE DEPONENT: Sorry. Go ahead, Margery.

MS. BRONSTER: I just asked if it was a question or a statement.

BY MR. ALLISON:

**Q. It's a question. Please confirm.**

A. So the question is -- I'm sorry, Grant.

**Q. Sure. Let me rephrase it for you. Let me rephrase it for you.**

**Between the time when the FEC complaint was filed that was February 3rd, 2020, and the date when you sent this e-mail that was February 28th, 2020 -- so in those approximately 25 days or three weeks, during that time period, you contacted each of the universities listed on this list except for University of Delaware who you would contact the weekend following the sending of this e-mail.**

**Is that accurate?**

A. I don't know that conclusively. You know, if you showed me evidence of the e-mails, I could tell you, but that's what this sentence implies,

right, that -- that I have contacted those universities about those scholarships prior to this e-mail other than University of Delaware.

**Q. When you contacted the universities in that effort, did you do it through e-mail or through phone calls or how did you do it?**

A. I -- I don't recall, but to the best of my recollection, it would have probably been a mix depending on my relationship or my knowledge of the point of contact on the other side, whether they generally take out-of-the-blue phone calls and that's how they like to operate or they like e-mails. So I can't -- I can't say for certain.

**Q. Okay. And when you made those contacts, who did you tell these universities was making the donation or making the -- creating the scholarships and funding them?**

A. That may have varied depending on when I contacted the university and which university it was. So -- yeah, I'll stop there.

**Q. Okay. So you said it varied. What were the different variations you told the universities on this list?**

A. At the end of the day, I and most of the university point of contacts, my counterparts at the

universities, understood and were aware that Martin Kao was by far the majority owner, if not nearly total owner of the company of Navatek and that he was also behind the Society and the scholarships that we were discussing here.

So to -- again, I don't know -- if you showed me documents of how I characterized the donations, I could tell you specifically. And I -- but, generally, it would have either been the company, Martin, or a society or philanthropic entity was making the donation, one of those three.

**Q. I'm sorry. You said it was either the Society, a philanthropic organization, or what was the third that you mentioned?**

A. No, sorry. The first was the company, the second was Martin, personally, and the third was the Society --

**Q. Okay.**

A. -- a philanthropic organization.

**Q. And did you vary the message because you yourself didn't know who was making the scholarship -- providing the scholarship amounts or did you vary the message because the specific persons at the universities receiving the message might have been more receptive to different answers?**

A. I varied the message because I wasn't 100 percent clear as to how Martin wanted to represent the source of the scholarships.

**Q. Okay. So at that point in time, did it give you any pause or did you think it might be improper for the company to fund those scholarships in this effort?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: You're asking did I think it would be improper for the company to fund scholarships?

BY MR. ALLISON:

**Q. Correct.**

A. By itself, the company funding scholarships sounds like a great thing.

**Q. If the company's funding scholarships so that that information can be provided in the response to the FEC in response to this FEC complaint involving the Society, 1820 PAC, and the company, does that context give you a reason to doubt the legitimacy of the scholarship effort?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: What I understood at the time was that the Society -- Martin was making these donations via the Society. Didn't understand exactly

why -- why it was via the Society, but that was what I was told Martin wanted to do.

And did I question that legitimacy? Generally, the act of giving scholarships to STEM students, I thought that that was a good idea and good for -- good for the public image of both Martin and the company.

BY MR. ALLISON:

**Q. Okay. But isn't one of the reasons that the Society was being used to give these scholarships was for the reasons laid out by Cleta Mitchell in the prior e-mails we just looked at?**

**That is, to use it in response to the FEC complaint? Isn't that what Cleta Mitchell's e-mail is saying?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.

THE DEPONENT: Cleta Mitchell was asking for information related to scholarships to respond to the FEC complaint. That's correct.

BY MR. ALLISON:

**Q. And don't you think, Mr. Hartman, or didn't you think at the time that it was reasonable to believe that it would be improper for the company to fund that effort?**

A. Grant, my knowledge of the rules around both entities that make political donations and entities that make philanthropic contributions or donations was very little to none. The purpose or the legitimacy or the legality of -- of those donations, frankly, I didn't know and that part of the equation, I had no problem with.

The idea of scholarships going to these university partners, I didn't have a problem with -- with that idea. That it's in response to an FEC complaint, again, my -- my -- at the time, my understanding and my hope was that Martin was working through the steps to ensure the compliance and legality as advised by his attorney of the Society and the way he's doing both political donations and philanthropic donations.

Did I have specific or special knowledge as to the legality and the compliance with laws? No.

**Q. Okay. I want to look at the very last e-mail here. It's from -- it's the very -- so when I say "last e-mail," it's the first e-mail on the first page from Clifford Chen to Bill Canfield with Andy Winer, Duke Hartman, and yourself [sic] copied.**

THE MODERATOR: Counsel, am I on the correct page right now?

MR. ALLISON: No, you're not, just scroll all the way to the top, please. There we go. Okay.

THE MODERATOR: Thank you.

BY MR. ALLISON:

**Q. So here, Cliff Chen is saying:**

**"My real point is that we should be very aware of the distinctions. If we cannot do so internally, it will be difficult to defend the distinctions externally even though they are real."**

**Do you see that?**

A. Yes.

**Q. Did you understand at this time, February 28th, 2020, and upon receiving this e-mail, did you understand and believe that the Society and the company were completely distinct and separate?**

A. I understood them to be separate entities. Yes.

**Q. Yet you were contacting universities and telling them that scholarships would be given and it was either to be given by the company or by the Society or by Martin; correct?**

A. The reason that I gave different answers

related to whether it was to Martin, the Society, or the company was that -- the way I understood it, there was common control across the Society and the company.

**Q. Right. And that common control was Martin Kao; correct?**

A. That was my understanding at the time.

**Q. And it was also Clifford Chen; correct?**

A. When you -- when you say "It was also Clifford Chen," what do you mean?

MR. KOBAYASHI: Objection. Vague and ambiguous. Calls for speculation. Lacks foundation.

BY MR. ALLISON:

**Q. The common control that you just referenced that went -- commonly controlled both the company and the Society included Martin Kao; correct?**

A. That's correct.

**Q. It included Clifford Chen; correct?**

MR. KOBAYASHI: Objection. Lacks foundation. Assumes facts not in evidence. Argumentative.

THE DEPONENT: That was not my understanding at the time. I understood Cliff to be an employee of the company and not -- not necessarily the -- I had no knowledge whether he was an employee

of the Society or not, but I understood him to be an employee of the company. And it was always clear to me that Cliff was not the one in control.

BY MR. ALLISON:

**Q. Okay. What about Kahele Lum Kee? Was he part of that common control that controlled both the company and the Society?**

A. No.

**Q. Okay. Well, what about yourself? Do you consider yourself to be part of that common control?**

MS. BRONSTER: Objection. Vague.

BY MR. ALLISON:

**Q. I'm sorry, Mr. Hartman. You cut out. I don't think the audio got your answer.**

A. No, I do not.

MR. ALLISON: Okay. I'd like to flip back to Exhibit 1, Mr. Hartman's declaration, Mr. Moderator. And I'd like to look at Paragraph 50 on Page 12.

MS. BRONSTER: Paragraph what?

MR. ALLISON: 50, five zero.

MS. BRONSTER: Thank you.

MR. ALLISON: Right there.

BY MR. ALLISON:

**Q. So in this statement in your declaration,**

**Mr. Hartman, you say:**

**"I understood that Bofman, in coordination with Lum Kee and Chen, would then send donation checks for scholarships via SYWSE to universities that were to be given to women studying STEM, S-T-E-M, at various universities."**

**Correct?**

A. Yes. That's what it says.

**Q. So you've previously taken a position that Lori Bofman, who you reference in this Paragraph 50, was the person who managed or operated the Society; correct?**

A. She performs tasks for the Society. Yes.

**Q. Okay. So she wasn't the manager, she wasn't the decision-maker for the Society, she just performed tasks?**

A. The only decision-maker for the company and the Society at the time we're discussing right now in the first quarter of 2020 was Martin Kao.

**Q. And so it's your testimony that Martin Kao made every decision underpinning or underlying every action of the Society?**

MS. BRONSTER: Objection. Argumentative.

THE DEPONENT: So when I say "control," I mean has the ultimate executive authority over an organization; right? Does that mean the executive might say to do something and there are lower level decisions made by somebody else? Yes. My definition of control allows for that.

So if Martin is the executive and the control of the Society and the company, does that mean he makes every single decision? No. He -- lower level decisions may be carried out and made by employees.

So, again, back to my point, Martin was the, you know, executive decision-maker for the Society and the company. Bofman supported operations and carried out tasks but, again, Martin was the -- was the common control across both entities.

BY MR. ALLISON:

**Q. Okay. And in this declaration paragraph we're looking at, Number 50, you say that Lum Kee and Chen, in coordination with Bofman, would send the donation checks via SYWSE to universities.**

**Is it accurate to say, based on this declaration, that you're saying that Lum Kee and Chen were both part of the common control of both the**

**company and the Society?**
MR. KOBAYASHI: Objection. Asked and answered. Argumentative. Lacks foundation.
MS. BRONSTER: Join.
THE DEPONENT: No.
MR. KUBOTA: Join in the objection.
BY MR. ALLISON:
**Q. Okay. So is it accurate to say that what you're stating in this declaration sentence is that Lum Kee and Chen were simply sending out these checks with Bofman at the direction of Martin Kao? Is that your testimony?**
A. Yes.
**Q. Okay. And is it also your testimony that Lum Kee and Chen were using the company money to send out these checks?**
MS. BRONSTER: Objection. Lacks foundation.
MR. KOBAYASHI: Join.
THE DEPONENT: I had no knowledge of the source of the funds that were -- that were behind the checks being sent to universities.
BY MR. ALLISON:
**Q. Were Lum Kee and Chen employees of the Society, to the best of your knowledge?**

A. I -- I did not -- I was not aware. So I had no reason to believe that they were employees of the Society. I -- I did not know.

**Q. And so your testimony is that they had no control over the Society; correct?**

MS. BRONSTER: Objection. Asked and answered.

MR. KOBAYASHI: Join.

MR. KUBOTA: Join.

THE DEPONENT: Based on the unilateral decision-making that would happen -- that Martin would make related to the Society, that's how I inferred that Chen and Lum Kee were not owners or executives or had any material influence on top-level decision-making at the Society.

BY MR. ALLISON:

**Q. Okay. So then they wouldn't have been sending Society checks with Society money based on your testimony; correct?**

MS. BRONSTER: Objection. Lacks foundation. Calls for speculation. Asked and answered.

MR. KOBAYASHI: Join in the objections.

MR. KUBOTA: Join.

THE DEPONENT: That's a -- that's a jump in

logic.

BY MR. ALLISON:

**Q. So you know that they were coordinating together to send donation checks for scholarships via the Society, but you don't have information about whose name were on those checks or where the money came from?**

MS. BRONSTER: Objection. Misstates the testimony. Misstates the document.

MR. KOBAYASHI: Join in the objection.

MR. KUBOTA: Join.

THE DEPONENT: I'll just repeat that I do not know the source of the funds for the checks that went to the universities.

BY MR. ALLISON:

**Q. Okay. But you did testify earlier that when you first contacted some universities, you told them that the money was coming from the company; correct?**

A. Waiting for the objections.

MS. BRONSTER: Yeah. Objection. Misstates the testimony.

THE DEPONENT: So I'm sorry. Grant, humor me. Can you repeat the question, please?

MR. ALLISON: I'll ask the court reporter

to read the question back, please.

(Requested portion was read.)

THE DEPONENT: What I -- what I intended to say earlier and I'll try to restate it here was that the source of the funds -- I -- because Martin Kao was the owner and executive of both the company and, the way I understood it at the time, the Society and that I was not given clear guidance at the time to specifically mention that the money is coming from this entity or that entity, that is the reason that I wasn't -- I didn't always tell my university partners that the money was coming from the Society.

BY MR. ALLISON:

**Q. And you didn't ask or try to confirm the source of the money or the payor of the donations before you contacted these university partners?**

A. No.

MS. BRONSTER: Grant, we've been going over an hour and a quarter now. I think it's time for a break.

MR. ALLISON: Sure. We'll take a five-minute break. And I'd like to ask the moderator -- we can go off the record now.

(Whereupon, a recess was held from 7:37 p.m. to 7:44 p.m.)

MR. ALLISON: Let's go back on the record, please.

BY MR. ALLISON:

**Q. Okay. Mr. Hartman, earlier when I was asking you about the list of universities that you sent in the e-mail we marked as Exhibit 4, you had said that Martin wrote it down on a whiteboard, and I asked you, you know, where did that happen?**

**And it dawned on me during the break that you had testified that you had just recently moved to South Carolina.**

**So you weren't in the same physical place as Martin during that time frame; correct?**

MS. BRONSTER: Objection. Misstates the earlier testimony.

THE DEPONENT: I -- I moved to South Carolina physically on February 9th, 2020. At least that's what I recall. So does that answer the question? Sorry.

BY MR. ALLISON:

**Q. Perhaps in a sense. Let me ask a clarifying question then.**

**So would Martin have put these notations down on the whiteboard sometime between the date when the FEC complaint was filed on February 3rd, 2020,**

**and the date when you moved to South Carolina on February 9th, 2020?**

A. I don't know the specific date is the answer. Again, I believe it was sometime between the FEC complaint and when I wrote the e-mail with the list of universities on -- I think that was the 28th, some time in that window.

**Q. And you don't recall where that whiteboard was physically located when that happened?**

A. My recollection is that it was in Washington, D.C. I don't remember where, but that's my recollection.

MR. ALLISON: Okay. Could we introduce Exhibit 6, please.

(Whereupon, Plaintiff's Exhibit 6 was marked for identification by the court reporter and is attached hereto.)

MR. ALLISON: I'd like to scroll down to the very first e-mail; it's at the very end of the last page.

BY MR. ALLISON:

**Q. Okay. You did not originally receive this e-mail, Mr. Hartman, but if we scroll up to the next e-mail, you received the next one; correct?**

A. That's what it appears on this document. Yes.

**Q. Okay. So if we go back down to the first one, the one that you didn't originally receive dated February 20th, 2020, it's from Sarah M. Castro.**

**Who is Sarah Castro?**

A. She was the -- oh, I think it's in her signature; right? Director of federal relations at the University of Washington.

**Q. Was the University of Washington one of the company's university partners at that time?**

A. It was one of the pursuits as -- yeah. That's what I recall.

**Q. Okay. And this is sent -- her e-mail is sent February 20th, 2020.**

**Did you -- do you recall reviewing this e-mail at the time you got included in the chain and it was sent to you?**

A. Yes, I do.

**Q. Okay. And at the very end, she says:**

**"We won't be doing joint meetings for a single project."**

**Is it your understanding based on the language in her e-mail that she's politely telling**

**the company that University of Washington doesn't want to have a relationship with the company going forward?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.

THE DEPONENT: No.

BY MR. ALLISON:

**Q. Okay. Let's scroll up to the next one, the one you received. This one's from Martin, and he sends it to Andy Winer and yourself. And he says:**

**"Andy, see message below from Sarah Castro. Easy enough to read between the lines."**

**Upon receiving this e-mail, what did you understand Martin meant, "Easy enough to read between the lines"?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.

THE DEPONENT: I don't know what Martin was thinking when he wrote that. My understanding of Sarah Castro's e-mail was that it was a politely declining to meet together with the company, not necessarily declining to have a relationship with the company.

///

BY MR. ALLISON:

**Q. Okay. And then Martin's e-mail to Andy continues and it's generally about the 1820 PAC. He says:**

**"I honestly don't have issues with the screwup with 1820."**

**Correct? Do you see that?**

A. Yes.

**Q. Okay. And so then based on these e-mails, is it reasonable to conclude that Sarah Castro's decision not to meet with representatives of the company was in relationship or a result from the bad press relating to the FEC complaint?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation. Objection as to form.

THE DEPONENT: I don't know why Sarah decided not to meet with company representatives.

MR. ALLISON: Okay. Let's introduce Document Number 7, please.

(Whereupon, Plaintiff's Exhibit 7 was marked for identification by the court reporter and is attached hereto.)

BY MR. ALLISON:
**Q. Okay. Here, Mr. Hartman, is an e-mail from Bill Canfield dated February 25th, 2020, sent to Martin Kao with copies to yourself and Andy Winer; correct?**
A. I'm just downloading the PDF. We're looking at Number 7; right?
**Q. Correct.**
A. This looks like there's a whole bunch of, like, gobbledygook in the two lines, but I see from William Canfield and looks like my name is on cc.
**Q. Do you recall receiving this e-mail?**
A. To be honest, I don't. I'm not -- not doubting that this is a true and correct copy of the e-mail, but I don't specifically remember this e-mail.
**Q. Okay. This e-mail is about Bill Canfield's engagement to represent the Society; is that correct?**
MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.
THE DEPONENT: I mean, reading this now and what I know now, that's what I would infer by reading this e-mail.
BY MR. ALLISON:
**Q. Okay. At the time you received this, did**

**you have an understanding of why Bill Canfield was including you with Andy Winer and Martin Kao on e-mails relating to his engagement for the Society?**

MS. BRONSTER: Objection. Assumes facts not in evidence. Misstates the testimony and calls for speculation. Lacks foundation.

THE DEPONENT: I don't know why.

BY MR. ALLISON:

**Q. Do you recall that you were copied on quite a few e-mails from Bill Canfield on this exact subject matter around the same time frame?**

A. I do remember being copied on e-mails with Bill Canfield. Yes.

**Q. Okay. So did this relate to your core job duties and obligations with the company at the time as of February 2020?**

A. My understanding of what Martin was trying to achieve with Bill Canfield was -- I mean, obviously, this is a lawyer that he's discussing engaging; right?

So he's working on -- what I understood was he was working on ensuring compliance with the law which obviously is important.

And I think I was being copied because part of my role was to ensure that the company had a

positive public image, especially in relation to our university partners.

**Q. Okay. But Bill Canfield was never the company's attorney; correct?**

A. I don't have knowledge of that. I wasn't aware that he was representing the company, but I don't -- I don't know.

**Q. You are aware that he was representing the Society around this time frame; correct?**

A. That's what I concluded. I mean, I don't -- I don't know if I ever saw the actual engagement letter and that it was for the Society or not. I don't recall that. But that's what I -- that's what I inferred based on the e-mails and discussions with Martin.

**Q. Okay. So do you consider this e-mail with the subject "FEC matter" and the contents that we're looking at, do you consider this e-mail to be company business and under the umbrella of your company duties and obligations?**

MS. BRONSTER: Objection. Compound.

You may answer.

THE DEPONENT: The understanding I had was that the FEC complaint, which is one and the same with the subject line of this e-mail, had created bad

press that was connected and tied to the company. So Martin, again, was working on both legal and public relations elements of that bad press and that's -- that's why I understood I was being included, because --

BY MR. ALLISON:

**Q. And that's part of your job? I'm sorry. Please continue.**

A. Okay. Because maintaining a positive public image for the company was part of my role.

**Q. And in this context, one way to maintain a positive public image for the company was to insist in engaging lead counsel for the Society; is that accurate?**

A. Again, this is -- this is the owner and CEO of the company. I understood that this FEC complaint was a problem, a public relations and image problem for the company, and so that Martin is working on that and that's why it matters for an employee of the company.

MR. ALLISON: Okay. Let's take a look at Exhibit 8, please, Document 8, and we'll mark it as Exhibit 8.

THE MODERATOR: Counsel, can you repeat that? I wasn't able to hear you.

MR. ALLISON: Yeah. Exhibit 8, please -- or Document 8 and we'll mark it as Exhibit 8.

(Whereupon, Plaintiff's Exhibit 8 was marked for identification by the court reporter and is attached hereto.)

BY MR. ALLISON:

**Q. All right. Mr. Hartman, I want to ask you about the first e-mail in the chain here. It's the one at the bottom.**

**So we just looked at an e-mail from Bill Canfield to yourself, Andy Winer, and Martin Kao dated February 25th, 2020. This one is to the same three recipients, yourself included, on February 26th, 2020, the next day.**

**And the subject line is "Engagement Letter - FEC Complaint." And in it, Bill Canfield says:**

**"Martin, please sign and return the attached to me via an e-mail."**

**Do you see where I'm referencing?**

A. I do. I just want to maybe correct one thing you said. You said the subject line said "FEC complaint." I think it says "FEC compliance." But,

otherwise, everything -- I agree with everything you just said.
**Q. That's correct. It says "FEC compliance."**
A. Yes, I see that.
**Q. So do you recall receiving this e-mail?**
A. Apparently I did, but it's -- only vaguely. Again, there were -- at this time, there were a number of e-mails with Bill Canfield and I wasn't the one signing it or reviewing it. So I don't think I -- I don't remember specifically.
**Q. Okay. Do you recall if the -- if there was an attachment to this e-mail?**
A. I don't know.
**Q. Based on the subject line, it's reasonable and likely that the attachment was Bill Canfield's engagement letter; correct?**
MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.
THE DEPONENT: I mean, that's what's in the subject line, "engagement letter."
BY MR. ALLISON:
**Q. Okay. And then continuing with the rest of the e-mail, Bill Canfield's providing information for his bank account to get a retainer; is that correct?**
A. It's what I'm reading in this e-mail. Yes.

**Q. And so as with the last e-mail, you were included in these efforts to engage counsel for the Society because it was part of a public image or relations cleanup for the company.**

**Is that -- is that accurate? Is that still your testimony?**

A. The first -- the first part of that question I wasn't -- I wasn't totally clear on.

Can you rephrase that, please?

**Q. Sure. Why is it -- at the time you received this e-mail February 26, 2020, what was your understanding of why you're being copied on these e-mails from Bill Canfield relating to his engagement letter covering the FEC matter for the Society?**

MS. BRONSTER: Objection. Calls for speculation.

THE DEPONENT: So you're asking why am I being copied on this e-mail from Bill Canfield? I think that Bill understood that I was an employee of the company and assisting Martin in the -- yeah, again, public relations campaign to improve the public image of the company.

BY MR. ALLISON:

**Q. And you weren't -- it's your testimony that you weren't included on these e-mails because you**

**were one of the managers for the Society?**

A. Yes, that's correct. I was not one of the managers for the Society.

**Q. Generally speaking, is it your understanding that when a company engages counsel, that's usually done at higher levels of management?**

MS. BRONSTER: Objection. Calls for speculation.

THE DEPONENT: I was never asked to review, sign, comment on the engagement letter. You'll notice Martin took me off on the very next e-mail with Cliff. That was not -- that was not part of my role.

BY MR. ALLISON:

**Q. At your current company, Integer, if Integer's going to engage legal counsel, what levels of employees would be involved in that effort?**

A. Maybe a business lead that it impacts or touches in any way, they might be copied for awareness. You know, a compliance-related person. You know, if there's any account managers that have to do with -- with the matter. And, obviously, you know, the chief executive officer, of course.

**Q. So it would be high-level managers of the company; correct?**

MS. BRONSTER: Objection. Misstates the testimony. Asked and answered.

THE DEPONENT: Yeah. I mean, I've already answered the question, I think.

MR. ALLISON: Okay. Let's go to Document Number 9, please, Moderator

(Whereupon, Plaintiff's Exhibit 9 was marked for identification by the court reporter and is attached hereto.)

BY MR. ALLISON:

**Q. Okay. Do you recognize these e-mails, Mr. Hartman?**

A. I'm waiting for the download. Okay. I see it now. Downloading. This is hard to see. Okay.

I'm looking at the e-mail. Yes, there's two pages here on the first page.

I'm sorry. Did you ask a question, Grant?

**Q. My first question was do you recognize these e-mails?**

A. Again, vaguely.

**Q. Okay. And I'll note that you were not copied or received the first two e-mails that's at the bottom of Page 1 and then on Page 2; correct?**

A. That's what appears in the e-mail -- or in

the document we're looking at. Yes.

**Q. Okay. But then on March 4th, 2020, at 9:15 a.m., Bill Canfield appears to have taken this thread and then sent it to Martin Kao and yourself. And I think that's a reasonable assumption because the subject line changes from "Regarding FEC engagement" to "Forward FEC engagement."**

**Do you see that?**

MS. BRONSTER: Objection to the form of the question and objection to the preface.

THE DEPONENT: What I can tell you is I see that the e-mail from Cliff on March 4th that looks around noon Eastern Time says "Regarding FEC engagement." And the later e-mail -- that's interesting, it says 9:15 a.m. -- I assume that's Hawaii time on the same day -- from Bill Canfield to Martin and myself, the subject line says "Forward FEC engagement."

BY MR. ALLISON:

**Q. Right. So my first question, Mr. Hartman is, looking at this, do you understand that Mr. Canfield took the prior e-mails and he forwarded them to you and Martin?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.

THE DEPONENT: This appears to be an e-mail that was forwarded and I am one of the recipients.
BY MR. ALLISON:
**Q. Okay. And Mr. Canfield says:**
**"Martin, can you move these two items forward, please? Thanks, Bill."**
**Do you see that?**
A. Yes.
**Q. And if we were to go down and look at the two prior e-mails, we would see that this is about the signed engagement letter; correct?**
A. I'm reading it now. Cliff says:
If it's the engagement letter that was distributed a week ago, it is still with Martin. I believe he and Tiffany are the only ones that should be signing the letter as I do not represent and probably should not be seen as representing the Kao family nor the Society in any official capacity. I communicated as such with Martin last week. Cliff."

So it appears to be related to the engagement letter.

**Q. Okay. At the time you received this on March 4th, 2020, did you have an understanding of why Bill Canfield was using you as a point of contact in conjunction with Martin Kao to get a signed engagement letter back for his engagement with the Society?**

MS. BRONSTER: Objection as to form. Calls for speculation. Lacks foundation.

THE DEPONENT: I do not.

BY MR. ALLISON:

**Q. Okay. But you still maintain that you had no operational control and no oversight over the Society; correct?**

MS. BRONSTER: Objection. Asked and answered.

THE DEPONENT: Yes. I've answered that question. Correct.

MR. ALLISON: Okay. Let's take a look at Document Number 10 and we'll mark it as Exhibit 10, please.

///

///

///

(Whereupon, Plaintiff's Exhibit 10 was marked for identification by the court reporter and is attached hereto.)

BY MR. ALLISON:

**Q. Mr. Hartman, do you recognize this document to be Bill Canfield's engagement letter?**

A. I am reading this letter now. And it appears to be an engagement letter from Bill Canfield to -- they spelled his name wrong, Martin Kao. So that much I can confirm.

**Q. Okay. And if you're looking at the moderator's copy, if we could scroll to the top, you can see the header. Okay.**

**So, Mr. Hartman, is this the same engagement letter that you received in the various e-mails that we just looked at as an attachment?**

A. I do not recall opening or reviewing in detail this engagement letter.

**Q. Okay. And just to be clear, the engagement letter in the first paragraph states that his engagement is with:**

**"The Society of Young Women Scientists and Engineers LLC to render legal services and**

**professional representation on your behalf and on behalf of the Society with respect to any and all issues involving the Federal Election Campaign Act."**

**It goes on from there; correct?**

MS. BRONSTER: Objection. Objection. Lacks foundation. The document speaks for itself.

BY MR. ALLISON:

**Q. Okay. So this engagement letter which you received attached to numerous e-mails to yourself, there's no question in your mind that this is the engagement letter in which Bill Canfield represents the Society with respect to the FEC complaint; correct?**

MS. BRONSTER: Objection. There's no evidence that this was the document that was attached to the various e-mails. Misstates the evidence.

THE DEPONENT: Yeah. I can't confirm or deny that this is the attachment that I received nor that I opened it and read it.

BY MR. ALLISON:

**Q. Okay. Is it typical for you to receive attachments in e-mails involving the CEO of your company at the time in 2020 but to not read the**

attachments?

MS. BRONSTER: Objection to form.

THE DEPONENT: Grant, as a high-performing person, you probably have a lot on your plate.

Typically, the way I operated at the time and I still do, if there's an e-mail addressed to me and I know that it's somebody else's responsibility to take care of it and I'm not being asked to review, comment, edit, anything, and I trust that the other person who is the primary action taker is going to take an action with respect to it, I don't always review it. I don't always open it. That's the way I operate.

Again, this is Martin's business. If he asked for my advice or review, I would have done that. But I was traveling 50 to 75 percent of the time, often checking e-mails on my phone. So maybe did I open this on a plane or in an airport, look at it on my phone at some point? Possibly. Did I review it in detail? I don't recall that review. No.

MR. ALLISON: Mr. Hartman, can you still hear me?

THE DEPONENT: Yes, I can. Can you hear me?

MR. ALLISON: I can, but at least on my screen it looks like my Zoom camera is frozen. So let's go off the record. Let's take, like, a two-minute break and I'm going to restart the Zoom and rejoin so that this doesn't create an issue for us.

THE DEPONENT: Okay. A two-minute break, you said?

MR. ALLISON: Yeah.

THE DEPONENT: Okay. Thanks.

(Whereupon, a recess was held from 8:13 p.m. to 8:19 p.m.)

MR. ALLISON: Let's go back on the record, please. Sorry about that, everybody. I had to restart my computer.

BY MR. ALLISON:

**Q. Mr. Hartman, same rules apply. Let's bring up Document Number 11 now, please.**

(Whereupon, Plaintiff's Exhibit 11 was marked for identification by the court reporter and is attached hereto.)

BY MR. ALLISON:

**Q. Okay. Mr. Hartman, do you recognize this document here?**

A. Yes.
**Q. Okay. Hang on just one sec. I think this is the incorrect version of this one. No, rather than just messing around, we'll just use this version. This is fine. Okay.**
**Mr. Hartman, I'd like you to scroll to the bottom and look at the very first e-mail from yourself to Bill and Hossein.**
**Who are Bill and Hossein?**
A. Hossein is Hossein Haj-Hariri, the -- at the time and who still is, the University of South Carolina dean of engineering -- dean of the College of Engineering.
**Q. And who is Bill?**
A. Bill is Bill Kirkland. At the time, I believe he was the vice president of economic development for the University of South Carolina.
**Q. Okay. And, earlier, when we discussed decision-makers at university partners, would Hossein and Bill be that for the University of South Carolina?**
MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.
THE DEPONENT: Bill and Hossein were at varying levels; right? Bill was the vice president

so he was in the central office. Hossein was the head of the College of Engineering.

Were they decision-makers at the highest level of the university? No. The president and vice president of research were. But were they decision-makers in their respective departments? Yes.

BY MR. ALLISON:

**Q. Okay. I want to ask you about the middle paragraph in your e-mail here. You say to Bill and Hossein:**

**"I am reaching out to let you know that Navatek is interested in providing funding for scholarships for women and students studying in STEM fields, particularly science and engineering at U of SC."**

**Do you see where I read that?**

A. Yes.

**Q. And this e-mail is dated February 25th, 2020; correct?**

A. Yes.

**Q. And do you recall earlier when we looked at the long e-mail thread marked as Exhibit 4 that**

**started with the e-mails between Martin and Cleta that were eventually sent to you, that you responded with the list of universities on February 28th, 2020.**
**Do you recall that?**
A. I'm pulling up that document. Yes, that is -- that is what it looks like. February 28th was when I responded to that e-mail.
**Q. And when we were going over that e-mail, you testified and told me that some time prior to sending that e-mail, you believed that you had contacted each of the universities listed in the e-mail except, at that time, University of Delaware; correct?**
A. That's what the e-mail implied, and I believe that to be true. I have no reason to doubt that.
**Q. And the e-mail we're looking at here, this would be one such communication that is indicated in that February 28th, 2020, e-mail.**
**And this is the communication to University of South Carolina; correct?**
A. This is an e-mail where I'm notifying Hossein and Bill about the interest in -- in scholarships. Yes.
**Q. Okay. And at this time, you're telling**

**them that the company Navatek will be providing the funding for the scholarships; correct?**

MS. BRONSTER: Objection. Misstates the document.

THE DEPONENT: I mean, I do think the document speaks for itself.

BY MR. ALLISON:

**Q. So it's correct that you are informing University of South Carolina that Navatek will fund these scholarships for women studying STEM fields?**

A. I think what it says is:

I am reaching out to let you
know that Navatek is interested
in providing funding for
scholarships for women students."

Et cetera. So, yes, that's what the e-mail says.

**Q. Okay. Next sentence says:**

**"We intend."**

**Who is the "we"?**

A. Good question. I don't know. So:

"We intend to make these
donations by way of a charitable
foundation set up for this
purpose."

I mean, really, I'm representing the company; right?

And so this gets back to my earlier testimony and comment that, at this time, it was not clear to me how Martin wanted to represent the scholarship program and specifically how much -- how much or how little he wanted to associate the company with the scholarship program. That was not 100 percent clear to me at the time I wrote this e-mail.

**Q. Is that why you continue in this e-mail by notifying Hossein and Bill that "we intend to make these donations by way of a charitable foundation set up for this purpose"?**

A. My confusion about how Martin wanted to -- to telegraph or communicate the source of funding in the scholarships is reflected in that statement. Yes.

**Q. And despite the fact that you had confusion about how these scholarships were funded, you, again, had no doubt in your mind that everything was being done legally?**

MS. BRONSTER: Objection. Asked and answered.

THE DEPONENT: Yeah. I'll repeat I had

concerns when the FEC complaint was published. But, again, I was told that all -- all the steps were being taken to ensure that everything was done legally.

BY MR. ALLISON:

**Q. Those concerns that you had, were any of them focused on yourself or for your own interests?**

A. I wouldn't say so. Again, I -- I was -- I never made any political contributions personally. I was an employee of the company. Everything that I was doing, I thought to be perfectly legal and ethical. So, no.

**Q. So then your concerns were for the company and for Martin; is that accurate?**

A. Yes, and the reputation of the company, of course. I'm a representative of the company so it's -- it reflects on everyone who works there.

MR. ALLISON: If we could scroll up and see Hossein's response. Okay.

BY MR. ALLISON:

**Q. So do you recall receiving Hossein's response?**

A. Yes.

**Q. So this is a pretty positive response from him; correct?**

A. Yeah. I mean he says:
"Thanks. This is wonderful news."
So that is possible -- positive.
**Q. And he says at the end of the second line going on to the third line:**
**"And I greatly appreciate the fine citizenship of Navatek."**
**Correct?**
A. That is what it says.
**Q. So he clearly understood from your e-mail that Navatek would be giving this money. Is that fair to say?**
MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.
THE DEPONENT: He's saying "I appreciate the fine citizenship of Navatek." So does that imply that he knows that Navatek is the one giving the money explicitly for the -- for the scholarships? I can't confirm that.
BY MR. ALLISON:
**Q. You don't think that's a reasonable inference to draw from his words here?**
MS. BRONSTER: Objection. Asked and answered. Calls for speculation. Lacks foundation.

THE DEPONENT: I can't answer the question.
BY MR. ALLISON:
**Q. You're going to stand by your prior answer, Mr. Hartman? You don't know?**
MS. BRONSTER: Objection. Argumentative. Same objections. Lacks foundation. Calls for speculation. Asked and answered.
THE DEPONENT: He appreciates the citizenship of Navatek. It's a positive e-mail. But does that imply that he knows the source of the funds? Not in my opinion.
BY MR. ALLISON:
**Q. Okay. At some point in time, you did personally become concerned about the outward associations between the company and the Society and yourself; correct?**
A. Is there a specific evidence or reference -- document you're referencing right now?
**Q. No, there's not, not at the moment.**
A. I mean, the big concern came when Martin was indicted.
**Q. Okay. But Martin was indicted on -- on or around September 30th, 2020; correct?**
A. Around there, yes.
**Q. Okay. So prior to September 30th, 2020,**

**was there a time where you became concerned about outward or public association of yourself with the Society?**

MS. BRONSTER: Objection. Vague.

THE DEPONENT: I wouldn't say that I personally became concerned especially of myself being associated with the Society. What -- what did happen was I was told probably most consistently and forcefully by Cliff to maintain separation between the Society, the company, and Martin.

BY MR. ALLISON:

**Q. And why did Cliff Chen tell you the basis for his concerns or the need for separation?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.

THE DEPONENT: Generally, it was to protect all parties involved, to protect Martin, to protect the Society, and to protect the company.

BY MR. ALLISON:

**Q. Okay. So to protect the Society and protect the company and protect all the parties involved.**

**Besides the Society and the company, who are the other parties involved?**

A. It was -- it was Martin and the company.

And, again, as a representative of the company, the company was my primary concern; right? So that's -- that's the real reason that it made sense to me when Cliff kind of mentioned and repeated that we should maintain that separation.

**Q. And so part of the reason why you wanted to extricate yourself from those outward or public communications had nothing to do with any concerns you had for yourself with respect to being associated with the Society?**

A. Well, there was a -- no. Short answer. No.

**Q. Okay. So conversely, it would be fair to say that if you were being publicly attached to the Society in this time frame, that would have been fine with you?**

MS. BRONSTER: Objection. Misstates the testimony.

THE DEPONENT: Grant, the company that I worked for already was publicly being attached to the Society; right? This article that was published in February of 2020 mentioned the article, mentioned the Society, mentioned the Collins donation.

BY MR. ALLISON:

**Q. We've spoken quite a bit and you've**

**provided quite a bit of testimony about how the concern was over bad press from those articles and you mentioned one by Civil Beat and one that was published in Maine in February 2020; correct?**
A. That's correct.
**Q. What was reason that the press -- that you considered the press to be bad?**
A. So university partners, like an e-mail that you referenced earlier from Sarah Castro at the University of Washington, politely declining to meet with the company. That's one small example where the University of Washington didn't pull out of a partnership but they did, I'll say, put a little distance between themselves and the company.
And my perception at the time was that it was due to the negative press around that article that you're referring to or one of the articles you're referring to.
**Q. Okay. And that article was based on the FEC complaint; correct?**
A. That's correct.
**Q. And so the distance that university partners like Washington and Sarah Castro were putting between themselves and the company that made it, as you put it, bad for business, that related**

**back to the FEC complaint as the source of the bad press; correct?**

MS. BRONSTER: Objection. Misstates the prior testimony. Objection to the preface.

THE DEPONENT: Yeah. I think you used words that I don't believe I used, but the bad press stemmed from the articles in February 2020 that tied the FEC complaint to the Society and made the connection from the Society to the company.

BY MR. ALLISON:

**Q. Okay. Let's take a look at exhibit -- or Document 12 now. We'll mark it as Exhibit 12.**

(Whereupon, Plaintiff's Exhibit 12 was marked for identification by the court reporter and is attached hereto.)

BY MR. ALLISON:

**Q. Okay. I want to ask you about -- I'm going to ask you about the e-mail at the end of this chain, it's the very first one on the very first page, and the one right below it.**

**So the one right below it is an e-mail from Kahele Lum to yourself with Lori Bofman and Cliff Chen also receiving it. The subject line is "Regarding Scholarship Programs - The Society" and**

**it's sent March 18th, 2020. And Mr. Lum Kee says:**
**"I already created a**
**tracking spreadsheet if needed.**
**Thanks."**
**Do you see that?**
A. Sorry. I'm just catching up. The court reporter just dropped the document in the chat just now. Downloaded it. Getting --
THE MODERATOR: Counsel, what page was that?
THE DEPONENT: What page is it, please?
BY MR. ALLISON:
**Q. It's on the first page. We're looking at it there on the screen, the middle bottom half of the page. He says:**
**"I already created a**
**tracking spreadsheet if needed.**
**Thanks."**
A. Okay. I see it.
**Q. Do you remember that tracking spreadsheet? Do you remember seeing it?**
A. No. And the answer, to be more specific, I don't remember seeing it.
**Q. Okay. And then you respond:**
**"Yes, that would be good for**

**me to see, for my awareness.**
**Where is it located? Is it possible to put it on a shared drive with restricted access?"**
**Do you see your response there?**

A. Yes.

**Q. Why did you respond and ask for it to be put on a shared drive with restricted access?**

A. Anything that is even partly sensitive on a company folder is generally on a restricted drive where it's not open to the entire company. So even then at the company, we had what's called least privileges, meaning any user of your system shouldn't have access to any documents that they don't have a need to know.

So their -- the restricted access drive, I think it was a shared folder but -- that said restricted -- was for anything, again, even NDAs and MOUs and things like that. So, again, a place where you can control the access privileges of the folder structure.

**Q. Who was it that you imagined would have access to this restricted folder containing Mr. Lum Kee's tracking spreadsheet about the Society scholarship programs?**

MS. BRONSTER: Objection as to form.
THE DEPONENT: I don't recall specifically. Yeah. So I'll stop there.
BY MR. ALLISON:
**Q. Was there any specific person that you wanted to prevent were accessing this document?**
A. My assumption is that Martin would have wanted the people working on the -- the PR plan, the public relations plan, to have access to it. So that would include Troy Keipper, Martin [sic] Schmicker, Lori Bofman, Cliff, Kahele, myself, him.
I don't know if there is anyone else. Oh, maybe Karen Ernst, the HR manager and, later on, Jen Oliver who is the marketing person at the company.
So those are the folks who I would assume Martin would want to have access to it. And basically anyone who didn't have a need to know would be -- would not have access to the folder. That's about it.
**Q. And you mentioned a moment ago that part of the reason you placed something on a shared drive with restricted access is because it's sensitive in nature.**
**Did I get that right?**
A. Yes. In the broadest sense; right? So

even -- even very basic agreements, the way -- you know, we -- the company treated IT was that only folks who have a need to know should be able to access certain files and folders.

**Q. What made this particular subject matter or document a need-to-know or sensitive document?**

MS. BRONSTER: Objection. Misstates the testimony.

THE DEPONENT: I think every -- for any project, the people who have a need to know are the people working on that project; and anyone who's not working on that project does not have a need to know.

So I don't think it's that this information was particularly sensitive. It's just that this was a project in which a certain of number of people were working on it. Those who weren't working on it don't need access to it.

BY MR. ALLISON:

**Q. So it's fair to say that the Society scholarship program was considered by you to be a company project to which you were assigned to work on?**

A. Supporting what I saw as the public relations plan to improve the public image of the company was a project I was assigned to. As part of

that, assisting with the list of universities and the scholarship amounts and, you know, ensuring that those were pushed forward, that was part of the project. And, yes, it was a company project. At least, that's what I was told by Martin.

MR. ALLISON: Okay. Notwithstanding my little two-minute break to restart my computer, it's been about an hour.

Would you like a five-minute break, Court Reporter and Mr. Hartman?

MS. BRONSTER: I would actually like one.

MR. ALLISON: Sure. We'll go off the record now and come back in five. Thanks.

MS. BRONSTER: Thanks.

(Whereupon, a recess was held from 8:44 p.m. to 8:52 p.m.)

MR. ALLISON: Okay. Let's bring back up the document we previously marked as Exhibit 14, please. Okay.

BY MR. ALLISON:

**Q. So, Mr. Hartman, we looked at this earlier.**
**Do you recall looking at this e-mail?**

A. Yes.

**Q. Okay. And you received this e-mail on March 25th, 2020; correct?**

A. I believe so. That's what it says in the document.

**Q. Okay. And just to refresh you on what this e-mail says, Bill Canfield's e-mailing yourself and Martin Kao and no other recipients an e-mail with the subject line, Society Letter to Cleta Mitchell. And he starts by saying:**

**"Cleta has asked for a brief letter explaining the purpose of the Society for inclusion with her pending response to the FEC in the complaint involving the Collins super PAC."**

**Do you see that?**

A. Yes.

**Q. Earlier you -- I had asked you questions and you had testified about what the purpose or business of the Society was as of late 2019.**

**Do you remember that discussion?**

A. Vaguely. It's getting late, been a lot of questions, but if you want to repeat so I know for sure what you're talking about, that would help.

**Q. Sure. I believe you told me that in late 2019, you were aware that the Society had made the $150,000 donation to 1820 PAC which supports Senator**

**Susan Collins; correct?**

MS. BRONSTER: Objection. Misstates the testimony.

THE DEPONENT: My understanding as of late 2019 was that there was a -- there was a donation made and that it was to the 1820 PAC. My understanding of what the 1820 PAC was was to support the campaign of Senator Collins.

BY MR. ALLISON:

**Q. Okay. And then some time later, starting in February of 2020, you started to undertake an effort on behalf of the company through the Society to issue scholarships through the Society; correct?**

MS. BRONSTER: Objection. Misstates the testimony.

THE DEPONENT: In February 2020, there was an article published about an FEC complaint and I was asked to help with what I considered a public relations campaign for the company.

BY MR. ALLISON:

**Q. And that public relations campaign was premised on the Society giving scholarships to women studying engineering or science-related fields; correct?**

A. Part of -- again, Martin's plan for this

improvement of the public image of the company did involve scholarships going to women studying science and engineering.

**Q. Okay. But prior to Martin coming to you and asking you to start making connections between the Society and the specific universities, the Society to your knowledge had never given any scholarships; correct?**

A. I wasn't aware of any scholarships prior to that date. But, again, Martin had many business dealings, other foundations. I wasn't privy to all of his business.

**Q. Okay. And prior to that date, prior to early February 2020, the only action that you knew the Society to have taken was the $150,000 donation to Senator Collins' PAC; correct?**

MS. BRONSTER: Objection. Misstate the testimony.

THE DEPONENT: Insofar as the entity could take an action, the only action I was aware of was -- was especially -- you know, what was alleged in the FEC complaint, that there -- a donation was made by the Society to the 1820 PAC and I --

BY MR. ALLISON:

**Q. You're also generally aware at that time,**

**Mr. Hartman --**

MS. BRONSTER: Please let the witness finish his answers.

BY MR. ALLISON:

**Q. Were you finished, Mr. Hartman?**

A. I can't remember what I was going to say, so -- I think I was still talking, but I can't remember what I was going to say. So go ahead.

**Q. Similarly, at that same time in or around late 2019 or early 2020, you were also generally aware that the Society had been registered and formed only a few months prior, sometime in late 2019; correct?**

A. I had never seen the articles of incorporation or any corporate documents related to the Society. I don't recall ever seeing those. So my understanding was that some time in the -- in late 2019, Martin stood up the Society but I, again, don't have definitive proof as to exactly when it was formed.

**Q. Okay. So prior to you taking any actions on behalf of the company and Society to arrange scholarships be paid out by the Society, what was your understanding of the purpose of the Society?**

MS. BRONSTER: Objection. Asked and

answered. And objection. Vague as to time.

THE DEPONENT: So is the question prior to February 20, what was my understanding of the purpose of the Society? Is that it?

BY MR. ALLISON:

**Q. That's correct.**

A. Again, based on the title, Young Women Scientists and Engineers, and I think -- you know, I don't recall Martin ever talking to me about a grander vision for the Society, but it was called Society of Young Women Scientists and Engineers. The only activity I was aware of was the Collins 1820 PAC donation. I was not made aware of other -- another purpose prior to February 2020.

**Q. Didn't you testify earlier that it was your understanding as of late 2019 that Martin created the Society in order to make the contribution to 1820 PAC?**

MS. BRONSTER: Objection. Asked and answered.

THE DEPONENT: I think I -- I think I just answered that, didn't I?

BY MR. ALLISON:

**Q. Okay. So -- well, no. Mr. Hartman, I don't think you did. So do you have an answer to**

**that question?**

**Late 2019, was it your understanding that Martin created the Society for the purpose of making the contribution to 1820 PAC?**

MS. BRONSTER: Objection. Asked and answered. And argumentative.

THE DEPONENT: Again, all I can say is what I know. I was never sat down by Martin and told for the grand purpose of the Society. I was copied on e-mails in late 2019 that discussed the check that the Society would be making and that I believe it was recently stood up and that's the only activity that I was aware of. So I did not see a founding charter or operating agreement or mission purpose statement of the -- of the entity.

BY MR. ALLISON:

**Q. To be clear, when you used the phrase "stood up," do you mean to say that -- is that an analog for created or formed or registered the company? The company, in this case, being the Society?**

A. When I said "stood up," I meant formed, legal entity being formed, incorporated.

**Q. Okay. Thank you.**

A. Or organized. Yeah.

**Q. Thank you. Second sentence of this e-mail we're looking at, Mr. Canfield says to you and Martin as the recipients:**

**"What she intends to indicate in her response is that the super PAC accepted a legitimate contribution from an LLC and that there is a factual basis for asserting that the LLC was not formed for the purpose of making that contribution."**

**So my first question here, Mr. Hartman, the reference to LLC, what did you understand Mr. Canfield to be referring to in this e-mail as the LLC?**

MS. BRONSTER: Objection. Lacks foundation. Calls for speculation.

THE DEPONENT: This is March 25th, 2020, from Bill Canfield to Martin and myself. Society letter to Cleta Mitchell. I think I understand this LLC to mean the Society.

BY MR. ALLISON:

**Q. Okay. And the legitimate contribution discussed in this sentence, what was your understanding of the legitimate contribution?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.

THE DEPONENT: (Reading:)

"What she intends to indicate in her response is that the super PAC accepted a legitimate contribution from an LLC."

I believe he's referring to the contribution made by the Society to the 1820 PAC.

BY MR. ALLISON:

**Q. And when he uses the phrase "that contribution," you understand -- did you understand upon receiving this e-mail that that contribution was a reference to the $150,000 donation from the Society to 1820 PAC?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.

THE DEPONENT: I wasn't aware of any other contribution that Martin was -- that this e-mail could be referring to. So that would have been my assumption.

BY MR. ALLISON:

**Q. Okay. And in the same sentence, the phrase "factual basis for asserting that the LLC was not**

**formed for the purpose of making that contribution," what did you understand at the time you received this e-mail the words "factual basis" to be in reference to?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.

THE DEPONENT: You're saying factual basis for asserting -- I'm sorry, Grant.

Can you please repeat the question?

BY MR. ALLISON:

**Q. Sure. The words "factual basis" in the context of this sentence we're looking at, what is it you understand factual basis to mean or reference at the time that you received this e-mail in 2020?**

MS. BRONSTER: Same objections. Lacks foundation. Calls for speculation.

THE DEPONENT: Yeah. I can't say that I understood this e-mail in detail and exactly what it meant, the implications, and the legality of -- of the situation. So I did not -- I didn't understand --

(Speaking simultaneously.)

BY MR. ALLISON:

**Q. -- sentence means that we're looking at?**

A. Sorry. I was trying to finish the

sentence.

MS. BRONSTER: Sorry. Can we speak one at a time, please? I think it'll help the record.

THE DEPONENT: I can't say that I had a basis for understanding that sentence and what it meant in the context of the laws surrounding campaign finance.

BY MR. ALLISON:

**Q. Why are you discussing laws surrounding campaign finance?**

**The question is what is your understanding of the phrase "factual basis" in that sentence?**

MS. BRONSTER: Objection. Asked and answered. Calls for speculation. Lacks foundation.

THE DEPONENT: I'm discussing campaign finance because this is -- and laws because this is an e-mail to a lawyer about campaign finance.

BY MR. ALLISON:

**Q. Okay. So back on the question at hand, Mr. Hartman. What is your understanding of the phrase "factual basis" in this sentence at the time you received the e-mail in 2020?**

A. I did not understand what he meant by that.

**Q. Okay. You didn't think that it referred to what the first sentence referenced, the purpose of**

**the Society and the giving of scholarships?**

MS. BRONSTER: Objection. Argumentative. Asked and answered. Calls for speculation. Lacks foundation.

THE DEPONENT: Again, I gave you the answer.

BY MR. ALLISON:

**Q. Okay. So you don't -- you don't know. That's your answer? You don't know what "factual basis" refers to?**

MS. BRONSTER: Objection. Asked and answered. Argumentative. Lacks foundation. Calls for speculation.

MR. ALLISON: No. Respectfully, he has not answered the question.

BY MR. ALLISON:

**Q. So, Mr. Hartman, the question is pending. Please either explain your understanding as of 2020 when you received the e-mail or state clearly that you just don't know.**

MS. BRONSTER: Objection. Asked --

THE DEPONENT: I just don't know.

MS. BRONSTER: Objection. Asked and answered. Calls for speculation. Lacks foundation.

///

BY MR. ALLISON:

**Q. Okay. So this sentence here that we just read, it's clearly saying that Cleta Mitchell wants the information about the Society scholarships that you're arranging because she's going to provide that to the FEC and make the claim that the Society was set up for making scholarships and not for making a $150,000 contribution to the 1820 PAC; isn't that right?**

MS. BRONSTER: Objection. Objection. Argumentative. Asked and answered. Lacks foundation. Calls for speculation.

I think you're wasting time here, Grant. I think you should just move on. You've done this repeatedly.

MR. ALLISON: Stop testifying for the witness. You know that's not proper.

MS. BRONSTER: I am not testifying. I'm making proper objections.

MR. ALLISON: No, you're not, and you know you're not.

MS. BRONSTER: Absolutely. And if you run out of time and seek more time, this will be an example of how you're wasting the time that you need.

MR. ALLISON: I think your three- or

four-minute long objection is going to be an example of why more time is needed.

BY MR. ALLISON:

**Q. But, Mr. Hartman, please answer the question.**

MS. BRONSTER: He's answered the question. Same objections. Argumentative. Calls for speculation. Lacks foundation.

BY MR. ALLISON:

**Q. Okay. Very well. You're not going to answer the question.**

**Let's take a look at the letter that you received attached to Mr. Canfield's e-mail.**

MR. ALLISON: Please bring up Document Number 15.

MS. BRONSTER: Objection to the characterization.

THE DEPONENT: Is that one that's already been sent or is that a new one that's coming soon?

(Whereupon, Plaintiff's Exhibit 15 was marked for identification by the court reporter and is attached hereto.)

BY MR. ALLISON:

**Q. Do you recall receiving this letter**

**attached to the e-mail we just looked at, Mr. Hartman?**

A. Exhibit 15. Okay. This is a letter from Bill Canfield marked -- dated March 25th. It looks like it was to -- I vaguely recall this letter.

**Q. Okay. And do you recall making edits or changes to this letter?**

A. I think this is one in which I was asked to make edits to. Yes.

**Q. Can you tell me what lines you edited or what changes you made?**

A. No, I'm sorry. I don't recall.

**Q. Okay. And after you made your changes or edits, anything that you didn't change or didn't edit, does that mean that you were accepting of that information or content in the letter?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: I was asked to review this related to, you know, both general flow; consistency; reference to STEM, higher education; that sort of thing for, you know, correctness, that sort of thing.

Not asked to comment on any -- anything related to the actual limited liability company; articles of organization; these other, I would call, legal or corporate details of which I had no

information.

BY MR. ALLISON:

**Q. At the time that you read this letter and made the edits to it that you made on or around March 25th, 2020, were there any factual items included in this letter that you disagreed with?**

A. I don't recall.

**Q. How about the first sentence of the second paragraph? I'll read it to you. It says:**

**"The purpose for which the Society was formed is to encourage and support young American women who are, or shortly will, be pursuing educational opportunities in the areas of science, technology, engineering, and mathematics, the, quote, unquote, "STEM" disciplines."**

**As of March 25th, 2020, did you agree that that was a factually accurate and correct statement?**

A. Martin Kao set up this Society and his purpose or motivation were unknown to me; right? All I can -- all I can say and all I can testify to are the actions that I either heard through e-mails from

Martin, saw in the FEC complaint, saw evidence of actions that the Society took.

I cannot speak to the purpose for which the Society was formed which is Martin -- in Martin's head. I -- I had no basis with which to agree or disagree with that statement. This is Martin's Society. He -- I'm going to trust that he knows and understands the purpose of the Society he formed and so I was not asked to comment on that sentence.

**Q. Isn't that sentence contrary to the facts that you yourself knew at the time?**

A. Again, Grant, my perception was only of the actions of the Society. If Martin had a purpose that he hadn't shared with me, I left that open as a possibility.

If he intended all along to donate scholarships via this Society and that's why he named it Society of Young Women Scientists and Engineers, I'm going to go ahead and leave that possibility open in my mind. And all I can speak to are the actions that I knew and the little bit I gathered about what the Society was doing up until this point.

**Q. Right. But those actions that you knew included, first, that as of late 2019, the Society had given $150,000 to 1820 PAC; correct?**

MS. BRONSTER: Objection. Misstates the testimony. Argumentative.

THE DEPONENT: Based on the FEC complaint in February of 2020, I was aware that there was an allegation that the Society had made a $150,000 donation to Senator Collins' 1820 PAC.

BY MR. ALLISON:

**Q. You also knew that because you were testified that you were copied on e-mails in late 2019 that indicated the same; right?**

A. They indicated Martin's intent. Again, I didn't ever see a check. I didn't ever see a balance sheet or financials of the Society that proved that that actually occurred.

**Q. The fact that you were aware of as of March 25th, 2020, as it relates to the Society is that it hadn't started giving out any scholarships or making efforts to do so until you were asked to spearhead that effort after the FEC complaint was filed; correct?**

A. I was not aware of any other efforts or actions that the Society took other than a donation to the Collins 1820 PAC prior to February 2020.

**Q. So given those two facts, I will ask you again, Mr. Hartman.**

**Do you still believe that the first sentence of the second paragraph discussing the purpose for which the Society was formed was accurate and correct as of March 25th, 2020, when you reviewed this letter for the first time?**

MS. BRONSTER: Objection. Argumentative. Asked and answered.

THE DEPONENT: I think I have directly answered this question.

BY MR. ALLISON:

**Q. And you also knew at the time in February 25th, 2020, that this information was being provided to the FEC in response --**

MS. BRONSTER: Did you mean March, Grant?

MR. ALLISON: Yes.

MS. BRONSTER: Did you mean March?

MR. ALLISON: 25th, 2020.

MS. BRONSTER: Why don't you restate. You mentioned February that's why.

MR. ALLISON: Sure. I'll restate the question.

BY MR. ALLISON:

**Q. Mr. Hartman, you knew that as of March 25th, 2020, when this letter was written and you reviewed it, that the purpose of this letter was**

**that it would be provided to the FEC in response to its complaint; correct?**

A. That was my understanding based on e-mails that I was copied on.

MR. ALLISON: Okay. I want to look at Document 16 now, please, and we'll mark it as Exhibit 16 as well.

(Whereupon, Plaintiff's Exhibit 16 was marked for identification by the court reporter and is attached hereto.)

BY MR. ALLISON:

**Q. And if we scroll all the way to the bottom, we can just take a look at what's at the bottom.**

**So this is a draft of that PR plan that we discussed earlier for the Society; is that correct?**

A. This -- let's see. So which page of Document 16 are we looking at?

**Q. It's parts of the last three pages.**

A. Okay. Beginning on Page 2? Is it starting on Page 2?

**Q. Yeah. That looks right.**

A. Okay. Yes, I think so. The subject of Mike Schmicker's e-mail is "SYWSE PR plan."

**Q. Okay. And if we look at the bottom of the**

**first page and going on to the second page, there's a e-mail from you with three bullet points; correct?**

A. Yes. So that -- you're talking about the e-mail from me, March 30th at 2:24 a.m.?

**Q. That's right.**

A. Okay. Yes, I see that.

**Q. Okay. And in this e-mail, you're calling for changes to the PR plan; correct?**

A. I'm questioning two parts of the PR plan and making one additional suggestion.

**Q. Okay. So I want to go over those first two parts, those first two suggestions. The first one under bullet point one, you're essentially saying that we should not connect Martin and the company to the Society; correct?**

A. What I say in the e-mail is:

"Are we ready to come out and admit the connection there?"

Referring to:

"The Society was created by Navatek CEO Martin Kao and his family to support young women engineers."

So I'm questioning this PR plan connecting Martin, Navatek, the company, and the Society because

this is something that Cliff has been pounding on to keep the separation between the Society and the company.

**Q. And then in the second suggestion, you're calling for a change with respect to the PR plan's potential notification of media including Civil Beat; correct?**

A. Yes.

**Q. And you don't want to contact Civil Beat to notify them of the Society's efforts in making scholarships; correct?**

A. Well, I'm commenting on Mike's PR plan which is down at the bottom of Page 3 of this document. It says:

"Hawaii, Civil Beat reporter who wrote original story. E-mail from Lori as Society agent with copy of UH news release thanking Society, thought you might be interested in this. Also see web now up. New office at X address."

So, in other words, Mike is suggesting that Lori, as the Society's agent, e-mail a copy of the University of Hawaii scholarship directly to the

Civil Beat reporter who wrote the original story. I'm suggesting that's not a good idea.

**Q. And was it that Mike just wasn't really aware of the bad press and the Civil Beat article that had been written?**

A. No. Mike was well aware that was the purpose of the PR plan.

**Q. Okay. And in Number 2, you mentioned that you have concerns that the scholarships will be seen as a new twist upon, quote, unquote, "pay to play."**

**What did you mean by "pay to play"?**

A. The article that was published by Civil Beat, if I'm not mistaken, mentioned pay to play. So that was already an accusation that was being leveled at the company and at Martin.

So a reporter who is pointing at that, making that accusation, might be inclined to see any -- anything related to scholarships, good press, that sort of thing as -- see sinister motive or a nonpositive motive to -- to those scholarships.

**Q. Is pay to play, as you used the phrase in this e-mail, something that is illegal or could be illegal?**

A. Pay to play is a phrase that gets used --

MS. BRONSTER: Objection to the extent it

calls for a legal conclusion.

THE DEPONENT: Strictly speaking, no, because pay to play is used by many people in different -- many different contexts and many of them are legal.

BY MR. ALLISON:

**Q. Yeah. But if many of them are legal, then that means that some of them are illegal; is that correct?**

A. Pay to play is a widely used term and, frankly, I don't think it has a standard definition across -- universally.

Are there -- are there instances of the use of the word pay to play that could be referring to illegal activity? Yes.

**Q. Was the Society's donation of $150,000 using company money to the 1820 PAC a form of pay to play as you used the phrase in this e-mail?**

A. What I'll restate is what I've been saying all evening which is Martin had made a donation via the Society. There was an FEC complaint published. I had -- I had concerns about it. There was, again, a complaint filed. But at that time, I did not believe that what he did was illegal.

**Q. Okay. But was it pay to play which a**

**moment ago you just said is not always illegal?**

MS. BRONSTER: Objection. Asked and answered.

You may answer it again.

THE DEPONENT: What's your definition of "pay to play"?

BY MR. ALLISON:

**Q. I don't need to give a definition, Mr. Hartman. I'm relying on your definition, the way you used the phrase in the e-mail we're looking at.**

A. Okay. So when I used the pay to play in the e-mail, I'm speculating as to what the reporter thinks of the company. The reporter thinks that the company is participating in pay-to-play activities; right?

And so in the defense industry, including by Steven Loui himself, pay to play could be considered legal personal donations up to your personal maximum to a politician who has power and appropriation authority over government contracts; right?

That could be seen as pay to play. Navatek was already known in Hawaii as being very politically active; right?

So in that sense, legal campaign donations

in which you are legally making relationships, making -- having positive goodwill with members of Congress or legislators, there's a legal a way to do that; right?

Could a reporter still call that pay to play? Yes.

Does that help?

**Q. No, it doesn't answer my question, Mr. Hartman.**

**Once again, the question is was the $150,000 donation by the Society using company money to 1820 PAC in late 2019 a form of pay to play as you understood and used the phrase and words in this e-mail?**

MS. BRONSTER: Objection. Misstates the testimony. Misstates the evidence.

You may answer.

THE DEPONENT: I am -- I am not -- I would not characterize it that way. I would not use the phrase "pay to play" with respect to -- to this scenario.

BY MR. ALLISON:

**Q. Why not?**

A. At the time, I would have called -- I mean, I would have used the words "pay to play" only to

describe activities that were not legal. And at the time, I understood Martin -- again, his reassurance to me that what he was doing at the time was legal.

**Q. So pay to play is only illegal activities, now, that's your testimony?**

MS. BRONSTER: Objection. Misstates the testimony.

THE DEPONENT: Correct. I'm not the arbitrator of the definition of pay to play. Different people use the word differently. I --

BY MR. ALLISON:

**Q. How do you -- sorry. Go ahead.**

A. I would use the words "pay to play" in the context of something that was illegal.

**Q. And so as you used it here in this e-mail that we're looking at, you're talking about illegal conduct?**

MS. BRONSTER: Objection. Misstates the testimony. Asked and answered.

THE DEPONENT: Again, the reporter was making accusations of pay to play already. I was referring to his accusations.

BY MR. ALLISON:

**Q. So that I understand correctly then, the reporter was making accusations of illegal conduct**

**and that's what you meant by the words "pay to play" in this e-mail?**

MS. BRONSTER: Objection. Misstates the testimony. Asked and answered.

You may answer again.

THE DEPONENT: Again, because there was an FEC complaint filed, there was -- there was an insinuation and an allegation that the activity was illegal; right?

BY MR. ALLISON:

**Q. Thank you. At the very bottom of the second bullet point paragraph, you say:**

**"I'll suggest we strengthen PR in every other area but for now we don't poke the snake. My two cents anyway."**

**What did you mean by "don't poke the snake"?**

A. I think I was referring to the reporter who had published an article that had negative press about the company.

**Q. Okay. Mr. Hartman, did you believe Martin that he wanted to make philanthropic donations to women studying STEM fields?**

**And if you didn't understand, I can**

**rephrase.**

A. Sure. Go ahead and rephrase, please.

**Q. Sure. My question is did you believe Martin had a genuine interest in making these philanthropic scholarship donations to women studying engineering- and science-related fields? Was it a genuine effort? Did you believe that?**

MS. BRONSTER: Objection. Vague as to time.

THE DEPONENT: Yeah. When -- when do you mean?

BY MR. ALLISON:

**Q. Let's say as of -- let's see. What's the date of this e-mail we're looking at? As of March 30th, 2020. It's the date you sent this e-mail so let's use that date.**

A. I understood Martin to want to have a respected and successful company, and I understand that he saw the benefit in a scholarship program like this for the purpose of having a successful company.

**Q. So it wasn't necessarily about funding scholarships for women, it was more a means to an end for Martin, in your opinion?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: Again, I'm not inside his

head, but from what I knew about Martin, funding scholarships for women scientists and engineers on its own, do I think he would have done that without any other benefits to his organization's or his own reputation just by itself, like, anonymously? No.

BY MR. ALLISON:

**Q. Okay. Why don't we take a look at Document 19.**

THE MODERATOR: Counsel, it's Document 18?

MR. ALLISON: No, 19. We're skipping ahead.

THE MODERATOR: 19. Thank you.

MR. ALLISON: Actually, you know what, Andrew? We'll do both 18 and 19. You can start putting them both in the chat.

(Whereupon, Plaintiff's Exhibit 18 was marked for identification by the court reporter and is attached hereto.)

BY MR. ALLISON:

**Q. We'll look at 18 first. And let me know when you have that in front of you, Mr. Hartman.**

A. You want 18 first? Is that correct, Grant? 18?

**Q. This is -- correct. This is the one.**

**Do you recognize this document?**
A. No. No. I don't.
**Q. I understand this to be like an internal company document that memorializes a pay increase that you received, and it's dated March 23rd, 2020.**
A. Okay.
MS. BRONSTER: Objection to counsel testifying.
BY MR. ALLISON:
**Q. Did you receive a pay increase from 210,000 per year base salary to 230,000 per year base salary on or around March 23rd, 2020?**
A. I would have to go back to my paychecks to really confirm that specific date but generally that aligns with my memory.
**Q. Okay. And then we'll take a look at Number 19 now.**
MS. BRONSTER: Grant, did we skip 17?
MR. ALLISON: Yes, we did.
MS. BRONSTER: Thank you.
(Whereupon, Plaintiff's Exhibit 19 was marked for identification by the court reporter and is attached hereto.)
///

BY MR. ALLISON:
**Q. Okay. So, you know, same general question, Mr. Hartman.**
**Do you recognize this document?**
A. Again, I don't think I ever saw this document. I don't recall seeing this document.
**Q. Okay. Well, on it's face, the document says that it is dated April 1st, 2020. So it's about a week after the last one we just looked at. And this document does not make a pay rate or salary increase like the prior document does, but on the right-hand side under Other Status Changes, it has remarks and it says that -- basically says you're receiving a new title and position, Vice President, Strategic Partnerships; correct?**
MS. BRONSTER: Objection. Objection. Lacks foundation. The witness said that he doesn't think he's ever seen this document. It's inappropriate to ask him questions about it.
THE DEPONENT: I can confirm that that's what's written on the document.
BY MR. ALLISON:
**Q. Did you receive the title -- new title and position on or around April 1st, 2020, to be the vice president of strategic partnerships?**

A. Some time around that time period, I do recall my title changing to vice president of strategic partnerships.

**Q. And sometime after this I think it was in or around August 2020, your title increased again to senior vice president of strategic partnerships; is that correct?**

A. I'd have to look at company documentation to know the exact date or month, but generally that is what I recollect.

**Q. Did you receive a pay increase when you were elevated from vice president of strategic partnerships to senior vice president of strategic partnerships?**

A. I don't believe so.

**Q. Okay. This document says in the remarks that, quote:**

**"A large part of functional reporting to Martin Kao on congressional business development and new relationships."**

**Is that an accurate statement that a large part of your functional reporting from this date on was to Martin Kao on congressional business**

**development and new relationships?**

A. I was responsible for congressional business development and new university relationships as primarily the relationships I was in charge of.

**Q. And did you report directly to Martin Kao on that subject matter?**

A. I mean, I never directly reported to Martin in the org chart or officially in any capacity, but did I work with him on those areas? Yes.

**Q. And that is closely related or the same type of job functions that you were doing on behalf of the company via the Society in making connections with the university partners for Society scholarships; correct?**

A. I would disagree with that characterization.

**Q. How -- how and why would you disagree with the characterization?**

A. The tasks I was asked to perform that related to the Society, in my mind, were related to public relations and marketing more than anything. So they were not part of business development or new university partnerships. They were, again, public relations damage control.

**Q. Okay. I want to take a look at Document 20**

**now. And we'll mark this as Exhibit 20.**

(Whereupon, Plaintiff's Exhibit 20 was marked for identification by the court reporter and is attached hereto.)

BY MR. ALLISON:

**Q. Okay. This is a pretty lengthy e-mail chain. I don't want to ask you about every e-mail in here, but one that I do want to ask you about starts at the very bottom of Page 7 and goes on to Page 8. Yeah, this e-mail here.**

**So here's an e-mail from you to Chenoa Diehm. Am I saying that correctly?**

A. I don't know if I ever knew how to pronounce her last name. Good enough.

**Q. Okay. And who was she?**

A. She was employed by the company on a part-time basis, and she started kind of right before I left Hawaii helping out with just kind of administrative tasks. So kind of supporting -- I didn't -- I didn't ever see a job description so I didn't know exactly what she was supposed to do.

I think Martin knew her personally and had hired her really without my input. So I wasn't sure exactly what she was supposed to do. But generally

she was trying to help -- help with -- with my tasks related to university partnerships. That was part of her job.

**Q. Okay. And in the list that you provide here in the e-mail, there's a couple of universities that have some old language including University of New Hampshire where you say that you're meeting with them soon; University of Delaware where, again, you say you're meeting with them soon; and if you scroll down a little bit, University of Washington which you, again, say you're meeting with them soon.**

**Do you see that?**

A. Yes.

**Q. So why was the instruction from you to hold off on further action with respect to those three universities pending your meeting with them?**

A. I don't recall.

**Q. Your meetings with them, was that to discuss the scholarships?**

A. So if these are university partners that we're pursuing, the meetings were likely primarily about the partnership. So I may have been saying "meeting with them soon" because in a meeting that's primarily about the partnership, mentioning this, you know, to the university representative verbally or in

person might have been what I was -- what I was implying that I would do.

**Q. The next e-mail up is an e-mail from you to a number of recipients that are copied, but the e-mail goes to Chenoa Diehm and Lori Bofman; correct?**

A. Yes. I see those two in the To line, although the e-mail is just addressed to Lori.

**Q. Yeah, just to Lori on the e-mail intro; I see that.**

**So in this e-mail, you are giving Lori direction on decisions that should be made with respect to the Society; is that accurate?**

A. Again, Martin had a lot of ideas and we would have meetings about these things and, generally, one of my roles was to summarize, you know, ultimately his decisions on what to do and capture them and write them for him and distribute them to whoever needed to take an action.

**Q. In doing that, if you distributed Martin's instructions to Lori or -- Lori Bofman or Chenoa Diehm and they struggled with those instructions or they didn't execute them correctly, was it your understanding that it would then be your role to step in and make corrections or direct them in the right -- to make the right actions?**

MS. BRONSTER: Objection as to form.
THE DEPONENT: I think my job as an employee at the company was to interpret Martin's direction and make sure it got carried out. Yeah.
BY MR. ALLISON:
**Q. In that sense, do you agree that you had some amount of oversight over Lori Bofman and, in this case, Chenoa Diehm with respect to the Society's scholarship programs and activities?**
A. Again, relaying decisions and intent from Martin to other people, at no point did either Lori or Chenoa -- well, I don't know if Chenoa actually functionally reported to me or not, but Lori -- Lori never did. So to your question about oversight, I wouldn't call it oversight.
**Q. Okay. I want to go to the bottom of Page 3.**
MS. BRONSTER: And, Duke, while there's no question pending, if I could just ask you to keep your voice up because there are times when I'm having difficulty in hearing you. Thank you.
THE DEPONENT: Sure.
MR. ALLISON: Okay. Let's leave it right there. Okay.
///

BY MR. ALLISON:

**Q. So there on the -- on Page 3 is an e-mail from Kahele Lum Kee and down below, we see an e-mail at the top of Page 4 also from Kahele Lum Kee. And both of these e-mails look to relate to the funding of these scholarships; correct?**

A. Both of those e-mails do appear to -- you know, the title is Scholarship Programs, the Society. And it does look like Kahele is talking about payments.

**Q. And Kahele is saying he's the one who's going to cut the checks for these scholarships, right, to fund them?**

A. I think -- well, let's go one by one. When he said on March 18th -- he says:

"I need to receive funding from Martin before checks are cut."

He --

**Q. And then -- sorry. Go ahead.**

A. He doesn't say explicitly that he is going to cut a check in that e-mail.

And then in the e-mail on March 23rd, what he says is, in the second sentence:

"I haven't cut checks yet

since I need to obtain funding from Martin once we determine the total need."

So that would imply that he's planning to cut checks once he obtains funding.

**Q. And Kahele, he was the controller of the company; correct?**

A. That's correct.

**Q. And is he the person who typically cut checks on behalf of the company?**

A. To be honest, that was a little opaque to me in the sense that we all had digital payroll and reimbursement for travel expenses and that sort of thing. So it was all electronic.

I don't recall him signing and handing me a check ever. So I would imagine so, that's typically the job of a controller, right, to make sure that checks are paid, accounts payables goes out.

**Q. And in the context of the company of Navatek's business at the time, March 2020, did you know Kahele Lum Kee to cut checks -- cut any other checks other than company checks in this context?**

A. I'm sorry. Can you be more specific?

**Q. Sure. Do you know or have any knowledge that Kahele had access to Martin Kao's personal**

**checking and could cut checks on behalf of Martin personally?**

A. I have no knowledge of that. I don't know.

**Q. Based on these e-mails and at the time you received them in March 2020, was it your understanding that Kahele is saying that he's going to be cutting company checks in this context?**

MR. KUBOTA: Objection. Calls for speculation.

MS. BRONSTER: Join.

THE DEPONENT: Yeah. I don't --

MR. KOBAYASHI: Join.

THE DEPONENT: He's not -- he's not attributing those checks -- the source of those checks in these e-mails, as far as I can tell.

BY MR. ALLISON:

**Q. So, as far as you can tell, you can't draw any conclusions about the source of funds or what checks are being cut here based on these e-mails?**

A. What I can say is that in the e-mail dated March 18th, it says:

I need to receive funding from Martin before checks are cut."

So what "from Martin" means, I don't know.

Whether that means from him personally, I don't know.

MS. BRONSTER: Grant, are we almost at a good breaking point?

MR. ALLISON: Let's finish with this document. Let's go just another two or three minutes and then we'll take a break.

MS. BRONSTER: Are you okay with that, Duke?

THE DEPONENT: Yes.

MS. BRONSTER: Okay.

BY MR. ALLISON:

**Q. Let's go up to the top of Page 2 now. This e-mail here from Lori Bofman, when you received this e-mail on March 23rd, 2020, did you understand this e-mail to be Lori explaining what she understood her marching orders to be with respect to the scholarship program and the Society?**

MS. BRONSTER: Objection. Calls for speculation. Lacks foundation.

THE DEPONENT: If you'll allow me to just read the e-mail briefly, I'll give you an answer.

I mean, it is what appears to be a -- Lori's description of what she thinks the steps are to carry out the tasks that she's been given related to the Society.

BY MR. ALLISON:

**Q. Okay. And the specific people who gave her those tasks are yourself and Cliff Chen; correct?**

A. Martin gave the direction about the list of universities he wanted to donate money to, the amounts, and generally that it should come from the Society. So that's --

**Q. Okay.**

A. -- filling in the details of the mechanics of how to carry that out, it generally was -- I mean, done in this fashion; right? Someone on the -- in this group suggesting this is how we should do it, and if there were modifications, somebody else would chime in.

BY MR. ALLISON:

**Q. Martin, to be clear, gave the instructions about the scholarships, who to contact, how much to give -- he gave those instructions to you and you were the specific person who then gave them to Lori Bofman; correct?**

MS. BRONSTER: Objection. Overbroad.

THE DEPONENT: I mean, I'll -- Martin met with this group multiple times to talk about this scholarship program. So was I sometimes involved in reminding Lori of the plan or making the plan more

detailed or helping her execute on those tasks? Sure, yes.

Was Cliff sometimes there, again, to help keep things on track? Yes.

So does that answer your question?

BY MR. ALLISON:

**Q. The day-to-day management of making sure that Martin's plan was enacted correctly, that fell to you and Cliff Chen; correct?**

MS. BRONSTER: Objection. Vague as to "plan."

MR. KOBAYASHI: Join. Lacks foundation. Calls for speculation.

MS. BRONSTER: Join.

THE DEPONENT: Again, Martin's -- Martin's plan was pretty detailed; right? These are the universities that need to receive checks, it should come from the Society, these are the amounts, it should happen as soon as humanly possible.

And those instructions were given to everyone working on the PR plan; right?

This is more than the people on this e-mail; right? Including Karen Ernst, Troy Keipper, Mike Schmicker. So to say that I and Cliff were giving directions and managing the operations, I

think, is -- is not an accurate characterization. Martin was -- was directing the operation.
BY MR. ALLISON:
**Q. Okay. Let go to the very last e-mail in this thread, meaning the first one on the first page. Here's an e-mail from yourself to Kahele Lum Kee and Lori Bofman with Cliff Chen copied but in the introduction to the e-mail, you're addressing it to Lori; correct?**
A. Yes. We're looking at the April 14th, 12:23 p.m. e-mail?
**Q. Correct.**
A. Yes.
**Q. So this is almost roughly three weeks later after the prior March 23rd, 2020, e-mails we were looking at.**
**And in this e-mail, you're pointing out to Lori that a mistake was made, that a specific university was left off the list of those that should be receiving scholarships through the Society; correct?**
A. This is letting Lori know that -- and, again, Martin being aware that South Carolina State was another potential university partner that was in the state and that we had already been talking to

related to recruiting and that sort of thing, Martin mentioned that, you know, this should be another university to add to the list.

**Q. And you were the specific person who was tasked with overseeing the company's employees executing the Society's objectives and you were the specific person who was empowered to go and give these directions to the group; correct?**

MS. BRONSTER: Objection. Compound. Objection as to form.

THE DEPONENT: You fit a lot in there. Martin was directing the activities of the Society.

BY MR. ALLISON:

**Q. Okay. But I -- I don't see Martin copied anywhere in these e-mails.**

**This e-mail's from you, right, Mr. Hartman?**

A. Correct. This would have been after a meeting with Martin in which he expressed his intent to me.

**Q. And then Martin instructed you to carry out his intent?**

A. That's correct. Just like the other folks at the company who were working on this PR plan to improve the public image of the company.

MR. ALLISON: Okay. We'll take a break.

Let's go off the record.
(Whereupon, a recess was held from 9:59 p.m. to 10:11 p.m.)
BY MR. ALLISON:
**Q. I want to look back at Exhibit 20 again for just a moment on the bottom of Page 6. And to refresh your recollection, Mr. Hartman, this was the last document we looked at before the break.**
A. Yes.
**Q. This e-mail here sent by you, Mr. Hartman, to Lori Bofman and Kahele Lum Kee, Cliff Chen, March 18th, 2020, 3:38 p.m. [sic], subject is Scholarship Programs - the Society.**
**I want to ask you about the second paragraph. You write:**
**"I will say that it probably wins us some points with the university by telling them now which could have a material effect on the result of the congressional request."**
**What did you mean by that sentence?**
A. So I think I mentioned it previously. Universities, like any organization, are happy to know that they're receiving money; right? So being

notified of a scholarship that's going to be funded for their university is -- is a very positive thing.

So what I'm saying there, "wins us some points," being -- the common ownership, so Martin Kao being the owner and CEO of the company and also being the one behind the Society and the scholarship program, probably wins us some goodwill with the university partners that -- that are being identified for scholarships.

**Q. And what effect would that have on the congressional request?**

A. I think what I am implying here, that it would have a positive effect on a congressional request.

**Q. And when you say "congressional request," are you speaking about programmatic adds or increases?**

A. Yes. It goes by many names but, yes, that's correct.

**Q. Is another name "plus up"? Do I have that correct?**

A. Yes.

MS. BRONSTER: Vague.

THE DEPONENT: Sorry. Go ahead, Margery.

MS. BRONSTER: I just said, Objection.

Vague.
THE DEPONENT: Okay. Requesting programmatic increases or plus-ups all mean similar things, and the term is used differently depending on who's using it.
BY MR. ALLISON:
**Q. Okay. And going back to the first part of this sentence, the "it" that you say -- I'll repeat the beginning part:**
**"I will say that it probably wins us some points."**
**The "it" that you're referring to, are those the Society scholarships that are being issued?**
A. (Reading):
"I will say that it probably wins us some points."
Frankly, scroll down to the other e-mail to see if there's anything I'm missing.
MR. ALLISON: Moderator, could you scroll down a little bit for Mr. Hartman, please.
THE DEPONENT: So back to your question. "I will say that it probably wins us some points," I think I'm referring to -- to scholarships.
BY MR. ALLISON:
**Q. Okay. So basically what you're saying is**

**that by giving the scholarships to universities in the districts of the members of US Congress on the Appropriations Committee, it could help us get -- "us" being the company -- it could help the company get programmatic adds or plus-ups?**

A. It could have, again, a positive effect. I don't think it's going to -- you know, I don't -- I didn't think at the time and I still don't think that would be -- that would be sufficient, but it can't hurt. It couldn't hurt, that's what I believed at the time.

MR. ALLISON: Moderator, could you go back up to the prior e-mail, please.

BY MR. ALLISON:

**Q. Mr. Hartman, aren't you underselling it a little bit because your e-mail here sent March 18th, 2020, says that it "could have a material effect on the result of congressional requests."**

**So didn't you say it would have a material effect?**

A. I mean, that's what I said in this e-mail, right, "which could have a material effect on the result."

**Q. Okay. Let's take a look at Document 22, please.**

(Whereupon, Plaintiff's Exhibit 22 was marked for identification by the court reporter and is attached hereto.)

THE DEPONENT: And may I clarify my statement? When I said "it wouldn't be sufficient," I meant the amount of steps required to successfully have a programmatic budget increase funded are numerous.

And so simply donating scholarships to the university in a district is like, you know, a cherry on top. But there's a -- a lot of other activity that's required to -- to make that happen. So that's what I was referring to in my prior statement.

BY MR. ALLISON:

**Q. And if we could take a look at -- well, take a look at this first page.**

**You recognize this first page of this PowerPoint presentation, Mr. Hartman?**

A. Yes.

**Q. You drafted this PowerPoint presentation; correct?**

A. If it's the same one I think it is. This -- so is this being provided in the chat?

**Q. It is. I see it there. Yes.**

A. 22? I'm loading it and opening it. I'd like to just scroll through, make sure this is the one. I think it is. Yes.

**Q. Do you recall when you drafted this document?**

MS. BRONSTER: I'm sorry. I didn't hear you, Grant.

MR. ALLISON: The question was does he recall when he created the document?

THE DEPONENT: I want to say -- I believe it was some time in the month of September 2020 or soon -- soon prior to that, but probably in the month of September.

BY MR. ALLISON:

**Q. Okay. Can we take a look at Page 8, please. And I want to direct your attention to the graphic on the right side that has a triangle with three points, the three points being the University of Rhode Island; and then a member of Congress, Jack Reed; and then the third point being Martin Defense Group or the company.**

**Do you see that? Does this graphic and the information on this slide summarize or restate what we just spoke about in terms of your e-mail that you sent stating that the scholarships by the Society can**

**score points resulting in programmatic ads for the company?**

MS. BRONSTER: Objection. Vague.

BY MR. ALLISON:

**Q. This slide is stating that the company will simultaneously create relationships with a research partner university in the district of a member of Congress and that the company will benefit; correct?**

A. It's talking about a research partnership between the company and a university and it's talking about relationships -- you know, government relations with the member of Congress in the state.

**Q. And isn't that what your prior e-mail we just looked at discussed, that you can score points through the university that will have an impact on plus-ups through members of Congress?**

MS. BRONSTER: Objection. Misstates the testimony.

THE DEPONENT: The e-mail you showed previously was discussing scholarships. You'll notice what's absent from this slide is scholarships.

BY MR. ALLISON:

**Q. But what is present on this slide is University of Rhode Island and they were a recipient of scholarships; correct?**

MS. BRONSTER: Objection. Argumentative.

THE DEPONENT: Those two things are true. University of Rhode Island is on the slide and they were on the list of scholarships.

MR. ALLISON: Okay. Can we take a look at the next slide, please.

BY MR. ALLISON:

**Q. What are we looking at here, Mr. Hartman?**

A. This is a slide. The title of it is SAC-D, and the acronym -- or the words that that acronym stands for, Senate Appropriations Committee Subcommittee on Defense.

So that's the title of the slide. This is a list, I think, as of the time the slide was created of the members on the Senate Appropriations Subcommittee on Defense.

**Q. What do the green checkmarks signify?**

A. The -- it says "success."

**Q. And what does that mean? What does "success" mean in this case?**

A. In this case, I believe what I was referring to is a successful programmatic budget increase in the state of that particular member.

**Q. Okay. And then if I go and look at each green checkmark, the first one started at the left**

**side is Senator Susan Collins; correct?**

A. Correct. I see a green checkmark next to Susan Collins.

**Q. And she's from Maine, it says that there. And the University of Maine received a Society scholarship; correct?**

A. I don't know if they received it, to be honest. Again, I know that as of September 30th when Martin got indicted, I think all -- I don't know, but I would speculate that all activity stopped on scholarships. So I don't know if University of Maine received a scholarship or not.

**Q. Let me rephrase. A scholarship by the Society was pledged to the University of Maine; is that correct?**

MS. BRONSTER: Objection as to the term "pledge."

BY MR. ALLISON:

**Q. Is that correct, Mr. Hartman?**

A. Again, I'd have to see the documents or the communication with Maine to know that that actually happened and went through.

**Q. Okay. And then down below -- and then, obviously, Senator Susan Collins is also the senator for whom whose benefit 1820 PAC operates, and they**

**received $150,000 from the Society; correct?**

A. Again, I know what was alleged was that $150,000 donation came from the Society to the 1820 PAC and I understood the 1820 PAC to support the campaign of Senator Collins.

**Q. Okay. Going down into the next row, Lindsey Graham, South Carolina. University of South Carolina, they were pledged Society scholarship money; correct?**

A. They were on the list of university recipients of scholarships.

**Q. Okay. And then on the other side we have Senator Jack Reed who we already discussed him on the prior slide. But Rhode Island University, they were pledged scholarships.**

**That's what you said a moment ago; correct?**

MS. BRONSTER: Objection. Compound. Objection to the preface.

THE DEPONENT: I believe University of Rhode Island was on the list. I'd have to go back and look, but I believe they were on the list of intended recipients.

BY MR. ALLISON:

**Q. And Senator Brian Schatz from Hawaii, University of Hawaii, they were on the intended list**

**of recipients of Society scholarships; correct?**
MS. BRONSTER: Objection as to form.
THE DEPONENT: I'm sorry. I missed -- I missed what you said about which state or which university?
BY MR. ALLISON:
**Q. University of Hawaii, Senator Brian Schatz.**
A. University of Hawaii was on the list of potential scholarship recipients.
**Q. And so what you predicted in your e-mail that we looked at a moment ago about how the Society scholarships can score points with members of Congress who are on the Appropriations Committee, that came to fruition at least in these four instances we just looked at; correct?**
A. That's incorrect. I can elaborate if you like but that's not right.
**Q. Okay. Let's take a look at Exhibit 26.**
(Whereupon, Plaintiff's Exhibit 26 was marked for identification by the court reporter and is attached hereto.)
BY MR. ALLISON:
**Q. Let's go all the way to the bottom and look at the very first e-mail.**

A. 26. Okay.

**Q. Do you recall seeing this e-mail, Mr. Hartman?**

A. I'm sorry. You said scroll to the bottom, Grant?

**Q. Yeah. I'm looking at the very first e-mail in the thread from you to Jennifer Oliver and other recipients dated May 21st, 2020, sent 11:18 a.m.**

A. Yes, I see it.

**Q. And the subject is WSU office opening press release draft; correct?**

A. Yes.

**Q. So, briefly, can you tell me what the subject matter is of this e-mail?**

A. I think it's talking about the possibility of a press release going out for the Wichita State University office, and I've copied a number of people. So I think I would assume by reading this e-mail that there was an attachment. I don't see any attachment, but it looks like it was a draft of a press release that was attached.

I am asking for a review and edits from Jen since she was the marketing -- either manager or director, I forget which. And then talking about possible next steps once that press release is, you

know, finalized and approved, what would be the follow-on next steps.

**Q. Did WSU -- were they pledged Society money?**

A. Wichita State University was on the list of university recipients of scholarship funds. Yes.

**Q. Okay. Let's go up to Page 2, please, and I'm looking at Martin Kao's e-mail in the middle of Page 2. Okay.**

**So Martin kicks everyone off of the e-mail chain except for yourself and Cliff and e-mails you and Cliff Chen:**

**"Maybe we should put in a plug for the Society."**

**Do you see that?**

A. Yes.

**Q. When you received this e-mail and you first read it, did you understand Martin to be making a joke here?**

A. Let's see. I honestly don't know if I -- exactly how I interpreted it right away or if I -- if I even read that e-mail prior to the back-and-forth that Cliff -- Cliff sent an e-mail two minutes later and it looks like Martin sent an e-mail one minute after that. I think some of these are in Eastern time and some are in Hawaii time.

**Q. Sure.**

A. I don't know. I may have read the e-mail after Martin said "Lol...I was joking." So I don't -- I don't know.

**Q. Okay. And Cliff's response, it looks like if Martin was joking at the time, the joke maybe went over Cliff's head based on his response.**

**Do you agree?**

A. It does appear that Cliff didn't believe that or didn't understand that Martin was joking. That's true.

**Q. And Martin replies:**

**"Lol...I was joking."**

A. Yes.

**Q. And then you reply:**

**"Lol."**

**And then in quotes:**

**"SYWSE pays to play again!"**

A. That's correct.

**Q. Why did you put "SYWSE pays to play again!" -- why did you put that sentence in quotes?**

A. So, obviously, this was a joke. It's a well-known fact that the company was being accused of this in the press, right, the pay to play was definitely a part of the articles that came out after

the FEC complaint.

So the LOL, meaning laugh out loud, in quotes, "The Society pays to play again" is what the press would say if Martin were serious and said, you know, we should put in a plug for the Society in this press release; right?

**Q. So it's your belief that if the press release included a plug for the Society that the media would pick up on it and report that the company Navatek or Martin Defense Group is conducting pay to play business operations?**

A. Again, like joking about this subject to make light of something that was uncomfortable and not a good thing for the company, that's -- that's what I said at the time. That's the joke I made.

**Q. So the reason why the company wasn't paying to play is because the plug for the Society wasn't put in the press release?**

MS. BRONSTER: Objection. Vague.

THE DEPONENT: I disagree with that statement it's a logical jump.

BY MR. ALLISON:

**Q. Okay. So it's your testimony that the company was not paying to play and you were just making a joke about what other people thought the**

**company was doing?**

A. It is my testimony that I was not aware that what Martin was doing with the Society was illegal.

**Q. Okay. I want to take a look at Number 27 now, please.**

(Whereupon, Plaintiff's Exhibit 27 was marked for identification by the court reporter and is attached hereto.)

THE DEPONENT: You said 7?

BY MR. ALLISON:

**Q. 27, 2-7. If we could scroll to the last page of this document, please. Okay.**

**Mr. Hartman, have you seen this document before? It's dated July 16th, 2020.**

A. I do not recall seeing this document.

**Q. Okay. So you -- it's your testimony you've never seen this document before?**

A. I'm not saying that I've never seen it before. I'm saying I don't recall seeing it.

**Q. Okay. Maybe I'll tell you what it is and we'll see if that refreshes your recollection.**

**This, on its face, appears to be a signed response from William Canfield or Bill Canfield who,**

**in this context, is the counsel for the Society and Jennifer Lam, its manager. And it's a letter to the FEC asking for the FEC complaint to be dismissed.**

**Does that refresh your recollection as to whether you've seen this letter previously?**

MS. BRONSTER: Objection to the characterization of the document. But could you tell me what number this is, please?

MR. ALLISON: 27.

MS. BRONSTER: Thank you.

THE DEPONENT: I'm afraid not.

BY MR. ALLISON:

**Q. Okay. We'll move on. Let's take a look at 28.**

(Whereupon, Plaintiff's Exhibit 28 was marked for identification by the court reporter and is attached hereto.)

BY MR. ALLISON:

**Q. So here's a document and there's an attachment in the next few pages. It's an e-mail from Gary Ambrose dated October 21st, 2020. It's addressed to "all Navatek users."**

**I assume that "all Navatek users" is like everybody with a Navatek company or Martin Defense**

**Group company e-mail address; is that correct?**
A. I don't know for sure whether that's true, but that would be my assumption reading this e-mail.
**Q. Okay. And the subject is "Message from the Management Team."**
**Did you have any input or awareness or participation in the drafting of this message?**
A. I don't -- I don't recall editing or reviewing this. I know -- you know, I do recall there was a lot of confusion at this time, the month of October following Martin's indictment.
So I don't remember specific meetings or what was discussed, but I know that every time I got on a call with anyone else considered a manager at the company, we discussed what is going on and both how to get better clarity from Martin and Steven and what to communicate to employees.
**Q. At this time, you were senior vice president of strategic programs. Do I have that right?**
A. I think it was strategic partnerships, but the rest is right.
**Q. Okay. Thank you. And as the senior vice president of strategic partnerships, did you consider yourself to be an executive of the company?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: What's your definition of "executive"?

BY MR. ALLISON:

**Q. Well, were you in a position where you owed the company fiduciary obligations?**

MS. BRONSTER: Objection to the extent it calls for a legal conclusion. Objection as to form.

THE DEPONENT: What's your definition of "fiduciary duties"?

BY MR. ALLISON:

**Q. Did you owe the company duties of care?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: What's your definition of "duty of care"?

BY MR. ALLISON:

**Q. Is it your testimony, Mr. Hartman, that you don't understand what fiduciary duties are in the corporate context?**

A. I don't understand what your definition of fiduciary duties in the corporate context are and the way you're asking the question.

**Q. You're the CEO of Integer; correct?**

MS. BRONSTER: I'm sorry. I didn't get that.

BY MR. ALLISON:

**Q. You're currently CEO of Integer; correct?**

A. That's correct.

**Q. And as CEO of Integer, do you owe Integer fiduciary obligations or duties?**

MS. BRONSTER: Objection to the extent it calls for a legal conclusion. Objection. Vague.

THE DEPONENT: Do I owe Integer fiduciary duties? In my definition, yes.

BY MR. ALLISON:

**Q. Okay. So using that same definition, at this time and as senior vice president of Martin Defense Group, did you believe that you owed Martin Defense Group fiduciary obligations?**

A. Again, I'm going to ask you what your definition of fiduciary duties is in the context of this question.

**Q. And once again, Mr. Hartman, I'm asking you to use your own definition as it relates to the current company of which you are CEO?**

MS. BRONSTER: Objection. Objection. Argumentative. Objection as to form.

THE DEPONENT: I have a different role at Integer Technologies so it's very clear to me that I owe a fiduciary duty to Integer Technologies. It was

not clear to me at -- at the company in reference to Navatek.

So if you could please define what you mean by that, I might be able to answer your question.

BY MR. ALLISON:

**Q. You know, Mr. Hartman, if it's your testimony that you need a definition and that you can't testify without some defined definition as to what fiduciary obligations mean, I think you've answered the question with that. We'll move on.**

MS. BRONSTER: Objection. Argumentative.

BY MR. ALLISON:

**Q. If we could look at Page 2 here, please. I want to look up, back up at the top, under General Questions, Question 1, who is leading the company? It says:**

**"The company will continue to be led by the management team, Gary, Eric, Cliff, Dave, John, Paco, Karen, Duke, with the additions of Martin's set of proxies, James Ota and Todd Lam.**

**So I want to ask you were you part of the management team that was leading the company as of the date when this e-mail was sent?**

A. So, again, I think Gary Ambrose was the primary author of this document. So clearly, in his

opinion, that's true.

**Q. In your opinion, was that true?**

A. Did I feel in control or managing the company at this time? Absolutely not. I felt like a confused employee.

**Q. Separate of feeling in control, were you trying to assert some amount of control on behalf of the company to lead it forward through the difficulties caused by Martin's arrest?**

MS. BRONSTER: Objection. Vague.

THE DEPONENT: I was doing my best to -- to do what I could for the benefit of the company.

BY MR. ALLISON:

**Q. Okay. I'd like to take a look at Number 30.**

(Whereupon, Plaintiff's Exhibit 30 was marked for identification by the court reporter and is attached hereto.)

BY MR. ALLISON:

**Q. And take a look at the first e-mail in the chain, the earliest e-mail in the chain. It starts on Page 3 and it goes over onto the fourth page. Okay.**

**So here's an e-mail that you sent to**

**Hossein Haj-Hariri of University of South Carolina; is that correct?**

A. Yes. It appears that way.

**Q. December 3rd, 2020, you're still an employee of the company; correct?**

A. At that time, I was still an employee. Yes.

**Q. Okay. But you're sending Hossein this e-mail from duke.hartman@gmail.com, your private e-mail address; correct?**

A. That's correct.

**Q. Why did you decide to send one of the company's university partners an e-mail from your personal e-mail address on this day?**

A. At this point, I had lost confidence in the management of the company to do anything that would preserve the future of the organization. And not only that, I was in charge of university partnerships. Every one of our university partners, to varying degrees, basically said, look, we can't really work with you, with the company anymore based on the indictments.

And so very -- what I saw was the writing was on the wall. There was a matter of time before my position would be eliminated. I had recently

moved to South Carolina on behalf of the company with my two small children and a -- now, at this point, a pregnant wife and during COVID and at this point realized that I would need a new job.

So I was e-mailing Hossein to discuss personal possibilities of working with him in some capacity, including possibly being an employee of the University of South Carolina.

**Q. Yeah. But in this e-mail at the very bottom of the second-to-the-last page, you say:**

**"As you would imagine, Josh and I have started a planning document for our newco and what we need to accomplish over the next few weeks and months to make this venture and partnership successful."**

**What is newco?**

A. In this context, I am referring to one of the possibilities that had been discussed which was that Josh and myself would form a new company and serve as subcontractors to the University of South Carolina doing very similar work. So working on maybe power systems and other related research and development with the University of South Carolina.

**Q. And that as -- excuse me -- that is, in fact, what transpired. You and Josh did, in fact, start a new company called Integer Technologies LLC that does work as a subcontractor to University of South Carolina on contracts such as naval power; correct?**

MS. BRONSTER: Objection. Compound.

THE DEPONENT: I mean, yeah. I'll restate in my own words for the record. Josh and myself formed a company called Integer Technologies in late January of 2021 and we did receive a subcontract from the University of South Carolina. And, in fact, it was a contract ultimately from the company, from -- Martin Defense Group was the name at the time.

So Dan Brunk was aware of this. He had to approve our very first contract, and we were transparent with him in telling him that was our plan to form a company to become a subcontractor of the University of South Carolina prior to departing the company and prior to starting the company.

BY MR. ALLISON:

**Q. And when did you notify Dan Brunk of that?**

A. Sometime in the month of December.

**Q. Okay. But here in the e-mail we're looking at, the purpose of using your private Gmail rather**

**than the company e-mail was to keep this a secret from the company.**

**Is that accurate?**

MS. BRONSTER: Objection. Asked and answered.

You may answer again.

THE DEPONENT: Yeah. So I'll repeat in different words what I've already said. It was clear that the company, to me, would eventually eliminate my position. I needed to make sure that I had a job opportunity.

A personal search for a new job, in everything that I've learned, is something that you're allowed to keep secret and on your personal -- personal device and personal e-mail communications. So that's the reason I did not inform Dan of that, as of, you know, this e-mail. And that's why I used my personal e-mail. It was a personal job hunt.

BY MR. ALLISON:

**Q. So then it's accurate that the reason why you used the personal Gmail was to keep it a secret from the company?**

MS. BRONSTER: Objection. Asked and answered. Objection. Misstates the testimony.

THE DEPONENT: Yeah. You're twisting my

words. That's not what I said.

BY MR. ALLISON:

**Q. Well, by using your personal e-mail, it's true that you did effectively keep it a secret from the company; correct?**

A. A person who is looking for a new job is under no obligation to inform the current employer that they're doing that.

**Q. Even in a situation where that person looking for a new job is a senior vice president of the company and the place that they're looking for a job is with the company's research partners?**

MS. BRONSTER: Objection. Argumentative.

You may answer.

THE DEPONENT: How should we unpack this here? It was made clear to me -- and, by the way, it was made clear in Dan Brunk's depo that the University of South Carolina had told the company that they would not partner with the company on future related partnership activities.

So the University of South Carolina decided that it no longer wanted to partner with the company in the same way that the company had established and began to work with the university in the year 2020.

So that -- that much was clear; right?

There was -- there was no longer an opportunity for the company to work with this partner in the way that it had been working previously. So my reaching out to the University of South Carolina on my private e-mail was done once it was very clear to me that the University of South Carolina would no longer partner with the company.

So, in other words, this was not an opportunity that the company was eligible for. New partnerships with this organization were not possible, and that was made by a decision of the University of South Carolina.

BY MR. ALLISON:

**Q. And did you learn of that decision in these covert e-mails with Hossein Haj-Hariri that you sent and received from your personal e-mail account?**

MS. BRONSTER: Objection. Argumentative. Objection as to form.

THE DEPONENT: I disagree with your characterization of e-mails, and no.

BY MR. ALLISON:

**Q. You mentioned the naval power contract that was originally slated to go to the company but eventually and instead was awarded to Integer as a subcontract.**

**What year of that contract is Integer in currently?**

A. It's a nonsensical question. I can't answer that.

**Q. Well, how many -- as I understand it, each year there's a new funding disbursement from Congress, correct, for these contracts?**

A. No.

**Q. Each fiscal year, monies are given for these contracts, no?**

A. There is a different research topic every -- every single fiscal year that the Office of Naval Research is able to award a contract to a research group. They can decide not to. They can decide to do something else with the money.

But it is not the same contract every year. So it's not -- it's not -- it's not more money for the same contract which is what I've heard you implying.

**Q. Okay. The naval power contract that you testified that you discussed with Dan Brunk, what was the gross amount that Integer received from that contract?**

A. You'll have to be more specific.

**Q. How much money did Integer receive under**

**that contract?**
A. Which contract do you mean?
**Q. The one that you discussed with Dan Brunk.**
A. You'll have to give me a contract number. There's -- there's many -- there's multiple contracts. So you'd have to --
**Q. You have multiple contracts with Dan Brunk?**
A. There -- okay. If you're -- I'll make it easy for you. The contract I discussed with Dan Brunk was the first and original contract. The first contract that Integer was awarded was a subcontract from the University of South Carolina which was a sub -- University of South Carolina was a subcontractor to Martin Defense Group, PacMar, the company.
And so your question about how much did Integer receive? Again, Dan Brunk as CEO at that time of the company knows full well because he had to approve the transaction. I don't have the specific number in front of me, but I want to say it was on the order of 250,000, something to that effect, something in that -- in that rough order and magnitude.
**Q. Is that a profit number or a gross income -- or gross revenue number?**
A. The total contract amount -- number.

**Q. Okay. And what would the number be for the unmanned logistics solutions for Marine Corps contractor line item budget?**

A. You'll have to be more specific.

**Q. As I understand it, there was a second contract that was slated to go to the company but instead went to Integer through South Carolina as a subcontract that was commonly called the unmanned logistics contract.**

MS. BRONSTER: Objection as to form.

THE DEPONENT: I don't know in which -- you'll have to -- you'll have to pull up a document or reference more information to help me understand which contract you're talking about and which fiscal year, Grant, so that I can answer the question.

BY MR. ALLISON:

**Q. We're not going to have time during today's depo so we'll have to do that at the trial. But we'll move on.**

**I have just a few more documents here I want to discuss with you, and we're almost through it. The first is Number 33, if we could bring up Number 33.**

**///**

**///**

(Whereupon, Plaintiff's Exhibit 33 was marked for identification by the court reporter and is attached hereto.)

THE MODERATOR: One second, Counsel. Sorry.

BY MR. ALLISON:

**Q. Okay. Mr. Hartman, I'll be candid with you.**

**What we have here is a cover e-mail. It appears to me that it's one you sent to yourself from your company e-mail to your private Gmail.**

**And there is a large number of attachments. And the specific PDF you have in front of you or that you may have downloaded does not include all of the attachments because there were so many pages that it would have been unwieldy to create a document of that size. So I will be candid with you that there are some attached -- some of the attachments are included but not all of them.**

**So given that backdrop, I first want to ask you why did you send yourself this e-mail with all of these attachments on January 8th, 2021?**

A. For the purpose of legal advice.

**Q. Okay. And is that why you titled this one**

**Privileged and Confidential Information - Attorney-Client Communication?**

A. Yes.

**Q. Okay. But there is no attorney involved in this communication; correct? It's just you e-mailing yourself?**

A. I was being asked to have an interview with the federal government in one of their criminal investigations.

And, to be honest, now, I don't know if it was the PPP loan. I believe it must have been the PPP loan criminal investigation. So I was being asked to speak to the -- I think it was the FBI related to that criminal investigation.

This was, you know, again, the way I understood my -- call it rights -- I did understand that I had the right to an attorney if I was interviewed by the federal government in a case like this. And the -- I knew -- this is January 8th, 2021.

My -- I think my last day was scheduled to be somewhere in this time frame, maybe a week later, maybe not, give or take a week of this day. And I knew that I wouldn't have access to these documents for reference when being interviewed by the federal

government.

**Q. Do you have any concerns that taking such a large number of company documents in this manner in the last few days that you were employed by the company was a security breach or a breach of the company's protocols?**

MS. BRONSTER: Objection as to form.

THE DEPONENT: My understanding was that if it were for the purpose of legal advice, and that was the purpose that I used it for, that that would be acceptable. I was under the impression that the criminal investigation, all these -- you know, all documents even tangentially related to the company would -- that confidentiality would be lost because discovery in the case.

You know, these documents would be -- would no longer have their confidentiality. That was my understanding.

MR. ALLISON: Okay. Let's take a look at the last four pages in this exhibit. Sorry. Go down one more page. I guess it's the last three.

MS. BRONSTER: Can you give me a Bates number, please.

MR. ALLISON: 1514.

MS. BRONSTER: Thank you.

BY MR. ALLISON:
**Q. So this document right here, was this a confidential document? We could scroll up and see the top of it, please.**
**Strike that. Let me ask this, Mr. Hartman.**
**Was this a public document?**
A. At this time, I was not aware whether or not this was a public document. I don't believe so. No.
MR. ALLISON: Okay. So let's scroll down to the bottom of this page. Keep scrolling please. Just the bottom. No, back up, please. Just want to see the bottom of the prior page. There we go.
BY MR. ALLISON:
**Q. So it's stamped "Navatek confidential." Do you see that?**
A. Yes.
**Q. Okay. And then if we go back up, the document is -- has the University of South Carolina and Navatek's logo and it's titled Unmanned Logistics Solutions for the US Marine Corps.**
**Do you see that?**
A. Yes.
**Q. Okay. So is this one of -- does this relate to one of the subcontracts that Integer**

**received through the University of South Carolina that was originally slated for the company?**

A. So the answer to that question is that the indictment by Martin effectively eliminated the company's claim to this appropriation and a number of other appropriations that -- that the company had -- had pursued. So, in other words, University of South Carolina had also lobbied and pursued a program by this name, a program budget increase by this name.

When Martin was indicted, the leadership of the University of South Carolina decided that they did not want to partner with Navatek anymore, with the company.

Also, all the supporter -- all the supporters of the plus-up, the stakeholders that helped to put the -- make sure the appropriation happened, very quickly withdrew their support from the company be being involved in any way in this -- in this partnership or within, you know, any sort of follow-on contracts with the Navy.

And as such, this program -- Navatek effectively lost its claim to this program and a number of others.

**Q. That's a lot of information, Mr. Hartman, but it doesn't answer my question.**

**My question was very simple: Does this document relate to either of the contracts or any of the subcontracts that Integer received through the University of South Carolina that Navatek was previously slated to obtain?**

**Does it relate to it, yes or no?**

MS. BRONSTER: Objection. Argumentative. Objection as to form and asked and answered.

MR. ALLISON: Respectfully, he did not answer it.

BY MR. ALLISON:

**Q. It's a "yes" or "no" question. Does it relate to the subcontract?**

MS. BRONSTER: He answered your question. Same objections.

THE DEPONENT: Grant, I think I was getting around to answering your question.

So, again, this document, this paper gets after a plus-up request that the company was pursuing with the University of South Carolina. The company lost its claim to this program and others.

The University of South Carolina decided to pursue the funding appropriated for this program. Of their own volition, the University of South Carolina decided to ask Integer Technologies to partner as a

subcontractor on -- on a contract of a similar -- in a similar research area. It was not exactly this -- you know, this white paper does not describe the statement of work of any specific contract that the University of South Carolina was awarded.

But, again, there was an appropriation made. The company lost its claim. The University of South Carolina decided to pursue the appropriation as a prime contractor. They, of their own volition, asked Integer Technologies to be involved as a subcontractor to support their effort.

So I think I've answered your question now.

BY MR. ALLISON:

**Q. And so given all of that information, you felt entitled to take this document from the company on your way out the door.**

**Is that accurate?**

MS. BRONSTER: Objection. Asked and answered.

THE DEPONENT: I've answered the question. This document and a number of the other documents were for the purpose of legal advice and under being interviewed in a criminal investigation by the FBI.

BY MR. ALLISON:

**Q. Really, Mr. Hartman? This document**

**relating to the very subcontract that your new company received from your prior company's research partner on an exact contract that your prior company was slated to get beforehand, this was for the purpose of legal advice?**

MS. BRONSTER: Objection. Misstates the testimony. Objection to the characterization of this contract. Argumentative. And objection as to form.

MR. ALLISON: Fine. His testimony is what it is. We'll move on.

THE DEPONENT: I mean, I could answer your question if you like.

BY MR. ALLISON:

**Q. We'll look at Document 32 now, please.**

(Whereupon, Plaintiff's Exhibit 32 was marked for identification by the court reporter and is attached hereto.)

BY MR. ALLISON:

**Q. Okay. Mr. Hartman, what are we looking at here?**

A. I can read the title. Looks like there's a little bit of an issue with the file, but Center for Development of Security Excellence, Certificate of Training, Security Awareness Hub. I think that's

supposed to be my name, has successfully completed, and I think it's supposed to say "insider threat awareness" is my guess.

**Q. Yeah. And is this the certificate that you received after completing the Insider Threat Awareness program?**

A. Again, I can't see the date. That's kind of occluded there. But I have received similar certificates for security training. Yes.

**Q. And do you still have to get a similar or same certificate in connection with your work with Integer?**

A. Yes.

**Q. Okay. And is it this same exact one that you still currently get with Integer?**

A. I can't say for certain. I think it may have changed a little bit. I believe it's the same -- this is the counterintelligence and security agency -- Defense Counterintelligence and Security Agency, DCSA. It's the same agency. I don't know if the certificate is exactly the same or not.

**Q. Okay. The e-mail we just looked at where you sent yourself numerous attachments including two confidential papers from the company, is that something that would have triggered an insider threat**

**awareness duty to report?**

MS. BRONSTER: Objection. Misstates the testimony. Misstates the prior document for what we discussed.

THE DEPONENT: The documents that I included, I don't believe those documents were sensitive government information. They were -- you know, as you noted, there were proprietary stamps on some of them, but I don't believe any of them were controlled and classified information or, you know, defense technical information.

They were really, you know, business -- business-related e-mails and documents, right, so -- as opposed to information that the Defense Counterintelligence and Security Agency, like technical information on -- on programs, would be interested in.

BY MR. ALLISON:

**Q. Okay. So if one of your employees at Integer e-mailed proprietary documents that were stamped "Integer confidential" from their Integer e-mail to their private e-mail, that would not trigger any kind of insider threat awareness concerns for you?**

MS. BRONSTER: Objection. Incomplete

hypothetical.

THE DEPONENT: Again, if I was being investigated for PPP loan fraud, eventually campaign finance fraud, mortgage fraud to top it all off, and my employees were being investigated -- or interviewed by the FBI related to that fraud that I had committed as the owner and executive of the company, I think sending e-mails to myself for legal advice to help with a criminal defense attorney in their interviews, probably the least of the company's worries.

BY MR. ALLISON:

**Q. Do you think that, particularly in that last month of your employment from the period of December -- roughly December 3rd through -- let's say when you sent yourself the e-mail with all the attachments, January 8th, 2021, do you believe you were acting in good faith to the company that employed you as senior vice president?**

A. Yes.

**Q. So you believe you acted in good faith by, for example, communicating with company partners on your private Gmail for the purpose of setting up a relationship with that partner through a new company that you had decided to start while still employed by**

**the company?**

A. Long question. I will give you reasons why I think I was acting in good faith which are that I continued to work with Dan who took over at CEO sometime in late 2020 to have the best chance possible of continuing some of the university relationships despite the very dark cloud over the company. And, in fact, what I learned later was that some of those contracts -- some of those appropriations did indeed lead to funding for the company.

So, again, going above and beyond even after leaving the company, offering both Dan Brunk, Priya Hicks, Eric Schiff, you know, anyone at the company who wanted assistance kind of understanding how they might be able to right the ship, I was always available to talk. I -- to the very end, I was trying to help Dan get settled and understand what pursuits or opportunities might be salvaged.

And, again, told Dan very transparently about our intention of forming a new company to partner with the University of South Carolina. And, reminder, Dan had to approve our very first contract. So if Dan had a problem with that, it would have been nice to know then versus suing me after Integer

becomes successful.

**Q. Ultimately, all of those actions you discussed, however, were primarily for your own benefit and own self-interest; isn't that right?**

A. Incorrect.

MS. BRONSTER: Objection.

BY MR. ALLISON:

**Q. You have already testified that you felt that your position with the company would be extinguished, that you had just moved to South Carolina, that you had two young children, that your wife was pregnant. I think the implication there is that you had pressure to continue earning a paycheck.**

**So, ultimately, Mr. Hartman, your interest was in yourself and protecting your family; correct?**

MS. BRONSTER: Objection as to form. Compound.

THE DEPONENT: I don't think you listened to my answer there. Everything I was mentioning was how can I help Dan Brunk, as the new leader of the company, get his feet under him and understand what opportunities for the company after I leave could be salvaged.

I'm not sure how that's a -- that's a directly self-interested motive other than obviously

doing my best to maintain a -- a positive relationship with my former employer.

MR. ALLISON: Well, ultimately, Mr. Hartman, I don't think you and I are going to agree, and it will be up to the jury to decide.

I have no more questions for you today, Mr. Hartman. Thank you very much. I know it's late where you are.

Your counsel may have some instructions for you now about the signing and review of the transcript.

MS. BRONSTER: Yes. We would like to have a copy for review and signing. And it can be processed through my office.

MR. ALLISON: I'll also take a copy of this transcript, please.

MS. BRONSTER: And --

MR. KUBOTA: (Indiscernible). Thank you.

THE COURT REPORTER: I'm sorry?

MR. KUBOTA: Copy for Scott Kubota.

THE COURT REPORTER: Okay. Thank you.

Counsel, Ms. Bronster, were you going to say something?

MS. BRONSTER: No, I think we're done.

MR. ALLISON: Okay. Mr. Hartman, thank you

very much. And thank you all, counsel. Everybody have a nice evening.

(Whereupon, the deposition was concluded at 11:18 p.m.)

STATE OF HAWAII )
) ss.
CITY AND COUNTY OF HONOLULU )

DECLARATION UNDER PENALTY OF PERJURY

I, ________________________, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on ________________________, 2025; that I have made such corrections as appear noted herein; that my testimony as contained herein, as corrected, is true and correct.

Dated this _____ day of _______________ 2025, in _____________________________________,
(city)
__________.
(state)

__________________________
(Signature)

I, Chantelle Hee, CSR No. 536, do hereby declare:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to text under my direction.

___X___ That the witness was requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

_______ Signature is Waived.

_______ The changes made by the witness are appended to the transcript.

_______ No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event or the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Witness my hand this 7th day of May, 2025.

Chantelle Hee

CHANTELLE HEE, RPR
Hawaii CSR No. 536
iDepo Hawaii, LLC
(808) 664-6677

ERRATA LIST

| PAGE | LINE | ERROR | CORRECTION | REASON |
|---|---|---|---|---|
| ______ | ______ | __________ | ________________ | _______________ |
| ______ | ______ | __________ | ________________ | _______________ |
| ______ | ______ | __________ | ________________ | _______________ |
| ______ | ______ | __________ | ________________ | _______________ |
| ______ | ______ | __________ | ________________ | _______________ |
| ______ | ______ | __________ | ________________ | _______________ |
| ______ | ______ | __________ | ________________ | _______________ |
| ______ | ______ | __________ | ________________ | _______________ |
| ______ | ______ | __________ | ________________ | _______________ |
| ______ | ______ | __________ | ________________ | _______________ |
| ______ | ______ | __________ | ________________ | _______________ |
| ______ | ______ | __________ | ________________ | _______________ |
| ______ | ______ | __________ | ________________ | _______________ |
| ______ | ______ | __________ | ________________ | _______________ |
| ______ | ______ | __________ | ________________ | _______________ |
| ______ | ______ | __________ | ________________ | _______________ |
| ______ | ______ | __________ | ________________ | _______________ |

I, the undersigned, do hereby certify that I have read the foregoing deposition and find it to be a true and accurate transcription of my testimony, with the above-noted corrections, if any:

_______________________________________ ________________

Signature of Deponent Date

## Exhibits


**307832_Exhibit 1** 6:4 75:9, 11 170:17

**307832_Exhibit 3** 6:5 96:9, 12 101:25

**307832_Exhibit 4** 6:7 120:24 121:1 154:16 155:8 160:19,20 177:6 199:25

**307832_Exhibit 6** 6:10 178:14,15

**307832_Exhibit 7** 6:12 181:22

**307832_Exhibit 8** 6:14 185:22,23 186:1,2,3

**307832_Exhibit 9** 6:16 190:7

**307832_Exhibit 10** 6:19 193:21 194:1

**307832_Exhibit 11** 6:21 197:19

**307832_Exhibit 12** 6:23 209:12,13

**307832_Exhibit 14** 7:4 151:22,23 152:1 155:11,15 214:18

**307832_Exhibit 15** 7:6 227:20 228:3

**307832_Exhibit 16** 7:8 233:7,8

**307832_Exhibit 18** 7:11 243:16

**307832_Exhibit 19** 7:13 244:21

**307832_Exhibit 20** 7:15 248:1,2 260:5

**307832_Exhibit 22** 7:17 264:1

**307832_Exhibit 26** 7:19 270:18,19

**307832_Exhibit 27** 7:22 275:7

**307832_Exhibit 28** 7:24 276:15

**307832_Exhibit 30** 8:4 281:16

**307832_Exhibit 32** 8:6 298:15

**307832_Exhibit 33** 8:8 291:1


## $


**$150,000** 84:4 85:4 91:20 92:10 143:12 149:7 215:25 217:15 222:15 226:8 230:25 231:5 237:16 239:11 269:1,3


## -


**-o0o-** 9:4,9,20,25


## 1


**1** 75:9,10,11 170:17 190:24 280:15

**1,000** 142:8

**10** 130:2,4,6 193:21 194:1

**100** 49:15 165:1 202:9

**10:11** 260:3

**11** 49:23 197:18,19

**11:18** 271:8 305:4

**11:46** 131:16 133:3

**11:53** 145:17

**12** 170:19 209:12,13

**12:23** 258:11

**13** 127:4,19 130:4,11

**14** 9:6 142:6 151:22,23 152:1 155:11,15 214:18

**140** 142:8

**14th** 258:10

**15** 227:15,20 228:3

**150,000** 149:20

**1514** 293:24

**15th** 32:14

**16** 51:9,12,17,19 60:9 233:6,7, 8,18

**16th** 275:16

**17** 121:10 244:18

**18** 51:9,12,17,20 59:24 60:3, 19 133:3 243:9,14,16,21,23, 24

**1820** 84:4 85:4,6,25 86:2 91:20 92:1,3,8 93:25 94:5,8 95:3,21 104:6,22 110:1 117:3 122:3 128:5 141:2 149:4,7,19, 20 150:1 156:8 165:19 181:3, 7 215:25 216:6,7 217:23 219:12,18 220:4 222:10,16 226:8 230:25 231:6,23 237:17 239:12 268:25 269:4

**18th** 130:11 131:16 141:19 142:13,22 144:13 145:17 210:1 252:15 254:21 260:12 263:16

**19** 243:8,10,12,14 244:17,21

**1st** 32:14 245:8,24


## 2


**2** 126:6,7 158:16 190:24 233:20,21 236:8 255:12 272:6,8 280:13

**2-7** 275:13

**20** 59:24 60:3,19 219:3 247:25 248:1,2 260:5

**2009** 23:5

**2012** 27:16 29:23 30:6,14

**2013** 27:16

**2017** 31:12 67:10

**2018** 28:23,25 29:1 30:17,21 31:13 32:2,17 36:21 42:11 47:1 53:13

**2019** 44:9 45:22 46:5 47:4 48:18,21 49:6,21,22 50:10,11, 15 52:16 54:16 55:7 65:16,17 66:8,12 83:8,12,24,25 84:1,3 85:17,23 86:22 91:19 92:4,9 95:2,23 96:4 102:13,21 104:3, 5,23 106:19,21 107:7,13,14, 22 108:18,21 109:24 117:4,5 215:18,24 216:5 218:10,12,18 219:16 220:2,10 230:24 231:10 239:12

**2019-10-25** 97:14

**2020** 19:11 20:18 42:18,23 43:1,14,19 44:9 45:25 46:2,6 50:11,16,22,24 51:1,5,25 52:1,16 55:3 56:5 60:9,13,17, 20 82:25 83:20,21 84:17,20, 23,24 85:1,2,18,23 86:22 91:19 92:4,15,18 99:22 104:23 105:21,25 106:23 111:8 112:9,12 113:9 114:16 119:3,10 121:25 122:12 123:5,24 124:25 125:5 127:20 130:11 131:16 132:7 139:10 140:7 141:20 142:10,13,22 144:13 145:17 148:14 149:17 152:13,15,19 157:6,16 158:17 160:16,25 161:21,22 162:15, 16 168:16 171:22 177:17,25 178:2 179:5,16 182:3 183:16 186:13,15 188:11 191:2 193:4 195:25 199:22 200:3,19 205:23,25 207:22 208:4 209:7 210:1 214:25 216:11,16 217:14 218:10 219:14 221:18 223:14 224:22 225:18 229:5, 20 231:4,16,23 232:4,12,17, 24 242:15 244:5,12 245:8,24 246:5 253:20 254:5 255:14 258:15 260:12 263:17 265:11 271:8 275:16 276:22 282:4 286:24 302:5

**2021** 13:20 32:10 96:24 97:2 98:19 99:1 284:11 291:23 292:20 301:17

**2022** 125:15

**2024** 67:15 125:14

**2025** 9:2 125:10,12

**20th** 179:5,16

**210,000** 244:10

**21st** 271:8 276:22

**22** 263:24 264:1 265:1

**230,000** 244:11

**23rd** 244:5,12 252:23 255:14 258:15

**24** 9:2

**25** 162:17

**250,000** 289:20

**25th** 102:13,21 104:3 152:13, 14,19 155:2,5 156:6 182:3 186:13 199:21 214:25 221:18 228:4 229:5,20 231:16 232:4, 12,17,24

**26** 83:8 92:9 188:11 270:18,19 271:1

**26th** 186:15

**27** 275:5,7,13 276:9

**2710** 13:9

**27th** 84:3 104:5

**28** 276:14,15

**28th** 122:12 123:4,24 132:7 139:10 140:7 146:3 148:14 149:17 155:7 157:6,16 158:17 161:22 162:16 168:16 178:6 200:3,6,19

**29206** 11:9,11

**2:24** 234:4

**2:59** 9:3

## 3

**3** 96:7,9,12 99:3,8 101:25 126:5,8 158:11 160:20 235:13 251:17 252:2 281:23

**30** 20:8 281:15,16

**30-minute** 21:5

**30th** 205:23,25 234:4 242:15 268:8

**32** 77:15 298:14,15

**33** 290:22,23 291:1

**34** 82:2

**360** 64:23

**38** 79:1,23 80:18,24 81:16 82:2,16

**3:04** 15:21

**3:38** 260:12

**3rd** 160:16 161:21 162:15 177:25 282:4 301:15

## 4

**4** 120:23,24 121:1 122:23 154:16 155:8 156:14 160:20 177:6 199:25 252:4

**4:08** 61:7

**4:14** 61:7

**4:45** 148:14

**4:52** 141:20

**4th** 191:2,12 193:4

## 5

**5** 102:14,23 148:11 154:16

**50** 170:18,21 171:13 172:20 196:16

**5:44** 120:16

**5th** 127:20 128:18

## 6

**6** 178:14,15 260:6

**60** 37:7

**6336** 11:8

**6:16** 120:16

## 7

**7** 77:16 102:14,24 145:8,15 181:21,22 182:7 248:10 275:11

**75** 196:16

**7:37** 176:25

**7:44** 176:25

## 8

**8** 141:17 185:22,23 186:1,2,3 248:10 265:15

**80** 37:5,7

**8:01** 158:18

**8:13** 197:12

**8:19** 197:12

**8:44** 214:16

**8:52** 214:16

**8th** 96:24 97:2 98:19 291:23 292:19 301:17

### 9

**9** 130:9 131:6 190:6,7
**90** 18:19
**90-minute** 18:21
**95** 36:24
**96816** 13:9
**9:15** 191:3,15
**9:59** 260:3
**9th** 119:3 177:17 178:2

### A

**a.m.** 120:16 131:16 133:3 145:17 191:3,15 234:4 271:8
**Abbott** 35:10,19 36:5 44:11 54:15
**Abbott's** 36:16 37:3,9
**ability** 19:1
**absent** 266:21
**Absolutely** 226:22 281:4
**abundance** 100:22
**acceptable** 293:11
**accepted** 221:6 222:6
**accepting** 228:15
**access** 211:4,8,14,16,20,23 212:9,16,18,22 213:4,17 253:25 292:24
**accessing** 212:6
**accomplish** 283:14
**account** 187:24 189:21 287:16
**accounted** 95:13
**accounts** 253:18
**accurate** 10:21 21:23 24:6 30:1 38:23 40:3,13 42:19 66:10 68:1 69:2,18 70:4,8,10 82:3,6 119:9,12,25 137:17 148:1 156:11 162:22 172:23 173:8 185:14 188:5 203:14 229:21 232:3 246:23 250:12 258:1 285:3,20 297:17
**accusation** 236:14,17
**accusations** 240:21,22,25
**accused** 273:23
**achieve** 183:18
**achieved** 60:2,4
**acronym** 267:10
**act** 166:4 195:5
**acted** 301:21
**acting** 72:19 301:18 302:3
**action** 85:8 107:10 130:17,23 171:25 196:10,11 217:14,20 249:15 250:18
**actions** 71:1,4,7,10 72:23 73:1,4,15,17 74:16 93:15 114:21 117:11 143:10 145:3,5,10 218:21 229:25 230:2,13,20,23 231:22 250:25 303:2
**active** 23:24 51:7 238:24
**actively** 142:5
**activities** 36:12 67:5 79:8,10,17 82:9 104:12 238:14 240:1,4 251:9 259:12 286:20
**activity** 41:5 80:11,23 107:12,19 110:10 139:23 219:12 220:12 237:15 241:8 264:12 268:10
**actual** 48:23 94:15 104:8 184:11 228:23
**add** 123:19 259:3
**added** 43:8 99:24 123:4,13 125:21 126:16
**addition** 45:15 56:15
**additional** 38:16 234:10
**additions** 280:19
**additive** 51:18
**address** 11:6 12:24 13:8 16:6 97:2,4,6 235:22 277:1 282:10,14
**addressed** 196:6 250:7 276:23
**addressing** 258:8
**adds** 261:16 263:5
**administrative** 248:20
**admit** 234:18
**ads** 266:1
**advanced** 38:11
**advertise** 47:16
**advertised** 114:24
**advice** 101:8,11,20 103:16 196:15 291:24 293:9 297:22 298:5 301:9
**advised** 167:14
**advising** 115:1
**advisors** 116:18
**affairs** 78:9,12
**affidavit** 67:18
**afraid** 100:9 276:11
**age** 44:15 45:11
**agency** 299:19,20 300:15
**agent** 235:17,24
**agree** 22:15 50:4 70:25 89:19,22 104:2,13 106:5 187:1 229:20 230:5 251:6 273:8 304:5
**agreement** 47:18,19 48:2,23 49:6,19 51:13,24 108:7 220:14
**agreements** 52:10 59:11,23 213:1
**ahead** 162:6 218:8 230:19 240:12 242:2 243:11 252:20 261:24
**aid** 61:14
**airport** 196:18
**Alaska** 56:15 58:6
**aligns** 244:15
**all-hands** 36:20,23
**allegation** 84:16,20 85:3 91:21 105:17 231:5 241:8
**allegations** 92:1 113:13 115:23

**alleged** 84:5 217:21 269:2

**allegedly** 104:22,25

**Allison** 10:2,4 11:12,15,18, 21,23 12:1,3 18:6,17 21:2,12 22:2,16 24:12,24 25:4,15,21 26:9,17 30:7 35:3 39:9 40:12, 23 42:1,9,24 43:13 44:19 45:2 46:16 47:22 48:19 50:8,19 51:10 55:16 57:3 59:13 60:1 61:1,8 62:18 63:1,12,23 64:16 65:6 68:6,13,23 69:11,23 70:11 71:9,21 72:21 73:10 75:1,8,16,17,22 76:2,13,17,22 78:7 79:16 80:2 81:13 82:7 83:2 84:12 86:19 89:1,11,15, 21 90:10,21 92:5 95:18 96:6, 16 98:4,10 99:2,5 101:14 104:1,24 105:10,12 106:7 108:17 109:23 110:5,19 112:5 114:7 115:5,12 116:8,19 117:1,9 118:22 119:22 120:8, 13,17 121:5,7 123:22 124:18 125:7 126:2,23 127:17 131:5 132:5 133:4 134:1,20 135:21 136:11,23 137:13,22 138:14 139:8 140:22 141:6,16 143:4, 22 144:9,24 146:6,20 147:15 148:6,10,12 149:13 150:24 151:12,19 152:5,12,17 154:15,17,20 155:19 156:1 158:4,11,15 159:8 162:9 165:12 166:8,21 168:1,4 169:13 170:4,12,16,21,23,24 172:18 173:7,23 174:16 175:2,15,25 176:13,21 177:1, 3,20 178:13,19,22 180:7 181:1,20 182:1,24 183:8 185:6,21 186:1,7 187:21 188:23 189:14 190:5,11 191:19 192:3 193:12,20 194:5 195:9,22 196:22 197:1,9,13, 16,23 199:8 201:7 203:5,18, 20 204:21 205:2,12 206:11,19 207:24 209:10,17 210:12 212:4 213:18 214:6,12,17,20 216:9,20 217:24 218:4 219:5, 23 220:16 221:22 222:11,23 223:10,23 224:8,18 225:7,14, 16 226:1,16,20,25 227:3,9,14, 24 229:2 231:7 232:10,15,17, 20,22 233:5,12 237:6 238:7 239:22 240:11,23 241:10 242:12 243:6,10,13,20 244:9, 19 245:1,22 248:6 251:5,23 252:1 254:16 255:4,11 256:1, 15 257:6 258:3 259:13,25 260:4 262:6,19,24 263:12,14 264:15 265:8,14 266:4,22 267:5,7 268:18 269:23 270:6, 23 274:22 275:12 276:9,12,19 278:4,11,16 279:1,10 280:5, 12 281:13,20 284:21 285:19 286:2 287:13,21 290:16 291:7 293:19,24 294:1,10,14 296:9, 11 297:13,24 298:9,13,19 300:18 301:12 303:7 304:3, 15,25

**allowed** 28:24 38:15 285:14

**alongside** 44:11

**ambiguous** 73:8 90:3 169:12

**Ambrose** 276:22 280:24

**American** 229:13

**amount** 86:10 92:10 251:7 264:7 281:7 288:22 289:25

**amounts** 41:2 87:1 90:11 159:19 160:21 164:22 214:2 256:6 257:18

**analog** 220:19

**analyzed** 72:7

**and/or** 21:6 31:19 72:3 122:2

**Andres** 26:24

**Andrew** 243:14

**Andy** 64:11,17,20 65:12,18, 24 66:2 67:1,2 97:16 98:17 102:5,6 103:3,8,16 121:14 122:4,13 131:8 141:21 145:16 148:15 156:22 157:16 158:23 159:4,7 167:22 180:10,11 181:2 182:4 183:2 186:12

**Andy's** 67:7

**Ann** 30:24 31:19 53:22

**anonymously** 243:5

**answering** 24:20 296:17

**answers** 164:25 168:25 218:3

**anymore** 282:21 295:12

**apologize** 83:25 109:22 149:15

**Apparently** 187:6

**appearance** 144:20

**appeared** 125:16 143:19

**appears** 77:14 96:25 97:8 121:16 122:22 123:2 126:13 152:14,21 179:1 190:25 191:3 192:1 193:1 194:9 255:22 275:24 282:3 291:11

**applications** 123:18

**apply** 120:19 197:17

**appointees** 87:22

**appreciates** 205:8

**appropriated** 87:7,9 296:23

**appropriates** 89:8,24

**appropriation** 238:20 295:5, 16 297:6,8

**appropriations** 54:2 86:6, 23,25 87:10,13 88:1,6,14,17 89:2,7,8,12,24 90:1,6,13,17, 18,19,22,25 263:3 267:11,15 270:13 295:6 302:10

**approval** 90:12,16,18

**approve** 284:16 289:18 302:23

**approved** 33:20 272:1

**approximate** 60:3 106:16

**approximately** 102:23 106:19,20 162:17

**April** 9:2 28:23 30:17 42:18, 23 43:1,14,19 105:24 119:10 245:8,24 258:10

**arbitrator** 240:9

**architects** 79:20 81:1

**area** 33:24 34:3,9,19 39:10 48:21 50:1 54:4 58:15 241:14 297:2

**areas** 33:14 34:16 43:5 74:6 229:16 247:9

**argued** 67:23

**argumentative** 68:10 89:18 104:18 109:19 117:24 169:21 172:1 173:3 205:5 220:6 225:2,12 226:11 227:7 231:2 232:6 267:1 279:22 280:11 286:13 287:17 296:7 298:8

**arrange** 218:22

**arrangement** 37:11

**arranging** 147:25 157:7 226:5

**arrest** 281:9

**arrived** 36:11 54:3

**article** 82:25 83:17 84:8,14, 16,22 92:15,17,22,23,24 93:2 94:2 105:4 112:11,14,15,17 113:3,4,19,23 114:16 119:2, 11 136:6 143:18 149:23,25 207:21,22 208:16,19 216:17 236:4,12 241:20

**articles** 112:17,18,22 141:14 208:2,17 209:7 218:14 228:24 273:25

**ASAP** 153:15

**asks** 129:24

**aspect** 95:11

**aspects** 39:24 66:24

**assert** 281:7

**asserting** 221:9 222:25 223:8

**assigned** 39:11,16 213:21,25

**assist** 61:13 73:23

**assistance** 302:15

**assisting** 188:20 214:1

**associate** 202:7

**association** 141:1 206:2

**associations** 205:15

**assume** 94:25 191:15 212:15 271:18 276:24

**Assumes** 169:20 183:4

**assuming** 141:13

**assumption** 89:7 95:16 136:19 191:5 212:7 222:22 277:3

**assured** 113:24

**attach** 150:7

**attached** 75:13 96:14 121:3 152:3 153:7,11 154:7,9 155:11 156:7 178:17 181:24 186:5,20 190:9 194:3 195:11, 17 197:21 207:14,20 209:15 227:13,22 228:1 233:10 243:18 244:23 248:4 264:3 270:21 271:21 275:9 276:17 281:18 291:3,19 298:17

**attachment** 97:14,20,23 98:12,16 187:12,15 194:17 195:20 271:19,20 276:21

**attachments** 195:24 196:1 291:13,16,19,23 299:23 301:17

**attend** 31:14,18 102:19 103:3,5

**attended** 31:16,20

**attendees** 102:4

**attention** 265:16

**attorney** 100:4,7,13 101:4,9, 16,21 121:20 128:3,4 167:14 184:4 292:4,17 301:9

**attorney-client** 24:16 99:12 100:1,19 101:6 292:2

**attorneys** 17:18,21 18:1 19:22,25 24:18 101:12,16 106:1

**attributing** 254:14

**audible** 70:15 156:18

**audio** 170:14

**August** 60:20 246:5

**author** 280:25

**authority** 87:1 88:7 172:3 238:20

**authorizing** 70:21 78:22

**availability** 129:25

**avoid** 24:17

**award** 288:13

**awarded** 287:24 289:11 297:5

**aware** 10:12 27:21 28:4,6 30:5 31:2 38:5 46:23 53:24 54:17 83:11,22 84:2,19 85:3 91:19,21,25 92:6 107:11,19 111:5 112:4 117:3 129:12 135:9,11,15 138:25 140:8 155:20 156:4,9 164:1 168:7 174:1 184:6,8 215:24 217:9, 20,25 218:11 219:12,13 220:13 222:19 231:4,15,21 236:4,6 258:23 275:2 284:15 294:7

**awareness** 83:15,16 189:20 211:1 277:6 298:25 299:3,6 300:1,23

**awkward** 11:14

### B

**Bachelor** 23:2,9

**back** 28:8 61:3,9 66:11 76:23 91:11,15 99:3 120:18 122:23 123:13 124:13,25 125:9,21 126:14,17 127:1 130:13 131:18,23 132:11,17,20 154:13,15 160:19 170:16 172:13 176:1 177:1 179:3 193:7 197:13 202:3 209:1 214:13,17 224:19 244:13 260:5 262:7,21 263:12 269:20 280:14 294:12,18

**back-and-forth** 124:9 272:21

**backdrop** 291:21

**background** 114:24

**bad** 114:1,18 136:4,5 140:16 141:12,13 181:13 184:25 185:3 208:2,7,25 209:1,6 236:4

**baked** 86:16

**balance** 231:12

**bank** 187:24

**base** 244:11

**based** 26:12 29:24 49:25 65:11 83:13 97:5 113:13 123:1 124:20 133:12 138:5,9 142:20 147:14,19 151:9 172:23 174:10,18 179:24 181:10 184:14 187:14 208:19 219:7 231:3 233:3 254:4,19 273:7 282:21

**basic** 14:11 83:5 91:12 111:1, 5,16 213:1

**basically** 16:18 34:7 54:5 212:17 245:13 262:25 282:20

**basis** 14:17 42:6 113:1 119:18 126:25 206:12 221:9 222:25 223:3,7,11,13 224:5, 12,21 225:10 230:5 248:18

**Bates** 293:22

**Beat** 112:20 113:4 119:2 208:3 235:6,9,15 236:1,4,13

**began** 105:21 286:24

**begin** 72:18

**beginning** 158:17 233:20 262:9

**begun** 143:6 157:7

**behalf** 65:1,19 66:1 67:14 71:1,6,7,12,18 73:2,15,20 79:21 81:2 82:1 195:2 216:12 218:22 247:11 253:10 254:1 281:7 283:1

**belief** 109:25 274:7

**believed** 27:25 49:11 54:15 114:11 200:10 263:10

**beneficial** 87:18 88:2,5

**benefit** 74:19,23 75:4 109:11, 16 110:1,16 242:19 266:8 268:25 281:12 303:4

**benefited** 39:8

**benefits** 66:3 243:4

**big** 205:20

**bill** 91:1 121:19,23 122:4 128:11 153:16 154:4 155:1,4, 15,21 156:6 158:22 167:22 182:3,17 183:1,10,13,18 184:3 186:11,17 187:8,15,23 188:13,18,19 191:3,16 192:7 193:5 194:7,9 195:13 198:8,9, 14,15,20,24,25 199:10 200:23 202:12 215:4 221:19 228:4 275:25

**bit** 11:13 40:2 67:12 207:25 208:1 230:21 249:10 262:20 263:16 298:23 299:17

**blunt** 100:11

**board** 57:7

**boat** 38:7

**body** 126:7

**Bofman** 79:20 80:5,6,8,13 81:1,11 171:2,13 172:15,21 173:11 209:23 212:11 250:5, 20 251:7 255:13 256:20 258:7 260:11

**born** 12:22

**bottom** 38:7 77:16 122:9,10, 11,23 126:6 145:15 152:6 153:10 158:16 186:10 190:24 198:7 210:14 233:13,14,25 235:13 241:11 248:10 251:16 260:6 270:24 271:4 283:10 294:11,12,13

**bragged** 109:5

**branch** 89:9

**brand-new** 52:25

**breach** 293:5

**break** 17:9,13,14 35:6 60:24 61:2,12 86:20 110:23 176:20, 22 177:9 197:4,7 214:7,9 255:6 259:25 260:8

**breaking** 255:3

**breaks** 17:6,10

**Brian** 64:21 269:24 270:7

**Briarwood** 11:8

**briefly** 112:24 127:6 130:3 255:21 271:13

**bring** 197:17 214:17 227:14 290:22

**bringing** 154:21

**brings** 12:4

**broad** 23:20 82:12

**broader** 74:3

**broadest** 212:25

**Bronster** 11:12,17,20,25 12:2 15:4 18:2,5,11,16 20:22 21:7, 24 22:9 24:7,15 25:1,8,19 26:5,14 30:2 34:23 38:24 40:7,20 41:17 42:4,20 43:10, 21 44:23 46:11 47:12 48:15 50:5,17 51:2 55:12 56:24 59:9,19 60:23 61:5 62:10,23 63:6,15 64:13 65:3 68:2,9,18 69:3,19 70:9 71:3,13 72:10 73:7 74:21 75:15,18 76:5,8,15 78:4 79:11,15,22 80:20 82:4, 21 84:10 86:14 88:19 89:4,14, 18 90:2,15 91:23 95:4 98:2,7 101:5 103:22 104:18 105:8 106:4 108:15 109:19 110:2,7 112:1 113:15 114:13 115:7 116:4,13,23 117:7,24 119:16 120:3 123:16 124:15 125:2,24 126:19 127:9 130:25 132:1,25 133:19 134:12 135:5,25 136:14 137:4,18 138:11,21 140:18 141:3,9 142:23 143:15 144:3,14 145:25 146:16 147:9 148:2 149:9 150:19 151:6,16 152:8,16 155:9,23 158:1,25 162:2,4,7 165:8,22 166:16 170:11,20,22 172:1 173:4,17 174:6,20 175:8,21 176:18 177:14 180:4,17 181:15 182:19 183:4 184:21 187:17 188:15 189:7 190:1 191:9,24 193:9,16 195:7,16 196:2 198:22 201:3 202:23 204:14, 24 205:5 206:4,14 207:17 209:3 212:1 213:7 214:11,14 216:2,14 217:17 218:2,25 219:19 220:5 221:16 222:1,17 223:5,15 224:2,13 225:2,11, 21,23 226:10,18,22 227:6,16 228:17 231:1 232:6,14,16,18 236:25 238:2 239:15 240:6,18 241:3 242:8,24 244:7,18,20 245:16 251:1,18 254:10 255:2,7,10,18 256:21 257:10, 14 259:9 261:23,25 265:6 266:3,17 267:1 268:16 269:17 270:2 274:19 276:6,10 278:1, 7,13,24 279:6,21 280:11 281:10 284:7 285:4,23 286:13 287:17 290:10 293:7,22,25 296:7,14 297:18 298:6 300:2, 25 303:6,16 304:12,17,22,24

**brother-in-law** 44:2

**brought** 54:14 66:4

**browser** 77:9

**Brunk** 284:15,22 288:21 289:3,7,10,16 302:13 303:20

**Brunk's** 286:17

**budget** 264:8 267:22 290:3 295:9

**build** 53:10

**building** 38:3 55:18

**bullet** 234:2,13 241:12

**bunch** 182:9

**business** 30:12,25 31:4 32:21 33:1,4,16 34:3,5,7 36:12 37:16 39:14 40:18 52:24 56:17 60:7 65:1,7,18 87:3 88:9,15 94:22,25 95:12, 17 106:17,25 107:15,24 125:20 184:19 189:18 196:14 208:25 215:18 217:10,12 246:20,25 247:3,22 253:20 274:11 300:12

**business-related** 300:13

**C**

**call** 18:8 58:18 59:3 60:18 129:25 130:20 134:3 228:24 239:5 251:15 277:14 292:16

**called** 9:22 10:20 21:17 22:6 26:23 38:10 41:4 53:15 139:15 211:12 219:10 239:24 284:3,10 290:8

**calling** 234:7 235:5

**calls** 24:8,16 25:9,10 42:5 84:10 93:17 113:16 120:4 124:15 125:2 132:25 133:20, 22 134:12 135:5 136:1,14 137:5,18 138:11,21 141:3,9 145:25 147:10 148:2 150:19 151:7 155:9,23 158:1,25 163:6,11 166:16 169:12 174:21 180:4,17 181:15 182:19 183:5 187:17 188:15 189:7 191:24 193:9 198:22 204:14,25 205:6 206:14 221:17 222:1,17 223:5,16 224:14 225:3,12,24 226:12 227:7 237:1 254:8 255:18 257:13 278:8 279:7

**camera** 197:2

**campaign** 29:17 42:3,7 67:9 70:21 78:15,23 85:12 86:3 95:25 103:16 107:3,11 109:13 113:8 116:16 117:19 118:8 119:15,21 121:21 188:21 195:5 216:8,19,21 224:6,10, 15,17 238:25 269:5 301:3

**campaigns** 85:10 95:12

**candid** 291:8,18

**Canfield** 121:14,18,20,23 122:4 128:11 152:19 154:4 155:1,5,21 156:6 167:22 182:3,11 183:1,10,13,18 184:3 186:12,17 187:8 188:13,18 191:3,16,22 192:4 193:5 194:9 195:13 221:2,14, 19 228:4 275:25

**Canfield's** 153:5 182:17 187:15,23 194:7 215:4 227:13

**capabilities** 53:3

**capacity** 41:16 71:24 72:19 192:23 247:8 283:7

**capitalized** 136:25 137:1

**Capitol** 35:11

**capture** 33:1 250:17

**captures** 159:23

**card** 32:21

**care** 118:14 196:8 278:12,15

**career** 24:3

**carefully** 137:8

**Carolina** 11:9 15:18 40:5,11, 14 52:9 57:21 58:25 59:2 119:4 177:11,17 178:1 198:12,17,21 200:21 201:9 258:23 269:7,8 282:1 283:1,8, 23,25 284:5,12,19 286:18,21 287:4,6,12 289:12,13 290:7 294:19 295:1,8,11 296:4,20, 22,24 297:5,8 302:22 303:11

**carried** 172:11,16 251:4

**carry** 255:24 256:10 259:20

**cars** 109:5

**case** 10:5 19:15 24:13 25:17 39:5 100:4 125:15,16 220:20 251:8 267:20,21 292:18 293:15

**cashed** 92:11

**Castro** 179:6,7 180:12 208:9, 23

**Castro's** 180:21 181:11

**catch** 15:11 51:11

**catching** 210:6

**category** 49:17 51:14,22

**caused** 114:18 118:21 281:9

**caution** 100:22

**caveat** 49:4,15

**cc'd** 94:3

**ceased** 106:22

**cell** 17:1

**center** 56:20 298:23

**central** 199:1

**cents** 241:16

**CEO** 26:24 27:1 71:23 72:8,19 94:23 118:13 124:3 185:15 195:24 234:21 261:5 278:23 279:2,4,20 289:16 302:4

**certificate** 298:24 299:4,11, 21

**certificates** 299:9

**cetera** 134:7 201:16

**CFO** 142:1

**chain** 121:13 122:20 123:9,15 124:6,8 125:10,21,23 126:4, 12,17,18,25 127:2 128:5 129:12 131:18 132:22 133:13 145:20 146:9 148:8 156:16 160:11 179:18 186:9 209:19 248:8 272:10 281:22

**challenge** 33:23

**Chan** 18:5

**chance** 302:5

**change** 43:1 50:21 105:16 228:14 235:5

**changed** 42:25 43:17,19,25 45:5 299:17

**changing** 43:24 246:2

**character** 36:19

**characterization** 227:17 247:16,18 258:1 276:7 287:20 298:7

**characterize** 39:1 45:21 46:22 48:4 239:19

**characterized** 164:7

**charge** 247:4 282:18

**charged** 95:15

**charitable** 201:23 202:13
**chart** 247:8
**charter** 220:13
**chat** 75:25 76:4,10,12 77:7 96:10,19 121:6 151:23 210:7 243:15 264:24
**check** 92:10 94:5,6,7 95:3 104:8 107:9 220:10 231:12 252:22 253:16
**checking** 196:17 254:1
**checkmark** 267:25 268:2
**checkmarks** 267:17
**checks** 171:5 172:22 173:10, 16,22 174:18 175:4,6,13 252:12,17,25 253:5,10,18,21, 22 254:1,7,14,15,19,23 257:17
**Chen** 19:12 29:15 81:18,22 121:13 122:13 131:9 141:21, 24 142:1 145:16 148:15 156:22 167:22 168:5 169:8, 10,18 171:4 172:21,24 173:10,15,24 174:13 206:12 209:24 256:3 257:9 258:7 260:11 272:11
**Chenoa** 248:12 250:5,20 251:8,12
**cherry** 264:11
**chief** 13:22 64:20 71:19 72:13 189:23
**children** 283:2 303:11
**chime** 256:14
**choose** 41:22
**Chris** 35:10,19 36:5,15 37:3, 8,12 44:11,12 54:15
**Chung** 30:24 31:19 53:22
**citizen** 41:23
**citizenship** 204:8,17 205:9
**civic** 41:22
**Civil** 112:20 113:4 119:2 208:3 235:6,9,15 236:1,4,12
**claim** 46:24 226:6 295:5,22 296:21 297:7
**clarify** 47:24 55:5 264:5
**clarifying** 177:22
**clarity** 277:16
**classified** 300:10
**cleanup** 188:4
**clear** 17:21 21:15 36:6 78:2 106:14 112:15 129:10 165:2 170:2 176:8 188:8 194:20 202:5,9 220:17 256:16 279:24 280:1 285:8 286:16,17,25 287:5
**Cleta** 124:9 127:20,22 128:7, 13,24,25 129:4,8,22 130:10, 13 131:8 137:10,15 138:24 140:14,24 141:20 142:4 145:15,21 146:8,23 147:24 148:13,18,23 150:2,12 151:3, 14 152:23 153:20 155:6,13, 16,22 156:7 166:11,14,18 200:1 215:6,8 221:20 226:3
**Cleta's** 150:16
**click** 77:7,8
**Cliff** 19:12 29:15 129:8 131:9 142:1 145:16 156:22 168:5 169:23 170:3 189:12 191:12 192:13,25 206:9,12 207:4 209:23 212:11 235:1 256:3 257:3,9,24 258:7 260:11 272:10,11,22 273:9 280:18
**Cliff's** 273:5,7
**Clifford** 121:13 122:13 141:21,24 148:15 167:22 169:8,10,18
**close** 80:7 98:22 160:9
**closely** 247:10
**cloud** 302:7
**clues** 22:14
**Code** 11:11
**codefendants** 20:19
**Colin's** 103:9
**college** 22:25 198:12 199:2
**Collins** 85:13,14,21 86:1,3,5, 22 87:19 96:1 97:17 103:12 104:9 141:1 153:25 207:23 215:13 216:1,8 219:12 231:23 268:1,3,24 269:5
**Collins'** 87:12 97:22 98:14,18 104:15,16,21 109:10 217:16 231:6
**Columbia** 11:8 15:18 29:16 118:8
**combination** 57:17,22
**comment** 189:10 196:9 202:4 228:22 230:9
**commenting** 235:12
**Commission** 111:2,8,22 112:8,13
**committed** 160:24 301:7
**committee** 85:8 86:6,10,23, 25 87:13,16 88:1,6,14,17 89:2,8,12,24 90:1,6,13,18,23, 25 107:10 263:3 267:11 270:13
**Committees** 87:10
**common** 39:19 169:3,5,14 170:6,10 172:17,25 261:4
**commonly** 21:22 169:15 290:8
**communicate** 202:16 277:17
**communicated** 34:18 192:24
**communicating** 65:18,22 301:22
**communication** 16:9 17:2 99:13 100:1,19 200:18,20 268:21 292:2,5
**communications** 55:23 56:7 64:25 128:10 207:8 285:15
**companies** 27:7 28:3 30:9 115:22
**company** 10:7,10,15,19,24 13:24 26:23,24 27:20 28:9,10, 12,16,18,21 29:2,5,25 30:21, 24 31:1,2,24 32:1,5,8 33:7 34:2,8 35:10,12,22 36:11,24, 25 37:9,12,13,15 38:5,22 39:2,20,23,25 40:19,25 41:2, 9,14 42:11 44:4,11 45:25 46:14 47:5,10 48:12 49:12 50:2 51:1 53:6,11,13,14,16 54:1,5,22 55:10,24,25 56:3,4,

18 58:15 59:1,6,7 60:2,14 62:3,8 63:4,14 64:8,12,22,25 65:1,14,19,25 66:1,9,13 69:21 70:3 71:15,18,19 72:2,3,5,13, 20,24,25 73:2,5,12,16,22,23, 25 74:1,5,17 75:4 78:12,20 80:6 82:24 83:1 86:12 87:2,4, 18 88:2,4,8,10,18 89:3,16,25 90:7,17,24 92:9,21,22 93:4 94:8,13,14,19,22,24,25 95:3, 7,12,15,17 97:6 98:20,25 101:17 103:21 108:5 109:11, 16 110:1,12,13,17,18 111:23 113:12,20,21,25 114:6,19,22 118:3,14,20 122:2 123:8 124:3 139:11,13,25 140:3 142:1 144:23 164:3,10,15 165:6,10,14,19 166:7,24 168:18,23 169:2,4,15,24 170:2,7 171:20 172:9,15 173:1,15 175:18 176:6 180:1, 2,22,24 181:13,19 183:15,25 184:6,18,19 185:1,10,12,16, 18,20 188:4,20,22 189:5,15, 25 195:25 201:1 202:2,7 203:10,13,15,16 205:15 206:10,18,21,23,25 207:1,2, 19 208:11,14,24 209:9 211:10,11,12 212:14 213:2, 21,25 214:4 216:12,19 217:1 218:22 220:20 228:23 234:14, 25 235:3 236:15 237:17 238:13,14 239:11 241:21 242:18,20 244:4 246:8 247:12 248:17 251:3 253:7,10,19,22 254:7 259:23,24 261:5 263:4 265:21 266:2,5,8,10 273:23 274:9,14,16,24 275:1 276:25 277:1,15,25 278:6,12 279:20 280:1,15,17,22 281:4,8,12 282:5,16,21 283:1,21 284:3, 10,13,18,20 285:1,2,9,22 286:5,11,18,19,22,23 287:2,7, 9,23 289:14,17 290:6 291:12 293:3,5,13 295:2,6,13,18 296:19,20 297:7,15 298:2,3 299:24 301:8,18,22,24 302:1, 8,11,13,15,21 303:9,21,22

**company's** 37:16 56:22 66:19 67:3 74:7,19 88:15 89:17 102:10 165:16 179:12 184:4 259:5 282:13 286:12 293:6 295:5 298:2 301:10

**complaint** 105:5 111:3,6,8, 22 112:8,13 113:1,5,6,10,14 114:6 115:23 117:17 118:2,4, 7,19,23 119:1,8,11 122:7 129:13,15 135:12 136:6,17 141:15 143:20 148:20,24 149:2,6,18,23 150:18,23 151:5 153:24 156:9 160:15 161:21 162:14 165:18 166:14, 20 167:11 177:25 178:5 181:14 184:24 185:16 186:17, 25 195:14 203:1 208:20 209:1,8 215:12 216:17 217:22 230:1 231:3,19 233:2 237:21, 23 241:7 274:1 276:3

**complaints** 115:21

**complete** 33:19 70:25

**completed** 299:1

**completely** 114:4 168:18

**completing** 299:5

**compliance** 70:7 78:15 167:13,18 183:22 186:25 187:3

**compliance-related** 189:20

**compliant** 119:14

**composite** 38:3 56:20

**composites** 38:3

**Compound** 18:12 65:4 116:14 184:21 259:9 269:17 284:7 303:17

**computer** 16:10 17:1 197:15 214:7

**conceived** 136:10

**conceptualized** 73:19

**concern** 113:23 118:21 205:20 207:2 208:2

**concerned** 114:17 205:14 206:1,6

**concerns** 143:18 203:1,6,13 206:13 207:8 236:9 237:22 293:2 300:23

**conclude** 142:20 181:11

**concluded** 184:10 305:4

**conclusion** 24:8 42:5 113:16 120:1,4,7 139:3 141:8 237:1 278:8 279:7

**conclusions** 25:17,23 26:3 254:18

**conclusively** 162:23

**conduct** 93:22 240:17,25

**conducting** 274:10

**conference** 18:8 102:8,9

**confidence** 282:15

**confidential** 99:12,25 100:18 292:1 294:3,15 299:24 300:21

**confidentiality** 293:14,17

**confirm** 43:7 77:1,13,17 82:18 111:1,11 127:7 162:10 176:14 194:11 195:19 204:20 244:14 245:20

**confirmed** 50:25 51:13,23 126:15

**confused** 119:23 281:5

**confusion** 202:15,19 277:10

**Congress** 74:8,13,20,24 75:6 87:8 239:3 263:2 265:19 266:8,12,16 270:13 288:7

**congressional** 246:20,25 247:2 260:21 261:11,13,15 263:18

**conjunction** 147:17 193:6

**connect** 73:19,21 234:14

**connected** 185:1

**connecting** 234:24

**connection** 92:24 93:3 209:9 234:18 299:11

**connections** 217:5 247:12

**considered** 28:9 72:7 208:7 213:20 216:18 238:18 277:14

**consistency** 228:19

**consistent** 109:13

**consistently** 206:8

**consultant** 44:9

**consultants** 116:18

**contact** 56:22 59:16 161:5 162:20 163:10 193:5 235:9 256:17

**contacted** 161:14,22 162:18 163:1,4,19 175:17 176:16

200:11

**contacting** 168:21

**contacts** 56:12 163:14,25

**contained** 123:20

**container** 128:20

**content** 94:21 134:2 154:9 228:16

**contents** 184:17

**context** 22:12,20 47:15 82:15 100:19 122:4 125:20 126:1 131:20 141:7 165:20 185:11 223:12 224:6 240:14 253:19, 22 254:7 276:1 278:19,21 279:16 283:19

**contexts** 237:4

**contextual** 22:14

**continue** 61:10 185:8 202:11 280:17 303:13

**continued** 60:18 302:4

**continues** 181:3

**continuing** 187:22 302:6

**contract** 47:19 48:10,14 49:12 51:6,7 62:22 66:14,17 284:13,16 287:22 288:1,13, 16,18,20,23 289:1,2,4,9,10, 11,25 290:6,9,14 297:1,4 298:3,8 302:23

**contractor** 290:3 297:9

**contracts** 39:7 40:15 52:10 64:8 86:11 87:5 88:11 238:20 284:5 288:7,10 289:6,7 295:20 296:2 302:9

**contrary** 230:10

**contribute** 158:10

**contribution** 219:17 220:4 221:7,11,23,25 222:7,10,13, 14,20 223:1 226:8

**contributions** 29:17 42:3 70:21 78:23 167:3 203:9

**control** 33:19 77:10 169:3,5, 14 170:3,6,10 172:2,7,9,17,25 174:5 193:14 211:20 247:24 281:3,6,7

**controlled** 169:15 170:6 300:10

**controller** 253:6,17

**conversation** 12:10 76:19

**conversations** 56:11

**conversely** 207:13

**conveyed** 155:1,4

**conviction** 115:24

**coordinating** 175:3

**coordination** 171:3 172:21

**copied** 56:13 94:12 121:15 122:21 123:24 131:9 141:22 145:16 156:22 167:23 183:9, 12,24 188:12,18 189:19 190:23 220:9 231:9 233:4 250:4 258:7 259:14 271:17

**copies** 182:4

**copy** 16:22 75:16,19 96:18 111:10 123:14 182:14 194:13 235:18,24 304:13,15,20

**copying** 122:13 157:18

**core** 36:10 38:13 47:4 183:14

**corporate** 106:25 107:15,22 108:3 218:15 228:25 278:19, 21

**Corps** 290:2 294:21

**correct** 16:8 20:1,2,6 21:19 22:8 23:15,16 24:25 26:16 29:17,18 32:2,3,16 39:23 40:6,16,17,19 41:13 43:15,16 44:21 45:7,8,12,13 46:21 48:2,6 50:11,16 52:18 56:9 60:12 61:19,23 62:3 64:1,2,5 65:19,20 69:22 70:19,22,23 72:25 73:3 77:22,24 78:3,5, 10,13,18,20,21,23,24 79:4,5, 8,9,21 80:9,10,14,15 82:10 84:21 85:4,5,15,16,18,24 86:7,13,23,24 87:20 88:9 89:17,23 91:22 92:4 96:24 97:7,17,18 99:13 102:2,6,7,11 104:6,17 107:23 111:10,25 117:23 121:15 122:3,14,21 123:6,15 124:23 126:4,12,18 127:20 129:25 132:8,12,13 133:5,11 140:3,4,17 141:22 142:11 143:14 144:2 145:13 146:9,15 147:12,18 149:4,8, 21 152:20,25 153:9 156:17 158:18 159:10,11 161:16 165:13 166:20 167:25 168:24 169:6,8,16,17,18 171:10,15 174:5,19 175:19 177:13 178:25 181:8 182:5,8,14,18 184:4,9 186:23 187:3,16,24 189:2,25 190:24 192:12 193:15,19 195:6,15 199:22 200:13,21 201:2,8 203:25 204:9 205:16,23 208:4,5,20, 21 209:2 214:25 216:1,13,24 217:8,16 218:13 219:6 229:21 230:25 231:20 232:4 233:2,16 234:2,8,15 235:7,11 237:9 240:8 243:23,25 245:15 246:7 247:14 250:5 252:6 253:7,8 256:3,20 257:9 258:9,12,21 259:8,17,22 261:19,21 264:22 266:8,25 268:1,2,6,15,19 269:1,9,16 270:1,15 271:11 273:19 277:1 278:23 279:2,3 282:2,5,10,11 284:6 286:5 288:7 292:5 303:15

**corrections** 250:24

**correctly** 38:19 115:15 240:24 248:13 250:22 257:8

**correctness** 228:21

**counsel** 10:4 12:4 15:3 21:4 25:9,11,14 26:8 67:13 76:7 77:6 115:2 154:19 167:24 185:13,24 188:2 189:5,16 210:9 243:9 244:7 276:1 291:5 304:9,22 305:1

**count** 37:6

**counted** 95:14

**counterintelligence** 299:18, 19 300:15

**counterparts** 163:25

**country** 41:24

**couple** 14:11 16:18 21:14 110:21 135:8 249:5

**court** 9:6,11,18,23 12:6 14:21,24 29:10,15 75:13 96:14 110:23 121:3 131:13 152:3 175:25 178:17 181:24 186:5 190:9 194:3 197:21 209:15 210:6 214:9 227:22 233:10 243:18 244:23 248:4 264:3 270:21 275:9 276:17 281:18 291:3 298:17 304:19,

21
**cover** 98:1 291:10
**covering** 188:14
**covert** 287:15
**COVID** 119:5 283:3
**create** 50:3 197:5 266:6 291:17
**created** 159:10 184:25 210:2, 16 219:16 220:3,19 234:20 265:9 267:14
**creating** 77:19,23 78:6 163:16
**credibility** 143:7
**credit** 63:14
**credits** 30:9
**criminal** 99:19 100:4,20 101:20 113:12 115:24 292:8, 12,14 293:12 297:23 301:9
**critical** 129:6
**crystallize** 62:20
**crystallized** 48:10 49:18
**current** 11:6 13:10,11 189:15 279:20 286:7
**cut** 70:16 170:13 252:12,18, 22,25 253:5,9,21 254:1,19,24
**cutting** 254:7
**cycle** 60:7

D

**D.C.** 121:20 128:4 178:11
**Dagher** 56:19
**damage** 247:24
**Dan** 284:15,22 285:16 286:17 288:21 289:3,7,9,16 302:4,13, 18,20,23,24 303:20
**dark** 108:4 302:7
**dash** 99:12 100:18 149:4
**dashes** 97:15
**date** 28:24 31:25 32:4,9,11 36:22 42:14 54:14,23 55:1 93:14 102:12 124:11 128:17 132:3 139:13 140:6 141:25 142:13,17 152:9,10,12 157:6, 10,13 158:9 160:8 162:15 177:24 178:1,3 217:10,13 242:14,15,16 244:14 246:9,24 280:23 299:7
**dated** 122:12 130:10 141:19 145:16 179:4 182:3 186:13 199:21 228:4 244:5 245:8 254:20 271:8 275:16 276:22
**dates** 31:9 106:16
**Dave** 57:17 280:18
**dawned** 177:9
**day** 15:19 17:11 32:7 91:16 92:7,9 98:20,23 114:4 121:24 148:14 163:24 186:15 191:16 282:14 292:21,23
**day-to-day** 257:7
**days** 130:11 162:17 293:4
**DCSA** 299:20
**de** 56:25
**deal** 19:19
**dealing** 65:22
**dealings** 65:1,8 122:1 217:11
**dean** 57:23,24 198:12
**decades** 95:8
**December** 36:21 83:21 84:1, 3 92:9 95:23 104:5 282:4 284:23 301:15
**decide** 91:5 159:15 282:12 288:14,15 304:5
**decided** 25:3 181:19 286:21 295:11 296:22,25 297:8 301:25
**decides** 89:13
**decision** 171:24 172:10 181:12 287:11,14
**decision-maker** 88:23 171:18,20 172:14
**decision-makers** 53:9 56:7, 12 198:19 199:3,6
**decision-making** 87:1 88:7 174:11,15
**decisions** 88:17 172:6,11 250:11,16 251:10
**declaration** 67:19,22 68:15 69:15 70:6 77:2,14 80:19 82:16,20 170:17,25 172:19,24 173:9
**declining** 180:22,23 208:10
**defend** 168:10
**defense** 10:11,16 87:4,6,7 88:24 91:1,4 101:21 238:16 265:20 267:12,16 274:10 276:25 279:13,14 284:14 289:14 299:19 300:11,14 301:9
**define** 47:7,9 48:8 55:15 85:19 280:3
**defined** 33:13 280:8
**definition** 49:5 172:6 237:11 238:5,8,9 240:9 278:2,9,14,20 279:9,11,16,19 280:7,8
**definitions** 21:14 66:11
**definitive** 218:19
**definitively** 123:9
**degree** 23:4,8,9 39:6 58:13 116:15,22
**degrees** 22:25 282:20
**Delaware** 161:9,15,24 162:20 163:3 200:12 249:8
**delayed** 28:24
**deleted** 127:11
**deliver** 95:3
**delivered** 94:8
**deny** 195:20
**departing** 284:19
**department** 56:2 87:4,6,7 88:23 91:1,4
**departments** 199:6
**depend** 22:11 47:14
**depending** 163:9,18 262:4
**depo** 76:18 286:17 290:18
**deponent** 9:17,22 18:4,15 20:25 21:10 22:1,11 24:10,19 25:2,13,20 26:7,16 30:5 34:25

39:1 40:9,22 41:20 42:6,21 43:11,23 44:25 46:12 47:14 48:16 50:6,18 51:4 55:14 56:25 59:10,21 61:4 62:11,24 63:7,17 64:14 65:5 68:4,11,19 69:20 70:10 71:5,15 72:12 73:9 74:22 78:5 79:14,25 80:23 82:6,22 86:16 88:21 89:6,19 90:5,16 91:25 95:6 101:11 103:23 104:20 106:5 109:21 110:4,9 112:3 113:18 114:15 115:10 116:6,15 118:2 119:18 120:6 123:17 124:17 125:4,25 126:21 127:10 131:2 132:3 133:2,21 134:16 135:7 136:2,16 137:7,20 138:13,23 140:20 141:5,11 142:24 143:17 144:5,16 146:2,18 147:11 148:4 149:11 150:21 151:9,18 155:12 158:3 159:2 162:3,6 165:9,23 166:18 169:22 172:2 173:5,20 174:10,25 175:12,23 176:3 177:16 180:6,19 181:18 182:21 183:7 184:23 187:19 188:17 189:9 190:3 191:11 192:1 193:11,18 195:19 196:3,24 197:7,10 198:24 201:5 202:25 204:16 205:1,8 206:5,16 207:19 209:5 210:11 212:2 213:9 216:4,16 217:19 219:2,21 220:7 221:18 222:3, 19 223:7,17 224:4,15 225:5, 22 227:18 228:18 231:3 232:8 237:2 238:5 239:18 240:8,20 241:6 242:10,25 245:20 251:2,22 254:11,13 255:9,20 256:22 257:15 259:11 261:24 262:2,21 264:5 265:10 266:19 267:2 269:19 270:3 274:20 275:11 276:11 278:2,9,14 279:8,23 281:11 284:8 285:7, 25 286:15 287:19 290:11 293:8 296:16 297:20 298:11 300:5 301:2 303:18

**deposition** 13:25 14:12 15:15 16:14,19 17:17 76:14 305:3

**describe** 37:23 73:11 79:6 112:25 240:1 297:3

**describing** 82:9

**description** 248:21 255:23

**designing** 38:6

**desire** 103:11 104:9

**desired** 87:2

**detail** 92:14 194:19 196:20 223:18

**detailed** 257:1,16

**details** 17:23 103:24 228:25 256:9

**determine** 82:15 253:2

**develop** 137:24

**developed** 38:13 53:22

**developer** 30:25 56:18

**developing** 55:9

**development** 31:4 33:5 34:4 36:12 52:24 60:7 198:17 246:21 247:1,3,22 283:25 298:24

**device** 285:15

**devices** 16:9

**die** 100:23

**Diehm** 248:13 250:5,21 251:8

**differently** 240:10 262:4

**difficult** 168:9

**difficulties** 281:9

**difficulty** 251:21

**digital** 253:12

**digitized** 159:25 160:5

**direct** 55:6 60:6 250:24 265:16

**directed** 142:14

**directing** 258:2 259:12

**direction** 72:12,25 73:5 74:17 80:14 173:11 250:11 251:4 256:4

**directions** 71:16 257:25 259:8

**directly** 54:8,21 128:22 232:8 235:25 247:5,7 303:25

**director** 33:8,10 34:22 35:5 39:12 42:10,22 43:6 179:9 271:24

**directs** 15:5

**disagree** 71:5 73:13 88:21 230:6 247:15,17 274:20 287:19

**disagreed** 229:6

**disbursement** 288:6

**discipline** 24:2

**disciplines** 229:19

**disclosed** 80:18

**disclosing** 24:17

**disclosure** 9:7

**disclosures** 127:16

**discovery** 293:15

**discuss** 25:13 26:7 61:20 97:17 103:8,20 104:20 110:22 122:6 130:20 133:23 249:19 283:5 290:21

**discussed** 24:18 43:5 61:15, 18 80:3 104:3 112:11 133:9, 18,23 134:9,19 146:13,14 148:25 198:18 220:10 221:24 233:16 266:14 269:13 277:13, 15 283:20 288:21 289:3,9 300:4 303:3

**discusses** 79:1

**discussing** 55:11 94:5 104:14 164:5 171:21 183:19 224:9,15 232:2 266:20

**discussion** 31:6 76:20 134:15 215:19

**discussions** 25:9,11 48:12 67:1 184:15

**dishonest** 144:17

**dishonestly** 144:10,21

**dismissed** 276:3

**displeased** 36:15

**distance** 208:14,22

**distinct** 168:18

**distinctions** 168:8,10

**distribute** 250:17

**distributed** 192:15 250:19

**district** 29:10,11,15,16 118:8 264:11 266:7

**districts** 74:9,14 263:2

**document** 22:18 68:3,5 69:4, 7,8 75:9,19,23 76:3,24,25 77:10 82:9,18 94:16 96:7,22 98:3,8,12 99:3,7 100:5 101:2 102:16 106:10 120:23 121:9 123:1 127:12,18 130:1,3 140:18,21 141:17 160:1 175:9 179:1 181:21 185:22 186:2 190:5 191:1 193:21 194:6 195:8,17 197:18,25 200:5 201:4,6 205:18 209:12 210:7 212:6 213:6 214:18 215:2 227:14 233:6,18 235:14 243:7,9 244:1,4 245:4,6,7,10, 11,18,21 246:16 247:25 255:5 260:8 263:24 265:5,9 275:14, 15,17,19 276:7,20 280:25 283:13 290:12 291:17 294:2, 3,6,8,19 296:2,18 297:15,21, 25 298:14 300:3

**documentation** 246:8

**documents** 10:14,23 13:14 16:16 18:20,23 19:3,4 20:9,13 22:4 37:24 42:17 164:7 211:14 218:15 268:20 290:20 292:24 293:3,13,16 297:21 300:5,6,13,20

**DOD** 87:9

**dollar** 87:6 160:21

**dollars** 89:16,17,24 160:24

**domain** 83:14

**donate** 41:22 103:15 104:9 230:16 256:5

**donated** 41:2 85:4 159:20

**donating** 109:15 264:10

**donation** 41:21 84:4,17 91:20 92:2,3,8 93:3,25 95:21, 25 103:9,12,14,21,24 104:2,5, 15,16,22,25 105:2,4,7,14,25 107:3,16 109:10,25 110:10,18 111:4 113:8 114:3,11 117:2, 15 143:12 149:7,20,24 163:16 164:11 171:4 172:22 175:4 207:23 215:25 216:5 217:15, 22 219:13 222:15 231:6,22 237:16,20 239:11 269:3

**donations** 41:6,11,15 42:3,8 81:12 85:10 95:8,9,10 104:11, 21 109:13 164:8 165:25 167:2,4,6,15,16 176:15 201:23 202:13 238:18,25 241:23 242:5

**donors** 41:5

**door** 297:16

**dot** 97:17

**doubt** 84:6 105:2,6,14,15,18 116:9,11,20 117:4,23 118:25 143:6 165:20 200:15 202:21

**doubting** 182:14

**doubts** 115:6,13,17,19 116:3 117:10,12,20,21 118:18 143:13

**download** 190:14

**downloaded** 210:8 291:15

**downloading** 152:8 182:6 190:15

**dozen** 19:2

**draft** 153:7,11 154:6 233:15 271:11,20

**drafted** 264:21 265:4

**drafting** 277:7

**draw** 204:23 254:17

**drive** 211:4,8,10,16 212:21

**drop** 151:22

**dropped** 210:7

**due** 208:16

**Duke** 9:21 11:5 18:13 79:12 97:16 157:2,18 158:18 167:23 251:18 255:8 280:19

**duke.hartman@gmail.com** 97:1 282:9

**duties** 33:11 36:1 39:17 43:18,24,25 44:18 45:4 46:1,7 55:11,13 129:19 143:10 183:15 184:20 278:10,12,18, 21 279:5,9,16

**duty** 278:15 279:25 300:1

### E

**e-mail** 17:1 72:2 76:11 94:13, 17,19 95:14 96:23 97:2,5,6,9, 10 98:6 99:16 100:17 121:13 122:12,20,24 123:3,11,14,20, 23,25 124:2 125:20 126:4,7, 12,16,25 127:12,18,19 128:16,18 129:20 130:5,8,10 131:7,17 132:12,21 133:13,15 134:4,22 135:16,23 136:8 137:2,8,9 138:7,16 141:8,13, 19 142:3,21 143:5,23,25 145:14,17,20 146:8,13 147:3, 22 148:8,13 150:9,15 151:2 152:7,10,11,12,13,18 153:5 154:3 155:7,14 156:6,15,21 157:15,24 158:17,20 159:4 160:10,19 161:22 162:1,16,21 163:3,5 166:14 167:20,21 168:16 177:6 178:5,20,24,25 179:15,18,25 180:14,21 181:2 182:2,12,15,16,17,23 184:16, 18,25 186:9,11,21 187:5,12, 23,25 188:1,11,18 189:11 190:16,25 191:12,14 192:1 196:6 198:7 199:10,21,25 200:7,8,10,12,14,17,19,22 201:17 202:10,11 204:11 205:9 208:8 209:19,22 214:22,24 215:4,5 221:1,14 222:14,20 223:3,14,18 224:17,22 225:19 227:13 228:1 233:24 234:2,4,7,16 235:16,24 236:22 237:18 238:10,12 239:14 240:15 241:2 242:14,15 248:7,8,11, 12 249:5 250:3,5,7,8,10 252:2,3,22,23 254:20 255:13, 14,15,21 257:23 258:4,6,8,11, 17 260:10 262:17 263:13,16, 21 265:24 266:13,19 270:10, 25 271:2,6,14,19 272:7,9,16, 21,22,23 273:2 276:21 277:1, 3 280:23 281:21,22,25 282:9, 10,13,14 283:9 284:24 285:1, 15,17,18 286:3 287:5,16 291:10,12,22 299:22 300:22 301:16

**e-mail's** 259:16

**e-mailed** 300:20

**e-mailing** 215:4 283:5 292:5

**e-mails** 19:7,11,13 20:17 21:4,10 54:17 56:12 83:19 93:16 94:3,12,18,22,24 95:21 105:24 106:9 107:20 123:5,8, 11,17,21 124:4,6,7,13,14,21 125:1,6,9,13,22 126:17 127:1, 8,11,14 129:4,15 130:4

131:19,22,24 132:6,11,17 136:20 139:10 140:7 147:20 148:17 152:14 154:25 158:24 159:3 162:24 163:12 166:12 181:10 183:3,10,12 184:14 187:8 188:13,25 190:12,20,23 191:22 192:11 194:17 195:11, 18,24 196:17 200:1 220:10 229:25 231:9 233:3 252:5,7 254:4,15,19 258:15 259:15 272:10 287:15,20 300:13 301:8

**earlier** 16:7 21:8 29:22 61:19 62:13,14 63:24 91:18 122:20 127:8,11 143:9 175:16 176:4 177:4,15 198:18 199:24 202:3 208:9 214:21 215:16 219:15 233:16

**earliest** 281:22

**early** 27:5 44:9 54:16 58:16 84:23 85:1,2,17,23 86:22 91:19 92:4,15,17 111:8 112:9, 12 113:9 114:16 217:14 218:10

**earning** 303:13

**easier** 96:21

**Eastern** 191:13 272:24

**easy** 180:12,15 289:9

**economic** 198:16

**edit** 196:9 228:15

**edited** 228:10

**editing** 277:8

**edits** 154:11 228:6,9,14 229:4 271:22

**education** 139:18 228:20

**educational** 22:25 229:15

**effect** 260:20 261:10,13 263:6,17,20,22 289:20

**effectively** 286:4 295:4,22

**effort** 53:13 64:4 136:9 163:5 165:7,21 166:25 189:17 216:12 231:19 242:7 297:11

**efforts** 188:2 231:18,21 235:10

**elaborate** 61:16 270:16

**elected** 74:9 85:14,22

**election** 85:12 111:2,7,22 112:8,13 195:5

**electronic** 253:14

**element** 128:5 129:11

**elements** 185:3

**elevated** 246:12

**eligible** 287:9

**eliminate** 285:9

**eliminated** 282:25 295:4

**else's** 196:7

**employ** 53:10

**employed** 32:8 39:22 54:22 59:6 248:17 293:4 301:19,25

**employee** 41:21 44:8 72:24 80:6 118:12 119:19 159:23 169:24,25 170:2 185:19 188:19 203:10 251:3 281:5 282:5,6 283:7

**employees** 36:24,25 53:21 101:16 172:12 173:24 174:2 189:17 259:5 277:17 300:19 301:5

**employer** 13:10,11 28:6 115:25 286:7 304:2

**employment** 30:6 37:9 98:25 301:14

**empowered** 259:7

**enacted** 257:8

**encourage** 229:12

**encouraged** 100:16 101:2

**end** 15:13 48:13 50:22 55:24 94:6 127:5 163:24 178:20 179:21 204:5 209:19 242:22 302:17

**ended** 32:21 58:8 98:24

**engage** 106:2 188:2 189:16

**engaged** 95:7

**engagement** 182:18 183:3 184:12 186:16 187:16,20 188:13 189:10 191:7,14,18 192:12,14 193:2,7 194:7,9,16, 19,20,22 195:10,13

**engages** 189:5

**engaging** 183:20 185:13

**engineering** 23:3,6,7,10,18 26:23 27:1,24 28:1,6,16 57:23 134:7,11 140:10 146:15 198:12,13 199:2,18 216:23 217:3 229:17

**engineering-** 242:6

**engineers** 19:16 21:18 22:7, 21 61:22 77:20 194:24 219:8, 11 230:18 234:23 243:2

**enormous** 41:2

**ensure** 167:13 183:25 203:3

**ensuring** 70:7 78:14 183:22 214:2

**enter** 48:13

**entire** 75:19 76:25 77:10 123:9,21 128:13 211:11

**entirety** 98:3

**entities** 167:2,3 168:19 172:17

**entitled** 75:19 98:9 297:15

**entity** 10:6 13:14,15 21:17,21 22:6,20 68:20 85:9 103:21,25 106:18 107:8,10 113:6 135:2 136:12,13 140:5 146:13 164:10 176:10 217:19 220:15, 23

**envisioned** 81:5

**equal** 115:24

**equation** 167:7

**Eric** 30:22,23 31:19,20,22 37:19 53:21 58:9 280:18 302:14

**Ernst** 212:13 257:23

**essentially** 67:23 68:15 78:1 114:12 234:13

**established** 53:12 57:5 286:23

**establishing** 113:6

**estimate** 18:25 27:17 42:15 49:2,4,22 51:9 59:18 65:11,16

**ethical** 144:22 203:12

**evening** 15:23 237:20 305:2

**eventually** 34:12 37:10,13 54:8,21 81:11 91:2 111:15 118:19 126:3 200:2 285:9 287:24 301:3

**evidence** 100:5 162:24 169:20 183:5 195:17,18 205:17 230:1 239:16

**exact** 42:14 54:23 55:1 73:4 183:10 246:9 298:3 299:14

**exaggerate** 144:6

**exaggerating** 143:1 144:25

**EXAMINATION** 10:1

**examined** 9:23

**Excellence** 298:24

**excited** 63:20

**exclude** 57:12

**excluding** 51:7

**excuse** 104:23 284:1

**execute** 73:5 91:6 250:22 257:1

**executes** 89:9

**executing** 55:10 88:3 104:10 259:6

**executive** 13:22 71:19 72:13 89:9 159:22,24 172:3,4,8,14 176:6 189:23 277:25 278:3 301:7

**executives** 41:9 174:14

**executors** 79:21 81:1

**exercise** 118:14

**exhibit** 75:9,11 96:9,12 101:25 120:23,24 121:1 122:9 127:7 151:22,23 152:1 154:16 155:8,11,15 160:19 170:17 177:6 178:14,15 181:22 185:22,23 186:1,2,3 190:7 193:21 194:1 197:19 199:25 209:11,12,13 214:18 227:20 228:3 233:7,8 243:16 244:21 248:1,2 260:5 264:1 270:18, 19 275:7 276:15 281:16 291:1 293:20 298:15

**exist** 88:23

**existed** 39:19 66:7,9

**existing** 135:12

**expenses** 253:13

**experience** 35:10 110:9

**expert** 24:14,22 25:6,7,17,23 26:2,3,12 116:16 121:21

**explain** 26:1 43:7 159:12,14 225:18

**explaining** 153:21 215:9 255:15

**explicit** 71:16

**explicitly** 129:8 204:19 252:21

**explode** 37:3

**expressed** 103:11 259:18

**extend** 145:2

**extent** 24:7,15 25:8 42:4 69:3 101:6,10 113:15 120:3 236:25 278:7 279:6

**externally** 168:11

**extinguished** 303:10

**extra** 126:25

**extricate** 207:7

**F**

**Fabulous** 145:18

**face** 245:7 275:24

**fact** 24:6 94:11 99:23 202:19 231:15 273:23 284:2,12 302:8

**facto** 56:25

**facts** 83:4,5 91:12 111:16 169:20 183:4 230:10 231:24

**factual** 221:8 222:25 223:3,7, 11,13 224:12,21 225:9 229:5

**factually** 229:21

**faded** 45:24

**fair** 55:2 56:6 84:19 116:20 204:13 207:13 213:19

**fairly** 110:21

**faith** 301:18,21 302:3

**false** 89:7

**familiar** 28:18 121:8,11

**family** 12:20,23 101:22 118:13 119:4 192:22 234:22 303:15

**fancy** 109:5

**fascination** 27:23 28:1

**fashion** 256:11

**faster** 144:21

**FBI** 292:13 297:23 301:6

**February** 82:24 84:17,20,23, 24 85:1,2 92:15 105:24 111:8 112:9,12 113:9 114:16,20 119:3,10 121:25 122:12 123:4,24 127:20 128:14,18 129:10 130:11 131:16 132:7 133:3 139:10 140:7 141:19 142:13,22 144:12 145:16 148:14 149:17 155:7 157:6,16 158:17 160:13,16 161:21,22 162:15,16 168:16 177:17,25 178:2 179:5,16 182:3 183:16 186:13,15 188:11 199:21 200:3,6,19 207:22 208:4 209:7 216:11,16 217:14 219:3,14 231:4,23 232:11,19

**FEC** 105:5 113:4,10,13 114:5 118:19,23 119:1,8 122:6 129:12,15 135:12 136:5,17 141:15 143:20 146:25 147:8 148:1,20,24 149:2,6,18,23 150:17,18,22 151:4,5 153:23 156:8 160:15 161:20 162:14 165:18 166:13,20 167:10 177:25 178:5 181:14 184:17, 24 185:16 186:17,24,25 187:3 188:14 191:6,7,13,17 195:14 203:1 208:20 209:1,8 215:11 216:17 217:22 226:6 230:1 231:3,19 232:13 233:1 237:21 241:7 274:1 276:3

**federal** 90:12,24 99:18 100:3 101:22 111:2,7,22 112:7,13 179:9 195:4 292:8,18,25

**feed** 118:13

**feel** 29:4 100:8 116:17 120:6 281:3

**feeling** 114:8 281:6

**feet** 303:21

**fell** 257:8

**felt** 100:14,21 108:4 281:4 297:15 303:8

**female** 142:9

**fiduciary** 278:6,10,18,21 279:5,8,14,16,25 280:9

**field** 23:7,10 25:6

**fields** 140:10 199:16 201:10 216:23 241:24 242:6

**figures** 49:25

**file** 298:23

**filed** 67:14 111:3,8 115:23 118:3,7 135:12 160:15 162:15 177:25 231:19 237:23 241:7

**files** 213:4

**filing** 67:13 161:20

**filling** 256:9

**final** 33:6 98:20,23 127:7 137:23 140:13

**finalized** 272:1

**finance** 78:15 116:16 117:19 118:9 119:15,21 224:7,10,16, 17 301:4

**finance-related** 121:21

**financials** 231:13

**find** 17:9,13 74:12 109:16

**finding** 53:1

**fine** 91:9 117:18 130:5 198:5 204:8,17 207:15 298:9

**finish** 218:3 223:25 255:4

**finished** 12:9 218:5

**firm** 28:1 53:15,24 64:22 65:14

**fiscal** 288:9,12 290:14

**fit** 259:11

**five-** 17:10

**five-minute** 61:2 176:22 214:9

**fix** 114:21

**flip** 122:19 126:5 127:4,6 131:6 141:17 145:8 148:10 156:14 158:11 170:16

**flow** 228:19

**flowing** 74:13 88:18

**flows** 33:22

**focused** 203:7

**foggy** 128:12

**folder** 211:10,17,20,23 212:18

**folders** 213:4

**folks** 73:19 212:15 213:3 259:22

**follow-on** 272:2 295:20

**footer** 127:13

**forcefully** 206:9

**forget** 271:24

**form** 22:9 29:6 38:24 42:20 43:10,21 46:11 48:15 50:5 55:12 56:24 59:9,19 61:25 62:10,23 63:6 65:3,25 68:18 72:11 73:7 74:21 78:4 80:20 82:4,21 84:11 88:20 90:15 103:22 104:19 109:20 112:1 116:13 117:25 119:16 123:16 132:2 135:22 141:9 142:23 154:9 162:2 165:8,22 181:17 191:9 193:9 196:2 212:1 228:17 237:17 239:12 242:24 251:1 259:10 270:2 278:1,8, 13 279:22 283:21 284:18 287:18 290:10 293:7 296:8 298:8 303:16

**formal** 35:18

**formalization** 49:10

**formation** 13:24 62:8,16 108:5

**formed** 13:18 83:7,10,11 218:11,20 220:19,22,23 221:10 223:1 229:11 230:4,8 232:3 284:10

**forming** 61:14 302:21

**forms** 38:4,6

**formulate** 29:2

**forward** 15:10,15 180:3 191:7,17 192:6 214:3 281:8

**forwarded** 131:17 132:7,12, 21 133:16 191:22 192:2

**found** 38:15 39:3,6 41:1 105:20

**foundation** 41:18 63:16 86:15 131:1 133:1,20 134:13 135:6 136:1,15 137:6,19 138:12,22 139:15,19 140:3,5 141:4,10 146:1 147:10 148:3 150:20 151:7 155:10,24 158:2 159:1 166:17 169:12,20 173:3,18 174:21 180:5,18 181:16 182:20 183:6 187:18 191:25 193:10 195:8 198:23 201:24 202:13 204:15,25 205:6 206:15 221:17 222:2,18 223:6,16 224:14 225:4,12,24 226:12 227:8 245:17 255:19 257:12

**foundations** 217:11

**founding** 220:13

**four-minute** 227:1

**fourth** 35:24 122:8,11 281:23

**frame** 19:6 20:17 27:14,17 30:15 37:25 47:1,21 50:22 54:23 60:13 65:10,15 66:16 92:7 112:19 119:10,12 124:12 131:20,22 132:16 144:12 177:13 183:11 184:9 207:15 292:22

**frames** 19:9 55:1

**frankly** 34:9 109:3,13 167:6 237:11 262:17

**fraud** 117:19 301:3,4,6

**Friday** 102:12

**friend** 101:22

**friends** 12:23

**front** 55:20 99:7 101:21 131:10 243:22 289:19 291:14

**frozen** 197:2

**fruition** 270:14

**Fujichaku** 18:4

**full** 53:16 289:17

**fully** 108:3 138:25

**function** 127:24 128:1
**functional** 246:18,24
**functionally** 251:13
**functions** 247:11
**fund** 165:6,10 166:25 201:9 252:13
**funded** 202:20 261:1 264:8
**funding** 38:16,21 39:4,7 68:21 86:11 91:4,6 108:12,23, 25 163:17 165:14,16 199:14 201:2,14 202:16 242:21 243:1 252:5,16 253:1,5 254:22 288:6 296:23 302:10
**fundraising** 128:5 129:12
**funds** 70:12 78:19 92:11 94:10 113:7 139:17 173:21 175:13 176:5 205:11 254:18 272:5
**future** 282:17 286:20

G

**gain** 83:16
**Gary** 276:22 280:18,24
**gathered** 113:5 230:21
**gave** 16:6 50:23 51:19 60:21 70:25 71:16 168:25 225:5 256:2,4,16,18,19
**gears** 67:11
**general** 20:17 33:24 34:3 45:15 55:1 65:10 69:9 74:6,12 79:19 80:25 81:2,18 82:22 83:14,16 103:13 119:10,12 124:12 144:12 228:19 245:2 280:14
**generalist** 67:3
**generally** 10:12 19:14 21:5, 10 22:13 26:21 27:5 33:10 40:3 48:3 55:3 63:20 68:14 75:4 81:4,9 83:11 85:3 91:19 94:23 100:23 112:25 121:8,11 124:2,24 125:25 126:21 129:9,24 139:19 163:11 164:9 166:4 181:3 189:4 206:16 211:10 217:25 218:10 244:14 246:9 248:25 250:15 256:6,10
**generate** 107:25
**gentleman** 35:9 53:17 57:17
**genuine** 242:4,7
**germane** 13:1,5
**give** 9:14 14:17,20 16:22 17:7 19:6 32:24 37:25 44:25 54:23, 25 60:6 93:11 114:10 121:5 126:25 135:15 142:7 152:9 165:5,20 166:10 238:8 255:21 256:18 259:7 289:4 292:23 293:22 302:2
**giving** 134:5,10 139:11 166:4 204:12,18 216:22 225:1 231:17 250:10 257:25 263:1
**Glen** 53:18
**Gmail** 284:25 285:21 291:12 301:23
**goal** 107:2
**gobbledygook** 182:10
**good** 10:3 12:4 17:14 21:13 74:6 82:25 87:19,21 94:15 97:23 113:19 118:9 124:4 148:11 166:5,6 201:21 210:25 236:2,18 248:15 255:3 274:14 301:18,21 302:3
**goodwill** 239:2 261:7
**governing** 9:6 119:14
**government** 34:14,20 39:13 44:10,14,22 46:2 63:25 66:3 90:12,24 99:19 100:3 101:22 238:20 266:11 292:8,18 293:1 300:7
**government-relations** 67:4
**grade** 27:22 28:9
**gradual** 45:21
**gradually** 46:1 56:2 129:9
**graduates** 58:3
**Graham** 269:7
**grammar** 147:12
**grand** 220:9
**grander** 219:10
**Grant** 10:4 21:1 32:6 35:1 43:12 45:1 55:15 60:23 64:15 68:11 69:9 77:4 86:17 97:24 98:15 108:13 109:22 116:7 118:2 126:10 132:4 138:23 143:18 149:15 162:11 167:1 175:23 176:18 190:18 196:3 207:19 223:8 226:13 230:12 232:14 243:23 244:18 255:2 265:7 271:5 290:15 296:16
**grants** 40:15
**graphic** 265:17,22
**grateful** 63:19,20
**great** 38:3 165:15
**greatly** 204:7
**green** 267:17,25 268:2
**grew** 52:18
**groceries** 72:17
**gross** 288:22 289:23,24
**ground** 14:11 16:24
**group** 10:11,16 19:22 160:10 256:12,23 259:8 265:21 274:10 277:1 279:13,14 284:14 288:14 289:14
**grow** 52:23 60:18
**growing** 31:3
**growth** 50:1 54:4 58:15
**guess** 14:15 31:11 52:2,13,14 107:20 114:15 116:6 125:4 133:12 155:12 159:15 161:3 293:21 299:3
**guessing** 159:25
**guidance** 176:8
**guy** 114:24 139:22
**guys** 110:16

H

**Habib** 56:19
**Haj-hariri** 198:10 282:1 287:15
**half** 19:2 32:10,12 55:3 98:25 210:14
**Hampshire** 249:7
**hand** 9:12 35:21,25 36:3 224:19

**handing** 44:16 253:15

**Hang** 198:2

**happen** 31:8 102:21 174:11 177:8 206:8 257:19 264:13

**happened** 37:8,12 54:24 55:4,5 119:5 178:9 268:22 295:17

**happening** 47:2 54:4,17 99:18 118:16 126:1,18

**happy** 36:7 260:24

**hard** 14:23 37:2 58:2 60:6 107:6 155:12 190:15

**Hartman** 9:11,21 10:3 11:5,7, 19 12:4 13:8 14:13 16:21,24 61:9 67:12 68:7 69:13 70:17 76:23 77:6 81:14 84:13 91:9, 16 96:18 97:16 98:11 99:6 105:13,23 108:19 109:18 110:25 117:10 120:18 121:8 127:6 130:21 132:14 134:8 145:19 146:22 147:1 148:18 150:25 151:20 152:18 154:18 155:3 156:2,17 157:19 158:18 166:22 167:23 170:13 171:1 177:4 178:24 182:2 186:8 190:13 191:20 194:6,15 196:22 197:17,24 198:6 205:4 214:10,21 218:1,5 219:24 221:12 224:20 225:17 227:4 228:2 231:25 232:23 238:9 239:9 241:22 243:22 245:3 259:16 260:7,10 262:20 263:15 264:19 267:8 268:19 271:3 275:15 278:17 279:18 280:6 291:8 294:5 295:24 297:25 298:20 303:14 304:4, 7,25

**Hartman's** 170:17

**hat** 72:1

**HAWAI'I** 9:1

**Hawaii** 9:7 12:14 13:9 23:3 28:3,7 29:11 58:8 101:13 119:4 139:18,20 191:16 235:15,25 238:23 248:19 269:24,25 270:7,8 272:25

**head** 14:22 37:3,6 56:20 199:2 230:5 243:1 273:7

**header** 126:6 130:8 158:13 194:14

**hear** 185:25 196:23,24 265:6

**heard** 26:20 139:14 149:1 229:25 288:18

**hearing** 79:13 138:24 251:21

**heavily** 44:10

**heavy** 35:21

**height** 59:5

**held** 13:23 35:4 43:20 61:6 76:21 120:15 176:24 197:11 214:15 260:2

**helped** 27:6 58:14 106:1 295:16

**helpful** 111:14

**helping** 248:19 257:1

**helps** 19:7

**hereto** 75:14 96:15 121:4 152:4 178:18 181:25 186:6 190:10 194:4 197:22 209:16 227:23 233:11 243:19 244:24 248:5 264:4 270:22 275:10 276:18 281:19 291:4 298:18

**hey** 118:10

**Hicks** 302:14

**high-level** 189:24

**high-net-worth** 109:4

**high-performing** 196:3

**high-powered** 110:14 114:25

**higher** 22:25 189:6 228:20

**highest** 144:22 199:3

**highly** 100:15

**Hill** 35:11

**hire** 53:24

**hired** 28:21 32:17,18 53:14, 19 54:9 58:3 64:7,22 65:14,24 67:3 110:14 129:18 248:24

**hiring** 64:4,6

**history** 38:5 139:23

**hold** 23:1,12,15 38:6 42:12 249:14

**honest** 52:1 54:13 131:2 144:2 182:13 253:11 268:8 292:10

**honestly** 181:5 272:19

**Honolulu** 9:1 13:9 102:10

**hope** 167:12

**Hossein** 198:8,9,10,19,24 199:1,11 200:23 202:12 282:1,8 283:5 287:15

**Hossein's** 203:19,21

**hour** 17:7 60:25 103:2 176:19 214:8

**hours** 56:3

**house** 87:11 128:19

**HR** 212:13

**Hub** 298:25

**hull** 38:11

**hulls** 38:11

**humanly** 257:19

**humor** 14:13 175:23

**hunt** 285:18

**hurt** 110:18 263:10

**hypothetical** 90:3 301:1

## I

**Ian** 101:22

**idea** 109:6 166:5 167:8,10 236:2

**ideas** 133:8,18,23 134:9,19 146:14 250:13

**identification** 75:12 96:13 121:2 152:2 178:16 181:23 186:4 190:8 194:2 197:20 209:14 227:21 233:9 243:17 244:22 248:3 264:2 270:20 275:8 276:16 281:17 291:2 298:16

**identified** 261:8

**illegal** 42:3,7 100:12 120:2,10 145:3,11,12 236:22,23 237:8, 15,24 238:1 240:4,14,16,25 241:9 275:4

**image** 73:24 74:1 113:20 114:22 136:4 166:6 184:1

185:10,12,17 188:3,22 213:24 217:1 259:24

**imagine** 123:7 253:16 283:11

**imagined** 211:22

**immediately** 58:23

**impact** 62:7 63:3 266:15

**impacts** 189:18

**implication** 138:19 303:12

**implications** 223:19

**implied** 159:6 200:14

**implies** 162:25

**imply** 204:17 205:10 253:4

**implying** 250:2 261:12 288:19

**important** 37:15 129:3 183:23

**impression** 293:11

**improper** 114:10 165:6,10 166:24

**improperly** 114:2

**improve** 73:24 74:1,7 82:23 114:22 188:21 213:24 259:24

**improvement** 217:1

**in-state** 53:24

**inappropriate** 245:19

**inclined** 236:17

**include** 38:4 54:16 81:21 146:24 147:2,7 212:10 291:15

**included** 31:22 55:22 56:13 83:19 92:14 156:15 169:16,18 179:18 185:4 186:14 188:2,25 229:5 230:24 274:8 291:19 300:6

**includes** 81:4 98:17

**including** 28:19 41:3 51:20 59:23 87:23 93:16 106:1 107:20 142:6 183:2 235:6 238:16 249:6 257:23 283:7 299:23

**inclusion** 153:22 215:10

**income** 107:25 289:24

**Incomplete** 90:2 300:25

**incorporated** 13:19 220:23

**incorporating** 68:16

**incorporation** 218:15

**incorrect** 40:22,24 198:3 270:16 303:5

**increase** 45:19,21 46:7,8 244:4,10 245:11 246:11 264:8 267:23 295:9

**increased** 44:22 46:1,10,14 54:5 246:5

**increases** 261:17 262:3

**indication** 100:20

**indicted** 105:21 205:21,22 268:9 295:10

**indictment** 29:10,14 60:17 99:21 106:23 277:11 295:4

**indictments** 29:7,9,16,19 282:22

**Indiscernible** 162:4 304:18

**individual** 41:5 72:9 103:14 109:4

**industry** 238:16

**infer** 133:13 134:18 148:4 159:6 182:22

**inference** 137:21 148:7 151:10 204:23

**inferred** 136:21 137:11,14 146:3,13 147:19 151:11 174:13 184:14

**influence** 86:10 174:14

**inform** 285:16 286:7

**information** 13:6 24:16 83:13 84:7,14 91:14 99:12,25 100:18 101:7 107:17 129:6 145:23 147:13,25 150:16 151:3 165:17 166:19 175:5 187:23 213:13 226:4 228:16 229:1 232:12 265:23 290:13 292:1 295:24 297:14 300:7, 10,11,14,16

**informing** 201:8

**infraction** 117:18

**initiated** 57:1

**initiative** 142:15,19

**Innovation** 34:5

**Innovations** 53:15

**innovative** 38:6

**input** 248:24 277:6

**inside** 242:25

**insider** 299:2,5,25 300:23

**insinuation** 241:8

**insist** 185:12

**instances** 237:13 270:15

**instruct** 25:11 101:9

**instructed** 259:20

**instruction** 26:6 72:8 249:14

**instructions** 26:15 250:20, 21 256:16,18 257:20 304:9

**insurance** 100:24

**Integer** 13:11,13,15,18,21 41:10 189:15 278:23 279:2,4, 8,24,25 284:3,10 287:24 288:1,22,25 289:11,16 290:7 294:25 296:3,25 297:10 299:12,15 300:20,21 302:25

**Integer's** 40:4 189:16

**intellectual** 38:14

**intend** 12:8 24:13 201:19,22 202:12

**intended** 135:14 176:3 230:16 269:22,25

**intending** 135:17

**intends** 221:4 222:4

**intent** 63:9 231:11 251:10 259:18,21

**intention** 147:24 302:21

**interact** 30:18 57:24

**interacted** 64:6

**interacting** 54:8,21

**interaction** 30:19 35:8 58:4

**interactions** 35:13 55:6,22 64:4 65:7

**interacts** 38:7

**interest** 27:23 72:4 200:23 242:4 303:14

**interested** 199:14 201:13 235:20 300:17

**interesting** 191:15

**interests** 39:3 203:7

**interfacing** 54:8

**interference** 139:6

**internal** 244:3

**internally** 113:22 168:9

**interpose** 18:13

**interpret** 251:3

**interpreted** 272:20

**interrupt** 11:13,20,25 79:11 89:14 105:9,11

**interview** 292:7

**interviewed** 100:3 292:18,25 297:23 301:6

**interviews** 301:10

**intro** 250:8

**introduce** 27:2 53:3 75:9,20 76:3 96:6,9 120:22,24 151:21 178:13 181:20

**introduced** 27:10,14 29:23 44:3 59:1 122:5

**introducing** 80:13 81:10

**introduction** 258:8

**introductions** 53:2 87:23

**investigated** 301:3,5

**investigation** 99:19,24 100:9,20 292:12,14 293:12 297:23

**investigations** 292:9

**investigator** 38:10

**investment** 74:13

**invite** 97:16 102:1

**invited** 31:5 54:19

**involve** 217:2

**involved** 30:9 34:4 44:10 57:14 58:16,19 63:25 69:10 80:12 140:1 149:19 189:17 206:17,22,24 256:24 292:4 295:18 297:10

**involvement** 77:19 78:1,2,6, 9,16,19,22 79:2,7

**involving** 95:22 122:2 153:24 165:19 195:4,24 215:12

**Island** 35:16,17 46:20 52:6 57:16,18 66:15 265:19 266:24 267:3 269:14,20

**issue** 63:9 134:25 135:19 197:5 216:13 298:23

**issued** 61:13 63:11 74:16 262:13

**issues** 27:7,8 181:6 195:4

**issuing** 135:17 156:24

**item** 290:3

**items** 80:17 81:16 82:2 160:4 192:6 229:5

J

**Jack** 265:19 269:13

**James** 280:20

**January** 13:20 32:10,14 96:24 97:2 98:19 99:1 284:11 291:23 292:19 301:17

**Jen** 212:13 271:22

**Jennifer** 271:7 276:2

**job** 30:20 33:11,17 36:1 39:10 43:5,18 45:4,17 46:7 47:4 48:20 50:14 63:25 65:25 183:14 185:7 247:11 248:21 249:3 251:2 253:17 283:4 285:10,12,18 286:6,10,12

**John** 280:18

**Join** 173:4,6,19 174:8,9,23,24 175:10,11 254:10,12 257:12, 14

**joined** 35:15 39:25 53:12,14 58:13 88:3

**joining** 35:22 38:1 41:1 139:25

**joint** 39:4 49:9 179:22

**joke** 37:1 272:18 273:6,22 274:15,25

**joking** 273:3,6,10,13 274:12

**Josh** 283:11,21 284:2,9

**José** 26:24 27:10,14 30:11,15

**judge** 119:19

**judgment** 67:14,23 77:3

**July** 275:16

**jump** 174:25 274:21

**jury** 304:5

K

**Kahele** 29:15 170:5 209:23 212:11 252:3,4,9,11 253:6,21, 25 254:6 258:6 260:11

**Kalihi** 13:9

**Kao** 19:12 26:19,20 29:8,14 31:14,22 41:7 71:16,24 72:8,9 79:21 80:14 81:2,5,17,22 82:23 92:18 95:22 97:16,21 98:13 99:21 102:4 103:3,8 104:4 105:20 109:4 113:11 121:15 122:13 123:4,24 127:19 133:16 141:20 142:14 147:17 148:15 152:20 153:6 155:2 156:21 164:2 169:6,16 171:22,23 173:11 176:5 182:4 183:2 186:12 191:4 192:21 193:6 194:10 215:5 229:22 234:21 246:19,25 247:5 261:4

**Kao's** 93:1,5,17,21 253:25 272:7

**Karen** 212:13 257:23 280:19

**Kee** 29:15 81:18,22 170:5 171:3 172:20,24 173:10,15,24 174:13 210:1 252:3,4 253:21 258:6 260:11

**Kee's** 211:24

**Keipper** 212:10 257:23

**kick** 119:5

**kicked** 52:6 66:17 67:10

**kicks** 272:9

**kind** 33:25 114:3 121:20 144:18 148:24 207:4 248:18,

19,20 299:7 300:23 302:15

**Kirkland** 198:15

**knew** 26:24 27:6,11 28:17 31:3 38:9 47:1 85:17,19,21 91:13 95:20 113:21 129:14,16 149:10,12,14,18 217:14 230:11,21,23 231:8 232:11,23 243:1 248:14,23 292:19,24

**knowledge** 35:13 92:12 93:21,24 94:9 95:24 104:7 110:17 122:6 139:11,22 140:8,11 149:23 163:9 167:1,17 169:25 173:20,25 184:5 217:7 253:24 254:3

**KOBAYASHI** 169:11,19 173:2,19 174:8,23 175:10 254:12 257:12

**Kring** 57:17

**Kubota** 173:6 174:9,24 175:11 254:8 304:18,20

**Kupau** 18:5

## L

**lack** 38:19 114:21

**Lacks** 41:17 63:16 86:14 130:25 133:1,19 134:13 135:6,25 136:15 137:6,19 138:12,22 141:4,10 146:1 147:9 148:3 150:20 151:6 155:10,24 158:2 159:1 166:17 169:12,19 173:3,17 174:20 180:5,18 181:16 182:20 183:6 187:18 191:25 193:10 195:8 198:23 204:15,25 205:6 206:15 221:16 222:2,18 223:6,15 224:14 225:3,12,24 226:11 227:8 245:17 255:19 257:12

**laid** 166:11

**Lam** 276:2 280:20

**language** 179:25 249:6

**Lanson** 18:5

**large** 38:10 49:3 84:17 103:14 104:14,16,20,22 246:18,23 291:13 293:3

**larger** 35:25 36:3 103:14

**largest** 60:14

**lasted** 102:25

**late** 66:8 67:15 83:12,20,24,25 84:23 85:17,23 86:21 91:19 92:3 96:3 104:14,23 106:19,20 107:7,13,14 108:18,21 109:24 117:5 215:18,20,23 216:4 218:10,12,17 219:16 220:2,10 230:24 231:9 239:12 284:10 302:5 304:7

**laugh** 274:2

**law** 91:3 116:15 183:22

**lawful** 116:12

**lawfully** 143:14

**laws** 70:7 119:14 167:18 224:6,9,16

**lawyer** 183:19 224:17

**lay** 24:6

**lead** 52:24 55:21 58:5,7,14 185:13 189:18 281:8 302:10

**leader** 56:1 303:20

**leaders** 53:8

**leadership** 28:19 53:2 58:17 295:10

**leading** 280:15,22

**leads** 48:17

**learn** 112:7,12 287:14

**learned** 84:7 94:1 95:20 117:6 128:23 285:13 302:8

**learning** 113:2,10

**leave** 97:14 230:19 251:23 303:22

**leaving** 302:13

**led** 280:17

**left** 44:12 61:10 65:12 230:14 248:19 258:19 267:25

**legal** 14:4 24:8 42:5,7 100:15 101:3 113:16 114:1,4,24 115:1,2,4,14,17 116:2,12 117:5 120:2,4,7,9 144:23 145:3,6 185:2 189:16 194:25 203:11 220:23 228:25 237:1,5,7 238:18,25 239:3 240:1,3 278:8 279:7 291:24 293:9 297:22 298:5 301:8

**legality** 115:20 117:2,11 143:10,11 167:5,14,18 223:19

**legally** 95:10 103:14 116:1 117:16 202:22 203:4 239:1

**legislators** 239:3

**legitimacy** 165:21 166:3 167:5

**legitimate** 221:7,23,25 222:7

**lengthy** 248:7

**letter** 32:20 150:5,11,22 151:14 152:23 153:7,12,21 154:6,8,10,12,14 155:1,4,5,6,10,14,15,17 156:5,7,9 184:12 186:17 187:16,20 188:14 189:10 192:12,15,19 193:2,7 194:7,8,9,16,19,21 195:10,13 215:6,9 221:20 227:12,25 228:3,5,7,16 229:3,6 232:5,24,25 276:2,5

**letters** 155:21 156:13

**letting** 110:23 258:22

**level** 22:25 59:22 117:13,18,22 144:22 172:5,11 199:4

**leveled** 236:14

**levels** 159:18 189:6,16 198:25

**levied** 24:2 115:21

**liability** 228:23

**license** 23:13,24 24:3

**licenses** 23:12,17,19,21

**life** 100:24

**light** 274:13

**limited** 79:8 143:13 228:23

**Lindsey** 269:7

**lines** 180:13,16 182:10 228:10

**link** 77:8 92:18,20 105:4

**linked** 92:22

**list** 22:24 57:10 59:14 135:14 157:3,19 158:5,9,22,23 159:5,7,9,13,16,17,25 160:2,3,20,22

162:19 163:23 177:5 178:6 200:3 214:1 249:4 256:4 258:19 259:3 267:4,14 269:10,20,21,25 270:8 272:4

**listed** 162:19 200:11

**listened** 303:18

**live** 11:6 12:18

**LLC** 10:5,11,20 13:12 21:18 22:7,21 106:17 132:24 133:8, 10 136:18 157:20,25 158:6 194:24 221:8,9,13,15,21 222:8,25 284:3

**loading** 96:20 265:1

**loan** 292:11,12 301:3

**loans** 29:11

**lobbied** 295:8

**lobby** 54:2

**lobbying** 41:5 53:14,24 65:13 67:9

**lobbyist** 30:25 64:7,22 65:24

**lobbyists** 35:12 53:18 54:9, 22 55:6 64:4,6,7,8 110:15 115:1

**located** 15:17 16:3 178:9 211:2

**Location** 102:8

**logging** 53:13

**logic** 175:1

**logical** 274:21

**logistics** 290:2,9 294:20

**logo** 294:20

**Lol** 273:16 274:2

**Lol...i** 273:3,13

**long** 13:23 17:23 18:18 20:7 38:5 42:12 103:1 121:10 199:25 227:1 302:2

**longer** 37:13 130:16,22 286:22 287:1,7 293:17

**looked** 21:4 114:1 132:8 146:9 154:25 156:16 166:12 186:11 194:17 199:24 214:21 228:1 245:9 260:8 266:14 270:11,15 299:22

**Lori** 80:6,8,13 171:13 209:23 212:11 235:17,24 250:5,7,8, 10,20 251:7,11,13 255:13,15 256:19,25 258:7,9,18,22 260:11

**Lori's** 255:23

**lost** 28:20 282:15 293:14 295:22 296:21 297:7

**lot** 49:8,9 58:3 86:16 109:6 119:6 196:4 215:20 250:13 259:11 264:12 277:10 295:24

**loud** 274:2

**Loui** 37:19 38:9 41:3,8 42:2 44:2 238:17

**loves** 74:13

**lower** 172:5,11

**Lum** 29:15 81:18,22 170:5 171:3 172:20,24 173:10,15,24 174:13 209:23 210:1 211:23 252:3,4 253:21 258:6 260:11

**lunch** 120:15

**Lynch** 53:17

**M**

**made** 37:1 41:6 42:7 84:3,17 91:20 92:2,3,8 93:17 95:10 104:5,16,22 105:1,2,4,14,18 114:4 115:24 117:2,14 158:9 159:17,24 163:14 171:24 172:6,11 203:9 207:3 208:24 209:8 213:5 215:24 216:6 217:22 219:13 222:10 228:11, 13 229:4 231:5 237:20 250:11 258:18 274:15 286:16,17 287:11 297:7

**Madison** 58:22

**magnitude** 289:22

**main** 102:8

**Maine** 35:15 37:21,22 38:2,21 39:2,5,20 46:20 49:7,13 51:8 52:3,13 53:23 54:7 56:16,19 57:13,19 66:8,12,19 67:7 85:15,22 86:13 112:21 140:16,25 141:1 142:7 208:4 268:4,5,11,14,21

**maintain** 185:11 193:13

206:9 207:5 304:1

**maintained** 57:7,11

**maintaining** 185:9

**major** 43:24

**majority** 87:5 164:2

**Makai** 26:23 27:1,7 31:5

**make** 21:14 24:20 37:3 41:11, 21 88:17 90:8 95:25 100:24 103:11,20 107:15 120:7 128:15 131:12 135:1 139:3,6 145:9,12 153:14 154:23 159:3,19 167:2,3 174:12 201:22 202:12 219:17 226:6 228:9 241:23 245:10 250:24, 25 251:4 253:17 264:13 265:2 274:13 283:15 285:10 289:8 295:16

**makes** 41:14 118:10 172:10

**making** 42:3 60:11 81:12 92:25 93:2 95:8 103:24 107:2 109:12 154:11 161:4 163:15, 16 164:11,21 165:24 217:5 220:3,11 221:11 223:1 226:7, 19 228:6 231:17 234:10 235:10 236:17 239:1,2 240:21,25 242:4 247:12 256:25 257:7 272:17 274:25

**managed** 35:19 171:14

**management** 68:25 69:16, 21,25 70:2 93:22 189:6 257:7 277:5 280:18,22 282:16

**manager** 33:1,5 56:22 57:8 58:19 59:4 171:17 212:13 271:23 276:2 277:14

**managers** 57:19 189:1,3,21, 24

**managing** 33:18,25 35:11 36:5 78:9,11 257:25 281:3

**Mandigo** 53:18

**manner** 293:3

**March** 28:23 30:16 105:24 119:10 152:13,14,19 155:2,5 156:6 191:2,12 193:4 210:1 214:25 221:18 228:4 229:4,20 231:15 232:4,14,16,24 234:4 242:15 244:5,12 252:15,23 253:20 254:5,21 255:14 258:15 260:11 263:16

**marching** 255:16

**Margery** 11:23 15:3 18:5 162:6 261:24

**Marine** 290:2 294:21

**mark** 151:23 185:22 186:2 193:21 209:12 233:6 248:1

**marked** 75:12 96:13 120:23 121:2 152:2 159:18 177:6 178:16 181:23 186:4 190:8 194:2 197:20 199:25 209:14 214:18 227:21 228:4 233:9 243:17 244:22 248:3 264:2 270:20 275:8 276:16 281:17 291:2 298:16

**marketing** 44:4 53:15 212:14 247:21 271:23

**Martin** 10:11,15 19:12 26:19, 20,24,25 27:3,10,15 28:20 29:7,14,23 30:18 31:14,19,20, 22 36:7,15,25 37:20 41:7 50:7 54:4,9 55:21 57:5,10,14,19, 22,23 58:5,14,15 59:15 64:9, 10 66:25 67:6 71:16,24 72:1, 8,9 73:19 80:7 82:23 83:19 92:18 93:1,4,5,17,21 94:3 95:22 97:15 99:21 102:4 103:3,8,11,16,19 104:4 105:20,22 107:2,7,18,19 109:4,12 110:13 113:11,24 114:11,17 115:4,18 117:14,22 118:20 121:15 122:5,13 123:4,23 124:2,9 127:19 129:8,21 130:10,12,22 131:3, 8 133:16 135:13,16 136:3,9 137:8,11,16 139:14 140:1 141:20 142:3,14,17,25 143:13 144:1,5,10,17 145:6,11,15 146:5 147:20 148:15 152:19 153:6 155:2 156:21 158:9,24 159:10,13 160:4 164:1,10,16 165:2,24 166:2,6 167:12 168:24 169:1,5,16 171:22,23 172:8,13,16 173:11 174:11 176:5 177:7,13,23 180:9,15, 19 182:4 183:2,17 184:15 185:2,18 186:12,19 188:20 189:11 191:4,17,23 192:5,17, 24 193:6 194:10 200:1 202:5, 15 203:14 205:20,22 206:10, 17,25 212:7,10,16 214:5 215:5 217:4,10 218:18 219:9, 16 220:3,8 221:2,19 222:20 229:22 230:1,4,13 234:14,21, 25 236:15 237:20 240:2 241:22 242:4,17,23 243:1 246:19,25 247:5,7 248:23 250:13 251:11 252:17 253:2, 25 254:1,23,25 256:4,16,22 258:2,23 259:1,12,14,18,20 261:4 265:20 268:9 272:7,9, 17,23 273:3,6,10,12 274:4,10 275:3 276:25 277:16 279:12, 13 284:14 289:14 295:4,10

**Martin's** 30:6 36:19 60:16 67:2 94:13 95:24 98:17 104:9, 12 106:22 114:5,9 116:17 138:25 142:21 143:7,25 144:25 181:2 196:14 216:25 230:4,6 231:11 250:19 251:3 257:8,15 277:11 280:19 281:9

**Marty** 139:15 140:2,4

**mastermind** 82:23

**material** 174:14 260:19 263:17,19,22

**mathematics** 229:17

**matter** 9:14 26:11 47:8 65:21 99:11 156:8 183:11 184:17 188:14 189:22 213:5 247:6 271:14 282:24

**matters** 121:21 185:19

**mature** 115:22

**maturity** 59:22

**maximum** 238:19

**MDG** 10:16

**meaning** 48:23 211:13 258:5 274:2

**means** 14:8 17:2 82:15 134:18 135:20 223:24 237:8 242:22 254:25 255:1

**meant** 61:18 83:25 131:3,4 133:17 135:24 161:4 180:15 220:22 223:19 224:6,23 241:1 264:7

**mechanical** 23:2,10

**mechanics** 256:9

**mechanism** 103:24

**media** 143:21 235:6 274:9

**meet** 19:21 30:17 102:5 180:22 181:12,19 208:10

**meeting** 18:7 19:20,25 20:4, 10 27:4,12,18 31:14,21 36:20, 23 37:4 53:8 97:16,21 98:13 102:2,13,17,25 103:10,18 104:3,21 249:7,9,11,16,23 259:18

**meetings** 31:15,17,18 54:20 58:16 179:23 249:18,21 250:14 277:12

**member** 74:13 86:6 87:16 265:19 266:7,12 267:23

**members** 74:8,20,23 75:6 87:25 88:13 239:2 263:2 266:16 267:15 270:12

**memorandum** 48:5

**memorializes** 244:4

**memory** 31:21 244:15

**mention** 176:9

**mentioned** 19:20,22 27:2 28:8 31:25 39:11 45:3,9 46:18,20 50:10,14 52:15 83:18 84:9,15 112:16 146:8 164:14 207:4,22,23 208:3 212:20 232:19 236:8,13 259:2 260:23 287:22

**mentioning** 249:24 303:19

**message** 164:20,23,24 165:1 180:11 277:4,7

**messing** 198:4

**met** 17:23 30:13,15,22,24 93:5,7,12 122:4 256:22

**methodology** 26:2

**methods** 88:12

**Michael** 44:1 45:10 56:1,10, 17 79:19 80:4

**Michigan** 52:8 58:1,3

**Mickey** 139:15 140:2,4

**middle** 131:7 199:9 210:14 272:7

**midyear** 60:13

**Mike** 37:19 44:1,7,9,15 45:23 53:19 54:16 57:14 58:6,10 233:24 235:23 236:3,6 257:24

**Mike's** 235:12

**Milwaukee** 58:22

**mind** 23:22 24:21 57:12 105:16 116:9 117:4 145:4 195:12 202:21 230:20 247:20

**minimal** 110:10

**minimum** 142:8

**minute** 272:23

**minutes** 18:19 20:8 61:3 255:5 272:22

**misplaced** 118:17

**missed** 270:3,4

**missing** 262:18

**mission** 220:14

**Misstate** 80:21 217:17

**Misstates** 20:23 21:7 30:2 40:20 59:20 72:10 79:22 82:5 91:23 95:4 115:8 117:8 126:19 132:1 143:15 144:3,14 146:16 175:8,9,21 177:14 183:5 190:1 195:18 201:3 207:17 209:3 213:7 216:2,14 231:1 239:15,16 240:6,18 241:3 266:17 285:24 298:6 300:2,3

**misstating** 90:20

**mistake** 258:18

**mistaken** 236:13

**Mitchell** 127:20,22 128:7,25 129:4 131:8 137:10 138:24 140:14,24 141:21 147:24 150:2,12 151:3 152:24 155:22 156:8 166:11,18 215:6 221:20 226:3

**Mitchell's** 128:24 166:14

**mix** 163:8

**Mm-hmm** 126:9 157:5

**model** 38:15 40:5,10,14

**moderator** 75:8,22,25 76:2, 7,16 77:8 96:6 99:2,3 121:5 131:13 151:21 154:19 167:24 168:3 170:18 176:23 185:24 190:6 210:9 243:9,12 262:19 263:12 291:5

**moderator's** 154:21 194:13

**modifications** 153:15 256:13

**moment** 16:4 37:14 45:3 83:18 84:9,15 121:6 156:16 205:19 212:20 238:1 260:6 269:16 270:11

**Monday** 17:18,20,25 19:24

**money** 41:2 63:22 86:11 87:2,8 88:7,18 89:3,8,9,25 90:6,11 94:8 108:12,22 109:2, 6,7 173:15 174:18 175:6,18 176:9,12,15 204:12,19 237:17 239:11 256:5 260:25 269:9 272:3 288:15,17,25

**monies** 90:23 288:9

**month** 35:24 60:10 84:24 119:6 128:14 129:9 160:13 246:9 265:11,12 277:10 284:23 301:14

**monthly** 33:23

**months** 31:10 35:7,22,23 36:16 60:8 104:15 138:2,18 140:15 218:12 283:15

**morning** 10:3

**mortgage** 301:4

**motion** 67:14,22 68:15 77:3

**motivation** 95:25 108:7 229:23

**motive** 236:19,20 303:25

**MOU** 47:19 48:2,5,10,14,24 49:19 50:25 51:6,24 62:21

**MOUS** 211:19

**move** 192:5 226:14 276:13 280:10 290:19 298:10

**moved** 57:18 119:3 128:17 177:10,16 178:1 283:1 303:10

**moving** 60:23 128:19

**MSJ** 70:5

**multiple** 37:18 39:21 87:21 104:11 112:17 155:21 256:23 289:5,7

**N**

**named** 53:17,18 57:17 101:22 230:17

**names** 19:5 32:19 118:3 261:18

**natural** 12:10

**nature** 212:23

**naval** 33:21 38:16 39:7 40:15 88:10 284:5 287:22 288:13,20

**Navatek** 10:20,25 27:21,25 28:2,9 31:5 38:13 41:1 94:17, 19 109:14 140:5 164:3 199:13 201:1,9,13 204:8,12,17,18 205:9 234:21,25 238:22 274:10 276:23,24,25 280:2 294:15 295:12,21 296:4

**Navatek's** 253:20 294:20

**Navy** 33:18 38:21 295:20

**NDAS** 211:18

**necessarily** 169:24 180:23 242:21

**need-to-know** 213:6

**needed** 210:3,17 227:2 250:18 285:10

**negate** 136:5

**negative** 110:11 208:16 241:20

**newco** 283:13,18

**news** 83:17 84:8,14 94:2 204:3 235:18

**nice** 302:25 305:2

**nod** 14:22

**Noelle** 18:5

**nonpositive** 236:20

**nonsensical** 90:7 288:3

**noon** 191:13

**notations** 177:23

**note** 190:22

**noted** 300:8

**notes** 16:19 159:23,24 160:5

**notice** 63:11 189:11 266:21

**notices** 127:13

**notification** 235:6

**notified** 63:8 161:9 261:1

**notifies** 63:21

**notify** 235:10 284:22

**notifying** 200:22 202:12

**Notwithstanding** 70:24 214:6

**November** 36:20 83:8

**now's** 21:13

**number** 18:24 20:11 30:22 33:15 46:7,9,13,18 48:17 49:1,3 51:19 52:2 57:6 59:7, 18,21 60:3,4,14,17,19 75:9,10 81:20 88:11 91:5,12 93:10 96:7 99:8 101:25 120:23 152:10 172:20 181:21 182:7 187:8 190:6 193:21 197:18 213:15 227:15 236:8 244:16 250:4 271:17 275:5 276:8 281:15 289:4,19,23,24,25 290:1,22,23 291:13 293:3,23 295:5,23 297:21

**numbers** 96:8 122:10

**numerous** 105:24 195:11 264:9 299:23

## O

**oath** 14:3,7 120:19

**object** 15:4 98:2 101:5

**objection** 18:2,11,14 20:22 21:7,24 22:9 24:7,15 25:8,19 26:5 30:2 34:23 38:24 40:7,20 41:17 42:4,20 43:10,21 44:23 46:11 47:12,13 48:15 50:5,17 51:2 55:12 56:24 59:9,19 62:10,23 63:6,15 64:13 65:3 68:2,9,18 69:3,19 70:9 71:3, 13 72:10,11 73:7 74:21 78:4 79:22 80:20 82:4,21 84:10,11 86:14 88:19,20 89:4,18 90:2, 15 91:23 95:4 103:22 104:18, 19 106:4 108:15 109:19,20 110:2,7 112:1,2 113:15 114:13 115:7 116:4,5,13,23, 24 117:7,24,25 119:16 120:3 123:16 124:15 125:2,24 126:19 127:9 130:25 132:1,2, 25 133:19 134:12 135:25 136:14 137:4,18 138:11,21 140:18 141:3,9 142:23 143:15 144:3,14 145:25 146:16 147:9 148:2 149:9 150:19 151:6,16 155:9,23 158:1,25 162:2 165:8,22 166:16 169:11,19 170:11 172:1 173:2,6,17 174:6,20 175:8,10,21 177:14 180:4,17 181:15,16 182:19 183:4 184:21 187:17 188:15 189:7 190:1 191:9,10,24 193:9,16 195:7,16 196:2 198:22 201:3 202:23 204:14, 24 205:5 206:4,14 207:17 209:3,4 212:1 213:7 216:2,14 217:17 218:25 219:1,19 220:5 221:16 222:1,17 223:5 224:13 225:2,11,21,23 226:10 227:1, 16 228:17 231:1 232:6 236:25 238:2 239:15 240:6,18 241:3 242:8,24 244:7 245:16 251:1 254:8 255:18 256:21 257:10 259:9,10 261:25 266:3,17 267:1 268:16 269:17,18 270:2 274:19 276:6 278:1,7,8,13 279:6,7,21,22 280:11 281:10 284:7 285:4,23,24 286:13 287:17,18 290:10 293:7 296:7,8 297:18 298:6,7,8 300:2,25 303:6,16

**objections** 25:1 26:14 135:5 174:23 175:20 205:6 223:15 226:19 227:7 296:15

**objective** 39:15 48:13 50:6

**objectives** 39:19 82:10 259:6

**obligation** 286:7

**obligations** 43:18 183:15 184:20 278:6 279:5,14 280:9

**obscures** 113:7

**observed** 144:5

**obtain** 87:2 253:1 296:5

**obtains** 253:5

**occasion** 144:6

**occluded** 299:8

**occur** 102:17

**occurred** 18:7 231:14

**occurring** 124:24

**ocean** 26:23 27:1,23 28:2

**October** 46:25 96:3 102:13, 21 104:3,14 276:22 277:11

**offer** 28:22 30:16,20 31:10,16 32:20,25 33:6

**offering** 161:23 302:13

**office** 33:21 38:16 39:7 40:15 88:10 102:10 130:14 199:1 235:21 271:10,17 288:12 304:14

**officer** 13:22 71:19 72:13 189:23

**offices** 31:6

**official** 192:23

**officially** 247:8

**Oklahoma** 58:20

**Oliver** 212:14 271:7

**on-site** 57:18

**one's** 58:2 180:9

**ongoing** 99:20 100:20

**opaque** 253:11

**open** 77:7 196:12,18 211:11 230:14,19

**opened** 195:21

**opening** 194:18 265:1 271:10

**opensecrets.org** 41:4

**operate** 163:12 196:13

**operated** 106:17 171:14 196:5

**operates** 109:16 268:25

**operating** 108:6 220:14

**operation** 106:22 258:2

**operational** 193:14

**operations** 33:16 69:1,17,21 70:1,3 78:9,12 87:3 107:24 172:15 257:25 274:11

**opinion** 29:2,6 110:6 116:17 205:11 242:23 281:1,2

**opportunities** 31:7 34:6,8 229:15 302:19 303:22

**opportunity** 285:11 287:2,9

**opposed** 300:14

**opt** 123:19

**options** 77:7

**order** 49:23 51:17 59:24 90:11 93:9 219:17 289:20,21

**orders** 255:16

**org** 247:8

**organization** 164:13,19 172:4 228:24 260:24 282:17 287:10

**organization's** 243:4

**organized** 102:2 220:25

**original** 32:25 56:17 101:20 113:7 235:16 236:1 289:10

**originally** 159:25 178:23 179:4 287:23 295:2

**Ota** 280:20

**out-of-the-blue** 163:11

**outlet** 143:21

**Outlook** 97:16 102:1

**outreach** 57:2 157:10

**outward** 205:14 206:2 207:7

**Overbroad** 40:7 125:24 256:21

**overseeing** 259:5

**oversight** 87:1 88:6 90:1 193:14 251:7,14,15

**oversimplifies** 88:22

**oversimplifying** 90:19

**owe** 278:12 279:4,8,25

**owed** 278:5 279:13

**owner** 118:13 164:2,3 176:6 185:15 261:5 301:7

**owners** 174:13

**ownership** 261:4

P

**p.m.** 9:3 15:21 61:7 102:14, 23,24 120:16 141:20 148:14 158:18 176:25 197:12 214:16 258:11 260:3,12 305:4

**PAC** 84:4 85:4,6,9,25 86:2 91:21 92:1,3,8 93:25 94:5,8 95:3,21 97:17,22 98:14,18 103:9 104:6,15,17,21,23 109:10 110:1 117:3 122:3 128:5 141:2 149:4,7,19,20 150:1 153:25 156:8 165:19 181:3 215:13,25 216:6,7 217:16,23 219:12,18 220:4 221:6 222:6,10,16 226:8 230:25 231:6,23 237:17 239:12 268:25 269:4

**packing** 128:19

**Pacmar** 10:5,7,10 289:14

**Paco** 280:18

**pages** 121:10 127:7 190:17 233:19 276:21 291:16 293:20

**paid** 218:23 253:18

**paper** 296:18 297:3

**papers** 299:24

**paragraph** 77:15 79:1,23,25 80:18,24 81:16 82:2,16 170:18,20 171:13 172:19 194:21 199:10 229:9 232:2 241:12 260:15

**parsing** 81:19

**part** 15:11 29:24 40:4 45:11 51:11 54:9,11 63:13,24 64:3 95:12 103:6 134:4,22 138:3 140:13 167:6 170:6,10 172:25 183:24 185:7,10 188:3,7 189:12 207:6 212:20 213:25 214:3 216:25 246:18,24 247:22 249:2 262:7,9 273:25 280:21

**part-time** 44:8 248:18

**participate** 93:18 134:14

**participated** 41:7,8,9 126:12

**participating** 238:14

**participation** 277:7

**parties** 39:8 206:17,21,24

**partly** 211:9

**partner** 39:3 53:4 258:24 266:7 286:19,22 287:2,7 295:12 296:25 298:3 301:24 302:22

**partnered** 74:4

**partnering** 74:5

**partners** 35:14 51:7,8 62:2,9 73:22 167:9 176:11,16 179:12 184:2 198:19 208:8,23 247:13 249:20 261:8 282:13,19 286:12 301:22

**partnership** 35:18 37:20,22 38:1,15 40:2,10,13 44:21 47:7,9,17,25 48:1,4 49:11 52:4,6 62:22 66:9 67:9 86:12 208:13 249:22,24 266:9 283:16 286:20 295:19

**partnerships** 34:14 36:10,13 37:15 39:13,25 43:3,9,15 44:14 45:5,7,19 46:3,5,14,19, 24 47:2,5 48:8,23 50:4,25 51:14,23 52:10,18,20 54:18 55:8 57:1,9 58:12,13 59:11,22 62:15,16 66:1,7 88:12 245:15, 25 246:3,6,13,14 247:23 249:2 277:21,24 282:19 287:10

**parts** 233:19 234:9,12

**pass** 91:2

**passing** 27:18 30:13,15

**past** 143:1

**path** 101:1

**pause** 165:5

**pay** 236:10,11,13,21,24 237:3,10,14,17,25 238:6,11, 17,22 239:5,12,20,25 240:4,9, 13,21 241:1 244:4,10 245:10 246:11 273:24 274:10

**pay-to-play** 238:14

**payables** 253:18

**paycheck** 303:13

**paychecks** 244:13

**paying** 274:16,24

**payments** 252:10

**payor** 176:15

**payroll** 253:12

**pays** 273:18,20 274:3

**PDF** 97:17 182:6 291:14

**PE** 23:13,15,24

**Peltzer** 31:22 33:8,15

**penalties** 113:13

**penchant** 144:1,25

**pending** 9:14 17:3,8 153:23 215:11 225:17 249:16 251:19

**people** 37:4,5,7,19 75:23 100:14 101:2,4,15,19 113:20 123:12 144:18 212:8 213:10, 11,15 237:3 240:10 251:11 256:2 257:22 271:18 274:25

**percent** 36:24 49:15 165:2 196:16 202:9

**perception** 38:1 75:4 109:6 208:15 230:12

**perfectly** 203:11

**perform** 247:19

**performance** 36:7,16

**performed** 171:19

**performing** 44:18

**performs** 171:16

**period** 35:4 43:20 44:20 45:15 46:5 50:10 55:2,11 86:22 162:18 246:1 301:14

**periods** 30:18

**person** 55:10,15 72:9 75:21 93:8 103:15 115:19 123:13 139:5 171:14 189:20 196:4,10 212:5,14 250:1 253:9 256:19 259:4,7 286:6,9

**personal** 16:5 41:15 71:24 72:16 94:24 110:17 118:18 238:18,19 253:25 282:14 283:6 285:12,14,15,18,21 286:3 287:16

**personally** 41:6,12 157:7 164:16 203:9 205:14 206:6 248:23 254:2 255:1

**persons** 164:23

**perspective** 67:2

**phase** 62:21

**philanthropic** 139:23 164:10,13,19 167:3,16 241:23 242:5

**phone** 16:11,12 17:2 93:16 129:25 134:3 163:5,11 196:17,19

**phrase** 38:19 82:14,20 220:17 222:12,24 224:12,21 236:21,24 237:18 238:10 239:13,20

**phrases** 22:4

**physical** 177:12

**physically** 16:3 177:17 178:9

**pick** 44:17 274:9

**picked** 60:10

**picking** 128:14

**piece** 129:6

**pieces** 128:15

**pioneered** 53:23

**place** 72:1 177:12 211:19 286:11

**plaintiff** 10:4,6,24 13:14

**Plaintiff's** 75:11 96:12 121:1 152:1 178:15 181:22 186:3 190:7 194:1 197:19 209:13 227:20 233:8 243:16 244:21 248:2 264:1 270:19 275:7 276:15 281:16 291:1 298:15

**plan** 79:2,3,7,18,19,21 80:12, 25 81:2,3,4,6,9,10,19,22 82:8, 11,14,17,22,23 100:23 136:3 137:24 212:8,9 213:24 216:25 233:15,24 234:8,9,24 235:12 236:7 256:25 257:8,11,16,21 259:23 284:17

**plan's** 235:5

**plane** 196:18

**planing** 38:11

**planning** 24:22 253:4 283:12

**plans** 82:9

**plate** 196:4

**play** 236:10,11,13,21,24 237:3,10,14,18,25 238:6,11, 17,22 239:6,12,20,25 240:4,9, 13,21 241:1 273:18,20,24 274:3,11,17,24

**pledge** 268:17

**pledged** 268:14 269:8,15 272:3

**plug** 272:13 274:5,8,17

**plus-up** 295:15 296:19

**plus-ups** 262:3 263:5 266:16

**POC** 57:25

**point** 12:5 36:4 44:5 56:21 100:13 123:12 124:8,21 130:14 132:10 134:25 135:19 136:19 141:25 150:4 159:17 163:10,25 165:4 168:6 172:13 193:5 196:19 205:13 230:22 234:13 241:12 251:11 255:3 265:20 282:15 283:2,3

**pointing** 140:25 236:16 258:17

**points** 234:2 260:17 261:4 262:11,16,22 265:18 266:1,14 270:12

**poke** 241:15,17

**politely** 179:25 180:21 208:10

**political** 41:11,21 66:2 67:4 85:8,10 87:22 95:7,9,10,11 103:15 107:3,10,11,16 109:12 110:9 167:2,15 203:9

**politically** 238:23

**politician** 41:23 238:19

**politicians** 41:3,6 109:15

**politics** 53:25 66:6

**pop** 77:9

**portfolio** 35:20 67:4

**portion** 176:2

**portray** 144:11

**position** 13:21,23 32:18 68:14 87:13 171:12 245:14,24 278:5 282:25 285:10 303:9

**positive** 63:10,13,14,18,19 110:11 184:1 185:9,12 203:24 204:4 205:9 239:2 261:2,13 263:6 304:1

**possibilities** 283:6,20

**possibility** 22:12 230:15,19 271:15

**possibly** 25:2 196:19 283:7

**posted** 145:22

**potential** 26:12 95:20 235:6 258:24 270:9

**potentially** 25:7 100:10

**pounding** 235:1

**power** 86:11 90:25 238:19 283:24 284:5 287:22 288:20

**Powerpoint** 264:19,21

**PPP** 29:11 292:11,12 301:3

**PR** 79:2,7,18 80:12 81:3 82:8, 11,14,17,22 212:8 233:15,24 234:8,9,24 235:5,12 236:7 241:14 257:21 259:23

**practically** 76:9

**practice** 125:19 126:16

**precaution** 100:14

**predicted** 270:10

**preface** 18:2 51:2 117:8 191:10 209:4 269:18

**prefer** 154:22

**pregnant** 283:3 303:12

**premise** 71:5 73:13

**premised** 216:22

**prepare** 17:16

**preparing** 148:19

**prerogative** 41:23

**present** 36:25 93:18 266:23

**presentation** 264:19,21

**preserve** 282:17

**president** 30:23 31:4,23 33:16 43:2,9,15 44:4 45:6 91:3 198:16,25 199:4,5 245:14,25 246:2,6,12,13 277:19,24 279:12 286:10 301:19

**press** 28:17 136:5 140:16 141:12,14 181:14 185:1,3 208:2,6,7,16 209:2,6 236:4,18 241:20 271:10,16,21,25 273:24 274:4,6,7,18

**pressed** 58:18

**pressure** 303:13

**pretty** 28:20 96:17 98:22 123:10,15 124:4 160:9 203:24 248:7 257:16

**prevent** 212:6

**preventing** 98:2,4

**previous** 123:21

**previously** 10:10,20 138:10, 20 140:9 148:25 171:12 214:18 260:23 266:20 276:5 287:3 296:5

**primarily** 57:23 247:4 249:21,24 303:3

**primary** 55:10,15 56:22 57:7, 11,25 58:2,18 59:3,15,16 79:20 81:1 196:10 207:2 280:25

**prime** 297:9

**principal** 38:10

**printed** 152:13

**prior** 29:20 31:10,15 43:25 51:19,21 52:25 57:6 60:16 64:10 91:17 92:7 96:1 123:5, 14,21 124:5,7,14,21 125:1,9, 22 126:14,17 127:1 130:9 131:19 132:11 139:25 141:18 142:13,22 147:14 158:24 159:4 163:2 166:12 191:22 192:11 200:9 205:3,25 209:4 217:4,9,13 218:12,21 219:2, 14 231:23 245:11 258:15 263:13 264:14 265:12 266:13 269:14 272:21 284:19,20 294:13 298:2,3 300:3

**private** 67:1 97:1 118:18 282:9 284:25 287:5 291:12 300:22 301:23

**privileged** 24:16 99:11,25 100:18 101:7 292:1

**privileges** 211:13,20

**privy** 67:1 146:11 217:11

**Priya** 302:14

**problem** 11:15 35:1 114:12 167:7,9 185:17 302:24

**proceeding** 14:4

**proceeds** 133:8

**process** 90:19 107:8 156:24

**processed** 304:14

**produced** 160:3

**product** 33:25

**production** 152:10

**profession** 23:18 100:15 101:3

**professional** 23:12,19 24:3 65:19 195:1

**profit** 289:23

**program** 38:10 71:17 73:18, 21 136:3 146:4,7 202:6,8 213:20 242:19 255:17 256:24 261:7 295:8,9,21,22 296:21, 23 299:6

**programmatic** 261:16 262:3 263:5 264:8 266:1 267:22

**programs** 33:2,9,10,18 34:1, 22 35:5 39:12 42:11,22 43:6 91:5 209:25 211:25 251:9 252:8 260:13 277:19 300:16

**progress** 48:11 49:20 58:12 145:23

**project** 179:23 213:10,11,12, 15,21,25 214:4

**projects** 28:16

**promotion** 43:14

**prone** 144:19

**pronoun** 137:10 147:11

**pronounce** 248:15

**pronounced** 26:21

**pronouncing** 26:22

**proof** 218:19

**proper** 226:17,19

**properly** 117:16

**property** 12:16,24 38:14

**proposals** 49:9

**proprietary** 300:8,20

**prosecution** 113:12

**protect** 135:2 136:12 137:16 206:16,17,18,20,21

**protecting** 303:15

**protocols** 293:6

**proved** 231:13

**provide** 75:15 81:18,21 129:24 147:24 150:17 151:4 160:2 226:5 249:4

**provided** 51:12 59:14 79:18 150:12 151:14 165:17 208:1 232:12 233:1 264:24

**providing** 22:19 80:24 81:2, 5,10 148:23 164:22 187:23 199:14 201:1,14

**proxies** 280:20

**proximity** 160:9

**prudent** 100:25

**public** 13:6 73:24 74:1,3 75:5 79:3 82:23 83:14 113:20 114:22 139:18 150:5 166:6 184:1 185:2,10,12,17 188:3, 21,22 206:2 207:7 212:9 213:23,24 216:18,21 217:1 247:21,23 259:24 294:6,8

**publicity** 114:19

**publicly** 207:14,20

**published** 112:18,19,20,22 119:3 136:6 143:19,21 149:24 203:1 207:21 208:4 216:17 236:12 237:21 241:20

**pull** 20:15 96:18 208:12 290:12

**pulling** 200:5

**purpose** 103:17 106:25 107:15,22 108:4 150:12 151:14 153:21 161:23 167:4 201:25 202:14 215:9,17 218:24 219:3,14 220:3,9,14 221:10 223:1 224:25 229:10, 23 230:3,8,13 232:3,25 236:7 242:20 284:25 291:24 293:9, 10 297:22 298:5 301:23

**pursuant** 9:6 151:15

**pursue** 296:23 297:8

**pursued** 51:18 87:4 88:10 295:7,8

**pursuing** 46:14 51:20 52:25 73:22 229:14 249:21 296:19

**pursuit** 49:20 51:15,16

**pursuits** 48:17 49:8 51:5,20 59:12,23 60:5,18 179:13 302:19

**pushed** 214:3

**put** 16:12,20,23 25:3 32:20 77:8 89:20 96:10 99:15 106:10 112:4 121:6 128:15 143:1 144:19 177:23 208:13, 25 211:3,8 272:12 273:20,21 274:5,18 295:16

**putting** 76:12 208:24 243:15

## Q

**qualified** 116:17 119:20 120:6

**qualify** 35:17

**quality** 33:19

**quarter** 19:10,11 20:18 30:21 31:12 34:11 46:2,6 50:11,15, 22,24 51:1,5,25 52:1,16 171:22 176:19

**question** 13:3 17:8 21:1,3 22:18 24:11,20,23 25:18 27:9 35:1 43:12 45:14 47:20 50:13 54:7 61:11,24 62:3,12,14 68:8,12 69:9,12 70:12 72:1,18 74:25 78:14 81:14,24 82:13 86:18 87:24 88:16 89:6 91:7, 8,10 98:9 105:19,21 108:14 109:17,21 111:5 112:11 115:3 116:17 118:4,6 119:8 126:11, 15 128:22 130:21 134:8 135:18 147:1 150:21,23,25 155:3 156:3 162:8,10,11 166:3 175:24 176:1 177:19,22 188:8 190:4,18,19 191:10,20 193:19 195:12 201:21 205:1 219:2 220:1 221:12 223:9 224:11,19 225:15,17 227:5,6, 11 232:9,21 239:8,10 242:3 245:2 251:14,19 257:5 262:21 265:8 278:22 279:17 280:4, 10,15 288:3 289:15 290:15 295:3,25 296:1,12,14,17 297:12,20 298:12 302:2

**question's** 23:20

**questioning** 117:14,22 234:9,24

**questions** 15:4,6 16:25 17:3 19:19 22:5 26:12 50:21 98:6 106:12,14 110:21 131:20,22 132:15,16 148:16 215:16,21 245:19 280:15 304:6

**quickly** 28:20 144:6,11 295:17

**quote** 41:15 134:9 229:18 236:10 246:17

**quotes** 273:17,21 274:3

## R

**R&d** 27:6,8 30:9 34:1

**raise** 9:12

**raised** 12:22

**range** 37:7 49:24 50:23 81:7

**rate** 245:10

**reached** 157:13

**reaching** 160:23 161:1 199:12 201:12 287:4

**reaction** 63:10,13,14

**read** 76:25 83:13,17 84:8,15, 22 92:15,17 94:2 112:11 113:3,21 118:19,23 119:1,11 124:3,7,20,25 125:5,9,16,18, 21 126:17 131:18,23 132:11, 17,20 133:15 134:22 135:23 137:7 140:24 146:18 147:20 150:14 161:13,17 176:1,2 180:13,15 195:21,25 199:19 226:3 229:3,9 255:21 272:17, 21 273:2 298:22

**reading** 92:23 112:14 121:10 123:25 124:4,5,8 128:16 129:4 133:13 136:19 138:16 140:20 141:12,13 146:12 147:3,22 148:8,17,22 151:2 182:21,22 187:25 192:13 194:8 222:3 262:14 271:18 277:3

**ready** 234:17

**real** 168:6,12 207:3

**realized** 283:4

**reason** 15:9,13 17:13 84:6 87:20 105:15 126:25 140:24 143:12 165:20 168:25 174:2

176:10 200:15 207:3,6 208:6 212:21 274:16 285:16,20

**reasonable** 17:9 137:21 138:15 141:8 142:20 166:23 181:11 187:14 191:5 204:22

**reasoning** 26:2

**reasons** 87:21,24 166:9,11 302:2

**reassurance** 240:2

**recall** 14:6 20:2 27:5 42:13,14 43:23 48:25 49:10,20 51:6 56:5 67:13,16,20 69:6 87:12 92:16 94:16 97:9 103:6 112:18 123:25 124:5 125:17 129:2 141:12 142:16 151:13 154:3,6,8,9,11,13 163:7 177:18 178:8 179:14,17 182:12 183:9 184:13 187:5,11 194:18 196:20 199:24 200:4 203:21 212:2 214:22 218:16 219:9 227:25 228:5,6,12 229:7 245:6 246:2 249:17 253:15 265:4,9 271:2 275:17, 21 277:8,9

**recalling** 58:23

**receipt** 94:22

**receive** 63:21 85:10 105:23 123:14 125:20 157:9 178:23 179:4 195:23 244:10 245:23 246:11 252:16 254:22 257:17 284:11 288:25 289:16

**received** 92:11 95:21 123:5 124:12 137:2,5 138:16 139:9 140:7 178:25 180:9 182:25 188:11 190:23 193:3 194:16 195:11,20 214:24 223:2,14 224:22 225:19 227:13 244:5 254:5 255:13 268:5,7,12 269:1 272:16 287:16 288:22 295:1 296:3 298:2 299:5,8

**receiving** 31:10,16 94:18 122:24 123:3,23 124:2 154:3 157:24 164:24 168:16 180:14 182:12 187:5 203:21 209:24 222:14 227:25 245:14 258:20 260:25

**recently** 177:10 220:12 282:25

**receptive** 164:25

**recess** 61:6 120:15 176:24 197:11 214:15 260:2

**recipient** 266:24

**recipients** 186:14 192:2 215:5 221:3 250:4 269:11,22 270:1,9 271:8 272:5

**recognition** 134:6,10

**recognize** 190:12,19 194:6 197:24 244:1 245:4 264:18

**recollect** 84:25 246:10

**recollection** 27:13 32:23 48:22 65:11,13 93:20 97:11 102:22 103:1 118:24 123:19 124:20 128:6 160:18 163:8 178:10,12 260:7 275:23 276:4

**record** 11:4 21:15 61:2,9 76:18,21,23 120:13,19 145:10,13 146:19 176:23 177:1 197:3,13 214:13 224:3 260:1 284:9

**recruiting** 259:1

**Reed** 94:4 95:22 129:23 265:20 269:13

**refer** 10:6,15,24 13:15 25:10

**reference** 22:3 82:11 100:6 122:10 137:3 147:5 149:1,24 150:1 157:4,25 159:3 171:13 205:18 221:13 222:15 223:3, 13 228:20 280:1 290:13 292:25

**referenced** 21:11 118:20 132:24 136:8,18 156:5 158:24 169:14 208:9 224:25

**references** 129:15 149:4 159:5

**referencing** 29:10,20 83:21 111:18,20 131:14 133:3,14 135:10 155:13,14 186:22 205:18

**referred** 21:22 224:24

**referring** 22:6,20 40:25 61:21 79:3 111:7 146:4,11 147:13 161:6 208:17,18 221:14 222:9,21 234:19 237:14 240:22 241:19 262:12,23 264:14 267:22 283:19

**refers** 22:13 116:24 137:10 225:10

**reflected** 202:17

**reflects** 203:17

**refresh** 215:3 260:7 276:4

**refreshes** 275:23

**refusing** 13:3

**registered** 92:25 218:11 220:19

**registering** 68:16,20

**regulations** 78:15 119:14,20

**reimbursement** 253:13

**rejoin** 197:5

**relate** 183:14 252:5 294:25 296:2,6,13

**related** 23:18 36:13 39:14 44:13 46:2 71:10,17 81:3 95:17 99:20 101:17 103:25 108:6 118:8 141:14 145:24 147:13 149:19 154:14 166:19 169:1 174:12 193:1 208:25 218:15 228:19,23 236:18 247:10,20 249:2 255:24 259:1 283:24 286:20 292:14 293:13 301:6

**relates** 40:14 97:20 98:12 231:16 279:19

**relating** 26:11 29:11,16 72:23 73:6 80:17 81:25 93:15 97:22 98:13 105:25 151:3 181:14 183:3 188:13 298:1

**relation** 184:1

**relations** 34:14,20 39:13 44:10,14,22 46:2 63:25 66:3 79:3 82:24 179:9 185:3,17 188:4,21 212:9 213:24 216:19,21 247:21,24 266:11

**relationship** 46:7 53:1 56:18 57:8,11,19 58:19 59:3,10 66:19,22,23 87:19 163:9 180:2,23 181:13 301:24 304:2

**relationships** 34:19,21 36:1, 6,17 46:9 48:7,9 49:18 53:11 55:9,18 56:23 57:5 58:20 59:7,17 60:15 61:14 62:1,8,20 63:3 74:19,23 87:22,25 88:13 157:8 239:1 246:22 247:1,3,4 266:6,11 302:7

**relaying** 251:10

**release** 235:18 271:11,16,21, 25 274:6,8,18

**released** 99:22

**relevance** 130:16,23

**relevant** 66:22 111:22

**relying** 238:9

**remained** 43:7

**remarks** 245:13 246:16

**remember** 30:19 56:15 103:12,23 124:8,11 129:7 156:13 178:11 182:15 183:12 187:10 210:20,21,23 215:19 218:6,8 277:12

**reminder** 302:23

**reminding** 256:25

**render** 194:25

**rental** 12:16,24

**repair** 136:4

**repeat** 20:25 24:19 43:4 47:20 68:12 69:14 70:18 82:13 91:8 108:13 109:21 149:16 175:12,24 185:24 202:25 215:21 223:9 262:8 285:7

**repeated** 207:4

**repeatedly** 226:15

**rephrase** 43:11 84:13 162:12,13 188:9 242:1,2 268:13

**replicated** 39:21 40:1

**replied** 146:2

**replies** 123:13 126:3,11,24 273:12

**reply** 135:16 273:15

**report** 247:5 274:9 300:1

**reported** 247:7 251:13

**reporter** 9:11,18,23 12:6 14:21,24 75:13 96:14 110:23 121:3 131:13 152:3 175:25 178:17 181:24 186:5 190:9 194:3 197:21 209:15 210:7 214:10 227:22 233:10 235:15 236:1,16 238:12,13 239:5 240:20,25 241:19 243:18 244:23 248:4 264:3 270:21 275:9 276:17 281:18 291:3 298:17 304:19,21

**reporter's** 9:7 12:7

**reporting** 9:7 33:7,15 246:19, 24

**reports** 33:19,23

**represent** 42:16 101:21 165:2 182:18 192:20 202:5

**representation** 195:1

**representative** 203:16 207:1 249:25

**representatives** 181:12,19

**represented** 128:4 129:17

**representing** 94:4 101:12 129:11 184:6,8 192:21 202:1

**represents** 195:13

**reputable** 28:1,10,12 29:3,5 143:21

**reputation** 30:11 203:15 243:5

**request** 72:16 151:15 159:7 260:21 261:11,14,15 296:19

**requested** 176:2

**requesting** 81:8 155:7 262:2

**requests** 81:8 263:18

**required** 102:4 264:7,13

**requires** 37:2

**research** 33:21 34:5 38:12,17 39:8 40:15 88:11 199:5 266:6, 9 283:24 286:12 288:11,13,14 297:2 298:2

**residence** 16:5

**residences** 12:14

**respect** 28:15,20 34:21 36:17 40:5 45:4,18 46:4 52:17,19 55:8 64:11 68:2 74:17 80:12 81:15 88:7,8 90:23 93:22 111:3 143:11 195:3,14 196:11 207:9 235:5 239:20 249:15 250:12 251:8 255:16

**respected** 242:18

**Respectfully** 225:14 296:9

**respective** 159:20 199:6

**respond** 166:19 210:24 211:7

**responded** 200:2,7

**response** 70:15 146:25 147:7 148:1,20,24 150:7,18, 22 151:5 153:23 156:18 159:6 165:17,18 166:13 167:10 203:19,22,24 211:5 215:11 221:5 222:5 232:13 233:1 273:5,7 275:25

**responses** 14:20

**responsibilities** 33:11 39:11 43:5,18 44:13,16 45:17,18 46:13 47:4 52:17,19 54:10,12 63:25

**responsibility** 33:14,25 34:12,16 48:21 50:15 196:7

**responsible** 46:23 53:1 247:2

**rest** 149:3 187:22 277:22

**restart** 197:4,15 214:7

**restate** 143:17 147:6 176:4 232:18,20 237:19 265:23 284:8

**restricted** 211:4,8,10,16,18, 23 212:22

**result** 88:18 181:13 260:20 263:18,23

**resulting** 266:1

**retainer** 187:24

**retirement** 44:15 45:11

**return** 186:20

**revealed** 36:19

**revelations** 105:19

**revenue** 34:8 87:5 108:1 289:24

**review** 100:6 127:1 153:14 189:9 196:8,12,15,20 228:18 271:22 304:10,13

**reviewed** 124:13 138:7 145:20 232:4,25

**reviewing** 179:17 187:9 194:18 277:9
**Rex** 18:4
**Rhode** 35:16,17 46:20 52:6 57:16,18 66:15 265:19 266:24 267:3 269:14,20
**right-hand** 245:12
**rights** 292:16
**rise** 117:13,22
**risk** 100:8,21 113:12 114:6
**risks** 118:15
**Road** 11:8
**role** 34:12 64:11 65:19 67:7 68:16,20,25 71:23 90:22 127:23,25 128:24 129:18 183:25 185:10 189:13 250:23 279:23
**roles** 73:4 250:15
**room** 15:25 16:16 102:8,9
**rough** 19:6 289:21
**roughly** 18:19 20:8 42:23 51:17 93:10 258:14 301:15
**row** 269:6
**rule** 9:6 16:24 139:24
**rules** 9:6 14:11 119:20 120:19 167:1 197:17
**run** 83:3 226:22
**running** 144:22
**runs** 110:13

## S

**S-T-E-M** 171:8
**SAC-D** 267:9
**salary** 244:11 245:10
**sales** 144:18
**salvaged** 302:19 303:23
**Sandison** 101:23
**Sarah** 179:6,7 180:12,21 181:11,18 208:9,23
**sat** 220:8
**SBIR** 34:5
**SC** 199:18
**scenario** 239:21
**Schatz** 64:21 269:24 270:7
**scheduled** 292:21
**Schiff** 30:22,23 31:19,20,22 37:19 53:21 58:9 302:14
**Schmicker** 37:19 44:1,8 45:10,16 53:19 54:16 56:1,11 57:14 58:6,10 79:19 80:4,25 212:10 257:24
**Schmicker's** 233:24
**scholarship** 62:15 63:21 71:17 73:18,21 81:4,12 136:3 142:18 146:4,7 161:24 164:22 165:21 202:6,8 209:25 211:25 213:20 214:2 235:25 242:5,19 251:9 252:8 255:16 256:24 260:12 261:1,6 268:6,12,13 269:8 270:9 272:5
**scholarships** 19:17 20:21 21:6,11 60:21 61:12,24 62:7, 19 63:2,10,11 74:15,18,24 134:5,10 135:14,17 136:8 138:1,9,18,19 139:4,12,24 140:9,15 142:8 145:24 146:15 147:13,16,25 150:17 151:4 156:24 157:9,21 158:6 159:20 163:2,16 164:4 165:3,6,11,14, 16 166:4,10,19 167:8 168:22 171:5 175:4 199:15 200:24 201:2,10,15 202:17,20 204:19 216:13,22 217:2,8,9 218:23 225:1 226:4,7 230:17 231:17 235:11 236:9,18,20 242:22 243:2 247:14 249:19 252:6,12 256:17 258:20 261:9 262:13, 23 263:1 264:10 265:25 266:20,21,25 267:4 268:11 269:11,15 270:1,12
**school** 27:22 28:9 139:18
**science** 23:2,6,10 199:17 217:2 229:16
**science-related** 216:23 242:6
**scientists** 19:16 21:18 22:7, 21 61:21 77:20 194:24 219:8, 11 230:18 243:2
**scope** 45:17 46:6,8 65:21
**score** 266:1,14 270:12
**Scott** 94:4,6 95:22 129:23 304:20
**screen** 76:10 99:7 122:16 154:22 197:2 210:14
**screwup** 181:6
**scroll** 77:4 152:6 168:1 178:19,24 180:8 194:13 198:6 203:18 233:13 249:9 262:17, 19 265:2 271:4 275:13 294:3, 10
**scrolling** 294:11
**search** 285:12
**sec** 198:2
**second-to-last** 153:4
**second-to-the-last** 283:10
**secret** 285:1,14,21 286:4
**security** 293:5 298:24,25 299:9,18,19 300:15
**seek** 226:23
**seeking** 103:16
**self-interest** 303:4
**self-interested** 303:25
**senate** 65:12 86:7 87:10 267:11,15
**senator** 64:21 85:12,14,21,22 86:1,3,5,22 87:12,19 96:1 97:22 98:14 103:9,12 104:9, 15,16,21 109:10 141:1 215:25 216:8 217:16 231:6 268:1,24 269:5,13,24 270:7
**send** 75:25 76:4 126:3,24 145:23 150:6,22 157:2 159:7, 13,15 171:4 172:21 173:15 175:4 282:12 291:22
**sending** 33:21 97:9,11 100:17 101:1 160:10 161:21, 25 162:21 173:10 174:18 200:10 282:8 301:8
**sends** 180:10
**senior** 246:6,13 277:18,23 279:12 286:10 301:19

**sense** 37:18 60:11 90:8 177:21 207:3 212:25 238:25 251:6 253:12

**sensical** 90:7

**sensitive** 211:9 212:22 213:6,14 300:7

**sentence** 15:12 131:3 132:22,24 133:18 134:17,23 137:23 138:3 140:13 146:23 147:14 148:18 149:3,5 150:15 151:1 153:19 157:17 161:7, 13,17 162:25 173:9 201:18 221:1,24 222:24 223:12,24 224:1,5,12,21,25 226:2 229:8 230:9,10 232:2 252:24 260:22 262:8 273:21

**separate** 77:9 103:25 168:18, 19 281:6

**separation** 206:9,13 207:5 235:2

**September** 28:25 32:2,18 42:11 46:25 60:17 99:22 105:21 106:23 205:23,25 265:11,13 268:8

**series** 19:19

**serve** 283:22

**serves** 31:21

**services** 194:25

**set** 85:9,11 86:3 102:13 107:2 157:21 158:6 201:24 202:13 226:7 229:22 280:19

**setting** 67:24 68:17,21 103:25 301:23

**settled** 302:18

**share** 75:23

**shared** 39:3 108:9 211:3,8,17 212:21 230:14

**sheet** 231:13

**ship** 302:16

**shiphold** 38:4

**shipping** 128:20

**shocking** 36:18

**short** 61:12 110:22 207:11

**shorter** 103:2

**shortly** 229:14

**shot** 15:24

**show** 111:10

**showed** 162:24 164:7 266:19

**showing** 69:5

**shows** 130:9

**sic** 167:23 212:10 260:12

**side** 163:10 245:12 265:17 268:1 269:12

**sign** 64:8 186:19 189:10

**signature** 77:13 94:14 97:5 179:9

**signatures** 127:16

**signed** 47:18 48:1,10,23 49:6,12,19 50:25 51:6,13,23 52:11 59:11,23 62:21,22 66:14,15 67:18 91:2 192:12 193:6 275:24

**significant** 66:14

**signify** 267:17

**signing** 187:9 192:19 253:15 304:10,13

**similar** 19:19 39:24 42:22 262:3 283:23 297:1,2 299:8, 10

**similarly** 68:24 218:9

**simple** 296:1

**simpler** 33:3

**simply** 13:15 60:7 119:25 173:10 264:10

**simultaneously** 11:22 223:22 266:6

**single** 27:18 30:19 103:15 112:17 172:10 179:23 288:12

**sinister** 236:19

**sit** 83:3,6 84:2 105:6,13 106:14

**site** 41:3

**situated** 74:10

**situation** 115:13 223:20 286:9

**size** 291:18

**skip** 96:8 244:18

**skipping** 243:10

**slated** 287:23 290:6 295:2 296:5 298:4

**slide** 265:23 266:5,21,23 267:3,6,9,13,14 269:14

**slightly** 33:3

**small** 34:5 49:3 96:17 208:11 283:2

**smaller** 20:11

**SMI** 53:15

**snake** 241:15,18

**society** 19:15 20:20 21:6,11, 16,17,21,22 22:4,7,13,19,21 60:21 61:13,17,18,21,25 62:7, 20 63:2 67:25 68:17,21 70:1, 7,13 71:1,6,8,11 72:23 73:6, 12,14 74:17,25 77:19,23 78:6, 20,23 79:2 80:17 81:15 82:1, 10 83:5,7,10,20,21,22 84:3,18 85:3 91:12,13,20 92:2,8,10, 11,18,21,23,25 93:3,16,23 94:1 104:6 106:2,13,17,22 107:2,12,24 108:4 110:1 111:23 117:3 119:13,19 122:2 133:14 135:11 136:22 137:16 140:9 142:5 143:11 145:3,6, 11 146:14 147:18 149:7,19, 20,25 152:23 153:22 155:22 157:8,25 164:4,10,13,17 165:19,24,25 166:1,10 167:14 168:17,24 169:1,3,16 170:1,7 171:14,16,18,21,25 172:9,15 173:1,25 174:3,5,12,15,18 175:5 176:7,12 182:18 183:3 184:9,12 185:13 188:3,14 189:1,3 192:22 193:8,15 194:23 195:3,14 205:15 206:3,7,10,18,20,23 207:10, 15,21,23 209:8,9,25 211:24 213:19 215:6,10,18,24 216:12,13,22 217:6,7,15,23 218:11,16,18,22,23,24 219:4, 10,11,17 220:3,9,11,21 221:19,21 222:10,15 225:1 226:4,6 229:11,22 230:2,4,7, 8,13,17,18,22,24 231:5,13,16, 22 232:3 233:16 234:15,20,25 235:2,17,19 237:21 239:11 247:12,13,20 250:12 252:8

255:17,25 256:7 257:18 258:20 259:12 260:13 261:6 262:13 265:25 268:5,14 269:1,3,8 270:1,11 272:3,13 274:3,5,8,17 275:3 276:1

**Society's** 63:9 69:17 106:25 107:15,22 108:11,22,25 109:2 235:10,24 237:16 251:8 259:6

**solemnly** 9:13

**solutions** 290:2 294:21

**sort** 44:16 45:23 49:9 53:5 58:11 67:2 117:18 139:17 161:4 228:20,21 236:19 253:13 259:1 295:19

**sorts** 87:23,24

**sought** 86:12 88:8 90:24

**sound** 42:19 70:16

**sounds** 29:23 50:1 165:15

**source** 94:9 108:11,22,25 109:2 113:7 165:3 173:21 175:13 176:5,15 202:16 205:10 209:1 254:14,18

**sources** 84:6

**South** 11:8 15:18 40:5,10,14 52:9 57:21 58:25 59:2 119:4 177:11,16 178:1 198:11,17,20 200:21 201:9 258:23 269:7 282:1 283:1,8,22,25 284:5,12, 19 286:18,21 287:4,6,12 289:12,13 290:7 294:19 295:1,7,11 296:4,20,22,24 297:5,8 302:22 303:10

**speak** 12:5,8,11 79:12 224:2 230:3,20 292:13

**speaker** 15:1

**speaking** 11:22 12:9 22:14 40:3 75:5 76:9 81:9 93:10 94:23 100:14 105:10 126:21 189:4 223:22 237:2 261:16

**speaks** 140:19,21 195:8 201:6

**spearhead** 231:18

**special** 167:17

**specific** 17:25 18:24 19:5 31:9 32:11 36:18 37:24,25 48:25 52:2 54:13 56:14 64:14 65:15 73:9 93:10,14 121:24 124:11 134:3 142:17 157:3, 10,13 158:8 164:23 167:17 178:3 205:17 210:22 212:5 217:6 244:14 253:23 256:2,19 258:18 259:4,7 277:12 288:24 289:18 290:4 291:14 297:4

**specifically** 15:5 34:20 46:4 82:24 88:5 97:10 106:1 128:9 129:16 136:20 140:25 149:4 160:7 164:8 176:9 182:15 187:10 202:6 212:2

**speculate** 14:17 31:11 63:18 74:11 268:10

**speculating** 137:20 155:18 238:12

**speculation** 84:11 124:16 125:3 133:1,20 134:13 135:6 136:1,15 137:6,19 138:12,22 141:4,10 146:1 147:10 148:3 150:20 151:7 155:10,24 158:2 159:1 166:17 169:12 174:21 180:5,18 181:16 182:20 183:6 187:18 188:16 189:8 191:25 193:10 198:23 204:15,25 205:7 206:15 221:17 222:2,18 223:6,16 224:14 225:3,13,24 226:12 227:8 254:9 255:19 257:13

**spelled** 194:10

**spending** 91:1

**spends** 87:7

**spoke** 17:18,20 18:1 129:22 265:24

**spoken** 207:25

**spreadsheet** 160:1 210:3,17, 20 211:24

**spring** 45:22 46:5 47:4 48:18, 21 49:6,21,22 50:9,10,15 52:16

**staff** 64:20

**stakeholder** 129:11

**stakeholders** 295:15

**stamp** 131:16

**stamped** 141:20 145:17 294:15 300:21

**stamps** 300:8

**stance** 114:5

**stand** 205:3

**standard** 123:10,15 125:19 126:15 127:13 237:11

**standing** 74:8 107:8

**stands** 267:11

**start** 28:24 31:25 65:8 142:14, 17,22 217:5 243:14 284:3 301:25

**started** 29:1 46:19,25 54:21 65:17 156:23 200:1 216:11 231:17 248:18 267:25 283:12

**starting** 35:24 42:11 50:9 216:10 233:20 284:20

**starts** 126:6 137:23 145:18 158:21 215:7 248:9 281:22

**state** 11:3 34:7 53:25 58:20, 21,25 59:2 66:3,6 74:14 79:17 85:15,22 87:23 137:4 225:19 258:23,25 266:12 267:23 270:4 271:16 272:4

**stated** 62:12 69:15 70:5 81:16 82:2

**statement** 22:15 62:12 88:22 89:20,23 90:8 106:6 108:2 162:5,8 170:25 202:17 220:14 229:21 230:6 246:23 264:6,14 274:21 297:4

**statements** 114:9 117:14 143:7

**states** 40:1 53:5 74:5,8,9 91:3 109:15 194:21

**stating** 173:9 265:25 266:5

**status** 30:6 57:8 160:23 161:1,4,6 245:12

**stay** 12:17

**STEM** 139:12 140:10 166:4 171:7 199:16 201:10 228:20 229:18 241:24

**stemmed** 209:7

**step** 250:23

**stepped** 56:2

**steps** 88:23 114:3,10,21 135:1 137:15 167:13 203:2 255:23 264:7 271:25 272:2

**Steven** 28:20 37:19 38:9 41:3,8 42:2,7 44:2 53:19 57:14 64:10 238:17 277:16

**stood** 218:18 220:12,18,22

**stop** 11:24 15:23 17:10 38:17 55:7 89:2 157:12 158:14 163:20 212:3 226:16

**stopped** 268:10

**story** 235:16 236:1

**straight** 65:13

**strategic** 43:3,9,15 45:6 53:15 57:9 245:15,25 246:3,6, 12,13 277:19,21,24

**strategies** 53:10 64:23

**strategy** 36:10 39:21 40:18 53:20,22 88:2

**Street** 13:9

**strengthen** 241:13

**Strictly** 237:2

**strike** 91:17 94:11 138:6 161:19 294:5

**structure** 211:21

**structures** 38:4

**struggled** 250:21

**students** 142:9 166:5 199:16 201:15

**studies** 28:5

**studying** 171:7 199:16 201:10 216:23 217:2 241:24 242:5

**Subcommittee** 267:12,16

**subcontract** 284:11 287:25 289:11 290:8 296:13 298:1

**subcontractor** 39:6 284:4, 18 289:13 297:1,11

**subcontractors** 283:22

**subcontracts** 294:25 296:3

**subject** 19:15 26:11 65:21 97:20 99:6,11,16,24 102:5 110:6 153:1,2,3 156:8 183:11 184:17,25 186:16,24 187:14, 20 191:6,17 209:24 213:5 215:6 233:23 247:6 260:12 271:10,14 274:12 277:4

**submitted** 33:20 67:18 77:2

**substance** 118:5 127:12,15 159:4

**success** 267:18,20

**successful** 37:1 67:8 242:18, 20 267:22 283:17 303:1

**successfully** 54:1,6 264:7 299:1

**sufficient** 111:18 263:9 264:6

**suggest** 241:13

**suggested** 153:15

**suggesting** 137:15 235:23 236:2 256:12

**suggestion** 234:10 235:4

**suggestions** 234:12

**suggests** 140:14

**suing** 302:25

**summarize** 250:15 265:23

**summary** 67:14,23 77:3

**summer** 45:25 55:6 56:5 60:13

**super** 153:25 215:13 221:6 222:6

**support** 25:22 67:19 71:17 77:2 85:12 86:3 146:5 216:7 229:12 234:22 269:4 295:17 297:11

**supported** 86:1 172:15

**supporter** 295:14

**supporters** 295:15

**supporting** 45:25 56:4 96:1 142:18 213:23 248:20

**supports** 215:25

**supposed** 248:22,25 299:1,2

**surface** 38:8

**surrounding** 224:6,9

**Susan** 85:12,14,21 86:1,5,22 216:1 268:1,3,24

**suspended** 24:1

**suspicions** 109:1

**swear** 9:13

**switch** 67:11

**sworn** 9:22 14:8 67:18

**system** 123:20 211:13

**systematic** 53:13

**systems** 283:24

**SYWSE** 21:23 22:4 171:5 172:22 233:24 273:18,20

**T**

**taker** 196:10

**takes** 88:22 159:23

**taking** 45:10,16 64:10 73:1 74:16 76:14 218:21 293:2

**talk** 97:24 111:13,15 256:23 302:17

**talked** 34:10 37:20

**talking** 13:5 21:16,17 50:9 56:6 86:21 108:18 133:10 136:21 139:7 141:14 155:15 215:22 218:7 219:9 234:3 240:16 252:9 258:25 266:9,10 271:15,24 290:14

**tangentially** 293:13

**target** 100:10

**tasked** 55:17 259:5

**tasks** 46:8 71:17 72:3 171:16, 19 172:16 247:19 248:20 249:1 255:24 256:3 257:1

**tax** 30:9

**tax-related** 27:7,8

**team** 20:3 277:5 280:18,22

**teaming** 47:18

**technical** 33:19 300:11,16

**Technologies** 10:5 13:11,13 279:24,25 284:3,10 296:25 297:10

**technology** 28:2 229:16

**Ted** 53:17

**telegraph** 202:16

**telephone** 18:8

**telling** 107:20 115:11 132:14 168:22 179:25 200:25 260:18 284:17

**ten** 49:23

**ten-minute** 17:10

**tentative** 102:14

**tenure** 55:24,25 57:9

**term** 22:19 237:10 262:4 268:16

**terms** 38:14 51:5 56:3 113:19 114:2 144:6 265:24

**testified** 9:24 14:3 29:22 30:8 63:24 64:3 116:10 117:21 132:10 134:14 143:12 146:12 177:10 200:9 215:17 231:9 288:21 303:8

**testify** 24:13 25:5,6 26:10 124:20 134:16 175:16 219:15 229:24 280:8

**testifying** 24:5 226:16,18 244:8

**testimony** 9:13 20:23 21:8 22:5 26:12 29:24 30:3 40:21 42:2 51:13 56:10 59:20 62:6 69:24 70:24 72:6,11 77:18,21 80:1,21 81:25 82:5 91:24 94:1 95:5,19 112:16 115:8 117:8 126:20 132:2 143:16 144:4,15 146:17,21 159:9 171:23 173:12,14 174:4,19 175:9,22 177:15 183:5 188:6,24 190:2 202:4 207:18 208:1 209:4 213:8 216:3,15 217:18 231:2 239:16 240:5,7,19 241:4 266:18 274:23 275:2,18 278:17 280:7 285:24 298:7,9 300:3

**thanking** 235:18

**theme** 103:13

**thereabouts** 111:9

**thing** 49:10 52:8 53:5 83:23 100:25 165:15 186:24 228:21 236:19 253:14 259:1 261:2 274:14

**things** 14:12 17:23 19:17 34:4 36:8 71:23 115:14,25 117:15 134:17 135:9 144:1 145:1 155:16 211:19 250:14 257:4 262:4 267:2

**thinking** 23:21 135:8 180:20

**thinks** 238:13 255:23

**thought** 12:9 72:7 144:10 166:5 203:11 235:19 274:25

**thoughts** 79:19 80:25 81:3,5, 8,10,18,22

**thread** 122:25 123:6,11,21 132:12 135:16 152:7,14 191:4 199:25 258:5 271:7

**threat** 299:2,5,25 300:23

**three-** 226:25

**THURSDAY** 9:2

**tied** 185:1 209:7

**Tiffany** 192:17

**time** 11:10 15:2,3,19,22 17:12,14 19:6,9 20:17 21:13 22:17 27:14,16,17,25 29:25 30:13,14,18,23 31:3,4,23 33:17,22,23 34:24 35:4,11,14 36:6 37:6,23,25 38:1 39:22 43:23 44:7,9,18,20,24,25 45:5,11,15 46:25 47:1,13,20 48:18 50:10,21,22,23 54:20, 23 55:1,2,11 56:21 57:18,24 60:3,13 63:7 64:21,24 65:10, 15,16,17,23 66:15,25 72:3,18 73:2,15 74:15 76:3,19 83:17 84:8 85:7,11,25 86:5,8,21,22 87:14 89:3 91:22 92:7,12,23 93:2,12,24 94:17 95:1,2,14, 15,20 99:18 101:1 105:3 107:13 108:10,16,21 109:9,24 110:15 112:19,23,24 113:9 114:14 115:22 117:5 118:24 119:10,12 121:19,25 122:6 124:12 125:5,9,11,12 127:23 128:3,21 131:15,19,22,24 132:15,17,18,21 134:22 135:3,9,15 137:2,12,14 138:7, 16,24 139:2,9,12 140:23 141:11,20,25 142:2,24 143:5 144:12 145:17,19 147:23 148:5,22 149:17 150:14 151:10 158:8 160:9,13 161:19,20 162:14,18 165:4,24 166:23 167:11 168:15 169:7, 23 171:21 176:7,8,19 177:13 178:7 179:12,18 182:25 183:11,15 184:9 187:7 188:10 191:13,16 193:3 195:25 196:5,17 198:11,15 200:9,12, 25 202:4,9 205:13 206:1 207:15 208:15 216:10 217:25 218:9,17 219:1 223:2,14 224:3,21 226:13,23,24 227:2 229:3 230:11 232:5,11 237:23 239:24 240:2,3 242:9 246:1 253:20 254:4 263:8,11 265:11 267:14 272:25 273:6 274:15 277:10,13,18 279:12 281:4 282:6,24 284:14 289:17 290:17 292:22 294:7

**times** 10:6,14 12:10 17:9 30:17,22 93:7,11 112:16 251:20 256:23

**timetable** 137:25

**timing** 52:5

**tips** 16:18

**title** 33:3,7,8 34:13 35:5 42:12,17,21,25 43:2,19,20 45:6 98:16 219:7 245:14,23 246:2,5 252:8 267:9,13 298:22

**titled** 38:12 100:17 291:25 294:20

**today** 14:8 15:10,15 24:5 26:13 28:11 69:24 77:18,21 83:3,6 84:2 100:23 105:6,13 106:15,20 128:1,2 129:17,23 304:6

**today's** 17:17 290:17

**Todd** 31:22 33:8,15,17 280:20

**told** 17:22 72:13 105:22 143:14,24 145:6,11 163:22 166:2 175:17 200:9 203:2 206:8 214:5 215:23 220:8 286:18 302:20

**top** 152:11,12 168:2 194:13 252:4 255:12 264:12 280:14 294:4 301:4

**top-level** 174:14

**topic** 60:24 110:22 288:11

**topics** 19:13

**total** 51:20 59:7,18,21 160:24 164:3 253:3 289:25

**totally** 100:11 188:8
**touch** 156:25
**touches** 189:19
**traceability** 104:8
**track** 257:4
**tracking** 210:3,17,20 211:24
**training** 298:25 299:9
**transaction** 92:13 289:18
**transcript** 304:11,16
**transferring** 70:12 78:19
**transmittals** 33:20
**transparent** 284:17
**transparently** 302:20
**transpired** 284:2
**travel** 253:13
**traveling** 53:5,7 196:16
**treated** 213:2
**trial** 24:23 290:18
**triangle** 265:17
**trigger** 300:23
**triggered** 299:25
**Troy** 212:10 257:23
**true** 25:20,25 57:2 68:22 83:15 143:25 155:16 182:14 200:15 267:2 273:11 277:2 281:1,2 286:4
**truncate** 123:18
**trust** 118:17 139:6 196:9 230:7
**trusted** 115:10 116:1,2 142:25 144:21
**trusting** 115:25 118:13
**truth** 9:15,16 14:9 115:11 116:10 143:6
**truthful** 118:15
**turn** 77:15 122:8 130:2
**Turning** 160:19
**turns** 118:16
**twist** 236:10
**twisting** 285:25
**two-minute** 197:4,7 214:7
**type** 247:11
**types** 59:6,16 60:15
**typical** 159:22 195:23
**typically** 196:5 253:9,16

**U**

**uh-huh** 14:23
**uh-uh** 14:23
**ultimate** 172:3
**ultimately** 250:16 284:13 303:2,14 304:3
**umbrella** 184:19
**uncomfortable** 274:13
**undergraduate** 28:5
**underlined** 77:25
**underlying** 26:2 171:24
**underpinning** 26:3 171:24
**underscore** 78:1
**underscores** 97:15
**underselling** 263:15
**understand** 10:8,17 11:1 12:13 13:16 14:7 15:7 17:4 22:6 24:10 30:14 43:12 44:2 49:17 50:12 51:22 54:25 66:2 69:12,20 74:18,22 75:3 78:11 83:6 89:5 90:4 94:7 109:9 111:17,20 120:20 121:17 125:22 126:18 128:2 131:25 134:9,21 137:3 138:5,8 140:23 145:20 148:23 150:15 155:6 157:25 161:3 165:25 168:15,17 180:15 191:21 221:13,20 222:13 223:2,13,21 224:23 240:24 241:25 242:18 244:3 255:14 272:17 273:10 278:18,20 288:5 290:5,13 292:16 302:18 303:21
**understanding** 36:14 38:18 44:7 48:5 63:7 66:5,12,25 67:6 73:17 82:19 83:4 85:7,11 86:2,8 87:17 95:1,9 99:17 100:2 106:13,15,20,21,24 107:1,5,7,21 108:10,22,23,24 109:3,25 110:15 111:2,12 112:25 113:11,18 114:17,23 128:7 132:23 133:17 135:22 136:2,7 138:8 144:17 148:7, 17 149:22 151:2 160:17 167:12 169:7,23 179:24 180:20 183:1,17 184:23 188:12 189:5 193:4 216:4,7 218:17,24 219:3,16 220:2 221:25 224:5,11,20 225:18 233:3 250:23 254:6 293:8,18 302:15
**understands** 230:8
**understood** 33:22 35:12 36:15 38:2 53:20 56:17 71:22 72:4,19 73:1,15 82:17 92:24 93:2 94:4 95:2,7 99:20 107:9, 14,23 108:3 109:12 115:16 121:19 128:2 136:13 140:4 147:4,23 149:18 164:1 165:23 168:19 169:2,23 170:1 171:2 176:7 183:21 185:4,16 188:19 204:11 223:18 239:13 240:2 242:17 255:15 269:4 292:16
**undertake** 216:11
**undertaking** 107:12
**unease** 114:8
**unilateral** 174:10
**union** 38:20
**United** 74:8 91:3
**universally** 237:12
**universities** 35:8 39:22 46:13,18 48:17,22 51:17 52:25 53:3,6 55:19 56:7,8 57:6,10 58:20,23 59:8 63:4,8, 19 74:4,10 80:13 81:11 135:14 142:6 157:1,9,11,14, 20 158:5,9 159:5,7,18 160:20 161:5,15,23 162:19 163:2,4, 15,22 164:1,24 168:21 171:6, 9 172:22 173:22 175:14,17 177:5 178:6 200:3,11 214:1 217:6 249:5,16 256:5 257:17 260:24 263:1
**university** 23:3 34:14,19,21 35:14,15,17,25 36:10,13,17 37:14,21 38:2,20 39:2,5,13,19 40:5,10,14 44:13,21 45:4,18 46:3,4,6,9,24 47:2,5,10,17,25

48:4,13 49:7,13 51:8 52:3,5,8, 9,13,17,20 53:4,8,9,23 54:1,6, 18 55:8 56:12,14,15,16,19,23 57:1,13,16,21 58:1,6,8,17,21, 22,25 59:2 61:14 62:2,9,16 63:5 65:25 66:6,12,13,14,19 67:7,8 73:22 86:13 88:12 142:18 159:21 161:15,24 162:20 163:3,19,25 167:9 176:11,16 179:10,11,12 180:1 184:2 198:11,17,19,20 199:4 200:12,20 201:9 208:8,10,12, 22 235:25 247:3,13,23 249:2, 6,8,10,20,25 258:19,24 259:3 260:18 261:2,8 264:11 265:18 266:7,10,15,24 267:3 268:5, 11,14 269:7,10,14,19,25 270:5,7,8 271:17 272:4,5 282:1,13,18,19 283:8,22,25 284:4,12,19 286:18,21,24 287:4,6,12 289:12,13 294:19 295:1,7,11 296:4,20,22,24 297:5,7 302:6,22

**unknown** 229:23

**unlock** 38:16

**unmanned** 290:2,8 294:20

**unnecessary** 11:23

**unpack** 286:15

**unquote** 41:15 229:18 236:10

**unwieldy** 291:17

**updated** 160:22

**upstanding** 115:19

**user** 211:13

**users** 276:23,24

## V

**vague** 21:24 34:23 44:23 47:12,13 50:17 55:12 64:13 69:19 71:3,13 73:7 89:4 90:3 97:11 108:15 114:13 116:5,24 127:9 132:2 169:11 170:11 206:4 219:1 242:8 257:10 261:23 262:1 266:3 274:19 279:7 281:10

**vaguely** 97:10 154:5 187:6 190:21 215:20 228:5

**valid** 100:5

**valuable** 74:12 88:14

**variations** 32:22,24 163:22

**varied** 163:18,21 165:1

**vary** 164:20,23

**varying** 198:25 282:20

**vast** 87:5

**vastly** 88:22 90:19

**venture** 283:16

**veracity** 143:7

**verbal** 14:20

**verbally** 249:25

**version** 198:3,5

**versus** 117:18 302:25

**vice** 30:23 31:4,23 33:16 43:2,8,15 44:3 45:6 198:16,25 199:4 245:14,24 246:2,6,12, 13 277:18,23 279:12 286:10 301:19

**videoconference** 18:8,10, 18,21 20:5 21:5

**view** 70:2 71:18

**viewed** 67:7

**visibility** 104:12

**vision** 219:10

**visit** 12:19

**voice** 251:20

**volition** 296:24 297:9

**VP** 57:9

## W

**wait** 18:13 76:8

**waiting** 126:9 175:20 190:14

**wall** 282:24

**wanted** 98:8 114:20 136:3 158:10 159:19 165:2 166:2 202:5,7,15 207:6 212:6,8 241:23 256:5 286:22 302:15

**warning** 127:13

**Washington** 178:11 179:10, 11 180:1 208:10,12,23 249:10

**wasting** 226:13,24

**water** 38:8

**ways** 88:11 123:18

**wearing** 72:1

**web** 77:9 235:20

**week** 114:4 128:18 130:14 148:21 192:16,25 245:9 292:22,23

**weekend** 128:19 161:10,16, 25 162:21

**weeks** 119:1 162:17 258:14 283:15

**well-known** 273:23

**white** 297:3

**whiteboard** 159:17 160:5 177:7,24 178:8

**wholesale** 117:19

**Wichita** 58:21 271:16 272:4

**widely** 237:10

**wife** 93:5,17,21 283:3 303:12

**wife's** 93:1

**William** 121:14,18,19 152:19 182:11 275:25

**window** 45:1 178:7

**Winer** 64:17,20 65:2,8,12,18, 23,24 66:18 97:16,21 98:13 102:6 103:3,8,19 104:4 121:14 122:5,13 131:8 141:21 145:16 148:15 156:22 157:16 167:23 180:10 182:4 183:2 186:12

**Winer's** 64:12 98:17 103:16 157:24

**wins** 260:17 261:3,7 262:11, 16,22

**Wisconsin** 58:22

**withdrew** 295:17

**women** 19:16 21:18 22:7,21 61:21 77:20 134:6,10 139:12 140:10 146:15 171:7 194:23 199:15 201:10,15 216:22

217:2 219:7,11 229:13 230:18 234:22 241:24 242:5,22 243:2

**wonderful** 204:2

**wondering** 13:4

**word** 114:22 116:2 144:16 145:18 147:1,4 237:14 240:10

**wording** 138:5,9

**words** 66:5 77:25 81:20 85:9 103:13 104:14 136:24 141:7 204:23 209:6 223:3,11 235:23 239:13,25 240:13 241:1 267:10 284:9 285:8 286:1 287:8 295:7

**work** 33:21,25 37:2 38:21 44:21 45:9,15,17 48:11 55:19 64:12 66:1 81:11 118:3 123:11 147:17 213:21 247:9 282:21 283:23 284:4 286:24 287:2 297:4 299:11 302:4

**work-in-progress** 62:21

**worked** 26:23 28:16 30:8 35:12 44:17 64:25 81:17 113:21 118:20 123:8,20 139:13 207:20

**working** 32:4 34:2 37:13 73:20,21 98:20 142:5,14 157:2,21 158:6 167:12 183:21,22 185:2,18 212:8 213:11,12,16 257:21 259:23 283:6,23 287:3

**works** 89:7 203:17

**worries** 301:11

**write** 14:24 91:1 160:4 250:17 260:15

**writes** 150:8

**writing** 12:7 14:21 107:9 282:23

**written** 34:17 49:9 82:8,18 104:8 232:24 236:5 245:21

**wrong** 99:3 194:10

**wrote** 92:9 135:8 145:21 177:7 178:5 180:20 202:9 235:16 236:1

**WSU** 271:10 272:3

**Y**

**Y-O-U** 137:1

**year** 12:19 51:21 52:7,11 94:6 96:4 124:25 125:10 244:11 286:24 288:1,6,9,12,16 290:15

**years** 38:14 109:14 110:14 156:12

**yesterday** 17:19 19:21 20:14 21:4

**yesterday's** 19:20,24 20:4

**young** 19:16 21:18 22:7,21 61:21 77:19 194:23 219:7,11 229:12 230:18 234:22 303:11

**Z**

**ZIP** 11:11

**Zoom** 11:14 75:24 96:11 110:24 197:2,4

**zoomed** 96:21