IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

PACMAR TECHNOLOGIES LLC (f/k/a MARTIN DEFENSE GROUP, LLC),

Plaintiff,

vs.

MARTIN KAO; TIFFANY JENNIFER LAM a.k.a. JENNY LAM and/or TIFFANY KAO; LAWRENCE KAHELE LUM KEE; CLIFFORD CHEN; DUKE HARTMAN; SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC,

Defendants.

Case No. 1:22-cv-00283

---

CLIFFORD CHEN,

Cross-Claimant,

vs.

MARTIN KAO,

Cross-Claim Defendant.

---

DEPOSITION VIA VIDEOCONFERENCE of MARTIN KAO, 30(b)(6) designee for Society of Young Women Scientists and Engineers LLC, commencing at 6:32 a.m., HST, on Friday, September 4th, 2026, pursuant to Rule 30 of the Hawaii Rules of Civil Procedure.

REPORTED BY: DARCY J. BROKAW, RPR, CRR, CSR #371



EXHIBIT 1

APPEARANCES:

For Plaintiff PACMAR TECHNOLOGIES LLC (f/k/a MARTIN DEFENSE GROUP, LLC):

GRANT FASI ALLISON, ESQ.
Lung Rose Voss & Wagnild
Topa Financial Center, Suite 900
700 Bishop Street
Honolulu, Hawaii 96813
808.523.9000
gallison@legalhawaii.com

For Defendant MARTIN KAO and SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC:

KEITH M. KIUCHI, ESQ.
Attorney at Law, ALC
American Savings Bank Tower
1001 Bishop Street, Suite 985
Honolulu, Hawaii 96813
808.533.2230
kkiuchi106@cs.com

For Defendant TIFFANY JENNIFER LAM:

PHILIP W. MIYOSHI, ESQ.
Miyoshi & Hironaka
City Financial Tower
201 Merchant Street, Suite 2240
Honolulu, Hawaii 96813
808.599.1645
philip@808-law.com

Also present: Nelson Kwok

Mike Formby

INDEX TO EXAMINATION

WITNESS: MARTIN KAO

| EXAMINATION | PAGE |
| --- | --- |
| BY MR. ALLISON | 8 |

INDEX TO EXHIBITS

MARTIN KAO

PacMar Technologies v. Kao et al./Chen v. Kao

Friday, September 4, 2026

Darcy J. Brokaw, RPR, CRR, CSR No. 371


| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Plaintiff's Third Amended Notice of Taking Deposition Upon Oral Examination Via Remote Zoom Conference Pursuant to HRCP Rule 30(b)(6); Exhibit A [Deponent: 30(b)(6) Representative of Society of Young Women Scientists and Engineers LLC] | 10 |
| Exhibit 2 | Subjects of Examination | 13 |
| Exhibit 3 | 8/10/2022 letter from U.S. Department of Justice to Shelli Peterson, re "United States v. Martin Kao, 22-cr-48 (CJN)" | 22 |
| Exhibit 4 | Statement of Offense in Support of Guilty Plea | 24 |
| Exhibit 5 | Signature | 44 |
| Exhibit 6 | Signature | 45 |
| Exhibit 7 | Landlord Signature, Tiffany Lam | 47 |
| Exhibit 8 | Signature | 48 |
| Exhibit 9 | Tiffany Jennifer Lam signature | 50 |
| Exhibit 10 | Tiffany Jennifer Lam signature | 50 |
| Exhibit 11 | "Jennifer Lam, its Manager and Member" signature | 54 |

INDEX TO EXHIBITS (Continued)


| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 12 | Tiffany Jennifer Lam signature with sworn block | 54 |
| Exhibit 13 | Wichita State University Gift Pledge Form with checks | 55 |
| Exhibit 14 | Central Pacific Bank Signature Card for SYWSE Bates Nos. PAC-006867 - 6872 | 61 |
| Exhibit 15 | Defendant/Respondent Martin Kao's Motion to Quash | 62 |
| Exhibit 16 | Split screen with Tiffany Lam signature dated 4/10/2023 on the left hand-side and Tiffany Lam and Martin Kao and Geremy G. Robinson signatures | 66 |
| Exhibit 17 | Society Check No. 1005 signature; Lease Agreement with Geremy G. Robinson Landlord signatures by Tiffany Lam and Martin Kao; Tiffany Lam signature for Tiffany Declaration Dated 4/10/2023 - Martin Kao's Motion to Quash | 70 |
| Exhibit 18 | 12/11/2019 email from 8083986921 to Kahele Lum Kee, with Hawaii Driver's License for Tiffany Jennifer Lam | 74 |
| Exhibit 19 | DCCA page for SYWSE | 91 |
| Exhibit 20 | Society of Young Women Scientists and Engineers LLC Operating Agreement Bates Nos. PAC-008196 - 8210 | 92 |

INDEX TO EXHIBITS (Continued)

| MARKED | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 21 | Split screen with Security Check No. 1005 signature; Lease Agreement with Geremy G. Robinson signatures by Tiffany Lam and Martin Kao on the left-hand side and Tiffany Lam signature with a Confidential In Witness Whereof signature by Jennifer Lam, Its Manager and Member | 93 |
| Exhibit 22 | Central Pacific Bank Signature Card for SYWSE Bates Nos. PAC-006867 - 6870 | 94 |
| Exhibit 23 | Central Pacific Bank Signature Card for SYWSE Bates Nos. PAC-006871 - 6872 | 96 |
| Exhibit 24 | Central Pacific Bank Beneficial Ownership Certification Bates Nos. PAC-008192 - 8193 | 101 |
| Exhibit 25 | Central Pacific Bank Address Change Request for SYWSE Bates No. PAC-008194 | 105 |
| Exhibit 26 | Complaint Before the Federal Election Commission Bates Nos. JSH-001994 - 2007 | 107 |
| Exhibit 27 | 2/25/2020 letter from William B. Canfield III to Martin Kao, re "Terms of Engagement" Bates Nos. PAC-007684 - 7685 | 113 |
| Exhibit 28 | Response of the SYWSE before the FEC made by William Canfield Bates Nos. PAC-006874 - 6875 | 115 |
| Exhibit 29 | Email string ending in a 2/28/2020 email from Clifford Chen to William Canfield, subject "Update re: scholarships etc." | 119 |

INDEX TO EXHIBITS (Continued)


| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 30 | 6/24/2020 email from William Canfield to Martin Kao, subject "Jennifer" Bates No. PAC-008162 | 135 |
| Exhibit 31 | 6/24/2020 email exchange between Martin Kao and William Canfield, subject "Jennifer's Statement" Bates No. PAC-008163 | 136 |
| Exhibit 32 | Email string ending in a 2/29/2020 email from Martin Kao to Clifford Chen, subject "Events next week?? Attorney Privileged Communication" Bates Nos. PAC-002384 - 2390 | 137 |
| Exhibit 33 | Email exchanges between Clifford Chen and Lori Bofman, subject "Scholarship Answer to SYWSE" Bates Nos. PAC-008180 - 8182 | 137 |
| Exhibit 34 | Text messaging between Martin Kao and Kahele Lum Kee | 142 |
| Exhibit 35 | Email string ending in a 4/14/2020 email from Duke Hartman to Kahele Lum Kee; Lori Bofman, subject "Scholarship Programs - The Society" Bates Nos. PAC-000930 - 940 | 149 |

MARTIN KAO
having first been duly sworn,
testified under oath as follows:

EXAMINATION

BY MR. ALLISON:

Q. Good morning, Martin. My name is Grant Allison. We met during your deposition yesterday.

Yesterday you told me that it was okay if I called you Martin throughout the deposition. Same thing today is okay?

A. Yes, sir.

Q. Okay. So, Martin, all the same rules apply as yesterday. I think we just went over two of them, and that was that only one speaker at a time, for the court reporter's benefit, and you're under oath and obligated to tell the truth.

Do you understand both of those rules?

A. Yes, sir.

Q. Okay. Today you are testifying as a representative of the Society of Young Women Scientists and Engineers LLC under Rule 30(b)(6).

Do you understand what that means, Martin?

A. I do not.

Q. So Rule 30(b)(6) is a rule, Federal Rules

of Civil Procedure, and it's a rule that designates that when you depose a company, the company has to put up a person or persons to testify on topics. Since the company can't testify, that's why there's a person who gets designated by the company.

I understand that the Society has designated you to be its representative on all topics. Is that correct?

A. I'm not sure if that's an accurate classification or description. What I tried to communicate yesterday is that the Society is really the alterego of the mendacious acts of the company, the executives and myself. So it's really not an entity, if you will.

Q. When you say that -- sorry, what word did you use there? It was the what acts of the executives?

A. Mendacious, inappropriate.

Q. And who are those other executives, if you could state them for the record, please, that in addition to yourself were doing these inappropriate actions and using the Society as an alterego to do those?

A. Cliff Chen, Lawrence Lum Kee, Michael Schmicker, Eric Schiff, the executive team. I don't

remember most of them now, it's been so long.

Q. Was Duke Hartman one --

A. Duke Hartman, yes.

MR. ALLISON: Okay. Nelson, could we bring up -- so, Nelson, we have the two files, so the original file, can you bring up what's marked as our document 1.

We'll introduce this as Exhibit 1 today.

(Deposition Exhibit No. 1 marked for identification.)

BY MR. ALLISON:

Q. Martin, have you seen this document before? This is the Plaintiff's Amended Notice of Deposition notice for today's deposition.

A. I don't see anything on the screen right now.

Q. You don't see the document on the screen?

A. No. Your pictures got all really small.

MR. ALLISON: Keith, do you see it? Phil, do you see it?

MR. KIUCHI: Yeah, I do.

MR. MIYOSHI: I do.

MR. ALLISON: I'll note for the record Phil Miyoshi says he can see it as well.

Nelson, why don't you try taking it down

and putting it back up. Maybe that will solve the issue.

THE WITNESS: You're back to normal size now.

MR. ALLISON: Okay. Let me try to put it up one more time here and see if that fixes it.

THE WITNESS: No, nothing on my end.

MR. KIUCHI: What about now?

THE WITNESS: No.

MR. KIUCHI: Okay. Was it working yesterday, Martin?

THE WITNESS: Yeah, yesterday was fine.

MR. KIUCHI: That's strange.

MR. ALLISON: Let's go off the record, please.

(Discussion off the record.)

BY MR. ALLISON:

Q. We're back on the record, Martin. Same rules apply. Do you understand?

A. Yes, sir.

MR. ALLISON: Quickly, before we go on, I'll note for the record that the plaintiff's client representative Mike Formby is also present today. He's the CEO of the parent company of the plaintiff.

///

BY MR. ALLISON:
Q. Okay. So, Martin, now that you can see the document on the screen, I'll ask the same question I was asking a moment ago: Have you ever seen this document before?
A. I have not.
MR. ALLISON: Okay. And, Nelson, if you could scroll down and show Martin the rest of the document, please, just to make sure he hasn't seen it before.
BY MR. ALLISON:
Q. So, Martin, just to confirm, this is not a document you're familiar with?
A. Not on its face. Is this the Complaint or something?
Q. No. This is the notice for today's deposition. I should say it's an amended notice because there's been a couple of them.
A. What is the date of this?
Q. This version was from August, but as I said, there's been a couple of them. Each time we attempted to take your deposition, we had to send out a new notice. This is the recent one for today's depo.
A. Yeah, I haven't seen anything since I've

been in prison.

MR. ALLISON: Nelson, if we could show the next document. We have it marked 1A in the same file.

We'll introduce this as the next exhibit in order, Darcy.

(Deposition Exhibit No. 2 marked for identification.)

BY MR. ALLISON:

Q. So, Martin, the same question. Have you seen this document before or one that looks substantially similar?

A. No, I have not.

Q. Okay.

MR. ALLISON: Nelson, could you zoom in to make the enumerated topics a little bit larger? And if you could scroll down to the very bottom so we can see how many there are.

BY MR. ALLISON:

Q. There are listed 15 items here, Martin.

MR. ALLISON: Nelson, could you go to the top of the list.

BY MR. ALLISON:

Q. I'd like you to, not out loud but read them to yourself, and let me know when you've looked

at each one.

A. You want me to read it?

Q. Not out loud. Just to yourself since you haven't seen it before.

A. Can you go to the very top of the document?

Okay. Thank you.

Go down.

Okay.

Q. So, Martin, my question to you is: Are you the person most knowledgeable to be able to testify on each of these 15 topics on behalf of the Society?

A. Yes. I'll say yes.

Q. Okay. Is there somebody else who's more knowledgeable on any of these topics?

A. Maybe specific ones but not in totality.

Q. Okay. So which specific ones?

A. Can you go back up?

Q. Sure. Let's go one by one. I want you to point out to me each topic in order which you believe you're not the most knowledgeable or best person to testify on behalf of the Society. Tell me which number it is and who is the person that is most knowledgeable.

A. Okay. So start with No. 2, SYWSE's businesses or business -- businesses.

Q. Business transactions, operations and management.

A. Okay. So transactions and operations and post-FCE investigation, the most knowledgeable person on its operations and transactions -- operations would be -- the Society's donations to universities, those would be Duke Hartman. Transactions, I would assume would be financial transactions. Accounting, that would be Kahele or Lawrence Lum Kee.

No. 4, SYWSE's communications with 1820 PAC and its representatives, that would be Michael Schmicker and Duke Hartman.

Duke Hartman's involvement in the five -- Duke Hartman's involvement on behalf of SYWSE, that would be Duke Hartman himself.

Scholarship funds donated by SYWSE universities, that would be Duke Hartman and Michael Schmicker.

Q. That's No. 6?

A. Yes.

No. 10, SYWSE's response, knowledge or conduct taken with respect to FCE commission

complaint would be Andy Winer, Michael Schmicker and Cliff Chen.

Location, storage and access -- No. 11, location, storage and access of SYWSE's business records would be Lawrence Lum Kee for the financial records, Duke Hartman and Lori Bofman for whatever else, paperwork, donation forms and whatever else, communications.

No. 12, Martin Kao's emails and communications relating to SYWSE's purpose, political donations and scholarship donations, those would be from -- I don't know who the IT manager is now, but whoever that is that maintains their email systems.

Q. I'm sorry, Martin, which number is that?

A. No. 12.

Q. So you're saying the person most knowledgeable about your emails for SYWSE's purposes, political donations and scholarship donations is the current IT manager of the plaintiff company. Do I have that right?

A. Sorry. When you're saying the purpose of the emails, the content, not the location?

Q. Yeah. The topic is your emails and communications relating to the Society's purpose,

political donations and scholarship donations.
A. That would be myself. I wouldn't know where they are at this point, but --
Q. Got it. But what the emails say, what the intent --
A. Yeah, that would be myself.
Q. Okay. Thank you.
A. 14, SYWSE's public relations, or PR, plan, that would be Michael Schmicker.
And the last one, the amount of money transferred from Martin Defense Group to SYWSE, I don't think that is an accurate question. I don't believe any money was transferred from Martin Defense Group to SYWSE. So I would say if it's an accounting question, then it would be Lawrence Lum Kee.
Q. So, Martin, yesterday I looked at your statement of offenses. It was part of your plea agreement in the DC campaign fraud case that was brought against you by the United States government.
One of the things that it stated in there that you agreed to -- and I can show it to you in just a moment, but one of the things you agreed to was the $150,000, for example, from the Society that was used to make the donation to 1820 PAC came out

of the company's general account.
Are you saying that that's not correct? Are you disputing that?
A. Yeah, I'm disputing that.
Q. Okay. Let's take a look at that document right now.
MR. ALLISON: Nelson, if you could bring up from yesterday document No. -- it wasn't yesterday's docs.
Let's go off the record right now and take a short break while I find that document. Be right back, Martin.
(Discussion off the record.)
BY MR. ALLISON:
Q. Back on the record. Same rules apply.
MR. KWOK: I have it right now.
MR. ALLISON: Hang on just a sec.
BY MR. ALLISON:
Q. Martin, a minute ago you listed a number of topics for which you felt that there were others who were more knowledgeable with respect to the Society's -- the various topics for the Society, and those were topics Nos. 2, 4, 6, 10, 11, 14 and 15, or at least portions of those topics.
And so I want to ask you did the Society

do anything to try to arrange or have those individuals you listed be appointed or testify on the topics that were more knowledgeable?

A. No.

Q. I notice that the recording just started, so I'll ask that question again.

Martin, the question was: For topics 2, 4, 6, 10, 11, 12, 14 and 15, you noted that there were other individuals, including Duke Hartman, Lori Bofman, Michael Schmicker, Lawrence Lum Kee and others who are more knowledgeable than yourself with respect to those topics for the Society.

And the question is: Did you or did the Society do anything to contact, request or arrange to have any of those other individuals testify as to the topics on which they're more knowledgeable than you are for the Society?

A. Testify where, when?

Q. Here. Yes, Martin, at the deposition for the Society as its 30(b)(6) representative.

A. I don't understand the question. I'm not a lawyer. I wouldn't arrange for anything.

Q. I understand, Martin. The question is -- let me ask it a different way since you said you didn't understand it.

A moment ago we discussed what Rule 30(b)(6) was and how a company has to designate a person to testify for the company. Do you understand that?

A. I understand that, but I don't think you understand that the Society is not a company. Again, you're creating a distraction that doesn't exist.

Q. Martin, I understand that that's your testimony, but the Society is a registered LLC. So in the eyes of the State of Hawaii, under law, it is a company. Whether or not --

A. It's a registered LLC. It's not an operating company. There's a huge difference. I can register 10 million LLCs in a matter of minutes on the DCCA website. Are those all companies that have board of directors and all these mechanics that you're alluding they should have? No, they're just registered LLCs. It's like a registered domain name. That doesn't mean it's an operating website.

Q. I see. Is it your testimony, then, Martin, because you believe the Society is a registered entity but not an actual company, that it doesn't need to follow the Federal Rules of Civil Procedure or the Court's orders?

A. I'm not a lawyer. I have no idea what it does or doesn't need to do. I'm just telling you what I know. I know it's not a company; I know it's not real; I know we made it up.

Q. Okay. We're getting a little bit off track here. Let me ask the question a different way.

Setting aside your testimony that the company is not a real company and that it doesn't have a board of directors, setting all that aside and just assuming that the company has to follow the federal rules here and the Court's orders, one of which requires the company to be present today to testify during this deposition, which requires the company to appoint people to discuss the topics requested -- and we looked at the 15 topics that were requested.

The question is simple. Did you or did the company, the Society, do anything to request any of the individuals you named under topics 2, 4, 6, 10, 11, 14 or 15 as most knowledgeable on those topics -- was anything done to ask those individuals to testify at this deposition on those topics?

A. Not to my knowledge.

Q. Okay. Thank you.

MR. ALLISON: Nelson, could you bring up the first document I emailed to you. I titled it "A."

(Deposition Exhibit No. 3 marked for identification.)

BY MR. ALLISON:

Q. Martin, I'm sure it's been a little while since you've seen this document, if you have seen this document, but take a look at it and let me know if it looks familiar to you.

A. It doesn't look familiar.

Q. And who is Shelli Peterson, if you know?

A. She's my attorney from Washington, D.C.

(Discussion off the record.)

MR. ALLISON: We are. Yes, please. Next exhibit in order.

BY MR. ALLISON:

Q. So Shelli Peterson was your attorney in the Washington, D.C., campaign contribution violation matter; is that correct?

A. Correct.

MR. ALLISON: Nelson, could you scroll down to page 3.

BY MR. ALLISON:

Q. You see at the top there, Martin, under

No. 2, it says "Factual Stipulations"?
A. Yes.
Q. It says: "Your client agrees that the attached 'Statement of Offense' fairly and accurately describes your client's actions and involvement in the offenses to which your client is pleading guilty. Please have your client sign and return the Statement of Offense as a written proffer of evidence along with this Agreement."
Do you see that?
A. Yes.
Q. Do you recall reviewing a Statement of Offense and then signing it and accepting all of its statements?
A. I do not.
Q. If you don't remember it specifically, do you remember that that was a requirement of the process in both of your plea agreements?
A. Yes, I do.
Q. You just don't remember it specifically with respect to this case. Is that your testimony?
A. Correct.
Q. But you don't dispute that that happened, correct?
A. I don't dispute that happened.

MR. ALLISON: Nelson, let's look at the document I marked as "B" in the email now.

(Deposition Exhibit No. 4 marked for identification.)

BY MR. ALLISON:

Q. And, Martin, do you recognize this document here?

A. I do not.

MR. ALLISON: Okay. Could we go all the way to the final page, Nelson.

BY MR. ALLISON:

Q. Do you recognize this page?

A. I do not.

Q. Is that your signature in the line above "Martin Kao, Defendant"?

A. It is.

Q. Is that your handwriting for the date and the signature?

A. Yes.

Q. And down below, under the header "Attorney's Acknowledgment," where it says "Michelle Peterson" on this signature block above "Shelli Peterson," is that your attorney's signature?

A. Yeah, I guess. I don't know that's her -- it's her digital signature. But yeah, that's my

attorney, Shelli Peterson.

Q. Okay. And I'm not going to read this entire block of text here, but there is a header above your signature that says "Defendant's Acceptance" in all capitals and underlined.

A part of the text below that header says: "I have read every word of this Statement of the Offense. Pursuant to the Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree and stipulate to this Statement of the Offense and declare under penalty of perjury that it is true and correct."

Do you see that?

A. Yes.

Q. Okay. And did you read this Statement of Offense with your attorney and understand it and agree to stipulate to each of the statements in the Statement of Offense?

A. I don't remember, but along the same lines, I don't dispute that I did. I just can't remember.

Q. You agree that your signature here under the statement indicates that you did, in fact, read it and understand it and agree to each statement, correct?

A. Yes.
Q. Okay.
MR. ALLISON: Nelson, could we go up and look at paragraph 44.
BY MR. ALLISON:
Q. Okay. So, Martin, do you see paragraph 44? It says: "On December 26th, 2019, Lum Kee wrote a check for $150,000 from Company A's corporate account to SYWSE."
Do you see that?
A. Yes.
Q. That says right there that the company gave the Society $150,000 from its corporate account, correct?
A. That's what was initially done and that's what they charged me with. What was subsequently done is that that check was reversed, and the check was written to me as a distribution from my capital account and that I distributed that money to the Society. But that would make this transaction completely legal, which is not why they prosecuted me.
That did, in fact, happen, but it was subsequently changed. And if you look at the accounting records for the company, it would show

clearly that the $150,000 was taken from my capital account.

Q. Okay. In this Statement of Offense here, can you point to where it says those facts that you just stated?

A. I have no idea. I'm not going to take the time to sit here and dissect this right now unless you really want me to, but I don't think it's in there. You would tell me if it is. I don't see why it would be in there, because if they agreed to it, it would eviscerate this charge.

That's why they said the part of the coverup was for you to reverse this transaction and take it out of your capital account.

Q. Somewhere --

A. Like you said, I agree that this happened, that a check was written at one point to the SYWSE from the company, but then that was reversed and taken from my personal capital account.

So this doesn't paint the whole picture of what it is you're asking about. It simply paints the picture of what the DOJ was able to do in order to get an indictment on me and for me to plead guilty to and move on with my life.

Q. So, Martin, I'll represent to you that it

does not say in this document, based on my reading, that another check was cut and that it was charged to you personally and that the $150,000 used to pay the Society was your money and not the company's money from its corporate account.

I don't believe it says that anywhere in here. And I also believe that if it did, your counsel would object or interject and direct us to where it says that.

So, Martin, a moment ago when we were talking about topic No. 15, the amount of money transferred from the company to the Society, you said Lum Kee was the person who was most knowledgeable about that information, but then you also said the entire premise of that question is wrong because that never happened, correct?

A. Correct.

Q. But we're also looking at the Statement of Offense that you signed your name to under the penalty of perjury that says that it is correct, right?

A. It's correct that this transaction happened, but you have to look at the totality of the transactions that subsequently followed, which was that he reversed this transaction on the books

of the company and charged the amount to my personal capital account.
He's most knowledgeable about that. He would be able to paint the full picture for you. This one statement here, although it's accurate, does not paint the full picture.
Q. Okay. Thank you.
A. It simply paints the first part of it, which is self-serving.
Q. Okay.
MR. ALLISON: We can take this document down now, Nelson.
BY MR. ALLISON:
Q. Okay. Martin, yesterday when you were deposed, you gave some testimony to the effect of Jennifer Lam was a fictitious, made-up person, and the selection of that name was, to use your word, "coincidental." Is that accurate?
A. I don't know if that's the right nomenclature, but the selection of the name is something that I contrived in order to create an illusion of truth.
Q. And when we were discussing the selection of the name Jennifer Lam and you said it was purely coincidental, can you explain to me what you meant

by the word "coincidental"?
A. It means that I could have used any name. I could have used your name. Does that make you guilty or did I implicate you? I could have used anybody's name.
I chose to use Jennifer Lam because I could -- I could create an illusion of truth with it if I had to. It doesn't -- it doesn't draw any connection to a real person.
Q. But there is a real person named Tiffany Jennifer Lam, and that's your wife, correct?
A. I'm sure there are many Tiffany Jennifer Lams in this world.
Q. Do you know any Tiffany Jennifer Lam other than your wife?
A. I do not. But I'm sure you can Google it and find thousands.
Q. From the period of 2019 through your arrest in late 2020, on a weekly basis, how many times a week would you say you saw your wife Tiffany Jennifer Lam?
A. Say that again.
Q. Over the course of the year 2019 and 2020 up until you were arrested -- that's, I believe, approximately -- let's call it a 20-month period of

time or so -- how frequently would you see your wife?
A. I have no idea.
Q. Did you live with her in the same household?
A. Yes.
Q. So would you see her every day?
A. No.
Q. On the days when you wouldn't see her, is it because you were traveling for work?
A. Yes.
Q. Did she ever travel for work or take vacations or leave the state of Hawaii without you?
A. Not to my knowledge.
Q. So the only time when you weren't in the house that you shared with her, the household that you shared with her during the 20-month period of time from 2019 through your arrest at the end of 2020 would have been times when you were traveling and you were away from Hawaii for work. Is that accurate?
A. No. I take care of my elderly parents, so I stay with them often.
Q. Some days you would go and stay with your elderly parents, correct?

A. Correct.

Q. During this roughly 20-month period of time that we're discussing, while you were in Hawaii and not traveling for work, approximately, on average, how many times per week or per month would you go and stay with your elderly parents?

A. I don't know.

Q. Can you estimate it for me, or would it be pure speculation because you just simply don't know?

A. It would be pure -- a pure guess.

Q. Okay. Based on what you can recall of your elderly parents' health and condition at this time in 2019 and 2020, what were the demands like for caring for them? I mean, did they need daily care, or was it just like they needed you to check in on them? Can you give us any information about that?

A. They needed all of the above. They were at the age where stoves get left on, doors remain open, unlocked, water faucets remain running. Even buying groceries and whatever else, daily need, they didn't drive at that point.

There was a time, I think around the same period, where my dad was in his 80s, at that point, early 80s, and he had shingles. So that was a big

issue.
But yeah, they needed constant attention and care.
Q. Did your parents have caregivers at that time?
A. They did not.
Q. And where are your parents now? Have they passed or what is their status now?
A. They're still alive.
Q. Do they have caregivers now?
A. Tiffany takes care of them.
Q. And do they live with Tiffany right now?
A. They do not.
Q. Okay. So during the 20-month period that we're discussing during 2019 and 2020, prior to your arrest, on the days in which you would go stay with your parents to help them, would you stay at their house?
A. Yes.
Q. And you would not see Tiffany on those days?
A. Correct.
Q. Would you communicate to her that you weren't coming home because you were going to your parents' house?

A. I don't remember. I think it was just part of my routine.
Q. If you left work and then went to your parents' house to take care of your parents and didn't come home, would it not worry Tiffany or worry you that she would be worried that where is Martin, why didn't he come home? Wouldn't you communicate that to her?
A. No, I would not.
Q. Getting back to my original question, if you were here in Hawaii and not traveling for work, would you at least go home to your house where Tiffany and your children lived a couple of times a week?
A. Yes.
Q. So it's fair to say that you would likely see and talk to Tiffany a couple of times a week?
A. Yes.
Q. And during this period, if you could indicate or estimate for me, how often and how frequently did you travel out of the state of Hawaii for work?
A. What was the period? Before my arrest?
Q. From 2019 through -- January 1st, 2019, through the date you were arrested in 2020.

A. I don't know.
Q. So while you were in Hawaii, you would see Tiffany at least a couple times a week. Would you talk to her when you saw her in the mornings or evenings when you came home from work?
A. Not always.
Q. How frequently would -- how common was it for you to have a day where you were at home and you would see Tiffany in the morning or in the afternoon and not talk to her? Is that common for you and Tiffany?
A. It's common for me in the way I behaved.
Q. And so would you talk to Tiffany about what was going on with you about work or about trials and tribulations you were facing with work or whatever was happening with you?
A. I do not talk to Tiffany about work, period. It is a hard-and-fast rule of mine that I do not talk to my spouse about work. I find it despicable.
Q. What is it that you find despicable?
A. I've had a very bad experience with working for executives and bosses who, for reasons I don't understand as a man, go home and tell their wives about the challenges they face at work only

for them to come back to work and make decisions about work based on the irrelevant input of their wife and spouse at home.

It has nothing to do with the company and nothing to do with its operations, and they were managed by the bedroom. And I found that to be a despicable practice amongst men in Hawaii that I worked for.

So I refused under any circumstances, in my own operations as a leader of a company, to go home and talk to my wife about something she knows absolutely nothing about, which is my business and my company, and have her opinion influence my decisions at work.

Q. How would you know with these other executives what they discussed with their wives and how that impacted their management decisions?

A. Because their wives were in the office. They'd come in. They'd sit in our meetings. They talk about their wives, they talk about what they discussed and what her input was.

Q. And who's -- what's an example of an executive you worked for where the wives came in and sat in meetings?

A. So I was -- before I joined -- so the most

vivid experience of this I had was I was a -- I forget -- my title might have been director, principal at Pricewaterhouse. That's where I met Steven.

Pricewaterhouse decided to close its offices in Honolulu, and the principals and partners within the Honolulu office gathered together to basically take over the practice here in Hawaii.

And there were two partners named -- I'm sorry, three partners named, two on the tax side and one on the audit side. I was one of the principals, not a partner. And throughout that entire experience of transitioning from the former partnership, Pricewaterhouse, the national firm, to a local company now called Acuity, it was an excruciating process of having not only to deal with the people you work with but then the opinions of their wives in terms of what was equitable and what wasn't in terms of what was fair for each partner, each principal, what our roles should be and what our compensation should be.

Q. But again, Martin, that wasn't necessarily the answer to the question I asked. What were the examples of when wives sat in in these meetings? Is that what happened here? These partners, these

three partners you mentioned had their wives come in and sit in on these meetings and give their input on what your shares should be?
A. Yes.
Q. And you sat there in these meetings, and the wives told you what they thought your value was?
A. I don't remember the exact conversation, but they provided input on what they thought their husbands' values should be.
Q. To be clear, the wives had no role or position with these companies?
A. None, nothing, no formal role.
Q. And in these instances with -- I think you said it was Acuity. Is that correct?
A. Correct.
Q. In these instances with Acuity, where these wives came and sat in on these meetings for purposes of deciding distributions and shares of the company, did these meetings happen at the Acuity offices?
A. Yes.
Q. Who else was in these meetings besides you, the three partners and their wives?
A. Other principals. I don't remember who. People that worked in the executive management team.

Q. Did any of them invite their wives to these meetings?
A. No.
Q. Just the three partners?
A. Correct.
Q. Were all three of the partners' wives in these meetings?
A. There were different meetings. Some were there some of the time, not other times.
Q. So then based on that experience with these three partners and their wives in these meetings deciding essentially your share and distribution of that company, Acuity, you decided from then on that you would never talk to your wife, Tiffany Jennifer Lam, about your work ever?
A. I don't know if it's based on that, but it's just my personal philosophy. I just don't do it.
Q. Okay. So what -- strike that.
Over the course of 2019 and 2020, until you were arrested at the end of 2020, what did you and Tiffany Jennifer Lam talk about when you spoke to each other?
A. I don't know how to answer that question.
Q. You said --

A. TV shows, the weather, the kids, school, dog, mom, dad.

Q. You did talk to each other. You spoke about common interests. You mentioned TV shows, food, you spoke about your family, you mentioned your parents, you mentioned a dog.

You guys had a dog together?

A. Yes, we had a dog.

Q. Okay. So you did speak to her about stuff going on in your lives, correct?

A. Correct. I speak to my wife.

Q. And if there's something major and difficult happening in your life, wouldn't you confide in your wife about it or seek her counsel or her guidance?

A. It depends on what it is.

Q. Well, let's divide things into two different categories, work and not work.

So if it's not work, not work related, would you discuss any challenges or trials and tribulations in your life with your wife, Tiffany Jennifer Lam, to get her opinion and get her counsel?

A. Not so much. Again, it depends on what it is.

Q. Can you think of anything over the course of 2019 and 2020 that was a challenge for you or a difficult thing for you for which you needed an opinion or some advice on and you sought the counsel of your wife?

A. I cannot think of anything.

Q. So then would it be accurate to say that you just wouldn't ever seek your wife's advice on anything difficult?

A. I think it would be fair to say that I had a very selfish perspective on life and my role within the household and that anything with substance, I did not value her opinion on.

Q. So you didn't think that your wife had anything of substance or value to add to you if you faced a challenge or a difficulty?

A. I never encountered that real situation of challenge or difficulty where I believed that her input -- to help clarify things, it would only confuse things that she didn't understand. So I did not seek her opinion on difficult matters.

Q. Your wife was a certified public accountant, as you were at one time, correct?

A. I don't know.

Q. You don't know if your wife held a CPA

license or not?

A. I do not know. I know she took the test or something like that when we first were dating, but I don't -- I have no idea if she -- I don't think she worked as a CPA or -- I have no recollection of that.

MR. ALLISON: Okay. We've been going for about an hour. Let's take just a quick two- or three-minute break. We lost a lot of time at the start, so I want to keep the breaks short. We'll go off the record now, and we'll be back in just a few minutes.

(A brief recess was taken.)

BY MR. ALLISON:

Q. We're back on the record, Mr. Kao. The same rules apply.

A. Okay.

Q. So, Martin, yesterday you told me that your wife, Tiffany Jennifer Lam, did not ever sign any documents related to the Society.

Is that accurate? She never signed any documents, to your knowledge?

A. Not to my knowledge.

Q. And you also told me that two people signed the names of Jennifer Lam or Tiffany Jennifer

Lam on the Society's various documents, checks, bank forms and that those two people were yourself and Lum Kee; is that correct?

A. Correct.

Q. Okay. And do you know or are you familiar with what your wife's authentic, genuine signature looks like by her hand?

A. I do not.

Q. So you wouldn't be able to recognize it if you saw it?

A. Not now.

Q. Do you know what the signature looks like that you forged for Jennifer Lam on documents for the Society?

A. Do I know what that looks like?

Q. Yes.

A. I do.

Q. Would you be able to recognize that?

A. Yes.

Q. And you'd be able to --

A. I think so, yeah.

Q. And you would be able to recognize it because you've seen it and you are the person that signed it, correct?

A. I could recognize to an extent. I'm not a

handwriting expert, but . . .
Q. But it's by your own hand, so it would be your handwriting, correct?
A. It's not my handwriting. It's a fake signature, so I purposefully held the pencil a different way to sign it. It was unnatural.
Q. And the version of that same fictitious person, as you've put it, signature that Lum Kee signed, would you recognize that signature if you saw it?
A. I don't know. I'd have to look at it.
Q. Okay. I'm going to show you some signatures, and I want to see if you can tell me who signed these signatures.
MR. ALLISON: Nelson, in the new document folder, please bring up the document marked No. 10.
(Deposition Exhibit No. 5 marked for identification.)
BY MR. ALLISON:
Q. Martin, do you recognize this signature?
A. I'm not a handwriting expert. What's the document? Show me the document.
MR. KIUCHI: Objection. He's not being shown the whole document.
MR. ALLISON: Well, the question is

whether or not he recognizes the signature, whether or not he himself signed it, whether or not this is Tiffany's signature. If the answer is no, he doesn't recognize it, then that's the answer.

MR. KIUCHI: You can answer the question, Martin.

THE WITNESS: This is my signature.

BY MR. ALLISON:

Q. And you're certain about that?

A. Yes.

MR. ALLISON: Okay. Can we look at No. 11 now.

(Deposition Exhibit No. 6 marked for identification.)

BY MR. ALLISON:

Q. Who signed this one, Martin?

A. It looks like my signature. Again, I don't think this exercise of me trying to guess whose signature this is is -- if it shows the reality of truth. Show me the document. What does this have to do with anything?

MR. KIUCHI: I'm going to raise an objection.

If you can answer the question, answer the question.

Same objection as the previous document.
THE WITNESS: I cannot answer the question.
BY MR. ALLISON:
Q. Okay. So you don't know whose signature this is? You need to see the full document. Is that your testimony?
A. Yes, that's my testimony. I do not know whose signature this is. I need to see the whole document. Because, again, I'm signing a fake signature. My fake signature is wholly inconsistent. So I need to see the full document. I can tell you whether or not I signed it.
Q. A moment ago, Martin, when we looked at this --
MR. ALLISON: I'm sorry, Darcy. We're going to mark these as the next exhibits in order. So the first one we looked at a moment ago is an exhibit, and this one is an exhibit as well.
(Discussion off the record.)
MR. KWOK: This would be Exhibit 6.
BY MR. ALLISON:
Q. This document that we've marked as Exhibit 6, Martin, a moment ago, when you first saw it, you said it was your signature, but now you're

telling me you need to see the full document and you're not sure. Is that accurate?
A. That's accurate.
Q. I will show you the full documents when we get through this, at the end. I'm not going to hide those from you. I just want to know whether or not you can recognize the signatures without seeing the full documents first.
Can we take a look at No. 13, please.
(Deposition Exhibit No. 7 marked for identification.)
BY MR. ALLISON:
Q. Whose signature is this?
A. I don't know. I don't recognize it.
Q. And is it the same thing, you need to see the full document to know?
I'm sorry, I didn't hear your answer, Martin. You need to see the full document to know whose signature this is or be able to give an answer?
A. No. I can guess who it is.
Q. I don't want you to guess, Martin. I only want you to testify if you know from your own personal knowledge.
A. This is -- let me put it to you this way:

This is not my fake signature. I don't know whose signature it is, but it's not my fake signature.

Q. Okay.

MR. ALLISON: We'll mark this one as the next exhibit in order. This would be 7.

THE WITNESS: So that is not the fake Jennifer Lam signature that I would normally sign. That's my testimony.

MR. ALLISON: Okay. Let's take a look at the one we have marked as No. 15, Nelson.

(Deposition Exhibit No. 8 marked for identification.)

BY MR. ALLISON:

Q. Is this your fake Jennifer Lam signature, Martin?

MR. KIUCHI: Same objection.

You can answer. Go ahead.

THE WITNESS: Yes.

BY MR. ALLISON:

Q. And you're certain that this is the one that you did that was your fake Jennifer Lam signature?

A. What do you mean by "certain"? 100 percent, 99 percent, 80 percent?

Q. You tell me, Martin. What percentage

certain are you?
A. 95.
Q. Okay. And can we look at the one we marked as Exhibit 5 again real quick, please.
So that one is remarkably similar to this one, right, the last two that we looked at, Exhibit A and Exhibit 5? This is the first one we looked at.
A. Correct.
Q. And this is your fake Jennifer Lam signature. That's what you said a moment ago, and it matches the one that we just looked at, correct?
A. Correct. It looks like my fake signature, correct.
Q. Did you ever sign the Jennifer Lam signature differently or in a different style, or did it always look like this?
A. It's a fake signature, so there's great inconsistencies to it. There's even inconsistencies to my own signature. So I can't answer that question.
Q. Okay.
MR. ALLISON: Can we look at the one we have marked as 17, please, Martin -- or Nelson, sorry.

(Deposition Exhibit No. 9 marked for identification.)

BY MR. ALLISON:

Q. Whose signature is this one, Martin?

MR. KIUCHI: Again, same objection.

You can answer if you know.

THE WITNESS: I don't know. It's not mine.

MR. ALLISON: Okay. Let's take a look at 20, please, Nelson.

(Deposition Exhibit No. 10 marked for identification.)

BY MR. ALLISON:

Q. Whose signature is this one, Martin?

MR. KIUCHI: Same objection.

You can answer.

THE WITNESS: It's not mine. It's not mine.

BY MR. ALLISON:

Q. But you don't recognize this one?

A. I can just tell you it's not mine.

Q. Okay. So of the signatures that we looked at, those are Exhibits 5, 6, 7, 8, 9 and 10, the only one that you recognize and can say is by your hand were No. 10 and 15. Is that accurate? The

first one we looked at and then the next one we looked at and you said you were 95 percent reasonably certain. I can put them back up for you if you want to see them again.
A. If you don't mind.
MR. ALLISON: Nelson, let's take a look at Exhibit 5 and then Exhibit 8 after that.
THE WITNESS: So this is -- you said 10 and 15? Is that what you said?
BY MR. ALLISON:
Q. So 10 and 15 are our internal document numbers.
A. Okay.
Q. This is the one I said is No. 10 but it's Exhibit 5 to this deposition.
A. Okay, sorry.
Q. This is the very first one we looked at.
A. Okay. That looks like my signature.
Q. And so looking at this, this is the one that you believe is yours, correct?
A. Yeah. My fake signature, correct.
MR. ALLISON: Okay. Let's take a look at the next one now, Nelson. It's our document 15 and it's Exhibit 8.
///

BY MR. ALLISON:
Q. We're now looking at Exhibit 8.
A. Okay.
Q. So same question, Martin. Are you reasonably certain that this is by your hand as well?
A. Yes.
Q. Okay. But all the others we looked at, you're not sure about, correct?
A. Do you mind putting those up again? The others, I can't remember.
Q. There were a few others. Sure, we can go through them again.
MR. ALLISON: Nelson, put up what we have marked as Exhibit 6, please, to the deposition.
BY MR. ALLISON:
Q. So we'll just go in order. This will be the second one we looked at. It's about to come up again.
A. I don't recognize that signature.
Q. Okay. And then --
A. But let me just clarify that the -- that may be mine. It kind of looks like my scratch a little bit.
Q. But you're not sure?

A. I'm not sure. This was a tossup for me.
Q. Okay. And then let's take a look at Exhibit 7.
A. Yeah, that's not mine. It doesn't look familiar to me.
Q. Okay. Let's take a look at Exhibit 9. So we're going to skip 8 because we just looked at 8 a second ago.
A. Okay. Yeah, that does not -- I don't recognize that.
Q. Okay. And let's take a look at Exhibit 10.
A. Yeah, I don't recognize that.
Q. Okay. So of the ones we've looked at, the only ones that you're sure are yours, by your hand, for the fake Tiffany Jennifer Lam person, as you put it, are Exhibits 5 and 8, the two that you designated as being by your hand, correct?
A. Correct.
Q. And the rest, you're just -- you're not sure? You haven't seen them before and you can't recall?
MR. KIUCHI: Objection. Misstates.
Go ahead. You can answer.
THE WITNESS: I don't recognize those as

being my fake signature. The second one's kind of a tossup. It looks like something I would do, but I can't say for sure.

BY MR. ALLISON:

Q. Okay. I want to look at two others and ask you about two others.

MR. ALLISON: Nelson, let's take a look at what we have marked as 16.

(Deposition Exhibit No. 11 marked for identification.)

BY MR. ALLISON:

Q. Whose signature is that, if you know, Martin?

A. That looks like mine.

Q. How sure are you?

A. 75 percent.

Q. Okay.

MR. ALLISON: And then let's take a look at --

We'll mark that as the next exhibit in order, please, Darcy.

And then let's take a look at 21.

(Deposition Exhibit No. 12 marked for identification.)

///

BY MR. ALLISON:
Q. Whose signature is that, Martin? Sorry, strike that.
MR. ALLISON: Darcy, next exhibit in order, please. All these will be marked that we've looked at.
BY MR. ALLISON:
Q. Martin, whose signature is this we're looking at in what's marked Exhibit 12?
A. That looks like mine.
Q. How certain are you?
A. 85 percent.
Q. Okay. Martin, I said I would show you the original documents, and I'll do that. So we'll just go in order. I'm going to ask you some questions about each.
MR. ALLISON: Nelson, please bring up what we have marked as 10A.
We'll go to the very last page.
(Deposition Exhibit No. 13 marked for identification.)
BY MR. ALLISON:
Q. Martin, I'll tell you that the first signature we looked at was the signature on the bottom check here. You can see there are three

checks on this page, and to my eye, the three signatures on the three checks look substantially the same.

Do you agree?

A. Yes.

Q. And is it your testimony that all three of these signatures are by your hand?

A. Yes.

Q. And before, you said you were fairly certain, but I don't think you said you were a hundred percent certain. Is that accurate?

A. On the first one, I'm a hundred percent certain.

Q. Okay. So you're a hundred percent certain. Now, looking at the document, does that confirm your testimony that it's by your hand?

A. Yes.

Q. And is that because these are checks from the Society of Young Women Scientists and Engineers to various universities in March of 2020 for scholarships that the Society was making as part of its coverup scheme?

A. Yes. These are the checks that were written by Kahele and passed to me for signature.

Q. Is the handwriting designating who the

payee is and writing out the amount and the date -- is that all Kahele or Lawrence Lum Kee's handwriting, and then the signature is your signature for Tiffany Jennifer Lam?
A. So the signature is mine. That's my fake signature for Jennifer Lam. Not Tiffany Jennifer Lam; it's Jennifer Lam.
The handwriting for the checks, I was told by the FBI investigators that that's Kahele's handwriting, and it's consistent throughout every single check that was written.
What's most notable is how he ends each of his checks. You'll see a 5,000 plus zero zero over 100. That's how he does his checks. So every single check that he writes has that same format.
Q. Okay.
MR. ALLISON: Nelson, could we scroll up to the prior page. Sorry, same document.
BY MR. ALLISON:
Q. That signature there in the middle of the page-- not on the check but down below, do you recognize that signature?
A. It's one that you showed me, right?
Q. No, I did not show you that one.
A. That may have been something Kahele

signed. I don't know.
Q. But you don't think you signed that one?
A. I don't know.
Q. Okay.
MR. ALLISON: Could we scroll up to the prior page, please.
BY MR. ALLISON:
Q. Now we're looking at page Bates-stamped PAC-008226. The signatures on this page, I'll note there are two of them, one for the donor approval signature line and then one on the check that is copied there at the bottom.
Do you recognize either of those signatures?
A. Yes.
Q. And who do you recognize those signatures to be signed by?
A. Myself.
MR. ALLISON: Okay. Nelson, could we go up to the eighth page of this document.
Yeah, this next page here.
BY MR. ALLISON:
Q. Okay. So, Martin, we're now looking at the page that's Bates-stamped PAC-008222. The signature at the bottom here, whose signature is

that?

THE WITNESS: Can you go down a little bit. Or up a little bit.

Good. Yeah, this is the one I remember seeing that you pointed out. That's my signature.

BY MR. ALLISON:

Q. This is the one that you mentioned to me yesterday where you meant to sign for Tiffany Jennifer Lam but you instead signed your own personal signature, correct?

A. Correct.

Again, Grant, I have to respectfully ask that you not conflate the two very distinct people you're conflating, compounding things that should be distinguished. So you continuously use the term "Tiffany Jennifer Lam" as if it were someone that's consistent and the same person as the fake Jennifer Lam. They're not one and the same.

I understand why you have to do that, but I have to respectfully again, each time, remind you if you're going to continue to do it, that that's just not accurate. They're not the same person. There is no Jennifer Lam -- or Tiffany Jennifer Lam in any of this. This is all fake Jennifer Lam. Again, that name could be anybody's name.

Q. Martin, you keep saying that it's a coincidence that the name was Jennifer Lam; on some documents, Tiffany Jennifer. And we are going to look at some documents where the name is Tiffany Jennifer Lam and the full name is written out that way. I understand it's your position and your defense that it's a fake person and that it's purely a coincidence that name was selected. But that's your position; that's not the plaintiff's position in this case.

MR. ALLISON: Nelson, let's go up to the first page of this document, please.

THE WITNESS: What evidence do you have?

BY MR. ALLISON:

Q. Martin, whose signature is this that we're looking at on the check for $2,500 to Wichita State University Foundation?

A. That's mine.

Q. Just to be clear, I'm talking about on the check, not down below on the donor line.

A. Oh, that's mine.

Q. So these are both your signatures?

A. Yes.

MR. ALLISON: Okay. We're done with this document, Nelson.

Let's take a look at the document we marked 12A. We're going to go down to the fourth page.

(Deposition Exhibit No. 14 marked for identification.)

BY MR. ALLISON:

Q. So, Martin, that was the second signature that we looked at. This is the one we marked as Exhibit 6. And you said you were not sure who signed this document.

As you look at it now, do you know who signed this document?

A. I signed it.

Q. And so now you're sure that you signed it?

A. One hundred percent.

Q. Previously you weren't sure when all you saw was the signature. Is it the document, is it the context of the document that now makes you sure?

A. Well, like I said before, this is a fake signature, so it's not consistent. And when you showed it to me again and again and again, it became more and more apparent to me that that looked like my fake signature.

Q. Okay.

A. Now, in the context of this document, I'm

a hundred percent sure. That's my testimony.
Q. Right. But when you just saw this signature, you didn't know, correct?
A. That's incorrect. If I took a picture of your feet and put it next to 20 other feet, would you know which one is yours right off the bat?
Q. Your testimony is your testimony. When you looked at just the signature, you didn't know.
MR. ALLISON: Nelson, let's take a look at --
THE WITNESS: I disagree with what you're saying.
MR. ALLISON: -- the document we've marked as 14A.
(Deposition Exhibit No. 15 marked for identification.)
MR. ALLISON: I want to start by going to page 15 of this document.
Keep going.
Stop. Go back up, the start of this Rental Agreement.
BY MR. ALLISON:
Q. Martin, do you recognize this Rental Agreement?
A. I do not.

MR. ALLISON: Okay. Let's scroll down to the 17th page. Stop.
BY MR. ALLISON:
Q. Whose handwriting is that, Martin, if you know?
A. That's mine.
Q. Is all of it yours?
A. Yes.
Q. You're certain that you wrote this handwriting and not somebody else?
A. Hundred percent. I can recognize my own handwriting.
Q. Okay.
MR. ALLISON: Nelson, let's scroll to the end of this document and take a look at the signatures on it.
BY MR. ALLISON:
Q. So these were the -- at least the one for Tiffany Lam on this document we're looking at, Martin, this was the third signature we looked at.
Is that your signature there in black above the Martin Kao line?
A. Yes.
Q. And is that Tiffany's signature, or is that one that you signed for Tiffany Lam?

A. That does not look like my fake signature.
Q. So is it your belief that that is Tiffany Lam's genuine signature?
A. Yes.
MR. ALLISON: Okay. And then, Nelson, let's scroll up.
Darcy, we'll mark this as the next exhibit in order.
Let's scroll back up, Nelson, please, to page 13.
Right there.
BY MR. ALLISON:
Q. Martin, do you recognize that signature?
A. I do not.
Q. So you're not sure if that's Tiffany Lam, your wife's genuine signature or not?
A. I forgot what her real signature looks like. I know it's not mine.
Q. Okay.
MR. ALLISON: Nelson, let's go up two pages, to the first page of this declaration.
BY MR. ALLISON:
Q. Martin, what we're looking at is a declaration by your wife submitted in a Circuit Court case.

MR. ALLISON: Nelson, you can scroll up so Martin can see the caption.
BY MR. ALLISON:
Q. This is a case between Navatek Capital, Inc., and Martin Defense Group LLC against yourself. And your wife submitted this Declaration in support of a motion that I believe your counsel filed.
MR. ALLISON: Scroll up to the very first page of this entire document. We'll show that to Martin.
BY MR. ALLISON:
Q. So, Martin, this was filed by your counsel, Keith Kiuchi, who's with you today. It was filed on April 10th, 2023. You can see the caption here, so you know what case it is.
MR. ALLISON: I want to go back now, Nelson, and take a look at Tiffany's signature to her declaration. It's on page 13 of this PDF.
BY MR. ALLISON:
Q. So, Martin, same question. You still don't recognize this signature, whether or not it's your wife's genuine signature?
A. I don't remember what her signature looks like.
Q. Okay. Would you take a look at that and

commit to memory what that signature looks like, please.

Now, Martin, I want you to take a look at the signatures on the lease one more time.

MR. ALLISON: Nelson, that's on page 37 of the PDF. If we could go to that page, please.

BY MR. ALLISON:

Q. Now take a look at this signature for Tiffany Lam. Do they look the same to you, Martin?

MR. KIUCHI: I'm going to let him answer, but I'm going to object on the basis that he's not an expert. But he can answer the question.

THE WITNESS: Can you put them side by side?

MR. ALLISON: Sure. Let's go off the record for just a moment, and we'll set that up.

(Discussion off the record.)

(Deposition Exhibit No. 16 marked for identification.)

BY MR. ALLISON:

Q. Okay. So, Martin, we've put the signatures up side by side that you asked to look at. You can see on the left is Tiffany Lam's signature in support of her Declaration made under the penalty of perjury in support of your Motion to

Quash dated April 10th, 2023.

And on the right are the signatures from the lease with Geremy G. Robinson, the tenant lease between yourself and Tiffany Lam with Geremy G. Robinson. I'll note that the date of that agreement is September 22nd, 2022. So that would be roughly, let's call it six or seven months prior to the signature on the Declaration.

So, Martin, I want to ask you, to your eye, does the signature on the left for Tiffany Lam signed to her Declaration look the same as the signature that is for Tiffany Lam on the lease agreement with Geremy G. Robinson?

MR. KIUCHI: Same objection.

You can answer.

BY MR. ALLISON:

Q. Yeah, if you have an answer. If you don't have an answer, then your answer is what it is.

A. I don't have an answer, but based on the other signatures that you showed me, I would assume on a real Tiffany Lam signature, they both look familiar. They both look consistent with those signatures. These two may not look, from an untrained eye, identical, but I see similarities. I think it's the same person that signed them.

Q. So the signature on the right for Tiffany Lam, that's not you who signed it. Is that your testimony?
A. That's my testimony.
Q. Because, Martin, I'll be honest with you, that looks a lot like your signatures for who you say is the fake Jennifer Lam on the right above the Tiffany Lam signature line.
So I'll ask you directly: Did you forge Tiffany Lam's signature on the lease agreement with Geremy G. Robinson?
A. Let me answer it this way. I don't recall if I did or didn't. But I will say that this forging of her signature has gotten me into a lot of trouble, hence here I sit. So I try to make it as much of being upright as possible going forward since my arrest to make sure, no matter how benign or administerial signing something is, that the actual person signs it.
So that being said, I can't say for sure that isn't my signature because it's been my policy, as you know, to forge her signature on documents that I thought were irrelevant. But I don't know. I can't say for hundred percent certainty.
I'll put it this way. I can say it's one

hundred percent certainty that that doesn't look like my normal fake signature of hers, for whatever that means, what it's worth, but I can't say with one hundred percent certainty I didn't forge this.

Q. Okay.

MR. ALLISON: Nelson, can you show us side by side, keep the one on the right up -- can you give me the share screen ability, Nelson? Do I have that?

MR. KWOK: You should be able to share on yours when you click on share. Let me stop sharing.

MR. ALLISON: Okay.

BY MR. ALLISON:

Q. Okay. Martin, can you see the document I have up now?

A. Yes.

Q. Is it big enough for you to see?

A. Yes.

Q. So what we're looking at --

MR. ALLISON: Darcy, to be clear, the last document that Nelson put up, we'll introduce that as the next exhibit in order, the two pages, and Nelson will provide that to you.

And the document we're looking at now will be the next exhibit in order, and we'll provide that

as well.

(Deposition Exhibit No. 17 marked for identification.)

BY MR. ALLISON:

Q. So, Martin, this document that we're looking at here, at the top is the first signature we looked at today, and that's from the Society check No. 1005.

The next block we're looking at are the two signatures for the Geremy G. Robinson lease we looked at a moment ago and the first for Tiffany Lam, and then there's your signature, Martin Kao, below that.

On the bottom is Tiffany Lam's signature from her Declaration from the same Motion to Quash that contained the Geremy G. Robinson lease.

I want you to look at the signature at the top from Society check No. 1005 and then the signature for the landlord for Tiffany Lam. I want you to tell me -- I want you to answer the question again whether or not these are by the same hand and whether or not the signature on the top of Society check 1005 is the same or similar signature that you signed on the lease for Geremy G. Robinson for your wife, Tiffany Lam.

A. Well, I can say that check No. 1005, that's my signature. I know that for sure. And if you're asking for my opinion, does the landlord lease under Tiffany Lam look more like my signature than hers, I would say yes.
Q. Yesterday I asked you if you had ever signed other documents for Tiffany outside of the Society context, and you said -- I believe you said you weren't sure but you thought maybe you had. Is that accurate?
A. Yes.
Q. And so this Geremy G. Robinson lease, is this a potential document that you would have signed for Tiffany Lam?
A. Yes.
Q. Would you have told your wife, Tiffany Lam, that you were signing on her behalf?
A. No.
Q. But surely at some point, Tiffany saw this and saw this signature and would have known that somebody else signed it for her, correct?
A. No.
Q. Why do you say no?
A. Because she doesn't -- that's not what she does. She doesn't read things; she doesn't look at

things; she doesn't review legal documents. That's not what she does.

Q. So, in the context of your marriage and your relationship, that's what you do, that's not what she does. Is that accurate?

A. It's predominately what I do. I just give her things to sign. I give her -- in general, yes, I take care of things like this. In general, I would take care of things of that nature.

Q. Okay. And that applies to -- is it fair to say that that applies to the signing of most or all documents, legal documents and contracts that you and your wife need to sign?

A. I don't know about most. I know that obviously anything that's notarized, she would sign with her signature. That may be the best basis for comparison, to find a notarized document. But anything else, whether right, wrong or unethical, I have a bad habit of just signing her signature.

Q. Okay. So, Martin, I put the signatures back up here. Again it's the Society check 1005, the signature blocks for yourself and Tiffany Lam from the Geremy G. Robinson lease, and then on the bottom is the signature for Tiffany Lam's Declaration dated April 10th, 2023, from Martin

Kao's Motion to Quash submitted to the First Circuit Court, State of Hawaii.

I just want to be -- I want the record to be as clear as possible. Yes or no, did you forge Tiffany Lam's signature on the landlord signature block of the Geremy G. Robinson lease?

A. I don't know.

Q. And why is it that you don't know? Where does the uncertainty come from?

A. The uncertainty comes from my conduct. This is something -- forging her signature is within the normal course of things that I do on a -- unfortunately on a consistent basis. So it's certainly within very much the realm of possibility and my conduct that that would be something I would do.

When you put them side by side with my fake signature, they look more like my fake signature than her real one. But I can't recall, so I don't know for sure.

Q. Okay. Thank you.

MR. ALLISON: Let's stop the screen share.

Nelson, can we put up on the screen now the document that we have in the new folder -- sorry, in the original folder marked as 23A.

Darcy, this will be the next exhibit in order.

MR. KWOK: 23A.

MR. ALLISON: I'll share it.

(Deposition Exhibit No. 18 marked for identification.)

BY MR. ALLISON:

Q. Okay. Let me try to zoom in here.

Okay. Martin, have you seen this document before?

A. I have not.

Q. So on the top, there's an email from Kahele Lum Kee, and it's from the email address klumkee@mdefensegroup.com, and it's dated December 11th, 2019, and it's to lori.kutara@centralpacificbank.com, and there's an attachment.

And down below that, we see another email, and it's from a phone number, and the phone number is 8083986921@pm.sprint.com. And it's sent Wednesday, December 11th, 2019, at 1:42 p.m., to Kahele Lum Kee. In the entirety of the email, there is no text. It's just a picture, and the picture is Tiffany Jennifer Lam's driver's license.

Do you see that?

A. Yes.
Q. Okay. So earlier you objected to my use of the name Tiffany Jennifer Lam in referring to the person who is the purported member and manager of the Society of Young Women Scientists and Engineers, correct?
A. Correct.
Q. And you asked me what evidence do I have that Tiffany Jennifer Lam is this person.
So, Martin, what we're looking at -- well, first let me ask you who is, to your knowledge, Lori Kutara of Central Pacific Bank?
Martin, you're on mute now. I'm not sure if you're aware.
MR. ALLISON: Can we unmute Martin?
Nelson, do you have moderator privileges?
MR. KWOK: I clicked to ask him to mute, but it doesn't do anything. It's to unmute only on his end.
MR. ALLISON: Martin, I think you muted yourself. We can't hear you.
THE WITNESS: Hello.
MR. ALLISON: Now we can hear you.
THE WITNESS: It says the host muted me. So okay.

MR. ALLISON: Okay. So, Darcy, could you read back my last question to Martin Kao, please.

(The record was read back by the reporter as follows:

"Q. And you asked me what evidence do I have that Tiffany Jennifer Lam is this person. So, Martin, what we're looking at -- well, first let me ask you who is, to your knowledge, Lori Kutara of Central Pacific Bank?")

BY MR. ALLISON:

Q. Martin, the question is who is Lori Kutara of Central Pacific Bank?

A. I don't know.

Q. I'll represent to you that Lori Kutara is the assistant to Roland Chang at Central Pacific Bank. Do you know who Roland Chang is?

A. I know who Roland Chang is, yes.

Q. We talked about that yesterday. For the record, please state who's Roland Chang of Central Pacific Bank.

A. He's the commercial banking something something. I don't know his official title, but he's the main point of contact for the companies

that were within the Pac Marine group at the bank.
Q. The bank accounts for the Society of Young Women Scientists and Engineers, those were also with Central Pacific Bank; is that accurate?
A. Correct.
Q. And did Roland Chang also assist with the Society's bank accounts at Central Pacific Bank?
A. I don't know. Kahele set those up.
Q. Was there any other banking representative at Roland Chang's level that assisted with the company's bank accounts while you were president of the company?
A. I don't know. I don't get involved with that at all.
Q. Was Roland Chang the only representative that you were familiar with at Central Pacific Bank?
A. Yes.
Q. And why, if you know, did Kahele Lum Kee email Lori Kutara at Central Pacific Bank a picture of your wife's driver's license on December 11th, 2019?
A. I assume that was because they needed her driver's license to open the account.
Q. So earlier, when you said it was purely coincidence that the name was Jennifer Lam and had

nothing to do with your wife, that wasn't entirely accurate given that your wife's driver's license was provided to the bank to open the bank accounts that were used to facilitate the Society's business and transactions, correct?

A. Again, when I say "coincidence," I mean it's the name that I picked because it was the best way to perpetrate this -- this fictitious company and fictitious person.

Q. Who's -- go ahead.

A. I'm sorry, go ahead.

Again, you have to have some element of truth in order to unfortunately, I would say, fool the bank and open this account.

Q. Whose phone number is (808)398-6921?

A. I don't know.

Q. How did Kahele -- sorry, go ahead.

A. Is that Cliff's phone number?

Q. I'm not sure. That's why I asked you.

A. I don't know.

Q. Is it your phone number?

A. It's not my phone number.

Q. Was it your work phone number from the time when you were president of the company?

A. No.

Q. Do you recall --
A. I don't recognize that phone number in any capacity.
Q. How many phones did you have, cell phones did you have in 2019 and 2020?
A. One.
Q. Just a single personal phone that you did business on?
A. Correct.
Q. You did not have a separate company phone?
A. It was one and the same.
Q. Okay. So how is it that Kahele Lum Kee came to have a copy or a picture of your wife's driver's license?
A. The only -- I can speculate. Do you want me to speculate?
Q. No. I only want you to testify from your personal knowledge.
A. I don't know.
Q. Okay.
MR. ALLISON: Let's take a break. We've been going about an hour. We'll take a five-minute break. Thank you.
(A brief recess was taken.)
///

BY MR. ALLISON:
Q. Martin, I want to ask you now about Pam Berry and some meetings she had with you at your house.
First question is who's Pam Berry? Who do you know her to be?
A. Can you remind me?
Q. Pam Berry, I understand her to be the company's security officer.
A. Correct, yes.
Q. Security officer.
A. Yes, yes, that's correct.
Q. And that may not be her official title, but I think that's generally the role she fulfills.
Do you recall her official title with the company when you were president?
A. It's something to that -- it's a longer title, but it's security officer -- facility, facility security officer.
Q. Thank you. Facility security officer.
And I believe that Pam, at least during the time that you were president, lived in Honolulu and physically worked out of the company's offices where you also had an office. Is that accurate?
A. I don't know where she lived, but she

worked in our office, correct, in Honolulu.
Q. She physically came into the Honolulu office of the company on a regular basis?
A. Yes.
Q. Okay. And Pam has told me and she submitted a declaration in this matter in which she said that after your arrest and then after you were released but before you were sentenced, she met with you at your house on Kahala Avenue two times, and that would have been in or around maybe November of 2020.
Do you recall those meetings?
A. I do not. Say that again. She said we met at my house in Kahala in November of 2020?
Q. Well, it would have been -- so you were arrested, correct, in or around -- was it October of 2020?
A. September 30th.
Q. September 30th. So the very end of September, you were arrested in Honolulu, correct?
A. Yes.
Q. And then a short time later, you were released from prison, correct?
A. Correct.
Q. Do you recall when you were released or

how long you were held for before the release?
A. It felt like an eternity, but I don't recall. I think it was two weeks, around there.
Q. Okay. So then sometime around the middle of October, about, you were released, accurate?
A. Correct.
Q. And how long were you released for before you were incarcerated again?
A. I don't know the exact number but a little over four years.
Q. Okay. So what Pam has said in her declaration -- and I'm paraphrasing here. You could look at the declaration and get her exact words. But sometime after the middle of October -- I believe she said that it was in November of 2020 that she met with you twice.
What I understand those meetings to have been for was one time she was asked by the government, as the company's facilities security officer, to provide them information about what foreign countries you had traveled to in the years preceding your arrest, and she was having trouble getting that information.
I believe that she thought the best way to get that information was to simply look at your

passport and write down the destinations that were marked on the passport. And so she contacted you and went to your house to do that.

Do you recall that?

A. No. That never happened.

Q. Okay. So it's your testimony that she never went to your house and met with you?

A. Well, there's two things that are just blatantly untrue. Number one, you said that she said -- you said -- what is it, her declaration?

Q. I'm just paraphrasing it, Martin. I could bring it up. I might be getting some details wrong. I'm going from memory here.

A. Okay. But you said that she met me at my house at Kahala two times. That would have been impossible. I was on house arrest -- I was on house arrest in Manoa. I could not leave the house. I couldn't go outside of the house within 50 feet. I couldn't go to the mailbox. It would have been impossible for me to meet her at Kahala.

The second impossibility that you articulated, her coming over to look at my passport, the day I was released from the FEC, I turned my passport over to the authorities. I had to surrender my passport.

So both of those are impossibilities.
Q. Okay. So did Pam ever go to your house in Manoa and meet with you?
A. No. She came over -- my recollection of her coming over was I had an orthopedic chair in my office for my back, and I asked Lori to bring it over. It wouldn't fit in her car, so Pam had a truck and she dropped that off.
Q. And she dropped it off at the Manoa house?
A. Correct.
Q. That's after you were released after your arrest?
A. Correct.
Q. And did you talk to Pam when she dropped it off?
A. Other than saying hello. I wasn't sure how I was supposed to talk to her, so I tried to avoid her. Told her thank you for dropping off the chair probably. That was it.
Q. That was the only time that you saw Pam after your release?
A. I don't recall seeing her in person besides that.
Q. Okay. Let's take a look at her -- actually, no, strike that.

A. That's actually a good point. Not her declaration but it just upsets me that someone would outright lie like that. I went over her with the FBI, her whatever you want to call it, testimony, whatever witnesses do when they talk. And during the declaration, her questioning, her transcript, I had to go over all of that with the FBI.

And one thing that you -- you should read it -- is that whatever it is she stated in her testimony in her arbitration completely conflicts with the two things you just said, that she met with me. She said she never met with me. Maybe once or something, and that might be for the chair, and there were no other meetings.

They wanted to know who I talked to within the company, the FBI wanted to know. And the two things that stuck out in that entire arbitration testimony was her testimony that she never -- as a security officer, she never mentioned once Tiffany Lam.

And then also this guy Simon or something, he's some expert witness. Pac Marine hired some hired hand, FBI guy. He himself, in his own expert witness report, stated that -- I think this was the exact language -- the three peas in a pod or

whatever were Cliff, Kahele and Martin.

There was zero mention of Tiffany in any of this. They wanted to know if we talked about the Society, if I talked to anybody else about the cases.

So they went and looked at the transcript, and I looked at it with them. You should go back and look at the transcript and see how it conflicts with Pam's testimony, whatever, her declaration that you referenced. I haven't seen it, but I'm sure it's riddled with inconsistencies.

Q. I'm sorry, Martin. What does this have to do with the question I asked?

A. It doesn't have to do with the question. I'm just irritated that this woman would lie.

Q. Let me ask you this: In your history of knowing Pam Berry as the company's facilities security officer, do you know Pam Berry to be credible and honest, or does she have a reputation for telling falsehoods in the workplace?

A. I had almost zero interaction with Pam Berry when I worked at the company.

Q. So you have no opinion on Pam's proclivity to lie or not, correct?

A. Like I said, I had almost zero interaction

with her. I don't think I'd recognize her on the street today.
Q. So the question was: Do you have any opinion on Pam's habits or proclivity to tell mistruths or lies?
A. No opinion.
Q. Okay. Yesterday we went through --
A. I take that back. I take that back. Subtract that. I do have an opinion. She clearly is a liar.
Q. Okay. But you said --
A. What you stated is true, that she said she met at my Kahala house, which is impossible; and she looked at my passport, which is also impossible.
She's clearly a liar. That's my opinion.
Q. You also testified yesterday about many, many, many lies that you told frequently in the workplace, correct?
A. Correct.
Q. And you'd agree that you have a reputation for being a habitual liar, correct?
MR. KIUCHI: Objection. Form of the question.
Go ahead.
///

BY MR. ALLISON:
Q. Would you say that's a fair characterization, Martin?
A. Sorry, there was a bug.
I would say that it's like a -- it's like the philosopher Cicero said that when you have no case and no evidence, you harass the witness. I understand that's part of what's happening here.
I'd be first to admit I have more disdain for my own actions and behavior in the past than anyone. But in that context, in the past, yes, I would say you're accurate, I was an untruthful person.
Q. And now you would like everybody to believe that you are a truthful person?
A. I would like for you to believe that when I started this process of a deposition and I raised my hand and swore to tell the truth and the whole truth, nothing but the truth, that that decalogue or oath -- and although I don't understand where that came from or the jurisprudence behind it, it's a sacred part of this process that either you believe in that process or you don't. And if you don't believe it, then there's no point to having this deposition.

I swore to tell the truth, and I'm telling the truth. It's that simple.
What I've done in the past has no relevance to what I swore to do under this deposition that you're having with me.
Q. And you truly believe that? You truly believe that your years and years, if not decades, of habitually lying to people has no impact on people's perceptions of your credibility today?
A. I can't speak for what other people think of me. They have their opinions. I recognize my own mistakes. I can be as self-effacing as anyone.
Q. I want to ask you about your wife, Tiffany's credit card she had with the company. Is it correct that she had a credit card with the company?
A. That's incorrect.
Q. She did not have an American Express card that was the company's credit card?
A. It's our personal credit card.
Q. Why were the charges on the credit card paid by the company?
A. So the company's credit card, you call it, is a personal credit card of Tiffany and myself. We obtained that credit card through American Express

prior to me even joining the company.

And because the company couldn't get its own credit card, I added the employees of the company to my credit card under my Social Security number. It was a personal credit card. The company could not get its own credit card because it did not have audited financial statements.

She continued to have, as an account holder -- before the company even had added its own employees a credit card -- a joint credit card with me, the American Express account.

Q. Why did the company not have audited financial statements?

A. It's a very expensive process, and you don't do audits unless you're required to do it, and we weren't required to do so, an independent accounting audit for a bank.

We were audited by the government for our accounting system and our expenses and whatever else, but audited financial statements in the context of what a bank needs in order to issue a credit card is something we never did. That decision was not made by me.

MR. ALLISON: Nelson, can we put up the document we have as No. 3 in today's folder, the

SYWSE folder.

(Deposition Exhibit No. 19 marked for identification.)

BY MR. ALLISON:

Q. Martin, what we're looking at here is the printout from the DCCA for the Society.

MR. ALLISON: Can we scroll down and look at the date of when the company was registered.

Keep scrolling down.

Okay. So right there.

BY MR. ALLISON:

Q. The member/manager, Martin, it notes "Jennifer Lam/Manager," and it's dated October 1st, 2020. Do you see that?

A. Yes.

Q. To the best of your recollection, was October 1st, 2020 when the Society was first incorporated, or was it on or about then?

A. I don't recall.

Q. Can you --

A. Sorry.

Q. Go ahead, Martin.

A. I'm just trying to put it in the context of when we decided to make the donation to the 1820 PAC. I know it was around the end of 2020.

No, not the end of 2020.

MR. ALLISON: Can you scroll down further, please, Nelson.

BY MR. ALLISON:

Q. I think it was the end of 2019.

A. Correct.

Yeah, right there, November 26th, 2019. Yeah, probably around November 2019 was when Kahele formed the -- registered the company with the DCCA.

MR. ALLISON: Okay. Let's take a look at the document marked 4 now in the same folder.

(Deposition Exhibit No. 20 marked for identification.)

BY MR. ALLISON:

Q. Martin, I just want to show you some Society documents and ask you questions about each one.

Do you recognize this document, Martin?

A. I do not.

MR. ALLISON: Sorry, Darcy, we're going to introduce both the prior document and this document as exhibits in order.

Nelson, can you scroll to the very bottom and show Martin the signature.

///

BY MR. ALLISON:
Q. Do you recognize that signature, Martin?
A. Yeah. Yes.
Q. Whose signature is that?
A. That's mine. I recognize this document now. Sorry.
Q. And what is this document that we're looking at?
A. It's the operating -- it's the Operating Agreement that Kahele created for the Society.
Q. Okay.
MR. ALLISON: Nelson, can you bring up the document that I had on the share screen that I emailed you earlier.
(Deposition Exhibit No. 21 marked for identification.)
BY MR. ALLISON:
Q. So, Martin, remember we looked at this a little while ago, and I asked you whether or not you signed the landlord signature block for Tiffany?
A. Yes.
Q. And I believe you said that it was a possibility but you weren't completely sure.
A. Yes.
Q. Okay.

MR. ALLISON: Nelson, can you put side by side with this document the signature block from the operating agreement that we were just looking at.

BY MR. ALLISON:

Q. Are you able to see this?

A. Yeah.

MR. ALLISON: So far it's just the same document.

(Discussion off the record.)

MR. ALLISON: You can just drop it into the same document, that's fine.

Darcy, this will be the next exhibit in order once Nelson is finished.

(Deposition Exhibit No. 22 marked for identification.)

BY MR. ALLISON:

Q. Okay. Martin, can you see that?

A. Yes.

Q. Okay. So on the left, you see the signature block from the Geremy G. Robinson lease that we looked at earlier, and on the right you see the signature block from the Society's Operating Agreement, correct?

A. Correct.

Q. And you just testified a moment ago that

you were certain that it was you who signed Jennifer Lam as the member and manager of the Society on the right, correct?

A. Correct.

Q. Compare that signature to the landlord signature for Tiffany Lam on the left. Do you agree that they are nearly identical matches of each other?

MR. KIUCHI: Same as previous objections. He's not an expert.

You can answer.

THE WITNESS: Yeah, I'm not an expert, but I can tell you that the reason I recognize this document, the Operating Agreement, is because it was shown to me by the FBI agents, and their handwriting expert compared that signature to mine. So I know that's my signature. I recall even signing it.

If you're asking me if that signature looks -- resembles the one on the lease, I would say it does. It's possible that I signed both.

BY MR. ALLISON:

Q. It doesn't just resemble it, right, Martin? It's nearly identical. Do you agree?

A. Sure.

Q. So now comparing these two signatures, the

one on the right, which you say you are certain is by your hand and the one on the left, which you just admitted is nearly identical to that one, I'll ask you again: Did you sign the Geremy G. Robinson for your wife, Tiffany Lam, as landlord?
A. It would appear so.
Q. Thank you.
MR. ALLISON: We can take this document down now.
Let's take a look, Nelson, at what we have marked as No. 5.
(Deposition Exhibit No. 23 marked for identification.)
BY MR. ALLISON:
Q. Martin, while he brings that up, let me ask you: You have the same time constraints today as you had yesterday; is that accurate?
A. Yes, sir.
Q. Was the timing okay for you yesterday? Were you able to get to where you needed to go on time?
A. Yes. Thank you.
Q. Do you recognize this document, Martin?
A. Yes.
Q. This is the signature card for Central

Pacific Bank to open a bank account for the Society; is that accurate?
A. You might -- yes, yes.
Q. Do you need to see more of the document? We can scroll down and show you the rest.
A. Yes.
Q. If you know, was it in conjunction with the submission of this document that Mr. Lum Kee provided Lori Kutara of Central Pacific Bank a photocopy of your wife's driver's license?
A. I don't know.
Q. Is the reason why you say you don't know because you just don't have any knowledge or information about Mr. Lum Kee providing Central Pacific Bank a photocopy of your wife's driver's license?
A. Correct. I have no knowledge of what he did to open the account other than this document here. I certainly don't -- I certainly have no idea how he got my wife's driver's license.
Q. Okay. Thank you.
MR. ALLISON: Let's take a look at No. 16.
THE WITNESS: I think these are two -- these are two separate documents, though, that you're just scrolling through.

BY MR. ALLISON:
Q. I see. So you're saying if we go back to the top, one is the signature card and --
A. One was the -- "Business Resolutions," I think -- let me see.
Q. What page do you need to look at, Martin?
THE WITNESS: Can you go down a little bit?
A little bit more.
Next. Okay, more.
Yeah. So, yeah, okay, right. This is two documents at two separate and distinct times.
MR. ALLISON: Darcy, we'll introduce this as the next exhibit in order.
BY MR. ALLISON:
Q. Martin, let me ask you a clarifying question that I think will get at what you're saying. So yesterday you told me that there were two sets of documents for Central Pacific Bank, for lack of a better phrase.
You told me that the first set was done sloppily, I think was the word you used yesterday, and it was when the Society was first incorporated and there was a rush to get a bank account.
And then there was a second submission of

documents later, after the donation to the 1820 PAC was made and after the Complaint to the Federal Elections Committee was made in which more careful documents were submitted in which errors and typos and things of that nature were corrected. Is that all accurate?

A. Correct. The second set of documents were submitted to update the name of the account, to add Tiffany to appear for optics that it was a real person, and it was to correct the spelling of the Young Women -- he spelled it "Scientist," singular. He said if the original document -- he said Society and Young Women Scientist, singular, and Engineers LLC, which I caught and razzed him on. So he corrected that to "Scientists," plural.

MR. ALLISON: Can we go to the first page of this document, please, Nelson.

BY MR. ALLISON:

Q. So that's what you're referencing, is that correct, Martin, that it says the "Society of Young Women Scientist and Engineers LLC"?

A. Yeah.

Q. So this is the first page of the first document; is that correct, Martin?

A. Yeah, it looks correct.

MR. ALLISON: Nelson, let's go down to the fifth page of this exhibit, please.
BY MR. ALLISON:
Q. Okay. Here on the fifth page, there's another header that says "Signature Card" again, and it says "Society of Young Women Scientists," plural, "and Engineers LLC," correct?
A. Correct. It says "Jennifer Lam."
Q. Would this be the start of the second document that you were noting?
A. Correct.
Q. Okay.
MR. ALLISON: So, Nelson, can we split these apart where Martin has said there's the division of the two documents.
Can we mark these as separate exhibits, please.
MR. KWOK: Okay.
BY MR. ALLISON:
Q. So, Martin, the document we're looking at here, the second document, this document says that the authorized signer is Tiffany Jennifer Lam, correct?
A. Correct.
Q. Okay.

MR. ALLISON: Can we do the next document in the folder that we have internally marked as 6, Nelson.

Darcy, we'll introduce this document as the next exhibit in order, please.

(Deposition Exhibit No. 24 marked for identification.)

BY MR. ALLISON:

Q. Martin, do you recognize this document?

A. Yes.

Q. How is it that you recognize this document?

A. It was shown to me by the FBI.

Q. You don't specifically recall this document from the date of the document, which if we go to the next page is April 22nd, 2020? You remember it from when the FBI showed it to you sometime subsequent to that date?

A. I don't. Most of my memory is from dealing with that, the discovery with the FBI going through these documents with them.

Q. Okay. And if we look at the middle of the page there, there's a signature. Is that one that you signed?

A. Yes.

Q. It says there, "I, Tiffany Jennifer Lam, hereby certify," and it goes on from there, correct?
A. Correct, but I stole her identity.
Q. Who typed in on a typewriter or Adobe PDF or other program the Tiffany Jennifer Lam in that blank spot for the name?
A. Kahele.
Q. So Kahele typed in Tiffany Jennifer Lam and then handed you the document -- printed it and handed you the document, and you signed it with an ink pen?
A. Correct.
Q. Did you sign it in front of Lum Kee?
A. Yes, I would say so. It's usually -- the standard procedure I have for signing those things is the person who has me sign it has me sign it in front of them, because if they leave it on my desk, it would never get -- it would never get signed. So it's always been the protocol with Kahele, he comes in, I sign it, he walks out.
Q. Did you ever sign this document or any similar Society documents on behalf of Tiffany Jennifer Lam or as Tiffany Jennifer Lam in front of Cliff Chen?
A. It's very possible.

Q. Even if you don't have a specific memory of doing that, did Cliff know that you were signing documents for Tiffany Jennifer Lam or as Tiffany Jennifer Lam?
A. Yes.
Q. And what is it that happened or what, in your personal knowledge, supports your testimony that Cliff knew that you were signing documents impersonating Tiffany Jennifer Lam?
A. This was part of the coverup. So we had discussed updating the bank documents to include her name so that it would have the appearance of a real person involved.
Q. We know from the emails that you and Cliff and Kahele had extensive communications about executing this plan as well as the PPP plan, correct?
A. Correct.
Q. We also know from the company's expense reports that you and Cliff and Kahele, just the three of you, ate lunch together nearly every single business day over the course of 2020 and 2019 when these plans were being put into motion and executed, correct?
A. Correct.

Q. Who else at the company had specific knowledge that you were signing documents impersonating Tiffany Jennifer Lam for the purpose of executing a coverup using the Society?

A. I don't know. I would say Cliff, Kahele and Mike Schmicker would have known.

Q. How would Mike Schmicker have known?

A. He sat in on these meetings.

Q. Which meetings were those?

A. When we discussed how to cover up the strawman and make it appear legitimate.

Q. Why wasn't Mike Schmicker copied on any of the emails that you and Kahele, Kahele Lum Kee and Cliff Chen sent each other about the planning and execution of all these plans? If he was in on the meetings, why was he left out of the emails?

A. He specifically told me not to copy him on emails regarding this matter.

Q. What about Duke Hartman? Did he know that you were impersonating Tiffany Jennifer Lam on Society documents for the purpose of a coverup?

A. Yes.

Q. How did Duke Hartman know?

A. He was there. He was in most of these -- many of these discussions.

Q. These discussions were these face-to-face meetings that you're mentioning?
A. In my office, closed door.
Q. Was anybody else -- did anybody else attend these meetings?
A. There may have been times where Eric participated in them, Eric Schiff. So Eric, Duke, Kahele, Cliff, Mike, that was kind of the inner circle, for this at least.
Q. Okay.
MR. ALLISON: Nelson, can we take this document down and do the next one in order, what we've marked as 7.
BY MR. ALLISON:
Q. I'll ask similar questions as the prior documents.
MR. ALLISON: This will be the next exhibit in order, Darcy, please.
(Deposition Exhibit No. 25 marked for identification.)
BY MR. ALLISON:
Q. Martin, do you recognize this document?
A. Yeah. Yes.
Q. What are we looking at here?
A. The change of address.

Q. This would have been submitted in that second grouping of documents that you mentioned after the FEC complaint was filed, correct?
A. Correct.
MR. ALLISON: Nelson, can we scroll down a little bit and show Martin --
THE WITNESS: Correct. I would have to confirm on the date but yeah.
BY MR. ALLISON:
Q. So the date is May 7th, 2020.
Whose signature is that, Martin?
A. That's mine.
Q. And why was this document submitted?
A. There was a couple addresses that were used for the Society. If you read the Complaint, they reference those addresses as being bogus. They're just P.O. boxes or mail office boxes. We had to cover up and provide an address that appeared to be legitimate or an actual office, physical office, as opposed to just a fake P.O. box kind of thing. It was in the Complaint. We wanted to cover that up.
Q. Okay. Was part of that coverup of the fake address and what was in the Complaint due to concerns on behalf of you and Cliff Chen and Kahele

Lum Kee that you had done something illegal by using a fake address?

A. It wasn't that it was so much at the time we thought it was illegal, but clearly the FEC identified the impropriety of the transaction as it pertains to campaign finance violations and the optics of using a strawman and a fake person to make a donation on behalf of a -- a conduit contribution on behalf of a government contractor.

So yeah, you could make -- and then specifically one of the things that they cited that was awfully suspicious was their researching of the company, that they had no actual physical office address. It was a P.O. box. So we had to address that issue.

Q. Whose address is noted here on the address change form, 307A Kaimana Street?

A. I do not know.

MR. ALLISON: Nelson, could we open or look at what we have marked as No. 12.

(Deposition Exhibit No. 26 marked for identification.)

THE WITNESS: Google that address. Google it. I don't know.

MR. ALLISON: I'm not going to do that

right now, Martin.
Nelson, can we open No. 12, please.
BY MR. ALLISON:
Q. Martin, do you recognize this document? We can show you the rest of it if you need it.
A. It's the Complaint, right?
Q. Yes, this is the FEC Complaint.
MR. ALLISON: If we scroll down to near the end, on the tenth page, Nelson, if you could go there.
BY MR. ALLISON:
Q. You'll see it's dated February 3rd, 2020.
A. Okay.
Q. Martin, when did you first become aware of this Complaint, to the best of your recollection?
A. I don't recall how I became aware of it.
Q. Okay. I'm generally aware from my involvement in this case that there were some "Civil Beat" articles that were published shortly after the Complaint was filed that discussed the Complaint and there were some other media about it.
Would it have been perhaps through that media, that reporting, that you learned about it?
A. I recall -- obviously I recall the "Civil Beat" article. I don't know the time frame in which

I saw it. I may have learned about it -- because I don't monitor "Civil Beat". The person that monitors it for us is Mike Schmicker, so he may have notified me on this, and I saw the Complaint -- or the "Civil Beat" article at the same time.

But walking it through my head right now, I do remember there was some -- some effort made to get someone over to the mailbox or something and check the mail immediately after some point. Something triggered that, whether it was the article or Mike Schmicker, whoever. I remember there was a panic to get to the mailbox to see what was in there, or the P.O. box.

MR. ALLISON: Nelson, can we go up to page 6 of -- yeah, page 6 of this document, please.

BY MR. ALLISON:

Q. So, Martin, yesterday we were talking about the coverup. I asked you what exactly was being covered up, and I believe your answer was something to the effect of you were concerned about embarrassing Susan Collins because of the business relationship between the company and the government and Susan Collins' role as a key appropriations member. Is that accurate?

A. That was my primary concern.

Q. And then I asked you weren't you also covering up crimes, and you told me that at the time, you didn't know that crimes had been committed. Is that accurate?
A. That's accurate.
Q. So when you look at this document here, you weren't aware as of January and February 2020 that crimes might have been committed based on the allegations in this Complaint?
A. No, I was not. My understanding is -- reading this stuff, USC blah-blah-blah, CFR blah-blah-blah, it's all Greek to me.
All I understood is that donations to a super PAC can be from anyone in any amount under Citizens United. That was my understanding.
MR. ALLISON: Nelson, can you mute, please. Thank you.
BY MR. ALLISON:
Q. Martin, so for -- looking at -- strike that.
Did you read this document in or around February 2020?
A. I did not.
Q. Have you ever read this document?
A. I can't recall reading it.

Q. But you were provided a copy of this document. Is that accurate?
A. That is accurate.
Q. So you were provided a copy of this document, and you just never read it; is that accurate?
A. I don't recall reading it.
Q. You agree that had you read it, you would have been put on notice that potential crimes had been committed; is that accurate?
A. Potential, I guess, alleged improprieties had been committed.
Q. Well, more than improprieties. Crimes, correct?
A. I don't -- this is -- someone -- so this was -- this is what I did when I found out about the Complaint. I'm certain you've seen my emails to my lobbyists asking about whether this is legal or not, to Cleta Mitchell asking if this is illegal or not, to Scott Reed, Andy Winer, Mike Schmicker, everybody involved.
And without me playing fake lawyer and trying to understand this, I just called my -- the people who advised me to do this and asked them is this legal or not. And I was told it was legal

under Citizens United.
Even if I read this, which I haven't -- I don't recall reading it -- I can't tell you that I would be able to come to any kind of legal conclusion as to the law. As you said, I lied. I'm not a lawyer.
Q. So, Martin, paragraph 14, what's shown on the share screen here, says: "There is reason to believe that Jennifer Lam and/or other person(s) who created, operated, and/or contributed to SYWSE ... may have violated 52 USC Section 30122 by making a contribution of money ... and attributing as the source of the money ... another person [namely, SYWSE] when in fact [the person(s) who created, operated and/or contributed to SYWSE] was the source."
Do you see that?
A. I see it.
Q. Doesn't that accurately describe what was done here with SYWSE by you and others?
A. I'd have to read it again real slow. I'm not a lawyer.
I can read that all day long. I'd have to still have someone explain it to me.
MR. ALLISON: Okay. Let's take a look at

document marked as 13 now, please.
This will be the next exhibit in order.
(Deposition Exhibit No. 27 marked for identification.)
BY MR. ALLISON:
Q. Do you recognize this document, Martin?
A. Yes.
Q. And what is this document?
A. It's the engagement letter for William Canfield.
Q. So surely by February 25th, 2020, you had knowledge of that FEC Complaint that we were just looking at, correct?
A. Correct.
Q. And the reason why that's correct is because William Canfield was engaged in response to that Complaint, correct?
A. Correct.
Q. How is it that you came to know about William or Bill Canfield? Who referred you to him?
A. Andy Winer.
Q. And was Mr. Canfield just the attorney for you and for the Society, or did he also come to later represent your wife, if you know?
A. He was -- so I hired him to respond to the

FEC Complaint. I don't really understand in the context that lawyers use or attorneys use who represents who and -- those are very -- I understand now, after having gone through my own legal challenges with the DOJ, how those things are very important, the interest of clients and conflicts of interest.

But at the time, he was just a person that Andy hired -- had suggested that I hire to respond to the FEC. I continued to use him to respond to the FEC Complaint.

Q. So could you -- sorry, go ahead.

A. I continued to use him to respond to whatever inquiries there were with the FEC investigation.

Q. If you know, can you clarify for me exactly who Mr. Canfield represented? He represented you personally, correct?

A. I think that's fair.

Q. He represented the Society of Young Women Scientists and Engineers LLC, correct?

A. He represented me and my interests. The Society was bogus. I think you said -- the idiosyncrasies you referred to about who represents who, that's beyond my acumen. I hired him to take

care of this and respond to it, and he represented me.

Q. Did you also hire him to represent your wife?

A. I did not hire him to represent my wife. I hired him to deal with the FEC. Whether that was in response to their inquiries about fictitious Jennifer Lam or the stolen identity of Tiffany Lam, that's what I hired him to do.

MR. ALLISON: Can we take a look at document 21 now, please. We'll mark it as the next exhibit in order.

(Deposition Exhibit No. 28 marked for identification.)

BY MR. ALLISON:

Q. Are you familiar with this document, Martin?

A. Yes.

Q. What is this document and how are you familiar with it?

A. I think this was his -- "his" being Bill Canfield's first response to the FEC Complaint.

Q. How many responses did Bill Canfield submit to the FEC?

A. I don't recall.

Q. Well, you just said this was his first response, so does that imply that there was more than one?
A. I believe so, yes.
Q. Okay.
MR. ALLISON: Can we scroll to the bottom of the last page.
BY MR. ALLISON:
Q. Can you see above his signature there, he says "William B Canfield, Esq., Counsel to the Society of Young Women Scientists and Engineers LLC and Jennifer Lam as manager"? Do you see that?
A. Yes.
Q. So, if you know, how is it that Bill Canfield came to write here that Jennifer Lam -- that he represented Jennifer Lam?
A. I told him that.
Q. Did you tell Mr. Canfield that Jennifer Lam was a fake, fictitious person that you made up for the purposes of committing this coverup?
MR. KIUCHI: I'll object because its calls for attorney-client communications. I instruct him not to --
MR. ALLISON: First of all, Keith, the attorney-client privilege has clearly been waived by

the production of all these documents. There's a ruling in the arbitration that that's the case because these documents are all in the company's system.

And third, there's a crime fraud exception here. This is clearly out of place. There's clearly no attorney-client privilege as to the commission of a fraud.

MR. KIUCHI: I'm still going to assert the attorney-client privilege.

BY MR. ALLISON:

Q. Martin, did you tell Bill Canfield that you made up Jennifer Lam and stole your wife's identity for the purposes of committing a coverup and that's who he was representing?

THE WITNESS: Do you want me to answer that, Keith?

MR. KIUCHI: You can answer it, subject to the objection.

THE WITNESS: Okay.

Sorry, Grant, can you repeat the question?

MR. ALLISON: I'll ask the court reporter to repeat the last question, please.

(The record was read back by the reporter as follows:

"Q. Did you tell Mr. Canfield
that Jennifer Lam was a fake,
fictitious person that you made up for
the purposes of committing this
coverup?")

THE WITNESS: No. I was dishonest with Mr. Canfield.

BY MR. ALLISON:

Q. At one point, Mr. Canfield asked to have your wife email him some statements to support his efforts.

Do you recall that?

MR. KIUCHI: Same objection.

You can answer.

THE WITNESS: I recall there was a time where I believe that he became a little skeptical about the existence of a real Jennifer Lam or Tiffany Lam. And just to cover his -- cover himself, he needed something from Tiffany. I remember that.

I had to perpetuate additional improprieties. I'm sending him documents. Whatever he asked for, I can't remember.

BY MR. ALLISON:

Q. So did you then go on your wife's computer

or use the iPad to access your wife's email to email Bill Canfield impersonating your wife?
A. Yes.
Q. Did you delete those emails after you sent them?
A. I don't know.
MR. ALLISON: Let's take a quick break here just for a few minutes, please. We'll go off the record now. Thank you.
(A brief recess was taken.)
BY MR. ALLISON:
Q. Martin, same rules apply. Do you understand that?
A. Yes.
Q. All right. I want to ask you now about a long email chain.
MR. ALLISON: Nelson, let's bring up the document we have noted internally as No. 13.
(Deposition Exhibit No. 29 marked for identification.)
BY MR. ALLISON:
Q. So, Martin, this is a long email chain. I want to start on page -- I want to start on page 13.
MR. ALLISON: Please go to page 13, Nelson.

BY MR. ALLISON:
Q. So, Martin, this is the --
MR. ALLISON: Go down a little bit, please, to the bottom.
BY MR. ALLISON:
Q. So, Martin, this is the first email in this chain. Below this are all the forwarding signatures.
MR. ALLISON: Nelson, scroll to the bottom just to show Martin the rest.
BY MR. ALLISON:
Q. Okay. So you see here, Martin, this is the first email. It's dated February 5th, 2020.
To refresh -- to refresh you, we just looked at the FEC Complaint, and that was dated February 3rd, 2020. So this email was sent two days after the FEC Complaint was dated.
Do you recall this email that you sent to Cleta Mitchell on February 5th, 2020?
A. Yes.
Q. And do you recall this email because you looked at it subsequently with the FBI, the U.S. government, or do you recall sending it as of February 5th, 2020?
A. I know I looked at it with them. I just

recall it. I don't know. I just recall it. I remember seeing it. I don't remember . . .
Q. Do you remember speaking to Scott Reed on that date, February 5th, 2020?
A. I do not.
Q. So if I asked you what did you and Scott Reed speak about on February 5th, 2020, obviously I think you probably spoke about the FEC Complaint. Is that accurate?
A. Yes.
Q. But if I asked you specifically what was said or what did you speak about or what did you discuss about the FEC Complaint, would you be able to answer those questions?
A. I can answer questions regarding what I recall as to my concerns of why I reached out to Scott. I think I can answer those questions.
Q. Please tell me what the reasons were that you reached out to Scott on that day.
A. I was furious about the article in the -- whatever, "Civil Beat," in the press, and about the Complaint. I had walked into this thinking that what we were doing was perfectly legal; although not necessarily savory, there was nothing that was illegal about it nor could embarrass our benefactor

Susan Collins.

Clearly there was nothing that I would have done to jeopardize that relationship with Susan Collins. There's no need for me to take this risk to compromise her ability to keep helping us.

So I thought that as the person who ran the 1820 PAC, after Duke and I sat down with him in Washington, D.C., this was something that was -- that was advised, vetted and would not blow up in our face at this level. I was upset with him and Andy Winer.

Q. Scott Reed, you said yesterday was somebody associated or employed by 1820 PAC. Is that correct?

A. I don't know what his official employment is, but he represented 1820 PAC, to my knowledge.

MR. ALLISON: Okay. Let's go up to page 9.

BY MR. ALLISON:

Q. So now we're looking at an email from Cleta Mitchell to you, Andy Winer and Cliff Chen, dated February 18th, 2020.

Do you see that?

A. Yes.

Q. So it's 13 days later, after the initial

email on February 5th, about two weeks later. In the very first sentence, Cleta emails you: "I want to be sure that the LLC proceeds with the ideas we discussed." And then it goes on from there.

So I want to ask you about this first part of that sentence. When he says "we discussed," does that mean you and her had a phone call about this?

A. I remember it was a conference call with Andy, myself, Cliff Chen, Cleta and Scott Reed.

Q. And when she says "the LLC" -- when she references the LLC, is she referring to the Society or somebody else?

A. The Society.

Q. Okay. The email continues "about the ideas we discussed."

She says: "Giving scholarships in recognition to women in engineering, et cetera, as that is going to be an issue at some point, so we should make sure to take necessary steps to protect the entity and you" -- with "you" in all capitalized letters -- "now while we have the time to do that."

Do you see that?

A. Yes.

Q. So when she says "Giving scholarships and recognition to women in engineering, et cetera, was

the ideas we discussed," what specifically did you discuss on this conference call with Scott Reed, Andy Winer, Cliff Chen and Cleta Mitchell?

A. There were two main points I recall that I took out of this. One was that we had to reverse the donation proceeds from the company, 150,000, with the company making no donation to myself.

So we proceeded on one front, on the accounting side, to have the money put back in the company and then myself, my capital account be deducted for the 150,000 so that at least the paper trail would show that the money came from me.

The second was to orchestrate the coverup that the Society and Jennifer Lam were totally fake and that this -- that the Society, the LLC, she references, actually did have some legitimate philanthropic purpose.

Q. So the idea to designate the Society's money that was taken from the company as coming from your capital account was made on or around February 18th, 2020 and in response to the FEC Complaint; is that accurate?

A. Correct. It was -- we didn't know that it couldn't come from the company. So we found that out from Cleta, and she said, you have to reverse

that and have it come from Martin's capital account.
Q. And when she says "to protect the entity and you now while we have time to do that," who is it that you understand "the entity" to be in that sentence?
A. Navatek.
Q. It's not the Society?
A. No. The Society is fake.
Q. Okay. So this was about protecting Navatek, which then became Martin Defense Group and is now Pac Mar Technologies LLC? This was about protecting that company, correct?
A. Correct.
Q. Okay. And then she says: "We should develop a plan and timetable so there are scholarships given over the next several months and particularly, perhaps, where the bad press was."
Do you see that?
A. Yes.
Q. So it was this conference call between yourself, Cliff Chen, Andy Winer, Cleta Mitchell and Scott Reed in which the coverup plan involving the Society was first hatched and first thought up and discussed. Is that accurate?
A. It's accurate.

Q. To the best of your recollection, did Cliff Chen say anything during that conference call? Did he provide any thoughts or ideas about this plan?
A. I don't recall. I certainly don't recall any of us objecting to it.
Q. Okay. And then you respond a few hours later. So this email was sent at 11:46 a.m. --
If we scroll up one page, please, we see that there's a response later in the day, at the end of the day, at 4:52 p.m. from you to Andy -- or to Cleta Mitchell, with Andy and Cliff Chen copied.
And you say: "Yes. The Society is now actively working with 14 universities, including University of Maine, to give out over 140 scholarships, minimum 1,000 each to female students in 2020."
My question, Martin, is: Between 11:46 a.m., when you received Cleta's email -- from the prior page we just looked at -- and 4:52 p.m., when you responded, in that time gap of about five or six hours, did you go and set up and put into action a plan to have 14 universities receive scholarships?
A. I don't know the exact -- if we put a plan

in action, but I think we made the collective decision to move forward and identified 14 universities that we would start working with to orchestrate this plan.

Q. Okay.

MR. ALLISON: Could we scroll up to the next page, please.

BY MR. ALLISON:

Q. So then there must be some time zone differences happening here because I note the next email is February 18th, 2020, at 11:53 a.m. So perhaps your email was not sent five or six hours later. It could just be a time zone issue with the emails.

This email was sent Tuesday, February 18th, 2020, it says 11:53 a.m., and Cleta's responds to you and says: "Fabulous. Keep me posted on the progress and send me information related to the scholarships. I will include that in the response to the FEC."

Do you see that?

A. Yes.

Q. So did you understand then, by Cleta's response here and/or the conversations that you had during the conference call with Cleta, Andy Winer,

Cliff Chen and Scott Reed, that this whole plan would then be provided to the FEC, that the results of this plan, the scholarship coverup would then be provided to the FEC?

A. Yes. Well -- so it was shortly after this email that someone much smarter than myself -- it was either Cliff or Cleta who mentioned -- or Andy, either Cliff or Andy that mentioned to me that because of this email, she wrote, "I will include that response to the FEC," that she meant that she was responding on behalf of the 1820 PAC because her client -- we were not her client.

That's when I believe Andy said, you need to hire your own attorney to respond to the FEC, and that's when the wheels were put into motion by Andy to find Bill Canfield.

MR. ALLISON: Okay. Can we scroll up to page 5 and 6 now.

Let's go up a little more, please. Okay. Stop.

BY MR. ALLISON:

Q. Do you remember receiving this email from Cleta Mitchell?

A. I don't remember specifically, but it looks familiar. It's on the email chain.

Q. What I want to ask you about, Martin -- and this email is from Cleta to yourself, and Andy Winer and Cliff Chen being copied. It's dated February 28th, 2020.

Cleta says: "I'm going to be preparing the response to the FEC Complaint in the next week, and I wonder if it is possible for any scholarships to be awarded or other activities taken by the LLC that gave the contribution to the 1820 PAC."

Did this confirm in your mind that the scholarship plan was going to be provided to the FEC as a coverup effort?

A. Yes.

Q. And that it was the 1820 PAC, through its counsel Cleta Mitchell, that would at this time be providing the coverup information to the FEC?

A. Also, this is when it was communicated to me that Cleta is looking out for the interest of Scott Reed and the 1820 PAC and not so much for the interest of Navatek and myself. That's two very distinct and different things. So we had to go and hire Bill Canfield.

Q. Right. But my question was that it was Cleta and the 1820 PAC who were going to provide the coverup information to the FEC.

Is that your understanding of what she's saying in this email?

A. I don't know. I don't know what she was going to provide to the FEC. I just know that when we orchestrated a plan to cover it up, it made all the sense in the world to now all of a sudden have to create some legitimacy around this fake Society that made it appear legitimate.

Q. In the next sentence in her email she says: "I would like to be able to point to something that is either public or perhaps a letter you could send to me and which I could attach to the response.

"Think about that, and let's work on how we can make sure to include other activities of the LLC as part of my response to the commission."

Do you understand or did you understand at the time her email to mean that she needed you and she needed the company, Navatek, known formerly known as Martin Defense Group, now known as PacMar Technologies LLC, to make these scholarship awards so she could provide that to the FEC to argue that the Society was a legitimate organization?

A. Yes.

Q. And that is, in essence, what the coverup

is that you've been referencing as the Society coverup in both yesterday's deposition and today's deposition; is that accurate?

A. Yes.

Q. And that is, in fact, what the Society did, correct?

A. Started awarding scholarships? Is that your question?

Q. Start awarding scholarships for the intended purpose of covering up bad conduct and criminal conduct committed by the Society and the people that controlled the Society.

A. Yes.

Q. You testified throughout the day yesterday and today that the people who controlled the Society and caused the Society to commit these crimes included yourself, included Cliff Chen, included Kahele Lawrence Lum Kee and included Duke Hartman, correct?

A. Mike Schmicker. I don't recall off the top of my head, but the list that was given to me came from the email I referred to yesterday. I can only recall where Mike sent out the email to a bunch of people, the ones you listed, about the plan, the plan or something like that.

Yeah, those are the people that were in charge of orchestrating the coverup.

Q. Was Mike Schmicker on the conference call in which this plan was hatched that Cleta referenced in her email that we looked at a little while ago in the same email chain?

A. I believe so. He was my main political guy. I can't remember if he was on it or not.

MR. ALLISON: Can we scroll up to the third page of this email.

I'm sorry, let's go to the fourth page.

THE WITNESS: Grant, just to let you know, they announced that we have about 45 minutes left.

BY MR. ALLISON:

Q. Okay. Thank you. We'll make sure to finish before you need to go, Martin.

A. Okay.

Q. Okay. I want you to look at Andy's email here from February 28th, in the middle of the page. He says: "Bill, I'm forwarding a thread starting with an email from Cleta Mitchell. If possible, we'd like you to respond to her."

And then in the next sentence he says: "I am also copying Duke Hartman, who has the list of universities where the LLC is working to set up

scholarships."
Is this when Duke Hartman became involved, on February 20th, 2020, or did he become involved sooner because he had already been working to set up the universities that would receive the scholarships as part of the coverup?
A. Yeah, he was involved much sooner. He was there day one when I -- he and I met Scott Reed in Washington, D.C., in a coffee shop.
MR. ALLISON: Okay. Let's scroll up to page 3, please.
BY MR. ALLISON:
Q. And so then this is an email from Duke Hartman.
MR. ALLISON: Let's go up just a little bit more so we can see the date and time.
BY MR. ALLISON:
Q. It's from the same date, February 28th, and Duke writes to Bill -- is it your understanding that "Bill" is Bill Canfield?
A. Yes.
Q. It says: "Bill, see list below. Here is the updated list with the status of reaching out and total dollars we have committed in 2020. Only one who hasn't been notified yet is U Delaware (I will

this weekend)."

Who made the decision on which universities would go on this list?

A. That would be Duke.

Q. Yesterday we discussed the reasons why these specific universities were selected. But can you tell me why it is that these specific universities and not others in other states were selected?

A. These are the ones that we -- these are the ones located in the states where we were working, actively working with members of the Senate and Congress for appropriations.

Q. And the critical point there is that by giving these scholarships to these schools in the districts of those particular Congress people, you felt and the company felt that it would increase the chances that these Congress people would look favorably upon the company, and that would help the company get contracts and appropriations from the government to bolster the company's business and bottom line. Correct?

A. Correct.

MR. ALLISON: Okay. Can we take a look at the document we have internally marked as 18.

Darcy, we'll mark that exhibit, that document as the next exhibit in order if I didn't say that earlier.

(Deposition Exhibit No. 30 marked for identification.)

MR. ALLISON: And then the document Nelson is about to pull up will be the next exhibit in order.

BY MR. ALLISON:

Q. Earlier I asked you if Canfield had asked for Tiffany to email him, and here we have an email from Canfield to you on June 24th, 2020, where he asks for Tiffany's email address.

It says: "The FEC wants a statement from her that she speaks for the Society. Thanks, Bill."

So is this one of the examples of the emails where Bill asked you for an email from your wife?

A. Yeah. He's still under the impression that Jennifer is a real person. I don't think at this point he even knows my wife's name is Tiffany. That's why he asked for Jennifer's email contact. Yeah, that's why he's asking.

Q. And in response, did you provide him Tiffany's email address or did you send him an

email?
A. I don't recall.
Q. Okay. I'll note that this is from June 24th, 2020.
MR. ALLISON: Let's pull up the next document we have marked internally as 19, Nelson.
And, Darcy, we'll mark this as the next exhibit in order, please.
(Deposition Exhibit No. 31 marked for identification.)
BY MR. ALLISON:
Q. So this is from the same date, June 24th, 2020, and he sends another -- Bill Canfield sends another email to you.
He says: "Martin: Let's have Jennifer email to me the following statement: 'I Jennifer Lam, am the executive director and Registered Agent for the Society of Young Women Scientists and Engineers LLC and am authorized to speak for the Society in all matters.'"
And you responded and said: "Will do."
Do you recall if you sent Bill Canfield the email that he asked for?
A. I do not recall.
Q. Okay.

MR. ALLISON: Nelson, bring up the document we have internally marked as 23.

(Deposition Exhibit No. 32 marked for identification.)

(Deposition Exhibit No. 33 marked for identification.)

BY MR. ALLISON:

Q. I'm going to ask you about this one, Martin. So this is an email from -- at the top, on February 29th, 2020, it's from you to Cliff Chen. And the last email, the one that you sent to Cliff Chen on that date says: "Spread the love? Stupid."

Do you remember this email?

A. I don't. Can you give me a chance to read it?

Q. Sure.

A. I don't remember looking at it, on its face.

MR. ALLISON: Can we scroll down and take a look at the first email.

Sorry, it looks as if -- I apologize. It looks as if there are a number of emails here that are all grouped together.

Let's go to the second page of this document.

BY MR. ALLISON:
Q. So this is what I believe to be the first email in this chain, Martin. You can tell me if you think differently. It's an email from Bill Canfield.
MR. ALLISON: Scroll up so Martin can see the beginning of it.
THE WITNESS: Okay.
BY MR. ALLISON:
Q. Do you remember this?
A. I vaguely remember it.
Q. Okay. Let's go up to your response. You said: "Not all, but most."
And then really what I want to ask you about is Bill Canfield's next email and the part where he says: "Martin: Just think going forward, contributions would best be spread ... to Members who do not have a direct influence on Navatek's business ... you need to be able to push back (if necessary) to the assertion that your giving is all focused on how it will benefit the company from the approps process. Plausible deniability as to the pay-for-play criticism. I'm not suggesting that you go overboard on spreading your contributions, just enough to indicate that the critics are wrong about

your motivations. Bill."

What did you understand Bill Canfield to be suggesting to you here?

A. That basically what the FEC Complaint alleges, that this is pay-to-play or the optics of pay-to-play.

Q. Is pay-to-play, as you put it, is that illegal conduct?

A. I don't think so.

Q. It's just bad conduct that you don't want associated with you?

A. It's just how Washington, D.C., works. That nomenclature, pay-to-play, has a nefarious connotation to it, I understand. Although it's unsavory, it's not illegal. That's -- you see it every day on "Fox News."

I think the people that pay to play just pay in a much more strategic and clever way than I did, and that's how they get away with it.

But thinking of it in this chain of emails, I just glanced -- when you were scrolling through it, you saw my anger towards Andy Winer to Bill.

Q. Okay. And then at the very top of this --

MR. ALLISON: If we scroll up.

BY MR. ALLISON:

Q. -- you say -- you take Bill off the email and you forward it to Cliff Chen. "Spread the love? Stupid."

So what did you mean there? Why did you take Bill Canfield off? Why did you forward it to Cliff Chen? Why did you call Bill's suggestions stupid?

A. Because either what we did is legal or it's not. And I was told that what we did was legal, and now we're getting pushback on it.

So for us to spend money to go above and beyond the optics of covering up for political purposes Susan Collins or other benefactors' reputations -- that the Society is real is -- was something that I thought was outrageous, to waste money on that.

To explain, if it wasn't for the fact that Navatek was a government contractor, this entire thing, however you may view it as being a complete facade and fiction, would have been perfectly legal. It is only the fact that Navatek is the donor and the strawman is the Society that makes this illegal.

If I or Tiffany or Cliff himself personally donated the money, it would have been

perfectly fine, however unsavory it may look.

Q. Martin, that's not necessarily true, though, is it? Aren't there two different -- two different types of conduct here that were illegal?

One is what you mentioned, that a government contractor can't make political contributions. But isn't it also illegal, regardless of whether or not it's a government contractor, to make any contribution through somebody else as a strawman, regardless of whether or not they're a contractor?

A. Not if it's a super PAC.

Q. So you can make -- what you're saying is you can make donations in somebody else's name to a super PAC, just not to individual campaigns?

A. Correct. The source of the money can't be -- has to be clean, for example. It can't be dark money, "dark money" being China, whatever, right, Ukraine, some foreign entity.

If the source of the money is from me, from you, Keith or whoever, I can make it through an LLC or anybody or any entity just, again, to a super PAC, not to a PAC but to a super PAC, which is what the 1820 PAC was.

Q. Okay. I want to ask you about another

document. Give me a second to pull it up.
Sorry, Martin, give me one second here.
I'm going to share my screen and ask you about an email here.
Can you see this email, Martin?
A. Can you make it a little bigger?
Q. Yes.
MR. ALLISON: We'll introduce this as the next exhibit in order.
(Deposition Exhibit No. 34 marked for identification.)
BY MR. ALLISON:
Q. I'll scroll down. I'll note you're not copied on these emails, but I'm just wondering if you've seen them before.
A. Yes, in the context of I recall seeing them in the DOJ investigation.
Q. Okay. So we'll start with the one on the bottom here. Lori emails Cliff Chen on February 26th, 2020, and so this is -- to put it in time context, this is while that long email chain is going on that we just looked at that ranged from February 5th to February 28th, in which Cleta Mitchell and yourself and Scott Reed and Andy Winer and Cliff Chen initially hatched the coverup plan.

So this is in that time frame, correct, February 26th, 2020?

A. Correct.

Q. And Lori emails Cliff Chen: "LORI - Question, for the scholarship donation, I was told Navatek will have nothing to do with it, instead it all comes from SYWSE, right?"

And then "MARTIN - Yes. SYWSE is making the donation. Not Navatek. The endowed scholarship is fine. It's only 5K a year."

So is Lori -- is it your understanding that Lori is telling Cliff Chen that she asked you this question and that was your answer?

A. Okay. So my recollection of this email, based on the DOJ investigation, is that that came from Cliff. There was some email or something that instructed her to do this. But that's what I recall. I obviously don't have access to emails or anything.

Q. Okay.

A. I recall being shown something where Cliff said the money needs to come from Martin's -- whatever -- Navatek.

Q. Is it this email here from Cliff Chen on February 26th, 2020? He says to Lori: "The

checks need to come from the Society.

"As I discussed with Martin before he left on his trip, the funding of the checks should come from Kao family accounts, best if Tiffany writes them to the Society, but Martin can.

"While we can potentially start with Navatek funds and pass them on as a distribution, we're better off having that firebreak in between."

A. Yes. There was something -- it's almost like she cut and paste something from here. I think my memory could be off but yes. I recall this email too, yes.

Q. And then she says: "Got it. So we do not have Society checks yet? I will compile that list of who to make the check out to and then give it to Tiffany."

So did Lori at this point or at any point know that Tiffany wasn't actually involved? At least I know that's your position.

A. Tiffany wasn't involved, so it's not a matter of Lori knowing; it's just she wasn't involved. This direction from Cliff to Lori to have Tiffany write the checks is probably what had her response that, okay, I'll give the checks to Tiffany.

Q. And how would Lori know Tiffany or know to communicate directly with Tiffany?
A. She has Tiffany's phone number.
Q. Okay.
I'm going to ask you about one more here. Let me share the screen.
BY MR. ALLISON:
Q. Let me make this bigger for you. So these are text messages. Is it big enough or should I make it bigger?
A. It's okay. I can see it.
Q. Okay. So the one that I specifically want to ask you about is this one here. I just highlighted it. I'll take the highlight off, though.
So it's a text message from you to Lum Kee and then to "Myself Owner." That number is Cliff Chen, and it's dated February 27th, 2020. So it's at the same time frame -- it's a day after the emails we just looked at. It's during that same time frame as the chain we looked at earlier with Cleta Mitchell where she suggested the scholarship coverup plan that ranged from February 5th to February 28th.
My question is about the content. And the

content of the text says, from you to Cliff and Kahele: "Text us instead of email, delete afterwards. Need you to deposit 120K into my FHB account. I guess you can take out a Schwab margin, don't sell stocks. I have 300K of 'events' next week. I can cover about 180K without having to sell stock."
The word "events" is in quotation marks. What was -- what were the events, and why did they cost $300,000?
A. Sorry, I got distracted. Sorry, I got distracted.
Q. I'll repeat the question, Martin. What were the events that you have in quotation marks in this text, and why did they cost $300,000?
A. The events were fundraisers for politicians.
Q. And the $300,000 were donations that you intended to make?
A. Correct.
Q. And would those donations have been on behalf of the company?
A. Yes.
Just real quick, Grant, that 398 number, that's Kahele's number that we talked about earlier.

Q. It's this number here that's Kahele?
A. Yeah.
Q. And that's the number that sent the copy of Tiffany's driver's license; is that correct?
A. Yeah. So I don't know how he got her license and sent it to himself, but that's the number. That's his number right there. That's the same number, and it says Kahele.
Q. Okay. Thanks for pointing that out.
Okay. I'm keeping an eye on the clock here, as I'm sure you are too.
I'm sorry, Darcy, I'm rushing a little bit. I want to mark all these as exhibits in order, the documents we just looked at.
The email that we looked at a moment ago, I'm going to put it back on the share screen. This is the email between Cliff and Lori Bofman.
Are these emails an indication that Cliff Chen was an employee of the company who was tasked with being the top-line manager of the Society and overseeing the coverup initiative?
A. Yes.
Q. And is it correct that based on this email, Cliff is answering questions of Lori Bofman, who's a lower-level employee, and directing her on

how this scheme should be conducted and executed?
A. I'm sorry, I didn't understand the question.
Q. Lori Bofman, she was just an employee, correct? She was not a manager and she was not empowered to make managerial decisions; is that accurate?
A. That's accurate.
Q. And so she just received orders and carried them out, correct?
A. Correct.
Q. But Cliff Chen was a manager of the company, and he was empowered and paid and compensated to make managerial decisions and to act as a director, correct?
A. Correct. He was the chief financial officer.
Q. Sorry, go ahead.
A. Whatever you want to call it. The C suite, whatever.
Q. So this email in the middle of the page, from Cliff to Lori, February 26th, 2020, 11:53 a.m., when he's telling her how the checks should be made out, where they should come from, where the funds should come from, what the priority

or preference order of funding decisions are, he's giving her those directions in his role as the top manager tasked with overseeing the Society by the company. Is that accurate?

A. That's accurate.

Q. Okay. I'm going to ask you about one last email here before I think you have to go.

A. I have about 15 minutes.

(Deposition Exhibit No. 35 marked for identification.)

BY MR. ALLISON:

Q. Do you recall these emails? Let's see here. This is a long email chain. I don't necessarily want to ask you about all of it. I want to ask you about Lori's questions here on March 23rd, 2020. So we're about a month later.

A. Can you make it a little bigger?

Q. Yes. How's that?

A. Okay.

Q. So the subject here of this email from Lori to Lum Kee, Duke Hartman and Cliff Chen is "Scholarship programs - The Society."

In the middle of that email, Lori types up what she calls "this is the protocol." Is that protocol that she typed up there accurate and the

correct protocol that the Society was supposed to operate according to?
A. I don't know what protocol Cliff asked her to follow, but that sequence of events would seem right.
Q. And No. 3 is "Cliff approves proposal," correct?
A. Correct.
Q. Is it correct that Cliff would approve any proposals because as the CFO of the company, he was the highest-level manager that you directed to oversee the Society coverup plan; so, therefore, he was the one who had approval power for what the Society did in executing this coverup?
A. Yeah, that's correct. Yes, that's correct.
Q. And here Kahele responds: "Okay, thanks. This works. I will wait until I hear back. Just didn't want to go piecemeal to Martin for funding. I don't think there is any issue with waiting until we get the amounts for the last two items before we send out all the checks at one time. Thanks."
Is it correct that Lum Kee would go to you for funding?
A. Yes. So he would give me a stack of

checks from the Society with the total amount. I don't think the Society's bank account really had any money in it. And then I would write a check from my personal checking account at First Hawaiian Bank to the Society so the money looked like it was coming from me or not from Navatek.

I can still see your screen.

Q. I've stopped sharing. I'm looking for another document.

Martin, isn't it true that in or around late 2019 or early 2020, you represented to people that the reason why -- the reason why the manager of the Society was Jennifer Lam was because it was your wife and she was passionate about women's studies, STEM fields in college, "STEM" being science, technology, mathematics and engineering?

A. Is that what I told people?

Q. Yes.

A. Yeah. That was part of the lie.

Q. And you did represent that publicly to people, correct?

A. I'm not sure I represented it publicly, but I certainly represented it to -- I needed to have everybody in our offices march to the same beat and understand the same protocol. So I had to be

dishonest with my -- the message I forwarded on so it would be consistent amongst the staff and the engineers.

MR. ALLISON: Okay. Martin, I'm going to end the deposition now so you have time to get to where you need to go. Thank you very much for being here today.

I think your attorney may make another statement similar to yesterday about your ability to review the transcript.

So go ahead, Keith.

MR. KIUCHI: Martin, you have the right to review the transcript. I'll get it from the court reporter and mail it to you.

You can make changes to the transcript, but any changes you make can be brought to the attention of the Court if you make changes.

THE WITNESS: Okay. It does take some time to get it to me because whatever documents you send me, they have to send it to some external source, and they don't give me the original. They copy it on fresh paper.

MR. KIUCHI: Okay.

THE WITNESS: Apparently, inmates have figured out how to lace paper with heroin or

something, so now we don't get any original documents.

So it does take a little bit of time. They send it out, it gets copied on new paper, and then we get a copy of the copy.

MR. KIUCHI: Okay.

MR. ALLISON: Martin, I'll just add that if you do make any changes, I'll have the opportunity to redepose you or cross-examine you in court about those changes.

THE WITNESS: When you say "changes," it just means like --

MR. KIUCHI: Substantive changes.

THE WITNESS: Substantive changes. Like if I misspoke or misrecollect or something to that effect?

MR. ALLISON: Martin, you should have this conversation off the record with your counsel.

THE WITNESS: Okay.

MR. ALLISON: Okay. Thank you very much, Martin. Thank you for taking the time. We do appreciate it.

We'll go off the record now.

(Signature was reserved.)

(Deposition concluded at 10:36 a.m., HST)

W I T N E S S   C E R T I F I C A T E

I, MARTIN KAO, hereby certify that I have read the foregoing transcript of my deposition, taken on September 4, 2026, and that corrections, if any, were noted by me, and the same is a true and correct transcript of my testimony.

Dated this ______ day of ____________________, 2026.

_________________________________

MARTIN KAO

Signed before me this ____ day of ___________________, 2026.

_______________________________

Deposition of: MARTIN KAO
Taken on: September 4, 2026
PacMar Technologies v. Kao et al./Chen v. Kao
Civil No. 1:22-cv-00283
United States District Court For The District of Hawaii
By: Darcy J. Brokaw, CSR #371

C E R T I F I C A T E

STATE OF HAWAII )
) SS.
COUNTY OF MAUI )

I, Darcy J. Brokaw, CSR for the State of Hawaii, do hereby certify:

That on September 4, 2026, at 6:32 a.m., HST, appeared before me MARTIN KAO, the witness, whose testimony is contained herein; that prior to being examined, the witness was by me duly sworn or affirmed pursuant to Act 110 of the 2010 Session of the Hawaii State Legislature.

That the proceedings were taken down by me in machine shorthand and were thereafter reduced to typewritten form under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

That pursuant to Rule 30(e) of the Hawaii Rules of Civil Procedure, a request for an opportunity to review and make changes to the transcript:

__X_ Was made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

____ Was not made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

____ Was waived.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause named in the caption.

Dated this 11th day of September, 2026.

__________________________________

Darcy J. Brokaw, RPR, CRR, CSR #371