IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PACMAR TECHNOLOGIES LLC (f/k/a MARTIN DEFENSE GROUP, LLC), Plaintiff, vs. MARTIN KAO; TIFFANY JENNIFER LAM a.k.a. JENNY LAM and/or TIFFANY KAO; LAWRENCE KAHELE LUM KEE; CLIFFORD CHEN; DUKE HARTMAN; SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC, Defendants. | Case No. 1:22-cv-00283 |
| CLIFFORD CHEN, Cross-Claimant, vs. MARTIN KAO, Cross-Claim Defendant. | |

DEPOSITION VIA VIDEOCONFERENCE of MARTIN KAO, commencing at 6:40 a.m., HST, on Thursday, September 3, 2026, pursuant to Rule 30 of the Hawaii Rules of Civil Procedure.

REPORTED BY: DARCY J. BROKAW, Hawaii CSR #371
Registered Professional Reporter
Certified Realtime Reporter



EXHIBIT 13

APPEARANCES:

For Plaintiff PACMAR TECHNOLOGIES LLC (f/k/a MARTIN DEFENSE GROUP, LLC):

GRANT FASI ALLISON, ESQ.
Lung Rose Voss & Wagnild
Topa Financial Center, Suite 900
700 Bishop Street
Honolulu, Hawaii 96813
808.523.9000
gallison@legalhawaii.com

For Defendant MARTIN KAO and SOCIETY OF YOUNG WOMEN SCIENTISTS AND ENGINEERS LLC:

KEITH M. KIUCHI, ESQ.
Attorney at Law, ALC
American Savings Bank Tower
1001 Bishop Street, Suite 985
Honolulu, Hawaii 96813
808.533.2230
kkiuchi106@cs.com

For Defendant TIFFANY JENNIFER LAM:

PHILIP W. MIYOSHI, ESQ.
Miyoshi & Hironaka
City Financial Tower
201 Merchant Street, Suite 2240
Honolulu, Hawaii 96813
808.599.1645
philip@808-law.com

Also present: Nelson Kwok

INDEX TO EXAMINATION

WITNESS: MARTIN KAO


| EXAMINATION | PAGE |
|---|---|
| BY MR. ALLISON | 6 |

INDEX TO EXHIBITS

MARTIN KAO

Pacmar v. Kao et al./Chen v. Kao

Thursday, September 3, 2026

Darcy J. Brokaw, RPR, CRR, CSR No. 371


| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | 5/7/2019 email exchange between Clifford Chen and Michael O'Malley, subject "Foundation rules" Bates No. MDG02544656 | 63 |
| Exhibit 2 | Cell phone text messages between M. Kao and J. S. Fitch Bates No. MDG02544656 | 66 |
| Exhibit 3 | Navatek Employee Status Report dated 4/1/2019 Bates No. PM00053 | 72 |
| Exhibit 4 | Navatek Employee Status Report dated 3/23/2020 Bates No. PM00051 | 73 |
| Exhibit 5 | Navatek Employee Status Report dated 5/11/2020 Bates No. PM00049 | 77 |
| Exhibit 6 | 11/22/2019 email exchange between Martin Kao and Scott Reed, subject "Navatek/Martin Kao - Thanks!" Bates No. MDG-DCGJ00162073 | 90 |
| Exhibit 7 | 11/22/2019-11/19/2019 email exchange between Kahele Lum Kee and Martin Kao, subject "1820 Good to go" Bates No. MDG-DCGJ00106627 | 98 |

INDEX TO EXHIBITS (Continued)


| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8 | 9/26/2019 email exchange between Martin Kao and Chenoa Diehm, subject "Wed, 10/2, 1:30 - 3:30 PM" Bates No. PAC-008236 | 122 |
| Exhibit 9 | 8/26/2020 email from Roland Chang to Tiffany Lam, subject "Letter to Society of Young Women Scientists and Engineers LLC" Bates No. PAC-008267 | 125 |
| Exhibit 10 | Transcript of Sentencing Proceedings in the case of United States of America vs. Martin Kao | 146 |

MARTIN KAO
having first been duly sworn,
testified under oath as follows:

EXAMINATION

BY MR. ALLISON:
Q. Hello, Mr. Kao. My name is Grant Allison. I'm one of the counsels for Pacmar Technologies LLC, formerly known as Martin Defense Group LLC, formerly known as a few other names.
Throughout today's deposition, do you prefer to be called Martin or Mr. Kao?
A. Martin is fine.
Q. Okay, Martin. I just mentioned that the company has gone by a couple of names, different names over the years. Are you familiar with all those different names?
A. Can you -- I'm not sure which one you're referring to.
Q. Sure. The company that you were previously, I believe, president of was called Martin Defense Group LLC, correct?
A. That's correct.
Q. And prior to that, it was called Navatek, correct?

A. Correct.
Q. And then after that, it changed its name again. It's now called Pacmar Technologies LLC.
A. Okay.
Q. And so all of those names refer to the same legal entity, the plaintiff in this case, and I'm counsel for that company. Throughout today's deposition, I may refer to that company, the plaintiff, as simply "the company," or I may refer to it as "Pacmar Technologies" or may refer to it as "Martin Defense Group."
Do you understand that all those names are interchangeable, that it's the same company?
A. I don't -- I don't understand.
Q. What don't you understand about that?
A. To me, they're distinctly different, so -- on several fronts. One, in terms of just accounting, ownership and control and also management of the company. Those three things are distinctly different.
When it was Navatek, Steven owned the company. I did not. He was the chairman and my boss, so every decision, everything was controlled by him, all management decisions were by him. It was only that short period of time when it was

Martin Defense Group that you could say that I had some level of titular control of the company and ownership.

And after the arbitration, it became Steven's company again or however you want to classify that, and it became -- I don't know why he renamed it Pacmar Technologies. But in my mind those are very distinct things, not just in terms of names but also in terms of actual function.

So when you get to the question, I can clarify or ask questions, but I don't think, at least in my mind, to refer to them as one and the same is accurate or fair.

Q. When you changed the name to Martin Defense Group from Navatek, did you create a new entity?

A. Yes, a new entity was created.

Q. Okay. Given your response, we will refer to the company that you were president of, that again is the same company that is the plaintiff in this case, Pacmar Technologies LLC -- I will refer to that entity as "the company" throughout today's deposition.

Do you understand that?

A. Yes.

Q. Okay. Could you state your name for the record, please, Martin?
A. Martin Kao.
Q. Do you have a middle name?
A. I do.
Q. What is that?
A. Yueshan.
Q. Could you spell that, please, for the court reporter?
A. Y-u-e-s-h-a-n.
Q. And do you go by any other names, Martin?
A. I do not.
Q. Okay. And can you tell me where you're located right now?
A. Yankton, in federal prison.
Q. Where is that?
A. South Dakota.
Q. And previously you were incarcerated in some other facilities, correct?
A. Correct.
Q. And which were those?
A. Sheridan, Oregon; Herlong, California; Victorville, California; and it's either Oklahoma City or something Oklahoma. I'm not sure.
Q. Okay. Have you ever had your deposition

taken before, Martin?
A. I don't know. The reason I don't know is because I've had a deposition before, but I just took the Fifth. I'm sure you're aware of that. So I don't know if that counts as a deposition or how you classify that.
Q. Yeah, that answer is fine.
When you were deposed and you took the Fifth, was it one time or multiple times?
A. I don't remember.
Q. And were each of these -- was this deposition or if there were multiple, each of these depositions in which you pled the Fifth, were those all related to the criminal investigations related to the PPP or the campaign contribution cases that were brought against you by the United States government?
A. Okay. So the deposition was taken with -- I forget the guy's name now. It was for the arbitration. I don't remember his name. Yeah, I forget his name.
Q. I see. So you were deposed in the arbitration, you pled the Fifth either to all or most of the questions, and that is the only time that you can recall being deposed. Is that

accurate?

A. I was questioned ad nauseam, and it's too much to articulate even or sum up, evidence related to my criminal investigation by the Department of Justice and FBI agents. I don't know if that's a deposition or inquisition or whatever. I don't know what the difference is.

Q. Okay. You mentioned your criminal investigation. There were a few different criminal investigations, correct?

A. Yes.

Q. Could you list them each for me or describe them to me?

A. The PPP loan was the first, and then the next one was the campaign finance violations. And then the last one was -- it wasn't an investigation; it was an indictment that I think was more vindictive than anything. It was mortgage fraud.

Q. And what's the status of that mortgage fraud indictment currently?

A. It's over, as far as I know.

Q. Okay. For today's deposition, did you do anything to prepare?

A. No. I'm in prison. I can't do anything.

Q. Okay. Very quickly. Our time is short

today, so I'm going to give you some general guidelines for the deposition, but I'm going to go quick. They're going to be abbreviated.

The two big ones, Mr. Kao, is because there's a court reporter who's writing down everything we say, for her benefit I ask that only one of us speaks at a time. So if I'm still asking a question and you know the answer, please let me finish before you give the answer. Conversely, if you're speaking, I'm going to wait until you finish before I ask my next question.

A. Okay.

Q. And then the second instruction is, you know, you've been put underneath oath here, so you're obligated to tell the truth.

Do you understand that?

A. Yes, sir.

Q. Okay. And I understand that we have limited time and that you need to be finished by 11:00 a.m., Hawaii time, which is roughly four hours from right now; is that correct?

A. Probably a little before that. I have to walk back to my cell for chow. If I'm not there, it's a big issue.

Q. Understood. So as we get close to the

time when you need to leave, if you would give me like a 30-minute warning on that, I would appreciate that, and I think that would help us.

A. Absolutely.

Q. Okay. I'm going to ask you about your educational background first, Mr. Kao. Can you please tell me each degree you hold from the college level or higher?

A. Bachelor's of Science in Accounting and Master's of Business with emphasis on tax, taxation.

Q. Where did you get the BS in accounting from?

A. University of Southern California.

Q. What about the master's?

A. University of Southern California.

Q. Do you have any other advanced degrees or just those?

A. Just those.

Q. Okay. And then can you list any professional licenses you've held in your career, in your life?

A. CPA, certified public accountant.

Q. Any others?

A. No.

Q. Are you still a certified public

accountant?
A. I'm not.
Q. And was that -- why not?
A. You have to -- there's a lot of requirements. It's not just passing the exam. There's a lot of work requirements and continuing -- I forget the term. It's not legal education but some kind of education you have to do every year to maintain your license, and so work experience. So I didn't do any of that.
Q. So you voluntarily gave it up, for lack of a better phrase?
A. I don't think I gave it up. I just never pursued it.
Q. When did you stop being a licensed CPA?
A. I don't know that I was actually licensed. I don't know. I never used the license. I worked for an accounting firm, but that was a long time ago.
Q. Okay. Before you went to work for Navatek, when Steven Loui was in control of Navatek, what jobs did you hold in the years prior to that?
A. I was a -- you want after college, right?
Q. Correct.
A. Okay. I worked for public accounting

firms in the time -- I was a -- tax consultant is what they called it.

Q. Which public accounting firms did you work for?

A. Ernst & Young; Deloitte & Touche, yeah Deloitte & Touche, which is Deloitte now; and Pricewaterhouse.

Q. Which one of these were you working for when you met Steven Louie?

A. Pricewaterhouse -- sorry, I take that back. When I -- does it matter? I don't want to waste time talking about when, how I met him, but it's a long story, how I met him.

When I moved to Hawaii, I worked for Ernst & Young, and I think I may have met him at some event when I was working there, but ultimately he became a client of Pricewaterhouse.

Q. I see. Were you the specific consultant who worked for Steven Loui or for his company?

A. Yes.

Q. And how long did you have that business relationship with Steven Loui, with Navatek before you went to work for Navatek?

A. I don't remember. A few years.

Q. A few years. Okay. And what year

approximately, to the best of your recollection, did you go to work for Navatek?

A. 2008.

Q. And you worked for the company up until in or around the end of 2020, correct?

A. Correct.

Q. Do you recall what year you became the president of Navatek and then changed the name to Martin Defense Group?

A. 2020.

Q. And am I correct that your title was president? Or did you go by a different title once you completed the agreement with Steven Loui and obtained an interest in the company?

A. That's correct.

Q. Okay. I want to ask you some questions about your current ability to communicate with others.

So currently, what abilities do you have to communicate with people outside of Yankton?

A. I can use the group facility protocols, which is an inmate email system, and the wall phones here. They have to be approved, and what is on -- whether or not that has to be upon the approval list.

Q. So you do have an email address, correct?
A. I do not.
Q. So you don't take advantage of the inmate email system that you mentioned?
A. It's not an email address. It's like a cryptic way of saying hello, I love you, or -- it's not what you think it is.
Q. So they're like short messages, not emails?
A. No, definitely not emails. They're not -- you can't forward, you can't -- none of that.
Q. I see. And you mentioned there's a phone system as well, correct?
A. Correct.
Q. And so if somebody wants to call you, how would they go about doing that?
A. Impossible. No one can call me.
Q. So, Martin, it's not possible for anybody to call you. You have to call them, correct?
A. Correct.
Q. Okay. How often do you make calls? Let's say in the last three months, about how many times have you called somebody?
A. Once or twice a week.
Q. And who have you called?

A. My parents. I check up on them once a week. And my wife.
Q. Other than your parents and your wife, have you ever called anybody else since you've been at Yankton?
A. Mr. Kiuchi.
Q. Other than your parents, your wife and Mr. Kiuchi, have you ever called anybody else?
A. No.
Q. Have you had any visitors at Yankton?
A. Yes.
Q. Who has visited you?
A. My wife and kids.
Q. And when was the last time they visited you?
A. The end of June.
Q. Has anybody else visited you?
A. They tried, but I turned them down.
Q. Who is that?
A. Reporters.
Q. Anybody else other than reporters?
A. No.
Q. And then same question for the other facilities. You mentioned Sheridan, Herlong, Victorville and the Oklahoma facility.

Has anybody visited you at any of those facilities besides your wife or your parents and your kids?
A. No.
Q. And have you communicated on the phone with anybody else other than your wife, your parents or Mr. Kiuchi at any of the other facilities by phone?
A. No.
Q. How long is your current sentence, Martin?
A. 87 months.
Q. And can you tell me briefly what you understand you were sentenced for?
A. I've got two concurrent sentences. One is for the PPP loan, and the other is for illegal campaign finance contributions.
Q. And for both of those sentences, you pled guilty, correct?
A. Correct.
Q. And as one of the terms of those pleas, you essentially did not contest certain of the allegations made against you, correct?
A. Correct.
Q. And those were all memorialized in sentencing memos or letters from the Department of

Justice which you signed, correct?
A. I don't know.
Q. But it's accurate to say that there were sets of facts that were presented to you by the government, and as part of your plea, you agreed to those facts, correct?
A. Correct.
Q. Okay. I want to ask you now about some of the things that you said and told people while you were at the company, and these are things that company employees have told me you said. These would have been things that you said in 2019 and 2020 or before that time when you were still with the company.
So the first is company employees have told me that you frequently told them that you had three brothers.
Do you have three brothers?
A. I do not.
Q. Did you tell people that you had three brothers?
A. I did, I did.
Q. Okay. So that was a lie?
A. Correct.
Q. Okay. Company employees told me that you

have a brother named Chris who lives in Beverly Hills.
Do you have a brother named Chris who lives in Beverly Hills?
A. No.
Q. Did you have a brother named Chris who lived in Beverly Hills at any time?
A. I just told you I have no brothers.
Q. Okay. So that was another lie that you told people?
A. Correct.
Q. Company employees told me that you showed them pictures of a mansion in Hollywood that was decorated for Christmas. You said it was your brother's mansion.
Since you don't have a brother, that would have been another lie, correct?
A. Correct.
Q. And where did you get the pictures of the mansion from that you showed people?
A. I don't recall.
Q. But you did show --
A. I don't recall.
Q. I'm sorry?
A. I don't recall. I don't recall a picture.

Q. Do you recall that you showed people pictures of a mansion in Hollywood?
A. I do not.
Q. Do you dispute or disagree that you did that?
A. All I can say is, like I told you, I lied about having three brothers. So how do you want to get into the nuances of what was shown and what wasn't? The fact is it's all fabricated.
Q. Very similar question. Company employees told me that you claimed that your brother Chris in Hollywood was friends with Denzel Washington.
Do you recall telling people that?
A. I do not.
Q. If you did, that would be another lie, correct?
A. Correct.
Q. Company employees told me that you told them that Chris purchased Denzel Washington's Mercedes G wagon and later gave it to you to drive in Honolulu.
Do you recall telling employees that?
A. I do not.
Q. Do you dispute --
A. I purchased Denzel Washington's G wagon.

Q. You did personally?
A. Personally.
Q. And how is it that you came to purchase Denzel Washington's G wagon?
A. It was on eBay.
Q. And did you ever tell company employees that you knew Denzel Washington as a result of that eBay transaction?
A. I don't recall.
Q. Do you dispute that you told company employees that?
A. I don't dispute or affirm it.
Q. Okay. And company employees also said that you told them that you had a brother who lived in New Jersey who died by suicide in 2019.
Do you recall telling people that?
A. I do not.
Q. If you did tell people that, that obviously would be another lie since you don't have brothers, correct?
A. Correct.
Q. Okay. Because you don't recall, you said you dispute telling people that or you just don't remember that one?
A. I don't remember.

Q. Okay. Company employees have told me that you frequently told them that your brothers were adopted by your parents after you and your brothers' parents died in an automobile accident.

Do you remember telling company employees that?

A. Can you say that again?

Q. Yes. Company employees told me that you claimed that you were adopted, you and your brothers were adopted when your biological parents died in an automobile accident.

Do you recall that?

A. No.

Q. So you have no recollection of saying that?

A. No, not at all.

Q. If you said that, that would be a lie? That's not true?

A. Yeah, I'm not adopted.

Q. Company employees have told me that you claim that your brother who lives in New York is a successful Wall Street stock trader.

Because you don't have any brothers, that is also a lie and not accurate, correct?

A. That's correct.

Q. Do you recall telling company employees that?
A. I do not.
Q. Company employees have told me that you claim that your sister is a founder of the company Lululemon.
Do you have a sister?
A. I do.
Q. Is she a founder or co-founder of the company Lululemon?
A. No.
Q. Do you recall telling people that your sister was a founder of the company Lululemon?
A. I do not.
Q. Do you dispute that you told people that?
A. I have no recollection of it.
Q. And so if you did tell people that, that was a lie, correct?
A. That's an if question. I can't answer an if question.
Q. Well, it's not true that your sister founded Lululemon, that's correct?
A. That's correct.
Q. Okay. Company employees have told me that you claimed you were the great-grandson of Chiang

Kai-shek.

Are you the great-grandson of Chiang Kai-shek?

A. It's questionable.

Q. So you believe there is a chance that you're the great-grandson of Chiang Kai-shek?

A. Yes.

Q. You do recall telling people that, then?

A. I never told anybody that. It was something that we had -- anecdotally, I mentioned my lineage.

Q. Company employees have mentioned to me that you claim that your father invented a postal sorting bar code technology used on U.S. mail envelopes.

Do you recall telling company employees that?

A. I do not.

Q. Company employees have also told me that this invention by your father is what made your family so wealthy.

Do you recall telling people that?

A. No.

Q. Did your father invent a postal sorting bar code technology used on U.S. mail envelopes?

A. He didn't invent it, but he worked at a company that did. He was one of the engineers.
Q. And is he credited with that invention?
A. No.
Q. Did he work on it in any way?
A. I don't know what his -- the details of what he did at work.
Q. So he worked for a company that invented some kind of technology, and that's the extent of your knowledge of his relationship to that invention?
A. Correct.
Q. And if you had told employees that he invented this technology, that would not be accurate, correct?
A. Correct.
Q. Employees also told me that you claimed that your mother was a university professor. Was your mother a university professor?
A. Yes.
Q. What was she a professor of?
A. Chinese history.
Q. At what university?
A. I don't know the name. It was in Taiwan.
Q. You did tell people that you held a law

degree. Is that correct?
A. Correct.
Q. And if I recall correctly and if what employees have told me is accurate, it was a law degree from UCLA. Correct?
A. Correct.
Q. And you even included this on your résumé to the company, correct?
A. Incorrect. Absolutely false.
Q. Did you include it on your résumé at any time?
A. Never.
Q. Did you represent to the company at any time that you held a law degree from UCLA?
A. Never.
Q. But you did tell people in the company, employees and others, that you held this law degree from UCLA, correct?
A. I'm not sure I could say that's correct. I never told anybody that. They formed their own conclusions based on -- I have no idea what they formed it on, but I never denied it. That would be the most accurate.
So the point being was I deceptive about it? Yes, I was.

Q. A moment ago I asked you about the mortgage fraud indictment. Is it correct that the allegations in that indictment were generally that you falsified information on a loan by Bank of America to acquire your Kahala home?
A. Please repeat that.
Q. Sure. A moment ago I asked you about the mortgage fraud indictment. You told me that that indictment is basically over and you thought it was vindictive, correct?
A. Correct.
Q. What were the general allegations of that case, meaning what were you alleged to have done and in what context?
A. It was -- they found a doctored statement within Bank of America's -- I'm sorry. They found an altered bank statement within my emails that they concluded was used to obtain a mortgage for the Kahala house.
Q. What was the alteration on the bank statement?
A. I don't recall the details, but it was obviously to inflate the value of that account.
Q. Was it that the value of the account was altered? Instead of showing $400,000, it showed

$4 million?
A. I don't remember.
Q. Was there an altered bank statement in your email?
A. There was an altered bank statement that was submitted to Bank of America for purposes of obtaining a working line of capital.
Bank of America was the same lender for the mortgage. I already received the mortgage before that fictitious document was created, and obviously they were linked by the Justice Department.
Q. Because the mortgage had already been obtained by you before that email or before the creation of that altered document, is that why the case and indictment are, as you said, over?
A. I don't know why -- I don't know why. I can't speak for that.
Q. This altered or doctored bank statement that we're discussing, did you alter it or doctor it?
A. I did.
Q. And what was the purpose or what was your goal in altering or doctoring that bank statement, inflating the size of the account?

A. To try to obtain a working line of capital with Bank of America.
Q. Did you obtain that working line of capital?
A. I did not.
Q. When did you doctor this statement?
A. I do not remember.
Q. Do you have any basis or way of ballparking it for me, estimating it?
A. It would be really speculative.
Q. That's fine. I don't want you to speculate.
But clearly it was prior to 2020 -- in 2020 or prior, correct?
A. Correct, correct.
Q. And you agree that doctoring a bank statement and providing it to a lender for the purposes of obtaining a working line of capital is another lie or instance of dishonest conduct?
A. Yes.
Q. And then same question for both the campaign finance allegations to which you pled guilty and the PPP allegations to which you pled guilty, which we'll get into in a little more detail later.

But both of those are instances of dishonest and fraudulent conduct. Do you agree?
A. Yes.
Q. Company employees have told me that you claim that as a child, you sold newspapers for members of the Blood and Crips gangs.
Do you recall saying that to company employees?
A. I do not.
Q. Do you dispute that you said that to company employees?
A. I don't dispute it or affirm it.
Q. Do you -- is it true? Did you sell newspapers for members of the Blood and Crips gangs?
A. No.
Q. So that would be -- I think you said it would be another instance of a lie.
A. Correct.
Q. Company employees have told me that you told people that you earned money in college by taking SATs for other students.
Did you earn money in college by taking SATs for other students?
A. Not in college.
Q. At what point in your life did you take

SATs for other students to earn money?
A. In high school.
Q. How many times did you do that?
A. I don't remember.
Q. To the best of your recollection, to ballpark it, was it more than once?
A. It was more than once.
Q. Do you think it was more than ten times?
A. No.
Q. So somewhere between two times and ten times?
A. Yeah, I think that's the math, but I don't remember at all.
Q. Do you recall how much money you charged for the service?
A. I do not.
Q. Do you agree that this is another instance of dishonest and fraudulent conduct?
A. Yes.
Q. And at the time you were doing that, did you know it was wrong and against the rules?
A. Yes.
Q. Company employees have told me that you claimed that you got into a fight with a woman in the Kahala Mall parking lot, the police were called,

and your son was taken briefly by Child Protective Services.

Did that happen? Is that true?

A. I don't think it was Child Protective Services, but he was taken for a moment by the police.

Q. And was it after you got into a fight with a woman in the Kahala Mall parking lot?

A. It was an argument.

Q. What was that argument over?

A. She threw her keys at my car.

Q. Why did she do that?

A. She was angry.

Q. Why was she angry?

A. I had parked -- she had parked in a handicap spot next to my car. She opened her door, hit my car door. I was in my car, so I got out and confronted her for opening her door into my car, and we got into a verbal argument.

Q. Were you also parked in a handicap stall?

A. I was not.

Q. Were you arrested?

A. I was not.

Q. Was she arrested?

A. No.

Q. Okay. I want to ask you about Cliff Chen. Are you familiar with Cliff Chen?
A. Yes. I know who he is. I don't --
Q. Sorry. Go ahead. Sorry, Martin. We spoke over. There's probably a little bit of lag with the internet. I'll ask the question again for the court reporter.
Do you know Cliff Chen?
A. Yes, I do.
Q. I'm just going to call him Cliff throughout this depo. Do you understand that? Is that okay?
A. That's okay.
Q. How do you know Cliff?
A. He was the chief financial officer for Navatek for a period of time and then Martin Defense Group.
Q. How were you first introduced to Cliff Chen?
A. Through a headhunter.
Q. And would that have been shortly before he was hired by the company in January of 2019?
A. Yes. It would have to be, yeah. I don't remember when he was hired, but I interviewed him, spoke with him before he was hired.

Q. I believe Cliff told me that when he was interviewed, he was interviewed by you and a gentleman named Fitch. Is that correct?
A. Correct.
Q. Who was Fitch?
A. Fitch was a person that worked for the company.
Q. What was Fitch's name, first name?
A. Jeff, Jeff Fitch.
Q. Cliff told me that at some point, you fired Jeff Fitch from the company. Is that correct?
A. Correct.
Q. Why did you fire Jeff Fitch?
A. I asked him to resign. I wouldn't say I fired him, but I asked him to resign because there was a lot of animosity towards him by the other employees, and it became a nonproductive working environment with him. It was -- yeah.
Q. When did you last communicate with Cliff Chen?
A. I don't remember.
Q. So to the best of your recollection, the last time you communicated with Cliff Chen, was it face to face, or would it have been over the phone or text message or email or some other medium?

A. When you say "communicated with him," what do you mean by that?
Q. Communicated with him in any way: exchanging information or messages or talking to him, whether in person, over the Internet, as you and I are doing now, text message, email, any method of communication.
A. So when I was -- after I was arrested and then released, I was given a conditions of release which included a no contact list, and that included a lot of people, one of which was Cliff. So I never communicated with him directly since that point.
Obviously he was still the chief financial officer for the company, so there were indirect communications to him probably from others within the company.
But I never saw him since. No, I take that back, I take that back. I ran into him one time trick or treating, and I said hi.
Q. That was after you were released from prison?
A. Correct.
Q. Okay. So sometime after you were arrested in late 2020 but before you were sentenced a few years ago?

A. Correct.
Q. Okay. You mentioned that Cliff was the CFO under you. If you recall, how long was he the CFO?
A. When was he hired, again?
Q. I believe it was January of 2019.
A. So from that date until Steven fired him. I don't know when that is.
Q. Can you describe to me what -- I want to ask about what the duties are of a CFO, and I want to do it in two ways. First, I want to ask a question of you generally, what is it that you understand a CFO does for a business like Martin Defense Group; and then I'm going to ask you the question what did Cliff do.
So let's first start generally. What are the job duties of a CFO for a company like Martin Defense Group?
A. So my expectations of Cliff in that role as the CFO were someone that could -- someone that could help grow the company, raise capital and manage the finances in a way that was commensurate with my growth objectives.
Q. Did he have responsibilities with respect to the company's financial health or books?

A. Yes. I would say yes.
Q. And what were those?
A. He was -- I expected of him to be aware at all times of opportunities to increase growth, opportunities to raise capital, whether through debt or some other means. Even financing and expansion, budgets, whatever else we needed to do on a high-level financial perspective in our expansion across the continental U.S.
Q. As the company's chief financial officer, if there were irregularities in the company's books or accounts, was Cliff Chen the manager who was ultimately responsible for those?
A. Yes.
Q. Was Cliff Chen the company manager who was ultimately responsible for the company's financial reporting?
A. Yes.
Q. Was he ultimately responsible to manage the company's financial health?
A. No. I think that would be a shared role of the executives.
Q. So it was -- sorry, go ahead.
A. Sorry. Yeah, between Cliff Chen, myself and others on the executive management team.

Q. Who were the others on the executive management team?
A. They changed over time, but in general, they were Scott Eric Schiff, Michael Schmicker, David Kring, and there was a time when it was a woman named Ann Chung and a guy by the name of Troy Keiper.
Q. So I'm going to repeat this back to you. Kring, Troy Keiper, Ann Chung, Mike Schmicker. Did I miss anybody?
A. Eric Schiff.
Q. Eric Schiff. And this is from the period of 2019 to 2020?
A. Yeah. All those people, with the exception of Dave Kring and Ann Chung, preceded me at the company and worked for Steven Loui for decades, and their role as chief members of management inevitably rolled over and continued throughout.
Q. And then obviously Cliff Chen was the other one that we discussed.
A. Right. Correct.
Q. Cliff was not part of the company under Steven. He did not roll over, as you said, correct?
A. Correct, he did not.

Q. And so was Cliff more trusted by you in 2019, 2020 than any of those others since he was a holdover from Steven Loui's time?

A. I trusted Cliff, but I would say my greatest confidante there was Michael Schmicker.

Q. I've been told Mike Schmicker was essentially retired by 2019 and that he was just working as an independent contractor for the company. Is that accurate?

A. That is not accurate.

Q. What was Mike Schmicker's position at the company when you were there in 2019 and 2020?

A. He was basically the head of our political affairs operations, everything we did politically. He did the same for Steven and was actually my mentor for all things on Capitol Hill: lobbying; Washington, D.C.; earmarks; local finance donations. His position was varied in that respect, in every respect when it came to politics.

And I just viewed him as someone that helped me grow the company when I needed someone the most, and he taught me how to do all these things. And he stayed on that role until -- I guess until I was arrested.

Q. I've reviewed hundreds, if not thousands

of emails from this time period, many of them about this exact topic, the political activities of the company in Washington, D.C., and I've noticed that on many of these emails, you were oftentimes involved. Other names that come up frequently are Duke Hartman, Andy Winer, other third-party lobbyists, to a certain extent Cliff Chen.

Michael Schmicker is not on any of these emails. Can you explain that?

A. I can't explain what you reviewed, but I can assure you that he's on a lot of emails. And I've seen those emails, studied them word for word ad nauseam with the Department of Justice, and I'm sure you've seen some of those too. But he was the master architect of the donations with the Society and even the coverup after.

So that's just not an accurate statement.

Q. I've seen emails where he worked on a PR plan for the Society. Is that what you're referring to?

A. A PR plan?

Q. That's right. A public relations plan.

A. That was -- this exercise, I want to step back just a little bit if you allow me to. This exercise of a deposition, I now view and take very

seriously. I understand the levity of telling the truth. And I do believe that it should serve as a compass for getting to the truth.

So if you look at the question you just asked about this plan, you'd have to look at it in the context of -- I believe -- I think we're referring to the same thing, which is his -- he came up with this list of who was going to do what, donations to universities, press releases.

Is that the one you're referring to?

Q. We'll take a break shortly, and I'll find the email. We'll look at it together.

A. Okay. My point being is that you have to look at the date in which he wrote that. It was clearly -- I went through this with the DOJ. I went through it ad nauseam. It was after the FEC investigation started, and it was this giant scramble by the company and all its executives -- you can see all the people copied on the email who played a role -- to cover up the improprieties of the fictitious Society that we created.

Q. And when you say they covered it up, specifically what was being covered up was the donation of $150,000 by the Society to an entity called 1820 PAC; is that accurate?

A. It's not the donation that was being covered up. It's the fact that -- let me step back a little bit.

So, as you know, I was indicted for the illegal campaign contributions, including one of $150,000. You're aware of that, obviously.

What makes it illegal -- and this is something that was beaten into my head and something I had to live with for five years, going through every piece, excruciating piece of discovery with my attorney in D.C. and the DOJ.

What makes it illegal is the fact that -- it's not that the donation from a super PAC is illegal. It's the fact that Navatek is a government contractor, and a government contractor cannot donate to a campaign or a PAC, is my understanding, or a super PAC, for that matter.

So the amount of time I had to spend listening to the Department of Justice beat it in my head that they had every piece of empirical evidence that showed me, point by point by point by point by point, why this entire facade that the company created was a strawman, it's a strawman. We created a fake entity that was a strawman that made this donation in order to cover up and create this

conduit contribution, illegal conduit contribution made by the company.

Everything after that point was completely -- it's completely fictitious. The company's fake, the Society's fake, Jennifer Lam is a fake person. Every decision that was made to create that organization was done by myself and Cliff Chen and Lawrence Lum Kee -- I don't know if you remember that name, an employee with that name -- and other executives in the company.

Q. This plan, coverup that you're discussing, is it accurate that Lawrence Lum Kee and Cliff Chen, along with yourself, were the three most critical operators of this plan and the three people that did the most to enact this plan?

A. As far as the decision to make the donation, that was -- that was a very high level. That was done by consultation with Mike Schmicker, obviously myself. I wouldn't say so much Kahele. It also even included Steven Loui in that decision and David Kring, because he operated the main office. He was more peripherally involved.

But the decision to make the donation, in order to placate Susan Collins, was a decision by Steven Loui, myself and Mike Schmicker and Cliff.

The execution of that, in terms of setting up the company, the operating agreement, whatever -- opening the bank accounts, everything else, that was all done by, yes, the three of us: Cliff, Kahele and myself.

Q. And just to be clear, when you say "Kahele," you're referring to Lawrence Lum Kee?

A. Yes. Sorry.

MR. KIUCHI: Grant, I want to put this on the record. You've been going back and forth between -- you're now going through campaign contributions. I'm not going to object to that, but then I'd also like the right to use that to defend Martin on behalf of the Society.

MR. ALLISON: Okay. Keith, I'm not agreeing to that. This isn't an objection, and it's not an appropriate statement to make on the record during this deposition.

MR. KIUCHI: I'm going to make the statement on the record.

MR. ALLISON: You can make arguments to the Court all you want. This is a deposition.

MR. KIUCHI: The deposition today is supposed to be of Martin and not in his capacity as the representative of SYWSE.

MR. ALLISON: This is not a deposition in his capacity as a representative for the Society. This is his personal deposition. He has personal knowledge. I can ask him these questions. There's nothing improper about it. Unless you have an objection --

MR. KIUCHI: I made the objection.

MR. ALLISON: That's not a properly formed objection.

MR. KIUCHI: I disagree. I'll put it on record.

MR. ALLISON: Sure.

Martin, we've been going just about an hour. Let's take a five-minute break. We'll give the court reporter a break and everybody can use the restroom. So we'll be back in five minutes.

THE WITNESS: Okay. I can't leave this room, so --

MR. ALLISON: Let's go off the record.

(A brief recess was taken.)

BY MR. ALLISON:

Q. Martin, we're back on the record. All the same rules apply. You're still under oath. Do you understand?

A. Yes.

Q. We were talking about Cliff Chen a moment ago. I want to ask you some more questions about his role with the company as CFO in 2019 and 2020.
Who was Cliff Chen's boss during that time?
A. I'm sorry, can you say the timeline again?
Q. 2019 and 2020, when Cliff Chen was the CFO, who was his boss at the company?
A. It was myself and Steven Loui.
Q. How was it that Steven Loui was Cliff Chen's boss?
A. Steven Loui was the chairman of the company, so Steven was my boss as well as Cliff's. Steven Loui was the hundred percent shareholder of Navatek. He was everybody's boss.
Q. Well, what about after you completed the deal with Steven Loui to become the 99 percent owner of the company's profits?
A. After that, he reported to me.
Q. So once the company, let's say, changed its name to Martin Defense Group, you were Cliff Chen's boss?
A. Correct.
Q. And what was Steven Loui's role with Martin Defense Group?

A. Steven, on title, was chief scientist, something to that effect. I don't remember exactly. But his primary role was a creative role by me as part of his -- basically as part of the deferred purchase plan where we were able to secure through our donations to Susan Collins about 16 to $20 million in government funding from the State of Maine for Steven Loui's projects, and he worked as the senior engineer on those two projects, building his boats.

Q. Was Steven Loui still the chairman of the company when it was Martin Defense Group?

A. On title, no, he was not.

Q. In fact, you fired Steven Louie in your role as president of Martin Defense Group, correct?

A. As an employee, yes. I fired him as an employee.

Q. Why did you fire him as an employee?

A. He was doing things that I thought were illegal and unethical.

Q. What, for example?

A. He was using these government contracts as basically a slush fund for charging his time building his personal boats, not working on projects or doing government work but still charging his time

to the government, offsetting his other projects with the repair and maintenance of his other endeavors at the shipyard with Navatek employees, having them charge time to the contracts for the State of Maine.

Q. Do you have evidence -- sorry, go ahead.

A. Do I have evidence of those?

Q. Yeah. Do you have evidence to support these allegations?

A. I don't have evidence. I have nothing in prison, but certainly you can go back and look at the books and see all of this.

Q. Did you have evidence of these allegations or to support these allegations prior to when you went to prison?

A. Yes.

Q. Did you present this evidence to anybody?

A. Yes.

Q. Who did you present it to?

A. Cliff Chen, David Kring, even a couple people -- I forget their names now -- contracts, officers at the Office of Naval Research, other engineers within the company.

Q. Did you present this evidence to any law enforcement or administrative government bodies or

investigators?
A. Office of Naval Research.
Q. Was Steven Loui ever investigated for these things?
A. Not to my knowledge.
Q. Was Steven Loui ever charged with any crimes related to these allegations?
A. Not to my knowledge.
Q. And so despite reporting it to the Office of Naval Research, the Office of Naval Research did not file any charges or start any investigations into these allegations?
A. That's not what they do. That's not what the Office of Naval Research does. So they wouldn't file charges or investigate him for those reasons. They're just aware of his -- of his conduct.
Q. During any of the Department of Justice U.S. government investigations into your conduct related to the PPP fraud, the campaign contribution violations or the mortgage loan indictment, did you ever mention these things to any of the investigators for the government?
A. I did not proactively mention them -- mention it to them. They mentioned it to me. We discussed it.

Q. Did they ever charge Steven Loui or investigate him or open an investigation, to your knowledge?
A. To my knowledge, they opened an investigation but they were subsequently terminated after Donald Trump was elected, is my understanding.
Q. How do you have that understanding? Who told that to you?
A. My public defender in Washington, D.C.
Q. Going back to Cliff Chen, what is your impression of the job Cliff Chen did as CFO? Was he good at his job. Was he smart, hard-working, honest, lazy, qualified, unqualified? How would you describe him?
A. My opinion of him now or at the time? Is that -- or both?
Q. Yeah, let's start with what's your opinion of him now.
A. I think he was -- he overinflated what his abilities were. I don't want to be the pot calling the kettle black or be hypocritical, but certainly I can look back and see a lot of the things he represented were abilities within his background were not necessarily accurate as well as maybe questions in my mind in terms of his ethical conduct

and his other positions that he held previously.
Q. Okay. So it sounds like you just listed two things. The first was overinflated abilities and then the second was ethical conduct, correct?
A. Correct.
Q. Okay. So I want to ask you about both of those. We'll take them one at a time.
In terms of his overinflation of his abilities, can you give me specific examples or go into more detail about that?
A. One of the primary reasons I was interested in bringing Cliff onboard was his -- what he said was his relationships with -- it may have been Bank of America or EBS Financial, where he worked. I can't remember exact names of the banks -- but his ability to leverage the relationships to raise capital and create additional working lines of credit for us to expand, and none of those really materialized.
So that was the biggest thing that I thought was inconsistent with what he advertised on his résumé in terms of his background and relationships he brought in that capacity in the finance world.
And then your second question was?

Q. Before we move on, what about some of those other core job duties that we discussed earlier that a CFO has? How was Cliff's performance with respect to managing the company's financial reporting?

A. So Cliff is not an accountant by education or training. So financial reporting was more a function of what I would say was Kahele's job. And Cliff was more a strategic level in terms of helping to increase the top line and reduce, help reduce the bottom -- reduce -- increase the bottom line.

Q. Okay. How was his performance at doing that?

A. It's hard to gauge. It was such a short time that we were doing all this, and then his involvement through the whole thing blew up.

But to understand better, also, is we were a small company. Whether that's -- our perspective is relative, but we were a small company, we were growing. So no one had real clear, defined roles. It wasn't realistic for a company our size at that time. We were so dynamic and growing that it's tough to answer that question, what his role was.

Q. If you had to recount what were Cliff Chen's major accomplishments or successes in his

role as CFO of the company, what would you say?

A. I would say he helped to identify a lot of the -- well, I'll put it to you this way: I worked for Steven Loui for -- I'd known him for a while, even before 2008 when I joined the company.

And despite how he may feel about me, at this time, I had viewed Steven as a bit of a father figure. I respected him. I even admired his indiscretions and his lack of respect for following the rules. I do not have any animosity towards Steven.

Over time, when I added Cliff, he identified all the areas that I was -- to the point of being obsequious and would roll over on anything and everything he told me to do, including the way he was compensated, how much he was compensated, intercompany transactions, everything and anything else that was just from a business perspective wholly inappropriate.

And he, as a CFO, would say, we can't do this, we're running our own company, there are other members within management who are now complaining about how much deference I'd given Steven and his other companies in terms of financial latitude in not just projects, anything of donations politically

but even subcontracting to his other companies in order to flow money that direction.

And I was starting -- people were starting to lose respect for me for not standing up to Steven, and that's when this rift started.

So I would credit Cliff in a way for identifying -- because he didn't have the same history I had with Steven -- with identifying all of the improprieties of that relationship and in continuing to perpetuate it even after I took over the company.

He was a very bright guy, extremely bright in terms of analyzing company structures, coming up with very, very creative ideas for accomplishing certain objectives that I had, whether it's interpreting rules in a certain way, legal or otherwise.

But those are the things I would credit him with. He's a very bright guy.

Q. So the three things that you mentioned are that, one, he pointed things out to you that he felt were wrong about the way Steven Loui conducted his business and fractured your relationship with Steven; two, he was creative about thinking about businesses; and three, he was a bright guy.

Did I summarize that correctly?
A. He was a very bright guy and very -- he just was able to advise me on a lot of things that were beyond my acumen.
Q. At the time you took over the company and then changed its name to Martin Defense Group, would you consider the company to be a successful company at that time?
A. No, not at all.
Q. Was it making money at that time? Did it have positive net income?
A. No.
Q. Did it have negative net income?
A. Yes.
Q. So it was losing money at the time you took it over?
A. Correct.
Q. How much money did it lose in that financial year when you took it over?
A. I don't recall.
Q. Okay. Those were Cliff Chen's successes. What were his failures?
A. Looking back, I think his greatest failure was -- in my opinion, was failing to advise more definitively on what, in retrospect, was walking in

the gray and crossing the line.
Q. So if I understand you correctly, Martin, you're saying that Cliff didn't properly advise you when you or the company were crossing the line?
A. You can look at things different ways, right. You can -- I can talk in context of the PPP loan if that helps give you some understanding.
Q. Sure.
A. So we applied for the PPP loan, and the reason I'm sitting in prison now, based on what the Department of Justice classified as false information related to our payroll expenses for the tax year 2019 -- or, I'm sorry, the calendar year 2019 and payroll.
Whereas when we discussed -- when I discussed it with Cliff, we came up or he came up with the idea that the -- it's not so much what our payroll is -- was back in 2019, as the letter of law states, but what our payroll is now, how much of a PPP loan do we need to cover our payroll expenses now to weather the COVID storm.
So we were able to come up with a methodology, which we disclosed to our bank, disclosed to our lobbyists, disclosed to the lawmakers, and everybody was still trying to figure

this thing out. He came up with a very compelling strategy for using our current payroll expenses in our hiring plan in order to apply for the PPP loan.

I don't disagree with him to this day, even though I'm sitting in prison, that what he did was wrong. But I do -- if you ask me what I think about his shortcomings, it would be that he's a little too creative in that respect.

Q. Martin, it's true that you didn't just use the current payroll in those PPP applications, but you used a number of employees that simply weren't employed by the company at the time, that didn't exist; isn't that correct?

A. It's not that they didn't exist. We used cost pools. So we know almost to the exact dollar what our payroll expenses will be based on our government contracts for the next 12 months. So we know with absolute precision what and how many people we need to hire in order to perform on these government contracts.

So when we applied for the PPP loan, we included the payroll categories of these engineers, whether it's engineer 1, scientist 1, scientist 2, because we know for contract X, we have to have 5,000 scientist 1 hours; for contract 2, we need to

have 10,000 engineer 2 hours. So you can go back and do the math easily of a full-time engineer, 2,080 hours a year, and that's how many people we had to hire.

And the question was do we hire these people in light of COVID or do we rescind all these job offers. And we decided, based on my discussions with the actual lawmakers, should we hire these people, and the answer was absolutely we should hire them. We should create jobs during COVID, not terminate them, not rescind job offers. So we included these prospective payroll numbers on the actual PPP application.

So even though they were prospective, if you go back and look retroactively how the money was spent, we spent every single penny and then some, an excess of $3 million, I think, on payroll above the PPP loans we got.

Q. That's not really an answer to my question. I asked you, at the time that the company applied for those PPP loans, it did not employ the 400 or some employees that it claimed it did.

That's correct, right? That's accurate?

A. That's correct.

Q. And what you're telling me is that that

decision to submit the 400 employee number, which was not accurate, was largely based on the advice of Cliff Chen?

A. Well, stepping back, just to clarify your statement, he didn't employ all 400 but employed -- I don't know the exact number -- say half of that. So to characterize it as all 400 were fabricated is just not accurate.

The decision to include our prospective -- our current payroll numbers and prospective payroll numbers was a strategy, if you want to call it that, was a methodology that Cliff came up with, which we managed with the lawmakers.

Q. Did you or the company or Cliff ever ask an attorney who is specialized and knowledgeable in these matters for a legal opinion on this conduct?

A. There was no attorney on the planning that specialized in getting PPP loans.

Q. But certainly there are attorneys that specialize in reading and understanding federal legislation even as it's coming out?

A. I disagree. I disagree.

Q. So it's your testimony that at the time, there was no attorney in the world that you could have consulted with that could have given you advice

on whether or not it was a good idea or a bad idea to overinflate the number of current employees on the company's payroll for the purposes of obtaining a PPP loan?

A. I spoke to the actual lawmakers. Not an attorney, not a third party, the actual lawmakers on whether or not this was appropriate. And they said yes. So I don't know of an attorney on the planet better than that authority.

And when I say yes, it wasn't just yes, this should be done; it was yes, this is what the whole point of the COVID relief act is, to maintain and create jobs.

Q. Looking back, do you now think those lawmakers perhaps had other priorities, chiefly to have jobs created in their districts regardless of how it's done?

A. Whether those priorities -- I can't speak to their priorities, but certainly I would assume that the lawmaker would love to have high-paying jobs retained and created within their state while the whole world was in furlough and people were being laid off.

Q. I'm going to ask you about Cliff's compensation. One of the things that I asked Cliff

about when I deposed him was the more than $91,000 that he received in tuition from the Micky and Marty Kao Foundation for tuition for his children.

Are you aware of that?

A. Yes. I don't know the exact amount, but . . .

Q. And then Cliff admitted that the money was initially from the company and it was transferred from the company to the Micky and Marty Kao Foundation before being paid out for his children's tuition.

Do you agree with that? Is that accurate?

A. That is not accurate.

Q. So where did that $91,000 come from?

A. My parents.

Q. How much money did your parents give to the Micky and Marty Kao Foundation?

A. I don't remember. It was a loan from my parents to the foundation. It was in the millions.

Q. Was that loan paid back?

A. In part.

MR. ALLISON: Nelson, could we take a look at the document marked as No. 4 please.

(Deposition Exhibit No. 1 marked for identification.)

BY MR. ALLISON:

Q. We're putting a document up on the screen for you to take a look at, Mr. Kao. So just a second.

If you need him to make it bigger, you can just say so.

THE WITNESS: Is it possible to make it bigger?

MR. KWOK: Are you able to see this?

MR. ALLISON: Can you zoom in, Nelson, please?

MR. KWOK: Sure.

BY MR. ALLISON:

Q. So what we're looking at here, Martin, is an email from Cliff Chen to Mike O'Malley, dated May 7th, 2019.

Who is Mike O'Malley?

A. He is our corporate attorney from Goodsill Anderson.

Q. And in this email, Cliff says: "Mike, Martin wants to proceed with the loans from Navatek LLC to each of his foundations, (Navatek Foundation and the Marty and Micky Kao Foundation).

"I presume you have simple forms that we could use to document the loans."

One, is it true that you wanted Navatek to make loans to the Micky and Marty Kao Foundation?

A. That was not true.

Q. Were you aware of this email that Cliff Chen sent to Mike O'Malley saying this is what you wanted to do?

A. Yeah, this email is -- I believe it's in reference to -- I'm not copied on it. This was at a time when Uber, the car company, the rideshare company, was going public. So Merrill Lynch would allow each account holder to participate in the IPO for the Uber offering. There were several accounts, so each account holder can only get up to a certain allocation of shares.

So what we decided to do was, in order to participate in the IPO and get as many shares as possible for each of these foundations, we -- or each of the companies' affiliated entities or whatever, foundations -- is we would have a loan of $250,000 for each and then use that to buy Uber stock or participate in the offering.

So they weren't real loans. They were just loans for accounting purposes, all of which I'm sure -- I assume you would know were repaid and then some by me personally.

Q. When did you repay those loans?
A. Shortly after I was released from the last detention center.
MR. ALLISON: Nelson, can you put up document number --
Oh, sorry, Darcy, let's introduce this as Exhibit 1, please.
(Discussion off the record.)
MR. ALLISON: It was 4 for internal marking. This will be Exhibit 1.
Nelson, let's put up our document 3, please.
(Deposition Exhibit No. 2 marked for identification.)
MR. ALLISON: Could you zoom in, please, Nelson?
MR. KWOK: Sure.
BY MR. ALLISON:
Q. So what we have here, Martin, is our text messages from company phones, and on the left, you can see who it is from, and on the right, you can see who it is to.
And the very top one, you see is from Jeffrey Scott Fitch, and the person that it is to -- I believe that is Cliff Chen's phone number. But

you can tell me if you recognize your number as being somebody else's.

A. I have no idea who those numbers belong to.

Q. What I'd like to ask you about is in the second-to-right-most column at the top, under the header Body, Fitch says: "Before I forget to bring up tomorrow, can we use Micky and Marty Foundation to fund school for our employees (current and future). Would we be able to get them to agree to sticking with us for a term after graduation rather than taking it from projects out of our OH rate. Just trying to think of alternative ways to free up cash for us."

Was it Mr. Fitch's idea, original idea to pay tuition for their children as a way of freeing up company cash?

A. I don't know what Fitch was thinking or what he was trying to do here, but we did use the loan from my parents in the Marty and Micky Foundation to pay for the tuition of, I guess, Cliff and others as far as the philanthropic activity of the foundation. Cliff Chen and others. I don't remember who the others were. I think one of them might have been Troy Keiper.

MR. ALLISON: Take that down, please, Nelson.

BY MR. ALLISON:

Q. Did Cliff apply for these scholarships?

A. No, he did not.

Q. Did he ask for them?

A. He did.

Q. And who determined that they would be given to him?

A. I did.

Q. Did you consider it part of his compensation for the company?

A. I did.

Q. As a former tax consultant and CPA, do you consider that to be taxable income?

A. I do not.

Q. Cliff Chen's starting pay as of January 2019 was $200,000. Is that correct, to your recollection?

A. I do not recall.

Q. I'll represent to you, Martin, that it was $200,000 and that's what the company records show.

A. Okay.

Q. Cliff then received a number of pay increases, which I'll just read off to you. There

are three of them. Less than three months after he started, on April 1st, 2019, his pay was increased from 200- to $250,000. Then a year later, on April 1st, 2020, it was increased from 250- to 350,000. And then about six weeks later, on May 21st, 2020, it was again increased, from 350,000 to $400,000.

Does that match your recollection of his pay raises?

A. It does.

Q. So I want to ask you about these pay raises. First, a general question. Why did he receive such large pay raises over such a short amount of time?

A. I don't know the exact -- I can't recall the exact catalyst for why he received those raises, but what I can say is that as far as my understanding of him when he was hired was he asked for a salary of 450, around there, starting salary.

When he was first -- when I was interviewing him, I told him that that was not doable given the company's financial health. So he started in at 200-, and the caveat to that was, look, you're the finance CFO. At a point where -- the ball's really in your hands. If you can create

a company that is financially healthy enough to substantiate your compensation demands of 400- or whatever it was, I'm not going to oppose it.

And so even when these raises that you listed were approved, it wasn't so much that I got into the weeds of did you earn it; but it was more if you, as a CFO who's responsible for all the financial interests of the company, believe that these -- these pay raises are appropriate given our financial condition, then I'm not going to oppose it. That was the level of discretion and authority I gave him.

Q. I see. And that pay raise on May 21st, 2020, the one that raised him from 350- to 400,000, that was dependent, as you say, on him helping to create a company that was financially able to pay its CFO such a large amount, correct?

A. Correct.

Q. And was part of the company's ability to pay a CFO 350- or increasing to $400,000 in May 2020 -- was part of that receiving the PPP loans and that influx of cash?

A. I know the PPP loan certainly helped increase our cash position, and given that we had now working capital or the PPP loans -- the company

never really had a safety net of cash, if you will. So that was always an issue, and whether that safety net was created by the PPP loans or some other way, I can certainly understand why he would feel it was appropriate to increase his compensation.

Q. Let me ask it a different way. Without the PPP loans, would Cliff Chen have received a raise to 350,000 or $400,000?

A. I don't know. I did not -- I did not get involved at that level to determine whether or not -- I left it to him.

Q. What do you mean by that, you left it to him?

A. Again, he's the CFO. If he believed that the company's financial health justified that level of compensation, I would not oppose it. I never got into the weeds of how did you come up with that determination, what makes you think that, show me the details. That's just not the way I managed.

Q. So you let Cliff Chen decide his own pay raises in April of 2020 and May 21st, 2020?

A. Yes, in a sense.

MR. ALLISON: Darcy, the last exhibit we looked at, can we mark that as Exhibit 2. If any counsel has any objection to that, I'll bring it

back up on screen and introduce it.

MR. KIUCHI: I don't have an objection.

MR. ALLISON: Nelson, can we take a look at the document we marked as Exhibit 5 -- sorry, document 5.

Darcy, this will be the next exhibit in order.

(Deposition Exhibit No. 3 marked for identification.)

BY MR. ALLISON:

Q. So, Martin, I'm just going to show you the internal paperwork for each of these raises. This would be the first one. And if you notice, in the upper right-hand corner --

MR. ALLISON: Nelson could you zoom in a little bit for us, please.

BY MR. ALLISON:

Q. Notice in the upper right-hand corner, it's dated April 1st, 2019, and on the left, it says "Clifford Chen"?

A. Yes.

MR. ALLISON: Could you scroll down, please, Nelson?

BY MR. ALLISON:

Q. Okay. And there in the middle, you see

some information about the pay raise. Under the word "Remarks," it says 200,000 to 250,000.

But what I want to ask you about, Martin, is that at the very bottom, it says "Recommended By" and "Approved By Martin Kao."

So how do you square your testimony that you let Cliff Chen decide these things when the pay raise was recommended and approved by you?

A. This is a perfunctory document. It means nothing. That's the way -- only way I can explain it. I don't even look at this thing when I sign it.

Q. Okay.

MR. ALLISON: Can we take a look at our document 6?

And, Darcy, we'll mark this as the next exhibit in order.

(Deposition Exhibit No. 4 marked for identification.)

THE WITNESS: Obviously, he would look forward, so he recommended his own raise, right.

BY MR. ALLISON:

Q. Martin, if it's a perfunctory document and you don't even look at it when you sign it, would it matter if he recommended his own raise? I mean, who -- let me ask it this way: Who is this document

for?

A. I don't know exactly who it's for, but I can tell you that most of these documents were created as a response to our government contracting protocols. So because every -- every expense of the company, every payroll amount, every dollar, every accounting transaction is reviewed by several government contracting agencies, as you can imagine, because we're a government contractor.

So from whatever the alphabet soup is, defense contract, management association, defense contract audit association, whatever it is, there's like four or five agencies that scrub through everything we do, come up with these documents that I don't really care to know about or understand from our accounting department. We sign them because when they get audited, they need to know who approved the raise, is this reasonable, internal controls, all the accounting stuff that has to be done in order for us to be compliant with government contracting requirements.

Q. So if this document that we're looking at here or the prior one or the next one we'll look at, for the third raise, if any of these documents listed that Cliff Chen recommended and approved his

own raise, that would likely -- these government auditing entities that you're discussing, they would likely take issue with that, correct?
A. I guess they would. I'm assuming they would.
Q. Was it a concern of the company -- was it a concern of yours that if you wrote on here that Cliff Chen recommended and approved his own raises, that that would create risk with the government and the company's ability to continue contracting with the government?
A. No.
Q. There would be no risk?
A. Was it ever raised to me? Is that the question?
Q. No. I'm asking was there risk? Was there risk that the government would take issue with Cliff recommending and approving his own raises?
A. Yes. It happened before. That's why.
Q. So then the point is that these documents that say you recommended and approved Cliff's raises, although you say they're perfunctory documents, they were for the purpose of fooling the government, correct?
A. It's not fooling the government. A lot of

these documents were created as a reaction to how things were done under Steven Loui's company or the way he operated the company.

So Steven Loui had a humungous salary, and he would approve his own raises, which became an issue, those raises, to the point where the Department of Defense prohibited him personally because his compensation was so excessive, even directly charging the government contract. So yeah, this document is -- is -- although it's perfunctory, it shows a purpose.

Q. And that purpose is hiding from the government the fact that Cliff Chen recommended and approved his own raises, correct?

A. He recommended his raise. I approved it. I have to sign off on it.

Q. Wasn't it contrary to what you testified a moment ago, that you stayed out of it and you let Cliff choose his own raises and you didn't pay attention to it? Isn't that what you said earlier?

A. Yeah, but I still have to sign this document.

Q. Okay. And by signing this document, you are effectively hiding from the government that Cliff set his own raise and went to you and approved

his own raise and that you didn't really review it, you just agreed with it, whatever Cliff asked for?

A. If he asked for a billion dollars, I would obviously disapprove it, but he asked for the number he asked for. I approved it.

Q. So in this instance, Cliff set his own raise. He set the amount that he wanted his pay increased by. And you approved it because you felt it was fine?

A. Correct.

MR. ALLISON: Okay. Could we take a look at the next document, Nelson, our document 7.

Darcy, we're introducing all these as exhibits in order.

(Deposition Exhibit No. 5 marked for identification.)

BY MR. ALLISON:

Q. All right. So, Martin, this is the third one. At the top, you can see the date is May -- the day it was submitted or dated is May 11th, 2020. And at the bottom --

MR. ALLISON: If you scroll down a little bit, Nelson.

BY MR. ALLISON:

Q. -- you can see that the date it was

approved by you was also May 11th, 2020, but the pay raise was effective May 21st, 2020.

Do you see those dates?

A. Yes.

Q. What I want to ask you, Martin, about is the PPP loans. The company received two of them, correct?

A. Correct.

Q. And the first one was a $10 million loan from Central Pacific Bank, correct?

A. Correct.

Q. And you may not recall the exact date off the top of your head, but I will represent to you that the money was -- the $10 million of PPP loan moneys was placed into the company's account in CPB on April 17th, 2020.

Does that sound accurate to you?

A. I don't know. I assume that's correct.

Q. And then the second loan was from Radius Bank, correct?

A. Correct.

Q. That amount was for $2,841,490, correct?

A. Was that 2 million 9?

Q. Essentially. I said $2,841,490.

A. Correct.

Q. And that money was placed into the company's bank account on May 4th, 2020. Does that sound accurate?
A. Yes.
Q. Okay. So Cliff's raises on April 1st and May 11th, 2020 correspond with the funding of these two PPP loans on April 17th and May 4th, 2020, respectively, correct?
A. Correct.
Q. So my question to you, Martin, is: Was Cliff given these raises as a reward or because the company had obtained these large essentially almost $13 million in PPP loans influx of cash? Was that what gave the company and you the comfort in approving Cliff's significant pay increases in April and May 2020?
A. I would -- yeah, I would say that the PPP loans or any other cash influx, by having a whatever, rainy day fund, it would give me comfort knowing that we could increase raises. I don't think it was just Cliff.
Q. I know from looking at the company records that Duke Hartman and Lawrence Lum Kee also received raises at about the same time. Correct?
A. That sounds correct.

Q. Did you also approve these raises for Cliff -- and also Hartman and Lum Kee, but let's just focus on Cliff right now, because they were also -- I'm sorry. I might have said Hartman. Let's just focus on Cliff right now.

Did you approve these raises for Cliff also because of the critical role that Cliff played in what you called the Society coverup earlier?

A. It's not the -- the correlation is not that he played a critical role in the coverup, but he played a critical role as a senior executive and orchestrating a lot of these strategic plans that we had, legal or otherwise, now clearly illegal.

Q. When Cliff was the CFO and the company was Martin Defense Group -- so this is the time period when Steven Loui was no longer chairman of the board and you were in control of the company -- would you have considered Cliff to be the second highest ranking executive at the company?

A. Yes.

Q. And that would be after yourself as the top ranking executive, correct?

A. Correct.

Q. And then who would you say was the third ranking executive?

A. Mike Schmicker.
Q. And in terms of who had the authority and power to bind the company and carry out your orders, would you say that Cliff was the main person who did that for you?
A. What kind of orders are you talking about?
Q. Well, specifically with respect to carrying out the PPP loan plan and fraud.
A. It would be Cliff and Kahele.
Q. Okay. And then specifically with respect to carrying out the Society coverup?
A. Who was primarily the approving authority on that?
Q. Who was the person that you trusted to carry out your instructions on the Society coverup?
A. Mike Schmicker.
Q. It wasn't Cliff Chen?
A. No.
Q. How did you communicate these instructions to Mike Schmicker?
A. He would come to my office and speak behind closed doors.
Q. Did you ever send him emails about these things?
A. I -- so again, this is about complete

honesty. So I don't believe I ever sent him -- I can't recall specific emails related to this that I sent to him, but I had conversations with him.

I recall at least two instances where he came to my office and handed me a piece of paper that had his comments and suggestions, and he did not want to send it to me via email.

Q. We've been talking about "the Society" throughout your deposition. Just to be clear, what we're referencing is the Society of Young Women Scientists and Engineers, correct?

A. Correct.

Q. So when I deposed Cliff, he testified that he had nothing to do with the Society. Do you agree with Cliff's statement?

A. I do not.

Q. Can you expand on your answer and explain to me what Cliff Chen's role with the Society was?

A. I don't have the specifics, but in general, I think that -- again, this -- I'm only speaking in the context of -- this isn't my -- I'm not some kind of legal expert or forensics expert. Everything I'm telling you is within the framework of what was presented to me in excruciating, painful detail by the FBI and the Department of Justice.

So you have to look at everything within a timeline. They created a very -- obviously, they're perfect at what they do. They created a perfect timeline of when things happened. And if you haven't done that, I would recommend that you do that. And you'll see what was done and who did what. There was no hiding, there was no obfuscating. It just laid out who did what and when it was done.

It was Cliff, Kahele, myself, Mike Schmicker, and the coverup involved a bunch of other people. But as far as their donation went, it was what I just named and Duke Hartman. So I don't know what he testified to. I didn't see his testimony. But to say that he had no involvement in it -- and I have nothing against Cliff -- it's just not accurate.

I'm sure you can go back and look at the email and see what he was copied on and what he wasn't copied on and what he did and put it in a timeline. You'll see who did what.

MR. ALLISON: We've been going about an hour. Let's go off the record and give our court reporter a five-minute break.

(A brief recess was taken.)

BY MR. ALLISON:
Q. Martin, same rules apply. Do you understand?
A. Yes.
Q. Okay. Earlier I asked you what was your impression of Cliff Chen, and you asked me did I mean right now, as you sit here today, or previously, in 2019 and 2020, when you worked with him at the company or he worked for you as CFO.
You gave the answer to the first question, what do you think of him now. Let me ask you the question about what were your impressions or what was your relationship like with him at the time in 2019 and 2020.
A. They were good. I thought he was very bright, very creative. And again, I don't know if -- I found him to be effective in the sense that he was to me a problem solver and not so much an issue spotter.
So every time I had issues -- not issues but challenges in how to do something, he seemed to always have a pretty good answer for it or an idea.
Q. Did you trust him?
A. I did.
Q. Do you have an understanding of what a

fiduciary obligation or relationship is in a business context?

A. In general.

Q. Could you describe to me your understanding?

A. In terms of his role or just in general?

Q. Just generally.

A. I guess like if you were to -- had a role of management, and you represent or have ability to make decisions for the company, you want to do what's in the best interest of the company because the company is not so much yourself but a separate entity. So you have a duty to that third party, I guess, for lack of a better term.

Q. You can't place your own interest, your own personal interests ahead of those of the company, correct?

A. Correct.

Q. And do you believe that Cliff Chen had those duties to the company in his role as CFO?

MR. KIUCHI: Objection. Calls for a legal conclusion.

You can answer. Go ahead, Martin.

THE WITNESS: I believe he had that, that mindset.

BY MR. ALLISON:

Q. It's not a mindset. It's an obligation, correct?

A. Correct.

Q. In your role as president of the company, do you believe he also had those obligations to the company?

MR. KIUCHI: Same objection.

You can answer.

THE WITNESS: I'm sorry? I can answer?

MR. KIUCHI: Yes.

THE WITNESS: Again, this goes back to roles in the company. So when Steven Loui owned the company, I felt that my fiduciary duties were to him and therefore the company because he owned the company.

When I owned the company, I was a 99 percent shareholder, so my fiduciary duties were really to myself, and that's what I believed.

BY MR. ALLISON:

Q. That's what you believed at the time in 2019 and 2020?

A. Whenever I owned the company.

Q. Do you still have that belief today?

A. I do.

Q. But if you own the company, then you don't owe the company fiduciary duties because you are the company?
A. Yes.
Q. So then to expand that to Cliff Chen, do you believe that Cliff Chen's fiduciary duties were to you and not to the company?
A. Yeah, I would say so. They're one and the same, in my opinion.
Q. Earlier you mentioned Lawrence Lum Kee or Kahele Lum Kee. What was his position with the company in 2019 and 2020?
A. He was the controller and chief accountant.
Q. What was your -- what are your impressions, as you sit here today, of Mr. Lum Kee?
A. He was very knowledgeable about accounting. He wasn't really a finance guy. He was a true accountant and was very also knowledgeable about the -- all the different little things, idiosyncrasies there are in terms of running the finances for a smaller company, a typical Hawaii company.
Q. Was he good at his job?
A. Yes.

Q. Did you personally like him?
A. Yes.
Q. Did you consider him a friend?
A. Not a friend but I liked him.
Q. What about today? Do you still feel the same way about him?
A. I have no feelings really towards anyone today besides my family.
Q. One of the things that I looked at and discussed with Cliff during his deposition was the company's records, expense records with respect to lunches.
Over the course of 2019 and 2020, you and Kahele and Cliff -- just the three of you, nobody else, according to the records -- got lunch together nearly every single day and expensed it to the company. Does that match your recollection?
A. It does.
Q. And so the three of you were pretty close if the three of you went out to lunch together nearly every day for a year or more, correct?
A. It was a small office. I think we -- I certainly enjoyed their company on a personal level and kind of seemed to jibe with each other.
Q. During these lunches, did you guys ever

talk about your business together, like the PPP loans or the Society coverup plan?

A. I don't recall what we spoke about during these lunches. It's certainly possible and makes sense.

Q. There's a lot of emails between the three of you on these various topics. Do you recall that you also communicated verbally with each other about the PPP loans and about the Society coverup?

A. Yes.

Q. And so then it's reasonable to think and conclude that if you're going out to lunch nearly every day during this period, that these topics would come up at these lunches? You'd discuss them there?

A. Yes.

Q. What was Lum Kee's role with respect to the Society coverup?

A. His main role was the initial setup and the accounting side of it, opening bank accounts. His secondary role of the coverup was when he -- since he's the primary accountant, I never got involved in the nuances of finances. But he would be the guy that would do all the financial transactions for the Society.

The coverup included making loans for the strawman, and that included having to make donations to real -- real donations to these various universities for the appearance of a legitimate organization.

I never really got involved in terms of what universities were being donated to. That was Duke's decision, and he would communicate those to Kahele, and Kahele would write the checks, and then he'd give me a stack of checks, and I'd sign them.

MR. ALLISON: Could we take a look at our document No. 8, Nelson?

Darcy, we'll mark this as the next exhibit in order.

Then let's make the document a little bigger for Martin. If you could scroll down to the bottom.

(Deposition Exhibit No. 6 marked for identification.)

BY MR. ALLISON:

Q. Martin, I want to ask you about this email here at the very bottom that you sent to I believe a gentleman named Scott Reed on November 22nd, 2019.

My first question is: Who is Scott Reed, if you recall?

A. Scott Reed was -- Andy Winer represented to us that Scott Reed was the person that headed the 1820 PAC.
Q. And what, if you could tell me for the record, is the 1820 PAC?
A. The 1820 PAC is the super PAC that supports Senator Susan Collins.
Q. Okay. And in the middle of your email there at the bottom -- sorry. More towards the top, you say: "Hi Scott: Had a chance to discuss 1820 with my CFO and attorney last night. They are suggesting setting up a separate new LLC to make the donations."
Do you recall sending this email and making that statement to Scott Reed?
A. Yes, I do. Now that I'm looking at it, yes, I do.
Q. Who is the CFO and attorney that you reference in the email?
A. The CFO is Cliff Chen. The attorney is Andy Winer.
Q. And Andy Winer is an attorney, correct?
A. Correct.
Q. Cliff Chen also has a law degree and at least was an attorney at one time, correct?

A. I do not believe so.
Q. Okay. Go ahead.
A. I don't believe so. He has an MBA.
Q. So when you say "attorney," you are not referencing Cliff Chen. You're only referencing Cliff Chen when you say "CFO" in this email, correct?
A. Correct. Two people.
Q. Is what you say in that first sentence accurate? Did you discuss this with Cliff Chen?
A. Yes.
Q. And is the second sentence accurate, that Cliff Chen suggested to you that you set up a new, separate LLC to make the donations?
A. It wasn't so much -- it wasn't so much Chen that suggested it. It was Kahele that suggested it.
Q. When you discussed it with Cliff Chen, what did he say about the suggestion?
A. I don't remember.
Q. But you do remember discussing it with Cliff?
A. Yes, absolutely.
Q. Did Cliff discourage it, to your recollection?

A. No.
Q. And at the bottom, in the sort of last chunk, you say: "In my personal real estate investments, we often us" -- "often us," but I think you meant "use," "we often use LLCs that can be set up to 'facilitate' transactions. They are super vague and very difficult to get any background info on. Totally legal and typically used in real estate transactions to conceal the identity of buyer/seller."
Do you see that?
A. Yes.
Q. So is it true that you wanted to conceal -- strike that.
Whose identity were you seeking to conceal in this transaction with 1820 PAC?
A. It was -- again, I view myself and Navatek, the company, as one and the same. So I was trying to conceal the identity of the -- the company making the donation, myself. It wasn't for the purposes of concealing the source of the money in terms of this conduit strawman contribution. The purpose of it was for my own personal lashing that I got from my political donations in the past to Republicans and the retaliation that was extended to

me afterwards from the Hawaii Democratic consortium for having supported Republicans.

That was my motive for concealing it.

Q. It wasn't because you thought what was happening at this time could be illegal, these donations could be illegal?

A. No.

Q. When did you learn that the donations could be illegal?

A. Shortly after my arrest and release from the FEC.

Q. It wasn't when the FEC complaint was filed in February 2020 and there was news reporting that there was an investigation into the company's political donations by the Federal Elections Commission?

A. No. I knew it was unsavory, but I didn't know it was illegal. I didn't know that it was illegal to make donations to a super PAC at any level. I only found out that it was illegal for a government contractor to make donations to a super PAC that was a specific statute under the law, 52 USC blah-blah-blah. It was beaten into my head by the Justice Department. 52 USC 30119 or something like that.

And because the whole time, I had maintained the position that under Citizen's United, any amount that was donated to a super PAC was perfectly legal. That was my understanding.

It wasn't until after I talked to the DOJ and they showed me anything and everything as to why they were indicting me and why I had no case that I found out about this prohibition for government contractors to donate and that their position on me was to indict me.

Q. Did you ever seek a legal opinion from an attorney knowledgeable in these matters as to whether or not the company's conduct in making these donations was lawful?

A. Yes.

Q. And who was that attorney that you sought the legal opinion from?

A. There were two. One was Cleta Mitchell, who was the attorney for the 1820 PAC, and the other one was William Canfield, who I believe was a sole proprietor or operated his own company.

Q. Cleta Mitchell wasn't your attorney or the company's attorney, though, correct?

A. Correct. She was the attorney for Scott Reed and the 1820 PAC.

Q. And William Canfield, he wasn't engaged until after the donation was made, correct?
A. He wasn't engaged until after the FEC investigation.
Q. So at the time when you were considering making this hundred -- strike that.
The donation that this email is contemplating was for $150,000 to the 1820 PAC, correct?
A. Yes.
Q. And that money was taken from the company's accounts, transferred to the Society and then transferred to the 1820 PAC, correct?
A. If that's the way it was initially done. Because we didn't know. We didn't know that the money had to come from me personally. It wasn't until Cleta Michelle told us that we had -- that it should come from us personally and not the company.
So it came from me personally, my personal capital account.
Q. Was your personal capital account a different account than the company's account?
A. Yes. It was my personal capital account, money that I paid taxes on, paid the taxes on, have to pay taxes on. It's my money.

Q. And so at the time that you were contemplating this transaction, was there any attorney that you consulted with to determine whether or not this was legal?

A. The only person we talked to was Andy Winer, who was our chief lobbyist and legal counsel for all things political. He was also the former chief of staff for Senator Brian Schatz, and he just deferred to him on what is or isn't. I'm not an expert on campaign finance donations or super PACs.

Q. At the time that you consulted with Andy Winer, was his primary profession and role a lobbyist, or was he a practicing attorney, as you knew it?

A. He's a lobbyist. That's not his -- that's the firm he worked for.

Q. Martin, I'll tell you one of the reasons I'm asking you these questions is because in his deposition, Cliff Chen repeatedly said that the reason why he feels he's done nothing wrong is because everything was vetted by legal counsel.

So what I'm asking you is -- I'm asking you what was vetted by legal counsel. Were any of these decisions vetted by an attorney engaged to represent the company who was knowledgeable in this

field and gave the company an opinion that this was either right or wrong?

A. In that level of specificity that you just articulated, no. As a lay person, I don't dissect and parse the idiosyncrasies of the law of what is or isn't counsel, what is or isn't whatever, conflicts of interest that -- I learned all these different things through this nightmare of the legal process I've been through for the last seven years.

I have no understanding of those things. If a guy tells me to do something who's an attorney, whether or not I engaged him as that or as a lobbyist, it's his advice and I take it.

Q. Okay.

MR. ALLISON: Nelson, we can take this document down. Nelson, can we look at what we have as No. 9 now?

Darcy, we'll mark this as the next exhibit in order.

(Deposition Exhibit No. 7 marked for identification.)

BY MR. ALLISON:

Q. Here's some more emails about the Society. At the top -- you can see this top one is from Lawrence Kahele Lum Kee, and it's sent to yourself

and Cliff Chen. The subject is "1820 Good to go." There's an attachment there, its title the "Society of Young Women Scientists and Engineers LLC Operating Agreement - 112619."

I want to first ask you about the email at the top, where Kahele emails you and Cliff Chen: "FYI: Lori obtaining PO box."

Who is Lori that's referenced in this email?

A. That's my executive assistant, secretary.

Q. What's her name?

A. Lori Bofman.

Q. And how is it that you know Lori Bofman?

A. I don't recall exactly how we met.

Q. I'm sorry. I hear noise in the background. There's a big truck nearby.

Is Lori Bofman personal friends with your wife?

A. I think they're friendly. I don't know they're friends. Lori lives on the mainland now.

Q. Do you know when she moved to the mainland?

A. I do not.

Q. Do you know -- can you recall how long you've known Lori for?

A. I don't recall.
Q. Did you know her before she became your executive assistant at the company?
A. Yes.
Q. Did you know her professionally or socially before she became your executive assistant at the company?
A. Professionally.
Q. In what capacity?
A. I had an issue with my back, so I had to get a medical procedure done at a doctor's office in California, and she was working there.
Q. And so how is it that she went from working at a doctor's office in California where you were a client to becoming your executive assistant at a company in Hawaii?
A. She -- she's from Hawaii. I don't know where exactly, but she's a Hawaii native. And I'm sure you know how that goes: Everybody who's from Hawaii wants to come back to Hawaii. It was no different with her.
At the time -- I don't recall exactly how she found out, but I was advertising for an executive assistant, and she applied.
Q. Have you ever been to Lori Bofman's house,

either in California or Hawaii or wherever --
A. Never.
Q. Has she ever been to your house?
A. Yes.
Q. Has she been to your house socially?
A. No.
Q. So she's been to your house professionally?
A. Correct.
Q. And for what purposes?
A. After I was arrested, I was prohibited from going back to the office, so -- or hadn't had contact with any individuals within the company.
So she would basically run documents back and forth between the company and myself, including bringing back some personal items I had in my office, dropping them off at my house.
Q. Has Lori ever baby-sat your children?
A. No.
Q. Has Lori ever worked for you in any other capacity outside of her role as executive assistant of the company?
A. No.
Q. How would you rate Lori at her job as an executive assistant?

A. Good. She was professional and responsible.

Q. Was Lori one of the company employees who worked on or with the Society of Young Women Scientists and Engineers?

A. Yes. I had her do a lot of things with that. She was basically Duke's assistant on stuff that he was doing.

Q. What kind of stuff was Duke doing for the Society?

A. So when we decided to execute the coverup for this fictitious organization and strawman, we started to, as I indicated before, make actual donations to the universities and the scholarship programs for engineers, and there was a lot of them. I don't remember how many, but I know there was a lot because I've seen them all in DOJ discovery.

We had decided at the time that these donations -- even though we were doing them as part of putting some validity around the Society, he actually helped -- he actually carried a lot of weight and bought us a lot of goodwill with the actual universities themselves.

That went a long way politically with our supporters within Congress, within the respective

states, that these local universities looked favorably upon us as a company supporting scholarships for the engineers.

So whether the decision -- whatever decision that was made to make these donations and how much for each university in order to obtain this kind of halo effect with each university or whatever constituent in that state was determined by Duke. There was a lot of paperwork involved, coordinating with the different university scholarship offices and whatever else. That was very administerial. So Lori handled that for Duke.

Q. And each university that donations were made to or proposed to be made to were in districts of congressmen and congresswomen who were on various appropriations committees that had some vote or some say in approving or disapproving contracts for the company, correct?

A. Correct.

Q. There was not one single university who received a donation or who was proposed to receive a donation who was from a district of a congressperson who was not on one of those appropriations committees, correct?

A. No, not that I can think of.

MR. ALLISON: Let's go off the record for just a second. I notice that Martin's counsel appears to have dropped off of the Zoom.

(Brief interruption.)

BY MR. ALLISON:

Q. Martin, we're back on the record. Same rules apply.

A. Okay.

Q. So we're looking at this email that was up on the screen here, and you were describing Duke Hartman's role with the Society.

Did you complete your answer, or did Duke Hartman have any other roles with the Society?

A. Yeah. He, again, orchestrated the coverup. It was not as if anybody knew what they were doing. We were just trying to cover it up. So everybody had their opinion, including Duke, and everybody played a role.

And if you go back and look at the emails to that effect, you'll see who said what and who did what. Again, I don't know them off the top of my head, but I saw them all when the DOJ showed them to me.

Q. As you sit here today, what is it that you understand that you were trying to cover up in the

Society coverup, as you've described it?

A. So clearly, we, the company, and the executives of the company, created a completely fictitious organization along with a completely fictitious individual, Jennifer Lam. I could have named it Grant Allison if I wanted to. It was completely fake.

And we got caught by the FEC for making this completely fake organization to what they accused us of as a strawman donation. And again, I did not believe that that was illegal. It was certainly unsavory but not illegal because of Citizens United.

But that was enough to do the irreparable harm of damaging our reputation with our benefactor, which was Susan Collins. And that was the most important part of now creating this coverup, to show Senator Collins and everybody else and anybody else involved that no, this was a real philanthropic and well-intentioned Society to sponsor young women scientists and engineers.

That's why you'll see in this whatever master plan that Mike Schmicker wrote up about press releases, let the universities do the talking themselves, it was all -- it wasn't to cover up some

kind of legal impropriety, but it was all about reputational preservation to the people that supported us. These are politicians. They're sensitive, ultrasensitive, hypersensitive to any kind of bad press like this.

And that was the purpose of the coverup.

Q. And it also turns out, looking back, that the donation that started it all was an illegal donation, correct?

A. Looking back, yes.

Q. And so the coverup also would have operated to cover up conduct that was illegal, contrary to the law, correct?

A. That wasn't what our objective was. It was to add economic substance or a business purpose behind this Society.

Q. Right. But the question I asked was, looking back, knowing what you now know, there was illegal conduct that was also being covered up, correct?

A. Correct. That was the DOJ's position, what they had to prove.

Q. You pled guilty to those charges and don't dispute them, correct?

A. Correct.

Q. I think I probably could guess the answer to this question, but I have to ask it. How do you feel about the fact that you did the PPP fraud in conjunction with Chen and Lum Kee and you did this coverup and the campaign violation crimes with Chen and Lum Kee but you're the only one who's serving sentence time?

A. My answer may surprise you, but I accept responsibility for my own improprieties and misconduct. I don't blame anybody else for them.

Whether the crimes were statutory, I think my behavior as a human being was despicable in so many ways. And kind of like Raskolnikov in "Crime and Punishment," you recognize at some point that any kind of redemption can only be made through suffering.

So I accept my suffering because I take responsibility for my actions. I don't blame anybody else.

Q. Martin, while I think that your viewpoint -- I don't disagree with that. I think it's correct and admirable that you think that way now. But separate from that, do you believe that Chen and Lum Kee were also culpable of these crimes and should be in prison?

A. I don't believe anybody -- any one of us should be in prison.
Q. How can you square in your mind what you said a moment ago about you accept responsibility and that what you did was despicable with your second opinion that you don't think you should be in prison?
A. Punishment can come in many different ways. Incarceration is just one of them. I lost everything: my reputation, my -- everything I worked for in life. The fact that I'm incarcerated serves no purpose other than to separate me from my family.
I don't -- so to clarify your comment, I do believe I should be punished and I do believe that my misconduct deserves consequences, but prison serves no purpose other than to basically denigrate and completely emasculate a human being.
Q. Martin, I'd like to go back to this email that we have on the screen.
MR. ALLISON: Nelson, if you could scroll down for us.
BY MR. ALLISON:
Q. So the email that starts this thread here, you can see it's from yourself to Lum Kee and Chen. The subject is "1820 Good to go." It's sent on

November 22nd, 2019.
And you say in this email: "Okay. Everyone is okay with this. Please proceed with setting up. Thanks!" That's the first sentence.
What I want to ask you, Martin, is the part of the sentence that says "Everyone is okay with this," to the best of your recollection, who is "everyone"?
A. Everyone would be the people that were involved externally and internally in this process. So that would be -- externally would be Scott Reed, Andy Winer. When I say Andy Winer, I don't know the names, but I know that it was represented to me that he let these things with the -- I don't know the technical term but the money -- many people for the Susan Collins campaign.
So those people internally would be the management group that makes so many of these decisions: Cliff, Duke, Schmicker -- I'm sorry, Mike Schmicker and some other guys, maybe Kahele.
So, yeah, that would be everyone.
Q. And so you named a number of people there, both internally and externally, but I note that this email you sent giving the instructions to set it up was sent only to Kahele Lum Kee and Clifford Chen.

Correct?
A. Correct.
Q. Why is it that you didn't include all those other people on this email?
A. I don't -- I can't say specifically why. I don't know why.
Q. Is it because Lum Kee and Chen, for lack of a better phrase, were your two main lieutenants or confidantes who were going to carry out these plans for you?
A. Yes, in a way. And also anything that typically involved finances, I generally did not like to include a gaggle of people on it.
Q. Why is that? Why only include Lum Kee and Chen if it involves finances?
A. Because I didn't want to cast aspersions on my own employees at the time, but the truth of the matter is that anytime they sensed any kind of financial stability with the company, hands were out for raises, and it was just -- it got to be too much.
Q. Did you also have concerns that if you included too many people, some of those people might have had relationships with Steven and Loui and would report back to him, and you wanted to keep

information away from Steven Loui?
A. I wanted to keep information away from Steven Loui but not this kind of information.
Q. What kind of information did you want to keep away from Steven Loui?
A. The financial health of the company.
Q. Your email here that we're looking at says: "Name of new LLC: Society of Young Women Scientists and Engineers."
Who came up with that name?
A. I did.
Q. And then it says "Agent/Member: Jennifer Lam." You said previously Jennifer Lam is a fictitious person, correct?
A. Correct.
Q. But it's also correct that your wife's name is Tiffany Jennifer Lam, correct?
A. Correct.
Q. So Jennifer is your wife's middle name and Lam is her last name, correct?
A. Correct.
Q. Why did you choose to use your wife's middle and last name for the agent and member here?
A. I found that the best way to -- again, this speaks for my character. I found that the best

way to perpetrate a grand lie is through deflection, and by putting in smaller lies, you can create an illusion of truth if you're ever questioned on it.

So the truth of the matter is that Tiffany Lam is not another name for Jennifer Lam. Rather, Jennifer Lam is the epithet for the strawman.

Q. You used a couple phrases I want to ask you about. You said the "grand lie" and then "smaller lies."

So what is a grand lie? What did you mean by that?

A. The Society was nothing more than a fabrication of the company, its executives. It was complete fiction. Jennifer Lam is complete fiction.

Q. At this time that this email was sent -- November 22nd, 2019, in or around this time, is it your belief that Cliff Chen knew this was a grand lie?

A. Yes.

Q. And what do you base that answer on?

A. We had meetings about it. We sat in a room and discussed this fallacious entity and structure.

Q. And Kahele Lum Kee, did he also understand that this was a grand lie?

A. You can look at his own email. Just go to the top of your email -- of this email. I had a lot of respect -- the reason I wrote this email is it was digging into my head.

Look what he says: I will fill the address in for the operating agreement, and I will file the articles of incorporation; I will obtain the FEIN number. I will provide articles, operating agreement, open a bank account.

I, I, I, it's all Kahele. The whole thing's fake. I hate to say it, but it's reality that it's all fake.

Q. Did you --

A. Sorry.

Q. No, no, sorry. Go ahead.

A. Again, this document was shown to me many, many times over and all the other ones you might have or don't have from the DOJ.

Q. I'm going to ask you a little bit more about the term "grand lie." Were there any other grand lies that you created and perpetrated while you were the president of Martin Defense Group?

A. So the reason I pause is there's an overlap between -- that's not a clear delineation. There was overlap between that I was CEO or

president of Martin Defense Group and worked under Steven.

The whole company is a lie. I hate to say it, the whole company is fishy. It's nothing more than government contracting done through placating senior appropriation numbers for contracts. It started with Daniel Inouye, and over the course of Navatek's existence, it produced nothing of value to the government. The whole thing is a grand lie. That's what I was trying to change.

Q. It's your opinion that Navatek has never produced anything of value for the government?

A. It's not my opinion; it's a fact.

Q. So other than that grand lie, are there any others?

A. There's the way our expenses, the company expenses were done, the way people are compensated. I didn't invent this business strategy of -- I didn't even know about it, of trying to move the generosity of appropriations officials. I was brought into this world by Steven Loui, and that entire business structure is a grand lie.

And this is the very issue I was -- that was brought to my attention. And I had to meet with the DOJ and FBI on many, many times in Hawaii to go

over -- this is a repeat -- all these lies.
Q. I want to ask you about any grand lies that you perpetrated or that you created, not Steven Loui.
Are there any others that you would attribute to yourself and not to Steven Loui?
A. Besides the ones that you rattled off at the beginning of statements and lies, personal and otherwise. Whether it was grand or not, I'm still ashamed of them. So I would say they're grand for me personally. But I can't really think of any other than this.
Q. Okay. I'd like to ask you now about your wife, Tiffany Lam. How long have you been married for?
A. I can't remember.
Q. In the time that you've been married, has Tiffany ever had a job or a career?
A. In the beginning, she worked -- I can't remember where -- when I first met her.
Q. But it's true she hasn't held a job or had a career for the substantial majority of your marriage, correct?
A. That's correct.
Q. And that's been at least 10 or 15 years or

more, correct?

A. Yes. Since I met her, I didn't want her to work.

Q. When did you meet her or when about did you meet her?

A. Oh, okay. I know. It was around -- it was somewhere in 2001. It was the beginning, when we first started dating, 2001, I think, somewhere around there.

Q. So it's been approximately 20 years since she last had consistent employment?

A. Correct.

Q. So then throughout the course of your marriage, you have been the sole financial provider for the family, correct?

A. Correct.

Q. You and Tiffany have children, correct?

A. Correct.

Q. How many children do you have?

A. Two.

Q. What are the ages of your children?

A. I'm not sure. Sorry. Once you go to prison, you kind of forget about time. 13 and 11, I think.

Q. Okay. And so certainly for the entirety

of your children's lives, you've been the sole financial provider for your family?

A. Correct.

Q. Do you agree that when you became the president of Martin Defense Group, your lifestyle for you and your family substantially increased and became substantially more luxurious?

A. No, I would not agree with that.

Q. How many cars did you own in 2019 and 2020?

A. I don't remember.

Q. Could you estimate? Do you have a basis to estimate?

A. Five, around there. Five or six. I don't remember.

Q. What kind of cars were they?

A. They were -- you want the exact model or just -- they were Ferraris.

Q. So you owned five Ferraris in 2019 and 2020?

A. I don't think five Ferraris. It was Mercedes and four Ferraris.

Q. And you and Tiffany purchased a house on Kahala Avenue sometime in around 2011 or 2020, correct?

A. Correct.
Q. To the best of your recollection or ballparking it, what was the purchase price of that house?
A. 4 1/2 million.
Q. And what was the down payment that you made on that house?
A. 1.5 million.
Q. So you paid $1.5 million cash as the down payment and then financed the rest of it?
A. The 1.5 was a loan from my parents.
Q. Your parents gave you and Tiffany 1.5 million for the down payment on the house, and then you financed the rest of it?
A. They gave it to me.
Q. Shortly after -- in fact, I believe the same day that the company received the $10 million in PPP funds, 2 million of it was transferred to you personally. Is that correct?
A. Incorrect.
Q. Well, 2 million that was transferred, who was it transferred to?
A. Well, 2 million of it was transferred from my -- as a loan from the company to me, from my company's working capital account.

So you're making the same -- you're trying to paint the same distraction that the Department of Justice tried to paint in that somehow money is unfungible. The fact that the PPP money was deposited into our working capital account and every dollar out of that account now that is transferred to me is somehow PPP money, it just isn't.

Q. Well, there wasn't $2 million in that account to transfer prior to the PPP money going into that account on that day, correct?

A. Incorrect. There was over $5 million in that account.

Q. Okay. And so then you say that a $2 million loan was made to you on that same day that the PPP money was transferred into the company's account by CPB, correct?

A. Well, it was booked as a loan. So under partnership accounting, if transactions are done with a partner, like myself, 99 percent owner, all distributions -- whether distributions or otherwise are generally booked as loans.

And then when the year closes, in the final accounting, they reconcile that -- it's either booked as a loan or some kind of expense account. And at the end of the year, when we reconcile with

the company's earnings, then that loan is reclassified as a distribution and then what the company makes as a distribution from my company account -- my capital account.
Q. Was it ever rebooked as a distribution, or is it still a loan?
A. It was rebooked as a distribution.
Q. So you never paid the 2 million back as a loan to the company?
A. It was taken from my capital account. That's paying it back.
Q. Do you know what Tiffany's personal email address is?
A. I do.
Q. What is it?
A. tiffany808@gmail.com.
Q. Does she have any other email addresses that you're aware of?
A. Not that I'm aware of.
Q. Did you ever use her email address as if it were your own?
A. Yeah, I have.
Q. You logged in with a password, or how have you done that?
A. Several ways.

Q. Tell me each way.

A. I have -- I can log in with my computer, home computer because it autopopulates -- my home computer, because I can just type in tiffany808@gmail, and it autopopulates the password.

The other way, which is what I was doing, is -- again, this speaks poorly of my character, but it is what it is. I basically stole her identity as part of the coverup. I could access her emails simply by bringing one of the iPads I had at home with me anywhere. I'd just bring my iPad at home to work. Her email automatically syncs with my iPad, so I would get emails -- I could see immediately when she got an email. When I used her name in vein, her email address in vein, to create a coverup, an email we sent to her would pop up on my iPad, and I would just forward it to myself immediately.

So I didn't need a password. It was always on the iPad. That's how I used the iPad at work.

Q. Tiffany knew that you were doing this and was okay with it, right?

A. I don't know what she knew. She was a good wife, she trusted me, and it boils down to me

stealing her email address.

Q. Did you ever tell her that you were using her email address in this way?

A. No.

Q. Did you know if she knew that you were using it in this way?

A. All she --

MR. KIUCHI: Calls for speculation.

You can answer. Go ahead.

THE WITNESS: She never mentioned it to me.

BY MR. ALLISON:

Q. So you don't know whether or not Tiffany consented to your use of her email address or not in this way?

A. She never consented. I just did it without telling her.

MR. ALLISON: Nelson, could we take a look at what's marked as or what we have as document 24.

And, Darcy, we'll introduce this as the next exhibit in order.

(Deposition Exhibit No. 8 marked for identification.)

BY MR. ALLISON:

Q. Martin, I want to ask you if this is an

example of an email in which you impersonated Tiffany through her email or used her email.

A. I don't remember this email at all.

Q. So I'll just note for the record that this email --

A. Oh, yeah.

Q. -- is an email from Martin to a lady named Chenoa, and it discusses appropriations, one-on-one training session, and tiffany808@gmail.com is copied on the email from Martin to Chenoa.

So, Martin, my question to you is: Did Tiffany have any relationship or business with the company's appropriations training sessions?

A. Nothing. She had nothing to do with the company.

Q. And so what would be the purpose of tiffany808@gmail.com being copied on this email?

A. I was introduced to -- I met Chenoa at Mililani school, at some parent-kid event. So she knew Tiffany, and I thought, given -- well, Chenoa was from Oklahoma, and one of our major campaigns was to get the -- we were making huge donations to Jim Inhofe and opening offices in Oklahoma.

Given Chenoa's background and family in Oklahoma, I thought she would be a good person to

hire to bring to some of these meetings with the senator from Oklahoma to show him how we have this connection to the state.

Q. And it was important because she was on an appropriations committee, correct?

A. Correct. Armed services.

Q. Armed services. Thank you.

Martin, just simply put, this email copies Tiffany's email address because you did that and not because Tiffany had any business or reason to be copied on this, correct?

A. Correct.

Q. Okay.

A. I wanted -- well, I'm fanatical about my loyalty in terms of a relationship to my wife and view very, very negatively on marital impropriety. So I wanted to make sure that under no circumstances Chenoa thought that I was trying to hire her for alternative reasons. So I copied Tiffany on it without her knowledge so that Chenoa would be well aware that Tiffany knows I'm talking to her.

Q. Is there a reason why you felt Chenoa would think that way?

A. No reasons. Just that's the way I operate. I don't like to leave things up in the air

when it comes to that kind of thing. I see it too much in Hawaii.

Q. So any time you would hire a woman, you would copy your wife's email address so that they would know that there wasn't some romantic motivation by yourself?

A. I barely, barely, barely, if ever -- I can't think of a single instance besides this one. And that's why I copied Tiffany on it, that I got involved in personally seeking out and trying to hire someone, let alone a woman.

Q. Okay.

A. Cliff is the other one.

MR. ALLISON: Could we take a look at what we have as our document 25, Nelson.

And, Darcy, we'll mark this next one as the next exhibit in order, please.

(Deposition Exhibit No. 9 marked for identification.)

MR. ALLISON: Nelson, if we could scroll down to the bottom. Actually, let's go up a little bit to see the header. Up a little bit more. Perfect.

BY MR. ALLISON:

Q. So, Martin, this is an email from Roland

Chang to tiffany808@gmail.com, and the subject is "Letter to Society of Young Women Scientists and Engineers LLC."

Who is Roland Chang?

A. He is our -- he's a commercial banker at Central Pacific Bank.

Q. Is he the person -- sorry, go ahead.

A. He's the guy that did all the accounts and stuff for all of Steven's companies.

Q. Is he the individual that you and Cliff and Kahele referred to in emails and text messages as "grandpa"?

A. Yes.

Q. And why did you guys call him grandpa?

A. It was -- it wasn't a term of endearment. It was more bad taste because it was some level that we perceived to be incompetence because of his age.

Q. Was Roland Chang incompetent?

A. I thought so.

Q. Do you still think so today?

A. Yes.

Q. Okay. So this email, he says: "Good afternoon, Tiffany.

"I tried calling you to inform you that Glenn Ching, CPB's Chief Legal Officer, requested

that I send you the above referenced letter. The letter is in regards to a complaint filed with the Federal Election Committee (see the attachment above)."

Do you see that?

A. Yes.

MR. ALLISON: And then, Nelson, if you could scroll up a little bit.

BY MR. ALLISON:

Q. So this first email from Roland to tiffany808@gmail.com was sent August 26th, 2020, at 3:46 p.m.; and then on that same day, at 5:10 p.m., so about an hour and a half later, the email is forwarded to martin.kao@gmail.com.

Do you see that?

A. Yes.

Q. So was that you forwarding it from Tiffany's email address to your own email address?

A. Yes.

Q. Do you know if Tiffany ever saw this email?

A. I do not know.

Q. Did you delete this email from her email account after you forwarded it?

A. I don't remember.

Q. Did you --
A. I know I forwarded it to myself because it's through the iPad because the iPad autopopulates. The iPad didn't have my work address on it. So when I type in, my personal email comes up, and I just clicked "forward" because it's too hard to type martin.kao@gmail.com.
This was as explained to me by the FBI too. I've seen this email before.
Q. And you don't know, as you sit here today, whether or not Tiffany saw this email when it was sent to her on August 26th, 2020?
A. I do not know what she saw. I just know I forwarded it to myself.
Q. And why did you forward it to yourself?
A. Because this was relevant, relevant for our business. This has nothing to do with Tiffany.
So stepping back again, the date of this email is August 26th, 2020. The coverup started back in -- when was the FEC investigation? February, March, around that time?
Q. I believe the complaint was dated February 3rd, 2020.
A. Okay. So shortly after that, we started to do the coverup. As part of the coverup, you'll

see, if you go through the documents, as you have them -- you'll see two sets of bank documents. One when we first opened the account. When I say "we," I mean Kahele and myself.

You'll see two sets of documents. The first set was real sloppy. It was Kahele opened everything, I signed the signature card, gave it back to him, he sent it in. That was done, and then nothing happened. Once the donation was made, nothing happened. We didn't care. It was over.

But then once the complaint came in, all of a sudden it was scrambled to try to create some legitimacy around the Society as well as the questions and smaller lies we made in setting it up. And that's why you see a second set of updated Central Pacific Bank documents that actually changed Jennifer Lam into Tiffany Jennifer Lam.

So at that point, that was at least what was told to me, identity theft on my part and the company's part of Tiffany's identity.

Sorry, someone's on the speaker.

MR. ALLISON: Keith, is that noise coming from you?

MR. KIUCHI: No.

THE WITNESS: It's coming from the speaker

here.

Yeah, so that's why -- that's why at that point I became very conscientious about carrying her iPad or my -- the family's iPad with me, one of them, because I was using her identity without her knowledge and the company was and her email. So I had to get those things off her email and forward it to myself as soon as possible.

BY MR. ALLISON:

Q. At that time, August 26th, 2020, when this email came in and you forwarded it to yourself and, as you said, you had to get things off her email and forward it to yourself immediately, did you know and understand that you were committing identity theft and that that was likely a crime?

A. I didn't think of it that way. I didn't think of it at all that way. I -- I was only presented with that reality when the FBI and the DOJ said that they could charge me for that.

Q. Did you ever talk to Cliff Chen about the fact that you were going to steal Tiffany's identity to do this?

A. I don't know if it was like we verbally discussed it, but all the documents that were updated were done through Cliff and Kahele.

We had to update the name to Tiffany Lam from Jennifer Lam. We had to correct -- this stood out to me -- misspellings on Kahele's part -- he originally set it up -- from Society of Women Scientist, singular, just sloppy stuff like that to something more legitimate.

We had to update the fake address or P.O. Box, whatever it was, into something that looked like a real office address.

These kind of things were done to cover up.

MR. ALLISON: Okay. Nelson, you can take this down.

BY MR. ALLISON:

Q. Martin, do you have any power of attorney for Tiffany?

A. I do not.

Q. Have you ever had one in the past?

A. I do not know. I don't think so.

Q. Have you ever signed documents for Tiffany with her consent?

A. With her consent?

Q. Yes.

A. I signed them without her consent more times than I can recall. But where they're

concerned, I made some benign or any old thing -- I don't know.

Q. Have you ever asked Tiffany to sign a document before?

A. For me?

Q. Yeah. Have you ever handed her a document and said, we need your signature on this, please sign it?

A. Yes.

Q. And when you do that, does she typically review and read the document, or does she just sign it because you asked her to?

A. She just signs it.

Q. It's true that Tiffany is noted in the DCCA of Hawaii records as the member and manager of the Society, correct?

A. That's not correct.

Q. Who is noted as the member and manager of the Society?

A. The fictitious Jennifer Lam.

Q. Is it true that the Society's bank accounts are under Tiffany's name?

A. They're under -- they're fake. They're under a fake name, Jennifer Lam.

Q. Didn't you just tell me a second ago that

you updated it in the second wave of documents to be Tiffany Jennifer Lam?

A. It's to create an illusion of truth if someone ever asked. It's all faked.

Q. But they are all under your wife's name, correct? Tiffany Jennifer Lam, that is your wife's name, and that's what the accounts are under, correct?

A. That's coincidental. It has no correlation to one another.

Q. It's purely coincidental that the bank accounts for the Society are under the same name as your wife's name, Tiffany Jennifer Lam?

A. Yeah. I creatively -- I stole her identity.

Q. Your counsel has argued in this case as well as Tiffany's counsel that Tiffany never signed any Society document and that you forged her name on every document that has been signed purportedly by her.

Do you understand that that's been argued in this case?

A. I don't know what they argued, but I would disagree with that. I never forged her signature. I created a fake person, Jennifer Lam, and I created

a fake signature for Jennifer Lam.

I wasn't trying to imitate or pretend this was Tiffany. I could have named it Bank United or anything. The whole thing is fake. I didn't fake her name. I didn't artificially sign on her behalf. I signed on the behalf of a fake Jennifer Lam. That's the whole -- that is the entire predicate of the DOJ's charge.

Because -- I'll explain it to you this way. Whether or not this is beyond the scope of the deposition, but it's a little frustrating for me to keep on doing this. The DOJ had to prove and show me, beat it in my head so I would plead guilty for the simple fact that Jennifer Lam is fake, the donations to the 1820 PAC was completely contrived by the company and its executives because, as we discussed before, the impropriety is the company making the donation.

So if Tiffany, the real Tiffany was somehow involved and controlled the bank, controlled the Society, controlled the bank's funds, whether you like it or not or whether the government likes it or not, there is no crime. There is no impropriety. Because Tiffany is a private citizen. She can donate money to whoever, however, however

much she wants.

So in order for it to be a crime, I had to have faked this. That's what they showed me, compelling evidence, empirical evidence.

Believe me, I literally tried to make the same obfuscations that you're trying to do, the same abstractions, that somehow this is real.

They blew me out of the water. Every evidence, evidentiary thing that you see -- you said it yourself that you reviewed thousands of emails, just like the FBI did. They showed me thousands of emails, maybe hundreds of thousands.

Not one, not one -- they showed -- they said, not one, Martin, Mr. Kao, has your wife's name on it, your real wife's name on it. Not one. Not copied, not To, not From, not Bcc, nothing. You did this, you stole her identity, you made this up. That's why you're guilty, that's why you're going to prison. That's why I'm in prison.

Q. Martin, here's the question, then: Did anybody else ever forge or sign the signature of the fictitious person Jennifer Lam or Tiffany Jennifer Lam?

A. Okay. So I'm trying to recall what the DOJ showed me.

Q. So, Martin, let me just clarify. I'm not asking what the DOJ showed you. I'm asking, based on your personal knowledge, whether anybody ever told you, hey, this document needed to be signed. Did Cliff or Kahele or anybody else ever tell you, I signed it because you weren't around? Did you ever see anybody else sign a document as Jennifer Lam or Tiffany Jennifer Lam?

A. Yes.

Q. And who did you see do that or who told you that?

A. I see it on -- I saw it on one of the exhibits you showed today.

Q. Which exhibit?

A. So if you look at the signature -- I'm saying this because I know you doubt my veracity. So I'm just telling you what the DOJ showed me.

If you look at the signature, the way we came up with that signature is almost a fake, a fake signature. It's like two Ls. It's actually like Lawrence Lum, LL. So he could sign it LL. That's how we came up with that fake signature.

If you look at the checks, every single check that was written, that check of 1820 PAC, the checks to the university, every single check was

written by Kahele. You can look at it. Because every one in the exact same way, he uses the fraction zero zero and denominator 100. Every single one of his checks are consistent. That's how the FBI knew it was him.

And there was only two people involved: him, who wrote the checks, and possibly him that signed some and possibly me that signed some. So if you go back and look at the one you showed with -- I saw the document before. The last one you showed with Cliff's pay raise?

Q. Sure.
A. 400,000 rounded or something, that one.

MR. ALLISON: Nelson, can we bring up the document that we have as our document 7? I don't know which exhibit number this was, but we have marked it.

BY MR. ALLISON:
Q. Is it this one, Martin?
A. Yes, this one. Look at the signature on the bottom next to ADP and Timberline. Does that look familiar?

MR. ALLISON: Can we zoom in a bit?

BY MR. ALLISON:
Q. So are you saying that those are Lawrence

Lum Kee's initials?

A. Yeah. He signed that.

Q. And you're saying that's the LL?

A. Look at that and look at whatever documents you have related to Tiffany's faked Jennifer Lam signature. They match perfectly. That's not the fake signature I used.

Q. We're going to run out of time in today's deposition, but we'll look at those signatures tomorrow.

MR. ALLISON: You can take this document down, Nelson.

BY MR. ALLISON:

Q. So other than yourself and Lawrence Lum Kee, did anybody else sign documents for the Society purporting to be Jennifer Lam?

A. There's some that I saw -- so all of the donations to the Society had not just the check but the donation form, whatever they were, a pledge or something like, a pledge form.

So I know Lori filled those out and the signatures on those. And one in particular that stands out to me was the one that the FBI showed me, which was -- it was a donation form made to the University of South Carolina, SCSU -- no, South

Carolina State University.

Q. Okay.

A. And on that, you'll see that in my haste, I signed the donation form Martin Kao, my signature. And it was corrected with that squiggly LL thing. I don't know if I corrected it or someone else corrected it.

But they said if you superimpose the two images on the 1820 PAC together, it matches it perfectly. That's been pointed out by -- a handwriting expert concluded you and Kahele faked this whole thing.

Q. Was Cliff Chen ever present when you or Kahele were signing these documents purporting to be Jennifer Lam?

A. I don't recall. I don't know. I can't remember. It's possible.

Q. Did you ever tell Cliff Chen that you and Kahele were doing this?

A. He knew about it.

Q. How did he know about it?

A. He was involved from inception to when everything collapsed. He knew about all the machinations we were using to create this false identity.

Q. Did he ever tell you guys that he thought this was wrong and you shouldn't do it?
A. He did not.
Q. And during the same time frame that this is going on, Cliff Chen received raises from 200- to 250- to 350,000 to eventually $400,000 per year, correct?
A. Yes.
Q. And he also received $91,000 in tuition payments, at least $91,000 in tuition payments for his children, correct?
A. Correct.
Q. Is it your opinion that those substantial financial benefits were reasons why Cliff Chen went along with these plans of yours?
A. I'm certain they had something to do with it.
Q. Did you intend, for lack of a better phrase, to buy Cliff Chen's loyalty with these substantial financial benefits for him?
A. Yeah, I would say so. It wasn't so much to buy it in terms of a quid pro quo, but it was more that I wanted to convey an environment where my executives believed that through their efforts in growing the company, they would equally share in the

profits, the upside.

Q. Martin, how are we doing on time right now? We're 45 minutes out from what I was told is the end time.

A. Yeah, we're about half an hour.

MR. KIUCHI: Hard stop, I think is 10:45 our time.

MR. ALLISON: Okay. We will stop by 10:45, then, Martin.

MR. KIUCHI: Appreciate that. Thank you.

BY MR. ALLISON:

Q. Martin, I want to ask you now about the company's growth strategy as it relates to the PPP loans.

Is it accurate to say that the company, under you as president, employed a growth strategy based on making promises to senate and congressional appropriation committee members to create jobs in their state in exchange for their votes or their support on providing the company contracts?

A. It wasn't overtly stated like that, but one of the things that we had to do was to give the people that supported us enough of a public optics that what they were doing, requesting, was benefiting the state.

At the end of the day, they don't care about the money; they care about being reelected. So creating the jobs is always a good thing.
Q. It sounds like you agreed with the statement that I made. The answer to my question was yes; is that right?
A. Do you mind reading the statement again?
Q. Sure. Is it accurate to say that the company, under you as president, employed a growth strategy based on making promises to senate and congressional appropriation committee members to create jobs in their state in exchange for their support with respect to contracts for the company?
A. Yes.
Q. So when you were sentenced -- I believe that was in -- might have been earlier this year -- you were allowed an opportunity to speak before the Court. Do you recall that?
A. What sentencing?
Q. Sorry. Let me clarify. The Hawaii case.
A. Okay.
Q. The PPP case.
A. Okay.
Q. Do you recall making statements before the Court?

A. I do. I don't recall what they were exactly, but yeah.
Q. So I have it and I'll show it to you in a second, but generally one of the things you said is -- you were asked why you did this, and you described that you wanted to open these new offices and it was COVID and that made things difficult and you needed the money from the PPP to open the new offices. Is that accurate?
A. Yes.
Q. So without the PPP money, then, the company could not have opened all the offices that it opened in 2020, correct?
A. We could not have hired the people we extended job offers to.
Q. What about the costs of opening those offices?
A. We had enough working capital, retained earnings to finance those costs. They were pretty minimal amounts. Our biggest cost was labor.
Q. So the offices that were open, those included South Carolina, correct?
A. Correct.
Q. And Michigan, correct?
A. Correct.

Q. And was also one the new office in Maine?
A. There were two.
Q. And then were there any others?
A. Oklahoma; Washington State; Wisconsin; Kansas, Wichita, Kansas; New Hampshire.
Q. These offices, did the company buy properties or lease space? How did it secure these office spaces?
A. Lease agreements, my understanding.
Q. To the best of your recollection, how long were these lease agreements for?
A. I don't know. I didn't get involved with that.
Q. Who was in charge of that effort?
A. Cliff.
Q. And these lease agreements would have been signed at least for many years, correct? I mean, you wouldn't sign a one-year lease agreement?
A. I don't know.
Q. I'll represent to you that these lease agreements in every instance were for multiple years.
A. Okay.
Q. So my question, Martin, is that if the company commits itself to these multiple-year lease

agreements and it needs the PPP money to fill these offices with workers but the PPP money is clawed back by the government, do you agree that the company is now harmed and in a bad financial position by virtue of having these empty offices that it has to pay for and is contractually obligated to lease for many years?

A. No, that is absolutely not correct.

Q. And why not?

A. So the purpose of the PPP loan, when we applied for them, was not to finance our expansions. It was to mitigate against the unknown disaster. So we had government contracts, we had -- for security. You can see them in the appropriations committee reports. You can see them in probably most of Duke's emails, I'm guessing.

The question became if COVID shut down the government, how long would it take to get those -- those pots of money under contract. Because if you have hundreds of engineers sitting around twiddling their thumbs, I can't just furlough them, I can't just lay them off. I needed a safety net to cover their salaries in order to weather the storm of COVID.

But if a contract came in on time and the

government didn't shut down, I didn't need any of the COVID money. It was a gift from heaven. By spending it correctly on payroll, it would be forgiven. So we didn't need the money at all to expand at all. It was just simply I thought my ethical duty to the people I gave jobs to, to have the ability to say to them, your job is secure even if the government shuts down. I'm not going to hire you, give you a job offer only to terminate you a month later.

MR. ALLISON: Nelson, could we take a look at what we have as our document 22.

(Deposition Exhibit No. 10 marked for identification.)

MR. ALLISON: This is a transcript of that sentencing hearing, and I'd like to take a look at page 50.

BY MR. ALLISON:

Q. Martin, while he's looking for page 50, let me ask you this: The statement you just made presupposes that those contracts are contracts the company has, correct?

A. So contract and funding are two different things. When the money shows up, it's verifiable through the defense budget. So when the defense

budget gets signed into law, we can see that our money that we paid to play for is sitting there in the United States budget. We can see that, we can confirm it, we know it's there, we know how much.

To get that money under contract takes a lot of time and effort. So you have to send a cost proposal; you have to submit technical proposals; you have to go through contracts, audits with the contracts office, whatever that title is.

All these things take time. So even though the money is sitting there and it's ours, if COVID shuts down the government -- even without COVID, sometimes because of just government bureaucracy, in order to get that funding under contract, it kind of really pushes the envelope in terms of our tolerance on cash flow and covering the engineers' salaries, let alone in a pandemic.

So yeah, even though the money is sitting there, to get it under contract takes an administerial effort to do.

Q. You agree that once you were arrested and there was at least a temporary debarment letter issued against you by the Navy, a lot of these contracts were lost or canceled, for the company, correct?

A. I don't know what happened since I was arrested. I was completely -- I've been put in the dark.

Q. So let me ask you this: If the contracts were canceled and over $8 million of PPP money was clawed back by the government out of the company's accounts, and the company is obligated under contracts to developers and landowners and property owners on these spaces in all the cities you listed, don't you agree that that is a damaging financial position and a damaging set of facts for the company, that they're now extended and obligated under these leases and have -- all the ways you mentioned and you described that the company would pay for those things, it doesn't have now, correct?

A. Absolutely not. It's like laying the foundation of a house. I've laid the foundation, get everything set up to be successful. You're only giving back what you don't need.

Everything -- you have an office, you have employees. You can go out now, and you have everything set up to be successful to run the company.

Q. But who are you going to get contracts from if nobody will contract with you because of the

cloud over the company due to the PPP crimes and the campaign finance crimes?

A. That's not true. During arbitration, I found out we have a $50 million contract because of my efforts.

Just because the new management team didn't know how to run the company does not make it a catastrophic event. The company was set up to succeed. Anybody who knew how to run a government contracting company could do it. In fact, it's so perfectly clear that Duke Hartman, Duke Hartman, whose company is Integer Technologies, took the very efforts and fruit of my labor, took that contract -- I don't know how he got it -- and carved it out through the new CEO, Dan Brunk, into his own company.

This is a very successful company, as far as I know. The DOJ was investigating them for their own improprieties. That's all I know.

Duke knew kind of what he was doing. That's why I hired him. Anybody who knew what they were doing would take what was set up perfectly -- it like you have keys to the empire. I passed them to you, passed the baton. You can either run it to ground or you can make it successful.

To say that anything that was done on my part to compromise the company is absolutely -- it's just not true. I own the company. I wouldn't do anything to hurt myself. It was set up perfectly. Officers were set up, arrangements with the universities were set up.

I recused myself under a trust agreement, to have a naval officer become the new CEO. The business could have succeeded far beyond when I had left. It's just not true, not at all.

Q. You mentioned Duke Hartman a couple times. We're running short on time, so I'll just ask you to be brief.

What are your impressions of Duke Hartman? Is he an honest guy, a good guy, a smart guy, a bad guy, dishonest? What do you think of him?

A. I think he was hard-working, ambitious, and my personal opinion is that he probably learned from myself and others the ways you can compromise your own ethics in order to grow your business.

Q. Do you think that -- sorry, go ahead.

A. And that's my opinion. Going back to less opinion and more empirical evidence, that's one of the reasons why the DOJ was so actively looking at him and his company. I saw all the

misrepresentations that he made to the DOJ -- and his testimony is there, and that's why they were very upset with him, to put it lightly.

Q. So is it your opinion that Hartman is unethical?

A. Yes.

Q. Okay. I'm going to ask you about the highlighted statements on this page. This is your testimony to the Court from your sentencing. I can show you the first page or the beginning, if you would like me to.

But you'll note there at the bottom, on line 18 and 20, it says "THE COURT" and "THE DEFENDANT." In this case, the Court is Judge Kobayashi, and you are the defendant who's speaking.

So I'd like to ask you, Martin, first is the top highlighted --

MR. ALLISON: Nelson, can we go up above to see who's saying this? There we go.

BY MR. ALLISON:

Q. So this is the Court speaking, this is Judge Kobayashi, and she says: "To falsify and multiply by almost a factor of like three, right, from 150 to 400 employees, that's because you were working in this terrible culture?"

What I want to ask you is: Is it your recollection that on the PPP applications, the number of employees for the company was increased from the actual number of 150, about 150 to 400?

A. So, to explain the question is that -- the PPP application, I did not fill out. I didn't fill it out, I didn't submit it. I signed it.

But to answer your question, to add clarity to it, is that -- is that when you submit a PPP application that had our payroll costs for our current employees and employees that we needed to hire that we made job commitments to -- the number of employees 150, 400, a million, I knew nothing about.

So I know this is Judge Kobayashi's statement, but I never even knew the application had a number or area until after I was arrested and released. It had a line item for number of employees.

It's not the number of employees that dictates the PPP loan. It's what your payroll is. That's what dictates it. You can have a million people making a dollar a year or ten people making a hundred thousand dollars a year. It's not the number of employees that matters to payroll. I have

no idea about 150, 400. I haven't even looked at that.

Q. Okay.

MR. ALLISON: Nelson, can you scroll down to --

BY MR. ALLISON:

Q. Martin, I'm going to ask you -- I think this gets to what we were speaking to a moment ago. You say here: "The way we grew our company was by making promises to senate appropriations, congressional appropriation members in exchange for creating jobs in their state."

That's what we talked about a moment ago, and you agreed that's accurate, right?

A. Correct.

Q. And you continue: "So when the pandemic hit, I was asked and directed by members that I served, will you continue to honor the job commitments you made in my state. And I couldn't do that. I could not have done it without the PPP loan."

Is that still an accurate statement, as you sit here today?

A. Yes. As I explained, I was not -- I was unwilling to hire someone under the auspices of a

pandemic only to have to fire them again if our contracts couldn't get awarded in time.

It wasn't a financial hurdle. It was a decision not to take that risk for myself, the company, its current employees and future employees.

MR. ALLISON: Okay. Martin, we're about ten minutes short of your deadline to get out of here and meet your commitments, so I'm going to end the deposition here for the day. We have your second deposition scheduled for tomorrow at the same time. Thank you for being here.

Keith, tell Martin about his ability to review the transcript. I don't know if that's even possible.

MR. KIUCHI: Martin, you have the right to review the transcript. I guess you and I have to figure out a way for me to get it to you by snail mail.

You can correct any portions of the transcript, but that can be brought to the attention of the Court if there's a difference.

THE WITNESS: Yeah. The only way to get documents to me would be through, yeah, snail mail.

MR. KIUCHI: Snail mail. Yeah, we'll do that.

MR. ALLISON: Okay. Martin, just to be clear, if you make any changes to the transcript after the deposition ends, through this process, I will be able to ask you about those changes perhaps in a redeposition or in court.

THE WITNESS: Sure.

MR. ALLISON: Okay. Martin, thank you very much for being here today. We do appreciate it. Have a good day.

THE REPORTER: Keith and Philip, do you want to purchase copies?

MR. KIUCHI: Yeah, I want to purchase a copy.

MR. MIYOSHI: Me as well. Electronic only for me.

(Signature was reserved.)

(Deposition concluded at 10:35 a.m.)

W I T N E S S   C E R T I F I C A T E

I, MARTIN KAO, hereby certify that I have read the foregoing transcript of my deposition, taken on September 3, 2026, and that corrections, if any, were noted by me, and the same is a true and correct transcript of my testimony.

Dated this ______ day of ____________________, 2026.

_________________________________

MARTIN KAO

Signed before me this ____ day of __________________, 2026.

_______________________________

Deposition of: MARTIN KAO
Taken on: September 3, 2026
Pacmar v. Kao et al./Chen v. Kao
Civil No. 1:22-cv-00283
United States District Court for the District of Hawaii
By: Darcy J. Brokaw, CSR #371

C E R T I F I C A T E

STATE OF HAWAII )
) SS.
COUNTY OF MAUI )

I, Darcy J. Brokaw, CSR for the State of Hawaii, do hereby certify:

That on September 3, 2026, at 6:40 a.m., HST, appeared before me MARTIN KAO, the witness, whose testimony is contained herein; that prior to being examined, the witness was by me duly sworn or affirmed pursuant to Act 110 of the 2010 Session of the Hawaii State Legislature.

That the proceedings were taken down by me in machine shorthand and were thereafter reduced to typewritten form under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

That pursuant to Rule 30(e) of the Hawaii Rules of Civil Procedure, a request for an opportunity to review and make changes to the transcript:

__X_ Was made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.
____ Was not made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.
____ Was waived.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause named in the caption.

Dated this 8th day of September, 2026.

_________________________________
Darcy J. Brokaw, RPR, CRR, CSR #371